**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:**<br><br>**POLISHED.COM INC., *et al.*,**[1]<br><br>**Debtors.** | **Chapter 7**<br><br>**Case No. 24-10353 (TMH)**<br><br>**(Jointly Administered)** |
| **GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Polished.com Inc., *et al.*,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ALBERT FOUERTI; MARIA JOHNSON; DOUGLAS T. MOORE; ELLERY W. ROBERTS; ROBERT BARRY; ELLETTE A. ANDERSON; CLARK R. CROSNOE; GLYN C. MILBURN; ALAN P. SHOR; EDWARD J. TOBIN; G. ALLAN SHAW; JAMES SCHNEIDER; and ELIE FOUERTI,**<br><br>**Defendants.** | **Adv. No. 26- _________**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>COMPLAINT</u>

## I. <u>INTRODUCTION</u>

Plaintiff George L. Miller, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Polished.com Inc. ("Polished"), 1 Stop Electronics

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number are: Polished.com Inc. (3938); 1 Stop Electronics Center, Inc. (9485); AC Gallery Inc. (3629); Appliances Connection Inc. (8366); Gold Coast Appliances, Inc. (1575); Joe's Appliances LLC (8354); Superior Deals Inc. (0096); and YF Logistics LLC (8373).

Center, Inc. ("1 Stop"), AC Gallery Inc. ("AC Gallery"), Appliances Connection Inc. ("Appliances Connection"), Gold Coast Appliances, Inc. ("Gold Coast"), Joe's Appliances LLC ("Joe's Appliances"), Superior Deals Inc. ("Superior Deals"), and YF Logistics LLC ("YF Logistics") (collectively, the "Debtors"), by and through his undersigned counsel, brings this action, *inter alia*: (a) to recover the mortal damages inflicted upon Polished, an online appliance retailer based in New York City, which collapsed into bankruptcy on March 7, 2024; (b) to recover as a fraud, constructive fraudulent transfer and unjust enrichment the transfer $180 million paid to Albert Fouerti, a founder and the CEO of Appliances Connection, which Polished acquired in 2021; and (c) to recover in excess of $200 million from the Defendants who include Albert Fouerti and Polished's other officers and directors who orchestrated, implemented, and/or failed to prevent the wrongdoing alleged herein, and aided and abetted the wrongdoing of others.

## II. JURISDICTION & VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

2. The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and, pursuant to Local Rule 7008-1, the Trustee does not consent to the entry of final judgment or adjudication by a bankruptcy judge.

3. Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III. PARTIES

### A. The Plaintiff

4. Plaintiff George L. Miller is the duly appointed Chapter 7 Trustee of the Debtors' bankruptcy estates.

5. On March 7, 2024 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the cases are being jointly administered under the caption *In re Polished.com Inc., et al.*, U.S.B.C. D. Del., Case No. 24-10353 (TMH).

6. On March 12, 2024, Plaintiff was appointed as Chapter 7 Trustee of the Debtors' estates.

7. Based in Brooklyn, New York, the Debtors were in the business of wholesale and retail sale of home appliances, furniture, fitness equipment, televisions, outdoor appliances, and plumbing fixtures, among other products. The Debtors sold products via an e-commerce shopping platform, as well as product showrooms in New York, Missouri, and Florida. To deliver their products, the Debtors used various warehouse fulfillment centers across the Northeast and Midwest, including the main warehouse operated by Debtor YF Logistics in Hamilton, New Jersey. The Debtors also offered appliance installing and old-appliance removal services.

8. Debtor Polished was publicly traded on the NYSE American exchange under the ticker symbol "POL." Prior to July 2022, Polished was known as 1847 Goedeker, Inc. ("1847 Goedeker") and traded under the ticker symbol "GOED."

9. Debtor Polished is the ultimate parent of the Debtors. Debtor Polished owns 100% of Debtor Appliances Connection, which in turn owns 100% of Debtors 1 Stop, AC Gallery, Gold Coast, Joe's Appliances, Superior Deals, and YF Logistics.

10. Polished is a Delaware corporation. 1 Stop, Gold Coast, and Superior Deals are New York corporations. Upon information and belief, AC Gallery and Appliances Connection are also New York corporations. Joe's Appliances is a New York limited liability company. YF Logistics is a New Jersey limited liability company.

**B. The Defendants**

11. Defendant Albert Fouerti is an individual with an address of 2217 E. 5th Street, Brooklyn, NY 11223. Albert Fouerti was the Chief Executive Officer ("CEO") of Polished from September 1, 2021 until October 14, 2022, as well as a member of Polished's Board of Directors from September 1, 2021 until December 2022. Albert Fouerti was also a founder and the CEO of Appliances Connection, which Polished acquired in 2021.

12. Defendant Douglas T. Moore is an individual with an address of 6905 Patterson Avenue, Richmond, VA 23226. Moore was the CEO of Polished from August 2019 until August 31, 2021, as well as a member of Polished's Board of Directors from April 2020 until September 2021.

13. Defendant Maria Johnson is an individual with an address of 117 West 82nd St., Apt. 1, New York, NY 10024. Johnson was the Chief Financial Officer ("CFO") of Polished from July 2021 until October 14, 2022.

14. Defendant Ellery W. Roberts is an individual with an address of 17025 NW 20th Street, Pembroke Pines, FL 33028. Roberts was the Executive Chairman of Polished's Board of Directors from January 2019 until the Petition Date. Roberts was also the Executive Chairman of the Boards of Directors of Debtors 1 Stop, AC Gallery, Appliances Connection, Gold Coast, and Superior Deals.

15. Defendant Robert Barry is an individual with an address of 7516 Wingfoot Dr., Raleigh, NC 27615. Barry was the Interim CFO and Secretary of Polished from October 14, 2022 until the Petition Date, the Chief Accounting Officer of Polished from July 2021 until January 2022, and the CFO of Polished from January 2019 to July 2021. As of the Petition Date, Barry was also the Interim CFO and Secretary of Debtors 1 Stop, AC Gallery, Appliances Connection,

Gold Coast, and Superior Deals, as well as the Interim CFO of Debtors Joe's Appliances and YF Logistics.

16. Defendant Ellette A. Anderson is an individual with an address of 1260 Spruce Place, Mound, MN 55364. Anderson was a member of Polished's Board of Directors from July 2020 until the Petition Date.

17. Defendant Clark R. Crosnoe is an individual with an address of 5327 Wenonah Drive, Dallas, TX 75209. Crosnoe was a member of Polished's Board of Directors from July 2020 until the Petition Date.

18. Defendant Glyn C. Milburn is an individual with an address of 15160 Burbank Blvd., Apt. 104, Sherman Oaks, CA 91411. Milburn was a member of Polished's Board of Directors from July 2020 until the Petition Date.

19. Defendant Alan P. Shor is an individual with an address of 2828 Hood St., #1701, Dallas, TX 75219. Shor was a member of Polished's Board of Directors from June 2021 until January 2024.

20. Defendant Edward J. Tobin is an individual with an address of 17 Rue Beautreillis, Paris, 4E ARR. 75004 France. Tobin was a member of Polished's Board of Directors from April 2020 until the Petition Date.

21. Defendant G. Allan Shaw is an individual with an address of 19120 Peninsula Club Dr., Cornelius, NC 28031. Shaw was a member of Polished's Board of Directors from October 2021 until the Petition Date. Shaw was also a Director of Debtors 1 Stop, AC Gallery, Appliances Connection, Gold Coast, and Superior Deals.

22. Defendant James Schneider is an individual with an address of 600 Congress Ave., Suite #500, Austin, TX 78701. Schneider was a member of Polished's Board of Directors from

January 2022 until the Petition Date. Schneider was also a Director of Debtors 1 Stop, AC Gallery, Appliances Connection, Gold Coast, and Superior Deals.

23. Defendant Elie Fouerti is an individual with an address of 2215 East 5th Street, Brooklyn, NY 11223. Elie Fouerti is the brother of Albert Fouerti. Elie Fouerti was a founder and the Vice President of Appliances Connection. After Polished acquired Appliances Connection, Elie Fouerti was the Chief Operating Officer ("COO") of Polished.

## IV. FACTS

24. Goedeker Television Co. was founded as a privately held company in 1951 in St. Louis, Missouri, and expanded over the next four decades to add showrooms and sell all appliances as well as furniture. In 2008, Goedeker Television Co. started its e-commerce website, "Number1Direct.com," and, in 2012, converted most of its showroom space into warehouse and office space and changed the website name to "goedekers.com."

25. Goedeker described itself in its SEC filings as a "one-stop e-commerce destination for home furnishings, including appliances, furniture, home goods and related products" and stated that more than 90% of its sales were placed through its website.

26. On January 10, 2019, Polished (then known as 1847 Goedeker) was incorporated in the state of Delaware as a special purpose acquisition company to acquire substantially all the assets of Goedeker Television Co. On April 5, 2019, Polished completed the acquisition and began trading on the NYSE American under the ticker symbol "GOED."

27. Albert and Elie Fouerti founded privately held Appliances Connection in 2015 as an online seller of appliances, with Albert Fouerti serving as CEO. Appliances Connection had its headquarters and a showroom located in Brooklyn, New York, but most of its business was the online sales of appliances to retail and commercial customers. Albert and Elie Fouerti also owned

several other related companies, including YF Logistics (which operated a 200,000 square foot warehouse in Hamilton, New Jersey), 1 Stop, Gold Coast, Joe's Appliances, and Superior Deals.

28. In August 2020, Ellery Roberts (Polished's Board President) began negotiating with the Fouertis to acquire through merger (the "Merger") Appliances Connection—which owned Debtors 1 Stop, AC Gallery, Gold Coast, Joe's Appliances, Superior Deals, and YF Logistics.

29. On October 20, 2020, Polished's Board of Directors approved the Merger. The parties executed the purchase agreement that same day, as well as amendments thereto on December 20, 2020 and April 6, 2021.

30. The Merger—which closed on June 2, 2021—was orchestrated by Defendant Albert Fouerti and other Defendants as the vehicle to sell Fouerti's companies for substantially more than they were worth, through the use of materially false and misleading financial statements and the concealment of other illegal activities, as a result of which Defendant Albert Fouerti and possibly other Defendants personally profited at Debtors' expense through fraud and self-dealing.

31. As reported in Note 15 - Stockholders' Equity (Deficit) of the company's Audited Financial Statements for 12/31/2021, which is attached to the SEC Form 10-K, the source of the proceeds to consummate the Merger was 1847 Goedeker Inc.'s sale of stock to the public.

32. After deducting underwriting commissions and expenses, 1847 Goedeker Inc. (whose name subsequently was changed to Polished) received net proceeds of approximately $194.4 million, $180 million of which was paid to Defendant Albert Fouerti personally, in cash.

33. On July 20, 2022, 1847 Goedeker Inc. changed its name to "Polished.com Inc." Pursuant to the name change, the company's stock ticker symbol changed to "POL."

**The Merger Was Based on False Financial Statements, and the Concealment of Other Illegal Activities For the Purpose of Personally Enriching Albert Fouerti**

34. Polished paid $222 million for Appliances Connection in connection with the Merger, and $180 million was paid to Albert Fouerti personally, in cash.

35. As set forth herein, Albert Fouerti caused Appliances Connection to engage in fraudulent business and accounting practices, which resulted in falsified financial statements which showed Appliances Connection to be profitable and valuable when it was not, and caused Polished to materially overpay to purchase Appliances Connection. He leveraged those practices and financials into negotiating the $180 million cash payout for himself.

36. These fraudulent business and accounting practices, which are set forth in greater detail below, were regular occurrences at Appliances Connection before the Merger, and then continued unabated following the Merger with Polished.

37. Defendants, all of whom were directors and/or officers of Polished during the relevant period, were aware of these fraudulent business and accounting practices at relevant times but participated in and encouraged them, and/or failed to take action to stop them.

**The Company Issued False Financial Statements,
Under Defendants' Leadership**

38. Both before and after the Merger, Polished issued financial statements which contained false and misleading statements as to Polished's internal controls over financial reporting and its financial condition.

39. On January 25, 2023, a Polished shareholder commenced a shareholder derivative action against Defendants Moore, Barry, Albert Fouerti, Johnson, Roberts, Anderson, Crosnoe, Milburn, Shor, Tobin, Shaw, and Schneider in the U.S. District Court for the Eastern District of New York, captioned *Wong v. Moore et al.*, U.S.D.C. E.D.N.Y., Case No. 23-cv-00559 (the "Derivative Case"). The Complaint in the derivative case asserts claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and

violations of certain securities laws. The Derivative Case is stayed as a result of Polished's bankruptcy filing.

40. As alleged, Polished continually made false and misleading statements in its public filings during the period from July 27, 2020 through August 25, 2022, in particular with respect to its statements concerning its inadequate internal controls over its financial reporting, including *inter alia*:

a. The IPO Registration Statement filed with the SEC April 22, 2020 (the "IPO Registration Statement") misrepresented a liability of $2,910,200, misrepresented the fair value of certain ownership interests, and misrepresented the effectiveness and adequacy of the Company's internal controls over financial reporting;

b. All Form 10-Q quarterly reports for the second and third quarters of 2020 and all quarters of 2021 falsely represented several line items (which later had to be restated) and failed to disclose inadequate internal controls;

c. The Secondary Public Offering Registration Statement filed with the SEC May 3, 2021 (the "SPO Registration Statement") and Form 10-Q quarterly report for 2Q 2021 continued to fail to disclose issues with internal controls; and

d. The 2021 Proxy Statement, filed November 18, 2021 and solicited by Defendants Barry, Roberts, Albert Fouerti, Anderson, Crosnoe, Milburn, Shaw, Shor, and Tobin, contained material misstatements and omissions about executives' compliance with the Company's Code of Conduct and executive compensation, the need for certain financial statements to be restated, and inadequate internal controls.

41. As a public company listed on the New York Stock Exchange, Polished was required to include in its public filings financial statements prepared in accordance with accounting

principles generally accepted in the United States (GAAP), and to comply with all statutes and SEC regulations applicable to public companies, including the Sarbanes-Oxley Act of 2002 ("SOX").

42. Certain Polished public filings required certifications pursuant to Section 302 of SOX, which included certifications that, *inter alia*, the filing did not contain any untrue statement of material fact, the financial statements were materially correct, and the company had adequate internal controls over financial reporting.

43. Polished's quarterly report for 2021 Q2 was certified by Defendants Moore and Johnson, and the certification was knowingly false.

44. Polished's quarterly report for 2021 Q3, annual report for 2021, and quarterly report for 2022 Q1 were certified by Defendants Johnson and Albert Fouerti, and these certifications were knowingly false.

45. In March 2021, 1847 Goedeker Inc. determined that its financial statements for 2019 should not be relied upon and should be restated. The company blamed the issues on a Supreme Court decision issued in 2018 concerning sales taxes, when the actual reason was the Company's own faulty internal controls, which continued post-Merger. The restated financials were issued the same day, revealing that the company had overstated its assets for 2019 by $372,063, understated its total liabilities by $2,910,200, understated its net loss by $3,089,721, and misstated the balance of total shareholders' equity by $3,282,263.

46. Furthermore, post-Merger Polished reported false inventory numbers in its public filings.

47. Typically, inventory was delivered to YF Logistics' warehouse in Hamilton, New Jersey, and then shipped to customers from that warehouse.

48. Following the Merger, Polished's Vice President of Logistics began examining Appliances Connection's inventory management system. Among other activities, he conducted two hand counts of inventory to compare with the inventory numbers in Appliances Connection's ledger. Both counts confirmed that the ledger and, as a result, Appliances Connection's balance sheet (which used the inventory numbers from the ledger) were materially false and overstated inventory by approximately 1,200 pieces, which material falsity and overstatement existed pre-Merger.

49. Defendants Moore, Barry, Johnson, and Albert Fouerti were directly told about the inventory problems and missing appliances by Polished's Vice President of Logistics during the summer and fall of 2021 but took no action to correct the issues or prevent materially false inventory numbers from continuing to be reported in Polished's financials.

50. Indeed, while doing nothing to remedy the problem, Moore negotiated a substantial severance for himself and resigned on August 30, 2021, leaving Polished, its stockholders, and creditors to hold the bag. Albert Fouerti then fired Polished's Vice President of Logistics in September 2021.

51. On October 31, 2022, a Polished shareholder commenced a securities fraud class action against Polished and Defendants Moore, Johnson, and Albert Fouerti, among others, in the U.S. District Court for the Eastern District of New York, captioned *Maschhoff v. Polished.com Inc. et al.*, U.S.D.C. E.D.N.Y., Case No. 22-cv-06606 (the "Securities Fraud Case"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

52. Among other allegations, the complaint in the Securities Fraud Case contains information provided by eleven former employees of Polished, Appliances Connection, and YF

Logistics, and outlines in detail fraudulent business practices that were routine at the company both pre and post-Merger, including:

a. Polished's VP of Logistics told Moore, Johnson, and Barry about the inventory issues on multiple occasions;

b. Polished's VP of Logistics told Albert Fouerti (serving as Polished's CEO at that time) that inventory was missing and materially overstated on the balance sheet on multiple occasions in August 2021, as well as in near-daily telephone calls with Albert Fouerti in September 2021 (many of which Johnson also participated in), but Albert Fouerti refused to take any action;

c. On September 21, 2021, Polished's VP of Logistics had a phone call with Albert Fouerti, Johnson, and Barry, in which he spent approximately 30 minutes explaining the problems with the inventory system and missing appliances, following which Albert Fouerti screamed at him and fired him;

d. Polished's reported inventory numbers were not even close to the actual inventory in the YF Logistics warehouse. While physical counts of inventory were performed from time to time, the physical count number was much smaller than the numbers that were in the ledger or, following the Merger, publicly reported. Nonetheless, neither the ledgers nor the financial statements was changed to reflect reality;

e. Employees would regularly search the warehouse for pieces that had been sold online but did not actually exist;

f. An inventory control manager working for Appliances Connection before the Merger made numerous recommendations to Elie Fouerti about how to

improve inventory practices, but Elie Fouerti did not implement those recommendations (either before or after the Merger); and

g. Refurbished, used, and damaged items were fraudulently advertised as "brand new."

53. Polished's publicly reported inventory numbers for the fiscal year of 2021 and the first quarter of 2022 were materially false.

54. On March 31, 2022, the Company filed its Form 10-K Annual Report for 2021 (the "2021 10-K"), with SOX certifications by Albert Fouerti and Johnson. The 2021 10-K disclosed a "material weakness" which "may result in material misstatements of our financial statements or cause us to fail to meet our reporting obligations or fail to prevent fraud."

55. The Audit Committee Investigation (hereinafter described), which occurred in late 2022, confirmed that the Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient.

56. By virtue of their positions as officers and directors of Polished, Defendants were aware of (i) the fraudulent inventory practices; (ii) that Polished did not have a sufficient inventory management system to accurately track inventory; and (iii) that false inventory numbers were being reported on Polished's books and to the public. Yet, Defendants failed to correct these deficiencies, failed to implement appropriate inventory management practices, and failed to prevent materially false statements from being made in public filings.

**The Company Routinely Forged Customer Records and Falsified Other Documents, Under Defendants' Leadership**

57. In addition to fraudulent inventory practices, Polished, under the leadership of Albert Fouerti and the other Defendants, routinely implemented fraudulent practices with respect

to customer records and other types of company records, which had the effect of defrauding customers, vendors, and others and exposing Debtors to liability.

58. For example:

a. Albert and Elie Fouerti routinely ordered an employee to alter documents to facilitate returns to the manufacturer outside the permitted return windows, such as by changing the date on the document to make it appear as if it had been returned within the permitted window, or by changing delivery dates on bills of lading to circumvent damage claims;

b. All damages claims with vendors were filed as "concealed damages" (*i.e.*, not the Company's fault), even when the damages were caused by Company workers;

c. Albert and Elie Fouerti routinely ordered employees to forge customer signatures, delivery signatures, and submissions to credit card companies to circumvent damage claims and avoid credit card chargebacks; and

d. Appliances Connection employees would routinely change dates of invoices and other documents to win chargeback disputes, submit warranty claims outside the warranty period, and avoid customer delivery complaints.

59. The Fouertis directed these illegal practices, while the other Defendants failed to have sufficient controls or procedures in place to prevent rampant alteration of Company records for fraudulent purposes.

**The Company Routinely Violated Tax Laws,**
**Under Defendants' Leadership**

60. Defendants created and permitted an environment at Polished that fostered non-compliance with obligations related to sales and use taxes.

61. Albert Fouerti directed employees to stop filing sales taxes on behalf of Polished, allowed employees to accept inadequate documents from customers claiming to be tax exempt, and knowingly failed to pay the appropriate workman's compensation insurance premiums, which Polished must pay.

62. The other Defendants failed to have sufficient controls or procedures in place to prevent Albert Fouerti from causing the Company to flout tax laws.

63. On February 21, 2024, Polished commenced an action against Albert Fouerti in the Supreme Court of the State of New York, County of Kings, captioned *Polished.com Inc. f/k/a 1847 Goedeker Inc. v. Albert Fouerti*, Case No. 505260/2024. Following the Debtors' bankruptcy filings, the case was removed to federal court, and then transferred to the District of Delaware, where it is currently pending as Case No. 24-cv-00739 (the "Tax Case").

64. As alleged in the Tax Case with respect to sales and use taxes:

a. Following the Merger, Polished used a platform called TaxJar to assist with calculating its sales and use tax compliance, and a Polished employee named John Winters typically uploaded the necessary information into TaxJar;

b. In or about August 2022, Albert Fouerti directed Winters to stop uploading the Company's sales information into TaxJar, without any directions for alternative ways to ensure sales taxes were being paid;

c. In or about October 2022, TaxJar sent a notice to Brad Adelsky, Director of Financial Planning & Analysis, stating that Polished's sales for September 2022 appeared to be inconsistent with prior periods;

d. Winters told Adelsky about Albert Fouerti's directive to stop submitting sales information to TaxJar;

e. Adelsky spoke with Defendant Johnson (CFO) about his concerns with the decision to stop filing sales and use taxes, and explained that Polished was not in compliance with its sales and use tax obligations and would begin accruing interest on any taxes owed;

f. Johnson ignored these concerns and made no effort to ensure the Company's compliance, responding only by telling Adelsky that the Company would "do whatever Albert decides";

g. The Company did not resume paying sales and use taxes until December 2022; and

h. The Company incurred penalties and interest for its failure to pay sales and use during August-November 2022.

65. With respect to tax exemption certificates, a purchaser may be eligible for tax-free purchases if they provide an "exemption certificate" to the seller—but if the seller accepts an incomplete, insufficient, or late certificate, the seller can be liable for the associated sales and use taxes.

66. Under Albert Fouerti's leadership, Polished accepted insufficient exemption certificates and sometimes extended exemptions to purchasers that failed to provide any certificate at all. During state tax audits, Polished was found liable for sales and use taxes related to these wrongly granted exemptions.

67. With respect to workers' compensation insurance premiums, Albert Fouerti failed to accurately assess the payroll amounts that were submitted to the insurance company to compute the premium for the coming year.

68. Indeed, for the 2022-2023 policy year, Albert Fouerti estimated payroll of approximately $2.3 million—but in fact, actual payroll was approximately $24.4 million, over ten times greater. Due to this massive understatement, Polished became liable for an increased premium of $494,401 that it had not accounted for.

**The Company Routinely Violated Labor and Immigration Laws, Under Defendants' Leadership**

69. The Debtors employed large numbers of undocumented workers. This was common knowledge among employees and, given their role as officers and directors, among the Defendants.

70. For example, as alleged in the Securities Fraud Case:

a. Polished's VP of Logistics knew of at least 15 people working for Appliances Connection who were not legally documented, and he informed Defendant Barry and others of this issue on September 9, 2021, and Defendants Albert Fouerti and Johnson of this issue on September 21, 2021;

b. Albert Fouerti was aware that Debtors employed individuals not allowed to work in the United States and were paying them via Forms 1099, but would not allow anyone else to examine the list of people paid on Forms 1099;

c. Multiple former employee witnesses confirmed that Polished knowingly employed large numbers of undocumented workers, who were hired without supporting paperwork and paid in cash or under the table;

d. One former employee, who worked at YF Logistics, estimated 30-40% of the workforce at the warehouse were undocumented workers;

e. The head of Human Resources from January 2021 to July 2021 found that 60% of workers at YF Logistics had no social security numbers and were not

authorized to work in the United States, but was fired when she presented these numbers to Albert Fouerti;

f. At least some undocumented workers were paid via a relationship Albert Fouerti had with an agency called DNL Power, where Albert Fouerti would cut a check to DNL Power, which would then take a cut of the money and distribute the rest of the money to the undocumented workers in cash; and

g. On September 9, 2021, Polished's VP of Logistics received an email from an Administrative Services Manager at Polished that identified 82 Appliances Connection employees for whom the company had no social security number on file.

71. The Audit Committee Investigation, which occurred in late 2022, confirmed that Polished, under the leadership of Defendants, employed undocumented workers and failed to comply with labor and immigration laws.

**The Audit Committee's Investigation & The Company's Issuance of Restated Financials for 2021 and Q1 2022**

72. On August 15, 2022, Polished filed a Form 12b-25 Notification of Late Filing with the SEC, announcing that it was unable to file its quarterly report for the second quarter of 2022 "because it requires additional time to complete the investigation described below":

> The Audit Committee of the Company's Board of Directors ("Audit Committee") recently began an independent investigation regarding certain allegations made by certain former employees related to the Company's business operations. The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and consultants to complete the investigation as soon as possible. The Company cannot predict the duration of the investigation, eventual scope, its outcome, or its impact on the Company's financial results. As a result of the additional time required to complete the investigation, the Company has not finalized its financial statements for the period ended June 30, 2022.

> The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation, but does not anticipate that it will be in a position to file the Second Quarter 10-Q on or before the fifth calendar date following the required filing date as prescribed in Rule 12b-25.

73. This news caused Polished's stock price to fall 35.7%.

74. On October 14, 2022, Polished announced that it had accepted the resignations of Defendants Albert Fouerti (CEO and President), Elie Fouerti (COO), and Johnson (CFO), effective immediately, though Albert Fouerti would remain a member of the company's Board of Directors. The company also announced that it had appointed J.E. "Rick" Bunka as Interim CEO and Barry as Interim CFO, effective immediately.

75. On November 2, 2022, Polished issued a press release describing the ongoing Audit Committee investigation:

> **Focus of Previously Disclosed Internal Investigation:** The investigation being carried out by the Audit Committee of the Board of Directors is focused on employment and inventory management practices. The investigation, which is supported by independent legal counsel and consultants, is focused on the time period of 2021 through the present. The Audit Committee intends to complete its accelerated, yet extensive, investigation by the end of this calendar year. If the investigation's scope or timeline materially changes, Polished will provide a subsequent update.

76. On November 14, 2022, Polished filed another Form 12b-25 Notification of Late Filing with the SEC, announcing that it was unable to file its quarterly report for the third quarter of 2022 because it needed additional time to complete the Audit Committee investigation.

77. On December 22, 2022, Polished issued a press release (the "December 2022 Press Release") disclosing the results of the Audit Committee investigation:

> ***<u>Internal Investigation Results</u>***

> The Company's Board of Directors (the "Board") has completed its assessment of the results of the Audit Committee's previously disclosed internal investigation. The investigation, which was supported by independent legal counsel and advisors, produced the following key findings pertaining to the Company's business operations under former management during the 2021-2022 period:
>
> - The Company was charged by its former Chief Executive Officer approximately $800,000 for expenses unrelated to the Company and its operations.
>
> - The Company appears to not have had in place all the necessary documentation for all of its employees and, in turn, may have failed to comply with certain legal requirements. As elaborated on below, the Company has subsequently put in place enhanced controls to remedy any labor issues and believes it is now in full compliance with legal requirements.
>
> - The Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient. As elaborated on below, the Company has subsequently put in place enhanced controls to remedy such issues.

78. A slide presentation concerning the Audit Committee Investigation summarized the investigation's findings in 5 key categories: (1) "Management and accounting of inventory"; (2) "Designation and sale of damages goods (scrap)"; (3) "Misappropriation of company resources by former management"; (4) "Violations of immigration laws"; (5) "Violations of labor and safety laws and regulations." Key findings of the investigation included:

a. There were "shortcomings in the strength of the Company's controls, software and procedures" that "raise more general questions about the accuracy of its inventory count";

b. "The process by which the Company labels (and disposes) of scrap is vulnerable to abuse" and the investigation revealed "some circumstantial evidence

suggesting that Albert and Elie [Fouerti] deposited the proceeds of these scrap sales in non-Company bank accounts, which they control personally";

c. Albert and Elie Fouerti "routinely charged substantial personal expenses to the Company," including tuition payments, religious donations, retail and personal expenses, and salaries for individuals performing services for the Fouertis personally or for the Fouertis' other businesses;

d. "Albert [Fouerti] (and the company) knowingly and repeatedly hired undocumented workers, often at wages that fell below the statutory minimum for New York State, and this practice appears to have been known by numerous Company employees. It appears that Albert [Fouerti] (and the company) tried to conceal these payments by routing them through third-party employment agencies and through the use of 1099 forms."; and

e. There was evidence of various labor law violations at the Company, including violations of minimum wage, workers compensation, and overtime laws.

79. The December 2022 Press Release disclosed that "the Board has reached an agreement with its former Chief Executive Officer [Albert Fouerti] to, among other things, be reimbursed for substantially all of (i) the non-Company related expenses that were charged to the Company and (ii) the costs pertaining to the Audit Committee's investigation."

80. On December 27, 2022, Polished filed a Form 8-K Current Report with the SEC, attaching the December 2022 Press Release, the company's settlement agreement with Albert Fouerti (the "Fouerti Settlement"), and a letter from its independent auditor, Friedman LLP ("Friedman").

81. The Fouerti Settlement required Albert Fouerti to reimburse $3.7 million to Polished, to pay back $800,000 that he stole and to pay for the cost of the Audit Committee's investigation.

82. Polished's Form 8-K filed December 27, 2022 also disclosed that Friedman had resigned as auditors of the Company effective December 20, 2022. The Form 8-K stated in relevant part:

> In the Letter [to the Company from Friedman], Friedman advised the Company that based on the results of the Company's Board of Directors (the "Board") internal investigation as reported to Friedman, it appears there may be material adjustments and/or disclosures necessary to previously reported financial information. Additionally, the Board's internal investigation has identified facts, that if further investigated by Friedman, might cause Friedman to no longer to be able to rely on the representations of (i) management that was in place at the time Friedman issued its audit report for the year ended December 31, 2021, or (ii) management that was in place at the time of Friedman's association with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021 and March 31, 2022. Prior to the Letter, in the past two years, the Company had not received from Friedman an adverse opinion or a disclaimer of opinion, and their opinion was not qualified or modified as to uncertainty, audit scope, or accounting principles. The resignation by Friedman was neither recommended nor approved by the audit committee of the Board (the "Audit Committee") or the Board and there were no disagreements with management and Friedman. Friedman had previously reported a material weakness to the Audit Committee, which was included on the Company's Form 10-K for the year ended December 31, 2021, filed on March 31, 2022, regarding the ineffectiveness of the Company's internal controls over financial reporting.
>
> In connection with the Letter, **Friedman advised us that it is withdrawing its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declined to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively.**

(emphasis added). The Company further disclosed that it had hired a new auditor, Sadler, Gibb & Associates, LLC ("Sadler").

83. On July 31, 2023, Polished filed a Form 8-K Current Report (the "July 2023 Form 8-K") with the SEC, which attached a Press Release entitled "Polished.com Announces Filing of Restated and Delayed Financial Statements and Release of Results for Q1 2023.

84. The July 2023 Form 8-K stated:

> On July 31, 2023, Polished.com Inc. (formerly known as 1847 Goedeker Inc.) (the "Company"), announced that the Audit Committee of the Company's Board of Directors (the "Audit Committee") determined, based on the recommendation of management, that the Company's previously issued financial statements included in the Company's Annual Report on Form 10-K for the period ended December 31, 2021, and Quarterly Report on Form 10-Q for the period ended March 31, 2022 (the "Affected Periods)" should no longer be relied upon due to errors identified in the affected periods primarily due to the findings of an investigation by the Audit Committee concerning certain allegations made against the Company by certain former employees. As previously disclosed, as a result of these allegations, the Company's prior independent registered public accounting firm, Friedman LLP, advised the Company that there may be material adjustments and/or disclosures necessary to restate previously reported financial information.
>
> As a result of the investigation, the Audit Committee and the Company's third-party experts concluded that during the 2021-2022 period the Company was charged by its former Chief Executive Officer approximately $800,000 for expenses unrelated to the Company and its operations. **While re-auditing its financial statements for the year ended December 31, 2021, the Company determined that it needed to restate its previously issued financial statements as of and for the year ended December 31, 2021** . . .
>
> . . . **Additionally, the Company determined that it needed to restate its previously issued financial statements as of and for the three months ended March 31, 2022** . . .
>
> . . . Because of this restatement, the previously issued financial statements for the Affected Periods, as well as the relevant portions of any communication which describes or are based on such

> financial statements, should no longer be relied upon. At this time, the Company cannot provide assurance that other errors will not be identified or impact additional prior accounting periods.

(emphasis added).

85. The same day, July 31, 2023, Polished filed a "comprehensive annual report on Form 10-K for the fiscal years ended December 31, 2022 and 2021 and the quarterly periods ended March 31, 2022, June 30, 2022, September 30, 2022 and March 31, 2023," which restated the Company's previously issued consolidated financial statements for 2021 and the first quarter of 2022 (the "Restated Financials").

86. The Restated Financials revealed that Polished's financial statements for 2021 and the first quarter of 2022 were materially false. Indeed, the Restated Financials revealed material and egregious errors in, *inter alia*, the Cost of Goods Sold ("COGS"), inventory, sales, accounts payable, accounts receivable, accrued expenses, and revenue numbers that had been publicly reported in Polished's income statement and balance sheet.

87. For fiscal year 2021, the July 2023 Form 8-K summarized the required adjustments as follows:

> *Consolidated Statement of Operations*
>
> 1. Reduction in revenue of $16.6 million, which comprised the following: (1) an increase in the allowance for sales returns of $7.4 million, (2) revenue of $8.1 million that should be recognized in 2022, and (3) sales tax collections of $1.1 million improperly recognized as revenue.
>
> 2. Net reduction in cost of goods of $6.7 million, which comprised of the following: (1) reduction in product cost of sales due to an increase in the allowance for sales returns of $4.0 million, (2) reduction in product cost of sales of $6.0 million relating to revenue cutoff that should be recognized in 2022, and (3) an offsetting increase in cost of goods sold from an over accrual of vendor rebates ($0.4 million), under accrual of vendor purchases ($1.5 million), and an error in inventory cutoff ($1.4 million).

3. Increase in general and administrative expenses of $0.9 million, resulting from an increase in bad debt expense of $0.6 million in accordance with the Company's policy for allowance for doubtful accounts, and an over accrual of sales tax receivable of $0.3 million.

4. As a result of the changes above, income tax changed from a tax benefit of $4.4 million to a tax expense of $0.1 million.

*Consolidated Balance Sheet*

5. Net increase in current assets of $6.6 million, which comprised the following: (1) increase in inventory of $7.7 million, resulting from the reduction in cost of goods sold attributable to the allowance for sales returns, revenue cutoff, and inventory cutoff, offset by a reduction in showroom inventory of $1.0 million that was reclassified as property and equipment, (2) reduction in receivables of $1.1 million, resulting from an increase to the allowance for doubtful accounts of $0.6 million, and an over accrual of vendor rebates (as detailed in Nos. 1-4 above).

6. Net increase in current liabilities of $18.3 million, which comprised the following: (1) increase in accounts payable of $10.3 million, as a result of the increase in the allowance for sales returns, and an under accrual of sales tax refund receivable (netted with the sales tax liability), and (2) increase in customer deposits related to revenue cutoff (as detailed in Nos. 1-4 above).

7. Increase in long-term liabilities of $4.5 million, relating to an increase to the deferred tax liability as a result of the changes described above.

88. For Q1 2022, the July 2023 Form 8-K summarized the required adjustments as follows:

*Consolidated Statements of Operations*

1. Revenue declined by $4.1 million because of an understatement of a returns allowance and revenue cutoff issues.

2. Cost of goods sold increased $1.0 million, net by reclassification of expenses from operating expenses to cost of goods sold offset by the reduction in product cost associated with the reduction in revenue.

3. Operating expense declined by $1.9 million primarily by reclassification of operating expense to cost of goods sold.

4. Other income (expense) various miscellaneous adjustments totaling $0.2 million.

5. Income tax expense declined by $3.3 million.

6. As a result of the above adjustments, net income declined by $0.1 million.

*Consolidated Balance Sheet*

7. Current assets declined by $13.2 million from a $3.8 million reduction in vendor rebate accrual, inventory declined by $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments, and prepaid expenses declined by $2.7 million by to adjust for charging some items to expense, rather than prepaid expense.

8. Reclassification of showroom inventory to property and equipment.

9. Eliminate a right-of-use asset on a property that was not occupied.

10. Reflect the issuance of shares granted to two directors.

11. Reflect adjustments made to 2021 accumulated deficit and adjustment to net income for the three months ended March 31, 2022.

89. The issuance of the Restated Financials caused Polished's stock price to fall 68%.

90. On February 13, 2024, Polished announced an SEC investigation into the findings of the Audit Committee investigation and restatement.

91. The Debtors filed voluntary petitions for relied under Chapter 7 of the Bankruptcy Code on March 7, 2024.

92. As a result of the wrongdoing of the Defendants, as aforesaid, Debtors were driven out of business and into liquidation in bankruptcy.

93. As a result of the wrongdoing of the Defendants, as aforesaid, the Debtors suffered damages which have yet to be fully determined but which exceed Two Hundred Million Dollars.

94. The conduct of the Defendants, as aforesaid, was intentional, reckless and/or sufficiently egregious as to warrant the imposition of punitive damages.

## V. CLAIMS

### FIRST CLAIM – COMMON LAW FRAUD
**(Against Albert Fouerti and Elie Fouerti)**

95. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

96. Albert Fouerti and Elie Fouerti engaged in the wrongdoing alleged above with the intent to defraud and deceive Polished and its creditors, for Albert Fouerti's pecuniary benefit.

97. Albert Fouerti and Elie Fouerti caused Appliances Connection to engage in fraudulent business and accounting practices, which resulted in falsified financial statements, showed Appliances Connection to be profitable and valuable when it was not, and caused Polished to materially overpay to purchase Appliances Connection. They further leveraged those illegal practices and false financials to obtain a $180 million cash payout for Albert Fouerti.

98. The conduct of Albert Fouerti and Elie Fouerti as alleged above constituted fraud and deceit.

99. As a result of the fraud and deceit of Albert Fouerti and Elie Fouerti, Defendant Albert Fouerti wrongly received $180 million and Polished has suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $200 million.

### SECOND CLAIM – BREACH OF FIDUCIARY DUTY
**(Albert Fouerti)**

100. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

101. Under Delaware law (and elsewhere) corporate directors and officers owe the fiduciary duties of care and loyalty to the corporation they serve.

102. The duty of care requires fiduciaries to manage the company with the care which ordinarily careful and prudent men would use in similar circumstances and not act with gross negligence. Gross negligence is defined as reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.

103. The duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director or officer and not shared by the stockholders generally.

104. The duty to act in good faith is subsumed within the duty of loyalty. The duty of loyalty is breached when fiduciaries fail to act in the face of a known duty to act, or act in bad faith.

105. Where officers and directors knowingly cause or permit a corporation to violate positive law, they have acted in bad faith and are liable to the corporation for resulting damages.

106. Accordingly:

> Where directors intentionally cause their corporation to violate positive law, they act in bad faith; this state does not "charter lawbreakers." While a Delaware corporation may pursue diverse means to make a profit, it remains subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue lawful business by lawful acts. As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profits by violating the law.
>
> Similarly, knowing failure to prevent such a violation implies bad faith. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their

> responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Kandell on behalf of FXCM, Inc. v. Niv*, No. CV 11812-VCG, 2017 WL 4334149, at *16-17 (Del. Ch. Sept. 29, 2017) (internal quotation marks and citations omitted). *Accord Lebanon Cnty. Employees' Ret. Fund v. Amerisourcebergen Corp.*, No. CV 2019-0527-JTL, 2020 WL 132752, at *21 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020):

> Directors must be particularly scrupulous when overseeing the corporation's compliance with its legal obligations. "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'" *Massey*, 2011 WL 2176479, at *20 (quoting 8 *Del. C.* §§ 101(b), 102). "[A] fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." When directors consciously fail to prevent violations of positive law, then they act in bad faith.

107. Albert Fouerti owed fiduciary duties to Polished and its creditors, including duties of loyalty and care.

108. In the exercise of his fiduciary duties, Albert Fouerti was required, among other things, to refrain from self-dealing, to manage Polished and its affiliated entities in accordance with the law and in the best interests of Polished and its creditors, and to refrain from abusing his positions of control to favor his own interests and/or those of his family and friends at the expense of Polished and its creditors.

109. Albert Fouerti's conduct as alleged above constituted a breach of his fiduciary duties to Polished and its creditors.

110. As a result of Albert Fouerti's breaches of fiduciary duty, Polished has suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $200 million.

**<u>THIRD CLAIM – BREACH OF FIDUCIARY DUTY</u>**
**(Director and Officer Defendants Aside from Albert Fouerti)**

111. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

112. Defendants Johnson, Moore, Roberts, Barry, Anderson, Crosnoe, Milburn, Shor, Tobin, Shaw, Schneider, and Elie Fouerti (the "Director and Officer Defendants")[2] owed fiduciary duties to Polished and its creditors, including duties of loyalty and care.

113. Additionally, as identified above, certain of the Director and Officer Defendants also acted as directors or officers of other Debtor entities and thus owed fiduciary duties directly to those entities as well.

114. The conduct of the Director and Officer Defendants as alleged above constituted a breach by each of the Director and Officer Defendants of his/her fiduciary duties to Polished, the other Debtors (as applicable), and the Debtors' creditors, including, *inter alia*, insofar as the Director and Officer Defendants knowingly facilitated and/or failed to prevent Polished from issuing false financial statements, defrauding customers and vendors, and violating labor, immigration, and tax laws.

115. As a result of the breaches of fiduciary duty by the Director and Officer Defendants, the Debtors have suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $200 million.

---

[2] The term "Director and Officer Defendants" is used herein to refer to all the Defendants named herein other than Albert Fouerti (the claims against whom are separately set forth).

**<u>FOURTH CLAIM – AIDING & ABETTING BREACH OF FIDUCIARY DUTY</u>**
**(Director and Officer Defendants)**

116. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

117. The Director and Officer Defendants had knowledge of the wrongful conduct of Albert Fouerti, as aforesaid, and provided substantial assistance to Albert Fouerti in connection with his breaches of his fiduciary duties to Polished.

118. The substantial assistance provided by the Director and Officer Defendants included, but was not limited to, facilitating Polished's fraudulent business and accounting practices and failing to take action to stop them, and providing financial cover and credibility in connection with Polished's business even though it was issuing false financial statements, defrauding customers and vendors, and violating labor, immigration, and tax laws.

119. The conduct of the Director and Officer Defendants, as aforesaid, constitutes aiding and abetting Albert Fouerti's breaches of fiduciary duties and subjects the Director and Officer Defendants to liability for the harm suffered by Polished and its creditors.

120. As a result of the wrongdoing of the Director and Officer Defendants, Polished suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $200 million.

**<u>FIFTH CLAIM – AIDING & ABETTING FRAUD</u>**
**(Director and Officer Defendants)**

121. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

122. The Director and Officer Defendants had knowledge of the wrongful conduct of Albert Fouerti, as aforesaid, and provided substantial assistance to Albert Fouerti in connection with the commission of the frauds alleged herein.

123. The substantial assistance provided by the Director and Officer Defendants included, but was not limited to, facilitating Polished's fraudulent business and accounting practices and failing to take action to stop them, and providing financial cover and credibility in connection with Polished's business even though it was issuing false financial statements, defrauding customers and vendors, and violating labor, immigration, and tax laws.

124. The conduct of the Director and Officer Defendants, as aforesaid, constitutes aiding and abetting the fraud committed by Albert Fouerti and subjects them to liability for the harm suffered by Polished and its creditors.

125. As a result of the wrongdoing of the Director and Officer Defendants, Polished suffered damages which have yet to be fully determined and quantified, but which exceed the sum of $200 million.

**SIXTH CLAIM – UNJUST ENRICHMENT**
**(Against Albert Fouerti)**

126. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

127. Having received and retained $180 million through fraud and deceit in connection with the sale of his companies, Defendant Albert Fouerti has unjustly retained that benefit at the expense of the Debtors' estates.

128. Defendant Albert Fouerti should be ordered to disgorge that benefit and judgment for the full amount, $180 million plus interest, should be entered against him.

**<u>SEVENTH CLAIM – AVOIDANCE OF TRANSFERS</u>**
**Pursuant to 6 Del. C. §§ 1304(a)(2) & 1305(a), and 11 U.S.C. § 544**
**(Albert Fouerti)**

129. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

130. On or around June 2, 2021, Polished transferred $180 million to Albert Fouerti and/or affiliates of Albert Fouerti, in cash (the "Transfer").

131. At all times material hereto, Polished had at least one creditor prior to making the Transfer.

132. At all times material hereto, Polished was insolvent or was rendered insolvent as a result of the Transfer.

133. Polished did not receive reasonably equivalent value in exchange for the Transfer because the purchase price paid for Appliances Connection substantially exceeded the fair market value of the company and was substantially inflated by false financials and the concealed violations of law which infected its operations.

134. Accordingly, the Transfer constitutes an avoidable fraudulent transfer pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Section 544 of the Bankruptcy Code.

**<u>EIGHTH CLAIM – RECOVERY OF TRANSFERS UNDER 11 U.S.C. § 550</u>**
**(Albert Fouerti)**

135. The averments set forth in the foregoing Paragraphs of this Complaint are incorporated herein by reference as if set forth in full.

136. The Trustee is entitled to avoid the Transfer pursuant to 6 Del. C. §§ 1304 & 1305 and 11 U.S.C. § 544.

137. Albert Fouerti was the initial transferee of the Transfer, or the entity for whose benefit the Transfers were made or, alternatively, the immediate or mediate transferee of such initial transferee.

138. Accordingly, the Trustee is entitled to recover the Transfer pursuant to Section 550 of the Bankruptcy Code.

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiff George L. Miller, Chapter 7 Trustee for the jointly administered estates of the Debtors, demands judgment in his favor and against the Defendants, jointly and severally where appropriate, for:

(a) Against all Defendants, jointly and severally, for damages in excess of $200 million;

(b) Against Albert Fouerti for $180 million, plus interest, on account of the fraud committed against Polished, unjust enrichment in connection with the Merger, and the avoidable Transfer;

(c) Against the Defendants, jointly and severally, for punitive damages;

(e) For reasonable attorneys' fees and costs; and

(f) For such additional relief as this Court deems just.

## VII. JURY DEMAND

The Trustee hereby demands a jury trial before an Article III Judge in connection with all claims asserted herein.

Dated: March 5, 2026
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Peter J. Keane*______________________
Bradford J. Sandler, Esq. (DE Bar No. 4142)
Peter J. Keane, Esq. (DE Bar No. 5503)
919 N. Market St., 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Tel: (302) 652-4100
Fax: (302) 652-4400
bsandler@pszjlaw.com
pkeane@pszjlaw.com

-and-

**COREN & RESS, P.C.**
Steven M. Coren, Esq.
(admitted pro hac vice)
Benjamin M. Mather, Esq.
(admitted pro hac vice)
Janice D. Felix, Esq.
(pro hac vice to be sought)

Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
jfelix@kcr-law.com

*Counsel for Plaintiff*
*George L. Miller, Chapter 7 Trustee*