**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>POLISHED.COM INC., *et al.*,<br><br>Debtors. [1] | Chapter 7<br><br>Case No. 24-10353 (TMH)<br><br>(Jointly Administered) |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Polished.com Inc., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>ALBERT FOUERTI; MARIA JOHNSON; DOUGLAS T. MOORE; ELLERY W. ROBERTS; ROBERT BARRY; ELLETTE A. ANDERSON; CLARK R. CROSNOE; GLYN C. MILBURN; ALAN P. SHOR; EDWARD J. TOBIN; G. ALLAN SHAW; JAMES SCHNEIDER; and ELIE FOUERTI,<br><br>Defendants. | Adv. Proc. No. 26-50213 (TMH) |

**DECLARATION OF EMILY KANSTROOM MUSGRAVE IN SUPPORT OF THE**
**MOTION OF DEFENDANTS ALBERT FOUERTI AND ELIE FOUERTI**
**TO DISMISS THE CHAPTER 7 TRUSTEE'S COMPLAINT**

I, Emily Kanstroom Musgrave, declare as follows:

1.      I am a Member of the law firm Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. and have been admitted to this Court *pro hac vice*. I am submitting this Declaration and the exhibits attached hereto, based upon my own personal knowledge, in support of the Motion of Defendants Albert Fouerti and Elie Fouerti to Dismiss the Chapter 7 Trustee's Complaint.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number are: Polished.com Inc. (3938); 1 Stop Electronics Center, Inc. (9485); AC Gallery Inc. (3629); Appliances Connection Inc. (8366); Gold Coast Appliances, Inc. (1575); Joe's Appliances LLC (8354); Superior Deals Inc. (0096); and YF Logistics LLC (8373).

2.	Attached as **Exhibit 1** is a true and accurate copy of 1847 Goedeker Inc.'s (now Polished.com Inc.) Form S-1 Statement filed with the Securities and Exchange Commission on May 3, 2021.

3.	Attached as **Exhibit 2** is a true and accurate copy of the 1847 Goedeker Inc.'s (now Polished.com Inc.) Stock Offering Prospectus Statement filed with the Securities and Exchange Commission on May 27, 2021.

4.	Attached as **Exhibit 3** is a true and accurate copy of the Settlement and Cooperation Agreement between Polished.com Inc. and Albert Fouerti, dated December 21, 2022, and filed as an exhibit to the 8-K filed on December 27, 2022.

5.	Attached as **Exhibit 4** is a true and accurate copy of Polished.com Inc.'s Annual Report on Form 10-K for the year ended December 31, 2022, containing a restatement of the company's financials.

6.	Attached as **Exhibit 5** is a true and accurate copy of Polished.com Inc.'s Form 10-Q Statement filed for the quarterly period ending on September 30, 2023.

7.	Attached as **Exhibit 6** is a true and accurate copy of *Eden Alpha CI LP v. Polished.com Inc.*, 763 F. Supp. 3d 270 (E.D.N.Y. 2025).

8.	Attached as **Exhibit 7** is a true and accurate copy of *Eden Alpha CI UP v. Polished.Com Inc.*, No. 22-CV-6606 (NGG) (VMS), 2026 U.S. Dist. LEXIS 49394 (E.D.N.Y. Mar. 10, 2026).

9.	Attached as **Exhibit 8** is a true and accurate copy of 1847 Goedeker Inc.'s (now Polished.com Inc.) Form 10-Q Statement for the quarterly period ending on June 30, 2021.

10.	Attached as **Exhibit 9** is a true and accurate copy of 1847 Goedeker Inc.'s (now Polished.com Inc.) Schedule 14-C, dated April 22, 2021.

I declare under the pains and penalties of perjury that the foregoing is true and correct.

Executed on June 8, 2026 in Boston, Massachusetts.

Emily Kanstroom Musgrave

3

# Exhibit 1

As filed with the Securities and Exchange Commission on May 3, 2021

**Registration No. 333-**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

———————————

**FORM S-1**
**REGISTRATION STATEMENT UNDER**
**THE SECURITIES ACT OF 1933**

———————————

# 1847 GOEDEKER INC.

**(Exact name of registrant as specified in its charter)**

———————————

| **Delaware** | **5700** | **83-3713938** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

———————————

**13850 Manchester Rd.**
**Ballwin, MO 63011**
**888-768-1710**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

———————————

**Douglas T. Moore**
**Chief Executive Officer**
**13850 Manchester Rd.**
**Ballwin, MO 63011**
**888-768-1710**

(Names, address, including zip code, and telephone number, including area code, of agent for service)

———————————

*Copies to:*

| | | |
|---|---|---|
| Louis A. Bevilacqua, Esq. | James W. McLaughlin, Esq. | Marc D. Jaffe, Esq. |
| **Bevilacqua PLLC** | **Murtha Cullina LLP** | Erika Weinberg, Esq. |
| 1050 Connecticut Avenue, NW | One Century Tower | **Latham & Watkins, LLP** |
| Suite 500 | 265 Church Street | 885 Third Avenue |
| Washington, DC 20036 | New Haven, CT 06510 | New York, NY 10022 |
| (202) 869-0888 | (203) 772-7790 | (212) 906-1200 |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this Registration Statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for comply with any new or revised financial accounting standards provided pursuant to

Section 7(a)(2)(B) of Securities Act. ☐

Table of Contents

**CALCULATION OF REGISTRATION FEE**

| Title of each class of securities to be registered | Proposed maximum aggregate offering price[1] | Amount of registration fee |
|---|---|---|
| Common Stock, par value $0.0001 per share[2] | $    235,750,000 | $    25,720.33 |

———————

(1)   Estimated solely for the purpose of calculating the amount of the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended.

(2)   Includes shares that may be purchased by the underwriters pursuant to their over-allotment option.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Commission, acting pursuant to such Section 8(a), may determine.**

[Table of Contents](#)

**The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting offers to buy these securities in any state where the offer or sale is not permitted.**

**PRELIMINARY PROSPECTUS**        **SUBJECT TO COMPLETION**        **DATED MAY 3, 2021**

**$205,000,000**

# GOEDEKERS

# 1847 Goedeker Inc.
## Common Stock

_____

We are offering $205,000,000 of our common stock, par value $0.0001 per share, in connection with our simultaneous acquisition of all of the issued and outstanding capital stock or other equity securities of 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC and YF Logistics LLC (commonly known as Appliances Connection) as described in more detail in this prospectus.

Our common stock trades on the NYSE American under the symbol "GOED." On April 28, 2021, the last reported sale price for our common stock was $7.38 per share. In connection with this offering, we intend to apply for the listing of our common stock on the New York Stock Exchange, or the NYSE.

We are an "emerging growth company" as defined in Section 2(a) of the Securities Act of 1933, as amended, and are subject to reduced public company reporting requirements.

**Investing in our securities involves risks that are described in the "Risk Factors" section beginning on page 23 of this prospectus.**

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions[1] | $ | $ |
| Proceeds, before expenses, to us | $ | $ |

_____

(1)    See "Underwriting" beginning on page 113 for additional information regarding underwriting compensation.

The underwriters may also exercise their option to purchase up to an additional $30,750,000 of common stock from us at the public offering price, less the underwriting discount, for 30 days after the date of this prospectus solely to cover over-allotments, if any.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

Certain of our existing stockholders and certain of our officers, directors, employees and related persons, have indicated an interest in purchasing an aggregate of approximately $       in shares of our common stock in this offering at the public offering price. However, because indications of interest are not binding agreements or commitments to purchase, the underwriters may determine to sell more, fewer or no shares in this offering to these persons, and any of these persons may determine to purchase more, fewer or no shares in this offering. The underwriters will receive the same underwriting discount on any shares purchased by these persons as they will on any other shares sold to the public in this offering.

The shares of common stock will be ready for delivery on or about          , 2021.

## BofA Securities                ThinkEquity

**a division of Fordham Financial Management, Inc.**

The date of this prospectus is       , 2021

Table of Contents





## Creating One of the Fastest Growing and Largest Appliance Retailers Online





Table of Contents

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 23 |
| Cautionary Statement Regarding Forward-Looking Statements | 44 |
| Use of Proceeds | 46 |
| Dividend Policy | 47 |
| Capitalization | 48 |
| Dilution | 49 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Corporate History and Structure | 72 |
| Proposed Acquisition of Appliances Connection | 73 |
| Business | 77 |
| Management | 90 |
| Executive Compensation | 97 |
| Current Relationships and Related Party Transactions | 102 |
| Principal Stockholders | 105 |
| Description of Capital Stock | 106 |
| Shares Eligible For Future Sale | 108 |
| Material United States Federal Income Tax Considerations For Non-United States Holders of Our Common Stock | 109 |
| Underwriting | 113 |
| Legal Matters | 120 |
| Experts | 120 |
| Interests of Named Experts and Counsel | 120 |
| Where You Can Find More Information | 120 |
| Financial Statements | F-1 |

**Please read this prospectus carefully. It describes our business, financial condition, results of operations and prospects, among other things. We are responsible for the information contained in this prospectus and in any free-writing prospectus we have authorized. Neither we nor the underwriters have authorized anyone to provide you with different information, and neither we nor the underwriters take responsibility for any other information others may give you. Neither we nor the underwriters are making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. The information contained in this prospectus is accurate only as of the date on the front of this prospectus, regardless of the time of delivery of this prospectus or any sale of shares of our common stock. You should not assume that the information contained in this prospectus is accurate as of any date other than its date.**

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information contained elsewhere in this prospectus. This summary is not complete and does not contain all of the information that you should consider before deciding whether to invest in our common stock. You should carefully read the entire prospectus, including "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus, before making an investment decision. Some of the statements in this prospectus are forward-looking statements. See the section titled "Cautionary Statement Regarding Forward-Looking Statements."*

*In this prospectus, "we," "us," "our," "our company" and "Goedeker" and similar references refer to 1847 Goedeker Inc. and references to "the combined company" are references to Goedeker after the consummation of its acquisition of Appliances Connection.*

OUR COMPANY

**Overview**

Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 stock-keeping units, or SKUs, across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

On October 20, 2020, we entered into a securities purchase agreement to acquire Appliances Connection, a leading retailer of household appliances based in Brooklyn, New York. We expect the closing of the proposed acquisition to occur simultaneously with the closing of this offering. We intend to enter into a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which we intend to use to pay a portion of the purchase price to acquire Appliances Connection. The proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses. On a pro forma basis, the combined company had total sales of $368 million for the year ended December 31, 2020. See "— Proposed Acquisition of Appliances Connection" below.

**The Large and Growing United States Appliance Market**

The United States household major appliances market is highly fragmented with big box retailers, online retailers, and thousands of local and regional retailers competing for share in what has historically been a high touch sale process. According to Statista, revenue in the United States household major appliances market (excluding small appliances) is projected to reach $22.9 billion in 2021 and is expected to grow at an annual growth rate of 1.68% from 2021 to 2025.

According to the United States Census Bureau, there are approximately 100 million households in the United States with annual incomes between $25,000 and $250,000 and approximately 193 million individuals between the ages of 20 and 64 in the United States, many of whom are accustomed to purchasing goods online. As younger generations age, start new families and move into new homes, we expect online sales of household appliances to increase. In addition, we believe the online household appliances market will further grow as older generations of consumers become increasingly comfortable purchasing online, particularly if the process is easy and efficient.

When shopping for appliances their homes, consumers bring their own unique combination of style and budget, requiring vast selection to garner broad appeal. Brick and mortar retailers must balance selection with the challenges of high inventory carrying costs, complex vendor requirements and limited showroom and storage space. As a result, consumers are faced with a decision between shopping in multiple stores, or settling for what is available. Just

Table of Contents

as e-commerce has changed the landscape of other retail sectors, we believe an easy-to-browse, online shopping experience with massive selection and excellent customer service has the potential to change the way people buy household appliances.

Logistics, fulfillment and customer service for household appliances are challenging given the myriad vendors and product specifications, and the cumbersome size and weight of items. Household appliances often have a low dollar value to weight ratio compared to other categories of retail, therefore requiring a logistics network that is optimized for items with those characteristics. Many consumers also seek first-rate customer service so they are not burdened with managing delivery, shipping and return logistics on their own. However, we believe big box retailers that serve the mass market for home goods are often unable or unwilling to provide this level of service.

**Our Solution — Key Benefits for Our Customers**

The combined company will offer broad selection and choice. We believe that the combined company will offer the largest online selection of household appliances, with over 51,000 household appliance SKUs. The combined company's easy to use websites make it easy for customers to discover products, styles and price points that appeal to them. Convenience and value are central to our offering. The combined company will offer a one-stop shop for consumers in the appliance category, with competitive pricing reflecting the many vendors on its platform and a differentiated and robust merchandising experience.

The combined company will offer consumers an engaging shopping journey through the combination of its technology-rich platform and its experienced customer support personnel, available via chat, email, text and phone. Superior customer service will be a core part of the experience that the combined company will offer shoppers. The combined company's customer service organization will help consumers navigate its sites, answer questions and complete orders, staffed with specialists focused on specific product classes. This team will help the combined company build trust with consumers, enhance its reputation and drive sales.

**Competitive Strengths**

We believe that the combined company will be a leading e-commerce appliance retailer due to its following key strengths:

- ***Name and reputation***.   We believe that the combined company will enjoy a long-standing (50+ years) reputation with vendors and customers for its focus on offering a full line of appliances and other home furnishings with competitive pricing and superior customer service.

- ***Product selection and pricing***.   We believe that the combined company's broad product selection and attractive pricing model will create a sustainable competitive advantage. The combined company will strive to offer consumers the broadest choice in the market and review pricing by other retailers on a daily basis to ensure its product offerings are competitively priced. Goedeker and Appliances Connection have negotiated attractive terms with their respective vendor partners, allowing them to pass through savings and selection to customers.

- ***Website ease of use***.   The combined company's purpose-built technology platform will be designed to provide consumers with a compelling user experience as they browse, research and purchase its products. The combined company will use personalization, based on past browsing and shopping patterns, to create a more engaging consumer experience.

- ***Best in class customer service and marketing technology***.   We believe that the investments that Goedeker and Appliances Connection have made in their respective call center tools and shopping platforms, combined with digital marketing optimization, will allow the combined company to offer an unmatched customer journey.

2

Table of Contents

- *Logistics technology and efficiency*.    The combined company's proprietary technology will eliminate manual steps and reduce order processing time, allowing it to provide faster services to customers.

**Our Growth Strategies**

Our mission is to change the way consumers buy appliances and, in doing so, become the leading online retailer of home appliances. The strategies of the combined company to achieve this mission, while increasing value for our shareholders, will include:

- *Grow our brand*.    Increasing brand awareness and growing favorable brand equity among consumers is central to the growth, of the combined company following the proposed acquisition. The combined company plans to drive brand awareness through a combination of sophisticated, multi-layered marketing programs and word-of-mouth referrals. The combined company will continue to invest in marketing initiatives to efficiently attract consumers.

- *Expand in the commercial market*.    To date, Goedeker and Appliances Connection have directed all marketing efforts toward the consumer. With remodels and new home construction, there is opportunity to market to home builders, real estate developers, contractors and interior designers who are making or influencing the purchasing decision for many consumers. We believe that the combined company's low price business model will be received well by this market, creating substantial revenue opportunities and more repeat business. Evidence of unmet demand and market need is ongoing with large commercial sales occurring organically each week through Goedeker and Appliances Connection's websites and contact centers.

- *Drive continued operational excellence*.    Goedeker and Appliances Connection are committed to improving productivity and profitability through several operational initiatives designed to grow revenue and expand margins. Some of the key initiatives for operational excellence for the combined company include:

  - *Logistics and shipping optimization*.    The combined company will implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. The combined company plans to pick up product from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, we expect to take advantage of buying opportunities and capture time-sensitive customers more frequently. The combined company will also explore options to use a showroom, warehousing and cross dock model in other key markets.

  - *Optimize price*.    The combined company will continue building a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing for our products.

  - *Drive marketing efficiencies*.    As the combined company continues to grow and scale, we believe that the combined company will continue to improve the efficiency of its marketing investments. We believe that with larger budgets and deeper experience, the combined company will benefit from lower media rates and increased data that will improve its customer targeting capabilities.

- *Opportunistically pursue strategic acquisitions*. The combined company may continue to expand its business through opportunistic acquisitions that allow it to enhance its customer offering, build its multi-brand portfolio, enter new geographies or enhance its operational infrastructure.

**Our Products and Services**

*Appliances*

The appliance category will be the largest revenue source of the combined company. Goedeker and Appliances Connection have a long history of selling these products and serving the distinct needs of consumers looking to replace or add to their home appliances. The combined company will offer over 51,000 appliance SKUs from all mainline original equipment manufacturers, including Bosch, Whirlpool, GE, Maytag, LG, Samsung, Sharp, Frigidaire and

3

Table of Contents

Kitchen Aid, among others, as well as from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte and Ilve. The combined company will sell all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers.

*Furniture*

The combined company will offer over 247,700 furniture SKUs from over 240 furniture vendors and will sell a full line of furniture for every room in the home. The combined company will utilize sophisticated websites that include organization of product by type and characteristics that make for a complete shopping experience in a complicated product category.

*Other Products*

The combined company will also offer a broad assortment of products in the décor, bed & bath, lighting, outdoor living and electronics categories. It will also sell fitness equipment, plumbing fixtures, air conditioners, fireplaces, fans, dehumidifiers, humidifiers, air purifiers, televisions and commercial appliances for our builder and business clients. While these are not individually high-volume categories, they complement the appliance and furniture categories to produce a one-stop home goods offering for customers.

*Installation and Other Services*

The combined company will offer installation and removal services within the continental United States. A full-service install involves hooking up the appliance, testing it to ensure proper operation, and removing packing materials from customer's home, office or other delivery location. The combined company will primarily fulfill such installation services internally through YF Logistics and utilize third-party logistics service provider partners to provide these services to delivery points in remote areas within the continental United States where YF Logistics may not be available.

The combined company will also have outside business partners such as Scavolini, a leader in kitchen cabinetry and design, and an in-house design team trained by the experts at Scavolini that will help customers remodel and reinvent their kitchens, living rooms, bathrooms and laundry rooms.

**Our Corporate History**

Goedeker was incorporated in the State of Delaware on January 10, 2019 for the sole purpose of acquiring substantially all of the assets of Goedeker Television Co., or Goedeker Television. On April 5, 2019, Goedeker acquired substantially all of the assets of Goedeker Television. As a result of this transaction, Goedeker acquired the former business of Goedeker Television, which was established in 1951, and continues to operate this business. All discussions in this prospectus regarding our business prior to the acquisition of Goedeker Television reflect the business of Goedeker Television, our predecessor company. Prior to our acquisition of substantially all of the assets of Goedeker Television, we had no operations other than operations relating to our incorporation and organization.

On October 20, 2020, we formed Appliances Connection Inc., or ACI, as our wholly owned subsidiary in the State of Delaware for the sole purpose of completing the proposed acquisition described below. As of the date of this prospectus, we do not have any other subsidiaries.

**Proposed Acquisition of Appliances Connection**

On October 20, 2020, we entered into a securities purchase agreement, which was amended on December 8, 2020 and April 6, 2021 (we refer to this agreement, as amended, as the purchase agreement), to acquire the following five household appliances companies through ACI: (1) 1 Stop Electronics Center, Inc., or 1 Stop, a New York corporation; (2) Gold Coast Appliances, Inc., or Gold Coast, a New York corporation; (3) Superior Deals Inc., or Superior Deals, a New York corporation; (4) Joe's Appliances LLC, or Joe's Appliances, a New York limited liability company; and (5) YF Logistics LLC, or YF Logistics, a New Jersey limited liability company (we collectively refer to these companies as Appliances Connection).

Pursuant to the purchase agreement, ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $222,000,000, subject to adjustment. The purchase price consists of (i) $180,000,000 in cash, (ii) 2,333,333 shares of our common stock having a stated

4

Table of Contents

value that is equal to $21,000,000 and (iii) a number of shares of our common stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the acquisition. We refer to this proposed acquisition of Appliances Connection in this prospectus as the proposed acquisition.

We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which will be used to pay a portion of the cash portion of the purchase price to acquire Appliances Connection. We intend to use all of the proceeds of the term loan to pay a portion of the purchase price, and the proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses.

See "Proposed Acquisition of Appliances Connection" for more information regarding the terms of the proposed acquisition.

The purchase agreement contains a number of conditions that must be fulfilled to complete the proposed acquisition. There can be no assurance that the conditions to the closing will be satisfied or that the proposed acquisition will be completed. In that event, any investment in our common stock in this offering will represent an investment in Goedeker's historical business only. See "Risk Factors — Risks Related to the Proposed Acquisition."

**About Appliances Connection**

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website 1stopcamera.com.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at goldcoastappliances.com.

Joe's Appliance, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, joesappliances.com.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website *www.appliancesconnection.com*.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

Appliances Connection has built powerful home-grown logistics technology that can help reduce cycle time and efficiencies for the combined company's operations. Appliances Connection will bring the relationships, network, and technology necessary to continue economies of scale for the entire business of the combined company throughout the United States e-commerce market. We intend to leverage Appliances Connection's powerful platform to increase speed, reduce costs and increase margins across our entire business.

Table of Contents

**Impact of COVID-19 Pandemic**

Starting in late 2019, a novel strain of the coronavirus, or COVID-19, began to rapidly spread around the world and every state in the United States. Most states and cities have at various times instituted quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, Goedeker's showroom was closed from April through June of 2020, but its call center and warehouse continued to operate. Appliances Connection's retail facilities and warehouse were deemed essential businesses that were not subject to restrictions in New York and New Jersey, so they remained open and continued to operate. Since over 95% of Goedeker's sales are completed online and its call center and warehouse and distribution operations continued to operate, and Appliances Connection continued to operate, the restrictions put in place in response to the pandemic have not had a materially negative impact on either company's operations. However, the situation surrounding COVID-19 remains fluid, and either company may be required to close or limit service offerings in its retail facilities or warehouses in response to guidance from applicable government and public health officials, which could adversely affect the combined company's operations and revenues.

In addition, Goedeker and Appliances Connection are dependent upon suppliers to provide them with all of the products that they sell. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain products. As a result, both companies have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect their respective business and financial results. Even if Goedeker and Appliances Connection are able to find alternate sources for such products, they may cost more, which could adversely impact their profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact the businesses of Goedeker and Appliances Connection. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on revenue.

Furthermore, the spread of COVID-19 has adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce the ability of the combined company to access capital in the future, which could negatively affect its liquidity.

If the COVID-19 pandemic does not continue to slow and the spread of COVID-19 is not contained, the combined company's business operations could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require the combined company to make further adjustments to its operations in order to comply with any such restrictions. The combined company may also experience limitations in employee resources. In addition, combined company's operations could be disrupted if any of its employees were suspected of having COVID-19, which could require quarantine of some or all such employees or closure of facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect the combined company's ability to operate its business and result in additional costs.

The extent to which the pandemic may impact the results of the combined company will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to the performance, financial condition, results of operations and cash flows of both companies. See also "Risk Factors" for more information.

Table of Contents

**Implications of Being an Emerging Growth Company**

We qualify as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As a result, we will be permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

•       have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act;

•       comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);

•       submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and

•       disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, or the Securities Act, for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year following the fifth anniversary of our initial public offering, (ii) the last day of the first fiscal year in which our total annual gross revenues are $1.07 billion or more, (iii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended, or the Exchange Act, which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iv) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

**Corporate Information**

Our principal executive offices are located at 13850 Manchester Rd., Ballwin, MO 63011, and our telephone number is 888-768-1710. We maintain a website at *www.goedekers.com*. Information available on our website is not incorporated by reference in and is not deemed a part of this prospectus.

Appliances Connection's executive offices are located at 1870 Bath Avenue, Brooklyn, NY 11214, and its telephone number is 800-299-9470. It maintains a website at *www.appliancesconnection.com*. Information available on the website is not incorporated by reference in and is not deemed a part of this prospectus.

**Stock Split**

On July 30, 2020, we completed a 4,750-for-1 forward stock split of our outstanding common stock. As a result of this stock split, our issued and outstanding common stock was increased from 1,000 shares to 4,750,000 shares. Accordingly, all share and per share information contained in this prospectus has been restated to retroactively show the effect of this stock split.

Table of Contents

THE OFFERING

| | |
|---|---|
| Common stock offered by us: | $205,000,000 of our common stock (or $235,750,000 if the underwriters exercise the over-allotment option in full). |
| Common stock to be outstanding after this offering[1]: | 33,888,978 shares of common stock (or 38,055,644 shares if the underwriters exercise the over-allotment option in full). |
| Over-allotment option: | We have granted to the underwriters a 30-day option to purchase from us up to an additional 15% of the shares of common stock sold in the offering ($30,750,000 of common stock) at the public offering price, less the underwriting discounts and commissions. |
| Use of proceeds: | We expect to receive net proceeds of approximately $190.2 million from this offering (or $218.7 million if the underwriters exercise their option to purchase additional shares of common stock in full), based on an assumed public offering price of $7.38 per share, the last reported sale price of our common stock on NYSE American on April 28, 2021, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. |
| | We intend to use the net proceeds from this offering to pay part of the cash portion of the purchase price for the proposed acquisition and related acquisition fees and expenses. Any remaining proceeds will be used working capital and general corporate purposes. See "Use of Proceeds." |
| Dividend policy: | We have not paid or declared dividends on our common stock. See "Dividend Policy" for more information. |
| Risk factors: | Investing in our common stock involves a high degree of risk. As an investor, you should be able to bear a complete loss of your investment. You should carefully consider the information set forth in the "Risk Factors" section beginning on page 23. |
| Lock-up: | We and all of our directors, officers and stockholders holding 5% or more of our outstanding common stock have agreed with the underwriters, subject to certain exceptions, not to sell, transfer or dispose of, directly or indirectly, any of our common stock or securities convertible into or exercisable or exchangeable for our common stock for a period of 90 days from the date of this prospectus. See "Underwriting" for more information. |
| Trading symbol and market: | Our common stock is traded on NYSE American under the symbol "GOED." In connection with this offering, we intend to apply for the listing of our common stock on the NYSE. |

The number of shares of common stock outstanding immediately following this offering is based on 6,111,200 shares outstanding as of April 28, 2021 and excludes:

- 555,000 shares of common stock issuable upon exercise of outstanding options at an exercise price of $9.00 per share;

- up to 445,000 additional shares of common stock that are reserved for issuance under our 2020 Equity Incentive Plan;

- 455,560 shares of common stock issuable upon exercise of outstanding warrants at a weighted average exercise price of $11.91 per share; and

- shares of common stock to be issued in connection with the proposed acquisition.

Table of Contents

SUMMARY OF RISK FACTORS

An investment in our common stock involves a high degree of risk. You should carefully consider the risks summarized below. These risks are discussed more fully in the "Risk Factors" section immediately following this Prospectus Summary. These risks include, but are not limited to, the following:

• The proposed acquisition is subject to a number of conditions, and may not close at all, in which case an investment in our common stock in this offering will represent an investment in Goedeker's historical business only.

• If the benefits of the proposed acquisition do not meet the expectations of investors, stockholders or financial analysts, the market price of our common stock may decline.

• Failure or delay to complete the proposed acquisition could negatively impact our business, financial condition, results of operations or stock price.

• The integration of Appliances Connection with Goedeker may not be as successful as anticipated.

• We have incurred and expect to continue to incur substantial transaction-related costs in connection with the proposed acquisition.

• Our future results following proposed acquisition may differ materially from the unaudited pro forma financial information included in this prospectus.

• As a result of the proposed acquisition, our company may have undisclosed liabilities and any such liabilities could harm our revenues, business, prospects, financial condition and results of operations.

• The COVID-19 pandemic may cause a material adverse effect on our business.

• If we fail to acquire new customers or retain existing customers, or fail to do so in a cost-effective manner, we may not be able to achieve profitability.

• Our success depends in part on our ability to increase our net revenue per active customer. If our efforts to increase customer loyalty and repeat purchasing as well as maintain high levels of customer engagement are not successful, our growth prospects and revenue will be materially adversely affected.

• Our business depends on our ability to build and maintain strong brands. We may not be able to maintain and enhance our brands if we receive unfavorable customer complaints, negative publicity or otherwise fail to live up to consumers' expectations, which could materially adversely affect our business, results of operations and growth prospects.

• Our efforts to expand our business into new brands, products, services, technologies, and geographic regions will subject us to additional business, legal, financial, and competitive risks and may not be successful.

• Risks associated with the suppliers from whom our products are sourced could materially adversely affect our financial performance as well as our reputation and brand.

• Our ability to obtain continued financing is critical to the growth of our business. We will need additional financing to fund operations, which additional financing may not be available on reasonable terms or at all.

• Our third-party loans contain certain terms that could materially adversely affect our financial condition.

• Our business is highly competitive. Competition presents an ongoing threat to the success of our business.

• We depend on our relationships with third parties, and changes in our relationships with these parties could adversely impact our revenue and profits.

• Uncertainties in economic conditions and their impact on consumer spending patterns, particularly in the home goods segment, could adversely impact our operating results.

Table of Contents

- Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.

- We may not be able to satisfy listing requirements of the NYSE or maintain a listing of our common stock on the NYSE or NYSE American.

- The market price, trading volume and marketability of our common stock may, from time to time, be significantly affected by numerous factors beyond our control, which may materially adversely affect the market price of your common stock, the marketability of your common stock and our ability to raise capital through future equity financings.

- An active, liquid trading market for our common stock may not be sustained, which may make it difficult for you to sell the common stock you purchase.

- We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future.

10

Table of Contents

SUMMARY FINANCIAL INFORMATION

The following tables summarize certain financial data for Goedeker and Appliances Connection and should be read in conjunction with their respective financial statements and related notes contained elsewhere in this prospectus and the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The following summary financial data for Goedeker as of December 31, 2020 and 2019, for the year ended December 31, 2020, for the period from January 1, 2019 through April 5, 2019 (Predecessor) and for the period from April 6, 2019 through December 31, 2019 (Successor) are derived from the audited consolidated financial statements of Goedeker and the unaudited pro forma combined financial statements included elsewhere in this prospectus. The following summary financial data for Appliances Connection as of December 31, 2020 and 2019 and for the years then ended are derived from the audited combined financial statements of Appliances Connection included elsewhere in this prospectus.

All financial statements included in this prospectus are prepared and presented in accordance with generally accepted accounting principles in the United States, or GAAP. The summary financial information is only a summary and should be read in conjunction with the historical financial statements and related notes contained elsewhere herein. The financial statements contained elsewhere fully represent financial condition and operations of Goedeker and Appliances Connection; however, they are not indicative of future performance.

**Goedeker**

| | Successor | | | Predecessor |
|---|---|---|---|---|
| Statements of Operations Data | Year Ended December 31, 2020 (Pro Forma) | Year Ended December 31, 2020 (Actual) | Period from April 6, 2019 through December 31, 2019 (As Restated) | Period from January 1, 2019 through April 5, 2019 |
| Products sales, net | $ 367,742,181 | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 |
| Cost of goods sold | 295,257,938 | 47,878,541 | 28,596,129 | 11,004,842 |
| Gross profit | 72,484,243 | 7,255,112 | 6,071,983 | 1,942,059 |
| Total operating expenses | 67,509,472 | 21,687,639 | 10,776,742 | 2,418,331 |
| Net income (loss) from operations | 4,974,771 | (14,432,527) | (4,704,759) | (476,272) |
| Total other income (expense) | (10,631,815) | (6,437,007) | (1,151,415) | 31,007 |
| Net loss before income taxes | (5,657,044) | (20,869,534) | (5,856,174) | (445,265) |
| Income tax benefit (expense) | (698,303) | (698,303) | 698,303 | — |
| Net loss | $ (6,355,347) | $ (21,567,837) | $ (5,157,871) | $ (445,265) |
| | | | | |
| Non-GAAP Financial Data: | | | | |
| Adjusted EBITDA[1] | $ 14,394,924 | — | — | — |
| Adjusted EBITDA Margin[1] | 3.91% | — | — | — |

_____

[1]   See "— Non-GAAP Financial Measures below" for a full reconciliation.

| | Successor | | |
|---|---|---|---|
| Balance Sheet Data | As of December 31, 2020 (Pro Forma) | As of December 31, 2020 (Actual) | As of December 31, 2019 (As Restated) |
| Cash and cash equivalents | $ 42,830,663 | $ 934,729 | $ 471,308 |
| Restricted cash | 5,791,818 | 8,977,187 | — |
| Total current assets | 88,464,745 | 18,240,121 | 4,494,402 |
| Total assets | 345,481,001 | 26,216,930 | 13,906,863 |
| Total current liabilities | 72,072,026 | 35,694,976 | 14,125,228 |
| Total liabilities | 131,670,085 | 39,532,699 | 17,985,080 |
| Total stockholders' equity (deficit) | 213,810,915 | (13,315,769) | (4,078,217) |

| | | | | |
|---|---|---|---|---|
| Total liabilities and stockholders' equity (deficit) | $ | 345,481,001 | $ | 26,216,930 | $ | 13,906,863 |

11

Table of Contents

**Appliances Connection**

| | | Years Ended December 31, | |
|---|---|---|---|
| **Statements of Operations Data** | | **2020** | **2019** |
| Net sales | $ | 312,608,528 | $ 219,333,461 |
| Cost of sales | | 247,379,397 | 176,771,632 |
| Gross profit | | 65,229,131 | 42,561,829 |
| Total operating expenses | | 45,821,833 | 33,055,976 |
| Income from operations | | 19,407,298 | 9,505,853 |
| Total other income (expense) | | 672,441 | 1,632,743 |
| Net income | $ | 20,079,739 | $ 11,138,596 |

| | | As of December 31, | |
|---|---|---|---|
| **Balance Sheet Data** | | **2020** | **2019** |
| Cash and cash equivalents | $ | 14,842,912 | $ 5,912,043 |
| Total current assets | | 78,190,386 | 53,514,272 |
| Total assets | | 84,979,244 | 61,195,270 |
| Total current liabilities | | 32,040,390 | 20,181,242 |
| Total liabilities | | 38,872,755 | 25,530,704 |
| Owners' capital | | 46,106,489 | 35,664,566 |
| Total liabilities and owners' equity | $ | 84,979,244 | $ 61,195,270 |

**Financial Information for First Quarter of 2021**

We have not yet completed our closing procedures for the first quarter of 2021. Presented below are estimated projections. These ranges are based on the information available to us at the time. Except for order information, we have provided ranges, rather than specific amounts, because these results are preliminary estimates. As such, our actual results may vary from the estimated projections and will not be finalized until after we close this offering and complete our normal quarter end accounting procedures. These results reflect management's best estimate of the impact of events during the quarter.

These estimates should not be viewed as a substitute for our financial statements prepared in accordance with GAAP. Accordingly, you should not place undue reliance on these projections. These projections should be read in conjunction with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors" sections and the audited consolidated financial statements of Goedeker and audited combined financial statements of Appliances Connection, including the notes thereto, included herein.

Management expects significant improvements in orders and revenue for the combined company (on a pro forma basis) for the first quarter 2021.

The combined company's orders for the three months ended March 31, 2021 were $199.3 million, which when compared to the combined company's orders for the three months ended March 31, 2020 of $97.2 million is an increase of 105.0%. Order information is available immediately, so we have not provided estimated ranges for this information.

Similarly, we expect that the combined company's revenues for the three months ended March 31, 2021 will be between $110.0 million and $122.0 million, an increase of between 67.0% and 85.2% when compared against the combined company's revenues of $65.9 million for the three months ended March 31, 2020. The expected revenues reflect a fill rate of between 55.2% and 61.2% for the combined company for three months ended March 31, 2021 compared to a fill rate of 67.8% for the three months ended March 31, 2020 and 85.0% for the year ended December 31, 2019. Vendor supply was constrained throughout the quarter and led to fill rates below the same time period a year ago. Fill rate refers to the percentage of the combined company's customer demand that is met by immediately available inventory, without backorders, items being out of stock or cancelled orders.

Table of Contents

We expect that the combined company's gross profit for the three months ended March 31, 2021 will be between $21.0 million and $24.0 million.

We expect that the combined company's operating income, excluding non-recurring expenses, for the three months ended March 31, 2021 will be between $5.2 million and $5.8. In computing operating income for the three months ended March 31, 2021, we excluded $695,000 of non-recurring expenses directly related to the acquisition and the reaudit of 2019.

The following table sets forth the high and low range of orders, fill rate, revenue, gross profit and operating income that we expect for the three months ended March 31, 2021.

| | Goedeker | | Appliances Connection | | Combined Company | |
|---|---|---|---|---|---|---|
| | Low End of Range | High End of Range | Low End of Range | High End of Range | Low End of Range | High End of Range |
| Orders | $ 30,700,000 | $ 30,700,000 | $ 168,600,000 | $ 168,600,000 | $ 199,300,000 | $ 199,300,000 |
| Fill rate | 40.7% | 44.6% | 58.2% | 64.2% | 55.2% | 61.2% |
| Revenue | $ 12,500,000 | $ 13,700,000 | $ 97,500,000 | $ 108,300,000 | $ 110,000,000 | $ 122,000,000 |
| Gross profit | $ 1,100,000 | $ 1,200,000 | $ 19,900,000 | $ 22,800,000 | $ 21,000,000 | $ 24,000,000 |
| Operating income (loss) | $ (4,400,000) | $ (4,100,000) | $ 9,600,000 | $ 9,900,000 | $ 5,200,000 | $ 5,800,000 |

In making these estimates, we considered a number of factors, including:

- our manufacturers' availability to produce product in a COVID-19 environment;

- the timing of our manufacturers' return to normal production levels;

- our expectation that the level of order cancellations will be reduced as the result of our increased working capital from this offering, which reduction may be somewhat offset by delivery delays due to reduced product availability from manufacturers as the result of COVID-19-related issues;

- the change in gross margin as we move to vendors who have availability; and

- the change in marketing expenses that drive traffic to our website.

**Quarterly Revenue Information**

The following table sets forth 2020 revenue information and estimated 2021 Q1 revenue information by quarter for Goedeker, Appliances Connection and the combined company (on a pro forma basis). Appliances Connection has not historically prepared quarterly financial statements. Management has prepared the following information from their sales records and believe they present a reasonable estimate of results for the periods shown.

(all amounts, other than percentages, in millions of U.S. dollars)

| | Goedeker | Appliances Connection | Combined Company | % of Total For Year |
|---|---|---|---|---|
| March 31, 2020 | $ 9.6 | $ 56.2 | $ 65.8 | 17.9% |
| June 30, 2020 | 15.3 | 76.2 | 91.5 | 24.9% |
| September 30, 2020 | 13.5 | 88.7 | 102.2 | 27.8% |
| December 31, 2020 | 16.7 | 91.5 | 108.2 | 29.4% |
| Year Ended December 31, 2020 | $ 55.1 | $ 312.6 | $ 367.7 | 100.0% |
| March 31, 2021 | $ 13.0 | $ 103.0 | $ 116.0 | |

As the chart illustrates, revenue for the combined company grew rapidly during the year ended 2020, a trend which continued into the first quarter of 2021.

13

Table of Contents

**Non-GAAP Financial Measures**

We believe the non-GAAP financial measures presented in this prospectus will help investors understand the financial condition and operating results of the combined company and assess our future prospects. We believe these non-GAAP financial measures, each of which is discussed in greater detail below, are important supplemental measures because they exclude unusual or non-recurring items as well as non-cash items that are unrelated to or may not be indicative of our ongoing operating results. Further, when read in conjunction with GAAP results, these non-GAAP financial measures provide a baseline for analyzing trends in our underlying businesses and can be used by management as a tool to help make financial, operational and planning decisions. Finally, these measures are often used by analysts and other interested parties to evaluate companies in our industry by providing more comparable measures that are less affected by factors such as capital structure.

We recognize that these non-GAAP financial measures have limitations, including that they may be calculated differently by other companies or may be used under different circumstances or for different purposes, thereby affecting their comparability from company to company. In order to compensate for these and the other limitations discussed below, management does not consider these measures in isolation from or as alternatives to the comparable financial measures determined in accordance with GAAP. Readers should review the reconciliations below and should not rely on any single financial measure to evaluate our business.

The non-GAAP financial measures used in this prospectus include Adjusted EBITDA and Adjusted EBITDA Margin. We define Adjusted EBITDA as net loss before income taxes, depreciation and amortization, financing costs, interest expense, sales tax accrual and one-time non-operational events. Adjusted EBITDA Margin is calculated by dividing Adjusted EBITDA by revenue. Adjusted EBITDA and Adjusted EBITDA Margin are not measures calculated in accordance with GAAP, and they should not be considered an alternative to any financial measures that were calculated under U.S. GAAP. Adjusted EBITDA and Adjusted EBITDA Margin are used to facilitate a comparison of the ordinary, ongoing and customary course of the operations of the combined company on a consistent basis from period to period and provide an additional understanding of factors and trends affecting the business of the combined company. Adjusted EBITDA and Adjusted EBITDA Margin may not be comparable to similarly titled non-GAAP measures used by other companies as other companies may have calculated the measures differently.

The reconciliation of Adjusted EBITDA to net loss for the combined company (on a pro forma basis) is provided below:

|  | Year Ended December 31, 2020 |
|---|---|
| Net loss | $ (6,355,347) |
| Income tax expense | 698,303 |
| Depreciation and amortization | 1,332,485 |
| Financing costs | 762,911 |
| Interest expense | 5,424,521 |
| Sales tax accrual | 7,700,378 |
| One-time non-operational events: | |
| Loss on extinguishment of debt | 1,756,095 |
| Write-off of acquisition receivable | 809,000 |
| Adjustment in value of contingency | 138,922 |
| Change on fair value of warrant liability | 2,127,656 |
| Adjusted EBITDA | $ 14,394,924 |

Table of Contents

UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION

The unaudited pro forma combined financial information presented below sets forth the financial position and results of operations of Goedeker after giving effect to the proposed acquisition and this offering. The following unaudited pro forma combined financial statements give effect to the proposed acquisition and related transactions and were prepared in accordance with the regulations of the Securities and Exchange Commission, or the SEC.

The pro forma financial information is presented for informational purposes only and is not necessarily indicative of what the combined company's financial position actually would have been had the proposed acquisition been completed on the dates indicated or what the combined company's results of operations actually would have been had the proposed acquisition been completed as of the beginning of the periods indicated. In addition, the combined pro forma financial statements do not purport to project the future financial position or operating results of the combined company. The pro forma combined financial statements include adjustments for events that are (1) directly attributable to the proposed acquisition, (2) factually supportable, and (3) with respect to the statements of operations, expected to have a continuing impact on the combined results.

It should be noted that there have been no material transactions between Goedeker and Appliances Connection prior to and during the periods presented in the unaudited pro forma combined financial statements. In addition, these statements do not reflect any cost or growth synergies that the combined company may achieve as a result of the proposed acquisition, or the costs to combine the operations of Goedeker and Appliances Connection.

The pro forma financial information has been derived from and should be read in conjunction with the following:

(a)    The consolidated financial statements and related notes of Goedeker for the year ended December 31, 2020, for the period from January 1, 2019 through April 5, 2019 (Predecessor) and for the period from April 6, 2019 through December 31, 2019 (Successor) (which are included elsewhere in this prospectus); and

(b)    The combined financial statements and related notes of Appliances Connection for the years ended December 31, 2020 and 2019 (which are included elsewhere in this prospectus).

15

Table of Contents

1847 GOEDEKER INC.
UNAUDITED PRO FORMA COMBINED BALANCE SHEET
AS OF DECEMBER 31, 2020

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets | | | | | |
| Cash and cash equivalents | $ 934,729 | $ 14,842,912 | $ 190,150,000 | (a) | $ 42,830,663 |
| | | | (180,000,000) | (b) | |
| | | | 56,450,000 | (c) | |
| | | | (12,680,161) | (d) | |
| | | | (26,866,817) | (e) | |
| Restricted cash | 8,977,187 | — | (3,185,369) | (f) | 5,791,818 |
| Receivables | 1,998,232 | 19,392,582 | — | | 21,390,814 |
| Vendor deposits | 547,648 | 31,733,415 | (31,733,415) | (g) | 547,648 |
| Merchandise inventory, net | 5,147,241 | 12,004,038 | — | | 17,151,279 |
| Prepaid expenses and other current assets | 635,084 | 217,439 | (100,000) | (d) | 752,523 |
| Total Current Assets | 18,240,121 | 78,190,386 | (7,965,762) | | 88,464,745 |
| Property and equipment, net | 245,948 | 1,997,822 | — | | 2,243,770 |
| Operating lease right-of-use assets | 1,578,235 | 4,646,508 | — | | 6,224,743 |
| Goodwill | 4,725,689 | — | 242,250,589 | (h) | 246,976,278 |
| Intangible assets, net | 1,381,937 | — | — | | 1,381,937 |
| Other long-term assets | 45,000 | 144,528 | — | | 189,528 |
| TOTAL ASSETS | $ 26,216,930 | $ 84,979,244 | $ 234,284,827 | | $ 345,481,001 |
| | | | | | |
| **LIABILITIES, OWNERS' EQUITY AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Current Liabilities | | | | | |
| Accounts payable and accrued expenses | $ 12,701,715 | $ 21,179,975 | $ — | | $ 33,881,690 |
| Customer deposits | 21,879,210 | 8,853,214 | — | | 30,732,424 |
| Current portion of notes payable | 663,339 | 466,235 | (663,339) | (f) | 466,235 |
| Current portion of acquisition note payable | — | — | 6,000,000 | (c) | 6,000,000 |
| Current portion of financing lease liability | — | 23,576 | — | | 23,576 |
| Current portion of operating lease liabilities | 450,712 | 1,517,390 | — | | 1,968,102 |
| Total Current Liabilities | 35,694,976 | 32,040,390 | 5,336,661 | | 72,072,027 |
| Notes payable, net of current portion | 2,522,030 | 3,505,620 | (2,522,030) | (f) | 3,505,620 |
| Acquisition note payable, net of current potion | — | — | 50,450,000 | (c) | 50,450,000 |
| Financing lease liabilities, net of current portion | — | 47,665 | — | | 47,665 |
| Operating lease liabilities, net of current portion | 1,127,523 | 3,279,080 | — | | 4,406,603 |
| Contingent note payable | 188,170 | — | — | | 188,170 |
| TOTAL LIABILITIES | 39,532,699 | 38,872,755 | 53,264,631 | | 131,670,085 |
| Owners' Equity | — | 46,103,489 | (46,103,489) | (i) | — |
| Stockholders' Equity (Deficit) | | | | | |
| Preferred stock, $.0001 par value, 20,000,000 shares authorized; none issued and outstanding at December 31, 2020 | — | — | — | | — |
| Common stock, $.0001 par value, 200,000,000 shares authorized; 6,111,200 and 4,750,000 shares issued and | | | | | |

| | | | | |
|---|---|---|---|---|
| outstanding as of December 31, 2020 (38,899,369 on a pro-forma basis) | 611 | 2,778 | (a) | 3,890 |
| | | 233 | (j) | |
| | | 268 | (j) | |

16

Table of Contents

1847 GOEDEKER INC.
UNAUDITED PRO FORMA COMBINED BALANCE SHEET — Continued
AS OF DECEMBER 31, 2020

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| Additional paid-in capital | 13,409,328 | — | 190,147,222 | (a) | 240,532,734 |
| | | | 17,219,764 | (j) | |
| | | | 19,756,420 | (j) | |
| Accumulated deficit | (26,725,708) | — | — | | (26,725,708) |
| Total Owners' Equity, Stockholders' Equity (Deficit) | (13,315,769) | 46,106,489 | 181,020,196 | | 213,810,916 |
| TOTAL LIABILITIES, OWNERS' EQUITY AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 26,216,930 | $ 84,979,244 | $ 234,284,827 | | $ 345,481,001 |

17

Table of Contents

1847 GOEDEKER INC.
UNAUDITED PRO FORMA COMBINED STATEMENT OF OPERATIONS
YEAR ENDED DECEMBER 31, 2020

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| Product sales, net | $ 55,133,653 | $ 312,608,528 | $ — | | $ 367,742,181 |
| Cost of goods sold | 47,878,541 | 247,379,397 | — | | 295,257,938 |
| Gross Profit | 7,255,112 | 65,229,131 | — | | 72,484,243 |
| Operating Expenses | | | | | |
| Personnel | 6,565,380 | 13,563,628 | — | | 20,129,008 |
| Advertising | 4,865,361 | 9,164,242 | — | | 14,029,603 |
| Bank and credit card fees | 1,806,620 | 12,361,428 | — | | 14,168,048 |
| Depreciation and amortization | 549,712 | 782,773 | — | | 1,332,485 |
| General and administrative | 7,900,566 | 9,949,762 | — | | 17,850,328 |
| Total Operating Expenses | 21,687,639 | 45,821,833 | — | | 67,509,472 |
| Income (Loss) From Operations | (14,432,527) | 19,407,298 | — | | 4,974,771 |
| Other Income (Expense) | | | | | |
| Interest income | 2,479 | 977,249 | (977,249) | (k) | 2,479 |
| Financing costs | (762,911) | — | — | | (762,911) |
| Interest expense | (870,847) | (663,674) | (4,010,000) | (l) | (5,424,521) |
| | | | 120,000 | (m) | |
| Loss on extinguishment of debt | (1,756,095) | — | — | | (1,756,095) |
| Write-off of acquisition receivable | (809,000) | — | — | | (809,000) |
| Adjustment in value of contingency | (138,922) | — | — | | (138,922) |
| Change on fair value of warrant liability | (2,127,656) | — | — | | (2,127,656) |
| Other income | 25,945 | 358,866 | — | | 384,811 |
| Total Other Income (Expense) | (6,437,007) | 672,441 | (4,867,249) | | (10,631,815) |
| Net Income (Loss) Before Income Taxes | (20,869,534) | 20,079,739 | (4,867,249) | | (5,237,044) |
| Income tax expense | (698,303) | — | * | | (698,303) |
| Net Income (Loss) | $ (21,567,837) | $ 20,079,739 | $ (4,867,249) | | $ (6,355,347) |
| | | | | | |
| Income (Loss) Per Common Share – Basic and Diluted | $ (3.95) | | | | $ (0.17) |
| Weighted-Average Number of Common Shares Outstanding – Basic and Diluted | 5,463,603 | | | | 38,251,772 |

_____

\*    The Company determined that there is no tax effect in the acquisition. Taxable income, if any, would be offset by the Company's available net loss carryforwards.

18

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 1 — DESCRIPTION OF THE TRANSACTIONS

On October 20, 2020, we entered into the purchase agreement, which was amended on December 8, 2020 and April 6, 2021, to acquire Appliances Connection. Pursuant to the purchase agreement, ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $222,000,000, subject to adjustment. The purchase price consists of (i) $180,000,000 in cash, (ii) 1,222,239 shares of our common stock and 1,111,094 shares of our series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of our series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the proposed acquisition; provided, that if we have obtained stockholder approval prior to closing, then we will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock. We have obtained such stockholder approval, so all shares will be issued as common stock.

The purchase price is subject to a closing net working capital adjustment provision.  Under this provision, the sellers shall deliver to ACI at least one day prior to the closing of the proposed acquisition a statement setting forth their good faith estimate of the net working capital of Appliances Connection (which excludes accruals for sales tax liabilities). If such estimated net working capital exceeds a target net working capital of ($15,476,941), then within five (5) days ACI shall make a cash payment to the sellers that is equal to such excess. If such target net working capital exceeds such estimated net working capital, then either (i) if finally determined at the closing, the cash portion of the purchase price shall be decreased by such excess or (ii) within 5 days of the closing, the sellers shall make a cash payment to ACI that is equal to such excess.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the proposed acquisition, ACI shall deliver to the sellers a statement setting forth its calculation of the net working capital. If such net working capital exceeds the estimated net working capital referred to above, then within five (5) days after the final determination of such net working capital ACI shall send payment by wire transfer of immediately available funds to the sellers in an amount equal to such excess. If the estimated net working capital exceeds such net working capital, then within five (5) days the sellers shall pay to ACI in cash an amount equal to such excess.

The cash portion of the purchase price will also be (i) decreased by (A) the amount of any outstanding unpaid indebtedness of Appliances Connection (other than trade debt) existing as of the closing date and (B) any transaction expenses, and (ii) increased by the amount of cash or cash equivalents held by, or on the books of, Appliances Connection as of the closing date, if any, that is in excess of $850,000.

Upon execution of the purchase agreement, ACI paid a deposit in the amount of $100,000, and upon execution of the first amendment to the purchase agreement, ACI paid an additional deposit in the amount of $75,000, all of which will be credited towards the cash portion of the purchase price at closing.

We intend to pay the cash portion of the purchase price for the proposed acquisition with (i) the proceeds from this offering and (ii) the proceeds of a term loan from a commercial bank. We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million.

19

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 2 — BASIS OF PRO FORMA PRESENTATION

The unaudited pro forma combined balance sheet as of December 31, 2020 combines the historical consolidated balance sheet of Goedeker with the historical combined balance sheet of Appliances Connection and was prepared as if the proposed acquisition had occurred on December 31, 2020.

The unaudited pro forma combined statement of operations for the year ended December 31, 2020 combines the historical consolidated statement of operations of Goedeker with the historical combined statement of operations of Appliances Connection and was prepared as if the proposed acquisition had occurred on January 1, 2020.

The historical financial information is adjusted in the unaudited pro forma combined financial information to give effect to pro forma events that are (1) directly attributable to the proposed acquisition, (2) factually supportable, and (3) with respect to the combined statement of operations, expected to have a continuing impact on the combined results.

We accounted for the proposed acquisition in the unaudited pro forma combined financial information using the acquisition method of accounting in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 805 "Business Combinations", or ASC 805. In accordance with ASC 805, we used our best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date. Goodwill of Appliances Connection is measured as the excess of the purchase consideration over the fair value of the net tangible assets and identifiable assets acquired. The preliminary fair value of the net assets to be acquired is $1,592,913. The excess of the aggregate estimated fair value of the net tangible assets, $242,250,589, has been allocated to provisional goodwill.

The pro forma adjustments described below were developed based on management's assumptions and estimates, including assumptions relating to the consideration paid and the allocation thereof to the assets acquired and liabilities assumed from Appliances Connection based on preliminary estimates to fair value. The final purchase consideration and allocation of the purchase consideration will differ from that reflected in the unaudited pro forma combined financial information after the final valuation procedures are performed and the amounts are finalized.

The unaudited pro forma combined financial information is provided for illustrative purposes only and does not purport to represent what the actual consolidated results of operations or the consolidated financial position of the combined company would have been had the acquisition occurred on the dates assumed, nor are the necessarily indicative of future consolidated results of operations or financial position.

We expect to incur costs and realize benefits associated with integrating the operations of Goedeker and Appliances Connection. The unaudited pro forma combined financial statements do not reflect the costs of any integration activities or any benefits that may result from operating efficiencies or revenue synergies. The unaudited pro forma combined statement of operations does not reflect any non-recurring charges directly related to the proposed acquisition that the combined company may incur upon completion of the proposed acquisition.

20

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 3 — PURCHASE PRICE ALLOCATION

The table below represents the estimated preliminary purchase price allocation to the net assets acquired based on their estimated fair values, as well as the associated estimated useful lives of the acquired intangible assets. Such amounts were estimated using the most recent balance sheet of Appliances Connection as of December 31, 2020. Upon closing of the proposed acquisition, final valuations will be performed, whereby increases or decreases in the fair value of relevant balance sheet accounts will result in adjustments, which may result in material differences from the information presented herein.

| | | |
|---|---|---:|
| **Provisional purchase consideration at preliminary fair value:** | | |
| Cash consideration | $ | 180,000,000 |
| Share issuance | | 36,976,685 |
| Working capital adjustment paid to sellers | | 26,866,817 |
| Amount of consideration (excluding potential gross-up): | $ | 243,843,502 |
| | | |
| **Assets acquired and liabilities assumed at preliminary fair value** | | |
| Cash | $ | 2,062,751 |
| Accounts receivable | | 19,392,582 |
| Inventories | | 12,004,038 |
| Other assets | | 361,967 |
| Property and equipment | | 1,997,822 |
| Operating lease right-of-use asset | | 4,646,508 |
| Accounts payable and accrued expenses | | (21,179,975) |
| Customer deposits | | (8,853,214) |
| Current portion of notes payable | | (466,235) |
| Long term portion of notes payable | | (3,505,620) |
| Current portion of operating and finance lease liabilities | | (1,540,966) |
| Operating and finance lease liabilities, net of current portions | | (3,326,745) |
| Net tangible assets acquired | $ | 1,592,913 |
| | | |
| Total net assets acquired | $ | 1,592,913 |
| Consideration paid | | 243,843,502 |
| Preliminary goodwill | $ | 242,250,589 |
| **Estimated working capital adjustment:** | | |
| Working capital on preliminary statement | $ | (11,389,876) |
| Target working capital | | (15,476,941) |
| Net estimated working capital adjustment | $ | (26,866,817) |

21

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 4 — PRO FORMA ADJUSTMENTS

The pro forma adjustments included in the unaudited pro forma condensed combined financial statements are as follows:

| | | | |
|---|---|---|---:|
| (a) | Net proceeds from common stock offering as follows: | | |
| | Sale of 27,777,778 shares of $.0001 par value common stock at $7.38, the April 28, 2021 closing price | $ | 205,000,000 |
| | Underwriting discount | | (14,350,000) |
| | Estimated cash expenses | | (500,000) |
| | Net proceeds | $ | 190,150,000 |
| (b) | Disbursed to sellers in cash | $ | 180,000,000 |
| (c) | Proceeds of acquisition note payable (term loan), net of a $1,450,000 discount and $2,100,000 placement agent fee | $ | 56,450,000 |
| (d) | Pay sellers' for cash, net of (i) $100,000 deposit paid at signing of purchase agreement, (ii) long-term debt of $3,505,620, and (iii) cash threshold of $850,000 | $ | 12,680,161 |
| (e) | Estimated working capital adjustment paid to sellers | $ | 26,866,817 |
| (f) | Payoff of debt in accordance with terms of acquisition note payable | $ | 3,185,369 |
| (g) | Appliances Connection vendor deposits not acquired in transaction | $ | 31,733,415 |
| (h) | Preliminary goodwill as the difference between consideration paid and net assets acquired | $ | 242,250,589 |
| (i) | Members' equity eliminated in consolidation | $ | 46,103,489 |
| (j) | Shares issued to sellers | | |
| | 2,333,333 at fixed price of $9.00 per share | $ | 17,219,764 |
| | 2,677,058 at the weighted average price of $7.84 for the 20 trading days ended April 28, 2021 | $ | 19,756,420 |
| (k) | Eliminate interest income earned on vendor deposits that do not transfer to the combined company | $ | 977,249 |
| (l) | Interest expense and amortization of loan discount on acquisition note payable | $ | 4,010,000 |
| (m) | Estimated reduction in interest expense on loans paid off in accordance with terms of acquisition note payable | $ | 120,000 |

Table of Contents

## RISK FACTORS

*An investment in our common stock involves a high degree of risk. You should carefully consider the following risk factors, together with the other information contained in this prospectus, before purchasing our common stock. We have listed below (not necessarily in order of importance or probability of occurrence) what we believe to be the most significant risk factors applicable to the proposed acquisition and the combined company, but they do not constitute all of the risks that may be applicable. Any of the following factors could harm our business, financial condition, results of operations or prospects, and could result in a partial or complete loss of your investment. Some statements in this prospectus, including statements in the following risk factors, constitute forward-looking statements. Please refer to the section titled "Cautionary Statement Regarding Forward-Looking Statements." For purposes of this "Risk Factors" section, references to "we," "us," "our" or "our company" are to the combined company resulting from the proposed acquisition unless the context requires otherwise.*

### Risks Related to the Proposed Acquisition

***The proposed acquisition is subject to a number of conditions, and may not close at all, in which case an investment in our common stock in this offering will represent an investment in Goedeker's historical business only.***

The purchase agreement contains a number of conditions that must be fulfilled to complete the proposed acquisition, including, without limitation: the receipt of all authorizations, consents, permits, licenses or approvals of all governmental authorities or other third parties; the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended; the absence of any temporary, preliminary or permanent restraining order preventing the consummation of the proposed acquisition; the release of any security interests related to Appliances Connection; the execution of new leases for certain properties; the execution of certain employment agreements between certain officers of Appliances Connection and ACI; the receipt of an opinion of the sellers' counsel; and the receipt of documents required for the transfer of the securities of Appliances Connection to ACI. In addition, ACI shall have obtained on terms and conditions reasonably satisfactory to it all of the financing necessary to pay the cash portion of the purchase price and pay related fees and expenses to consummate the proposed acquisition and provide reasonably adequate working capital for the combined company after the closing, which includes the term loan in the expected principal amount of $60 million to pay a portion of the cash portion of the purchase price for the proposed acquisition.

The required satisfaction of the foregoing conditions could delay the completion of the proposed acquisition for a significant period of time or prevent it from occurring. Any delay in completing the proposed acquisition could cause our company not to realize some or all of the benefits that the parties expect our company to achieve. Further, there can be no assurance that the conditions to the closing of the proposed acquisition will be satisfied or waived or that the proposed acquisition will be completed. The completion of this offering is not contingent upon the completion of the proposed acquisition. We can provide no assurance that the proposed acquisition will be consummated in a timely manner, or at all. If the proposed acquisition is not completed, then we intend to use all of the net proceeds for general corporate purposes, which could include other acquisitions. In that event, your investment in our common stock will represent an investment in Goedeker's historical business only.

***If the benefits of the proposed acquisition do not meet the expectations of investors, stockholders or financial analysts, the market price of our common stock may decline.***

If the benefits of the proposed acquisition do not meet the expectations of investors or securities analysts, the market price of our common stock prior to the closing of the proposed acquisition may decline. The market values of our common stock at the time of the proposed acquisition may vary significantly from their prices on the date the acquisition target was identified.

In addition, broad market and industry factors may materially harm the market price of our common stock irrespective of our operating performance. The stock market in general has experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A loss of investor confidence in the market for retail stocks or the stocks of other companies which investors perceive to be similar to us could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price of our securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

23

Table of Contents

***Failure or delay to complete the proposed acquisition could negatively impact our business, financial condition, results of operations or stock price.***

Completion of the proposed acquisition is conditioned upon the satisfaction of certain closing conditions, including those discussed above, and other closing conditions customary for a transaction of this size and type. The required conditions to closing may not be satisfied in a timely manner, if at all. If the proposed acquisition is not consummated for these or any other reasons, we may be subject to a number of adverse effects, including:

- the price of our common stock may decline to the extent that the current market price reflects a market assumption that the proposed acquisition will be completed;

- our operations may continue to incur loss; and

- costs related to the proposed acquisition, such as legal, accounting, financial advisory and printing fees, must be paid even if the proposed acquisition is not completed.

Furthermore, if the proposed acquisition is not completed, there can be no assurance that we will be able to find another target business on terms as favorable as those of the proposed acquisition.

***The integration of Appliances Connection with Goedeker may not be as successful as anticipated.***

The proposed acquisition of Appliances Connection, a company that is significantly larger than Goedeker, involves numerous operational, strategic, financial, accounting, legal, tax and other risks; potential liabilities associated with the acquired business; and uncertainties related to design, operation and integration of Appliances Connection's internal control over financial reporting. Difficulties in integrating Appliances Connection with Goedeker may result in the combined company performing differently than expected, in operational challenges or in the failure to realize anticipated expense-related efficiencies. Goedeker's and Appliances Connection's existing businesses could also be negatively impacted by the proposed acquisition. Potential difficulties that may be encountered in the integration process include, among other factors:

- the inability to successfully integrate the business of Appliances Connection with Goedeker in a manner that permits the combined company to achieve the full revenue and cost savings anticipated from the proposed acquisition;

- complexities associated with managing the larger, more complex, integrated business;

- not realizing anticipated operating synergies or incurring unexpected costs to realize such synergies;

- integrating personnel from the two companies while maintaining focus on providing consistent, high-quality products and services;

- potential unknown liabilities and unforeseen expenses, delays or regulatory conditions associated with the proposed acquisition;

- loss of key employees and need to hire new employees to accommodate the larger business and expected growth of the combined company;

- integrating relationships with customers, vendors and business partners;

- performance shortfalls at one or both of the companies as a result of the diversion of management's attention caused by completing the proposed acquisition and integrating Appliances Connection's operations with Goedeker; and

- the disruption of, or the loss of momentum in each, company's ongoing business or inconsistencies in standards, controls, procedures and policies.

***We have incurred and expect to continue to incur substantial transaction-related costs in connection with the proposed acquisition.***

We have incurred, and expect to continue to incur, a number of non-recurring transaction-related costs associated with completing the proposed acquisition. These fees and costs have been, and will continue to be, substantial. Non-recurring transaction costs include, but are not limited to, fees paid to legal, financial and accounting advisors, filing fees and printing costs. Additional unanticipated costs may be incurred, which may be higher than expected and could have a material adverse effect on the combined company financial condition and operating results.

24

Table of Contents

***Our future results following proposed acquisition may differ materially from the unaudited pro forma financial information included in this prospectus.***

The unaudited pro forma financial information contained in this prospectus is presented for purposes of presenting our historical consolidated financial statements with the historical combined financial statements of Appliances Connection, as adjusted to give effect to the proposed acquisition, and is not necessarily indicative of the financial condition or results of operations of the business following the proposed acquisition. The assumptions used in preparing the pro forma financial information may not prove to be accurate, and other factors may affect our financial condition and results of operations following the proposed acquisition. Any change in our financial condition or results of operations may cause significant variations in the price of our common stock.

***As a result of the proposed acquisition, our company may have undisclosed liabilities and any such liabilities could harm our revenues, business, prospects, financial condition and results of operations.***

The due diligence process that we conducted on Appliances Connection may not reveal all material liabilities of Appliances Connection currently existing or which may be asserted in the future against our company relating to its activities before the consummation of the proposed acquisition transaction. There can be no assurance that our company will not have any liabilities in connection with the closing of the proposed acquisition that we are unaware of or that we will be successful in enforcing any indemnification provisions or that such indemnification provisions will be adequate to reimburse us. Any such liabilities of Appliances Connection that survive the proposed acquisition could harm our revenues, business, prospects, financial condition and results of operations.

**Risks Related to the Business and Industry of the Combined Company**

***The COVID-19 pandemic may cause a material adverse effect on our business.***

The COVID-19 pandemic continues to rapidly evolve. At this time, there continues to be significant volatility and uncertainty relating to the full extent to which the COVID-19 pandemic and the various responses to it will impact our business, operations and financial results.

Most states and cities have at various times instituted quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, Goedeker's showroom was closed from April through June of 2020, but its call center and warehouse continued to operate. Appliances Connection's retail facilities and warehouse were deemed essential businesses that were not subject to restrictions in New York and New Jersey, so they remained open and continued to operate. Since over 95% of Goedeker's sales are completed online and its call center and warehouse and distribution operations continued to operate, and Appliances Connection continued to operate, the restrictions put in place have not had a materially negative impact on our operations. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facilities or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

In addition, we are dependent upon suppliers to provide us with all of the products that we sell. We source, and sell products from domestic and international vendors, and their ability to reliably and efficiently fulfill our orders is critical to our business success. The COVID-19 pandemic has impacted and may continue to impact suppliers and manufacturers of certain of our products. As a result, we have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect our business and financial results. For example, late in the second quarter of 2020 and through the remainder of 2020, Goedeker experienced delays in getting products from manufacturers whose production facilities were closed or operating at reduced capacity because of the COVID-19 pandemic, which resulted in some cancellations of customer orders. We estimate that cancellations caused by shipping delays approximated $39.7 million in the year ended December 31, 2020, based on the historical ratio of shipped sales to customer orders of approximately 79% to the actual ratio of approximately 45% in the year ended December 31, 2020. Even if we are able to find alternate sources for such products, they may cost more, which could adversely impact our profitability and financial condition.

Table of Contents

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact our business and demand for our products. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on our revenue.

The spread of COVID-19 has also adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce our ability to access capital in the future, which could negatively affect our liquidity.

If the COVID-19 pandemic does not continue to slow and the spread of COVID-19 is not contained, our business operations, including those of our suppliers, could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require us to make further adjustments to our operations in order to comply with any such restrictions. We may also experience limitations in employee resources. In addition, our operations could be disrupted if any of our employees were suspected of having COVID-19, which could require quarantine of some or all such employees or closure of our facilities for disinfection. We may also delay or reduce certain capital spending and related projects until the travel and logistical impacts of the pandemic are lifted, which will delay the completion of such projects. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect our ability to operate our business and result in additional costs.

The extent to which the COVID-19 pandemic may impact our results will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including the effectiveness of vaccines and other treatments for COVID-19, and other new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to our performance, financial condition, results of operations and cash flows.

To the extent the COVID-19 pandemic adversely affects our business and financial results, it may also have the effect of heightening many of the other risks described in this "Risk Factors" section.

***If we fail to acquire new customers or retain existing customers, or fail to do so in a cost-effective manner, our net revenue may decrease, and our business, financial condition and operating results may be materially adversely affected.***

Our success depends on our ability to acquire and retain customers in a cost-effective manner. In order to expand our customer base, we must appeal to and acquire customers who have historically used other means of commerce to purchase home goods and may prefer alternatives to our offerings, such as the websites of our competitors or our suppliers' own websites. We have made significant investments related to customer acquisition and expect to continue to spend significant amounts to acquire additional customers. Goedeker's advertising efforts consist primarily of email marketing, affiliate marketing, and to a lesser extent, social media. Appliances Connection's advertising efforts including online advertisements and promotions, digital marketing, and to a lesser degree, more traditional forms of marketing like television and radio advertisements in the New York City media market. These efforts are expensive and may not result in the cost-effective acquisition of customers. We cannot assure you that the net profit from new customers we acquire will ultimately exceed the cost of acquiring those customers. If we fail to deliver a quality shopping experience, or if consumers do not perceive the products we offer to be of high value and quality, we may not be able to acquire new customers. If we are unable to acquire new customers who purchase products in numbers sufficient to grow our business, we may not be able to generate the scale necessary to drive beneficial network effects with our suppliers or efficiencies in our logistics network, our net revenue may decrease, and our business, financial condition and operating results may be materially adversely affected.

We believe that many of our new customers originate from word-of-mouth and other non-paid referrals from existing customers. Therefore, we must ensure that our existing customers remain loyal to us in order to continue receiving those referrals. If our efforts to satisfy our existing customers are not successful, we may not be able to acquire new customers in sufficient numbers to continue to grow our business, or we may be required to incur significantly higher marketing expenses in order to acquire new customers.

26

Table of Contents

***Our success depends in part on our ability to increase our net revenue per active customer. If our efforts to increase customer loyalty and repeat purchasing as well as maintain high levels of customer engagement are not successful, our growth prospects and revenue will be materially adversely affected.***

Our ability to grow our business depends on our ability to retain our existing customer base and generate increased revenue and repeat purchases from this customer base, and maintain high levels of customer engagement. To do this, we must continue to provide our customers and potential customers with a unified, convenient, efficient and differentiated shopping experience by:

- providing imagery, tools and technology that attract customers who historically would have bought elsewhere;

- maintaining a high-quality and diverse portfolio of products;

- delivering products on time and without damage; and

- maintaining and further developing our online platforms.

If we fail to increase net revenue per active customer, generate repeat purchases or maintain high levels of customer engagement, our growth prospects, operating results and financial condition could be materially adversely affected.

***Our business depends on our ability to build and maintain strong brands. We may not be able to maintain and enhance our brands if we receive unfavorable customer complaints, negative publicity or otherwise fail to live up to consumers' expectations, which could materially adversely affect our business, results of operations and growth prospects.***

Maintaining and enhancing our brands is critical to expanding our base of customers and suppliers. Our ability to maintain and enhance our brand depends largely on our ability to maintain customer confidence in our product and service offerings, including by delivering products on time and without damage. If customers do not have a satisfactory shopping experience, they may seek out alternative offerings from our competitors and may not return to our sites as often in the future, or at all. In addition, unfavorable publicity regarding, for example, our practices relating to privacy and data protection, product quality, delivery problems, competitive pressures, litigation or regulatory activity, could seriously harm our reputation. Such negative publicity also could have an adverse effect on the size, engagement, and loyalty of our customer base and result in decreased revenue, which could adversely affect our business and financial results. A significant portion of our customers' brand experience also depends on third parties outside of our control, including suppliers and logistics providers such as R+L Carriers, AM Home Delivery and other third-party delivery agents. If these third parties do not meet our or our customers' expectations, our brands may suffer irreparable damage.

In addition, maintaining and enhancing these brands may require us to make substantial investments, and these investments may not be successful. If we fail to promote and maintain our brands, or if we incur excessive expenses in this effort, our business, operating results and financial condition may be materially adversely affected. We anticipate that, as our market becomes increasingly competitive, maintaining and enhancing our brands may become increasingly difficult and expensive. Maintaining and enhancing our brands will depend largely on our ability to provide high quality products to our customers and a reliable, trustworthy and profitable sales channel to our suppliers, which we may not be able to do successfully.

Customer complaints or negative publicity about our sites, products, delivery times, customer data handling and security practices or customer support, especially on blogs, social media websites and our sites, could rapidly and severely diminish consumer use of our sites and consumer and supplier confidence in us and result in harm to our brands.

***Our efforts to expand our business into new brands, products, services, technologies, and geographic regions will subject us to additional business, legal, financial, and competitive risks and may not be successful.***

Our business success depends to some extent on our ability to expand our customer offerings by launching new brands and services and by expanding our existing offerings into new geographies. Launching new brands and services or expanding geographically requires significant upfront investments, including investments in marketing, information technology, and additional personnel. We may not be able to generate satisfactory revenue from these efforts to offset these costs. Any lack of market acceptance of our efforts to launch new brands and services or to expand our existing offerings could have a material adverse effect on our business, prospects, financial condition and results of operations.

27

Table of Contents

Further, as we continue to expand our fulfillment capability or add new businesses with different requirements, our logistics networks become increasingly complex and operating them becomes more challenging. There can be no assurance that we will be able to operate our networks effectively.

We have also entered and may continue to enter into new markets in which we have limited or no experience, which may not be successful or appealing to our customers. These activities may present new and difficult technological and logistical challenges, and resulting service disruptions, failures or other quality issues may cause customer dissatisfaction and harm our reputation and brand. Further, our current and potential competitors in new market segments may have greater brand recognition, financial resources, longer operating histories and larger customer bases than we do in these areas. As a result, we may not be successful enough in these newer areas to recoup our investments in them. If this occurs, our business, financial condition and operating results may be materially adversely affected.

***Risks associated with the suppliers from whom our products are sourced could materially adversely affect our financial performance as well as our reputation and brand.***

We depend on our ability to provide our customers with a wide range of products from qualified suppliers in a timely and efficient manner. Political and economic instability, the financial stability of suppliers, suppliers' ability to meet our standards, labor problems experienced by suppliers, the availability or cost of raw materials, merchandise quality issues, currency exchange rates, trade tariff developments, transport availability and cost, transport security, inflation, the COVID-19 pandemic and other factors relating to our suppliers are beyond our control.

Our agreements with most of our suppliers do not provide for the long-term availability of merchandise or the continuation of particular pricing practices, nor do they usually restrict such suppliers from selling products to other buyers. There can be no assurance that our current suppliers will continue to seek to sell us products on current terms or that we will be able to establish new or otherwise extend current supply relationships to ensure product acquisitions in a timely and efficient manner and on acceptable commercial terms. Our ability to develop and maintain relationships with reputable suppliers and offer high quality merchandise to our customers is critical to our success. If we are unable to develop and maintain relationships with suppliers that would allow us to offer a sufficient amount and variety of quality merchandise on acceptable commercial terms, our ability to satisfy our customers' needs, and therefore our long-term growth prospects, would be materially adversely affected.

Further, we rely on our suppliers' representations of product quality, safety and compliance with applicable laws and standards. If our suppliers or other vendors violate applicable laws, regulations or our supplier code of conduct, or implement practices regarded as unethical, unsafe, or hazardous to the environment, it could damage our reputation and negatively affect our operating results. Further, concerns regarding the safety and quality of products provided by our suppliers could cause our customers to avoid purchasing those products from us, or avoid purchasing products from us altogether, even if the basis for the concern is outside of our control. As such, any issue, or perceived issue, regarding the quality and safety of any items we sell, regardless of the cause, could adversely affect our brand, reputation, operations and financial results.

We also are unable to predict whether any of the countries in which our suppliers' products are currently manufactured or may be manufactured in the future will be subject to new, different, or additional trade restrictions imposed by the United States or foreign governments or the likelihood, type or effect of any such restrictions. Any event causing a disruption or delay of imports from suppliers with international manufacturing operations, including the imposition of additional import restrictions, restrictions on the transfer of funds or increased tariffs or quotas, could increase the cost or reduce the supply of merchandise available to our customers and materially adversely affect our financial performance as well as our reputation and brand. Furthermore, some or all of our suppliers' foreign operations may be adversely affected by political and financial instability, resulting in the disruption of trade from exporting countries, restrictions on the transfer of funds or other trade disruptions.

In addition, our business with foreign suppliers may be affected by changes in the value of the United States dollar relative to other foreign currencies. For example, any movement by any other foreign currency against the United States dollar may result in higher costs to us for those goods. Declines in foreign currencies and currency exchange rates might negatively affect the profitability and business prospects of one or more of our foreign suppliers. This, in turn, might cause such foreign suppliers to demand higher prices for merchandise in their effort to offset any lost profits associated with any currency devaluation, delay merchandise shipments, or discontinue selling to us altogether, any of which could ultimately reduce our sales or increase our costs.

Table of Contents

***Our suppliers have imposed conditions in our business arrangements with them. If we are unable to continue satisfying these conditions, or such suppliers impose additional restrictions with which we cannot comply, it could have a material adverse effect on our business, financial condition and operating results.***

Our suppliers have strict conditions for doing business with them. Several are sizeable such as General Electric, Whirlpool and DMI. If we cannot satisfy these conditions or if they impose additional or more restrictive conditions that we cannot satisfy, our business would be materially adversely affected. It would be materially detrimental to our business if these suppliers decided to no longer do business with us, increased the pricing at which they allow us to purchase their goods or impose other restrictions or conditions that make it more difficult for us to work with them. Any of these events could have a material adverse effect on our business, financial condition and operating results.

***Our dependence on one supplier for a substantial portion of our purchases makes us vulnerable to a disruption in the supply of its products.***

Goedeker relies on Whirlpool for a substantial portion of product purchases. For the years ended December 31, 2020 and 2019, approximately 38.0% and 44.1%, respectively, of its total purchases were from Whirlpool. As a result, any of the following could have a material adverse effect on our business, financial condition and results of operations:

- termination of the supply agreement;

- an adverse change in the financial condition of Whirlpool; or

- an adverse change in the Whirlpool's ability to manufacture and/or deliver desired products on a timely basis.

Our agreement with Whirlpool is terminable at will by either party upon short notice, so does not provide for the long-term availability of products, nor does it provide for the continuation of particular pricing practices. There can be no assurance that Whirlpool will continue to sell us products or that we will be able to establish new supply relationships to ensure similar product acquisitions in a timely and efficient manner and on acceptable commercial terms.

Successful performance of these supply agreement is critical to our success. If the supply relationship is affected adversely, we may be unable to replace quickly or effectively the products sold to us by Whirlpool. Significant disruptions could have a dramatic effect on our performance.

***We may be unable to source new suppliers or strengthen our relationships with current suppliers.***

Goedeker and Appliances Connection have relationships with over 240 and nearly 2,000 suppliers, respectively. Our agreements with suppliers are generally terminable at will by either party upon short notice. If we do not maintain our existing relationships or build new relationships with suppliers on acceptable commercial terms, we may not be able to maintain a broad selection of merchandise, and our business and prospects would suffer severely.

In order to attract quality suppliers, we must:

- demonstrate our ability to help our suppliers increase their sales;

- offer suppliers a high quality, cost-effective fulfillment process; and

- continue to provide suppliers with a dynamic and real-time view of our demand and inventory needs.

If we are unable to provide our suppliers with a compelling return on investment and an ability to increase their sales, we may be unable to maintain and/or expand our supplier network, which would negatively impact our business.

***We depend on our suppliers to perform certain services regarding the products that we offer.***

As part of offering our suppliers' products for sale on our sites, suppliers are often responsible for conducting a number of traditional retail operations with respect to their respective products, including maintaining inventory and preparing merchandise for shipment to our customers. In these instances, we may be unable to ensure that suppliers will perform these services to our or our customers' satisfaction in a manner that provides our customer with a unified brand experience or on commercially reasonable terms. If our customers become dissatisfied with the services provided by our suppliers, our business, reputation and brands could suffer.

29

Table of Contents

***If we fail to manage our growth effectively, our business, financial condition and operating results could be harmed.***

To manage our growth effectively, we must continue to implement our operational plans and strategies, improve and expand our infrastructure of people and information systems and expand, train and manage our employee base. We have rapidly increased employee headcount since our inception to support the growth in our business. To support continued growth, we must effectively integrate, develop and motivate a large number of new employees. We face significant competition for personnel. Failure to manage our hiring needs effectively or successfully integrate our new hires may have a material adverse effect on our business, financial condition and operating results.

Additionally, the growth of our business places significant demands on our operations, as well as our management and other employees. For example, we typically launch hundreds of promotional events across thousands of products each month on our sites via emails and personalized displays. These events require us to produce updates of our sites and emails to our customers on a daily basis with different products, photos and text. Any surge in online traffic and orders associated with such promotional activities places increased strain on our operations, including our logistics network, and may cause or exacerbate slowdowns or interruptions. The growth of our business may require significant additional resources to meet these daily requirements, which may not scale in a cost-effective manner or may negatively affect the quality of our sites and customer experience. We are also required to manage relationships with a growing number of suppliers, customers and other third parties. Our information technology systems and our internal controls and procedures may not be adequate to support future growth of our supplier and employee base. If we are unable to manage the growth of our organization effectively, our business, financial condition and operating results may be materially adversely affected.

***Our ability to obtain continued financing is critical to the growth of our business. We will need additional financing to fund operations, which additional financing may not be available on reasonable terms or at all.***

Our future growth, including the potential for future market expansion will require additional capital. We will consider raising additional funds through various financing sources, including the procurement of additional commercial debt financing. For example, completion of the proposed acquisition depends on us securing a term loan to pay a portion of the cash portion of the purchase price to acquire Appliances Connection. However, there can be no assurance that such funds will be available on commercially reasonable terms, if at all. If such financing is not available on satisfactory terms, we may be unable to execute our growth strategy, and operating results may be adversely affected. Any additional debt financing will increase expenses and must be repaid regardless of operating results and may involve restrictions limiting our operating flexibility.

Our ability to obtain financing may be impaired by such factors as the capital markets, both generally and specifically in our industry, which could impact the availability or cost of future financings. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, are not sufficient to satisfy our capital needs, we may be required to decrease the pace of, or eliminate, our future product offerings and market expansion opportunities and potentially curtail operations.

***Our third-party loans contain certain terms that could materially adversely affect our financial condition.***

We are party to third party loans that are secured by our assets. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" and "— Recent Developments" for a description of these loans. The loan documents contain customary representations, warranties and affirmative and negative covenants. If an event of default were to occur under these loans, the lenders thereto may pursue all remedies available to them, including declaring the obligations under the loans immediately due and payable, which could materially adversely affect our financial condition.

***Our business is highly competitive. Competition presents an ongoing threat to the success of our business.***

Our business is rapidly evolving and intensely competitive, and we have many competitors in different industries. Our competition includes furniture stores, big box retailers, department stores, specialty retailers, and online retailers and marketplaces in the United States, including:

- *Furniture Stores:* Ashley Furniture, Bob's Discount Furniture, Havertys, Raymour & Flanagan and Rooms To Go

- *Big Box Retailers:* Bed Bath & Beyond, Home Depot, IKEA, Lowe's, Target, Best Buy and Walmart

Table of Contents

- *Department Stores:*   JCPenney and Macy's

- *Specialty Retailers:*   Crate and Barrel, Ethan Allen, TJX, At Home, Williams Sonoma, Restoration Hardware, Arhaus, Horchow, Room & Board and Mitchell Gold + Bob Williams

- *Online Retailers and Marketplaces:*   Amazon, Wayfair, Houzz and eBay

- *Other:*   AJ Madison and US Appliance

We expect competition in e-commerce generally to continue to increase. We believe that our ability to compete successfully depends upon many factors both within and beyond our control, including:

- the size and composition of our customer base;

- the number of suppliers and products we feature on our sites;

- our selling and marketing efforts;

- the quality, price and reliability of products we offer;

- the convenience of the shopping experience that we provide;

- our ability to distribute our products and manage our operations; and

- our reputation and brand strength.

Many of our current competitors have, and potential competitors may have, longer operating histories, greater brand recognition, larger fulfillment infrastructures, greater technical capabilities, faster and less costly shipping, significantly greater financial, marketing and other resources and larger customer bases than we do. These factors may allow our competitors to derive greater net revenue and profits from their existing customer base, acquire customers at lower costs or respond more quickly than we can to new or emerging technologies and changes in consumer habits. These competitors may engage in more extensive research and development efforts, undertake more far-reaching marketing campaigns and adopt more aggressive pricing policies, which may allow them to build larger customer bases or generate net revenue from their customer bases more effectively than we do.

***Our success depends, in substantial part, on our continued ability to market our products through search engines and social media platforms.***

The marketing of our products depends on our ability to cultivate and maintain cost-effective and otherwise satisfactory relationships with search engines and social media platforms, including those operated by Google, Facebook, Bing and Yahoo! These platforms could decide to change their terms and conditions of use at any time (and without notice) and/or significantly increase their fees. No assurances can be provided that we will be able to maintain cost-effective and otherwise satisfactory relationships with these platforms and our inability to do so in the case of one or more of these platforms could have a material adverse effect on our business, financial condition and results of operations.

We obtain a significant number of visits via search engines such as Google, Bing and Yahoo! Search engines frequently change the algorithms that determine the ranking and display of results of a user's search and may make other changes to the way results are displayed, which can negatively affect the placement of links and, therefore, reduce the number of visits to our website. The growing use of online ad-blocking software may also impact the success of our marketing efforts because we may reach a smaller audience and fail to bring more customers to our website, which could have a material adverse effect on our business, financial condition and results of operations.

***System interruptions that impair customer access to our sites or other performance failures or incidents involving our logistics network, our technology infrastructure or our critical technology partners could damage our business, reputation and brand and substantially harm our business and results of operations.***

The satisfactory performance, reliability and availability of our sites, transaction processing systems, logistics network, and technology infrastructure are critical to our reputation and our ability to acquire and retain customers, as well as maintain adequate customer service levels.

31

Table of Contents

For example, if one of our data centers fails or suffers an interruption or degradation of services, we could lose customer data and miss order fulfillment deadlines, which could harm our business. Our systems and operations, including our ability to fulfill customer orders through our logistics network, are also vulnerable to damage or interruption from inclement weather, fire, flood, power loss, telecommunications failure, terrorist attacks, labor disputes, cyber-attacks, data loss, acts of war, break-ins, earthquake and similar events. In the event of a data center failure, the failover to a back-up could take substantial time, during which time our sites could be completely shut down. Further, our back-up services may not effectively process spikes in demand, may process transactions more slowly and may not support all of our site's functionality.

We use complex proprietary software in our technology infrastructure, which we seek to continually update and improve. We may not always be successful in executing these upgrades and improvements, and the operation of our systems may be subject to failure. In particular, we have in the past and may in the future experience slowdowns or interruptions on some or all of our sites when we are updating them, and new technologies or infrastructures may not be fully integrated with existing systems on a timely basis, or at all. Additionally, if we expand our use of third-party services, including cloud-based services, our technology infrastructure may be subject to increased risk of slowdown or interruption as a result of integration with such services and/or failures by such third parties, which are out of our control. Our net revenue depends on the number of visitors who shop on our sites and the volume of orders we can handle. Unavailability of our sites or reduced order fulfillment performance would reduce the volume of goods sold and could also materially adversely affect consumer perception of our brand.

We may experience periodic system interruptions from time to time. In addition, continued growth in our transaction volume, as well as surges in online traffic and orders associated with promotional activities or seasonal trends in our business, place additional demands on our technology platform and could cause or exacerbate slowdowns or interruptions. If there is a substantial increase in the volume of traffic on our sites or the number of orders placed by customers, we may be required to further expand and upgrade our technology, logistics network, transaction processing systems and network infrastructure. There can be no assurance that we will be able to accurately project the rate or timing of increases, if any, in the use of our sites or expand and upgrade our systems and infrastructure to accommodate such increases on a timely basis. In order to remain competitive, we must continue to enhance and improve the responsiveness, functionality and features of our sites, which is particularly challenging given the rapid rate at which new technologies, customer preferences and expectations and industry standards and practices are evolving in the e-commerce industry. Accordingly, we redesign and enhance various functions on our sites on a regular basis, and we may experience instability and performance issues as a result of these changes.

Any slowdown, interruption or performance failure of our sites and the underlying technology and logistics infrastructure could harm our business, reputation and our ability to acquire, retain and serve our customers, which could materially adversely affect our results of operations.

***Our failure or the failure of third-party service providers to protect our sites, networks and systems against security breaches, or otherwise to protect our confidential information, could damage our reputation and brand and substantially harm our business and operating results.***

We collect, maintain, transmit and store data about our customers, employees, contractors, suppliers, vendors and others, including credit card information and personally identifiable information, as well as other confidential and proprietary information. We also employ third-party service providers that store, process and transmit certain proprietary, personal and confidential information on our behalf. We rely on encryption and authentication technology licensed from third parties in an effort to securely transmit, encrypt, anonymize or pseudonymize certain confidential and sensitive information, including credit card numbers. Advances in computer capabilities, new technological discoveries or other developments may result in the whole or partial failure of this technology to protect transaction and personal data or other confidential and sensitive information from being breached or compromised. Our security measures, and those of our third-party service providers, may not detect or prevent all attempts to hack our systems, denial-of-service attacks, viruses, malicious software, break-ins, phishing attacks, social engineering, security breaches or other attacks and similar disruptions that may jeopardize the security of information stored in or transmitted by our sites, networks and systems or that we or our third-party service providers otherwise maintain, including payment card systems and human resources management platforms. We and our service providers may not anticipate or prevent all types of attacks until after they have already been launched, and techniques used to obtain unauthorized access to or sabotage systems change frequently and may not be known until launched against

32

Table of Contents

us or our third-party service providers. In addition, security breaches can also occur as a result of non-technical issues, including intentional or inadvertent breaches by our employees or by persons with whom we have commercial relationships.

Breaches of our security measures or those of our third-party service providers or cyber security incidents could result in unauthorized access to our sites, networks and systems; unauthorized access to and misappropriation of personal information, including consumers' and employees' personally identifiable information, or other confidential or proprietary information of ourselves or third parties; limited or terminated access to certain payment methods or fines or higher transaction fees to use such methods; viruses, worms, spyware or other malware being served from our sites, networks or systems; deletion or modification of content or the display of unauthorized content on our sites; interruption, disruption or malfunction of operations; costs relating to breach remediation, deployment or training of additional personnel and protection technologies, responses to governmental investigations and media inquiries and coverage; engagement of third party experts and consultants; litigation, regulatory action and other potential liabilities. If any of these breaches of security occur, our reputation and brand could be damaged, our business may suffer, we could be required to expend significant capital and other resources to alleviate problems caused by such breaches and we could be exposed to a risk of loss, litigation or regulatory action and possible liability. In addition, any party who is able to illicitly obtain a customer's password could access that customer's transaction data or personal information. Any compromise or breach of our security measures, or those of our third-party service providers, could violate applicable privacy, data security and other laws, and cause significant legal and financial exposure, adverse publicity and a loss of confidence in our security measures, which could have a material adverse effect on our business, financial condition and operating results. We may need to devote significant resources to protect against security breaches or to address problems caused by breaches, diverting resources from the growth and expansion of our business.

***We may be subject to product liability and other similar claims if people or property are harmed by the products we sell.***

Some of the products we sell may expose us to product liability and other claims and litigation (including class actions) or regulatory action relating to safety, personal injury, death or environmental or property damage. Some of our agreements with members of our supply chain may not indemnify us from product liability for a particular product, and some members of our supply chain may not have sufficient resources or insurance to satisfy their indemnity and defense obligations. Although we maintain liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms, or at all.

***We depend on our relationships with third parties, and changes in our relationships with these parties could adversely impact our revenue and profits.***

We rely on third parties to operate certain elements of our business. For example, Goedeker primarily uses R+L Carriers for most of its larger shipping services and AM Home Delivery for furniture deliveries, and both companies use carriers such as FedEx, UPS, DHL and the United States Postal Service to deliver small parcel products. As a result, we may be subject to shipping delays or disruptions caused by inclement weather, natural disasters, system interruptions and technology failures, labor activism, health epidemics or bioterrorism. We are also subject to risks of breakage or other damage during delivery by any of these third parties. We also use and rely on other services from third parties, such as retail partner services, telecommunications services, customs, consolidation and shipping services, as well as warranty, installation and design services.

We may be unable to maintain these relationships, and these services may also be subject to outages and interruptions that are not within our control. For example, failures by our telecommunications providers have in the past and may in the future interrupt our ability to provide phone support to our customers. Third parties may in the future determine they no longer wish to do business with us or may decide to take other actions or make changes to their practices that could harm our business. We may also determine that we no longer want to do business with them. If products are not delivered in a timely fashion or are damaged during the delivery process, or if we are not able to provide adequate customer support or other services or offerings, our customers could become dissatisfied and cease buying products through our sites, which would adversely affect our operating results.

Table of Contents

***Certain trends in our business place increased strain on our operations.***

We experience surges in orders associated with promotional activities. This activity may place additional demands on our technology systems and logistics network and could cause or exacerbate slowdowns or interruptions. Any such system, site or service interruptions could prevent us from efficiently receiving or fulfilling orders, which may reduce the volume or quality of goods or services we sell and may cause customer dissatisfaction and harm our reputation and brand. These activities are primarily during holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

***Our business may be adversely affected if we are unable to provide our customers a cost-effective shopping platform that is able to respond and adapt to rapid changes in technology.***

The number of people who access the Internet through devices other than personal computers, including mobile phones, smartphones, handheld computers such as notebooks and tablets, video game consoles, and television set-top devices, has increased dramatically in the past few years. We continually upgrade existing technologies and business applications to keep pace with these rapidly changing and continuously evolving technologies, and we may be required to implement new technologies or business applications in the future. The implementation of these upgrades and changes requires significant investments and as new devices and platforms are released, it is difficult to predict the problems we may encounter in developing applications for these alternative devices and platforms. Additionally, we may need to devote significant resources to the support and maintenance of such applications once created. Our results of operations may be affected by the timing, effectiveness and costs associated with the successful implementation of any upgrades or changes to our systems and infrastructure to accommodate such alternative devices and platforms. Further, in the event that it is more difficult or less compelling for our customers to buy products from us on their mobile or other devices, or if our customers choose not to buy products from us on such devices or to use mobile or other products that do not offer access to our sites, our customer growth could be harmed and our business, financial condition and operating results may be materially adversely affected.

***Significant merchandise returns could harm our business.***

We allow our customers to return products, subject to our return policy. If merchandise returns are significant, our business, prospects, financial condition and results of operations could be harmed. Further, we modify our policies relating to returns from time to time, which may result in customer dissatisfaction or an increase in the number of product returns. Many of our products are large and require special handling and delivery. From time to time our products are damaged in transit, which can increase return rates and harm our brand.

***Uncertainties in economic conditions and their impact on consumer spending patterns, particularly in the home goods segment, could adversely impact our operating results.***

Consumers may view a substantial portion of the products we offer as discretionary items rather than necessities. As a result, our results of operations are sensitive to changes in macro-economic conditions that impact consumer spending, including discretionary spending. Some of the factors adversely affecting consumer spending include levels of unemployment; consumer debt levels; changes in net worth based on market changes and uncertainty; home foreclosures and changes in home values or the overall housing, residential construction or home improvement markets; fluctuating interest rates; credit availability, including mortgages, home equity loans and consumer credit; government actions; fluctuating fuel and other energy costs; fluctuating commodity prices and general uncertainty regarding the overall future economic environment. Adverse economic changes in any of the regions in which we sell our products could reduce consumer confidence and could negatively affect net revenue and have a material adverse effect on our operating results.

***Our business relies heavily on email and other messaging services, and any restrictions on the sending of emails or messages or an inability to timely deliver such communications could materially adversely affect our net revenue and business.***

Our business is highly dependent upon email and other messaging services for promoting our sites and products. Daily promotions offered through emails and other messages sent by us, or on our behalf by our vendors, generate a significant portion of our net revenue. We provide daily emails to customers and other visitors informing them of what is available for purchase on our sites that day, and we believe these messages are an important part of our customer

34

Table of Contents

experience and help generate a substantial portion of our net revenue. If we are unable to successfully deliver emails or other messages to our subscribers, or if subscribers decline to open our emails or other messages, our net revenue and profitability would be materially adversely affected. Changes in how webmail applications organize and prioritize email may also reduce the number of subscribers opening our emails. For example, in 2013 Google Inc.'s Gmail service began offering a feature that organizes incoming emails into categories (for example, primary, social and promotions). Such categorization or similar inbox organizational features may result in our emails being delivered in a less prominent location in a subscriber's inbox or viewed as "spam" by our subscribers and may reduce the likelihood of that subscriber opening our emails. Actions by third parties to block, impose restrictions on or charge for the delivery of emails or other messages could also adversely impact our business. From time to time, Internet service providers or other third parties may block bulk email transmissions or otherwise experience technical difficulties that result in our inability to successfully deliver emails or other messages to third parties. Changes in the laws or regulations that limit our ability to send such communications or impose additional requirements upon us in connection with sending such communications would also materially adversely impact our business. Our use of email and other messaging services to send communications about our sites or other matters may also result in legal claims against us, which may cause us increased expenses, and if successful might result in fines and orders with costly reporting and compliance obligations or might limit or prohibit our ability to send emails or other messages. We also rely on social networking messaging services to send communications and to encourage customers to send communications. Changes to the terms of these social networking services to limit promotional communications, any restrictions that would limit our ability or our customers' ability to send communications through their services, disruptions or downtime experienced by these social networking services or decline in the use of or engagement with social networking services by customers and potential customers could materially adversely affect our business, financial condition and operating results.

### We are subject to risks related to online payment methods.

We accept payments using a variety of methods, including credit card, debit card, PayPal, credit accounts and gift cards. As we offer new payment options to consumers, we may be subject to additional regulations, compliance requirements and fraud. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower profitability. We are also subject to payment card association operating rules and certification requirements, including the Payment Card Industry Data Security Standard and rules governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply. As our business changes, we may also be subject to different rules under existing standards, which may require new assessments that involve costs above what we currently pay for compliance. If we fail to comply with the rules or requirements of any provider of a payment method we accept, if the volume of fraud in our transactions limits or terminates our rights to use payment methods we currently accept, or if a data breach occurs relating to our payment systems, we may, among other things, be subject to fines or higher transaction fees and may lose, or face restrictions placed upon, our ability to accept credit card and debit card payments from consumers or to facilitate other types of online payments. If any of these events were to occur, our business, financial condition and operating results could be materially adversely affected.

We occasionally receive orders placed with fraudulent credit card data. We may suffer losses as a result of orders placed with fraudulent credit card data even if the associated financial institution approved payment of the orders. Under current credit card practices, we may be liable for fraudulent credit card transactions. If we are unable to detect or control credit card fraud, our liability for these transactions could harm our business, financial condition and results of operations.

### Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and e-commerce. Existing and future regulations and laws could impede the growth of the Internet, e-commerce or mobile commerce. These regulations and laws may involve taxes, tariffs, privacy and data security, anti-spam, content protection, electronic contracts and communications, consumer protection, Internet neutrality and gift cards. It is not clear how existing laws governing issues such as property ownership, sales and other taxes and consumer privacy apply to the Internet as the vast majority of these laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or e-commerce. It is possible that general business regulations and laws, or those specifically governing the

35

Table of Contents

Internet or e-commerce, may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. We cannot be sure that our practices have complied, comply or will comply fully with all such laws and regulations. Any failure, or perceived failure, by us to comply with any of these laws or regulations could result in damage to our reputation, a loss in business and proceedings or actions against us by governmental entities or others. Any such proceeding or action could hurt our reputation, force us to spend significant amounts in defense of these proceedings, distract our management, increase our costs of doing business, decrease the use of our sites by consumers and suppliers and may result in the imposition of monetary liability. We may also be contractually liable to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any such laws or regulations. Adverse legal or regulatory developments could substantially harm our business. Further, if we enter into new market segments or geographical areas and expand the products and services we offer, we may be subject to additional laws and regulatory requirements or prohibited from conducting our business, or certain aspects of it, in certain jurisdictions. We will incur additional costs complying with these additional obligations and any failure or perceived failure to comply would adversely affect our business and reputation.

***Failure to comply with applicable laws and regulations relating to privacy, data protection and consumer protection, or the expansion of current or the enactment of new laws or regulations relating to privacy, data protection and consumer protection, could adversely affect our business and our financial condition.***

A variety of laws and regulations govern the collection, use, retention, sharing, export and security of personal information. Laws and regulations relating to privacy, data protection and consumer protection are evolving and subject to potentially differing interpretations. These requirements may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another or may conflict with other rules or our practices. As a result, our practices may not comply, or may not comply in the future with all such laws, regulations, requirements and obligations. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any applicable privacy or consumer protection- related laws, regulations, industry self-regulatory principles, industry standards or codes of conduct, regulatory guidance, orders to which we may be subject or other legal obligations relating to privacy or consumer protection could adversely affect our reputation, brand and business, and may result in claims, proceedings or actions against us by governmental entities or others or other liabilities or require us to change our operations and/or cease using certain data sets. Any such claim, proceeding or action could hurt our reputation, brand and business, force us to incur significant expenses in defense of such proceedings, distract our management, increase our costs of doing business, result in a loss of customers and suppliers and may result in the imposition of monetary penalties. We may also be contractually required to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any laws, regulations or other legal obligations relating to privacy or consumer protection or any inadvertent or unauthorized use or disclosure of data that we store or handle as part of operating our business.

Federal, state and international governmental authorities continue to evaluate the privacy implications inherent in the use of proprietary or third-party "cookies" and other methods of online tracking for behavioral advertising and other purposes. United States and foreign governments have enacted, have considered or are considering legislation or regulations that could significantly restrict the ability of companies and individuals to engage in these activities, such as by regulating the level of consumer notice and consent required before a company can employ cookies or other electronic tracking tools or the use of data gathered with such tools. Additionally, some providers of consumer devices and web browsers have implemented, or announced plans to implement, means to make it easier for Internet users to prevent the placement of cookies or to block other tracking technologies, which could if widely adopted significantly reduce the effectiveness of such practices and technologies. The regulation of the use of cookies and other current online tracking and advertising practices or a loss in our ability to make effective use of services that employ such technologies could increase our costs of operations and limit our ability to acquire new customers on cost-effective terms and consequently, materially adversely affect our business, financial condition and operating results.

In addition, various federal, state and foreign legislative and regulatory bodies, or self-regulatory organizations, may expand current laws or regulations, enact new laws or regulations or issue revised rules or guidance regarding privacy, data protection and consumer protection. Any such changes may force us to incur substantial costs or require us to change our business practices. This could compromise our ability to pursue our growth strategy effectively and may adversely affect our ability to acquire customers or otherwise harm our business, financial condition and operating results.

36

Table of Contents

***Changes in tax treatment of companies engaged in e-commerce may adversely affect the commercial use of our sites and our financial results.***

Due to the global nature of the Internet, it is possible that various states or foreign countries might attempt to impose additional or new regulation on our business or levy additional or new sales, income or other taxes relating to our activities. Tax authorities at the international, federal, state and local levels are currently reviewing the appropriate treatment of companies engaged in e-commerce. New or revised international, federal, state or local tax regulations or court decisions may subject us or our customers to additional sales, income and other taxes. For example, on June 21, 2018, the United States Supreme Court rendered a 5-4 majority decision in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)* where the Court held, among other things, that a state may require an out-of-state seller with no physical presence in the state to collect and remit sales taxes on goods the seller ships to consumers in the state, overturning existing court precedent. Other new or revised taxes and, in particular, sales taxes, value added tax and similar taxes could increase the cost of doing business online and decrease the attractiveness of selling products over the Internet. New taxes and rulings could also create significant increases in internal costs necessary to capture data and collect and remit taxes. In addition, we may charge sales taxes in jurisdictions where our competitors do not, resulting in our product prices potentially being higher than those of our competitors. As a result, we may lose sales to our competitors in these jurisdictions. Any of these events could have a material adverse effect on our business, financial condition and operating results.

***We rely on the performance of members of management and highly skilled personnel, and if we are unable to attract, develop, motivate and retain well-qualified employees, our business could be harmed.***

We believe our success has depended, and continues to depend, on the members of our senior management team. The loss of any of our senior management or other key employees could materially harm our business. Our future success also depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees, particularly mid-level managers and merchandising and technology personnel. The market for such positions is competitive. Qualified individuals are in high demand, and we may incur significant costs to attract them. Our inability to recruit and develop mid-level managers could materially adversely affect our ability to execute our business plan, and we may not be able to find adequate replacements. All of our officers and other United States employees are at-will employees, meaning that they may terminate their employment relationship with us at any time, and their knowledge of our business and industry would be extremely difficult to replace. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business, financial condition and operating results may be materially adversely affected.

***We may not be able to adequately protect our intellectual property rights.***

We regard our customer lists, domain names, trademarks, trade dress, trade secrets, proprietary technology and similar intellectual property as critical to our success, and we rely on trade secret protection, agreements and other methods with our employees and others to protect our proprietary rights. We might not be able to obtain broad protection for all of our intellectual property. For example, we are the registrant of the Internet domain names for our websites. However, we might not be able to prevent third parties from registering, using or retaining domain names that interfere with our consumer communications or infringe or otherwise decrease the value of our marks, domain names and other proprietary rights.

The protection of our intellectual property rights may require the expenditure of significant financial, managerial and operational resources. We may initiate claims or litigation against others for infringement, misappropriation or violation of our intellectual property rights or proprietary rights or to establish the validity of such rights. Any litigation, whether or not it is resolved in our favor, could result in significant expense to us and divert the efforts of our technical and management personnel, which may materially adversely affect our business, financial condition and operating results. Moreover, the steps we take to protect our intellectual property may not adequately protect our rights or prevent third parties from infringing or misappropriating our proprietary rights, and we may not be able to broadly enforce all of our intellectual property rights. Any of our intellectual property rights may be challenged by others or invalidated through administrative process or litigation. Additionally, the process of obtaining intellectual property protections is expensive and time-consuming, and we may not be able to pursue all necessary or desirable actions at a reasonable cost or in a timely manner. Even if issued, there can be no assurance that these protections will adequately safeguard our intellectual property, as the legal standards relating to the validity, enforceability and scope of protection of patent and other intellectual property rights are uncertain. We also cannot be certain that others will not independently develop or otherwise acquire equivalent or superior technology or intellectual property rights. We may also be exposed

37

Table of Contents

to claims from third parties claiming infringement of their intellectual property rights, or demanding the release or license of open source software or derivative works that we developed using such software (which could include our proprietary code) or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to purchase a costly license, publicly release the affected portions of our source code, be limited in or cease using the implicated software unless and until we can re-engineer such software to avoid infringement or change the use of the implicated open source software.

***We may be accused of infringing intellectual property rights of third parties.***

The e-commerce industry is characterized by vigorous protection and pursuit of intellectual property rights, which has resulted in protracted and expensive litigation for many companies. We may be subject to claims and litigation by third parties that we infringe their intellectual property rights. The costs of supporting such litigation and disputes are considerable, and there can be no assurances that favorable outcomes will be obtained. As our business expands and the number of competitors in our market increases and overlaps occur, we expect that infringement claims may increase in number and significance. Any claims or proceedings against us, whether meritorious or not, could be time-consuming, result in considerable litigation costs, require significant amounts of management time or result in the diversion of significant operational resources, any of which could materially adversely affect our business, financial condition and operating results.

We have received in the past, and we may receive in the future, communications alleging that certain items posted on or sold through our sites violate third-party copyrights, designs, marks and trade names or other intellectual property rights or other proprietary rights. Brand and content owners and other proprietary rights owners have actively asserted their purported rights against online companies. In addition to litigation from rights owners, we may be subject to regulatory, civil or criminal proceedings and penalties if governmental authorities believe we have aided and abetted in the sale of counterfeit or infringing products.

Such claims, whether or not meritorious, may result in the expenditure of significant financial, managerial and operational resources, injunctions against us or the payment of damages by us. We may need to obtain licenses from third parties who allege that we have violated their rights, but such licenses may not be available on terms acceptable to us, or at all. These risks have been amplified by the increase in third parties whose sole or primary business is to assert such claims.

***We are engaged in legal proceedings that could cause us to incur unforeseen expenses and could occupy a significant amount of our management's time and attention.***

From time to time, we are subject to litigation or claims that could negatively affect our business operations and financial position. Litigation disputes could cause us to incur unforeseen expenses, result in site unavailability, service disruptions, and otherwise occupy a significant amount of our management's time and attention, any of which could negatively affect our business operations and financial position. We also from time to time receive inquiries and subpoenas and other types of information requests from government authorities and we may become subject to related claims and other actions related to our business activities. While the ultimate outcome of investigations, inquiries, information requests and related legal proceedings is difficult to predict, such matters can be expensive, time-consuming and distracting, and adverse resolutions or settlements of those matters may result in, among other things, modification of our business practices, reputational harm or costs and significant payments, any of which could negatively affect our business operations and financial position.

***We have identified material weaknesses in our disclosure controls and procedures. If we fail to develop or maintain an effective system of controls, we may not be able to accurately report our financial results and prevent fraud. As a result, current and potential stockholders could lose confidence in our financial statements, which would harm the trading price of our common stock.***

We have adopted and maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports filed under the Exchange Act is collected, recorded, processed, summarized and reported within the time periods specified in the rules of the SEC. Our disclosure controls and procedures are also designed to ensure that such information is accumulated and communicated to management to allow timely decisions regarding required disclosure. As required under Exchange Act Rule 13a-15, our management, including our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of disclosure

38

Table of Contents

controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2020, have concluded that, due to a material weakness identified in our evaluation, our disclosure controls and procedures were ineffective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

Subject to receipt of additional financing, we intend to retain additional individuals and resources to remedy the ineffective controls. We are also undertaking remedial measures, which measures will take time to implement and test, to address these deficiencies. There can be no assurance that such measures will be sufficient to remedy the deficiencies identified or that additional deficiencies will not be identified in the future. If we continue to experience deficiencies or fail to maintain or implement required new or improved controls, such circumstances could cause us to fail to meet our periodic reporting obligations or result in material misstatements in our financial statements, or adversely affect the results of periodic management evaluations. Each of the foregoing results could cause investors to lose confidence in our reported financial information and lead to a decline in our stock price.

***We may not complete our analysis of our internal control over financial reporting in a timely manner, or these internal controls may not be determined to be effective.***

We will be required, pursuant to Section 404 of the Sarbanes-Oxley Act, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting in the second annual report we file with the SEC. This assessment will need to include disclosure of any material weaknesses identified by our management in our internal control over financial reporting. However, our auditors will not be required to formally attest to the effectiveness of our internal control over financial reporting pursuant to Section 404 until we are no longer a non-accelerated filer or no longer an emerging growth company if we take advantage of the exemptions available to us through the JOBS Act.

We are in the very early stages of the costly and challenging process of compiling the system and process documentation necessary to perform the evaluation needed to comply with Section 404. In this regard, we will need to continue to dedicate internal resources, engage outside consultants and adopt a detailed work plan to assess and document the adequacy of internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing that controls are functioning as documented and implement a continuous reporting and improvement process for internal control over financial reporting. As we transition to the requirements of reporting as a public company, we may need to add additional finance staff. We may not be able to remediate any future material weaknesses, or to complete our evaluation, testing and any required remediation in a timely fashion. During the evaluation and testing process, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective. If we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to express an opinion on the effectiveness of our internal controls when they are required to issue such opinion, investors could lose confidence in the accuracy and completeness of our financial reports, which could harm our stock price.

**Risks Related to This Offering and Ownership of Our Common Stock**

***We may not be able to satisfy listing requirements of the NYSE or maintain a listing of our common stock on the NYSE or NYSE American.***

Our common stock is currently traded on NYSE American. In connection with this offering, we intend to apply for the listing of our common stock on the NYSE. There is no guarantee that the NYSE will permit our common stock to be listed and traded. In addition, we must meet certain financial and liquidity criteria to maintain the listing of our common stock on the NYSE (if we are approved) or on NYSE American. If we fail to meet any listing standards or if we violate any listing requirements, our common stock may be delisted. In addition, our board of directors may determine that the cost of maintaining our listing on a national securities exchange outweighs the benefits of such listing. A delisting of our common stock from the NYSE or NYSE American may materially impair our stockholders' ability to buy and sell our common stock and could have an adverse effect on the market price of, and the efficiency of the trading market for, our common stock. The delisting of our common stock could significantly impair our ability to raise capital and the value of your investment.

[Table of Contents](#)

***The market price, trading volume and marketability of our common stock may, from time to time, be significantly affected by numerous factors beyond our control, which may materially adversely affect the market price of your common stock, the marketability of your common stock and our ability to raise capital through future equity financings.***

The market price and trading volume of our common stock may fluctuate significantly. Many factors that are beyond our control may materially adversely affect the market price of your common stock, the marketability of your common stock and our ability to raise capital through equity financings. These factors include the following

- actual or anticipated variations in our periodic operating results;

- increases in market interest rates that lead investors of our common stock to demand a higher investment return;

- changes in earnings estimates;

- changes in market valuations of similar companies;

- actions or announcements by our competitors;

- adverse market reaction to any increased indebtedness we may incur in the future;

- additions or departures of key personnel;

- actions by stockholders;

- speculation in the media, online forums, or investment community; and

- our intentions and ability to list our common stock on the NYSE and our subsequent ability to maintain such listing, or our ability to maintain the listing of our common stock on NYSE American if our common stock is not approved for listing on the NYSE.

***An active, liquid trading market for our common stock may not be sustained, which may cause our common stock to trade at a discount from the public offering price and make it difficult for you to sell the common stock you purchase.***

We cannot predict the extent to which investor interest in us will sustain a trading market or how active and liquid that market may remain. If an active and liquid trading market is not sustained, you may have difficulty selling any of our common stock that you purchase at a price above the price you purchase it or at all. The failure of an active and liquid trading market to continue would likely have a material adverse effect on the value of our common stock. The market price of our common stock may decline below the public offering price, and you may not be able to sell your shares of our common stock at or above the price you paid or at all. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares and may impair our ability to acquire other companies or technologies by using our shares as consideration.

***Certain of our directors could be in a position of conflict of interest.***

Our Chairman, Ellery W. Roberts, is the controlling principal of 1847 Partners LLC, or our manager, which provides certain services to us, including administrative supervision and oversight of our day-to-day business operations, for a quarterly management fee equal to $62,500. He may obtain compensation and other benefits in transactions relating to us that involve our manager. Consequently, there exists the possibility for Mr. Roberts to be in a position of conflict. These conflicts may not be resolved in our favor. Such conflicts of interest could have a material adverse effect on our business and operations. Further, the appearance of conflicts of interest created by related party transactions could impair the confidence of our investors. In the case of transactions with these affiliates, there may be an absence of arms' length negotiations with respect to the terms, conditions and consideration with respect to goods and services provided to or by us.

***Our management has broad discretion as to the use of the net proceeds from this offering allocated to working capital and general corporate purposes.***

Our management will have broad discretion in the application of the net proceeds that are allocated to working capital and general corporate purposes. Accordingly, you will have to rely upon the judgment of our management with respect

Table of Contents

to the use of these proceeds. If we complete the proposed acquisition, we intend to use a portion of the net proceeds of this offering to fund part of the cost of the proposed acquisition, and the remainder, if any, for general corporate purposes, which could include future acquisitions, capital expenditures and working capital. The completion of this offering is not contingent upon the completion of the proposed acquisition. We can provide no assurance that the proposed acquisition will be consummated in a timely manner, or at all. If the proposed acquisition is not completed, then we intend to use all of the net proceeds for general corporate purposes, which could include other acquisitions. Our management may spend a portion or all of the net proceeds from this offering that are allocated to working capital and general corporate purposes in ways that holders of our common stock may not desire or that may not yield a significant return or any return at all. Our management not applying these funds effectively could harm our business. Pending their use, we may also invest the net proceeds from this offering that are allocated to working capital and general corporate purposes in a manner that does not produce income or that loses value. See "Use of Proceeds" for more information.

***You will experience immediate and substantial dilution as a result of this offering.***

As of December 31, 2020, our net tangible book value was approximately $(19,423,395), or approximately $(3.18) per share. Since the effective price per share of our common stock being offered in this offering is substantially higher than the net tangible book value per share of our common stock, you will suffer substantial dilution with respect to the net tangible book value of the common stock you purchase in this offering. Based on the assumed public offering price of $7.38 per share of common stock being sold in this offering, which is the last reported sale price of our common stock on April 28, 2021, and our net tangible book value per share as of December 31, 2020, if you purchase shares of common stock in this offering, you will suffer immediate and substantial dilution of $8.27 per share (or $7.52 per share if the underwriters exercise the over-allotment option in full) with respect to the net tangible book value of the common stock. See "Dilution" for a more detailed discussion of the dilution you will incur if you purchase securities in this offering.

***We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future.***

We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future, as we anticipate that we will invest future earnings in the development and growth of our business. Therefore, holders of our common stock will not receive any return on their investment unless they sell their securities, and holders may be unable to sell their securities on favorable terms or at all.

***If securities industry analysts do not publish research reports on us, or publish unfavorable reports on us, then the market price and market trading volume of our common stock could be negatively affected.***

Any trading market for our common stock may be influenced in part by any research reports that securities industry analysts publish about us. We do not currently have and may never obtain research coverage by securities industry analysts. If no securities industry analysts commence coverage of us, the market price and market trading volume of our common stock could be negatively affected. In the event we are covered by analysts, and one or more of such analysts downgrade our securities, or otherwise reports on us unfavorably, or discontinues coverage of us, the market price and market trading volume of our common stock could be negatively affected.

***Future issuances of our common stock or securities convertible into, or exercisable or exchangeable for, our common stock, or the expiration of lock-up agreements that restrict the issuance of new common stock or the trading of outstanding common stock, could cause the market price of our common stock to decline and would result in the dilution of your holdings.***

Future issuances of our common stock or securities convertible into, or exercisable or exchangeable for, our common stock, or the expiration of lock-up agreements that restrict the issuance of new common stock or the trading of outstanding common stock, could cause the market price of our common stock to decline. We cannot predict the effect, if any, of future issuances of our securities, or the future expirations of lock-up agreements, on the price of our common stock. In all events, future issuances of our common stock would result in the dilution of your holdings. In addition, the perception that new issuances of our securities could occur, or the perception that locked-up parties will sell their securities when the lock-ups expire, could adversely affect the market price of our common stock. In connection with this offering, we will enter into a lock-up agreement that prevents us, subject to certain exceptions, from offering additional shares of capital stock for up to 90 days after the date of this prospectus, as further described

41

Table of Contents

in the section titled "Underwriting." In addition to any adverse effects that may arise upon the expiration of these lock-up agreements, the lock-up provisions in these agreements may be waived, at any time and without notice. If the restrictions under the lock-up agreements are waived, our common stock may become available for resale, subject to applicable law, including without notice, which could reduce the market price for our common stock.

***Future issuances of debt securities, which would rank senior to our common stock upon our bankruptcy or liquidation, and future issuances of preferred stock, which could rank senior to our common stock for the purposes of dividends and liquidating distributions, may adversely affect the level of return you may be able to achieve from an investment in our common stock.***

In the future, we may attempt to increase our capital resources by offering debt securities. Upon bankruptcy or liquidation, holders of our debt securities, and lenders with respect to other borrowings we may make, would receive distributions of our available assets prior to any distributions being made to holders of our common stock. Moreover, if we issue preferred stock, the holders of such preferred stock could be entitled to preferences over holders of common stock in respect of the payment of dividends and the payment of liquidating distributions. Because our decision to issue debt or preferred stock in any future offering, or borrow money from lenders, will depend in part on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of any such future offerings or borrowings. Holders of our common stock must bear the risk that any future offerings we conduct or borrowings we make may adversely affect the level of return, if any, they may be able to achieve from an investment in our common stock.

***If our shares of common stock become subject to the penny stock rules, it would become more difficult to trade our shares.***

The SEC has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. Penny stocks are generally equity securities with a price of less than $5.00, other than securities registered on certain national securities exchanges or authorized for quotation on certain automated quotation systems, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system. If we do not retain a listing on NYSE American or another national securities exchange and if the price of our common stock is less than $5.00, our common stock could be deemed a penny stock. The penny stock rules require a broker-dealer, before a transaction in a penny stock not otherwise exempt from those rules, to deliver a standardized risk disclosure document containing specified information. In addition, the penny stock rules require that before effecting any transaction in a penny stock not otherwise exempt from those rules, a broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive (i) the purchaser's written acknowledgment of the receipt of a risk disclosure statement; (ii) a written agreement to transactions involving penny stocks; and (iii) a signed and dated copy of a written suitability statement. These disclosure requirements may have the effect of reducing the trading activity in the secondary market for our common stock, and therefore stockholders may have difficulty selling their shares.

***We are subject to ongoing public reporting requirements that are less rigorous than Exchange Act rules for companies that are not emerging growth companies and our stockholders could receive less information than they might expect to receive from more mature public companies.***

We are required to publicly report on an ongoing basis as an "emerging growth company" (as defined in the JOBS Act) under the reporting rules set forth under the Exchange Act. For so long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting requirements that are applicable to other Exchange Act reporting companies that are not emerging growth companies, including but not limited to:

- not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act;

- being permitted to comply with reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements; and

- being exempt from the requirement to hold a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

42

Table of Contents

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We expect to take advantage of these reporting exemptions until we are no longer an emerging growth company. We would remain an emerging growth company for up to five years, although if the market value of our common stock that is held by non-affiliates exceeds $700 million as of any June 30 before that time, we would cease to be an emerging growth company as of the following December 31.

Because we will be subject to ongoing public reporting requirements that are less rigorous than Exchange Act rules for companies that are not emerging growth companies, our stockholders could receive less information than they might expect to receive from more mature public companies. We cannot predict if investors will find our common stock less attractive if we elect to rely on these exemptions, or if taking advantage of these exemptions would result in less active trading or more volatility in the price of our common stock.

***Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of our company more difficult, and limit attempts by our stockholders to replace or remove our current management.***

Certain provisions of Delaware law and our certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. Our certificate of incorporation and bylaws include provisions that:

- permit the board of directors to establish the number of directors and fill any vacancies and newly created directorships;

- provide that directors may only be removed by the majority of the shares of voting stock then outstanding; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. They may also make it more difficult for a third party to acquire us, even if the third party's offer may be considered beneficial by many of our stockholders. As a result, our stockholders may be limited in their ability to obtain a premium for their shares.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in our management.

43

Table of Contents

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements that are based on our management's beliefs and assumptions and on information currently available to us. All statements other than statements of historical facts are forward-looking statements. The forward-looking statements are contained principally in, but not limited to, the sections entitled "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business." These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- our ability to consummate the proposed acquisition;

- the synergies that we expect to experience resulting from the proposed acquisition;

- our ability to successfully integrate Appliances Connection's business with our existing business;

- the impact of the COVID-19 pandemic on our operations and financial condition;

- our goals and strategies;

- our future business development, financial condition and results of operations;

- expected changes in our revenue, costs or expenditures;

- growth of and competition trends in our industry;

- our expectations regarding demand for, and market acceptance of, our products;

- our expectations regarding our relationships with investors, institutional funding partners and other parties we collaborate with;

- our expectation regarding the use of proceeds from this offering;

- fluctuations in general economic and business conditions in the markets in which we operate; and

- relevant government policies and regulations relating to our industry.

In some cases, you can identify forward-looking statements by terms such as "may," "could," "will," "should," "would," "expect," "plan," "intend," "anticipate," "believe," "estimate," "predict," "potential," "project" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions. You should not place undue reliance on forward-looking statements because they involve known and unknown risks, uncertainties and other factors, which are, in some cases, beyond our control and which could materially affect results. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under the heading "Risk Factors" and elsewhere in this prospectus. If one or more of these risks or uncertainties occur, or if our underlying assumptions prove to be incorrect, actual events or results may vary significantly from those implied or projected by the forward-looking statements. No forward-looking statement is a guarantee of future performance.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this prospectus, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should read this prospectus and the documents that we reference in this prospectus and have filed as exhibits to the registration statement of which this prospectus forms a part with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

Table of Contents

The forward-looking statements made in this prospectus relate only to events or information as of the date on which the statements are made in this prospectus. Although we have ongoing disclosure obligations under United States federal securities laws, we do not intend to update or otherwise revise the forward-looking statements in this prospectus, whether as a result of new information, future events or otherwise.

Table of Contents

**USE OF PROCEEDS**

After deducting the estimated underwriters' commissions and offering expenses payable by us, we expect to receive net proceeds of approximately $190.2 million from this offering (or approximately $218.7 million if the underwriters exercise the over-allotment option in full), based on an assumed public offering price of $7.38 per share, which is the last reported sale price of our common stock on April 28, 2021.

We intend to use the net proceeds from this offering to pay part of the cash portion of the purchase price for the proposed acquisition and related acquisition fees and expenses. The cash portion of the purchase price for the proposed acquisition is $180 million. We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which will be used to pay a portion of the cash portion of the purchase price, and a revolving loan in the expected principal amount of $10 million, which will be used for general corporate and working capital purposes. We intend to use all of the proceeds of the term loan to pay a portion of the purchase price and the proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses. Any remaining proceeds will be used working capital and general purposes.

Pending use of the net proceeds from this offering described above, we may invest the net proceeds in short- and intermediate-term interest-bearing obligations, investment-grade instruments, certificates of deposit or direct or guaranteed obligations of the United States government.

Our management will retain broad discretion over the allocation of the net proceeds from this offering with respect to working capital and general corporate uses. If the proposed acquisition is not completed, then we intend to use all of the net proceeds for general corporate purposes, which could include other acquisitions. See "Risk Factors — Risks Related to this Offering and the Ownership of Our Common Stock — Our management has broad discretion as to the use of the net proceeds from this offering allocated to working capital and general corporate purposes."

46

Table of Contents

**DIVIDEND POLICY**

We have never declared or paid cash dividends on our common stock. We currently intend to retain all available funds and any future earnings for use in the operation of our business and do not anticipate paying any cash dividends on our common stock in the near future.

On March 19, 2021, we entered into a securities purchase agreement with two institutional investors, pursuant to which we issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of our common stock at an exercise price of $12.00, subject to adjustments. Pursuant to this securities purchase agreement, we agreed that, so long as any of the notes remain outstanding, we will not without each investor's written consent, (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of common stock solely in the form of additional shares of common stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of our capital stock. We may enter into other credit agreements or borrowing arrangements in the future that will restrict our ability to declare or pay cash dividends on our common stock, including in connection with the new term loan described in "Use of Proceeds" above.

Any future determination to declare dividends will be made at the discretion of our board of directors and will depend on our financial condition, operating results, capital requirements, contractual restrictions, general business conditions and other factors that our board of directors may deem relevant. See also "Risk Factors — Risks Related to This Offering and Ownership of Our Common Stock — We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future."

47

Table of Contents

**CAPITALIZATION**

The following table sets forth our capitalization as of December 31, 2020:

- on an actual basis; and

- on an as adjusted basis to reflect this offering, after deducting underwriting discounts and commissions and estimated offering expenses payable by us, and after giving effect to the use of proceeds to complete the proposed acquisition. The table below assumes no exercise by the underwriters of their option to purchase additional shares of common stock from us.

The as adjusted information below is illustrative only and our capitalization following the completion of this offering is subject to adjustment based on the public offering price of our common stock and other terms of this offering determined at pricing. You should read this table together with our financial statements and the related notes included elsewhere in this prospectus and the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

|  | As of December 31, 2020 | |
|---|---|---|
|  | Actual | As Adjusted |
| Cash and cash equivalents and restricted cash | $ 9,911,916 | $ 48,622,481 |
| Long-term debt |  |  |
| Notes payable | $ 3,185,369 | $ 60,421,855 |
| Contingent note payable | 188,170 | 188,170 |
| Total long-term debt | 3,373,539 | 60,610,025 |
|  |  |  |
| Stockholders' equity (deficit): |  |  |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized, no shares issued and outstanding, actual and as adjusted basis | — | — |
| Common stock, $0.0001 par value, 200,000,000 shares authorized, 6,111,200 shares issued and outstanding, actual; 38,899,369 shares issued and outstanding, as adjusted | 611 | 3,890 |
| Additional paid-in capital | 13,409,328 | 240,532,735 |
| Accumulated deficit | (26,725,708) | (26,725,708) |
| Total stockholders' equity (deficit) | (13,315,769) | 213,810,917 |
| **Total capitalization** | $ (9,942,230) | $ 274,420,942 |

Each $1.00 increase or decrease in the assumed offering price per share of $7.38 (which is the last reported sale price of our common stock on April 28, 2021), assuming no change in the number of shares to be sold, would increase or decrease the as-adjusted cash and cash equivalents, working capital, total assets and total stockholders' equity by approximately $25.8 million (or $29.7 million if the underwriters exercise the over-allotment option in full), after deducting (i) estimated underwriting discounts and commissions and (ii) estimated offering expenses, in each case, payable by us.

The number of shares of our common stock outstanding after this offering is based on 6,111,200 shares of our common stock outstanding as of December 31, 2020, and excludes:

- 555,000 shares of common stock issuable upon exercise of outstanding options at an exercise price of $9.00 per share;

- up to 445,000 additional shares of common stock that are reserved for issuance under our 2020 Equity Incentive Plan; and

- 455,560 shares of common stock issuable upon exercise of outstanding warrants at a weighted average exercise price of $11.91 per share.

48

Table of Contents

**DILUTION**

If you invest in our common stock in this offering, your ownership will be diluted immediately to the extent of the difference between the public offering price per share of common stock and the pro forma as adjusted net tangible book value per share of common stock immediately after this offering. Dilution in net tangible book value per share to new investors is the amount by which the offering price paid by the purchasers of the shares of our common stock sold in this offering exceeds the pro forma as adjusted net tangible book value per share of common stock after this offering. Net tangible book value per share is determined at any date by subtracting our total liabilities from the total book value of our tangible assets and dividing the difference by the number of shares of common stock deemed to be outstanding at that date.

The net tangible book value (deficit) of our common stock as of December 31, 2020 was approximately $(19,423,395), or approximately $(3.18) per share.

Pro forma as adjusted net tangible book value dilution per share to new investors represents the difference between the amount per share paid by purchasers of our common stock in this offering and the pro forma as adjusted net tangible book value per share of our common stock immediately after completion of this offering and after giving effect to the proposed acquisition. Investors participating in this offering will incur immediate, substantial dilution. After giving effect to our sale of $205,000,000 of our common stock in this offering at an assumed public offering price of $7.38 per share, which is the last reported sale price of our common stock on April 28, 2021, and after deducting the underwriting discounts and commissions and estimated offering expenses, our pro forma as adjusted net tangible book value (deficit) as of December 31, 2020 (assuming completion of the proposed acquisition and the issuance of 5,010,391 shares of our common stock in connection therewith) would have been approximately $(34,547,299), or approximately $(0.89) per share. This amount represents an immediate increase in pro forma as adjusted net tangible book value of $2.29 per share to existing stockholders and an immediate dilution in pro forma as adjusted net tangible book value of $8.27 per share to purchasers of our common stock in this offering, as illustrated in the following table.

| | | |
|---|---|---|
| Assumed public offering price per share | $ | 7.38 |
| Historical net tangible book value (deficit) per share as of December 31, 2020   $   (3.18) | | |
| Increase in pro forma as adjusted net tangible book value per share to existing stockholders   2.29 | | |
| Pro forma as-adjusted net tangible book value per share after this offering | | (0.89) |
| Dilution per share to new investors purchasing shares in this offering | $ | 8.27 |

A $1.00 increase or decrease in the assumed public offering price of $7.38 per share, which is the last reported sale price of our common stock on April 28, 2021, would increase or decrease the pro forma as adjusted net tangible book value per share after this offering by approximately $0.66, and dilution in pro forma as adjusted net tangible book value per share to new investors by approximately $0.34, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

If the underwriters exercise their over-allotment option in full, the pro forma as adjusted net tangible book value (deficit) per share of our common stock, as adjusted to give effect to this offering and the proposed acquisition, would be $(0.14) per share, and the dilution in pro forma net tangible book value per share to new investors purchasing shares of common stock in this offering would be $7.52 per share.

49

Table of Contents

The following table sets forth the total number of shares of common stock previously issued and sold to existing investors, the total consideration paid for the foregoing and the average price per share of common stock paid, or to be paid, by existing owners and by the new investors. The calculation below is based on the assumed public offering price of $7.38 per share, which is the last reported sale price of our common stock on April 28, 2021, before deducting estimated underwriter commissions and offering expenses, in each case payable by us.

| | Share Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing stockholders | 6,111,200 | 18.03% $ | 10,000,901 | 4.65% $ | 1.64 |
| New investors | 27,777,778 | 81.97% $ | 205,000,000 | 95.35% $ | 7.38 |
| Total | 33,888,978 | 100.00% $ | 215,000,901 | 100.00% | |

The number of shares of our common stock outstanding after this offering is based on 6,111,200 shares of our common stock outstanding as of December 31, 2020, and excludes:

- 555,000 shares of common stock issuable upon exercise of outstanding options at an exercise price of $9.00 per share;

- up to 445,000 additional shares of common stock that are reserved for issuance under our 2020 Equity Incentive Plan;

- 455,560 shares of common stock issuable upon exercise of outstanding warrants at a weighted average exercise price of $11.91 per share; and

- shares of common stock to be issued in connection with the proposed acquisition.

50

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis summarizes the significant factors affecting the operating results, financial condition, liquidity and cash flows of each of Goedeker and Appliances Connection as of and for the periods presented below. The following discussion and analysis should be read in conjunction with the financial statements and the related notes thereto included elsewhere in this prospectus. The discussion contains forward-looking statements that are based on the beliefs of management, as well as assumptions made by, and information currently available to, management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed below and elsewhere in this prospectus, particularly in the sections titled "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

**Goedeker**

*All periods presented on or prior to April 5, 2019 represent the operations of Goedeker Television, our predecessor. Unless otherwise specified, all results of operations information for the year ended December 31, 2019 reflects the full year.*

*References to "Successor" refer to the financial position and results of operations of our company subsequent to April 5, 2019. References to "Predecessor" refer to the financial position and results of operations of Goedeker Television on and before April 5, 2019.*

*Overview*

Our company operates a technology-driven  e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 SKUs across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

*Recent Developments*

Impact of Coronavirus Pandemic

In late 2019, a novel strain of coronavirus, or COVID-19, was reported to have surfaced in Wuhan, China. The virus has since spread to over 150 countries and every state in the United States. On March 11, 2020, the World Health Organization declared the outbreak a pandemic, and on March 13, 2020, the United States declared a national emergency.

Most states and cities, including in markets in which we operate, reacted by instituting quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, our showroom was closed from April through June of 2020, but our call center and warehouse continued to operate. Since over 95% of our sales are completed online and our call center and warehouse and distribution operations continued to operate, the restrictions put in place have not had a materially negative impact on our operations. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facility or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

Table of Contents

In addition, we are dependent upon suppliers to provide us with all of the products that we sell. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain of our products. As a result, we have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect our business and financial results. Even if we are able to find alternate sources for such products, they may cost more, which could adversely impact our profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact our business. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on our revenue.

Furthermore, the spread of COVID-19 has adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce our ability to access capital in the future, which could negatively affect our liquidity.

We have taken steps to take care of our employees, including providing the ability for employees to work remotely and implementing strategies to support appropriate social distancing techniques for those employees who are not able to work remotely. We have also taken precautions with regard to employee, facility and office hygiene as well as implementing significant travel restrictions. We are also assessing our business continuity plans for all business units in the context of the pandemic. This is a rapidly evolving situation, and we will continue to monitor and mitigate developments affecting our workforce, our suppliers, our customers, and the public at large to the extent we are able to do so. We have and will continue to carefully review all rules, regulations, and orders and responding accordingly.

If the current pace of the pandemic does not continue to slow and the spread of COVID-19 is not contained, our business operations could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require us to make further adjustments to our operations in order to comply with any such restrictions. We may also experience limitations in employee resources. In addition, our operations could be disrupted if any of our employees were suspected of having COVID-19, which could require quarantine of some or all such employees or closure of our facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect our ability to operate our business and result in additional costs.

The extent to which the pandemic may impact our results will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to our performance, financial condition, results of operations and cash flows. See also "Risk Factors" for more information.

### *Lease Agreement*

On January 13, 2021, we entered into a lease agreement with Westgate 200, LLC, which was amended on March 30, 2021, for a new location totaling approximately 86,800 square feet of office, showroom and warehouse space in St. Charles, Missouri. The initial term of the lease expires on April 30, 2027 with two (2) options to renew for additional five (5) year periods. The base rent is initially $20,976.79 per month and increases to $31,465 on October 1, 2021, with annual increases thereafter to a base rent during the sixth year of $35,558 per month. We will also pay our 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and are also responsible to pay for the utilities used on the premises.

### *Securities Purchase Agreement*

On March 19, 2021, we entered into a securities purchase agreement with two institutional investors, pursuant to which we issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of our common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis, for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. After deducting a placement fee and other expenses, we received net proceeds of $4,590,000.

Table of Contents

The notes bear interest at a rate of 10% per annum and mature on December 19, 2021. We may prepay the notes in whole or in part at any time or from time to time without penalty or premium upon at least five (5) days prior written notice, which notice period may be waived by the holder. In addition, if we issue and sell shares of our equity securities to investors on or before the maturity date in an equity financing with total gross proceeds of not less than $10,000,000 (excluding the conversion of the notes or other convertible securities issued for capital raising purposes), then we must repay the then-outstanding principal amount of the notes and any accrued but unpaid interest.

The notes are secured by a first priority security interest in all of our assets and contain customary events of default. Upon, and during the continuance of, an event of default, the notes are convertible, in whole or in part, at the option of the holder into shares of common stock at a conversion price equal to $12.00, or if lower, 80% of the lowest volume weighted average price for the twenty (20) consecutive trading days prior to the applicable conversion date, but in no event less than $9.00. The conversion price will be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction that proportionately decreases or increases the common stock. In addition, if we sell or grant any common stock or securities convertible into or exchangeable for common stock or grant any right to reprice such securities at an effective price per share that is lower than the then conversion price, the conversion price shall be reduced to such price, subject to certain exceptions set forth in the notes.

Notwithstanding the foregoing, we shall not effect any conversion of a note, and a holder shall not have the right to convert any principal and/or interest of a note, to the extent that after giving effect to the conversion the holder (together with the holder's affiliates and any persons acting as a group together with the holder or any of the holder's affiliates) would beneficially own over 4.99% of the number of shares of our common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the note. The holder may, upon not less than 61 days' prior notice to us, increase or decrease such limitation, provided that such limitation in no event exceeds 9.99% of the number of shares of our common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the note. The warrants also contain this beneficial ownership limitation.

The securities purchase agreement contains customary representations, warranties and covenants for a transaction of this type. Pursuant to the securities purchase agreement, the investors were granted piggy-back registration rights with respect to the shares issuable upon conversion of the notes and exercise of the warrants. We also agreed that, until the date that no investor own any securities, we will timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by us pursuant to the Exchange Act even if we are not then subject to the reporting requirements of the Exchange Act. In addition, we agreed that, so long as any of the notes remain outstanding, neither our company, nor any subsidiary of our company, shall, without each investor's written consent and subject to certain exceptions set forth in the securities purchase agreement:

- sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business;

- incur, create, assume or suffer to exist any lien on any of its property or assets, except for certain liens set forth in the Purchase Agreement;

- incur or suffer to exist or guarantee any indebtedness that is senior to or *pari passu* with (in priority of payment and performance) our obligations under the securities purchase agreement except for non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;

- pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock, other than dividends on shares of common stock solely in the form of additional shares of common stock, or directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock;

- redeem, repurchase or otherwise acquire in any one transaction or series of related transactions any shares of our capital stock or any warrants, rights or options to purchase or acquire any such shares, or repay any *pari passu* or subordinated indebtedness other than non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;

- lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of our company, except loans, credits or advances (i) in existence or committed on the closing date and which

Table of Contents

we have informed each investor in writing prior to the closing date, (ii) in regard to transactions with unaffiliated third parties, made in the ordinary course of business, or (iii) in regard to transactions with unaffiliated third parties, not in excess of $50,000; or

•     repay any affiliate (as defined in Rule 144) of our company in connection with any indebtedness or accrued amounts owed to any such party.

We expect to repay these notes from the proceeds of the term loan described in the "Use of Proceeds" section above.

### *Principal Factors Affecting Our Financial Performance*

Our operating results are primarily affected by the following factors:

•     our ability to acquire new customers or retain existing customers;

•     our ability to offer competitive product pricing;

•     our ability to broaden product offerings;

•     industry demand and competition; and

•     market conditions and our market position.

### *Key Financial Operating Metrics*

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | **2020** | **2019** |
| Site Sessions (in millions) | 9.9 | 6.3 |
| Order History (in millions) | $ 123.2 | $ 61.8 |

A site session occurs when a person visits our website. An order occurs when a customer has visited our website and ordered one or more items and has paid for them. An order is paid for by our customer when the order is placed and booked as revenue by us when the order is shipped.

Total revenues and total orders for any given month may not be equal for two primary reasons: (1) normal customer cancellations and (2) the time required to ship an order and recognize revenue. When there are no supply chain issues, the time from order to shipping is between 20 and 25 days. Thus, an order made after the 10th of the current month will become revenue in the succeeding month, distorting the comparison between a months' orders and its sales. In 2020, supply chain issues related to COVID-19 increased the time up to 44 days from order to delivery.

Our site sessions increased to approximately 9.9 million in the year ended December 31, 2020, as compared to approximately 6.3 million in the year ended December 31, 2019. These increased site sessions resulted in three-year highs for orders in the year ended December 31, 2020.

### *Emerging Growth Company*

We qualify as an "emerging growth company" under the JOBS Act. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

•     have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;

•     comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);

•     submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and

•     disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

Table of Contents

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year following the fifth anniversary of our initial public offering, (ii) the last day of the first fiscal year in which our total annual gross revenues are $1.07 billion or more, (iii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Exchange Act, which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iv) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

### Results of Operations

*Comparison of Years Ended December 31, 2020 and 2019*

The following table sets forth key components of our results of operations for the year ended December 31, 2020 (Successor), for the period from April 6 to December 31, 2019 (Successor), and for the period from January 1 to April 5, 2019 (Predecessor), in dollars and as a percentage of our revenue.

| | Successor | | | | Predecessor | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2020 | | Period April 6 to December 31, 2019 (As Restated) | | Period January 1 to April 5, 2019 | |
| | Amount | % of Net Sales | Amount | % of Net Sales | Amount | % of Net Sales |
| Product sales, net | $ 55,133,653 | 100.00% | $ 34,668,112 | 100.0% | $ 12,946,901 | 100.0% |
| Cost of goods sold | 47,878,541 | 86.84% | 28,596,129 | 82.49% | 11,004,842 | 85.00% |
| Gross profit | 7,255,112 | 13.16% | 6,071,983 | 17.51% | 1,942,059 | 15.00% |
| Operating expenses | | | | | | |
| Personnel | 6,565,380 | 11.91% | 2,909,751 | 8.39% | 913,919 | 7.06% |
| Advertising | 4,865,361 | 8.82% | 1,996,507 | 5.76% | 714,276 | 5.52% |
| Bank and credit card fees | 1,806,620 | 3.28% | 870,877 | 2.51% | 329,247 | 2.54% |
| Depreciation and amortization | 549,712 | 1.00% | 271,036 | 0.78% | 9,675 | 0.07% |
| General and administrative | 7,900,566 | 14.33% | 4,728,571 | 13.64% | 451,214 | 3.49% |
| Total operating expenses | 21,687,639 | 39.37% | 10,776,742 | 31.09% | 2,418,331 | 18.68% |
| Loss from operations | (14,432,527) | (26.18)% | (4,704,759) | (13.57)% | (476,272) | (3.68)% |
| Other income (expense) | | | | | | |
| Interest income | 2,479 | — | — | — | 23,807 | 0.18% |
| Financing costs | (762,911) | (1.38)% | (520,160) | (1.50)% | — | — |
| Adjustment in value of contingency | (138,922) | (0.25)% | 32,246 | 0.09% | — | — |
| Interest expense | (870,847) | (1.58)% | (785,411) | (2.27)% | — | — |
| Loss on extinguishment of debt | (1,756,095) | (3.19)% | — | — | — | — |
| Write-off of acquisition receivable | (809,000) | (1.47)% | — | — | — | — |
| Change in fair value of warrant liability | (2,127,656) | (3.86)% | 106,900 | 0.31% | — | — |
| Other income | 25,945 | 0.05% | 15,010 | 0.04% | 7,200 | 0.06% |
| Total other income (expense) | (6,437,007) | (11.68)% | (1,151,415) | (3.32)% | 31,007 | 0.24% |
| Net loss before income taxes | (20,869,534) | (37.85)% | (5,856,174) | (16.89)% | (445,265) | (3.44)% |
| Income tax benefit (expense) | (698,303) | (1.27)% | 698,303 | 2.01% | — | — |
| Net loss | $ (21,567,837) | (39.12)% | $ (5,157,871) | (14.88)% | $ (445,265) | (3.44)% |

55

Table of Contents

We believe that reviewing our operating results for the year ended December 31, 2019 by combining the results of the 2019 successor period (April 6, 2019 through December 31, 2019) and 2019 predecessor period (January 1, 2019 through April 5, 2019) with the pro forma adjustment related to the acquisition described below, is more useful in discussing our overall operating performance compared to the results of the year ended December 31, 2020 (successor). We do not see any potential risks associated with utilizing this pro forma presentation.

Following are the year ended December 31, 2020 and the combined period for 2019:

| | Year Ended December 31, 2020 | Period April 6 to December 31, 2019 Successor (As Restated) | Period January 1 to April 5, 2019 Predecessor | Pro Forma Combined Year Ended December 31, 2019 | Increase (Decrease) |
|---|---|---|---|---|---|
| Product sales, net | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 | $ 47,615,013 | $ 7,518,640 |
| Cost of goods sold | 47,878,541 | 28,596,129 | 11,004,842 | 39,600,971 | 8,277,570 |
| Gross profit | 7,255,112 | 6,071,983 | 1,942,059 | 8,014,042 | (758,930) |
| Operating expenses | | | | | |
| Personnel | 6,565,380 | 2,909,751 | 913,919 | 3,823,670 | 2,741,710 |
| Advertising | 4,865,361 | 1,996,507 | 714,276 | 2,710,783 | 2,154,578 |
| Bank and credit card fees | 1,806,620 | 870,877 | 329,247 | 1,200,124 | 606,496 |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 | 280,711 | 269,001 |
| General and administrative | 7,900,566 | 4,728,571 | 451,214 | 5,246,045* | 2,654,521 |
| Total operating expenses | 21,687,639 | 10,776,742 | 2,418,331 | 13,261,333 | 8,426,306 |
| Loss from operations | (14,432,527) | (4,704,759) | (476,272) | (5,247,291) | 9,185,236 |
| Other income (expense) | | | | | |
| Interest income | 2,479 | — | 23,807 | 23,807 | (21,328) |
| Financing costs | (762,911) | (520,160) | — | (520,160) | 242,751 |
| Adjustment in value of contingency | (138,922) | 32,246 | — | 32,246 | (171,168) |
| Interest expense | (870,847) | (785,411) | — | (785,411) | 85,436 |
| Loss on extinguishment of debt | (1,756,095) | — | — | — | 1,756,095 |
| Write-off of acquisition receivable | (809,000) | — | — | — | 809,000 |
| Change in fair value of warrant liability | (2,127,656) | 106,900 | — | 106,900 | (2,234,556) |
| Other income | 25,945 | 15,010 | 7,200 | 22,210 | 3,735 |
| Total other income (expense) | (6,437,007) | (1,151,415) | 31,007 | (1,120,408) | 5,316,599 |
| Net loss before income taxes | (20,869,534) | (5,856,174) | (445,265) | (6,367,699)* | 14,501,835 |
| Income tax benefit (expense) | (698,303) | 698,303 | — | 698,303 | (1,396,606) |
| Net loss | $ (21,567,837) | $ (5,157,871) | $ (445,265) | $ (5,669,396)* | $ 15,898,441 |

_____

\*      Includes a pro forma adjustment of $66,260 for the management fee to our manager.

*Product sales, net.*      We generate revenue from the retail sale of home furnishings, including appliances, furniture, home goods and related products. Our product sales increased by $7,518,640, or 15.79%, to $55,133,653 for the year ended December 31, 2020 from $47,615,013 for the combined year ended December 31, 2019, which included $12,946,901 for our predecessor from January 1, 2019 to April 5, 2019 and $34,668,112 for our successor from April 6, 2019 to December 31, 2019.

The increase is due to increased sales volume to meet appliance and furniture demand resulting from increased advertising, which has a direct impact on customer orders and shipped sales. In the first three months of 2020, sales were affected by working capital issues, which delayed the timing of ordering product to fulfill customer orders resulting in increased order cancellations. Late in the second quarter of 2020 and through the remainder of 2020, we experienced delays in getting products from manufacturers whose production facilities were closed or operating at reduced capacity because of the COVID-19 pandemic, which resulted in some cancellations of customer orders. We estimate that cancellations caused by shipping delays approximated $39.7 million in the year ended December 31, 2020, based on the historical ratio of shipped sales to customer orders of approximately 79% to the actual ratio of approximately 45% in the year ended December 31, 2020.

56

Table of Contents

Our net sales by sales type is as follows:

| | 2020 Successor | | 2019 Successor | 2019 Predecessor | 2019 Total | |
|---|---|---|---|---|---|---|
| | Amount | % of Net Sales | | | Amount | % of Net Sales |
| Appliance sales | $ 40,113,568 | 72.76% | $ 28,487,053 | $ 9,784,525 | $ 38,271,578 | 80.38% |
| Furniture sales | 11,800,277 | 21.40% | 4,405,866 | 2,456,085 | 6,861,951 | 14.41% |
| Other sales | 3,219,808 | 5.84% | 1,775,193 | 706,291 | 2,481,484 | 5.21% |
| Total | $ 55,133,653 | 100.00% | $ 34,668,112 | $ 12,946,901 | $ 47,615,013 | 100.00% |

The percentage of furniture sales increased in 2020 as compared to 2019 as furniture was more readily available from manufacturers than appliances.

*Cost of goods sold.*   Our cost of goods sold consists of the cost of purchased merchandise plus the cost of delivering merchandise and, where applicable, installation, net of promotional rebates and other incentives received from vendors. Our cost of goods sold increased by $8,277,570, or 20.90%, to $47,878,541 for the year ended December 31, 2020 from $39,600,971 for the combined year ended December 31, 2019, which included $11,004,842 for our predecessor from January 1, 2019 to April 5, 2019 and $28,596,129 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, cost of goods sold increased from 83.17% in 2019 to 86.84% in 2020. Such increase was due to COVID-19 related supply chain issues reducing the volume we purchased, which resulted in decreased manufacturer rebates, as well as due to the change in product mix, with furniture sales, which have lower margins, accounting for a larger portion of our total sales in 2020.

*Personnel expenses.*   Personnel expenses include employee salaries and bonuses plus related payroll taxes. It also includes health insurance premiums, 401(k) contributions, training costs and stock compensation expense. Our personnel expenses increased by $2,741,710, or 71.70%, to $6,565,380 for the year ended December 31, 2020 from $3,823,670 for the combined year ended December 31, 2019, which included $913,919 for our predecessor from January 1, 2019 to April 5, 2019 and $2,909,751 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, personnel expenses increased from 8.03% in 2019 to 11.91% in 2020. The increase is the result of hiring additional senior management and other staff needed for increased customer demand for our products, the accrual of $359,216 as the present value of a severance contract payable to our former president and $398,908 in stock compensation expense. Beginning in the second quarter of 2020, there was a dramatic increase in cancellations of customer orders, which were primarily related to the lack of product availability. We hired a number of temporary employees to process cancellations and address the related customer service issues. As a percentage of orders, our personnel expense declined to 5.8% in 2020 from 6.2% in 2019.

*Advertising expenses.*   Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses increased by $2,154,578, or 79.48%, to $4,865,361 for the year ended December 31, 2020 from $2,710,783 for the combined year ended December 31, 2019, which included $714,276 for our predecessor from January 1, 2019 to April 5, 2019 and $1,996,507 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, advertising expenses increased from 5.69% in 2019 to 8.82% in 2020. The increase relates to an increase in advertising spending to drive traffic to our website. Measuring our advertising expense as a percentage of orders, we had a decline in 2020 of 3.9% compared to 4.4% in 2019.

*Bank and credit card fees.*   Bank and credit card fees are primarily the fees we pay credit card processors for processing credit card payments made by customers. Our bank and credit card fees increased by $606,496, or 50.54%, to $1,806,620 for the year ended December 31, 2020 from $1,200,124 for the combined year ended December 31, 2019, which included $329,247 for our predecessor from January 1, 2019 to April 5, 2019 and $870,877 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, bank and credit card fees increased from 2.52% in 2019 to 3.28% in 2020. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders. We pay a credit card fee for each order, regardless of whether that order is shipped or cancelled by customer. Comparing bank and credit card fees as a percentage orders shows a reduction from 1.9% of orders in 2019 to 1.5% in 2020.

*Depreciation and amortization.*   Depreciation and amortization was $549,712, or 1.00% of net sales, for the year ended December 31, 2020, as compared to $280,711, or 0.59% of net sales, for the combined year ended December 31, 2019.

Table of Contents

*General and administrative expenses*.   Our general and administrative expenses consist primarily of professional advisor fees, bad debts, rent expense, insurance, unremitted sales tax, and other expenses incurred in connection with general operations. Our general and administrative expenses increased by $2,654,521, or 50.60%, to $7,900,566 for the year ended December 31, 2020 from $5,246,045 for the combined year ended December 31, 2019, which included $451,214 for our predecessor from January 1, 2019 to April 5, 2019, $4,728,571 for our successor from April 6, 2019 to December 31, 2019 and a pro forma adjustment of $66,260 for the management fee to our manager. As a percentage of net sales, general and administrative expenses increased from 11.02% in 2019 to 14.33% in 2020. The increase was largely due to increased directors and officers insurance expenses, fees to our board of directors, and legal, audit and other professional fees in connection with becoming a public company, as well as consulting fees to upgrade our online shopping cart, fees to our manager under the offsetting management services agreement described below, fees for our Electronic Data Interchange initiative, and other consulting fees. Comparing general and administrative expenses as a percentage orders shows a reduction from 8.4% of orders in 2019 to 6.4% in 2020.

*Total other income (expense)*.   We had $6,437,007 in total other expense, net, for the year ended December 31, 2020, as compared to total other expense, net, of $1,120,408 for the combined year ended December 31, 2019, which included income of $31,007 for our predecessor from January 1, 2019 to April 5, 2019 and expenses of $1,151,415 for our successor from April 6, 2019 to December 31, 2019. Total other expense, net, for the year ended December 31, 2020 consisted of financing costs of $762,911, interest expense of $870,847, adjustment in value of contingency of $138,922, loss on debt modification and extinguishment of $1,756,095, write-off of acquisition receivable of $809,000, and change in the warrant liability of $2,127,656, offset by interest income of $2,479 and other income of $25,945, while total other expense, net, for the year ended December 31, 2019 consisted of financing costs of $520,160 and interest expense of $785,411, offset by a gain on write-down of contingency of $32,246, a change in fair value of warrant liability of $106,900, interest income of $23,807 and other income of $22,210.

*Income tax benefit (expense)*.   We had an income tax expense of $698,303 for the year ended December 31, 2020, as compared to an income tax benefit of $698,303 for the combined year ended December 31, 2019. In the fourth quarter of 2020, we determined that we should establish a valuation allowance for the deferred tax asset, resulting in an income tax expense of $698,303.

*Net loss*.   As a result of the cumulative effect of the factors described above, our net loss increased by $15,898,441, or 280.43%, to $21,567,837 for the year ended December 31, 2020 from $5,669,396 for the combined year ended December 31, 2019, which included $445,265 for our predecessor from January 1, 2019 to April 5, 2019 and $5,856,174 for our successor from April 6, 2019 to December 31, 2019 and a pro forma adjustment of $66,260 for the management fee to our manager. The net loss for the year ended December 31, 2020 was also affected by certain non-cash charges described below equal to $4,831,673 in the aggregate.

## *Non-GAAP to GAAP Reconciliation*

This prospectus contains financial measures that are not calculated in accordance with generally accepted accounting principles in the United States of America, or GAAP. The non-GAAP financial measures are net loss before taxes for the year ended December 31, 2020 excluding the following non-cash charges (i) an adjustment in value of contingency of $138,922, (ii) a loss on extinguishment of debt of $1,756,095, (iii) a write-off of acquisition receivable of $809,000 and (iv) a non-cash charge to change in warrant liability expense of $2,127,656.

The non-GAAP financial information should be considered supplemental to, and not as a substitute for, or superior to, financial measures calculated in accordance with GAAP. Management, however, believes that these non-GAAP financial measures, when used in conjunction with the results presented in accordance with GAAP, may provide a more complete understanding of our results and may facilitate a fuller analysis of our results, particularly in evaluating performance from one period to another. Management has chosen to provide this supplemental information to investors, analysts, and other interested parties to enable them to perform additional analyses of results and to illustrate the results giving effect to the non-GAAP adjustments shown in the reconciliation described in the next paragraph. Furthermore, the economic substance behind our decision to use such non-GAAP measures is that such measures approximate our controllable operating performance more closely than the most directly comparable GAAP financial measures. Management strongly encourages investors to review our consolidated financial statements and publicly filed reports in their entirety and cautions investors that the non-GAAP measures used by us may differ from similar measures used by other companies, even when similar terms are used to identify such measures.

58

Table of Contents

The following tables provides a reconciliation of the non-GAAP net loss before taxes to the comparable GAAP measure.

| | Year Ended December 31, 2020 | | |
| --- | --- | --- | --- |
| | GAAP | Elimination of Non-Cash Charges | Non-GAAP |
| Loss from operations | $ (14,432,527) | $        — | $ (14,432,527) |
| Other income (expense) | | | |
| Interest income | 2,479 | — | 2,479 |
| Financing costs | (762,911) | — | (762,911) |
| Adjustment in value of contingency | (138,922) | (138,922) | — |
| Interest expense | (870,847) | — | (870,847) |
| Loss on extinguishment of debt | (1,756,095) | (1,756,095) | — |
| Write-off of acquisition receivable | (809,000) | (809,000) | — |
| Change in fair value of warrant liability | (2,127,656) | (2,127,656) | — |
| Other income | 25,945 | — | 25,945 |
| Total other income (expense) | (6,437,007) | (4,831,673) | (1,605,334) |
| Net loss before income taxes | $ (20,869,534) | | $ (16,037,861) |

### Liquidity and Capital Resources

As of December 31, 2020, we had cash and cash equivalents of $934,729 and restricted cash of $8,977,187. We have generated significant losses since our acquisition of Goedeker Television and have relied on cash on hand, external bank lines of credit, proceeds from our initial public offering described below, issuance of third party and related party debt and the issuance of a note to support cashflow from operations. For the year ended December 31, 2020, we incurred operating losses of approximately $14.4 million, cash flows from operations of $5.4 million, and negative working capital of $17.5 million.

On August 4, 2020, we completed an initial public offering of our common stock, pursuant to which we sold 1,111,200 shares of common stock, at a purchase price of $9.00 per share, for total gross proceeds of $10,000,800. After deducting the underwriting commission and offering expenses, we received net proceeds of $8,602,166. We used a portion of the proceeds from the initial public offering to pay off certain debt.

As noted above, we received net proceeds of $4,590,000 from the sale of notes and warrants on March 19, 2021. These proceeds will supplement our cash flow from operations and provide additional liquidity.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund our operations and to service our debt obligations for one year from the date of the filing of this prospectus. We may, however, in the future require additional cash resources due to changing business conditions, implementation of our strategy to expand our business, or other investments or acquisitions we may decide to pursue. If our own financial resources are insufficient to satisfy our capital requirements, we may seek to sell additional equity or debt securities or obtain additional credit facilities. The sale of additional equity securities could result in dilution to our stockholders. The incurrence of indebtedness would result in increased debt service obligations and could require us to agree to operating and financial covenants that would restrict our operations. Financing may not be available in amounts or on terms acceptable to us, if at all. Any failure by us to raise additional funds on terms favorable to us, or at all, could limit our ability to expand our business operations and could harm our overall business prospects.

The impact of COVID-19 on our business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying consolidated financial statements have been prepared on a going concern basis under which we are expected to be able to realize our assets and satisfy our liabilities in the normal course of business.

Table of Contents

*Summary of Cash Flow*

The following table provides detailed information about our net cash flow for all financial statement periods presented in this prospectus.

| | Year Ended December 31, 2020 Successor | Year Ended December 31, 2019 | | |
| --- | --- | --- | --- | --- |
| | | 2019 Successor (As Restated) | 2019 Predecessor | 2019 Total (As Restated) |
| Net cash provided by (used in) operating activities | $ 5,408,883 | $ (2,299,215) | $ 611,268 | $ (1,687,947) |
| Net cash used in investing activities | (113,147) | (2,200) | — | (2,200) |
| Net cash provided by financing activities | 4,144,872 | 2,772,723 | — | 2,772,723 |
| Net change in cash | $ 9,440,608 | $ 471,308 | $ 611,268 | $ 1,082,576 |

Our net cash provided by operating activities was $5,408,883 for the year ended December 31, 2020, as compared to net cash used in operating activities of $1,687,947 for the combined year ended December 31, 2019, which included net cash used in operating activities of $2,299,215 for our successor from April 6, 2019 to December 31, 2019 and net cash provided by operating activities of $611,268 for our predecessor from January 1, 2019 to April 5, 2019. For the year ended December 31, 2020, our net loss of $21,567,837 and an increase in merchandise inventory of $3,767,151, offset by an increase in customer deposits of $17,714,914, an increase in accounts payable and accrued expenses of $7,337,081, a change in fair value of warrant liability of $2,127,656 and a loss on extinguishment of debt of $1,756,095, were the primary drivers of the net cash provided by operating activities. For the combined year ended December 31, 2019, our net loss of $5,603,136, offset by increases in accounts payable and accrued expenses of $1,821,629 and merchandise inventory of $1,066,627, were the primary drivers of the net cash used in operating activities.

Our net cash used in investing activities was $113,147 for the year ended December 31, 2020, as compared to $2,200 for the year ended December 31, 2019, all of which was during the period from April 6, 2019 to December 31, 2019. The net cash used in investing activities for both years consisted entirely of purchases of property and equipment.

Our net cash provided by financing activities was $4,144,872 for the year ended December 31, 2020, as compared to $2,772,723 for the combined year ended December 31, 2019, all of which was during the period from April 6, 2019 to December 31, 2019. Net cash provided by financing activities for the year ended December 31, 2020 consisted of net proceeds of $8,602,166 from our initial public offering and $642,600 in proceeds from our Paycheck Protection Program loan, offset by payments of $2,883,754 on our notes payable (including repayment of our Paycheck Protection Program loan), payments of $771,431 on our convertible notes payable, net payments on lines of credit of $1,339,430 and $105,279 in loan financing costs. For the combined year ended December 31, 2019, net cash provided by financing activities consisted of proceeds from note payable of $1,500,000, net borrowings from lines of credit of $1,339,430 and proceeds from convertible notes payable of $650,000, offset by repayments on notes payable $357,207 and cash paid for financing costs of $359,500.

*Initial Public Offering*

On August 4, 2020, we sold 1,111,200 shares of common stock in connection with our initial public offering to the underwriters at a purchase price per share of $8.325 (the offering price to the public of $9.00 per share minus the underwriters' discount) for total gross proceeds of $10,000,800. After deducting the underwriting commission and expenses, we received net proceeds of approximately $8,602,166. We also issued warrants for the purchase of 55,560 shares of common stock to affiliates of ThinkEquity, a division of Fordham Financial Management, Inc. The warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25 (125% of the public offering price per share).

*Term Loan*

On August 25, 2020, we entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of December 31, 2020, the outstanding balance of this loan is $3,185,369, comprised of principal of $3,283,628, net of unamortized loan costs of $98,259.

Table of Contents

The loan matures on August 25, 2025 and bears interest at 3.250% per annum; provided that, upon an event of default, the interest rate shall increase by 6% until paid in full. Pursuant to the terms of the loan agreement, we are required to make monthly payments of $63,353 beginning on September 25, 2020 and until the maturity date, at which time all unpaid principal and interest will be due. We may prepay the loan in full or in part at any time without penalty. The loan agreement contains customary events of default and affirmative and negative covenants for a loan of this type. The loan is secured by all financial assets credited to our securities account held by Arvest Investments, Inc.

***Contractual Obligations***

Our principal commitments consist mostly of obligations under the loan described above, the operating leases described under "Business — Facilities" and other contractual commitments described below.

*Management Services Agreement*

On April 5, 2019, we entered into a management services agreement with our manager, pursuant to which we appointed our manager to provide certain services to us for a quarterly management fee equal to $62,500. Under certain circumstances specified in the management services agreement, our quarterly fee may be reduced if similar fees payable to our manager by subsidiaries of our former parent company, 1847 Holdings LLC, or 1847 Holdings, exceed a threshold amount.

Pursuant to the management services agreement, we must also reimburse our manager for all costs and expenses which are specifically approved by our board of directors, including all out-of-pocket costs and expenses, that are actually incurred by our or our affiliates on our behalf in connection with performing services under the management services agreement.

The services provided by our manager include: conducting general and administrative supervision and oversight of our day-to-day business and operations, including, but not limited to, recruiting and hiring of personnel, administration of personnel and personnel benefits, development of administrative policies and procedures, establishment and management of banking services, managing and arranging for the maintaining of liability insurance, arranging for equipment rental, maintenance of all necessary permits and licenses, acquisition of any additional licenses and permits that become necessary, participation in risk management policies and procedures; and overseeing and consulting with respect to our business and operational strategies, the implementation of such strategies and the evaluation of such strategies, including, but not limited to, strategies with respect to capital expenditure and expansion programs, acquisitions or dispositions and product or service lines.

We expensed $250,000 and $183,790 in management fees for the years ended December 31, 2020 and 2019, respectively.

*Earn Out Payments*

Pursuant to the asset purchase agreement with Goedeker Television, it is entitled to receive the following earn out payments to the extent that our business achieves the applicable EBITDA (as defined in the asset purchase agreement) targets:

1.   An earn out payment of $200,000 if the EBITDA of our business for the trailing twelve (12) month period from the closing date is $2,500,000 or greater, which target was not met;

2.   An earn out payment of $200,000 if the EBITDA of our business for the trailing twelve (12) month period from the first anniversary of closing date is $2,500,000 or greater, which target we do not expect to meet; and

3.   An earn out payment of $200,000 if the EBITDA of our business for the trailing twelve (12) month period from the second anniversary of the closing date is $2,500,000 or greater. We expect to meet this target and adjusted the contingent note payable in the consolidated balance sheet to the present value of the amount due.

To the extent the EBITDA of our business for any applicable period is less than $2,500,000 but greater than $1,500,000, we must pay a partial earn out payment to Goedeker Television in an amount equal to the product determined by multiplying (i) the EBITDA Achievement Percentage by (ii) the applicable earn out payment for such period, where the "Achievement Percentage" is the percentage determined by dividing (A) the amount of (i) the EBITDA of our

61

Table of Contents

business for the applicable period less (ii) $1,500,000, by (B) $1,000,000. For avoidance of doubt, no partial earn out payments shall be earned or paid to the extent the EBITDA of our business for any applicable period is equal or less than $1,500,000.

To the extent Goedeker Television is entitled to all or a portion of an earn out payment, the applicable earn out payment(s) (or portion thereof) shall be paid on the date that is three (3) years from the closing date, and shall accrue interest from the date on which it is determined Goedeker Television is entitled to such earn out payment (or portion thereof) at a rate equal to five percent (5%) per annum, computed on the basis of a 360 day year for the actual number of days elapsed.

### *Off-Balance Sheet Arrangements*

We have no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

### *Critical Accounting Policies*

The following discussion relates to critical accounting policies for our company. The preparation of consolidated financial statements in conformity with GAAP requires our management to make assumptions, estimates and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. We have identified certain accounting policies that are significant to the preparation of our consolidated financial statements. These accounting policies are important for an understanding of our financial condition and results of operation. Critical accounting policies are those that are most important to the portrayal of our financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to our consolidated financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and judgments used in the preparation of our consolidated financial statements:

### *Revenue Recognition and Cost of Revenue*

We record revenue in accordance with Financial Accounting Standards Board, or FASB, Accounting Standards Codification, or ASC, Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

We collect the full sales price from the customer at the time the order is placed, which is recorded as customer deposits on the accompanying consolidated balance sheet. We do not incur incremental costs obtaining purchase orders from customers, however, if we did, because all our contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

The revenue that we recognize arises from orders we receive from our customers. Our performance obligations under the customer orders correspond to each sale of merchandise that we make to customers under the purchase orders; as a result, each purchase order generally contains only one performance obligation based on the merchandise sale to be completed.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, our products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. We deliver products to our customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from our warehouse to the customer (which we refer to as a company shipment). The second way is through a shipment of the products through a third-party carrier from a warehouse other than our warehouse to the customer (which we refer to as a drop shipment) and the third way is where we deliver the products to the customer and often also install the product (which we refer to as a local delivery). In the case of a local delivery, we load the product on to our own truck and deliver and install the product at the customer's location. When a product is delivered through a local delivery, risk of loss passes

62

Table of Contents

to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a company shipment and a drop shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from our warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves our warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, we have satisfied our performance obligation and we recognize revenue.

We agree with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In our contracts with customers, we allocate the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax we collect concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all our sales are to individual retail consumers.

Shipping and Handling — We bill our customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue — We disaggregate revenue from contracts with customers by product type, as we believe it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

We also sell extended warranty contracts. We are an agent for the warranty company and earn a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the our consolidated statement of operations. We assume no liability for repairs to products on which we have sold a warranty contract.

We experience operational trends which are primarily holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

*Receivables*

Receivables represent rebates receivable due from manufacturers from whom we purchase products and amounts due from credit card processors that do not settle within two days. Rebates receivable are stated at the amount that management expects to collect from manufacturers, net of accounts payable amounts due the vendor. Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on our assessment of the credit history with our manufacturers, we have concluded that there should be no allowance for uncollectible accounts. We historically collect substantially all of our outstanding rebates receivables. Uncollectible balances are expensed in the period it is determined to be uncollectible.

*Merchandise Inventory*

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. We periodically evaluate the value of items in inventory and provide write-downs to inventory based on our estimate of market conditions.

*Goodwill*

We test our goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in our expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and our consolidated financial results.

Table of Contents

We test goodwill by estimating fair value using a discounted cash flow model. The key assumptions used in the discounted cash flow model to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during the years ended December 31, 2020 and 2019.

*Intangible Assets*

As of December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

We periodically evaluate the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. We have no intangibles with indefinite lives.

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value.

*Long-Lived Assets*

We review our property and equipment and any identifiable intangibles (including ROU asset) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Lease Liabilities*

Lease liabilities and their corresponding right of use, or ROU, assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of our leases do not provide an implicit rate, we use an estimated incremental borrowing rate, or IBR, based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. We adjust the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

We review the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, we compare the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

Table of Contents

**Appliances Connection**

*Overview*

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website 1stopcamera.com.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at goldcoastappliances.com.

Joe's Appliances, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, joesappliances.com.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website *www.appliancesconnection.com.*

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

*Recent Developments*

*Impact of Coronavirus Pandemic*

In late 2019, a novel strain of coronavirus, or COVID-19, was reported to have surfaced in Wuhan, China. The virus has since spread to over 150 countries and every state in the United States. On March 11, 2020, the World Health Organization declared the outbreak a pandemic, and on March 13, 2020, the United States declared a national emergency.

Most states and cities reacted by instituting quarantines, restrictions on travel, "stay at home" rules and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Appliances Connection's retail facilities and warehouse were deemed essential businesses that were not subject to restrictions in New York and New Jersey, so they remained open and continued to operate. Therefore, the restrictions put in place have not had a materially negative impact on the operations Appliances Connection. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facilities or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

In addition, Appliances Connection is dependent upon suppliers to provide it with all of the products that its sells. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain products. As a result, Appliances Connection has faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect its business and financial results. Even if Appliances Connection is able to find alternate sources for such products, they may cost more, which could adversely impact its profitability and financial condition.

65

Table of Contents

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact Appliances Connection's business. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on Appliances Connection's revenue.

Appliances Connection has taken steps to take care of its employees, including providing the ability for employees to work remotely and implementing strategies to support appropriate social distancing techniques for those employees who are not able to work remotely. Appliances Connection has also taken precautions with regard to employee, facility and office hygiene as well as implementing significant travel restrictions. Appliances Connection continues to assess business continuity plans for all business units in the context of the pandemic. This is a rapidly evolving situation, and Appliances Connection will continue to monitor and mitigate developments affecting its workforce, its suppliers, its customers and the public at large to the extent they are able to do so and it will continue to carefully review all rules, regulations, and orders and responding accordingly.

If the current pace of the pandemic cannot be slowed and the spread of the virus is not contained, Appliances Connection's business operations could be further delayed or interrupted. It is expected that government and health authorities may announce new or extend existing restrictions, which could require Appliances Connection to make further adjustments to its operations in order to comply with any such restrictions. In addition, Appliances Connection's operations could be disrupted if any of its employees were suspected of having the virus, which could require quarantine of some or all such employees or closure of its facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect Appliances Connection's ability to operate its business and result in additional costs.

The extent to which the pandemic may impact the results of Appliances Connection will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to the performance, financial condition, results of operations and cash flows of Appliances Connection. See also "Risk Factors" for more information.

### *Principal Factors Affecting Financial Performance*

Appliances Connection's operating results are primarily affected by the following factors:

- its ability to acquire new customers or retain existing customers;

- its ability to offer competitive product pricing;

- its ability to broaden product offerings;

- industry demand and competition; and

- market conditions and its market position.

### *Key Financial Operating Metrics*

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Site Sessions (in millions) | 31.0 | 17.6 |
| Order History (in millions) | $ 466.9 | $ 252.3 |

A site session occurs when a person visits Appliances Connection's website. An order occurs when a customer has visited the website and ordered one or more items and has paid for them. An order is paid for by the customer when the order is placed and booked as revenue by when the order is shipped.

Appliances Connection's site sessions increased to approximately 31.0 million in the year ended December 31, 2020, as compared to approximately 17.6 million in the year ended December 31, 2019. These increased site sessions resulted in record orders in the year ended December 31, 2020.

66

Table of Contents

**Results of Operations**

*Comparison of Years Ended December 31, 2020 and 2019*

The following table sets forth key components of the results of operations of Appliances Connection for the years ended December 31, 2020 and 2019, in dollars and as a percentage of net sales.

| | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
| | Amount | % of Net Sales | Amount | % of Net Sales |
| --- | --- | --- | --- | --- |
| Net sales | $ 312,608,528 | 100.00% | $ 219,333,461 | 100.00% |
| Cost of sales | 247,379,397 | 79.13% | 176,771,632 | 80.59% |
| Gross profit | 65,229,131 | 20.87% | 42,561,829 | 19.41% |
| Operating expenses | | | | |
| Personnel | 13,563,628 | 4.34% | 10,919,298 | 4.98% |
| Advertising | 9,164,242 | 2.93% | 5,073,731 | 2.31% |
| Bank and credit card fees | 12,361,428 | 3.95% | 9,413,611 | 4.29% |
| Depreciation and amortization | 782,773 | 0.25% | 553,357 | 0.25% |
| General and administrative | 9,949,762 | 3.18% | 7,095,979 | 3.24% |
| Total operating expenses | 45,821,833 | 14.66% | 33,055,976 | 15.07% |
| Income from operations | 19,407,298 | 6.21% | 9,505,853 | 4.33% |
| Other income (expense) | | | | |
| Other income | 1,336,115 | 0.43% | 1,880,282 | 0.86% |
| Other expense | (663,674) | (0.21)% | (247,539) | (0.11)% |
| Total other income (expense) | 672,441 | 0.22% | 1,632,743 | 0.74% |
| Net Income | $ 20,079,739 | 6.42% | $ 11,138,596 | 5.08% |

*Net sales.*   Appliances Connection generates revenue from the retail sale of home furnishings, including appliances, furniture, home goods, and related products. Its net sales increased by $93,275,067, or 42.53%, to $312,608,528 for the year ended December 31, 2020 from $219,333,461 for the year ended December 31, 2019. Such increase is due to increased demand for its home furnishings, appliances, furniture, home goods and related products due to increased advertising, as well as customers spending more time at their homes as a result of the ongoing COVID-19 pandemic, combined with governmental and enhanced unemployment benefits, and its position as an "essential business". Additionally, management believes its net sales in the year ended December 31, 2020 were favorably impacted by a strong alignment of its technologically advanced online sales and infrastructure platform with current customer trends for online and phone-based shopping and decreased competition from certain of its competitors that are relatively more reliant on showroom and in-person sales that were closed for a portion of such period due to the pandemic.

*Cost of sales.*   Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendors. Cost of sales increased by $70,607,765, or 39.94%, to $247,379,397 for the year ended December 31, 2020 from $176,771,632 for the year ended December 31, 2019. Such increase was generally in line with the increase in net sales. As a percentage of net sales, cost of sales decreased slightly from 80.59% in 2019 to 79.13% in 2020.

*Personnel expenses.*   Personnel expenses include employee salaries and bonuses plus related payroll taxes as well as health insurance premiums. Personnel expenses increased by $2,644,330, or 24.22%, to $13,563,628 for the year ended December 31, 2020 from $10,919,298 for the year ended December 31, 2019. Such increase was due to additional payroll hours to support the increased sales in 2020, as well as increases in the minimum wage in New Jersey and Long Island. As a percentage of net sales, personnel expenses were 4.34% and 4.98% for the years ended December 31, 2020 and 2019, respectively.

*Advertising expenses.*   Advertising expenses include the cost of marketing products and primarily include online search engine, digital, social media, television and radio advertising expenses. Advertising expenses increased by $4,090,511, or 80.62%, to $9,164,242 for the year ended December 31, 2020 from $5,073,731 for the year ended December 31, 2019. Such increase was due to increased investments in digital and social media engagement to capitalize on current customer trends for online shopping, as well as increased investment on television and radio to promote additional brand recognition. As a percentage of net sales, advertising expenses were 2.93% and 2.31% for the years ended December 31, 2020 and 2019, respectively.

Table of Contents

*Bank and credit card fees.*    Bank and credit card fees are primarily the fees paid to credit card processors for processing credit card payments made by customers. Bank and credit card fees increased by $2,947,817, or 31.31%, to $12,361,428 for the year ended December 31, 2020 from $9,413,611 for the year ended December 31, 2019. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was primarily due to the increase in customer orders as well as recent increases in interchange rates charged by credit card networks. As a percentage of net sales, bank and credit card fees were 3.95% and 4.29% for the years ended December 31, 2020 and 2019, respectively.

*Depreciation and amortization.*    Depreciation and amortization was $782,773, or 0.25% of net sales, for the year ended December 31, 2020, as compared to $553,357, or 0.25% of net sales, for the year ended December 31, 2019.

*General and administrative expenses.*    General and administrative expenses consist primarily of professional advisor fees, bad debts, rent expense, sales tax expense, insurance, and other expenses incurred in connection with general operations. General and administrative expenses increased by $2,853,783, or 40.22%, to $9,949,762 for the year ended December 31, 2020 from $7,095,979 for the year ended December 31, 2019. The primary increases are were increases in insurance, rent, and telephone service expenses and payments on notes payable used to finance purchases of transportation vehicles. As a percentage of net sales, general and administrative expenses were 3.18% and 3.24% for the years ended December 31, 2020 and 2019, respectively.

*Total other income (expense).*    Total other income, net, was $672,441 for the for the year ended December 31, 2020, which included other income of $1,336,115 and other expense of $663,674. For the for the year ended December 31, 2019, total other income, net, was $1,632,743, which included other income of $1,880,282 and other expense of $247,539. Other income includes interest income on bank and vendor deposits and other expense includes interest expense on financed equipment.

*Net income.*    As a result of the cumulative effect of the factors described above, net income was $20,079,739 for the year ended December 31, 2020, as compared to $11,138,596 for the year ended December 31, 2019, an increase of $8,941,143, or 80.27%. As a percentage of net sales, net income was 6.42% and 5.08% for the years ended December 31, 2020 and 2019, respectively.

**Liquidity and Capital Resources**

As of December 31, 2020, Appliances Connection had cash and cash equivalents of $14,842,912. To date, Appliances Connection has financed its operations primarily through revenue generated from operations.

_Summary of Cash Flow_

The following table provides detailed information about Appliances Connection's net cash flow for all financial statement periods presented in this prospectus.

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Net cash provided by operating activities | $ 16,594,919 | 2,125,205 |
| Net cash provided by (used in) investing activities | 2,610 | (68,636) |
| Net cash used in financing activities | (7,666,660) | (1,577,959) |
| Net change in cash | 8,930,869 | 478,610 |
| Cash at beginning of year | 5,912,043 | 5,433,433 |
| Cash at end of year | $ 14,842,912 | $ 5,912,043 |

Net cash provided by operating activities was $16,594,919 and $2,125,205 for the years ended December 31, 2020 and 2019, respectively. For the year ended December 31, 2020, the primary drivers of the net cash provided by operating activities were net income of $20,079,739, an increase in accounts payable and accrued expenses of $5,959,575, an increase in customer deposits of $5,611,683 and operating lease right-of-use assets of $1,442,621, offset by a decrease in deposits with vendors of $9,728,097, a decrease in accounts receivable of $5,674,584 and operating lease liabilities of $1,363,066. For the year ended December 31, 2019, the primary drivers of the net cash provided by operating activities were net income of $11,138,596 and an increase in accounts payable and accrued expenses of $6,768,230, offset by decreases in customer deposits of $7,612,046, inventory of $3,934,936 and deposits with vendors of $3,236,141.

Table of Contents

Net cash provided by investing activities was $2,610 for the year ended December 31, 2020, compared with net cash used in investing activities of $68,636 for the year ended December 31, 2019. The net cash provided by investing activities for the year ended December 31, 2020 consisted of proceeds from disposal of assets of $33,444, offset by purchases of property and equipment of $30,834, while the net cash used in investing activities for the year ended December 31, 2019 consisted entirely of purchases of property and equipment.

Net cash used in financing activities was $7,666,660 and $1,577,959 for the years ended December 31, 2020 and 2019, respectively. Net cash used in financing activities for the year ended December 31, 2020 consisted of distributions of $9,637,816, repayments on notes payable of $318,457 and repayments of financing lease liabilities of $19,978, offset by proceeds from PPP and EIDL (as defined below) loans of $2,309,591, while net cash used in financing activities for the year ended December 31, 2019 consisted of distributions of $1,318,549, repayments on notes payable of $241,647 and repayments of financing lease liabilities of $17,763.

*Notes Payable*

Appliances Connection has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.09% to 5.74%. As of December 31, 2020, the outstanding balance of these notes is $1,687,285.

During the year ended December 31, 2020, Appliances Connection received Paycheck Protection Program, or PPP, loans pursuant to the Coronavirus Aid, Relief and Economic Security Act, or the CARES Act, in an aggregate principal amount of $1,872,470, which have two-year maturities and bear interest at 1.0% per annum. The PPP loans may be prepaid in whole or in part without penalty. No interest payments are due within the initial six months of the PPP loans. The interest accrued during the initial six-month period is due and payable, together with the principal, on the maturity date. Appliances Connection intends to use all proceeds from the PPP loans to retain employees, maintain payroll and make lease and utility payments to support business continuity throughout the COVID-19 pandemic, which amounts are intended to be eligible for forgiveness, subject to the provisions of the CARES Act. As of December 31, 2020, the outstanding balance of the PPP loans is $1,872,470. Subsequent to December 31, 2020, Appliances Connection was notified by its bank that its application for forgiveness of the PPP loans had been approved and that the loans had been forgiven in their entirety.

Additionally, during the year ended December 31, 2020, pursuant to the Economic Injury Disaster Loan, or EIDL, program under the CARES Act, Appliances Connection entered into three promissory notes with the U.S. Small Business Administration with an aggregate principal amount of $412,200. The EIDL loans have thirty-year maturities and bear interest at 3.75% per annum. The EIDL loans are secured by all of the assets of 1 Stop, Gold Coast and YF Logistics. Installment payments, including principal and interest, will begin one-year from the origination date. The EIDL loans may be prepaid at any time prior to maturity with no prepayment penalties. As of December 31, 2020, the outstanding balance of the EIDL loans is $412,200.

*Financing Leases*

On March 3, 2018, Appliances Connection entered in an equipment financing lease to purchase a forklift for $59,326, maturing on March 2, 2023. As of December 31, 2020, the balance payable was $33,346.

On January 23, 2019, Appliances Connection entered in an equipment financing lease to purchase a forklift for $55,510, maturing on January 23, 2024. As of December 31, 2020, the balance payable was $36,828.

**Contractual Obligations**

Appliances Connection's principal commitments consist mostly of obligations under the notes and financing leases described above and the operating leases described under "Business — Facilities" below.

**Off-Balance Sheet Arrangements**

Appliances Connection has no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on its financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

Table of Contents

***Critical Accounting Policies***

The following discussion relates to critical accounting policies for Appliances Connection. The preparation of the combined financial statements in conformity with GAAP requires management to make assumptions, estimates and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. Appliances Connection has identified certain accounting policies that are significant to the preparation of its combined financial statements. These accounting policies are important for an understanding of its financial condition and results of operation. Critical accounting policies are those that are most important to the portrayal of its financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to the combined financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and judgments used in the preparation of Appliances Connection's combined financial statements:

*Revenue Recognition and Cost of Revenue*

Appliances Connection records revenue in accordance with FASB ASC Topic 606. This ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. This ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments. Appliances Connection's adoption of this ASU resulted in no change to the Company's results of operations or balance sheet.

Appliances Connection collects 100 percent of the payment for internet and phone orders, including tax in certain jurisdictions, from the customer at the time the order is placed. Customers placing orders with a purchase order are allowed to purchase on credit and make payment after receipt of product. Appliances Connection does not incur incremental costs obtaining purchase orders from customers; however, if Appliances Connection did, because all Appliances Connection's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

Performance Obligations — The revenue that Appliances Connection recognizes arises from orders it receives from contracts with customers. Appliances Connection's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers and each order generally contains only one performance obligation based on the merchandise sale to be completed. Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, Appliances Connection's products, which generally occurs when the customer assumes the risk of loss. The transfer of control generally occurs at the point of pickup, shipment, or installation, depending on the type of order. Once this occurs, Appliances Connection has satisfied its performance obligation and Appliances Connection's recognizes revenue.

Transaction Price — Appliances Connection agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In Appliances Connection's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax that Appliances Connection collects concurrently with revenue-producing activities are excluded from revenue.

Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendor to Appliances Connection.

Substantially all Appliances Connection's sales are to individual retail consumers (homeowners), builders, and designers. The large majority of customers are homeowners and their contractors, with the homeowner being key in the final decisions. Appliances Connection has a diverse customer base with no one customer accounting for more than five percent of total revenue.

70

Table of Contents

*Receivables*

Receivables consists of customer's balance payments for which Appliances Connection extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom Appliances Connection purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on Appliances Connection's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

Appliances Connection historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. Appliances Connection had no significant concentrations of receivables balances as of December 31, 2020 and 2019.

*Inventory*

Inventory mainly consists of finished goods acquired for resale and is valued at the average cost determined on a specific item basis. Appliances Connection periodically evaluates the value of items in inventory and provides write-downs to inventory based on estimate of its ability to sell the item as well as general market conditions.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

|  | Useful Life (Years) |
|---|---|
| Furniture and fixtures | 7 |
| Transportation equipment | 5 |
| Machinery and equipment | 5 – 7 |
| Office equipment | 5 – 7 |
| Leasehold improvements | Shorter of lease term of estimated useful life |

*Long-lived Assets*

Appliances Connection reviews its property and equipment and any identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management if triggering events occur. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash receivables, inventory, and prepaid expenses approximate fair value. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

Table of Contents

## CORPORATE HISTORY AND STRUCTURE

### History of Goedeker

Our company was incorporated in the State of Delaware on January 10, 2019 for the sole purpose of acquiring substantially all of the assets of Goedeker Television. On April 5, 2019, we acquired substantially all of the assets of Goedeker Television for an aggregate purchase price of $4,175,373, consisting of: (i) the issuance of a promissory note in the principal amount of $4,100,000 and a deemed fair value of $3,637,898; (ii) up to $600,000 in earn out payments with a deemed fair value of $81,494; (iii) a 22.5% ownership interest in our parent company at the time, 1847 Goedeker Holdco Inc., with a deemed fair value of $786,981, (iv) cash of $478,000, and (v) net of a working capital adjustment of $809,000. As a result of this transaction, we acquired the former business of Goedeker Television and continue to operate this business. Prior to our acquisition of substantially all of the assets of Goedeker Television, we had no operations other than operations relating to our incorporation and organization.

On October 20, 2020, we formed ACI as a wholly owned subsidiary in the State of Delaware for the sole purpose of completing the proposed acquisition. As of the date of this prospectus, we do not have any other subsidiaries.

### History of Appliances Connection

1 Stop was incorporated in the State of New York on February 2, 2000. It specializes in the sale of appliances and consumer electronics. 1 Stop operates under the assumed name appliancesconnection.com.

Gold Coast is a family-owned appliance business originally incorporated in New York in 1971 and located in Brooklyn, New York. Appliances Connection acquired Gold Coast in 2015.

Superior Deals was incorporated in the State of New York on September 21, 2000. It is in the electrical appliances, television and radio sets industry. Super Deals also operates under the assumed name appliancesconnection.com.

Joe's Appliances is a family-owned discount appliances and electronics business originally incorporated in New York in 1942 and based in Brooklyn, NY. Appliances Connection acquired Joe's Appliances in 2018.

YF Logistics was incorporated in the State of New Jersey on January 24, 2014. It is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances.

### Corporate Structure

The following chart depicts our pro forma organization structure following completion of the proposed acquisition.



72

Table of Contents

**PROPOSED ACQUISITION OF APPLIANCES CONNECTION**

On October 20, 2020, we entered into the purchase agreement with ACI, Appliances Connection and the holders of all of the issued and outstanding capital stock or other equity securities of Appliances Connection (which we refer to as the sellers) to acquire Appliances Connection, which was amended on December 8, 2020 and April 6, 2021. The following is a summary of the material terms and conditions of the purchase agreement. This summary may not contain all the information about the purchase agreement that may be important to you. This summary is qualified in its entirety by reference to the purchase agreement, a copy of which has been filed as an exhibit to the registration statement of which this prospectus forms a part. You are encouraged to read the purchase agreement in its entirety because it is the legal document that governs the proposed acquisition.

**Reasons for the Proposed Acquisition**

In evaluating the purchase agreement and the proposed acquisition, our board of directors consulted with our management and its advisors and, in reaching its decision to approve the purchase agreement and the transactions contemplated by the purchase agreement, our board of directors considered a variety of factors, including the following (which are not necessarily in order of relative importance):

- the accretive nature of Appliances Connection's earnings when combined with our earnings;

- the relatively stable nature of Appliances Connection's revenue and earnings year to year;

- the expected synergies that would result from the business combination in the areas of product ordering, marketing, cost of goods sold and third-party logistics;

- the location and demographic mix of Appliances Connection;

- Appliances Connection's foothold in the country's largest market, New York, which immediately provides a model of how to be more effective in similar large urban markets throughout the United States and their demonstrated success in providing appliances at the premium and super premium part of the industry's product offerings which will allow more access to the upper end of the business model where margins are higher and less prone to swings in consumer demand;

- the diversity of brand name product offerings of Appliances Connection, which are both complimentary and similar to our brand name product offerings;

- the extensive assortments of global appliance brands offered by Appliances Connection; and

- Appliances Connection's ability to provide "last mile" customer services through its large warehouse, its acquisition of inventory at discounted rates and its expertise in delivering, hooking up and hauling away of old appliances, which puts them in a top of class position for the logistics required to compete across the country on a low cost distribution model.

Our board of directors also considered the risks and potentially negative factors relating to the proposed acquisition, including:

- the potential inability to quickly integrate the business of Appliances Connection with our own business;

- the potential underestimation of time and resources necessary for integration and to achieve expected synergies;

- information technology and infrastructure capability and transition costs;

- unforeseen costs and expenses relating to the combination of the two companies;

- supply interruptions continuing beyond the first quarter of 2021, which would impact both businesses;

- the possibility of an economic downturn affecting demand for appliances; and

- other risks described under the section "Risk Factors — Risks Related to Proposed Acquisition."

73

Table of Contents

Our board of directors believed that, overall, the potential benefits of the proposed acquisition to our stockholders outweighed the risks and uncertainties of the proposed acquisition. The foregoing discussion of factors considered by our board of directors is not intended to be exhaustive and is not provided in any specific order or ranking, but includes material factors considered by our board. In reaching its decision regarding the proposed acquisition, our board did not quantify or otherwise assign relative weights to the specific factors. Moreover, each member of our board applied his or her own personal business judgment and may have given different weights to different factors. Our board did not undertake to make any specific determination as to whether any factor, or any particular aspect of any factor, supported or did not support its ultimate determination. Our board based its decision to approve the purchase agreement on the totality of the information presented.

The factors, potential risks and uncertainties contained in this explanation of our reasons for the proposed acquisition and other information presented in this section contain information that is forward-looking in nature and, therefore, should be read in light of the factors discussed in "Cautionary Statement Regarding Forward-Looking Statements."

**Structure of the Proposed Acquisition**

Pursuant to the purchase agreement, we, through ACI, will acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection, which includes 1 Stop, Gold Coast, Superior Deals, Joe's Appliances and YF Logistics. Each of these companies will become a wholly owned subsidiary of ACI.

**Consideration**

The aggregate purchase price for our acquisition of Appliances Connection is $222,000,000, subject to adjustment as described below. The purchase agreement provides that the purchase price consists of (i) $180,000,000 in cash, (ii) 1,222,239 shares of our common stock and 1,111,094 shares of our series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of our series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the acquisition; provided, that if we have obtained stockholder approval prior to closing, then we will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock.

Under Section 712 of the NYSE American Company Guide, with certain exceptions, we are required to obtain stockholder approval prior to increasing our outstanding common stock by 20% or more. We obtained such stockholder approval by written consent on April 9, 2021 and thereafter filed an information statement on Schedule 14C with the SEC and mailed it to our stockholders on April 23, 2021. Pursuant to Rule 14c-2 promulgated under the Exchange Act, such stockholder approval will become effective on May 13, 2021, which is 20 calendar days following the date on which the information statement was first mailed to our stockholders. Therefore, we will issue common stock in lieu of the series A preferred stock and series A-1 preferred stock.

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the sellers shall deliver to ACI at least one day prior to the closing of the proposed acquisition a statement setting forth their good faith estimate of the net working capital of Appliances Connection (which excludes accruals for sales tax liabilities). If such estimated net working capital exceeds a target net working capital of ($15,476,941), then within five (5) days ACI shall make a cash payment to the sellers that is equal to such excess. If such target net working capital exceeds such estimated net working capital, then either (i) if finally determined at the closing, the cash portion of the purchase price shall be decreased by such excess or (ii) within 5 days of the closing, the sellers shall make a cash payment to ACI that is equal to such excess.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the proposed acquisition, ACI shall deliver to the sellers a statement setting forth its calculation of the net working capital. If such net working capital exceeds the estimated net working capital referred to above, then within five (5) days after the final determination of such net working capital ACI shall send payment by wire transfer of immediately available funds to the sellers in an amount equal to such excess. If the estimated net working capital exceeds such net working capital, then within five (5) days the sellers shall pay to ACI in cash an amount equal to such excess.

The cash portion of the purchase price will also be (i) decreased by (A) the amount of any outstanding unpaid indebtedness of Appliances Connection (other than trade debt) existing as of the closing date and (B) any transaction expenses, and (ii) increased by the amount of cash or cash equivalents held by, or on the books of, Appliances Connection as of the closing date, if any, that is in excess of $850,000.

74

Table of Contents

Upon execution of the purchase agreement, ACI paid a deposit in the amount of $100,000 and upon execution of the first amendment to the purchase agreement, ACI paid an additional deposit in the amount of $75,000, all of which will be credited towards the cash portion of the purchase price at closing.

We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which will be used to pay a portion of the cash portion of the purchase price, and a revolving loan in the expected principal amount of $10 million, which will be used for general corporate and working capital purposes. We intend to use all of the proceeds of the term loan to pay a portion of the purchase price and the proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses.

**Representations, Warranties and Covenants**

The purchase agreement contains customary representations, warranties and covenants, including those related to the operation of Appliances Connection's business prior to the closing, a customary non-solicitation covenant during the period prior to closing, and a covenant that the sellers will not compete with the business of 1 Stop as of the closing date for a period of two (2) years following closing.

The purchase agreement also contains customary demand and "piggy-back" registration rights with respect to the shares to be issued to the sellers.

**Conditions to Closing**

The closing of the purchase agreement is subject to customary closing conditions, including, without limitation:

•	the receipt of all authorizations, consents, permits, licenses or approvals of all governmental authorities or other third parties;

•	the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended, which has been completed;

•	the absence of any temporary, preliminary or permanent restraining order preventing the consummation of the proposed acquisition;

•	the release of any security interests related to Appliances Connection;

•	the execution of new leases for properties leased by 1 Stop and Joe's Appliances;

•	the execution of certain employment agreements between certain officers of Appliances Connection and ACI;

•	the receipt of an opinion of the sellers' counsel; and

•	the receipt of documents required for the transfer of the securities of Appliances Connection to ACI.

In addition, ACI shall have obtained on terms and conditions reasonably satisfactory to it all of the financing necessary to pay the cash portion of the purchase price and pay related fees and expenses to consummate the proposed acquisition and provide reasonably adequate working capital for Appliances Connection after the closing.

The purchase agreement contains a number of conditions that must be fulfilled to complete the proposed acquisition. There can be no assurance that the conditions to the closing will be satisfied or that the proposed acquisition will be completed. See "Risk Factors — Risks Related to the Proposed Acquisition."

**Other Agreements**

In connection with closing of the proposed acquisition, we agreed to use commercially reasonable efforts to cause each holder of 10% or more of our voting power to enter into a voting agreement requiring such persons to vote in favor all proposals coming before stockholders at the meeting referred to above. The voting agreement will also contain certain transfer restrictions for our securities owned by them.

Table of Contents

In addition, each seller agreed to enter into a lock-up agreement which will provide that the seller may not transfer or assign or otherwise dispose of the shares that will be issued to such seller at closing for a period of 180 days after the closing, and thereafter the seller will only be permitted to sell shares at a rate of no more than one percent of our outstanding stock per quarter until the one year anniversary of the closing.

**Indemnification**

The purchase agreement contains mutual indemnification for breaches of representations or warranties and failure to perform covenants or obligations contained in the purchase agreement. In the case of the indemnification provided by the sellers with respect to breaches of certain non-fundamental representations and warranties, the sellers will only become liable for indemnified losses if the amount exceeds an aggregate of $2,100,000, whereupon the sellers will be liable for all losses relating back to the first dollar, provided that the liability of the sellers for breaches of certain non-fundamental representations and warranties shall not exceed $21,000,000.

**Termination**

The purchase agreement may be terminated as follows:

- by mutual written consent of ACI, our company and the sellers at any time prior to the closing;

- by either ACI and our company or the sellers if any governmental entity will have issued an order or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by the purchase agreement;

- by either ACI and our company or the sellers if the closing does not occur on or before June 30, 2021; provided, that the right to terminate shall not be available to any party that has breached in any material respect its obligations under the purchase agreement in any manner that shall have caused the failure of a condition to the consummation of the proposed acquisition;

- by ACI and our company if any seller or Appliances Connection has breached its respective representations and warranties or any covenant or other agreement to be performed by it in a manner such that the closing conditions related to such representations, warranties or covenants of such party would not be satisfied; or

- by the sellers if ACI or our company has breached its representations and warranties or any covenant or other agreement to be performed by it in a manner such that the closing conditions related to such representations, warranties or covenants of such party would not be satisfied.

In the event that the purchase agreement is terminated in accordance with the circumstances described in the first, second or fourth bullets set forth above, the deposit referred to above shall be returned to ACI with two (2) business days. In the event that the purchase agreement is terminated by the sellers in accordance with the circumstances described in the third or fifth bullets set forth above, the sellers shall retain the deposit.

76

Table of Contents

**BUSINESS**

**Overview**

*About Goedeker*

Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 SKUs across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

*About Appliances Connection*

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website *1stopcamera.com*.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at *goldcoastappliances.com*.

Joe's Appliances, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, *joesappliances.com*.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website *www.appliancesconnection.com*.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

Appliances Connection has built powerful home-grown logistics technology that can help reduce cycle time and efficiencies for the combined company's operations. Appliances Connection will bring the relationships, network, and technology necessary to continue economies of scale for the entire business of the combined company throughout the United States e-commerce market. The combined company will leverage Appliances Connection's powerful platform to increase speed, reduce costs and increase margins across our entire business.

Table of Contents

On a combined (pro forma) basis, the combined company had total sales of $368 million for the year ended December 31, 2020.

**The Large and Growing United States Appliance Market**

The United States household major appliances market is highly fragmented with big box retailers, online retailers, and thousands of local and regional retailers competing for share in what has historically been a high touch sale process. According to Statista, revenue in the United States household major appliances market (excluding small appliances) is projected to reach $22.9 billion in 2021 and is expected to grow at an annual growth rate of 1.68% from 2021 to 2025.

According to the United States Census Bureau, there are approximately 100 million households in the United States with annual incomes between $25,000 and $250,000 and approximately 193 million individuals between the ages of 20 and 64 in the United States, many of whom are accustomed to purchasing goods online. As younger generations age, start new families and move into new homes, we expect online sales of household appliances to increase. In addition, we believe the online household appliances market will further grow as older generations of consumers become increasingly comfortable purchasing online, particularly if the process is easy and efficient.

When shopping for appliances their homes, consumers bring their own unique combination of style and budget, requiring vast selection to garner broad appeal. Brick and mortar retailers must balance selection with the challenges of high inventory carrying costs, complex vendor requirements and limited showroom and storage space. As a result, consumers are faced with a decision between shopping in multiple stores, or settling for what is available. Just as e-commerce has changed the landscape of other retail sectors, we believe an easy-to-browse, online shopping experience with massive selection and excellent customer service has the potential to change the way people buy household appliances.

Logistics, fulfillment and customer service for household appliances are challenging given the myriad vendors and product specifications, and the cumbersome size and weight of items. Household appliances often have a low dollar value to weight ratio compared to other categories of retail, therefore requiring a logistics network that is optimized for items with those characteristics. Many consumers also seek first-rate customer service so they are not burdened with managing delivery, shipping and return logistics on their own. However, we believe big box retailers that serve the mass market for home goods are often unable or unwilling to provide this level of service.

**Our Solution — Key Benefits for Our Customers**

The combined company will offer broad selection and choice. We believe that the combined company will offer the largest online selection of household appliances, with over 51,000 household appliance SKUs. The combined company's easy to use websites make it easy for customers to discover products, styles and price points that appeal to them. Convenience and value are central to our offering. The combined company will offer a one-stop shop for consumers in the appliance category, with competitive pricing reflecting the many vendors on its platform and a differentiated and robust merchandising experience.

The combined company will offer consumers an engaging shopping journey through the combination of its technology-rich platform and its experienced customer support personnel, available via chat, email, text and phone. Superior customer service will be a core part of the experience that the combined company will offer shoppers. The combined company's customer service organization will help consumers navigate its sites, answer questions and complete orders, staffed with specialists focused on specific product classes. This team will help the combined company build trust with consumers, enhance its reputation and drive sales.

**Competitive Strengths**

We believe that the combined company will be a leading e-commerce appliance retailer due to its following key strengths:

- ***Name and reputation***.   We believe that the combined company will enjoy a long-standing (50+ years) reputation with vendors and customers for its focus on offering a full line of appliances and other home furnishings with competitive pricing and superior customer service.

- ***Product selection and pricing***.   We believe that the combined company's broad product selection and attractive pricing model will create a sustainable competitive advantage. The combined company will

78

Table of Contents

strive to offer consumers the broadest choice in the market and review pricing by other retailers on a daily basis to ensure its product offerings are competitively priced. Goedeker and Appliances Connection have negotiated attractive terms with their respective vendor partners, allowing them to pass through savings and selection to customers.

- *Website ease of use*.    The combined company's purpose-built technology platform will be designed to provide consumers with a compelling user experience as they browse, research and purchase its products. The combined company will use personalization, based on past browsing and shopping patterns, to create a more engaging consumer experience.

- *Best in class customer service and marketing technology*.    We believe that the investments that Goedeker and Appliances Connection have made in their respective call center tools and shopping platforms, combined with digital marketing optimization, will allow the combined company to offer an unmatched customer journey.

- *Logistics technology and efficiency*.    The combined company's proprietary technology will eliminate manual steps and reduce order processing time, allowing it to provide faster services to customers.

**Our Growth Strategies**

Our mission is to change the way consumers buy appliances and, in doing so, become the leading online retailer of home appliances. The strategies of the combined company to achieve this mission, while increasing value for our shareholders, will include:

- *Grow our brand*.    Increasing brand awareness and growing favorable brand equity among consumers is central to the growth, of the combined company following the proposed acquisition. The combined company plans to drive brand awareness through a combination of sophisticated, multi-layered marketing programs and word-of-mouth referrals. The combined company will continue to invest in marketing initiatives to efficiently attract consumers.

- *Expand in the commercial market*.    To date, Goedeker and Appliances Connection have directed all marketing efforts toward the consumer. With remodels and new home construction, there is opportunity to market to home builders, real estate developers, contractors and interior designers who are making or influencing the purchasing decision for many consumers. We believe that the combined company's low price business model will be received well by this market, creating substantial revenue opportunities and more repeat business. Evidence of unmet demand and market need is ongoing with large commercial sales occurring organically each week through Goedeker and Appliances Connection's websites and contact centers.

- *Drive continued operational excellence*.    Goedeker and Appliances Connection are committed to improving productivity and profitability through several operational initiatives designed to grow revenue and expand margins. Some of the key initiatives for operational excellence for the combined company include:

- *Logistics and shipping optimization*.    The combined company will implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. The combined company plans to pick up product from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, we expect to take advantage of buying opportunities and capture time-sensitive customers more frequently. The combined company will also explore options to use a showroom, warehousing and cross dock model in other key markets.

- *Optimize price*.    The combined company will continue building a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing for our products.

Table of Contents

- *Drive marketing efficiencies*.   As the combined company continues to grow and scale, we believe that the combined company will continue to improve the efficiency of its marketing investments. We believe that with larger budgets and deeper experience, the combined company will benefit from lower media rates and increased data that will improve its customer targeting capabilities.

- *Opportunistically pursue strategic acquisitions*.   The combined company may continue to expand its business through opportunistic acquisitions that allow it to enhance its customer offering, build its multi-brand portfolio, enter new geographies or enhance its operational infrastructure.

**Products and Services**

*Appliances*

The appliance category is our largest revenue source. We have a long history of selling these products and serving the distinct needs of consumers looking to replace or add to their home appliances. We offer nearly 22,000 appliance SKUs from all mainline original equipment manufacturers, including Bosch, Whirlpool, GE, Maytag, LG, Samsung, Sharp, and Kitchen Aid, among others. We sell all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers.

Appliances Connection is an authorized dealer of most major appliance brands, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool. It offers approximately 51,000 appliance SKUs. It sells all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers, and air conditioners.

*Furniture*

We began selling furniture online in 2015 and currently offer approximately 63,000 SKUs from approximately 150 furniture vendors. Appliances Connection also sells a full line of furniture for every room in the home and currently offers approximately 247,700 SKUs from approximately 240 furniture vendors.

Both companies utilize sophisticated websites that include organization of product by type and characteristics that make for a complete shopping experience in a complicated product category.

*Other Products*

We also offer a broad assortment of products in the décor, bed & bath, lighting, outdoor living and electronics categories. While these are not individually high-volume categories, they complement the appliance and furniture categories to produce a one-stop home goods offering for our customers.

Appliances Connection also sells outdoor living products, fitness equipment, plumbing fixtures, air conditioners, fireplaces, fans, dehumidifiers, humidifiers, air purifiers and televisions. Appliances Connection also sells commercial appliances for its builder and business clients.

Appliances Connection is an authorized dealer of most major outdoor appliance and furniture brands. It sells all major outdoor living appliances and furniture including various types of electronic, charcoal, and gas grills, barbeques, and smokers. Appliances Connection also offers anything a customer would need to create a fully functioning outdoor kitchen, including outdoor refrigerators, sinks, ranges, kitchen islands, ice makers, and warming drawers. Appliances Connection's patio and lawn furniture selection include umbrellas, lounge chairs, outdoor beds, outdoor fireplaces and fire pits, swings, patio sets, and patio sofas.

We also offer customers the opportunity to purchase warranties that protect their appliances beyond the manufacturers' warranty period. These warranties are offered through third party vendors. We remit the cost of the warranty to the warranty company, net of our commission. The warranty company assumes all costs of the warrantied product.

*Installation and Other Services*

We and Appliances Connection offer installation and removal services within the continental United States. A full-service install involves hooking up the appliance, testing it to ensure proper operation, and removing packing materials from customer's home, office or other delivery location. We fulfill such installation services through third-party logistics

Table of Contents

service provider partners. Appliances Connection primarily fulfills such installation services internally through YF Logistics, utilizing third-party logistics service provider partners provide these services to delivery points in remote areas within the continental United States where YF Logistics may not be available.

Appliances Connection also has outside business partners such as Scavolini, a leader in kitchen cabinetry and design, and an in-house design team trained by the experts at Scavolini that will help customers remodel and reinvent their kitchens, living rooms, bathrooms and laundry rooms.

**Pricing**

We believe that our pricing model creates a competitive advantage as we strive to sell at the lowest possible price in the market. Our team tracks pricing daily on more than 15,000 appliance SKUs, comparing prices with all major resellers. Adjustments are made daily to ensure the success this strategy. Our business model emphasizes value added products up to and including super premium products. As a result, we believe that our average selling price by product category is higher than industry norms.

Appliances Connection provides the customer with a full suite of appliance and furniture options, from familiar household names up to luxury and premium brands, utilizing a pricing model intended to offer customers the lowest prices available in the market. This allows the customer to easily find the appliance they are looking for within their budget. Appliances Connection's team tracks the manufacturer minimum advertised price, or MAP, daily on more than 51,000 appliance SKUs, comparing prices across all major resellers. Price adjustments are made monthly or more frequent basis to ensure product offerings are competitively priced, maximizing value for customers.

**Vendor/Supplier Relationships**

We offer more than 240 vendors and over 141,000 SKUs available for purchase through our website. During the year ended December 31, 2020, we purchased a substantial portion of products from Whirlpool (38%) and General Electric brands (12.3%). Whirlpool brands accounted for 44.1% of product purchases during the year ended December 31, 2019. No other supplier accounted for more than 10% of our purchases in the years ended December 31, 2020 or 2019.

Appliances Connection offers more nearly 2,000 vendors and nearly 300,000 SKUs available for purchase through its website. Appliances Connection is a member of Dynamic Marketing, Inc., or DMI, a 60-member appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and them make such products available to its members, including Appliances Connection, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including Appliances Connection, with leverage and purchasing power with appliance vendors, and increases Appliances Connection's ability to compete with competitors, including big box appliance and electronics retailers. Appliances Connection owns an approximate 5% equity interest in DMI. Additionally, Albert Fouerti, one of the owners of Appliances Connection who will also become a member of our board of directors upon closing of the proposed acquisition, is on the Board of DMI. During the years ended December 31, 2020 and 2019, Appliances Connection purchased a substantial portion of products (75.2% and 70.7%, respectively) from DMI. The other largest vendors include the following: Ashley Furniture, Sub-Zero, Miele, BSH Home Appliances, Ilve, and ALMO Distributing. Appliances Connection's business model allows it to constantly review and evaluate each supplier relationship and it is are always open to building new supplier/vendor relationships.

As noted above, we are substantially dependent on Whirlpool for a large portion of our product purchases and Appliances Connection utilizes DMI for a large portion of its product purchases. Products are purchased from all suppliers, including any purchases made from Whirlpool or through DMI, on an at-will basis. Neither our company nor Appliances Connection has any long-term purchase agreements with Whirlpool or DMI, as applicable, or any other suppliers. Relationships with suppliers are subject to change from time to time. Changes in relationships with suppliers occur periodically and could positively or negatively impact net sales and operating profits. We believe that both companies can be successful in mitigating negative effects resulting from unfavorable changes in the relationships with suppliers through, among other things, the development of new or expanded supplier relationships. Please see "Risk Factors" for a description of the risks related to supplier relationships, including our dependence on Whirlpool.

81

Table of Contents

**Sales and Marketing**

*Goedeker*

We market our products through a variety of methods, including through paid shopping and paid searches, display marketing, affiliate marketing, organic marketing, paid social media marketing and email marketing. The diagram below sets forth some of our key marketing statistics for 2020.



This chart shows results from our marketing efforts. The revenue shown exceeds total revenue as a customer may visit the site more than once before making a purchase, causing revenue attribution in multiple channels.

*Paid Shopping and Paid Search*

Our most effective channel is paid shopping and paid search. We utilize multiple search platforms (primarily Google) to put our products in front of consumers that are searching for products online. We have engaged a "best in class" agency and continually monitor and optimize campaigns in order to create more efficient and profitable campaign results. We specialize in a "bottom of the funnel" approach, meaning our campaigns are designed to spend more liberally with those at the end of the purchase cycle, and more conservatively with those in the beginning of the purchase journey.

*Display Marketing*

The majority of our display efforts are in the form of remarketing across the Google ad network. At this time, we are not focused on major branding efforts as much as we are on capitalizing on consumers who have begun their buying journey. With high average order values, we find that remarketing works effectively at bringing consumers back on the website or the phone to place an order.

*Affiliate Marketing*

Keeping a keen eye on nexus laws, we have scaled back our affiliate marketing in order to protect the interests of our company. We have found that the administrative burden and tax impact or revenue generated by many of the affiliates outweighed the benefits. As of the date of this prospectus, we have only one affiliate marketing relationship remaining with 169 affiliate partners.

Table of Contents

*Organic Marketing*

Organic marketing continues to be a strong channel for our company. While we are not heavily invested in organic at this time, the channel resulted in approximately 1.1 million users coming to our website in 2020. We understand best practices in technology, programming, copywriting, link acquisition as well as many other strategies to ensure we are in a strong position with the largest search engines.

*Paid Social Media*

Social media is utilized sparingly to drive traffic and manage brand perception. It is our goal to not look irrelevant to consumers viewing us on social media, while at the same time minimizing spending on these channels. We have found awareness campaigns on social media to be ineffective with products at our price point. We do take advantage of the remarketing opportunities on Facebook, which work well for us by driving highly qualified traffic back to our website where that traffic is converted to customers.

*Email*

Using email marketing, we put relevant products and offers in front our of a growing email database of approximately 259,000 opted-in consumers multiple times per week. Our marketing team produces email content by utilizing in-house design, copy and programming resources. Messages are sent using an enterprise-level email service provider and metrics such as deliverability, open rates and click rates are constantly monitored. Messages are targeted to individuals based on numerous factors including what time they are most likely to read emails, past purchase behavior and frequency of interaction.

Additionally, we utilize a multitude of triggered email programs, such as cart and browse abandonment, to entice customers back into the funnel. We continue to pursue best practices such as offer modals and scraping the checkout in order to facilitate continued list growth. Below is a diagram representing key performance metrics for the period from July to December 2020.



**Appliances Connection**

Appliances Connection markets its products through a variety of methods, including through online advertisements and promotions and digital marketing, including through Appliances Connection's retail website, *www.appliancesconnection.com*. To a lesser degree, it also utilizes more traditional forms of marketing like television and radio advertisements in the New York City media market.

Table of Contents

*Online Advertisement and Promotions*

Appliances Connection's major marketing channel is its website located at *www.appliancesconnection.com*. The website is key to new product launches as consumers can view product features and specifications. The website is up to date with all promotional MAP pricing, falling in line with expectations from the manufacturers and taking advantage of buyer holidays. The website facilitates sales of products to markets not reached by Appliances Connection's brick and mortar store.

*Digital Marketing*

Appliances Connection has more than 12,100 followers on Twitter, 28,700 fans on Facebook and 2,000 subscribers on YouTube. It has been using digital marketing media with engaging posts to promote its products.

*Television and Radio Marketing*

Appliances Connection utilizes television and radio marketing as a more traditional means to reach customers who may not be as active online or on social media, primarily targeting the New York City media audience.

*Showrooms*

Appliances Connection maintains two showrooms in Brooklyn, New York where customers can fully visualize their renovations by touching and seeing the products in the showroom. The showrooms also allow customers to access factory-trained staff's knowledge and experience to assist customers with their product selections.

**Customers and Markets**

Based on a study that we commissioned in 2019, our average shopper is between 35 and 64 years old and lives in a single-family home, which they own. Most of our customers are not reluctant to buy at a premium price for top quality as long as we and our products provide good value. Our most popular brands tend to be middle to upper market brands that are not found in the stores of many large retailers. A significant percentage of our customers have household income above $100,000.

Our physical store presence and warehouse is located in St Louis, Missouri, and third-party distribution, delivery and installation agreements allow us to serve, sell and ship to customers nationwide. We plan to expand our agreements directly with manufacturers to pick up and deliver from their warehouse to reach more customers, more quickly at reduced costs. In fact, while we started many years ago as a brick and mortar only business, about 78% of our sales originate from outside the Midwest market. The diagram below represents our sales by region for 2020:



84

Table of Contents

Most of Appliances Connection's customers are not reluctant to buy at a premium price for top quality as long as Appliances Connection and its products provide good value. The most popular brands tend to be middle to upper market brands that are not found in the stores of many large retailers. Customers demand variety and Appliances Connection has successfully been able to provide them with an abundance of options when it comes to choosing their household appliances and furniture.

While Appliances Connection's physical showrooms are located in Brooklyn, New York and its warehouse is located in New Jersey, the combination of YF Logistics and third-party distribution, delivery and installation agreements allow Appliances Connection to serve, sell and ship to customers nationwide. Its proprietary logistical technology has allowed it to expand its presence outside of the Northeast region and Appliances Connection is able to provide customers all over the country with the top-notch level of support that the original Northeastern customers have always enjoyed. While about one-third of Appliances Connection's sales are still in the Northeast market, it has successfully been expanding its footprint into the rest of the Continental United States The diagram below represents Appliances Connection's sales by region for 2020:



**Customer Support**

Our customer support team exists to sell and service customers at all parts of the buying and ownership cycle. We believe that by integrating phone support with marketing efforts, we differentiate ourselves from big box and independent retailers. Leading edge contact center technology and management is in early stage deployment and promises to increase sales close rates, decrease cancellations, increase average ticket size and create customers that purchase within the next twelve months. Current repeat purchasing is roughly 11% within a year, which demonstrates a reasonable satisfaction with the current model. We have a customer service team of 29 members and call center sales team of 22 members.

Our call center is now available to field inbound customer calls from 8:00 am to 6:00 pm CT, Monday through Saturday and Sunday from 12:00pm to 6:00 pm CT. Approximately 36% of all sales involve an order that was placed with a sales representative. This percentage should increase in 2021 as chat becomes a more deployed resource for our shoppers and customers.

Appliances Connection's in-house customer support team facilitates sales and support for its products at each stage of the purchasing process as well as ongoing post-sale technical support. Appliances Connection's customer care staff, which includes approximately 54 employees, includes a highly-trained and knowledgably call center sales team that also provides customer support over the phone, via email, or via online chat on its website. Additionally, the customer care staff provides technical support to customers, offering additional information with respect to product features and manufacturer warranties to increase customer satisfaction and return business.

85

Table of Contents

Appliances Connection's call center is now available to field inbound customer calls from 9:00 am to 9:00 pm ET, Monday through Thursday, Friday from 9:00 am to 4:00 pm ET and Sunday from 10:00 am to 5:00 pm ET. Approximately 50% of all sales involve an order that was placed with a sales representative. Appliances Connection expects this percentage to increase in 2021 as online chat becomes a more deployed resource for shoppers and customers.

**Logistics**

***Purchasing and Inventory Management***

We primarily purchase inventory only after a sale has been made through our website, which allows us to tightly manage our inventory and warehouse space while still providing customers quick delivery times and control over the entire process. However, we do also make some strategic inventory buys to take advantage of lower costs and to satisfy consumer demand more quickly. About 64% of appliances flow through our warehouse while almost all furniture is drop shipped to the customer. All inventory is managed with a barcode system and is automatically tracked through our Microsoft Dynamics GP ERP system. As described above, initiatives are underway that will allow us to pick up products closer and more quickly directly from our manufacturers' warehouses.

Appliances Connection carefully monitors and manages its inventory levels in an effort to match quantities on hand with customer demand as closely as possible by tracking historical and projected consumer demand, as well as continuous monitoring and adjustment of inventory receipt levels. In some instances, Appliances Connection purchases inventory only after a sale has been made through its website. Nearly all of Appliances Connection's appliances flow through its Hamilton, New Jersey warehouse. All inventory is managed with a barcode system and is automatically tracked through its proprietary in-house inventory management system.

***Shipping and Delivery***

We take ownership of inventory when it is delivered to our warehouse. At this point, warehouse staff unloads the product, determines the delivery location, picks a carrier and ultimately ships the product. We primarily use R+L Carriers for most of our larger shipping services. We also use AM Home Delivery for furniture deliveries. If a customer is outside of their service zones or requires faster delivery times, we will use one of our three or four specialty carriers to get the job done.

Appliances Connection takes ownership of inventory when it is delivered to its warehouse in New Jersey. At this point, warehouse staff unloads the product, determines the delivery location, picks a carrier and ultimately ships the product. Appliances Connection primarily uses YF Logistics for its shipping and logistics services; however, if the shipment is outside of YF Logistics' service zone, it utilizes other third party carriers for shipping and installation services to get the job done.

Appliances Connection plans to implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. Appliances Connection plans to pick up product from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, Appliances Connection expects to take advantage of buying opportunities and capture time-sensitive customers more frequently. The combined entity will explore options to use a showroom, warehousing and cross dock model in other key markets.

***Returns and Exchanges***

We offer a 30-day money back, 100% satisfaction guarantee. If a customer is not satisfied with his or her order, we will exchange or refund the full purchase price, minus all shipping costs, within 30 days of delivery. We do not charge a restocking fee when items are returned or exchanged, which we believe differentiates us from other retailers. We will not take returns of, or exchange, products that are damaged, installed, assembled, or used after the customer has taken delivery.

Appliances Connection offers a 30-day return policy that allows customers to return merchandise if, for any reason, they are not 100% satisfied with their purchase. If a customer is not satisfied with his or her order, Appliances Connection will exchange or refund the full purchase price within 30 days of delivery.

Each company's return and exchange policy is designed to be as worry-free and customer-friendly as possible.

Table of Contents

**Competition**

Both companies compete with big box retailers, independent appliance and furniture retailers, hybrid retail and direct-to-consumer companies and web only companies. As hybrid retail and direct-to-consumer companies, they have the ability to navigate the competitive offerings of each competitor, utilizing online marketing, their customer service expertise and large curated assortments to attract and retain new customers.

*Appliances*

The United States appliance market in general is highly fragmented with thousands of local and regional retailers competing for share. The primary competitors in the appliance market include:

- *Big Box Retailers:*   Home Depot, Lowe's, Best Buy and Walmart

- *Online Retailers and Marketplaces:*   Amazon and Wayfair

- *Specialty Retailers:*   AJ Madison and US Appliance

- *Regional Retailers:*   P.C. Richards & Sons

The shifting landscape to online sales in the segment is providing a significant market share capture and positioning opportunity for companies. Both companies are continuing to capitalize on this market shift.

*Furniture and Homewares*

Although consolidation in the United States furniture and homeware market continues to progress, the industry is still relatively fragmented compared to other retail subsectors of similar market value. The main competitors in the furniture and homewares market include:

- *Furniture Stores:*   Ashley Furniture, Bob's Discount Furniture, Havertys, Raymour & Flanagan and Rooms To Go

- *Big Box Retailers:*   Bed Bath & Beyond, IKEA, Target and Walmart

- *Department Stores:*   JCPenney and Macy's

- *Specialty Retailers:*   Crate and Barrel, Ethan Allen, TJX, At Home, Williams Sonoma, Restoration Hardware, Arhaus, Horchow, Room & Board and Mitchell Gold + Bob Williams

- *Online Retailers and Marketplaces:*   Amazon, Wayfair and eBay

Much like the appliance market, the shifting landscape to online sales in the segment is providing a significant market share capture and positioning opportunity for companies. Both companies are continuing to capitalize on this market shift. We believe there may be opportunities for nationally distributed niche products, like sleeper sofas, where we could benefit from not inventorying product but marketing and then ordering on demand after payment. Similar opportunities are even more broadly available in the appliance market.

**Intellectual Property**

We own several domain names, including for our *www.goedekers.com* website.

1 Stop operates under the registered trademark "CONNECT TO GOOD." Superior Deals owns four registered trademarks, "FORTÉ," "SUPERIORBRANDS," "MILO ITALIA" and "SUPERIORBRANDS." 1 Stop and Gold Coast own numerous domain names, including the *www.appliancesconnection.com website, as well as 1stopcamera.com, goldcoastappliances.com, and joesappliances.com.*

The agreements with suppliers generally provide us and Appliances Connection with limited, non-exclusive licenses to use the supplier's trademarks, service marks and trade names for the sole purpose of promoting and selling their products.

Table of Contents

To protect intellectual property, both companies rely on a combination of laws and regulations, as well as contractual restrictions. They also rely on the protection of laws regarding unregistered copyrights for certain content they create. They also rely on trade secret laws to protect proprietary technology and other intellectual property. To further protect intellectual property, we enter into confidentiality agreements with our executive officers and directors.

**Facilities**

We are headquartered at 13850 Manchester Rd., St. Louis, Missouri 63011. This facility totals 50,000 square feet of office, showroom and warehouse space. We lease this facility pursuant to a lease agreement entered into with S.H.J., L.L.C., a Missouri limited liability company and affiliate of Goedeker Television, on April 5, 2019. The lease is for a term of five (5) years and provides for a base rent of $45,000 per month. In addition, we are responsible for all taxes and insurance premiums during the lease term.

On January 13, 2021, we entered into a lease agreement with Westgate 200, LLC, which was amended on March 30, 2021, for a new location totaling approximately 86,800 square feet of office, showroom and warehouse space in St. Charles, Missouri. The initial term of the lease expires on April 30, 2027 with two (2) options to renew for additional five (5) year periods. The base rent is initially $20,976.79 per month and increases to $31,465 on October 1, 2021, with annual increases thereafter to a base rent during the sixth year of $35,558 per month. We will also pay our 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and are also responsible to pay for the utilities used on the premises.

Appliances Connection is headquartered at 1870 Bath Avenue, Brooklyn, NY 11214. It has a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York.

Appliances Connection leases two facilities pursuant to lease agreements entered into between 1 Stop and Joe's Appliances and 1870 Bath Ave. LLC and 7812 5th Ave Realty LLC, respectively, which are entities owned and controlled by Albert Fouerti and Elie Fouerti, the principal officers and owners of 1 Stop and Joe's Appliances. The leases are for a term of ten (10) years and provide for different monthly fixed rent from $5,300 per month to $74,000 per month for the first year of the term. In addition, Appliances Connection is responsible for all taxes and insurance premiums during the lease term.

YF Logistics subleases the warehouse space from DMI for a rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty (30) days' prior written notice or (ii) April 30, 2024.

We believe that all properties have been adequately maintained, are generally in good condition, and are suitable and adequate for the businesses of Goedeker and Appliances Connection.

**Employees**

As of December 31, 2020, we employed 102 full-time employees, 1 Stop employed 154 full-time employees, YF Logistics employed 135 full-time employees, Superior Deals employed 5 full-time employees and Joe's Appliances employed 1 full-time employee. Gold Coast did not have any full-time employees. None of the employees are represented by labor unions, and we believe that Goedeker and Appliances Connection have excellent relationships with their respective employees.

**Legal Proceedings**

From time to time, the combined company may become involved in various lawsuits and legal proceedings which arise in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these or other matters may arise from time to time that may harm our business. We are not currently aware of any such legal proceedings or claims that we believe will have a material adverse effect on the business, financial condition or operating results of Goedeker, Appliances Connection or the combined company.

88

Table of Contents

**Regulation**

Our combined business is subject a variety of laws and regulations applicable to companies conducting business on the Internet. Jurisdictions vary as to how, or whether, existing laws governing areas such as personal privacy and data security, consumer protection or sales and other taxes, among other areas, apply to the Internet and e-commerce, and these laws are continually evolving. For example, certain applicable privacy laws and regulations require us to provide customers with our policies on sharing information with third parties, and advance notice of any changes to these policies. Related laws may govern the manner in which we store or transfer sensitive information or impose obligations on us in the event of a security breach or inadvertent disclosure of such information. Additionally, tax regulations in jurisdictions where we do not currently collect state or local taxes may subject us to the obligation to collect and remit such taxes, or to additional taxes, or to requirements intended to assist jurisdictions with their tax collection efforts. New legislation or regulation, the application of laws from jurisdictions whose laws do not currently apply to our business, or the application of existing laws and regulations to the Internet and e-commerce generally could result in significant additional taxes on our business. Further, we could be subject to fines or other payments for any past failures to comply with these requirements. The continued growth and demand for e-commerce is likely to result in more laws and regulations that impose additional compliance burdens on e-commerce companies.

89

Table of Contents

**MANAGEMENT**

**Directors and Executive Officers**

Set forth below is information regarding our directors, executive officers and significant employees as of the date of this prospectus.

| Name | Age | Position |
| --- | --- | --- |
| Douglas T. Moore | 64 | Chief Executive Officer and Director |
| Robert D. Barry | 77 | Chief Financial Officer |
| Thomas S. Harcum | 38 | Chief Marketing Officer and Chief Technology Officer |
| Jacob Guilhas | 42 | Vice President of Logistics |
| Michael K. Hargrave | 55 | Chief Merchant |
| Albert Fouerti | 41 | President of ACI and Director Nominee[1] |
| Elie Fouerti | 42 | Vice President of ACI[2] |
| Ellery W. Roberts | 50 | Chairman of the Board |
| Edward J. Tobin | 64 | Director |
| Ellette A. Anderson | 44 | Director |
| Clark R. Crosnoe | 52 | Director |
| Paul A. Froning | 50 | Director |
| Glyn C. Milburn | 50 | Director |
| Alan P. Shor | 62 | Director Nominee[3] |

———————

(1)    Albert Fouerti will become the President of ACI and a member of our board of directors upon closing of the proposed acquisition.

(2)    Elie Fouerti will become the Vice President of ACI upon closing of the proposed acquisition.

(3)    Alan P. Shor will become a member of our board of directors upon closing of the proposed acquisition.

***Douglas T. Moore.***   Mr. Moore has served as our Chief Executive Officer since August 2019 and as a director since April 2020. Through his more than 25 years of retail experience, Mr. Moore has developed an understanding of strategic and tactical business issues that include store operations, merchandising, supply chain, sourcing and human resource planning. He also possesses senior management, marketing, risk assessment and retail knowledge. Prior to joining us, Mr. Moore was President and Chief Executive Officer of Med-Air Homecare, a home healthcare equipment and service provider, from November 2013 until May 2019, Principal of First Street Consulting, LLC, a retail consulting firm, from January 2011 until October 2017, and Senior Vice President of FirstSTREET for Boomers and Beyond, Inc., a leading direct marketer of products for baby boomers, from October 2017 until August 2019. From February 2012 through June 2012, Mr. Moore served as the Chief Merchandising and Marketing Officer at hhgregg, Inc., a consumer electronics retail chain. Mr. Moore has served on the board of directors of Lumber Liquidators Holdings, Inc., one of the leading specialty retailers of hard-surface flooring in North America, since April 2006. Mr. Moore received his undergraduate degree and M.B.A. from the University of Virginia. We believe Mr. Moore is qualified to serve on our board of directors due to his extensive experience in the retail industry and public company board experience.

***Robert D. Barry.***   Mr. Barry has served as our Chief Financial Officer since our inception and as a director from inception until April 2020. He has served on the board of directors of our former parent company, 1847 Holdings LLC, or 1847 Holdings, since January 2014 and has served as Controller of 1847 Holdings' subsidiary Neese, Inc., since July 2017. From April 2013 until August 2016, Mr. Barry was Chief Executive Officer and Chief Financial Officer of Pawn Plus Inc., a chain of five retail pawn stores in suburban Philadelphia and one pawn store in northeastern Ohio. Prior to that, Mr. Barry served as Executive Vice President and Chief Financial Officer of Regional Management Corp., a consumer loan company based in Greenville, South Carolina, from March 2007 to January 2013. Prior to joining Regional Management Corp., Mr. Barry was the Managing Member of AccessOne Mortgage Company, LLC in Raleigh, North Carolina, from 1997 to 2007. During this time, he also served as part-time Chief Financial Officer for Patriot State Bank, in Fuquay-Varina, North Carolina, from March 2006 to March 2007 and Nuestro Banco, Raleigh, North Carolina, from July 2006 to March 2007. Prior to his time at AccessOne, Mr. Barry was Executive Vice President and Chief Financial Officer for Regional Acceptance Corporation, a consumer finance company based in Greenville, North Carolina and prior to that he was a financial institutions partner in the Raleigh, North Carolina office of KPMG LLP. Mr. Barry is a Certified Public Accountant licensed in North Carolina and Georgia.

Table of Contents

***Thomas S. Harcum***.   Mr. Harcum has served as our Chief Marketing Officer and Chief Technology Officer since January 2020. He has almost 20 years of experience in marketing and technology in several fields, including pharmaceuticals and publishing. Particularly, Mr. Harcum's expertise includes direct to consumer e-commerce, lead generation and cost center management and P&L responsibilities for marketing funnel management, customer acquisition, telephony, product development, technology management, project management, development lifecycle and brand management. Previously, he was the Senior Director of Marketing for firstSTREET from October 2012 to December 2019. Mr. Harcum has a B.A. from Virginia Commonwealth University.

***Jacob Guilhas***.   Mr. Guilhas has served as our Vice President of Logistics since October 2020. In his 20 years of retail logistics experience, he has vast experience in leading a full spectrum of multi-site business operations in highly competitive, fast-paced, and complex environments. Prior to joining us, Mr. Guilhas served as Managing Director at FedEx Supply Chain from March 2016 to October 2019, Head of Logistics and Fulfillment for Groupon from October 2014 to March 2016, facility General Manager with Exel (now DP-DHL) from September 2013 to October 2014, and Regional Operations Director for Walmart eCommerce from September 2003 to September 2013. Mr. Guilhas has served in leadership positions for multiple large-scale distribution and fulfillment centers, and has led a variety of projects including multiple distribution center "greenfield" start-ups, international operations start-ups, and long-term strategic planning. Mr. Guilhas brings specialized experience in coordinating multi-channel operations, complex systems integrations, safety controls, and continuous improvement. Mr. Guilhas holds multiple advanced degrees including a Doctorate of Management from Colorado Tech.

***Michael K. Hargrave***.   Mr. Hargrave has served as our Chief Merchant since May 2020. He has almost 34 years of experience in retail merchandising and management across multiple product categories, especially hardlines segments including appliances, hardware and lawn and garden. Mr. Hargrave has developed an understanding of strategic and tactical business issues that include sales management, merchandising, marketing, product development, strategic sourcing and online content management. He also possesses store operation, supply chain management, website development and affiliate marketing knowledge. Prior to joining us, Mr. Hargrave held roles for Sears Holdings Corporation as Senior Director, Online Hardlines Merchandising from June 2017 until April 2020, Divisional Merchandise Manager Online Tools, from July 2014 until June 2017, and Director, Online Merchandising Lawn & Garden, from March 2009 until July 2014. Mr. Hargrave serves as a founding member of the Advisory Council for the Home Improvement e-Retailer Summit and has been named to the Home Improvement Executive Magazine's "Top 100 Retail Executives." Mr. Hargrave received his undergraduate degree from the University of Michigan.

***Albert Fouerti***.   Mr. A. Fouerti will become the President of ACI and a member of our board of directors upon closing of the proposed acquisition. He has served as the Chief Executive Officer of 1 Stop since 1999. With over 20 years of experience in retail, he has made Appliances Connection into a household name for kitchen appliances. With 1 Stop starting out as a small camera and computer shop in Great Neck, NY, Mr. A. Fouerti was a pioneer for online shopping. Driven by technology, he entered the appliance business in 2008, and has contributed in taking the appliance industry into to the digital age. Along with his brother, Elie Fouerti, they developed a process of delivering bulky items across the United States. We believe Mr. A. Fouerti is qualified to serve as a member of our board because of his extensive experience building and leading the Appliances Connection business from its founding and his insight into our industry and business as Appliances Connection's co-founder and Chief Executive Officer.

***Elie Fouerti***.   Mr. E. Fouerti will become the Vice President of ACI upon closing of the proposed acquisition. He has served as both the Chief Financial Officer and Vice President of 1 Stop for over 20 years. Along with his brother, Mr. A. Fouerti, they have created a successful independent online retailer of appliances. Mr. E. Fouerti helped his brother in developing a process for delivering bulky items across the United States, paving the way for a new era of ordering appliances online. We believe Mr. E. Fouerti is qualified to serve as a member of ACI's management team because of his extensive experience building and leading the Appliances Connection business from its founding and his insight into our industry and business as Appliances Connection's co-founder and Chief Financial Officer.

***Ellery W. Roberts***.   Mr. Roberts has served as the Chairman of our board of directors since our inception. Mr. Roberts brings over 20 years of private equity investing experience to our company. Mr. Roberts has been the Chairman, Chief Executive Officer, President and Chief Financial Officer of 1847 Holdings since its inception on January 22, 2013 and is also the sole manager of our manager. Mr. Roberts has also been a director of Western Capital Resources, Inc., a public company, since May 2010.  In July 2011, Mr. Roberts formed The 1847 Companies LLC, a company that is no longer active, where he began investing his own personal capital and capital of high net worth individuals in select transactions. Prior to forming The 1847 Companies LLC, Mr. Roberts was the co-founder and was co-managing

91

Table of Contents

principal from October 2009 to June 2011 of RW Capital Partners LLC, the recipient of a "Green Light" letter from the United States Small Business Administration permitting RW Capital Partners LLC to raise capital in pursuit of the Small Business Investment Company license with the preliminary support of the Small Business Administration. Mr. Roberts was a founding member of Parallel Investment Partners, LP (formerly SKM Growth Investors, LP), a Dallas-based private equity fund focused on re-capitalizations, buyouts and growth capital investments in lower middle market companies throughout the United States. Previously, Mr. Roberts served as Principal with Lazard Group LLC, a Senior Financial Analyst at Colony Capital, Inc., and a Financial Analyst with the Corporate Finance Division of Smith Barney Inc. (now known as Morgan Stanley Smith Barney LLC). Mr. Roberts received his B.A. degree in English from Stanford University. We believe Mr. Roberts is qualified to serve on our board of directors due to his extensive investment experience.

*Edward J. Tobin*.   Mr. Tobin has served on our board of directors since April 2020. Mr. Tobin has served as Managing Director of our manager since January 2014. From 1997 until November 2014, Mr. Tobin was a Director of Global Emerging Markets North America, Inc., where he managed Special Situations and Venture investing. In this role, he oversaw structured finance transactions in industries such as clean tech, media, telecommunications, manufacturing, real estate and life sciences. Prior to that, Mr. Tobin was Managing Director of Lincklaen Partners, a private family investment office. Previously, he had been a portfolio manager with Neuberger and Berman and a Vice President of Nordberg Capital, Inc. Mr. Tobin received his MBA from the Wharton School, as well as a Master of Science in Engineering and a Bachelor of Science in Economics from the University of Pennsylvania. We believe Mr. Tobin is qualified to serve on our board of directors due to his extensive investment experience.

*Ellette A. Anderson*.   Ms. Anderson has served on our board of directors since July 2020. In 2013, Ms. Anderson founded Griffin Archer LLC, a full-service advertising agency that offers a comprehensive range of services addressing both the traditional and digital marking aspects of business. As the Chief Executive Officer of Griffin Archer, Ms. Anderson is responsible for overseeing new business acquisitions, strategic planning, and creative direction for their entire client portfolio. From April 2004 to August 2013, she served as a Writer and Associate Creative Director at Carmichael Lynch Advertising in Minneapolis where she received multiple industry awards for her creative work on several iconic brands. She holds a B.A. degree in English Literature from the University of Kansas. We believe Ms. Anderson is qualified to serve on our board of directors due to her deep experience in the advertising and marketing industry.

*Clark R. Crosnoe*.   Mr. Crosnoe has served on our board of directors since July 2020. In 2009, Mr. Crosnoe founded CRC Capital LLC, a registered investment advisor and manager of the CRC Investment Fund LP, a private investment partnership focused on publicly-traded equity securities. As managing member of CRC Capital LLC, Mr. Crosnoe is responsible for strategy, oversight and the day-to-day investment decisions of the fund. The portfolio typically includes investments in the consumer, financial, healthcare, industrial and energy sectors. In 1999, Mr. Crosnoe was a founding employee of Parallel Investment Partners where he was named partner in 2003. As a partner, he was responsible for sourcing, evaluating, structuring, executing and monitoring investments, and also dedicated a substantial portion of his time to marketing activities for the firm. Mr. Crosnoe began his career in investment banking at Wasserstein Perella & Co. and also gained valuable experience at multi-billion dollar hedge fund HBK Investments. Mr. Crosnoe holds undergraduate degrees from the University of Texas at Austin and earned an MBA from Harvard Business School in 1996. We believe Mr. Crosnoe is qualified to serve on our board due to his approximately 24 years of private and public investment and advisory experience.

*Paul A. Froning*.   Mr. Froning has served on our board of directors since July 2020. He has served on the board of directors of 1847 Holdings since April 2013. In 2009, Mr. Froning co-founded Focus Healthcare Partners LLC, a Chicago-based private equity investment, advisory and asset management firm targeting the senior housing and healthcare sectors. Prior to that, from February 2008 to October 2009, Mr. Froning was a Managing Director in the private equity department of Fortress Investment Group LLC, a publicly-traded New York-based private investment firm. Prior to that, Mr. Froning was the Chief Investment Officer and Executive Vice President of Brookdale Senior Living Inc., a publicly-traded affiliate of Fortress Investment Group LLC, from 2005 to 2008. Previously, Mr. Froning held senior investment positions at the private equity investment arms of Lazard Group LLC and Security Capital Group, prior to its acquisition by GE Capital Corp., in addition to investment banking experience at Salomon Brothers, prior to its acquisition by Travelers Group, and the securities subsidiary of Principal Financial Group. Mr. Froning has a B.A. degree from the University of Notre Dame. We believe Mr. Froning is qualified to serve on our board of directors due to his twenty years of private equity, investment and advisory experience.

Table of Contents

*Glyn C. Milburn*.   Mr. Milburn has served on our board of directors since July 2020.  Since February 2016, Mr. Milburn has served as a Partner at Jimmy Blackman & Associates, a full-service Government and Public Affairs firm, where he is responsible for business strategy, client management, communications and campaign management for a client portfolio comprised of large public safety labor unions, banking/finance companies, and hotel operators across the State of California. From April 2013 to January 2016, Mr. Milburn served as a Special Assistant in the City of Los Angeles where he held two positions in the City of Los Angeles, one in the Office of Los Angeles Mayor Eric Garcetti's Office of Economic Development and another in the Office of Los Angeles Councilman Dennis Zine.  From August 2012 to March 2013, Mr. Milburn co-Founded Provident Investment Advisors LLC, a special investment vehicle for energy, technology and healthcare ventures, where he served as Managing Member.  Mr. Milburn holds a B.A. degree in Public Policy from Stanford University.  We believe Mr. Milburn is qualified to serve on our board of directors due to his valuable background in policy development, regulatory and strategic planning experience.

*Alan P. Shor*.     Mr. Shor will become a member of our board of directors upon closing of the proposed acquisition. Mr. Shor is a co-founder of The Retail Connection, L.P., a retail real estate company, and has served as its President and Co-Chairman of the Board of Directors since its launch in January 2004. Mr. Shor is deeply involved in the strategic direction and day-to-day operations of the company and also leads its investment and merchant banking business. He has served as an operating partner with leading private equity firms which have deep experience in consumer and multi-unit based investments. He is an investor in and a Board member of four high-growth retail chains: Diamonds Direct (since 2015), WSS (since 2015), Neighborhood Goods (since 2017) and Obsession Fragrance (since 2019). Prior to launching The Retail Connection, Mr. Shor served as President, Chief Operating Officer and a member of the Board of Zale Corporation, a publicly-held specialty retailer of fine jewelry. Prior to joining Zale, he spent 12 years with Troutman Sanders, an international law firm, where he built a strong track record of advising senior management teams of Fortune 1000 companies. Mr. Shor is also active in a number of professional and charitable organizations. Mr. Shor graduated with honors from both the University of Georgia and University of Georgia School of Law. We believe Mr. Shor is qualified to serve on our board of directors due to his valuable background in the retail and investment industries.

Our directors currently have terms which will end at our next annual meeting of the stockholders or until their successors are elected and qualify, subject to their prior death, resignation or removal. Officers serve at the discretion of the board of directors. There is no arrangement or understanding between any director or executive officer and any other person pursuant to which he was or is to be selected as a director, nominee or officer.

**Family Relationships**

There are no family relationships among any of our executive officers or directors.

**Involvement in Certain Legal Proceedings**

To the best of our knowledge, except as described below, none of our directors or executive officers has, during the past ten years:

> • been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offences);
>
> • had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two years prior to that time;
>
> • been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in any type of business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;
>
> • been found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

93

Table of Contents

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26))), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

**Corporate Governance**

*Governance Structure*

We chose to appoint a separate Chairman of the Board who is not our Chief Executive Officer. Our board of directors has made this decision based on their belief that a separate Chairman of the Board can act as a balance to the Chief Executive Officer, who also serves as a non-independent director.

*The Board's Role in Risk Oversight*

The board of directors oversees that the assets of our company are properly safeguarded, that the appropriate financial and other controls are maintained, and that our business is conducted wisely and in compliance with applicable laws and regulations and proper governance. Included in these responsibilities is the board's oversight of the various risks facing our company. In this regard, our board seeks to understand and oversee critical business risks. Our board does not view risk in isolation. Risks are considered in virtually every business decision and as part of our business strategy. Our board recognizes that it is neither possible nor prudent to eliminate all risk. Indeed, purposeful and appropriate risk-taking is essential for our company to be competitive on a global basis and to achieve its objectives.

While the board oversees risk management, company management is charged with managing risk. Management communicates routinely with the board and individual directors on the significant risks identified and how they are being managed. Directors are free to, and indeed often do, communicate directly with senior management.

Our board administers its risk oversight function as a whole by making risk oversight a matter of collective consideration. Much of this work has been delegated to committees, which will meet regularly and report back to the full board. The audit committee oversees risks related to our consolidated financial statements, the financial reporting process, accounting and legal matters, the compensation committee evaluates the risks and rewards associated with our compensation philosophy and programs, and the nominating and corporate governance committee evaluates risk associated with management decisions and strategic direction.

*Independent Directors*

The rules of NYSE American and the NYSE generally require that a majority of an issuer's board of directors must consist of independent directors. Our board of directors currently consists of seven (7) directors, four (4) of whom, Ellette A. Anderson, Clark R. Crosnoe, Paul A. Froning and Glyn C. Milburn, are independent within the meaning of the rules of NYSE American and the NYSE.

In connection with the proposed acquisition, Albert Fouerti, who is not independent, will be appointed to our board. In addition, we have appointed Alan P. Shor, who is independent, to our board effective upon closing of the proposed acquisition. As a result, our board of directors will consist of nine (9) directors, five (5) of whom will be independent within the meaning of the rules of NYSE American and the NYSE.

94

Table of Contents

***Committees of the Board of Directors***

Our board has established an audit committee, a compensation and nominating and corporate governance committee, each with its own charter approved by the board. Each committee's charter is available on our website at *www.goedekers.com*.

In addition, our board of directors may, from time to time, designate one or more additional committees, which shall have the duties and powers granted to it by our board of directors.

<u>*Audit Committee*</u>

Paul A. Froning, Clark R. Crosnoe and Glyn C. Milburn, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American and the NYSE, serve on our audit committee, with Mr. Froning serving as the chairman. Our board has determined that Messrs. Froning and Crosnoe qualify as "audit committee financial experts." The audit committee oversees our accounting and financial reporting processes and the audits of the consolidated financial statements of our company.

The audit committee is responsible for, among other things: (i) retaining and overseeing our independent accountants; (ii) assisting the board in its oversight of the integrity of our consolidated financial statements, the qualifications, independence and performance of our independent auditors and our compliance with legal and regulatory requirements; (iii) reviewing and approving the plan and scope of the internal and external audit; (iv) pre-approving any audit and non-audit services provided by our independent auditors; (v) approving the fees to be paid to our independent auditors; (vi) reviewing with our chief executive officer and chief financial officer and independent auditors the adequacy and effectiveness of our internal controls; (vii) reviewing hedging transactions; and (viii) reviewing and assessing annually the audit committee's performance and the adequacy of its charter.

<u>*Compensation Committee*</u>

Paul A. Froning, Clark R. Crosnoe and Ellette A. Anderson, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American and the NYSE, serve on our compensation committee, with Mr. Crosnoe serving as the chairman. The members of the compensation committee are also "outside directors" as defined in Section 162(m) of the Internal Revenue Code of 1986, as amended, or the Code, and "non-employee directors" within the meaning of Section 16 of the Exchange Act. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers.

The compensation committee is responsible for, among other things: (i) reviewing and approving the remuneration of our executive officers; (ii) making recommendations to the board regarding the compensation of our independent directors; (iii) making recommendations to the board regarding equity-based and incentive compensation plans, policies and programs; and (iv) reviewing and assessing annually the compensation committee's performance and the adequacy of its charter.

<u>*Nominating and Corporate Governance Committee*</u>

Paul A. Froning, Clark R. Crosnoe and Glyn C. Milburn, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American and the NYSE, serve on our nominating and corporate governance committee, with Mr. Milburn serving as the chairman. The nominating and corporate governance committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees.

The nominating and corporate governance committee will be responsible for, among other things: (i) identifying and evaluating individuals qualified to become members of the board by reviewing nominees for election to the board submitted by stockholders and recommending to the board director nominees for each annual meeting of stockholders and for election to fill any vacancies on the board; (ii) advising the board with respect to board organization, desired qualifications of board members, the membership, function, operation, structure and composition of committees (including any committee authority to delegate to subcommittees), and self-evaluation and policies; (iii) advising on matters relating to corporate governance and monitoring developments in the law and practice of corporate governance; (iv) overseeing compliance with the our code of ethics; and (v) approving any related party transactions.

95

Table of Contents

The nominating and corporate governance committee's methods for identifying candidates for election to our board of directors (other than those proposed by our stockholders, as discussed below) will include the solicitation of ideas for possible candidates from a number of sources — members of our board of directors, our executives, individuals personally known to the members of our board of directors, and other research. The nominating and corporate governance committee may also, from time-to-time, retain one or more third-party search firms to identify suitable candidates.

In making director recommendations, the nominating and corporate governance committee may consider some or all of the following factors: (i) the candidate's judgment, skill, experience with other organizations of comparable purpose, complexity and size, and subject to similar legal restrictions and oversight; (ii) the interplay of the candidate's experience with the experience of other board members; (iii) the extent to which the candidate would be a desirable addition to the board and any committee thereof; (iv) whether or not the person has any relationships that might impair his or her independence; and (v) the candidate's ability to contribute to the effective management of our company, taking into account the needs of our company and such factors as the individual's experience, perspective, skills and knowledge of the industry in which we operate.

A stockholder may nominate one or more persons for election as a director at an annual meeting of stockholders if the stockholder complies with the notice and information provisions contained in our bylaws. Such notice must be in writing to our company not less than 120 days and not more than 150 days prior to the anniversary date of the preceding year's annual meeting of stockholders or as otherwise required by requirements of the Exchange Act. In addition, stockholders furnishing such notice must be a holder of record on both (i) the date of delivering such notice and (ii) the record date for the determination of stockholders entitled to vote at such meeting.

**Code of Ethics**

We have adopted a code of ethics that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Such code of ethics addresses, among other things, honesty and ethical conduct, conflicts of interest, compliance with laws, regulations and policies, including disclosure requirements under the federal securities laws, and reporting of violations of the code.

We are required to disclose any amendment to, or waiver from, a provision of our code of ethics applicable to our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. We intend to use our website as a method of disseminating this disclosure, as permitted by applicable SEC rules. Any such disclosure will be posted to our website within four (4) business days following the date of any such amendment to, or waiver from, a provision of our code of ethics.

Table of Contents

**EXECUTIVE COMPENSATION**

**Summary Compensation Table — Years Ended December 31, 2020 and 2019**

The following table sets forth information concerning all cash and non-cash compensation awarded to, earned by or paid to the named persons for services rendered in all capacities during the noted periods. No other executive officers received total annual salary and bonus compensation in excess of $100,000.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Option Awards ($)[1] | All Other Compensation ($)[2] | Total ($) |
|---|---|---|---|---|---|---|
| Douglas T. Moore, | 2020 | 341,923 | 130,000 | 910,264 | 16,965 | 1,399,152 |
| Chief Executive Officer | 2019 | 133,727 | 35,000 | — | 9,465 | 178,192 |
| | | | | | | |
| Robert D. Barry, | 2020 | 149,077 | — | 376,800 | — | 525,877 |
| Chief Financial Officer[3] | 2019 | 61,762 | — | — | — | 61,762 |
| | | | | | | |
| Thomas S. Harcum, | 2020 | 131,923 | — | 157,000 | 17,470 | 306,393 |
| Chief Marketing and Technology Officer | 2019 | — | — | — | — | — |

—————————

(1)    The amount is equal to the aggregate grant-date fair value with respect to the awards, computed in accordance with FASB ASC Topic 718.

(2)    The amounts included for Mr. Moore for 2019 include reimbursement for accommodations in the amount of $6,955, reimbursement for airline tickets in the amount of $1,640, and reimbursement for car rental expenses in the amount of $870. In 2020, the amounts represent reimbursement for accommodations of $14,630 and $2,335 for 401(k) plan matches. For Mr. Harcum, the amount represents reimbursement for accommodations.

(3)    Mr. Barry was a part-time employee in 2019 following the acquisition of Goedeker Television until our initial public offering on July 31, 2020, at which time he became a full-time employee. Compensation for 2020 includes $55,385 as a part-time employee.

**Employment Agreements**

On August 15, 2019, we entered into an employment letter agreement with Mr. Moore setting forth the terms of the compensation for his services as Chief Executive Officer of our company. On April 21, 2020, we amended the employment letter agreement, which became effective upon closing of our initial public offering on August 4, 2020. Pursuant to the employment letter agreement, as amended, Mr. Moore is entitled to an annual base salary of $400,000 and an annual incentive bonus of up to 100% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. On August 19, 2020, we also granted Mr. Moore a special bonus of up to $125,000 to the extent that we achieve certain milestones. We also agreed to grant to Mr. Moore an option to purchase 263,158 shares of our common stock immediately following the closing of the initial public offering with an exercise price of $9.00, equal to the public offering price per share paid in the initial public offering. Vesting of the options will occur annually over a 4-year period in increments of 25% per year beginning on August 15, 2020. Mr. Moore also received relocation compensation, including a signing bonus of $35,000, reimbursement of living and accommodations in the St. Louis area for up to six months, car rental expenses for up to two months, and reimbursement of once monthly round trip airline tickets to St. Louis for either Mr. Moore or his spouse until April 2020. Mr. Moore is also entitled to a 15% discount on all purchases from our company. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Moore's employment is at-will and may be terminated by us at any time. Mr. Moore may terminate his employment upon 90 days' notice. If we terminate Mr. Moore's employment without cause, he is entitled to six months of base compensation, which will be paid in a lump sum upon termination. The employment letter agreement contains restrictive covenants prohibiting Mr. Moore from (i) owning or operating a business that competes with our company during the term of his employment and for a period of one year following the termination of his employment or (ii) soliciting our employees for a period of two years following the termination of his employment.

On April 21, 2020, we entered into an employment letter agreement with Robert D. Barry setting forth the terms of the compensation for his services as Chief Financial Officer of our company. This employment letter agreement became effective upon closing of our initial public offering on August 4, 2020. Pursuant to the employment letter agreement,

97

Table of Contents

Mr. Barry is entitled to an annual base salary of $250,000 and an annual incentive bonus of up to 50% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. Mr. Barry is also entitled to a 15% discount on all purchases from our company. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Barry's employment is at-will and may be terminated by us at any time. Mr. Barry may terminate his employment upon 90 days' notice. If we terminate Mr. Barry's employment without cause, he is entitled to six months of base compensation, which will be paid in a lump sum upon termination. The employment letter agreement contains restrictive covenants prohibiting Mr. Barry from (i) owning or operating a business that competes with our company during the term of his employment and for a period of one year following the termination of his employment or (ii) soliciting our employees for a period of two years following the termination of his employment.

On December 13, 2019, we entered into an employment offer letter with Thomas S. Harcum setting forth the terms of the compensation for his services as Chief Marketing Officer and Chief Technology Officer of our company, effective as of January 6, 2020. Pursuant to the employment offer letter, Mr. Harcum is entitled to an annual base salary of $140,000 and an annual incentive bonus of up to 20% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Harcum's employment is at-will and may be terminated by us at any time.

**Outstanding Equity Awards at Fiscal Year-End**

The following table includes certain information with respect to the value of all unexercised options and unvested shares of restricted stock previously awarded to the executive officers named above at the fiscal year ended December 31, 2020.

| | Option Awards | | | | |
|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date |
| Douglas T. Moore | 65,790 | 197,368 | — $ | 9.00 | 08/04/2030 |
| Robert D. Barry | — | 120,000 | — $ | 9.00 | 09/10/2030 |
| Thomas S. Harcum | — | 50,000 | — $ | 9.00 | 09/10/2030 |

**Additional Narrative Disclosure**

*Retirement Benefits*

We have not maintained, and do not currently maintain, a defined benefit pension plan or nonqualified deferred compensation plan. We currently make available a retirement plan intended to provide benefits under Section 401(k) of the Code, pursuant to which employees, including the executive officers named above, can make voluntary pre-tax contributions. We currently match 100% of elective deferrals up to 3% of compensation and 50% of elective deferrals for next 2% of compensation. These matching contributions vest 100% following 60 days of the participant's employment. All contributions under the plan are subject to certain annual dollar limitations, which are periodically adjusted for changes in the cost of living. See "— Summary Compensation Table — Years Ended December 31, 2020 and 2019" for matches made for the executive officers named above.

*Potential Payments Upon Termination or Change in Control*

As described under "— Employment Agreements" above, Messrs. Moore and Barry are entitled severance if their employment is terminated without cause.

In the event of a change in control (as defined in our 2020 Equity Incentive Plan), all options issued to the executive officers named above shall become immediately vested and exercisable with respect to 100% of the shares subject to the option.

Table of Contents

**Director Compensation**

We have agreed to pay our independent directors a fee of $35,000 per year, which is payable monthly commencing in the first month following the closing of the of our initial public offering in August 2020. We also agreed to reimburse the independent directors for pre-approved reasonable business expenses incurred in good faith in connection with the performance of their duties for us.

The table below sets forth the compensation to our independent directors during the fiscal year ended December 31, 2020.

| Name | Fees Earned or Paid in Cash ($) | Total ($) |
|---|---|---|
| Ellette A. Anderson | 14,583 | 14,583 |
| Clark R. Crosnoe | 14,583 | 14,583 |
| Paul A. Froning | 14,583 | 14,583 |
| Glyn C. Milburn | 14,583 | 14,583 |

**2020 Equity Incentive Plan**

On July 30, 2020, we established the 1847 Goedeker Inc. 2020 Equity Incentive Plan, or the Plan. The purpose of the Plan is to grant restricted stock, stock options and other forms of incentive compensation to our officers, employees, directors and consultants. The maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan is 1,000,000 shares. Cancelled and forfeited stock options and stock awards may again become available for grant under the Plan. As of the date of this prospectus, 445,000 shares remain available for issuance under the Plan.

The following summary briefly describes the principal features of the Plan and is qualified in its entirety by reference to the full text of the Plan.

Awards that may be granted include: (a) incentive stock options, (b) non-qualified stock options, (c) stock appreciation rights, (d) restricted awards, (e) performance share awards, and (f) performance compensation awards. These awards offer our officers, employees, consultants and directors the possibility of future value, depending on the long-term price appreciation of our common stock and the award holder's continuing service with our company.

Stock options give the option holder the right to acquire from us a designated number of shares of common stock at a purchase price that is fixed upon the grant of the option. The exercise price will not be less than the market price of the common stock on the date of grant. Stock options granted may be either tax-qualified stock options (so-called "incentive stock options") or non-qualified stock options.

Stock appreciation rights, or SARs, which may be granted alone or in tandem with options, have an economic value similar to that of options. When a SAR for a particular number of shares is exercised, the holder receives a payment equal to the difference between the market price of the shares on the date of exercise and the exercise price of the shares under the SAR. Again, the exercise price for SARs normally is the market price of the shares on the date the SAR is granted. Under the Plan, holders of SARs may receive this payment — the appreciation value — either in cash or shares of common stock valued at the fair market value on the date of exercise. The form of payment will be determined by us.

Restricted shares are shares of common stock awarded to participants at no cost. Restricted shares can take the form of awards of restricted stock, which represent issued and outstanding shares of our common stock subject to vesting criteria, or restricted stock units, which represent the right to receive shares of our common stock subject to satisfaction of the vesting criteria. Restricted shares are forfeitable and non-transferable until the shares vest. The vesting date or dates and other conditions for vesting are established when the shares are awarded.

The Plan also provides for performance compensation awards, representing the right to receive a payment, which may be in the form of cash, shares of common stock, or a combination, based on the attainment of pre-established goals.

Table of Contents

All of the permissible types of awards under the Plan are described in more detail as follows:

***Purposes of Plan***:    The purposes of the Plan are to attract and retain officers, employees and directors for our company and its subsidiaries; motivate them by means of appropriate incentives to achieve long-range goals; provide incentive compensation opportunities; and further align their interests with those of our stockholders through compensation that is based on our common stock.

***Administration of the Plan***:    The Plan is administered by our compensation committee (which we refer to as the administrator). Among other things, the administrator has the authority to select persons who will receive awards, determine the types of awards and the number of shares to be covered by awards, and to establish the terms, conditions, performance criteria, restrictions and other provisions of awards. The administrator has authority to establish, amend and rescind rules and regulations relating to the Plan.

***Eligible Recipients***:    Persons eligible to receive awards under the Plan will be those officers, employees, consultants, and directors of our company and its subsidiaries who are selected by the administrator.

***Shares Available Under the Plan***:    The maximum number of shares of our common stock that may be delivered to participants under the Plan is 1,000,000, subject to adjustment for certain corporate changes affecting the shares, such as stock splits. Shares subject to an award under the Plan for which the award is canceled, forfeited or expires again become available for grants under the Plan. Shares subject to an award that is settled in cash will not again be made available for grants under the Plan.

***Stock Options:***

*General.*    Subject to the provisions of the Plan, the administrator has the authority to determine all grants of stock options. That determination will include: (i) the number of shares subject to any option; (ii) the exercise price per share; (iii) the expiration date of the option; (iv) the manner, time and date of permitted exercise; (v) other restrictions, if any, on the option or the shares underlying the option; and (vi) any other terms and conditions as the administrator may determine.

*Option Price.*    The exercise price for stock options will be determined at the time of grant. Normally, the exercise price will not be less than the fair market value on the date of grant. As a matter of tax law, the exercise price for any incentive stock option awarded may not be less than the fair market value of the shares on the date of grant. However, incentive stock option grants to any person owning more than 10% of our voting stock must have an exercise price of not less than 110% of the fair market value on the grant date.

*Exercise of Options.*    An option may be exercised only in accordance with the terms and conditions for the option agreement as established by the administrator at the time of the grant. The option must be exercised by notice to us, accompanied by payment of the exercise price. Payments may be made in cash or, at the option of the administrator, by actual or constructive delivery of shares of common stock to the holder of the option based upon the fair market value of the shares on the date of exercise.

*Expiration or Termination.*    Options, if not previously exercised, will expire on the expiration date established by the administrator at the time of grant. In the case of incentive stock options, such term cannot exceed ten years provided that in the case of holders of more than 10% of our voting stock, such term cannot exceed five years. Options will terminate before their expiration date if the holder's service with our company or a subsidiary terminates before the expiration date. The option may remain exercisable for specified periods after certain terminations of employment, including terminations as a result of death, disability or retirement, with the precise period during which the option may be exercised to be established by the administrator and reflected in the grant evidencing the award.

*Incentive and Non-Qualified Options.*    As described elsewhere in this summary, an incentive stock option is an option that is intended to qualify under certain provisions of the Code, for more favorable tax treatment than applies to non-qualified stock options. Any option that does not qualify as an incentive stock option will be a non-qualified stock option. Under the Code, certain restrictions apply to incentive stock options. For example, the exercise price for incentive stock options may not be less than the fair market value of the shares on the grant date and the term of the option may not exceed ten years. In addition, an incentive stock option may not be transferred, other than by will or the laws of descent and distribution, and is exercisable during the holder's lifetime only by the holder. In addition, no incentive stock options may be granted to a holder that is first exercisable in a single year if that option, together with all incentive stock options previously granted to the holder that also first become exercisable in that year, relate to shares having an aggregate fair market value in excess of $100,000, measured at the grant date.

100

Table of Contents

***Stock Appreciation Rights***:    Awards of SARs may be granted alone or in tandem with stock options. SARs provide the holder with the right, upon exercise, to receive a payment, in cash or shares of stock, having a value equal to the excess of the fair market value on the exercise date of the shares covered by the award over the exercise price of those shares. Essentially, a holder of a SAR benefits when the market price of the common stock increases, to the same extent that the holder of an option does, but, unlike an option holder, the SAR holder need not pay an exercise price upon exercise of the award.

***Stock Awards***:    Stock awards can also be granted under the Plan. A stock award is a grant of shares of common stock or of a right to receive shares in the future. These awards will be subject to such conditions, restrictions and contingencies as the administrator shall determine at the date of grant. Those may include requirements for continuous service and/or the achievement of specified performance goals.

***Cash Awards***:    A cash award is an award that may be in the form of cash or shares of common stock or a combination, based on the attainment of pre-established performance goals and other conditions, restrictions and contingencies identified by the administrator.

***Section 162(m) of the Code***:    Section 162(m) of the Code limits publicly-held companies to an annual deduction for United States federal income tax purposes of $1.0 million for compensation paid to each of their chief executive officer and their three highest compensated executive officers (other than the chief executive officer) determined at the end of each year, referred to as covered employees.

***Performance Criteria***:    Under the Plan, one or more performance criteria will be used by the administrator in establishing performance goals. Any one or more of the performance criteria may be used on an absolute or relative basis to measure the performance of our company, as the administrator may deem appropriate, or as compared to the performance of a group of comparable companies, or published or special index that the administrator deems appropriate. In determining the actual size of an individual performance compensation award, the administrator may reduce or eliminate the amount of the award through the use of negative discretion if, in its sole judgment, such reduction or elimination is appropriate. The administrator shall not have the discretion to (i) grant or provide payment in respect of performance compensation awards if the performance goals have not been attained or (ii) increase a performance compensation award above the maximum amount payable under the Plan.

***Other Material Provisions***:    Awards will be evidenced by a written agreement, in such form as may be approved by the administrator. In the event of various changes to the capitalization of our company, such as stock splits, stock dividends and similar re-capitalizations, an appropriate adjustment will be made by the administrator to the number of shares covered by outstanding awards or to the exercise price of such awards. The administrator is also permitted to include in the written agreement provisions that provide for certain changes in the award in the event of a change of control of our company, including acceleration of vesting. Except as otherwise determined by the administrator at the date of grant, awards will not be transferable, other than by will or the laws of descent and distribution. Prior to any award distribution, we are permitted to deduct or withhold amounts sufficient to satisfy any employee withholding tax requirements. Our board also has the authority, at any time, to discontinue the granting of awards. The board also has the authority to alter or amend the Plan or any outstanding award or may terminate the Plan as to further grants, provided that no amendment will, without the approval of our stockholders, to the extent that such approval is required by law or the rules of an applicable exchange, increase the number of shares available under the Plan, change the persons eligible for awards under the Plan, extend the time within which awards may be made, or amend the provisions of the Plan related to amendments. No amendment that would adversely affect any outstanding award made under the Plan can be made without the consent of the holder of such award.

Table of Contents

**CURRENT RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

**Transactions with Related Persons**

*The following includes a summary of transactions since the beginning of our 2019 fiscal year, or any currently proposed transaction, in which we were or are to be a participant and the amount involved exceeded or exceeds the lesser of $120,000 or one percent of the average of our total assets at year end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest (other than compensation described under "Executive Compensation"). We believe the terms obtained or consideration that we paid or received, as applicable, in connection with the transactions described below were comparable to terms available or the amounts that would be paid or received, as applicable, in arm's-length transactions.*

*Management Services Agreement*

On April 5, 2019, we entered into the management services agreement with our manager, which is owned and controlled by Ellery W. Roberts, our Chairman. Pursuant to the management services agreement, we expensed $250,000 and $183,790 in management fees for the years ended December 31, 2020 and 2019, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Goedeker — Contractual Obligations" for a description of this agreement. See also Item 1A "Risks Related to this Offering and Ownership of Our Common Stock — Certain of our directors could be in a position of conflict of interest."

*Advances*

As of December 31, 2019, our manager had funded $33,738 to us in related party advances. These advances were unsecured, bore no interest, and did not have formal repayment terms or arrangements. These advances were repaid from the proceeds of our initial public offering in August 2020.

*Related Party Note*

A portion of the purchase price for the acquisition of Goedeker Television was paid by our issuance to Steve Goedeker, as representative of Goedeker Television, of a 9% subordinated promissory note in the principal amount of $4,100,000. Michael Goedeker, our director, President and Chief Operating Officer until March 2020 and a significant stockholder, was also a director, officer and principal stockholder of Goedeker Television.

As of December 31, 2019, the balance of the note was $3,300,444. On June 2, 2020, the parties entered into an amendment and restatement of the note that became effective as of the closing of our initial public offering on August 4, 2020, pursuant to which (i) the principal amount of the existing note was increased by $250,000, (ii) upon the closing of the initial public offering, we agreed to make all payments of principal and interest due under the note through the date of the closing, and (iii) from and after the closing, the interest rate of the note was increased from 9% to 12%. In accordance with the terms of the amended and restated note, we used a portion of the proceeds from the initial public offering to pay $1,083,842 of the balance of the note representing a $696,204 reduction in the principal balance and interest accrued through August 4, 2020 of $387,638. We repaid this note in August 2020.

*Securities Purchase Agreement*

On April 5, 2019, our company, 1847 Goedeker Holdco Inc., or Holdco (our direct parent company at such time) and 1847 Holdings (Holdco's parent company at such time) entered into a securities purchase agreement with Leonite Capital LLC, or Leonite, pursuant to which our company, Holdco and 1847 Holdings issued to Leonite a secured convertible promissory note in the aggregate principal amount of $714,286. As additional consideration for the purchase of the note, (i) 1847 Holdings issued to Leonite 50,000 common shares (valued at $137,500), (ii) 1847 Holdings issued to Leonite a five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis, and (iii) Holdco issued to Leonite shares of common stock equal to a 7.5% non-dilutable interest in Holdco. As of December 31, 2019, the balance of the note was $584,943. As a result of this transaction, Leonite became a related party.

Table of Contents

On May 11, 2020, our company, Holdco, 1847 Holdings and Leonite entered into a first amendment to secured convertible promissory note, pursuant to which the parties agreed (i) to extend the maturity date of the note to October 5, 2020, (ii) that our failure to repay the note on the original maturity date of April 5, 2020 shall not constitute and event of default under the note and (iii) to increase the principal amount of the note by $207,145, as a forbearance fee.

In connection with the amendment, (i) 1847 Holdings issued to Leonite another five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis and (ii) upon closing of 1847 Holdings' acquisition of Asien's Appliance, Inc., 1847 Holdings' wholly owned subsidiary 1847 Asien Inc. issued to Leonite shares of common stock equal to a 5% interest in 1847 Asien Inc.

Under the note, Leonite had the right at any time at its option to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of the note into fully paid and non-assessable common shares or any shares of capital stock or other securities of 1847 Holdings into which such common shares may be changed or reclassified.

On May 4, 2020, Leonite converted $100,000 of the outstanding balance of the note into 100,000 common shares of 1847 Holdings. On July 24, 2020, Leonite converted $50,000 of the outstanding balance of the note into 50,000 common shares of 1847 Holdings.

On August 4, 2020, we used a portion of the proceeds from our initial public offering to repay the note in full.

On September 2, 2020, 1847 Holdings and Leonite entered into an amendment to the warrant issued on April 5, 2019, pursuant to which the warrant was amended to allow for the exercise of the warrant for 180,000 common shares of 1847 Holdings in exchange for Leonite's surrender of the remaining 20,000 common shares underlying that warrant, as well as all 200,000 common shares underlying the second warrant issued to Leonite on May 11, 2020. On September 18, 2020, Leonite exercised the warrant in accordance with the foregoing for 180,000 common shares of 1847 Holdings. As a result, both warrants have terminated.

### Related Party Leases

Appliances Connection leases two facilities pursuant to lease agreements entered into between 1 Stop and Joe's Appliances and 1870 Bath Ave. LLC and 7812 5th Ave Realty LLC, respectively, which are entities owned and controlled by Albert Fouerti and Elie Fouerti, the principal officers and owners of 1 Stop and Joe's Appliances. Please see "Business — Facilities" for a description of these leases.

### DMI Cooperative

As described above, Appliances Connection is a member of DMI, an appliance purchasing cooperative. Appliances Connection owns an approximate 5% equity interest in DMI. Additionally, Albert Fouerti, one of the owners of Appliances Connection who will also become a member of our board of directors upon closing of the proposed acquisition, is on the Board of DMI. As such, DMI is deemed to be a related party. At December 31, 2020 and 2019, vendor rebate deposits, net, due from DMI were $31,733,415 and $22,005,318, respectively, and vendor rebates receivable were $4,691,514 and $3,284,594, respectively. During the year ended December 31, 2020, the following transactions were carried out with DMI: total purchases $175,630,820, vendor rebates $8,222,373, interest income $968,080, consulting income $255,000, and rent expense $675,000. During the year ended December 31, 2019, the following transactions were carried out with DMI: total purchases $120,328,645, vendor rebates $3,284,594, interest income $1,428,546, consulting income $188,617, and rent expense $337,500.

### Participation in this Offering

Certain of our existing stockholders and certain of our officers, directors, employees and related persons, have indicated an interest in purchasing an aggregate of approximately $      in shares of our common stock in this offering at the public offering price. However, because indications of interest are not binding agreements or commitments to purchase, the underwriters may determine to sell more, fewer or no shares in this offering to these persons, and any of these persons may determine to purchase more, fewer or no shares in this offering. The underwriters will receive the same underwriting discount on any shares purchased by these persons as they will on any other shares sold to the public in this offering.

Table of Contents

**Promoters and Certain Control Persons**

Each of Ellery W. Roberts, our Chairman and Robert D. Barry, our Chief Financial Officer, may be deemed a "promoter" as defined by Rule 405 of the Securities Act. For information regarding compensation, including items of value, that have been provided or that may be provided to these individuals, please refer to "Executive Compensation" above.

**Indemnification Agreements**

Our amended and restated certificate of incorporation and bylaws provide for indemnification of directors and officers to the fullest extent permitted by law, including payment of expenses in advance of resolution of any such matter.

We have entered into separate indemnification agreements with our directors and certain officers. Each indemnification agreement provides for, among other things, indemnification to the fullest extent permitted by law and our amended and restated certificate of incorporation and bylaws against any and all expenses, judgments, fines, penalties and amounts paid in settlement of any claim. The indemnification agreements provide for the advancement or payment of all expenses to the indemnitee and for reimbursement to us if it is found that such indemnitee is not entitled to such indemnification under applicable law and our amended and restated certificate of incorporation and bylaws.

We have obtained standard policies of insurance under which coverage is provided (a) to our directors and officers against loss rising from claims made by reason of breach of duty or other wrongful act, and (b) to us with respect to payments which we may make to such officers and directors pursuant to the above indemnification provision or otherwise as a matter of law.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us under the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

Table of Contents

**PRINCIPAL STOCKHOLDERS**

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of April 28, 2021 for (i) each of our named executive officers and directors; (ii) all of our named executive officers and directors as a group; and (iii) each other stockholder known by us to be the beneficial owner of more than 5% of our outstanding common stock. The following table assumes that the underwriters have not exercised the over-allotment option.

Beneficial ownership is determined in accordance with SEC rules and generally includes voting or investment power with respect to securities. For purposes of this table, a person or group of persons is deemed to have "beneficial ownership" of any shares of common stock that such person or any member of such group has the right to acquire within sixty (60) days of April 28, 2021. For purposes of computing the percentage of outstanding shares of our common stock held by each person or group of persons named above, any shares that such person or persons has the right to acquire within sixty (60) days of April 28, 2021 are deemed to be outstanding for such person, but not deemed to be outstanding for the purpose of computing the percentage ownership of any other person. The inclusion herein of any shares listed as beneficially owned does not constitute an admission of beneficial ownership by any person. The share ownership numbers after the offering for the beneficial owners indicated below exclude any potential purchases that may be made by such persons in this offering.

Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o our company, 13850 Manchester Rd., Ballwin, MO 63011.

| Name of Beneficial Owner | Common Stock Beneficially Owned Prior to this Offering[1] | | Common Stock Beneficially Owned After this Offering[2] | |
|---|---|---|---|---|
| | Shares | % | Shares | % |
| Douglas T. Moore, CEO and Director[3] | 65,790 | 1.07% | 65,790 | * |
| Robert D. Barry, CFO | 12,433 | * | 12,433 | * |
| Thomas S. Harcum, CMO and CTO | — | * | — | * |
| Jacob Guilhas, VP of Logistics | — | * | — | * |
| Michael K. Hargrave, Chief Merchant | — | * | — | * |
| Ellery W. Roberts, Chairman of the Board | 1,375,597 | 22.51% | 1,375,597 | 4.06% |
| Edward J. Tobin, Director | 960,680 | 15.72% | 960,680 | 2.83% |
| Ellette A. Anderson, Director | — | * | — | * |
| Clark R. Crosnoe. Director | — | * | — | * |
| Paul A. Froning, Director | 42,628 | * | 42,628 | * |
| Glyn C. Milburn, Director | — | * | — | * |
| Albert Fouerti, Director Nominee | — | * | — | * |
| Alan P. Shor, Director Nominee | — | * | — | * |
| All executive officers and directors (13 persons) | 2,457,128 | 40.20% | 2,457,128 | 7.25% |
| Michael Goedeker[4] | 534,375 | 8.74% | 534,375 | 1.58% |
| Stephen Goedeker[5] | 534,375 | 8.74% | 534,375 | 1.58% |
| Avi Geller[6] | 503,369 | 8.24% | 503,369 | 1.49% |

_____

\*      Less than 1%

(1)    Based on 6,111,200 shares of common stock issued and outstanding as of April 28, 2021.

(2)    Based on 33,888,978 shares of common stock issued and outstanding after this offering.

(3)    Consists of 65,790 shares of common stock which Mr. Moore has the right to acquire within 60 days through the exercise of vested options.

(4)    Based solely on the information set forth in the Schedule 13G filed by Michael Goedeker with the SEC on February 26, 2021.

(5)    Based solely on the information set forth in the Schedule 13G filed by Stephen Goedeker with the SEC on February 26, 2021.

(6)    Represents shares of common stock held by Leonite. Based on the information set forth in the Schedule 13G filed by Leonite with the SEC on October 26, 2020, Avi Geller is the Chief Investment Officer of Leonite and has voting and investment power over the securities held by it. Mr. Geller disclaims beneficial ownership of the shares held by Leonite except to the extent of his pecuniary interest, if any, in such shares. The address of Leonite is 1 Hillcrest Center Dr, Suite 232, Spring Valley, NY 10977.

We do not currently have any arrangements which if consummated may result in a change of control of our company.

Table of Contents

**DESCRIPTION OF CAPITAL STOCK**

**General**

Our authorized capital stock currently consists of 200,000,000 shares of common stock, par value $0.0001 per share, and 20,000,000 shares of preferred stock, par value $0.0001 per share.

The following description summarizes important terms of the classes of our capital stock. This summary does not purport to be complete and is qualified in its entirety by the provisions of our amended and restated certificate of incorporation and our bylaws, which have been filed as exhibits to the registration statement of which this prospectus is a part.

Certain provisions of our amended and restated certificate of incorporation and our bylaws summarized below may be deemed to have an anti-takeover effect and may delay or prevent a tender offer or takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares of common stock.

As of the date of this prospectus, there were 6,111,200 shares of common stock and no shares of preferred stock issued and outstanding. As of such date, there were approximately          stockholders of record of our common stock. In computing the number of holders of record of our common stock, each broker-dealer and clearing corporation holding shares on behalf of its customers is counted as a single stockholder.

**Common Stock**

The holders of common stock are entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders. Under our amended and restated certificate of incorporation and bylaws, any corporate action to be taken by vote of stockholders other than for election of directors shall be authorized by the affirmative vote of the majority of votes cast. Directors are elected by a plurality of votes. Stockholders do not have cumulative voting rights.

Subject to preferences that may be applicable to any then-outstanding preferred stock, holders of common stock are entitled to receive ratably those dividends, if any, as may be declared from time to time by the board of directors out of legally available funds. In the event of our liquidation, dissolution or winding up, holders of common stock will be entitled to share ratably in the net assets legally available for distribution to stockholders after the payment of all of our debts and other liabilities and the satisfaction of any liquidation preference granted to the holders of any then-outstanding shares of preferred stock.

Holders of common stock have no preemptive, conversion or subscription rights and there are no redemption or sinking fund provisions applicable to the common stock. The rights, preferences and privileges of the holders of common stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of preferred stock.

**Preferred Stock**

Our amended and restated certificate of incorporation authorizes our board to issue up to 20,000,000 shares of preferred stock in one or more series, to determine the designations and the powers, preferences and rights and the qualifications, limitations and restrictions thereof, including the dividend rights, conversion or exchange rights, voting rights (including the number of votes per share), redemption rights and terms, liquidation preferences, sinking fund provisions and the number of shares constituting the series. Our board of directors could, without stockholder approval, issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of common stock and which could have the effect of making it more difficult for a third party to acquire, or of discouraging a third party from attempting to acquire, a majority of our outstanding voting stock.

**Warrants**

In connection with our initial public offering, we issued warrants for the purchase of 55,560 shares of common stock to affiliates of ThinkEquity, a division of Fordham Financial Management, Inc. The warrants will be exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25 (125% of the public offering price per share).

On March 19, 2021, we issued four-year warrants to purchase an aggregate of 400,000 shares of common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis.

Table of Contents

**Options**

As of the date of this prospectus, we have issued options to purchase an aggregate of 555,000 shares of common stock under the Plan, each at an exercise price of $9.00 per share.

**Anti-takeover Effects of Delaware Law and Charter Provisions**

We have elected not to be governed by Section 203 of the General Corporation Law of the State of Delaware, which prohibits a publicly-held Delaware corporation from engaging in a business combination, except under certain circumstances, with an interested stockholder.

Our amended and restated certificate of incorporation and bylaws contain certain provisions that may have anti-takeover effects, making it more difficult for or preventing a third party from acquiring control of our company or changing our board of directors and management.

Our amended and restated certificate of incorporation authorizes our board of directors to issue up to 20,000,000 shares of preferred stock without further stockholder approval. The preferred stock may be issued in one or more series, the terms of which may be determined at the time of issuance by the board of directors without further action by the stockholders. These terms may include preferences as to dividends and liquidation, conversion rights, redemption rights and sinking fund provisions. The issuance of any preferred stock could diminish the rights of holders of our common stock, and therefore could reduce the value of such common stock. In addition, specific rights granted to future holders of preferred stock could be used to restrict our ability to merge with, or sell assets to, a third party. The ability of our board of directors to issue preferred stock could make it more difficult, delay, discourage, prevent or make it more costly to acquire or effect a change-in-control, which in turn could prevent our stockholders from recognizing a gain in the event that a favorable offer is extended and could materially and negatively affect the market price of our common stock.

Our bylaws permit the board of directors to establish the number of directors and fill any vacancies and newly created directorships. These provisions will prevent a stockholder from increasing the size of our board of directors and gaining control of our board of directors by filling the resulting vacancies with its own nominees. In addition, our bylaws provide that no member of our board of directors may be removed from office by our stockholders without cause and, in addition to any other vote required by law, upon the approval of not less than the majority of the total voting power of all of our outstanding voting stock then entitled to vote in the election of directors.

Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to the board of directors. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of the board of directors or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given us timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although our bylaws do not give the board of directors the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, our bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of our company.

Furthermore, neither the holders of our common stock nor the holders of our preferred stock have cumulative voting rights in the election of our directors. The combination of the present ownership by a few stockholders of a significant portion of our issued and outstanding common stock and lack of cumulative voting makes it more difficult for other stockholders to replace our board of directors or for a third party to obtain control of our company by replacing its board of directors.

**Transfer Agent and Registrar**

VStock Transfer, LLC, 18 Lafayette Place, Woodmere, NY 11598, telephone 212-828-8436, is the transfer agent for our common stock.

**Trading Symbol and Market**

Our common stock is listed and traded on the NYSE American under the symbol "GOED." In connection with this offering, we intend to apply for the listing of our common stock on the NYSE.

Table of Contents

**SHARES ELIGIBLE FOR FUTURE SALE**

Future sales of substantial amounts of shares of our common stock, including shares issued upon the conversion of convertible notes, the exercise of outstanding options and warrants, in the public market after this offering, or the possibility of these sales occurring, could cause the prevailing market price for our common stock to fall or impair our ability to raise equity capital in the future.

Immediately following the closing of this offering, we will have 33,888,978 shares of common stock issued and outstanding. In the event the underwriters exercise the over-allotment option in full, we will have 38,055,644 shares of common stock issued and outstanding. The common stock sold in this offering will be freely tradable without restriction or further registration or qualification under the Securities Act.

Previously issued shares of common stock that were not offered and sold in this offering, as well as shares issuable upon the exercise of warrants and subject to employee stock options, are or will be upon issuance, "restricted securities," as that term is defined in Rule 144 under the Securities Act. These restricted securities are eligible for public sale only if such public resale is registered under the Securities Act or if the resale qualifies for an exemption from registration under Rule 144 or Rule 701 under the Securities Act, which are summarized below.

**Rule 144**

In general, a person who has beneficially owned restricted shares of our common stock for at least twelve months, or at least six months in the event we have been a reporting company under the Exchange Act for at least ninety (90) days before the sale, would be entitled to sell such securities, provided that such person is not deemed to be an affiliate of ours at the time of sale or to have been an affiliate of ours at any time during the ninety (90) days preceding the sale. A person who is an affiliate of ours at such time would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of shares that does not exceed the greater of the following:

- 1% of the number of shares of our common stock then outstanding; or

- 1% of the average weekly trading volume of our common stock during the four calendar weeks preceding the filing by such person of a notice on Form 144 with respect to the sale;

provided that, in each case, we are subject to the periodic reporting requirements of the Exchange Act for at least 90 days before the sale. Rule 144 trades must also comply with the manner of sale, notice and other provisions of Rule 144, to the extent applicable.

**Rule 701**

In general, Rule 701 allows a stockholder who purchased shares of our capital stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of ours during the immediately preceding 90 days to sell those shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation or notice provisions of Rule 144. All holders of Rule 701 shares, however, are required to wait until ninety (90) days after the date of this prospectus before selling shares pursuant to Rule 701.

**Lock-Up Agreements**

We and all of our directors, officers and stockholders holding 5% or more of our outstanding common stock have agreed with the underwriters, subject to certain exceptions, not to sell, transfer or dispose of, directly or indirectly, any of our common stock or securities convertible into or exercisable or exchangeable for our common stock for a period of 90 days from the date of this prospectus. See "Underwriting — No Sales of Similar Securities."

Table of Contents

**MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS
FOR NON-UNITED STATES HOLDERS OF OUR COMMON STOCK**

The following is a summary of the material United States federal income tax consequences of the purchase, ownership and disposition of our common stock that is being issued pursuant to this offering. This summary is limited to Non-United States Holders (as defined below) that hold our common stock as a capital asset (generally, property held for investment) for United States federal income tax purposes. This summary does not discuss all of the aspects of United States federal income taxation that may be relevant to a Non-United States Holder in light of the Non-United States Holder's particular investment or other circumstances. Accordingly, all prospective Non-United States Holders should consult their own tax advisors with respect to the United States federal, state, local and non-United States tax consequences of the purchase, ownership and disposition of our common stock.

This summary is based on provisions of the Code, applicable United States Treasury regulations and administrative and judicial interpretations, all as in effect or in existence on the date of this prospectus. Subsequent developments in United States federal income tax law, including changes in law or differing interpretations, which may be applied retroactively, could alter the United States federal income tax consequences of owning and disposing of our common stock as described in this summary. There can be no assurance that the Internal Revenue Service, or IRS, will not take a contrary position with respect to one or more of the tax consequences described herein and we have not obtained, nor do we intend to obtain, a ruling from the IRS with respect to the United States federal income tax consequences of the ownership or disposition of our common stock.

As used in this summary, the term "Non-United States Holder" means a beneficial owner of our common stock that is not, for United States federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity treated as a corporation) created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an entity or arrangement treated as a partnership;

- an estate whose income is includible in gross income for United States federal income tax purposes regardless of its source; or

- a trust, if (1) a United States court is able to exercise primary supervision over the trust's administration and one or more "United States persons" (within the meaning of the Code) has the authority to control all of the trust's substantial decisions, or (2) the trust has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

If an entity or arrangement treated as a partnership for United States federal income tax purposes holds our common stock, the tax treatment of a partner in such a partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner level. Partnerships, and partners in partnerships, that hold our common stock should consult their own tax advisors as to the particular United States federal income tax consequences of owning and disposing of our common stock that are applicable to them.

This summary does not consider any specific facts or circumstances that may apply to a Non-United States Holder, including the impact of the Medicare contribution tax on net investment income and the alternative minimum tax, and does not address any special tax rules that may apply to particular Non-United States Holders, including, without limitation:

- a Non-United States Holder that is a financial institution, insurance company, tax-exempt organization, pension plan, broker, dealer or trader in stocks, securities or currencies, United States expatriate, controlled foreign corporation or passive foreign investment company;

- a Non-United States Holder holding our common stock as part of a conversion, constructive sale, wash sale or other integrated transaction or a hedge, straddle or synthetic security;

- a Non-United States Holder that holds or receives our common stock pursuant to the exercise of any employee stock option or otherwise as compensation; or

- a Non-United States Holder that at any time owns, directly, indirectly or constructively, 5% or more of our outstanding common stock.

Table of Contents

In addition, this summary does not address any United States state or local, or non-United States or other tax consequences, or any United States federal income tax consequences for beneficial owners of a Non-United States Holder, including stockholders of a controlled foreign corporation or passive foreign investment company that holds our common stock. This summary also does not address the effects of other United States federal tax laws, such as estate and gift tax laws.

**Each Non-United States Holder should consult its tax advisor regarding the United States federal, state, local and non-United States income and other tax consequences of owning and disposing of our common stock.**

**Distributions on Our Common Stock**

We do not currently expect to pay any cash dividends on our common stock. If we make distributions of cash or property (other than certain pro rata distributions of our common stock) with respect to our common stock, any such distributions generally will constitute dividends for United States federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under United States federal income tax principles. If a distribution exceeds our current and accumulated earnings and profits, the excess will be treated as a nontaxable return of capital to the extent of the Non-United States Holder's adjusted tax basis in its common stock and will reduce (but not below zero) such Non-United States Holder's adjusted tax basis in its common stock. Any remaining excess will be treated as gain from a disposition of our common stock subject to the tax treatment described below in "— Dispositions of Our Common Stock."

Subject to the discussion below on effectively connected income, dividends paid to a Non-United States Holder of our common stock will be subject to United States federal withholding tax at a rate of 30% of the gross amount of the dividends (or such lower rate specified by an applicable income tax treaty, provided the Non-United States Holder furnishes a valid IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) certifying qualification for the lower treaty rate).

Distributions on our common stock that are treated as dividends and that are effectively connected with a Non-United States Holder's conduct of a trade or business in the United States will be taxed on a net income basis at the regular graduated rates and in the manner applicable to United States persons. An exception may apply if the Non-United States Holder is eligible for, and properly claims, the benefit of an applicable income tax treaty and the dividends are not attributable to a permanent establishment or fixed base maintained by the Non-United States Holder in the United States. In such case, the Non-United States Holder may be eligible for a lower rate under an applicable income tax treaty between the United States and its jurisdiction of tax residence. Dividends that are effectively connected with a Non-United States Holder's conduct of a trade or business in the United States will not be subject to the United States withholding tax if the Non-United States Holder provides to the applicable withholding agent a properly executed IRS Form W-8ECI (or other applicable form) in accordance with the applicable certification and disclosure requirements. A Non-United States Holder treated as a corporation for United States federal income tax purposes may also be subject to a "branch profits tax" at a 30% rate (unless the Non-United States Holder is eligible for a lower rate under an applicable income tax treaty) on the Non-United States Holder's earnings and profits (attributable to dividends on our common stock or otherwise) that are effectively connected with the Non-United States Holder's conduct of a trade or business within the United States.

The IRS Forms and other certifications described above must be provided to the applicable withholding agent prior to the payment of dividends and must be updated periodically. A Non-United States Holder may obtain a refund or credit of any excess amounts withheld by timely filing an appropriate claim for a refund with the IRS. Non-United States Holders should consult their tax advisors regarding their eligibility for benefits under a relevant income tax treaty and the manner of claiming such benefits.

The foregoing discussion is subject to the discussions below under "— Backup Withholding and Information Reporting" and "— FATCA Withholding."

**Dispositions of Our Common Stock**

A Non-United States Holder generally will not be subject to United States federal income tax (including United States withholding tax) on gain recognized on any sale or other disposition of our common stock unless:

> • the gain is effectively connected with the Non-United States Holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base maintained by the Non-United States Holder in the United States); in this case, the gain will be subject to United States federal income tax on a net income basis at the regular rates and in

110

Table of Contents

the manner applicable to United States persons (unless an applicable income tax treaty provides otherwise) and, if the Non-United States Holder is treated as a corporation for United States federal income tax purposes, the "branch profits tax" described above may also apply;

•    the Non-United States Holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and meets certain other requirements; in this case, except as otherwise provided by an applicable income tax treaty, the gain, which may be offset by certain United States source capital losses (provided the Non-United States Holder has timely filed United States federal income tax returns with respect to such losses), generally will be subject to a flat 30% United States federal income tax, even if the Non-United States Holder is not treated as a resident of the United States under the Code; or

•    we are or have been a "United States real property holding corporation" for United States federal income tax purposes at any time during the shorter of (i) the five-year period ending on the date of disposition and (ii) the period that the Non-United States Holder held our common stock.

Generally, a corporation is a "United States real property holding corporation" if the fair market value of its "United States real property interests" equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests plus its other assets used or held for use in a trade or business. We believe that we are not currently, and we do not anticipate becoming in the future, a United States real property holding corporation. However, because the determination of whether we are a United States real property holding corporation is made from time to time and depends on the relative fair market values of our assets, there can be no assurance in this regard. If we were a United States real property holding corporation, the tax relating to disposition of stock in a United States real property holding corporation generally will not apply to a Non-United States Holder whose holdings, direct, indirect and constructive, constituted 5% or less of our common stock at all times during the applicable period, provided that our common stock is "regularly traded on an established securities market" (as provided in applicable United States Treasury regulations) at any time during the calendar year in which the disposition occurs. However, no assurance can be provided that our common stock will be regularly traded on an established securities market for purposes of the rules described above. Non-United States Holders should consult their tax advisors regarding the possible adverse United States federal income tax consequences to them if we are, or were to become, a United States real property holding corporation.

The foregoing discussion is subject to the discussions below under "— Backup Withholding and Information Reporting" and "— FATCA Withholding."

**Backup Withholding and Information Reporting**

Backup withholding (currently at a rate of 24%) will not apply to payments of dividends on our common stock to a Non-United States Holder if the Non-United States Holder provides to the applicable withholding agent a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable form) certifying under penalties of perjury that the Non-United States Holder is not a United States person or is otherwise entitled to an exemption. However, the applicable withholding agent generally will be required to report to the IRS (and to such Non-United States Holder) payments of distributions on our common stock and the amount of United States federal income tax, if any, withheld from those payments, regardless of whether such distributions constitute dividends. In accordance with applicable treaties or agreements, the IRS may provide copies of such information returns to the tax authorities in the country in which the Non-United States Holder resides.

The gross proceeds from sales or other dispositions of our common stock may be subject, in certain circumstances discussed below, to United States backup withholding and information reporting. If a Non-United States Holder sells or otherwise disposes of our common stock outside the United States through a non-United States office of a non-United States broker and the disposition proceeds are paid to the Non-United States Holder outside the United States, then the United States backup withholding and information reporting requirements generally will not apply to that payment. However, United States information reporting, but not United States backup withholding, will apply to a payment of disposition proceeds, even if that payment is made outside the United States, if a Non-United States Holder sells our common stock through a non-United States office of a broker that is a United States person or has certain enumerated connections with the United States, unless the broker has documentary evidence in its files that the Non-United States Holder is not a United States person and certain other conditions are met or the Non-United States Holder otherwise qualifies for an exemption.

111

Table of Contents

If a Non-United States Holder receives payments of the proceeds of a disposition of our common stock to or through a United States office of a broker, the payment will be subject to both United States backup withholding and information reporting unless the Non-United States Holder provides to the broker a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable form) certifying under penalties of perjury that the Non-United States Holder is not a United States person, or the Non-United States Holder otherwise qualifies for an exemption.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be credited against the Non-United States Holder's United States federal income tax liability (which may result in the Non-United States Holder being entitled to a refund), provided that the required information is timely furnished to the IRS.

**FATCA Withholding**

The Foreign Account Tax Compliance Act and related Treasury guidance (commonly referred to as FATCA) impose United States federal withholding tax at a rate of 30% on payments to certain foreign entities of (i) United States-source dividends (including dividends paid on our common stock) and (ii) (subject to the proposed Treasury Regulations discussed below) the gross proceeds from the sale or other disposition of property that produces United States-source dividends (including sales or other dispositions of our common stock). This withholding tax applies to a foreign entity, whether acting as a beneficial owner or an intermediary, unless such foreign entity complies with (i) certain information reporting requirements regarding its United States account holders and its United States owners and (ii) certain withholding obligations regarding certain payments to its account holders and certain other persons. Accordingly, the entity through which a Non-United States Holder holds its common stock will affect the determination of whether such withholding is required. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on our common stock. While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of stock on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

Non-United States Holders are encouraged to consult their tax advisors regarding FATCA.

112

Table of Contents

**UNDERWRITING**

BofA Securities, Inc. is acting as representative of each of the underwriters named below. Subject to the terms and conditions set forth in an underwriting agreement among us and the underwriters, we have agreed to sell to the underwriters, and each of the underwriters has agreed, severally and not jointly, to purchase from us, the number of shares of common stock set forth opposite its name below.

| Underwriter | Number of Shares |
|---|---|
| BofA Securities, Inc. | |
| ThinkEquity, a division of Fordham Financial Management, Inc. | |
| Total | |

Subject to the terms and conditions set forth in the underwriting agreement, the underwriters have agreed, severally and not jointly, to purchase all of the shares sold under the underwriting agreement if any of these shares are purchased. If an underwriter defaults, the underwriting agreement provides that the purchase commitments of the nondefaulting underwriters may be increased or the underwriting agreement may be terminated.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make in respect of those liabilities.

The underwriters are offering the shares, subject to prior sale, when, as and if issued to and accepted by them, subject to approval of legal matters by their counsel, including the validity of the shares, and other conditions contained in the underwriting agreement, such as the receipt by the underwriters of officer's certificates and legal opinions. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

**Commissions and Discounts**

The representative has advised us that the underwriters propose initially to offer the shares to the public at the public offering price set forth on the cover page of this prospectus and to dealers at that price less a concession not in excess of $        per share. After the initial offering, the public offering price, concession or any other term of the offering may be changed.

The following table shows the public offering price, underwriting discount and proceeds before expenses to us. The information assumes either no exercise or full exercise by the underwriters of their option to purchase additional shares.

| | Per Share | Without Option | With Option |
|---|---|---|---|
| Public offering price | $ | $ | $ |
| Underwriting discount | $ | $ | $ |
| Proceeds, before expenses, to us | $ | $ | $ |

The expenses of the offering, not including the underwriting discount, are estimated at $410,000 and are payable by us. We have also agreed to reimburse the underwriters for up to $417,500 of documented expenses incurred in connection with this offering.

**Option to Purchase Additional Shares**

We have granted an option to the underwriters, exercisable for 30 days after the date of this prospectus, to purchase up to        additional shares at the public offering price, less the underwriting discount. If the underwriters exercise this option, each will be obligated, subject to conditions contained in the underwriting agreement, to purchase a number of additional shares proportionate to that underwriter's initial amount reflected in the above table.

113

Table of Contents

**No Sales of Similar Securities**

We, our executive officers and directors have agreed not to sell or transfer any common stock or securities convertible into, exchangeable for, exercisable for, or repayable with common stock, for 90 days after the date of this prospectus without first obtaining the written consent of BofA Securities, Inc. Specifically, we and these other persons have agreed, with certain limited exceptions, not to directly or indirectly

- offer, pledge, sell or contract to sell any common stock,

- sell any option or contract to purchase any common stock,

- purchase any option or contract to sell any common stock,

- grant any option, right or warrant for the sale of any common stock,

- lend or otherwise dispose of or transfer any common stock,

- request or demand that we file or make a confidential submission of a registration statement related to

- enter into any swap or other agreement that transfers, in whole or in part, the economic consequence of ownership of any common stock, whether any such swap or transaction is to be settled by delivery of shares or other securities, in cash or otherwise.

This lock-up provision applies to common stock and to securities convertible into or exchangeable or exercisable for or repayable with common stock. It also applies to common stock owned now or acquired later by the person executing the agreement or for which the person executing the agreement later acquires the power of disposition.

**New York Stock Exchange American Listing**

The shares are listed on NYSE American under the symbol "GOED." In connection with this offering, we intend to apply for the listing of our common stock on the NYSE.

**Price Stabilization, Short Positions**

Until the distribution of the shares is completed, SEC rules may limit underwriters and selling group members from bidding for and purchasing our common stock. However, the representative may engage in transactions that stabilize the price of the common stock, such as bids or purchases to peg, fix or maintain that price.

In connection with the offering, the underwriters may purchase and sell our common stock in the open market. These transactions may include short sales, purchases on the open market to cover positions created by short sales and stabilizing transactions. Short sales involve the sale by the underwriters of a greater number of shares than they are required to purchase in the offering. "Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional shares described above. The underwriters may close out any covered short position by either exercising their option to purchase additional shares or purchasing shares in the open market. In determining the source of shares to close out the covered short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the option granted to them. "Naked" short sales are sales in excess of such option. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of our common stock in the open market after pricing that could adversely affect investors who purchase the offering. Stabilizing transactions consist of various bids for or purchases of shares of common stock made by the underwriters in the open market prior to the completion of the offering.

Similar to other purchase transactions, the underwriters' purchases to cover the syndicate short sales may have the effect of raising or maintaining the market price of our common stock or preventing or retarding a decline in the market price of our common stock. As a result, the price of our common stock may be higher than the price that might otherwise exist in the open market. The underwriters may conduct these transactions on NYSE American, in the over-the-counter market or otherwise.

114

Table of Contents

Neither we nor any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of our common stock. In addition, neither we nor any of the underwriters make any representation that the representative will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

**Electronic Distribution**

In connection with the offering, certain of the underwriters or securities dealers may distribute prospectuses by electronic means, such as e-mail.

**Other Relationships**

Some of the underwriters and their affiliates have engaged in, and may in the future engage in, investment banking and other commercial dealings in the ordinary course of business with us or our affiliates. They have received, or may in the future receive, customary fees and commissions for these transactions.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**European Economic Area**

In relation to each Member State of the European Economic Area (each being referred to as a Relevant State), no shares have been offered or will be offered pursuant to the public in that Relevant State prior to the publication of a prospectus in relation to the shares which has been approved by the competent authority in that Relevant State or, where appropriate, approved in another Relevant State and notified to the competent authority in that Relevant State, all in accordance with the Prospectus Regulation), except that offers of shares may be made to the public in that Relevant State at any time under the following exemptions under the Prospectus Regulation:

      a.    to any legal entity which is a qualified investor as defined under the Prospectus Regulation;

      b.    to fewer than 150 natural or legal persons (other than qualified investors as defined under the Prospectus Regulation), subject to obtaining the prior consent for any such offer; or

      c.    in any other circumstances falling within Article 1(4) of the Prospectus Regulation, provided that no such offer of shares shall require the Issuer or any Manager to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation.

Each person in a Relevant State who initially acquires any shares or to whom any offer is made will be deemed to have represented, acknowledged and agreed to and with our company and the Managers that it is a qualified investor within the meaning of the Prospectus Regulation.

In the case of any shares being offered to a financial intermediary as that term is used in Article 5(1) of the Prospectus Regulation, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the shares acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer to the public other than their offer or resale in a Relevant State to qualified investors, in circumstances in which the prior consent has been obtained to each such proposed offer or resale.

Our company and its affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgements and agreements.

Table of Contents

For the purposes of this provision, the expression an "offer to the public" in relation to any shares in any Relevant State means the communication in any form and by any means of sufficient information on the terms of the offer and any shares to be offered so as to enable an investor to decide to purchase or subscribe for any shares, and the expression "Prospectus Regulation" means Regulation (EU) 2017/1129.

The above selling restriction is in addition to any other selling restrictions set out below.

**Notice to Prospective Investors in the United Kingdom**

In relation to the United Kingdom, or the UK, no shares have been offered or will be offered pursuant to the public in the UK prior to the publication of a prospectus in relation to the shares which has been approved by the Financial Conduct Authority in the UK in accordance with the UK Prospectus Regulation and the FSMA, except that offers of Shares may be made to the public in the UK at any time under the following exemptions under the UK Prospectus Regulation and the FSMA:

   a.   to any legal entity which is a qualified investor as defined under the UK Prospectus Regulation;

   b.   to fewer than 150 natural or legal persons (other than qualified investors as defined under the UK Prospectus Regulation), subject to obtaining the prior consent of the Global Co-ordinator for any such offer; or

   c.   at any time in other circumstances falling within section 86 of the FSMA,

provided that no such offer of shares shall require the Issuer or any Manager to publish a prospectus pursuant to Section 85 of the FSMA or Article 3 of the UK Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the UK Prospectus Regulation.

Each person in the UK who initially acquires any shares or to whom any offer is made will be deemed to have represented, acknowledged and agreed to and with our company and the Managers that it is a qualified investor within the meaning of the UK Prospectus Regulation.

In the case of any shares being offered to a financial intermediary as that term is used in Article 5(1) of the UK Prospectus Regulation, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the shares acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer to the public other than their offer or resale in the UK to qualified investors, in circumstances in which the prior consent has been obtained to each such proposed offer or resale.

Our company and its affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgements and agreements.

For the purposes of this provision, the expression an "offer to the public" in relation to any shares in the UK means the communication in any form and by any means of sufficient information on the terms of the offer and any shares to be offered so as to enable an investor to decide to purchase or subscribe for any shares, the expression "UK Prospectus Regulation" means Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, and the expression "FSMA" means the Financial Services and Markets Act 2000.

This document is for distribution only to persons who (i) have professional experience in matters relating to investments and who qualify as investment professionals within the meaning of Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or the Financial Promotion Order, (ii) are persons falling within Article 49(2)(a) to (d) ("high net worth companies, unincorporated associations etc.") of the Financial Promotion Order, (iii) are outside the United Kingdom, or (iv) are persons to whom an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000, as amended, in connection with the issue or sale of any securities may otherwise lawfully be communicated or caused to be communicated (all such persons together being referred to as "relevant persons"). This document is directed only at relevant persons and must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this document relates is available only to relevant persons and will be engaged in only with relevant persons.

Table of Contents

**Notice to Prospective Investors in Switzerland**

The shares may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange, or SIX, or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the shares or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, our company, the shares have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of shares will not be supervised by, the Swiss Financial Market Supervisory Authority, FINMA, and the offer of shares has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes, or CISA. The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of shares.

**Notice to Prospective Investors in the Dubai International Financial Centre**

This prospectus supplement relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority, or the DFSA. This prospectus supplement is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus supplement nor taken steps to verify the information set forth herein and has no responsibility for the prospectus supplement. The shares to which this prospectus supplement relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the shares offered should conduct their own due diligence on the shares. If you do not understand the contents of this prospectus supplement you should consult an authorized financial advisor.

**Notice to Prospective Investors in Australia**

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission in relation to the offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001, or the Corporations Act, and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act. Any offer in Australia of the shares may only be made to persons, or Exempt Investors, who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the shares without disclosure to investors under Chapter 6D of the Corporations Act.

The shares applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring shares must observe such Australian on-sale restrictions.

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

Table of Contents

**Notice to Prospective Investors in Hong Kong**

The securities have not been offered or sold and will not be offered or sold in Hong Kong, by means of any document, other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance. No advertisement, invitation or document relating to the securities has been or may be issued or has been or may be in the possession of any person for the purposes of issue, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

**Notice to Prospective Investors in Japan**

The securities have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948, as amended) and, accordingly, will not be offered or sold, directly or indirectly, in Japan, or for the benefit of any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person, except in compliance with all applicable laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

**Notice to Prospective Investors in Singapore**

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, the securities were not offered or sold or caused to be made the subject of an invitation for subscription or purchase and will not be offered or sold or caused to be made the subject of an invitation for subscription or purchase, and this prospectus or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the securities, has not been circulated or distributed, nor will it be circulated or distributed, whether directly or indirectly, to any person in Singapore other than (i) to an institutional investor (as defined in Section 4A of the Securities and Futures Act (Chapter 289) of Singapore, as modified or amended from time to time, or the SFA) pursuant to Section 274 of the SFA, (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

    a)    a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

    b)    a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the securities pursuant to an offer made under Section 275 of the SFA except:

    a)    to an institutional investor or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

    b)    where no consideration is or will be given for the transfer;

    c)    where the transfer is by operation of law; or

    d)    as specified in Section 276(7) of the SFA.

Table of Contents

**Notice to Prospective Investors in Canada**

The securities may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the securities must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws. Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor. Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI33-105 regarding underwriter conflicts of interest in connection with this offering.

119

Table of Contents

## LEGAL MATTERS

Certain legal matters with respect to the shares of common stock offered hereby will be passed upon by Bevilacqua PLLC, Washington, DC. Latham & Watkins, LLP, New York, New York, is acting as counsel to the underwriters.

## EXPERTS

The consolidated financial statements of our company appearing elsewhere in this prospectus have been included herein in reliance upon the report of Friedman LLP, an independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

The combined financial statements of Appliances Connection appearing elsewhere in this prospectus have been included herein in reliance upon the report of Friedman LLP, an independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

## INTERESTS OF NAMED EXPERTS AND COUNSEL

As of the date of this prospectus, Louis A. Bevilacqua, the managing member of our legal counsel, Bevilacqua PLLC, owns 298,427 shares of our common stock, representing approximately 4.88% of our outstanding common stock, which equity securities were received upon the distribution of shares by 1847 Holdings. Mr. Bevilacqua also owns approximately 10% of our manager. Mr. Bevilacqua received these securities as partial consideration for legal services previously provided to 1847 Holdings and our manager.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed a registration statement, of which this prospectus is a part, on Form S-1 with the SEC relating to this offering. This prospectus, which constitutes a part of the registration statement, does not contain all of the information in the registration statement and the exhibits filed with the registration statement. For further information pertaining to us and the common stock to be sold in this offering, you should refer to the registration statement and its exhibits. References in this prospectus to any of our contracts, agreements or other documents are not necessarily complete, and you should refer to the exhibits attached to the registration statement for copies of the actual contracts, agreements or documents.

We file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information are available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. Additionally, we will make these filings available, free of charge, on our website at *www.goedekers.com* as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the SEC. The information on our website, other than these filings, is not, and should not be, considered part of this prospectus and is not incorporated by reference into this document.

Table of Contents

**FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| **Audited Consolidated Financial Statements of 1847 Goedeker Inc. as of and for the Years Ended December 31, 2020 and 2019** | **F-2** |
| Report of Independent Registered Public Accounting Firm | F-3 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 (as Restated) | F-4 |
| Consolidated Statements of Operations for the Year Ended December 31, 2020 and the Period from April 6, 2019 to December 31, 2019 (Successor) (as Restated) and for the Period from January 1, 2019 to April 5, 2019 (Predecessor) | F-5 |
| Statement of Stockholders' Equity for Predecessor for the Period from January 1, 2019 to April 5, 2019 | F-6 |
| Consolidated Statement of Stockholder's Deficit for Successor for the Year Ended December 31, 2020 and the Period from April 5, 2019 to December 31, 2019 (as Restated) | F-7 |
| Consolidated Statements of Cash Flows for the Year Ended December 31, 2020 and the Period from April 6, 2019 to December 31, 2019 (Successor) (as Restated) and for the Period from January 1, 2019 to April 5, 2019 (Predecessor) | F-8 |
| Notes to Consolidated Financial Statements | F-10 |
|  |  |
| **Audited Combined Financial Statements of 1 Stop Electronics Center, Inc., YF Logistics LLC, Gold Coast Appliances, Inc., Joe's Appliances LLC and Superior Deals Inc. (dba Appliances Connection) as of and for the Years Ended December 31, 2020 and 2019** | **F-35** |
| Report of Independent Registered Public Accounting Firm | F-36 |
| Combined Balance Sheets as of December 31, 2020 and 2019 | F-37 |
| Combined Statements of Income and Changes in Owners' Equity for the Years Ended December 31, 2020 and 2019 | F-38 |
| Combined Statements of Cash Flows for the Years Ended December 31, 2020 and 2019 | F-39 |
| Notes to Combined Financial Statements | F-40 |

F-1

Table of Contents

**1847 GOEDEKER INC.**

**AUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2020 AND 2019**

F-2

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
1847 Goedeker Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of 1847 Goedeker Inc. and subsidiary (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of operations, stockholder's deficit, and cash flows for the year ended December 31, 2020 and the period from April 6, 2019 through December 31, 2019 (effective April 6, 2019, the "Successor Company"), the period from January 1, 2019 through April 5, 2019 (pre-April 6, 2019, the "Predecessor Company"), and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Successor Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the year ended December 31, 2020 and for the period from April 6, 2019 through December 31, 2019, in conformity with accounting principles generally accepted in the United States of America. Further, in our opinion, the Predecessor Company financial statements referred to above present fairly, in all material respects, the results of its operations and cash flows for the period from January 1, 2019 through April 5, 2019 in conformity with accounting principles generally accepted in the United States of America.

**Restatement of Previously Issued Financial Statements**

As discussed in Note 3 to the consolidated financial statements, the Company has restated its 2019 financial statements to correct errors.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2020.
Marlton, New Jersey
March 29, 2021

F-3

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| | | (As Restated) |
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 934,729 | $ 471,308 |
| Restricted cash | 8,977,187 | — |
| Receivables | 1,998,232 | 1,455,248 |
| Vendor deposits | 547,648 | 294,960 |
| Merchandise inventory, net | 5,147,241 | 1,380,090 |
| Prepaid expenses and other current assets | 635,084 | 892,796 |
| Total Current Assets | 18,240,121 | 4,494,402 |
| Property and equipment, net | 245,948 | 185,606 |
| Operating lease right-of-use assets, net | 1,578,235 | 2,000,755 |
| Goodwill | 4,725,689 | 4,603,953 |
| Intangible assets, net | 1,381,937 | 1,878,844 |
| Deferred tax assets | — | 698,303 |
| Other long-term assets | 45,000 | 45,000 |
| TOTAL ASSETS | $ 26,216,930 | $ 13,906,863 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 12,701,715 | $ 5,375,420 |
| Customer deposits | 21,879,210 | 4,164,296 |
| Advances, related party | — | 137,500 |
| Lines of credit | — | 1,250,930 |
| Current portion of notes payable, related parties | — | 1,068,075 |
| Current portion of notes payable | 663,339 | 999,200 |
| Convertible notes payable | — | 584,943 |
| Warrant liability | — | 122,344 |
| Current portion of operating lease liabilities | 450,712 | 422,520 |
| Total Current Liabilities | 35,694,976 | 14,125,228 |
| Notes payable, related parties, net of current portion | — | 2,232,369 |
| Notes payable, net of current portion | 2,522,030 | — |
| Operating lease liabilities, net of current portion | 1,127,523 | 1,578,235 |
| Contingent note payable | 188,170 | 49,248 |
| TOTAL LIABILITIES | 39,532,699 | 17,985,080 |
| Stockholders' Deficit | | |
| Preferred stock, $.0001 par value, 20,000,000 shares authorized; none issued and outstanding at December 31, 2020 or 2019 | — | — |
| Common stock, $.0001 par value, 200,000,000 shares authorized; 6,111,200 and 4,750,000 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 611 | 475 |
| Additional paid-in capital | 13,409,328 | 1,079,179 |
| Accumulated deficit | (26,725,708) | (5,157,871) |
| Total Stockholders' Deficit | (13,315,769) | (4,078,217) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 26,216,930 | $ 13,906,863 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-4

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor |
|---|---|---|---|
| | **Year Ended December 31, 2020** | **Period from April 6, 2019 through December 31, 2019** | **Period from January 1, 2019 through April 5, 2019** |
| | | **(As Restated)** | |
| Product sales, net | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 |
| Cost of goods sold | 47,878,541 | 28,596,129 | 11,004,842 |
| Gross profit | 7,255,112 | 6,071,983 | 1,942,059 |
| | | | |
| Operating Expenses | | | |
| Personnel | 6,565,380 | 2,909,751 | 913,919 |
| Advertising | 4,865,361 | 1,996,507 | 714,276 |
| Bank and credit card fees | 1,806,620 | 870,877 | 329,247 |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 |
| General and administrative | 7,900,566 | 4,728,571 | 451,214 |
| Total Operating Expenses | 21,687,639 | 10,776,742 | 2,418,331 |
| | | | |
| LOSS FROM OPERATIONS | (14,432,527) | (4,704,759) | (476,272) |
| | | | |
| Other Income (Expense) | | | |
| Interest income | 2,479 | — | 23,807 |
| Financing costs – amortization of debt discount | (762,911) | (520,160) | — |
| Adjustment in value of contingency | (138,922) | 32,246 | |
| Interest expense | (870,847) | (785,411) | — |
| Loss on extinguishment of debt | (1,756,095) | — | — |
| Write-off of acquisition receivable | (809,000) | — | — |
| Change in fair value of warrant liability | (2,127,656) | 106,900 | — |
| Other income | 25,945 | 15,010 | 7,200 |
| Total Other Income (Expense) | (6,437,007) | (1,151,415) | 31,007 |
| | | | |
| NET LOSS BEFORE INCOME TAXES | (20,869,534) | (5,856,174) | (445,265) |
| | | | |
| INCOME TAX BENEFIT (EXPENSE) | (698,303) | 698,303 | — |
| | | | |
| NET LOSS | $ (21,567,837) | $ (5,157,871) | $ (445,265) |
| | | | |
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ (3.95) | $ (1.03) | $ (63.61) |
| | | | |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | 5,463,603 | 5,000,000 | 7,000 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-5

Table of Contents

**1847 GOEDEKER INC.**
**STATEMENT OF STOCKHOLDERS' EQUITY**
**(PREDECESSOR)**

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance, December 31, 2018 | 7,000 | $ 7,000 | $ 707,049 | $ 2,684,628 | $ 3,398,677 |
| Net loss for the period from January 1, 2019 through April 5, 2019 | — | — | — | (445,265) | (445,265) |
| Balance, April 5, 2019 | 7,000 | $ 7,000 | $ 707,049 | $ 2,239,363 | $ 2,953,412 |

*The accompanying notes are an integral part of consolidated these financial statements*

F-6

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(SUCCESSOR)**

**For the Period from April 6, 2019 through December 31, 2019 (as Restated)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance, April 6, 2019 | — | $ — | $ — | $ — | $ — |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 786,506 | — | 786,981 |
| Issuance of warrants in connection with notes payable | — | — | 292,673 | — | 292,673 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | — | — | — | (5,157,871) | (5,157,871) |
| Balance, December 31, 2019 | 4,750,000 | $ 475 | $ 1,079,179 | $ (5,157,871) | $ (4,078,217) |

**For the Year Ended December 31, 2020**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance, January 1, 2020 (as restated) | 4,750,000 | $ 475 | $ 1,079,179 | $ (5,157,871) | $ (4,078,217) |
| Issuance of 1847 Holdings warrants in connection with notes payable | — | — | 566,711 | — | 566,711 |
| Forgiveness of related party debt | — | — | 137,500 | — | 137,500 |
| Issuance of 1847 Holdings shares in connection with conversion of notes payable | — | — | 375,000 | — | 375,000 |
| Issuance of common stock for cash | 1,111,200 | 111 | 8,602,055 | — | 8,602,166 |
| Issuance of common stock in connection with exercise of warrant | 250,000 | 25 | 2,249,975 | — | 2,250,000 |
| Stock-based compensation expense | — | — | 398,908 | — | 398,908 |
| Net loss | — | — | — | (21,567,837) | (21,567,837) |
| Balance, December 31, 2020 | 6,111,200 | $ 611 | $ 13,409,328 | $ (26,725,708) | $ (13,315,769) |

*The accompanying notes are an integral part of these consolidated financial statements*

F-7

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2020 | Period from April 6, 2019 through December 31, 2019 | Period from January 1, 2019 through April 5, 2019 |
| | | (As Restated) | |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net loss | $ (21,567,837) | $ (5,157,871) | $ (445,265) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 |
| Amortization of finance costs | 681,976 | 599,814 | — |
| Loss on extinguishment of debt | 1,756,095 | — | — |
| Write-off of acquisition receivable | 809,000 | — | — |
| Adjustment in contingent liability | 138,922 | (32,246) | — |
| Stock-based compensation | 398,908 | — | — |
| Change in fair value of warrant liability | 2,127,656 | (106,900) | — |
| Non-cash lease expense | 422,520 | 299,245 | — |
| Deferred tax assets | 698,303 | (698,303) | — |
| Changes in operating assets and liabilities: | | | |
| Receivables | (664,720) | (999,066) | 1,730,079 |
| Vendor deposits | (252,688) | (294,960) | (73,770) |
| Merchandise inventory | (3,767,151) | 471,161 | 595,466 |
| Prepaid expenses and other assets | (551,288) | 167,066 | 2,784 |
| Accounts payable and accrued expenses | 7,337,081 | 1,625,064 | 196,565 |
| Customer deposits | 17,714,914 | 1,855,990 | (1,404,266) |
| Operating lease liabilities | (422,520) | (299,245) | — |
| Net cash provided by (used in) operating activities | 5,408,883 | (2,299,215) | 611,268 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Purchases of property and equipment | (113,147) | (2,200) | — |
| Net cash used in investing activities | (113,147) | (2,200) | — |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Proceeds from initial public offering, net | 8,602,166 | — | — |
| Proceeds from note payable | 642,600 | 1,500,000 | — |
| Payments on notes payable | (2,883,754) | (357,207) | — |
| Proceeds from convertible notes payable | — | 650,000 | — |
| Payments on convertible notes payable | (771,431) | — | |
| Net borrowings (payments) on lines of credit | (1,339,430) | 1,339,430 | — |
| Cash paid for financing costs | (105,279) | (359,500) | — |
| Net cash provided by financing activities | 4,144,872 | 2,772,723 | — |
| NET CHANGE IN CASH AND RESTRICTED CASH | 9,440,608 | 471,308 | 611,268 |
| CASH AND RESTRICTED CASH, BEGINNING OF YEAR | 471,308 | — | 1,525,693 |
| CASH AND RESTRICTED CASH, END OF YEAR | $ 9,911,916 | $ 471,308 | $ 2,136,961 |

F-8

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS** — Continued

| | | Successor | | Predecessor |
|---|---|---|---|---|
| | | **Year Ended December 31, 2020** | **Period from April 6, 2019 through December 31, 2019** | **Period from January 1, 2019 through April 5, 2019** |
| | | | **(As Restated)** | |
| Cash, cash equivalents and restricted cash consist of the following: | | | | |
| End of year | | | | |
| Cash and cash equivalents | $ | 934,726 | $ 471,308 | $ — |
| Restricted cash | | 8,977,187 | — | — |
| | $ | 9,911,916 | $ 471,308 | $ — |
| | | | | |
| Cash, cash equivalents and restricted cash consist of the following: | | | | |
| Beginning of year | | | | |
| Cash and cash equivalents | $ | 471,308 | $ — | $ 1,525,693 |
| Restricted cash | | — | — | — |
| | $ | 471,308 | $ — | $ 1,525,693 |
| | | | | |
| SUPPLEMENTAL CASH FLOW INFORMATION | | | | |
| Cash paid for interest | $ | 764,424 | $ 292,890 | $ — |
| Cash paid for taxes | $ | — | $ — | $ — |
| | | | | |
| NON-CASH INVESTING AND FINANCING ACTIVITIES | | | | |
| Operating lease right-of-use asset and liability | $ | — | $ 2,300,000 | $ — |
| Debt discounts on notes payable | $ | — | $ 64,286 | $ — |
| Warrants in 1847 Holdings contributed on notes payable | $ | 566,711 | $ 292,673 | $ — |
| 1847 Holdings common shares contributed on note payable | $ | — | $ 137,500 | $ — |
| Acquisition of Goedeker Television Co. | $ | — | $ 4,725,689 | $ — |
| Conversion of debt through issuance of 1847 Holdings common shares | $ | 375,000 | $ — | $ — |
| Derecognition of related party debt | $ | 137,500 | $ — | $ — |
| Adjustment to fair value of goodwill based on final purchase price allocation | $ | 121,736 | $ — | $ — |
| Conversion of warrant into common stock | $ | 2,250,000 | $ — | $ — |
| Issuance of note payable to repay Seller note | $ | 3,500,000 | $ — | $ — |

*The accompanying notes are an integral part of these consolidated financial statements*

F-9

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

## NOTE 1 — ORGANIZATION AND NATURE OF BUSINESS

1847 Goedeker Inc. (the "Company") was formed under the laws of the State of Delaware on January 10, 2019 for the sole purpose of acquiring the business of Goedeker Television Co. Prior to the acquisition, the Company did not have any operations other than operations relating to its incorporation and organization.

On April 5, 2019, the Company acquired substantially all the assets and assumed substantially all the liabilities of Goedeker Television Co., a Missouri corporation ("Goedeker"). As a result of this transaction, the Company acquired the former business of Goedeker and continues to operate this business.

October 20, 2020, the Company formed Appliances Connection Inc. ("ACI") as a wholly owned subsidiary in the State of Delaware. At December 31, 2020, ACI had no assets or liabilities.

The Company is a one-stop e-commerce destination for home furnishings, including appliances, furniture, home goods and related products. Since Goedeker's founding in 1951, it has evolved from a local brick and mortar operation serving the St. Louis metro area to a large nationwide omnichannel retailer that offers one-stop shopping. While the Company still maintains its St. Louis showroom, over 95% of its sales are placed through its website at *www.goedekers.com*.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The consolidated financial statements of the Company and ACI have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars.

Management has analyzed the impact of the Coronavirus pandemic ("COVID-19") on its consolidated financial statements as of December 31, 2020 and has determined that the changes to its significant judgments and estimates did not have a material impact with respect to goodwill, intangible assets or long-lived assets.

### Principles of Consolidation

The consolidated financial statements include the accounts of the Company and its consolidated subsidiary, ACI. All significant intercompany balances and transactions have been eliminated in consolidation. The Company does not have a majority or minority interest in any other company, either consolidated or unconsolidated.

### Stock Split

On July 30, 2020, the Company completed a 4,750-for-1 forward stock split of its outstanding common stock. As a result of this stock split, the Company's issued and outstanding common stock increased from 1,000 to 4,750,000 shares. Accordingly, all share and per share information has been restated to retroactively show the effect of this stock split.

### Predecessor and Successor Reporting

The acquisition of Goedeker, as described in Note 1, was accounted for under the acquisition method of accounting in accordance with GAAP. For the purpose of financial reporting, Goedeker was deemed to be the predecessor company and the Company is deemed to be the successor company in accordance with the rules and regulations issued by the Securities and Exchange Commission. The assets and liabilities of Goedeker were recorded at their respective fair values as of the acquisition date. Fair value adjustments related to the transaction are reflected in the books of the Company, resulting in assets and liabilities of the Company being recorded at fair value at April 6, 2019. Therefore, the Company's financial information prior to the transaction is not comparable to its financial information subsequent to the transaction.

F-10

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

As a result of the impact of pushdown accounting, the consolidated financial statements and certain note presentations separate the Company's presentations into two distinct periods, the period before the consummation of the transaction (labeled "Predecessor") and the period after that date (labeled "Successor"), to indicate the application of a different basis of accounting between the periods presented.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Cash and equivalents include: (1) currency on hand, (2) demand deposits with banks or financial institutions, (3) other kinds of accounts that have the general characteristics of demand deposits, and (4) short-term, highly liquid investments that are both readily convertible to known amounts of cash and so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. The majority of payments due from financial institutions for the settlement of credit card and debit card transactions process within two business days and are, therefore, classified as cash and cash equivalents. Other payment methods that take more time to settle are classified as receivables.

Restricted cash includes $3,298,529 pledged to secure a note, $100,000 to secure a vendor letter of credit and $5,578,658 withheld by credit card processors as security for the Company's customer refund claims and credit card chargebacks. The cash pledged to secure the note payable will be released as the note is repaid, the cash pledged to secure the letter of credit will be released when the vendor offers the Company credit terms, and the cash held by credit card processors will be released at the discretion of the credit card companies.

*Revenue Recognition and Cost of Revenue*

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

The Company collects the full sales price from the customer at the time the order is placed, which is recorded as customer deposits on the accompanying consolidated balance sheet. The Company does not incur incremental costs obtaining purchase orders from customers, however, if the Company did, because all the Company's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

The revenue that the Company recognizes arises from orders it receives from its customers. The Company's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers under the purchase orders; as a result, each purchase order generally contains only one performance obligation based on the merchandise sale to be completed.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, the Company's products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. The Company delivers products to its customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from the Company's warehouse to the customer (a "Company Shipment"). The second way is through a shipment of the products through a third-party carrier from a warehouse other than the Company's warehouse to the customer (a "Drop Shipment") and the third way is where the Company itself delivers the products to the customer and often

F-11

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

also installs the product (a "Local Delivery"). In the case of a Local Delivery, the Company loads the product on to its own truck and delivers and installs the product at the customer's location. When a product is delivered through a Local Delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a Company Shipment and a Drop Shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from the Company's warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves the Company's warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, the Company has satisfied its performance obligation and the Company recognizes revenue.

The Company agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In the Company's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all the Company's sales are to individual retail consumers.

Shipping and Handling — The Company bills its customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue — The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows:

| | Successor | | Predecessor |
| --- | --- | --- | --- |
| | Year Ended December 31, 2020 | Period from April 6, 2019 through December 31, 2019 | Period from January 1, 2019 through April 5, 2019 |
| Appliance sales | $ 40,113,568 | $ 28,487,053 | $ 9,784,525 |
| Furniture sales | 11,800,277 | 4,405,866 | 2,456,085 |
| Other sales | 3,219,808 | 1,775,193 | 706,291 |
| Total | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 |

The Company also sells extended warranty contracts. The Company is an agent for the warranty company and earns a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the accompanying consolidated statement of operations. The Company assumes no liability for repairs to products on which it has sold a warranty contract.

The Company experiences operational trends which are primarily holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Receivables*

Receivables represent rebates receivable due from manufacturers from whom the Company purchases products and amounts due from credit card processors that do not settle within two days. Rebates receivable are stated at the amount that management expects to collect from manufacturers, net of accounts payable amounts due the vendor. Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts. The Company historically collects substantially all of its outstanding rebates receivables. Uncollectible balances are expensed in the period it is determined to be uncollectible.

*Merchandise Inventory*

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on its estimate of market conditions.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements. Depreciation is computed using the straight-line method over estimated useful lives as follows:

| Category | Useful Life (Years) |
|---|---|
| Machinery and equipment | 5 |
| Office equipment | 5 |
| Vehicles | 5 |

*Goodwill*

The Company tests its goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in the Company's expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and the Company's consolidated financial results.

The Company tests goodwill by estimating fair value using a Discounted Cash Flow ("DCF") model. The key assumptions used in the DCF model to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during the years ended December 31, 2020 and 2019.

*Intangible Assets*

As of December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

F-13

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. At December 31, 2020 and 2019, there were no impairments in intangible or the right of use ("ROU") assets.

### Long-Lived Assets

The Company reviews its property and equipment and any identifiable intangibles (including ROU asset) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell. At December 31, 2020 and 2019, there were no impairments in long-lived assets.

### Lease Liabilities

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

### Fair Value of Financial Instruments

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction

F-14

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value, due to their short-term nature. The fair value hierarchy is defined in the following three categories:

> Level 1:  Quoted market prices in active markets for identical assets or liabilities.
>
> Level 2:  Observable market-based inputs or inputs that are corroborated by market data.
>
> Level 3:  Unobservable inputs that are not corroborated by market data.

**Customer Deposits**

Customer deposits represent the amount collected from customers when an order is placed. The deposits are transferred to revenue when the order ships to the customer or returned to the Company if the order is subsequently cancelled.

**Derivative Instrument Liability**

The Company accounts for derivative instruments in accordance with ASC 815, *Derivatives and Hedging*, which establishes accounting and reporting standards for derivative instruments and hedging activities, including certain derivative instruments embedded in other financial instruments or contracts, and requires recognition of all derivatives on the balance sheet at fair value, regardless of hedging relationship designation. Accounting for changes in fair value of the derivative instruments depends on whether the derivatives qualify as hedge relationships and the types of relationships designated are based on the exposures hedged. At December 31, 2019, the Company classified a warrant issued in conjunction with a term loan as a derivative instrument (see Note 12). There were no derivative instruments at December 31, 2020.

**Income Taxes**

Under the Company's accounting policies, the Company initially recognizes a tax position in its consolidated financial statements when it becomes more likely than not that the position will be sustained upon examination by the tax authorities. Such tax positions are initially and subsequently measured as the largest amount of tax positions that has a greater than 50% likelihood of being realized upon ultimate settlement with the tax authorities assuming full knowledge of the position and all relevant facts. Although the Company believes its provisions for unrecognized tax positions are reasonable, the Company can make no assurance that the final tax outcome of these matters will not be different from that which the Company has reflected in its income tax provisions and accruals. The tax law is subject to varied interpretations, and the Company has taken positions related to certain matters where the law is subject to interpretation. Such differences could have a material impact on the Company's income tax provisions and operating results in the period(s) in which the Company makes such determination.

**Sales Tax Liability**

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At December 31, 2020 and 2019, the amount of such accrual was $5,804,100 and $2,910,200, respectively, which is included in accounts payable and accrued expenses. To date, only one state has notified the Company of a potential sales tax liability of approximately $11,000.

F-15

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Basic Income (Loss) Per Share*

Basic income (loss) per share is calculated by dividing the net loss applicable to common shareholders by the weighted average number of common shares during the period. Diluted earnings per share is calculated by dividing the net income available to common shareholders by the diluted weighted average number of shares outstanding during the year. The diluted weighted average number of shares outstanding is the basic weighted number of shares adjusted for any potentially dilutive securities. For the year ended December 31, 2020, the potentially dilutive securities were warrants for the purchase of 55,560 shares of common stock issued to affiliates of the underwriter in its initial public offering described below and options for the purchase of 555,000 shares of common stock. For the year ended December 31, 2019, the potentially dilutive securities were penny warrants for the purchase of 250,000 shares of common stock, which were included in basic loss per share, but excluded from diluted loss per share.

*Reclassifications*

Certain accounts have been reclassified to conform with classifications adopted in the period ended December 31, 2020. Such reclassifications had no effect on net earnings or financial position.

*Going Concern Assessment*

Management assesses going concern uncertainty in the Company's consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

The Company has generated significant losses since its acquisition and has relied on cash on hand, external bank lines of credit, proceeds from the IPO described below, issuance of third party and related party debt and the issuance of a note to support cashflow from operations.

For the year ended December 31, 2020, the Company incurred operating losses of approximately $14.4 million, cash flows from operations of $5.4 million, and negative working capital of $17.5 million.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these consolidated financial statements in the Company's 10-K.

On August 4, 2020, the Company completed an initial public offering of its common stock, pursuant to which the Company sold 1,111,200 shares of its common stock, at a purchase price of $9.00 per share, for total gross proceeds of $10,000,800 (the "IPO"). After deducting the underwriting commission and offering expenses, the Company received net proceeds of $8,602,166. The Company used a portion of the proceeds from the IPO to pay off certain debt as described below.

As described in Note 19 below, the Company received net proceeds of $4,590,000 from the sale of 10% OID senior secured promissory note and warrants on March 19, 2021. These proceeds will supplement the Company's cash flow from operations and provide additional liquidity.

F-16

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The impact of COVID-19 on the Company's business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business.

Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern. The Company has contingency plans to reduce or defer expenses and cash outlays should operations not improve in the look forward period.

***Recent Accounting Pronouncements***

<u>*Recently Adopted*</u>

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASC 842"), which requires lessees to recognize ROU assets and related lease liabilities on the balance sheet for all leases greater than one year in duration. The Company adopted ASC 842 on January 1, 2019 using a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the consolidated financial statements. The modified retrospective approach did not require any transition accounting for leases that expired before the earliest comparative period presented. The adoption of this standard resulted in the recording of ROU assets and lease liabilities for all of the Company's lease agreements with original terms of greater than one year. The adoption of ASC 842 did not have a significant impact on the Company's consolidated statements of income or cash flows. See Note 15 for the required disclosures relating to the Company's lease agreements.

In June 2018, the FASB issued Accounting Standards Update ("ASU") 2018-07, *Compensation — Stock Compensation (Topic 718):   Improvements to Nonemployee Share-Based Payment Accounting,* which simplifies the accounting for nonemployee share-based payment transactions by expanding the scope of ASC Topic 718, *Compensation — Stock Compensation*, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new standard, most of the guidance on stock compensation payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. This standard became effective for the Company on January 1, 2019. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In February 2018, the FASB issued ASU 2018-02, *Income Statement-Reporting Comprehensive Income (Topic 220):   Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*, which allows a reclassification from accumulated other comprehensive income ("AOCI") to retained earnings for stranded tax effects resulting from U.S. federal tax legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017.

In August 2017, the FASB issued ASU 2017-12, *Derivatives and Hedging (Topic 815):   Targeted Improvements to Accounting for Hedging Activities*, which expands and refines hedge accounting for both financial and non-financial risk components, aligns the recognition and presentation of the effects of hedging instruments and hedge items in the consolidated financial statements, and includes certain targeted improvements to ease the application of current guidance related to the assessment of hedge effectiveness. ASU 2017-12 became effective for the Company on January 1, 2019. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40):   Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop

F-17

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods beginning after December 15, 2019, including interim periods within those annual periods. Early adoption is permitted. The Company adopted ASU 2018-15 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820):    Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. The Company adopted ASU 2018-13 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

*Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments-Credit Losses (Topic 326):    Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to the Company's consolidated financial statements.

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS**

The Company restated its previously issued financial statements as of and for the year ended December 31, 2019 to reflect the modification of a sales tax liability and purchase accounting adjustments:

(1)    The Company determined that it should accrue a liability for potential 2019 sales taxes that might be payable to the states in which it operates as a result of the Wayfair decision (See Note 2 — Sales Tax Liability). Accordingly, the Company accrued a liability of $2,910,200, representing a potential liability for sales taxes and penalties of $2,808,000 and interest expense of $102,200.

(2)    The Company adjusted the fair value of ownership interests in Holdco that were transferred to seller and the value of liabilities assumed in the April 5, 2019 acquisition (see Note 10) resulting in a $372,063 reduction in Goodwill; a $192,542 reduction in Additional Paid in Capital, and $179,521 reduction in liabilities assumed, which was recognized as a general and administrative expense.

F-18

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS** (cont.)

The following tables summarize the effect of the restatement on the specific items presented in our historical financial statements included in our previously reported December 31, 2019 financial statements:

1847 GOEDEKER INC.
BALANCE SHEET

| | December 31, 2019 (As Filed) | | Adjustments | December 31, 2019 (As Restated) |
|---|---|---|---|---|
| ASSETS | | | | |
| Total Current Assets | 4,494,402 | | — | 4,494,402 |
| Goodwill | 4,976,016 | (2) | (372,063) | 4,603,953 |
| TOTAL ASSETS | $ 14,278,926 | $ | (372,063) | $ 13,906,863 |
| | | | | |
| LIABILITIES AND STOCKHOLDERS' DEFICIT | | | | |
| Current Liabilities | | | | |
| Accounts payable and accrued expenses | $ 2,465,220 | (1) $ | 2,910,200 | $ 5,375,420 |
| Total Current Liabilities | 11,215,028 | | 2,910,200 | 14,125,228 |
| TOTAL LIABILITIES | 15,074,880 | | 2,910,200 | 17,985,080 |
| Stockholders' Deficit | | | | |
| Additional paid-in capital | 1,271,721 | (2) | (192,542) | 1,079,179 |
| Accumulated deficit | (2,068,150) | (1) | (2,910,200) | (5,157,871) |
| | | (2) | (179,521) | |
| Total Stockholders' Deficit | (795,954) | | (3,282,263) | (4,078,217) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | 14,278,926 | $ | (372,063) | $ 13,906,863 |

1847 GOEDEKER INC.
STATEMENTS OF OPERATIONS

| | Period from April 6, 2019 through December 31, 2019 (As Filed) | | Adjustments | Period from April 6, 2019 through December 31, 2019 (As Restated) |
|---|---|---|---|---|
| Gross profit | 6,071,983 | | — | 6,071,983 |
| Operating Expenses | | | | |
| General and administrative | 1,741,050 | (1) | 2,808,000 | 4,728,571 |
| | | (2) | 179,521 | |
| Total Operating Expenses | 7,789,221 | | 2,987,521 | 10,776,742 |
| | | | | |
| LOSS FROM OPERATIONS | (1,717,238) | | (2,987,521) | (4,704,759) |
| | | | | |
| Total Other Income (Expense) | (1,049,215) | | (102,200) | (1,151,415) |
| | | | | |
| NET LOSS BEFORE INCOME TAXES | (2,766,453) | | (3,089,721) | (5,856,174) |
| | | | | |
| INCOME TAX BENEFIT (EXPENSE) | 698,303 | | — | 698,303 |
| NET LOSS | $ (2,068,150) | $ | (3,089,721) | $ (5,157,871) |

| | | | | |
|---|---|---|---|---|
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ | (0.41) | $ | (1.03) |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | | 5,000,000 | | 5,000,000 |

F-19

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS** (cont.)

1847 GOEDEKER INC.
STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| As Filed: | | | | | |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 979,048 | — | 979,523 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | — | — | — | (2,068,150) | (2,068,150) |
| Balance, December 31, 2019 | 4,750,000 $ | 475 $ | 1,272,195 $ | (2,068,150) $ | (795,954) |
| | | | | | |
| As Restated: | | | | | |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 786,506 | — | 786,981 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | — | — | — | (5,157,871) | (5,157,871) |
| Balance, December 31, 2019 | 4,750,000 $ | 475 $ | 1,079,179 $ | (5,157,871) $ | (4,078,217) |

1847 GOEDEKER INC.
STATEMENTS OF CASH FLOWS

| | Period from April 6, 2019 through December 31, 2019 (As Filed) | | Adjustments | Period from April 6, 2019 through December 31, 2019 (As Restated) |
|---|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | | | |
| Net loss | $ (2,068,150) | (1) | $ (2,910,200) | $ (5,157,871) |
| | | (2) | (179,521) | |
| Accounts payable and accrued expenses | (1,464,657) | (1) | 2,910,200 | |
| | | (2) | 179,521 | 1,625,064 |
| Net cash provided by (used in) operating activities | (2,299,215) | | — | (2,299,215) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | | |
| Net cash used in investing activities | (2,200) | | | (2,200) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | |
| Net cash provided by financing activities | 2,772,723 | | — | 2,772,723 |
| NET CHANGE IN CASH AND RESTRICTED CASH | 471,308 | | — | 471,308 |
| CASH AND RESTRICTED CASH, BEGINNING OF YEAR | — | | — | — |
| CASH AND RESTRICTED CASH, END OF YEAR | $ 471,308 | | $ — | $ 471,308 |

F-20

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 4 — RECEIVABLES**

At December 31, 2020 and 2019, receivables consisted of the following: respectively.

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Vendor rebates receivable | $ 1,337,791 | $ 1,455,248 |
| Credit cards in process of collection | 660,441 | — |
| Total receivables | $ 1,998,232 | $ 1,455,248 |

**NOTE 5 — MERCHANDISE INVENTORY**

At December 31, 2020 and 2019, the inventory balances are composed of:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Appliances | $ 5,285,975 | $ 1,538,552 |
| Furniture | 194,852 | 184,755 |
| Other | 91,414 | 81,783 |
| Total merchandise inventory | 5,572,241 | 1,805,090 |
| Allowance for inventory obsolescence | (425,000) | (425,000) |
| Merchandise inventory, net | $ 5,147,241 | $ 1,380,090 |

**NOTE 6 — VENDOR DEPOSITS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income.

Prior to obtaining an open line of credit with a major vendor, the Company paid in advance for its purchases. The vendor did not ship product to the Company until an order was complete. As a result, the vendor held Company funds. A second vendor uses the Company's vendor deposit account as collateral. Orders from this vendor exceeded the deposit account and the Company prepaid for some orders. Vendor deposits as of December 31, 2020 and 2019 were $547,648 and $294,960, respectively.

**NOTE 7 — PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Equipment | $ 69,336 | $ 7,376 |
| Warehouse equipment | 61,070 | 29,188 |
| Furniture and fixtures | 512 | 512 |
| Transportation equipment | 63,784 | 63,784 |
| Leasehold improvements | 136,931 | 117,626 |
| Total property and equipment | 331,633 | 218,486 |
| Accumulated depreciation | (85,685) | (32,880) |
| Property and equipment, net | $ 245,948 | $ 185,606 |

Depreciation expense for the year ended December 31, 2020, the period April 6, 2019 to December 31, 2019 and the period January 1, 2019 to April 5, 2019 was approximately $53,000, $33,000 and $10,000, respectively.

F-21

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 8 — INTANGIBLE ASSETS**

The following provides a breakdown of identifiable intangible assets as of December 31, 2020 and 2019:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Customer relationships | $ 749,000 | $ 749,000 |
| Marketing related – tradename | 1,368,000 | 1,368,000 |
| Total intangible assets | 2,117,000 | 2,117,000 |
| Accumulated amortization | (735,063) | (238,156) |
| Intangible assets, net | $ 1,381,937 | $ 1,878,844 |

In connection with the acquisition of Goedeker, the Company identified intangible assets of $2,117,000, representing trade names and customer relationships. These assets are being amortized on a straight-line basis over their weighted average estimated useful life of 3.3 years. Amortization expense for the year ended December 31, 2020, the period April 6, 2019 to December 31, 2019 and the period January 1, 2019 to April 5, 2019 was $496,907, $238,156 and $-0-, respectively.

As of December 31, 2020, the estimated annual amortization expense for each of the next five years is as follows:

|  |  |
|---|---|
| 2021 | $ 423,396 |
| 2022 | 423,396 |
| 2023 | 423,396 |
| 2024 | 111,749 |
| Total | $ 1,381,937 |

**NOTE 9 — ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

The following is schedule of accounts payable and accrued expenses at December 31, 2020 and 2019:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade accounts payable | $ 5,975,486 | $ 1,644,216 |
| Sales tax | 5,804,100 | 2,910,200 |
| Accrued payroll liabilities | 492,573 | 192,305 |
| Accrued interest | 10,000 | 253,678 |
| Accrued liability for sales returns | 200,000 | 200,000 |
| Other accrued liabilities | 219,556 | 175,021 |
| Total accounts payable and accrued expenses | $ 12,701,715 | $ 5,375,420 |

**NOTE 10 — BUSINESS COMBINATION**

On January 18, 2019, the Company entered into an asset purchase agreement with Goedeker and Steve Goedeker and Mike Goedeker (the "Stockholders"), pursuant to which the Company agreed to acquire substantially all of the assets of Goedeker used in its retail appliance and furniture business (the "Goedeker Business").

On April 5, 2019, the Company, Goedeker and the Stockholders entered into an amendment to the asset purchase agreement and closing of the acquisition of substantially all of the assets of Goedeker was completed.

The aggregate purchase price, recorded as a capital contribution from the Company's parent company at that time, 1847 Goedeker Holdco Inc. ("Holdco"), was $4,175,373 consisting of: (i) the issuance of a promissory note in the principal amount of $4,100,000 and a deemed fair value of $3,637,898; (ii) up to $600,000 in earn out payments (as described below) with a deemed fair value of $81,494; (iii) a 22.5% ownership interest in Holdco transferred to the Stockholders with a deemed fair value of $786,981, (iv) cash of $478,000, and (v) net of a working capital adjustment of $809,000.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 10 — BUSINESS COMBINATION** (cont.)

The asset purchase agreement provided for an adjustment to the purchase price based on the difference between actual working capital at closing and the seller's preliminary estimate of closing date working capital. In accordance with the asset purchase agreement, an independent CPA firm was retained by the Company and Goedeker to resolve differences in the working capital amounts. The report issued by that CPA firm determined that Goedeker owed the Company $809,000, which Goedeker has not paid. On or about March 23, 2020, the Company submitted a claim for arbitration to the American Arbitration Association relating to Goedeker's failure to pay. The claim alleged, *inter alia*, breach of contract, fraud, indemnification and the breach of the covenant of good faith and fair dealing. The Company alleged damages in the amount of $809,000, plus attorneys' fees and costs. The $809,000 is included in other assets in the accompanying balance sheet as of December 31, 2019.

On June 2, 2020, the Company entered into a settlement agreement with Goedeker, Steve Goedeker, Mike Goedeker and 1847 Holdings LLC, the Company's indirect parent company at such time ("1847 Holdings"). The settlement agreement and the related transaction documents that are exhibits to the settlement agreement were all signed on June 2, 2020 only became effective upon the closing of the IPO on August 4, 2020. Pursuant to the settlement agreement, the parties entered into an amendment and restatement of the 9% subordinated promissory note described below (see Note 13). In addition, the parties agreed that the arbitration action described above would be settled effective upon the closing of the IPO and that each party to such arbitration action would release all claims that it has against the other parties to such action. As part of the settlement of the arbitration action, the Company agreed that the sellers will not have to pay the $809,000 working capital adjustment amount, which resulted in a loss on write-off of acquisition receivable during the year ended December 31, 2020.

Goedeker is also entitled to receive the following earn out payments to the extent the Goedeker Business achieves the applicable EBITDA (as defined in the asset purchase agreement) targets:

> 1.    An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the closing date is $2,500,000 or greater, which target was not met;

> 2.    An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the first anniversary of closing date is $2,500,000 or greater, which target the Company does not expect to meet; and

> 3.    An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the second anniversary of the closing date is $2,500,000 or greater. The Company expects to meet this target and adjusted the contingent note payable in the consolidated balance sheet to the present value of the amount due.

To the extent the EBITDA of the Goedeker Business for any applicable period is less than $2,500,000 but greater than $1,500,000, the Company must pay a partial earn out payment to Goedeker in an amount equal to the product determined by multiplying (i) the EBITDA Achievement Percentage by (ii) the applicable earn out payment for such period, where the "Achievement Percentage" is the percentage determined by dividing (A) the amount of (i) the EBITDA of the Goedeker Business for the applicable period less (ii) $1,500,000, by (B) $1,000,000. For avoidance of doubt, no partial earn out payments shall be earned or paid to the extent the EBITDA of the Goedeker Business for any applicable period is equal or less than $1,500,000. For the trailing twelve (12) month period from the closing date, EBITDA for the Goedeker Business was ($2,825,000) so Goedeker is not entitled to an earn our payment for that period.

To the extent Goedeker is entitled to all or a portion of an earn out payment, the applicable earn out payment(s) (or portion thereof) shall be paid on the date that is three (3) years from the closing date, and shall accrue interest from the date on which it is determined Goedeker is entitled to such earn out payment (or portion thereof) at a rate equal to five percent (5%) per annum, computed on the basis of a 360 day year for the actual number of days elapsed.

F-23

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 10 — BUSINESS COMBINATION** (cont.)

The Company determined the fair value of the earnout on the date of acquisition was $81,494. Such amount was recorded as a contingent consideration liability within the accounts payable and accrued expense line item on the consolidated balance sheet and is revalued to fair value each reporting period until settled. The year 1 contingent liability of $32,246 was written-off in the year ended December 31, 2019 as the target was not met and the balance of the liability at December 31, 2019 is $49,248. Management reviewed the contingent consideration due at December 31, 2020 and adjusted the balance to the present value of the amount it estimates will be due in April 2022.

The fair value of the purchase consideration issued to Goedeker was allocated to the net tangible assets acquired. The Company accounted for the acquisition as the purchase of a business under GAAP under the acquisition method of accounting, and the assets and liabilities acquired were recorded as of the acquisition date, at their respective fair values and consolidated with those of the Company. The fair value of the net liabilities assumed was approximately $550,316. The excess of the aggregate fair value of the net tangible assets has been allocated to goodwill. Provisional goodwill was estimated at $4,603,953 at December 31, 2019 due to the preliminary valuation. During the year ended December 31, 2020, the Company subsequently adjusted the value of goodwill by $121,736 to $4,725,689 based on the finalized purchase price allocation.

The table below shows the analysis of the Goedeker asset purchase:

| Purchase consideration at fair value (as restated): | | |
|---|---|---|
| Note payable, net of $462,102 debt discount and $215,500 of capitalized financing costs | $ | 3,637,898 |
| Cash to seller at closing | | 478,000 |
| Working capital adjustment | | (809,000) |
| Contingent note payable | | 81,494 |
| Fair value of ownership interest in Holdco transferred to seller | | 786,981 |
| Amount of consideration | $ | 4,175,373 |
| | | |
| Assets acquired and liabilities assumed at fair value | | |
| Accounts receivable | $ | 456,183 |
| Inventories | | 1,851,251 |
| Other assets | | 295,863 |
| Property and equipment | | 216,286 |
| Customer related intangibles | | 749,000 |
| Marketing related intangibles – tradename | | 1,368,000 |
| Accounts payable and accrued expenses | | (3,056,855) |
| Customer deposits | | (2,430,044) |
| Net tangible assets acquired (liabilities assumed) | $ | (550,316) |
| | | |
| Total net assets acquired (liabilities assumed) | $ | (550,316) |
| Consideration paid | | 4,175,373 |
| Goodwill | $ | 4,725,689 |

**NOTE 11 — LINES OF CREDIT**

*Burnley Capital LLC*

On April 5, 2019, the Company, as borrower, and Holdco entered into a loan and security agreement with Burnley Capital LLC ("Burnley") for revolving loans in an aggregate principal amount that will not exceed the lesser of (i) the borrowing base (as defined in the loan and security agreement) or (ii) $1,500,000 minus reserves established Burnley at any time in accordance with the loan and security agreement. In connection with the closing of the acquisition of Goedeker on April 5, 2019, the Company borrowed $744,000 under the loan and security agreement and issued a revolving note to Burnley in the principal amount of up to $1,500,000. As of December 31, 2019, the balance of the line of credit was $571,997.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 11 — LINES OF CREDIT** (cont.)

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the revolving note in full and the loan and security agreement was terminated. The total payoff amount was $118,194, consisting of principal of $32,350, interest of $42 and prepayment, legal, and other fees of $85,802.

*Northpoint Commercial Finance LLC*

On June 24, 2019, the Company, as borrower, entered into a loan and security agreement with Northpoint Commercial Finance LLC, which was amended on August 2, 2019, for revolving loans up to an aggregate maximum loan amount of $1,000,000 for the acquisition, financing or refinancing by the Company of inventory at an interest rate of LIBOR plus 7.99%. As of December 31, 2019, the balance of the line of credit was $678,993. The loan and security agreement was terminated on May 18, 2020 and there is no outstanding balance as of December 31, 2020.

**NOTE 12 — NOTES PAYABLE AND WARRANT LIABILITY**

*Arvest Loan*

On August 25, 2020, the Company entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of December 31, 2020, the outstanding balance of this loan is $3,185,369 comprised of principal of $3,283,628, net of unamortized loan costs of $98,259. The Company classified $663,339 as a current liability and the balance as a long-term liability.

The loan matures on August 25, 2025 and bears interest at 3.250% per annum; provided that, upon an event of default, the interest rate shall increase by 6% until paid in full. Pursuant to the terms of the loan agreement, the Company is required to make monthly payments of $63,353 beginning on September 25, 2020 and until the maturity date, at which time all unpaid principal and interest will be due. The Company may prepay the loan in full or in part at any time without penalty. The loan agreement contains customary events of default and affirmative and negative covenants for a loan of this type. The loan is secured by all financial assets credited to the Company's securities account held by Arvest Investments, Inc.

Maturities of the debt are as follows:

| For the years ended December 31, | | |
|---|---|---|
| 2021 | $ | 663,339 |
| 2022 | | 685,222 |
| 2023 | | 707,826 |
| 2024 | | 731,177 |
| 2025 | | 496,064 |
| Total | $ | 3,283,628 |
| Less: Loan costs | | (98,259) |
| Total | $ | 3,185,369 |

*Small Business Community Capital II, L.P.*

On April 5, 2019, the Company, as borrower, and Holdco entered into a loan and security agreement with Small Business Community Capital II, L.P. ("SBCC") for a term loan in the principal amount of $1,500,000, pursuant to which the Company issued to SBCC a term note in the principal amount of up to $1,500,000 and a ten-year warrant to purchase shares of the most senior capital stock of the Company equal to 5.0% of the outstanding equity securities of the Company on a fully-diluted basis for an aggregate price equal to $100. As of December 31, 2019, the balance of the note was $999,201.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 12 — NOTES PAYABLE AND WARRANT LIABILITY** (cont.)

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the term note in full and the loan and security agreement was terminated. The total payoff amount was $1,122,412 consisting of principal of $1,066,640, interest of $11,773 and prepayment, legal, and other fees of $43,999.

The Company classified the warrant as a derivative liability on the balance sheet at June 30, 2020 of $2,250,000 based on the estimated value of the warrant in the IPO. The increase in the value of the warrant from the estimated value of $122,344 at December 31, 2019 resulted in a charge of $2,127,656 during the year ended December 31, 2020. Immediately prior to the closing of the IPO on August 4, 2020, SBCC converted the warrant into 250,000 shares of common stock.

**NOTE 13 — NOTES PAYABLE, RELATED PARTIES**

As noted in Note 10, a portion of the purchase price for the acquisition was paid by the issuance by the Company to Steve Goedeker, as representative of Goedeker, of a 9% subordinated promissory note in the principal amount of $4,100,000. As of December 31, 2019, the balance of the note was $3,300,444.

Pursuant to the settlement agreement described above (see Note 10), the parties entered into an amendment and restatement of the note that became effective as of the closing of the IPO on August 4, 2020, pursuant to which (i) the principal amount of the existing note was increased by $250,000, (ii) upon the closing of the IPO, the Company agreed to make all payments of principal and interest due under the note through the date of the closing, and (iii) from and after the closing, the interest rate of the note was increased from 9% to 12%. In accordance with the terms of the amended and restated note, the Company used a portion of the proceeds from the IPO to pay $1,083,842 of the balance of the note representing a $696,204 reduction in the principal balance and interest accrued through August 4, 2020 of $387,638.

The Company repaid this note payable with proceeds from the Arvest Loan. In connection with the refinance, the Company recorded a $757,239 loss on extinguishment of debt consisting of a $250,000 forbearance fee, write-off of unamortized loan discount of $338,873, and write-off of unamortized debt costs of $168,366.

**NOTE 14 — CONVERTIBLE PROMISSORY NOTE**

On April 5, 2019, 1847 Holdings, Holdco and the Company (collectively, "1847") entered into a securities purchase agreement with Leonite Capital LLC, a Delaware limited liability company ("Leonite"), pursuant to which 1847 issued to Leonite a secured convertible promissory note in the aggregate principal amount of $714,286. As additional consideration for the purchase of the note, (i) 1847 Holdings issued to Leonite 50,000 common shares (valued at $137,500), (ii) 1847 Holdings issued to Leonite a five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis, and (iii) Holdco issued to Leonite shares of common stock equal to a 7.5% non-dilutable interest in Holdco. As of December 31, 2019, the balance of the note was $584,943. As a result of this transaction, Leonite became a related party.

On May 11, 2020, 1847 and Leonite entered into a first amendment to secured convertible promissory note, pursuant to which the parties agreed (i) to extend the maturity date of the note to October 5, 2020, (ii) that 1847's failure to repay the note on the original maturity date of April 5, 2020 shall not constitute and event of default under the note and (iii) to increase the principal amount of the note by $207,145, as a forbearance fee. The Company accounted for this transaction as a loss on extinguishment of debt.

In connection with the amendment, (i) 1847 Holdings issued to Leonite another five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis and (ii) upon closing of 1847 Holdings' acquisition of Asien's Appliance, Inc., 1847 Holdings' wholly owned subsidiary 1847 Asien Inc. issued to Leonite shares of common stock equal to a 5% interest in 1847 Asien Inc. The

F-26

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 14 — CONVERTIBLE PROMISSORY NOTE** (cont.)

Company accounted for the issuance of the 200,000 additional warrants as a $566,711 loss on debt restructuring and an increase in additional paid-in-capital, representing the estimated fair value of the 200,000 additional warrants for a five-year period.

1847 Holdings issued 50,000 common shares valued at $137,500 and a debt-discount related to the warrants valued at $292,673. In the second quarter of 2020, the $137,500 value of the shares was transferred from a liability to 1847 Holdings to additional paid-in-capital. The Company amortized $129,343 of financing costs related to the shares and warrants in the year ended December 31, 2020.

Under the note, Leonite had the right at any time at its option to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of the note into fully paid and non-assessable common shares or any shares of capital stock or other securities of 1847 Holdings into which such common shares may be changed or reclassified.

On May 4, 2020, Leonite converted $100,000 of the outstanding balance of the note into 100,000 common shares of 1847 Holdings. The Company accounted for this transaction as a $100,000 reduction in the principal amount of the debt, a $175,000 loss on extinguishment of debt, and a $275,000 increase in additional paid-in-capital representing the fair value of the 1847 Holdings common shares on the conversion date.

On July 24, 2020, Leonite converted $50,000 of the outstanding balance of the note into 50,000 common shares of 1847 Holdings. The Company accounted for this transaction as a $50,000 reduction in the principal amount of the debt, a $50,000 loss on extinguishment of debt, and a $100,000 increase in additional paid-in-capital representing the fair value of the 1847 Holdings common shares on the conversion date.

As a result of the activity on this note, $948,856 was recorded as loss on extinguishment of debt for the year ended December 31, 2020.

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the note in full. The total payoff amount was $780,653, consisting of principal of $771,431 and interest of $9,222.

On September 2, 2020, 1847 Holdings and Leonite entered into an amendment to the warrant issued on April 5, 2019, pursuant to which the warrant was amended to allow for the exercise of the warrant for 180,000 common shares of 1847 Holdings in exchange for Leonite's surrender of the remaining 20,000 common shares underlying that warrant, as well as all 200,000 common shares underlying the second warrant issued to Leonite on May 11, 2020. On September 18, 2020, Leonite exercised the warrant in accordance with the foregoing for 180,000 common shares of 1847 Holdings. As a result, both warrants have terminated.

**NOTE 15 — OPERATING LEASE**

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C., a Missouri limited liability company and affiliate of the Company at that time. The lease is for a term five (5) years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. In the event of late payment, interest shall accrue on the unpaid amount at the rate of eighteen percent (18%) per annum. The lease contains customary events of default, including if: (i) the Company shall fail to pay rent within five (5) days after the due date; (ii) any insurance required to be maintained by the Company pursuant to the lease shall be canceled, terminated, expire, reduced, or materially changed; (iii) the Company shall fail to comply with any term, provision, or covenant of the lease and shall not begin and pursue with reasonable diligence the cure of such failure within fifteen (15) days after written notice thereof to the Company; (iv) the Company shall become insolvent, make an assignment for the benefit of creditors, or file a petition under any section or chapter of the Bankruptcy Code, or under any similar law or statute of the United States of America or any State thereof; or (v) a receiver or trustee shall be appointed for the leased premises or for all or substantially all of the assets of the Company.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 15 — OPERATING LEASE** (cont.)

During the year ended December 31, 2020 and the period April 6 to December 31, 2019, the Company paid and expensed rent payments of $540,000 and $397,500, respectively.

At December 31, 2019, the operating lease right of use asset was $2,000,755. Supplemental balance sheet information related to lease at December 31, 2020 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use asset | $ | 2,300,000 |
| | | |
| Lease liability, current portion | $ | 450,712 |
| Lease liability, long-term | | 1,127,523 |
| Total operating lease liability | $ | 1,578,235 |
| | | |
| Weighted average remaining lease term (months) | | 39 |
| Weighted average discount rate | | 6.5% |

Maturities of the lease liability for each of the next five years is as follows:

| | | |
|---|---|---|
| 2021 | $ | 540,000 |
| 2022 | | 540,000 |
| 2023 | | 540,000 |
| 2024 | | 135,000 |
| Total lease payments | $ | 1,755,000 |
| | | |
| Less imputed interest | | (176,765) |
| Total lease liability | $ | 1,578,235 |

**NOTE 16 — RELATED PARTIES**

*Offsetting Management Services Agreement*

On April 5, 2019, the Company entered into an offsetting management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and a significant stockholder. This agreement was amended on April 21, 2020 with the amendment becoming effective at the closing of IPO on August 4, 2020.

Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that, (i) pro-rated payments shall be made in the first quarter and the last quarter of the term, (ii) if the aggregate amount of management fees paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal year exceeds, or is expected to exceed, 9.5% of 1847 Holdings' gross income with respect to such fiscal year, then the management fee to be paid by the Company for any remaining fiscal quarters in such fiscal year shall be reduced, on a pro rata basis determined by reference to the management fees to be paid to the Manager by all of the subsidiaries of 1847 Holdings, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal year, does not exceed 9.5% of 1847 Holdings' gross income with respect to such fiscal year, and (iii) if the aggregate amount the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal quarter exceeds, or is expected to exceed, the aggregate amount of the parent management fee (as defined in the offsetting management services agreement) with respect to such fiscal quarter, then the management fee to be paid by the Company for such fiscal quarter shall be reduced, on a pro rata basis, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal quarter, does not exceed the parent management fee calculated and payable with respect to such fiscal quarter.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 16 — RELATED PARTIES** (cont.)

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of Goedeker in connection with performing services under the offsetting management services agreement. The Company did not pay any expenses for the years ended December 31, 2020 and 2019.

The Company expensed $250,000 and $183,790 in management fees for the years ended December 31, 2020 and 2019, respectively.

*Other Transactions*

See Note 14 for a description of the securities purchase agreement and secured convertible promissory note that the Company entered into with 1847 Holdings, Holdco and Leonite, as well as the related shares and warrants issued by 1847 Holdings, the Company's indirect parent company at such time.

**NOTE 17 — STOCKHOLDERS' DEFICIT**

As of December 31, 2020, the Company was authorized to issue 200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. To date, the Company has not designated or issued any shares of preferred stock.

*Common Stock*

As of December 31, 2020 and 2019, the Company had 6,111,200 and 4,750,000 shares of common stock issued and outstanding, respectively. Each share entitles the holder thereof to one vote per share on all matters coming before the stockholders of the Company for a vote.

Upon the Company's inception on January 10, 2019, the Company issued 4,750,000 shares of common stock for a total purchase price of $1.00.

On August 4, 2020, the Company sold 1,111,200 shares of common stock for total gross proceeds of $10,000,800. After deducting the underwriting commission and expenses, the Company received net proceeds of $8,602,166.

On August 4, 2020, the Company issued 250,000 shares of common stock to SBCC upon conversion of its warrant (see Note 12).

*Equity Incentive Plan*

Effective as of July 30, 2020, the Company established the 1847 Goedeker Inc. 2020 Equity Incentive Plan ("Plan"). The Plan was approved by the Company's board of directors and stockholders on April 21, 2020. The Plan is administered by compensation committee of the board of directors. The Plan permits the grant of restricted stock, stock options and other forms of incentive compensation to the Company's officers, employees, directors and consultants. The maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan is 555,000 shares. As of December 31, 2020, there were 555,000 shares granted and no shares available for grant.

During the year ended December 31, 2020, the Company issued options for the purchase of 555,000 shares of common stock with a total value of $1,848,056. The Company recorded stock option expense of $398,908 and for the year ended December 31, 2020. The remaining compensation expense of $1,449,148 will be recognized over the remaining vesting periods.

F-29

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 17 — STOCKHOLDERS' DEFICIT** (cont.)

The following table presents activity relating to stock options for the year ended December 31, 2020:

| | Shares | | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|---|
| Outstanding at December 31, 2019 | — | $ | — | — |
| Granted | 555,000 | | 9.00 | 10 |
| Exercised | — | | — | — |
| Forfeited/Cancelled/Expired | — | | — | — |
| Outstanding at December 31, 2020 | 555,000 | $ | 9.00 | 9 |
| Exercisable at December 31, 2020 | 65,790 | $ | 9.00 | 9 |

As of December 31, 2020, vested outstanding stock options had no intrinsic value as the exercise price is greater than the estimated fair value of the underlying common stock.

The Company recognizes compensation expense for stock option awards on a straight-line basis over the applicable service period of the award. The service period is generally the vesting period. The following assumptions were used to calculate stock-based compensation expense for the year ended December 31, 2020:

| | |
|---|---|
| Volatility | 46.6% |
| Risk-free interest rate | 0.47% |
| Dividend yield | 0.0% |
| Expected term | 6.25 Years |

The following table sets forth stock-based compensation expense for the year ended December 31, 2020 and the four succeeding years:

| | | |
|---|---|---|
| Year Ended December 31, 2020 | $ | 398,908 |
| 2021 | | 483,185 |
| 2022 | | 462,024 |
| 2023 | | 367,198 |
| 2024 | | 136,741 |
| 2025 | | — |
| Total stock-based compensation | $ | 1,848,056 |

*Warrants*

On August 4, 2020, the Company issued warrants for the purchase of 55,560 shares of common stock to affiliates of the representative in the IPO (the "Underwriter Warrants"). The Underwriter Warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25.

On April 5, 2019, the Company issued to SBCC a ten-year warrant to purchase shares of the most senior capital stock of the Company equal to 5.0% of the outstanding equity securities of the Company on a fully-diluted basis for an aggregate price equal to $100. SBCC exercised this warrant for the purchase of 250,000 shares of common stock on August 4, 2020.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 17 — STOCKHOLDERS' DEFICIT** (cont.)

The following table presents activity relating to the Underwriter Warrants for the year ended December 31, 2020:

| | Shares | | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|---|
| Outstanding at December 31, 2019 | — | $ | — | — |
| Granted | 55,560 | | 11.25 | 5 |
| Exercised | — | | — | — |
| Cancelled/Expired | — | | — | — |
| Outstanding at December 31, 2020 | 55,560 | $ | 11.25 | 4.5 |
| Exercisable at December 31, 2020 | -0- | $ | 11.25 | 4.5 |

The Company recognizes stock issuance expense for the Underwriter Warrants on a straight-line basis over the vesting period of the Underwriter Warrants. The following assumptions were used to calculate stock issuance expense for the year ended December 31, 2020:

| | |
|---|---|
| Volatility | 46.5% |
| Risk-free interest rate | 0.47% |
| Dividend yield | 0.0% |
| Term | 4.5 years |

**NOTE 18 — INCOME TAXES**

As of December 31, 2020 and 2019, the Company had net operating loss carry forwards of approximately $15,002,557 and $1,593,680, respectively, that may be available to reduce future years' taxable income indefinitely. Future tax benefits which may arise as a result of these losses have not been recognized in these consolidated financial statements, as their realization is determined not likely to occur and accordingly, the Company has recorded a valuation allowance for the deferred tax asset relating to these tax loss carry-forwards. The net change in the valuation allowance resulted in an increase of $4,377,815 and $709,582 for the years ended December 31, 2020 and 2019, respectively.

The provision for Federal and state income tax consists of the following.

The cumulative tax effect at the expected rate of 25.7% and 25.7% of significant items comprising the Company's net deferred tax amount is as follows.

Due to the change in ownership provisions of the Tax Reform Act of 1986, net operating loss carry forwards incurred prior to 2018 for Federal income tax reporting purposes are subject to annual limitations. Should a change in ownership occur net operating loss carry forwards may be limited as to use in future years.

The components for the provision of income taxes include:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Current Federal and State | $ — | $ — |
| Deferred Federal and State | 698,303 | (698,303) |
| Total provision (benefit) for income taxes | $ 698,303 | $ (698,303) |

F-31

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 18 — INCOME TAXES** (cont.)

A reconciliation of the statutory US Federal income tax rate to the Company's effective income tax rate is as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Federal tax | $ (4,382,602) | $ (1,229,797) |
| State tax, net of Federal benefit | (891,129) | (250,059) |
| Change in warrant value | 537,535 | — |
| Write-off of acquisition and other receivables | 238,540 | — |
| Other | 108,439 | 71,971 |
| Valuation allowance | 5,087,396 | 709,582 |
| Total income tax provision (benefit) | $ 698,303 | $ (698,303) |
| Effective tax rate | (3.3)% | 11.92% |

Deferred income taxes reflect the net tax effect of temporary differences between amounts recorded for financial reporting purposes and amounts used for tax purposes. The major components of deferred tax assets and liabilities are as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Deferred tax assets | | |
| Inventory | $ 107,398 | $ 107,398 |
| Accrued expenses | 1,589,889 | 792,845 |
| Interest limitation | 319,698 | 191,886 |
| Other | 6,597 | — |
| Lease liability | 398,820 | 505,591 |
| Loss carryforward | 3,791,146 | 339,287 |
| Valuation allowance | (5,796,978) | (709,582) |
| Total deferred tax assets | $ 416,595 | $ 1,227,425 |
| | | |
| Deferred tax liabilities | | |
| Other | — | (94) |
| Right of use assets | (398,820 | (505,591) |
| Intangibles | $ (17,775) $ | (23,437) |
| Total deferred tax liabilities | $ (416,595) $ | (529,122) |
| Total net deferred income tax assets (liabilities) | $ — $ | 698,303 |

The Company accrues interest and penalties related to unrecognized tax benefits. The Company does not believe it has any unrecognized tax benefits for December 31, 2020 and 2019 that would have a material impact on the financial statements. The Company's income tax returns are open to examination by the Internal Revenue Service and various State jurisdictions.

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Net deferred tax asset (liability) | $ 5,796,978 | $ 1,407,885 |
| Valuation allowance | $ (5,796,978) | $ (709,852) |

F-32

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 19 — SUBSEQUENT EVENTS**

In accordance with ASC 855-10, the Company has analyzed its operations subsequent to December 31, 2020 to the date these consolidated financial statements were issued and has determined that it does not have any material subsequent events to disclose in these consolidated financial statements, except as set forth below.

*Lease Agreement*

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC for a new premises in St. Charles, Missouri. The lease is for a term of 63 months with two (2) options to renew for additional five (5) year periods and provides for a base rent of $4.35 per square foot per year with 2.5% annual increases and a three-month abatement, resulting in a base rent during the first year of $20,976.79 per month, increasing to a base rent during the fifth year of $23,146.80 per month. The Company must also pay its 29% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. In the event of late payment, interest shall accrue on the unpaid amount at the rate equal to the greater of (i) two (2) percentage points in excess of the prime lending rate as established by U.S. Bank, N.A., or (ii) the default rate applicable to the first priority mortgage in effect at the time such default interest rate is imposed.

The lease contains customary events of default, including (i) if the Company shall fail to pay rent within five (5) days after the due date, (ii) if the Company shall fail to observe or perform any other terms, covenants, conditions or provisions under the lease and fail to cure such default within thirty (30) days after written notice to the Company, (iii) if the Company fails to occupy all or any material portion of the lease premises for more than ninety (90) consecutive days, for reasons other than force majeure, and fails to pay all costs incurred by the landlord as a result of such failure to occupy, and other customary representations, warranties and covenants.

*Securities Purchase Agreement*

On March 19, 2021, the Company entered into a Securities Purchase Agreement (the "Purchase Agreement") with two institutional investors (each, a "Purchaser" and together, the "Purchasers"), pursuant to which the Company issued to each Purchaser (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 (together, the "Notes") and (ii) a four-year warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis (together, the "Warrants"), for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. After deducting a placement fee and other expenses, the Company received net proceeds of $4,590,000.

The Notes bear interest at a rate of 10% per annum and mature on December 19, 2021. The Notes may be prepaid by the Company in whole or in part at any time or from time to time without penalty or premium upon at least five (5) days prior written notice, which notice period may be waived by the holder. In addition, if the Company issues and sells shares of its equity securities to investors on or before the maturity date in an equity financing with total gross proceeds of not less than $10,000,000 (excluding the conversion of the notes or other convertible securities issued for capital raising purposes), then the Company must repay the then-outstanding principal amount of the Notes and any accrued but unpaid interest.

The Notes are secured by a first priority security interest in all of the Company's assets and contain customary events of default. Upon, and during the continuance of, an event of default, the Notes are convertible, in whole or in part, at the option of the holder into shares of common stock at a conversion price equal to $12.00, or if lower, 80% of the lowest volume weighted average price for the twenty (20) consecutive trading days prior to the applicable conversion date, but in no event less than $9.00. The conversion price will be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction that proportionately decreases or increases the common stock. In addition, if the Company sells or grants any common stock or securities convertible into or exchangeable for common stock or grants any right to reprice such securities at an effective price per share that is lower than the then conversion price, the conversion price shall be reduced to such price, subject to certain exceptions set forth in the Notes.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 19 — SUBSEQUENT EVENTS** (cont.)

Notwithstanding the foregoing, the Company shall not effect any conversion of a Note, and a holder shall not have the right to convert any principal and/or interest of a Note, to the extent that after giving effect to the conversion the holder (together with the holder's affiliates and any persons acting as a group together with the holder or any of the holder's affiliates) would beneficially own over 4.99% of the number of shares of the common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Note. The holder may, upon not less than 61 days' prior notice to the Company, increase or decrease such limitation, provided that such limitation in no event exceeds 9.99% of the number of shares of the common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Note. The Warrants also contain this beneficial ownership limitation.

The Purchase Agreement contains customary representations, warranties and covenants for a transaction of this type. Pursuant to the Purchase Agreement, the Purchasers were granted piggy-back registration rights with respect to the shares issuable upon conversion of the Notes and exercise of the Warrants. The Company also agreed that, until the date that no Purchasers own any securities, the Company will timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company pursuant to the Exchange Act even if the Company is not then subject to the reporting requirements of the Exchange Act. In addition, the Company agreed that, so long as any of the Notes remain outstanding, neither the Company, nor any subsidiary of the Company, shall, without each Purchaser's written consent and subject to certain exceptions set forth in the Purchase Agreement:

- sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business;

- incur, create, assume or suffer to exist any lien on any of its property or assets, except for certain liens set forth in the Purchase Agreement;

- incur or suffer to exist or guarantee any indebtedness that is senior to or *pari passu* with (in priority of payment and performance) the Company's obligations under the Purchase Agreement except for non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;

- pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock, other than dividends on shares of common stock solely in the form of additional shares of common stock, or directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock;

- redeem, repurchase or otherwise acquire in any one transaction or series of related transactions any shares of capital stock of the Company or any warrants, rights or options to purchase or acquire any such shares, or repay any *pari passu* or subordinated indebtedness of the Company other than non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;

- lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Company, except loans, credits or advances (i) in existence or committed on the closing date and which the Company has informed each Purchaser in writing prior to the closing date, (ii) in regard to transactions with unaffiliated third parties, made in the ordinary course of business, or (iii) in regard to transactions with unaffiliated third parties, not in excess of $50,000; or

repay any affiliate (as defined in Rule 144) of the Company in connection with any indebtedness or accrued amounts owed to any such party.

F-34

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;
GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.
(dba APPLIANCES CONNECTION)**

**AUDITED COMBINED FINANCIAL STATEMENTS**

**DECEMBER 31, 2020 AND 2019**

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members and Owners of
1 Stop Electronics Center, lnc., YF Logistics LLC,
Gold Coast Appliances, lnc., Superior Deals lnc.
and Joe's Appliances LLC (dba Appliances Connection)

**Opinion on the Combined Financial Statements**

We have audited the accompanying combined balance sheets of 1 Stop Electronics Center, lnc., YF Logistics LLC, Gold Coast Appliances, lnc., Superior Deals lnc. and Joe's Appliances LLC (dba Appliances Connection and collectively the "Company") as of December 31, 2020 and 2019, and the related combined statements of income and changes in owners' equity, and cash flows for the years ended December 31, 2020 and 2019, and the related notes (collectively referred to as the "combined financial statements"). In our opinion, the combined financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the years ended December 31, 2020 and 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These combined financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's combined financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the combined financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the combined financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the combined financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the combined financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2020.
Marlton, New Jersey
April 5, 2021

F-36

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED BALANCE SHEETS**

| | | December 31, 2020 | | December 31, 2019 |
|---|---|---:|---|---:|
| **ASSETS** | | | | |
| Current Assets | | | | |
| Cash and cash equivalents | $ | 14,842,912 | $ | 5,912,043 |
| Receivables, net | | 19,392,582 | | 13,717,998 |
| Deposits with vendors | | 31,733,415 | | 22,005,318 |
| Inventories, net | | 12,004,038 | | 11,702,331 |
| Prepaid expenses and other current assets | | 217,439 | | 176,582 |
| Total Current Assets | | 78,190,386 | | 53,514,272 |
| Property and equipment, net | | 1,997,822 | | 1,591,869 |
| Other assets | | 144,528 | | — |
| Operating lease right-of-use assets | | 4,646,508 | | 6,089,129 |
| TOTAL ASSETS | $ | 84,979,244 | $ | 61,195,270 |
| | | | | |
| **LIABILITIES AND OWNERS' EQUITY** | | | | |
| Current Liabilities | | | | |
| Accounts payable and accrued liabilities | $ | 21,179,975 | $ | 15,220,400 |
| Customer deposits | | 8,853,214 | | 3,241,531 |
| Current portion of notes payable | | 466,235 | | 276,534 |
| Current portion of financing lease liabilities | | 23,576 | | 21,081 |
| Current portion of operating lease liabilities | | 1,517,390 | | 1,421,696 |
| Total Current Liabilities | | 32,040,390 | | 20,181,242 |
| Notes payable, net of current portion | | 3,505,620 | | 541,484 |
| Financing lease liabilities, net of current portion | | 47,665 | | 70,138 |
| Operating lease liabilities, net of current portion | | 3,279,080 | | 4,737,840 |
| TOTAL LIABILITIES | | 38,872,755 | | 25,530,704 |
| Owners' Equity | | | | |
| Common stock | | 3,000 | | 3,000 |
| Members' equity | | 46,103,489 | | 35,661,566 |
| Total Owners' Equity | | 46,106,489 | | 35,664,566 |
| TOTAL LIABILITIES AND OWNERS' EQUITY | $ | 84,979,244 | $ | 61,195,270 |

The accompanying notes are an integral part of these combined financial statements.

F-37

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF INCOME AND CHANGES IN OWNERS' EQUITY**

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Net sales | $ 312,608,528 | $ 219,333,461 |
| Cost of sales | 247,379,397 | 176,771,632 |
| Gross Profit | 65,229,131 | 42,561,829 |
| Operating Expenses | | |
| Personnel | 13,563,628 | 10,919,298 |
| Advertising | 9,164,242 | 5,073,731 |
| Bank and credit card fees | 12,361,428 | 9,413,611 |
| Depreciation and amortization | 782,773 | 553,357 |
| General and administrative | 9,949,762 | 7,095,979 |
| Total Operating Expenses | 45,821,833 | 33,055,976 |
| INCOME FROM OPERATIONS | 19,407,298 | 9,505,853 |
| Other Income (Expense) | | |
| Other income | 1,336,115 | 1,880,282 |
| Other expense | (663,674) | (247,539) |
| Total Other Income (Expense) | 672,441 | 1,632,743 |
| NET INCOME | $ 20,079,739 | $ 11,138,596 |
| | | |
| OWNERS' EQUITY – Beginning | $ 35,664,566 | $ 25,844,519 |
| Distributions paid | (9,637,816) | (1,318,549) |
| OWNERS' EQUITY – Ending | $ 46,106,489 | $ 35,664,566 |

The accompanying notes are an integral part of these combined financial statements.

F-38

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF CASH FLOWS**

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income | $ 20,079,739 | $ 11,138,596 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 782,773 | 553,357 |
| Change in inventory reserves | 275,646 | 108,727 |
| Gain on disposition of assets | (28,633) | — |
| Operating lease right-of-use assets | 1,442,621 | 1,133,031 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (5,674,584) | (1,611,014) |
| Deposits with vendors | (9,728,097) | (3,236,141) |
| Inventory | (577,353) | (3,934,936) |
| Prepaid expenses and other current assets | (40,857) | (138,760) |
| Accounts payable and accrued expenses | 5,959,575 | 6,768,230 |
| Customer deposits | 5,611,683 | (7,612,046) |
| Operating lease liabilities | (1,363,066) | (1,081,172) |
| Other assets | (144,528 | — |
| Due from related parties | — | 37,333 |
| Net cash provided by operating activities | 16,594,919 | 2,125,205 |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from disposal of assets | 33,444 | — |
| Purchases of property and equipment | (30,834) | (68,636) |
| Net cash provided by (used in) investing activities | 2,610 | (68,636) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from notes payable | 2,309,591 | — |
| Repayments on notes payable | (318,457) | (241,647) |
| Repayments of financing lease liabilities | (19,978) | (17,763) |
| Distributions paid | (9,637,816) | (1,318,549) |
| Net cash used in financing activities | (7,666,660) | (1,577,959) |
| | | |
| NET CHANGE IN CASH IN CASH AND CASH EQUIVALENTS | 8,930,869 | 478,610 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | 5,912,043 | 5,433,433 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $ 14,842,912 | $ 5,912,043 |
| | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash paid for interest | $ 56,876 | $ 54,213 |
| Non-cash investing and financing activities: | | |
| Financed purchases of property and equipment | $ 1,180,711 | $ 398,698 |
| Operating lease right-of-use asset and liability | $ — | $ 3,245,290 |

The accompanying notes are an integral part of these combined financial statements.

F-39

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;
GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.
(dba APPLIANCES CONNECTION)
NOTES TO COMBINED FINANCIAL STATEMENTS
December 31, 2020 and 2019**

## NOTE 1 — ORGANIZATION AND NATURE OF BUSINESS

1 Stop Electronics Center, Inc. was formed under the laws of the State of New York on February 2, 2000. YF Logistics LLC was formed under the laws of the State of New Jersey on January 24, 2014. Gold Coast Appliances, Inc. was formed under the laws of the State of New York on February 11, 2015. Joe's Appliances LLC was formed under the laws of the State of New York on November 9, 2018. Superior Deals Inc. was formed under the laws of the State of New York on September 21, 2020. The entities collectively do business as Appliances Connection and are referred to throughout as "the Company."

Founded in 2000, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, NJ and a 23,000 square foot showroom in Brooklyn, New York. Appliances Connection carries many household name brands, including Bosch, GE, Frigidaire, Whirlpool, LG, and Samsung, and also carries many major luxury appliance brands such as Verona, Thermador, La Cornue, Dacor, Smeg, and Viking. Appliances Connection provides appliance installation services and old appliance removal services. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The combined financial statements of the Company have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars. All intercompany transactions have been eliminated. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with the original maturities of three months or less to be cash equivalents. At December 31, 2020 and 2019, the Company had $12,203,949 and $3,914,525, respectively, in its domestic accounts in excess of Federal Deposit Insurance Corporation ("FDIC") insured limits. No losses have been incurred by the Company as a result of such excesses of FDIC limits.

### Use of Estimates

The preparation of combined financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Revenue Recognition and Cost of Revenue

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. This ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. This ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments. The Company's adoption of this ASU resulted in no change to the Company's results of operations or balance sheet.

F-40

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

Appliances Connection collects 100 percent of the payment for internet and phone orders, including tax in certain jurisdictions, from the customer at the time the order is placed. Customers placing orders with a purchase order are allowed to purchase on credit and make payment after receipt of product. Appliances Connection does not incur incremental costs obtaining purchase orders from customers; however, if Appliances Connection did, because all Appliances Connection's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

Performance Obligations — The revenue that Appliances Connection recognizes arises from orders it receives from contracts with customers. Appliances Connection's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers and each order generally contains only one performance obligation based on the merchandise sale to be completed. Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, Appliances Connection's products, which generally occurs when the customer assumes the risk of loss. The transfer of control generally occurs at the point of pickup, shipment, or installation, depending on the type of order. Once this occurs, Appliances Connection has satisfied its performance obligation and Appliances Connection's recognizes revenue.

Transaction Price — Appliances Connection agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In Appliances Connection's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax that Appliances Connection collects concurrently with revenue-producing activities are excluded from revenue.

Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendor to the company.

Substantially all Appliances Connection's sales are to individual retail consumers (homeowners), builders, and designers. The large majority of customers are homeowners and their contractors, with the homeowner being key in the final decisions. The Company has a diverse customer base with no one customer accounting for more than five percent of total revenue.

### *Receivables*

Receivables consists of customer's balance payments for which the Company extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom the Company purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

The Company historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. The Company had no significant concentrations of receivables balances as of December 31, 2020 and 2019.

F-41

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Inventory*

Inventory mainly consists of finished goods acquired for resale and is valued at the average cost determined on a specific item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on estimate of its ability to sell the item as well as general market conditions. Based on these evaluations, the Company determined an obsolescence allowance of $550,101 and $274,455 was needed at December 31, 2020 and 2019, respectively.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

|  | Useful Life (Years) |
|---|---|
| Furniture and fixtures | 7 |
| Transportation equipment | 5 |
| Machinery and equipment | 5 – 7 |
| Office equipment | 5 – 7 |
| Leasehold improvements | Shorter of lease term of estimated useful life |

*Intangible Assets*

At December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of capitalized web development costs which are being amortized over their estimated useful lives of three years.

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of October 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. No impairment of intangible assets was recognized as of and for the years ended December 31, 2020 and 2019.

*Long-lived Assets*

The Company reviews its property and equipment and any identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management if triggering events occur. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected

F-42

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Lease Liabilities*

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

*Impact of COVID-19*

In December 2019, a novel strain of coronavirus ("COVID-19") emerged in China. On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. The extent of the COVID-19 pandemic's continued effect on our operational and financial performance and those of third parties on which the Company relies will depend on future developments, including the duration, spread and intensity of the outbreak, the pace at which jurisdictions across the country re-open and restrictions begin to lift. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change. The Company does not yet know the full extent of potential impacts on its business and financing. However, these effects could have a material impact on the Company's liquidity, capital resources, operations and business and those of the third parties on which the Company relies.

*Proposed Acquisition*

On October 20, 2020, the Company entered into a Securities Purchase Agreement, which was amended on December 8, 2020 (as amended, the "Purchase Agreement") with 1847 Goedeker Inc. ("Goedeker"), Appliances Connection Inc., a wholly owned subsidiary of Goedeker (the "Buyer") and the holders of all of the equity interests of the Company (the "Sellers"), pursuant to which the Buyer agreed to acquire all of the issued and outstanding capital stock or other equity interests of the Company from the Sellers for an aggregate purchase price of $210,000,000, subject to adjustment, consisting of (i) $168,000,000 in cash (the "Cash Portion"), (ii) 1,222,239 shares of Goedeker's common stock and 1,111,094 shares of Goedeker's series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of Goedeker's series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of Goedeker's common stock (as reported on the NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the transaction; provided, that if Goedeker has obtained stockholder approval prior to closing, then Goedeker will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock.

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the Sellers shall deliver to the Buyer at least one day prior to the closing of the acquisition a statement setting forth its good faith estimate of the net working capital of the Company (the "Estimated Closing Net Working Capital"). If the Estimated Closing Net Working Capital exceeds the Target Net Working Capital, then within 5 days the Buyer shall make a cash payment to the Sellers that is equal to such excess. If the Target Net Working Capital exceeds the Estimated Closing Net Working Capital, then either (i) if finally determined at the closing, the Cash Portion shall be decreased by such excess or (ii) within 5 days of the closing, the Sellers shall make a cash payment to the Buyer that is equal to such excess. "Target Net Working Capital" is defined in the Purchase Agreement as negative $15,476,941.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the acquisition, the Buyer shall deliver to the Sellers a statement setting forth its calculation of Net Working Capital (the "Closing Net Working Capital"). The "Post-Closing Net Working Capital Adjustment" shall be an amount equal to the Closing Net Working Capital minus the Estimated Closing Net Working Capital. If the Post-Closing Net Working Capital Adjustment is a negative number, then within 5 days the Sellers shall pay to the Buyer in cash an amount equal to the Post-Closing Net Working Capital Adjustment. If the Post-Closing Net Working Capital Adjustment is a positive number, the Buyer shall, within 5 days after the final determination of the Post-Closing Net Working Capital Adjustment, send payment by wire transfer of immediately available funds to the Sellers in an amount equal to the Post-Closing Net Working Capital Adjustment.

The Cash Portion of the purchase price will also be (A) decreased by (i) the amount of any outstanding unpaid indebtedness of the Company (other than trade debt) existing as of the closing date and (ii) any transaction expenses, and (B) increased by the amount of cash or cash equivalents held by, or on the books of, the Company as of the closing date, if any, that is in excess of $850,000.

The Purchase Agreement contains customary representations, warranties and covenants, including a covenant that the Sellers will not compete with the business of 1 Stop as of the closing date for a period of two (2) years following closing.

The Purchase Agreement also contains mutual indemnification for breaches of representations or warranties and failure to perform covenants or obligations contained in the Purchase Agreement. In the case of the indemnification provided by the Sellers with respect to breaches of certain non-fundamental representations and warranties, the Sellers will only become liable for indemnified losses if the amount exceeds an aggregate of $2,100,000, whereupon the Sellers will be liable for all losses relating back to the first dollar, provided that the liability of the Sellers for breaches of certain non-fundamental representations and warranties shall not exceed $21,000,000.

The closing of the Purchase Agreement is subject to customary closing conditions, including, without limitation, the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended; the receipt of all authorizations, consents and approvals of all governmental authorities or agencies; the release of any security interests; the Buyer obtaining the requisite acquisition financing; and delivery of all opinions and documents required for the transfer of the Securities to the Buyer.

In connection with closing of the transaction, the Sellers will enter into a Voting Support and Confidentiality Agreement with the other parties named therein, pursuant to which the parties will agree to vote in favor of the transactions contemplated by the Purchase Agreement and also agreed to certain transfer restrictions on the securities of Goedeker owned by them.

F-44

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

In connection with closing of the transaction, Goedeker will enter into a Lock-Up and Resale Restriction Agreement with the holders names therein, pursuant to which the parties will agree that such holders will not transfer the securities of Goedeker owned by them for a period of 180 days.

***Fair Value of Financial Instruments***

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

***Sales Tax Liability***

On June 21, 2018, the U.S. Supreme Court issued an opinion in South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018), whereby the longstanding Quill Corp v. North Dakota sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At December 31, 2020 and 2019, the amount of such accrual was $11,700,329 and $6,138,533 respectively, which is included in accounts payable and accrued expenses.

***Income Taxes***

All combined entities have elected to be taxed as an "S Corporation" under the provisions of the Internal Revenue Code and comparable state income tax law. As an S Corporation, the Company is generally not subject to corporate income taxes and the Company's net income or loss is reported on the individual tax return of the stockholder of the Company. Therefore, no provision or liability for income taxes is reflected in the combined financial statements.

Management has evaluated its tax positions and has concluded that the Company had taken no uncertain tax positions that could require adjustment or disclosure in the combined financial statements to comply with provisions set forth in ASC 740, Income Taxes.

***Recent Accounting Pronouncements***

In June 2018, the FASB issued ASU 2018-07, *Compensation — Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for nonemployee share-based payment transactions by expanding the scope of ASC Topic 718, *Compensation — Stock Compensation*, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new standard, most of the guidance on stock compensation payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. This standard became effective for us on January 1, 2019. The adoption of this standard did not have a material impact on the combined financial statements.

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

In February 2018, the FASB issued ASU 2018-02, *Income Statement — Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*, which allows a reclassification from accumulated other comprehensive income (AOCI) to retained earnings for stranded tax effects resulting from U.S. federal tax legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017 (the "2017 Tax Act"). The adoption of this standard did not have a material impact on the combined financial statements.

In August 2017, the FASB issued ASU 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities*, which expands and refines hedge accounting for both financial and non-financial risk components, aligns the recognition and presentation of the effects of hedging instruments and hedge items in the financial statements, and includes certain targeted improvements to ease the application of current guidance related to the assessment of hedge effectiveness. ASU 2017-12 became effective for us on January 1, 2019. The adoption of this standard did not have a material impact on the combined financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods beginning after December 15, 2019, including interim periods within those annual periods. Early adoption is permitted. We adopted ASU 2018-15 on January 1, 2020 on a prospective basis, and do not expect the adoption will result in a material impact for future periods.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. We adopted ASU 2018-13 on January 1, 2020 on a prospective basis, and do not expect the adoption will result in a material impact for future periods.

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to its combined financial statements.

F-46

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 3 — RECEIVABLES**

At December 31, 2020 and 2019, receivables consisted of the following:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade receivables from customers | $ 11,831,572 | $ 8,889,916 |
| Credit card receivables in process of collection | 1,716,364 | 724,440 |
| Vendor rebate receivables | 5,844,646 | 4,103,642 |
| Total receivables | $ 19,392,582 | $ 13,717,998 |

**NOTE 4 — DEPOSITS WITH VENDORS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income. There were no purchase commitments outstanding at December 31, 2020 or 2019.

**NOTE 5 — PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at December 31, 2020 and, 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Furniture and fixtures | $ 241,469 | $ 181,593 |
| Transportation equipment | 2,880,673 | 1,858,185 |
| Leasehold improvements | 870,034 | 870,034 |
| Machinery and equipment | 205,435 | 161,828 |
| Office equipment | 92,431 | 92,431 |
| Total property and equipment | 4,290,042 | 3,164,071 |
| Less: accumulated depreciation | (2,292,220) | (1,572,202) |
| Property and equipment, net | $ 1,997,822 | $ 1,591,869 |

Depreciation expense for the years ended December 31, 2020 and 2019 was $782,773 and $454,014, respectively.

**NOTE 6 — ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

The following is schedule of accounts payable and accrued expenses at December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade accounts payable | $ 7,260,224 | $ 6,910,165 |
| Accrued tax liability | 12,568,110 | 7,632,886 |
| Accrued payroll liabilities | 275,672 | 468,590 |
| Other accrued liabilities | 1,075,969 | 208,759 |
| Total accounts payable and accrued expenses | $ 21,179,975 | $ 15,220,400 |

F-47

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 7 — NOTES PAYABLE**

The Company has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased.

Notes payable consist of the following at December 31, 2020 and 2019:

| Lender | Origination Date | Maturity Date | Interest Rate | December 31, 2020 | December 31, 2019 |
|---|---|---|---|---|---|
| Ally | 11/16/15 | 11/16/20 | 3.09% | $ — | $ 10,442 |
| Ally | 11/16/15 | 11/16/20 | 3.09% | — | 9,432 |
| Ally | 12/22/15 | 12/21/20 | 3.09% | — | 9,748 |
| Ally | 6/19/16 | 6/19/21 | 3.59% | 5,970 | 24,886 |
| Toyota | 10/31/16 | 10/31/21 | 5.39% | 16,041 | 31,610 |
| Toyota | 10/31/16 | 10/31/21 | 5.39% | — | 39,920 |
| Toyota | 12/1/16 | 12/1/21 | 5.39% | 14,616 | 27,372 |
| Ally | 4/19/17 | 4/19/22 | 4.99% | 19,788 | 31,370 |
| Toyota | 7/12/17 | 7/12/22 | 5.39% | 57,754 | 97,121 |
| Hitachi | 10/10/17 | 10/10/22 | 5.40% | 24,007 | 35,290 |
| Hitachi | 10/30/17 | 10/30/22 | 5.40% | 36,377 | 52,498 |
| Hitachi | 10/4/18 | 10/4/23 | 5.49% | 51,611 | 65,140 |
| Hitachi | 9/17/18 | 10/17/23 | 5.49% | 48,615 | 67,042 |
| Toyota | 4/25/19 | 4/25/24 | 5.74% | 120,600 | 154,158 |
| Toyota | 10/7/19 | 10/7/24 | 4.48% | 61,462 | 76,371 |
| Toyota | 12/16/19 | 12/15/24 | 4.52% | 69,730 | 85,618 |
| Toyota | 7/2/20 | 7/1/25 | 5.14% | 267,938 | — |
| Toyota | 2/5/20 | 2/4/25 | 4.52% | 70,458 | — |
| Hitachi | 3/4/20 | 2/28/25 | 4.99% | 147,493 | — |
| Hitachi | 9/1/20 | 8/31/25 | 4.75% | 77,813 | — |
| Toyota | 6/18/20 | 6/17/25 | 4.99% | 262,776 | — |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 77,391 | — |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 87,973 | — |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 89,049 | — |
| Popular Bank | 4/15/20 | 4/15/22 | 1.00% | 1,192,780 | — |
| Popular Bank | 4/27/20 | 4/27/22 | 1.00% | 679,690 | — |
| SBA | 7/25/20 | 10/25/50 | 3.75% | 112,100 | — |
| SBA | 7/20/20 | 10/20/50 | 3.75% | 150,000 | — |
| SBA | 7/25/20 | 10/25/50 | 3.75% | 150,000 | — |
| Toyota | 12/16/20 | 12/16/25 | 3.75% | 79,823 | — |
| Total notes payable | | | | $ 3,971,855 | $ 818,018 |
| Less: current portion | | | | (466,235) | (276,534) |
| Notes payable, net of current portion | | | | $ 3,505,620 | $ 541,484 |

F-48

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 7 — NOTES PAYABLE** (cont.)

Following is a summary of notes payable payments due for the succeeding five years:

| Year Ending December 31, | Amount |
|---|---|
| 2021 | $ 466,235 |
| 2022 | 2,269,302 |
| 2023 | 355,381 |
| 2024 | 303,025 |
| 2025 | 207,276 |
| Thereafter | 370,636 |
| Total | $ 3,971,855 |

**NOTE 8 — LEASES**

*Financing Leases*

On March 3, 2018, the Company entered in an equipment financing lease to purchase a forklift for $59,326, maturing on March 2, 2023. As of December 31, 2020 and 2019, the balance payable was $33,346 and $44,320, respectively.

On January 23, 2019, the Company entered in an equipment financing lease to purchase a forklift for $55,510, maturing on January 23, 2024. As of December 31, 2020 and 2019, the balance payable was $36,828 and $46,935, respectively.

Following is a summary of payments due on financing leases for the succeeding five years:

| Year Ending December 31, | Amount |
|---|---|
| 2021 | $ 31,724 |
| 2022 | 31,724 |
| 2023 | 18,084 |
| 2024 | 1,128 |
| 2025 and thereafter | — |
| Total payments | 82,660 |
| Less: amount representing interest | (11,419) |
| Present value of minimum lease payments | $ 71,241 |

*Operating Leases*

The Company has entered into four lease agreements under which it leases warehouse equipment, and which have been classified as operating leases. The Company leases warehouse, showroom, and office facilities under long-term leases. All the facility leases include fixed rental payments and have been classified as operating leases.

As of December 31, 2020 and 2019, the weighted-average remaining lease term for all operating leases is 2.9 years and 3.9 years, respectively, while the weighted-average remaining lease term for all finance leases is 2.6 years and 3.6 years, respectively.

Because the Company generally does not have access to the rate implicit in operating leases, we utilize our incremental borrowing rate as the discount rate. The weighted average discount rate associated with operating leases as of December 31, 2020 and 2019 is 4.8 percent and 4.8 percent, respectively.

The Company recognizes operating lease expense on a straight-line basis over the lease term. Rental expense under the operating lease for the years ended December 31, 2020 and 2019 were $1,707,095 and $1,319,220, respectively.

F-49

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 8 — LEASES** (cont.)

Cash payments included in the measurement of our operating lease liabilities for the years ended December 31, 2020 and 2019 were $1,686,170 and $981,720, respectively.

Supplemental balance sheet information related to lease at December 31, 2020 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use asset | $ | 4,646,508 |
| Lease liability, current portion | | 1,517,390 |
| Lease liability, long-term | | 3,279,080 |
| Total operating lease liability | $ | 4,796,470 |
| | | |
| Weighted-average remaining lease term (months) | | 35 |
| | | |
| Weighted average discount rate | | 4.8% |

Future minimum lease payments under operating leases as of December 31, 2020 (in thousands) were as follows:

| Year Ending December 31, | | Amount |
|---|---|---|
| 2021 | $ | 1,716,503 |
| 2022 | | 1,747,752 |
| 2023 | | 1,404,330 |
| 2024 | | 281,250 |
| 2025 and thereafter | | — |
| Total | $ | 5,149,835 |
| Less imputed interest | | (353,365) |
| Total lease liability | $ | 4,796,470 |

**NOTE 9 — SUPPLIER CONCENTRATION**

Significant customers and suppliers are those that account for greater than ten percent of the Company's revenues and purchases.

In 2020 and 2019, the Company purchased a substantial portion of finished goods from a third-party vendor (75.2% and 70.7%, respectively).

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

**NOTE 10 — RELATED PARTY TRANSACTIONS**

The Company leases four facilities pursuant to lease agreements entered into with four separate entities owned by Albert and Elie Fouerti, the Company's Chief Executive Officer and Vice President, respectively. Albert and Elie Fouerti, directly and indirectly through affiliated trusts, are each a 50 percent owner of 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Joe's Appliances LLC, and YF Logistics LLC. See Note 8 for disclosures of cash payments made and amounts recognized as expense during the years ended December 31, 2020 and 2019 and for disclosure of future minimum lease payments as of December 31, 2020 under these leases.

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 10 — RELATED PARTY TRANSACTIONS** (cont.)

The Company is a member of Dynamic Marketing, Inc. ("DMI"), an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 5% equity interest in DMI. Additionally, one of the owners of the Company is on the Board of DMI. As such, DMI is deemed to be a related party. At December 31, 2020 and 2019, vendor rebate deposits, net, due from DMI were $31,733,415 and $22,005,318, respectively, and vendor rebates receivable were $4,691,514 and $3,284,594, respectively. During the year ended December 31, 2020, the following transactions were carried out with DMI: total purchases $175,630,820, vendor rebates $8,222,373, interest income $968,080, consulting income $255,000, and rent expense $675,000. During the year ended December 31, 2019, the following transactions were carried out with DMI: total purchases $120,328,645, vendor rebates $3,284,594, interest income $1,428,546, consulting income $188,617, and rent expense $337,500.

**NOTE 11 — SUBSEQUENT EVENTS**

Subsequent to December 31, 2020, the Company was notified by its bank that the application for forgiveness of the Paycheck Protection loans had been approved and that the loans had been fully forgiven, resulting in the recognition of other income of $1,888,174 including principal and interest.

Subsequent to December 31, 2020, the Company paid $9,228,596 in member distributions

Table of Contents

**$205,000,000**

# GOEDEKERS

**Common Stock**

———————————————

**PROSPECTUS**

———————————————

**BofA Securities**

**ThinkEquity**

a division of Fordham Financial Management, Inc.

**, 2021**

Table of Contents

**PART II**
**INFORMATION NOT REQUIRED IN THE PROSPECTUS**

**Item 13. Other Expenses of Issuance and Distribution**

The following table sets forth the costs and expenses, other than underwriting discounts and commissions, payable by us in connection with the sale of common shares being registered. All amounts, other than the SEC registration fee, NYSE American listing fee and FINRA filing fee, are estimates. We will pay all these expenses.

|  | | Amount |
|---|---|---|
| SEC registration fee | $ | 25,720.33 |
| FINRA filing fee | $ | 35,862.50 |
| Accounting fees and expenses | $ | 100,000.00 |
| Legal fees and expenses | $ | 182,500.00 |
| Transfer agent fees and expenses | $ | 3,000.00 |
| Printing and related fees and expenses | $ | 10,000.00 |
| Miscellaneous fees and expenses | $ | 52,917.17 |
| **Total** | **$** | **410,000.00** |

**Item 14. Indemnification of Directors and Officers**

Section 145 of the General Corporation Law of the State of Delaware provides that a corporation may indemnify directors and officers as well as other employees and individuals against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement in connection with specified actions, suits and proceedings whether civil, criminal, administrative, or investigative, other than a derivative action by or in the right of the corporation, if they acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe their conduct was unlawful. A similar standard is applicable in the case of derivative actions, except that indemnification extends only to expenses, including attorneys' fees, incurred in connection with the defense or settlement of such action and the statute requires court approval before there can be any indemnification where the person seeking indemnification has been found liable to the corporation. The statute provides that it is not exclusive of other indemnification that may be granted by a corporation's certificate of incorporation, bylaws, disinterested director vote, stockholder vote, agreement or otherwise.

Our amended and restated certificate of incorporation and bylaws provide for indemnification of directors and officers to the fullest extent permitted by law, including payment of expenses in advance of resolution of any such matter.

We have entered into separate indemnification agreements with our directors and certain officers. Each indemnification agreement provides for, among other things, indemnification to the fullest extent permitted by law and our amended and restated certificate of incorporation and bylaws against any and all expenses, judgments, fines, penalties and amounts paid in settlement of any claim. The indemnification agreements provide for the advancement or payment of all expenses to the indemnitee and for reimbursement to us if it is found that such indemnitee is not entitled to such indemnification under applicable law and our amended and restated certificate of incorporation and bylaws.

We have obtained standard policies of insurance under which coverage is provided (a) to our directors and officers against loss rising from claims made by reason of breach of duty or other wrongful act, and (b) to us with respect to payments which we may make to such officers and directors pursuant to the above indemnification provision or otherwise as a matter of law.

The underwriting agreement, filed as Exhibit 1.1 to this registration statement, will provide for indemnification, under certain circumstances, by the underwriter of us and our officers and directors for certain liabilities arising under the Securities Act or otherwise.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us under the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

II-1

Table of Contents

**Item 15. Recent Sales of Unregistered Securities**

During the past three years, we issued the following securities which were not registered under the Securities Act.

Upon our inception on January 10, 2019, we issued 1,000 shares of common stock to 1847 Holdings at par value for a total purchase price of $1.00. On March 22, 2019, these shares were transferred to 1847 Holdco. The issuance of these securities was made in reliance upon exemptions provided by Section 4(a)(2) of the Securities Act for the offer and sale of securities not involving a public offering.

On April 5, 2019, we issued a ten-year warrant to SBCC in connection with the loan from SBCC. The warrant was exercisable for shares of our most senior capital stock equal to 5.0% of our outstanding equity securities on a fully-diluted basis, including all vested and unvested equity grants, for an aggregate exercise price equal to $100. The issuance of these securities was made in reliance upon exemptions provided by Section 4(a)(2) of the Securities Act for the offer and sale of securities not involving a public offering. On August 4, 2020, SBCC converted this warrant into 250,000 shares of our common stock.

On March 19, 2021, we entered into a securities purchase agreement with two institutional investors, pursuant to which we issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000, which is convertible into shares of our common stock only upon an event of default, and (ii) a four-year warrant to purchase 200,000 shares of our common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis, for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. ThinkEquity, a division of Fordham Financial Management, Inc., acted as placement agent in connection with the offer and sale of these securities. As compensation, it received a commission equal to 7% of the gross proceeds, or $350,000, and reimbursement for legal fees in the amount of $35,000. The issuance of these securities was made in reliance upon exemptions provided by Section 4(a)(2) of the Securities Act for the offer and sale of securities not involving a public offering.

In instances described above where we indicate that we relied upon Section 4(a)(2) of the Securities Act in issuing securities, our reliance was based upon the following factors: (a) the issuance of the securities was an isolated private transaction by us which did not involve a public offering; (b) there were only a limited number of offerees; (c) there were no subsequent or contemporaneous public offerings of the securities by us; (d) the securities were not broken down into smaller denominations; and (e) the negotiations for the sale of the stock took place directly between the offeree and us.

**Item 16. Exhibits.**

(a) Exhibits.

| Exhibit No. | Description |
|---|---|
| 1.1 | Form of Underwriting Agreement |
| 3.1 | Amended and Restated Certificate of Incorporation of 1847 Goedeker Inc. (incorporated by reference to Exhibit 4.1 to the Registration Statement on Form S-8 filed on August 3, 2020) |
| 3.2 | Bylaws of 1847 Goedeker Inc. (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 4.1 | Common Stock Purchase Warrant issued to Evergreen Capital Management LLC on March 19, 2021 (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on March 25, 2021) |
| 4.2 | Common Stock Purchase Warrant issued to SILAC Insurance Company on March 19, 2021 (incorporated by reference to Exhibit 4.2 to the Current Report on Form 8-K filed on March 25, 2021) |
| 4.3 | Form of Representative's Warrant for Initial Public Offering (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on August 5, 2020) |
| 5.1 | Opinion of Bevilacqua PLLC as to the legality of the shares |
| 10.1 | Securities Purchase Agreement, dated October 20, 2020, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and the other parties signatory thereto (incorporated by reference to Exhibit 10.1 to the Annual Report on Form 10-K filed on March 29, 2021) |

II-2

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.2 | Amendment No. 1 to Securities Purchase Agreement, dated December 8, 2020, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and the other parties signatory thereto (incorporated by reference to Exhibit 10.2 to the Annual Report on Form 10-K filed on March 29, 2021) |
| 10.3 | Amendment No. 2 to Securities Purchase Agreement, dated April 6, 2021, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and the other parties signatory thereto (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on April 6, 2021) |
| 10.4 | Management Services Agreement, dated April 5, 2019, between 1847 Goedeker Inc. and 1847 Partners LLC (incorporated by reference to Exhibit 10.1 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.5 | Amendment No. 1 to Management Services Agreement, dated April 21, 2020, between 1847 Goedeker Inc. and 1847 Partners LLC (incorporated by reference to Exhibit 10.2 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.6 | Whirlpool Corporation Major Appliances Retail Dealer Sales Agreement, dated March 20, 2014, between Goedeker Television Co. and Whirlpool Corporation (incorporated by reference to Exhibit 10.37 to Amendment No. 1 to Registration Statement on Form S-1/A filed on June 4, 2020) |
| 10.7 | Trademark Assignment Agreement, dated October 15, 2020, between Superior Deals, Inc. and Albert Fouerti |
| 10.8 | Trademark Assignment Agreement, dated October 15, 2020, between 1 Stop Electronics, Inc. and Albert Fouerti |
| 10.9 | Lease Agreement, dated April 5, 2019, between S.H.J., L.L.C. and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.22 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.10 | Lease Agreement, dated January 13, 2021, by and between Westgate 200, LLC and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on January 20, 2021) |
| 10.11 | First Amendment to Lease Agreement, dated January 13, 2021, by and between Westgate 200, LLC and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on April 5, 2021) |
| 10.12 | Lease Agreement, dated September 1, 2018, between 1 Stop Electronic Center, Inc. and 1870 Bath Ave. LLC |
| 10.13 | Form of New Lease Agreement between 1 Stop Electronic Center, Inc. and 1870 Bath Ave. LLC (to be entered into at closing of proposed acquisition) |
| 10.14 | Lease Agreement, dated September 1, 2018, between Joe's Appliances LLC and 7812 5th Ave Realty LLC |
| 10.15 | Form of New Lease Agreement between Joe's Appliances LLC and 7812 5th Ave Realty LLC (to be entered into at closing of proposed acquisition) |
| 10.16 | Sublease Agreement, dated May 31, 2019, between YF Logistics LLC and Icon 400 Cabot Owner Pool 4 NJ, LLC |
| 10.17 | Securities Purchase Agreement, dated March 19, 2021, among 1847 Goedeker Inc., Evergreen Capital Management LLC and SILAC Insurance Company (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.18 | Security Agreement, dated March 19, 2021, between 1847 Goedeker Inc. and SILAC Insurance Company (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.19 | 10% OID Senior Secured Promissory Note issued to Evergreen Capital Management LLC on March 19, 2021 (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.20 | 10% OID Senior Secured Promissory Note issued to SILAC Insurance Company on March 19, 2021 (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.21 | Promissory Note and Security Agreement, dated August 25, 2020, by 1847 Goedeker Inc. in favor of Arvest Bank (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on August 31, 2020) |
| 10.22 | Securities Entitlement Control Agreement, dated August 25, 2020, among Arvest Bank, 1847 Goedeker Inc. and Arvest Investments, Inc. (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on August 31, 2020) |

II-3

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.23† | Employment Letter Agreement, dated August 15, 2019, between 1847 Goedeker Inc. and Douglas T. Moore (incorporated by reference to Exhibit 10.23 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.24† | Amendment to Employment Letter Agreement, dated April 21, 2020, between 1847 Goedeker Inc. and Douglas T. Moore (incorporated by reference to Exhibit 10.24 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.25† | Employment Letter Agreement, dated April 21, 2020, between 1847 Goedeker Inc. and Robert D. Barry (incorporated by reference to Exhibit 10.25 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.26† | Form of Employment Agreement between Appliances Connection Inc. and Albert Fouerti (to be entered into at closing of proposed acquisition) |
| 10.27† | Form of Employment Agreement between Appliances Connection Inc. and Elie Fouerti (to be entered into at closing of proposed acquisition) |
| 10.28 | Form of Independent Director Agreement between 1847 Goedeker Inc. and each independent director (incorporated by reference to Exhibit 10.27 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.29 | Form of Indemnification Agreement between 1847 Goedeker Inc. and each independent director (incorporated by reference to Exhibit 10.28 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.30† | 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 4.3 to the Registration Statement on Form S-8 filed on August 3, 2020) |
| 10.31† | Amendment No. 1 to 1847 Goedeker Inc. 2020 Equity Incentive Plan |
| 10.32† | Form of Stock Option Agreement for 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 10.30 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.33† | Form of Restricted Stock Award Agreement for 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 10.31 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 14.1 | Code of Ethics and Business Conduct (incorporated by reference to Exhibit 14.1 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 21.1 | List of Subsidiaries (incorporated by reference to Exhibit 21.1 to the Annual Report on Form 10-K filed on March 29, 2021) |
| 23.1 | Consent of Friedman LLP for 1847 Goedeker Inc. |
| 23.2 | Consent of Friedman LLP for Appliances Connection |
| 23.3 | Consent of Bevilacqua PLLC (included in Exhibit 5.1) |
| 24.1 | Power of Attorney (included on the signature page of this registration statement) |
| 99.1 | Consent of Albert Fouerti (Director Nominee) |
| 99.2 | Consent of Alan P. Shor (Director Nominee) |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

———————

†     Executive compensation plan or arrangement

II-4

Table of Contents

(b)    Financial Statement Schedules.

All financial statement schedules are omitted because the information called for is not required or is shown either in the financial statements or in the notes thereto.

**Item 17. Undertakings**

The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement, certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1)    For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2)    For purposes of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-5

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of St. Louis, State of Missouri, on May 3, 2021.

**1847 GOEDEKER INC.**

By:  /s/ Douglas T. Moore
_____
Douglas T. Moore
Chief Executive Officer

**POWER OF ATTORNEY**

Each person whose signature appears below constitutes and appoints each of Douglas T. Moore and Robert D. Barry as his or her true and lawful attorneys-in-fact and agents with full power of substitution and resubstitution, for him and his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this registration statement and to file a new registration statement under Rule 461, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the foregoing, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or their substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ Douglas T. Moore<br>Douglas T. Moore | Chief Executive Officer and Director<br>(principal executive officer) | May 3, 2021 |
| /s/ Robert D. Barry<br>Robert D. Barry | Chief Financial Officer<br>(principal financial and accounting officer) | May 3, 2021 |
| /s/ Ellery W. Roberts<br>Ellery W. Roberts | Chairman of the Board | May 3, 2021 |
| /s/ Edward J. Tobin<br>Edward J. Tobin | Director | May 3, 2021 |
| /s/ Ellette A. Anderson<br>Ellette A. Anderson | Director | May 3, 2021 |
| /s/ Clark R. Crosnoe<br>Clark R. Crosnoe | Director | May 3, 2021 |
| /s/ Paul A. Froning<br>Paul A. Froning | Director | May 3, 2021 |
| /s/ Glyn C. Milburn<br>Glyn C. Milburn | Director | May 3, 2021 |

II-6

# Exhibit 2

**PROSPECTUS**                                    **Filed Pursuant to Rule 424(b)(4)**
                                                 **Registration No. 333-255709**

## 91,111,111 Units

# GOEDEKERS

# 1847 Goedeker Inc.

We are offering 91,111,111 units, each unit consisting of one share of our common stock, par value $0.0001 per share, and a warrant to purchase one share of common stock, in connection with our simultaneous acquisition of all of the issued and outstanding capital stock or other equity securities of 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC and YF Logistics LLC (commonly known as Appliances Connection) as described in more detail in this prospectus. The warrants included within the units are exercisable immediately, have an exercise price of $2.25 per share and expire five years from the date of issuance. The shares of common stock and warrants contained in the units are immediately separable and will be issued separately.

Our common stock is listed and traded on NYSE American under the symbol "GOED." On May 27, 2021, the last reported sale price for our common stock was $6.07 per share. The warrants have been approved for trading on NYSE American under the symbol "GOED WS" and will commence trading on May 28, 2021. In connection with this offering, we have applied for the listing of our common stock and warrants on the New York Stock Exchange, or the NYSE, however, we do not currently meet the minimum share price requirements of the NYSE and will not be able to list our common stock and warrants on the NYSE unless we meet such minimum share price and other listing requirements of the NYSE.

We are an "emerging growth company" as defined in Section 2(a) of the Securities Act of 1933, as amended, and are subject to reduced public company reporting requirements.

**Investing in our securities involves risks that are described in the "Risk Factors" section beginning on page 25 of this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

|                                                     | Per Unit |        | Total |             |
| --------------------------------------------------- | -------- | ------ | ----- | ----------- |
| Public offering price                               | $        | 2.2500 | $     | 205,000,000 |
| Underwriting discounts and commissions[1]           | $        | 0.1575 | $     | 14,350,000  |
| Proceeds, before expenses, to us                    | $        | 2.0925 | $     | 190,650,000 |

_____

(1)   See "Underwriting" beginning on page 124 for additional information regarding underwriting compensation.

We have granted a 30-day option to the underwriters to purchase up to 2,000,000 additional shares of common stock and/or warrants to purchase up to 2,000,000 additional shares of common stock, in any combination thereof, solely to cover over-allotments, if any.

Certain of our existing stockholders and certain of our officers, directors, employees and related persons, have indicated an interest in purchasing an aggregate of approximately 2,779,600 units in this offering at the public offering price. However, because indications of interest are not binding agreements or commitments to purchase, the underwriters may determine to sell more, fewer or no units in this offering to these persons, and any of these persons may determine to purchase more, fewer or no units in this offering. The underwriters will receive the same underwriting discount on any units purchased by these persons as they will on any other units sold to the public in this offering.

The units will be ready for delivery on or about June 2, 2021.

# ThinkEquity

**a division of Fordham Financial Management, Inc.**

The date of this prospectus is May 27, 2021

Table of Contents





## Creating One of the Fastest Growing and Largest Appliance Retailers Online





Table of Contents

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 25 |
| Cautionary Statement Regarding Forward-Looking Statements | 46 |
| Use of Proceeds | 48 |
| Dividend Policy | 49 |
| Capitalization | 50 |
| Dilution | 51 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 53 |
| Corporate History and Structure | 79 |
| Proposed Acquisition of Appliances Connection | 80 |
| Business | 84 |
| Management | 97 |
| Executive Compensation | 104 |
| Current Relationships and Related Party Transactions | 109 |
| Principal Stockholders | 112 |
| Description of Capital Stock | 114 |
| Shares Eligible for Future Sale | 118 |
| Material U.S. Federal Income Tax Considerations for Non-U.S. Holders of Our Common Stock and Warrants | 119 |
| Underwriting | 124 |
| Legal Matters | 131 |
| Experts | 131 |
| Interests of Named Experts and Counsel | 131 |
| Where You Can Find More Information | 131 |
| Financial Statements | F-1 |

**Please read this prospectus carefully. It describes our business, financial condition, results of operations and prospects, among other things. We are responsible for the information contained in this prospectus and in any free-writing prospectus we have authorized. Neither we nor the underwriters have authorized anyone to provide you with different information, and neither we nor the underwriters take responsibility for any other information others may give you. Neither we nor the underwriters are making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. The information contained in this prospectus is accurate only as of the date on the front of this prospectus, regardless of the time of delivery of this prospectus or any sale of our securities. You should not assume that the information contained in this prospectus is accurate as of any date other than its date.**

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information contained elsewhere in this prospectus. This summary is not complete and does not contain all of the information that you should consider before deciding whether to invest in our securities. You should carefully read the entire prospectus, including "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus, before making an investment decision. Some of the statements in this prospectus are forward-looking statements. See the section titled "Cautionary Statement Regarding Forward-Looking Statements."*

*In this prospectus, "we," "us," "our," "our company" and "Goedeker" and similar references refer to 1847 Goedeker Inc. and references to "the combined company" are references to Goedeker after the consummation of its acquisition of Appliances Connection.*

OUR COMPANY

**Overview**

Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 stock-keeping units, or SKUs, across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

On October 20, 2020, we entered into a securities purchase agreement to acquire Appliances Connection, a leading retailer of household appliances based in Brooklyn, New York. The closing of the proposed acquisition will occur simultaneously with the closing of this offering. We intend to enter into a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which we intend to use to pay a portion of the purchase price to acquire Appliances Connection. The proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses. On a pro forma basis, the combined company had total sales of $368 million for the year ended December 31, 2020 and $123 million for the three months ended March 31, 2021. See "— Proposed Acquisition of Appliances Connection" below.

**The Large and Growing United States Appliance Market**

The United States household major appliances market is highly fragmented with big box retailers, online retailers, and thousands of local and regional retailers competing for share in what has historically been a high touch sale process. According to Statista, revenue in the United States household major appliances market (excluding small appliances) is projected to reach $22.9 billion in 2021 and is expected to grow at an annual growth rate of 1.68% from 2021 to 2025.

According to the United States Census Bureau, there are approximately 100 million households in the United States with annual incomes between $25,000 and $250,000 and approximately 193 million individuals between the ages of 20 and 64 in the United States, many of whom are accustomed to purchasing goods online. As younger generations age, start new families and move into new homes, we expect online sales of household appliances to increase. In addition, we believe the online household appliances market will further grow as older generations of consumers become increasingly comfortable purchasing online, particularly if the process is easy and efficient.

When shopping for appliances their homes, consumers bring their own unique combination of style and budget, requiring vast selection to garner broad appeal. Brick and mortar retailers must balance selection with the challenges of high inventory carrying costs, complex vendor requirements and limited showroom and storage space. As a result, consumers are faced with a decision between shopping in multiple stores, or settling for what is available. Just

1

Table of Contents

as e-commerce has changed the landscape of other retail sectors, we believe an easy-to-browse, online shopping experience with massive selection and excellent customer service has the potential to change the way people buy household appliances.

Logistics, fulfillment and customer service for household appliances are challenging given the myriad vendors and product specifications, and the cumbersome size and weight of items. Household appliances often have a low dollar value to weight ratio compared to other categories of retail, therefore requiring a logistics network that is optimized for items with those characteristics. Many consumers also seek first-rate customer service so they are not burdened with managing delivery, shipping and return logistics on their own. However, we believe big box retailers that serve the mass market for home goods are often unable or unwilling to provide this level of service.

**Our Solution — Key Benefits for Our Customers**

The combined company will offer broad selection and choice. We believe that the combined company will offer the largest online selection of household appliances, with over 51,000 household appliance SKUs. The combined company's easy to use websites make it easy for customers to discover products, styles and price points that appeal to them. Convenience and value are central to our offering. The combined company will offer a one-stop shop for consumers in the appliance category, with competitive pricing reflecting the many vendors on its platform and a differentiated and robust merchandising experience.

The combined company will offer consumers an engaging shopping journey through the combination of its technology-rich platform and its experienced customer support personnel, available via chat, email, text and phone. Superior customer service will be a core part of the experience that the combined company will offer shoppers. The combined company's customer service organization will help consumers navigate its sites, answer questions and complete orders, staffed with specialists focused on specific product classes. This team will help the combined company build trust with consumers, enhance its reputation and drive sales.

**Competitive Strengths**

We believe that the combined company will be a leading e-commerce appliance retailer due to its following key strengths:

- *Name and reputation*.   We believe that the combined company will enjoy a long-standing (50+ years) reputation with vendors and customers for its focus on offering a full line of appliances and other home furnishings with competitive pricing and superior customer service.

- *Product selection and pricing*.   We believe that the combined company's broad product selection and attractive pricing model will create a sustainable competitive advantage. The combined company will strive to offer consumers the broadest choice in the market and review pricing by other retailers on a daily basis to ensure its product offerings are competitively priced. Goedeker and Appliances Connection have negotiated attractive terms with their respective vendor partners, allowing them to pass through savings and selection to customers.

- *Website ease of use*.   The combined company's purpose-built technology platform will be designed to provide consumers with a compelling user experience as they browse, research and purchase its products. The combined company will use personalization, based on past browsing and shopping patterns, to create a more engaging consumer experience.

- *Best in class customer service and marketing technology*.   We believe that the investments that Goedeker and Appliances Connection have made in their respective call center tools and shopping platforms, combined with digital marketing optimization, will allow the combined company to offer an unmatched customer journey.

- *Logistics technology and efficiency*.   The combined company's proprietary technology will eliminate manual steps and reduce order processing time, allowing it to provide faster services to customers.

2

Table of Contents

**Our Growth Strategies**

Our mission is to change the way consumers buy appliances and, in doing so, become the leading online retailer of home appliances. The strategies of the combined company to achieve this mission, while increasing value for our shareholders, will include:

- *Grow our brand*.   Increasing brand awareness and growing favorable brand equity among consumers is central to the growth, of the combined company following the proposed acquisition. The combined company plans to drive brand awareness through a combination of sophisticated, multi-layered marketing programs and word-of-mouth referrals. The combined company will continue to invest in marketing initiatives to efficiently attract consumers.

- *Expand in the commercial market*.   To date, Goedeker and Appliances Connection have directed all marketing efforts toward the consumer. With remodels and new home construction, there is opportunity to market to home builders, real estate developers, contractors and interior designers who are making or influencing the purchasing decision for many consumers. We believe that the combined company's low price business model will be received well by this market, creating substantial revenue opportunities and more repeat business. Evidence of unmet demand and market need is ongoing with large commercial sales occurring organically each week through Goedeker and Appliances Connection's websites and contact centers.

- *Drive continued operational excellence*.   Goedeker and Appliances Connection are committed to improving productivity and profitability through several operational initiatives designed to grow revenue and expand margins. Some of the key initiatives for operational excellence for the combined company include:

  - *Logistics and shipping optimization*.   The combined company will implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. The combined company plans to pick up product from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, we expect to take advantage of buying opportunities and capture time-sensitive customers more frequently. The combined company will also explore options to use a showroom, warehousing and cross dock model in other key markets.

  - *Optimize price*.   The combined company will continue building a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing for our products.

  - *Drive marketing efficiencies*.   As the combined company continues to grow and scale, we believe that the combined company will continue to improve the efficiency of its marketing investments. We believe that with larger budgets and deeper experience, the combined company will benefit from lower media rates and increased data that will improve its customer targeting capabilities.

- *Opportunistically pursue strategic acquisitions*. The combined company may continue to expand its business through opportunistic acquisitions that allow it to enhance its customer offering, build its multi-brand portfolio, enter new geographies or enhance its operational infrastructure.

**Our Products and Services**

*Appliances*

The appliance category will be the largest revenue source of the combined company. Goedeker and Appliances Connection have a long history of selling these products and serving the distinct needs of consumers looking to replace or add to their home appliances. The combined company will offer over 51,000 appliance SKUs from all mainline original equipment manufacturers, including Bosch, Whirlpool, GE, Maytag, LG, Samsung, Sharp, Frigidaire and Kitchen Aid, among others, as well as from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte and Ilve. The combined company will sell all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers.

3

Table of Contents

*Furniture*

The combined company will offer over 247,700 furniture SKUs from over 240 furniture vendors and will sell a full line of furniture for every room in the home. The combined company will utilize sophisticated websites that include organization of product by type and characteristics that make for a complete shopping experience in a complicated product category.

*Other Products*

The combined company will also offer a broad assortment of products in the décor, bed & bath, lighting, outdoor living and electronics categories. It will also sell fitness equipment, plumbing fixtures, air conditioners, fireplaces, fans, dehumidifiers, humidifiers, air purifiers, televisions and commercial appliances for our builder and business clients. While these are not individually high-volume categories, they complement the appliance and furniture categories to produce a one-stop home goods offering for customers.

*Installation and Other Services*

The combined company will offer installation and removal services within the continental United States. A full-service install involves hooking up the appliance, testing it to ensure proper operation, and removing packing materials from customer's home, office or other delivery location. The combined company will primarily fulfill such installation services internally through YF Logistics and utilize third-party logistics service provider partners to provide these services to delivery points in remote areas within the continental United States where YF Logistics may not be available.

The combined company will also have outside business partners such as Scavolini, a leader in kitchen cabinetry and design, and an in-house design team trained by the experts at Scavolini that will help customers remodel and reinvent their kitchens, living rooms, bathrooms and laundry rooms.

**Our Corporate History**

Goedeker was incorporated in the State of Delaware on January 10, 2019 for the sole purpose of acquiring substantially all of the assets of Goedeker Television Co., or Goedeker Television. On April 5, 2019, Goedeker acquired substantially all of the assets of Goedeker Television. As a result of this transaction, Goedeker acquired the former business of Goedeker Television, which was established in 1951, and continues to operate this business. All discussions in this prospectus regarding our business prior to the acquisition of Goedeker Television reflect the business of Goedeker Television, our predecessor company. Prior to our acquisition of substantially all of the assets of Goedeker Television, we had no operations other than operations relating to our incorporation and organization.

On October 20, 2020, we formed Appliances Connection Inc., or ACI, as our wholly owned subsidiary in the State of Delaware for the sole purpose of completing the proposed acquisition described below. As of the date of this prospectus, we do not have any other subsidiaries.

**Proposed Acquisition of Appliances Connection**

On October 20, 2020, we entered into a securities purchase agreement, which was amended on December 8, 2020 and April 6, 2021 (we refer to this agreement, as amended, as the purchase agreement), to acquire the following five household appliances companies through ACI: (1) 1 Stop Electronics Center, Inc., or 1 Stop, a New York corporation; (2) Gold Coast Appliances, Inc., or Gold Coast, a New York corporation; (3) Superior Deals Inc., or Superior Deals, a New York corporation; (4) Joe's Appliances LLC, or Joe's Appliances, a New York limited liability company; and (5) YF Logistics LLC, or YF Logistics, a New Jersey limited liability company (we collectively refer to these companies as Appliances Connection).

Pursuant to the purchase agreement, ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $222,000,000, subject to adjustment. The purchase price consists of (i) $180,000,000 in cash (subject to adjustment), (ii) 2,333,333 shares of our common stock having a stated value that is equal to $21,000,000 and (iii) 3,562,640 shares of our common stock, which is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the acquisition. We refer to this proposed acquisition of Appliances Connection in this prospectus as the proposed acquisition.

Table of Contents

We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which will be used to pay a portion of the cash portion of the purchase price to acquire Appliances Connection. We intend to use all of the proceeds of the term loan to pay a portion of the purchase price, and the proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses.

See "Proposed Acquisition of Appliances Connection" for more information regarding the terms of the proposed acquisition.

The purchase agreement contains a number of conditions that must be fulfilled to complete the proposed acquisition. There can be no assurance that the conditions to the closing will be satisfied or that the proposed acquisition will be completed. See "Risk Factors — Risks Related to the Proposed Acquisition."

**About Appliances Connection**

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website 1stopcamera.com.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at goldcoastappliances.com.

Joe's Appliance, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, joesappliances.com.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website *www.appliancesconnection.com*.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

Appliances Connection has built powerful home-grown logistics technology that can help reduce cycle time and efficiencies for the combined company's operations. Appliances Connection will bring the relationships, network, and technology necessary to continue economies of scale for the entire business of the combined company throughout the United States e-commerce market. We intend to leverage Appliances Connection's powerful platform to increase speed, reduce costs and increase margins across our entire business.

Table of Contents

**Impact of COVID-19 Pandemic**

Starting in late 2019, a novel strain of the coronavirus, or COVID-19, began to rapidly spread around the world and every state in the United States. Most states and cities have at various times instituted quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, Goedeker's showroom was closed from April through June of 2020, but its call center and warehouse continued to operate. Appliances Connection's retail facilities and warehouse were deemed essential businesses that were not subject to restrictions in New York and New Jersey, so they remained open and continued to operate. Since over 95% of Goedeker's sales are completed online and its call center and warehouse and distribution operations continued to operate, and Appliances Connection continued to operate, the restrictions put in place in response to the pandemic have not had a materially negative impact on either company's operations. However, the situation surrounding COVID-19 remains fluid, and either company may be required to close or limit service offerings in its retail facilities or warehouses in response to guidance from applicable government and public health officials, which could adversely affect the combined company's operations and revenues.

In addition, Goedeker and Appliances Connection are dependent upon suppliers to provide them with all of the products that they sell. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain products. As a result, both companies have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect their respective business and financial results. Even if Goedeker and Appliances Connection are able to find alternate sources for such products, they may cost more, which could adversely impact their profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact the businesses of Goedeker and Appliances Connection. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on revenue.

Furthermore, the spread of COVID-19 has adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce the ability of the combined company to access capital in the future, which could negatively affect its liquidity.

If the COVID-19 pandemic does not continue to slow and the spread of COVID-19 is not contained, the combined company's business operations could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require the combined company to make further adjustments to its operations in order to comply with any such restrictions. The combined company may also experience limitations in employee resources. In addition, combined company's operations could be disrupted if any of its employees were suspected of having COVID-19, which could require quarantine of some or all such employees or closure of facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect the combined company's ability to operate its business and result in additional costs.

The extent to which the pandemic may impact the results of the combined company will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to the performance, financial condition, results of operations and cash flows of both companies. See also "Risk Factors" for more information.

Table of Contents

**Implications of Being an Emerging Growth Company**

We qualify as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As a result, we will be permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act;

- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);

- submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and

- disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, or the Securities Act, for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year following the fifth anniversary of our initial public offering, (ii) the last day of the first fiscal year in which our total annual gross revenues are $1.07 billion or more, (iii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended, or the Exchange Act, which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iv) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

**Corporate Information**

Our principal executive offices are located at 3817 Millstone Parkway, St. Charles, MO 63301, and our telephone number is 888-768-1710. We maintain a website at *www.goedekers.com*. Information available on our website is not incorporated by reference in and is not deemed a part of this prospectus.

Appliances Connection's executive offices are located at 1870 Bath Avenue, Brooklyn, NY 11214, and its telephone number is 800-299-9470. It maintains a website at *www.appliancesconnection.com*. Information available on the website is not incorporated by reference in and is not deemed a part of this prospectus.

**Stock Split**

On July 30, 2020, we completed a 4,750-for-1 forward stock split of our outstanding common stock. As a result of this stock split, our issued and outstanding common stock was increased from 1,000 shares to 4,750,000 shares. Accordingly, all share and per share information contained in this prospectus has been restated to retroactively show the effect of this stock split.

7

Table of Contents

THE OFFERING

| | |
|---|---|
| Units offered by us: | 91,111,111 units, each unit consisting of one share of common stock and a warrant to purchase one share of common stock. The shares and warrants that are part of the units are immediately separable and will be issued separately in this offering. |
| The warrants: | The warrants included within the units are exercisable immediately, have an exercise price of $2.25 per share and expire five years from the date of issuance. This prospectus also relates to the offering of the shares of common stock issuable upon exercise of the warrants. |
| Common stock to be outstanding after this offering[1]: | 103,118,284 shares of common stock (or 105,118,284 shares if the underwriters exercise the over-allotment option to purchase additional shares of common stock and warrants in full), assuming no exercise of the warrants being offered in this offering, which includes 5,895,973 shares to be issued in connection with the proposed acquisition. |
| Over-allotment option: | We have granted a 30-day option to the underwriters to purchase up to 2,000,000 additional shares of common stock and/or warrants to purchase up to 2,000,000 additional shares of common stock, in any combination thereof, solely to cover over-allotments, if any. |
| Use of proceeds: | We expect to receive net proceeds of approximately $189.6 million from this offering (or $193.8 million if the underwriters exercise their option to purchase additional shares of common stock and warrants in full), after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. |
| | We intend to use the net proceeds from this offering to pay part of the cash portion of the purchase price for the proposed acquisition and related acquisition fees and expenses. Any remaining proceeds will be used working capital and general corporate purposes. See "Use of Proceeds." |
| Dividend policy: | We have not paid or declared dividends on our common stock. See "Dividend Policy" for more information. |
| Risk factors: | Investing in our securities involves a high degree of risk. As an investor, you should be able to bear a complete loss of your investment. You should carefully consider the information set forth in the "Risk Factors" section beginning on page 25. |
| Lock-up: | We and all of our directors and executive officers have agreed with the underwriters, subject to certain exceptions, not to sell, transfer or dispose of, directly or indirectly, any of our common stock or securities convertible into or exercisable or exchangeable for our common stock for a period of 90 days from the date of this prospectus. See "Underwriting" for more information. |
| Trading symbol and market: | Our common stock is listed and traded on NYSE American under the symbol "GOED." The warrants have been approved for trading on NYSE American under the symbol "GOED WS" and will commence trading on May 28, 2021. In connection with this offering, we have applied for the listing of our common stock and warrants on the NYSE, however, we do not currently meet the minimum share price requirements of the NYSE and will not be able to list our common stock and warrants on the NYSE unless we meet such minimum share price and other listing requirements of the NYSE. |

Table of Contents

The number of shares of common stock outstanding immediately following this offering is based on 6,111,200 shares outstanding as of the date of this prospectus and excludes:

- 555,000 shares of common stock issuable upon exercise of outstanding options at an exercise price of $9.00 per share;

- up to 445,000 additional shares of common stock that are reserved for issuance under our 2020 Equity Incentive Plan; and

- 455,560 shares of common stock issuable upon exercise of outstanding warrants at a weighted average exercise price of $11.91 per share.

9

Table of Contents

SUMMARY OF RISK FACTORS

An investment in our securities involves a high degree of risk. You should carefully consider the risks summarized below. These risks are discussed more fully in the "Risk Factors" section immediately following this Prospectus Summary. These risks include, but are not limited to, the following:

• The proposed acquisition is subject to a number of conditions, and may not close at all, in which case this offering will not be consummated.

• If the benefits of the proposed acquisition do not meet the expectations of investors, stockholders or financial analysts, the market price of our securities may decline.

• Failure or delay to complete the proposed acquisition could negatively impact our business, financial condition, results of operations or stock price.

• The integration of Appliances Connection with Goedeker may not be as successful as anticipated.

• We have incurred and expect to continue to incur substantial transaction-related costs in connection with the proposed acquisition.

• Our future results following proposed acquisition may differ materially from the unaudited pro forma financial information included in this prospectus.

• As a result of the proposed acquisition, our company may have undisclosed liabilities and any such liabilities could harm our revenues, business, prospects, financial condition and results of operations.

• The COVID-19 pandemic may cause a material adverse effect on our business.

• If we fail to acquire new customers or retain existing customers, or fail to do so in a cost-effective manner, we may not be able to achieve profitability.

• Our success depends in part on our ability to increase our net revenue per active customer. If our efforts to increase customer loyalty and repeat purchasing as well as maintain high levels of customer engagement are not successful, our growth prospects and revenue will be materially adversely affected.

• Our business depends on our ability to build and maintain strong brands. We may not be able to maintain and enhance our brands if we receive unfavorable customer complaints, negative publicity or otherwise fail to live up to consumers' expectations, which could materially adversely affect our business, results of operations and growth prospects.

• Our efforts to expand our business into new brands, products, services, technologies, and geographic regions will subject us to additional business, legal, financial, and competitive risks and may not be successful.

• Risks associated with the suppliers from whom our products are sourced could materially adversely affect our financial performance as well as our reputation and brand.

• Our ability to obtain continued financing is critical to the growth of our business. We will need additional financing to fund operations, which additional financing may not be available on reasonable terms or at all.

• Our third-party loans contain certain terms that could materially adversely affect our financial condition.

• Our business is highly competitive. Competition presents an ongoing threat to the success of our business.

• We depend on our relationships with third parties, and changes in our relationships with these parties could adversely impact our revenue and profits.

• Uncertainties in economic conditions and their impact on consumer spending patterns, particularly in the home goods segment, could adversely impact our operating results.

• Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.

Table of Contents

- We may not be able to satisfy listing requirements of the NYSE or maintain a listing of our securities on the NYSE or NYSE American.

- The market price, trading volume and marketability of our securities may, from time to time, be significantly affected by numerous factors beyond our control, which may materially adversely affect the market price of your common stock and warrants, the marketability of your common stock and warrants and our ability to raise capital through future equity financings.

- An active, liquid trading market for our securities may not be sustained, which may make it difficult for you to sell the common stock and warrants you purchase.

- We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future.

11

Table of Contents

SUMMARY FINANCIAL INFORMATION

The following tables summarize certain financial data for Goedeker and Appliances Connection and should be read in conjunction with their respective financial statements and related notes contained elsewhere in this prospectus and the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The following summary financial data for Goedeker as of December 31, 2020 and 2019, for the year ended December 31, 2020, for the period from January 1, 2019 through April 5, 2019 (Predecessor) and for the period from April 6, 2019 through December 31, 2019 (Successor) are derived from the audited consolidated financial statements of Goedeker and the unaudited pro forma combined financial statements included elsewhere in this prospectus. We derived the summary financial data of Goedeker as of March 31, 2021 and for the three months ended March 31, 2021 and 2020 from its unaudited condensed consolidated financial statements included elsewhere in this prospectus, which include all adjustments, consisting of normal recurring adjustments, that management considers necessary for a fair presentation of Goedeker's financial position and results of operations as of the dates and for the periods presented.

The following summary financial data for Appliances Connection as of December 31, 2020 and 2019 and for the years then ended are derived from the audited combined financial statements of Appliances Connection included elsewhere in this prospectus. We derived the summary financial data of Appliances Connection as of March 31, 2021 and for the three months ended March 31, 2021 and 2020 from its unaudited condensed combined financial statements included elsewhere in this prospectus, which include all adjustments, consisting of normal recurring adjustments, that management considers necessary for a fair presentation of Appliances Connection's financial position and results of operations as of the dates and for the periods presented.

All financial statements included in this prospectus are prepared and presented in accordance with generally accepted accounting principles in the United States, or GAAP. The summary financial information is only a summary and should be read in conjunction with the historical financial statements and related notes contained elsewhere herein. The financial statements contained elsewhere fully represent financial condition and operations of Goedeker and Appliances Connection; however, they are not indicative of future performance.

**Goedeker**

| Statements of Operations Data | Three Months Ended March 31, 2021 (Pro Forma) | Three Months Ended March 31, 2021 (Actual) | Three Months Ended March 31, 2020 (As Restated) | Year Ended December 31, 2020 (Pro Forma) | Year Ended December 31, 2020 (Actual) | Period from April 6, 2019 through December 31, 2019 (As Restated) [Successor] | Period from January 1, 2019 through April 5, 2019 [Predecessor] |
|---|---|---|---|---|---|---|---|
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | | | |
| Products sales, net | $122,957,457 | $13,697,368 | $ 9,677,178 | $367,742,181 | $ 55,133,653 | $ 34,668,112 | $12,946,901 |
| Cost of goods sold | 90,792,515 | 11,068,911 | 8,111,170 | 295,257,938 | 47,878,541 | 28,596,129 | 11,004,842 |
| Gross profit | 32,164,942 | 2,628,457 | 1,566,008 | 72,484,243 | 7,255,112 | 6,071,983 | 1,942,059 |
| Total operating expenses | 17,928,6002 | 5,909,143 | 3,754,341 | 67,509,472 | 21,687,639 | 10,776,742 | 2,418,331 |
| Net income (loss) from operations | 14,236,340 | (3,280,686) | (2,188,333) | 4,974,771 | (14,432,527) | (4,704,759) | (476,272) |
| Total other income (expense) | (1,253,156) | (212,529) | (453,687) | (10,631,815) | (6,437,007) | (1,151,415) | 31,007 |
| Net income (loss) before income taxes | 12,983,184 | (3,493,215) | (2,642,020) | (5,657,044) | (20,869,534) | (5,856,174) | (445,265) |
| Income tax benefit (expense) | — | — | 435,000 | (698,303) | (698,303) | 698,303 | — |
| Net income (loss) | $ 12,983,184 | $ (3,493,215) | $(2,207,020) | $ (6,355,347) | $(21,567,837) | $ (5,157,871) | $ (445,265) |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Non-GAAP Financial Data:** | | | | | | |
| Adjusted EBITDA[1] | $ 14,654,450 | — | — | $ 14,394,924 | — | — | — |
| Adjusted EBITDA Margin[1] | 11.92% | — | — | 3.91% | — | — | — |

———————

(1)    See "— Non-GAAP Financial Measures below" for a full reconciliation.

---

12

Table of Contents

| Balance Sheet Data | As of March 31, | | As of December 31, | | |
|---|---|---|---|---|---|
| | 2021 (Pro Forma) | 2021 (Actual) | 2020 (Pro Forma) | 2020 (Actual) | 2019 (As Restated) |
| | (unaudited) | (unaudited) | (unaudited) | | |
| Cash and cash equivalents | $ 40,077,497 | $ 1,309,374 | $ 42,830,663 | $ 934,729 | $ 471,308 |
| Restricted cash | 7,068,120 | 10,094,932 | 5,791,818 | 8,977,187 | — |
| Total current assets | 87,356,435 | 19,505,030 | 88,464,745 | 18,240,121 | 4,494,402 |
| Total assets | 319,673,100 | 29,312,248 | 345,481,001 | 26,216,930 | 13,906,863 |
| Total current liabilities | 78,877,820 | 39,306,778 | 72,072,026 | 35,694,976 | 14,125,228 |
| Total liabilities | 136,838,638 | 44,656,219 | 131,670,085 | 39,532,699 | 17,985,080 |
| Total stockholders' equity (deficit) | 182,834,462 | (15,343,971) | 213,810,915 | (13,315,769) | (4,078,217) |
| Total liabilities and stockholders' equity (deficit) | $ 319,673,100 | $ 29,312,248 | $ 345,481,001 | $ 26,216,930 | $ 13,906,863 |

**Appliances Connection**

| Statements of Operations Data | Three Months Ended March 31, | | Years Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2020 | 2019 |
| | (unaudited) | (unaudited) | | |
| Net sales | $ 109,260,089 | $ 57,074,441 | $ 312,608,528 | $ 219,333,461 |
| Cost of sales | 79,723,604 | 46,025,053 | 247,379,397 | 176,771,632 |
| Gross profit | 29,536,485 | 11,049,388 | 65,229,131 | 42,561,829 |
| Total operating expenses | 12,019,459 | 7,352,502 | 45,821,833 | 33,055,976 |
| Income from operations | 17,517,026 | 3,696,886 | 19,407,298 | 9,505,853 |
| Total other income (expense) | 2,031,198 | 232,225 | 672,441 | 1,632,743 |
| Net income | $ 19,548,224 | $ 3,929,111 | $ 20,079,739 | $ 11,138,596 |

| Balance Sheet Data | As of March 31, 2021 | As of December 31, | |
|---|---|---|---|
| | | 2020 | 2019 |
| | (unaudited) | | |
| Cash and cash equivalents | $ 23,668,538 | $ 14,842,912 | $ 5,912,043 |
| Total current assets | 92,258,164 | 78,190,386 | 53,514,272 |
| Total assets | 98,549,842 | 84,979,244 | 61,195,270 |
| Total current liabilities | 37,605,631 | 32,040,390 | 20,181,242 |
| Total liabilities | 42,125,076 | 38,872,755 | 25,530,704 |
| Owners' capital | 56,424,766 | 46,106,489 | 35,664,566 |
| Total liabilities and owners' equity | $ 98,549,842 | $ 84,979,244 | $ 61,195,270 |

Table of Contents

**Quarterly Revenue Information**

The following table sets forth quarterly revenue information for Goedeker, Appliances Connection and the combined company (on a pro forma basis) for 2020 and 2021. Appliances Connection has not historically prepared quarterly financial statements. Management has prepared the following information from their sales records and believe they present a reasonable estimate of results for the periods shown.

(all amounts, other than percentages, in millions of U.S. dollars)

| | Goedeker | Appliances Connection | Combined Company | % of Total For Year |
|---|---|---|---|---|
| March 31, 2020 | $ 9.7 | $ 57.1 | $ 66.8 | 18.17% |
| June 30, 2020 | 15.3 | 76.2 | 91.5 | 24.88% |
| September 30, 2020 | 13.4 | 88.7 | 102.1 | 27.77% |
| December 31, 2020 | 16.7 | 90.6 | 107.3 | 29.18% |
| Year Ended December 31, 2020 | $ 55.1 | $ 312.6 | $ 367.7 | 100.0% |
| March 31, 2021 | $ 13.7 | $ 109.3 | $ 123.0 | |

As the chart illustrates, revenue for the combined company grew rapidly during the year ended 2020, a trend which continued into the first quarter of 2021.

**Non-GAAP Financial Measures**

We believe the non-GAAP financial measures presented in this prospectus will help investors understand the financial condition and operating results of the combined company and assess our future prospects. We believe these non-GAAP financial measures, each of which is discussed in greater detail below, are important supplemental measures because they exclude unusual or non-recurring items as well as non-cash items that are unrelated to or may not be indicative of our ongoing operating results. Further, when read in conjunction with GAAP results, these non-GAAP financial measures provide a baseline for analyzing trends in our underlying businesses and can be used by management as a tool to help make financial, operational and planning decisions. Finally, these measures are often used by analysts and other interested parties to evaluate companies in our industry by providing more comparable measures that are less affected by factors such as capital structure.

We recognize that these non-GAAP financial measures have limitations, including that they may be calculated differently by other companies or may be used under different circumstances or for different purposes, thereby affecting their comparability from company to company. In order to compensate for these and the other limitations discussed below, management does not consider these measures in isolation from or as alternatives to the comparable financial measures determined in accordance with GAAP. Readers should review the reconciliations below and should not rely on any single financial measure to evaluate our business.

The non-GAAP financial measures used in this prospectus include Adjusted EBITDA and Adjusted EBITDA Margin. We define Adjusted EBITDA as net loss before income taxes, depreciation and amortization, financing costs, interest expense, sales tax accrual and one-time non-operational events. Adjusted EBITDA Margin is calculated by dividing Adjusted EBITDA by revenue. Adjusted EBITDA and Adjusted EBITDA Margin are not measures calculated in accordance with GAAP, and they should not be considered an alternative to any financial measures that were calculated under U.S. GAAP. Adjusted EBITDA and Adjusted EBITDA Margin are used to facilitate a comparison of the ordinary, ongoing and customary course of the operations of the combined company on a consistent basis from period to period and provide an additional understanding of factors and trends affecting the business of the combined company. Adjusted EBITDA and Adjusted EBITDA Margin may not be comparable to similarly titled non-GAAP measures used by other companies as other companies may have calculated the measures differently.

14

Table of Contents

The reconciliation of Adjusted EBITDA to net loss for the combined company (on a pro forma basis) is provided below:

| | Three Months Ended March 31, 2021 | Year Ended December 31, 2020 |
|---|---:|---:|
| Net income (loss) | $ 12,983,184 | $ (6,355,347) |
| Income tax expense | — | 698,303 |
| Depreciation and amortization | 275,427 | 1,332,485 |
| Financing costs | — | 762,911 |
| Interest expense | 1,395,839 | 5,424,521 |
| Sales tax accrual | — | 7,700,378 |
| One-time non-operational events: | | |
| Loss on extinguishment of debt | — | 1,756,095 |
| Write-off of acquisition receivable | — | 809,000 |
| Adjustment in value of contingency | — | 138,922 |
| Change on fair value of warrant liability | — | 2,127,656 |
| Adjusted EBITDA | $ 14,654,450 | $ 14,394,924 |

15

Table of Contents

UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION

The unaudited pro forma combined financial information presented below sets forth the financial position and results of operations of Goedeker after giving effect to the proposed acquisition and this offering. The following unaudited pro forma combined financial statements give effect to the proposed acquisition and related transactions and were prepared in accordance with the regulations of the Securities and Exchange Commission, or the SEC.

The pro forma financial information is presented for informational purposes only and is not necessarily indicative of what the combined company's financial position actually would have been had the proposed acquisition been completed on the dates indicated or what the combined company's results of operations actually would have been had the proposed acquisition been completed as of the beginning of the periods indicated. In addition, the combined pro forma financial statements do not purport to project the future financial position or operating results of the combined company. The pro forma combined financial statements include adjustments for events that are (1) directly attributable to the proposed acquisition, (2) factually supportable, and (3) with respect to the statements of operations, expected to have a continuing impact on the combined results.

It should be noted that there have been no material transactions between Goedeker and Appliances Connection prior to and during the periods presented in the unaudited pro forma combined financial statements. In addition, these statements do not reflect any cost or growth synergies that the combined company may achieve as a result of the proposed acquisition, or the costs to combine the operations of Goedeker and Appliances Connection.

The pro forma financial information has been derived from and should be read in conjunction with the following:

(a)    The unaudited condensed consolidated financial statements and related notes of Goedeker for the three months ended March 31, 2021 and 2020 (which are included elsewhere in this prospectus);

(b)    The consolidated financial statements and related notes of Goedeker for the year ended December 31, 2020, for the period from January 1, 2019 through April 5, 2019 (Predecessor) and for the period from April 6, 2019 through December 31, 2019 (Successor) (which are included elsewhere in this prospectus);

(c)    The unaudited combined financial statements and related notes of Appliances Connection for the three months ended March 31, 2021 and 2020 (which are included elsewhere in this prospectus); and

(d)    The combined financial statements and related notes of Appliances Connection for the years ended December 31, 2020 and 2019 (which are included elsewhere in this prospectus).

16

Table of Contents

1847 GOEDEKER INC.
UNAUDITED PRO FORMA COMBINED BALANCE SHEET
AS OF MARCH 31, 2021

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current Assets | | | | | |
| Cash and cash equivalents | $ 1,309,374 | $ 23,668,538 | $ 189,600,000 | (a) | $ 40,077,497 |
| | | | (180,000,000) | (b) | |
| | | | 56,450,000 | (c) | |
| | | | (23,387,319) | (d) | |
| | | | (22,045,014) | (e) | |
| | | | (5,518,082) | (f) | |
| Restricted cash | 10,094,932 | — | (3,026,812) | (g) | 7,068,120 |
| Receivables | 948,354 | 15,810,245 | — | | 16,758,599 |
| Vendor deposits | 742,926 | 36,304,532 | (36,304,532) | (h) | 742,926 |
| Merchandise inventory, net | 5,883,484 | 15,194,247 | — | | 21,077,731 |
| Prepaid expenses and other current assets | 525,960 | 1,280,602 | (175,000) | (d) | 1,631,562 |
| Total Current Assets | 19,505,030 | 92,258,164 | (24,406,759) | | 87,356,435 |
| Property and equipment, net | 355,581 | 1,996,520 | — | | 2,352,101 |
| Operating lease right-of-use assets | 3,404,860 | 4,275,036 | — | | 7,679,896 |
| Goodwill | 4,725,689 | — | 216,217,769 | (i) | 220,943,458 |
| Intangible assets, net | 1,276,088 | — | — | | 1,276,088 |
| Other long-term assets | 45,000 | 20,122 | — | | 65,122 |
| TOTAL ASSETS | $ 29,312,248 | $ 98,549,842 | $ 191,811,010 | | $ 319,673,100 |
| | | | | | |
| **LIABILITIES, OWNERS' EQUITY AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Current Liabilities | | | | | |
| Accounts payable and accrued expenses | $ 12,356,822 | $ 25,313,287 | $ (18,082) | (f) | $ 37,652,027 |
| Customer deposits | 22,269,406 | 10,231,950 | | | 32,501,356 |
| Short term notes payable, net | 3,347,763 | — | (3,347,763) | (f) | — |
| Current portion of notes payable, net | 668,744 | 447,025 | (668,744) | (g) | 447,025 |
| Current portion of acquisition note payable | — | — | 6,000,000 | (c) | 6,000,000 |
| Current portion of financing lease liability | — | 64,912 | — | | 64,912 |
| Current portion of operating lease liabilities | 664,043 | 1,548,457 | — | | 2,212,500 |
| Total Current Liabilities | 39,306,778 | 37,605,631 | 1,965,411 | | 78,877,820 |
| Notes payable, net of current portion, net | 2,358,068 | 1,549,088 | (2,358,068) | (g) | 1,549,088 |
| Acquisition note payable, net of current potion | — | — | 50,450,000 | (c) | 50,450,000 |
| Financing lease liabilities, net of current portion | — | 152,220 | — | | 152,220 |
| Operating lease liabilities, net of current portion | 2,803,203 | 2,818,137 | — | | 5,621,340 |
| Contingent note payable | 188,170 | — | — | | 188,170 |
| TOTAL LIABILITIES | 44,656,219 | 42,125,076 | 50,057,343 | | 136,838,638 |
| Owners' Equity | — | 56,424,766 | (56,424,766) | (j) | — |
| Stockholders' Equity (Deficit) | | | | | |
| Preferred stock, $.0001 par value, 20,000,000 shares authorized; none issued and outstanding at March 31, 2021 | — | — | — | | — |

| | | | | | |
|---|---|---|---|---|---|
| Common stock, $.0001 par value, 200,000,000 shares authorized; 6,111,200 shares issued and outstanding as of March 31, 2021 (103,118,284 on a pro-forma basis) | 611 | — | 9,111 | (a) | 10,311 |
| | | | 233 | (k) | |
| | | | 356 | (k) | |

17

Table of Contents

1847 GOEDEKER INC.
UNAUDITED PRO FORMA COMBINED BALANCE SHEET — Continued
AS OF MARCH 31, 2021

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| Additional paid-in capital | 14,874,341 | — | 189,590,889 | (a) | 215,195,311 |
| | | | 4,246,432 | (k) | |
| | | | 6,483,649 | (k) | |
| Accumulated deficit | (30,218,923) | — | (2,152,237) | (f) | (32,371,160) |
| Total Owners' Equity, Stockholders' Equity (Deficit) | (15,343,971) | 56,424,766 | 141,753,667 | | 182,834,462 |
| TOTAL LIABILITIES, OWNERS' EQUITY AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 29,312,248 | $ 98,549,842 | $ 191,811,010 | | $ 319,673,100 |

18

Table of Contents

1847 GOEDEKER INC.
UNAUDITED PRO FORMA COMBINED STATEMENT OF OPERATIONS
THREE MONTHS ENDED MARCH 31, 2021

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| Product sales, net | $ 13,697,368 | $ 109,260,089 | $ — | | $ 122,957,457 |
| Cost of goods sold | 11,068,911 | 79,723,604 | — | | 90,792,515 |
| Gross Profit | 2,628,457 | 29,536,485 | — | | 32,164,942 |
| Operating Expenses | | | | | |
| Personnel | 1,931,324 | 4,426,724 | — | | 6,358,048 |
| Advertising | 1,083,248 | 2,269,449 | — | | 3,352,697 |
| Bank and credit card fees | 532,742 | 1,863,628 | — | | 2,396,370 |
| Depreciation and amortization | 122,331 | 153,096 | — | | 275,427 |
| General and administrative | 2,239,498 | 3,306,562 | — | | 5,546,060 |
| Total Operating Expenses | 5,909,143 | 12,019,459 | — | | 17,928,602 |
| Income (Loss) From Operations | (3,280,686) | 17,517,026 | — | | 14,236,340 |
| Other Income (Expense) | | | | | |
| Interest income | 10,096 | 223,092 | (223,092) | (l) | 10,096 |
| Interest expense | (232,831) | (186,745) | (1,002,500) | (m) | (1,395,839) |
| | | | 26,237 | (n) | |
| Other income | 10,206 | 1,994,851 | (1,872,470) | (o) | 132,587 |
| Total Other Income (Expense) | (212,529) | 2,031,198 | (3,071,825) | | (1,253,156) |
| Net Income (Loss) | $ (3,493,215) | $ 19,548,224 | $ (3,071,825) | * | $ 12,983,184 |
| | | | | | |
| Income (Loss) Per Common Share – Basic and Diluted | $ (0.57) | | | | $ 0.13 |
| Weighted-Average Number of Common Shares Outstanding – Basic and Diluted | 6,111,200 | | | | 103,118,284 |

---

\* We determined that there is no tax effect in the acquisition. Taxable income, if any, would be offset by our available net loss carryforwards.

[Table of Contents](#)

**1847 GOEDEKER INC.**
**UNAUDITED PRO FORMA COMBINED STATEMENT OF OPERATIONS**
**YEAR ENDED DECEMBER 31, 2020**

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| Product sales, net | $ 55,133,653 | $ 312,608,528 | $ — | | $ 367,742,181 |
| Cost of goods sold | 47,878,541 | 247,379,397 | — | | 295,257,938 |
| Gross Profit | 7,255,112 | 65,229,131 | — | | 72,484,243 |
| Operating Expenses | | | | | |
| Personnel | 6,565,380 | 13,563,628 | — | | 20,129,008 |
| Advertising | 4,865,361 | 9,164,242 | — | | 14,029,603 |
| Bank and credit card fees | 1,806,620 | 12,361,428 | — | | 14,168,048 |
| Depreciation and amortization | 549,712 | 782,773 | — | | 1,332,485 |
| General and administrative | 7,900,566 | 9,949,762 | — | | 17,850,328 |
| Total Operating Expenses | 21,687,639 | 45,821,833 | — | | 67,509,472 |
| Income (Loss) From Operations | (14,432,527) | 19,407,298 | — | | 4,974,771 |
| Other Income (Expense) | | | | | |
| Interest income | 2,479 | 977,249 | (977,249) | (p) | 2,479 |
| Financing costs | (762,911) | — | — | | (762,911) |
| Interest expense | (870,847) | (663,674) | (4,010,000) | (q) | (5,424,521) |
| | | | 120,000 | (r) | |
| Loss on extinguishment of debt | (1,756,095) | — | — | | (1,756,095) |
| Write-off of acquisition receivable | (809,000) | — | — | | (809,000) |
| Adjustment in value of contingency | (138,922) | — | — | | (138,922) |
| Change on fair value of warrant liability | (2,127,656) | — | — | | (2,127,656) |
| Other income | 25,945 | 358,866 | — | | 384,811 |
| Total Other Income (Expense) | (6,437,007) | 672,441 | (4,867,249) | | (10,631,815) |
| Net Income (Loss) Before Income Taxes | (20,869,534) | 20,079,739 | (4,867,249) | | (5,237,044) |
| Income tax expense | (698,303) | — | * | | (698,303) |
| Net Income (Loss) | $ (21,567,837) | $ 20,079,739 | $ (4,867,249) | | $ (6,355,347) |
| | | | | | |
| Income (Loss) Per Common Share – Basic and Diluted | $ (3.95) | | | | $ (0.06) |
| Weighted-Average Number of Common Shares Outstanding – Basic and Diluted | 5,463,603 | | | | 102,470,687 |

———————

\* We determined that there is no tax effect in the acquisition. Taxable income, if any, would be offset by our available net loss carryforwards.

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 1 — DESCRIPTION OF THE TRANSACTIONS

On October 20, 2020, we entered into the purchase agreement, which was amended on December 8, 2020 and April 6, 2021, to acquire Appliances Connection. Pursuant to the purchase agreement, ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $222,000,000, subject to adjustment. The purchase price consists of (i) $180,000,000 in cash (subject to adjustment), (ii) 2,333,333 shares of our common stock having a stated value that is equal to $21,000,000, and (iii) 3,562,640 shares of our common stock, which is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the proposed acquisition.

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the sellers shall deliver to ACI at least one day prior to the closing of the proposed acquisition a statement setting forth their good faith estimate of the net working capital of Appliances Connection (which excludes accruals for sales tax liabilities). If such estimated net working capital exceeds a target net working capital of ($15,476,941), then within five (5) days ACI shall make a cash payment to the sellers that is equal to such excess. If such target net working capital exceeds such estimated net working capital, then either (i) if finally determined at the closing, the cash portion of the purchase price shall be decreased by such excess or (ii) within 5 days of the closing, the sellers shall make a cash payment to ACI that is equal to such excess.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the proposed acquisition, ACI shall deliver to the sellers a statement setting forth its calculation of the net working capital. If such net working capital exceeds the estimated net working capital referred to above, then within five (5) days after the final determination of such net working capital ACI shall send payment by wire transfer of immediately available funds to the sellers in an amount equal to such excess. If the estimated net working capital exceeds such net working capital, then within five (5) days the sellers shall pay to ACI in cash an amount equal to such excess.

The cash portion of the purchase price will also be (i) decreased by (A) the amount of any outstanding unpaid indebtedness of Appliances Connection (other than trade debt) existing as of the closing date and (B) any transaction expenses, and (ii) increased by the amount of cash or cash equivalents held by, or on the books of, Appliances Connection as of the closing date, if any, that is in excess of $850,000.

Upon execution of the purchase agreement, ACI paid a deposit in the amount of $100,000, and upon execution of the first amendment to the purchase agreement, ACI paid an additional deposit in the amount of $75,000, all of which will be credited towards the cash portion of the purchase price at closing.

We intend to pay the cash portion of the purchase price for the proposed acquisition with (i) the proceeds from this offering and (ii) the proceeds of a term loan from a commercial bank. We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million.

21

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 2 — BASIS OF PRO FORMA PRESENTATION

The unaudited pro forma combined balance sheet as of March 31, 2021 combines the historical unaudited condensed consolidated balance sheet of Goedeker with the historical unaudited condensed combined balance sheet of Appliances Connection and was prepared as if the proposed acquisition had occurred on March 31, 2021.

The unaudited pro forma combined statement of operations for the three months ended March 31, 2021 combines the historical unaudited condensed consolidated statement of operations of Goedeker with the historical unaudited condensed combined statement of operations of Appliances Connection and was prepared as if the proposed acquisition had occurred on January 1, 2021.

The unaudited pro forma combined statement of operations for the year ended December 31, 2020 combines the historical unaudited condensed consolidated statement of operations of Goedeker with the historical unaudited condensed combined statement of operations of Appliances Connection and was prepared as if the proposed acquisition had occurred on January 1, 2020.

The historical financial information is adjusted in the unaudited pro forma combined financial information to give effect to pro forma events that are (1) directly attributable to the proposed acquisition, (2) factually supportable, and (3) with respect to the combined statement of operations, expected to have a continuing impact on the combined results.

We accounted for the proposed acquisition in the unaudited pro forma combined financial information using the acquisition method of accounting in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 805 "Business Combinations", or ASC 805. In accordance with ASC 805, we used our best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date. Goodwill of Appliances Connection is measured as the excess of the purchase consideration over the fair value of the net tangible assets and identifiable assets acquired. The preliminary fair value of the net assets to be acquired is $(3,442,085). The excess of the aggregate estimated fair value of the net tangible assets, $216,217,769, has been allocated to provisional goodwill.

The pro forma adjustments described below were developed based on management's assumptions and estimates, including assumptions relating to the consideration paid and the allocation thereof to the assets acquired and liabilities assumed from Appliances Connection based on preliminary estimates to fair value. The final purchase consideration and allocation of the purchase consideration will differ from that reflected in the unaudited pro forma combined financial information after the final valuation procedures are performed and the amounts are finalized.

The unaudited pro forma combined financial information is provided for illustrative purposes only and does not purport to represent what the actual consolidated results of operations or the consolidated financial position of the combined company would have been had the acquisition occurred on the dates assumed, nor are the necessarily indicative of future consolidated results of operations or financial position.

We expect to incur costs and realize benefits associated with integrating the operations of Goedeker and Appliances Connection. The unaudited pro forma combined financial statements do not reflect the costs of any integration activities or any benefits that may result from operating efficiencies or revenue synergies. The unaudited pro forma combined statement of operations does not reflect any non-recurring charges directly related to the proposed acquisition that the combined company may incur upon completion of the proposed acquisition.

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 3 — PURCHASE PRICE ALLOCATION

The table below represents the estimated preliminary purchase price allocation to the net assets acquired based on their estimated fair values, as well as the associated estimated useful lives of the acquired intangible assets. Such amounts were estimated using the most recent balance sheet of Appliances Connection as of March 31, 2021. Upon closing of the proposed acquisition, final valuations will be performed, whereby increases or decreases in the fair value of relevant balance sheet accounts will result in adjustments, which may result in material differences from the information presented herein.

| Provisional purchase consideration at preliminary fair value: | | |
|---|---|---|
| Cash consideration | $ | 180,000,000 |
| Share issuance | | 10,730,670 |
| Working capital adjustment paid to sellers | | 22,045,014 |
| Amount of consideration (excluding potential gross-up): | $ | 212,775,684 |
| | | |
| Assets acquired and liabilities assumed at preliminary fair value | | |
| Cash | $ | 106,219 |
| Accounts receivable | | 15,810,245 |
| Inventories | | 15,194,247 |
| Other assets | | 1,300,724 |
| Property and equipment | | 1,996,520 |
| Operating lease right-of-use asset | | 4,275,036 |
| Accounts payable and accrued expenses | | (25,313,287) |
| Customer deposits | | (10,231,950) |
| Current portion of notes payable | | (447,025) |
| Long term portion of notes payable | | (1,549,088) |
| Current portion of operating and finance lease liabilities | | (1,613,369) |
| Operating and finance lease liabilities, net of current portions | | (2,970,357) |
| Net tangible assets acquired | $ | (3,442,085) |
| | | |
| Total net assets acquired | $ | (3,442,085) |
| Consideration paid | | 212,775,684 |
| Preliminary goodwill | $ | 216,217,769 |
| | | |
| Estimated working capital adjustment: | | |
| Working capital on preliminary statement | $ | 6,568,073 |
| Target working capital | | (15,476,941) |
| Net estimated working capital adjustment | $ | (22,045,014) |

23

Table of Contents

1847 GOEDEKER INC.
NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 4 — PRO FORMA ADJUSTMENTS

The pro forma adjustments included in the unaudited pro forma condensed combined financial statements are as follows:

| | | | |
|---|---|---|---|
| (a) | Net proceeds from offering as follows: | | |
| | Sale of 91,111,111 units at $2.25 | $ | 205,000,000 |
| | Underwriting discount | | (14,350,000) |
| | Estimated cash expenses | | (1,050,000) |
| | Net proceeds | $ | 189,600,000 |
| (b) | Disbursed to sellers in cash | $ | 180,000,000 |
| (c) | Proceeds of acquisition note payable (term loan), net of a $1,450,000 discount and $2,100,000 placement agent fee | $ | 56,450,000 |
| (d) | Pay sellers' for cash, net of (i) $175,000 deposit paid at signing of purchase agreement, (ii) long-term debt of $1,549,088, and (iii) cash threshold of $850,000 | $ | 23,387,319 |
| (e) | Estimated working capital adjustment paid to sellers | $ | 22,045,014 |
| (f) | Payoff short-term note payable and accrued interest and write-off of unamortized debt discount and warrant expenses | $ | 5,518,082 |
| (g) | Payoff of debt in accordance with terms of acquisition note payable | $ | 3,026,812 |
| (h) | Appliances Connection vendor deposits not acquired in transaction | $ | 36,304,532 |
| (i) | Preliminary goodwill as the difference between consideration paid and net assets acquired | $ | 218,753,038 |
| (j) | Members' equity eliminated in consolidation | $ | 56,424,766 |
| (k) | Shares issued to sellers (based on the assumed fair value of stock of $1.82) | | |
| | 2,333,333 at fixed price of $9.00 per share | $ | 4,246,665 |
| | 3,562,640 at the average price of $5.8945 for the 20 trading days ended May 26, 2021 | $ | 6,484,005 |
| (l) | Eliminate interest income earned on vendor deposits that do not transfer to the combined company for the three months ended March 31, 2021 | $ | 223,092 |
| (m) | Interest expense and amortization of loan discount on acquisition note payable for the three months ended March 31, 2021 | $ | 1,002,500 |
| (n) | Estimated reduction in interest expense on loans paid off in accordance with terms of acquisition note payable for the three months ended March 31, 2021 | $ | 26,237 |
| (o) | Eliminate forgiveness of PPP loans | $ | 1,872,470 |
| (p) | Eliminate interest income earned on vendor deposits that do not transfer to the combined company for the year ended December 31, 2020 | $ | 977,249 |

| (q) | Interest expense and amortization of loan discount on acquisition note payable for the year ended December 31, 2020 | $ | 4,010,000 |
|-----|-----|-----|-----|
| (r) | Estimated reduction in interest expense on loans paid off in accordance with terms of acquisition note payable for the year ended December 31, 2020 | $ | 120,000 |

24

Table of Contents

**RISK FACTORS**

*An investment in our securities involves a high degree of risk. You should carefully consider the following risk factors, together with the other information contained in this prospectus, before purchasing our securities. We have listed below (not necessarily in order of importance or probability of occurrence) what we believe to be the most significant risk factors applicable to the proposed acquisition and the combined company, but they do not constitute all of the risks that may be applicable. Any of the following factors could harm our business, financial condition, results of operations or prospects, and could result in a partial or complete loss of your investment. Some statements in this prospectus, including statements in the following risk factors, constitute forward-looking statements. Please refer to the section titled "Cautionary Statement Regarding Forward-Looking Statements." For purposes of this "Risk Factors" section, references to "we," "us," "our" or "our company" are to the combined company resulting from the proposed acquisition unless the context requires otherwise.*

**Risks Related to the Proposed Acquisition**

***The proposed acquisition is subject to a number of conditions, and may not close at all, in which case this offering will not be consummated.***

The purchase agreement contains a number of conditions that must be fulfilled to complete the proposed acquisition, including, without limitation: the receipt of all authorizations, consents, permits, licenses or approvals of all governmental authorities or other third parties; the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended; the absence of any temporary, preliminary or permanent restraining order preventing the consummation of the proposed acquisition; the release of any security interests related to Appliances Connection; the execution of new leases for certain properties; the execution of certain employment agreements between certain officers of Appliances Connection and ACI; the receipt of an opinion of the sellers' counsel; and the receipt of documents required for the transfer of the securities of Appliances Connection to ACI. In addition, ACI shall have obtained on terms and conditions reasonably satisfactory to it all of the financing necessary to pay the cash portion of the purchase price and pay related fees and expenses to consummate the proposed acquisition and provide reasonably adequate working capital for the combined company after the closing, which includes the term loan in the expected principal amount of $60 million to pay a portion of the cash portion of the purchase price for the proposed acquisition.

The required satisfaction of the foregoing conditions could delay the completion of the proposed acquisition for a significant period of time or prevent it from occurring. Any delay in completing the proposed acquisition could cause our company not to realize some or all of the benefits that the parties expect our company to achieve. Further, there can be no assurance that the conditions to the closing of the proposed acquisition will be satisfied or waived or that the proposed acquisition will be completed. The completion of this offering is contingent upon the completion of the proposed acquisition. We can provide no assurance that the proposed acquisition will be consummated in a timely manner, or at all. If the proposed acquisition is not completed, then this offering will not be consummated.

***If the benefits of the proposed acquisition do not meet the expectations of investors, stockholders or financial analysts, the market price of our securities may decline.***

If the benefits of the proposed acquisition do not meet the expectations of investors or securities analysts, the market price of our securities prior to the closing of the proposed acquisition may decline. The market values of our securities at the time of the proposed acquisition may vary significantly from their prices on the date the acquisition target was identified.

In addition, broad market and industry factors may materially harm the market price of our securities irrespective of our operating performance. The stock market in general has experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A loss of investor confidence in the market for retail stocks or the stocks of other companies which investors perceive to be similar to us could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price of our securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

25

Table of Contents

***Failure or delay to complete the proposed acquisition could negatively impact our business, financial condition, results of operations or stock price.***

Completion of the proposed acquisition is conditioned upon the satisfaction of certain closing conditions, including those discussed above, and other closing conditions customary for a transaction of this size and type. The required conditions to closing may not be satisfied in a timely manner, if at all. If the proposed acquisition is not consummated for these or any other reasons, we may be subject to a number of adverse effects, including:

- the price of our securities may decline to the extent that the current market price reflects a market assumption that the proposed acquisition will be completed;

- our operations may continue to incur loss; and

- costs related to the proposed acquisition, such as legal, accounting, financial advisory and printing fees, must be paid even if the proposed acquisition is not completed.

Furthermore, if the proposed acquisition is not completed, there can be no assurance that we will be able to find another target business on terms as favorable as those of the proposed acquisition.

***The integration of Appliances Connection with Goedeker may not be as successful as anticipated.***

The proposed acquisition of Appliances Connection, a company that is significantly larger than Goedeker, involves numerous operational, strategic, financial, accounting, legal, tax and other risks; potential liabilities associated with the acquired business; and uncertainties related to design, operation and integration of Appliances Connection's internal control over financial reporting. Difficulties in integrating Appliances Connection with Goedeker may result in the combined company performing differently than expected, in operational challenges or in the failure to realize anticipated expense-related efficiencies. Goedeker's and Appliances Connection's existing businesses could also be negatively impacted by the proposed acquisition. Potential difficulties that may be encountered in the integration process include, among other factors:

- the inability to successfully integrate the business of Appliances Connection with Goedeker in a manner that permits the combined company to achieve the full revenue and cost savings anticipated from the proposed acquisition;

- complexities associated with managing the larger, more complex, integrated business;

- not realizing anticipated operating synergies or incurring unexpected costs to realize such synergies;

- integrating personnel from the two companies while maintaining focus on providing consistent, high-quality products and services;

- potential unknown liabilities and unforeseen expenses, delays or regulatory conditions associated with the proposed acquisition;

- loss of key employees and need to hire new employees to accommodate the larger business and expected growth of the combined company;

- integrating relationships with customers, vendors and business partners;

- performance shortfalls at one or both of the companies as a result of the diversion of management's attention caused by completing the proposed acquisition and integrating Appliances Connection's operations with Goedeker; and

- the disruption of, or the loss of momentum in each, company's ongoing business or inconsistencies in standards, controls, procedures and policies.

***We have incurred and expect to continue to incur substantial transaction-related costs in connection with the proposed acquisition.***

We have incurred, and expect to continue to incur, a number of non-recurring transaction-related costs associated with completing the proposed acquisition. These fees and costs have been, and will continue to be, substantial. Non-recurring transaction costs include, but are not limited to, fees paid to legal, financial and accounting advisors, filing fees and printing costs. Additional unanticipated costs may be incurred, which may be higher than expected and could have a material adverse effect on the combined company financial condition and operating results.

26

Table of Contents

***Our future results following proposed acquisition may differ materially from the unaudited pro forma financial information included in this prospectus.***

The unaudited pro forma financial information contained in this prospectus is presented for purposes of presenting our historical consolidated financial statements with the historical combined financial statements of Appliances Connection, as adjusted to give effect to the proposed acquisition, and is not necessarily indicative of the financial condition or results of operations of the business following the proposed acquisition. The assumptions used in preparing the pro forma financial information may not prove to be accurate, and other factors may affect our financial condition and results of operations following the proposed acquisition. Any change in our financial condition or results of operations may cause significant variations in the price of our securities.

***As a result of the proposed acquisition, our company may have undisclosed liabilities and any such liabilities could harm our revenues, business, prospects, financial condition and results of operations.***

The due diligence process that we conducted on Appliances Connection may not reveal all material liabilities of Appliances Connection currently existing or which may be asserted in the future against our company relating to its activities before the consummation of the proposed acquisition transaction. There can be no assurance that our company will not have any liabilities in connection with the closing of the proposed acquisition that we are unaware of or that we will be successful in enforcing any indemnification provisions or that such indemnification provisions will be adequate to reimburse us. Any such liabilities of Appliances Connection that survive the proposed acquisition could harm our revenues, business, prospects, financial condition and results of operations.

**Risks Related to the Business and Industry of the Combined Company**

***The COVID-19 pandemic may cause a material adverse effect on our business.***

The COVID-19 pandemic continues to rapidly evolve. At this time, there continues to be significant volatility and uncertainty relating to the full extent to which the COVID-19 pandemic and the various responses to it will impact our business, operations and financial results.

Most states and cities have at various times instituted quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, Goedeker's showroom was closed from April through June of 2020, but its call center and warehouse continued to operate. Appliances Connection's retail facilities and warehouse were deemed essential businesses that were not subject to restrictions in New York and New Jersey, so they remained open and continued to operate. Since over 95% of Goedeker's sales are completed online and its call center and warehouse and distribution operations continued to operate, and Appliances Connection continued to operate, the restrictions put in place have not had a materially negative impact on our operations. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facilities or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

In addition, we are dependent upon suppliers to provide us with all of the products that we sell. We source, and sell products from domestic and international vendors, and their ability to reliably and efficiently fulfill our orders is critical to our business success. The COVID-19 pandemic has impacted and may continue to impact suppliers and manufacturers of certain of our products. As a result, we have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect our business and financial results. For example, late in the second quarter of 2020 and through the remainder of 2020, Goedeker experienced delays in getting products from manufacturers whose production facilities were closed or operating at reduced capacity because of the COVID-19 pandemic, which resulted in some cancellations of customer orders. We estimate that cancellations caused by shipping delays approximated $39.7 million in the year ended December 31, 2020, based on the historical ratio of shipped sales to customer orders of approximately 79% to the actual ratio of approximately 45% in the year ended December 31, 2020. Even if we are able to find alternate sources for such products, they may cost more, which could adversely impact our profitability and financial condition.

Table of Contents

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact our business and demand for our products. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on our revenue.

The spread of COVID-19 has also adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce our ability to access capital in the future, which could negatively affect our liquidity.

If the COVID-19 pandemic does not continue to slow and the spread of COVID-19 is not contained, our business operations, including those of our suppliers, could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require us to make further adjustments to our operations in order to comply with any such restrictions. We may also experience limitations in employee resources. In addition, our operations could be disrupted if any of our employees were suspected of having COVID-19, which could require quarantine of some or all such employees or closure of our facilities for disinfection. We may also delay or reduce certain capital spending and related projects until the travel and logistical impacts of the pandemic are lifted, which will delay the completion of such projects. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect our ability to operate our business and result in additional costs.

The extent to which the COVID-19 pandemic may impact our results will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including the effectiveness of vaccines and other treatments for COVID-19, and other new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to our performance, financial condition, results of operations and cash flows.

To the extent the COVID-19 pandemic adversely affects our business and financial results, it may also have the effect of heightening many of the other risks described in this "Risk Factors" section.

***If we fail to acquire new customers or retain existing customers, or fail to do so in a cost-effective manner, our net revenue may decrease, and our business, financial condition and operating results may be materially adversely affected.***

Our success depends on our ability to acquire and retain customers in a cost-effective manner. In order to expand our customer base, we must appeal to and acquire customers who have historically used other means of commerce to purchase home goods and may prefer alternatives to our offerings, such as the websites of our competitors or our suppliers' own websites. We have made significant investments related to customer acquisition and expect to continue to spend significant amounts to acquire additional customers. Goedeker's advertising efforts consist primarily of email marketing, affiliate marketing, and to a lesser extent, social media. Appliances Connection's advertising efforts including online advertisements and promotions, digital marketing, and to a lesser degree, more traditional forms of marketing like television and radio advertisements in the New York City media market. These efforts are expensive and may not result in the cost-effective acquisition of customers. We cannot assure you that the net profit from new customers we acquire will ultimately exceed the cost of acquiring those customers. If we fail to deliver a quality shopping experience, or if consumers do not perceive the products we offer to be of high value and quality, we may not be able to acquire new customers. If we are unable to acquire new customers who purchase products in numbers sufficient to grow our business, we may not be able to generate the scale necessary to drive beneficial network effects with our suppliers or efficiencies in our logistics network, our net revenue may decrease, and our business, financial condition and operating results may be materially adversely affected.

We believe that many of our new customers originate from word-of-mouth and other non-paid referrals from existing customers. Therefore, we must ensure that our existing customers remain loyal to us in order to continue receiving those referrals. If our efforts to satisfy our existing customers are not successful, we may not be able to acquire new customers in sufficient numbers to continue to grow our business, or we may be required to incur significantly higher marketing expenses in order to acquire new customers.

28

Table of Contents

***Our success depends in part on our ability to increase our net revenue per active customer. If our efforts to increase customer loyalty and repeat purchasing as well as maintain high levels of customer engagement are not successful, our growth prospects and revenue will be materially adversely affected.***

Our ability to grow our business depends on our ability to retain our existing customer base and generate increased revenue and repeat purchases from this customer base, and maintain high levels of customer engagement. To do this, we must continue to provide our customers and potential customers with a unified, convenient, efficient and differentiated shopping experience by:

- providing imagery, tools and technology that attract customers who historically would have bought elsewhere;

- maintaining a high-quality and diverse portfolio of products;

- delivering products on time and without damage; and

- maintaining and further developing our online platforms.

If we fail to increase net revenue per active customer, generate repeat purchases or maintain high levels of customer engagement, our growth prospects, operating results and financial condition could be materially adversely affected.

***Our business depends on our ability to build and maintain strong brands. We may not be able to maintain and enhance our brands if we receive unfavorable customer complaints, negative publicity or otherwise fail to live up to consumers' expectations, which could materially adversely affect our business, results of operations and growth prospects.***

Maintaining and enhancing our brands is critical to expanding our base of customers and suppliers. Our ability to maintain and enhance our brand depends largely on our ability to maintain customer confidence in our product and service offerings, including by delivering products on time and without damage. If customers do not have a satisfactory shopping experience, they may seek out alternative offerings from our competitors and may not return to our sites as often in the future, or at all. In addition, unfavorable publicity regarding, for example, our practices relating to privacy and data protection, product quality, delivery problems, competitive pressures, litigation or regulatory activity, could seriously harm our reputation. Such negative publicity also could have an adverse effect on the size, engagement, and loyalty of our customer base and result in decreased revenue, which could adversely affect our business and financial results. A significant portion of our customers' brand experience also depends on third parties outside of our control, including suppliers and logistics providers such as R+L Carriers, AM Home Delivery and other third-party delivery agents. If these third parties do not meet our or our customers' expectations, our brands may suffer irreparable damage.

In addition, maintaining and enhancing these brands may require us to make substantial investments, and these investments may not be successful. If we fail to promote and maintain our brands, or if we incur excessive expenses in this effort, our business, operating results and financial condition may be materially adversely affected. We anticipate that, as our market becomes increasingly competitive, maintaining and enhancing our brands may become increasingly difficult and expensive. Maintaining and enhancing our brands will depend largely on our ability to provide high quality products to our customers and a reliable, trustworthy and profitable sales channel to our suppliers, which we may not be able to do successfully.

Customer complaints or negative publicity about our sites, products, delivery times, customer data handling and security practices or customer support, especially on blogs, social media websites and our sites, could rapidly and severely diminish consumer use of our sites and consumer and supplier confidence in us and result in harm to our brands.

***Our efforts to expand our business into new brands, products, services, technologies, and geographic regions will subject us to additional business, legal, financial, and competitive risks and may not be successful.***

Our business success depends to some extent on our ability to expand our customer offerings by launching new brands and services and by expanding our existing offerings into new geographies. Launching new brands and services or expanding geographically requires significant upfront investments, including investments in marketing, information technology, and additional personnel. We may not be able to generate satisfactory revenue from these efforts to offset these costs. Any lack of market acceptance of our efforts to launch new brands and services or to expand our existing offerings could have a material adverse effect on our business, prospects, financial condition and results of operations.

Table of Contents

Further, as we continue to expand our fulfillment capability or add new businesses with different requirements, our logistics networks become increasingly complex and operating them becomes more challenging. There can be no assurance that we will be able to operate our networks effectively.

We have also entered and may continue to enter into new markets in which we have limited or no experience, which may not be successful or appealing to our customers. These activities may present new and difficult technological and logistical challenges, and resulting service disruptions, failures or other quality issues may cause customer dissatisfaction and harm our reputation and brand. Further, our current and potential competitors in new market segments may have greater brand recognition, financial resources, longer operating histories and larger customer bases than we do in these areas. As a result, we may not be successful enough in these newer areas to recoup our investments in them. If this occurs, our business, financial condition and operating results may be materially adversely affected.

***Risks associated with the suppliers from whom our products are sourced could materially adversely affect our financial performance as well as our reputation and brand.***

We depend on our ability to provide our customers with a wide range of products from qualified suppliers in a timely and efficient manner. Political and economic instability, the financial stability of suppliers, suppliers' ability to meet our standards, labor problems experienced by suppliers, the availability or cost of raw materials, merchandise quality issues, currency exchange rates, trade tariff developments, transport availability and cost, transport security, inflation, the COVID-19 pandemic and other factors relating to our suppliers are beyond our control.

Our agreements with most of our suppliers do not provide for the long-term availability of merchandise or the continuation of particular pricing practices, nor do they usually restrict such suppliers from selling products to other buyers. There can be no assurance that our current suppliers will continue to seek to sell us products on current terms or that we will be able to establish new or otherwise extend current supply relationships to ensure product acquisitions in a timely and efficient manner and on acceptable commercial terms. Our ability to develop and maintain relationships with reputable suppliers and offer high quality merchandise to our customers is critical to our success. If we are unable to develop and maintain relationships with suppliers that would allow us to offer a sufficient amount and variety of quality merchandise on acceptable commercial terms, our ability to satisfy our customers' needs, and therefore our long-term growth prospects, would be materially adversely affected.

Further, we rely on our suppliers' representations of product quality, safety and compliance with applicable laws and standards. If our suppliers or other vendors violate applicable laws, regulations or our supplier code of conduct, or implement practices regarded as unethical, unsafe, or hazardous to the environment, it could damage our reputation and negatively affect our operating results. Further, concerns regarding the safety and quality of products provided by our suppliers could cause our customers to avoid purchasing those products from us, or avoid purchasing products from us altogether, even if the basis for the concern is outside of our control. As such, any issue, or perceived issue, regarding the quality and safety of any items we sell, regardless of the cause, could adversely affect our brand, reputation, operations and financial results.

We also are unable to predict whether any of the countries in which our suppliers' products are currently manufactured or may be manufactured in the future will be subject to new, different, or additional trade restrictions imposed by the United States or foreign governments or the likelihood, type or effect of any such restrictions. Any event causing a disruption or delay of imports from suppliers with international manufacturing operations, including the imposition of additional import restrictions, restrictions on the transfer of funds or increased tariffs or quotas, could increase the cost or reduce the supply of merchandise available to our customers and materially adversely affect our financial performance as well as our reputation and brand. Furthermore, some or all of our suppliers' foreign operations may be adversely affected by political and financial instability, resulting in the disruption of trade from exporting countries, restrictions on the transfer of funds or other trade disruptions.

In addition, our business with foreign suppliers may be affected by changes in the value of the United States dollar relative to other foreign currencies. For example, any movement by any other foreign currency against the United States dollar may result in higher costs to us for those goods. Declines in foreign currencies and currency exchange rates might negatively affect the profitability and business prospects of one or more of our foreign suppliers. This, in turn, might cause such foreign suppliers to demand higher prices for merchandise in their effort to offset any lost profits associated with any currency devaluation, delay merchandise shipments, or discontinue selling to us altogether, any of which could ultimately reduce our sales or increase our costs.

Table of Contents

***Our suppliers have imposed conditions in our business arrangements with them. If we are unable to continue satisfying these conditions, or such suppliers impose additional restrictions with which we cannot comply, it could have a material adverse effect on our business, financial condition and operating results.***

Our suppliers have strict conditions for doing business with them. Several are sizeable such as General Electric, Whirlpool and DMI. If we cannot satisfy these conditions or if they impose additional or more restrictive conditions that we cannot satisfy, our business would be materially adversely affected. It would be materially detrimental to our business if these suppliers decided to no longer do business with us, increased the pricing at which they allow us to purchase their goods or impose other restrictions or conditions that make it more difficult for us to work with them. Any of these events could have a material adverse effect on our business, financial condition and operating results.

***Our dependence on one supplier for a substantial portion of our purchases makes us vulnerable to a disruption in the supply of its products.***

Goedeker relies on Whirlpool for a substantial portion of product purchases. For the years ended December 31, 2020 and 2019, approximately 38.0% and 44.1%, respectively, of its total purchases were from Whirlpool. As a result, any of the following could have a material adverse effect on our business, financial condition and results of operations:

- termination of the supply agreement;

- an adverse change in the financial condition of Whirlpool; or

- an adverse change in the Whirlpool's ability to manufacture and/or deliver desired products on a timely basis.

Our agreement with Whirlpool is terminable at will by either party upon short notice, so does not provide for the long-term availability of products, nor does it provide for the continuation of particular pricing practices. There can be no assurance that Whirlpool will continue to sell us products or that we will be able to establish new supply relationships to ensure similar product acquisitions in a timely and efficient manner and on acceptable commercial terms.

Successful performance of these supply agreement is critical to our success. If the supply relationship is affected adversely, we may be unable to replace quickly or effectively the products sold to us by Whirlpool. Significant disruptions could have a dramatic effect on our performance.

***We may be unable to source new suppliers or strengthen our relationships with current suppliers.***

Goedeker and Appliances Connection have relationships with over 240 and nearly 2,000 suppliers, respectively. Our agreements with suppliers are generally terminable at will by either party upon short notice. If we do not maintain our existing relationships or build new relationships with suppliers on acceptable commercial terms, we may not be able to maintain a broad selection of merchandise, and our business and prospects would suffer severely.

In order to attract quality suppliers, we must:

- demonstrate our ability to help our suppliers increase their sales;

- offer suppliers a high quality, cost-effective fulfillment process; and

- continue to provide suppliers with a dynamic and real-time view of our demand and inventory needs.

If we are unable to provide our suppliers with a compelling return on investment and an ability to increase their sales, we may be unable to maintain and/or expand our supplier network, which would negatively impact our business.

***We depend on our suppliers to perform certain services regarding the products that we offer.***

As part of offering our suppliers' products for sale on our sites, suppliers are often responsible for conducting a number of traditional retail operations with respect to their respective products, including maintaining inventory and preparing merchandise for shipment to our customers. In these instances, we may be unable to ensure that suppliers will perform these services to our or our customers' satisfaction in a manner that provides our customer with a unified brand experience or on commercially reasonable terms. If our customers become dissatisfied with the services provided by our suppliers, our business, reputation and brands could suffer.

31

Table of Contents

***If we fail to manage our growth effectively, our business, financial condition and operating results could be harmed.***

To manage our growth effectively, we must continue to implement our operational plans and strategies, improve and expand our infrastructure of people and information systems and expand, train and manage our employee base. We have rapidly increased employee headcount since our inception to support the growth in our business. To support continued growth, we must effectively integrate, develop and motivate a large number of new employees. We face significant competition for personnel. Failure to manage our hiring needs effectively or successfully integrate our new hires may have a material adverse effect on our business, financial condition and operating results.

Additionally, the growth of our business places significant demands on our operations, as well as our management and other employees. For example, we typically launch hundreds of promotional events across thousands of products each month on our sites via emails and personalized displays. These events require us to produce updates of our sites and emails to our customers on a daily basis with different products, photos and text. Any surge in online traffic and orders associated with such promotional activities places increased strain on our operations, including our logistics network, and may cause or exacerbate slowdowns or interruptions. The growth of our business may require significant additional resources to meet these daily requirements, which may not scale in a cost-effective manner or may negatively affect the quality of our sites and customer experience. We are also required to manage relationships with a growing number of suppliers, customers and other third parties. Our information technology systems and our internal controls and procedures may not be adequate to support future growth of our supplier and employee base. If we are unable to manage the growth of our organization effectively, our business, financial condition and operating results may be materially adversely affected.

***Our ability to obtain continued financing is critical to the growth of our business. We will need additional financing to fund operations, which additional financing may not be available on reasonable terms or at all.***

Our future growth, including the potential for future market expansion will require additional capital. We will consider raising additional funds through various financing sources, including the procurement of additional commercial debt financing. For example, completion of the proposed acquisition depends on us securing a term loan to pay a portion of the cash portion of the purchase price to acquire Appliances Connection. However, there can be no assurance that such funds will be available on commercially reasonable terms, if at all. If such financing is not available on satisfactory terms, we may be unable to execute our growth strategy, and operating results may be adversely affected. Any additional debt financing will increase expenses and must be repaid regardless of operating results and may involve restrictions limiting our operating flexibility.

Our ability to obtain financing may be impaired by such factors as the capital markets, both generally and specifically in our industry, which could impact the availability or cost of future financings. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, are not sufficient to satisfy our capital needs, we may be required to decrease the pace of, or eliminate, our future product offerings and market expansion opportunities and potentially curtail operations.

***Our third-party loans contain certain terms that could materially adversely affect our financial condition.***

We are party to third party loans that are secured by our assets. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources" and "— Recent Developments" for a description of these loans. The loan documents contain customary representations, warranties and affirmative and negative covenants. If an event of default were to occur under these loans, the lenders thereto may pursue all remedies available to them, including declaring the obligations under the loans immediately due and payable, which could materially adversely affect our financial condition.

***Our business is highly competitive. Competition presents an ongoing threat to the success of our business.***

Our business is rapidly evolving and intensely competitive, and we have many competitors in different industries. Our competition includes furniture stores, big box retailers, department stores, specialty retailers, and online retailers and marketplaces in the United States, including:

- *Furniture Stores:* Ashley Furniture, Bob's Discount Furniture, Havertys, Raymour & Flanagan and Rooms To Go

- *Big Box Retailers:* Bed Bath & Beyond, Home Depot, IKEA, Lowe's, Target, Best Buy and Walmart

Table of Contents

- *Department Stores:*   JCPenney and Macy's

- *Specialty Retailers:*   Crate and Barrel, Ethan Allen, TJX, At Home, Williams Sonoma, Restoration Hardware, Arhaus, Horchow, Room & Board and Mitchell Gold + Bob Williams

- *Online Retailers and Marketplaces:*   Amazon, Wayfair, Houzz and eBay

- *Other:*   AJ Madison and US Appliance

We expect competition in e-commerce generally to continue to increase. We believe that our ability to compete successfully depends upon many factors both within and beyond our control, including:

- the size and composition of our customer base;

- the number of suppliers and products we feature on our sites;

- our selling and marketing efforts;

- the quality, price and reliability of products we offer;

- the convenience of the shopping experience that we provide;

- our ability to distribute our products and manage our operations; and

- our reputation and brand strength.

Many of our current competitors have, and potential competitors may have, longer operating histories, greater brand recognition, larger fulfillment infrastructures, greater technical capabilities, faster and less costly shipping, significantly greater financial, marketing and other resources and larger customer bases than we do. These factors may allow our competitors to derive greater net revenue and profits from their existing customer base, acquire customers at lower costs or respond more quickly than we can to new or emerging technologies and changes in consumer habits. These competitors may engage in more extensive research and development efforts, undertake more far-reaching marketing campaigns and adopt more aggressive pricing policies, which may allow them to build larger customer bases or generate net revenue from their customer bases more effectively than we do.

***Our success depends, in substantial part, on our continued ability to market our products through search engines and social media platforms.***

The marketing of our products depends on our ability to cultivate and maintain cost-effective and otherwise satisfactory relationships with search engines and social media platforms, including those operated by Google, Facebook, Bing and Yahoo! These platforms could decide to change their terms and conditions of use at any time (and without notice) and/or significantly increase their fees. No assurances can be provided that we will be able to maintain cost-effective and otherwise satisfactory relationships with these platforms and our inability to do so in the case of one or more of these platforms could have a material adverse effect on our business, financial condition and results of operations.

We obtain a significant number of visits via search engines such as Google, Bing and Yahoo! Search engines frequently change the algorithms that determine the ranking and display of results of a user's search and may make other changes to the way results are displayed, which can negatively affect the placement of links and, therefore, reduce the number of visits to our website. The growing use of online ad-blocking software may also impact the success of our marketing efforts because we may reach a smaller audience and fail to bring more customers to our website, which could have a material adverse effect on our business, financial condition and results of operations.

***System interruptions that impair customer access to our sites or other performance failures or incidents involving our logistics network, our technology infrastructure or our critical technology partners could damage our business, reputation and brand and substantially harm our business and results of operations.***

The satisfactory performance, reliability and availability of our sites, transaction processing systems, logistics network, and technology infrastructure are critical to our reputation and our ability to acquire and retain customers, as well as maintain adequate customer service levels.

33

Table of Contents

For example, if one of our data centers fails or suffers an interruption or degradation of services, we could lose customer data and miss order fulfillment deadlines, which could harm our business. Our systems and operations, including our ability to fulfill customer orders through our logistics network, are also vulnerable to damage or interruption from inclement weather, fire, flood, power loss, telecommunications failure, terrorist attacks, labor disputes, cyber-attacks, data loss, acts of war, break-ins, earthquake and similar events. In the event of a data center failure, the failover to a back-up could take substantial time, during which time our sites could be completely shut down. Further, our back-up services may not effectively process spikes in demand, may process transactions more slowly and may not support all of our site's functionality.

We use complex proprietary software in our technology infrastructure, which we seek to continually update and improve. We may not always be successful in executing these upgrades and improvements, and the operation of our systems may be subject to failure. In particular, we have in the past and may in the future experience slowdowns or interruptions on some or all of our sites when we are updating them, and new technologies or infrastructures may not be fully integrated with existing systems on a timely basis, or at all. Additionally, if we expand our use of third-party services, including cloud-based services, our technology infrastructure may be subject to increased risk of slowdown or interruption as a result of integration with such services and/or failures by such third parties, which are out of our control. Our net revenue depends on the number of visitors who shop on our sites and the volume of orders we can handle. Unavailability of our sites or reduced order fulfillment performance would reduce the volume of goods sold and could also materially adversely affect consumer perception of our brand.

We may experience periodic system interruptions from time to time. In addition, continued growth in our transaction volume, as well as surges in online traffic and orders associated with promotional activities or seasonal trends in our business, place additional demands on our technology platform and could cause or exacerbate slowdowns or interruptions. If there is a substantial increase in the volume of traffic on our sites or the number of orders placed by customers, we may be required to further expand and upgrade our technology, logistics network, transaction processing systems and network infrastructure. There can be no assurance that we will be able to accurately project the rate or timing of increases, if any, in the use of our sites or expand and upgrade our systems and infrastructure to accommodate such increases on a timely basis. In order to remain competitive, we must continue to enhance and improve the responsiveness, functionality and features of our sites, which is particularly challenging given the rapid rate at which new technologies, customer preferences and expectations and industry standards and practices are evolving in the e-commerce industry. Accordingly, we redesign and enhance various functions on our sites on a regular basis, and we may experience instability and performance issues as a result of these changes.

Any slowdown, interruption or performance failure of our sites and the underlying technology and logistics infrastructure could harm our business, reputation and our ability to acquire, retain and serve our customers, which could materially adversely affect our results of operations.

***Our failure or the failure of third-party service providers to protect our sites, networks and systems against security breaches, or otherwise to protect our confidential information, could damage our reputation and brand and substantially harm our business and operating results.***

We collect, maintain, transmit and store data about our customers, employees, contractors, suppliers, vendors and others, including credit card information and personally identifiable information, as well as other confidential and proprietary information. We also employ third-party service providers that store, process and transmit certain proprietary, personal and confidential information on our behalf. We rely on encryption and authentication technology licensed from third parties in an effort to securely transmit, encrypt, anonymize or pseudonymize certain confidential and sensitive information, including credit card numbers. Advances in computer capabilities, new technological discoveries or other developments may result in the whole or partial failure of this technology to protect transaction and personal data or other confidential and sensitive information from being breached or compromised. Our security measures, and those of our third-party service providers, may not detect or prevent all attempts to hack our systems, denial-of-service attacks, viruses, malicious software, break-ins, phishing attacks, social engineering, security breaches or other attacks and similar disruptions that may jeopardize the security of information stored in or transmitted by our sites, networks and systems or that we or our third-party service providers otherwise maintain, including payment card systems and human resources management platforms. We and our service providers may not anticipate or prevent all types of attacks until after they have already been launched, and techniques used to obtain unauthorized access to or sabotage systems change frequently and may not be known until launched against

34

Table of Contents

us or our third-party service providers. In addition, security breaches can also occur as a result of non-technical issues, including intentional or inadvertent breaches by our employees or by persons with whom we have commercial relationships.

Breaches of our security measures or those of our third-party service providers or cyber security incidents could result in unauthorized access to our sites, networks and systems; unauthorized access to and misappropriation of personal information, including consumers' and employees' personally identifiable information, or other confidential or proprietary information of ourselves or third parties; limited or terminated access to certain payment methods or fines or higher transaction fees to use such methods; viruses, worms, spyware or other malware being served from our sites, networks or systems; deletion or modification of content or the display of unauthorized content on our sites; interruption, disruption or malfunction of operations; costs relating to breach remediation, deployment or training of additional personnel and protection technologies, responses to governmental investigations and media inquiries and coverage; engagement of third party experts and consultants; litigation, regulatory action and other potential liabilities. If any of these breaches of security occur, our reputation and brand could be damaged, our business may suffer, we could be required to expend significant capital and other resources to alleviate problems caused by such breaches and we could be exposed to a risk of loss, litigation or regulatory action and possible liability. In addition, any party who is able to illicitly obtain a customer's password could access that customer's transaction data or personal information. Any compromise or breach of our security measures, or those of our third-party service providers, could violate applicable privacy, data security and other laws, and cause significant legal and financial exposure, adverse publicity and a loss of confidence in our security measures, which could have a material adverse effect on our business, financial condition and operating results. We may need to devote significant resources to protect against security breaches or to address problems caused by breaches, diverting resources from the growth and expansion of our business.

***We may be subject to product liability and other similar claims if people or property are harmed by the products we sell.***

Some of the products we sell may expose us to product liability and other claims and litigation (including class actions) or regulatory action relating to safety, personal injury, death or environmental or property damage. Some of our agreements with members of our supply chain may not indemnify us from product liability for a particular product, and some members of our supply chain may not have sufficient resources or insurance to satisfy their indemnity and defense obligations. Although we maintain liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms, or at all.

***We depend on our relationships with third parties, and changes in our relationships with these parties could adversely impact our revenue and profits.***

We rely on third parties to operate certain elements of our business. For example, Goedeker primarily uses R+L Carriers for most of its larger shipping services and AM Home Delivery for furniture deliveries, and both companies use carriers such as FedEx, UPS, DHL and the United States Postal Service to deliver small parcel products. As a result, we may be subject to shipping delays or disruptions caused by inclement weather, natural disasters, system interruptions and technology failures, labor activism, health epidemics or bioterrorism. We are also subject to risks of breakage or other damage during delivery by any of these third parties. We also use and rely on other services from third parties, such as retail partner services, telecommunications services, customs, consolidation and shipping services, as well as warranty, installation and design services.

We may be unable to maintain these relationships, and these services may also be subject to outages and interruptions that are not within our control. For example, failures by our telecommunications providers have in the past and may in the future interrupt our ability to provide phone support to our customers. Third parties may in the future determine they no longer wish to do business with us or may decide to take other actions or make changes to their practices that could harm our business. We may also determine that we no longer want to do business with them. If products are not delivered in a timely fashion or are damaged during the delivery process, or if we are not able to provide adequate customer support or other services or offerings, our customers could become dissatisfied and cease buying products through our sites, which would adversely affect our operating results.

35

Table of Contents

***Certain trends in our business place increased strain on our operations.***

We experience surges in orders associated with promotional activities. This activity may place additional demands on our technology systems and logistics network and could cause or exacerbate slowdowns or interruptions. Any such system, site or service interruptions could prevent us from efficiently receiving or fulfilling orders, which may reduce the volume or quality of goods or services we sell and may cause customer dissatisfaction and harm our reputation and brand. These activities are primarily during holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

***Our business may be adversely affected if we are unable to provide our customers a cost-effective shopping platform that is able to respond and adapt to rapid changes in technology.***

The number of people who access the Internet through devices other than personal computers, including mobile phones, smartphones, handheld computers such as notebooks and tablets, video game consoles, and television set-top devices, has increased dramatically in the past few years. We continually upgrade existing technologies and business applications to keep pace with these rapidly changing and continuously evolving technologies, and we may be required to implement new technologies or business applications in the future. The implementation of these upgrades and changes requires significant investments and as new devices and platforms are released, it is difficult to predict the problems we may encounter in developing applications for these alternative devices and platforms. Additionally, we may need to devote significant resources to the support and maintenance of such applications once created. Our results of operations may be affected by the timing, effectiveness and costs associated with the successful implementation of any upgrades or changes to our systems and infrastructure to accommodate such alternative devices and platforms. Further, in the event that it is more difficult or less compelling for our customers to buy products from us on their mobile or other devices, or if our customers choose not to buy products from us on such devices or to use mobile or other products that do not offer access to our sites, our customer growth could be harmed and our business, financial condition and operating results may be materially adversely affected.

***Significant merchandise returns could harm our business.***

We allow our customers to return products, subject to our return policy. If merchandise returns are significant, our business, prospects, financial condition and results of operations could be harmed. Further, we modify our policies relating to returns from time to time, which may result in customer dissatisfaction or an increase in the number of product returns. Many of our products are large and require special handling and delivery. From time to time our products are damaged in transit, which can increase return rates and harm our brand.

***Uncertainties in economic conditions and their impact on consumer spending patterns, particularly in the home goods segment, could adversely impact our operating results.***

Consumers may view a substantial portion of the products we offer as discretionary items rather than necessities. As a result, our results of operations are sensitive to changes in macro-economic conditions that impact consumer spending, including discretionary spending. Some of the factors adversely affecting consumer spending include levels of unemployment; consumer debt levels; changes in net worth based on market changes and uncertainty; home foreclosures and changes in home values or the overall housing, residential construction or home improvement markets; fluctuating interest rates; credit availability, including mortgages, home equity loans and consumer credit; government actions; fluctuating fuel and other energy costs; fluctuating commodity prices and general uncertainty regarding the overall future economic environment. Adverse economic changes in any of the regions in which we sell our products could reduce consumer confidence and could negatively affect net revenue and have a material adverse effect on our operating results.

***Our business relies heavily on email and other messaging services, and any restrictions on the sending of emails or messages or an inability to timely deliver such communications could materially adversely affect our net revenue and business.***

Our business is highly dependent upon email and other messaging services for promoting our sites and products. Daily promotions offered through emails and other messages sent by us, or on our behalf by our vendors, generate a significant portion of our net revenue. We provide daily emails to customers and other visitors informing them of what is available for purchase on our sites that day, and we believe these messages are an important part of our customer

Table of Contents

experience and help generate a substantial portion of our net revenue. If we are unable to successfully deliver emails or other messages to our subscribers, or if subscribers decline to open our emails or other messages, our net revenue and profitability would be materially adversely affected. Changes in how webmail applications organize and prioritize email may also reduce the number of subscribers opening our emails. For example, in 2013 Google Inc.'s Gmail service began offering a feature that organizes incoming emails into categories (for example, primary, social and promotions). Such categorization or similar inbox organizational features may result in our emails being delivered in a less prominent location in a subscriber's inbox or viewed as "spam" by our subscribers and may reduce the likelihood of that subscriber opening our emails. Actions by third parties to block, impose restrictions on or charge for the delivery of emails or other messages could also adversely impact our business. From time to time, Internet service providers or other third parties may block bulk email transmissions or otherwise experience technical difficulties that result in our inability to successfully deliver emails or other messages to third parties. Changes in the laws or regulations that limit our ability to send such communications or impose additional requirements upon us in connection with sending such communications would also materially adversely impact our business. Our use of email and other messaging services to send communications about our sites or other matters may also result in legal claims against us, which may cause us increased expenses, and if successful might result in fines and orders with costly reporting and compliance obligations or might limit or prohibit our ability to send emails or other messages. We also rely on social networking messaging services to send communications and to encourage customers to send communications. Changes to the terms of these social networking services to limit promotional communications, any restrictions that would limit our ability or our customers' ability to send communications through their services, disruptions or downtime experienced by these social networking services or decline in the use of or engagement with social networking services by customers and potential customers could materially adversely affect our business, financial condition and operating results.

### *We are subject to risks related to online payment methods.*

We accept payments using a variety of methods, including credit card, debit card, PayPal, credit accounts and gift cards. As we offer new payment options to consumers, we may be subject to additional regulations, compliance requirements and fraud. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower profitability. We are also subject to payment card association operating rules and certification requirements, including the Payment Card Industry Data Security Standard and rules governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply. As our business changes, we may also be subject to different rules under existing standards, which may require new assessments that involve costs above what we currently pay for compliance. If we fail to comply with the rules or requirements of any provider of a payment method we accept, if the volume of fraud in our transactions limits or terminates our rights to use payment methods we currently accept, or if a data breach occurs relating to our payment systems, we may, among other things, be subject to fines or higher transaction fees and may lose, or face restrictions placed upon, our ability to accept credit card and debit card payments from consumers or to facilitate other types of online payments. If any of these events were to occur, our business, financial condition and operating results could be materially adversely affected.

We occasionally receive orders placed with fraudulent credit card data. We may suffer losses as a result of orders placed with fraudulent credit card data even if the associated financial institution approved payment of the orders. Under current credit card practices, we may be liable for fraudulent credit card transactions. If we are unable to detect or control credit card fraud, our liability for these transactions could harm our business, financial condition and results of operations.

### *Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.*

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and e-commerce. Existing and future regulations and laws could impede the growth of the Internet, e-commerce or mobile commerce. These regulations and laws may involve taxes, tariffs, privacy and data security, anti-spam, content protection, electronic contracts and communications, consumer protection, Internet neutrality and gift cards. It is not clear how existing laws governing issues such as property ownership, sales and other taxes and consumer privacy apply to the Internet as the vast majority of these laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or e-commerce. It is possible that general business regulations and laws, or those specifically governing the

37

Table of Contents

Internet or e-commerce, may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. We cannot be sure that our practices have complied, comply or will comply fully with all such laws and regulations. Any failure, or perceived failure, by us to comply with any of these laws or regulations could result in damage to our reputation, a loss in business and proceedings or actions against us by governmental entities or others. Any such proceeding or action could hurt our reputation, force us to spend significant amounts in defense of these proceedings, distract our management, increase our costs of doing business, decrease the use of our sites by consumers and suppliers and may result in the imposition of monetary liability. We may also be contractually liable to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any such laws or regulations. Adverse legal or regulatory developments could substantially harm our business. Further, if we enter into new market segments or geographical areas and expand the products and services we offer, we may be subject to additional laws and regulatory requirements or prohibited from conducting our business, or certain aspects of it, in certain jurisdictions. We will incur additional costs complying with these additional obligations and any failure or perceived failure to comply would adversely affect our business and reputation.

***Failure to comply with applicable laws and regulations relating to privacy, data protection and consumer protection, or the expansion of current or the enactment of new laws or regulations relating to privacy, data protection and consumer protection, could adversely affect our business and our financial condition.***

A variety of laws and regulations govern the collection, use, retention, sharing, export and security of personal information. Laws and regulations relating to privacy, data protection and consumer protection are evolving and subject to potentially differing interpretations. These requirements may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another or may conflict with other rules or our practices. As a result, our practices may not comply, or may not comply in the future with all such laws, regulations, requirements and obligations. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any applicable privacy or consumer protection- related laws, regulations, industry self-regulatory principles, industry standards or codes of conduct, regulatory guidance, orders to which we may be subject or other legal obligations relating to privacy or consumer protection could adversely affect our reputation, brand and business, and may result in claims, proceedings or actions against us by governmental entities or others or other liabilities or require us to change our operations and/or cease using certain data sets. Any such claim, proceeding or action could hurt our reputation, brand and business, force us to incur significant expenses in defense of such proceedings, distract our management, increase our costs of doing business, result in a loss of customers and suppliers and may result in the imposition of monetary penalties. We may also be contractually required to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any laws, regulations or other legal obligations relating to privacy or consumer protection or any inadvertent or unauthorized use or disclosure of data that we store or handle as part of operating our business.

Federal, state and international governmental authorities continue to evaluate the privacy implications inherent in the use of proprietary or third-party "cookies" and other methods of online tracking for behavioral advertising and other purposes. United States and foreign governments have enacted, have considered or are considering legislation or regulations that could significantly restrict the ability of companies and individuals to engage in these activities, such as by regulating the level of consumer notice and consent required before a company can employ cookies or other electronic tracking tools or the use of data gathered with such tools. Additionally, some providers of consumer devices and web browsers have implemented, or announced plans to implement, means to make it easier for Internet users to prevent the placement of cookies or to block other tracking technologies, which could if widely adopted significantly reduce the effectiveness of such practices and technologies. The regulation of the use of cookies and other current online tracking and advertising practices or a loss in our ability to make effective use of services that employ such technologies could increase our costs of operations and limit our ability to acquire new customers on cost-effective terms and consequently, materially adversely affect our business, financial condition and operating results.

In addition, various federal, state and foreign legislative and regulatory bodies, or self-regulatory organizations, may expand current laws or regulations, enact new laws or regulations or issue revised rules or guidance regarding privacy, data protection and consumer protection. Any such changes may force us to incur substantial costs or require us to change our business practices. This could compromise our ability to pursue our growth strategy effectively and may adversely affect our ability to acquire customers or otherwise harm our business, financial condition and operating results.

38

Table of Contents

***Changes in tax treatment of companies engaged in e-commerce may adversely affect the commercial use of our sites and our financial results.***

Due to the global nature of the Internet, it is possible that various states or foreign countries might attempt to impose additional or new regulation on our business or levy additional or new sales, income or other taxes relating to our activities. Tax authorities at the international, federal, state and local levels are currently reviewing the appropriate treatment of companies engaged in e-commerce. New or revised international, federal, state or local tax regulations or court decisions may subject us or our customers to additional sales, income and other taxes. For example, on June 21, 2018, the United States Supreme Court rendered a 5-4 majority decision in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)* where the Court held, among other things, that a state may require an out-of-state seller with no physical presence in the state to collect and remit sales taxes on goods the seller ships to consumers in the state, overturning existing court precedent. Other new or revised taxes and, in particular, sales taxes, value added tax and similar taxes could increase the cost of doing business online and decrease the attractiveness of selling products over the Internet. New taxes and rulings could also create significant increases in internal costs necessary to capture data and collect and remit taxes. In addition, we may charge sales taxes in jurisdictions where our competitors do not, resulting in our product prices potentially being higher than those of our competitors. As a result, we may lose sales to our competitors in these jurisdictions. Any of these events could have a material adverse effect on our business, financial condition and operating results.

***We rely on the performance of members of management and highly skilled personnel, and if we are unable to attract, develop, motivate and retain well-qualified employees, our business could be harmed.***

We believe our success has depended, and continues to depend, on the members of our senior management team. The loss of any of our senior management or other key employees could materially harm our business. Our future success also depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees, particularly mid-level managers and merchandising and technology personnel. The market for such positions is competitive. Qualified individuals are in high demand, and we may incur significant costs to attract them. Our inability to recruit and develop mid-level managers could materially adversely affect our ability to execute our business plan, and we may not be able to find adequate replacements. All of our officers and other United States employees are at-will employees, meaning that they may terminate their employment relationship with us at any time, and their knowledge of our business and industry would be extremely difficult to replace. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business, financial condition and operating results may be materially adversely affected.

***We may not be able to adequately protect our intellectual property rights.***

We regard our customer lists, domain names, trademarks, trade dress, trade secrets, proprietary technology and similar intellectual property as critical to our success, and we rely on trade secret protection, agreements and other methods with our employees and others to protect our proprietary rights. We might not be able to obtain broad protection for all of our intellectual property. For example, we are the registrant of the Internet domain names for our websites. However, we might not be able to prevent third parties from registering, using or retaining domain names that interfere with our consumer communications or infringe or otherwise decrease the value of our marks, domain names and other proprietary rights.

The protection of our intellectual property rights may require the expenditure of significant financial, managerial and operational resources. We may initiate claims or litigation against others for infringement, misappropriation or violation of our intellectual property rights or proprietary rights or to establish the validity of such rights. Any litigation, whether or not it is resolved in our favor, could result in significant expense to us and divert the efforts of our technical and management personnel, which may materially adversely affect our business, financial condition and operating results. Moreover, the steps we take to protect our intellectual property may not adequately protect our rights or prevent third parties from infringing or misappropriating our proprietary rights, and we may not be able to broadly enforce all of our intellectual property rights. Any of our intellectual property rights may be challenged by others or invalidated through administrative process or litigation. Additionally, the process of obtaining intellectual property protections is expensive and time-consuming, and we may not be able to pursue all necessary or desirable actions at a reasonable cost or in a timely manner. Even if issued, there can be no assurance that these protections will adequately safeguard our intellectual property, as the legal standards relating to the validity, enforceability and scope of protection of patent and other intellectual property rights are uncertain. We also cannot be certain that others will not independently develop or otherwise acquire equivalent or superior technology or intellectual property rights. We may also be exposed

39

Table of Contents

to claims from third parties claiming infringement of their intellectual property rights, or demanding the release or license of open source software or derivative works that we developed using such software (which could include our proprietary code) or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to purchase a costly license, publicly release the affected portions of our source code, be limited in or cease using the implicated software unless and until we can re-engineer such software to avoid infringement or change the use of the implicated open source software.

***We may be accused of infringing intellectual property rights of third parties.***

The e-commerce industry is characterized by vigorous protection and pursuit of intellectual property rights, which has resulted in protracted and expensive litigation for many companies. We may be subject to claims and litigation by third parties that we infringe their intellectual property rights. The costs of supporting such litigation and disputes are considerable, and there can be no assurances that favorable outcomes will be obtained. As our business expands and the number of competitors in our market increases and overlaps occur, we expect that infringement claims may increase in number and significance. Any claims or proceedings against us, whether meritorious or not, could be time-consuming, result in considerable litigation costs, require significant amounts of management time or result in the diversion of significant operational resources, any of which could materially adversely affect our business, financial condition and operating results.

We have received in the past, and we may receive in the future, communications alleging that certain items posted on or sold through our sites violate third-party copyrights, designs, marks and trade names or other intellectual property rights or other proprietary rights. Brand and content owners and other proprietary rights owners have actively asserted their purported rights against online companies. In addition to litigation from rights owners, we may be subject to regulatory, civil or criminal proceedings and penalties if governmental authorities believe we have aided and abetted in the sale of counterfeit or infringing products.

Such claims, whether or not meritorious, may result in the expenditure of significant financial, managerial and operational resources, injunctions against us or the payment of damages by us. We may need to obtain licenses from third parties who allege that we have violated their rights, but such licenses may not be available on terms acceptable to us, or at all. These risks have been amplified by the increase in third parties whose sole or primary business is to assert such claims.

***We are engaged in legal proceedings that could cause us to incur unforeseen expenses and could occupy a significant amount of our management's time and attention.***

From time to time, we are subject to litigation or claims that could negatively affect our business operations and financial position. Litigation disputes could cause us to incur unforeseen expenses, result in site unavailability, service disruptions, and otherwise occupy a significant amount of our management's time and attention, any of which could negatively affect our business operations and financial position. We also from time to time receive inquiries and subpoenas and other types of information requests from government authorities and we may become subject to related claims and other actions related to our business activities. While the ultimate outcome of investigations, inquiries, information requests and related legal proceedings is difficult to predict, such matters can be expensive, time-consuming and distracting, and adverse resolutions or settlements of those matters may result in, among other things, modification of our business practices, reputational harm or costs and significant payments, any of which could negatively affect our business operations and financial position.

***We have identified material weaknesses in our disclosure controls and procedures. If we fail to develop or maintain an effective system of controls, we may not be able to accurately report our financial results and prevent fraud. As a result, current and potential stockholders could lose confidence in our financial statements, which would harm the trading price of our securities.***

We have adopted and maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports filed under the Exchange Act is collected, recorded, processed, summarized and reported within the time periods specified in the rules of the SEC. Our disclosure controls and procedures are also designed to ensure that such information is accumulated and communicated to management to allow timely decisions regarding required disclosure. As required under Exchange Act Rule 13a-15, our management, including our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of December 31, 2020, have

Table of Contents

concluded that, due to a material weakness identified in our evaluation, our disclosure controls and procedures were ineffective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

Subject to receipt of additional financing, we intend to retain additional individuals and resources to remedy the ineffective controls. We are also undertaking remedial measures, which measures will take time to implement and test, to address these deficiencies. There can be no assurance that such measures will be sufficient to remedy the deficiencies identified or that additional deficiencies will not be identified in the future. If we continue to experience deficiencies or fail to maintain or implement required new or improved controls, such circumstances could cause us to fail to meet our periodic reporting obligations or result in material misstatements in our financial statements, or adversely affect the results of periodic management evaluations. Each of the foregoing results could cause investors to lose confidence in our reported financial information and lead to a decline in our stock price.

***We may not complete our analysis of our internal control over financial reporting in a timely manner, or these internal controls may not be determined to be effective.***

We will be required, pursuant to Section 404 of the Sarbanes-Oxley Act, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting in the second annual report we file with the SEC. This assessment will need to include disclosure of any material weaknesses identified by our management in our internal control over financial reporting. However, our auditors will not be required to formally attest to the effectiveness of our internal control over financial reporting pursuant to Section 404 until we are no longer a non-accelerated filer or no longer an emerging growth company if we take advantage of the exemptions available to us through the JOBS Act.

We are in the very early stages of the costly and challenging process of compiling the system and process documentation necessary to perform the evaluation needed to comply with Section 404. In this regard, we will need to continue to dedicate internal resources, engage outside consultants and adopt a detailed work plan to assess and document the adequacy of internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing that controls are functioning as documented and implement a continuous reporting and improvement process for internal control over financial reporting. As we transition to the requirements of reporting as a public company, we may need to add additional finance staff. We may not be able to remediate any future material weaknesses, or to complete our evaluation, testing and any required remediation in a timely fashion. During the evaluation and testing process, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective. If we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to express an opinion on the effectiveness of our internal controls when they are required to issue such opinion, investors could lose confidence in the accuracy and completeness of our financial reports, which could harm our stock price.

**Risks Related to This Offering and Ownership of Our Securities**

***We may not be able to satisfy listing requirements of the NYSE or maintain a listing of our securities on the NYSE or NYSE American.***

Our common stock is currently traded on NYSE American and we have applied for the listing of the warrants on NYSE American. In connection with this offering, we have applied for the listing of our common stock and warrants on the NYSE, however, we do not currently meet the minimum share price requirements of the NYSE and will not be able to list our common stock and warrants on the NYSE unless we meet such minimum share price and other listing requirements of the NYSE. There is no guarantee that the NYSE will permit our common stock and warrants to be listed and traded even if we ultimately satisfy the minimum share price requirements of the NYSE. In addition, we must meet certain financial and liquidity criteria to maintain the listing of our securities on the NYSE (if we are approved) or on NYSE American. If we fail to meet any listing standards or if we violate any listing requirements, our securities may be delisted. In addition, our board of directors may determine that the cost of maintaining our listing on a national securities exchange outweighs the benefits of such listing. A delisting of our securities from the NYSE or NYSE American may materially impair our stockholders' ability to buy and sell our securities and could have an adverse effect on the market price of, and the efficiency of the trading market for, our securities. The delisting of our securities could significantly impair our ability to raise capital and the value of your investment.

41

Table of Contents

***The market price, trading volume and marketability of our securities may, from time to time, be significantly affected by numerous factors beyond our control, which may materially adversely affect the market price of your common stock and warrants, the marketability of your common stock and warrants and our ability to raise capital through future equity financings.***

The market price and trading volume of our securities may fluctuate significantly. Many factors that are beyond our control may materially adversely affect the market price of your common stock and warrants, the marketability of your common stock and warrants and our ability to raise capital through equity financings. These factors include the following

- actual or anticipated variations in our periodic operating results;

- increases in market interest rates that lead investors of our securities to demand a higher investment return;

- changes in earnings estimates;

- changes in market valuations of similar companies;

- actions or announcements by our competitors;

- adverse market reaction to any increased indebtedness we may incur in the future;

- additions or departures of key personnel;

- actions by stockholders;

- speculation in the media, online forums, or investment community; and

- our intentions and ability to list our securities on the NYSE and our subsequent ability to maintain such listing, or our ability to maintain the listing of our securities on NYSE American if our securities are not approved for listing on the NYSE.

***An active, liquid trading market for our securities may not be sustained, which may cause our securities to trade at a discount from the public offering price and make it difficult for you to sell the common stock and warrants you purchase.***

We cannot predict the extent to which investor interest in us will sustain a trading market or how active and liquid that market may remain. If an active and liquid trading market is not sustained, you may have difficulty selling any of our common stock and warrants that you purchase at a price above the price you purchase it or at all. The failure of an active and liquid trading market to continue would likely have a material adverse effect on the value of our securities. The market price of our securities may decline below the public offering price, and you may not be able to sell your shares of our common stock and warrants at or above the price you paid or at all. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares and may impair our ability to acquire other companies or technologies by using our shares as consideration.

***The warrants may not have any value.***

The warrants will be exercisable for five years from the date of initial issuance at an initial exercise price equal to the public offering price per unit set forth on the cover page of this prospectus. There can be no assurance that the market price of our common stock will ever equal or exceed the exercise price of the warrants. In the event that the stock price of our common stock does not exceed the exercise price of the warrants during the period when the warrants are exercisable, the warrants may not have any value.

***Holders of warrants purchased in this offering will have no rights as stockholders until such holders exercise their warrants and acquire our common stock.***

Until holders of the warrants purchased in this offering acquire common stock upon exercise thereof, such holders will have no rights with respect to the common stock underlying the warrants. Upon exercise of the warrants, the holders will be entitled to exercise the rights of a common stockholder only as to matters for which the record date occurs after the exercise date.

42

***Certain of our directors could be in a position of conflict of interest.***

Our Chairman, Ellery W. Roberts, is the controlling principal of 1847 Partners LLC, or our manager, which provides certain services to us, including administrative supervision and oversight of our day-to-day business operations, for a quarterly management fee equal to $62,500. He may obtain compensation and other benefits in transactions relating to us that involve our manager. Consequently, there exists the possibility for Mr. Roberts to be in a position of conflict. These conflicts may not be resolved in our favor. Such conflicts of interest could have a material adverse effect on our business and operations. Further, the appearance of conflicts of interest created by related party transactions could impair the confidence of our investors. In the case of transactions with these affiliates, there may be an absence of arms' length negotiations with respect to the terms, conditions and consideration with respect to goods and services provided to or by us.

***Our management has broad discretion as to the use of the net proceeds from this offering allocated to working capital and general corporate purposes.***

Our management will have broad discretion in the application of the net proceeds that are allocated to working capital and general corporate purposes. Accordingly, you will have to rely upon the judgment of our management with respect to the use of these proceeds. We intend to use a portion of the net proceeds of this offering to fund part of the cost of the proposed acquisition, and the remainder, if any, for general corporate purposes, which could include future acquisitions, capital expenditures and working capital. Our management may spend a portion or all of the net proceeds from this offering that are allocated to working capital and general corporate purposes in ways that holders of our securities may not desire or that may not yield a significant return or any return at all. Our management not applying these funds effectively could harm our business. Pending their use, we may also invest the net proceeds from this offering that are allocated to working capital and general corporate purposes in a manner that does not produce income or that loses value. See "Use of Proceeds" for more information.

***You will experience immediate and substantial dilution as a result of this offering.***

As of March 31, 2021, our net tangible book value (deficit) was approximately $(21,345,748), or approximately $(3.49) per share. Since the price unit being offered in this offering is substantially higher than the net tangible book value per share of our common stock, you will suffer substantial dilution with respect to the net tangible book value of the units that you purchase in this offering. Based on the public offering price of $2.25 per unit, and assuming no exercise of the warrants being offered in this offering, if you purchase units in this offering, you will suffer immediate and substantial dilution of $2.63 per share (or $2.58 per share if the underwriters exercise the over-allotment option to purchase additional shares of common stock and warrants in full) with respect to the net tangible book value of the common stock included in the units. See "Dilution" for a more detailed discussion of the dilution you will incur if you purchase securities in this offering.

***We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future.***

We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future, as we anticipate that we will invest future earnings in the development and growth of our business. Therefore, holders of our common stock will not receive any return on their investment unless they sell their securities, and holders may be unable to sell their securities on favorable terms or at all.

***If securities industry analysts do not publish research reports on us, or publish unfavorable reports on us, then the market price and market trading volume of our securities could be negatively affected.***

Any trading market for our securities may be influenced in part by any research reports that securities industry analysts publish about us. We do not currently have and may never obtain research coverage by securities industry analysts. If no securities industry analysts commence coverage of us, the market price and market trading volume of our securities could be negatively affected. In the event we are covered by analysts, and one or more of such analysts downgrade our securities, or otherwise reports on us unfavorably, or discontinues coverage of us, the market price and market trading volume of our securities could be negatively affected.

Table of Contents

***Future issuances of our common stock or securities convertible into, or exercisable or exchangeable for, our common stock, or the expiration of lock-up agreements that restrict the issuance of new common stock or the trading of outstanding common stock, could cause the market price of our securities to decline and would result in the dilution of your holdings.***

Future issuances of our common stock or securities convertible into, or exercisable or exchangeable for, our common stock, or the expiration of lock-up agreements that restrict the issuance of new common stock or the trading of outstanding common stock, could cause the market price of our securities to decline. We cannot predict the effect, if any, of future issuances of our securities, or the future expirations of lock-up agreements, on the price of our securities. In all events, future issuances of our common stock would result in the dilution of your holdings. In addition, the perception that new issuances of our securities could occur, or the perception that locked-up parties will sell their securities when the lock-ups expire, could adversely affect the market price of our securities. In connection with this offering, we will enter into a lock-up agreement that prevents us, subject to certain exceptions, from offering additional shares of capital stock for up to 90 days after the date of this prospectus, as further described in the section titled "Underwriting." In addition to any adverse effects that may arise upon the expiration of these lock-up agreements, the lock-up provisions in these agreements may be waived, at any time and without notice. If the restrictions under the lock-up agreements are waived, our common stock may become available for resale, subject to applicable law, including without notice, which could reduce the market price for our common stock.

***Future issuances of debt securities, which would rank senior to our common stock upon our bankruptcy or liquidation, and future issuances of preferred stock, which could rank senior to our common stock for the purposes of dividends and liquidating distributions, may adversely affect the level of return you may be able to achieve from an investment in our securities.***

In the future, we may attempt to increase our capital resources by offering debt securities. Upon bankruptcy or liquidation, holders of our debt securities, and lenders with respect to other borrowings we may make, would receive distributions of our available assets prior to any distributions being made to holders of our common stock. Moreover, if we issue preferred stock, the holders of such preferred stock could be entitled to preferences over holders of common stock in respect of the payment of dividends and the payment of liquidating distributions. Because our decision to issue debt or preferred stock in any future offering, or borrow money from lenders, will depend in part on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of any such future offerings or borrowings. Holders of our securities must bear the risk that any future offerings we conduct or borrowings we make may adversely affect the level of return, if any, they may be able to achieve from an investment in our securities.

***If our securities become subject to the penny stock rules, it would become more difficult to trade our securities.***

The SEC has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. Penny stocks are generally equity securities with a price of less than $5.00, other than securities registered on certain national securities exchanges or authorized for quotation on certain automated quotation systems, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system. If we do not retain a listing on NYSE American or another national securities exchange and if the price of our securities is less than $5.00, our securities could be deemed a penny stock. The penny stock rules require a broker-dealer, before a transaction in a penny stock not otherwise exempt from those rules, to deliver a standardized risk disclosure document containing specified information. In addition, the penny stock rules require that before effecting any transaction in a penny stock not otherwise exempt from those rules, a broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive (i) the purchaser's written acknowledgment of the receipt of a risk disclosure statement; (ii) a written agreement to transactions involving penny stocks; and (iii) a signed and dated copy of a written suitability statement. These disclosure requirements may have the effect of reducing the trading activity in the secondary market for our securities, and therefore stockholders may have difficulty selling their securities.

44

Table of Contents

***We are subject to ongoing public reporting requirements that are less rigorous than Exchange Act rules for companies that are not emerging growth companies and our stockholders could receive less information than they might expect to receive from more mature public companies.***

We are required to publicly report on an ongoing basis as an "emerging growth company" (as defined in the JOBS Act) under the reporting rules set forth under the Exchange Act. For so long as we remain an emerging growth company, we may take advantage of certain exemptions from various reporting requirements that are applicable to other Exchange Act reporting companies that are not emerging growth companies, including but not limited to:

- not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act;

- being permitted to comply with reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements; and

- being exempt from the requirement to hold a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We expect to take advantage of these reporting exemptions until we are no longer an emerging growth company. We would remain an emerging growth company for up to five years, although if the market value of our common stock that is held by non-affiliates exceeds $700 million as of any June 30 before that time, we would cease to be an emerging growth company as of the following December 31.

Because we will be subject to ongoing public reporting requirements that are less rigorous than Exchange Act rules for companies that are not emerging growth companies, our stockholders could receive less information than they might expect to receive from more mature public companies. We cannot predict if investors will find our securities less attractive if we elect to rely on these exemptions, or if taking advantage of these exemptions would result in less active trading or more volatility in the price of our securities.

***Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of our company more difficult, and limit attempts by our stockholders to replace or remove our current management.***

Certain provisions of Delaware law and our certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. Our certificate of incorporation and bylaws include provisions that:

- permit the board of directors to establish the number of directors and fill any vacancies and newly created directorships;

- provide that directors may only be removed by the majority of the shares of voting stock then outstanding; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. They may also make it more difficult for a third party to acquire us, even if the third party's offer may be considered beneficial by many of our stockholders. As a result, our stockholders may be limited in their ability to obtain a premium for their shares.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in our management.

Table of Contents

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements that are based on our management's beliefs and assumptions and on information currently available to us. All statements other than statements of historical facts are forward-looking statements. The forward-looking statements are contained principally in, but not limited to, the sections entitled "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business." These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- our ability to consummate the proposed acquisition;

- the synergies that we expect to experience resulting from the proposed acquisition;

- our ability to successfully integrate Appliances Connection's business with our existing business;

- the impact of the COVID-19 pandemic on our operations and financial condition;

- our goals and strategies;

- our future business development, financial condition and results of operations;

- expected changes in our revenue, costs or expenditures;

- growth of and competition trends in our industry;

- our expectations regarding demand for, and market acceptance of, our products;

- our expectations regarding our relationships with investors, institutional funding partners and other parties we collaborate with;

- our expectation regarding the use of proceeds from this offering;

- fluctuations in general economic and business conditions in the markets in which we operate; and

- relevant government policies and regulations relating to our industry.

In some cases, you can identify forward-looking statements by terms such as "may," "could," "will," "should," "would," "expect," "plan," "intend," "anticipate," "believe," "estimate," "predict," "potential," "project" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions. You should not place undue reliance on forward-looking statements because they involve known and unknown risks, uncertainties and other factors, which are, in some cases, beyond our control and which could materially affect results. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under the heading "Risk Factors" and elsewhere in this prospectus. If one or more of these risks or uncertainties occur, or if our underlying assumptions prove to be incorrect, actual events or results may vary significantly from those implied or projected by the forward-looking statements. No forward-looking statement is a guarantee of future performance.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this prospectus, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

Table of Contents

You should read this prospectus and the documents that we reference in this prospectus and have filed as exhibits to the registration statement of which this prospectus forms a part with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

The forward-looking statements made in this prospectus relate only to events or information as of the date on which the statements are made in this prospectus. Although we have ongoing disclosure obligations under United States federal securities laws, we do not intend to update or otherwise revise the forward-looking statements in this prospectus, whether as a result of new information, future events or otherwise.

47

Table of Contents

**USE OF PROCEEDS**

After deducting the estimated underwriters' commissions and offering expenses payable by us, we expect to receive net proceeds of approximately $189.6 million from this offering (or approximately $193.8 million if the underwriters exercise the over-allotment option to purchase additional shares of common stock and warrants in full).

We intend to use the net proceeds from this offering to pay part of the cash portion of the purchase price for the proposed acquisition and related acquisition fees and expenses. The cash portion of the purchase price for the proposed acquisition is $180 million. We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which will be used to pay a portion of the cash portion of the purchase price, and a revolving loan in the expected principal amount of $10 million, which will be used for general corporate and working capital purposes. We intend to use all of the proceeds of the term loan to pay a portion of the purchase price and the proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses. Any remaining proceeds will be used working capital and general purposes.

Pending use of the net proceeds from this offering described above, we may invest the net proceeds in short- and intermediate-term interest-bearing obligations, investment-grade instruments, certificates of deposit or direct or guaranteed obligations of the United States government.

Our management will retain broad discretion over the allocation of the net proceeds from this offering with respect to working capital and general corporate uses. If the proposed acquisition is not completed, then we intend to use all of the net proceeds for general corporate purposes, which could include other acquisitions. See "Risk Factors — Risks Related to this Offering and the Ownership of Our Common Securities — Our management has broad discretion as to the use of the net proceeds from this offering allocated to working capital and general corporate purposes."

48

Table of Contents

**DIVIDEND POLICY**

We have never declared or paid cash dividends on our common stock. We currently intend to retain all available funds and any future earnings for use in the operation of our business and do not anticipate paying any cash dividends on our common stock in the near future.

On March 19, 2021, we entered into a securities purchase agreement with two institutional investors, pursuant to which we issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of our common stock at an exercise price of $12.00, subject to adjustments. Pursuant to this securities purchase agreement, we agreed that, so long as any of the notes remain outstanding, we will not without each investor's written consent, (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of common stock solely in the form of additional shares of common stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of our capital stock. We may enter into other credit agreements or borrowing arrangements in the future that will restrict our ability to declare or pay cash dividends on our common stock, including in connection with the new term loan described in "Use of Proceeds" above.

Any future determination to declare dividends will be made at the discretion of our board of directors and will depend on our financial condition, operating results, capital requirements, contractual restrictions, general business conditions and other factors that our board of directors may deem relevant. See also "Risk Factors — Risks Related to This Offering and Ownership of Our Common Securities — We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future."

49

Table of Contents

**CAPITALIZATION**

The following table sets forth our capitalization as of March 31, 2021:

- on an actual basis; and

- on an as adjusted basis to reflect this offering, after deducting underwriting discounts and commissions and estimated offering expenses payable by us, and after giving effect to the use of proceeds to complete the proposed acquisition. The table below assumes no exercise by the underwriters of their option to purchase additional shares of common stock and/or warrants from us and no exercise of the warrants included in the units.

The as adjusted information below is illustrative only and our capitalization following the completion of this offering is subject to adjustment based on the public offering price of our units and other terms of this offering determined at pricing. You should read this table together with our financial statements and the related notes included elsewhere in this prospectus and the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

|  | As of March 31, 2021 | |
|---|---|---|
|  | Actual | As Adjusted |
| Cash and cash equivalents and restricted cash | $ 11,404,306 | $ 47,145,617 |
| Long-term debt |  |  |
| Notes payable | $ 6,374,575 | $ 58,446,113 |
| Contingent note payable | 188,170 | 188,170 |
| Total long-term debt | 6,562,745 | 58,634,283 |
|  |  |  |
| Stockholders' equity (deficit): |  |  |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized, no shares issued and outstanding, actual and as adjusted basis | — | — |
| Common stock, $0.0001 par value, 200,000,000 shares authorized, 6,111,200 shares issued and outstanding, actual; 103,118,284 shares issued and outstanding, as adjusted | 611 | 10,311 |
| Additional paid-in capital | 14,874,341 | 215,195,311 |
| Accumulated deficit | (30,218,923) | (32,371,160) |
| Total stockholders' equity (deficit) | (15,343,971) | 182,834,462 |
| **Total capitalization** | $ (8,781,226) | $ 241,468,745 |

The number of shares of our common stock outstanding after this offering is based on 6,111,200 shares of our common stock outstanding as of the date of this prospectus, assumes no exercise of the warrants included in the units, and excludes:

- 555,000 shares of common stock issuable upon exercise of outstanding options at an exercise price of $9.00 per share;

- up to 445,000 additional shares of common stock that are reserved for issuance under our 2020 Equity Incentive Plan; and

- 455,560 shares of common stock issuable upon exercise of outstanding warrants at a weighted average exercise price of $11.91 per share.

Table of Contents

**DILUTION**

If you invest in our units in this offering, your ownership will be diluted immediately to the extent of the difference between the public offering price unit and the pro forma as adjusted net tangible book value per share of common stock immediately after this offering. Dilution in net tangible book value per share to new investors is the amount by which the offering price paid by the purchasers of the units sold in this offering exceeds the pro forma as adjusted net tangible book value per share of common stock after this offering. Net tangible book value per share is determined at any date by subtracting our total liabilities from the total book value of our tangible assets and dividing the difference by the number of shares of common stock deemed to be outstanding at that date.

The net tangible book value (deficit) of our common stock as of March 31, 2021 was approximately $(21,345,748), or approximately $(3.49) per share.

Pro forma as adjusted net tangible book value dilution per share to new investors represents the difference between the amount per unit paid by purchasers in this offering and the pro forma as adjusted net tangible book value per share of our common stock immediately after completion of this offering and after giving effect to the proposed acquisition. Investors participating in this offering will incur immediate, substantial dilution. After giving effect to our sale of 91,111,111 units this offering at the public offering price of $2.25 per unit, after deducting the underwriting discounts and commissions and estimated offering expenses, and assuming no exercise of the warrants being offered in this offering, our pro forma as adjusted net tangible book value (deficit) as of March 31, 2021 (assuming completion of the proposed acquisition and the issuance of 5,895,973 shares of our common stock in connection therewith) would have been approximately $(39,385,084), or approximately $(0.38) per share. This amount represents an immediate increase in pro forma as adjusted net tangible book value of $3.11 per share to existing stockholders and an immediate dilution in pro forma as adjusted net tangible book value of $2.63 per share to purchasers of our units in this offering, as illustrated in the following table.

| | | |
|---|---|---|
| Public offering price per unit (attributing no value to the warrants) | $ | 2.25 |
| Historical net tangible book value (deficit) per share as of March 31, 2021 | $ (3.49) | |
| Increase in pro forma as adjusted net tangible book value per share to existing stockholders | 3.11 | |
| Pro forma as-adjusted net tangible book value per share after this offering | | (0.38) |
| Dilution per share to new investors purchasing units in this offering | $ | 2.63 |

If the underwriters exercise their over-allotment option to purchase additional shares of common stock and warrants in full, the pro forma as adjusted net tangible book value (deficit) per share of our common stock, as adjusted to give effect to this offering and the proposed acquisition, would be $(0.33) per share, and the dilution in pro forma net tangible book value per share to new investors purchasing units in this offering would be $2.58 per share.

The following table sets forth the total number of shares of common stock previously issued and sold to existing investors, the total consideration paid for the foregoing and the average price per share of common stock paid, or to be paid, by existing owners and by the new investors. The calculation below is based on the public offering price of $2.25 per unit, before deducting estimated underwriter commissions and offering expenses, in each case payable by us, and assumes no exercise of the warrants included in the units.

| | Share Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing stockholders | 6,111,200 | 6.29% | $ 10,000,901 | 4.65% | $ 1.64 |
| New investors | 91,111,111 | 93.71% | $ 205,000,000 | 95.35% | $ 2.25 |
| Total | 97,222,311 | 100.00% | $ 215,000,901 | 100.00% | |

51

Table of Contents

The number of shares of our common stock outstanding after this offering is based on 6,111,200 shares of our common stock outstanding as of the date of this prospectus and excludes:

- 555,000 shares of common stock issuable upon exercise of outstanding options at an exercise price of $9.00 per share;

- up to 445,000 additional shares of common stock that are reserved for issuance under our 2020 Equity Incentive Plan;

- 455,560 shares of common stock issuable upon exercise of outstanding warrants at a weighted average exercise price of $11.91 per share; and

- 5,895,973 shares of common stock to be issued in connection with the proposed acquisition.

52

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis summarizes the significant factors affecting the operating results, financial condition, liquidity and cash flows of each of Goedeker and Appliances Connection as of and for the periods presented below. The following discussion and analysis should be read in conjunction with the financial statements and the related notes thereto included elsewhere in this prospectus. The discussion contains forward-looking statements that are based on the beliefs of management, as well as assumptions made by, and information currently available to, management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed below and elsewhere in this prospectus, particularly in the sections titled "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

**Goedeker**

*All periods presented on or prior to April 5, 2019 represent the operations of Goedeker Television, our predecessor. Unless otherwise specified, all results of operations information for the year ended December 31, 2019 reflects the full year.*

*References to "Successor" refer to the financial position and results of operations of our company subsequent to April 5, 2019. References to "Predecessor" refer to the financial position and results of operations of Goedeker Television on and before April 5, 2019.*

### *Overview*

Our company operates a technology-driven  e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 SKUs across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

### *Recent Developments*

#### *Impact of Coronavirus Pandemic*

In late 2019, a novel strain of coronavirus, or COVID-19, was reported to have surfaced in Wuhan, China. The virus has since spread to over 150 countries and every state in the United States. On March 11, 2020, the World Health Organization declared the outbreak a pandemic, and on March 13, 2020, the United States declared a national emergency.

Most states and cities, including in markets in which we operate, reacted by instituting quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, our showroom was closed from April through June of 2020, but our call center and warehouse continued to operate. Since over 95% of our sales are completed online and our call center and warehouse and distribution operations continued to operate, the restrictions put in place have not had a materially negative impact on our operations. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facility or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

Table of Contents

In addition, we are dependent upon suppliers to provide us with all of the products that we sell. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain of our products. As a result, we have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect our business and financial results. Even if we are able to find alternate sources for such products, they may cost more, which could adversely impact our profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact our business. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on our revenue.

Furthermore, the spread of COVID-19 has adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce our ability to access capital in the future, which could negatively affect our liquidity.

We have taken steps to take care of our employees, including providing the ability for employees to work remotely and implementing strategies to support appropriate social distancing techniques for those employees who are not able to work remotely. We have also taken precautions with regard to employee, facility and office hygiene as well as implementing significant travel restrictions. We are also assessing our business continuity plans for all business units in the context of the pandemic. This is a rapidly evolving situation, and we will continue to monitor and mitigate developments affecting our workforce, our suppliers, our customers, and the public at large to the extent we are able to do so. We have and will continue to carefully review all rules, regulations, and orders and responding accordingly.

If the current pace of the pandemic does not continue to slow and the spread of COVID-19 is not contained, our business operations could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require us to make further adjustments to our operations in order to comply with any such restrictions. We may also experience limitations in employee resources. In addition, our operations could be disrupted if any of our employees were suspected of having COVID-19, which could require quarantine of some or all such employees or closure of our facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect our ability to operate our business and result in additional costs.

The extent to which the pandemic may impact our results will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to our performance, financial condition, results of operations and cash flows. See also "Risk Factors" for more information.

*Amendment to Purchase Agreement*

On April 6, 2021, the parties entered into an amendment to the purchase agreement for the proposed acquisition, pursuant to which (i) the outside date (as defined in the purchase agreement) by which the closing of the purchase agreement must be completed was changed to June 30, 2021, (ii) the definition of net working capital set forth in the purchase agreement was revised to clarify that the accrued liabilities for potential sales tax will not be included in such calculation, and (iii) the condition to closing the transaction contemplated by the purchase agreement relating to a lease for the Gold Coast location was deleted, because such lease has since been terminated.

*Repayment of Note*

On May 10, 2021, we repaid the term loan from Arvest Bank described below by transferring principal and accrued interest from the restricted cash account.

**Principal Factors Affecting Our Financial Performance**

Our operating results are primarily affected by the following factors:

- our ability to acquire new customers or retain existing customers;

Table of Contents

- our ability to offer competitive product pricing;

- our ability to broaden product offerings;

- industry demand and competition; and

- market conditions and our market position.

***Key Financial Operating Metrics***

| | Three Months Ended March 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2020 | 2019 |
| Site Sessions (in millions) | 2.5 | 1.4 | 9.9 | 6.3 |
| Order History (in millions) | $ 30.7 | $ 15.4 | $ 123.2 | $ 61.8 |

A site session occurs when a person visits our website. An order occurs when a customer has visited our website and ordered one or more items and has paid for them. An order is paid for by our customer when the order is placed and booked as revenue by us when the order is shipped.

Total revenues and total orders for any given month may not be equal for two primary reasons: (1) normal customer cancellations and (2) the time required to ship an order and recognize revenue. When there are no supply chain issues, the time from order to shipping is between 20 and 25 days. Thus, an order made after the 10th of the current month will become revenue in the succeeding month, distorting the comparison between a months' orders and its sales. COVID-19 significantly increased the time between order and shipment, which increased customer returns.

Our site sessions increased to approximately 9.9 million in the year ended December 31, 2020, as compared to approximately 6.3 million in the year ended December 31, 2019. In the three months ended March 31, 2021, our site sessions increased to approximately 2.5 million, as compared to approximately 1.4 million in the three months ended March 31, 2020. These increased site sessions resulted in three-year highs for orders in the three months ended March 31, 2021.

***Emerging Growth Company***

We qualify as an "emerging growth company" under the JOBS Act. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;

- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);

- submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and

- disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

Table of Contents

We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year following the fifth anniversary of our initial public offering, (ii) the last day of the first fiscal year in which our total annual gross revenues are $1.07 billion or more, (iii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Exchange Act, which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iv) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

## Results of Operations

### Comparison of Three Months Ended March 31, 2021 and 2020

The following table sets forth key components of our results of operations for the three months ended March 31, 2021 and 2020, in dollars and as a percentage of our net sales.

| | Three Months Ended March 31, 2021 | | Three Months Ended March 31, 2020 (As Restated) | |
| --- | --- | --- | --- | --- |
| | Amount | % of Net Sales | Amount | % of Net Sales |
| Products sales, net | $ 13,697,368 | 100.00% | $ 9,677,178 | 100.00% |
| Cost of goods sold | 11,068,911 | 80.81% | 8,111,170 | 83.82% |
| Gross profit | 2,628,457 | 19.19% | 1,566,008 | 16.18% |
| Operating expenses | | | | |
| Personnel | 1,931,324 | 14.10% | 1,311,484 | 13.55% |
| Advertising | 1,083,248 | 7.91% | 666,436 | 6.89% |
| Bank and credit card fees | 532,742 | 3.89% | 244,740 | 2.53% |
| Depreciation and amortization | 122,331 | 0.89% | 91,841 | 0.95% |
| General and administrative | 2,239,498 | 16.35% | 1,439,840 | 14.88% |
| Total operating expenses | 5,909,143 | 43.14% | 3,754,341 | 38.80% |
| Loss from operations | (3,280,686) | (23.95)% | (2,188,333) | (22.61)% |
| Other income (expense) | | | | |
| Interest income | 10,096 | 0.07% | — | — |
| Interest expense | (232,831) | (1.70)% | (456,070) | (4.71)% |
| Other income | 10,206 | 0.07% | 2,383 | 0.02% |
| Total other income (expense) | (212,529) | (1.55)% | (453,687) | (4.69)% |
| Net loss before income taxes | (3,493,215) | (25.50)% | (2,642,020) | (27.30)% |
| Income tax benefit | — | — | 435,000 | 4.50% |
| Net loss | $ (3,493,215) | (25.50)% | $ (2,207,020) | (22.81)% |

*Product sales, net.* We generate revenue from the retail sale of home furnishings, including appliances, furniture, home goods and related products. Our product sales increased by $4,020,190, or 41.54%, to $13,697,368 for the three months ended March 31, 2021 from $9,677,178 for the three months ended March 31, 2020. The increase is due to increased sales volume to meet appliance and furniture demand resulting from increased advertising, which has a direct impact on customer orders and shipped sales.

During the three months ended March 31, 2021, we experienced delays in getting products from manufacturers whose production facilities were closed or operating at reduced capacity because of the coronavirus pandemic, which resulted in cancellations of some customer orders. For the three months ended March 31, 2021, we estimate that cancellations caused by shipping delays approximated $11.0 million based on the historical ratio of shipped sales to customer orders of approximately 80.7% for the three most recent pre COVID-19 years (2017 to 2019) to the actual ratio of approximately 44.7% in the three months ended March 31, 2021.

Our past performance is generally indicative of future performance to the extent that there are seasonal factors such as Black Friday, Cyber Monday, and other shopping days when sales spike.

Table of Contents

Our revenue by sales type is as follows:

| | Three Months Ended March 31, 2021 | | Three Months Ended March 31, 2020 | |
|---|---|---|---|---|
| | Amount | % | Amount | % |
| Appliance sales | $ 10,273,393 | 75.00% | $ 7,802,104 | 80.62% |
| Furniture sales | 2,327,834 | 16.99% | 1,281,836 | 13.25% |
| Other sales | 1,096,141 | 8.00% | 593,238 | 6.13% |
| Total | $ 13,697,368 | 100.00% | $ 9,677,178 | 100.00% |

The percentage of furniture sales increased in the 2021 period as compared to the 2020 period as furniture was more readily available from manufacturers than appliances.

*Cost of goods sold.*   Our cost of goods sold consists of the cost of purchased merchandise plus the cost of delivering merchandise and, where applicable, installation, net of promotional rebates and other incentives received from vendors. Our cost of goods sold increased by $2,957,741, or 36.47%, to $11,068,911 for the three months ended March 31, 2021 from $8,111,170 for the three months ended March 31, 2020. As a percentage of net sales, cost of goods sold decreased from 83.82% in the 2020 period to 80.81% in the 2021 period. Such decrease was due to the sale of more furniture and other products in the quarter. Product cost for appliances sold in the 2021 period was similar to product cost for appliances that were sold in the 2020 period; however, the mix of furniture and other items sold in 2021 had a lower product cost than the furniture and other items sold in 2020.

*Personnel expenses.*   Personnel expenses include employee salaries and bonuses plus related payroll taxes. It also includes health insurance premiums, 401(k) contributions, training costs and stock compensation expense. Our personnel expenses increased by $619,840, or 47.26%, to $1,931,324 for the three months ended March 31, 2021 from $1,311,484 for the three months ended March 31, 2020. As a percentage of net sales, personnel expenses increased from 13.55% in the 2020 period to 14.10% in the 2021 period. The increase is the result of hiring the senior management team and support staff needed because of increased customer orders. Additionally, during the quarter, we incurred stock compensation expenses of $124,575 that we did not have in the 2020 quarter. We believe it is important to also compare our expenses to orders when product availability is constrained as our personnel, advertising, and bank and credit card fees are directly or indirectly related to customer orders. As a percentage of orders, personnel expenses decreased from 8.5% in the 2020 period to 6.2% in the 2021 period.

*Advertising expenses.*   Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses increased by $416,812, or 62.54%, to $1,083,248 for the three months ended March 31, 2021 from $666,436 for the three months ended March 31, 2020. As a percentage of net sales, advertising expenses increased from 6.89% in the 2021 period to 7.91% in the 2021 period. The increase relates to an increase in advertising spending to drive traffic to our website. As a percentage of orders, advertising expenses decreased from 4.3% in the 2020 period to 3.5% in the 2021 period.

*Bank and credit card fees.*   Bank and credit card fees are primarily the fees we pay credit card processors for processing credit card payments made by customers. Our bank and credit card fees increased by $288,002, or 117.68%, to $532,742 for the three months ended March 31, 2021 from $244,740 for the three months ended March 31, 2020. As a percentage of net sales, bank and credit card fees increased from 2.53% in the 2020 period to 3.89% in the 2021 period. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders. We pay a credit card fee for each order, regardless of whether that order is shipped or cancelled by customer. As a percentage of orders, bank and credit card fees increased from 1.6% in the 2020 period to 1.7% in the 2021 period.

*Depreciation and amortization.*   Depreciation and amortization was $122,331, or 0.89% of net sales, for the three months ended March 31, 2021, as compared to $91,841, or 0.95% of net sales, for the three months ended March 31, 2020.

*General and administrative expenses.*   Our general and administrative expenses consist primarily of professional advisor fees, rent expense, insurance, unremitted sales tax, and other expenses incurred in connection with general operations. Our general and administrative expenses increased by $799,658, or 55.54%, to $2,239,498 for the three months ended March 31, 2021 from $1,439,840 for the three months ended March 31, 2020. As a percentage of net sales, general and administrative expenses increased from 14.88% in the 2020 period to 16.35% in the 2021 period. The increase was largely due to increased directors and officers insurance expenses, fees to our independent directors, and legal, audit and other professional fees in connection with becoming a public company in August 2020, as well as consulting fees to upgrade our online shopping cart, fees for our Electronic Data Interchange initiative,

Table of Contents

and other consulting fees. In the three months ended March 31, 2021, we incurred non-recurring expenses totaling approximately $695,000, representing $445,488 in expenses related to the Appliances Connection acquisition and the balance for the reaudit of 2019. In the 2020 period, we incurred $873,200 non-recurring accrual for sales tax. General and administrative expenses without these non-recurring expenses were $1,544,011 and $566,640 for the three months ended March 31, 2021 and 2020, respectively. As a percentage of orders, general and administrative expenses were 7.3% in the 2021 period compared to 9.4% 2020 period.

*Total other income (expense).*    We had $212,529 in total other expense, net, for the three months ended March 31, 2021, as compared to total other expense, net, of $453,687 for the three months ended March 31, 2020. Total other expense, net, for the three months ended March 31, 2021 consisted of interest expense of $232,831, offset by interest income of $10,096 and other income of $10,206, while other expense, net, for the three months ended March 31, 2020 consisted of interest expense of $456,070, offset by other income of $2,383.

*Net loss.*    As a result of the cumulative effect of the factors described above, we had a net loss of $3,493,215 for the three months ended March 31, 2021, as compared to $2,207,020 for the three months ended March 31, 2020, an increase of $1,286,195, or 58.28%.

*Comparison of Years Ended December 31, 2020 and 2019*

The following table sets forth key components of our results of operations for the year ended December 31, 2020 (Successor), for the period from April 6 to December 31, 2019 (Successor), and for the period from January 1 to April 5, 2019 (Predecessor), in dollars and as a percentage of our revenue.

| | Successor | | | | Predecessor | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2020 | | Period April 6 to December 31, 2019 (As Restated) | | Period January 1 to April 5, 2019 | |
| | Amount | % of Net Sales | Amount | % of Net Sales | Amount | % of Net Sales |
| Product sales, net | $ 55,133,653 | 100.00% | $ 34,668,112 | 100.0% | $ 12,946,901 | 100.0% |
| Cost of goods sold | 47,878,541 | 86.84% | 28,596,129 | 82.49% | 11,004,842 | 85.00% |
| Gross profit | 7,255,112 | 13.16% | 6,071,983 | 17.51% | 1,942,059 | 15.00% |
| Operating expenses | | | | | | |
| Personnel | 6,565,380 | 11.91% | 2,909,751 | 8.39% | 913,919 | 7.06% |
| Advertising | 4,865,361 | 8.82% | 1,996,507 | 5.76% | 714,276 | 5.52% |
| Bank and credit card fees | 1,806,620 | 3.28% | 870,877 | 2.51% | 329,247 | 2.54% |
| Depreciation and amortization | 549,712 | 1.00% | 271,036 | 0.78% | 9,675 | 0.07% |
| General and administrative | 7,900,566 | 14.33% | 4,728,571 | 13.64% | 451,214 | 3.49% |
| Total operating expenses | 21,687,639 | 39.34% | 10,776,742 | 31.09% | 2,418,331 | 18.68% |
| Loss from operations | (14,432,527) | (26.18)% | (4,704,759) | (13.57)% | (476,272) | (3.68)% |
| Other income (expense) | | | | | | |
| Interest income | 2,479 | — | — | — | 23,807 | 0.18% |
| Financing costs | (762,911) | (1.38)% | (520,160) | (1.50)% | — | — |
| Adjustment in value of contingency | (138,922) | (0.25)% | 32,246 | 0.09% | — | — |
| Interest expense | (870,847) | (1.58)% | (785,411) | (2.27)% | — | — |
| Loss on extinguishment of debt | (1,756,095) | (3.19)% | — | — | — | — |
| Write-off of acquisition receivable | (809,000) | (1.47)% | — | — | — | — |
| Change in fair value of warrant liability | (2,127,656) | (3.86)% | 106,900 | 0.31% | — | — |
| Other income | 25,945 | 0.05% | 15,010 | 0.04% | 7,200 | 0.06% |
| Total other income (expense) | (6,437,007) | (11.68)% | (1,151,415) | (3.32)% | 31,007 | 0.24% |
| Net loss before income taxes | (20,869,534) | (37.85)% | (5,856,174) | (16.89)% | (445,265) | (3.44)% |
| Income tax benefit (expense) | (698,303) | (1.27)% | 698,303 | 2.01% | — | — |
| Net loss | $ (21,567,837) | (39.12)% | $ (5,157,871) | (14.88)% | $ (445,265) | (3.44)% |

58

Table of Contents

We believe that reviewing our operating results for the year ended December 31, 2019 by combining the results of the 2019 successor period (April 6, 2019 through December 31, 2019) and 2019 predecessor period (January 1, 2019 through April 5, 2019) with the pro forma adjustment related to the acquisition described below, is more useful in discussing our overall operating performance compared to the results of the year ended December 31, 2020 (successor). We do not see any potential risks associated with utilizing this pro forma presentation.

Following are the year ended December 31, 2020 and the combined period for 2019:

| | Year Ended December 31, 2020 | Period April 6 to December 31, 2019 Successor (As Restated) | Period January 1 to April 5, 2019 Predecessor | Pro Forma Combined Year Ended December 31, 2019 | Increase (Decrease) |
|---|---|---|---|---|---|
| Product sales, net | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 | $ 47,615,013 | $ 7,518,640 |
| Cost of goods sold | 47,878,541 | 28,596,129 | 11,004,842 | 39,600,971 | 8,277,570 |
| Gross profit | 7,255,112 | 6,071,983 | 1,942,059 | 8,014,042 | (758,930) |
| Operating expenses | | | | | |
| Personnel | 6,565,380 | 2,909,751 | 913,919 | 3,823,670 | 2,741,710 |
| Advertising | 4,865,361 | 1,996,507 | 714,276 | 2,710,783 | 2,154,578 |
| Bank and credit card fees | 1,806,620 | 870,877 | 329,247 | 1,200,124 | 606,496 |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 | 280,711 | 269,001 |
| General and administrative | 7,900,566 | 4,728,571 | 451,214 | 5,246,045* | 2,654,521 |
| Total operating expenses | 21,687,639 | 10,776,742 | 2,418,331 | 13,261,333 | 8,426,306 |
| Loss from operations | (14,432,527) | (4,704,759) | (476,272) | (5,247,291) | 9,185,236 |
| Other income (expense) | | | | | |
| Interest income | 2,479 | — | 23,807 | 23,807 | (21,328) |
| Financing costs | (762,911) | (520,160) | — | (520,160) | 242,751 |
| Adjustment in value of contingency | (138,922) | 32,246 | — | 32,246 | (171,168) |
| Interest expense | (870,847) | (785,411) | — | (785,411) | 85,436 |
| Loss on extinguishment of debt | (1,756,095) | — | — | — | 1,756,095 |
| Write-off of acquisition receivable | (809,000) | — | — | — | 809,000 |
| Change in fair value of warrant liability | (2,127,656) | 106,900 | — | 106,900 | (2,234,556) |
| Other income | 25,945 | 15,010 | 7,200 | 22,210 | 3,735 |
| Total other income (expense) | (6,437,007) | (1,151,415) | 31,007 | (1,120,408) | 5,316,599 |
| Net loss before income taxes | (20,869,534) | (5,856,174) | (445,265) | (6,367,699)* | 14,501,835 |
| Income tax benefit (expense) | (698,303) | 698,303 | — | 698,303 | (1,396,606) |
| Net loss | $ (21,567,837) | $ (5,157,871) | $ (445,265) | $ (5,669,396)* | $ 15,898,441 |

_____

\*      Includes a pro forma adjustment of $66,260 for the management fee to our manager.

*Product sales, net.*    Our product sales increased by $7,518,640, or 15.79%, to $55,133,653 for the year ended December 31, 2020 from $47,615,013 for the combined year ended December 31, 2019, which included $12,946,901 for our predecessor from January 1, 2019 to April 5, 2019 and $34,668,112 for our successor from April 6, 2019 to December 31, 2019.

The increase is due to increased sales volume to meet appliance and furniture demand resulting from increased advertising, which has a direct impact on customer orders and shipped sales. In the first three months of 2020, sales were affected by working capital issues, which delayed the timing of ordering product to fulfill customer orders resulting in increased order cancellations. Late in the second quarter of 2020 and through the remainder of 2020, we experienced delays in getting products from manufacturers whose production facilities were closed or operating at reduced capacity because of the COVID-19 pandemic, which resulted in some cancellations of customer orders. We estimate that cancellations caused by shipping delays approximated $39.7 million in the year ended December 31, 2020, based on the historical ratio of shipped sales to customer orders of approximately 79% to the actual ratio of approximately 45% in the year ended December 31, 2020.

Table of Contents

Our net sales by sales type is as follows:

| | 2020 Successor | | 2019 Successor | 2019 Predecessor | 2019 Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Amount | % of Net Sales | | | Amount | % of Net Sales |
| Appliance sales | $ 40,113,568 | 72.76% | $ 28,487,053 | $ 9,784,525 | $ 38,271,578 | 80.38% |
| Furniture sales | 11,800,277 | 21.40% | 4,405,866 | 2,456,085 | 6,861,951 | 14.41% |
| Other sales | 3,219,808 | 5.84% | 1,775,193 | 706,291 | 2,481,484 | 5.21% |
| Total | $ 55,133,653 | 100.00% | $ 34,668,112 | $ 12,946,901 | $ 47,615,013 | 100.00% |

The percentage of furniture sales increased in 2020 as compared to 2019 as furniture was more readily available from manufacturers than appliances.

*Cost of goods sold.*   Our cost of goods sold increased by $8,277,570, or 20.90%, to $47,878,541 for the year ended December 31, 2020 from $39,600,971 for the combined year ended December 31, 2019, which included $11,004,842 for our predecessor from January 1, 2019 to April 5, 2019 and $28,596,129 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, cost of goods sold increased from 83.17% in 2019 to 86.84% in 2020. Such increase was due to COVID-19 related supply chain issues reducing the volume we purchased, which resulted in decreased manufacturer rebates, as well as due to the change in product mix, with furniture sales, which have lower margins, accounting for a larger portion of our total sales in 2020.

*Personnel expenses.*   Our personnel expenses increased by $2,741,710, or 71.70%, to $6,565,380 for the year ended December 31, 2020 from $3,823,670 for the combined year ended December 31, 2019, which included $913,919 for our predecessor from January 1, 2019 to April 5, 2019 and $2,909,751 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, personnel expenses increased from 8.03% in 2019 to 11.91% in 2020. The increase is the result of hiring additional senior management and other staff needed for increased customer demand for our products, the accrual of $359,216 as the present value of a severance contract payable to our former president and $398,908 in stock compensation expense. Beginning in the second quarter of 2020, there was a dramatic increase in cancellations of customer orders, which were primarily related to the lack of product availability. We hired a number of temporary employees to process cancellations and address the related customer service issues. As a percentage of orders, our personnel expense declined to 5.8% in 2020 from 6.2% in 2019.

*Advertising expenses.*   Our advertising expenses increased by $2,154,578, or 79.48%, to $4,865,361 for the year ended December 31, 2020 from $2,710,783 for the combined year ended December 31, 2019, which included $714,276 for our predecessor from January 1, 2019 to April 5, 2019 and $1,996,507 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, advertising expenses increased from 5.69% in 2019 to 8.82% in 2020. The increase relates to an increase in advertising spending to drive traffic to our website. Measuring our advertising expense as a percentage of orders, we had a decline in 2020 of 3.9% compared to 4.4% in 2019.

*Bank and credit card fees.*   Our bank and credit card fees increased by $606,496, or 50.54%, to $1,806,620 for the year ended December 31, 2020 from $1,200,124 for the combined year ended December 31, 2019, which included $329,247 for our predecessor from January 1, 2019 to April 5, 2019 and $870,877 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, bank and credit card fees increased from 2.52% in 2019 to 3.28% in 2020. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders. We pay a credit card fee for each order, regardless of whether that order is shipped or cancelled by customer. Comparing bank and credit card fees as a percentage orders shows a reduction from 1.9% of orders in 2019 to 1.5% in 2020.

*Depreciation and amortization.*   Depreciation and amortization was $549,712, or 1.00% of net sales, for the year ended December 31, 2020, as compared to $280,711, or 0.59% of net sales, for the combined year ended December 31, 2019.

*General and administrative expenses.*   Our general and administrative expenses increased by $2,654,521, or 50.60%, to $7,900,566 for the year ended December 31, 2020 from $5,246,045 for the combined year ended December 31, 2019, which included $451,214 for our predecessor from January 1, 2019 to April 5, 2019, $4,728,571 for our successor from April 6, 2019 to December 31, 2019 and a pro forma adjustment of $66,260 for the management fee

Table of Contents

to our manager. As a percentage of net sales, general and administrative expenses increased from 11.02% in 2019 to 14.33% in 2020. The increase was largely due to increased directors and officers insurance expenses, fees to our board of directors, and legal, audit and other professional fees in connection with becoming a public company, as well as consulting fees to upgrade our online shopping cart, fees to our manager under the offsetting management services agreement described below, fees for our Electronic Data Interchange initiative, and other consulting fees. Comparing general and administrative expenses as a percentage orders shows a reduction from 8.4% of orders in 2019 to 6.4% in 2020.

*Total other income (expense).*    We had $6,437,007 in total other expense, net, for the year ended December 31, 2020, as compared to total other expense, net, of $1,120,408 for the combined year ended December 31, 2019, which included income of $31,007 for our predecessor from January 1, 2019 to April 5, 2019 and expenses of $1,151,415 for our successor from April 6, 2019 to December 31, 2019. Total other expense, net, for the year ended December 31, 2020 consisted of financing costs of $762,911, interest expense of $870,847, adjustment in value of contingency of $138,922, loss on debt modification and extinguishment of $1,756,095, write-off of acquisition receivable of $809,000, and change in the warrant liability of $2,127,656, offset by interest income of $2,479 and other income of $25,945, while total other expense, net, for the year ended December 31, 2019 consisted of financing costs of $520,160 and interest expense of $785,411, offset by a gain on write-down of contingency of $32,246, a change in fair value of warrant liability of $106,900, interest income of $23,807 and other income of $22,210.

*Income tax benefit (expense).*    We had an income tax expense of $698,303 for the year ended December 31, 2020, as compared to an income tax benefit of $698,303 for the combined year ended December 31, 2019. In the fourth quarter of 2020, we determined that we should establish a valuation allowance for the deferred tax asset, resulting in an income tax expense of $698,303.

*Net loss.*    As a result of the cumulative effect of the factors described above, our net loss increased by $15,898,441, or 280.43%, to $21,567,837 for the year ended December 31, 2020 from $5,669,396 for the combined year ended December 31, 2019, which included $445,265 for our predecessor from January 1, 2019 to April 5, 2019 and $5,856,174 for our successor from April 6, 2019 to December 31, 2019 and a pro forma adjustment of $66,260 for the management fee to our manager. The net loss for the year ended December 31, 2020 was also affected by certain non-cash charges described below equal to $4,831,673 in the aggregate.

## *Non-GAAP to GAAP Reconciliation*

This prospectus contains financial measures that are not calculated in accordance with generally accepted accounting principles in the United States of America, or GAAP. The non-GAAP financial measures are net loss before taxes for the year ended December 31, 2020 excluding the following non-cash charges (i) an adjustment in value of contingency of $138,922, (ii) a loss on extinguishment of debt of $1,756,095, (iii) a write-off of acquisition receivable of $809,000 and (iv) a non-cash charge to change in warrant liability expense of $2,127,656.

The non-GAAP financial information should be considered supplemental to, and not as a substitute for, or superior to, financial measures calculated in accordance with GAAP. Management, however, believes that these non-GAAP financial measures, when used in conjunction with the results presented in accordance with GAAP, may provide a more complete understanding of our results and may facilitate a fuller analysis of our results, particularly in evaluating performance from one period to another. Management has chosen to provide this supplemental information to investors, analysts, and other interested parties to enable them to perform additional analyses of results and to illustrate the results giving effect to the non-GAAP adjustments shown in the reconciliation described in the next paragraph. Furthermore, the economic substance behind our decision to use such non-GAAP measures is that such measures approximate our controllable operating performance more closely than the most directly comparable GAAP financial measures. Management strongly encourages investors to review our consolidated financial statements and publicly filed reports in their entirety and cautions investors that the non-GAAP measures used by us may differ from similar measures used by other companies, even when similar terms are used to identify such measures.

Table of Contents

The following tables provides a reconciliation of the non-GAAP net loss before taxes to the comparable GAAP measure.

|  | Year Ended December 31, 2020 | | |
|  | GAAP | Elimination of Non-Cash Charges | Non-GAAP |
|---|---|---|---|
| Loss from operations | $ (14,432,527) | $ — | $ (14,432,527) |
| Other income (expense) |  |  |  |
| Interest income | 2,479 | — | 2,479 |
| Financing costs | (762,911) | — | (762,911) |
| Adjustment in value of contingency | (138,922) | (138,922) | — |
| Interest expense | (870,847) | — | (870,847) |
| Loss on extinguishment of debt | (1,756,095) | (1,756,095) | — |
| Write-off of acquisition receivable | (809,000) | (809,000) | — |
| Change in fair value of warrant liability | (2,127,656) | (2,127,656) | — |
| Other income | 25,945 | — | 25,945 |
| Total other income (expense) | (6,437,007) | (4,831,673) | (1,605,334) |
| Net loss before income taxes | $ (20,869,534) |  | $ (16,037,861) |

***Liquidity and Capital Resources***

As of March 31, 2021, we had cash and cash equivalents of $1,309,374 and restricted cash of $10,094,932. We have relied on cash on hand, external bank lines of credit, proceeds from our initial public offering described below, issuance of third party and related party debt and the issuance of notes to support cashflow from operations. For the three months ended March 31, 2021, we incurred operating losses of approximately $3,280,686, cash flows used in operations of $2,807,673 and negative working capital of $19,801,748.

On March 19, 2021, we received net proceeds of $4,590,000 from the sale of notes due December 19, 2021 and warrants described below. These proceeds will supplement our cash flow from operations and provide additional liquidity.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund our operations and to service our debt obligations for one year from the date of the filing of our quarterly report on Form 10-Q for the quarter ended March 31, 2021. We may, however, in the future require additional cash resources due to changing business conditions, implementation of our strategy to expand our business, or other investments or acquisitions we may decide to pursue. If our own financial resources are insufficient to satisfy our capital requirements, we may seek to sell additional equity or debt securities or obtain additional credit facilities. The sale of additional equity securities could result in dilution to our stockholders. The incurrence of indebtedness would result in increased debt service obligations and could require us to agree to operating and financial covenants that would restrict our operations. Financing may not be available in amounts or on terms acceptable to us, if at all. Any failure by us to raise additional funds on terms favorable to us, or at all, could limit our ability to expand our business operations and could harm our overall business prospects.

The impact of COVID-19 on our business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying consolidated financial statements have been prepared on a going concern basis under which we are expected to be able to realize our assets and satisfy our liabilities in the normal course of business.

Table of Contents

*Summary of Cash Flow*

The following table provides detailed information about our net cash flow for all financial statement periods presented in this prospectus.

| | 2021 Three Months Ended March 31, 2021 | Three Months Ended March 31, 2020 (As Restated) | Year Ended December 31, 2020 Successor | Year Ended December 31, 2019 | | |
|---|---|---|---|---|---|---|
| | | | | 2019 Successor (As Restated) | 2019 Predecessor | 2019 Total (As Restated) |
| Net cash provided by (used in) operating activities | $ (2,807,673) | $ 958,356 | $ 5,408,883 | $ (2,299,215) | $ 611,268 | $ (1,687,947) |
| Net cash used in investing activities | (126,115) | — | (113,147) | (2,200) | — | (2,200) |
| Net cash provided by financing activities | 4,426,178 | (775,158) | 4,144,872 | 2,772,723 | — | 2,772,723 |
| Net change in cash | $ 1,492,390 | $ 183,198 | $ 9,440,608 | $ 471,308 | $ 611,268 | $ 1,082,576 |

Our net cash used in operating activities was $2,807,673 for the three months ended March 31, 2021, as compared to net cash provided by operating activities of $958,356 for the three months ended March 31, 2020. For the three months ended March 31, 2021, our net loss of $3,493,215, a decrease in merchandise inventory of $736,243 and a decrease in accounts payable and accrued expensed of $344,893, offset by an increase in receivables of $1,049,878 and an increase in customer deposits of $390,196, were the primary drivers of the net cash used in operating activities. For the three months ended March 31, 2020, our net loss of $2,207,020 and deferred tax assets of $435,000, offset by increases in customer deposits of $1,270,488 and accounts payable and accrued expenses of $1,442,264, were the primary drivers of the net cash provided by operating activities.

Our net cash provided by operating activities was $5,408,883 for the year ended December 31, 2020, as compared to net cash used in operating activities of $1,687,947 for the combined year ended December 31, 2019, which included net cash used in operating activities of $2,299,215 for our successor from April 6, 2019 to December 31, 2019 and net cash provided by operating activities of $611,268 for our predecessor from January 1, 2019 to April 5, 2019. For the year ended December 31, 2020, our net loss of $21,567,837 and an increase in merchandise inventory of $3,767,151, offset by an increase in customer deposits of $17,714,914, an increase in accounts payable and accrued expenses of $7,337,081, a change in fair value of warrant liability of $2,127,656 and a loss on extinguishment of debt of $1,756,095, were the primary drivers of the net cash provided by operating activities. For the combined year ended December 31, 2019, our net loss of $5,603,136, offset by increases in accounts payable and accrued expenses of $1,821,629 and merchandise inventory of $1,066,627, were the primary drivers of the net cash used in operating activities.

Our net cash used in investing activities was $126,115 for the three months ended March 31, 2021, all of which consisted of expenditures to upgrade our new warehouse. We had no investing activities for the three months ended March 31, 2020.

Our net cash used in investing activities was $113,147 for the year ended December 31, 2020, as compared to $2,200 for the year ended December 31, 2019, all of which was during the period from April 6, 2019 to December 31, 2019. The net cash used in investing activities for both years consisted entirely of purchases of property and equipment.

Our net cash provided by financing activities was $4,426,178 for the three months ended March 31, 2021, as compared to net cash used in financing activities of $775,158 for the three months ended March 31, 2020. Net cash provided by financing activities for the three months ended March 31, 2021 consisted of proceeds from the private placement described below of 4,590,000, offset by repayment on notes payable of $163,822. Net cash used in financing activities for the three months ended March 31, 2020 consisted of net payments on lines of credit of $681,408 and repayment on notes payable of $93,750.

Our net cash provided by financing activities was $4,144,872 for the year ended December 31, 2020, as compared to $2,772,723 for the combined year ended December 31, 2019, all of which was during the period from April 6, 2019 to December 31, 2019. Net cash provided by financing activities for the year ended December 31, 2020 consisted of net proceeds of $8,602,166 from our initial public offering and $642,600 in proceeds from our Paycheck Protection Program loan, offset by payments of $2,883,754 on our notes payable (including repayment of our Paycheck Protection Program loan), payments of $771,431 on our convertible notes payable, net payments on lines of credit of $1,339,430

Table of Contents

and $105,279 in loan financing costs. For the combined year ended December 31, 2019, net cash provided by financing activities consisted of proceeds from note payable of $1,500,000, net borrowings from lines of credit of $1,339,430 and proceeds from convertible notes payable of $650,000, offset by repayments on notes payable $357,207 and cash paid for financing costs of $359,500.

*Initial Public Offering*

On August 4, 2020, we sold 1,111,200 shares of common stock in connection with our initial public offering to the underwriters at a purchase price per share of $8.325 (the offering price to the public of $9.00 per share minus the underwriters' discount) for total gross proceeds of $10,000,800. After deducting the underwriting commission and expenses, we received net proceeds of approximately $8,602,166. We also issued warrants for the purchase of 55,560 shares of common stock to affiliates of ThinkEquity, a division of Fordham Financial Management, Inc. The warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25 (125% of the public offering price per share).

*Private Placement*

On March 19, 2021, we entered into a securities purchase agreement with two institutional investors, pursuant to which we issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of our common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis, for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. After deducting a placement fee and other expenses, we received net proceeds of $4,590,000. As of March 31, 2021, the outstanding balance of the notes is $3,347,763, comprised of principal of $5,500,000, net of unamortized loan costs of $2,152,237. Loan costs consist of unamortized original issue discount of $870,291 and unamortized warrant value of $1,281,946.

The notes bear interest at a rate of 10% per annum and mature on December 19, 2021. The notes may be prepaid by us in whole or in part at any time or from time to time without penalty or premium upon at least five (5) days prior written notice, which notice period may be waived by the holder. In addition, if we issue and sell shares of our equity securities to investors on or before the maturity date in an equity financing with total gross proceeds of not less than $10,000,000 (excluding the conversion of the notes or other convertible securities issued for capital raising purposes), then we must repay the then-outstanding principal amount of the notes and any accrued but unpaid interest.

The notes are secured by a first priority security interest in all of our assets and contain customary events of default. Upon, and during the continuance of, an event of default, the notes are convertible, in whole or in part, at the option of the holder into shares of common stock at a conversion price equal to $12.00, or if lower, 80% of the lowest volume weighted average price for the twenty (20) consecutive trading days prior to the applicable conversion date, but in no event less than $9.00. The conversion price will be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction that proportionately decreases or increases the common stock. In addition, if we sell or grant any common stock or securities convertible into or exchangeable for common stock or grants any right to reprice such securities at an effective price per share that is lower than the then conversion price, the conversion price shall be reduced to such price, subject to certain exceptions set forth in the notes.

We expect to repay these notes from the proceeds of the term loan described in the "Use of Proceeds" section above.

*Term Loan*

On August 25, 2020, we entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of March 31, 2021, the outstanding balance of this loan is $3,026,812, comprised of principal of $3,119,806, net of unamortized loan costs of $92,994.

The loan matures on August 25, 2025 and bears interest at 3.250% per annum; provided that, upon an event of default, the interest rate shall increase by 6% until paid in full. Pursuant to the terms of the loan agreement, we are required to make monthly payments of $63,353 beginning on September 25, 2020 and until the maturity date, at which time all unpaid principal and interest will be due. We may prepay the loan in full or in part at any time without penalty. The loan agreement contains customary events of default and affirmative and negative covenants for a loan of this type. The loan is secured by all financial assets credited to our securities account held by Arvest Investments, Inc.

As noted above, this loan was repaid on May 10, 2021.

Table of Contents

**Contractual Obligations**

Our principal commitments consist mostly of obligations under the loan described above, the operating leases described under "Business — Facilities" and other contractual commitments described below.

*Management Services Agreement*

On April 5, 2019, we entered into a management services agreement with our manager, pursuant to which we appointed our manager to provide certain services to us for a quarterly management fee equal to $62,500. Under certain circumstances specified in the management services agreement, our quarterly fee may be reduced if similar fees payable to our manager by subsidiaries of our former parent company, 1847 Holdings LLC, or 1847 Holdings, exceed a threshold amount.

Pursuant to the management services agreement, we must also reimburse our manager for all costs and expenses which are specifically approved by our board of directors, including all out-of-pocket costs and expenses, that are actually incurred by our or our affiliates on our behalf in connection with performing services under the management services agreement.

The services provided by our manager include: conducting general and administrative supervision and oversight of our day-to-day business and operations, including, but not limited to, recruiting and hiring of personnel, administration of personnel and personnel benefits, development of administrative policies and procedures, establishment and management of banking services, managing and arranging for the maintaining of liability insurance, arranging for equipment rental, maintenance of all necessary permits and licenses, acquisition of any additional licenses and permits that become necessary, participation in risk management policies and procedures; and overseeing and consulting with respect to our business and operational strategies, the implementation of such strategies and the evaluation of such strategies, including, but not limited to, strategies with respect to capital expenditure and expansion programs, acquisitions or dispositions and product or service lines.

We expensed $62,500 in management fees for the three months ended March 31, 2021 and 2020 and $250,000 and $183,790 for the years ended December 31, 2020 and 2019, respectively.

*Earn Out Payment*

Pursuant to an asset purchase agreement, dated January 18, 2019, as amended, among our company, Goedeker Television, Steve Goedeker and Mike Goedeker, Goedeker Television is entitled to receive an earn out payment of $200,000 if the EBITDA (as defined in the asset purchase agreement) of the business acquired from Goedeker Television for the trailing twelve (12) month period from April 5, 2022 is $2,500,000 or greater, and may be entitled to receive a partial earn out payment if the EBITDA is less than $2,500,000 but greater than $1,500,000.

**Off-Balance Sheet Arrangements**

We have no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Critical Accounting Policies**

The following discussion relates to critical accounting policies for our company. The preparation of consolidated financial statements in conformity with GAAP requires our management to make assumptions, estimates and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. We have identified certain accounting policies that are significant to the preparation of our consolidated financial statements. These accounting policies are important for an understanding of our financial condition and results of operation. Critical accounting policies are those that are most important to the portrayal of our financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to our

Table of Contents

consolidated financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and judgments used in the preparation of our consolidated financial statements:

*Revenue Recognition and Cost of Revenue*

We record revenue in accordance with Financial Accounting Standards Board, or FASB, Accounting Standards Codification, or ASC, Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

We collect the full sales price from the customer at the time the order is placed, which is recorded as customer deposits on the accompanying consolidated balance sheet. We do not incur incremental costs obtaining purchase orders from customers, however, if we did, because all our contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

The revenue that we recognize arises from orders we receive from our customers. Our performance obligations under the customer orders correspond to each sale of merchandise that we make to customers under the purchase orders; as a result, each purchase order generally contains only one performance obligation based on the merchandise sale to be completed.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, our products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. We deliver products to our customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from our warehouse to the customer (which we refer to as a company shipment). The second way is through a shipment of the products through a third-party carrier from a warehouse other than our warehouse to the customer (which we refer to as a drop shipment) and the third way is where we deliver the products to the customer and often also install the product (which we refer to as a local delivery). In the case of a local delivery, we load the product on to our own truck and deliver and install the product at the customer's location. When a product is delivered through a local delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a company shipment and a drop shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from our warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves our warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, we have satisfied our performance obligation and we recognize revenue.

We agree with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In our contracts with customers, we allocate the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax we collect concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all our sales are to individual retail consumers.

Shipping and Handling — We bill our customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue — We disaggregate revenue from contracts with customers by product type, as we believe it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

66

Table of Contents

We also sell extended warranty contracts. We are an agent for the warranty company and earn a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the our consolidated statement of operations. We assume no liability for repairs to products on which we have sold a warranty contract.

We experience operational trends which are primarily holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

*Receivables*

Receivables represent rebates receivable due from manufacturers from whom we purchase products and amounts due from credit card processors that do not settle within two days. Rebates receivable are stated at the amount that management expects to collect from manufacturers, net of accounts payable amounts due the vendor. Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on our assessment of the credit history with our manufacturers, we have concluded that there should be no allowance for uncollectible accounts. We historically collect substantially all of our outstanding rebates receivables. Uncollectible balances are expensed in the period it is determined to be uncollectible.

*Merchandise Inventory*

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. We periodically evaluate the value of items in inventory and provide write-downs to inventory based on our estimate of market conditions.

*Goodwill*

We test our goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in our expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and our consolidated financial results.

We test goodwill by estimating fair value using a discounted cash flow model. The key assumptions used in the discounted cash flow model to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during the three months ended March 31, 2021 and 2020 or the years ended December 31, 2020 and 2019.

*Intangible Assets*

As of March 31, 2021 and December 31, 2020, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

We periodically evaluate the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. We have no intangibles with indefinite lives.

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. At March 31, 2021 and December 31, 2020, there were no impairments in intangible or the right of use, or ROU, assets.

Table of Contents

*Long-Lived Assets*

We review our property and equipment and any identifiable intangibles (including ROU asset) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell. At March 31, 2021 and December 31, 2020, there were no impairments in long-lived assets.

*Lease Liabilities*

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of our leases do not provide an implicit rate, we use an estimated incremental borrowing rate, or IBR, based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. We adjust the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

We review the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, we compare the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

*Sales Tax Liability*

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, we began collecting sales tax in nearly all states that have sales tax. We accrued sales taxes in the states with sales tax. We accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date we began collecting and filing sales taxes in the various states. At March 31, 2021 and December 31, 2020, the amount of such accrual was $5,915,910 and $5,804,100, respectively, which is included in accounts payable and accrued expenses. To date, only one state has notified us of a potential sales tax liability of approximately $82,000, all of which was previously accrued.

**Appliances Connection**

*Overview*

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

68

Table of Contents

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website 1stopcamera.com.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at goldcoastappliances.com.

Joe's Appliances, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, joesappliances.com.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website *www.appliancesconnection.com*.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

### *Recent Developments*

#### *Impact of Coronavirus Pandemic*

In late 2019, a novel strain of coronavirus, or COVID-19, was reported to have surfaced in Wuhan, China. The virus has since spread to over 150 countries and every state in the United States. On March 11, 2020, the World Health Organization declared the outbreak a pandemic, and on March 13, 2020, the United States declared a national emergency.

Most states and cities reacted by instituting quarantines, restrictions on travel, "stay at home" rules and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Appliances Connection's retail facilities and warehouse were deemed essential businesses that were not subject to restrictions in New York and New Jersey, so they remained open and continued to operate. Therefore, the restrictions put in place have not had a materially negative impact on the operations Appliances Connection. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facilities or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

In addition, Appliances Connection is dependent upon suppliers to provide it with all of the products that its sells. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain products. As a result, Appliances Connection has faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect its business and financial results. Even if Appliances Connection is able to find alternate sources for such products, they may cost more, which could adversely impact its profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact Appliances Connection's business. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on Appliances Connection's revenue.

Appliances Connection has taken steps to take care of its employees, including providing the ability for employees to work remotely and implementing strategies to support appropriate social distancing techniques for those employees who are not able to work remotely. Appliances Connection has also taken precautions with regard to employee, facility

Table of Contents

and office hygiene as well as implementing significant travel restrictions. Appliances Connection continues to assess business continuity plans for all business units in the context of the pandemic. This is a rapidly evolving situation, and Appliances Connection will continue to monitor and mitigate developments affecting its workforce, its suppliers, its customers and the public at large to the extent they are able to do so and it will continue to carefully review all rules, regulations, and orders and responding accordingly.

If the current pace of the pandemic cannot be slowed and the spread of the virus is not contained, Appliances Connection's business operations could be further delayed or interrupted. It is expected that government and health authorities may announce new or extend existing restrictions, which could require Appliances Connection to make further adjustments to its operations in order to comply with any such restrictions. In addition, Appliances Connection's operations could be disrupted if any of its employees were suspected of having the virus, which could require quarantine of some or all such employees or closure of its facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect Appliances Connection's ability to operate its business and result in additional costs.

The extent to which the pandemic may impact the results of Appliances Connection will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this prospectus, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to the performance, financial condition, results of operations and cash flows of Appliances Connection. See also "Risk Factors" for more information.

***Principal Factors Affecting Financial Performance***

Appliances Connection's operating results are primarily affected by the following factors:

- its ability to acquire new customers or retain existing customers;

- its ability to offer competitive product pricing;

- its ability to broaden product offerings;

- industry demand and competition; and

- market conditions and its market position.

***Key Financial Operating Metrics***

| | Three Months Ended March 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2020 | 2019 |
| Site Sessions (in millions) | 8.6 | 5.5 | 31.0 | 17.6 |
| Order History (in millions) | $ 168.6 | $ 81.9 | $ 466.9 | $ 252.3 |

A site session occurs when a person visits Appliances Connection's website. An order occurs when a customer has visited the website and ordered one or more items and has paid for them. An order is paid for by the customer when the order is placed and booked as revenue by when the order is shipped.

Appliances Connection's site sessions increased to approximately 31.0 million in the year ended December 31, 2020, as compared to approximately 17.6 million in the year ended December 31, 2019. In the three months ended March 31, 2021, its site sessions increased to approximately 8.6 million, as compared to approximately 5.5 million in the three months ended March 31, 2020. These increased site sessions resulted in record orders in the year ended December 31, 2020 and the three months ended March 31, 2021.

Table of Contents

***Results of Operations***

*Comparison of Three Months Ended March 31, 2021 and 2020*

The following table sets forth key components of the results of operations of Appliances Connection for the three months ended March 31, 2021 and 2020, in dollars and as a percentage of net sales.

| | Three Months Ended March 31, 2021 | | Three Months Ended March 31, 2020 | |
| | Amount | % of Net Sales | Amount | % of Net Sales |
|---|---|---|---|---|
| Net sales | $ 109,260,089 | 100.00% | $ 57,074,441 | 100.00% |
| Cost of sales | 79,723,604 | 72.97% | 46,025,053 | 80.64% |
| Gross profit | 29,536,485 | 27.03% | 11,049,388 | 19.36% |
| Operating expenses | | | | |
| Personnel | 4,426,724 | 4.05% | 2,708,990 | 4.75% |
| Advertising | 2,269,449 | 2.08% | 1,795,218 | 3.15% |
| Bank and credit card fees | 1,863,628 | 1.71% | 822,905 | 1.44% |
| Depreciation and amortization | 153,096 | 0.14% | 155,739 | 0.27% |
| General and administrative | 3,306,562 | 3.03% | 1,869,650 | 3.28% |
| Total operating expenses | 12,019,459 | 11.00% | 7,352,502 | 12.88% |
| Income from operations | 17,517,026 | 16.03% | 3,696,886 | 6.48% |
| Other income (expense) | | | | |
| Other income | 2,217,943 | 2.03% | 393,627 | 0.69% |
| Other expense | (186,745) | (0.17)% | (161,402) | (0.28)% |
| Total other income (expense) | 2,031,198 | 1.86% | 232,225 | 0.41% |
| Net Income | $ 19,548,224 | 17.89% | $ 3,929,111 | 6.88% |

*Net sales.* Appliances Connection generates revenue from the retail sale of home furnishings, including appliances, furniture, home goods, and related products. Its net sales increased by $52,185,648, or 91.43%, to $109,260,089 for the three months ended March 31, 2021 from $57,074,441 for the three months ended March 31, 2020. Such increase is due to increased demand for its appliances, home furnishings, furniture, home goods and related products due to increased advertising, as well as customers spending more time at their homes as a result of the ongoing COVID-19 pandemic, combined with governmental and enhanced unemployment benefits, and its position as an "essential business". Additionally, management believes its net sales in the three months ended March 31, 2021 were favorably impacted by a strong alignment of its technologically advanced online sales and infrastructure platform with current customer trends for online and phone-based shopping and decreased competition from certain of its competitors that are relatively more reliant on showroom and in-person sales that were closed for a portion of such period due to the pandemic. Also, there was an increase in overall product mix available from more brand manufactures increasing production.

*Cost of sales.* Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendors. Cost of sales increased by $33,698,551, or 73.22%, to $79,723,604 for the three months ended March 31, 2021 from $46,025,053 for the three months ended March 31, 2020. As a percentage of net sales, cost of sales decreased from 80.64% in the 2020 period to 72.97% in the 2021 period. Such a decrease was due to an overall improvement in margins from the product mix sold. Most of the sold brands have many high to low-end appliances for the consumer to purchase. The higher-end appliances have better margins and are currently in greater demand, resulting in better margins when sold. Further, as a result of the pandemic, many manufacturers could not fulfill orders on some of the in-demand appliances promptly, resulting in increased costs, cancellations, and delivery time for many products. In 2021, Appliances Connection has seen an overall increase in product availability and improved delivery time on orders, contributing to the decrease in the cost of sales during the period.

71

Table of Contents

*Personnel expenses.*    Personnel expenses include employee salaries and bonuses plus related payroll taxes as well as health insurance premiums. Personnel expenses increased by $1,717,734, or 63.41%, to $4,426,724 for the three months ended March 31, 2021 from $2,708,990 for the three months ended March 31, 2020. Such increase was due to additional personnel and payroll hours to support the increased sales, as well as wage increases for some employees. As a percentage of net sales, personnel expenses were 4.05% and 4.75% for the three months ended March 31, 2021 and 2020, respectively.

*Advertising expenses.*    Advertising expenses include the cost of marketing products and primarily include online search engine, digital, social media, television and radio advertising expenses. Advertising expenses increased by $474,231, or 26.42%, to 2,269,449 for the three months ended March 31, 2021 from $1,795,218 for the three months ended March 31, 2020. Such increase was due to increased investments in digital and social media engagement to capitalize on current customer trends for online shopping, as well as increased investment on television and radio to promote additional brand recognition. As a percentage of net sales, advertising expenses were 2.08% and 3.15% for the three months ended March 31, 2021 and 2020, respectively.

*Bank and credit card fees.*    Bank and credit card fees are primarily the fees paid to credit card processors for processing credit card payments made by customers. Bank and credit card fees increased by $1,040,723, or 126.47%, to $1,863,628 for the three months ended March 31, 2021 from $822,905 for the three months ended March 31, 2020. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was primarily due to the increase in customer orders resulting in increased merchant processing fees by credit card networks. As a percentage of net sales, bank and credit card fees were 1.71% and 1.44% for the three months ended March 31, 2021 and 2020, respectively.

*Depreciation and amortization.*    Depreciation and amortization was $153,096, or 0.14% of net sales, for the three months ended March 31, 2021, as compared to $155,739, or 0.27% of net sales, for the three months ended March 31, 2020.

*General and administrative expenses.*    General and administrative expenses consist primarily of professional advisor fees, bad debts, rent expense, sales tax expense, insurance, and other expenses incurred in connection with general operations. General and administrative expenses increased by $1,436,912, or 76.85%, to $3,306,562 for the three months ended March 31, 2021 from $1,869,650 for the three months ended March 31, 2020. The primary increases were increases in insurance, rent, state corporation tax, and professional fees. As a percentage of net sales, general and administrative expenses were 3.03% and 3.28% for the three months ended March 31, 2021 and 2020, respectively.

*Total other income (expense).*    Total other income, net, was $2,031,198 for the for the three months ended March 31, 2021, which included other income of $2,217,943 and other expense of $186,745. For the for the three months ended March 31, 2020, total other income, net, was $232,225, which included other income of $393,627 and other expense of $161,402. Other income includes interest income on bank and vendor deposits and other expense includes interest expense on financed equipment.

*Net income.*    As a result of the cumulative effect of the factors described above, net income was $19,548,224 for the three months ended March 31, 2021, as compared to $3,929,111 for the three months ended March 31, 2020, an increase of $15,619,113, or 397.52%. As a percentage of net sales, net income was 17.89% and 6.88% for the three months ended March 31, 2021 and 2020, respectively.

72

Table of Contents

*Comparison of Years Ended December 31, 2020 and 2019*

The following table sets forth key components of the results of operations of Appliances Connection for the years ended December 31, 2020 and 2019, in dollars and as a percentage of net sales.

| | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
| | Amount | % of Net Sales | Amount | % of Net Sales |
|---|---|---|---|---|
| Net sales | $ 312,608,528 | 100.00% | $ 219,333,461 | 100.00% |
| Cost of sales | 247,379,397 | 79.13% | 176,771,632 | 80.59% |
| Gross profit | 65,229,131 | 20.87% | 42,561,829 | 19.41% |
| Operating expenses | | | | |
| Personnel | 13,563,628 | 4.34% | 10,919,298 | 4.98% |
| Advertising | 9,164,242 | 2.93% | 5,073,731 | 2.31% |
| Bank and credit card fees | 12,361,428 | 3.95% | 9,413,611 | 4.29% |
| Depreciation and amortization | 782,773 | 0.25% | 553,357 | 0.25% |
| General and administrative | 9,949,762 | 3.18% | 7,095,979 | 3.24% |
| Total operating expenses | 45,821,833 | 14.66% | 33,055,976 | 15.07% |
| Income from operations | 19,407,298 | 6.21% | 9,505,853 | 4.33% |
| Other income (expense) | | | | |
| Other income | 1,336,115 | 0.43% | 1,880,282 | 0.86% |
| Other expense | (663,674) | (0.21)% | (247,539) | (0.11)% |
| Total other income (expense) | 672,441 | 0.22% | 1,632,743 | 0.74% |
| Net Income | $ 20,079,739 | 6.42% | $ 11,138,596 | 5.08% |

*Net sales.*   Net sales increased by $93,275,067, or 42.53%, to $312,608,528 for the year ended December 31, 2020 from $219,333,461 for the year ended December 31, 2019. Such increase is due to increased demand for its home furnishings, appliances, furniture, home goods and related products due to increased advertising, as well as customers spending more time at their homes as a result of the ongoing COVID-19 pandemic, combined with governmental and enhanced unemployment benefits, and its position as an "essential business". Additionally, management believes its net sales in the year ended December 31, 2020 were favorably impacted by a strong alignment of its technologically advanced online sales and infrastructure platform with current customer trends for online and phone-based shopping and decreased competition from certain of its competitors that are relatively more reliant on showroom and in-person sales that were closed for a portion of such period due to the pandemic.

*Cost of sales.*   Cost of sales increased by $70,607,765, or 39.94%, to $247,379,397 for the year ended December 31, 2020 from $176,771,632 for the year ended December 31, 2019. Such increase was generally in line with the increase in net sales. As a percentage of net sales, cost of sales decreased slightly from 80.59% in 2019 to 79.13% in 2020.

*Personnel expenses.*   Personnel expenses increased by $2,644,330, or 24.22%, to $13,563,628 for the year ended December 31, 2020 from $10,919,298 for the year ended December 31, 2019. Such increase was due to additional payroll hours to support the increased sales in 2020, as well as increases in the minimum wage in New Jersey and Long Island. As a percentage of net sales, personnel expenses were 4.34% and 4.98% for the years ended December 31, 2020 and 2019, respectively.

*Advertising expenses.*   Advertising expenses increased by $4,090,511, or 80.62%, to $9,164,242 for the year ended December 31, 2020 from $5,073,731 for the year ended December 31, 2019. Such increase was due to increased investments in digital and social media engagement to capitalize on current customer trends for online shopping, as well as increased investment on television and radio to promote additional brand recognition. As a percentage of net sales, advertising expenses were 2.93% and 2.31% for the years ended December 31, 2020 and 2019, respectively.

*Bank and credit card fees.*   Bank and credit card fees increased by $2,947,817, or 31.31%, to $12,361,428 for the year ended December 31, 2020 from $9,413,611 for the year ended December 31, 2019. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was primarily due to the increase in

73

Table of Contents

customer orders as well as recent increases in interchange rates charged by credit card networks. As a percentage of net sales, bank and credit card fees were 3.95% and 4.29% for the years ended December 31, 2020 and 2019, respectively.

*Depreciation and amortization.*    Depreciation and amortization was $782,773, or 0.25% of net sales, for the year ended December 31, 2020, as compared to $553,357, or 0.25% of net sales, for the year ended December 31, 2019.

*General and administrative expenses.*    General and administrative expenses increased by $2,853,783, or 40.22%, to $9,949,762 for the year ended December 31, 2020 from $7,095,979 for the year ended December 31, 2019. The primary increases are were increases in insurance, rent, and telephone service expenses and payments on notes payable used to finance purchases of transportation vehicles. As a percentage of net sales, general and administrative expenses were 3.18% and 3.24% for the years ended December 31, 2020 and 2019, respectively.

*Total other income (expense).*    Total other income, net, was $672,441 for the for the year ended December 31, 2020, which included other income of $1,336,115 and other expense of $663,674. For the for the year ended December 31, 2019, total other income, net, was $1,632,743, which included other income of $1,880,282 and other expense of $247,539. Other income includes interest income on bank and vendor deposits and other expense includes interest expense on financed equipment.

*Net income.*    As a result of the cumulative effect of the factors described above, net income was $20,079,739 for the year ended December 31, 2020, as compared to $11,138,596 for the year ended December 31, 2019, an increase of $8,941,143, or 80.27%. As a percentage of net sales, net income was 6.42% and 5.08% for the years ended December 31, 2020 and 2019, respectively.

**Liquidity and Capital Resources**

As of March 31, 2021, Appliances Connection had cash and cash equivalents of $23,668,538. To date, Appliances Connection has financed its operations primarily through revenue generated from operations.

*Summary of Cash Flow*

The following table provides detailed information about Appliances Connection's net cash flow for all financial statement periods presented in this prospectus.

| | Three Months Ended March 31, | | Years Ended December 31, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2020 | 2019 |
| Net cash provided by operating activities | $ 18,164,748 | $ 8,558,116 | $ 16,594,919 | 2,125,205 |
| Net cash provided by (used in) investing activities | — | — | 2,610 | (68,636) |
| Net cash used in financing activities | (9,339,122) | (2,395,852) | (7,666,660) | (1,577,959) |
| Net change in cash | 8,825,626 | 6,162,264 | 8,930,869 | 478,610 |
| Cash at beginning of period | 14,842,912 | 5,912,043 | 5,912,043 | 5,433,433 |
| Cash at end of period | $ 23,668,538 | $ 12,074,307 | $ 14,842,912 | $ 5,912,043 |

Net cash provided by operating activities was $18,164,748 and $8,558,116 for the three months ended March 31, 2021 and 2020, respectively. For the three months ended March 31, 2021, the primary drivers of the net cash provided by operating activities were net income of $19,548,224, an increase in accounts payable and accrued expenses of $4,133,312, an increase in accounts receivable of $3,582,337 and an increase in customer deposits of $1,378,736, offset by a decrease in deposits with vendors of $4,571,117, a decrease in inventory of $3,190,209, a decrease in prepaid expenses and other current assets of $1,063,163 and forgiveness of the PPP loan described below in the amount of $1,872,470.

Net cash provided by operating activities was $16,594,919 and $2,125,205 for the years ended December 31, 2020 and 2019, respectively. For the year ended December 31, 2020, the primary drivers of the net cash provided by operating activities were net income of $20,079,739, an increase in accounts payable and accrued expenses of $5,959,575, an increase in customer deposits of $5,611,683 and operating lease right-of-use assets of $1,442,621, offset by a decrease in deposits with vendors of $9,728,097, a decrease in accounts receivable of $5,674,584 and operating lease liabilities of $1,363,066. For the year ended December 31, 2019, the primary drivers of the net cash provided by operating activities

Table of Contents

were net income of $11,138,596 and an increase in accounts payable and accrued expenses of $6,768,230, offset by decreases in customer deposits of $7,612,046, inventory of $3,934,936 and deposits with vendors of $3,236,141.

Appliances Connection had no investing activities for the three months ended March 31, 2021 and 2020. Net cash provided by investing activities was $2,610 for the year ended December 31, 2020, compared with net cash used in investing activities of $68,636 for the year ended December 31, 2019. The net cash provided by investing activities for the year ended December 31, 2020 consisted of proceeds from disposal of assets of $33,444, offset by purchases of property and equipment of $30,834, while the net cash used in investing activities for the year ended December 31, 2019 consisted entirely of purchases of property and equipment.

Net cash used in financing activities was $9,339,122 and $2,395,852 for the three months ended March 31, 2021 and 2020, respectively. Net cash used in financing activities for the three months ended March 31, 2020 consisted of distributions of $9,229,947, repayments on notes payable of $103,272 and repayments of financing lease liabilities of $5,903, while net cash used in financing activities for the three months ended March 31, 2020 consisted of distributions of $2,317,868, repayments on notes payable of $72,749 and repayments of financing lease liabilities of $5,235.

Net cash used in financing activities was $7,666,660 and $1,577,959 for the years ended December 31, 2020 and 2019, respectively. Net cash used in financing activities for the year ended December 31, 2020 consisted of distributions of $9,637,816, repayments on notes payable of $318,457 and repayments of financing lease liabilities of $19,978, offset by proceeds from PPP and EIDL (as defined below) loans of $2,309,591, while net cash used in financing activities for the year ended December 31, 2019 consisted of distributions of $1,318,549, repayments on notes payable of $241,647 and repayments of financing lease liabilities of $17,763.

*Notes Payable*

Appliances Connection has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.59% to 5.74%. As of March 31, 2021, the outstanding balance of these notes is $1,584,013.

During the year ended December 31, 2020, Appliances Connection received Paycheck Protection Program, or PPP, loans pursuant to the Coronavirus Aid, Relief and Economic Security Act, or the CARES Act, in an aggregate principal amount of $1,872,470, which had two-year maturities and bore interest at 1.0% per annum. As of December 31, 2020, the outstanding balance of the PPP loans was $1,872,470. Subsequent to December 31, 2020, Appliances Connection was notified by its bank that its application for forgiveness of the PPP loans had been approved and that the loans had been forgiven in their entirety.

Additionally, during the year ended December 31, 2020, pursuant to the Economic Injury Disaster Loan, or EIDL, program under the CARES Act, Appliances Connection entered into three promissory notes with the U.S. Small Business Administration with an aggregate principal amount of $412,200. The EIDL loans have thirty-year maturities and bear interest at 3.75% per annum. The EIDL loans are secured by all of the assets of 1 Stop, Gold Coast and YF Logistics. Installment payments, including principal and interest, will begin one-year from the origination date. The EIDL loans may be prepaid at any time prior to maturity with no prepayment penalties. As of March 31, 2021 the outstanding balance of the EIDL loans is $412,100.

*Financing Leases*

In March 2018, Appliances Connection entered in an equipment financing lease to purchase a forklift for $59,326, maturing in March 2023. As of March 31, 2021, the balance payable was $30,275.

In January 2019, Appliances Connection entered in an equipment financing lease to purchase a forklift for $55,510, maturing in January 2024. As of March 31, 2021, the balance payable was $35,063.

In March 2021, Appliances Connection entered in an equipment financing lease to purchase four forklifts totaling $151,794, maturing in March 2026. As of March 31, 2021, the balance payable was $151,794.

Table of Contents

***Contractual Obligations***

Appliances Connection's principal commitments consist mostly of obligations under the notes and financing leases described above and the operating leases described under "Business — Facilities" below.

***Off-Balance Sheet Arrangements***

Appliances Connection has no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on its financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

***Critical Accounting Policies***

The following discussion relates to critical accounting policies for Appliances Connection. The preparation of the combined financial statements in conformity with GAAP requires management to make assumptions, estimates and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. Appliances Connection has identified certain accounting policies that are significant to the preparation of its combined financial statements. These accounting policies are important for an understanding of its financial condition and results of operation. Critical accounting policies are those that are most important to the portrayal of its financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to the combined financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and judgments used in the preparation of Appliances Connection's combined financial statements:

*Revenue Recognition and Cost of Revenue*

Appliances Connection records revenue in accordance with FASB ASC Topic 606. This ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. This ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments. Appliances Connection's adoption of this ASU resulted in no change to the Company's results of operations or balance sheet.

Appliances Connection collects 100% of the payment for internet and phone orders, including tax in certain jurisdictions, from the customer at the time the order is placed. Customers placing orders with a purchase order are allowed to purchase on credit and make payment after receipt of product. Appliances Connection does not incur incremental costs obtaining purchase orders from customers; however, if Appliances Connection did, because all Appliances Connection's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

Performance Obligations — The revenue that Appliances Connection recognizes arises from orders it receives from contracts with customers. Appliances Connection's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers and each order generally contains only one performance obligation based on the merchandise sale to be completed. Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, Appliances Connection's products, which generally occurs when the customer assumes the risk of loss. The transfer of control generally occurs at the point of pickup, shipment, or installation, depending on the type of order. Once this occurs, Appliances Connection has satisfied its performance obligation and Appliances Connection's recognizes revenue.

Transaction Price — Appliances Connection agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In Appliances Connection's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax that Appliances Connection collects concurrently with revenue-producing activities are excluded from revenue.

Table of Contents

Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendor to Appliances Connection.

Substantially all Appliances Connection's sales are to individual retail consumers (homeowners), builders, and designers. The large majority of customers are homeowners and their contractors, with the homeowner being key in the final decisions. Appliances Connection has a diverse customer base with no one customer accounting for more than five percent of total revenue.

*Receivables*

Receivables consists of customer's balance payments for which Appliances Connection extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom Appliances Connection purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on Appliances Connection's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

Appliances Connection historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. Appliances Connection had no significant concentrations of receivables balances as of March 31, 2021, December 31, 2020 and 2019.

*Inventory*

Inventory mainly consists of finished goods acquired for resale and is valued at the average cost determined on a specific item basis. Appliances Connection periodically evaluates the value of items in inventory and provides write-downs to inventory based on estimate of its ability to sell the item as well as general market conditions.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

|  | Useful Life (Years) |
|---|---|
| Furniture and fixtures | 7 |
| Transportation equipment | 5 |
| Machinery and equipment | 5 – 7 |
| Office equipment | 5 – 7 |
| Leasehold improvements | Shorter of lease term of estimated useful life |

*Long-lived Assets*

Appliances Connection reviews its property and equipment and any identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management if triggering events occur. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

Table of Contents

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash receivables, inventory, and prepaid expenses approximate fair value. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

Table of Contents

## CORPORATE HISTORY AND STRUCTURE

### History of Goedeker

Our company was incorporated in the State of Delaware on January 10, 2019 for the sole purpose of acquiring substantially all of the assets of Goedeker Television. On April 5, 2019, we acquired substantially all of the assets of Goedeker Television for an aggregate purchase price of $4,175,373, consisting of: (i) the issuance of a promissory note in the principal amount of $4,100,000 and a deemed fair value of $3,637,898; (ii) up to $600,000 in earn out payments with a deemed fair value of $81,494; (iii) a 22.5% ownership interest in our parent company at the time, 1847 Goedeker Holdco Inc., with a deemed fair value of $786,981, (iv) cash of $478,000, and (v) net of a working capital adjustment of $809,000. As a result of this transaction, we acquired the former business of Goedeker Television and continue to operate this business. Prior to our acquisition of substantially all of the assets of Goedeker Television, we had no operations other than operations relating to our incorporation and organization.

On October 20, 2020, we formed ACI as a wholly owned subsidiary in the State of Delaware for the sole purpose of completing the proposed acquisition. As of the date of this prospectus, we do not have any other subsidiaries.

### History of Appliances Connection

1 Stop was incorporated in the State of New York on February 2, 2000. It specializes in the sale of appliances and consumer electronics. 1 Stop operates under the assumed name appliancesconnection.com.

Gold Coast is a family-owned appliance business originally incorporated in New York in 1971 and located in Brooklyn, New York. Appliances Connection acquired Gold Coast in 2015.

Superior Deals was incorporated in the State of New York on September 21, 2000. It is in the electrical appliances, television and radio sets industry. Super Deals also operates under the assumed name appliancesconnection.com.

Joe's Appliances is a family-owned discount appliances and electronics business originally incorporated in New York in 1942 and based in Brooklyn, NY. Appliances Connection acquired Joe's Appliances in 2018.

YF Logistics was incorporated in the State of New Jersey on January 24, 2014. It is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances.

### Corporate Structure

The following chart depicts our pro forma organization structure following completion of the proposed acquisition.



Table of Contents

**PROPOSED ACQUISITION OF APPLIANCES CONNECTION**

On October 20, 2020, we entered into the purchase agreement with ACI, Appliances Connection and the holders of all of the issued and outstanding capital stock or other equity securities of Appliances Connection (which we refer to as the sellers) to acquire Appliances Connection, which was amended on December 8, 2020 and April 6, 2021. The following is a summary of the material terms and conditions of the purchase agreement. This summary may not contain all the information about the purchase agreement that may be important to you. This summary is qualified in its entirety by reference to the purchase agreement, a copy of which has been filed as an exhibit to the registration statement of which this prospectus forms a part. You are encouraged to read the purchase agreement in its entirety because it is the legal document that governs the proposed acquisition.

**Reasons for the Proposed Acquisition**

In evaluating the purchase agreement and the proposed acquisition, our board of directors consulted with our management and its advisors and, in reaching its decision to approve the purchase agreement and the transactions contemplated by the purchase agreement, our board of directors considered a variety of factors, including the following (which are not necessarily in order of relative importance):

•    the accretive nature of Appliances Connection's earnings when combined with our earnings;

•    the relatively stable nature of Appliances Connection's revenue and earnings year to year;

•    the expected synergies that would result from the business combination in the areas of product ordering, marketing, cost of goods sold and third-party logistics;

•    the location and demographic mix of Appliances Connection;

•    Appliances Connection's foothold in the country's largest market, New York, which immediately provides a model of how to be more effective in similar large urban markets throughout the United States and their demonstrated success in providing appliances at the premium and super premium part of the industry's product offerings which will allow more access to the upper end of the business model where margins are higher and less prone to swings in consumer demand;

•    the diversity of brand name product offerings of Appliances Connection, which are both complimentary and similar to our brand name product offerings;

•    the extensive assortments of global appliance brands offered by Appliances Connection; and

•    Appliances Connection's ability to provide "last mile" customer services through its large warehouse, its acquisition of inventory at discounted rates and its expertise in delivering, hooking up and hauling away of old appliances, which puts them in a top of class position for the logistics required to compete across the country on a low cost distribution model.

Our board of directors also considered the risks and potentially negative factors relating to the proposed acquisition, including:

•    the potential inability to quickly integrate the business of Appliances Connection with our own business;

•    the potential underestimation of time and resources necessary for integration and to achieve expected synergies;

•    information technology and infrastructure capability and transition costs;

•    unforeseen costs and expenses relating to the combination of the two companies;

•    supply interruptions continuing beyond the first quarter of 2021, which would impact both businesses;

•    the possibility of an economic downturn affecting demand for appliances; and

•    other risks described under the section "Risk Factors — Risks Related to Proposed Acquisition."

Table of Contents

Our board of directors believed that, overall, the potential benefits of the proposed acquisition to our stockholders outweighed the risks and uncertainties of the proposed acquisition. The foregoing discussion of factors considered by our board of directors is not intended to be exhaustive and is not provided in any specific order or ranking, but includes material factors considered by our board. In reaching its decision regarding the proposed acquisition, our board did not quantify or otherwise assign relative weights to the specific factors. Moreover, each member of our board applied his or her own personal business judgment and may have given different weights to different factors. Our board did not undertake to make any specific determination as to whether any factor, or any particular aspect of any factor, supported or did not support its ultimate determination. Our board based its decision to approve the purchase agreement on the totality of the information presented.

The factors, potential risks and uncertainties contained in this explanation of our reasons for the proposed acquisition and other information presented in this section contain information that is forward-looking in nature and, therefore, should be read in light of the factors discussed in "Cautionary Statement Regarding Forward-Looking Statements."

**Structure of the Proposed Acquisition**

Pursuant to the purchase agreement, we, through ACI, will acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection, which includes 1 Stop, Gold Coast, Superior Deals, Joe's Appliances and YF Logistics. Each of these companies will become a wholly owned subsidiary of ACI.

**Consideration**

The aggregate purchase price for our acquisition of Appliances Connection is $222,000,000, subject to adjustment as described below. The purchase price consists of (i) $180,000,000 in cash (subject to adjustment), (ii) 2,333,333 shares of our common stock having a stated value that is equal to $21,000,000 and (iii) 3,562,640 shares of our common stock, which is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the acquisition.

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the sellers shall deliver to ACI at least one day prior to the closing of the proposed acquisition a statement setting forth their good faith estimate of the net working capital of Appliances Connection (which excludes accruals for sales tax liabilities). If such estimated net working capital exceeds a target net working capital of ($15,476,941), then within five (5) days ACI shall make a cash payment to the sellers that is equal to such excess. If such target net working capital exceeds such estimated net working capital, then either (i) if finally determined at the closing, the cash portion of the purchase price shall be decreased by such excess or (ii) within 5 days of the closing, the sellers shall make a cash payment to ACI that is equal to such excess.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the proposed acquisition, ACI shall deliver to the sellers a statement setting forth its calculation of the net working capital. If such net working capital exceeds the estimated net working capital referred to above, then within five (5) days after the final determination of such net working capital ACI shall send payment by wire transfer of immediately available funds to the sellers in an amount equal to such excess. If the estimated net working capital exceeds such net working capital, then within five (5) days the sellers shall pay to ACI in cash an amount equal to such excess.

The cash portion of the purchase price will also be (i) decreased by (A) the amount of any outstanding unpaid indebtedness of Appliances Connection (other than trade debt) existing as of the closing date and (B) any transaction expenses, and (ii) increased by the amount of cash or cash equivalents held by, or on the books of, Appliances Connection as of the closing date, if any, that is in excess of $850,000.

Upon execution of the purchase agreement, ACI paid a deposit in the amount of $100,000 and upon execution of the first amendment to the purchase agreement, ACI paid an additional deposit in the amount of $75,000, all of which will be credited towards the cash portion of the purchase price at closing.

We have entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million, which will be used to pay a portion of the cash portion of the purchase price, and a revolving loan in the expected principal amount of $10 million,

Table of Contents

which will be used for general corporate and working capital purposes. We intend to use all of the proceeds of the term loan to pay a portion of the purchase price and the proceeds of this offering will be used to pay the remainder of the purchase price and related acquisition fees and expenses.

**Representations, Warranties and Covenants**

The purchase agreement contains customary representations, warranties and covenants, including those related to the operation of Appliances Connection's business prior to the closing, a customary non-solicitation covenant during the period prior to closing, and a covenant that the sellers will not compete with the business of 1 Stop as of the closing date for a period of two (2) years following closing.

The purchase agreement also contains customary demand and "piggy-back" registration rights with respect to the shares to be issued to the sellers.

**Conditions to Closing**

The closing of the purchase agreement is subject to customary closing conditions, including, without limitation:

- the receipt of all authorizations, consents, permits, licenses or approvals of all governmental authorities or other third parties;

- the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended, which has been completed;

- the absence of any temporary, preliminary or permanent restraining order preventing the consummation of the proposed acquisition;

- the release of any security interests related to Appliances Connection;

- the execution of new leases for properties leased by 1 Stop and Joe's Appliances;

- the execution of certain employment agreements between certain officers of Appliances Connection and ACI;

- the receipt of an opinion of the sellers' counsel; and

- the receipt of documents required for the transfer of the securities of Appliances Connection to ACI.

In addition, ACI shall have obtained on terms and conditions reasonably satisfactory to it all of the financing necessary to pay the cash portion of the purchase price and pay related fees and expenses to consummate the proposed acquisition and provide reasonably adequate working capital for Appliances Connection after the closing.

The purchase agreement contains a number of conditions that must be fulfilled to complete the proposed acquisition. There can be no assurance that the conditions to the closing will be satisfied or that the proposed acquisition will be completed. See "Risk Factors — Risks Related to the Proposed Acquisition."

**Lock-Up Agreement**

Each seller agreed to enter into a lock-up agreement which will provide that the seller may not transfer or assign or otherwise dispose of the shares that will be issued to such seller at closing for a period of 180 days after the closing, and thereafter the seller will only be permitted to sell shares at a rate of no more than one percent of our outstanding stock per quarter until the one year anniversary of the closing.

**Indemnification**

The purchase agreement contains mutual indemnification for breaches of representations or warranties and failure to perform covenants or obligations contained in the purchase agreement. In the case of the indemnification provided by the sellers with respect to breaches of certain non-fundamental representations and warranties, the sellers will only become liable for indemnified losses if the amount exceeds an aggregate of $2,100,000, whereupon the sellers will be liable for all losses relating back to the first dollar, provided that the liability of the sellers for breaches of certain non-fundamental representations and warranties shall not exceed $21,000,000.

Table of Contents

**Termination**

The purchase agreement may be terminated as follows:

- by mutual written consent of ACI, our company and the sellers at any time prior to the closing;

- by either ACI and our company or the sellers if any governmental entity will have issued an order or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by the purchase agreement;

- by either ACI and our company or the sellers if the closing does not occur on or before June 30, 2021; provided, that the right to terminate shall not be available to any party that has breached in any material respect its obligations under the purchase agreement in any manner that shall have caused the failure of a condition to the consummation of the proposed acquisition;

- by ACI and our company if any seller or Appliances Connection has breached its respective representations and warranties or any covenant or other agreement to be performed by it in a manner such that the closing conditions related to such representations, warranties or covenants of such party would not be satisfied; or

- by the sellers if ACI or our company has breached its representations and warranties or any covenant or other agreement to be performed by it in a manner such that the closing conditions related to such representations, warranties or covenants of such party would not be satisfied.

In the event that the purchase agreement is terminated in accordance with the circumstances described in the first, second or fourth bullets set forth above, the deposit referred to above shall be returned to ACI with two (2) business days. In the event that the purchase agreement is terminated by the sellers in accordance with the circumstances described in the third or fifth bullets set forth above, the sellers shall retain the deposit.

83

Table of Contents

**BUSINESS**

**Overview**

*About Goedeker*

Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 SKUs across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

*About Appliances Connection*

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website *1stopcamera.com*.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at *goldcoastappliances.com*.

Joe's Appliances, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, *joesappliances.com*.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website *www.appliancesconnection.com*.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

Appliances Connection has built powerful home-grown logistics technology that can help reduce cycle time and efficiencies for the combined company's operations. Appliances Connection will bring the relationships, network, and technology necessary to continue economies of scale for the entire business of the combined company throughout the United States e-commerce market. The combined company will leverage Appliances Connection's powerful platform to increase speed, reduce costs and increase margins across our entire business.

Table of Contents

On a pro forma basis, the combined company had total sales of $368 million for the year ended December 31, 2020 and $123 million for the three months ended March 31, 2021.

**The Large and Growing United States Appliance Market**

The United States household major appliances market is highly fragmented with big box retailers, online retailers, and thousands of local and regional retailers competing for share in what has historically been a high touch sale process. According to Statista, revenue in the United States household major appliances market (excluding small appliances) is projected to reach $22.9 billion in 2021 and is expected to grow at an annual growth rate of 1.68% from 2021 to 2025.

According to the United States Census Bureau, there are approximately 100 million households in the United States with annual incomes between $25,000 and $250,000 and approximately 193 million individuals between the ages of 20 and 64 in the United States, many of whom are accustomed to purchasing goods online. As younger generations age, start new families and move into new homes, we expect online sales of household appliances to increase. In addition, we believe the online household appliances market will further grow as older generations of consumers become increasingly comfortable purchasing online, particularly if the process is easy and efficient.

When shopping for appliances their homes, consumers bring their own unique combination of style and budget, requiring vast selection to garner broad appeal. Brick and mortar retailers must balance selection with the challenges of high inventory carrying costs, complex vendor requirements and limited showroom and storage space. As a result, consumers are faced with a decision between shopping in multiple stores, or settling for what is available. Just as e-commerce has changed the landscape of other retail sectors, we believe an easy-to-browse, online shopping experience with massive selection and excellent customer service has the potential to change the way people buy household appliances.

Logistics, fulfillment and customer service for household appliances are challenging given the myriad vendors and product specifications, and the cumbersome size and weight of items. Household appliances often have a low dollar value to weight ratio compared to other categories of retail, therefore requiring a logistics network that is optimized for items with those characteristics. Many consumers also seek first-rate customer service so they are not burdened with managing delivery, shipping and return logistics on their own. However, we believe big box retailers that serve the mass market for home goods are often unable or unwilling to provide this level of service.

**Our Solution — Key Benefits for Our Customers**

The combined company will offer broad selection and choice. We believe that the combined company will offer the largest online selection of household appliances, with over 51,000 household appliance SKUs. The combined company's easy to use websites make it easy for customers to discover products, styles and price points that appeal to them. Convenience and value are central to our offering. The combined company will offer a one-stop shop for consumers in the appliance category, with competitive pricing reflecting the many vendors on its platform and a differentiated and robust merchandising experience.

The combined company will offer consumers an engaging shopping journey through the combination of its technology-rich platform and its experienced customer support personnel, available via chat, email, text and phone. Superior customer service will be a core part of the experience that the combined company will offer shoppers. The combined company's customer service organization will help consumers navigate its sites, answer questions and complete orders, staffed with specialists focused on specific product classes. This team will help the combined company build trust with consumers, enhance its reputation and drive sales.

**Competitive Strengths**

We believe that the combined company will be a leading e-commerce appliance retailer due to its following key strengths:

- *Name and reputation*.    We believe that the combined company will enjoy a long-standing (50+ years) reputation with vendors and customers for its focus on offering a full line of appliances and other home furnishings with competitive pricing and superior customer service.

- *Product selection and pricing*.    We believe that the combined company's broad product selection and attractive pricing model will create a sustainable competitive advantage. The combined company will

85

Table of Contents

strive to offer consumers the broadest choice in the market and review pricing by other retailers on a daily basis to ensure its product offerings are competitively priced. Goedeker and Appliances Connection have negotiated attractive terms with their respective vendor partners, allowing them to pass through savings and selection to customers.

• *Website ease of use*.    The combined company's purpose-built technology platform will be designed to provide consumers with a compelling user experience as they browse, research and purchase its products. The combined company will use personalization, based on past browsing and shopping patterns, to create a more engaging consumer experience.

• *Best in class customer service and marketing technology*.    We believe that the investments that Goedeker and Appliances Connection have made in their respective call center tools and shopping platforms, combined with digital marketing optimization, will allow the combined company to offer an unmatched customer journey.

• *Logistics technology and efficiency*.    The combined company's proprietary technology will eliminate manual steps and reduce order processing time, allowing it to provide faster services to customers.

**Our Growth Strategies**

Our mission is to change the way consumers buy appliances and, in doing so, become the leading online retailer of home appliances. The strategies of the combined company to achieve this mission, while increasing value for our shareholders, will include:

• *Grow our brand*.    Increasing brand awareness and growing favorable brand equity among consumers is central to the growth, of the combined company following the proposed acquisition. The combined company plans to drive brand awareness through a combination of sophisticated, multi-layered marketing programs and word-of-mouth referrals. The combined company will continue to invest in marketing initiatives to efficiently attract consumers.

• *Expand in the commercial market*.    To date, Goedeker and Appliances Connection have directed all marketing efforts toward the consumer. With remodels and new home construction, there is opportunity to market to home builders, real estate developers, contractors and interior designers who are making or influencing the purchasing decision for many consumers. We believe that the combined company's low price business model will be received well by this market, creating substantial revenue opportunities and more repeat business. Evidence of unmet demand and market need is ongoing with large commercial sales occurring organically each week through Goedeker and Appliances Connection's websites and contact centers.

• *Drive continued operational excellence*.    Goedeker and Appliances Connection are committed to improving productivity and profitability through several operational initiatives designed to grow revenue and expand margins. Some of the key initiatives for operational excellence for the combined company include:

• *Logistics and shipping optimization*.    The combined company will implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. The combined company plans to pick up product from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, we expect to take advantage of buying opportunities and capture time-sensitive customers more frequently. The combined company will also explore options to use a showroom, warehousing and cross dock model in other key markets.

• *Optimize price*.    The combined company will continue building a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing for our products.

Table of Contents

- *Drive marketing efficiencies*.    As the combined company continues to grow and scale, we believe that the combined company will continue to improve the efficiency of its marketing investments. We believe that with larger budgets and deeper experience, the combined company will benefit from lower media rates and increased data that will improve its customer targeting capabilities.

- *Opportunistically pursue strategic acquisitions*.    The combined company may continue to expand its business through opportunistic acquisitions that allow it to enhance its customer offering, build its multi-brand portfolio, enter new geographies or enhance its operational infrastructure.

## Products and Services

### Appliances

The appliance category is our largest revenue source. We have a long history of selling these products and serving the distinct needs of consumers looking to replace or add to their home appliances. We offer nearly 22,000 appliance SKUs from all mainline original equipment manufacturers, including Bosch, Whirlpool, GE, Maytag, LG, Samsung, Sharp, and Kitchen Aid, among others. We sell all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers.

Appliances Connection is an authorized dealer of most major appliance brands, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool. It offers approximately 51,000 appliance SKUs. It sells all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers, and air conditioners.

### Furniture

We began selling furniture online in 2015 and currently offer approximately 63,000 SKUs from approximately 150 furniture vendors. Appliances Connection also sells a full line of furniture for every room in the home and currently offers approximately 247,700 SKUs from approximately 240 furniture vendors.

Both companies utilize sophisticated websites that include organization of product by type and characteristics that make for a complete shopping experience in a complicated product category.

### Other Products

We also offer a broad assortment of products in the décor, bed & bath, lighting, outdoor living and electronics categories. While these are not individually high-volume categories, they complement the appliance and furniture categories to produce a one-stop home goods offering for our customers.

Appliances Connection also sells outdoor living products, fitness equipment, plumbing fixtures, air conditioners, fireplaces, fans, dehumidifiers, humidifiers, air purifiers and televisions. Appliances Connection also sells commercial appliances for its builder and business clients.

Appliances Connection is an authorized dealer of most major outdoor appliance and furniture brands. It sells all major outdoor living appliances and furniture including various types of electronic, charcoal, and gas grills, barbeques, and smokers. Appliances Connection also offers anything a customer would need to create a fully functioning outdoor kitchen, including outdoor refrigerators, sinks, ranges, kitchen islands, ice makers, and warming drawers. Appliances Connection's patio and lawn furniture selection include umbrellas, lounge chairs, outdoor beds, outdoor fireplaces and fire pits, swings, patio sets, and patio sofas.

We also offer customers the opportunity to purchase warranties that protect their appliances beyond the manufacturers' warranty period. These warranties are offered through third party vendors. We remit the cost of the warranty to the warranty company, net of our commission. The warranty company assumes all costs of the warrantied product.

### Installation and Other Services

We and Appliances Connection offer installation and removal services within the continental United States. A full-service install involves hooking up the appliance, testing it to ensure proper operation, and removing packing materials from customer's home, office or other delivery location. We fulfill such installation services through third-party logistics

87

Table of Contents

service provider partners. Appliances Connection primarily fulfills such installation services internally through YF Logistics, utilizing third-party logistics service provider partners provide these services to delivery points in remote areas within the continental United States where YF Logistics may not be available.

Appliances Connection also has outside business partners such as Scavolini, a leader in kitchen cabinetry and design, and an in-house design team trained by the experts at Scavolini that will help customers remodel and reinvent their kitchens, living rooms, bathrooms and laundry rooms.

**Pricing**

We believe that our pricing model creates a competitive advantage as we strive to sell at the lowest possible price in the market. Our team tracks pricing daily on more than 15,000 appliance SKUs, comparing prices with all major resellers. Adjustments are made daily to ensure the success this strategy. Our business model emphasizes value added products up to and including super premium products. As a result, we believe that our average selling price by product category is higher than industry norms.

Appliances Connection provides the customer with a full suite of appliance and furniture options, from familiar household names up to luxury and premium brands, utilizing a pricing model intended to offer customers the lowest prices available in the market. This allows the customer to easily find the appliance they are looking for within their budget. Appliances Connection's team tracks the manufacturer minimum advertised price, or MAP, daily on more than 51,000 appliance SKUs, comparing prices across all major resellers. Price adjustments are made monthly or more frequent basis to ensure product offerings are competitively priced, maximizing value for customers.

**Vendor/Supplier Relationships**

We offer more than 240 vendors and over 141,000 SKUs available for purchase through our website. During the year ended December 31, 2020, we purchased a substantial portion of products from Whirlpool (38%) and General Electric brands (12.3%). Whirlpool brands accounted for 44.1% of product purchases during the year ended December 31, 2019. No other supplier accounted for more than 10% of our purchases in the years ended December 31, 2020 or 2019.

Appliances Connection offers more nearly 2,000 vendors and nearly 300,000 SKUs available for purchase through its website. Appliances Connection is a member of Dynamic Marketing, Inc., or DMI, a 60-member appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and them make such products available to its members, including Appliances Connection, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including Appliances Connection, with leverage and purchasing power with appliance vendors, and increases Appliances Connection's ability to compete with competitors, including big box appliance and electronics retailers. Appliances Connection owns an approximate 5% equity interest in DMI. Additionally, Albert Fouerti, one of the owners of Appliances Connection who will also become a member of our board of directors upon closing of the proposed acquisition, is on the Board of DMI. During the years ended December 31, 2020 and 2019, Appliances Connection purchased a substantial portion of products (75.2% and 70.7%, respectively) from DMI. The other largest vendors include the following: Ashley Furniture, Sub-Zero, Miele, BSH Home Appliances, Ilve, and ALMO Distributing. Appliances Connection's business model allows it to constantly review and evaluate each supplier relationship and it is are always open to building new supplier/vendor relationships.

As noted above, we are substantially dependent on Whirlpool for a large portion of our product purchases and Appliances Connection utilizes DMI for a large portion of its product purchases. Products are purchased from all suppliers, including any purchases made from Whirlpool or through DMI, on an at-will basis. Neither our company nor Appliances Connection has any long-term purchase agreements with Whirlpool or DMI, as applicable, or any other suppliers. Relationships with suppliers are subject to change from time to time. Changes in relationships with suppliers occur periodically and could positively or negatively impact net sales and operating profits. We believe that both companies can be successful in mitigating negative effects resulting from unfavorable changes in the relationships with suppliers through, among other things, the development of new or expanded supplier relationships. Please see "Risk Factors" for a description of the risks related to supplier relationships, including our dependence on Whirlpool.

Table of Contents

**Sales and Marketing**

*Goedeker*

We market our products through a variety of methods, including through paid shopping and paid searches, display marketing, affiliate marketing, organic marketing, paid social media marketing and email marketing. The diagram below sets forth some of our key marketing statistics for 2020.



This chart shows results from our marketing efforts. The revenue shown exceeds total revenue as a customer may visit the site more than once before making a purchase, causing revenue attribution in multiple channels.

*Paid Shopping and Paid Search*

Our most effective channel is paid shopping and paid search. We utilize multiple search platforms (primarily Google) to put our products in front of consumers that are searching for products online. We have engaged a "best in class" agency and continually monitor and optimize campaigns in order to create more efficient and profitable campaign results. We specialize in a "bottom of the funnel" approach, meaning our campaigns are designed to spend more liberally with those at the end of the purchase cycle, and more conservatively with those in the beginning of the purchase journey.

*Display Marketing*

The majority of our display efforts are in the form of remarketing across the Google ad network. At this time, we are not focused on major branding efforts as much as we are on capitalizing on consumers who have begun their buying journey. With high average order values, we find that remarketing works effectively at bringing consumers back on the website or the phone to place an order.

*Affiliate Marketing*

Keeping a keen eye on nexus laws, we have scaled back our affiliate marketing in order to protect the interests of our company. We have found that the administrative burden and tax impact or revenue generated by many of the affiliates outweighed the benefits. As of the date of this prospectus, we have only one affiliate marketing relationship remaining with 169 affiliate partners.

89

Table of Contents

*Organic Marketing*

Organic marketing continues to be a strong channel for our company. While we are not heavily invested in organic at this time, the channel resulted in approximately 1.1 million users coming to our website in 2020. We understand best practices in technology, programming, copywriting, link acquisition as well as many other strategies to ensure we are in a strong position with the largest search engines.

*Paid Social Media*

Social media is utilized sparingly to drive traffic and manage brand perception. It is our goal to not look irrelevant to consumers viewing us on social media, while at the same time minimizing spending on these channels. We have found awareness campaigns on social media to be ineffective with products at our price point. We do take advantage of the remarketing opportunities on Facebook, which work well for us by driving highly qualified traffic back to our website where that traffic is converted to customers.

*Email*

Using email marketing, we put relevant products and offers in front our of a growing email database of approximately 259,000 opted-in consumers multiple times per week. Our marketing team produces email content by utilizing in-house design, copy and programming resources. Messages are sent using an enterprise-level email service provider and metrics such as deliverability, open rates and click rates are constantly monitored. Messages are targeted to individuals based on numerous factors including what time they are most likely to read emails, past purchase behavior and frequency of interaction.

Additionally, we utilize a multitude of triggered email programs, such as cart and browse abandonment, to entice customers back into the funnel. We continue to pursue best practices such as offer modals and scraping the checkout in order to facilitate continued list growth. Below is a diagram representing key performance metrics for the period from July to December 2020.



**Appliances Connection**

Appliances Connection markets its products through a variety of methods, including through online advertisements and promotions and digital marketing, including through Appliances Connection's retail website, *www.appliancesconnection.com*. To a lesser degree, it also utilizes more traditional forms of marketing like television and radio advertisements in the New York City media market.

Table of Contents

*Online Advertisement and Promotions*

Appliances Connection's major marketing channel is its website located at *www.appliancesconnection.com*. The website is key to new product launches as consumers can view product features and specifications. The website is up to date with all promotional MAP pricing, falling in line with expectations from the manufacturers and taking advantage of buyer holidays. The website facilitates sales of products to markets not reached by Appliances Connection's brick and mortar store.

*Digital Marketing*

Appliances Connection has more than 12,100 followers on Twitter, 28,700 fans on Facebook and 2,000 subscribers on YouTube. It has been using digital marketing media with engaging posts to promote its products.

*Television and Radio Marketing*

Appliances Connection utilizes television and radio marketing as a more traditional means to reach customers who may not be as active online or on social media, primarily targeting the New York City media audience.

*Showrooms*

Appliances Connection maintains two showrooms in Brooklyn, New York where customers can fully visualize their renovations by touching and seeing the products in the showroom. The showrooms also allow customers to access factory-trained staff's knowledge and experience to assist customers with their product selections.

**Customers and Markets**

Based on a study that we commissioned in 2019, our average shopper is between 35 and 64 years old and lives in a single-family home, which they own. Most of our customers are not reluctant to buy at a premium price for top quality as long as we and our products provide good value. Our most popular brands tend to be middle to upper market brands that are not found in the stores of many large retailers. A significant percentage of our customers have household income above $100,000.

Our physical store presence and warehouse is located in St Louis, Missouri, and third-party distribution, delivery and installation agreements allow us to serve, sell and ship to customers nationwide. We plan to expand our agreements directly with manufacturers to pick up and deliver from their warehouse to reach more customers, more quickly at reduced costs. In fact, while we started many years ago as a brick and mortar only business, about 78% of our sales originate from outside the Midwest market. The diagram below represents our sales by region for 2020:



Table of Contents

Most of Appliances Connection's customers are not reluctant to buy at a premium price for top quality as long as Appliances Connection and its products provide good value. The most popular brands tend to be middle to upper market brands that are not found in the stores of many large retailers. Customers demand variety and Appliances Connection has successfully been able to provide them with an abundance of options when it comes to choosing their household appliances and furniture.

While Appliances Connection's physical showrooms are located in Brooklyn, New York and its warehouse is located in New Jersey, the combination of YF Logistics and third-party distribution, delivery and installation agreements allow Appliances Connection to serve, sell and ship to customers nationwide. Its proprietary logistical technology has allowed it to expand its presence outside of the Northeast region and Appliances Connection is able to provide customers all over the country with the top-notch level of support that the original Northeastern customers have always enjoyed. While about one-third of Appliances Connection's sales are still in the Northeast market, it has successfully been expanding its footprint into the rest of the Continental United States The diagram below represents Appliances Connection's sales by region for 2020:



**Customer Support**

Our customer support team exists to sell and service customers at all parts of the buying and ownership cycle. We believe that by integrating phone support with marketing efforts, we differentiate ourselves from big box and independent retailers. Leading edge contact center technology and management is in early stage deployment and promises to increase sales close rates, decrease cancellations, increase average ticket size and create customers that purchase within the next twelve months. Current repeat purchasing is roughly 11% within a year, which demonstrates a reasonable satisfaction with the current model. We have a customer service team of 29 members and call center sales team of 22 members.

Our call center is now available to field inbound customer calls from 8:00 am to 6:00 pm CT, Monday through Saturday and Sunday from 12:00pm to 6:00 pm CT. Approximately 36% of all sales involve an order that was placed with a sales representative. This percentage should increase in 2021 as chat becomes a more deployed resource for our shoppers and customers.

Appliances Connection's in-house customer support team facilitates sales and support for its products at each stage of the purchasing process as well as ongoing post-sale technical support. Appliances Connection's customer care staff, which includes approximately 54 employees, includes a highly-trained and knowledgably call center sales team that also provides customer support over the phone, via email, or via online chat on its website. Additionally, the customer care staff provides technical support to customers, offering additional information with respect to product features and manufacturer warranties to increase customer satisfaction and return business.

92

Table of Contents

Appliances Connection's call center is now available to field inbound customer calls from 9:00 am to 9:00 pm ET, Monday through Thursday, Friday from 9:00 am to 4:00 pm ET and Sunday from 10:00 am to 5:00 pm ET. Approximately 50% of all sales involve an order that was placed with a sales representative. Appliances Connection expects this percentage to increase in 2021 as online chat becomes a more deployed resource for shoppers and customers.

**Logistics**

*Purchasing and Inventory Management*

We primarily purchase inventory only after a sale has been made through our website, which allows us to tightly manage our inventory and warehouse space while still providing customers quick delivery times and control over the entire process. However, we do also make some strategic inventory buys to take advantage of lower costs and to satisfy consumer demand more quickly. About 64% of appliances flow through our warehouse while almost all furniture is drop shipped to the customer. All inventory is managed with a barcode system and is automatically tracked through our Microsoft Dynamics GP ERP system. As described above, initiatives are underway that will allow us to pick up products closer and more quickly directly from our manufacturers' warehouses.

Appliances Connection carefully monitors and manages its inventory levels in an effort to match quantities on hand with customer demand as closely as possible by tracking historical and projected consumer demand, as well as continuous monitoring and adjustment of inventory receipt levels. In some instances, Appliances Connection purchases inventory only after a sale has been made through its website. Nearly all of Appliances Connection's appliances flow through its Hamilton, New Jersey warehouse. All inventory is managed with a barcode system and is automatically tracked through its proprietary in-house inventory management system.

*Shipping and Delivery*

We take ownership of inventory when it is delivered to our warehouse. At this point, warehouse staff unloads the product, determines the delivery location, picks a carrier and ultimately ships the product. We primarily use R+L Carriers for most of our larger shipping services. We also use AM Home Delivery for furniture deliveries. If a customer is outside of their service zones or requires faster delivery times, we will use one of our three or four specialty carriers to get the job done.

Appliances Connection takes ownership of inventory when it is delivered to its warehouse in New Jersey. At this point, warehouse staff unloads the product, determines the delivery location, picks a carrier and ultimately ships the product. Appliances Connection primarily uses YF Logistics for its shipping and logistics services; however, if the shipment is outside of YF Logistics' service zone, it utilizes other third party carriers for shipping and installation services to get the job done.

Appliances Connection plans to implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. Appliances Connection plans to pick up product from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, Appliances Connection expects to take advantage of buying opportunities and capture time-sensitive customers more frequently. The combined entity will explore options to use a showroom, warehousing and cross dock model in other key markets.

*Returns and Exchanges*

We offer a 30-day money back, 100% satisfaction guarantee. If a customer is not satisfied with his or her order, we will exchange or refund the full purchase price, minus all shipping costs, within 30 days of delivery. We do not charge a restocking fee when items are returned or exchanged, which we believe differentiates us from other retailers. We will not take returns of, or exchange, products that are damaged, installed, assembled, or used after the customer has taken delivery.

Appliances Connection offers a 30-day return policy that allows customers to return merchandise if, for any reason, they are not 100% satisfied with their purchase. If a customer is not satisfied with his or her order, Appliances Connection will exchange or refund the full purchase price within 30 days of delivery.

Each company's return and exchange policy is designed to be as worry-free and customer-friendly as possible.

Table of Contents

**Competition**

Both companies compete with big box retailers, independent appliance and furniture retailers, hybrid retail and direct-to-consumer companies and web only companies. As hybrid retail and direct-to-consumer companies, they have the ability to navigate the competitive offerings of each competitor, utilizing online marketing, their customer service expertise and large curated assortments to attract and retain new customers.

*Appliances*

The United States appliance market in general is highly fragmented with thousands of local and regional retailers competing for share. The primary competitors in the appliance market include:

- *Big Box Retailers:*   Home Depot, Lowe's, Best Buy and Walmart

- *Online Retailers and Marketplaces:*   Amazon and Wayfair

- *Specialty Retailers:*   AJ Madison and US Appliance

- *Regional Retailers:*   P.C. Richards & Sons

The shifting landscape to online sales in the segment is providing a significant market share capture and positioning opportunity for companies. Both companies are continuing to capitalize on this market shift.

*Furniture and Homewares*

Although consolidation in the United States furniture and homeware market continues to progress, the industry is still relatively fragmented compared to other retail subsectors of similar market value. The main competitors in the furniture and homewares market include:

- *Furniture Stores:*   Ashley Furniture, Bob's Discount Furniture, Havertys, Raymour & Flanagan and Rooms To Go

- *Big Box Retailers:*   Bed Bath & Beyond, IKEA, Target and Walmart

- *Department Stores:*   JCPenney and Macy's

- *Specialty Retailers:*   Crate and Barrel, Ethan Allen, TJX, At Home, Williams Sonoma, Restoration Hardware, Arhaus, Horchow, Room & Board and Mitchell Gold + Bob Williams

- *Online Retailers and Marketplaces:*   Amazon, Wayfair and eBay

Much like the appliance market, the shifting landscape to online sales in the segment is providing a significant market share capture and positioning opportunity for companies. Both companies are continuing to capitalize on this market shift. We believe there may be opportunities for nationally distributed niche products, like sleeper sofas, where we could benefit from not inventorying product but marketing and then ordering on demand after payment. Similar opportunities are even more broadly available in the appliance market.

**Intellectual Property**

We own several domain names, including for our *www.goedekers.com* website.

1 Stop operates under the registered trademark "CONNECT TO GOOD." Superior Deals owns four registered trademarks, "FORTÉ," "SUPERIORBRANDS," "MILO ITALIA" and "SUPERIORBRANDS." 1 Stop and Gold Coast own numerous domain names, including the  *www.appliancesconnection.com website, as well as 1stopcamera.com, goldcoastappliances.com, and joesappliances.com.*

The agreements with suppliers generally provide us and Appliances Connection with limited, non-exclusive licenses to use the supplier's trademarks, service marks and trade names for the sole purpose of promoting and selling their products.

94

Table of Contents

To protect intellectual property, both companies rely on a combination of laws and regulations, as well as contractual restrictions. They also rely on the protection of laws regarding unregistered copyrights for certain content they create. They also rely on trade secret laws to protect proprietary technology and other intellectual property. To further protect intellectual property, we enter into confidentiality agreements with our executive officers and directors.

**Facilities**

We are headquartered at 3817 Millstone Parkway, St. Charles, MO 63301. This facility totals 86,800 square feet of office, showroom and warehouse space. We lease this facility pursuant to a lease agreement with Westgate 200, LLC, dated January 13, 2021, and amended on March 30, 2021. The initial term of the lease expires on April 30, 2027 with two (2) options to renew for additional five (5) year periods. The base rent is initially $20,976.79 per month and increases to $31,465 on October 1, 2021, with annual increases thereafter to a base rent during the sixth year of $35,558 per month. We also pay our 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and are also responsible to pay for the utilities used on the premises.

Our prior headquarters were located in Ballwin, MO. This facility totals 50,000 square feet of office, showroom and warehouse space. We lease this facility pursuant to a lease agreement entered into with S.H.J., L.L.C., a Missouri limited liability company and affiliate of Goedeker Television, on April 5, 2019. The lease is for a term of five (5) years and provides for a base rent of $45,000 per month. In addition, we are responsible for all taxes and insurance premiums during the lease term. We intend to continue to use this space for at least the next few months as we continue to transition our operations to the St. Charles location.

Appliances Connection is headquartered at 1870 Bath Avenue, Brooklyn, NY 11214. It has a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York.

Appliances Connection leases two facilities pursuant to lease agreements entered into between 1 Stop and Joe's Appliances and 1870 Bath Ave. LLC and 7812 5th Ave Realty LLC, respectively, which are entities owned and controlled by Albert Fouerti and Elie Fouerti, the principal officers and owners of 1 Stop and Joe's Appliances. The leases are for a term of ten (10) years and provide for different monthly fixed rent from $5,300 per month to $74,000 per month for the first year of the term. In addition, Appliances Connection is responsible for all taxes and insurance premiums during the lease term.

YF Logistics subleases the warehouse space from DMI for a rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty (30) days' prior written notice or (ii) April 30, 2024.

We believe that all properties have been adequately maintained, are generally in good condition, and are suitable and adequate for the businesses of Goedeker and Appliances Connection.

**Employees**

As of March 31, 2021, we employed 107 full-time employees, 1 Stop employed 192 full-time employees, YF Logistics employed 145 full-time employees, Superior Deals employed 5 full-time employees, Joe's Appliances employed 3 full-time employees and Gold Coast employed 2 full-time employees. None of the employees are represented by labor unions, and we believe that Goedeker and Appliances Connection have excellent relationships with their respective employees.

**Legal Proceedings**

From time to time, the combined company may become involved in various lawsuits and legal proceedings which arise in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these or other matters may arise from time to time that may harm our business. We are not currently aware of any such legal proceedings or claims that we believe will have a material adverse effect on the business, financial condition or operating results of Goedeker, Appliances Connection or the combined company.

95

Table of Contents

**Regulation**

Our combined business is subject a variety of laws and regulations applicable to companies conducting business on the Internet. Jurisdictions vary as to how, or whether, existing laws governing areas such as personal privacy and data security, consumer protection or sales and other taxes, among other areas, apply to the Internet and e-commerce, and these laws are continually evolving. For example, certain applicable privacy laws and regulations require us to provide customers with our policies on sharing information with third parties, and advance notice of any changes to these policies. Related laws may govern the manner in which we store or transfer sensitive information or impose obligations on us in the event of a security breach or inadvertent disclosure of such information. Additionally, tax regulations in jurisdictions where we do not currently collect state or local taxes may subject us to the obligation to collect and remit such taxes, or to additional taxes, or to requirements intended to assist jurisdictions with their tax collection efforts. New legislation or regulation, the application of laws from jurisdictions whose laws do not currently apply to our business, or the application of existing laws and regulations to the Internet and e-commerce generally could result in significant additional taxes on our business. Further, we could be subject to fines or other payments for any past failures to comply with these requirements. The continued growth and demand for e-commerce is likely to result in more laws and regulations that impose additional compliance burdens on e-commerce companies.

96

Table of Contents

**MANAGEMENT**

**Directors and Executive Officers**

Set forth below is information regarding our directors, executive officers and significant employees as of the date of this prospectus.

| Name | Age | Position |
|---|---|---|
| Douglas T. Moore | 64 | Chief Executive Officer and Director |
| Robert D. Barry | 77 | Chief Financial Officer |
| Thomas S. Harcum | 38 | Chief Marketing Officer and Chief Technology Officer |
| Jacob Guilhas | 42 | Vice President of Logistics |
| Michael K. Hargrave | 55 | Chief Merchant |
| Albert Fouerti | 41 | President of ACI and Director Nominee[1] |
| Elie Fouerti | 42 | Vice President of ACI[2] |
| Ellery W. Roberts | 50 | Chairman of the Board |
| Edward J. Tobin | 64 | Director |
| Ellette A. Anderson | 44 | Director |
| Clark R. Crosnoe | 52 | Director |
| Paul A. Froning | 50 | Director |
| Glyn C. Milburn | 50 | Director |
| Alan P. Shor | 62 | Director Nominee[3] |

——————

(1)    Albert Fouerti will become the President of ACI and a member of our board of directors upon closing of the proposed acquisition.

(2)    Elie Fouerti will become the Vice President of ACI upon closing of the proposed acquisition.

(3)    Alan P. Shor will become a member of our board of directors upon closing of the proposed acquisition.

*Douglas T. Moore*.    Mr. Moore has served as our Chief Executive Officer since August 2019 and as a director since April 2020. Through his more than 25 years of retail experience, Mr. Moore has developed an understanding of strategic and tactical business issues that include store operations, merchandising, supply chain, sourcing and human resource planning. He also possesses senior management, marketing, risk assessment and retail knowledge. Prior to joining us, Mr. Moore was President and Chief Executive Officer of Med-Air Homecare, a home healthcare equipment and service provider, from November 2013 until May 2019, Principal of First Street Consulting, LLC, a retail consulting firm, from January 2011 until October 2017, and Senior Vice President of FirstSTREET for Boomers and Beyond, Inc., a leading direct marketer of products for baby boomers, from October 2017 until August 2019. From February 2012 through June 2012, Mr. Moore served as the Chief Merchandising and Marketing Officer at hhgregg, Inc., a consumer electronics retail chain. Mr. Moore has served on the board of directors of Lumber Liquidators Holdings, Inc., one of the leading specialty retailers of hard-surface flooring in North America, since April 2006. Mr. Moore received his undergraduate degree and M.B.A. from the University of Virginia. We believe Mr. Moore is qualified to serve on our board of directors due to his extensive experience in the retail industry and public company board experience.

*Robert D. Barry*.    Mr. Barry has served as our Chief Financial Officer since our inception and as a director from inception until April 2020. He has served on the board of directors of our former parent company, 1847 Holdings LLC, or 1847 Holdings, since January 2014 and has served as Controller of 1847 Holdings' subsidiary Neese, Inc., since July 2017. From April 2013 until August 2016, Mr. Barry was Chief Executive Officer and Chief Financial Officer of Pawn Plus Inc., a chain of five retail pawn stores in suburban Philadelphia and one pawn store in northeastern Ohio. Prior to that, Mr. Barry served as Executive Vice President and Chief Financial Officer of Regional Management Corp., a consumer loan company based in Greenville, South Carolina, from March 2007 to January 2013. Prior to joining Regional Management Corp., Mr. Barry was the Managing Member of AccessOne Mortgage Company, LLC in Raleigh, North Carolina, from 1997 to 2007. During this time, he also served as part-time Chief Financial Officer for Patriot State Bank, in Fuquay-Varina, North Carolina, from March 2006 to March 2007 and Nuestro Banco, Raleigh, North Carolina, from July 2006 to March 2007. Prior to his time at AccessOne, Mr. Barry was Executive Vice President and Chief Financial Officer for Regional Acceptance Corporation, a consumer finance company based in Greenville, North Carolina and prior to that he was a financial institutions partner in the Raleigh, North Carolina office of KPMG LLP. Mr. Barry is a Certified Public Accountant licensed in North Carolina and Georgia.

97

Table of Contents

***Thomas S. Harcum***.   Mr. Harcum has served as our Chief Marketing Officer and Chief Technology Officer since January 2020. He has almost 20 years of experience in marketing and technology in several fields, including pharmaceuticals and publishing. Particularly, Mr. Harcum's expertise includes direct to consumer e-commerce, lead generation and cost center management and P&L responsibilities for marketing funnel management, customer acquisition, telephony, product development, technology management, project management, development lifecycle and brand management. Previously, he was the Senior Director of Marketing for firstSTREET from October 2012 to December 2019. Mr. Harcum has a B.A. from Virginia Commonwealth University.

***Jacob Guilhas***.   Mr. Guilhas has served as our Vice President of Logistics since October 2020. In his 20 years of retail logistics experience, he has vast experience in leading a full spectrum of multi-site business operations in highly competitive, fast-paced, and complex environments. Prior to joining us, Mr. Guilhas served as Managing Director at FedEx Supply Chain from March 2016 to October 2019, Head of Logistics and Fulfillment for Groupon from October 2014 to March 2016, facility General Manager with Exel (now DP-DHL) from September 2013 to October 2014, and Regional Operations Director for Walmart eCommerce from September 2003 to September 2013. Mr. Guilhas has served in leadership positions for multiple large-scale distribution and fulfillment centers, and has led a variety of projects including multiple distribution center "greenfield" start-ups, international operations start-ups, and long-term strategic planning. Mr. Guilhas brings specialized experience in coordinating multi-channel operations, complex systems integrations, safety controls, and continuous improvement. Mr. Guilhas holds multiple advanced degrees including a Doctorate of Management from Colorado Tech.

***Michael K. Hargrave***.   Mr. Hargrave has served as our Chief Merchant since May 2020. He has almost 34 years of experience in retail merchandising and management across multiple product categories, especially hardlines segments including appliances, hardware and lawn and garden. Mr. Hargrave has developed an understanding of strategic and tactical business issues that include sales management, merchandising, marketing, product development, strategic sourcing and online content management. He also possesses store operation, supply chain management, website development and affiliate marketing knowledge. Prior to joining us, Mr. Hargrave held roles for Sears Holdings Corporation as Senior Director, Online Hardlines Merchandising from June 2017 until April 2020, Divisional Merchandise Manager Online Tools, from July 2014 until June 2017, and Director, Online Merchandising Lawn & Garden, from March 2009 until July 2014. Mr. Hargrave serves as a founding member of the Advisory Council for the Home Improvement e-Retailer Summit and has been named to the Home Improvement Executive Magazine's "Top 100 Retail Executives." Mr. Hargrave received his undergraduate degree from the University of Michigan.

***Albert Fouerti***.   Mr. A. Fouerti will become the President of ACI and a member of our board of directors upon closing of the proposed acquisition. He has served as the Chief Executive Officer of 1 Stop since 1999. With over 20 years of experience in retail, he has made Appliances Connection into a household name for kitchen appliances. With 1 Stop starting out as a small camera and computer shop in Great Neck, NY, Mr. A. Fouerti was a pioneer for online shopping. Driven by technology, he entered the appliance business in 2008, and has contributed in taking the appliance industry into to the digital age. Along with his brother, Elie Fouerti, they developed a process of delivering bulky items across the United States. We believe Mr. A. Fouerti is qualified to serve as a member of our board because of his extensive experience building and leading the Appliances Connection business from its founding and his insight into our industry and business as Appliances Connection's co-founder and Chief Executive Officer.

***Elie Fouerti***.   Mr. E. Fouerti will become the Vice President of ACI upon closing of the proposed acquisition. He has served as both the Chief Financial Officer and Vice President of 1 Stop for over 20 years. Along with his brother, Mr. A. Fouerti, they have created a successful independent online retailer of appliances. Mr. E. Fouerti helped his brother in developing a process for delivering bulky items across the United States, paving the way for a new era of ordering appliances online. We believe Mr. E. Fouerti is qualified to serve as a member of ACI's management team because of his extensive experience building and leading the Appliances Connection business from its founding and his insight into our industry and business as Appliances Connection's co-founder and Chief Financial Officer.

***Ellery W. Roberts***.   Mr. Roberts has served as the Chairman of our board of directors since our inception. Mr. Roberts brings over 20 years of private equity investing experience to our company. Mr. Roberts has been the Chairman, Chief Executive Officer, President and Chief Financial Officer of 1847 Holdings since its inception on January 22, 2013 and is also the sole manager of our manager. Mr. Roberts has also been a director of Western Capital Resources, Inc., a public company, since May 2010.  In July 2011, Mr. Roberts formed The 1847 Companies LLC, a company that is no longer active, where he began investing his own personal capital and capital of high net worth individuals in select transactions. Prior to forming The 1847 Companies LLC, Mr. Roberts was the co-founder and was co-managing

98

Table of Contents

principal from October 2009 to June 2011 of RW Capital Partners LLC, the recipient of a "Green Light" letter from the United States Small Business Administration permitting RW Capital Partners LLC to raise capital in pursuit of the Small Business Investment Company license with the preliminary support of the Small Business Administration. Mr. Roberts was a founding member of Parallel Investment Partners, LP (formerly SKM Growth Investors, LP), a Dallas-based private equity fund focused on re-capitalizations, buyouts and growth capital investments in lower middle market companies throughout the United States. Previously, Mr. Roberts served as Principal with Lazard Group LLC, a Senior Financial Analyst at Colony Capital, Inc., and a Financial Analyst with the Corporate Finance Division of Smith Barney Inc. (now known as Morgan Stanley Smith Barney LLC).  Mr. Roberts received his B.A. degree in English from Stanford University. We believe Mr. Roberts is qualified to serve on our board of directors due to his extensive investment experience.

*Edward J. Tobin*.    Mr. Tobin has served on our board of directors since April 2020. Mr. Tobin has served as Managing Director of our manager since January 2014. From 1997 until November 2014, Mr. Tobin was a Director of Global Emerging Markets North America, Inc., where he managed Special Situations and Venture investing. In this role, he oversaw structured finance transactions in industries such as clean tech, media, telecommunications, manufacturing, real estate and life sciences. Prior to that, Mr. Tobin was Managing Director of Lincklaen Partners, a private family investment office. Previously, he had been a portfolio manager with Neuberger and Berman and a Vice President of Nordberg Capital, Inc. Mr. Tobin received his MBA from the Wharton School, as well as a Master of Science in Engineering and a Bachelor of Science in Economics from the University of Pennsylvania. We believe Mr. Tobin is qualified to serve on our board of directors due to his extensive investment experience.

*Ellette A. Anderson*.    Ms. Anderson has served on our board of directors since July 2020. In 2013, Ms. Anderson founded Griffin Archer LLC, a full-service advertising agency that offers a comprehensive range of services addressing both the traditional and digital marking aspects of business. As the Chief Executive Officer of Griffin Archer, Ms. Anderson is responsible for overseeing new business acquisitions, strategic planning, and creative direction for their entire client portfolio. From April 2004 to August 2013, she served as a Writer and Associate Creative Director at Carmichael Lynch Advertising in Minneapolis where she received multiple industry awards for her creative work on several iconic brands. She holds a B.A. degree in English Literature from the University of Kansas. We believe Ms. Anderson is qualified to serve on our board of directors due to her deep experience in the advertising and marketing industry.

*Clark R. Crosnoe*.    Mr. Crosnoe has served on our board of directors since July 2020. In 2009, Mr. Crosnoe founded CRC Capital LLC, a registered investment advisor and manager of the CRC Investment Fund LP, a private investment partnership focused on publicly-traded equity securities. As managing member of CRC Capital LLC, Mr. Crosnoe is responsible for strategy, oversight and the day-to-day investment decisions of the fund. The portfolio typically includes investments in the consumer, financial, healthcare, industrial and energy sectors. In 1999, Mr. Crosnoe was a founding employee of Parallel Investment Partners where he was named partner in 2003. As a partner, he was responsible for sourcing, evaluating, structuring, executing and monitoring investments, and also dedicated a substantial portion of his time to marketing activities for the firm. Mr. Crosnoe began his career in investment banking at Wasserstein Perella & Co. and also gained valuable experience at multi-billion dollar hedge fund HBK Investments. Mr. Crosnoe holds undergraduate degrees from the University of Texas at Austin and earned an MBA from Harvard Business School in 1996. We believe Mr. Crosnoe is qualified to serve on our board due to his approximately 24 years of private and public investment and advisory experience.

*Paul A. Froning*.    Mr. Froning has served on our board of directors since July 2020. He has served on the board of directors of 1847 Holdings since April 2013. In 2009, Mr. Froning co-founded Focus Healthcare Partners LLC, a Chicago-based private equity investment, advisory and asset management firm targeting the senior housing and healthcare sectors. Prior to that, from February 2008 to October 2009, Mr. Froning was a Managing Director in the private equity department of Fortress Investment Group LLC, a publicly-traded New York-based private investment firm.  Prior to that, Mr. Froning was the Chief Investment Officer and Executive Vice President of Brookdale Senior Living Inc., a publicly-traded affiliate of Fortress Investment Group LLC, from 2005 to 2008. Previously, Mr. Froning held senior investment positions at the private equity investment arms of Lazard Group LLC and Security Capital Group, prior to its acquisition by GE Capital Corp., in addition to investment banking experience at Salomon Brothers, prior to its acquisition by Travelers Group, and the securities subsidiary of Principal Financial Group. Mr. Froning has a B.A. degree from the University of Notre Dame. We believe Mr. Froning is qualified to serve on our board of directors due to his twenty years of private equity, investment and advisory experience.

Table of Contents

***Glyn C. Milburn***.   Mr. Milburn has served on our board of directors since July 2020.  Since February 2016, Mr. Milburn has served as a Partner at Jimmy Blackman & Associates, a full-service Government and Public Affairs firm, where he is responsible for business strategy, client management, communications and campaign management for a client portfolio comprised of large public safety labor unions, banking/finance companies, and hotel operators across the State of California. From April 2013 to January 2016, Mr. Milburn served as a Special Assistant in the City of Los Angeles where he held two positions in the City of Los Angeles, one in the Office of Los Angeles Mayor Eric Garcetti's Office of Economic Development and another in the Office of Los Angeles Councilman Dennis Zine.  From August 2012 to March 2013, Mr. Milburn co-Founded Provident Investment Advisors LLC, a special investment vehicle for energy, technology and healthcare ventures, where he served as Managing Member.  Mr. Milburn holds a B.A. degree in Public Policy from Stanford University.  We believe Mr. Milburn is qualified to serve on our board of directors due to his valuable background in policy development, regulatory and strategic planning experience.

***Alan P. Shor***.    Mr. Shor will become a member of our board of directors upon closing of the proposed acquisition. Mr. Shor is a co-founder of The Retail Connection, L.P., a retail real estate company, and has served as its President and Co-Chairman of the Board of Directors since its launch in January 2004. Mr. Shor is deeply involved in the strategic direction and day-to-day operations of the company and also leads its investment and merchant banking business. He has served as an operating partner with leading private equity firms which have deep experience in consumer and multi-unit based investments. He is an investor in and a Board member of four high-growth retail chains: Diamonds Direct (since 2015), WSS (since 2016), Neighborhood Goods (since 2018) and Obsession Fragrance (since 2019). Prior to launching The Retail Connection, Mr. Shor served as President, Chief Operating Officer and a member of the Board of Zale Corporation, a publicly-held specialty retailer of fine jewelry. Prior to joining Zale, he spent 12 years with Troutman Sanders, an international law firm, where he built a strong track record of advising senior management teams of Fortune 1000 companies. Mr. Shor is also active in a number of professional and charitable organizations. Mr. Shor graduated with honors from both the University of Georgia and University of Georgia School of Law. We believe Mr. Shor is qualified to serve on our board of directors due to his valuable background in the retail and investment industries.

Our directors currently have terms which will end at our next annual meeting of the stockholders or until their successors are elected and qualify, subject to their prior death, resignation or removal. Officers serve at the discretion of the board of directors. There is no arrangement or understanding between any director or executive officer and any other person pursuant to which he was or is to be selected as a director, nominee or officer.

**Family Relationships**

There are no family relationships among any of our executive officers or directors.

**Involvement in Certain Legal Proceedings**

To the best of our knowledge, except as described below, none of our directors or executive officers has, during the past ten years:

> •      been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offences);
>
> •      had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two years prior to that time;
>
> •      been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in any type of business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;
>
> •      been found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

100

Table of Contents

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26))), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

**Corporate Governance**

*Governance Structure*

We chose to appoint a separate Chairman of the Board who is not our Chief Executive Officer. Our board of directors has made this decision based on their belief that a separate Chairman of the Board can act as a balance to the Chief Executive Officer, who also serves as a non-independent director.

*The Board's Role in Risk Oversight*

The board of directors oversees that the assets of our company are properly safeguarded, that the appropriate financial and other controls are maintained, and that our business is conducted wisely and in compliance with applicable laws and regulations and proper governance. Included in these responsibilities is the board's oversight of the various risks facing our company. In this regard, our board seeks to understand and oversee critical business risks. Our board does not view risk in isolation. Risks are considered in virtually every business decision and as part of our business strategy. Our board recognizes that it is neither possible nor prudent to eliminate all risk. Indeed, purposeful and appropriate risk-taking is essential for our company to be competitive on a global basis and to achieve its objectives.

While the board oversees risk management, company management is charged with managing risk. Management communicates routinely with the board and individual directors on the significant risks identified and how they are being managed. Directors are free to, and indeed often do, communicate directly with senior management.

Our board administers its risk oversight function as a whole by making risk oversight a matter of collective consideration. Much of this work has been delegated to committees, which will meet regularly and report back to the full board. The audit committee oversees risks related to our consolidated financial statements, the financial reporting process, accounting and legal matters, the compensation committee evaluates the risks and rewards associated with our compensation philosophy and programs, and the nominating and corporate governance committee evaluates risk associated with management decisions and strategic direction.

*Independent Directors*

The rules of NYSE American and the NYSE generally require that a majority of an issuer's board of directors must consist of independent directors. Our board of directors currently consists of seven (7) directors, four (4) of whom, Ellette A. Anderson, Clark R. Crosnoe, Paul A. Froning and Glyn C. Milburn, are independent within the meaning of the rules of NYSE American and the NYSE.

In connection with the proposed acquisition, Albert Fouerti, who is not independent, will be appointed to our board. In addition, we have appointed Alan P. Shor, who is independent, to our board effective upon closing of the proposed acquisition. As a result, our board of directors will consist of nine (9) directors, five (5) of whom will be independent within the meaning of the rules of NYSE American and the NYSE.

101

Table of Contents

***Committees of the Board of Directors***

Our board has established an audit committee, a compensation and nominating and corporate governance committee, each with its own charter approved by the board. Each committee's charter is available on our website at *www.goedekers.com*.

In addition, our board of directors may, from time to time, designate one or more additional committees, which shall have the duties and powers granted to it by our board of directors.

<u>Audit Committee</u>

Paul A. Froning, Clark R. Crosnoe and Glyn C. Milburn, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American and the NYSE, serve on our audit committee, with Mr. Froning serving as the chairman. Our board has determined that Messrs. Froning and Crosnoe qualify as "audit committee financial experts." The audit committee oversees our accounting and financial reporting processes and the audits of the consolidated financial statements of our company.

The audit committee is responsible for, among other things: (i) retaining and overseeing our independent accountants; (ii) assisting the board in its oversight of the integrity of our consolidated financial statements, the qualifications, independence and performance of our independent auditors and our compliance with legal and regulatory requirements; (iii) reviewing and approving the plan and scope of the internal and external audit; (iv) pre-approving any audit and non-audit services provided by our independent auditors; (v) approving the fees to be paid to our independent auditors; (vi) reviewing with our chief executive officer and chief financial officer and independent auditors the adequacy and effectiveness of our internal controls; (vii) reviewing hedging transactions; and (viii) reviewing and assessing annually the audit committee's performance and the adequacy of its charter.

<u>Compensation Committee</u>

Paul A. Froning, Clark R. Crosnoe and Ellette A. Anderson, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American and the NYSE, serve on our compensation committee, with Mr. Crosnoe serving as the chairman. The members of the compensation committee are also "outside directors" as defined in Section 162(m) of the Internal Revenue Code of 1986, as amended, or the Code, and "non-employee directors" within the meaning of Section 16 of the Exchange Act. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers.

The compensation committee is responsible for, among other things: (i) reviewing and approving the remuneration of our executive officers; (ii) making recommendations to the board regarding the compensation of our independent directors; (iii) making recommendations to the board regarding equity-based and incentive compensation plans, policies and programs; and (iv) reviewing and assessing annually the compensation committee's performance and the adequacy of its charter.

<u>Nominating and Corporate Governance Committee</u>

Paul A. Froning, Clark R. Crosnoe and Glyn C. Milburn, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American and the NYSE, serve on our nominating and corporate governance committee, with Mr. Milburn serving as the chairman. The nominating and corporate governance committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees.

The nominating and corporate governance committee will be responsible for, among other things: (i) identifying and evaluating individuals qualified to become members of the board by reviewing nominees for election to the board submitted by stockholders and recommending to the board director nominees for each annual meeting of stockholders and for election to fill any vacancies on the board; (ii) advising the board with respect to board organization, desired qualifications of board members, the membership, function, operation, structure and composition of committees (including any committee authority to delegate to subcommittees), and self-evaluation and policies; (iii) advising on matters relating to corporate governance and monitoring developments in the law and practice of corporate governance; (iv) overseeing compliance with the our code of ethics; and (v) approving any related party transactions.

Table of Contents

The nominating and corporate governance committee's methods for identifying candidates for election to our board of directors (other than those proposed by our stockholders, as discussed below) will include the solicitation of ideas for possible candidates from a number of sources — members of our board of directors, our executives, individuals personally known to the members of our board of directors, and other research. The nominating and corporate governance committee may also, from time-to-time, retain one or more third-party search firms to identify suitable candidates.

In making director recommendations, the nominating and corporate governance committee may consider some or all of the following factors: (i) the candidate's judgment, skill, experience with other organizations of comparable purpose, complexity and size, and subject to similar legal restrictions and oversight; (ii) the interplay of the candidate's experience with the experience of other board members; (iii) the extent to which the candidate would be a desirable addition to the board and any committee thereof; (iv) whether or not the person has any relationships that might impair his or her independence; and (v) the candidate's ability to contribute to the effective management of our company, taking into account the needs of our company and such factors as the individual's experience, perspective, skills and knowledge of the industry in which we operate.

A stockholder may nominate one or more persons for election as a director at an annual meeting of stockholders if the stockholder complies with the notice and information provisions contained in our bylaws. Such notice must be in writing to our company not less than 120 days and not more than 150 days prior to the anniversary date of the preceding year's annual meeting of stockholders or as otherwise required by requirements of the Exchange Act. In addition, stockholders furnishing such notice must be a holder of record on both (i) the date of delivering such notice and (ii) the record date for the determination of stockholders entitled to vote at such meeting.

**Code of Ethics**

We have adopted a code of ethics that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Such code of ethics addresses, among other things, honesty and ethical conduct, conflicts of interest, compliance with laws, regulations and policies, including disclosure requirements under the federal securities laws, and reporting of violations of the code.

We are required to disclose any amendment to, or waiver from, a provision of our code of ethics applicable to our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. We intend to use our website as a method of disseminating this disclosure, as permitted by applicable SEC rules. Any such disclosure will be posted to our website within four (4) business days following the date of any such amendment to, or waiver from, a provision of our code of ethics.

Table of Contents

**EXECUTIVE COMPENSATION**

**Summary Compensation Table — Years Ended December 31, 2020 and 2019**

The following table sets forth information concerning all cash and non-cash compensation awarded to, earned by or paid to the named persons for services rendered in all capacities during the noted periods. No other executive officers received total annual salary and bonus compensation in excess of $100,000.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Option Awards ($)[1] | All Other Compensation ($)[2] | Total ($) |
|---|---|---|---|---|---|---|
| Douglas T. Moore, | 2020 | 341,923 | 130,000 | 910,264 | 16,965 | 1,399,152 |
| Chief Executive Officer | 2019 | 133,727 | 35,000 | — | 9,465 | 178,192 |
| | | | | | | |
| Robert D. Barry, | 2020 | 149,077 | — | 376,800 | — | 525,877 |
| Chief Financial Officer[3] | 2019 | 61,762 | — | — | — | 61,762 |
| | | | | | | |
| Thomas S. Harcum, | 2020 | 131,923 | — | 157,000 | 17,470 | 306,393 |
| Chief Marketing and Technology Officer | 2019 | — | — | — | — | — |

----------

(1)    The amount is equal to the aggregate grant-date fair value with respect to the awards, computed in accordance with FASB ASC Topic 718.

(2)    The amounts included for Mr. Moore for 2019 include reimbursement for accommodations in the amount of $6,955, reimbursement for airline tickets in the amount of $1,640, and reimbursement for car rental expenses in the amount of $870. In 2020, the amounts represent reimbursement for accommodations of $14,630 and $2,335 for 401(k) plan matches. For Mr. Harcum, the amount represents reimbursement for accommodations.

(3)    Mr. Barry was a part-time employee in 2019 following the acquisition of Goedeker Television until our initial public offering on July 31, 2020, at which time he became a full-time employee. Compensation for 2020 includes $55,385 as a part-time employee.

**Employment Agreements**

On August 15, 2019, we entered into an employment letter agreement with Mr. Moore setting forth the terms of the compensation for his services as Chief Executive Officer of our company. On April 21, 2020, we amended the employment letter agreement, which became effective upon closing of our initial public offering on August 4, 2020.  Pursuant to the employment letter agreement, as amended, Mr. Moore is entitled to an annual base salary of $400,000 and an annual incentive bonus of up to 100% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee.  On August 19, 2020, we also granted Mr. Moore a special bonus of up to $125,000 to the extent that we achieve certain milestones. We also agreed to grant to Mr. Moore an option to purchase 263,158 shares of our common stock immediately following the closing of the initial public offering with an exercise price of $9.00, equal to the public offering price per share paid in the initial public offering. Vesting of the options will occur annually over a 4-year period in increments of 25% per year beginning on August 15, 2020.  Mr. Moore also received relocation compensation, including a signing bonus of $35,000, reimbursement of living and accommodations in the St. Louis area for up to six months, car rental expenses for up to two months, and reimbursement of once monthly round trip airline tickets to St. Louis for either Mr. Moore or his spouse until April 2020. Mr. Moore is also entitled to a 15% discount on all purchases from our company. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position.  Mr. Moore's employment is at-will and may be terminated by us at any time. Mr. Moore may terminate his employment upon 90 days' notice. If we terminate Mr. Moore's employment without cause, he is entitled to six months of base compensation, which will be paid in a lump sum upon termination. The employment letter agreement contains restrictive covenants prohibiting Mr. Moore from (i) owning or operating a business that competes with our company during the term of his employment and for a period of one year following the termination of his employment or (ii) soliciting our employees for a period of two years following the termination of his employment.

On April 21, 2020, we entered into an employment letter agreement with Robert D. Barry setting forth the terms of the compensation for his services as Chief Financial Officer of our company.  This employment letter agreement became effective upon closing of our initial public offering on August 4, 2020.  Pursuant to the employment letter agreement,

104

Table of Contents

Mr. Barry is entitled to an annual base salary of $250,000 and an annual incentive bonus of up to 50% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. Mr. Barry is also entitled to a 15% discount on all purchases from our company. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Barry's employment is at-will and may be terminated by us at any time. Mr. Barry may terminate his employment upon 90 days' notice. If we terminate Mr. Barry's employment without cause, he is entitled to six months of base compensation, which will be paid in a lump sum upon termination. The employment letter agreement contains restrictive covenants prohibiting Mr. Barry from (i) owning or operating a business that competes with our company during the term of his employment and for a period of one year following the termination of his employment or (ii) soliciting our employees for a period of two years following the termination of his employment.

On December 13, 2019, we entered into an employment offer letter with Thomas S. Harcum setting forth the terms of the compensation for his services as Chief Marketing Officer and Chief Technology Officer of our company, effective as of January 6, 2020. Pursuant to the employment offer letter, Mr. Harcum is entitled to an annual base salary of $140,000 and an annual incentive bonus of up to 20% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Harcum's employment is at-will and may be terminated by us at any time.

**Outstanding Equity Awards at Fiscal Year-End**

The following table includes certain information with respect to the value of all unexercised options and unvested shares of restricted stock previously awarded to the executive officers named above at the fiscal year ended December 31, 2020.

| | Option Awards | | | | |
|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date |
| Douglas T. Moore | 65,790 | 197,368 | — $ | 9.00 | 08/04/2030 |
| Robert D. Barry | — | 120,000 | — $ | 9.00 | 09/10/2030 |
| Thomas S. Harcum | — | 50,000 | — $ | 9.00 | 09/10/2030 |

**Additional Narrative Disclosure**

*Retirement Benefits*

We have not maintained, and do not currently maintain, a defined benefit pension plan or nonqualified deferred compensation plan. We currently make available a retirement plan intended to provide benefits under Section 401(k) of the Code, pursuant to which employees, including the executive officers named above, can make voluntary pre-tax contributions. We currently match 100% of elective deferrals up to 3% of compensation and 50% of elective deferrals for next 2% of compensation. These matching contributions vest 100% following 60 days of the participant's employment. All contributions under the plan are subject to certain annual dollar limitations, which are periodically adjusted for changes in the cost of living. See "— Summary Compensation Table — Years Ended December 31, 2020 and 2019" for matches made for the executive officers named above.

*Potential Payments Upon Termination or Change in Control*

As described under "— Employment Agreements" above, Messrs. Moore and Barry are entitled severance if their employment is terminated without cause.

In the event of a change in control (as defined in our 2020 Equity Incentive Plan), all options issued to the executive officers named above shall become immediately vested and exercisable with respect to 100% of the shares subject to the option.

Table of Contents

**Director Compensation**

We have agreed to pay our independent directors a fee of $35,000 per year, which is payable monthly commencing in the first month following the closing of the of our initial public offering in August 2020. We also agreed to reimburse the independent directors for pre-approved reasonable business expenses incurred in good faith in connection with the performance of their duties for us.

The table below sets forth the compensation to our independent directors during the fiscal year ended December 31, 2020.

| Name | Fees Earned or Paid in Cash ($) | Total ($) |
|------|------|------|
| Ellette A. Anderson | 14,583 | 14,583 |
| Clark R. Crosnoe | 14,583 | 14,583 |
| Paul A. Froning | 14,583 | 14,583 |
| Glyn C. Milburn | 14,583 | 14,583 |

**2020 Equity Incentive Plan**

On July 30, 2020, we established the 1847 Goedeker Inc. 2020 Equity Incentive Plan, or the Plan. The purpose of the Plan is to grant restricted stock, stock options and other forms of incentive compensation to our officers, employees, directors and consultants. The maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan is 1,000,000 shares. Cancelled and forfeited stock options and stock awards may again become available for grant under the Plan. As of the date of this prospectus, 445,000 shares remain available for issuance under the Plan.

The following summary briefly describes the principal features of the Plan and is qualified in its entirety by reference to the full text of the Plan.

Awards that may be granted include: (a) incentive stock options, (b) non-qualified stock options, (c) stock appreciation rights, (d) restricted awards, (e) performance share awards, and (f) performance compensation awards. These awards offer our officers, employees, consultants and directors the possibility of future value, depending on the long-term price appreciation of our common stock and the award holder's continuing service with our company.

Stock options give the option holder the right to acquire from us a designated number of shares of common stock at a purchase price that is fixed upon the grant of the option. The exercise price will not be less than the market price of the common stock on the date of grant. Stock options granted may be either tax-qualified stock options (so-called "incentive stock options") or non-qualified stock options.

Stock appreciation rights, or SARs, which may be granted alone or in tandem with options, have an economic value similar to that of options. When a SAR for a particular number of shares is exercised, the holder receives a payment equal to the difference between the market price of the shares on the date of exercise and the exercise price of the shares under the SAR. Again, the exercise price for SARs normally is the market price of the shares on the date the SAR is granted. Under the Plan, holders of SARs may receive this payment — the appreciation value — either in cash or shares of common stock valued at the fair market value on the date of exercise. The form of payment will be determined by us.

Restricted shares are shares of common stock awarded to participants at no cost. Restricted shares can take the form of awards of restricted stock, which represent issued and outstanding shares of our common stock subject to vesting criteria, or restricted stock units, which represent the right to receive shares of our common stock subject to satisfaction of the vesting criteria. Restricted shares are forfeitable and non-transferable until the shares vest. The vesting date or dates and other conditions for vesting are established when the shares are awarded.

The Plan also provides for performance compensation awards, representing the right to receive a payment, which may be in the form of cash, shares of common stock, or a combination, based on the attainment of pre-established goals.

Table of Contents

All of the permissible types of awards under the Plan are described in more detail as follows:

***Purposes of Plan***:    The purposes of the Plan are to attract and retain officers, employees and directors for our company and its subsidiaries; motivate them by means of appropriate incentives to achieve long-range goals; provide incentive compensation opportunities; and further align their interests with those of our stockholders through compensation that is based on our common stock.

***Administration of the Plan***:    The Plan is administered by our compensation committee (which we refer to as the administrator). Among other things, the administrator has the authority to select persons who will receive awards, determine the types of awards and the number of shares to be covered by awards, and to establish the terms, conditions, performance criteria, restrictions and other provisions of awards. The administrator has authority to establish, amend and rescind rules and regulations relating to the Plan.

***Eligible Recipients***:    Persons eligible to receive awards under the Plan will be those officers, employees, consultants, and directors of our company and its subsidiaries who are selected by the administrator.

***Shares Available Under the Plan***:    The maximum number of shares of our common stock that may be delivered to participants under the Plan is 1,000,000, subject to adjustment for certain corporate changes affecting the shares, such as stock splits. Shares subject to an award under the Plan for which the award is canceled, forfeited or expires again become available for grants under the Plan. Shares subject to an award that is settled in cash will not again be made available for grants under the Plan.

***Stock Options:***

*General.*    Subject to the provisions of the Plan, the administrator has the authority to determine all grants of stock options. That determination will include: (i) the number of shares subject to any option; (ii) the exercise price per share; (iii) the expiration date of the option; (iv) the manner, time and date of permitted exercise; (v) other restrictions, if any, on the option or the shares underlying the option; and (vi) any other terms and conditions as the administrator may determine.

*Option Price.*    The exercise price for stock options will be determined at the time of grant. Normally, the exercise price will not be less than the fair market value on the date of grant. As a matter of tax law, the exercise price for any incentive stock option awarded may not be less than the fair market value of the shares on the date of grant. However, incentive stock option grants to any person owning more than 10% of our voting stock must have an exercise price of not less than 110% of the fair market value on the grant date.

*Exercise of Options.*    An option may be exercised only in accordance with the terms and conditions for the option agreement as established by the administrator at the time of the grant. The option must be exercised by notice to us, accompanied by payment of the exercise price. Payments may be made in cash or, at the option of the administrator, by actual or constructive delivery of shares of common stock to the holder of the option based upon the fair market value of the shares on the date of exercise.

*Expiration or Termination.*    Options, if not previously exercised, will expire on the expiration date established by the administrator at the time of grant. In the case of incentive stock options, such term cannot exceed ten years provided that in the case of holders of more than 10% of our voting stock, such term cannot exceed five years. Options will terminate before their expiration date if the holder's service with our company or a subsidiary terminates before the expiration date. The option may remain exercisable for specified periods after certain terminations of employment, including terminations as a result of death, disability or retirement, with the precise period during which the option may be exercised to be established by the administrator and reflected in the grant evidencing the award.

*Incentive and Non-Qualified Options.*    As described elsewhere in this summary, an incentive stock option is an option that is intended to qualify under certain provisions of the Code, for more favorable tax treatment than applies to non-qualified stock options. Any option that does not qualify as an incentive stock option will be a non-qualified stock option. Under the Code, certain restrictions apply to incentive stock options. For example, the exercise price for incentive stock options may not be less than the fair market value of the shares on the grant date and the term of the option may not exceed ten years. In addition, an incentive stock option may not be transferred, other than by will or the laws of descent and distribution, and is exercisable during the holder's lifetime only by the holder. In addition, no incentive stock options may be granted to a holder that is first exercisable in a single year if that option, together with all incentive stock options previously granted to the holder that also first become exercisable in that year, relate to shares having an aggregate fair market value in excess of $100,000, measured at the grant date.

107

Table of Contents

***Stock Appreciation Rights***:    Awards of SARs may be granted alone or in tandem with stock options. SARs provide the holder with the right, upon exercise, to receive a payment, in cash or shares of stock, having a value equal to the excess of the fair market value on the exercise date of the shares covered by the award over the exercise price of those shares. Essentially, a holder of a SAR benefits when the market price of the common stock increases, to the same extent that the holder of an option does, but, unlike an option holder, the SAR holder need not pay an exercise price upon exercise of the award.

***Stock Awards***:    Stock awards can also be granted under the Plan. A stock award is a grant of shares of common stock or of a right to receive shares in the future. These awards will be subject to such conditions, restrictions and contingencies as the administrator shall determine at the date of grant. Those may include requirements for continuous service and/or the achievement of specified performance goals.

***Cash Awards***:    A cash award is an award that may be in the form of cash or shares of common stock or a combination, based on the attainment of pre-established performance goals and other conditions, restrictions and contingencies identified by the administrator.

***Section 162(m) of the Code***:    Section 162(m) of the Code limits publicly-held companies to an annual deduction for United States federal income tax purposes of $1.0 million for compensation paid to each of their chief executive officer and their three highest compensated executive officers (other than the chief executive officer) determined at the end of each year, referred to as covered employees.

***Performance Criteria***:    Under the Plan, one or more performance criteria will be used by the administrator in establishing performance goals. Any one or more of the performance criteria may be used on an absolute or relative basis to measure the performance of our company, as the administrator may deem appropriate, or as compared to the performance of a group of comparable companies, or published or special index that the administrator deems appropriate. In determining the actual size of an individual performance compensation award, the administrator may reduce or eliminate the amount of the award through the use of negative discretion if, in its sole judgment, such reduction or elimination is appropriate. The administrator shall not have the discretion to (i) grant or provide payment in respect of performance compensation awards if the performance goals have not been attained or (ii) increase a performance compensation award above the maximum amount payable under the Plan.

***Other Material Provisions***:    Awards will be evidenced by a written agreement, in such form as may be approved by the administrator. In the event of various changes to the capitalization of our company, such as stock splits, stock dividends and similar re-capitalizations, an appropriate adjustment will be made by the administrator to the number of shares covered by outstanding awards or to the exercise price of such awards. The administrator is also permitted to include in the written agreement provisions that provide for certain changes in the award in the event of a change of control of our company, including acceleration of vesting. Except as otherwise determined by the administrator at the date of grant, awards will not be transferable, other than by will or the laws of descent and distribution. Prior to any award distribution, we are permitted to deduct or withhold amounts sufficient to satisfy any employee withholding tax requirements. Our board also has the authority, at any time, to discontinue the granting of awards. The board also has the authority to alter or amend the Plan or any outstanding award or may terminate the Plan as to further grants, provided that no amendment will, without the approval of our stockholders, to the extent that such approval is required by law or the rules of an applicable exchange, increase the number of shares available under the Plan, change the persons eligible for awards under the Plan, extend the time within which awards may be made, or amend the provisions of the Plan related to amendments. No amendment that would adversely affect any outstanding award made under the Plan can be made without the consent of the holder of such award.

108

Table of Contents

**CURRENT RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

**Transactions with Related Persons**

*The following includes a summary of transactions since the beginning of our 2019 fiscal year, or any currently proposed transaction, in which we were or are to be a participant and the amount involved exceeded or exceeds the lesser of $120,000 or one percent of the average of our total assets at year end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest (other than compensation described under "Executive Compensation"). We believe the terms obtained or consideration that we paid or received, as applicable, in connection with the transactions described below were comparable to terms available or the amounts that would be paid or received, as applicable, in arm's-length transactions.*

*Management Services Agreement*

On April 5, 2019, we entered into the management services agreement with our manager, which is owned and controlled by Ellery W. Roberts, our Chairman. Pursuant to the management services agreement, we expensed $62,500 in management fees for the three months ended March 31, 2021 and 2020 and $250,000 and $183,790 for the years ended December 31, 2020 and 2019, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Goedeker — Contractual Obligations" for a description of this agreement. See also Item 1A "Risks Related to this Offering and Ownership of Our Common Stock — Certain of our directors could be in a position of conflict of interest."

*Advances*

As of December 31, 2019, our manager had funded $33,738 to us in related party advances. These advances were unsecured, bore no interest, and did not have formal repayment terms or arrangements. These advances were repaid from the proceeds of our initial public offering in August 2020.

*Related Party Note*

A portion of the purchase price for the acquisition of Goedeker Television was paid by our issuance to Steve Goedeker, as representative of Goedeker Television, of a 9% subordinated promissory note in the principal amount of $4,100,000. Michael Goedeker, our director, President and Chief Operating Officer until March 2020 and a significant stockholder, was also a director, officer and principal stockholder of Goedeker Television.

As of December 31, 2019, the balance of the note was $3,300,444. On June 2, 2020, the parties entered into an amendment and restatement of the note that became effective as of the closing of our initial public offering on August 4, 2020, pursuant to which (i) the principal amount of the existing note was increased by $250,000, (ii) upon the closing of the initial public offering, we agreed to make all payments of principal and interest due under the note through the date of the closing, and (iii) from and after the closing, the interest rate of the note was increased from 9% to 12%. In accordance with the terms of the amended and restated note, we used a portion of the proceeds from the initial public offering to pay $1,083,842 of the balance of the note representing a $696,204 reduction in the principal balance and interest accrued through August 4, 2020 of $387,638. We repaid this note in August 2020.

*Securities Purchase Agreement*

On April 5, 2019, our company, 1847 Goedeker Holdco Inc., or Holdco (our direct parent company at such time) and 1847 Holdings (Holdco's parent company at such time) entered into a securities purchase agreement with Leonite Capital LLC, or Leonite, pursuant to which our company, Holdco and 1847 Holdings issued to Leonite a secured convertible promissory note in the aggregate principal amount of $714,286. As additional consideration for the purchase of the note, (i) 1847 Holdings issued to Leonite 50,000 common shares (valued at $137,500), (ii) 1847 Holdings issued to Leonite a five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis, and (iii) Holdco issued to Leonite shares of common stock equal to a 7.5% non-dilutable interest in Holdco. As of December 31, 2019, the balance of the note was $584,943. As a result of this transaction, Leonite became a related party.

Table of Contents

On May 11, 2020, our company, Holdco, 1847 Holdings and Leonite entered into a first amendment to secured convertible promissory note, pursuant to which the parties agreed (i) to extend the maturity date of the note to October 5, 2020, (ii) that our failure to repay the note on the original maturity date of April 5, 2020 shall not constitute and event of default under the note and (iii) to increase the principal amount of the note by $207,145, as a forbearance fee.

In connection with the amendment, (i) 1847 Holdings issued to Leonite another five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis and (ii) upon closing of 1847 Holdings' acquisition of Asien's Appliance, Inc., 1847 Holdings' wholly owned subsidiary 1847 Asien Inc. issued to Leonite shares of common stock equal to a 5% interest in 1847 Asien Inc.

Under the note, Leonite had the right at any time at its option to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of the note into fully paid and non-assessable common shares or any shares of capital stock or other securities of 1847 Holdings into which such common shares may be changed or reclassified.

On May 4, 2020, Leonite converted $100,000 of the outstanding balance of the note into 100,000 common shares of 1847 Holdings. On July 24, 2020, Leonite converted $50,000 of the outstanding balance of the note into 50,000 common shares of 1847 Holdings.

On August 4, 2020, we used a portion of the proceeds from our initial public offering to repay the note in full.

On September 2, 2020, 1847 Holdings and Leonite entered into an amendment to the warrant issued on April 5, 2019, pursuant to which the warrant was amended to allow for the exercise of the warrant for 180,000 common shares of 1847 Holdings in exchange for Leonite's surrender of the remaining 20,000 common shares underlying that warrant, as well as all 200,000 common shares underlying the second warrant issued to Leonite on May 11, 2020. On September 18, 2020, Leonite exercised the warrant in accordance with the foregoing for 180,000 common shares of 1847 Holdings. As a result, both warrants have terminated.

### Related Party Leases

Appliances Connection leases two facilities pursuant to lease agreements entered into between 1 Stop and Joe's Appliances and 1870 Bath Ave. LLC and 7812 5th Ave Realty LLC, respectively, which are entities owned and controlled by Albert Fouerti and Elie Fouerti, the principal officers and owners of 1 Stop and Joe's Appliances. Please see "Business — Facilities" for a description of these leases.

### DMI Cooperative

As described above, Appliances Connection is a member of DMI, an appliance purchasing cooperative. Appliances Connection owns an approximate 5% equity interest in DMI. Additionally, Albert Fouerti, one of the owners of Appliances Connection who will also become a member of our board of directors upon closing of the proposed acquisition, is on the Board of DMI. As such, DMI is deemed to be a related party.

At March 31, 2021, vendor rebate deposits, net, due from DMI were $36,304,532 and vendor rebates receivable were $2,407,616. During the three months ended March 31, 2021, the following transactions were carried out with DMI: total purchases $61,088,556, purchase volume rebate income $2,345,939, interest income $222,036, consulting income $63,750, and rent expense $168,750. During the three months ended March 31, 2020, the following transactions were carried out with DMI: total purchases $34,749,175, purchase volume rebate income $3,762,689, interest income $326,676, consulting income $63,750, and rent expense $168,750.

At December 31, 2020 and 2019, vendor rebate deposits, net, due from DMI were $31,733,415 and $22,005,318, respectively, and vendor rebates receivable were $4,691,514 and $3,284,594, respectively. During the year ended December 31, 2020, the following transactions were carried out with DMI: total purchases $175,630,820, vendor rebates $8,222,373, interest income $968,080, consulting income $255,000, and rent expense $675,000. During the year ended December 31, 2019, the following transactions were carried out with DMI: total purchases $120,328,645, vendor rebates $3,284,594, interest income $1,428,546, consulting income $188,617, and rent expense $337,500.

110

Table of Contents

**Participation in this Offering**

Certain of our existing stockholders and certain of our officers, directors, employees and related persons, have indicated an interest in purchasing an aggregate of approximately 2,779,600 units in this offering at the public offering price. However, because indications of interest are not binding agreements or commitments to purchase, the underwriters may determine to sell more, fewer or no units in this offering to these persons, and any of these persons may determine to purchase more, fewer or no units in this offering. The underwriters will receive the same underwriting discount on any units purchased by these persons as they will on any other units sold to the public in this offering.

**Promoters and Certain Control Persons**

Each of Ellery W. Roberts, our Chairman and Robert D. Barry, our Chief Financial Officer, may be deemed a "promoter" as defined by Rule 405 of the Securities Act. For information regarding compensation, including items of value, that have been provided or that may be provided to these individuals, please refer to "Executive Compensation" above.

**Indemnification Agreements**

Our amended and restated certificate of incorporation and bylaws provide for indemnification of directors and officers to the fullest extent permitted by law, including payment of expenses in advance of resolution of any such matter.

We have entered into separate indemnification agreements with our directors and certain officers. Each indemnification agreement provides for, among other things, indemnification to the fullest extent permitted by law and our amended and restated certificate of incorporation and bylaws against any and all expenses, judgments, fines, penalties and amounts paid in settlement of any claim. The indemnification agreements provide for the advancement or payment of all expenses to the indemnitee and for reimbursement to us if it is found that such indemnitee is not entitled to such indemnification under applicable law and our amended and restated certificate of incorporation and bylaws.

We have obtained standard policies of insurance under which coverage is provided (a) to our directors and officers against loss rising from claims made by reason of breach of duty or other wrongful act, and (b) to us with respect to payments which we may make to such officers and directors pursuant to the above indemnification provision or otherwise as a matter of law.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling us under the foregoing provisions, we have been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

111

Table of Contents

**PRINCIPAL STOCKHOLDERS**

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of the date of this prospectus for (i) each of our named executive officers and directors; (ii) all of our named executive officers and directors as a group; and (iii) each other stockholder known by us to be the beneficial owner of more than 5% of our outstanding common stock. The following table assumes that the underwriters have not exercised the over-allotment option.

Beneficial ownership is determined in accordance with SEC rules and generally includes voting or investment power with respect to securities. For purposes of this table, a person or group of persons is deemed to have "beneficial ownership" of any shares of common stock that such person or any member of such group has the right to acquire within sixty (60) days of the date of this prospectus. For purposes of computing the percentage of outstanding shares of our common stock held by each person or group of persons named above, any shares that such person or persons has the right to acquire within sixty (60) days of the date of this prospectus are deemed to be outstanding for such person, but not deemed to be outstanding for the purpose of computing the percentage ownership of any other person. The inclusion herein of any shares listed as beneficially owned does not constitute an admission of beneficial ownership by any person. The share ownership numbers after the offering for the beneficial owners indicated below exclude any potential purchases that may be made by such persons in this offering.

Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o our company, 3817 Millstone Parkway, St. Charles, MO 63301.

| Name of Beneficial Owner | Common Stock Beneficially Owned Prior to this Offering[1] | | Common Stock Beneficially Owned After this Offering[2] | |
|---|---|---|---|---|
| | Shares | % | Shares | % |
| Douglas T. Moore, CEO and Director[3] | 65,790 | 1.07% | 65,790 | * |
| Robert D. Barry, CFO | 12,433 | * | 12,433 | * |
| Thomas S. Harcum, CMO and CTO | — | * | — | * |
| Jacob Guilhas, VP of Logistics | — | * | — | * |
| Michael K. Hargrave, Chief Merchant | — | * | — | * |
| Ellery W. Roberts, Chairman of the Board | 1,375,597 | 22.51% | 1,397,819 | 1.36% |
| Edward J. Tobin, Director | 960,680 | 15.72% | 960,680 | * |
| Ellette A. Anderson, Director | — | * | — | * |
| Clark R. Crosnoe, Director[4] | — | * | 533,200 | * |
| Paul A. Froning, Director | 42,628 | * | 42,628 | * |
| Glyn C. Milburn, Director | — | * | 2,200 | * |
| Albert Fouerti, Director Nominee | — | * | — | * |
| Alan P. Shor, Director Nominee | — | * | — | * |
| All executive officers and directors (13 persons) | 2,457,128 | 40.20% | 3,014,728 | 2.92% |
| Michael Goedeker[5] | 534,375 | 8.74% | 534,375 | * |
| Stephen Goedeker[6] | 534,375 | 8.74% | 534,375 | * |
| Avi Geller[7] | 503,369 | 8.24% | 2,725,369 | 2.64% |

———————

\*      Less than 1%

(1)      Based on 6,111,200 shares of common stock issued and outstanding as of the date of this prospectus.

(2)      Based on 103,118,284 shares of common stock issued and outstanding after this offering (including 5,895,973 shares issued in connection with the proposed acquisition).

(3)      Consists of 65,790 shares of common stock which Mr. Moore has the right to acquire within 60 days through the exercise of vested options.

(4)      Includes 444,400 shares held by CRC Investment Fund LP and 88,800 shares held by NM 2018 Trust. Mr. Crosnoe is the Managing Member and owns 100% of CRC Investment Fund GP, LLC, the General Partner of CRC Investment Fund LP, and of CRC Capital LLC, the Manager of CRC Investment Fund LP, and has voting and investment power over the securities held by CRC Investment Fund LP. Mr. Crosnoe is the Investment Adviser to NM 2018 Trust and also has a power of attorney to direct purchases and sales of securities held by it. Mr. Crosnoe disclaims beneficial ownership of the shares held by CRC Investment Fund LP and NM 2018 Trust except to the extent of his pecuniary interest, if any, in such shares.

Table of Contents

(5)    Based solely on the information set forth in the Schedule 13G filed by Michael Goedeker with the SEC on February 26, 2021.

(6)    Based solely on the information set forth in the Schedule 13G filed by Stephen Goedeker with the SEC on February 26, 2021.

(7)    Represents shares of common stock held by Leonite. Avi Geller is the Chief Investment Officer of Leonite and has voting and investment power over the securities held by it. Mr. Geller disclaims beneficial ownership of the shares held by Leonite except to the extent of his pecuniary interest, if any, in such shares. The address of Leonite is 1 Hillcrest Center Dr, Suite 232, Spring Valley, NY 10977.

We do not currently have any arrangements which if consummated may result in a change of control of our company.

113

Table of Contents

**DESCRIPTION OF CAPITAL STOCK**

**General**

Our authorized capital stock currently consists of 200,000,000 shares of common stock, par value $0.0001 per share, and 20,000,000 shares of preferred stock, par value $0.0001 per share.

The following description summarizes important terms of the classes of our capital stock. This summary does not purport to be complete and is qualified in its entirety by the provisions of our amended and restated certificate of incorporation and our bylaws, which have been filed as exhibits to the registration statement of which this prospectus is a part.

Certain provisions of our amended and restated certificate of incorporation and our bylaws summarized below may be deemed to have an anti-takeover effect and may delay or prevent a tender offer or takeover attempt that a stockholder might consider in its best interest, including those attempts that might result in a premium over the market price for the shares of common stock.

As of the date of this prospectus, there were 6,111,200 shares of common stock and no shares of preferred stock issued and outstanding. As of such date, there were approximately 42 stockholders of record of our common stock. In computing the number of holders of record of our common stock, each broker-dealer and clearing corporation holding shares on behalf of its customers is counted as a single stockholder.

**The Units**

Each unit being offered in this offering consists of one share of common stock and a warrant to purchase one share of common stock. The common stock and warrants that are part of the units are immediately separable and will be issued separately in this offering, although they will have been purchased together in this offering.

**Common Stock**

The holders of common stock are entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders. Under our amended and restated certificate of incorporation and bylaws, any corporate action to be taken by vote of stockholders other than for election of directors shall be authorized by the affirmative vote of the majority of votes cast. Directors are elected by a plurality of votes. Stockholders do not have cumulative voting rights.

Subject to preferences that may be applicable to any then-outstanding preferred stock, holders of common stock are entitled to receive ratably those dividends, if any, as may be declared from time to time by the board of directors out of legally available funds. In the event of our liquidation, dissolution or winding up, holders of common stock will be entitled to share ratably in the net assets legally available for distribution to stockholders after the payment of all of our debts and other liabilities and the satisfaction of any liquidation preference granted to the holders of any then-outstanding shares of preferred stock.

Holders of common stock have no preemptive, conversion or subscription rights and there are no redemption or sinking fund provisions applicable to the common stock. The rights, preferences and privileges of the holders of common stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of preferred stock.

**Preferred Stock**

Our amended and restated certificate of incorporation authorizes our board to issue up to 20,000,000 shares of preferred stock in one or more series, to determine the designations and the powers, preferences and rights and the qualifications, limitations and restrictions thereof, including the dividend rights, conversion or exchange rights, voting rights (including the number of votes per share), redemption rights and terms, liquidation preferences, sinking fund provisions and the number of shares constituting the series. Our board of directors could, without stockholder approval, issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of common stock and which could have the effect of making it more difficult for a third party to acquire, or of discouraging a third party from attempting to acquire, a majority of our outstanding voting stock.

114

Table of Contents

**Warrants Issued in this Offering**

*Form*.    The warrants will be issued under a warrant agent agreement between us and American Stock Transfer & Trust Company, LLC, as warrant agent. The material terms and provisions of the warrants offered hereby are summarized below. The following description is subject to, and qualified in its entirety by, the form of warrant agent agreement and accompanying form of warrant, which is filed as an exhibit to the registration statement of which this prospectus is a part. You should review a copy of the form of warrant agent agreement and accompanying form of warrant for a complete description of the terms and conditions applicable to the warrants.

*Exercisability*.    The warrants are exercisable immediately upon issuance and will thereafter remain exercisable at any time up to five (5) years from the date of original issuance. The warrants will be exercisable, at the option of each holder, in whole or in part by delivering to us a duly executed exercise notice accompanied by payment in full for the number of shares purchased upon such exercise (except in the case of a cashless exercise as discussed below). No fractional shares will be issued in connection with the exercise of a warrant. In lieu of fractional shares, we will round down to the nearest whole share.

*Exercise Price*.    Each warrant represents the right to purchase one share of common stock at an exercise price of $2.25 per share. The exercise price is subject to appropriate adjustment in the event of certain stock dividends and distributions, stock splits, stock combinations, reclassifications or similar events affecting our common stock and also upon any distributions of assets, including cash, stock or other property to our stockholders.

*Cashless Exercise*.    If, at any time during the term of the warrants, the issuance of common stock upon exercise of the warrants is not covered by an effective registration statement, the holder is permitted to effect a cashless exercise of the warrants (in whole or in part) by having the holder deliver to us a duly executed exercise notice, canceling a portion of the warrant in payment of the purchase price payable in respect of the number of shares purchased upon such exercise.

*Failure to Timely Deliver Shares*.    If we fail for any reason to deliver to the holder the shares subject to an exercise by the date that is the earlier of (i) two (2) trading days and (ii) the number of trading days that is the standard settlement period on our primary trading market as in effect on the date of delivery of the exercise notice, we must pay to the holder, in cash, as liquidated damages and not as a penalty, for each $1,000 of shares subject to such exercise (based on the daily volume weighted average price of our common stock on the date of the applicable exercise notice), $10 per trading day (increasing to $20 per trading day on the fifth (5th) trading day after such liquidated damages begin to accrue) for each trading day after such date until such shares are delivered or the holder rescinds such exercise. In addition, if after such date the holder is required by its broker to purchase (in an open market transaction or otherwise) or the holder's brokerage firm otherwise purchases, shares of common stock to deliver in satisfaction of a sale by the holder of the shares which the holder anticipated receiving upon such exercise, then we shall (A) pay in cash to the holder the amount, if any, by which (x) the holder's total purchase price (including brokerage commissions, if any) for the shares of common stock so purchased exceeds (y) the amount obtained by multiplying (1) the number of shares that we were required to deliver to the holder in connection with the exercise at issue times (2) the price at which the sell order giving rise to such purchase obligation was executed, and (B) at the option of the holder, either reinstate the portion of the warrant and equivalent number of shares for which such exercise was not honored (in which case such exercise shall be deemed rescinded) or deliver to the holder the number of shares of common stock that would have been issued had we timely complied with our exercise and delivery obligations.

*Exercise Limitation*.    A holder will not have the right to exercise any portion of the warrant if the holder (together with its affiliates) would beneficially own in excess of 4.99% of the number of shares of our common stock outstanding immediately after giving effect to the exercise, as such percentage ownership is determined in accordance with the terms of the warrants. However, any holder may increase or decrease such percentage to any other percentage not in excess of 9.99%, provided that any increase in such percentage shall not be effective until 61 days following notice from the holder to us.

*Exchange Listing*.    The warrants have been approved for trading on NYSE American under the symbol "GOED WS" and will commence trading on May 28, 2021.

115

Table of Contents

***Rights as a Stockholder***.    Except as otherwise provided in the warrants or by virtue of such holder's ownership of our common stock, the holder of a warrant does not have the rights or privileges of a holder of our common stock, including any voting rights, until the holder exercises the warrant.

***Governing Law and Jurisdiction***.    The warrant agent agreement and warrant provide that the validity, interpretation, and performance of the warrant agent agreement and the warrants will be governed by the laws of the State of New York, without giving effect to conflicts of law principles that would result in the application of the substantive laws of another jurisdiction. In addition, the warrant agent agreement and warrant provide that any action, proceeding or claim against any party arising out of or relating to the warrant agent agreement or the warrants must be brought and enforced in the state and federal courts sitting in the City of New York, Borough of Manhattan. Investors in this offering will be bound by these provisions. However, we do not intend that the foregoing provisions would apply to actions arising under the Securities Act or the Exchange Act.

## Other Warrants

In connection with our initial public offering, we issued warrants for the purchase of 55,560 shares of common stock to affiliates of ThinkEquity, a division of Fordham Financial Management, Inc. The warrants will be exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25 (125% of the public offering price per share).

On March 19, 2021, we issued four-year warrants to purchase an aggregate of 400,000 shares of common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis.

## Options

As of the date of this prospectus, we have issued options to purchase an aggregate of 555,000 shares of common stock under the Plan, each at an exercise price of $9.00 per share.

## Anti-takeover Effects of Delaware Law and Charter Provisions

We have elected not to be governed by Section 203 of the General Corporation Law of the State of Delaware, which prohibits a publicly-held Delaware corporation from engaging in a business combination, except under certain circumstances, with an interested stockholder.

Our amended and restated certificate of incorporation and bylaws contain certain provisions that may have anti-takeover effects, making it more difficult for or preventing a third party from acquiring control of our company or changing our board of directors and management.

Our amended and restated certificate of incorporation authorizes our board of directors to issue up to 20,000,000 shares of preferred stock without further stockholder approval. The preferred stock may be issued in one or more series, the terms of which may be determined at the time of issuance by the board of directors without further action by the stockholders. These terms may include preferences as to dividends and liquidation, conversion rights, redemption rights and sinking fund provisions. The issuance of any preferred stock could diminish the rights of holders of our common stock, and therefore could reduce the value of such common stock. In addition, specific rights granted to future holders of preferred stock could be used to restrict our ability to merge with, or sell assets to, a third party. The ability of our board of directors to issue preferred stock could make it more difficult, delay, discourage, prevent or make it more costly to acquire or effect a change-in-control, which in turn could prevent our stockholders from recognizing a gain in the event that a favorable offer is extended and could materially and negatively affect the market price of our common stock.

Our bylaws permit the board of directors to establish the number of directors and fill any vacancies and newly created directorships. These provisions will prevent a stockholder from increasing the size of our board of directors and gaining control of our board of directors by filling the resulting vacancies with its own nominees. In addition, our bylaws provide that no member of our board of directors may be removed from office by our stockholders without cause and, in addition to any other vote required by law, upon the approval of not less than the majority of the total voting power of all of our outstanding voting stock then entitled to vote in the election of directors.

116

Table of Contents

Our bylaws establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to the board of directors. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of the board of directors or by a stockholder who was a stockholder of record on the record date for the meeting, who is entitled to vote at the meeting and who has given us timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. Although our bylaws do not give the board of directors the power to approve or disapprove stockholder nominations of candidates or proposals regarding other business to be conducted at a special or annual meeting, our bylaws may have the effect of precluding the conduct of certain business at a meeting if the proper procedures are not followed or may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect its own slate of directors or otherwise attempting to obtain control of our company.

Furthermore, neither the holders of our common stock nor the holders of our preferred stock have cumulative voting rights in the election of our directors. The combination of the present ownership by a few stockholders of a significant portion of our issued and outstanding common stock and lack of cumulative voting makes it more difficult for other stockholders to replace our board of directors or for a third party to obtain control of our company by replacing its board of directors.

**Transfer Agent and Registrar**

American Stock Transfer & Trust Company, LLC, 6201 15th Avenue, Brooklyn, NY 11219, telephone (800) 937-5449, is the transfer agent for our common stock.

**Trading Symbol and Market**

Our common stock is listed and traded on NYSE American under the symbol "GOED." The warrants have been approved for trading on NYSE American under the symbol "GOED WS" and will commence trading on May 28, 2021. In connection with this offering, we have applied for the listing of our common stock and warrants on the NYSE, however, we do not currently meet the minimum share price requirements of the NYSE and will not be able to list our common stock and warrants on the NYSE unless we meet such minimum share price and other listing requirements of the NYSE.

Table of Contents

**SHARES ELIGIBLE FOR FUTURE SALE**

Future sales of substantial amounts of shares of our common stock, including shares issued upon the conversion of convertible notes, the exercise of outstanding options and warrants, in the public market after this offering, or the possibility of these sales occurring, could cause the prevailing market price for our common stock to fall or impair our ability to raise equity capital in the future.

Immediately following the closing of this offering, we will have 103,118,284 shares of common stock issued and outstanding (including 5,895,973 shares issued in connection with the proposed acquisition), assuming no exercise of the warrants being offered in this offering. In the event the underwriters exercise the over-allotment option to purchase additional shares of common stock and warrants in full, we will have 105,118,284 shares of common stock issued and outstanding. The common stock sold in this offering will be freely tradable without restriction or further registration or qualification under the Securities Act.

Previously issued shares of common stock that were not offered and sold in this offering, shares issued in the proposed acquisition, as well as shares issuable upon the exercise of previously issued warrants and subject to employee stock options, are or will be upon issuance, "restricted securities," as that term is defined in Rule 144 under the Securities Act. These restricted securities are eligible for public sale only if such public resale is registered under the Securities Act or if the resale qualifies for an exemption from registration under Rule 144 or Rule 701 under the Securities Act, which are summarized below.

**Rule 144**

In general, a person who has beneficially owned restricted shares of our common stock for at least twelve months, or at least six months in the event we have been a reporting company under the Exchange Act for at least ninety (90) days before the sale, would be entitled to sell such securities, provided that such person is not deemed to be an affiliate of ours at the time of sale or to have been an affiliate of ours at any time during the ninety (90) days preceding the sale. A person who is an affiliate of ours at such time would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of shares that does not exceed the greater of the following:

- 1% of the number of shares of our common stock then outstanding; or

- 1% of the average weekly trading volume of our common stock during the four calendar weeks preceding the filing by such person of a notice on Form 144 with respect to the sale;

provided that, in each case, we are subject to the periodic reporting requirements of the Exchange Act for at least 90 days before the sale. Rule 144 trades must also comply with the manner of sale, notice and other provisions of Rule 144, to the extent applicable.

**Rule 701**

In general, Rule 701 allows a stockholder who purchased shares of our capital stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of ours during the immediately preceding 90 days to sell those shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation or notice provisions of Rule 144. All holders of Rule 701 shares, however, are required to wait until ninety (90) days after the date of this prospectus before selling shares pursuant to Rule 701.

**Lock-Up Agreements**

We and all of our directors and executive officers have agreed with the underwriters, subject to certain exceptions, not to sell, transfer or dispose of, directly or indirectly, any of our common stock or securities convertible into or exercisable or exchangeable for our common stock for a period of 90 days from the date of this prospectus. See "Underwriting — No Sales of Similar Securities."

118

Table of Contents

**MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS**
**FOR NON-U.S. HOLDERS OF OUR COMMON STOCK AND WARRANTS**

The following is a summary of the material United States federal income tax consequences of the purchase, ownership and disposition of our common stock and warrants that are being issued pursuant to this offering. This summary is limited to Non-United States Holders (as defined below) that hold our common stock and warrants as capital assets (generally, property held for investment) for United States federal income tax purposes. This summary does not discuss all of the aspects of United States federal income taxation that may be relevant to a Non-United States Holder in light of the Non-United States Holder's particular investment or other circumstances. Accordingly, all prospective Non-United States Holders should consult their own tax advisors with respect to the United States federal, state, local and non-United States tax consequences of the purchase, ownership and disposition of our common stock or warrants.

This summary is based on provisions of the Code, applicable United States Treasury regulations and administrative and judicial interpretations, all as in effect or in existence on the date of this prospectus. Subsequent developments in United States federal income tax law, including changes in law or differing interpretations, which may be applied retroactively, could alter the United States federal income tax consequences of owning and disposing of our common stock or warrants as described in this summary. There can be no assurance that the Internal Revenue Service, or IRS, will not take a contrary position with respect to one or more of the tax consequences described herein and we have not obtained, nor do we intend to obtain, a ruling from the IRS with respect to the United States federal income tax consequences of the ownership or disposition of our common stock or warrants.

As used in this summary, the term "Non-United States Holder" means a beneficial owner of our common stock or warrants that is not, for United States federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation (or other entity treated as a corporation) created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an entity or arrangement treated as a partnership;

- an estate whose income is includible in gross income for United States federal income tax purposes regardless of its source; or

- a trust, if (1) a United States court is able to exercise primary supervision over the trust's administration and one or more "United States persons" (within the meaning of the Code) has the authority to control all of the trust's substantial decisions, or (2) the trust has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

If an entity or arrangement treated as a partnership for United States federal income tax purposes holds our common stock or warrants, the tax treatment of a partner in such a partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner level. Partnerships, and partners in partnerships, that hold our common stock or warrants should consult their own tax advisors as to the particular United States federal income tax consequences of owning and disposing of our common stock or warrants that are applicable to them.

This summary does not consider any specific facts or circumstances that may apply to a Non-United States Holder, including the impact of the Medicare contribution tax on net investment income and the alternative minimum tax, and does not address any special tax rules that may apply to particular Non-United States Holders, including, without limitation:

- a Non-United States Holder that is a financial institution, insurance company, tax-exempt organization, pension plan, broker, dealer or trader in stocks, securities or currencies, United States expatriate, controlled foreign corporation or passive foreign investment company;

- a Non-United States Holder holding our common stock or warrants as part of a conversion, constructive sale, wash sale or other integrated transaction or a hedge, straddle or synthetic security;

119

Table of Contents

- a Non-United States Holder that holds or receives our common stock or warrants pursuant to the exercise of any employee stock option or otherwise as compensation; or

- a Non-United States Holder that at any time owns, directly, indirectly or constructively, 5% or more of our outstanding common stock.

In addition, this summary does not address any United States state or local, or non-United States or other tax consequences, or any United States federal income tax consequences for beneficial owners of a Non-United States Holder, including stockholders of a controlled foreign corporation or passive foreign investment company that holds our common stock or warrants. This summary also does not address the effects of other United States federal tax laws, such as estate and gift tax laws.

**Each Non-United States Holder should consult its tax advisor regarding the United States federal, state, local and non-United States income and other tax consequences of owning and disposing of our common stock or warrants.**

**Exercise and Expiration of Warrants**

In general, a Non-United States Holder will not recognize gain or loss for U.S. federal income tax purposes upon the exercise of warrants into shares of common stock.

The expiration of a warrant will be treated as if the Non-United States Holder sold or exchanged the warrant and recognized a capital loss equal to the Non-United States Holder's tax basis in the warrant. However, a Non-United States Holder will not be able to utilize a loss recognized upon expiration of a warrant against the Non-United States Holder's United States federal income tax liability unless the loss is effectively connected with the Non-United States Holder's conduct of a trade or business within the United States (and, if an income tax treaty applies, is attributable to a permanent establishment or fixed base in the United States) or is treated as a U.S.-source loss and the Non-United States Holder is present 183 days or more in the taxable year of disposition and certain other conditions are met.

**Certain Adjustments to Warrants**

The number of shares of common stock issued on the exercise of the warrants and the exercise price of warrants are subject to adjustment in certain circumstances. Adjustments (or failure to make adjustments) that have the effect of increasing a Non-United States Holder's proportionate interest in our assets or earnings and profits may, in some circumstances, result in a constructive distribution to the Non-United States Holder. Adjustments to the conversion rate made pursuant to a bona fide reasonable adjustment formula which has the effect of preventing the dilution of the interest of the holders of our warrants generally will not be deemed to result in a constructive distribution. If an adjustment is made that does not qualify as being made pursuant to a bona fide reasonable adjustment formula, a Non-United States Holder of warrants may be deemed to have received a constructive distribution from us, even though such Non-United States Holder has not received any cash or property as a result of such adjustment. The tax consequences of the receipt of a distribution from us are described above under "— Distributions on Our Common Stock" below. Any resulting withholding tax attributable to deemed dividends would be collected from other amounts payable or distributable to the Non-United States Holder. Non-United States Holders should consult their tax advisors regarding the proper treatment of any adjustments to the terms of the warrants.

**Distributions on Our Common Stock**

We do not currently expect to pay any cash dividends on our common stock. If we make distributions of cash or property (other than certain pro rata distributions of our common stock) with respect to our common stock, any such distributions generally will constitute dividends for United States federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under United States federal income tax principles. If a distribution exceeds our current and accumulated earnings and profits, the excess will be treated as a nontaxable return of capital to the extent of the Non-United States Holder's adjusted tax basis in its common stock and will reduce (but not below zero) such Non-United States Holder's adjusted tax basis in its common stock. Any remaining excess will be treated as gain from a disposition of our common stock subject to the tax treatment described below in "— Dispositions of Our Common Stock or Warrants."

120

Table of Contents

Subject to the discussion below on effectively connected income, dividends paid to a Non-United States Holder of our common stock will be subject to United States federal withholding tax at a rate of 30% of the gross amount of the dividends (or such lower rate specified by an applicable income tax treaty, provided the Non-United States Holder furnishes a valid IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) certifying qualification for the lower treaty rate).

Distributions on our common stock that are treated as dividends and that are effectively connected with a Non-United States Holder's conduct of a trade or business in the United States will be taxed on a net income basis at the regular graduated rates and in the manner applicable to United States persons. An exception may apply if the Non-United States Holder is eligible for, and properly claims, the benefit of an applicable income tax treaty and the dividends are not attributable to a permanent establishment or fixed base maintained by the Non-United States Holder in the United States. In such case, the Non-United States Holder may be eligible for a lower rate under an applicable income tax treaty between the United States and its jurisdiction of tax residence. Dividends that are effectively connected with a Non-United States Holder's conduct of a trade or business in the United States will not be subject to the United States withholding tax if the Non-United States Holder provides to the applicable withholding agent a properly executed IRS Form W-8ECI (or other applicable form) in accordance with the applicable certification and disclosure requirements. A Non-United States Holder treated as a corporation for United States federal income tax purposes may also be subject to a "branch profits tax" at a 30% rate (unless the Non-United States Holder is eligible for a lower rate under an applicable income tax treaty) on the Non-United States Holder's earnings and profits (attributable to dividends on our common stock or otherwise) that are effectively connected with the Non-United States Holder's conduct of a trade or business within the United States.

The IRS Forms and other certifications described above must be provided to the applicable withholding agent prior to the payment of dividends and must be updated periodically. A Non-United States Holder may obtain a refund or credit of any excess amounts withheld by timely filing an appropriate claim for a refund with the IRS. Non-United States Holders should consult their tax advisors regarding their eligibility for benefits under a relevant income tax treaty and the manner of claiming such benefits.

The foregoing discussion is subject to the discussions below under "— Backup Withholding and Information Reporting" and "— FATCA Withholding."

**Dispositions of Our Common Stock or Warrants**

A Non-United States Holder generally will not be subject to United States federal income tax (including United States withholding tax) on gain recognized on any sale or other disposition of our common stock or warrants unless:

• the gain is effectively connected with the Non-United States Holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment or fixed base maintained by the Non-United States Holder in the United States); in this case, the gain will be subject to United States federal income tax on a net income basis at the regular rates and in the manner applicable to United States persons (unless an applicable income tax treaty provides otherwise) and, if the Non-United States Holder is treated as a corporation for United States federal income tax purposes, the "branch profits tax" described above may also apply;

• the Non-United States Holder is an individual who is present in the United States for 183 days or more in the taxable year of the disposition and meets certain other requirements; in this case, except as otherwise provided by an applicable income tax treaty, the gain, which may be offset by certain United States source capital losses (provided the Non-United States Holder has timely filed United States federal income tax returns with respect to such losses), generally will be subject to a flat 30% United States federal income tax, even if the Non-United States Holder is not treated as a resident of the United States under the Code; or

• we are or have been a "United States real property holding corporation" for United States federal income tax purposes at any time during the shorter of (i) the five-year period ending on the date of disposition and (ii) the period that the Non-United States Holder held our common stock or warrants.

Generally, a corporation is a "United States real property holding corporation" if the fair market value of its "United States real property interests" equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests plus its other assets used or held for use in a trade or business. We believe that we are not currently, and we do not anticipate becoming in the future, a United States real property holding corporation. However, because the determination

121

Table of Contents

of whether we are a United States real property holding corporation is made from time to time and depends on the relative fair market values of our assets, there can be no assurance in this regard. If we were a United States real property holding corporation, the tax relating to disposition of stock in a United States real property holding corporation generally will not apply to a Non-United States Holder whose holdings, direct, indirect and constructive, constituted 5% or less of our common stock at all times during the applicable period, provided that our common stock is "regularly traded on an established securities market" (as provided in applicable United States Treasury regulations) at any time during the calendar year in which the disposition occurs. However, no assurance can be provided that our common stock will be regularly traded on an established securities market for purposes of the rules described above. Non-United States Holders should consult their tax advisors regarding the possible adverse United States federal income tax consequences to them if we are, or were to become, a United States real property holding corporation.

The foregoing discussion is subject to the discussions below under "— Backup Withholding and Information Reporting" and "— FATCA Withholding."

**Backup Withholding and Information Reporting**

Backup withholding (currently at a rate of 24%) will not apply to payments of dividends on our common stock to a Non-United States Holder if the Non-United States Holder provides to the applicable withholding agent a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable form) certifying under penalties of perjury that the Non-United States Holder is not a United States person or is otherwise entitled to an exemption. However, the applicable withholding agent generally will be required to report to the IRS (and to such Non-United States Holder) payments of distributions on our common stock and the amount of United States federal income tax, if any, withheld from those payments, regardless of whether such distributions constitute dividends. In accordance with applicable treaties or agreements, the IRS may provide copies of such information returns to the tax authorities in the country in which the Non-United States Holder resides.

The gross proceeds from sales or other dispositions of our common stock or warrants may be subject, in certain circumstances discussed below, to United States backup withholding and information reporting. If a Non-United States Holder sells or otherwise disposes of our common stock or warrants outside the United States through a non-United States office of a non-United States broker and the disposition proceeds are paid to the Non-United States Holder outside the United States, then the United States backup withholding and information reporting requirements generally will not apply to that payment. However, United States information reporting, but not United States backup withholding, will apply to a payment of disposition proceeds, even if that payment is made outside the United States, if a Non-United States Holder sells our common stock or warrants through a non-United States office of a broker that is a United States person or has certain enumerated connections with the United States, unless the broker has documentary evidence in its files that the Non-United States Holder is not a United States person and certain other conditions are met or the Non-United States Holder otherwise qualifies for an exemption.

If a Non-United States Holder receives payments of the proceeds of a disposition of our common stock or warrants to or through a United States office of a broker, the payment will be subject to both United States backup withholding and information reporting unless the Non-United States Holder provides to the broker a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable form) certifying under penalties of perjury that the Non-United States Holder is not a United States person, or the Non-United States Holder otherwise qualifies for an exemption.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be credited against the Non-United States Holder's United States federal income tax liability (which may result in the Non-United States Holder being entitled to a refund), provided that the required information is timely furnished to the IRS.

**FATCA Withholding**

The Foreign Account Tax Compliance Act and related Treasury guidance (commonly referred to as FATCA) impose United States federal withholding tax at a rate of 30% on payments to certain foreign entities of (i) United States-source dividends (including dividends paid on our common stock) and (ii) (subject to the proposed Treasury Regulations discussed below) the gross proceeds from the sale or other disposition of property that produces United States-source dividends (including sales or other dispositions of our common stock or warrants). This withholding tax applies to a foreign entity, whether acting as a beneficial owner or an intermediary, unless such foreign entity complies with (i) certain information reporting requirements regarding its United States account holders and its United States owners and (ii) certain withholding obligations regarding certain payments to its account holders and certain other persons.

122

Table of Contents

Accordingly, the entity through which a Non-United States Holder holds its common stock or warrants will affect the determination of whether such withholding is required. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on our common stock. While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of stock on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

Non-United States Holders are encouraged to consult their tax advisors regarding FATCA.

Table of Contents

**UNDERWRITING**

ThinkEquity, a division of Fordham Financial Management, Inc., is acting as representative of each of the underwriters named below. Subject to the terms and conditions set forth in an underwriting agreement among us and the underwriters, we have agreed to sell to the underwriters, and each of the underwriters has agreed, severally and not jointly, to purchase from us, the number of units set forth opposite its name below.

| Underwriter | Number of Units |
|---|---|
| ThinkEquity, a division of Fordham Financial Management, Inc. | 91,111,111 |

Subject to the terms and conditions set forth in the underwriting agreement, the underwriters have agreed, severally and not jointly, to purchase all of the units sold under the underwriting agreement if any of these units are purchased. If an underwriter defaults, the underwriting agreement provides that the purchase commitments of the nondefaulting underwriters may be increased or the underwriting agreement may be terminated.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make in respect of those liabilities.

The underwriters are offering the units, subject to prior sale, when, as and if issued to and accepted by them, subject to approval of legal matters by their counsel, including the validity of the units, and other conditions contained in the underwriting agreement, such as the receipt by the underwriters of officer's certificates and legal opinions. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

**Commissions and Discounts**

The representative has advised us that the underwriters propose initially to offer the units to the public at the public offering price set forth on the cover page of this prospectus and to dealers at that price less a concession not in excess of $0.078750 per unit. After the initial offering, the public offering price, concession or any other term of the offering may be changed.

The following table shows the public offering price, underwriting discount and proceeds before expenses to us. The information assumes either no exercise or full exercise by the underwriters of their option to purchase additional shares of common stock and/or warrants.

| | Per Unit | Without Option | With Option |
|---|---|---|---|
| Public offering price | $ 2.2500 | $ 205,000,000 | $ 209,500,000 |
| Underwriting discount (7%) | $ 0.1575 | $ 14,350,000 | $ 14,665,000 |
| Proceeds, before expenses, to us | $ 2.0925 | $ 190,650,000 | $ 194,835,000 |

We have paid an expense deposit of $50,000 to the representative, which will be applied against the actual out-of-pocket accountable expenses that will be paid by us to the representative in connection with this offering, and will be reimbursed to us to the extent not incurred.

In addition, we have also agreed to pay the following expenses of the representative relating to the offering: (a) all fees, expenses and disbursements relating to background checks of our officers and directors in an amount not to exceed $15,000 in the aggregate; (b) all filing fees and communication expenses associated with the review of this offering by FINRA; (c) all fees, expenses and disbursements relating to the registration, qualification or exemption of securities offered under the securities laws of foreign jurisdictions designated by the underwriter, including the reasonable fees and expenses of the underwriter's blue sky counsel; (d) $29,500 for the underwriters' use of Ipreo's book-building, prospectus tracking and compliance software for this offering; (e) the costs associated with bound volumes of the public offering materials as well as commemorative mementos and lucite tombstones in an amount not to exceed $3,000, (f) the fees and expenses of the representatives' legal counsel incurred in connection with this offering, not to exceed $150,000 and legal fees and expenses of the former underwriter, previously engaged with respect to the offering, not to exceed $404,330; (g) $10,000 for data services; and (h) up to $30,000 of the representative's actual accountable road show expenses for the offering.

The expenses of the offering, not including the underwriting discount, are estimated at $1,050,000 and are payable by us.

Table of Contents

**Option to Purchase Additional Units**

We have granted a 30-day option to the underwriters to purchase up to 2,000,000 additional shares of common stock and/or warrants to purchase up to 2,000,000 additional shares of common stock, in any combination thereof, solely to cover over-allotments, if any. The underwriters may exercise this option for 30 days from the date of this prospectus solely to cover sales of shares of common stock and/or warrants by the underwriters in excess of the total number of shares of common stock and/or warrants underlying the units set forth in the table above. If any of these additional shares and/or warrants are purchased, the underwriters will offer the additional shares and/or warrants on the same terms as those on which the units are being offered.

**No Sales of Similar Securities**

We, our executive officers and directors have agreed not to sell or transfer any common stock or securities convertible into, exchangeable for, exercisable for, or repayable with common stock, for 90 days after the date of this prospectus without first obtaining the written consent of the representative. Specifically, we and these other persons have agreed, with certain limited exceptions, not to directly or indirectly:

- offer, pledge, sell or contract to sell any common stock,

- sell any option or contract to purchase any common stock,

- purchase any option or contract to sell any common stock,

- grant any option, right or warrant for the sale of any common stock,

- lend or otherwise dispose of or transfer any common stock, or

- request or demand that we file or make a confidential submission of a registration statement related to, or enter into any swap or other agreement that transfers, in whole or in part, the economic consequence of ownership of any common stock, whether any such swap or transaction is to be settled by delivery of shares or other securities, in cash or otherwise.

This lock-up provision applies to common stock and to securities convertible into or exchangeable or exercisable for or repayable with common stock. It also applies to common stock owned now or acquired later by the person executing the agreement or for which the person executing the agreement later acquires the power of disposition.

**New York Stock Exchange American Listing**

Our common stock is listed and traded on NYSE American under the symbol "GOED." The warrants have been approved for trading on NYSE American under the symbol "GOED WS" and will commence trading on May 28, 2021. In connection with this offering, we have applied for the listing of our common stock and warrants on the NYSE, however, we do not currently meet the minimum share price requirements of the NYSE and will not be able to list our common stock and warrants on the NYSE unless we meet such minimum share price and other listing requirements of the NYSE.

**Price Stabilization, Short Positions**

Until the distribution of the units is completed, SEC rules may limit underwriters and selling group members from bidding for and purchasing our securities. However, the representative may engage in transactions that stabilize the price of our securities, such as bids or purchases to peg, fix or maintain that price.

In connection with the offering, the underwriters may purchase and sell our securities in the open market. These transactions may include short sales, purchases on the open market to cover positions created by short sales and stabilizing transactions. Short sales involve the sale by the underwriters of a greater number of securities than they are required to purchase in the offering. "Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional securities described above. The underwriters may close out any covered short position by either exercising their option to purchase additional securities or purchasing securities in the open market. In determining the source of securities to close out the covered short position, the underwriters will consider, among other things, the price of securities available for purchase in the open market as compared to the price at which they may purchase securities through the option granted to them. "Naked" short sales are sales in excess of such

125

Table of Contents

option. The underwriters must close out any naked short position by purchasing securities in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of our securities in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for or purchases of securities made by the underwriters in the open market prior to the completion of the offering.

Similar to other purchase transactions, the underwriters' purchases to cover the syndicate short sales may have the effect of raising or maintaining the market price of our securities or preventing or retarding a decline in the market price of our securities. As a result, the price of our securities may be higher than the price that might otherwise exist in the open market. The underwriters may conduct these transactions on NYSE American, in the over-the-counter market or otherwise.

Neither we nor any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of our securities. In addition, neither we nor any of the underwriters make any representation that the representative will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

**Electronic Distribution**

In connection with the offering, certain of the underwriters or securities dealers may distribute prospectuses by electronic means, such as e-mail.

**Other Relationships**

Some of the underwriters and their affiliates have engaged in, and may in the future engage in, investment banking and other commercial dealings in the ordinary course of business with us or our affiliates. They have received, or may in the future receive, customary fees and commissions for these transactions.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**European Economic Area**

In relation to each Member State of the European Economic Area (each being referred to as a Relevant State), no securities have been offered or will be offered pursuant to the public in that Relevant State prior to the publication of a prospectus in relation to the securities which has been approved by the competent authority in that Relevant State or, where appropriate, approved in another Relevant State and notified to the competent authority in that Relevant State, all in accordance with the Prospectus Regulation), except that offers of securities may be made to the public in that Relevant State at any time under the following exemptions under the Prospectus Regulation:

> a.     to any legal entity which is a qualified investor as defined under the Prospectus Regulation;
>
> b.     to fewer than 150 natural or legal persons (other than qualified investors as defined under the Prospectus Regulation), subject to obtaining the prior consent for any such offer; or
>
> c.     in any other circumstances falling within Article 1(4) of the Prospectus Regulation, provided that no such offer of securities shall require the Issuer or any Manager to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation.

Each person in a Relevant State who initially acquires any securities or to whom any offer is made will be deemed to have represented, acknowledged and agreed to and with our company and the Managers that it is a qualified investor within the meaning of the Prospectus Regulation.

Table of Contents

In the case of any securities being offered to a financial intermediary as that term is used in Article 5(1) of the Prospectus Regulation, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the securities acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer to the public other than their offer or resale in a Relevant State to qualified investors, in circumstances in which the prior consent has been obtained to each such proposed offer or resale.

Our company and its affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgements and agreements.

For the purposes of this provision, the expression an "offer to the public" in relation to any securities in any Relevant State means the communication in any form and by any means of sufficient information on the terms of the offer and any securities to be offered so as to enable an investor to decide to purchase or subscribe for any securities, and the expression "Prospectus Regulation" means Regulation (EU) 2017/1129.

The above selling restriction is in addition to any other selling restrictions set out below.

**Notice to Prospective Investors in the United Kingdom**

In relation to the United Kingdom, or the UK, no securities have been offered or will be offered pursuant to the public in the UK prior to the publication of a prospectus in relation to the securities which has been approved by the Financial Conduct Authority in the UK in accordance with the UK Prospectus Regulation and the FSMA, except that offers of securities may be made to the public in the UK at any time under the following exemptions under the UK Prospectus Regulation and the FSMA:

a.   to any legal entity which is a qualified investor as defined under the UK Prospectus Regulation;

b.   to fewer than 150 natural or legal persons (other than qualified investors as defined under the UK Prospectus Regulation), subject to obtaining the prior consent of the Global Co-ordinator for any such offer; or

c.   at any time in other circumstances falling within section 86 of the FSMA,

provided that no such offer of securities shall require the Issuer or any Manager to publish a prospectus pursuant to Section 85 of the FSMA or Article 3 of the UK Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the UK Prospectus Regulation.

Each person in the UK who initially acquires any securities or to whom any offer is made will be deemed to have represented, acknowledged and agreed to and with our company and the Managers that it is a qualified investor within the meaning of the UK Prospectus Regulation.

In the case of any securities being offered to a financial intermediary as that term is used in Article 5(1) of the UK Prospectus Regulation, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the securities acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer to the public other than their offer or resale in the UK to qualified investors, in circumstances in which the prior consent has been obtained to each such proposed offer or resale.

Our company and its affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgements and agreements.

For the purposes of this provision, the expression an "offer to the public" in relation to any securities in the UK means the communication in any form and by any means of sufficient information on the terms of the offer and any securities to be offered so as to enable an investor to decide to purchase or subscribe for any securities, the expression "UK Prospectus Regulation" means Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, and the expression "FSMA" means the Financial Services and Markets Act 2000.

This document is for distribution only to persons who (i) have professional experience in matters relating to investments and who qualify as investment professionals within the meaning of Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or the Financial Promotion Order, (ii) are persons falling within Article 49(2)(a) to (d) ("high net worth companies, unincorporated associations etc.") of the Financial

127

Table of Contents

Promotion Order, (iii) are outside the United Kingdom, or (iv) are persons to whom an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000, as amended, in connection with the issue or sale of any securities may otherwise lawfully be communicated or caused to be communicated (all such persons together being referred to as "relevant persons"). This document is directed only at relevant persons and must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this document relates is available only to relevant persons and will be engaged in only with relevant persons.

**Notice to Prospective Investors in Switzerland**

The securities may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange, or SIX, or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the securities or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, our company, the securities have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of securities will not be supervised by, the Swiss Financial Market Supervisory Authority, FINMA, and the offer of securities has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes, or CISA. The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of securities.

**Notice to Prospective Investors in the Dubai International Financial Centre**

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority, or the DFSA. This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The securities to which this prospectus relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the securities offered should conduct their own due diligence on the securities. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

**Notice to Prospective Investors in Australia**

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission in relation to the offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001, or the Corporations Act, and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act. Any offer in Australia of the securities may only be made to persons, or Exempt Investors, who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the securities without disclosure to investors under Chapter 6D of the Corporations Act.

The securities applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring securities must observe such Australian on-sale restrictions.

128

Table of Contents

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

**Notice to Prospective Investors in Hong Kong**

The securities have not been offered or sold and will not be offered or sold in Hong Kong, by means of any document, other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance. No advertisement, invitation or document relating to the securities has been or may be issued or has been or may be in the possession of any person for the purposes of issue, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

**Notice to Prospective Investors in Japan**

The securities have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948, as amended) and, accordingly, will not be offered or sold, directly or indirectly, in Japan, or for the benefit of any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person, except in compliance with all applicable laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

**Notice to Prospective Investors in Singapore**

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, the securities were not offered or sold or caused to be made the subject of an invitation for subscription or purchase and will not be offered or sold or caused to be made the subject of an invitation for subscription or purchase, and this prospectus or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the securities, has not been circulated or distributed, nor will it be circulated or distributed, whether directly or indirectly, to any person in Singapore other than (i) to an institutional investor (as defined in Section 4A of the Securities and Futures Act (Chapter 289) of Singapore, as modified or amended from time to time, or the SFA) pursuant to Section 274 of the SFA, (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

a)      a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

b)      a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

129

Table of Contents

securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the securities pursuant to an offer made under Section 275 of the SFA except:

a)      to an institutional investor or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

b)      where no consideration is or will be given for the transfer;

c)      where the transfer is by operation of law; or

d)      as specified in Section 276(7) of the SFA.

**Notice to Prospective Investors in Canada**

The securities may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the securities must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws. Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor. Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI33-105 regarding underwriter conflicts of interest in connection with this offering.

130

Table of Contents

## LEGAL MATTERS

Certain legal matters with respect to the shares of common stock and warrants offered hereby will be passed upon by Bevilacqua PLLC, Washington, DC. Loeb & Loeb LLP, New York, New York, is acting as counsel to the underwriters.

## EXPERTS

The consolidated financial statements of our company appearing elsewhere in this prospectus have been included herein in reliance upon the report of Friedman LLP, an independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

The combined financial statements of Appliances Connection appearing elsewhere in this prospectus have been included herein in reliance upon the report of Friedman LLP, an independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

## INTERESTS OF NAMED EXPERTS AND COUNSEL

As of the date of this prospectus, Louis A. Bevilacqua, the managing member of our legal counsel, Bevilacqua PLLC, owns 298,427 shares of our common stock, representing approximately 4.88% of our outstanding common stock, which equity securities were received upon the distribution of shares by 1847 Holdings. Mr. Bevilacqua also owns approximately 10% of our manager. Mr. Bevilacqua received these securities as partial consideration for legal services previously provided to 1847 Holdings and our manager.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed a registration statement, of which this prospectus is a part, on Form S-1 with the SEC relating to this offering. This prospectus, which constitutes a part of the registration statement, does not contain all of the information in the registration statement and the exhibits filed with the registration statement. For further information pertaining to us and the units to be sold in this offering, you should refer to the registration statement and its exhibits. References in this prospectus to any of our contracts, agreements or other documents are not necessarily complete, and you should refer to the exhibits attached to the registration statement for copies of the actual contracts, agreements or documents.

We file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information are available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. Additionally, we will make these filings available, free of charge, on our website at *www.goedekers.com* as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the SEC. The information on our website, other than these filings, is not, and should not be, considered part of this prospectus and is not incorporated by reference into this document.

131

Table of Contents

**FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| **Unaudited Condensed Consolidated Financial Statements of 1847 Goedeker Inc. for the Three Months Ended March 31, 2021 and 2020** | **F-2** |
| Condensed Consolidated Balance Sheets as of March 31, 2021 (unaudited) and December 31, 2020 | F-3 |
| Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2021 and 2020 (As Restated) (unaudited) | F-4 |
| Condensed Consolidated Statement of Stockholders' Deficit for Three Months Ended March 31, 2021 and 2020 (As Restated) (unaudited) | F-5 |
| Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2021 and 2020 (As Restated) (unaudited) | F-6 |
| Notes to Condensed Consolidated Financial Statements (unaudited) | F-7 |
|  |  |
| **Audited Consolidated Financial Statements of 1847 Goedeker Inc. as of and for the Years Ended December 31, 2020 and 2019** | **F-24** |
| Report of Independent Registered Public Accounting Firm | F-25 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 (as Restated) | F-26 |
| Consolidated Statements of Operations for the Year Ended December 31, 2020 and the Period from April 6, 2019 to December 31, 2019 (Successor) (as Restated) and for the Period from January 1, 2019 to April 5, 2019 (Predecessor) | F-27 |
| Statement of Stockholders' Equity for Predecessor for the Period from January 1, 2019 to April 5, 2019 | F-28 |
| Consolidated Statement of Stockholder's Deficit for Successor for the Year Ended December 31, 2020 and the Period from April 5, 2019 to December 31, 2019 (as Restated) | F-29 |
| Consolidated Statements of Cash Flows for the Year Ended December 31, 2020 and the Period from April 6, 2019 to December 31, 2019 (Successor) (as Restated) and for the Period from January 1, 2019 to April 5, 2019 (Predecessor) | F-30 |
| Notes to Consolidated Financial Statements | F-32 |
|  |  |
| **Unaudited Combined Financial Statements of 1 Stop Electronics Center, Inc., YF Logistics LLC, Gold Coast Appliances, Inc., Joe's Appliances LLC and Superior Deals Inc. (dba Appliances Connection) for the Three Months Ended March 31, 2021 and 2020** | **F-57** |
| Combined Balance Sheets as of March 31, 2021 (unaudited) and December 31, 2020 | F-58 |
| Combined Statements of Income and Changes in Owners' Equity for the Three Months Ended March 31, 2021 and 2020 (unaudited) | F-59 |
| Combined Statements of Cash Flows for the Three Months Ended March 31, 2021 and 2020 (unaudited) | F-60 |
| Notes to Combined Financial Statements (unaudited) | F-61 |
|  |  |
| **Audited Combined Financial Statements of 1 Stop Electronics Center, Inc., YF Logistics LLC, Gold Coast Appliances, Inc., Joe's Appliances LLC and Superior Deals Inc. (dba Appliances Connection) as of and for the Years Ended December 31, 2020 and 2019** | **F-71** |
| Report of Independent Registered Public Accounting Firm | F-72 |
| Combined Balance Sheets as of December 31, 2020 and 2019 | F-73 |
| Combined Statements of Income and Changes in Owners' Equity for the Years Ended December 31, 2020 and 2019 | F-74 |
| Combined Statements of Cash Flows for the Years Ended December 31, 2020 and 2019 | F-75 |
| Notes to Combined Financial Statements | F-76 |

Table of Contents

**1847 GOEDEKER INC.**

**UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

**THREE MONTHS ENDED MARCH 31, 2021 AND 2020**

F-2

Table of Contents

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 1,309,374 | $ 934,729 |
| Restricted cash | 10,094,932 | 8,977,187 |
| Receivables | 948,354 | 1,998,232 |
| Vendor deposits | 742,926 | 547,648 |
| Merchandise inventory, net | 5,883,484 | 5,147,241 |
| Prepaid expenses and other current assets | 525,960 | 635,084 |
| Total Current Assets | 19,505,030 | 18,240,121 |
| Property and equipment, net | 355,581 | 245,948 |
| Operating lease right-of-use assets, net | 3,404,860 | 1,578,235 |
| Goodwill | 4,725,689 | 4,725,689 |
| Intangible assets, net | 1,276,088 | 1,381,937 |
| Other long-term assets | 45,000 | 45,000 |
| TOTAL ASSETS | $ 29,312,248 | $ 26,216,930 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 12,356,822 | $ 12,701,715 |
| Customer deposits | 22,269,406 | 21,879,210 |
| Short term notes payable, net | 3,347,763 | — |
| Current portion of notes payable, net | 668,744 | 663,339 |
| Current portion of operating lease liabilities | 664,043 | 450,712 |
| Total Current Liabilities | 39,306,778 | 35,694,976 |
| Notes payable, net of current portion, net | 2,358,068 | 2,522,030 |
| Operating lease liabilities, net of current portion | 2,803,203 | 1,127,523 |
| Contingent note payable | 188,170 | 188,170 |
| TOTAL LIABILITIES | 44,656,219 | 39,532,699 |
| Stockholders' Deficit | | |
| Preferred stock, $.0001 par value, 20,000,000 shares authorized; none issued and outstanding as of March 31, 2021 or December 31, 2020 | — | — |
| Common stock, $.0001 par value, 200,000,000 shares authorized; 6,111,200 shares issued and outstanding as of March 31, 2021 and December 31, 2020 | 611 | 611 |
| Additional paid-in capital | 14,874,341 | 13,409,328 |
| Accumulated deficit | (30,218,923) | (26,725,708) |
| Total Stockholders' Deficit | (15,343,971) | (13,315,769) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 29,312,248 | $ 26,216,930 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

F-3

Table of Contents

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2021** | **2020 (As Restated)** |
| Product sales, net | $ 13,697,368 | $ 9,677,178 |
| Cost of goods sold | 11,068,911 | 8,111,170 |
| Gross profit | 2,628,457 | 1,566,008 |
| | | |
| Operating Expenses | | |
| Personnel | 1,931,324 | 1,311,484 |
| Advertising | 1,083,248 | 666,436 |
| Bank and credit card fees | 532,742 | 244,740 |
| Depreciation and amortization | 122,331 | 91,841 |
| General and administrative | 2,239,498 | 1,439,840 |
| Total Operating Expenses | 5,909,143 | 3,754,341 |
| LOSS FROM OPERATIONS | (3,280,686) | (2,188,333) |
| | | |
| Other Income (Expense) | | |
| Interest income | 10,096 | — |
| Interest expense | (232,831) | (456,070) |
| Other income | 10,206 | 2,383 |
| Total Other Income (Expense) | (212,529) | (453,687) |
| | | |
| NET LOSS BEFORE INCOME TAXES | (3,493,215) | (2,642,020) |
| | | |
| INCOME TAX BENEFIT | — | 435,000 |
| | | |
| NET LOSS | $ (3,493,215) | $ (2,207,020) |
| | | |
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ (0.57) | $ (0.44) |
| | | |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | 6,111,200 | 5,000,000 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

F-4

Table of Contents

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIT**
**(UNAUDITED)**

**For the Three Months Ended March 31, 2021**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
| | Shares | Amount | Capital | Deficit | Deficit |
|---|---|---|---|---|---|
| Balance, January 1, 2021 | 6,111,200 $ | 611 $ | 13,409,328 $ | (26,725,708) $ | (13,315,769) |
| Stock-based compensation expense | — | — | 124,575 | — | 124,575 |
| Issuance of warrants in connection with notes payable | — | — | 1,340,438 | — | 1,340,438 |
| Net loss | — | — | — | (3,493,215) | (3,493,215) |
| Balance, March 31, 2021 | 6,111,200 $ | 611 $ | 14,874,341 $ | (30,218,923) $ | (15,343,971) |

**For the Three Months Ended March 31, 2020 (As Restated)**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
| | Shares | Amount | Capital | Deficit | Deficit |
|---|---|---|---|---|---|
| Balance, January 1, 2020 | 4,750,000 $ | 475 $ | 1,079,179 $ | (5,157,871) $ | (4,078,217) |
| Net loss | — | — | — | (2,207,020) | (2,207,020) |
| Balance, March 31, 2020 | 4,750,000 $ | 475 $ | 1,079,179 $ | (7,364,891) $ | (6,285,237) |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

F-5

Table of Contents

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2021 | 2020 (As Restated) |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net loss | $ (3,493,215) | $ (2,207,020) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 127,596 | 91,841 |
| Amortization of debt discount | 98,201 | 209,132 |
| Stock-based compensation expense | 124,575 | — |
| Non-cash lease expense | 127,397 | 103,145 |
| Deferred tax assets | — | (435,000) |
| Changes in operating assets and liabilities: | | |
| Receivables | 1,049,878 | 290,707 |
| Vendor deposits | (195,278) | — |
| Merchandise inventory | (736,243) | 310,631 |
| Prepaid expenses and other assets | 109,124 | (14,687) |
| Accounts payable and accrued expenses | (344,893) | 1,442,264 |
| Customer deposits | 390,196 | 1,270,488 |
| Operating lease liabilities | (65,011) | (103,145) |
| Net cash provided by (used in) operating activities | (2,807,673) | 958,356 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Purchases of property and equipment | (126,115) | — |
| Net cash used in investing activities | (126,115) | — |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Proceeds from short term notes payable | 4,590,000 | — |
| Repayment on notes payable | (163,822) | (93,750) |
| Net payments on lines of credit | — | (681,408) |
| Net cash provided by (used in) financing activities | 4,426,178 | (775,158) |
| NET CHANGE IN CASH AND RESTRICTED CASH | 1,492,390 | 183,198 |
| CASH AND RESTRICTED CASH, BEGINNING OF PERIOD | 9,911,916 | 64,470 |
| CASH AND RESTRICTED CASH, END OF PERIOD | $ 11,404,306 | $ 247,668 |
| | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | |
| End of period | | |
| Cash and cash equivalents | $ 1,309,374 | $ 247,668 |
| Restricted cash | 10,094,932 | — |
| | $ 11,404,306 | $ 247,668 |
| Cash, cash equivalents, and restricted cash consist of the following | | |
| Beginning of period | | |
| Cash and cash equivalents | $ 934,729 | $ 471,308 |
| Restricted cash | 8,977,187 | — |
| | $ 9,911,916 | $ 471,308 |
| SUPPLEMENTAL CASH FLOW INFORMATION | | |
| Cash paid for interest | $ 29,473 | $ 92,398 |
| Cash paid for taxes | $ — | $ — |
| NON-CASH INVESTING AND FINANCING ACTIVITIES | | |

| | | | | |
|---|---|---|---|---|
| Debt discount, warrants on short-term note payable | $ | 1,340,438 | | — |
| Original issue discount on short-term note payable | $ | 910,000 | | — |
| Adjustment to fair value of goodwill based on final purchase price allocation | $ | — | $ | 121,736 |
| Right of use asset acquired | $ | 1,954,022 | | — |
| Right of use liability assumed | $ | (1,954,022) | | — |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

F-6

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

## NOTE 1 — ORGANIZATION AND NATURE OF BUSINESS

1847 Goedeker Inc. (the "Company") was formed under the laws of the State of Delaware on January 10, 2019 for the sole purpose of acquiring the business of Goedeker Television Co. Prior to the acquisition, the Company did not have any operations other than operations relating to its incorporation and organization.

On April 5, 2019, the Company acquired substantially all the assets and assumed substantially all the liabilities of Goedeker Television Co., a Missouri corporation ("Goedeker"). As a result of this transaction, the Company acquired the former business of Goedeker and continues to operate this business.

October 20, 2020, the Company formed Appliances Connection Inc. ("ACI") as a wholly owned subsidiary in the State of Delaware. At December 31, 2020, ACI had no assets or liabilities.

The Company is a one-stop e-commerce destination for home furnishings, including appliances, furniture, home goods and related products. Since Goedeker's founding in 1951, it has evolved from a local brick and mortar operation serving the St. Louis metro area to a large nationwide omnichannel retailer that offers one-stop shopping. While the Company still maintains its St. Louis showroom, over 95% of its sales are placed through its website at *www.goedekers.com*.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The unaudited condensed consolidated financial statements of the Company and ACI have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and with the instructions to Article 8 of Regulation S-X.

In the opinion of management, all adjustments considered necessary for a fair presentation have been included. Operating results for the three months March 31, 2021 are not necessarily indicative of the results that may be expected for the year ending December 31, 2021.

These unaudited interim consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Company's annual report on Form 10-K for the year ended December 31, 2020.

### Principles of Consolidation

The unaudited condensed consolidated financial statements include the accounts of the Company and its consolidated subsidiary, ACI. All significant intercompany balances and transactions have been eliminated in consolidation. The Company does not have a majority or minority interest in any other company, either consolidated or unconsolidated.

### Stock Split

On July 30, 2020, the Company completed a 4,750-for-1 forward stock split of its outstanding common stock. As a result of this stock split, the Company's issued and outstanding common stock increased from 1,000 to 4,750,000 shares. Accordingly, all share and per share information has been restated to retroactively show the effect of this stock split.

### Use of Estimates

The preparation of these unaudited condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the unaudited condensed consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

F-7

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Cash and Cash Equivalents*

Cash and equivalents include: (1) currency on hand, (2) demand deposits with banks or financial institutions, (3) other kinds of accounts that have the general characteristics of demand deposits, and (4) short-term, highly liquid investments that are both readily convertible to known amounts of cash and so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. The majority of payments due from financial institutions for the settlement of credit card and debit card transactions process within two business days and are, therefore, classified as cash and cash equivalents. Other payment methods that take more time to settle are classified as receivables.

At March 31, 2021, restricted cash includes approximately $3,120,000 pledged to secure a note, $100,000 to secure a vendor letter of credit and $6,874,932 withheld by credit card processors as security for the Company's customer refund claims and credit card chargebacks. The cash pledged to secure the note payable will be released as the note is repaid, the cash pledged to secure the letter of credit will be released when the vendor offers the Company credit terms, and the cash held by credit card processors will be released at the discretion of the credit card companies.

*Revenue Recognition and Cost of Revenue*

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

The Company collects the full sales price from the customer at the time the order is placed, which is recorded as customer deposits on the accompanying consolidated balance sheet. The Company does not incur incremental costs obtaining purchase orders from customers, however, if the Company did, because all the Company's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

The revenue that the Company recognizes arises from orders it receives from its customers. The Company's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers under the purchase orders; as a result, each purchase order generally contains only one performance obligation based on the merchandise sale to be completed.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, the Company's products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. The Company delivers products to its customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from the Company's warehouse to the customer (a "Company Shipment"). The second way is through a shipment of the products through a third-party carrier from a warehouse other than the Company's warehouse to the customer (a "Drop Shipment") and the third way is where the Company itself delivers the products to the customer and often also installs the product (a "Local Delivery"). In the case of a Local Delivery, the Company loads the product on to its own truck and delivers and installs the product at the customer's location. When a product is delivered through a Local Delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a Company Shipment and a Drop Shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from the Company's warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves the Company's warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, the Company has satisfied its performance obligation and the Company recognizes revenue.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The Company agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In the Company's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all the Company's sales are to individual retail consumers.

Shipping and Handling — The Company bills its customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue — The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows:

|  | March 31, | |
|  | 2021 | 2020 |
| --- | ---: | ---: |
| Appliance sales | $ 10,273,393 | $ 7,802,104 |
| Furniture sales | 2,327,834 | 1,281,836 |
| Other sales | 1,096,141 | 593,238 |
| Total | $ 13,697,368 | $ 9,677,178 |

The Company also sells extended warranty contracts. The Company is an agent for the warranty company and earns a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the accompanying consolidated statement of operations. The Company assumes no liability for repairs to products on which it has sold a warranty contract.

The Company experiences operational trends which are primarily holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

***Receivables***

Receivables represent rebates receivable due from manufacturers from whom the Company purchases products and amounts due from credit card processors that do not settle within two days. Rebates receivable are stated at the amount that management expects to collect from manufacturers, net of accounts payable amounts due the vendor. Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts. The Company historically collects substantially all of its outstanding rebates receivables. Uncollectible balances are expensed in the period it is determined to be uncollectible.

***Merchandise Inventory***

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on its estimate of market conditions.

F-9

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements. Depreciation is computed using the straight-line method over estimated useful lives as follows:

| Category | Useful Life (Years) |
|---|---|
| Machinery and equipment | 5 |
| Office equipment | 5 |
| Vehicles | 5 |

*Goodwill*

The Company tests its goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in the Company's expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and the Company's consolidated financial results.

The Company tests goodwill by estimating fair value using a Discounted Cash Flow ("DCF") model. The key assumptions used in the DCF model to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during three months ended March 31, 2021 and 2020.

*Intangible Assets*

As of March 31, 2021 and December 31, 2020, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. At March 31, 2021 and December 31, 2020, there were no impairments in intangible or the right of use ("ROU") assets.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Long-Lived Assets*

The Company reviews its property and equipment and any identifiable intangibles (including ROU asset) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell. At March 31, 2021 and December 31, 2020, there were no impairments in long-lived assets.

*Lease Liabilities*

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value, due to their short-term nature. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

*Customer Deposits*

Customer deposits represent the amount collected from customers when an order is placed. The deposits are transferred to revenue when the order ships to the customer or returned to the Company if the order is subsequently cancelled.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Income Taxes*

Under the Company's accounting policies, the Company initially recognizes a tax position in its unaudited condensed consolidated financial statements when it becomes more likely than not that the position will be sustained upon examination by the tax authorities. Such tax positions are initially and subsequently measured as the largest amount of tax positions that has a greater than 50% likelihood of being realized upon ultimate settlement with the tax authorities assuming full knowledge of the position and all relevant facts. Although the Company believes its provisions for unrecognized tax positions are reasonable, the Company can make no assurance that the final tax outcome of these matters will not be different from that which the Company has reflected in its income tax provisions and accruals. The tax law is subject to varied interpretations, and the Company has taken positions related to certain matters where the law is subject to interpretation. Such differences could have a material impact on the Company's income tax provisions and operating results in the period(s) in which the Company makes such determination.

*Sales Tax Liability*

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At March 31, 2021 and December 31, 2020, the amount of such accrual was $5,915,910 and $5,804,100, respectively, which is included in accounts payable and accrued expenses. To date, only one state has notified the Company of a potential sales tax liability of approximately $82,000, all of which was previously accrued.

*Basic Income (Loss) Per Share*

Basic income (loss) per share is calculated by dividing the net loss applicable to common shareholders by the weighted average number of common shares during the period. Diluted earnings per share is calculated by dividing the net income available to common shareholders by the diluted weighted average number of shares outstanding during the year. The diluted weighted average number of shares outstanding is the basic weighted number of shares adjusted for any potentially dilutive securities. For the three months ended March 31, 2021, the potentially dilutive securities were warrants for the purchase of 455,560 shares of common stock and options for the purchase of 555,000 shares of common stock. The potentially dilutive securities for the three months ended March 31, 2020 were warrants for the purchase of 250,000 shares of common stock. These potentially dilutive securities were excluded from diluted loss per share.

*Reclassifications*

Certain accounts have been reclassified to conform with classifications adopted in the period ended March 31, 2021. Such reclassifications had no effect on net earnings or financial position.

*Going Concern Assessment*

Management assesses going concern uncertainty in the Company's unaudited condensed consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability

F-12

[Table of Contents](#)

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

The Company has generated significant losses since its acquisition and has relied on cash on hand, external bank lines of credit, proceeds from the IPO described below, issuance of third party and related party debt and the issuance of a note to support cashflow from operations.

For the three months ended March 31, 2021, the Company incurred operating losses of approximately $3,280,686, cash flows used in operations of $2,807,673 and negative working capital of $19,801,748.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these unaudited condensed consolidated financial statements in the Company's Form 10-Q.

As described in Note 10 below, the Company received net proceeds of $4,590,000 from the sale of 10% OID senior secured promissory notes due December 19, 2021 and warrants on March 19, 2021. These proceeds will supplement the Company's cash flow from operations and provide additional liquidity.

The impact of COVID-19 on the Company's business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying unaudited condensed consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business.

Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern. The Company has contingency plans to reduce or defer expenses and cash outlays should operations not improve in the look forward period.

***Recent Accounting Pronouncements***

*Recently Adopted*

In August 2018, the FASB issued ASU 2018-15, *Intangibles – Goodwill and Other – Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods beginning after December 15, 2019, including interim periods within those annual periods. Early adoption is permitted. The Company adopted ASU 2018-15 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's unaudited condensed consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. The Company adopted ASU 2018-13 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's unaudited condensed consolidated financial statements.

*Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to the Company's unaudited condensed consolidated financial statements.

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS**

The Company restated its previously issued financial statements as for the three months ended March 31, 2020 to reflect the modification of a sales tax liability. The Company determined that it should accrue a liability for potential 2020 sales taxes that might be payable to the states in which it operates as a result of the Wayfair decision (See Note 2 — Sales Tax Liability). Accordingly, the Company accrued a liability of $921,900, representing a potential liability for sales taxes and penalties of $873,200 and interest expense of $48,700.

The following tables summarize the effect of the restatement on the specific items presented in the Company's previously reported financial statements:

1847 GOEDEKER INC.
STATEMENTS OF OPERATIONS
Three Months Ended March 31, 2020

| | As Filed | Adjustments | As Restated |
|---|---|---|---|
| Gross profit | $ 1,566,008 | $ — | $ 1,566,008 |
| Operating Expenses | | | |
| General and administrative | 566,640 | 873,200 | 1,439,840 |
| Total Operating Expenses | 2,881,141 | 873,200 | 3,754,341 |
| LOSS FROM OPERATIONS | (1,315,133) | (873,200) | (2,188,333) |
| Total Other Income (Expense) | (404,987) | (48,700) | (453,687) |
| NET LOSS BEFORE INCOME TAXES | (1,720,120) | (921,900) | (2,642,020) |
| INCOME TAX BENEFIT (EXPENSE) | 435,000 | — | 435,000 |
| NET LOSS | $ (1,285,120) | $ (921,900) | $ (2,207,020) |
| | | | |
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ (0.26) | | $ (0.44) |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | 5,000,000 | | 5,000,000 |

F-14

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS** (cont.)

1847 GOEDEKER INC.
STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)
Three Months Ended March 31, 2020

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **As Filed:** | | | | | |
| Balance, January 1, 2020 | 4,750,000 $ | 475 $ | 1,079,179 $ | (2,068,150) $ | (795,954) |
| Net loss | — | — | — | (1,285,120) | (1,285,120) |
| Balance, March 31, 2020 | 4,750,000 $ | 475 $ | 1,079,179 $ | (3,353,270) $ | (2,081,074) |
| | | | | | |
| **As Restated:** | | | | | |
| Balance, January 1, 2020 | 4,750,000 $ | 475 $ | 1,079,179 $ | (5,157,871) $ | (4,078,217) |
| Net loss | — | — | — | (2,207,020) | (2,207,020) |
| Balance, March 31, 2020 | 4,750,000 $ | 475 $ | 1,079,179 $ | (7,364,891) $ | (6,285,237) |

1847 GOEDEKER INC.
STATEMENTS OF CASH FLOWS
Three Months Ended March 31, 2020

| | As Filed | Adjustments | As Restated |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net loss | $ (1,285,120) | $ (921,900) | $ (2,207,020) |
| Accounts payable and accrued expenses | 520,364 | 921,900 | 1,442,264 |
| Net cash provided by (used in) operating activities | 958,356 | — | 958,356 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Net cash used in investing activities | — | — | — |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Net cash provided by (used in) financing activities | (775,158) | — | (775,158) |
| NET CHANGE IN CASH AND RESTRICTED CASH | 183,198 | — | 183,198 |
| CASH AND RESTRICTED CASH, BEGINNING OF PERIOD | 64,470 | — | 64,470 |
| CASH AND RESTRICTED CASH, END OF PERIOD | $ 247,668 | $ — | $ 247,668 |

**NOTE 4 — RECEIVABLES**

At March 31, 2021 and December 31, 2020, receivables consisted of the following: respectively.

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Vendor rebates receivable | $ 604,372 $ | 1,337,791 |
| Credit cards in process of collection | 343,982 | 660,441 |
| Total receivables | $ 948,354 $ | 1,998,232 |

F-15

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 5 — MERCHANDISE INVENTORY**

At March 31, 2021 and December 31, 2020, the inventory balances are composed of:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Appliances | $ 5,985,757 | $ 5,285,975 |
| Furniture | 249,008 | 194,852 |
| Other | 73,719 | 91,414 |
| Total merchandise inventory | 6,308,484 | 5,572,241 |
| | | |
| Allowance for inventory obsolescence | (425,000) | (425,000) |
| Merchandise inventory, net | $ 5,883,484 | $ 5,147,241 |

**NOTE 6 — VENDOR DEPOSITS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income.

Prior to obtaining an open line of credit with a major vendor, the Company paid in advance for its purchases. The vendor did not ship product to the Company until an order was complete. As a result, the vendor held Company funds. A second vendor uses the Company's vendor deposit account as collateral. Orders from this vendor exceeded the deposit account and the Company prepaid for some orders. Vendor deposits as of March 31, 2021 and December 31, 2020 were $742,926 and $547,648, respectively.

**NOTE 7 — PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at March 31, 2021 and December 31, 2020:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Equipment | $ 69,336 | $ 69,336 |
| Warehouse equipment | 61,070 | 61,070 |
| Furniture and fixtures | 512 | 512 |
| Transportation equipment | 63,784 | 63,784 |
| Leasehold improvements | 136,931 | 136,931 |
| Construction in progress | 126,116 | — |
| Total property and equipment | 457,749 | 331,633 |
| Accumulated depreciation | (102,168) | (85,685) |
| Property and equipment, net | $ 355,581 | $ 245,948 |

Depreciation expense for the three months ended March 31, 2021 and 2020 was $16,483 and $10,959, respectively.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

### NOTE 8 — INTANGIBLE ASSETS

The following provides a breakdown of identifiable intangible assets as of March 31, 2021 and December 31, 2020:

|  | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Customer relationships | $ 749,000 | $ 749,000 |
| Marketing related – tradename | 1,368,000 | 1,368,000 |
| Total intangible assets | 2,117,000 | 2,117,000 |
| Accumulated amortization | (840,912) | (735,063) |
| Intangible assets, net | $ 1,276,088 | $ 1,381,937 |

In connection with the acquisition of Goedeker, the Company identified intangible assets of $2,117,000, representing trade names and customer relationships. These assets are being amortized on a straight-line basis over their weighted average estimated useful life of 3 years. Amortization expense for the three months ended March 31, 2021 and 2020 was $105,849 and $80,882, respectively.

As of March 31, 2021, the estimated annual amortization expense for each of the next five years is as follows:

|  |  |
|---|---|
| 2021 (remainder of year) | $ 317,547 |
| 2022 | 423,396 |
| 2023 | 423,396 |
| 2024 | 111,749 |
| Total | $ 1,276,088 |

### NOTE 9 — ACCOUNTS PAYABLE AND ACCRUED EXPENSES

The following is schedule of accounts payable and accrued expenses at March 31, 2021 and December 31, 2020:

|  | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Trade accounts payable | $ 5,267,392 | $ 5,975,486 |
| Sales tax | 5,915,910 | 5,804,100 |
| Accrued payroll liabilities | 510,388 | 492,573 |
| Accrued interest | 10,000 | 10,000 |
| Accrued liability for sales returns | 200,000 | 200,000 |
| Other accrued liabilities | 453,132 | 219,556 |
| Total accounts payable and accrued expenses | $ 12,356,822 | $ 12,701,715 |

### NOTE 10 — NOTES PAYABLE

*Arvest Loan*

On August 25, 2020, the Company entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of March 31, 2021, the outstanding balance of this loan is $3,026,812, comprised of principal of $3,119,806, net of unamortized loan costs of $92,994. The Company classified $668,744 as a current liability and the balance as a long-term liability.

The loan matures on August 25, 2025 and bears interest at 3.250% per annum; provided that, upon an event of default, the interest rate shall increase by 6% until paid in full. Pursuant to the terms of the loan agreement, the Company is required to make monthly payments of $63,353 beginning on September 25, 2020 and until the maturity date, at which time all unpaid principal and interest will be due. The Company may prepay the loan in full or in part at any time

F-17

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 10 — NOTES PAYABLE** (cont.)

without penalty. The loan agreement contains customary events of default and affirmative and negative covenants for a loan of this type. The loan is secured by all financial assets credited to the Company's securities account held by Arvest Investments, Inc.

Maturities of the debt are as follows:

| For the years ended December 31, | | |
|---|---|---|
| 2021 (remainder of year) | $ | 499,517 |
| 2022 | | 685,222 |
| 2023 | | 707,826 |
| 2024 | | 731,177 |
| 2025 | | 496,064 |
| Total | $ | 3,119,806 |
| Less: Loan costs | | (92,994) |
| Total | $ | 3,026,812 |

The Company repaid this loan on May 10, 2021. See Note 15.

***10% OID Senior Promissory Notes***

On March 19, 2021, the Company entered into a securities purchase agreement with two institutional investors, pursuant to which the Company issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis, for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate, the relative fair value of which is $1,340,438 and was recorded as debt discount. After deducting a placement fee and other expenses, the Company received net proceeds of $4,590,000. As of March 31, 2021, the outstanding balance of the notes is $3,347,763, comprised of principal of $5,500,000, net of unamortized loan costs of $2,152,237. Loan costs consist of unamortized original issue discount of $870,291 and unamortized warrant value of $1,281,946. The original issue discount and warrant expense are amortized as interest expense. See also Note 13.

The notes bear interest at a rate of 10% per annum and mature on December 19, 2021. The notes may be prepaid by the Company in whole or in part at any time or from time to time without penalty or premium upon at least five (5) days prior written notice, which notice period may be waived by the holder. In addition, if the Company issues and sells shares of its equity securities to investors on or before the maturity date in an equity financing with total gross proceeds of not less than $10,000,000 (excluding the conversion of the notes or other convertible securities issued for capital raising purposes), then the Company must repay the then-outstanding principal amount of the notes and any accrued but unpaid interest.

The notes are secured by a first priority security interest in all of the Company's assets and contain customary events of default. Upon, and during the continuance of, an event of default, the notes are convertible, in whole or in part, at the option of the holder into shares of common stock at a conversion price equal to $12.00, or if lower, 80% of the lowest volume weighted average price for the twenty (20) consecutive trading days prior to the applicable conversion date, but in no event less than $9.00. The conversion price will be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction that proportionately decreases or increases the common stock. In addition, if the Company sells or grants any common stock or securities convertible into or exchangeable for common stock or grants any right to reprice such securities at an effective price per share that is lower than the then conversion price, the conversion price shall be reduced to such price, subject to certain exceptions. See Note 13 for additional terms of the warrants.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 11 — OPERATING LEASES**

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C., a Missouri limited liability company and affiliate of the Company at that time. The lease is for a term five (5) years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. In the event of late payment, interest shall accrue on the unpaid amount at the rate of eighteen percent (18%) per annum. The lease contains customary events of default.

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC for a new premises in St. Charles, Missouri. The lease is for a term of 63 months with two (2) options to renew for additional five (5) year periods and provides for a base rent of $4.35 per square foot per year with 2.5% annual increases and a three-month abatement, resulting in a base rent during the first year of $20,977 per month, increasing to a base rent during the fifth year of $23,147 per month. The Company must also pay its 29% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. The lease contains customary events of default.

On March 31, 2021, the Company amended the lease agreement with Westgate 200, LLC that increased the space available to the Company. The amendment increased the Company's share of the pro rata portion property taxes, operating expenses and insurance costs from 29% to 43.4%. The initial term of the lease is extended by one year to April 30, 2027. Monthly rent payments remain at $20,977 until September 30, 2021 and increase to $31,465 per month until April 30, 2022 and then increases at approximately 2.5% per month every year. In connection with the new leases, the Company recorded a Right of Use asset and liability of $1,954,022 representing the present value of future lease payments.

During the three months ended March 31, 2021, the Company accrued rent expense of $62,386. During the three months ended March 31, 2020, the Company paid and expensed rent payments of $135,000.

Supplemental balance sheet information related to leases at March 31, 2021 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use assets | $ | 3,404,861 |
| | | |
| Lease liabilities, current portion | $ | 664,043 |
| Lease liabilities, long-term | | 2,803,203 |
| Total operating lease liabilities | $ | 3,467,246 |
| | | |
| Weighted average remaining lease term (months) | | 57 |
| | | |
| Weighted average discount rate | | 5.9% |

Maturities of the lease liabilities for each of the next five years is as follows:

| | | |
|---|---|---|
| 2021 (remainder of year) | $ | 604,279 |
| 2022 | | 923,945 |
| 2023 | | 933,493 |
| 2024 | | 538,041 |
| 2025 | | 413,168 |
| Thereafter | | 565,936 |
| Total lease payments | $ | 3,978,862 |
| Less imputed interest | | (511,616) |
| Total lease liability | $ | 3,467,246 |

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 12 — RELATED PARTIES**

On April 5, 2019, the Company entered into an offsetting management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and a significant stockholder. This agreement was amended on April 21, 2020 with the amendment becoming effective at the closing of IPO on August 4, 2020.

Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that, (i) pro-rated payments shall be made in the first quarter and the last quarter of the term, (ii) if the aggregate amount of management fees paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal year exceeds, or is expected to exceed, 9.5% of 1847 Holdings' gross income with respect to such fiscal year, then the management fee to be paid by the Company for any remaining fiscal quarters in such fiscal year shall be reduced, on a pro rata basis determined by reference to the management fees to be paid to the Manager by all of the subsidiaries of 1847 Holdings, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal year, does not exceed 9.5% of 1847 Holdings' gross income with respect to such fiscal year, and (iii) if the aggregate amount the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal quarter exceeds, or is expected to exceed, the aggregate amount of the parent management fee (as defined in the offsetting management services agreement) with respect to such fiscal quarter, then the management fee to be paid by the Company for such fiscal quarter shall be reduced, on a pro rata basis, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal quarter, does not exceed the parent management fee calculated and payable with respect to such fiscal quarter.

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of Goedeker in connection with performing services under the offsetting management services agreement. The Company did not pay any expenses for the three months ended March 31, 2021 and 2020.

The Company expensed $62,500 in management fees for the three months ended March 31, 2021 and 2020.

**NOTE 13 — STOCKHOLDERS' DEFICIT**

As of March 31, 2021, the Company was authorized to issue 200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. To date, the Company has not designated or issued any shares of preferred stock.

***Common Stock***

As of March 31, 2021 and December 31, 2020, the Company had 6,111,200 shares of common stock issued and outstanding. Each share entitles the holder thereof to one vote per share on all matters coming before the stockholders of the Company for a vote.

The Company did not issue any shares of common stock during the three months ended March 31, 2021 and 2020.

***Equity Incentive Plan***

Effective as of July 30, 2020, the Company established the 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "Plan"). The Plan was approved by the Company's board of directors and stockholders on April 21, 2020. The Plan is administered by compensation committee of the board of directors. The Plan permits the grant of restricted stock, stock

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 13 — STOCKHOLDERS' DEFICIT** (cont.)

options and other forms of incentive compensation to the Company's officers, employees, directors and consultants. As of March 31, 2021, the maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan was 555,000 shares and there were 555,000 shares granted. See also Note 15.

During the year ended December 31, 2020, the Company issued options for the purchase of 555,000 shares of common stock with a total value of $1,848,056. The Company recorded stock option expense of $124,575 for the three months ended March 31, 2021. The remaining compensation expense of $1,324,573 will be recognized over the remaining vesting period of forty months.

The following table presents activity relating to stock options for the three months ended March 31, 2021:

| | Shares | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|
| Outstanding at January 1, 2021 | 555,000 | $ 9.00 | 9 |
| Granted | — | — | — |
| Exercised | — | — | — |
| Forfeited/Cancelled/Expired | — | — | — |
| Outstanding at March 31, 2021 | 555,000 | $ 9.00 | 8.75 |
| | | | |
| Exercisable at March 31, 2021 | 65,790 | $ 9.00 | 8.75 |

As of March 31, 2021, vested outstanding stock options had no intrinsic value as the exercise price is greater than the estimated fair value of the underlying common stock.

The Company recognizes compensation expense for stock option awards on a straight-line basis over the applicable service period of the award. The service period is generally the vesting period.

*Warrants*

On August 4, 2020, the Company issued warrants for the purchase of 55,560 shares of common stock to affiliates of the representative in the IPO. These warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25.

On March 19, 2021, the Company issued four-year warrants to purchase an aggregate of 400,000 shares of common stock to two investors at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis (See Note 10).

The following table presents activity relating to the warrants for the three months ended March 31, 2021:

| | Shares | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|
| Outstanding at January 1, 2021 | 55,560 | $ 11.25 | 4.5 |
| Granted | 400,000 | 12.00 | 4.0 |
| Exercised | — | — | — |
| Cancelled/Expired | — | — | — |
| Outstanding at March 31, 2021 | 455,560 | $ 11.91 | 4.1 |

F-21

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 13 — STOCKHOLDERS' DEFICIT** (cont.)

The Company recognizes stock issuance expense for the warrants on a straight-line basis over the vesting period of the warrants. The following assumptions were used to calculate warrant expense for the three months ended March 31, 2021:

| | |
|---|---|
| Volatility | 74.2% |
| Risk-free interest rate | 0.615% |
| Dividend yield | 0.0% |
| Term | 4.0 years |

**NOTE 14 — COMMITMENTS AND CONTINGENCIES**

On January 18, 2019, the Company entered into an asset purchase agreement with Goedeker, Steve Goedeker and Mike Goedeker, pursuant to which on April 5, 2019 the Company acquired substantially all of the assets of Goedeker used in its retail appliance and furniture business (the "Goedeker Business").

Pursuant to the asset purchase agreement, Goedeker entitled to receive an earn out payment of $200,000 if the EBITDA (as defined in the asset purchase agreement) of the Goedeker Business for the trailing twelve (12) month period from April 5, 2022 is $2,500,000 or greater, and may be entitled to receive a partial earn out payment if the EBITDA of the Goedeker Business is less than $2,500,000 but greater than $1,500,000. The Company expects to meet this target and adjusted the contingent note payable in the condensed consolidated balance sheet to the present value of the amount due.

**NOTE 15 — SUBSEQUENT EVENTS**

In accordance with ASC 855-10, the Company has analyzed its operations subsequent to March 31, 2021 to the date these unaudited condensed consolidated financial statements were issued and has determined that it does not have any material subsequent events to disclose in these unaudited condensed consolidated financial statements, except as set forth below.

*Amendment to Securities Purchase Agreement*

On October 20, 2020, the Company entered into a securities purchase agreement, which was amended on December 8, 2020, with ACI and 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC and YF Logistics LLC (collectively, "Appliances Connection") and the sellers set forth on Exhibit A thereto, pursuant to which ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $210,000,000, subject to adjustment, consisting of (i) $168,000,000 in cash, (ii) 2,333,333 shares of the Company's common stock having a stated value that is equal to $21,000,000, and (iii) a number of shares of the Company's common stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of the Company's common stock (as reported on the NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the transaction.

On April 6, 2021, the parties entered into an amendment to the securities purchase agreement, pursuant to which (i) the outside date (as defined in the securities purchase agreement) by which the closing of the securities purchase agreement must be completed was changed to June 30, 2021, (ii) the definition of net working capital set forth in the securities purchase agreement was revised to clarify that the accrued liabilities for potential sales tax will not be included in such calculation, and (iii) the condition to closing the transaction contemplated by the securities purchase agreement relating to a lease for the Gold Coast location was deleted, because such lease has since been terminated.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 15 — SUBSEQUENT EVENTS** (cont.)

*Amendment to Equity Incentive Plan Increase*

On April 9, 2021, the board of directors approved an amendment to the Plan to increase the number of shares of common Stock reserved for issuance under the Plan from 555,000 to 1,000,000 shares. Such increase was approved by the Company's stockholders effective as of May 13, 2021.

*Repayment of Note*

On May 10, 2021, the Company repaid the Arvest loan (see Note 10) by transferring principal and accrued interest from the restricted cash account.

F-23

Table of Contents

**1847 GOEDEKER INC.**

**AUDITED CONSOLIDATED FINANCIAL STATEMENTS**

**AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2020 AND 2019**

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
1847 Goedeker Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of 1847 Goedeker Inc. and subsidiary (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of operations, stockholder's deficit, and cash flows for the year ended December 31, 2020 and the period from April 6, 2019 through December 31, 2019 (effective April 6, 2019, the "Successor Company"), the period from January 1, 2019 through April 5, 2019 (pre-April 6, 2019, the "Predecessor Company"), and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Successor Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the year ended December 31, 2020 and for the period from April 6, 2019 through December 31, 2019, in conformity with accounting principles generally accepted in the United States of America. Further, in our opinion, the Predecessor Company financial statements referred to above present fairly, in all material respects, the results of its operations and cash flows for the period from January 1, 2019 through April 5, 2019 in conformity with accounting principles generally accepted in the United States of America.

**Restatement of Previously Issued Financial Statements**

As discussed in Note 3 to the consolidated financial statements, the Company has restated its 2019 financial statements to correct errors.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2020.
Marlton, New Jersey
March 29, 2021

F-25

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| | | (As Restated) |
| ASSETS | | |
| Current Assets | | |
| Cash and cash equivalents | $ 934,729 | $ 471,308 |
| Restricted cash | 8,977,187 | — |
| Receivables | 1,998,232 | 1,455,248 |
| Vendor deposits | 547,648 | 294,960 |
| Merchandise inventory, net | 5,147,241 | 1,380,090 |
| Prepaid expenses and other current assets | 635,084 | 892,796 |
| Total Current Assets | 18,240,121 | 4,494,402 |
| Property and equipment, net | 245,948 | 185,606 |
| Operating lease right-of-use assets, net | 1,578,235 | 2,000,755 |
| Goodwill | 4,725,689 | 4,603,953 |
| Intangible assets, net | 1,381,937 | 1,878,844 |
| Deferred tax assets | — | 698,303 |
| Other long-term assets | 45,000 | 45,000 |
| TOTAL ASSETS | $ 26,216,930 | $ 13,906,863 |
| | | |
| LIABILITIES AND STOCKHOLDERS' DEFICIT | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 12,701,715 | $ 5,375,420 |
| Customer deposits | 21,879,210 | 4,164,296 |
| Advances, related party | — | 137,500 |
| Lines of credit | — | 1,250,930 |
| Current portion of notes payable, related parties | — | 1,068,075 |
| Current portion of notes payable | 663,339 | 999,200 |
| Convertible notes payable | — | 584,943 |
| Warrant liability | — | 122,344 |
| Current portion of operating lease liabilities | 450,712 | 422,520 |
| Total Current Liabilities | 35,694,976 | 14,125,228 |
| Notes payable, related parties, net of current portion | — | 2,232,369 |
| Notes payable, net of current portion | 2,522,030 | — |
| Operating lease liabilities, net of current portion | 1,127,523 | 1,578,235 |
| Contingent note payable | 188,170 | 49,248 |
| TOTAL LIABILITIES | 39,532,699 | 17,985,080 |
| Stockholders' Deficit | | |
| Preferred stock, $.0001 par value, 20,000,000 shares authorized; none issued and outstanding at December 31, 2020 or 2019 | — | — |
| Common stock, $.0001 par value, 200,000,000 shares authorized; 6,111,200 and 4,750,000 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 611 | 475 |
| Additional paid-in capital | 13,409,328 | 1,079,179 |
| Accumulated deficit | (26,725,708) | (5,157,871) |
| Total Stockholders' Deficit | (13,315,769) | (4,078,217) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 26,216,930 | $ 13,906,863 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-26

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor |
|---|---|---|---|
| | **Year Ended December 31, 2020** | **Period from April 6, 2019 through December 31, 2019** | **Period from January 1, 2019 through April 5, 2019** |
| | | **(As Restated)** | |
| Product sales, net | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 |
| Cost of goods sold | 47,878,541 | 28,596,129 | 11,004,842 |
| Gross profit | 7,255,112 | 6,071,983 | 1,942,059 |
| | | | |
| Operating Expenses | | | |
| Personnel | 6,565,380 | 2,909,751 | 913,919 |
| Advertising | 4,865,361 | 1,996,507 | 714,276 |
| Bank and credit card fees | 1,806,620 | 870,877 | 329,247 |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 |
| General and administrative | 7,900,566 | 4,728,571 | 451,214 |
| Total Operating Expenses | 21,687,639 | 10,776,742 | 2,418,331 |
| | | | |
| LOSS FROM OPERATIONS | (14,432,527) | (4,704,759) | (476,272) |
| | | | |
| Other Income (Expense) | | | |
| Interest income | 2,479 | — | 23,807 |
| Financing costs – amortization of debt discount | (762,911) | (520,160) | — |
| Adjustment in value of contingency | (138,922) | 32,246 | |
| Interest expense | (870,847) | (785,411) | — |
| Loss on extinguishment of debt | (1,756,095) | — | — |
| Write-off of acquisition receivable | (809,000) | — | — |
| Change in fair value of warrant liability | (2,127,656) | 106,900 | — |
| Other income | 25,945 | 15,010 | 7,200 |
| Total Other Income (Expense) | (6,437,007) | (1,151,415) | 31,007 |
| | | | |
| NET LOSS BEFORE INCOME TAXES | (20,869,534) | (5,856,174) | (445,265) |
| | | | |
| INCOME TAX BENEFIT (EXPENSE) | (698,303) | 698,303 | — |
| | | | |
| NET LOSS | $ (21,567,837) | $ (5,157,871) | $ (445,265) |
| | | | |
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ (3.95) | $ (1.03) | $ (63.61) |
| | | | |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | 5,463,603 | 5,000,000 | 7,000 |

*The accompanying notes are an integral part of these consolidated financial statements*

Table of Contents

**1847 GOEDEKER INC.**
**STATEMENT OF STOCKHOLDERS' EQUITY**
**(PREDECESSOR)**

| | Common Stock | | Additional Paid-in Capital | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance, December 31, 2018 | 7,000 | $  7,000 | $  707,049 | $  2,684,628 | $  3,398,677 |
| Net loss for the period from January 1, 2019 through April 5, 2019 | — | — | — | (445,265) | (445,265) |
| Balance, April 5, 2019 | 7,000 | $  7,000 | $  707,049 | $  2,239,363 | $  2,953,412 |

*The accompanying notes are an integral part of consolidated these financial statements*

F-28

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(SUCCESSOR)**

**For the Period from April 6, 2019 through December 31, 2019 (as Restated)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance, April 6, 2019 | — $ | — $ | — $ | — $ | — |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 786,506 | — | 786,981 |
| Issuance of warrants in connection with notes payable | — | — | 292,673 | — | 292,673 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | — | — | — | (5,157,871) | (5,157,871) |
| Balance, December 31, 2019 | 4,750,000 $ | 475 $ | 1,079,179 $ | (5,157,871) $ | (4,078,217) |

**For the Year Ended December 31, 2020**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance, January 1, 2020 (as restated) | 4,750,000 $ | 475 $ | 1,079,179 $ | (5,157,871) $ | (4,078,217) |
| Issuance of 1847 Holdings warrants in connection with notes payable | — | — | 566,711 | — | 566,711 |
| Forgiveness of related party debt | — | — | 137,500 | — | 137,500 |
| Issuance of 1847 Holdings shares in connection with conversion of notes payable | — | — | 375,000 | — | 375,000 |
| Issuance of common stock for cash | 1,111,200 | 111 | 8,602,055 | — | 8,602,166 |
| Issuance of common stock in connection with exercise of warrant | 250,000 | 25 | 2,249,975 | — | 2,250,000 |
| Stock-based compensation expense | — | — | 398,908 | — | 398,908 |
| Net loss | — | — | — | (21,567,837) | (21,567,837) |
| Balance, December 31, 2020 | 6,111,200 $ | 611 $ | 13,409,328 $ | (26,725,708) $ | (13,315,769) |

*The accompanying notes are an integral part of these consolidated financial statements*

F-29

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor |
|---|---|---|---|
| | **Year Ended December 31, 2020** | **Period from April 6, 2019 through December 31, 2019** | **Period from January 1, 2019 through April 5, 2019** |
| | | **(As Restated)** | |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net loss | $ (21,567,837) | $ (5,157,871) | $ (445,265) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 |
| Amortization of finance costs | 681,976 | 599,814 | — |
| Loss on extinguishment of debt | 1,756,095 | — | — |
| Write-off of acquisition receivable | 809,000 | — | — |
| Adjustment in contingent liability | 138,922 | (32,246) | — |
| Stock-based compensation | 398,908 | — | — |
| Change in fair value of warrant liability | 2,127,656 | (106,900) | — |
| Non-cash lease expense | 422,520 | 299,245 | — |
| Deferred tax assets | 698,303 | (698,303) | — |
| Changes in operating assets and liabilities: | | | |
| Receivables | (664,720) | (999,066) | 1,730,079 |
| Vendor deposits | (252,688) | (294,960) | (73,770) |
| Merchandise inventory | (3,767,151) | 471,161 | 595,466 |
| Prepaid expenses and other assets | (551,288) | 167,066 | 2,784 |
| Accounts payable and accrued expenses | 7,337,081 | 1,625,064 | 196,565 |
| Customer deposits | 17,714,914 | 1,855,990 | (1,404,266) |
| Operating lease liabilities | (422,520) | (299,245) | — |
| Net cash provided by (used in) operating activities | 5,408,883 | (2,299,215) | 611,268 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Purchases of property and equipment | (113,147) | (2,200) | — |
| Net cash used in investing activities | (113,147) | (2,200) | — |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Proceeds from initial public offering, net | 8,602,166 | — | — |
| Proceeds from note payable | 642,600 | 1,500,000 | — |
| Payments on notes payable | (2,883,754) | (357,207) | — |
| Proceeds from convertible notes payable | — | 650,000 | — |
| Payments on convertible notes payable | (771,431) | — | |
| Net borrowings (payments) on lines of credit | (1,339,430) | 1,339,430 | — |
| Cash paid for financing costs | (105,279) | (359,500) | — |
| Net cash provided by financing activities | 4,144,872 | 2,772,723 | — |
| NET CHANGE IN CASH AND RESTRICTED CASH | 9,440,608 | 471,308 | 611,268 |
| CASH AND RESTRICTED CASH, BEGINNING OF YEAR | 471,308 | — | 1,525,693 |
| CASH AND RESTRICTED CASH, END OF YEAR | $ 9,911,916 | $ 471,308 | $ 2,136,961 |

F-30

Table of Contents

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS** — Continued

| | | Successor | | Predecessor |
|---|---|---|---|---|
| | | **Year Ended December 31, 2020** | **Period from April 6, 2019 through December 31, 2019** | **Period from January 1, 2019 through April 5, 2019** |
| | | | **(As Restated)** | |
| Cash, cash equivalents and restricted cash consist of the following: | | | | |
| End of year | | | | |
| Cash and cash equivalents | $ | 934,726 | $ 471,308 | $ — |
| Restricted cash | | 8,977,187 | — | — |
| | $ | 9,911,916 | $ 471,308 | $ — |
| | | | | |
| Cash, cash equivalents and restricted cash consist of the following: | | | | |
| Beginning of year | | | | |
| Cash and cash equivalents | $ | 471,308 | $ — | $ 1,525,693 |
| Restricted cash | | — | — | — |
| | $ | 471,308 | $ — | $ 1,525,693 |
| | | | | |
| SUPPLEMENTAL CASH FLOW INFORMATION | | | | |
| Cash paid for interest | $ | 764,424 | $ 292,890 | $ — |
| Cash paid for taxes | $ | — | $ — | $ — |
| | | | | |
| NON-CASH INVESTING AND FINANCING ACTIVITIES | | | | |
| Operating lease right-of-use asset and liability | $ | — | $ 2,300,000 | $ — |
| Debt discounts on notes payable | $ | — | $ 64,286 | $ — |
| Warrants in 1847 Holdings contributed on notes payable | $ | 566,711 | $ 292,673 | $ — |
| 1847 Holdings common shares contributed on note payable | $ | — | $ 137,500 | $ — |
| Acquisition of Goedeker Television Co. | $ | — | $ 4,725,689 | $ — |
| Conversion of debt through issuance of 1847 Holdings common shares | $ | 375,000 | $ — | $ — |
| Derecognition of related party debt | $ | 137,500 | $ — | $ — |
| Adjustment to fair value of goodwill based on final purchase price allocation | $ | 121,736 | $ — | $ — |
| Conversion of warrant into common stock | $ | 2,250,000 | $ — | $ — |
| Issuance of note payable to repay Seller note | $ | 3,500,000 | $ — | $ — |

*The accompanying notes are an integral part of these consolidated financial statements*

F-31

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 1 — ORGANIZATION AND NATURE OF BUSINESS**

1847 Goedeker Inc. (the "Company") was formed under the laws of the State of Delaware on January 10, 2019 for the sole purpose of acquiring the business of Goedeker Television Co. Prior to the acquisition, the Company did not have any operations other than operations relating to its incorporation and organization.

On April 5, 2019, the Company acquired substantially all the assets and assumed substantially all the liabilities of Goedeker Television Co., a Missouri corporation ("Goedeker"). As a result of this transaction, the Company acquired the former business of Goedeker and continues to operate this business.

October 20, 2020, the Company formed Appliances Connection Inc. ("ACI") as a wholly owned subsidiary in the State of Delaware. At December 31, 2020, ACI had no assets or liabilities.

The Company is a one-stop e-commerce destination for home furnishings, including appliances, furniture, home goods and related products. Since Goedeker's founding in 1951, it has evolved from a local brick and mortar operation serving the St. Louis metro area to a large nationwide omnichannel retailer that offers one-stop shopping. While the Company still maintains its St. Louis showroom, over 95% of its sales are placed through its website at *www.goedekers.com*.

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation*

The consolidated financial statements of the Company and ACI have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars.

Management has analyzed the impact of the Coronavirus pandemic ("COVID-19") on its consolidated financial statements as of December 31, 2020 and has determined that the changes to its significant judgments and estimates did not have a material impact with respect to goodwill, intangible assets or long-lived assets.

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its consolidated subsidiary, ACI. All significant intercompany balances and transactions have been eliminated in consolidation. The Company does not have a majority or minority interest in any other company, either consolidated or unconsolidated.

*Stock Split*

On July 30, 2020, the Company completed a 4,750-for-1 forward stock split of its outstanding common stock. As a result of this stock split, the Company's issued and outstanding common stock increased from 1,000 to 4,750,000 shares. Accordingly, all share and per share information has been restated to retroactively show the effect of this stock split.

*Predecessor and Successor Reporting*

The acquisition of Goedeker, as described in Note 1, was accounted for under the acquisition method of accounting in accordance with GAAP. For the purpose of financial reporting, Goedeker was deemed to be the predecessor company and the Company is deemed to be the successor company in accordance with the rules and regulations issued by the Securities and Exchange Commission. The assets and liabilities of Goedeker were recorded at their respective fair values as of the acquisition date. Fair value adjustments related to the transaction are reflected in the books of the Company, resulting in assets and liabilities of the Company being recorded at fair value at April 6, 2019. Therefore, the Company's financial information prior to the transaction is not comparable to its financial information subsequent to the transaction.

F-32

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

As a result of the impact of pushdown accounting, the consolidated financial statements and certain note presentations separate the Company's presentations into two distinct periods, the period before the consummation of the transaction (labeled "Predecessor") and the period after that date (labeled "Successor"), to indicate the application of a different basis of accounting between the periods presented.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Cash and equivalents include: (1) currency on hand, (2) demand deposits with banks or financial institutions, (3) other kinds of accounts that have the general characteristics of demand deposits, and (4) short-term, highly liquid investments that are both readily convertible to known amounts of cash and so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. The majority of payments due from financial institutions for the settlement of credit card and debit card transactions process within two business days and are, therefore, classified as cash and cash equivalents. Other payment methods that take more time to settle are classified as receivables.

Restricted cash includes $3,298,529 pledged to secure a note, $100,000 to secure a vendor letter of credit and $5,578,658 withheld by credit card processors as security for the Company's customer refund claims and credit card chargebacks. The cash pledged to secure the note payable will be released as the note is repaid, the cash pledged to secure the letter of credit will be released when the vendor offers the Company credit terms, and the cash held by credit card processors will be released at the discretion of the credit card companies.

*Revenue Recognition and Cost of Revenue*

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

The Company collects the full sales price from the customer at the time the order is placed, which is recorded as customer deposits on the accompanying consolidated balance sheet. The Company does not incur incremental costs obtaining purchase orders from customers, however, if the Company did, because all the Company's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

The revenue that the Company recognizes arises from orders it receives from its customers. The Company's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers under the purchase orders; as a result, each purchase order generally contains only one performance obligation based on the merchandise sale to be completed.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, the Company's products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. The Company delivers products to its customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from the Company's warehouse to the customer (a "Company Shipment"). The second way is through a shipment of the products through a third-party carrier from a warehouse other than the Company's warehouse to the customer (a "Drop Shipment") and the third way is where the Company itself delivers the products to the customer and often

F-33

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

also installs the product (a "Local Delivery"). In the case of a Local Delivery, the Company loads the product on to its own truck and delivers and installs the product at the customer's location. When a product is delivered through a Local Delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a Company Shipment and a Drop Shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from the Company's warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves the Company's warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, the Company has satisfied its performance obligation and the Company recognizes revenue.

The Company agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In the Company's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all the Company's sales are to individual retail consumers.

Shipping and Handling — The Company bills its customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue — The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows:

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2020 | Period from April 6, 2019 through December 31, 2019 | Period from January 1, 2019 through April 5, 2019 |
| Appliance sales | $ 40,113,568 | $ 28,487,053 | $ 9,784,525 |
| Furniture sales | 11,800,277 | 4,405,866 | 2,456,085 |
| Other sales | 3,219,808 | 1,775,193 | 706,291 |
| Total | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 |

The Company also sells extended warranty contracts. The Company is an agent for the warranty company and earns a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the accompanying consolidated statement of operations. The Company assumes no liability for repairs to products on which it has sold a warranty contract.

The Company experiences operational trends which are primarily holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Receivables*

Receivables represent rebates receivable due from manufacturers from whom the Company purchases products and amounts due from credit card processors that do not settle within two days. Rebates receivable are stated at the amount that management expects to collect from manufacturers, net of accounts payable amounts due the vendor. Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts. The Company historically collects substantially all of its outstanding rebates receivables. Uncollectible balances are expensed in the period it is determined to be uncollectible.

*Merchandise Inventory*

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on its estimate of market conditions.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements. Depreciation is computed using the straight-line method over estimated useful lives as follows:

| Category | Useful Life (Years) |
| --- | --- |
| Machinery and equipment | 5 |
| Office equipment | 5 |
| Vehicles | 5 |

*Goodwill*

The Company tests its goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in the Company's expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and the Company's consolidated financial results.

The Company tests goodwill by estimating fair value using a Discounted Cash Flow ("DCF") model. The key assumptions used in the DCF model to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during the years ended December 31, 2020 and 2019.

*Intangible Assets*

As of December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

F-35

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. At December 31, 2020 and 2019, there were no impairments in intangible or the right of use ("ROU") assets.

*Long-Lived Assets*

The Company reviews its property and equipment and any identifiable intangibles (including ROU asset) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell. At December 31, 2020 and 2019, there were no impairments in long-lived assets.

*Lease Liabilities*

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction

F-36

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value, due to their short-term nature. The fair value hierarchy is defined in the following three categories:

Level 1:   Quoted market prices in active markets for identical assets or liabilities.

Level 2:   Observable market-based inputs or inputs that are corroborated by market data.

Level 3:   Unobservable inputs that are not corroborated by market data.

***Customer Deposits***

Customer deposits represent the amount collected from customers when an order is placed. The deposits are transferred to revenue when the order ships to the customer or returned to the Company if the order is subsequently cancelled.

***Derivative Instrument Liability***

The Company accounts for derivative instruments in accordance with ASC 815, *Derivatives and Hedging*, which establishes accounting and reporting standards for derivative instruments and hedging activities, including certain derivative instruments embedded in other financial instruments or contracts, and requires recognition of all derivatives on the balance sheet at fair value, regardless of hedging relationship designation. Accounting for changes in fair value of the derivative instruments depends on whether the derivatives qualify as hedge relationships and the types of relationships designated are based on the exposures hedged. At December 31, 2019, the Company classified a warrant issued in conjunction with a term loan as a derivative instrument (see Note 12). There were no derivative instruments at December 31, 2020.

***Income Taxes***

Under the Company's accounting policies, the Company initially recognizes a tax position in its consolidated financial statements when it becomes more likely than not that the position will be sustained upon examination by the tax authorities. Such tax positions are initially and subsequently measured as the largest amount of tax positions that has a greater than 50% likelihood of being realized upon ultimate settlement with the tax authorities assuming full knowledge of the position and all relevant facts. Although the Company believes its provisions for unrecognized tax positions are reasonable, the Company can make no assurance that the final tax outcome of these matters will not be different from that which the Company has reflected in its income tax provisions and accruals. The tax law is subject to varied interpretations, and the Company has taken positions related to certain matters where the law is subject to interpretation. Such differences could have a material impact on the Company's income tax provisions and operating results in the period(s) in which the Company makes such determination.

***Sales Tax Liability***

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At December 31, 2020 and 2019, the amount of such accrual was $5,804,100 and $2,910,200, respectively, which is included in accounts payable and accrued expenses. To date, only one state has notified the Company of a potential sales tax liability of approximately $11,000.

F-37

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Basic Income (Loss) Per Share*

Basic income (loss) per share is calculated by dividing the net loss applicable to common shareholders by the weighted average number of common shares during the period. Diluted earnings per share is calculated by dividing the net income available to common shareholders by the diluted weighted average number of shares outstanding during the year. The diluted weighted average number of shares outstanding is the basic weighted number of shares adjusted for any potentially dilutive securities. For the year ended December 31, 2020, the potentially dilutive securities were warrants for the purchase of 55,560 shares of common stock issued to affiliates of the underwriter in its initial public offering described below and options for the purchase of 555,000 shares of common stock. For the year ended December 31, 2019, the potentially dilutive securities were penny warrants for the purchase of 250,000 shares of common stock, which were included in basic loss per share, but excluded from diluted loss per share.

*Reclassifications*

Certain accounts have been reclassified to conform with classifications adopted in the period ended December 31, 2020. Such reclassifications had no effect on net earnings or financial position.

*Going Concern Assessment*

Management assesses going concern uncertainty in the Company's consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

The Company has generated significant losses since its acquisition and has relied on cash on hand, external bank lines of credit, proceeds from the IPO described below, issuance of third party and related party debt and the issuance of a note to support cashflow from operations.

For the year ended December 31, 2020, the Company incurred operating losses of approximately $14.4 million, cash flows from operations of $5.4 million, and negative working capital of $17.5 million.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these consolidated financial statements in the Company's 10-K.

On August 4, 2020, the Company completed an initial public offering of its common stock, pursuant to which the Company sold 1,111,200 shares of its common stock, at a purchase price of $9.00 per share, for total gross proceeds of $10,000,800 (the "IPO"). After deducting the underwriting commission and offering expenses, the Company received net proceeds of $8,602,166. The Company used a portion of the proceeds from the IPO to pay off certain debt as described below.

As described in Note 19 below, the Company received net proceeds of $4,590,000 from the sale of 10% OID senior secured promissory note and warrants on March 19, 2021. These proceeds will supplement the Company's cash flow from operations and provide additional liquidity.

F-38

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The impact of COVID-19 on the Company's business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business.

Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern. The Company has contingency plans to reduce or defer expenses and cash outlays should operations not improve in the look forward period.

***Recent Accounting Pronouncements***

<u>*Recently Adopted*</u>

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASC 842"), which requires lessees to recognize ROU assets and related lease liabilities on the balance sheet for all leases greater than one year in duration. The Company adopted ASC 842 on January 1, 2019 using a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the consolidated financial statements. The modified retrospective approach did not require any transition accounting for leases that expired before the earliest comparative period presented. The adoption of this standard resulted in the recording of ROU assets and lease liabilities for all of the Company's lease agreements with original terms of greater than one year. The adoption of ASC 842 did not have a significant impact on the Company's consolidated statements of income or cash flows. See Note 15 for the required disclosures relating to the Company's lease agreements.

In June 2018, the FASB issued Accounting Standards Update ("ASU") 2018-07, *Compensation — Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting,* which simplifies the accounting for nonemployee share-based payment transactions by expanding the scope of ASC Topic 718, *Compensation — Stock Compensation*, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new standard, most of the guidance on stock compensation payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. This standard became effective for the Company on January 1, 2019. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In February 2018, the FASB issued ASU 2018-02, *Income Statement-Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*, which allows a reclassification from accumulated other comprehensive income ("AOCI") to retained earnings for stranded tax effects resulting from U.S. federal tax legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017.

In August 2017, the FASB issued ASU 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities*, which expands and refines hedge accounting for both financial and non-financial risk components, aligns the recognition and presentation of the effects of hedging instruments and hedge items in the consolidated financial statements, and includes certain targeted improvements to ease the application of current guidance related to the assessment of hedge effectiveness. ASU 2017-12 became effective for the Company on January 1, 2019. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop

F-39

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods beginning after December 15, 2019, including interim periods within those annual periods. Early adoption is permitted. The Company adopted ASU 2018-15 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820):    Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. The Company adopted ASU 2018-13 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

*Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments-Credit Losses (Topic 326):    Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to the Company's consolidated financial statements.

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS**

The Company restated its previously issued financial statements as of and for the year ended December 31, 2019 to reflect the modification of a sales tax liability and purchase accounting adjustments:

(1)    The Company determined that it should accrue a liability for potential 2019 sales taxes that might be payable to the states in which it operates as a result of the Wayfair decision (See Note 2 — Sales Tax Liability). Accordingly, the Company accrued a liability of $2,910,200, representing a potential liability for sales taxes and penalties of $2,808,000 and interest expense of $102,200.

(2)    The Company adjusted the fair value of ownership interests in Holdco that were transferred to seller and the value of liabilities assumed in the April 5, 2019 acquisition (see Note 10) resulting in a $372,063 reduction in Goodwill; a $192,542 reduction in Additional Paid in Capital, and $179,521 reduction in liabilities assumed, which was recognized as a general and administrative expense.

F-40

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS** (cont.)

The following tables summarize the effect of the restatement on the specific items presented in our historical financial statements included in our previously reported December 31, 2019 financial statements:

1847 GOEDEKER INC.
BALANCE SHEET

|  | December 31, 2019 (As Filed) |  | Adjustments | | December 31, 2019 (As Restated) |
|---|---|---|---|---|---|
| ASSETS |  |  |  |  |  |
| Total Current Assets | 4,494,402 |  | — |  | 4,494,402 |
| Goodwill | 4,976,016 | (2) | (372,063) |  | 4,603,953 |
| TOTAL ASSETS | $ 14,278,926 |  | $ (372,063) | $ | 13,906,863 |
|  |  |  |  |  |  |
| LIABILITIES AND STOCKHOLDERS' DEFICIT |  |  |  |  |  |
| Current Liabilities |  |  |  |  |  |
| Accounts payable and accrued expenses | $ 2,465,220 | (1) $ | 2,910,200 | $ | 5,375,420 |
| Total Current Liabilities | 11,215,028 |  | 2,910,200 |  | 14,125,228 |
| TOTAL LIABILITIES | 15,074,880 |  | 2,910,200 |  | 17,985,080 |
| Stockholders' Deficit |  |  |  |  |  |
| Additional paid-in capital | 1,271,721 | (2) | (192,542) |  | 1,079,179 |
| Accumulated deficit | (2,068,150) | (1) | (2,910,200) |  | (5,157,871) |
|  |  | (2) | (179,521) |  |  |
| Total Stockholders' Deficit | (795,954) |  | (3,282,263) |  | (4,078,217) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | 14,278,926 |  | $ (372,063) | $ | 13,906,863 |

1847 GOEDEKER INC.
STATEMENTS OF OPERATIONS

|  | Period from April 6, 2019 through December 31, 2019 (As Filed) |  | Adjustments | | Period from April 6, 2019 through December 31, 2019 (As Restated) |
|---|---|---|---|---|---|
| Gross profit | 6,071,983 |  | — |  | 6,071,983 |
| Operating Expenses |  |  |  |  |  |
| General and administrative | 1,741,050 | (1) | 2,808,000 |  | 4,728,571 |
|  |  | (2) | 179,521 |  |  |
| Total Operating Expenses | 7,789,221 |  | 2,987,521 |  | 10,776,742 |
|  |  |  |  |  |  |
| LOSS FROM OPERATIONS | (1,717,238) |  | (2,987,521) |  | (4,704,759) |
|  |  |  |  |  |  |
| Total Other Income (Expense) | (1,049,215) |  | (102,200) |  | (1,151,415) |
|  |  |  |  |  |  |
| NET LOSS BEFORE INCOME TAXES | (2,766,453) |  | (3,089,721) |  | (5,856,174) |
|  |  |  |  |  |  |
| INCOME TAX BENEFIT (EXPENSE) | 698,303 |  | — |  | 698,303 |
| NET LOSS | $ (2,068,150) |  | $ (3,089,721) | $ | (5,157,871) |

| | | | | |
|---|---|---|---|---|
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ | (0.41) | $ | (1.03) |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | | 5,000,000 | | 5,000,000 |

F-41

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 3 — RESTATEMENT OF FINANCIAL STATEMENTS** (cont.)

1847 GOEDEKER INC.
STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **As Filed:** | | | | | |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 979,048 | — | 979,523 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | — | — | — | (2,068,150) | (2,068,150) |
| Balance, December 31, 2019 | 4,750,000 $ | 475 $ | 1,272,195 $ | (2,068,150) $ | (795,954) |
| | | | | | |
| **As Restated:** | | | | | |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 786,506 | — | 786,981 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | — | — | — | (5,157,871) | (5,157,871) |
| Balance, December 31, 2019 | 4,750,000 $ | 475 $ | 1,079,179 $ | (5,157,871) $ | (4,078,217) |

1847 GOEDEKER INC.
STATEMENTS OF CASH FLOWS

| | Period from April 6, 2019 through December 31, 2019 (As Filed) | | Adjustments | Period from April 6, 2019 through December 31, 2019 (As Restated) |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net loss | $ (2,068,150) | (1) $ | (2,910,200) $ | (5,157,871) |
| | | (2) | (179,521) | |
| Accounts payable and accrued expenses | (1,464,657) | (1) | 2,910,200 | |
| | | (2) | 179,521 | 1,625,064 |
| Net cash provided by (used in) operating activities | (2,299,215) | | — | (2,299,215) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Net cash used in investing activities | (2,200) | | | (2,200) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Net cash provided by financing activities | 2,772,723 | | — | 2,772,723 |
| NET CHANGE IN CASH AND RESTRICTED CASH | 471,308 | | — | 471,308 |
| CASH AND RESTRICTED CASH, BEGINNING OF YEAR | — | | — | — |
| CASH AND RESTRICTED CASH, END OF YEAR | $ 471,308 | $ | — $ | 471,308 |

F-42

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 4 — RECEIVABLES**

At December 31, 2020 and 2019, receivables consisted of the following: respectively.

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Vendor rebates receivable | $ | 1,337,791 | $ | 1,455,248 |
| Credit cards in process of collection | | 660,441 | | — |
| Total receivables | $ | 1,998,232 | $ | 1,455,248 |

**NOTE 5 — MERCHANDISE INVENTORY**

At December 31, 2020 and 2019, the inventory balances are composed of:

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Appliances | $ | 5,285,975 | $ | 1,538,552 |
| Furniture | | 194,852 | | 184,755 |
| Other | | 91,414 | | 81,783 |
| Total merchandise inventory | | 5,572,241 | | 1,805,090 |
| Allowance for inventory obsolescence | | (425,000) | | (425,000) |
| Merchandise inventory, net | $ | 5,147,241 | $ | 1,380,090 |

**NOTE 6 — VENDOR DEPOSITS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income.

Prior to obtaining an open line of credit with a major vendor, the Company paid in advance for its purchases. The vendor did not ship product to the Company until an order was complete. As a result, the vendor held Company funds. A second vendor uses the Company's vendor deposit account as collateral. Orders from this vendor exceeded the deposit account and the Company prepaid for some orders. Vendor deposits as of December 31, 2020 and 2019 were $547,648 and $294,960, respectively.

**NOTE 7 — PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at December 31, 2020 and 2019:

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| Equipment | $ | 69,336 | $ | 7,376 |
| Warehouse equipment | | 61,070 | | 29,188 |
| Furniture and fixtures | | 512 | | 512 |
| Transportation equipment | | 63,784 | | 63,784 |
| Leasehold improvements | | 136,931 | | 117,626 |
| Total property and equipment | | 331,633 | | 218,486 |
| Accumulated depreciation | | (85,685) | | (32,880) |
| Property and equipment, net | $ | 245,948 | $ | 185,606 |

Depreciation expense for the year ended December 31, 2020, the period April 6, 2019 to December 31, 2019 and the period January 1, 2019 to April 5, 2019 was approximately $53,000, $33,000 and $10,000, respectively.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 8 — INTANGIBLE ASSETS**

The following provides a breakdown of identifiable intangible assets as of December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Customer relationships | $ 749,000 | $ 749,000 |
| Marketing related – tradename | 1,368,000 | 1,368,000 |
| Total intangible assets | 2,117,000 | 2,117,000 |
| Accumulated amortization | (735,063) | (238,156) |
| Intangible assets, net | $ 1,381,937 | $ 1,878,844 |

In connection with the acquisition of Goedeker, the Company identified intangible assets of $2,117,000, representing trade names and customer relationships. These assets are being amortized on a straight-line basis over their weighted average estimated useful life of 3.3 years. Amortization expense for the year ended December 31, 2020, the period April 6, 2019 to December 31, 2019 and the period January 1, 2019 to April 5, 2019 was $496,907, $238,156 and $-0-, respectively.

As of December 31, 2020, the estimated annual amortization expense for each of the next five years is as follows:

| | | |
|---|---|---|
| 2021 | $ | 423,396 |
| 2022 | | 423,396 |
| 2023 | | 423,396 |
| 2024 | | 111,749 |
| Total | $ | 1,381,937 |

**NOTE 9 — ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

The following is schedule of accounts payable and accrued expenses at December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade accounts payable | $ 5,975,486 | $ 1,644,216 |
| Sales tax | 5,804,100 | 2,910,200 |
| Accrued payroll liabilities | 492,573 | 192,305 |
| Accrued interest | 10,000 | 253,678 |
| Accrued liability for sales returns | 200,000 | 200,000 |
| Other accrued liabilities | 219,556 | 175,021 |
| Total accounts payable and accrued expenses | $ 12,701,715 | $ 5,375,420 |

**NOTE 10 — BUSINESS COMBINATION**

On January 18, 2019, the Company entered into an asset purchase agreement with Goedeker and Steve Goedeker and Mike Goedeker (the "Stockholders"), pursuant to which the Company agreed to acquire substantially all of the assets of Goedeker used in its retail appliance and furniture business (the "Goedeker Business").

On April 5, 2019, the Company, Goedeker and the Stockholders entered into an amendment to the asset purchase agreement and closing of the acquisition of substantially all of the assets of Goedeker was completed.

The aggregate purchase price, recorded as a capital contribution from the Company's parent company at that time, 1847 Goedeker Holdco Inc. ("Holdco"), was $4,175,373 consisting of: (i) the issuance of a promissory note in the principal amount of $4,100,000 and a deemed fair value of $3,637,898; (ii) up to $600,000 in earn out payments (as described below) with a deemed fair value of $81,494; (iii) a 22.5% ownership interest in Holdco transferred to the Stockholders with a deemed fair value of $786,981, (iv) cash of $478,000, and (v) net of a working capital adjustment of $809,000.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 10 — BUSINESS COMBINATION** (cont.)

The asset purchase agreement provided for an adjustment to the purchase price based on the difference between actual working capital at closing and the seller's preliminary estimate of closing date working capital. In accordance with the asset purchase agreement, an independent CPA firm was retained by the Company and Goedeker to resolve differences in the working capital amounts. The report issued by that CPA firm determined that Goedeker owed the Company $809,000, which Goedeker has not paid. On or about March 23, 2020, the Company submitted a claim for arbitration to the American Arbitration Association relating to Goedeker's failure to pay. The claim alleged, *inter alia*, breach of contract, fraud, indemnification and the breach of the covenant of good faith and fair dealing. The Company alleged damages in the amount of $809,000, plus attorneys' fees and costs. The $809,000 is included in other assets in the accompanying balance sheet as of December 31, 2019.

On June 2, 2020, the Company entered into a settlement agreement with Goedeker, Steve Goedeker, Mike Goedeker and 1847 Holdings LLC, the Company's indirect parent company at such time ("1847 Holdings"). The settlement agreement and the related transaction documents that are exhibits to the settlement agreement were all signed on June 2, 2020 only became effective upon the closing of the IPO on August 4, 2020. Pursuant to the settlement agreement, the parties entered into an amendment and restatement of the 9% subordinated promissory note described below (see Note 13). In addition, the parties agreed that the arbitration action described above would be settled effective upon the closing of the IPO and that each party to such arbitration action would release all claims that it has against the other parties to such action. As part of the settlement of the arbitration action, the Company agreed that the sellers will not have to pay the $809,000 working capital adjustment amount, which resulted in a loss on write-off of acquisition receivable during the year ended December 31, 2020.

Goedeker is also entitled to receive the following earn out payments to the extent the Goedeker Business achieves the applicable EBITDA (as defined in the asset purchase agreement) targets:

> 1.    An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the closing date is $2,500,000 or greater, which target was not met;

> 2.    An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the first anniversary of closing date is $2,500,000 or greater, which target the Company does not expect to meet; and

> 3.    An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the second anniversary of the closing date is $2,500,000 or greater. The Company expects to meet this target and adjusted the contingent note payable in the consolidated balance sheet to the present value of the amount due.

To the extent the EBITDA of the Goedeker Business for any applicable period is less than $2,500,000 but greater than $1,500,000, the Company must pay a partial earn out payment to Goedeker in an amount equal to the product determined by multiplying (i) the EBITDA Achievement Percentage by (ii) the applicable earn out payment for such period, where the "Achievement Percentage" is the percentage determined by dividing (A) the amount of (i) the EBITDA of the Goedeker Business for the applicable period less (ii) $1,500,000, by (B) $1,000,000. For avoidance of doubt, no partial earn out payments shall be earned or paid to the extent the EBITDA of the Goedeker Business for any applicable period is equal or less than $1,500,000. For the trailing twelve (12) month period from the closing date, EBITDA for the Goedeker Business was ($2,825,000) so Goedeker is not entitled to an earn our payment for that period.

To the extent Goedeker is entitled to all or a portion of an earn out payment, the applicable earn out payment(s) (or portion thereof) shall be paid on the date that is three (3) years from the closing date, and shall accrue interest from the date on which it is determined Goedeker is entitled to such earn out payment (or portion thereof) at a rate equal to five percent (5%) per annum, computed on the basis of a 360 day year for the actual number of days elapsed.

F-45

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 10 — BUSINESS COMBINATION** (cont.)

The Company determined the fair value of the earnout on the date of acquisition was $81,494. Such amount was recorded as a contingent consideration liability within the accounts payable and accrued expense line item on the consolidated balance sheet and is revalued to fair value each reporting period until settled. The year 1 contingent liability of $32,246 was written-off in the year ended December 31, 2019 as the target was not met and the balance of the liability at December 31, 2019 is $49,248. Management reviewed the contingent consideration due at December 31, 2020 and adjusted the balance to the present value of the amount it estimates will be due in April 2022.

The fair value of the purchase consideration issued to Goedeker was allocated to the net tangible assets acquired. The Company accounted for the acquisition as the purchase of a business under GAAP under the acquisition method of accounting, and the assets and liabilities acquired were recorded as of the acquisition date, at their respective fair values and consolidated with those of the Company. The fair value of the net liabilities assumed was approximately $550,316. The excess of the aggregate fair value of the net tangible assets has been allocated to goodwill. Provisional goodwill was estimated at $4,603,953 at December 31, 2019 due to the preliminary valuation. During the year ended December 31, 2020, the Company subsequently adjusted the value of goodwill by $121,736 to $4,725,689 based on the finalized purchase price allocation.

The table below shows the analysis of the Goedeker asset purchase:

| Purchase consideration at fair value (as restated): | | |
|---|---|---|
| Note payable, net of $462,102 debt discount and $215,500 of capitalized financing costs | $ | 3,637,898 |
| Cash to seller at closing | | 478,000 |
| Working capital adjustment | | (809,000) |
| Contingent note payable | | 81,494 |
| Fair value of ownership interest in Holdco transferred to seller | | 786,981 |
| Amount of consideration | $ | 4,175,373 |
| | | |
| Assets acquired and liabilities assumed at fair value | | |
| Accounts receivable | $ | 456,183 |
| Inventories | | 1,851,251 |
| Other assets | | 295,863 |
| Property and equipment | | 216,286 |
| Customer related intangibles | | 749,000 |
| Marketing related intangibles – tradename | | 1,368,000 |
| Accounts payable and accrued expenses | | (3,056,855) |
| Customer deposits | | (2,430,044) |
| Net tangible assets acquired (liabilities assumed) | $ | (550,316) |
| | | |
| Total net assets acquired (liabilities assumed) | $ | (550,316) |
| Consideration paid | | 4,175,373 |
| Goodwill | $ | 4,725,689 |

**NOTE 11 — LINES OF CREDIT**

***Burnley Capital LLC***

On April 5, 2019, the Company, as borrower, and Holdco entered into a loan and security agreement with Burnley Capital LLC ("Burnley") for revolving loans in an aggregate principal amount that will not exceed the lesser of (i) the borrowing base (as defined in the loan and security agreement) or (ii) $1,500,000 minus reserves established Burnley at any time in accordance with the loan and security agreement. In connection with the closing of the acquisition of Goedeker on April 5, 2019, the Company borrowed $744,000 under the loan and security agreement and issued a revolving note to Burnley in the principal amount of up to $1,500,000. As of December 31, 2019, the balance of the line of credit was $571,997.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 11 — LINES OF CREDIT** (cont.)

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the revolving note in full and the loan and security agreement was terminated. The total payoff amount was $118,194, consisting of principal of $32,350, interest of $42 and prepayment, legal, and other fees of $85,802.

*Northpoint Commercial Finance LLC*

On June 24, 2019, the Company, as borrower, entered into a loan and security agreement with Northpoint Commercial Finance LLC, which was amended on August 2, 2019, for revolving loans up to an aggregate maximum loan amount of $1,000,000 for the acquisition, financing or refinancing by the Company of inventory at an interest rate of LIBOR plus 7.99%. As of December 31, 2019, the balance of the line of credit was $678,993. The loan and security agreement was terminated on May 18, 2020 and there is no outstanding balance as of December 31, 2020.

**NOTE 12 — NOTES PAYABLE AND WARRANT LIABILITY**

*Arvest Loan*

On August 25, 2020, the Company entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of December 31, 2020, the outstanding balance of this loan is $3,185,369 comprised of principal of $3,283,628, net of unamortized loan costs of $98,259. The Company classified $663,339 as a current liability and the balance as a long-term liability.

The loan matures on August 25, 2025 and bears interest at 3.250% per annum; provided that, upon an event of default, the interest rate shall increase by 6% until paid in full. Pursuant to the terms of the loan agreement, the Company is required to make monthly payments of $63,353 beginning on September 25, 2020 and until the maturity date, at which time all unpaid principal and interest will be due. The Company may prepay the loan in full or in part at any time without penalty. The loan agreement contains customary events of default and affirmative and negative covenants for a loan of this type. The loan is secured by all financial assets credited to the Company's securities account held by Arvest Investments, Inc.

Maturities of the debt are as follows:

| For the years ended December 31, | | |
|---|---|---|
| 2021 | $ | 663,339 |
| 2022 | | 685,222 |
| 2023 | | 707,826 |
| 2024 | | 731,177 |
| 2025 | | 496,064 |
| Total | $ | 3,283,628 |
| Less: Loan costs | | (98,259) |
| Total | $ | 3,185,369 |

*Small Business Community Capital II, L.P.*

On April 5, 2019, the Company, as borrower, and Holdco entered into a loan and security agreement with Small Business Community Capital II, L.P. ("SBCC") for a term loan in the principal amount of $1,500,000, pursuant to which the Company issued to SBCC a term note in the principal amount of up to $1,500,000 and a ten-year warrant to purchase shares of the most senior capital stock of the Company equal to 5.0% of the outstanding equity securities of the Company on a fully-diluted basis for an aggregate price equal to $100. As of December 31, 2019, the balance of the note was $999,201.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 12 — NOTES PAYABLE AND WARRANT LIABILITY** (cont.)

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the term note in full and the loan and security agreement was terminated. The total payoff amount was $1,122,412 consisting of principal of $1,066,640, interest of $11,773 and prepayment, legal, and other fees of $43,999.

The Company classified the warrant as a derivative liability on the balance sheet at June 30, 2020 of $2,250,000 based on the estimated value of the warrant in the IPO. The increase in the value of the warrant from the estimated value of $122,344 at December 31, 2019 resulted in a charge of $2,127,656 during the year ended December 31, 2020. Immediately prior to the closing of the IPO on August 4, 2020, SBCC converted the warrant into 250,000 shares of common stock.

**NOTE 13 — NOTES PAYABLE, RELATED PARTIES**

As noted in Note 10, a portion of the purchase price for the acquisition was paid by the issuance by the Company to Steve Goedeker, as representative of Goedeker, of a 9% subordinated promissory note in the principal amount of $4,100,000. As of December 31, 2019, the balance of the note was $3,300,444.

Pursuant to the settlement agreement described above (see Note 10), the parties entered into an amendment and restatement of the note that became effective as of the closing of the IPO on August 4, 2020, pursuant to which (i) the principal amount of the existing note was increased by $250,000, (ii) upon the closing of the IPO, the Company agreed to make all payments of principal and interest due under the note through the date of the closing, and (iii) from and after the closing, the interest rate of the note was increased from 9% to 12%. In accordance with the terms of the amended and restated note, the Company used a portion of the proceeds from the IPO to pay $1,083,842 of the balance of the note representing a $696,204 reduction in the principal balance and interest accrued through August 4, 2020 of $387,638.

The Company repaid this note payable with proceeds from the Arvest Loan. In connection with the refinance, the Company recorded a $757,239 loss on extinguishment of debt consisting of a $250,000 forbearance fee, write-off of unamortized loan discount of $338,873, and write-off of unamortized debt costs of $168,366.

**NOTE 14 — CONVERTIBLE PROMISSORY NOTE**

On April 5, 2019, 1847 Holdings, Holdco and the Company (collectively, "1847") entered into a securities purchase agreement with Leonite Capital LLC, a Delaware limited liability company ("Leonite"), pursuant to which 1847 issued to Leonite a secured convertible promissory note in the aggregate principal amount of $714,286. As additional consideration for the purchase of the note, (i) 1847 Holdings issued to Leonite 50,000 common shares (valued at $137,500), (ii) 1847 Holdings issued to Leonite a five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis, and (iii) Holdco issued to Leonite shares of common stock equal to a 7.5% non-dilutable interest in Holdco. As of December 31, 2019, the balance of the note was $584,943. As a result of this transaction, Leonite became a related party.

On May 11, 2020, 1847 and Leonite entered into a first amendment to secured convertible promissory note, pursuant to which the parties agreed (i) to extend the maturity date of the note to October 5, 2020, (ii) that 1847's failure to repay the note on the original maturity date of April 5, 2020 shall not constitute and event of default under the note and (iii) to increase the principal amount of the note by $207,145, as a forbearance fee. The Company accounted for this transaction as a loss on extinguishment of debt.

In connection with the amendment, (i) 1847 Holdings issued to Leonite another five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis and (ii) upon closing of 1847 Holdings' acquisition of Asien's Appliance, Inc., 1847 Holdings' wholly owned subsidiary 1847 Asien Inc. issued to Leonite shares of common stock equal to a 5% interest in 1847 Asien Inc. The

F-48

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 14 — CONVERTIBLE PROMISSORY NOTE** (cont.)

Company accounted for the issuance of the 200,000 additional warrants as a $566,711 loss on debt restructuring and an increase in additional paid-in-capital, representing the estimated fair value of the 200,000 additional warrants for a five-year period.

1847 Holdings issued 50,000 common shares valued at $137,500 and a debt-discount related to the warrants valued at $292,673. In the second quarter of 2020, the $137,500 value of the shares was transferred from a liability to 1847 Holdings to additional paid-in-capital. The Company amortized $129,343 of financing costs related to the shares and warrants in the year ended December 31, 2020.

Under the note, Leonite had the right at any time at its option to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of the note into fully paid and non-assessable common shares or any shares of capital stock or other securities of 1847 Holdings into which such common shares may be changed or reclassified.

On May 4, 2020, Leonite converted $100,000 of the outstanding balance of the note into 100,000 common shares of 1847 Holdings. The Company accounted for this transaction as a $100,000 reduction in the principal amount of the debt, a $175,000 loss on extinguishment of debt, and a $275,000 increase in additional paid-in-capital representing the fair value of the 1847 Holdings common shares on the conversion date.

On July 24, 2020, Leonite converted $50,000 of the outstanding balance of the note into 50,000 common shares of 1847 Holdings. The Company accounted for this transaction as a $50,000 reduction in the principal amount of the debt, a $50,000 loss on extinguishment of debt, and a $100,000 increase in additional paid-in-capital representing the fair value of the 1847 Holdings common shares on the conversion date.

As a result of the activity on this note, $948,856 was recorded as loss on extinguishment of debt for the year ended December 31, 2020.

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the note in full. The total payoff amount was $780,653, consisting of principal of $771,431 and interest of $9,222.

On September 2, 2020, 1847 Holdings and Leonite entered into an amendment to the warrant issued on April 5, 2019, pursuant to which the warrant was amended to allow for the exercise of the warrant for 180,000 common shares of 1847 Holdings in exchange for Leonite's surrender of the remaining 20,000 common shares underlying that warrant, as well as all 200,000 common shares underlying the second warrant issued to Leonite on May 11, 2020. On September 18, 2020, Leonite exercised the warrant in accordance with the foregoing for 180,000 common shares of 1847 Holdings. As a result, both warrants have terminated.

**NOTE 15 — OPERATING LEASE**

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C., a Missouri limited liability company and affiliate of the Company at that time. The lease is for a term five (5) years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. In the event of late payment, interest shall accrue on the unpaid amount at the rate of eighteen percent (18%) per annum. The lease contains customary events of default, including if: (i) the Company shall fail to pay rent within five (5) days after the due date; (ii) any insurance required to be maintained by the Company pursuant to the lease shall be canceled, terminated, expire, reduced, or materially changed; (iii) the Company shall fail to comply with any term, provision, or covenant of the lease and shall not begin and pursue with reasonable diligence the cure of such failure within fifteen (15) days after written notice thereof to the Company; (iv) the Company shall become insolvent, make an assignment for the benefit of creditors, or file a petition under any section or chapter of the Bankruptcy Code, or under any similar law or statute of the United States of America or any State thereof; or (v) a receiver or trustee shall be appointed for the leased premises or for all or substantially all of the assets of the Company.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 15 — OPERATING LEASE** (cont.)

During the year ended December 31, 2020 and the period April 6 to December 31, 2019, the Company paid and expensed rent payments of $540,000 and $397,500, respectively.

At December 31, 2019, the operating lease right of use asset was $2,000,755. Supplemental balance sheet information related to lease at December 31, 2020 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use asset | $ | 1,578,235 |
| | | |
| Lease liability, current portion | $ | 450,712 |
| Lease liability, long-term | | 1,127,523 |
| Total operating lease liability | $ | 1,578,235 |
| | | |
| Weighted average remaining lease term (months) | | 39 |
| Weighted average discount rate | | 6.5% |

Maturities of the lease liability for each of the next five years is as follows:

| | | |
|---|---|---|
| 2021 | $ | 540,000 |
| 2022 | | 540,000 |
| 2023 | | 540,000 |
| 2024 | | 135,000 |
| Total lease payments | $ | 1,755,000 |
| | | |
| Less imputed interest | | (176,765) |
| Total lease liability | $ | 1,578,235 |

**NOTE 16 — RELATED PARTIES**

*Offsetting Management Services Agreement*

On April 5, 2019, the Company entered into an offsetting management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and a significant stockholder. This agreement was amended on April 21, 2020 with the amendment becoming effective at the closing of IPO on August 4, 2020.

Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that, (i) pro-rated payments shall be made in the first quarter and the last quarter of the term, (ii) if the aggregate amount of management fees paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal year exceeds, or is expected to exceed, 9.5% of 1847 Holdings' gross income with respect to such fiscal year, then the management fee to be paid by the Company for any remaining fiscal quarters in such fiscal year shall be reduced, on a pro rata basis determined by reference to the management fees to be paid to the Manager by all of the subsidiaries of 1847 Holdings, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal year, does not exceed 9.5% of 1847 Holdings' gross income with respect to such fiscal year, and (iii) if the aggregate amount the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal quarter exceeds, or is expected to exceed, the aggregate amount of the parent management fee (as defined in the offsetting management services agreement) with respect to such fiscal quarter, then the management fee to be paid by the Company for such fiscal quarter shall be reduced, on a pro rata basis, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal quarter, does not exceed the parent management fee calculated and payable with respect to such fiscal quarter.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 16 — RELATED PARTIES** (cont.)

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of Goedeker in connection with performing services under the offsetting management services agreement. The Company did not pay any expenses for the years ended December 31, 2020 and 2019.

The Company expensed $250,000 and $183,790 in management fees for the years ended December 31, 2020 and 2019, respectively.

***Other Transactions***

See Note 14 for a description of the securities purchase agreement and secured convertible promissory note that the Company entered into with 1847 Holdings, Holdco and Leonite, as well as the related shares and warrants issued by 1847 Holdings, the Company's indirect parent company at such time.

**NOTE 17 — STOCKHOLDERS' DEFICIT**

As of December 31, 2020, the Company was authorized to issue 200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. To date, the Company has not designated or issued any shares of preferred stock.

***Common Stock***

As of December 31, 2020 and 2019, the Company had 6,111,200 and 4,750,000 shares of common stock issued and outstanding, respectively. Each share entitles the holder thereof to one vote per share on all matters coming before the stockholders of the Company for a vote.

Upon the Company's inception on January 10, 2019, the Company issued 4,750,000 shares of common stock for a total purchase price of $1.00.

On August 4, 2020, the Company sold 1,111,200 shares of common stock for total gross proceeds of $10,000,800. After deducting the underwriting commission and expenses, the Company received net proceeds of $8,602,166.

On August 4, 2020, the Company issued 250,000 shares of common stock to SBCC upon conversion of its warrant (see Note 12).

***Equity Incentive Plan***

Effective as of July 30, 2020, the Company established the 1847 Goedeker Inc. 2020 Equity Incentive Plan ("Plan"). The Plan was approved by the Company's board of directors and stockholders on April 21, 2020. The Plan is administered by compensation committee of the board of directors. The Plan permits the grant of restricted stock, stock options and other forms of incentive compensation to the Company's officers, employees, directors and consultants. The maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan is 555,000 shares. As of December 31, 2020, there were 555,000 shares granted and no shares available for grant.

During the year ended December 31, 2020, the Company issued options for the purchase of 555,000 shares of common stock with a total value of $1,848,056. The Company recorded stock option expense of $398,908 and for the year ended December 31, 2020. The remaining compensation expense of $1,449,148 will be recognized over the remaining vesting periods.

F-51

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 17 — STOCKHOLDERS' DEFICIT** (cont.)

The following table presents activity relating to stock options for the year ended December 31, 2020:

| | Shares | | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|---|
| Outstanding at December 31, 2019 | — | $ | — | — |
| Granted | 555,000 | | 9.00 | 10 |
| Exercised | — | | — | — |
| Forfeited/Cancelled/Expired | — | | — | — |
| Outstanding at December 31, 2020 | 555,000 | $ | 9.00 | 9 |
| Exercisable at December 31, 2020 | 65,790 | $ | 9.00 | 9 |

As of December 31, 2020, vested outstanding stock options had no intrinsic value as the exercise price is greater than the estimated fair value of the underlying common stock.

The Company recognizes compensation expense for stock option awards on a straight-line basis over the applicable service period of the award. The service period is generally the vesting period. The following assumptions were used to calculate stock-based compensation expense for the year ended December 31, 2020:

| | |
|---|---|
| Volatility | 46.6% |
| Risk-free interest rate | 0.47% |
| Dividend yield | 0.0% |
| Expected term | 6.25 Years |

The following table sets forth stock-based compensation expense for the year ended December 31, 2020 and the four succeeding years:

| | | |
|---|---|---|
| Year Ended December 31, 2020 | $ | 398,908 |
| 2021 | | 483,185 |
| 2022 | | 462,024 |
| 2023 | | 367,198 |
| 2024 | | 136,741 |
| 2025 | | — |
| Total stock-based compensation | $ | 1,848,056 |

***Warrants***

On August 4, 2020, the Company issued warrants for the purchase of 55,560 shares of common stock to affiliates of the representative in the IPO (the "Underwriter Warrants"). The Underwriter Warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25.

On April 5, 2019, the Company issued to SBCC a ten-year warrant to purchase shares of the most senior capital stock of the Company equal to 5.0% of the outstanding equity securities of the Company on a fully-diluted basis for an aggregate price equal to $100. SBCC exercised this warrant for the purchase of 250,000 shares of common stock on August 4, 2020.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 17 — STOCKHOLDERS' DEFICIT** (cont.)

The following table presents activity relating to the Underwriter Warrants for the year ended December 31, 2020:

| | Shares | | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|---|
| Outstanding at December 31, 2019 | — | $ | — | — |
| Granted | 55,560 | | 11.25 | 5 |
| Exercised | — | | — | — |
| Cancelled/Expired | — | | — | — |
| Outstanding at December 31, 2020 | 55,560 | $ | 11.25 | 4.5 |
| Exercisable at December 31, 2020 | -0- | $ | 11.25 | 4.5 |

The Company recognizes stock issuance expense for the Underwriter Warrants on a straight-line basis over the vesting period of the Underwriter Warrants. The following assumptions were used to calculate stock issuance expense for the year ended December 31, 2020:

| | |
|---|---|
| Volatility | 46.5% |
| Risk-free interest rate | 0.47% |
| Dividend yield | 0.0% |
| Term | 4.5 years |

**NOTE 18 — INCOME TAXES**

As of December 31, 2020 and 2019, the Company had net operating loss carry forwards of approximately $15,002,557 and $1,593,680, respectively, that may be available to reduce future years' taxable income indefinitely. Future tax benefits which may arise as a result of these losses have not been recognized in these consolidated financial statements, as their realization is determined not likely to occur and accordingly, the Company has recorded a valuation allowance for the deferred tax asset relating to these tax loss carry-forwards. The net change in the valuation allowance resulted in an increase of $4,377,815 and $709,582 for the years ended December 31, 2020 and 2019, respectively.

The provision for Federal and state income tax consists of the following.

The cumulative tax effect at the expected rate of 25.7% and 25.7% of significant items comprising the Company's net deferred tax amount is as follows.

Due to the change in ownership provisions of the Tax Reform Act of 1986, net operating loss carry forwards incurred prior to 2018 for Federal income tax reporting purposes are subject to annual limitations. Should a change in ownership occur net operating loss carry forwards may be limited as to use in future years.

The components for the provision of income taxes include:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Current Federal and State | $ — | $ — |
| Deferred Federal and State | 698,303 | (698,303) |
| Total provision (benefit) for income taxes | $ 698,303 | $ (698,303) |

F-53

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 18 — INCOME TAXES** (cont.)

A reconciliation of the statutory US Federal income tax rate to the Company's effective income tax rate is as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Federal tax | $ (4,382,602) | $ (1,229,797) |
| State tax, net of Federal benefit | (891,129) | (250,059) |
| Change in warrant value | 537,535 | — |
| Write-off of acquisition and other receivables | 238,540 | — |
| Other | 108,439 | 71,971 |
| Valuation allowance | 5,087,396 | 709,582 |
| Total income tax provision (benefit) | $ 698,303 | $ (698,303) |
| Effective tax rate | (3.3)% | 11.92% |

Deferred income taxes reflect the net tax effect of temporary differences between amounts recorded for financial reporting purposes and amounts used for tax purposes. The major components of deferred tax assets and liabilities are as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Deferred tax assets | | |
| Inventory | $ 107,398 | $ 107,398 |
| Accrued expenses | 1,589,889 | 792,845 |
| Interest limitation | 319,698 | 191,886 |
| Other | 6,597 | — |
| Lease liability | 398,820 | 505,591 |
| Loss carryforward | 3,791,146 | 339,287 |
| Valuation allowance | (5,796,978) | (709,582) |
| Total deferred tax assets | $ 416,595 | $ 1,227,425 |
| | | |
| Deferred tax liabilities | | |
| Other | — | (94) |
| Right of use assets | (398,820) | (505,591) |
| Intangibles | $ (17,775) | $ (23,437) |
| Total deferred tax liabilities | $ (416,595) | $ (529,122) |
| Total net deferred income tax assets (liabilities) | $ — | $ 698,303 |

The Company accrues interest and penalties related to unrecognized tax benefits. The Company does not believe it has any unrecognized tax benefits for December 31, 2020 and 2019 that would have a material impact on the financial statements. The Company's income tax returns are open to examination by the Internal Revenue Service and various State jurisdictions.

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Net deferred tax asset (liability) | $ 5,796,978 | $ 1,407,885 |
| Valuation allowance | $ (5,796,978) | $ (709,852) |

F-54

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 19 — SUBSEQUENT EVENTS**

In accordance with ASC 855-10, the Company has analyzed its operations subsequent to December 31, 2020 to the date these consolidated financial statements were issued and has determined that it does not have any material subsequent events to disclose in these consolidated financial statements, except as set forth below.

*Lease Agreement*

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC for a new premises in St. Charles, Missouri. The lease is for a term of 63 months with two (2) options to renew for additional five (5) year periods and provides for a base rent of $4.35 per square foot per year with 2.5% annual increases and a three-month abatement, resulting in a base rent during the first year of $20,976.79 per month, increasing to a base rent during the fifth year of $23,146.80 per month. The Company must also pay its 29% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. In the event of late payment, interest shall accrue on the unpaid amount at the rate equal to the greater of (i) two (2) percentage points in excess of the prime lending rate as established by U.S. Bank, N.A., or (ii) the default rate applicable to the first priority mortgage in effect at the time such default interest rate is imposed.

The lease contains customary events of default, including (i) if the Company shall fail to pay rent within five (5) days after the due date, (ii) if the Company shall fail to observe or perform any other terms, covenants, conditions or provisions under the lease and fail to cure such default within thirty (30) days after written notice to the Company, (iii) if the Company fails to occupy all or any material portion of the lease premises for more than ninety (90) consecutive days, for reasons other than force majeure, and fails to pay all costs incurred by the landlord as a result of such failure to occupy, and other customary representations, warranties and covenants.

*Securities Purchase Agreement*

On March 19, 2021, the Company entered into a Securities Purchase Agreement (the "Purchase Agreement") with two institutional investors (each, a "Purchaser" and together, the "Purchasers"), pursuant to which the Company issued to each Purchaser (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 (together, the "Notes") and (ii) a four-year warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis (together, the "Warrants"), for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. After deducting a placement fee and other expenses, the Company received net proceeds of $4,590,000.

The Notes bear interest at a rate of 10% per annum and mature on December 19, 2021. The Notes may be prepaid by the Company in whole or in part at any time or from time to time without penalty or premium upon at least five (5) days prior written notice, which notice period may be waived by the holder. In addition, if the Company issues and sells shares of its equity securities to investors on or before the maturity date in an equity financing with total gross proceeds of not less than $10,000,000 (excluding the conversion of the notes or other convertible securities issued for capital raising purposes), then the Company must repay the then-outstanding principal amount of the Notes and any accrued but unpaid interest.

The Notes are secured by a first priority security interest in all of the Company's assets and contain customary events of default. Upon, and during the continuance of, an event of default, the Notes are convertible, in whole or in part, at the option of the holder into shares of common stock at a conversion price equal to $12.00, or if lower, 80% of the lowest volume weighted average price for the twenty (20) consecutive trading days prior to the applicable conversion date, but in no event less than $9.00. The conversion price will be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction that proportionately decreases or increases the common stock. In addition, if the Company sells or grants any common stock or securities convertible into or exchangeable for common stock or grants any right to reprice such securities at an effective price per share that is lower than the then conversion price, the conversion price shall be reduced to such price, subject to certain exceptions set forth in the Notes.

Table of Contents

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 19 — SUBSEQUENT EVENTS** (cont.)

Notwithstanding the foregoing, the Company shall not effect any conversion of a Note, and a holder shall not have the right to convert any principal and/or interest of a Note, to the extent that after giving effect to the conversion the holder (together with the holder's affiliates and any persons acting as a group together with the holder or any of the holder's affiliates) would beneficially own over 4.99% of the number of shares of the common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Note. The holder may, upon not less than 61 days' prior notice to the Company, increase or decrease such limitation, provided that such limitation in no event exceeds 9.99% of the number of shares of the common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Note. The Warrants also contain this beneficial ownership limitation.

The Purchase Agreement contains customary representations, warranties and covenants for a transaction of this type. Pursuant to the Purchase Agreement, the Purchasers were granted piggy-back registration rights with respect to the shares issuable upon conversion of the Notes and exercise of the Warrants. The Company also agreed that, until the date that no Purchasers own any securities, the Company will timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company pursuant to the Exchange Act even if the Company is not then subject to the reporting requirements of the Exchange Act. In addition, the Company agreed that, so long as any of the Notes remain outstanding, neither the Company, nor any subsidiary of the Company, shall, without each Purchaser's written consent and subject to certain exceptions set forth in the Purchase Agreement:

- sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business;

- incur, create, assume or suffer to exist any lien on any of its property or assets, except for certain liens set forth in the Purchase Agreement;

- incur or suffer to exist or guarantee any indebtedness that is senior to or *pari passu* with (in priority of payment and performance) the Company's obligations under the Purchase Agreement except for non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;

- pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock, other than dividends on shares of common stock solely in the form of additional shares of common stock, or directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock;

- redeem, repurchase or otherwise acquire in any one transaction or series of related transactions any shares of capital stock of the Company or any warrants, rights or options to purchase or acquire any such shares, or repay any *pari passu* or subordinated indebtedness of the Company other than non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;

- lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Company, except loans, credits or advances (i) in existence or committed on the closing date and which the Company has informed each Purchaser in writing prior to the closing date, (ii) in regard to transactions with unaffiliated third parties, made in the ordinary course of business, or (iii) in regard to transactions with unaffiliated third parties, not in excess of $50,000; or

- repay any affiliate (as defined in Rule 144) of the Company in connection with any indebtedness or accrued amounts owed to any such party.

F-56

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**

**UNAUDITED COMBINED FINANCIAL STATEMENTS**

**MARCH 31, 2021 AND 2020**

F-57

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED BALANCE SHEETS**

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 23,668,538 | $ 14,842,912 |
| Receivables, net | 15,810,245 | 19,392,582 |
| Deposits with vendors | 36,304,532 | 31,733,415 |
| Inventories, net | 15,194,247 | 12,004,038 |
| Prepaid expenses and other current assets | 1,280,602 | 217,439 |
| Total Current Assets | 92,258,164 | 78,190,386 |
| Property and equipment, net | 1,996,520 | 1,997,822 |
| Other assets | 20,122 | 144,528 |
| Operating lease right-of-use assets | 4,275,036 | 4,646,508 |
| TOTAL ASSETS | $ 98,549,842 | $ 84,979,244 |
| | | |
| **LIABILITIES AND OWNERS' EQUITY** | | |
| Current Liabilities | | |
| Accounts payable and accrued liabilities | $ 25,313,287 | $ 21,179,975 |
| Customer deposits | 10,231,950 | 8,853,214 |
| Current portion of notes payable | 447,025 | 466,235 |
| Current portion of financing lease liabilities | 64,912 | 23,576 |
| Current portion of operating lease liabilities | 1,548,457 | 1,517,390 |
| Total Current Liabilities | 37,605,631 | 32,040,390 |
| Notes payable, net of current portion | 1,549,088 | 3,505,620 |
| Financing lease liabilities, net of current portion | 152,220 | 47,665 |
| Operating lease liabilities, net of current portion | 2,818,137 | 3,279,080 |
| TOTAL LIABILITIES | 42,125,076 | 38,872,755 |
| Owners' Equity | | |
| Common stock | 3,000 | 3,000 |
| Members' equity | 56,421,766 | 46,103,489 |
| Total Owners' Equity | 56,424,766 | 46,106,489 |
| TOTAL LIABILITIES AND OWNERS' EQUITY | $ 98,549,842 | $ 84,979,244 |

The accompanying notes are an integral part of these unaudited combined financial statements.

F-58

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF INCOME AND CHANGES IN OWNERS' EQUITY**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Net sales | $ 109,260,089 | $ 57,074,441 |
| Cost of sales | 79,723,604 | 46,025,053 |
| Gross Profit | 29,536,485 | 11,049,388 |
| Operating Expenses | | |
| Personnel | 4,426,724 | 2,708,990 |
| Advertising | 2,269,449 | 1,795,218 |
| Bank and credit card fees | 1,863,628 | 822,905 |
| Depreciation and amortization | 153,096 | 155,739 |
| General and administrative | 3,306,562 | 1,869,650 |
| Total Operating Expenses | 12,019,459 | 7,352,502 |
| INCOME FROM OPERATIONS | 17,517,026 | 3,696,886 |
| Other Income (Expense) | | |
| Other income | 2,217,943 | 393,627 |
| Other expense | (186,745) | (161,402) |
| Total Other Income (Expense) | 2,031,198 | 232,225 |
| NET INCOME | $ 19,548,224 | $ 3,929,111 |
| | | |
| OWNERS' EQUITY – Beginning | $ 46,106,489 | $ 35,664,566 |
| Distributions paid | (9,229,947) | (2,317,868) |
| OWNERS' EQUITY – Ending | $ 56,424,766 | $ 37,275,809 |

The accompanying notes are an integral part of these unaudited combined financial statements.

F-59

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net income | $ 19,548,224 | $ 3,929,111 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 153,096 | 155,739 |
| Change in inventory reserves | — | 275,646 |
| Operating lease right-of-use assets | 371,472 | 447,054 |
| Forgiveness of PPP Loans | (1,872,470) | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 3,582,337 | (2,266,243)) |
| Deposits with vendors | (4,571,117) | 1,464,619 |
| Inventory | (3,190,209) | (1,574,075) |
| Prepaid expenses and other current assets | (1,063,163) | 132,805 |
| Accounts payable and accrued expenses | 4,133,312 | 1,918,328 |
| Customer deposits | 1,378,736 | 4,514,453 |
| Operating lease liabilities | (429,876) | (439,321) |
| Other assets | 124,406 | — |
| Net cash provided by operating activities | 18,164,748 | 8,558,116 |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Repayments on notes payable | (103,272) | (72,749) |
| Repayments of financing lease liabilities | (5,903) | (5,235) |
| Distributions paid | (9,229,947) | (2,317,868) |
| Net cash used in financing activities | (9,339,122) | (2,395,852) |
| | | |
| NET CHANGE IN CASH IN CASH AND CASH EQUIVALENTS | 8,825,626 | 6,162,264 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 14,842,912 | 5,912,043 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 23,668,538 | $ 12,074,307 |
| | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash paid for interest | $ 23,432 | $ 19,887 |
| Cash paid for income taxes | $ 1,500,000 | $ — |
| Non-cash investing and financing activities: | | |
| Financed purchases of property and equipment | $ 151,794 | $ 273,117 |
| Principal of Paycheck Protection Program loans forgiven | $ 1,872,470 | $ — |

The accompanying notes are an integral part of these unaudited combined financial statements.

F-60

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

## NOTE 1 — ORGANIZATION AND NATURE OF BUSINESS

1 Stop Electronics Center, Inc. was formed under the laws of the State of New York on February 2, 2000. YF Logistics LLC was formed under the laws of the State of New Jersey on January 24, 2014. Gold Coast Appliances, Inc. was formed under the laws of the State of New York on February 11, 2015. Joe's Appliances LLC was formed under the laws of the State of New York on November 9, 2018. Superior Deals Inc. was formed under the laws of the State of New York on September 21, 2020. The entities collectively do business as Appliances Connection and are referred to throughout as "the Company."

Founded in 2000, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, NJ and a 23,000 square foot showroom in Brooklyn, New York. Appliances Connection carries many household name brands, including Bosch, GE, Frigidaire, Whirlpool, LG, and Samsung, and also carries many major luxury appliance brands such as Verona, Thermador, La Cornue, Dacor, Smeg, and Viking. Appliances Connection provides appliance installation services and old appliance removal services. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The combined financial statements of the Company have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars. All intercompany transactions have been eliminated.

The interim combined financial statements of the Company for the three months ended March 31, 2021 and 2020 are not audited. In the opinion of our management, the accompanying combined financial statements contain all adjustments, consisting of normal recurring accruals, necessary for a fair presentation of our financial position as of March 31, 2021, and our results of operations and cash flows for the three-month periods ended March 31, 2021 and 2020. The results of operations for the three-month periods ended March 31, 2021 and 2020 are not necessarily indicative of the results for a full-year period. These unaudited interim combined financial statements should be read in conjunction with the audited financial statements.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with the original maturities of three months or less to be cash equivalents. At March 31, 2021 and December 31, 2020, the Company had $21,398,444 and $12,203,949, respectively, in its domestic accounts in excess of Federal Deposit Insurance Corporation ("FDIC") insured limits. No losses have been incurred by the Company as a result of such excesses of FDIC limits.

### Use of Estimates

The preparation of combined financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Revenue Recognition and Cost of Revenue

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. This ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects

F-61

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

to be entitled in exchange for those goods or services. This ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments. The Company's adoption of this ASU resulted in no change to the Company's results of operations or balance sheet.

Appliances Connection collects 100 percent of the payment for internet and phone orders, including tax in certain jurisdictions, from the customer at the time the order is placed. Customers placing orders with a purchase order are allowed to purchase on credit and make payment after receipt of product. Appliances Connection does not incur incremental costs obtaining purchase orders from customers; however, if Appliances Connection did, because all Appliances Connection's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

Performance Obligations — The revenue that Appliances Connection recognizes arises from orders it receives from contracts with customers. Appliances Connection's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers and each order generally contains only one performance obligation based on the merchandise sale to be completed. Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, Appliances Connection's products, which generally occurs when the customer assumes the risk of loss. The transfer of control generally occurs at the point of pickup, shipment, or installation, depending on the type of order. Once this occurs, Appliances Connection has satisfied its performance obligation and Appliances Connection's recognizes revenue.

Transaction Price – Appliances Connection agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In Appliances Connection's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax that Appliances Connection collects concurrently with revenue-producing activities are excluded from revenue.

Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendor to the company.

Substantially all Appliances Connection's sales are to individual retail consumers (homeowners), builders, and designers. The large majority of customers are homeowners and their contractors, with the homeowner being key in the final decisions. The Company has a diverse customer base with no one customer accounting for more than five percent of total revenue.

*Receivables*

Receivables consists of customer's balance payments for which the Company extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom the Company purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

F-62

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The Company historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. The Company had no significant concentrations of receivables balances as of March 31, 2021 and December 31, 2020.

*Inventory*

Inventory mainly consists of finished goods acquired for resale and is valued at the average cost determined on a specific item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on estimate of its ability to sell the item as well as general market conditions. Based on these evaluations, the Company determined an obsolescence allowance of $550,101 was needed at March 31, 2021 and December 31, 2020, respectively.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

|  | Useful Life (Years) |
| --- | --- |
| Furniture and fixtures | 7 |
| Transportation equipment | 5 |
| Machinery and equipment | 5-7 |
| Office equipment | 5-7 |
| Leasehold improvements | Shorter of lease term of estimated useful life |

*Long-lived Assets*

The Company reviews its property and equipment and any identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management if triggering events occur. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Lease Liabilities*

Lease liabilities and their corresponding right-of-use ("ROU") assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

*Impact of COVID-19*

In December 2019, a novel strain of coronavirus ("COVID-19") emerged in China. On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. The extent of the COVID-19 pandemic's continued effect on our operational and financial performance and those of third parties on which the Company relies will depend on future developments, including the duration, spread and intensity of the outbreak, the pace at which jurisdictions across the country re-open and restrictions begin to lift. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change. The Company does not yet know the full extent of potential impacts on its business and financing. However, these effects could have a material impact on the Company's liquidity, capital resources, operations and business and those of the third parties on which the Company relies.

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

*Sales Tax Liability*

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At March 31, 2021 and December 31, 2020, the amount of such accrual was $14,766,986 and $11,700,329, respectively, which is included in accounts payable and accrued expenses.

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Income Taxes*

All combined entities have elected to be taxed as an "S Corporation" under the provisions of the Internal Revenue Code and comparable state income tax law. As an S Corporation, the Company is generally not subject to corporate income taxes and the Company's net income or loss is reported on the individual tax return of the stockholder of the Company. Therefore, no provision or liability for income taxes is reflected in the combined financial statements.

However, the state of New York requires S corporations to pay corporation franchise tax, which the applicable tax rate to the Company is 8.85%. At March 31, 2021 and December 31, 2020, the amount of such accrual was $1,770,000 and $1,576,851, respectively, which is included in accounts payable and accrued expenses.

Management has evaluated its tax positions and has concluded that the Company had taken no uncertain tax positions that could require adjustment or disclosure in the combined financial statements to comply with provisions set forth in ASC 740, Income Taxes.

*Recent Accounting Pronouncements*

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company has evaluated all other recent accounting pronouncements and determined that the adoption of pronouncements applicable to the Company has not had or is not expected to have a material impact on the Company's financial position, results of operations or cash flows.

**NOTE 3 — RECEIVABLES**

At March 31, 2021 and December 31, 2020, receivables consisted of the following:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Trade receivables from customers | $ 9,857,750 | $ 11,831,572 |
| Credit card receivables in process of collection | 2,594,727 | 1,716,364 |
| Vendor rebate receivables | 3,357,768 | 5,844,646 |
| Total receivables | $ 15,810,245 | $ 19,392,582 |

**NOTE 4 — DEPOSITS WITH VENDORS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income. There were no purchase commitments outstanding at March 31, 2021 or December 31, 2020.

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 5 — PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at March 31, 2021 and December 31, 2020:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Furniture and fixtures | $ 41,621 | $ 241,469 |
| Transportation equipment | 2,880,673 | 2,880,673 |
| Leasehold improvements | 870,034 | 870,034 |
| Machinery and equipment | 557,077 | 205,435 |
| Office equipment | 92,431 | 92,431 |
| Total property and equipment | 4,441,836 | 4,290,042 |
| Less: accumulated depreciation | (2,445,316) | (2,292,220) |
| Property and equipment, net | $ 1,996,520 | $ 1,997,822 |

Depreciation expense for the three months periods ended March 31, 2021 and 2020 was $153,096 and $155,739, respectively.

**NOTE 6 — ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

The following is schedule of accounts payable and accrued expenses at March 31, 2021 and December 31, 2020:

| | March 31, 2021 | December 31, 2020 |
|---|---|---|
| Trade accounts payable | $ 7,649,737 | $ 7,260,224 |
| Sales and state taxes | 16,538,562 | 13,284,287 |
| Accrued payroll liabilities | 684,064 | 275,672 |
| Other accrued liabilities | 440,924 | 359,792 |
| Total accounts payable and accrued expenses | $ 25,313,287 | $ 21,179,975 |

**NOTE 7 — NOTES PAYABLE**

The Company has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased.

Notes payable consist of the following at March 31, 2021 and December 31, 2020:

| Lender | Origination Date | Maturity Date | Interest Rate | March 31, 2021 | December 31, 2020 |
|---|---|---|---|---|---|
| Ally | 06/19/16 | 06/19/21 | 3.59% | 2,994 | 5,970 |
| Toyota | 10/31/16 | 10/31/21 | 5.39% | 14,458 | 16,041 |
| Toyota | 12/01/16 | 12/01/21 | 5.39% | 13,523 | 14,616 |
| Ally | 04/19/17 | 04/19/22 | 4.99% | 16,178 | 19,788 |
| Toyota | 07/12/17 | 07/12/22 | 5.39% | 51,810 | 57,754 |
| Hitachi | 10/10/17 | 10/10/22 | 5.40% | — | 24,007 |
| Hitachi | 10/30/17 | 10/30/22 | 5.40% | 31,840 | 36,377 |
| Hitachi | 10/04/18 | 10/04/23 | 5.49% | 47,237 | 51,611 |
| Hitachi | 09/17/18 | 10/17/23 | 5.49% | 47,152 | 48,615 |
| Toyota | 04/25/19 | 04/25/24 | 5.74% | 115,513 | 120,600 |
| Toyota | 10/07/19 | 10/07/24 | 4.48% | 57,940 | 61,462 |
| Toyota | 12/16/19 | 12/15/24 | 4.52% | 68,666 | 69,730 |

F-66

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 7 — NOTES PAYABLE** (cont.)

| Lender | Origination Date | Maturity Date | Interest Rate | March 31, 2021 | December 31, 2020 |
|---|---|---|---|---|---|
| Toyota | 07/02/20 | 07/01/25 | 5.14% | 255,152 | 267,938 |
| Toyota | 02/05/20 | 02/04/25 | 4.52% | 66,507 | 70,458 |
| Hitachi | 03/04/20 | 02/28/25 | 4.99% | 141,916 | 147,493 |
| Hitachi | 09/01/20 | 08/31/25 | 4.75% | 73,913 | 77,813 |
| Toyota | 06/18/20 | 06/17/25 | 4.99% | 254,234 | 262,776 |
| Toyota | 11/09/20 | 11/09/25 | 4.75% | 75,309 | 77,391 |
| Toyota | 11/09/20 | 11/09/25 | 4.75% | 85,607 | 87,973 |
| Toyota | 11/09/20 | 11/09/25 | 4.75% | 86,654 | 89,049 |
| Toyota | 12/16/20 | 12/16/25 | 3.75% | 77,410 | 79,823 |
| PPP – Popular Bank | 04/15/20 | 04/15/22 | 1.00% | — | 1,192,780 |
| PPP – Popular Bank | 04/27/20 | 04/27/22 | 1.00% | — | 679,690 |
| EIDL – SBA | 07/25/20 | 10/25/50 | 3.75% | 150,000 | 150,000 |
| EIDL – SBA | 07/20/20 | 10/20/50 | 3.75% | 112,100 | 112,100 |
| EIDL – SBA | 07/25/20 | 10/25/50 | 3.75% | 150,000 | 150,000 |
| Total notes payable | | | | $ 1,996,113 | $ 3,971,855 |
| Less: current portion | | | | (447,025) | (466,235) |
| Notes payable, net of current portion | | | | $ 1,549,088 | $ 3,505,620 |

Following is a summary of notes payable payments due for the succeeding five years:

| Period Ending March 31, | Amount |
|---|---|
| 2021 – Remaining | $ 342,154 |
| 2022 | 401,869 |
| 2023 | 371,613 |
| 2024 | 320,047 |
| 2025 | 177,566 |
| Thereafter | 382,864 |
| Total | $ 1,996,113 |

**NOTE 8 — LEASES**

*Financing Leases*

The Company has outstanding three financing lease agreements for equipment. The Following is a summary of payments due on financing leases for the succeeding five years:

| Period Ending March 31, | Amount |
|---|---|
| 2021 – Remaining | $ 50,841 |
| 2022 | 66,284 |
| 2023 | 52,644 |
| 2024 | 35,688 |
| 2025 and thereafter | 34,560 |
| Total payments | 14,400 |
| Less: amount representing interest | (37,285) |
| Present value of minimum lease payments | $ 217,132 |

F-67

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 8 — LEASES** (cont.)

In March 2021, the Company entered in an equipment financing lease to purchase four forklifts totaling $151,794, maturing in March 2026. As of March 31, 2021, the balance payable was $151,794.

*Operating Leases*

The Company has entered into four lease agreements under which it leases warehouse equipment, and which have been classified as operating leases. The Company leases warehouse, showroom, and office facilities under long-term leases. All the facility leases include fixed rental payments and have been classified as operating leases.

As of March 31, 2021 and December 31, 2020, the weighted-average remaining lease term for all operating leases is 2.7 years and 2.9 years, respectively, while the weighted-average remaining lease term for all finance leases is 4.2 years and 2.6 years, respectively.

Because the Company generally does not have access to the rate implicit in operating leases, we utilize our incremental borrowing rate as the discount rate. The weighted average discount rate associated with operating leases as of March 31, 2021 and December 31, 2020 is 4.8 percent, respectively.

The Company recognizes operating lease expense on a straight-line basis over the lease term. Rental expense under the operating lease for the periods ended March 31, 2021 and 2020 were $426,774 and $426,774, respectively.

Cash payments included in the measurement of our operating lease liabilities for the periods ended March 31, 2021 and 2020 were $398,750 and $419,040, respectively.

Supplemental balance sheet information related to lease at March 31, 2021 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use asset | $ | 4,275,036 |
| Lease liability, current portion | | 1,548,457 |
| Lease liability, long-term | | 2,818,137 |
| Total operating lease liability | $ | 4,366,594 |
| | | |
| Weighted-average remaining lease term (months) | | 32 |
| | | |
| Weighted average discount rate | | 4.8% |

*Operating Leases (Continued)*

Future minimum lease payments under operating leases as of March 31, 2021 were as follows:

| Period Ending March 31, | | Amount |
|---|---|---|
| 2021 – Remaining | $ | 1,289,956 |
| 2022 | | 1,747,752 |
| 2023 | | 1,404,329 |
| 2024 | | 225,000 |
| 2025 and thereafter | | — |
| Total | $ | 4,667,037 |
| Less imputed interest | | (300,443) |
| Total lease liability | $ | 4,366,594 |

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

## NOTE 9 — SUPPLIER CONCENTRATION

Significant customers and suppliers are those that account for greater than ten percent of the Company's revenues and purchases.

For the three months ended March 31, 2021 and 2020, the Company purchased a substantial portion of finished goods from a third-party vendor (77% and 76%, respectively).

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

## NOTE 10 — RELATED PARTY TRANSACTIONS

Appliances Connection leases four facilities pursuant to lease agreements entered into with four separate entities owned by Albert and Elie Fouerti, the Company's Chief Executive Officer and Vice President, respectively. Albert and Elie Fouerti, directly and indirectly through affiliated trusts, are each a 50 percent owner of 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Joe's Appliances LLC, and YF Logistics LLC. See Note 8 for disclosures of cash payments made and amounts recognized as expense during the periods ended March 31, 2021 and 2020 and for disclosure of future minimum lease payments as of March 31, 2021 under these leases.

The Company is a member of Dynamic Marketing, Inc. ("DMI"), an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 5% equity interest in DMI. Additionally, one of the owners of the Company is on the Board of DMI.

As such, DMI is deemed to be a related party. At March 31, 2021 and December 31, 2020, vendor rebate deposits, net, due from DMI were $36,304,532 and $31,733,415, respectively, and vendor rebates receivable were $2,407,616 and $4,691,514, respectively. During the three months ended March 31, 2021, the following transactions were carried out with DMI: total purchases $61,088,556, purchase volume rebate income $2,345,939, interest income $222,036, consulting income $63,750, and rent expense $168,750. During the three months ended March 31, 2020, the following transactions were carried out with DMI: total purchases $34,749,175, purchase volume rebate income $3,762,689, interest income $326,676, consulting income $63,750, and rent expense $168,750.

## NOTE 11 — SUBSEQUENT EVENTS

Subsequent to March 31, 2021 the Company paid $4,501,200 in member distributions.

### *Amendment to Proposed Acquisition*

On October 20, 2020, the Company entered into a Securities Purchase Agreement, which was amended on December 8, 2020 and April 6, 2021 (as amended, the "Purchase Agreement") with 1847 Goedeker Inc. ("Goedeker"), Appliances Connection Inc., a wholly owned subsidiary of Goedeker (the "Buyer") and the holders of all of the equity interests of the Company (the "Sellers"), pursuant to which the Buyer agreed to acquire all of the issued and outstanding capital stock or other equity interests of the Company from the Sellers for an aggregate purchase price of $222,000,000, subject to adjustment, consisting of (i) $180,000,000 in cash (the "Cash Portion"), (ii) 2,333,333 shares of Goedeker's common stock having a stated value that is equal to $21,000,000, and (iii) a number of shares of Goedeker's series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of Goedeker's common stock (as reported on the NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the transaction.

F-69

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO UNAUDITED COMBINED FINANCIAL STATEMENTS**
**March 31, 2021 and 2020**

**NOTE 11 — SUBSEQUENT EVENTS** (cont.)

On April 6, 2021, the parties entered into an amendment to the securities purchase agreement, pursuant to which (i) the outside date (as defined in the securities purchase agreement) by which the closing of the securities purchase agreement must be completed was changed to June 30, 2021, (ii) the definition of net working capital set forth in the securities purchase agreement was revised to clarify that the accrued liabilities for potential sales tax will not be included in such calculation, and (iii) the condition to closing the transaction contemplated by the securities purchase agreement relating to a lease for the Gold Coast location was deleted, because such lease has since been terminated.

F-70

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**

**AUDITED COMBINED FINANCIAL STATEMENTS**

**DECEMBER 31, 2020 AND 2019**

F-71

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members and Owners of
1 Stop Electronics Center, lnc., YF Logistics LLC,
Gold Coast Appliances, lnc., Superior Deals lnc.
and Joe's Appliances LLC (dba Appliances Connection)

**Opinion on the Combined Financial Statements**

We have audited the accompanying combined balance sheets of 1 Stop Electronics Center, lnc., YF Logistics LLC, Gold Coast Appliances, lnc., Superior Deals lnc. and Joe's Appliances LLC (dba Appliances Connection and collectively the "Company") as of December 31, 2020 and 2019, and the related combined statements of income and changes in owners' equity, and cash flows for the years ended December 31, 2020 and 2019, and the related notes (collectively referred to as the "combined financial statements"). In our opinion, the combined financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the years ended December 31, 2020 and 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These combined financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's combined financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the combined financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the combined financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the combined financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the combined financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2020.

Marlton, New Jersey
April 5, 2021

F-72

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED BALANCE SHEETS**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 14,842,912 | $ 5,912,043 |
| Receivables, net | 19,392,582 | 13,717,998 |
| Deposits with vendors | 31,733,415 | 22,005,318 |
| Inventories, net | 12,004,038 | 11,702,331 |
| Prepaid expenses and other current assets | 217,439 | 176,582 |
| Total Current Assets | 78,190,386 | 53,514,272 |
| Property and equipment, net | 1,997,822 | 1,591,869 |
| Other assets | 144,528 | — |
| Operating lease right-of-use assets | 4,646,508 | 6,089,129 |
| TOTAL ASSETS | $ 84,979,244 | $ 61,195,270 |
| | | |
| **LIABILITIES AND OWNERS' EQUITY** | | |
| Current Liabilities | | |
| Accounts payable and accrued liabilities | $ 21,179,975 | $ 15,220,400 |
| Customer deposits | 8,853,214 | 3,241,531 |
| Current portion of notes payable | 466,235 | 276,534 |
| Current portion of financing lease liabilities | 23,576 | 21,081 |
| Current portion of operating lease liabilities | 1,517,390 | 1,421,696 |
| Total Current Liabilities | 32,040,390 | 20,181,242 |
| Notes payable, net of current portion | 3,505,620 | 541,484 |
| Financing lease liabilities, net of current portion | 47,665 | 70,138 |
| Operating lease liabilities, net of current portion | 3,279,080 | 4,737,840 |
| TOTAL LIABILITIES | 38,872,755 | 25,530,704 |
| Owners' Equity | | |
| Common stock | 3,000 | 3,000 |
| Members' equity | 46,103,489 | 35,661,566 |
| Total Owners' Equity | 46,106,489 | 35,664,566 |
| TOTAL LIABILITIES AND OWNERS' EQUITY | $ 84,979,244 | $ 61,195,270 |

The accompanying notes are an integral part of these combined financial statements.

F-73

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF INCOME AND CHANGES IN OWNERS' EQUITY**

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Net sales | $ 312,608,528 | $ 219,333,461 |
| Cost of sales | 247,379,397 | 176,771,632 |
| Gross Profit | 65,229,131 | 42,561,829 |
| Operating Expenses | | |
| Personnel | 13,563,628 | 10,919,298 |
| Advertising | 9,164,242 | 5,073,731 |
| Bank and credit card fees | 12,361,428 | 9,413,611 |
| Depreciation and amortization | 782,773 | 553,357 |
| General and administrative | 9,949,762 | 7,095,979 |
| Total Operating Expenses | 45,821,833 | 33,055,976 |
| INCOME FROM OPERATIONS | 19,407,298 | 9,505,853 |
| Other Income (Expense) | | |
| Other income | 1,336,115 | 1,880,282 |
| Other expense | (663,674) | (247,539) |
| Total Other Income (Expense) | 672,441 | 1,632,743 |
| NET INCOME | $ 20,079,739 | $ 11,138,596 |
| | | |
| OWNERS' EQUITY – Beginning | $ 35,664,566 | $ 25,844,519 |
| Distributions paid | (9,637,816) | (1,318,549) |
| OWNERS' EQUITY – Ending | $ 46,106,489 | $ 35,664,566 |

The accompanying notes are an integral part of these combined financial statements.

F-74

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF CASH FLOWS**

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net income | $ 20,079,739 | $ 11,138,596 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 782,773 | 553,357 |
| Change in inventory reserves | 275,646 | 108,727 |
| Gain on disposition of assets | (28,633) | — |
| Operating lease right-of-use assets | 1,442,621 | 1,133,031 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (5,674,584) | (1,611,014) |
| Deposits with vendors | (9,728,097) | (3,236,141) |
| Inventory | (577,353) | (3,934,936) |
| Prepaid expenses and other current assets | (40,857) | (138,760) |
| Accounts payable and accrued expenses | 5,959,575 | 6,768,230 |
| Customer deposits | 5,611,683 | (7,612,046) |
| Operating lease liabilities | (1,363,066) | (1,081,172) |
| Other assets | (144,528 | — |
| Due from related parties | — | 37,333 |
| Net cash provided by operating activities | 16,594,919 | 2,125,205 |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Proceeds from disposal of assets | 33,444 | — |
| Purchases of property and equipment | (30,834) | (68,636) |
| Net cash provided by (used in) investing activities | 2,610 | (68,636) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Proceeds from notes payable | 2,309,591 | — |
| Repayments on notes payable | (318,457) | (241,647) |
| Repayments of financing lease liabilities | (19,978) | (17,763) |
| Distributions paid | (9,637,816) | (1,318,549) |
| Net cash used in financing activities | (7,666,660) | (1,577,959) |
| | | |
| NET CHANGE IN CASH IN CASH AND CASH EQUIVALENTS | 8,930,869 | 478,610 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | 5,912,043 | 5,433,433 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $ 14,842,912 | $ 5,912,043 |
| | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash paid for interest | $ 56,876 | $ 54,213 |
| Non-cash investing and financing activities: | | |
| Financed purchases of property and equipment | $ 1,180,711 | $ 398,698 |
| Operating lease right-of-use asset and liability | $ — | $ 3,245,290 |

The accompanying notes are an integral part of these combined financial statements.

F-75

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 1 — ORGANIZATION AND NATURE OF BUSINESS**

1 Stop Electronics Center, Inc. was formed under the laws of the State of New York on February 2, 2000. YF Logistics LLC was formed under the laws of the State of New Jersey on January 24, 2014. Gold Coast Appliances, Inc. was formed under the laws of the State of New York on February 11, 2015. Joe's Appliances LLC was formed under the laws of the State of New York on November 9, 2018. Superior Deals Inc. was formed under the laws of the State of New York on September 21, 2020. The entities collectively do business as Appliances Connection and are referred to throughout as "the Company."

Founded in 2000, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, NJ and a 23,000 square foot showroom in Brooklyn, New York. Appliances Connection carries many household name brands, including Bosch, GE, Frigidaire, Whirlpool, LG, and Samsung, and also carries many major luxury appliance brands such as Verona, Thermador, La Cornue, Dacor, Smeg, and Viking. Appliances Connection provides appliance installation services and old appliance removal services. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients.

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation*

The combined financial statements of the Company have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars. All intercompany transactions have been eliminated. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with the original maturities of three months or less to be cash equivalents. At December 31, 2020 and 2019, the Company had $12,203,949 and $3,914,525, respectively, in its domestic accounts in excess of Federal Deposit Insurance Corporation ("FDIC") insured limits. No losses have been incurred by the Company as a result of such excesses of FDIC limits.

*Use of Estimates*

The preparation of combined financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Revenue Recognition and Cost of Revenue*

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. This ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. This ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments. The Company's adoption of this ASU resulted in no change to the Company's results of operations or balance sheet.

Appliances Connection collects 100 percent of the payment for internet and phone orders, including tax in certain jurisdictions, from the customer at the time the order is placed. Customers placing orders with a purchase order are

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

allowed to purchase on credit and make payment after receipt of product. Appliances Connection does not incur incremental costs obtaining purchase orders from customers; however, if Appliances Connection did, because all Appliances Connection's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

Performance Obligations — The revenue that Appliances Connection recognizes arises from orders it receives from contracts with customers. Appliances Connection's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers and each order generally contains only one performance obligation based on the merchandise sale to be completed. Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, Appliances Connection's products, which generally occurs when the customer assumes the risk of loss. The transfer of control generally occurs at the point of pickup, shipment, or installation, depending on the type of order. Once this occurs, Appliances Connection has satisfied its performance obligation and Appliances Connection's recognizes revenue.

Transaction Price — Appliances Connection agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In Appliances Connection's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax that Appliances Connection collects concurrently with revenue-producing activities are excluded from revenue.

Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendor to the company.

Substantially all Appliances Connection's sales are to individual retail consumers (homeowners), builders, and designers. The large majority of customers are homeowners and their contractors, with the homeowner being key in the final decisions. The Company has a diverse customer base with no one customer accounting for more than five percent of total revenue.

### *Receivables*

Receivables consists of customer's balance payments for which the Company extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom the Company purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

The Company historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. The Company had no significant concentrations of receivables balances as of December 31, 2020 and 2019.

### *Inventory*

Inventory mainly consists of finished goods acquired for resale and is valued at the average cost determined on a specific item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on estimate of its ability to sell the item as well as general market conditions. Based on these evaluations, the Company determined an obsolescence allowance of $550,101 and $274,455 was needed at December 31, 2020 and 2019, respectively.

F-77

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

| | Useful Life (Years) |
|---|---|
| Furniture and fixtures | 7 |
| Transportation equipment | 5 |
| Machinery and equipment | 5 – 7 |
| Office equipment | 5 – 7 |
| Leasehold improvements | Shorter of lease term of estimated useful life |

*Intangible Assets*

At December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of capitalized web development costs which are being amortized over their estimated useful lives of three years.

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of October 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. No impairment of intangible assets was recognized as of and for the years ended December 31, 2020 and 2019.

*Long-lived Assets*

The Company reviews its property and equipment and any identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management if triggering events occur. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Lease Liabilities*

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

***Impact of COVID-19***

In December 2019, a novel strain of coronavirus ("COVID-19") emerged in China. On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. The extent of the COVID-19 pandemic's continued effect on our operational and financial performance and those of third parties on which the Company relies will depend on future developments, including the duration, spread and intensity of the outbreak, the pace at which jurisdictions across the country re-open and restrictions begin to lift. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change. The Company does not yet know the full extent of potential impacts on its business and financing. However, these effects could have a material impact on the Company's liquidity, capital resources, operations and business and those of the third parties on which the Company relies.

***Proposed Acquisition***

On October 20, 2020, the Company entered into a Securities Purchase Agreement, which was amended on December 8, 2020 (as amended, the "Purchase Agreement") with 1847 Goedeker Inc. ("Goedeker"), Appliances Connection Inc., a wholly owned subsidiary of Goedeker (the "Buyer") and the holders of all of the equity interests of the Company (the "Sellers"), pursuant to which the Buyer agreed to acquire all of the issued and outstanding capital stock or other equity interests of the Company from the Sellers for an aggregate purchase price of $210,000,000, subject to adjustment, consisting of (i) $168,000,000 in cash (the "Cash Portion"), (ii) 1,222,239 shares of Goedeker's common stock and 1,111,094 shares of Goedeker's series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of Goedeker's series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of Goedeker's common stock (as reported on the NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the transaction; provided, that if Goedeker has obtained stockholder approval prior to closing, then Goedeker will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock.

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the Sellers shall deliver to the Buyer at least one day prior to the closing of the acquisition a statement setting forth its good faith estimate of the net working capital of the Company (the "Estimated Closing Net Working Capital"). If the Estimated Closing Net Working Capital exceeds the Target Net Working Capital, then within 5 days the Buyer shall make a cash payment to the Sellers that is equal to such excess. If the Target Net Working Capital exceeds the Estimated Closing Net Working Capital, then either (i) if finally determined at the closing, the Cash Portion shall be decreased by such excess or (ii) within 5 days of the closing, the Sellers shall make a cash payment to the Buyer that is equal to such excess. "Target Net Working Capital" is defined in the Purchase Agreement as negative $15,476,941.

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the acquisition, the Buyer shall deliver to the Sellers a statement setting forth its calculation of Net Working Capital (the "Closing Net Working Capital"). The "Post-Closing Net Working Capital Adjustment" shall be an amount equal to the Closing Net Working Capital minus the Estimated Closing Net Working Capital. If the Post-Closing Net Working Capital Adjustment is a negative number, then within 5 days the Sellers shall pay to the Buyer in cash an amount equal to the Post-Closing Net Working Capital Adjustment. If the Post-Closing Net Working Capital Adjustment is a positive number, the Buyer shall, within 5 days after the final determination of the Post-Closing Net Working Capital Adjustment, send payment by wire transfer of immediately available funds to the Sellers in an amount equal to the Post-Closing Net Working Capital Adjustment.

The Cash Portion of the purchase price will also be (A) decreased by (i) the amount of any outstanding unpaid indebtedness of the Company (other than trade debt) existing as of the closing date and (ii) any transaction expenses, and (B) increased by the amount of cash or cash equivalents held by, or on the books of, the Company as of the closing date, if any, that is in excess of $850,000.

The Purchase Agreement contains customary representations, warranties and covenants, including a covenant that the Sellers will not compete with the business of 1 Stop as of the closing date for a period of two (2) years following closing.

The Purchase Agreement also contains mutual indemnification for breaches of representations or warranties and failure to perform covenants or obligations contained in the Purchase Agreement. In the case of the indemnification provided by the Sellers with respect to breaches of certain non-fundamental representations and warranties, the Sellers will only become liable for indemnified losses if the amount exceeds an aggregate of $2,100,000, whereupon the Sellers will be liable for all losses relating back to the first dollar, provided that the liability of the Sellers for breaches of certain non-fundamental representations and warranties shall not exceed $21,000,000.

The closing of the Purchase Agreement is subject to customary closing conditions, including, without limitation, the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended; the receipt of all authorizations, consents and approvals of all governmental authorities or agencies; the release of any security interests; the Buyer obtaining the requisite acquisition financing; and delivery of all opinions and documents required for the transfer of the Securities to the Buyer.

In connection with closing of the transaction, the Sellers will enter into a Voting Support and Confidentiality Agreement with the other parties named therein, pursuant to which the parties will agree to vote in favor of the transactions contemplated by the Purchase Agreement and also agreed to certain transfer restrictions on the securities of Goedeker owned by them.

In connection with closing of the transaction, Goedeker will enter into a Lock-Up and Resale Restriction Agreement with the holders names therein, pursuant to which the parties will agree that such holders will not transfer the securities of Goedeker owned by them for a period of 180 days.

***Fair Value of Financial Instruments***

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair

F-80

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

**Sales Tax Liability**

On June 21, 2018, the U.S. Supreme Court issued an opinion in South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018), whereby the longstanding Quill Corp v. North Dakota sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At December 31, 2020 and 2019, the amount of such accrual was $11,700,329 and $6,138,533 respectively, which is included in accounts payable and accrued expenses.

**Income Taxes**

All combined entities have elected to be taxed as an "S Corporation" under the provisions of the Internal Revenue Code and comparable state income tax law. As an S Corporation, the Company is generally not subject to corporate income taxes and the Company's net income or loss is reported on the individual tax return of the stockholder of the Company. Therefore, no provision or liability for income taxes is reflected in the combined financial statements.

Management has evaluated its tax positions and has concluded that the Company had taken no uncertain tax positions that could require adjustment or disclosure in the combined financial statements to comply with provisions set forth in ASC 740, Income Taxes.

**Recent Accounting Pronouncements**

In June 2018, the FASB issued ASU 2018-07, *Compensation — Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for nonemployee share-based payment transactions by expanding the scope of ASC Topic 718, *Compensation — Stock Compensation*, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new standard, most of the guidance on stock compensation payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. This standard became effective for us on January 1, 2019. The adoption of this standard did not have a material impact on the combined financial statements.

In February 2018, the FASB issued ASU 2018-02, *Income Statement — Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*, which allows a reclassification from accumulated other comprehensive income (AOCI) to retained earnings for stranded tax effects resulting from U.S. federal tax legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017 (the "2017 Tax Act"). The adoption of this standard did not have a material impact on the combined financial statements.

In August 2017, the FASB issued ASU 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities*, which expands and refines hedge accounting for both financial and non-financial risk components, aligns the recognition and presentation of the effects of hedging instruments and hedge items in the

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (cont.)

financial statements, and includes certain targeted improvements to ease the application of current guidance related to the assessment of hedge effectiveness. ASU 2017-12 became effective for us on January 1, 2019. The adoption of this standard did not have a material impact on the combined financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles — Goodwill and Other — Internal-Use Software (Subtopic 350-40):    Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods beginning after December 15, 2019, including interim periods within those annual periods. Early adoption is permitted. We adopted ASU 2018-15 on January 1, 2020 on a prospective basis, and do not expect the adoption will result in a material impact for future periods.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820):    Disclosure Framework — Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. We adopted ASU 2018-13 on January 1, 2020 on a prospective basis, and do not expect the adoption will result in a material impact for future periods.

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments — Credit Losses (Topic 326):    Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to its combined financial statements.

**NOTE 3 — RECEIVABLES**

At December 31, 2020 and 2019, receivables consisted of the following:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade receivables from customers | $ 11,831,572 | $ 8,889,916 |
| Credit card receivables in process of collection | 1,716,364 | 724,440 |
| Vendor rebate receivables | 5,844,646 | 4,103,642 |
| Total receivables | $ 19,392,582 | $ 13,717,998 |

F-82

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

## NOTE 4 — DEPOSITS WITH VENDORS

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income. There were no purchase commitments outstanding at December 31, 2020 or 2019.

## NOTE 5 — PROPERTY AND EQUIPMENT

Property and equipment consist of the following at December 31, 2020 and, 2019:

| | December 31, 2020 | | December 31, 2019 |
|---|---:|---|---:|
| Furniture and fixtures | $ 241,469 | $ | 181,593 |
| Transportation equipment | 2,880,673 | | 1,858,185 |
| Leasehold improvements | 870,034 | | 870,034 |
| Machinery and equipment | 205,435 | | 161,828 |
| Office equipment | 92,431 | | 92,431 |
| Total property and equipment | 4,290,042 | | 3,164,071 |
| Less: accumulated depreciation | (2,292,220) | | (1,572,202) |
| Property and equipment, net | $ 1,997,822 | $ | 1,591,869 |

Depreciation expense for the years ended December 31, 2020 and 2019 was $782,773 and $454,014, respectively.

## NOTE 6 — ACCOUNTS PAYABLE AND ACCRUED EXPENSES

The following is schedule of accounts payable and accrued expenses at December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---:|---:|
| Trade accounts payable | $ 7,260,224 | $ 6,910,165 |
| Accrued tax liability | 12,568,110 | 7,632,886 |
| Accrued payroll liabilities | 275,672 | 468,590 |
| Other accrued liabilities | 1,075,969 | 208,759 |
| Total accounts payable and accrued expenses | $ 21,179,975 | $ 15,220,400 |

## NOTE 7 — NOTES PAYABLE

The Company has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased.

Notes payable consist of the following at December 31, 2020 and 2019:

| Lender | Origination Date | Maturity Date | Interest Rate | December 31, 2020 | December 31, 2019 |
|---|---|---|---|---:|---:|
| Ally | 11/16/15 | 11/16/20 | 3.09% | $ — | $ 10,442 |
| Ally | 11/16/15 | 11/16/20 | 3.09% | — | 9,432 |
| Ally | 12/22/15 | 12/21/20 | 3.09% | — | 9,748 |
| Ally | 6/19/16 | 6/19/21 | 3.59% | 5,970 | 24,886 |
| Toyota | 10/31/16 | 10/31/21 | 5.39% | 16,041 | 31,610 |
| Toyota | 10/31/16 | 10/31/21 | 5.39% | — | 39,920 |

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 7 — NOTES PAYABLE** (cont.)

| Lender | Origination Date | Maturity Date | Interest Rate | December 31, 2020 | December 31, 2019 |
|---|---|---|---|---|---|
| Toyota | 12/1/16 | 12/1/21 | 5.39% | 14,616 | 27,372 |
| Ally | 4/19/17 | 4/19/22 | 4.99% | 19,788 | 31,370 |
| Toyota | 7/12/17 | 7/12/22 | 5.39% | 57,754 | 97,121 |
| Hitachi | 10/10/17 | 10/10/22 | 5.40% | 24,007 | 35,290 |
| Hitachi | 10/30/17 | 10/30/22 | 5.40% | 36,377 | 52,498 |
| Hitachi | 10/4/18 | 10/4/23 | 5.49% | 51,611 | 65,140 |
| Hitachi | 9/17/18 | 10/17/23 | 5.49% | 48,615 | 67,042 |
| Toyota | 4/25/19 | 4/25/24 | 5.74% | 120,600 | 154,158 |
| Toyota | 10/7/19 | 10/7/24 | 4.48% | 61,462 | 76,371 |
| Toyota | 12/16/19 | 12/15/24 | 4.52% | 69,730 | 85,618 |
| Toyota | 7/2/20 | 7/1/25 | 5.14% | 267,938 | — |
| Toyota | 2/5/20 | 2/4/25 | 4.52% | 70,458 | — |
| Hitachi | 3/4/20 | 2/28/25 | 4.99% | 147,493 | — |
| Hitachi | 9/1/20 | 8/31/25 | 4.75% | 77,813 | — |
| Toyota | 6/18/20 | 6/17/25 | 4.99% | 262,776 | — |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 77,391 | — |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 87,973 | — |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 89,049 | — |
| Popular Bank | 4/15/20 | 4/15/22 | 1.00% | 1,192,780 | — |
| Popular Bank | 4/27/20 | 4/27/22 | 1.00% | 679,690 | — |
| SBA | 7/25/20 | 10/25/50 | 3.75% | 112,100 | — |
| SBA | 7/20/20 | 10/20/50 | 3.75% | 150,000 | — |
| SBA | 7/25/20 | 10/25/50 | 3.75% | 150,000 | — |
| Toyota | 12/16/20 | 12/16/25 | 3.75% | 79,823 | — |
| Total notes payable | | | | $ 3,971,855 | $ 818,018 |
| Less: current portion | | | | (466,235) | (276,534) |
| Notes payable, net of current portion | | | | $ 3,505,620 | $ 541,484 |

Following is a summary of notes payable payments due for the succeeding five years:

| Year Ending December 31, | Amount |
|---|---|
| 2021 | $ 466,235 |
| 2022 | 2,269,302 |
| 2023 | 355,381 |
| 2024 | 303,025 |
| 2025 | 207,276 |
| Thereafter | 370,636 |
| Total | $ 3,971,855 |

F-84

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 8 — LEASES**

*Financing Leases*

On March 3, 2018, the Company entered in an equipment financing lease to purchase a forklift for $59,326, maturing on March 2, 2023. As of December 31, 2020 and 2019, the balance payable was $33,346 and $44,320, respectively.

On January 23, 2019, the Company entered in an equipment financing lease to purchase a forklift for $55,510, maturing on January 23, 2024. As of December 31, 2020 and 2019, the balance payable was $36,828 and $46,935, respectively.

Following is a summary of payments due on financing leases for the succeeding five years:

| Year Ending December 31, | | Amount |
|---|---|---|
| 2021 | $ | 31,724 |
| 2022 | | 31,724 |
| 2023 | | 18,084 |
| 2024 | | 1,128 |
| 2025 and thereafter | | — |
| Total payments | | 82,660 |
| Less: amount representing interest | | (11,419) |
| Present value of minimum lease payments | $ | 71,241 |

*Operating Leases*

The Company has entered into four lease agreements under which it leases warehouse equipment, and which have been classified as operating leases. The Company leases warehouse, showroom, and office facilities under long-term leases. All the facility leases include fixed rental payments and have been classified as operating leases.

As of December 31, 2020 and 2019, the weighted-average remaining lease term for all operating leases is 2.9 years and 3.9 years, respectively, while the weighted-average remaining lease term for all finance leases is 2.6 years and 3.6 years, respectively.

Because the Company generally does not have access to the rate implicit in operating leases, we utilize our incremental borrowing rate as the discount rate. The weighted average discount rate associated with operating leases as of December 31, 2020 and 2019 is 4.8 percent and 4.8 percent, respectively.

The Company recognizes operating lease expense on a straight-line basis over the lease term. Rental expense under the operating lease for the years ended December 31, 2020 and 2019 were $1,707,095 and $1,319,220, respectively.

Cash payments included in the measurement of our operating lease liabilities for the years ended December 31, 2020 and 2019 were $1,686,170 and $981,720, respectively.

Supplemental balance sheet information related to lease at December 31, 2020 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use asset | $ | 4,646,508 |
| Lease liability, current portion | | 1,517,390 |
| Lease liability, long-term | | 3,279,080 |
| Total operating lease liability | $ | 4,796,470 |
| | | |
| Weighted-average remaining lease term (months) | | 35 |
| | | |
| Weighted average discount rate | | 4.8% |

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 8 — LEASES** (cont.)

Future minimum lease payments under operating leases as of December 31, 2020 (in thousands) were as follows:

| Year Ending December 31, | | Amount |
|---|---|---|
| 2021 | $ | 1,716,503 |
| 2022 | | 1,747,752 |
| 2023 | | 1,404,330 |
| 2024 | | 281,250 |
| 2025 and thereafter | | — |
| Total | $ | 5,149,835 |
| Less imputed interest | | (353,365) |
| Total lease liability | $ | 4,796,470 |

**NOTE 9 — SUPPLIER CONCENTRATION**

Significant customers and suppliers are those that account for greater than ten percent of the Company's revenues and purchases.

In 2020 and 2019, the Company purchased a substantial portion of finished goods from a third-party vendor (75.2% and 70.7%, respectively).

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

**NOTE 10 — RELATED PARTY TRANSACTIONS**

The Company leases four facilities pursuant to lease agreements entered into with four separate entities owned by Albert and Elie Fouerti, the Company's Chief Executive Officer and Vice President, respectively. Albert and Elie Fouerti, directly and indirectly through affiliated trusts, are each a 50 percent owner of 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Joe's Appliances LLC, and YF Logistics LLC. See Note 8 for disclosures of cash payments made and amounts recognized as expense during the years ended December 31, 2020 and 2019 and for disclosure of future minimum lease payments as of December 31, 2020 under these leases.

The Company is a member of Dynamic Marketing, Inc. ("DMI"), an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 5% equity interest in DMI. Additionally, one of the owners of the Company is on the Board of DMI. As such, DMI is deemed to be a related party. At December 31, 2020 and 2019, vendor rebate deposits, net, due from DMI were $31,733,415 and $22,005,318, respectively, and vendor rebates receivable were $4,691,514 and $3,284,594, respectively. During the year ended December 31, 2020, the following transactions were carried out with DMI: total purchases $175,630,820, vendor rebates $8,222,373, interest income $968,080, consulting income $255,000, and rent expense $675,000. During the year ended December 31, 2019, the following transactions were carried out with DMI: total purchases $120,328,645, vendor rebates $3,284,594, interest income $1,428,546, consulting income $188,617, and rent expense $337,500.

Table of Contents

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**NOTES TO COMBINED FINANCIAL STATEMENTS**
**December 31, 2020 and 2019**

**NOTE 11 — SUBSEQUENT EVENTS**

Subsequent to December 31, 2020, the Company was notified by its bank that the application for forgiveness of the Paycheck Protection loans had been approved and that the loans had been fully forgiven, resulting in the recognition of other income of $1,888,174 including principal and interest.

Subsequent to December 31, 2020, the Company paid $9,228,596 in member distributions

F-87

Table of Contents

**91,111,111 Units**

# GOEDEKERS

———————————————

**PROSPECTUS**

———————————————

**ThinkEquity**
**a division of Fordham Financial Management, Inc.**

**May 27, 2021**

# Exhibit 3

EX-10.1 2 ea170694ex10-1_polished.htm SETTLEMENT AGREEMENT, DATED DECEMBER 21, 2022, BETWEEN ALBERT FOUERTI AND POLISHED.COM INC

**Exhibit 10.1**

EXECUTION COPY

CERTAIN IDENTIFIED INFORMATION HAS BEEN EXCLUDED FROM THIS EXHIBIT BECAUSE IT IS BOTH (I) NOT MATERIAL AND (II) THE TYPE THAT THE REGISTRANT NORMALLY TREATS AS PRIVATE AND CONFIDENTIAL.

### SETTLEMENT AND COOPERATION AGREEMENT

This Settlement and Cooperation Agreement (the "Agreement") is entered into as of December 21, 2022 by Albert Fouerti ("Mr. Fouerti") and by Polished.com Inc. f/k/a 1847 Goedeker Inc. ("Polished.com" or the "Company", and together with Mr. Fouerti, the "Parties").

WHEREAS, Albert Fouerti served as the Chief Executive Officer ("CEO") of Polished.com from September 1, 2021 until October 14, 2022;

WHEREAS, the Audit Committee of the Board of Directors (the "Board") of Polished.com conducted an internal investigation into issues described in Schedule 1, (the "Audit Committee Investigation"), including expenses incurred for non-business purposes during Mr. Fouerti's time as CEO (the "Expense Issues").

WHEREAS, following the Audit Committee Investigation, the Audit Committee produced key findings, which included findings related to the Expense Issues;

WHEREAS, as of the date hereof, the Parties have determined to come to an agreement with respect to the matters identified in the Audit Committee Investigation; and

NOW THEREFORE, in consideration of the foregoing, and of the promises, covenants, settlement and release terms contained herein below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**1. Payment.** As full and final settlement of the key findings concerning the Expense Issues, Mr. Fouerti will pay Polished.com the total sum of Three Million and Seven Hundred Thousand Dollars ($3,700,000.00) (the "Settlement Amount"). The Settlement Amount will be paid according to the following terms.

a. Within 14 days after the signing of the Agreement, Mr. Fouerti will pay the Settlement Amount to the Company, pursuant to the following instructions:

**WIRE TRANSFER INSTRUCTIONS:**

Bank Name: [***]
Beneficiary Name: [***]
Account Number: [***]
Transit Routing Number: [***]

**2. Mutual Release.**

a. **Release by Mr. Fouerti.** Mr. Fouerti, and on behalf of himself and his heirs and assigns, hereby releases and forever discharges Polished.com, Polished.com's affiliates, and all of its respective directors, officers, employees, agents, insurers, and all other persons acting by, through, under or in concert with Polished.com (the "Polished.com Released Parties"), from and against any and all actions, causes of action, suits, proceedings, debts, expenses, fees, attorney fees, sums of money, accounts, indemnities, liabilities, losses, bills, controversies, agreements, promises, damages, obligations, awards, deficiencies, executions, claims and/or demands, of any type, nature or kind, whether known or unknown, liquidated or unliquidated, matured or unmatured, from the beginning of time through the date of this Agreement. Notwithstanding the generality of the foregoing, nothing herein constitutes a release or waiver by Mr. Fouerti of, or prevents Mr. Fouerti from making or asserting: (i) the enforcement of the obligations contained in this Agreement, (ii) any claim or right Mr. Fouerti may have under COBRA, (iii) any claim or right Mr. Fouerti may have for unemployment insurance benefits or workers' compensation benefits, (iv) any claim to vested benefits under the written terms of any employee benefit plan, (v) any claim that cannot be waived as a matter of law pursuant to federal, state or local law, (vi) any rights to insurance benefits under any directors & officers liability insurance policy maintained by the Company, and/or (vii) any claim for indemnification as an employee, officer or director of the Company under the Company's certificate of incorporation or bylaws.

b. **Release by the Company.** Polished.com hereby releases and forever discharges Mr. Fouerti from and against any and all actions, causes of action, suits, proceedings, debts, expenses, fees, attorney fees, sums of money, accounts, liabilities, losses, bills, controversies, agreements, promises, damages, obligations, awards, deficiencies, executions, claims and/or demands, related to the Audit Committee Investigation. Notwithstanding the foregoing, nothing in this Section 2(b) shall apply to any indemnification claim by Polished.com for any third party or government seeking recovery from Polished.com in connection with any matters identified in the Audit Committee Investigation attributable to Mr. Fouerti's negligence or willful misconduct or any claim against Mr. Fouerti for conduct or additional damages or fines arising from Mr. Fouerti's conduct.

**3. Standstill Provisions.**

a. Mr. Fouerti agree that, from the date of this Agreement until the date that is two years after the date of the next scheduled annual meeting of shareholders (through such time, "Standstill Period"), Mr. Fouerti shall not in any manner:

i. engage in any solicitation of proxies or become a "participant" in a "solicitation" (as such terms are defined in Regulation 14A under the Exchange Act) of proxies (including, without limitation, any solicitation of consents that seeks to call a special meeting of stockholders), in each case, with respect to securities of the Company;

ii. form, join, or in any way knowingly participate in any "group" (within the meaning of Section 13(d)(3) of the Exchange Act) with respect to the shares of Common Stock; *provided, however*, that nothing herein shall limit the ability of an affiliate of Mr. Fouerti to join such a "group" following the execution of this Agreement, so long as any such affiliate agrees to be bound by the terms and conditions of this Agreement;

iii. deposit any shares of Common Stock in any voting trust or subject any shares of Common Stock to any arrangement or agreement with respect to the voting of any shares of Common Stock;

iv. seek or submit, or knowingly encourage any person or entity to seek or submit, nomination(s) in furtherance of a "contested solicitation" for the appointment, election or removal of directors with respect to the Company or seek, or knowingly encourage or take any other action with respect to, the appointment, election or removal of any directors of the Company, in each case in opposition to the recommendation of the Board;

v. seek, alone or in concert with others, representation on the Board;

vi. sell or transfer any shares of the Company other than pursuant to an open market transaction on the New York Stock Exchange, except Mr. Fouerti may sell or transfer shares to a buyer provided buyer enter into a written agreement with the Company to the provisions of this Agreement;

vii. (A) make any proposal for consideration by stockholders at any Applicable Meeting, or solicit the written consents of stockholders in lieu of any annual or special meeting in connection with any proposal, including, for the avoidance of doubt, any election of candidates to the Board if such nomination has not been previously approved by the Board or any proposal to amend the Company's Certificate of Incorporation or By-Laws, (B) make any offer or proposal (with or without conditions) with respect to any merger, tender (or exchange) offer, acquisition, recapitalization, restructuring, disposition or other business combination

involving Mr. Fouerti and the Company, (C) solicit a third party to make an offer or proposal (with or without conditions) with respect to any merger, tender (or exchange) offer, acquisition, recapitalization, restructuring, disposition or other business combination involving the Company, or knowingly publicly encourage, initiate or support any third party in making such an offer or proposal, or (D) call or seek to call a special meeting of stockholders of the Company;

        viii. advise, knowingly encourage, knowingly support or knowingly influence any person or entity with respect to the voting or disposition of any securities of the Company at any Applicable Meeting with respect to the appointment, election or removal of director(s);

2

---

ix. acquire, announce an intention to acquire, offer or propose to acquire, or agree to acquire, by purchase or otherwise, any security of the Company, including any stock, option, warrant, convertible security, stock appreciation right or other similar right (including, without limitation, any put or call option or "swap" transaction) with respect to any security (other than a broad-based market basket or index);

x. submit a formal demand to inspect a copy of any books and records of the Company under the Delaware General Corporation Law or any equivalent state or federal law; or

xi. make any request or submit any proposal to amend the terms of this Agreement other than through non-public communication with the Company's management or the Board that would not be reasonably expected to trigger an obligation for any Party to publicly disclose such communication.

**4. <u>Non-Compete and Non-Solicitation.</u>**

a. Mr. Fouerti acknowledges that: (i) he is one of the limited number of persons who assisted with developing the current business of the Company, which involves the wholesale and retail sale of home goods and appliances pursuant to an e-commerce platform (the "Company's Current Lines of Business"); (ii) the Company and its affiliates conduct business nationwide; (iii) his work for the Company brought him into close contact with many confidential affairs not readily available to the public; and (iv) the covenants contained in this Section 4 will not involve a substantial hardship upon his future livelihood. In order to induce the Company to enter into this Agreement, the Mr. Fouerti covenants and agrees that:

i. **Noncompetition.** For two years subsequent to the execution of this Settlement Agreement (the "Restricted Period"), the Mr. Fouerti shall not, in those states in the United States of America in which either the Company or any of its Subsidiaries or affiliates then operates within the Company's Current Lines of Business, directly or indirectly, (i) in any manner whatsoever engage in any capacity with any business that is competitive with the Company's Current Lines of Business for the Mr. Fouerti's own benefit or for the benefit of any person or entity other than the Company or affiliate of the Company; or (ii) have any interest as owner, sole proprietor, shareholder, partner, lender, director, officer, manager, employee, consultant, agent or otherwise in any business that operates within the Company's Current Lines of Business; provided, however, that the Mr. Fouerti may hold, directly or indirectly, solely as an investment, not more than two percent (2%) of the outstanding securities of any person or entity which are listed on any national securities exchange or regularly traded in the over-the-counter market notwithstanding the fact that such person or entity is engaged in a business competitive with the Company's Current Lines of Business. In addition, during the Restricted Period, if Mr. Fouerti develops any property for use in the Company's Current Lines of Business, he shall offer the Company an exclusive right of first refusal to acquire such property.

ii. **Employees of and Consultants to the Company.** During the Restricted Period, Mr. Fouerti shall not, directly or indirectly (other than in furtherance of the business of the Company), initiate communications with, solicit, persuade, entice, induce or encourage any individual who is then or who has been within the preceding 12-month period, an employee of or consultant to the Company or any of its affiliates to terminate employment with, or a consulting relationship with, the Company or such affiliate, as the case may be, or to become employed by or enter into a contract or other agreement with any other person, and Mr. Fouerti shall not approach any such employee or consultant for any such purpose or authorize or knowingly approve the taking of any such actions by any other person.

iii. **Solicitation of Customers.** During the Restricted Period, Mr. Fouerti shall not, knowingly directly or indirectly, initiate communications with, solicit, persuade, entice, induce, encourage (or assist in connection with any of the foregoing) any person who is then or has been within the preceding 12-month period a customer or account of the Company or its affiliates, or any actual customer leads whose identity Mr. Fouerti learned during the course of his employment with the Company, to terminate or to adversely alter its contractual or other relationship with the Company or its affiliates.

b. **Incorporated Provisions.** Mr. Fouerti acknowledges that any restrictions to which he was bound regarding Confidential Information, including, without limitation, those contained in the June 2, 2021 employment agreement between the parties, remain enforceable pursuant to their terms. Mr. Fouerti acknowledges and agrees that he has been in compliance with such terms at all times hereto.

c. **Injunctive Relief.** If the Executive breaches any of the provisions of Section 4(a) hereof (collectively, the "Restrictive Covenants"), the Company and its affiliates shall, in addition any rights maintained by law, have the right and remedy to seek from any court of competent jurisdiction specific performance of the Restrictive Covenants or injunctive relief against any act which would

violate any of the Restrictive Covenants, it being acknowledged and agreed that any such breach may cause irreparable injury to the Company and its affiliates and that money damages will not provide an adequate remedy to the Company and its affiliates.

    d. **Severability of Covenants.** If any of the Restrictive Covenants, or any part thereof, is held by a court of competent jurisdiction or any foreign, federal, state, county or local government or other governmental, regulatory or administrative agency or authority to be invalid, void, unenforceable or against public policy for any reason, the remainder of the Restrictive Covenants shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and such court, government, agency or authority shall be empowered to substitute, to the extent enforceable, provisions similar thereto or other provisions so as to provide to the Company and its affiliates, to the fullest extent permitted by applicable law, the benefits intended by such provisions.

3

**5. No Litigation.** During the longer of the Standstill Period or any applicable statute of limitations, Mr. Fouerti hereby covenants and agrees that he shall not, and shall not permit any of his respective agents, Affiliates, representatives, alone or in concert with others, knowingly encourage, pursue or assist any other person to institute, solicit, assist or join, as a party, any litigation, arbitration or other proceeding against Polished.com or any of its agents, subsidiaries, Affiliates, officers, key employees or current or former directors or officers (including derivative actions), except for any action to enforce the provisions of this Agreement.

**6. Return of Fouerti Property.** Within ten (10) calendar days after execution of this Agreement, the Company shall (a) promptly deliver to Mr. Fouerti all physical hard drives provided by Mr. Fouerti, and (b) destroy all personal information of Mr. Fouerti which bears no relation to the Company or the Company's operations, prepared or generated by the Company based upon the foregoing physical hard drives without retaining a copy of any such material.

**7. Indemnification.** Mr. Fouerti agrees to indemnify and hold harmless the Polished.com Released Parties from and against any and all damages, losses, expenses, costs, claims or liabilities arising from any and all actions, causes of action, suits, proceedings, allegations, and investigations made by any individuals or governmental authorities relating to any of the matters identified in the Audit Committee Investigation attributable to Mr. Fouerti's gross negligence or willful misconduct during his employment by the Company.

**8. Agreement to Vote.** For a term of two years after the date of the next scheduled annual meeting of shareholders, Mr. Fouerti agrees to vote in accordance with the recommendations of Polished.com management and/or Board with respect to any Company business decision requiring or soliciting a vote, except with respect to a business decision that would disadvantage Mr. Fouerti relative to any other common stockholder.

**9. Cooperation.**

a. As part of the consideration for this Settlement, Mr. Fouerti agrees to provide full assistance to Polished.com with respect to any potential, current, or future claims or actions against Polished.com by any individuals and/or any governmental authorities based in part or entirely on the subject matters of the Audit Committee Investigation, and/or any investigations, actions, causes of action, suits, and/or proceedings related to the subject matters of the Audit Committee Investigation, and/or any other matter during Mr. Fouerti's employment and/or service on the Board, and/or the issues raised in connection with pending shareholder litigation in the United States District Court for the Eastern District of New York, and in connection with Polished.com's audits for the 2021 fiscal year end, interim periods and any periods subject to potential restatement.

b. Subject to the terms of the Mutual Release set forth in paragraph 2, the Company shall provide indemnification in accordance with Article 6 of the Company's Amended and Restated Bylaws dated July 20, 2022 and/or certificate of incorporation.

**10. Expenses.** Subject to the provisions in paragraphs 1, 2, and 6, the Parties will bear their own respective costs, expenses, and attorneys' fees in connection with the subject matters addressed by the Audit Committee Investigation and related to the enforcement of any of the covenants contained in this Agreement.

**11. Applicable Law.** This Agreement and any disputes arising from or relating to the Agreement, shall be governed, construed, and enforced under the laws of the State of New York, without regard to its conflicts of law principles.

**12. Non-disparagement.** Unless otherwise required by law, each of the Parties shall refrain from making, and the Company shall cause its directors and officers and each of the Parties shall cause their respective agents, successors, and assigns not to, directly or indirectly, in any capacity or manner, make, express, transmit, speak, write, verbalize or otherwise communicate in any way (or cause, further, assist, solicit, encourage, support or participate in any of the foregoing), any remark, comment, message, information, declaration, communication or other statement of any kind, whether verbal, in writing, electronically transferred or otherwise, that might reasonably be construed to be derogatory of (a) in the case of statements, communications or announcements by Mr. Fouerti or any of his affiliates described above, the Polished.com Released Parties, or (b) in the case of statements, communications or announcements by the Company or any of its affiliates described above, Mr. Fouerti or his agents, successors, and assigns. The Parties agree and acknowledge that this non-disparagement provision is a material term of this Agreement, the absence of which would have resulted each Party refusing to enter into this Agreement. The Parties acknowledge that any breach of this Paragraph shall constitute a material breach of this Agreement for which they shall be liable, not only for actual damages, but also for attorneys' fees.

4

13. **Information Disparity.** Mr. Fouerti acknowledges that the Company is in possession of information about the Company and its securities (which may include material non-public information) that may or may not be material or superior to information available to Mr. Fouerti, and Mr. Fouerti has freely entered into this agreement with knowledge of this potential informational disparity.

14. **Notice.**

a.  Any notice or writing required under this Agreement to be provided to the Company shall be sent by overnight delivery and e-mail to:

Ellery W. Roberts
Executive Chairman, Polished.com
1870 Bath Avenue
Brooklyn, NY 11214
Email: eroberts@1847holdings.com

Robert Cohen, Esq.
Timothy Hoeffner, Esq.
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017
Email: rcohen@mwe.com
Email: thoeffner@mwe.com

b.  Any notice or writing required under this Agreement to be provided to Mr. Fouerti shall be sent by overnight delivery and e-mail to:

Albert Fouerti
[***]
[***]
Email: [***]

With required copies (which shall not constitute notice) to:

Joseph E. Wolfson, Esq.
Stevens & Lee, P.C.
1500 Market Street, East Tower
18th Floor
Philadelphia, PA 19102
Email: joseph.wolfson@stevenslee.com

Zach Intrater, Esq.
Brafman & Associates, P.C.
256 5th Avenue, 2nd Floor
New York, NY 10001
Email: zintrater@braflaw.com

15. **Entirety of Agreement.** This Agreement constitutes the entire agreement and settlement between the Parties with respect to all disputes and controversies related to the Audit Committee Investigation. All prior discussions, negotiations or understandings with respect to the subject matter hereof are canceled and superseded by this Agreement. This Agreement may not be amended except by a writing signed by the signatories to this Agreement.

16. **Execution.** The Parties agree that this Agreement may be executed in one or more counterparts, each of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

5

**17. <u>Representations</u>.** The Parties represent and warrant that: (a) they have had an opportunity to review fully the provisions of the Agreement with attorneys of their choice, as a result of which the parties acknowledge and agree that any rule of law that provides that ambiguities are to be construed against the drafting party shall not be employed in the interpretation of this Agreement; (b) they have entered into this Agreement willingly and voluntarily; and (c) all approvals and authorizations necessary for the effectiveness of this Agreement have been duly obtained.

**18. <u>No Modification or Amendment Except by Writing</u>.** No modification, amendment or waiver of any of the provisions of this Agreement, nor any future representation, promise, or condition in connection with the subject matter hereof shall be binding upon any Party unless made in writing and signed by a duly authorized officer or agent on behalf of each Party.

**19. <u>Captions and Headings, Counterparts, Interpretation</u>.** Captions and section headings used herein are for convenience only and shall not be used in construing it. As used in this Agreement, "persons" includes natural persons, corporations, partnerships, joint ventures and any other entity. Whenever in this Agreement the context so requires, the masculine gender shall be deemed to refer to and include the feminine and neuter, and the singular to refer to and include the plural.

**20. <u>Survival</u>.** All representations, warranties, covenants, agreements and acknowledgments made by the Parties herein, shall be considered to have been relied upon by the parties hereto and shall survive the execution, performance and delivery of this Agreement and all other documents contemplated herein.

**21. <u>Successors and Assigns</u>.** This Agreement shall inure to the benefit of and be enforceable by the Parties and the Parties' successors, assigns, heirs, legal representatives and transferees, and to the persons released under the releases herein (only for purposes of enforcing the release), and shall be binding upon and enforceable against the Parties. Without limiting the foregoing, no Party may assign its rights, interests or obligations hereunder, without the prior written consent of the other Parties. The Parties represent and warrant that no Party has assigned its claims against the other to any other person or entity.

**22. <u>Counterparts</u>.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. A signature of a Party to this Agreement sent by facsimile, email or other electronic transmission shall be deemed to constitute an original and fully effective signature of such Party.

[SIGNATURES ON NEXT PAGE]

6

Albert Fouerti

/s/ Albert Fouerti
Albert Fouerti, an adult individual

Polished.com Inc. f/k/a 1847 Goedeker Inc.

**By:**    /s/ Robert D. Barry
**Title:** CFO

## SCHEDULE 1

[***]

# Exhibit 4

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: December 31, 2022

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission File No. 001-39418

# Polished.com Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **83-3713938** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1870 Bath Avenue, Brooklyn, NY** | **11214** |
| (Address of principal executive offices) | (Zip code) |

**800-299-9470**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.0001 per share | POL | NYSE American LLC |
| Warrants to Purchase Common Stock | POL WS | NYSE American LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☐ No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the common stock held by non-affiliates of the registrant was approximately $47.3 million computed by reference to the closing sale price of the common stock on the New York Stock Exchange on June 30, 2022, the last trading day of the registrant's most recently

completed second fiscal quarter.

As of July 26, 2023, there were a total of 105,386,867 shares of the registrant's common stock issued and outstanding.

**Polished.com Inc.**

**Annual Report on Form 10-K**
**Year Ended December 31, 2022**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **PART I** | | |
| ITEM 1. | BUSINESS | 1 |
| ITEM 1A. | RISK FACTORS | 8 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 27 |
| ITEM 2. | PROPERTIES | 27 |
| ITEM 3. | LEGAL PROCEEDINGS | 28 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 29 |
| **PART II** | | |
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 30 |
| ITEM 6. | [RESERVED] | 30 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 31 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 63 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 63 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 64 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 64 |
| ITEM 9B. | OTHER INFORMATION | 65 |
| ITEM 9C. | DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 65 |
| **PART III** | | |
| ITEM 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 66 |
| ITEM 11. | EXECUTIVE COMPENSATION | 72 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 77 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 79 |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 82 |
| **PART IV** | | |
| ITEM 15. | EXHIBIT AND FINANCIAL STATEMENT SCHEDULES | 83 |
| ITEM 16. | FORM 10-K SUMMARY | 88 |

**EXPLANATORY NOTE**

Polished.com Inc. (the "Company") is filing this comprehensive annual report on Form 10-K for the fiscal years ended December 31, 2022 and 2021 and the quarterly periods ended March 31, 2022, June 30, 2022, September 30, 2022 and March 31, 2023 (the "Comprehensive Form 10-K") as part of its efforts to become current in its filing obligations under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Although we have regularly made filings through current reports on Form 8-K when deemed appropriate, this Comprehensive Form 10-K is our first periodic filing with the Securities and Exchange Commission (the "SEC") since the filing of our quarterly report on Form 10-Q for the quarter ended March 31, 2022 as a result of the matters related to investigation described in this Annual Report under the heading "*Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operation – Investigation*". As a result of the foregoing, our former auditor withdrew its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declined to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively. Included in this Comprehensive Form 10-K are our audited financial statements for the fiscal year ended December 31, 2022, and our select, unaudited quarterly financial information for the periods ended June 30, 2022, September 30, 2022 and March 31, 2023, in each case which have not been previously filed with the SEC.

In addition, the Comprehensive Form 10-K also restates the Company's previously issued consolidated financial statements as of and for the fiscal year ended December 31, 2021 (see Note 2, "*Summary of Significant Accounting Policies – Restatement*," in "*Item 8 Financial Statements and Supplementary Data*", for additional information), which have been re-audited by our new independent registered public accounting firm, Sadler, Gibb & Associates, LLC. See Item 9. Changes In and Disagreements with Accountants on Accounting and Financial Disclosure. The relevant unaudited interim financial information for the period ended March 31, 2022 has also been restated. See Note 2, "*Summary of Significant Accounting Policies – Restatement*," in "*Item 8 Financial Statements and Supplementary Data*", for such restated information.

The impact of the restatement is discussed in detail in this Annual Report under the headings "Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operation – Investigation."

**Control Considerations**

Management has determined that the Company's ineffective internal control over financial reporting and resulting material weaknesses were attributed to: the Company's lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls; ineffective assessment and identification of changes in risk impacting internal control over financial reporting; inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures; ineffective evaluation and determination as to whether the components of internal control were present and functioning; and the lack of an accounting system that is required for a company or our size. See Item 9A, Controls and Procedures, for additional information related to these material weaknesses in internal control over financial reporting and the related remedial measures.

**INTRODUCTORY NOTES**

**Use of Terms**

Except as otherwise indicated by the context and for the purposes of this Annual Report on Form 10-K, the terms "Company," "we," "us," or "our" refer to Polished.com Inc., a Delaware corporation, and its consolidated subsidiaries, including but not limited to, 1 Stop Electronics Center, Inc., a New York corporation ("1 Stop"), Gold Coast Appliances, Inc., a New York corporation ("Gold Coast"), Superior Deals Inc., a New York corporation ("Superior Deals"), Joe's Appliances LLC, a New York limited liability company ("Joe's Appliances"), and YF Logistics LLC, a New Jersey limited liability company ("YF Logistics" and together with 1 Stop, Gold Coast, Superior Deals, and Joe's Appliances, "Appliances Connection"), and AC Gallery Inc., a Delaware corporation ("AC Gallery").

**Cautionary Statement Regarding Forward-Looking Statements**

This report contains forward-looking statements that are based on our management's beliefs and assumptions and on information currently available to us. All statements other than statements of historical facts are forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- delinquency in connection with the filing of our ongoing SEC reports and the risk that the SEC will initiate an administrative proceeding to suspend or revoke the registration of our common stock under the Exchange Act due to our previous failure to file such reports or of the NYSE American to delist our stock from the exchange;

- cybersecurity or data security breaches such as the hacking attack we disclosed in May 2023, the improper disclosure of confidential, personal or proprietary data and changes to laws and regulations governing cybersecurity and data privacy, including any related costs, fines or lawsuits, and our ability to continue ongoing operations and safeguard the integrity of our information technology infrastructure, data, and employee, customer and vendor information;

- our ability to acquire new customers and sustain and/or manage our growth;

- the effect of supply chain delays and disruptions on our operations and financial condition;

- our goals and strategies;

- the identification of material weaknesses in our internal control over financial reporting and disclosure controls and procedures that, if not corrected, could affect the reliability of our consolidated financial statements and have other adverse consequences such as a failure to meet reporting obligations;

- our future business development, financial condition and results of operations;

- expected changes in our revenue, costs or expenditures;

- growth of and competition trends in our industry;

- our expectations regarding demand for, and market acceptance of, our products;

- our expectations regarding our relationships with investors, institutional funding partners and other parties we collaborate with;

- fluctuations in general economic and business conditions in the markets in which we operate; and

- relevant government policies and regulations relating to our industry.

In some cases, you can identify forward-looking statements by terms such as "may," "could," "will," "should," "would," "expect," "plan," "intend," "anticipate," "believe," "estimate," "predict," "potential," "project" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions. You should not place undue reliance on forward-looking statements because they involve known and unknown risks, uncertainties and other factors, which are, in some cases, beyond our control and which could materially affect results. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under Item 1A "*Risk Factors*" and elsewhere in this report. If one or more of these risks or uncertainties occur, or if our underlying assumptions prove to be incorrect, actual events or results may vary significantly from those implied or projected by the forward-looking statements. No forward-looking statement is a guarantee of future performance.

The forward-looking statements made in this report relate only to events or information as of the date on which the statements are made in this report. Except as expressly required by the federal securities laws, there is no undertaking to publicly update or revise any forward-looking statements, whether as a result of new information, future events, changed circumstances or any other reason.

**Risk Factors Summary**

We are subject to a variety of risks and uncertainties that could adversely affect our business, financial condition and operating results. These risks are discussed in more detail under "*Risk Factors*" in Item 1A of this report, but are not limited to, risks related to:

*Risks Related to Our Business and Industry*

- Prior to the filing of this annual report on Form 10-K, we have been delinquent in our SEC reporting obligations for over 12 months. Although we expect to file our periodic reports in a timely fashion going forward, we cannot provide assurance that our business and the price of our common stock will not be materially adversely affected by our previous failure to file required periodic reports.

- The Investigation and subsequent restatement of our financial statements has consumed a significant amount of our time and resources and may lead to, among other things, shareholder litigation, loss of investor confidence, negative impacts on our stock price, a material adverse effect on our reputation, business and stock price and certain other risks.

- Macroeconomic trends including inflation and rising interest rates may adversely affect our financial condition and results of operations.

- Our continued revenue growth will depend upon, among other factors, our ability to acquire more customers, build our brands and launch new brands, introduce new products or offerings and improve existing products, and successfully compete in the products and services retail industry, especially in the e-commerce sector.

- Our business model and growth strategy depend on our marketing efforts and ability to maintain our brand and attract customers to our platform in a cost-effective manner, including our ability to develop new features to enhance the consumer experience on our websites, mobile-optimized websites and mobile applications, which we collectively refer to as our "sites."

- We may be unsuccessful in launching or marketing new products or services, or launching existing products and services into new markets, or may be unable to successfully integrate new offerings into our existing platform, which would result in significant expense and could adversely affect our results.

- We have experienced rapid growth since inception, which may not be indicative of future growth, and, if we continue to grow rapidly, we may experience difficulties in managing our growth and expanding our operations and service offerings.

- We depend on our relationships with third parties, and changes in our relationships with these parties could adversely affect our revenues and profits. We may be unable to expand our relationships with existing suppliers or source new or additional suppliers, negotiate acceptable pricing and other terms with third-party service providers, suppliers and outsourcing partners and maintain our relationships with such entities.

- Our suppliers have imposed conditions in our business arrangements with them. If we are unable to continue satisfying these conditions, or such suppliers impose additional restrictions with which we cannot comply, it could have a material adverse effect on our business.

- We may be unable to optimize, operate and manage the expansion of the capacity of our fulfillment centers, and our plans to expand capacity and develop new facilities may be adversely affected by global events.

- Our business is dependent upon our ability to acquire, accurately value and manage inventory.

- If we fail to maintain adequate cybersecurity with respect to our systems and ensure that our third-party service providers do the same with respect to their systems, our business may be harmed.

- Our internal information technology systems may fail or suffer security breaches, loss or leakage of data, and other disruptions, which could disrupt our business or result in the loss of critical and confidential information.

- Our limited operating history makes it difficult to evaluate our current business and future prospects and the risk of your investment.

- Certain of our directors and officers could be in a position of conflict of interest.

- We have identified a material weakness in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, which may result in material misstatements of our financial statements or cause us to fail to meet our reporting obligations or fail to prevent fraud, which would harm our business and could negatively impact the price of our common stock.

- Our business, financial condition and results of operations could be adversely affected by disruptions in the global economy resulting from the ongoing military conflict between Russia and Ukraine.

- The ongoing global COVID-19 pandemic and any future pandemics or other public health emergencies, could materially affect our operations, liquidity, financial condition and operating results.

*Risks Related to Our Indebtedness and Liquidity*

- If we require additional financing to fuel our continued business growth, this additional financing may not be available on reasonable terms or at all.

- Our current debt and our ability to increase future leverage could limit our operating flexibility and ability to grow, and adversely affect our financial condition and cash flows.

*Risks Related to Laws and Regulations*

- Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with existing or future regulations in a cost-efficient manner could substantially harm our business and results of operations.

- Failure to comply with applicable laws and regulations relating to privacy, data protection and consumer protection, or the expansion of current or the enactment of new laws or regulations relating to privacy, data protection and consumer protection, could adversely affect our business and our financial condition.

- We may be subject to product liability and other similar claims if people or property are harmed by the products we sell. The market price, trading volume and marketability of our common stock may, from time to time, be significantly affected by numerous factors beyond our control, which may materially adversely affect the market price of our common stock, the marketability of our common stock and our ability to raise capital through future equity financings.

*Risks Related to Ownership of Our Common Stock*

- We have a limited number of shares of common stock available for issuance, which may limit our ability to raise capital.

- We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future.

- For as long as we are an "emerging growth company," or a "smaller reporting company" we will not be required to comply with certain reporting requirements that apply to some other public companies, and such reduced disclosures requirement may make our common stock less attractive.

- We may not be able to maintain a listing of our common stock and warrants on NYSE American.

**PART I**

**ITEM 1. BUSINESS.**

**Overview**

Our Company is a content-driven and technology-enabled shopping destination for appliances, furniture and home goods.

Our goal is to give customers a wide array of choices and a premium experience through detail on the best brands, volume purchasing, and rebates with manufacturer discounts, supported by human customer service agents.

**Corporate History and Structure**

Our Company was incorporated in the State of Delaware on January 10, 2019, to form an acquisition platform. In April 2019, we acquired substantially all of the assets of Goedeker Television, a brick and mortar operation with an online presence serving the St. Louis metro area. Since that acquisition, we have grown into a nationwide omnichannel retailer. Through our June 2021 acquisition of Appliances Connection, we have evolved into a growth-oriented e-commerce platform, offering an expansive selection of household appliances throughout the United States. In July 2021, we added to our platform by acquiring Appliances Gallery. On July 20, 2022, we changed our corporate name from 1847 Goedeker Inc. to Polished.com Inc. With warehouse fulfillment centers in the Northeast and Midwest, as well as showrooms in Brooklyn, New York, Largo, Florida and St. Louis, Missouri, we offer one-stop shopping for national and global brands. We carry many household name-brands, including Bosch, Cafe, Frigidaire Pro, Whirlpool, LG, and Samsung, and many major luxury appliance brands such as Miele, Thermador, La Cornue, Dacor, Ilve, Jenn-Air and Viking, among others. We also sell furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients.

*Key Acquisitions*

*Acquisition of Goedeker Television*

On April 5, 2019, we acquired substantially all of the assets of Goedeker Television (the "Goedeker Television Acquisition"). As a result of this transaction, we acquired the former business of Goedeker Television, which was founded in 1951, and continue to operate this business. Prior to the Goedeker Television Acquisition, we had no operations other than operations relating to our incorporation and organization.

*Acquisition of Appliances Connection*

Appliances Connection was founded in 1998 and is one of the leading retailers of household appliances. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial-grade appliances for builder and business clients. It also provides appliance installation services and appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other businesses. We completed the acquisition of Appliances Connection on June 2, 2021, for an aggregate purchase price of $224.7 million, consisting of (i) $180.0 million in cash, (ii) 5,895,973 shares of the Company's common stock valued at $12.3 million, and (iii) $32.4 million as a result of the post-closing net working capital adjustment provision (such acquisition, the "Appliances Connection Acquisition"). We recorded $0.9 million in acquisition-related expenses.

*Acquisition of AC Gallery*

On July 29, 2021, we acquired substantially all of the assets of, and assumed substantially all of the liabilities of, Appliance Gallery, Inc., a retail appliance store in Largo, Florida ("Appliance Gallery"), for a total purchase price of $1.4 million (such acquisition, the "Appliance Gallery Acquisition").

*Name Change*

On July 20, 2022, we changed our corporate name from 1847 Goedeker Inc. to Polished.com Inc., pursuant to a Certificate of Amendment to the Amended and Restated Certificate of Incorporation (the "Certificate of Amendment") filed with the Delaware Secretary of State on July 20, 2022 (the "Name Change"). Pursuant to Delaware law, a shareholder vote was not necessary to effectuate the Name Change and the Name Change does not affect the rights of the Company's stockholders. The only change in the Certificate of Amendment was the change of the Company's corporate name. We also amended and restated our Bylaws on July 20, 2022 to reflect the Name Change and to make other minor cleanup and conforming changes thereto.

In connection with the Name Change, our common stock and warrants to purchase common stock ceased trading under the ticker symbols "GOED" and "GOED WS," respectively, and began trading on the NYSE American under the new ticker symbols "POL" and "POL WS," respectively.

1

*Investigation*

On August 15, 2022, the Company filed a Form 12b-25 with the Securities and Exchange Commission related to its 10-Q for the six months ended June 30, 2022 reporting that the Audit Committee had begun an independent investigation regarding certain allegations made by certain former employees related to the Company's business operations.

On December 22, 2022, the Company issued a press release stating that the Board had completed its assessment of the results of the Audit Committee's previously disclosed investigation. The investigation, which was supported by independent legal counsel and advisors, produced the following key findings pertaining to the Company's business operations under former management during the 2021-2022 period:

- The Company was charged by its former Chief Executive Officer approximately $800,000 for expenses unrelated to the Company and its operations.

- The Company appears to not have had in place all the necessary documentation for all of its employees and, in turn, may have failed to comply with certain legal requirements. The Company subsequently put in place enhanced controls to remedy any labor issues, including but not limited to hiring a controller with significant relevant experience, hiring a new human resources director who is leading an overhaul of certain employee policies and initiating the installation of enhanced payroll software that requires all new employees to provide I-9 information and verifies the validity of key information, and believes it is now in full compliance with legal requirements.

- The Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient. The Company subsequently put in place enhanced controls to remedy such issues, including but not limited to initiating the installation of enhanced software and systems for inventory management, ensuring the implementation of standardized policies for the handling and sale of damaged inventory and developing a plan to convert the Company to a new ERP and system for accounting.

The Company entered into a settlement agreement with Albert Fouerti, our former Chief Executive Officer, regarding matters relating to the investigation. Among other things, Mr. Fouerti agreed not to compete for a period of two years following the execution of the settlement agreement.

*Resignation of Auditors*

On December 20, 2022, the Company received a letter (the "Letter") from the Company's independent registered public accounting firm, Friedman LLP ("Friedman"), informing the Company of its decision to resign effective December 20, 2022 as the auditors of the Company.

In the Letter, Friedman advised the Company that based on the results of the Board's internal investigation as reported to Friedman, it appeared there may be material adjustments and/or disclosures necessary to previously reported financial information. Additionally, the Board's internal investigation identified facts, that if further investigated by Friedman, might cause Friedman to no longer to be able to rely on the representations of (i) management that was in place at the time Friedman issued its audit report for the year ended December 31, 2021, or (ii) management that was in place at the time of Friedman's association with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021 and March 31, 2022. Prior to the Letter, in the past two years, the Company had not received from Friedman an adverse opinion or a disclaimer of opinion, and Friedman's opinion was not qualified or modified as to uncertainty, audit scope, or accounting principles. The resignation by Friedman was neither recommended nor approved by the Audit Committee or the Board and there were no disagreements with management and Friedman. Friedman had previously reported a material weakness to the Audit Committee, which was included on the Company's Form 10-K for the year ended December 31, 2021, filed on March 31, 2022, regarding the ineffectiveness of the Company's internal controls over financial reporting.

In connection with the Letter, Friedman advised the Company that it was withdrawing its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declined to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively.

*Engagement of New Independent Registered Public Accounting Firm*

On December 26, 2022, the Audit Committee approved the engagement of Sadler, Gibb & Associates, LLC ("Sadler") as the Company's independent registered public accounting firm for the fiscal years ended December 31, 2022 and 2021.

*Cybersecurity Incident*

On March 16, 2023, we experienced a hacking attack that impacted the check-out page on the Company's e-commerce website. In response, the Company deployed containment measures, launched an investigation with assistance from third-party cybersecurity experts and notified appropriate law enforcement authorities. The Company considers the matter remediated. The investigation determined that certain personal information, including names, addresses, zip codes, payment card numbers, expiration dates, and CVVs, was extracted from the Company's systems as part of this incident. The investigation could not determine with precision which payment card data was included in the timeframe of exposure. Out of an abundance of caution, the Company notified all payment card users who made transactions on the Company's e-commerce website within the window of exposure. As of May 24, 2023, the Company provided appropriate notice to approximately 9,290 individuals, as well as to regulatory authorities in accordance with applicable law. The Company has incurred, and may continue to incur, certain expenses related to this attack. Further, the Company remains subject to risks and uncertainties as a result of the incident, including as a result of the data that was extracted from the Company's network as noted above. Additionally, security and privacy incidents have led to, and may continue to lead to, additional regulatory scrutiny. Although we are unable to predict the full impact of this incident, including how it could negatively impact our operations or results of operations on an ongoing basis, we presently do not expect that it will have a material effect on the Company's operations.

The Company has engaged outside consultants through its outside counsel to help assess and expand the Company's cyber defenses and payment card protections and policies.

**Credit Agreement Amendment**

In July 2023, the Company's lender amended the credit agreement to waive defaults on the May 9, 2022 credit agreement. The amendment establishes a new EBITDA covenant and requires the Company to maintain minimum liquidity of $8 million including restricted cash and $3 million excluding restricted cash. Liquidity as defined in the credit agreement amendment includes cash and certain qualifying customer accounts receivable. The credit agreement amendment requires the Company to pay the existing loan by August 31, 2024. The Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024. See Item 7 "*Management's Discussion and Analysis of Financial Condition and Results of Operations—Debt.*"

**Industry**

The U.S. major home appliances market is highly fragmented with big box retailers, online retailers, and thousands of local and regional retailers competing for share in what has historically been a high touch sale process. According to Statista, revenue in the U.S. major household appliances market (excluding small appliances) is projected to reach $23.2 billion in 2022 and grow at an annual growth rate of 3.08% from 2022 to 2026.

According to the U.S. Census Bureau, there are approximately 76 million households in the United States with annual incomes over $25,000 aged between 25 and 65 years, many of whom are accustomed to purchasing goods online. As younger generations age, start new families and move into new homes, we expect online sales of household appliances to increase. In addition, we believe the online household appliances market will further grow as older generations of consumers become increasingly comfortable purchasing online, particularly if the process is easy and efficient.

**Our Products**

We sell a vast assortment of household appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers. In addition to appliances, we also offer a broad assortment of products in the furniture, décor, bed & bath, lighting, outdoor living, electronics categories, fitness equipment, plumbing fixtures, air conditioners, fireplaces, fans, dehumidifiers, humidifiers, air purifiers and televisions. While these are not individually high-volume categories, they complement the appliance to produce a one-stop home goods offering for customers.

**Vendor/Supplier Relationships**

We offer more than 400 vendors and over 500,000 SKUs available for purchase through our website. We believe that this depth of vendor relationships gives consumers numerous options in all product categories resulting in a true one-stop shopping destination. Our principal vendors and suppliers are Dynamic Marketing Inc (a buying coop), Frigidaire, General Electric, LG, Whirlpool, Bosch, Viking, Miele, Samsung, Fisher Paykel and Ilve.

We are a member and 1.6% equity interest holder of Dynamic Marketing, Inc. ("DMI"), a 60-member appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, who sell such products to end consumers. DMI's purchasing group arrangement provides its members with leverage and purchasing power with appliance vendors, and increases our ability to compete with competitors, including big box appliance and electronics retailers. For the years ended December 31, 2022 and 2021, the Company purchased a substantial portion of finished goods from DMI, representing 69% and 72% of purchases, respectively.

During the year ended December 31, 2022, Dynamic Marketing Inc accounted for approximately 69% of our purchases; no other vendor accounted for more than 10% of our purchases during the same period.

Our business model allows us to constantly review and evaluate each supplier relationship, and we are open to building new supplier/vendor relationships. Products are purchased from all suppliers on an at-will basis. Relationships with suppliers are subject to change from time to time. Please see Item 1A "*Risk Factors*" for a description of the risks related to our supplier relationships.

**Marketing**

Our marketing efforts drive new and repeat customers and promote our websites as online communities relating to major appliances and other products. Our strategy is to inspire the customer at each point of their shopping journey, delivering curated messaging, content and advice in an effort to increase engagement and repeat purchasing. We utilize a combination of paid and earned media, including search engine marketing, email, digital display, social media, retargeting, radio and events, in our media strategy. We also have programs to engage appliance enthusiasts and build community through design and customer portals that are intended both to inspire and provide help the business-to-business ("B2B") and business-to-consumer ("B2C") customers with their projects.

3

**Customers and Markets**

We have physical stores and warehouses located in Brooklyn, New York, Somerset, New Jersey, Hamilton, New Jersey, St. Charles, Missouri and Largo, Florida. Our internal logistics network and third-party distribution, delivery and installation agreements allow us to serve, sell and ship to customers nationwide. The diagram below represents our sales by region for 2022:



**Logistics**

In our fulfillment of large durable goods, we have created an infrastructure that allows us to deliver products in most states. We want to scale this infrastructure by continuing to improve execution, fulfillment center locations, and delivery timing. This proprietary logistic process enables us to provide our customers' products quickly and to provide a better shipping and delivery experience than they might otherwise experience. Additionally, we believe this logistics network will help us reduce expenses, touchpoints, damages and returns.

**Technology**

We are continuing to build out our custom-built, proprietary technology and operational platform to deliver the best experience for both our customers and suppliers. Our success has been built on a culture of data-driven decision-making and proprietary software for order management and customer fulfillment. We believe that control of our technology systems, which gives us the ability to update them often, is a competitive advantage. Our team of engineers has built a technology solution for durable goods. Our software consists of a large set of tools and systems with which our customers directly interact, that are specifically tuned for shopping the major appliance category by mixing lifestyle imagery with easy-to-use navigation tools and personalization features designed to increase customer conversion. We have designed operations software to deliver the reliable and consistent experience consumers desire, with proprietary software enhancing our performance in areas such as integration with our suppliers, our warehouse and logistics network and our customer service operation. Much of our customer marketing technology was internally developed, including campaign management and bidding algorithms for online advertising. This allows us to leverage our internal data and target customers efficiently across various channels. We also partner with select marketing and trade partners where we find solutions that meet our marketing objectives and inspire our B2B and B2C customers.

**Competition**

While we are primarily focused on the online U.S. appliances, furniture and other home goods market, we compete across all segments of the market. Our competition includes online retailers and marketplaces, furniture stores, big box retailers, department stores and specialty retailers.

4

**Competitive Strengths**

The U.S. appliance market is highly fragmented, with thousands of local and regional retailers competing for a share. We believe this fragmented market presents an opportunity to streamline business and make brands and products available to everyone across the country. We are standardizing a consistent end-to-end experience to provide products to the consumer no matter where they are located in the country.

We are strengthening our e-commerce platform and increasing our showroom and distribution center model to provide a smooth path to purchase. We are also investing in our brand presence and marketing efforts to drive customer acquisition and engagement. Our goal is to be the appliance destination for our customers from inspiration to installation.

Our competitive strengths include:

- **Name and reputation**. In 2022, we introduced our Polished name and continue to build off our Goedeker legacy in offering competitively priced name-brand products and services, which has been recognized over 50+ years in the business.

- **Product selection and pricing**. Our comprehensive product selection and competitive pricing model, with support from inspiration to delivery and installation, means we provide a complete solution for customers.

- **Strong customer relationships**. We focus on the needs and experience of customers, whether they are in the market for a replacement, renovation or new construction project. This customer-centric approach is evidenced by our repeat customers, over-indexing the industry.

- **Highly trained and professional staff**. Our team is trained to educate and support customers when selecting and buying products. A large percentage of customer orders involve a phone conversation with a sales team member—a differentiator when competing with online-only companies as well as brick-and-mortar outlets.

- **Website ease of use**. Our proprietary, purpose-built technology platform is designed to provide consumers a compelling user experience as they browse, research and purchase our products. We use personalization, based on past browsing and shopping patterns, to create a more engaging consumer interaction.

- **Proprietary technology and content**. Investments in our technology platform create a scalable process and support the customer at every point in the journey, including call center tools, digital marketing optimization, B2B design portals, product reviews and lifestyle content.

**Growth Strategies**

Our mission is to change the way consumers buy appliances and, in doing so, become the leading online retailer of home appliances. The strategies of the Company to achieve this mission, while increasing value for our stockholders, will include:

- **Rebrand the combined company.** We plan to drive brand awareness through strategic omni-channel marketing.

- **Strengthening the Company's Leadership Team.** We have made significant executive and senior management hires and are continuing to build our talent pool and hire highly-skilled employees. Recruiting top-tier talent at all levels remains a priority, especially as the Company evolves and grows.

- **Secure design and builder trade business.** We have created new tools and benefits to engage and simplify appliance shopping and buying for B2B projects with builders, contractors, architects and interior designers who are making or influencing the purchasing decision for their clients.

5

- **Category expansion and Deeper Connectivity with Customers.** We will be adding new, complementary categories and services to our selection to meet our customers' ever-changing needs. We are in the process of enhancing the content and resources available on our site that will ultimately help us create more meaningful relationships with customers.

- **Drive continued operational excellence.** We are committed to improving productivity and profitability through operational initiatives designed to grow revenue and expand margins. Some of our key initiatives for operational excellence include:

  o *Logistics and shipping optimization.* We have identified the geographic areas in which we want to establish a presence to reach more customers and further penetrate markets that are experiencing high levels of housing development and home remodeling. Although we currently are holding off on entering into agreements due to inventory and supply chain issues, we expect to add at least two new fulfillment centers over the next year. We believe that adding fulfillment centers in other parts of the country will minimize product touchpoints and damage, as well as expedite delivery. With access to vendor warehouse operations, we expect to capitalize on buying opportunities and capture time-sensitive customers more frequently.

  o *Price optimization.* We are building a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing for our products.

**Intellectual Property**

We own several registered domain names, including for our *www.polished.com* website and the Appliances Connection websites *www.appliancesconnection.com, 1stopcamera.com, goldcoastappliances.com, and joesappliances.com.* The agreements with our suppliers generally provide us with limited, nonexclusive licenses to use the supplier's trademarks, service marks and trade names for the sole purpose of promoting and selling their products.

To protect our intellectual property, we rely on a combination of laws and regulations, as well as contractual restrictions. We rely on the protection of laws regarding unregistered copyrights for certain content we create. We also rely on trade secret laws to protect our proprietary technology and other intellectual property. To further protect our intellectual property, we enter into confidentiality agreements with our executive officers and directors.

As of December 31, 2022, in an effort to protect our brand, we had three registered trademarks in the United States.

**Human Capital**

As of December 31, 2022, we employed 391 total employees, all of which were full-time employees.

We have not experienced any work stoppages and we consider our relationship with our employees to be good. None of our employees are subject to a collective bargaining agreement or represented by a labor union. Our people are integral to our business, and we are highly dependent on our ability to attract and retain qualified personnel.

**Government Regulation**

Our business is subject to the laws of the U.S. jurisdictions in which we operate and the rules and regulations of various governing bodies, which may differ among jurisdictions as to how, or whether, laws governing personal privacy, data security, consumer protection or sales and other taxes, among others, apply to the Internet and e-commerce. These laws are continually evolving. For example, certain applicable privacy laws and regulations require us to provide customers with our policies on sharing information with third parties, and advance notice of any changes to these policies. Related laws may govern the manner in which we store or transfer sensitive information or impose obligations on us in the event of a security breach or inadvertent disclosure of such information. Additionally, tax regulations in jurisdictions where we do not currently collect state or local taxes may subject us to the obligation to collect and remit such taxes, or to additional taxes, or to requirements intended to assist jurisdictions with their tax collection efforts. New legislation or regulation, the application of laws from jurisdictions whose laws do not currently apply to our business, or the application of existing laws and regulations to the Internet and e-commerce generally could result in significant additional taxes on our business. Further, we could be subject to fines or other payments for any past failures to comply with these requirements. The continued growth and demand for e-commerce is likely to result in more laws and regulations that impose additional compliance burdens on e-commerce companies.

6

**Emerging Growth Company and Smaller Reporting Company**

We qualify as an "emerging growth company" under the JOBS Act and a "smaller reporting company" within the meaning of the Securities Act. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements.

For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;

- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the consolidated financial statements (i.e., an auditor discussion and analysis);

- submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and

- disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year following the fifth anniversary of our initial public offering, (ii) the last day of the first fiscal year in which our total annual gross revenues are $1.235 billion or more, (ii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Exchange Act, which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iv) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

We may continue to qualify as a smaller reporting company if either (i) the market value of our common stock held by non-affiliates is less than $250 million or (ii) our annual revenue was less than $100 million during the most recently completed fiscal year and the market value of our common stock held by non-affiliates is less than $700 million. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements, including, but not limited to presenting only the two most recent fiscal years of audited financial statements in our Annual Report on Form 10-K and reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements.

**Additional Information About the Company**

The following documents are available free of charge through the Company's website, www.polished.com: the Company's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports that are filed with or furnished to the Securities and Exchange Commission ("SEC") pursuant to Sections 13(a) or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"). These materials are made available through the Company's website as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. In addition to its reports filed or furnished with the SEC, the Company publicly discloses material information from time to time in its press releases, at annual meetings of stockholders, in publicly accessible conferences and investor presentations, and through its website (principally in its News and Investor Relations pages). References to the Company's website in this Form 10-K are provided as a convenience and do not constitute, and should not be deemed, an incorporation by reference of the information contained on, or available through, the website, and such information should not be considered part of this Form 10-K.

**ITEM 1A. RISK FACTORS.**

*An investment in our common stock involves a high degree of risk. You should carefully consider the following risk factors, together with the other information contained in this report, before purchasing our common stock. We have listed below (not necessarily in order of importance or probability of occurrence) what we believe to be the most significant risk factors, but additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may become material and adversely affect our business. Any of the following factors could harm our business, financial condition, results of operations or prospects, and could result in a partial or complete loss of your investment. Some statements in this report, including statements in the following risk factors, constitute forward-looking statements. Please refer to the section titled "Cautionary Statement Regarding Forward-Looking Statements."*

**Risks Related to our Business and Industry**

***Prior to the filing of this annual report on Form 10-K, we have been delinquent in our SEC reporting obligations for over 12 months. Although we expect to file our periodic reports in a timely fashion going forward, we cannot provide assurance that our business and the price of our common stock will not be materially adversely affected by our previous failure to file required periodic reports.***

Despite the filing of this annual report on Form 10-K, we face a continuing risk that the SEC will initiate an administrative proceeding to suspend or revoke the registration of our common stock under the Exchange Act due to our previous failure to file quarterly reports on Form 10-Q since March 31, 2022.

Furthermore, the Company is not in compliance with the continued listing standards of NYSE American LLC (the "Exchange"), as set forth in Sections 134 and 1101 of the NYSE American Company Guide (the "Company Guide"), since the Company failed to timely file (the "Filing Delinquency") its Form 10-Qs for the periods ended June 30, 2022 and September 30, 2022 (collectively, the "Delayed Reports"). The Filing Delinquency will be cured via the filing of the Delayed Reports. Pursuant to Section 1007 of the Company Guide, the Company submitted to NYSE Regulation on February 13, 2023 an extension request as the Company was unable to cure the Filing Delinquency within the initial six-month cure period automatically granted to the Company when it became delinquent. On February 21, 2023, NYSE Regulation notified the Company that it had accepted the Company's request to extend the cure period through July 31, 2023. NYSE Regulation staff will review the Company periodically for compliance with adherence to the milestones in the Company's plan to regain compliance If the Company does not make progress consistent with the plan during the plan period or if the Company does not complete its Delayed Filings with the Securities and Exchange Commission by the end of the maximum 12-month cure period on August 22, 2023, Exchange staff will initiate delisting proceedings as appropriate. The Company may appeal an Exchange staff delisting determination in accordance with Section 1010 and Part 12 of the Company Guide.

In addition, there may be continued concern on the part of customers, investors and employees about our financial condition and extended filing delay status, which may result in the loss of business opportunities, limitations on our ability to raise capital, including the temporal unavailability of the abbreviated Form S-3, and general reputational harm. Any of the foregoing could materially adversely affect our business, results of operations, financial condition and stock price.

***The Investigation and subsequent restatement of our financial statements has consumed a significant amount of our time and resources and may lead to, among other things, shareholder litigation, loss of investor confidence, negative impacts on our stock price, a material adverse effect on our reputation, business and stock price and certain other risks.***

As described in this Annual Report under the headings "Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operation – Investigation" and elsewhere herein, the Company launched an investigation (the "Investigation") due to certain of the Company's business operations under former management during the 2021-2022 period, which resulted in our former auditor withdrawing its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declining to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively. Consequently, we have restated our previously issued consolidated financial statements as of and for the year ended December 31, 2021 and for the quarter ended March 31, 2022. See Note 2, "*Summary of Significant Accounting Policies – Restatement*," in "*Item 8 Financial Statements and Supplementary Data*", for additional information.

The Investigation and subsequent restatement process was highly time and resource-intensive and involved substantial attention from management and significant legal and accounting costs. Furthermore, as a result of the circumstances giving rise to the restatement, we have become subject to a number of additional risks and uncertainties, including unanticipated costs for accounting and legal fees in connection with or related to the restatement, shareholder litigation and government investigations, including potential inquires from the Securities and Exchange Commission ("SEC") regarding our financial statements or matters relating thereto. Any such proceeding could result in substantial defense costs regardless of the outcome of the litigation or investigation and any future inquiries from the SEC as a result of our historical financial statements will, regardless of the outcome, likely consume a significant amount of our resources in addition to those resources already consumed in connection with the Investigation and restatement itself. If we do not prevail in any such litigation, we could be required to pay substantial damages or settlement costs. In addition, the restatement and related matters could impair our reputation and could cause our counterparties to lose confidence in us. Each of these occurrences could have an adverse effect on our business, results of operations, financial condition and stock price.

***Macroeconomic trends including inflation and rising interest rates may adversely affect our financial condition and results of operations.***

Macroeconomic trends, including increases in inflation and rising interest rates, may adversely impact our business, financial condition and results of operations. Inflation in the United States has recently accelerated and is currently expected to continue at an elevated level in the near-term. Rising inflation could have an adverse impact on our operating expenses and our credit facilities. There is no guarantee we will be able to mitigate the impact of rising inflation. The Federal Reserve has started raising interest rates to combat inflation and restore price stability and it is expected that rates will continue to rise throughout the remainder of 2023. Increases in interest rates on any of our debt will result in higher debt service costs, which will adversely affect our cash flows. We cannot assure you that our access to capital and other sources of funding will not become constrained, which could adversely affect the availability and terms of future borrowings. Such future constraints could increase our borrowing costs, which would make it more difficult or expensive to obtain additional financing or refinance existing obligations and commitments, which could slow or deter future growth.

***Our business is dependent on general economic conditions and consumer discretionary spending, and reductions in such spending might adversely affect the Company's business, operations, liquidity, financial results and stock price.***

Our business depends on consumer discretionary spending, and our results are highly dependent on U.S. consumer confidence and the health of the U.S. economy. Consumer spending may be affected by many factors outside of the Company's control, including general economic conditions; consumer disposable income; consumer confidence and perception of economic conditions; the threat or outbreak of war, terrorism or public unrest (including, without limitation, the conflict in Ukraine) which may cause supply chain disruptions, increase fuel costs and transportation costs, and create general economic instability; wage and unemployment levels; consumer debt and inflationary pressures; the costs of basic necessities and other goods; effects of weather and natural disasters caused by climate change or otherwise; and epidemics, contagious disease outbreaks, and other public health concerns including the COVID-19 pandemic. Adverse economic changes in any of the regions in which we sell our products could reduce consumer confidence and could negatively affect net revenue and have a material adverse effect on our operating results.

Consumers may view a substantial portion of the products we offer as discretionary items rather than necessities. As a result, our results of operations are sensitive to changes in macro-economic conditions that impact consumer spending, including discretionary spending. Decreases in consumer discretionary spending may result in a decrease in comparable sales, and average value per transaction, which might cause us to increase promotional activities, which will have a negative impact on our gross margins, all of which could negatively affect the Company's business, operations, liquidity, financial results and stock price, particularly if consumer spending levels are depressed for a prolonged period of time.

***Our business model and growth strategy depend on our marketing efforts and ability to maintain our brand and attract customers to our platform in a cost-effective manner, including our ability to develop new features to enhance the consumer experience on our websites, mobile-optimized websites and mobile applications.***

Our success depends on our ability to acquire and retain customers in a cost-effective manner through marketing efforts and maintenance of our brand. In order to expand our customer base, we must appeal to and acquire customers who have historically used other means of commerce to purchase home goods and may prefer alternatives to our offerings, such as the websites of our competitors or our suppliers' own websites. We have made significant investments related to customer acquisition and expect to continue to spend significant amounts to acquire additional customers. Our advertising efforts consist primarily of email marketing, online advertisements and promotions, digital marketing and social media. These efforts are expensive and may not result in the cost-effective acquisition of customers. We cannot assure you that the net profit from new customers we acquire will ultimately exceed the cost of acquiring those customers through enhancements to the customer experience on our websites, mobile-optimized websites and mobile operations. If we fail to deliver a quality shopping experience, or if consumers do not perceive the products we offer to be of high value and quality, we may not be able to acquire new customers. If we are unable to acquire new customers who purchase products in numbers sufficient to grow our business, we may not be able to generate the scale necessary to drive beneficial network effects with our suppliers or efficiencies in our logistics network, our net revenue may decrease, and our business, financial condition and operating results may be materially adversely affected.

We believe that many of our new customers originate from word-of-mouth and other non-paid referrals from existing customers. Therefore, we must ensure that our existing customers remain loyal to us in order to continue receiving those referrals. If our efforts to satisfy our existing customers are not successful, we may not be able to acquire new customers in sufficient numbers to continue to grow our business, or we may be required to incur significantly higher marketing expenses in order to acquire new customers.

***Our success depends in part on our ability to increase our net revenue per active customer. If our efforts to increase customer loyalty and repeat purchasing as well as maintain high levels of customer engagement are not successful, our growth prospects and revenue will be materially adversely affected.***

Our ability to grow our business depends on our ability to retain our existing customer base and generate increased revenue and repeat purchases from this customer base, and maintain high levels of customer engagement. To do this, we must continue to provide our customers and potential customers with a unified, convenient, efficient and differentiated shopping experience by:

- providing imagery, tools and technology that attract customers who historically would have bought elsewhere;

- maintaining a high-quality and diverse portfolio of products;

- delivering products on time and without damage; and

- maintaining and further developing our online and mobile platforms.

If we fail to increase net revenue per active customer, generate repeat purchases or maintain high levels of customer engagement, our growth prospects, operating results and financial condition could be materially adversely affected.

***Our continued revenue growth will depend upon, among other factors, our ability to acquire more customers, build our brands and launch new brands, introduce new products or offerings and improve existing product.***

Maintaining and enhancing our brands is critical to acquiring and expanding our base of customers and suppliers. Our ability to maintain and enhance our brands depends largely on our ability to maintain customer confidence in our product and customer service offerings, including by delivering products on time and without damage. If customers do not have a satisfactory shopping experience, they may seek out alternative offerings from our competitors and may not return to our sites as often in the future, or at all. In addition, unfavorable publicity regarding, for example, our practices relating to privacy and data protection, product quality, delivery problems, competitive pressures, litigation or regulatory activity could seriously harm our reputation. Such negative publicity also could have an adverse effect on the size, engagement, and loyalty of our customer base and result in decreased revenue, which could adversely affect our business and financial results. A significant portion of our customers' brand experience also depends on third parties outside of our control, including suppliers and logistics providers such as R+L Carriers, AM Home Delivery and other third-party delivery agents. If these third parties do not meet our or our customers' expectations, our brands may suffer irreparable damage.

In addition, maintaining and enhancing these brands may require us to make substantial investments in launching new brands or introducing new products or offerings, and these investments may not be successful. If we fail to promote, maintain, and improve our brands and products, or if we incur excessive expenses in this effort, our business, operating results and financial condition may be materially adversely affected. We anticipate that, as our market becomes increasingly competitive, maintaining and enhancing our brands or products may become increasingly difficult and expensive. Maintaining and enhancing our brands will depend largely on our ability to provide high quality products to our customers and a reliable, trustworthy and profitable sales channel to our suppliers, which we may not be able to do successfully.

Customer complaints or negative publicity about our sites, products, delivery times, customer data handling and security practices or customer support, especially on blogs, social media websites and our sites, could rapidly and severely diminish consumer use of our sites and consumer and supplier confidence in us and result in harm to our brands.

***We may be unsuccessful in launching or marketing new products or services, or launching existing products and services into new markets, or may be unable to successfully integrate new offerings into our existing platform, which would result in significant expense and may not achieve desired results.***

Our business success depends to some extent on our ability to expand our customer offerings by launching new brands, products and services and by expanding our existing offerings into new markets. Launching new brands and services or expanding geographically requires significant upfront investments, including investments in marketing, information technology and additional personnel. We may not be able to generate satisfactory revenue from these efforts to offset these costs. Any lack of market acceptance of our efforts to launch new brands, products and services or to expand our existing offerings, or failure to successfully integrate new offerings into our existing offerings, platforms, and markets, could have a material adverse effect on our business, prospects, financial condition and results of operations. Further, as we continue to expand our fulfillment capability or add new businesses with different requirements, our logistics networks become increasingly complex and operating them becomes more challenging. There can be no assurance that we will be able to operate our networks effectively.

We have also entered and may continue to enter into new markets in which we have limited or no experience, which may not be successful or appealing to our customers. These activities may present new and difficult technological and logistical challenges, and resulting service disruptions, failures or other quality issues may cause customer dissatisfaction and harm our reputation and brand. Further, our current and potential competitors in new market segments may have greater brand recognition, financial resources, longer operating histories and larger customer bases than we do in these areas. As a result, we may not be successful enough in these newer areas to recoup our investments in them. If this occurs, our business, financial condition and operating results may be materially adversely affected.

***We have experienced rapid growth since inception, which may not be indicative of future growth. If we fail to manage our growth effectively, we may experience difficulties in expanding our operations and service offerings and our business, financial condition and operating results could be harmed.***

To manage our growth effectively, we must continue to implement our operational plans and strategies, improve and expand our infrastructure of people and information systems and expand, train and manage our employee base. We have rapidly increased employee headcount since our inception to support the growth in our business. To support continued growth, we must effectively integrate, develop and motivate a large number of new employees. We face significant competition for personnel and increased labor shortages. Failure to manage our hiring needs effectively or successfully integrate our new hires may have a material adverse effect on our business, financial condition and operating results.

Additionally, the growth of our business places significant demands on our operations, as well as our management and other employees. Surges in online traffic and orders associated with any promotional activities or new brand or product offerings could place increased strain on our operations, including our logistics network, and may cause or exacerbate slowdowns or interruptions. The growth of our business may require significant additional resources to meet these daily requirements, which may not scale in a cost-effective manner or may negatively affect the quality of our sites and customer experience. We are also required to manage relationships with a growing number of suppliers, customers and other third parties. Our information technology systems and our internal controls and procedures may not be adequate to support future growth of our supplier and employee base. If we are unable to manage the growth of our organization effectively, our business, financial condition and operating results may be materially adversely affected.

***Our business, and e-commerce generally, is highly competitive. Competition presents an ongoing threat to the success of our business.***

Our business is rapidly evolving and intensely competitive, and we have many competitors in different industries. Our competition includes furniture stores, big box retailers, department stores, specialty retailers, and online retailers and marketplaces in the United States.

We expect competition in e-commerce generally to continue to increase. We believe that our ability to compete successfully depends upon many factors both within and beyond our control, including:

- the size and composition of our customer base;

- the number of suppliers and products we feature on our sites;

- our selling and marketing efforts;

- the quality, price and reliability of products we offer;

- the convenience of the shopping experience that we provide;

- our ability to distribute our products and manage our operations; and

- our reputation and brand strength.

Many of our current competitors have, and potential competitors may have, longer operating histories, greater brand recognition, larger fulfillment infrastructures, greater technical capabilities, faster and less costly shipping, significantly greater financial, marketing and other resources and larger customer bases than we do. These factors may allow our competitors to derive greater net revenue and profits from their existing customer base, acquire customers at lower costs or respond more quickly than we can to new or emerging technologies and changes in consumer habits. These competitors may engage in more extensive research and development efforts, undertake more far-reaching marketing campaigns and adopt more aggressive pricing policies, which may allow them to build larger customer bases or generate net revenue from their customer bases more effectively than we do.

***Our success depends, in substantial part, on our continued ability to market our products through search engines and social media platforms.***

The marketing of our products depends on our ability to cultivate and maintain cost-effective and otherwise satisfactory relationships with search engines and social media platforms, including those operated by Google, Facebook, Bing and Yahoo! These platforms could change their terms and conditions of use at any time (and without notice) and/or significantly increase their fees. No assurances can be provided that we will be able to maintain cost-effective and otherwise satisfactory relationships with these platforms and our inability to do so in the case of one or more of these platforms could have a material adverse effect on our business, financial condition and results of operations.

We obtain a significant number of visits via search engines such as Google, Bing and Yahoo! Search engines frequently change the algorithms that determine the ranking and display of results of a user's search and may make other changes to the way results are displayed, which can negatively affect the placement of links and, therefore, reduce the number of visits to our website. The growing use of online ad-blocking software may also impact the success of our marketing efforts because we may reach a smaller audience and fail to bring more customers to our website, which could have a material adverse effect on our business, financial condition and results of operations.

***Our internal information technology systems may fail or suffer security breaches, loss or leakage of data, and other disruptions, which could disrupt our business or result in the loss of critical and confidential information.***

The satisfactory performance, reliability and availability of our websites, transaction processing systems, logistics network, and technology infrastructure are critical to our reputation and our ability to acquire and retain customers, as well as maintain adequate customer service levels.

For example, if one of our data centers fails or suffers an interruption or degradation of services, we could lose customer data and miss order fulfillment deadlines, which could harm our business. Our systems and operations, including our ability to fulfill customer orders through our logistics network, are also vulnerable to damage or interruption from inclement weather, fire, flood, power loss, telecommunications failure, terrorist attacks, labor disputes, cybersecurity-attacks, data loss, acts of war, break-ins, earthquake and similar events. In the event of a data center failure, the failover to a back-up could take substantial time, during which time our sites could be completely shut down. Further, our back-up services may not effectively process spikes in demand, may process transactions more slowly and may not support all of our site's functionality.

We use complex proprietary software in our technology infrastructure, which we seek to continually update and improve. We may not always be successful in executing these upgrades and improvements, and the operation of our systems may be subject to failure. In particular, we have in the past and may in the future experience slowdowns or interruptions on some or all of our sites when we are updating them, and new technologies or infrastructures may not be fully integrated with existing systems on a timely basis, or at all. Additionally, if we expand our use of third-party services, including cloud-based services, our technology infrastructure may be subject to increased risk of slowdown or interruption as a result of integration with such services and/or failures by such third parties, which are out of our control. Our net revenue depends on the number of visitors who shop on our sites and the volume of orders we can handle. Unavailability of our websites or reduced order fulfillment performance would reduce the volume of goods sold and could also materially adversely affect consumer perception of our brand.

We may experience periodic system interruptions from time to time. In addition, continued growth in our transaction volume, as well as surges in online traffic and orders associated with promotional activities or seasonal trends in our business, place additional demands on our technology platform and could cause or exacerbate slowdowns or interruptions. If there is a substantial increase in the volume of traffic on our sites or the number of orders placed by customers, we may be required to further expand and upgrade our technology, logistics network, transaction processing systems and network infrastructure. There can be no assurance that we will be able to accurately project the rate or timing of increases, if any, in the use of our sites or expand and upgrade our systems and infrastructure to accommodate such increases on a timely basis. In order to remain competitive, we must continue to enhance and improve the responsiveness, functionality and features of our sites, which is particularly challenging given the rapid rate at which new technologies, customer preferences and expectations and industry standards and practices are evolving in the e-commerce industry. Accordingly, we redesign and enhance various functions on our sites on a regular basis, and we may experience instability and performance issues as a result of these changes.

Any slowdown, interruption or performance failure of our sites and the underlying technology and logistics infrastructure could harm our business, reputation and our ability to acquire, retain and serve our customers, which could materially adversely affect our results of operations.

***If we fail to maintain adequate cybersecurity with respect to our systems and ensure that our third-party service providers do the same with respect to their systems, our business may be harmed.***

We collect, maintain, transmit and store data about our customers, employees, contractors, suppliers, vendors and others, including credit card information and personally identifiable information, as well as other confidential and proprietary information. We also employ third-party service providers that store, process and transmit certain proprietary, personal and confidential information on our behalf. We rely on encryption and authentication technology licensed from third parties in an effort to securely transmit, encrypt, anonymize or pseudonymize certain confidential and sensitive information, including credit card numbers. Advances in computer capabilities, new technological discoveries or other developments may result in the whole or partial failure of this technology to protect transaction and personal data or other confidential and sensitive information from being breached or compromised. Our security measures, and those of our third-party service providers, may not detect or prevent all attempts to hack our systems, denial-of-service attacks, viruses, malicious software, break-ins, phishing attacks, social engineering, cybersecurity breaches or other attacks and similar disruptions that may jeopardize the security of information stored in or transmitted by our sites, networks and systems or that we or our third-party service providers otherwise maintain, including payment card systems and human resources management platforms. We and our service providers may not anticipate or prevent all types of attacks until after they have already been launched, and techniques used to obtain unauthorized access to or sabotage systems change frequently and may not be known until launched against us or our third-party service providers. In addition, security breaches can also occur as a result of non-technical issues, including intentional or inadvertent breaches by our employees or by persons with whom we have commercial relationships.

12

Breaches of our security measures or those of our third-party service providers or cyber security incidents could result in unauthorized access to our sites, networks and systems; unauthorized access to and misappropriation of personal information, including consumers' and employees' personally identifiable information, or other confidential or proprietary information of ourselves or third parties; limited or terminated access to certain payment methods or fines, penalties, assessments or higher transaction fees to use such methods; viruses, worms, spyware or other malware being served from our sites, networks or systems; deletion or modification of content or the display of unauthorized content on our sites; interruption, disruption or malfunction of operations; costs relating to breach remediation, deployment or training of additional personnel and protection technologies, responses to governmental investigations and media inquiries and coverage; engagement of third party experts and consultants; litigation, regulatory action and other potential liabilities. If any of these breaches of security occur, and/or our cybersecurity processes, procedures or policies are found to be deficient, our reputation and brand could be damaged, our business may suffer, we could be required to expend significant capital and other resources to alleviate problems caused by such breaches and we could be exposed to a risk of loss, litigation or regulatory action and possible liability. In addition, any party who is able to illicitly obtain a customer's password or other relevant information could access that customer's transaction data or personal information. Any compromise or breach of our security measures, or those of our third-party service providers, could violate applicable privacy, data security and other laws, and cause significant legal and financial exposure, adverse publicity and a loss of confidence in our security measures, which could have a material adverse effect on our business, financial condition and operating results. We may need to devote significant resources to protect against cybersecurity breaches or to address problems caused by breaches, diverting resources from the growth and expansion of our business.

On March 16, 2023, we experienced a cybersecurity incident. See Item 7 "*Management's Discussion and Analysis of Financial Condition and Results of Operations – Recent Developments – Cybersecurity Incident.*"

***Our suppliers have imposed conditions in our business arrangements with them. If we are unable to continue satisfying these conditions, or such suppliers impose additional restrictions with which we cannot comply, it could have a material adverse effect on our business, financial condition and operating results.***

Our suppliers place restrictive conditions on our doing business with them. If we cannot satisfy these conditions or if they impose additional or more restrictive conditions that we cannot satisfy, our business would be materially adversely affected. It would be materially detrimental to our business if these suppliers decided to no longer do business with us, increased the pricing at which they allow us to purchase their goods or impose other restrictions or conditions that make it more difficult for us to work with them. Any of these events could have a material adverse effect on our business, financial condition and operating results.

***We may be unable to source new suppliers or source additional, or strengthen our existing relationships with, suppliers, negotiate acceptable pricing and other terms with third-party service providers, suppliers and outsourcing partners and maintain our relationships with such entities.***

We have relationships with numerous suppliers. Our agreements with suppliers are generally terminable at will by either party upon short notice. If we do not maintain our existing relationships or build new relationships with suppliers on acceptable commercial terms, we may not be able to maintain a broad selection of merchandise, and our business and prospects would suffer severely. Part of our business with our suppliers is conducted through our participation in DMI's purchasing group arrangement. For the years ended December 31, 2022 and 2021, we purchased a substantial portion of finished goods from DMI, representing 69.2% and 72.1% of purchases, respectively. Our participation in this consortium provides us with leverage and purchasing power with appliance vendors, and increases our ability to compete with competitors. If the relationship between DMI and suppliers materially changes, or if we are unable to participate in DMI on materially the same terms as we currently participate, then there is a risk that the prices of finished goods may increase or the availability of finished goods to the Company would decrease.

In order to attract quality suppliers, we must:

- demonstrate our ability to help our suppliers increase their sales;

- offer suppliers a high-quality, cost-effective fulfillment process; and

- continue to provide suppliers with a dynamic and real-time view of our demand and inventory needs.

13

If we are unable to provide our suppliers with a compelling return on investment and an ability to increase their sales, we may be unable to maintain and/or expand our supplier network, which would negatively impact our business.

Our agreements with most of our suppliers do not provide for the long-term availability of merchandise or the continuation of particular pricing practices, nor do they usually restrict such suppliers from selling products to other buyers. There can be no assurance that our current suppliers will continue to seek to sell us products on current terms or that we will be able to establish new or otherwise extend current supply relationships to ensure product acquisitions in a timely and efficient manner and on acceptable commercial terms. Our ability to develop and maintain relationships with reputable suppliers and offer high quality merchandise to our customers is critical to our success. If we are unable to develop and maintain relationships with suppliers that would allow us to offer a sufficient amount and variety of quality merchandise on acceptable commercial terms, our ability to satisfy our customers' needs, and therefore our long-term growth prospects, would be materially adversely affected.

Further, we rely on our suppliers' representations of product quality, safety and compliance with applicable laws and standards. If our suppliers or other vendors violate applicable laws, regulations or our supplier code of conduct, or implement practices regarded as unethical, unsafe, or hazardous to the environment, it could damage our reputation and negatively affect our operating results. Further, concerns regarding the safety and quality of products provided by our suppliers could cause our customers to avoid purchasing those products from us, or avoid purchasing products from us altogether, even if the basis for the concern is outside of our control. As such, any issue, or perceived issue, regarding the quality and safety of any items we sell, regardless of the cause, could adversely affect our brand, reputation, operations and financial results.

Moreover, we depend on our ability to provide our customers with a wide range of products from qualified suppliers in a timely and efficient manner. Political and economic instability, the financial stability of suppliers, suppliers' ability to meet our standards, labor problems experienced by suppliers, the availability or cost of raw materials, merchandise quality issues, currency exchange rates, trade tariff developments, transport availability and cost, transport security, inflation, the COVID-19 pandemic and other factors relating to our suppliers are beyond our control. For example, the COVID-19 pandemic adversely affected supplier facilities and operations due to factory closures, raw material and labor inflation and risks of labor shortages, among other things. Similar disruptions may materially and adversely affect our business, financial condition and operating results.

We also are unable to predict whether any of the countries in which our suppliers' products are currently manufactured or may be manufactured in the future will be subject to new, different, or additional trade restrictions imposed by the U.S. or foreign governments or the likelihood, type or effect of any such restrictions. Any event causing a disruption or delay of imports from suppliers with international manufacturing operations, including the imposition of additional import restrictions, restrictions on the transfer of funds or increased tariffs or quotas, could increase the cost or reduce the supply of merchandise available to our customers and materially adversely affect our financial performance as well as our reputation and brand. Furthermore, some or all of our suppliers' foreign operations may be adversely affected by political and financial instability, resulting in the disruption of trade from exporting countries, restrictions on the transfer of funds or other trade disruptions.

In addition, our business with foreign suppliers may be affected by changes in the value of the U.S. dollar relative to other foreign currencies. For example, any movement by any other foreign currency against the U.S. dollar may result in higher costs to us for those goods. Declines in foreign currencies and currency exchange rates might negatively affect the profitability and business prospects of one or more of our foreign suppliers. This, in turn, might cause such foreign suppliers to demand higher prices for merchandise in their effort to offset any lost profits associated with any currency devaluation, delay merchandise shipments, or discontinue selling to us altogether, any of which could ultimately reduce our sales or increase our costs.

***We depend on our suppliers to perform certain services regarding the products that we offer.***

As part of offering our suppliers' products for sale on our sites, suppliers are often responsible for conducting a number of traditional retail operations with respect to their respective products, including maintaining inventory and preparing merchandise for shipment to our customers. In these instances, we may be unable to ensure that suppliers will perform these services to our or our customers' satisfaction in a manner that provides our customer with a unified brand experience or on commercially reasonable terms. If our customers become dissatisfied with the services provided by our suppliers, our business, reputation and brands could suffer.

14

***We depend on our relationships with third parties, and changes in our relationships with these parties could adversely affect our revenue and profits.***

We rely on third parties to operate certain elements of our business. For example, we rely on a variety of regional and national carriers for our larger shipping services and small parcel products. As a result, we may be subject to shipping delays or disruptions caused by factors beyond our and our carriers' control, including inclement weather, natural disasters, system interruptions and technology failures, labor shortages, increased fuel costs, health epidemics or bioterrorism. We are also subject to risks of breakage or other damage during delivery by any of these third parties. We also use and rely on other services from third parties, such as retail partner services, telecommunications services, customs, consolidation and shipping services, as well as warranty, installation and design services.

We may be unable to maintain these relationships, and these services may also be subject to outages and interruptions that are not within our control. For example, failures by our telecommunications providers have in the past and may in the future interrupt our ability to provide phone support to our customers. Third parties may in the future determine they no longer wish to do business with us take other actions that could harm our business. We may also determine that we no longer want to do business with them. If products are not delivered in a timely fashion or are damaged during the delivery process, or if we are not able to provide adequate customer support or other services or offerings, our customers could become dissatisfied and cease buying products through our sites, which would adversely affect our operating results.

***We may be unable to optimize, operate and manage the expansion of the capacity of our fulfillment centers, and our plans to expand capacity and develop new facilities may be adversely affected by global events.***

If we do not optimize and operate our fulfillment centers successfully and efficiently, it could result in excess or insufficient fulfillment capacity, an increase in costs or impairment charges or harm our business in other ways. In addition, if we do not have sufficient fulfillment capacity or experience a problem fulfilling orders in a timely manner, our customers may experience delays in receiving their purchases, which could harm our reputation and our relationship with our customers. For example, the COVID-19 pandemic has disrupted and strained our fulfillment center labor pool and may continue to do so. Any unanticipated occurrences with respect to the COVID-19 pandemic, including any potential outbreak of cases or the development of a vaccine-resistant strain during the reopening of the U.S. economy by state and local governments, or certain other global events could cause us to experience disruptions to the operations of our fulfillment centers, including an insufficient and strained labor pool from time to time, which may negatively impact our ability to fulfill orders in a timely manner, which could harm our reputation, relationship with customers and results of operations. Failure to successfully address such challenges in a cost-effective and expedient manner could impair our ability to timely deliver our customers' purchases and could harm our reputation and ultimately, our business, financial condition, and results of operations.

We anticipate the need to add additional fulfillment centers as our business continues to grow. We cannot assure you that we will be able to locate suitable facilities on commercially acceptable terms in accordance with our expansion plans, nor can we assure you that we will be able to recruit qualified managerial and operational personnel to support our expansion plans. If we are unable to secure new or expanded facilities for the expansion of our fulfillment operations, recruit qualified personnel to support any such facilities, or effectively control expansion-related expenses, our business, financial condition, and results of operations could be materially and adversely affected. If demand for our product offerings grow faster than we anticipate, we may exceed our fulfillment center capacity sooner than we anticipate, we may experience problems fulfilling orders in a timely manner or our customers may experience delays in receiving their purchases, which could harm our reputation and our relationship with our customers, and we would need to increase our capital expenditures more than anticipated and in a shorter time frame than we currently anticipate. Our ability to expand our fulfillment center capacity, including our ability to secure suitable facilities and recruit qualified employees, may be substantially affected by global events such as the spread of COVID-19. Many of the expenses and investments with respect to our fulfillment centers are fixed, and any expansion of such fulfillment centers will require additional capital investment. We expect to incur higher capital expenditures in the future for our fulfillment center operations as our business continues to grow. We would incur such expenses and make such investments in advance of expected sales, and such expected sales may not occur. Any of these factors could materially and adversely affect our business, financial condition, and results of operations.

15

***Our business is dependent upon our ability to acquire, accurately value and manage inventory.***

We purchase inventory to stock both current sales and future sales to satisfy consumer demand more quickly. Our purchases of inventory consist of products for resale and are based in large part on our estimates of projected demand. If actual sales are materially less than our forecasts, we would experience an over-supply of inventory. An over-supply of inventory will generally cause downward pressure on our liquidity, sales prices and margins and increase our average days to sale. If we have excess inventory or our average days to sale increases, our liquidity and the results of our operations may be adversely affected because we may be unable to sell such inventory at prices that allow us to meet margin targets or to recover our costs. Inventory valuation requires us to make judgments, based on currently available information, about the likely method of disposition, such as through sales to individual customers, liquidations and expected recoverable values of each disposition category.

Supply chain disruptions and shortages, disruptions in the availability of labor, and increased transportation costs can also significantly impair our ability to accurately manage inventory. As a result of these factors, we may be unable to acquire or sell inventory at attractive prices or to manage inventory effectively, and accordingly our revenue, gross margins and results of operations would be affected, which could have a material adverse effect on our business, financial condition and results of operations.

***Seasonal trends in our business create variability in our financial and operating results and place increased strain on our operations.***

Historically, we have experienced surges in online traffic and orders associated with promotional activities and seasonal trends, primarily during holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, Christmas, Black Friday, and Cyber Monday. This activity may place additional demands on our technology systems and logistics network and could cause or exacerbate slowdowns or interruptions. Any such system, site or service interruptions could prevent us from efficiently receiving or fulfilling orders, which may reduce the volume or quality of goods or services we sell and may cause customer dissatisfaction and harm our reputation and brand. For example, the COVID-19 pandemic disrupted the historical seasonality of our business and created additional variability in our financial and operating results. There can be no assurance that a similar disruption will not occur again in the future.

***Our business may be adversely affected if we are unable to provide our customers a cost-effective shopping platform that is able to respond and adapt to rapid changes in technology.***

The number of people who access the Internet through devices other than personal computers, including mobile phones, smartphones, handheld computers such as notebooks and tablets, video game consoles, and television set-top devices, has increased dramatically in the past few years. We continually upgrade existing technologies and business applications to keep pace with these rapidly changing and continuously evolving technologies, and we may be required to implement new technologies or business applications in the future. The implementation of these upgrades and changes requires significant investments and as new devices and platforms are released, it is difficult to predict the problems we may encounter in developing applications for these alternative devices and platforms. Additionally, we may need to devote significant resources to the support and maintenance of such applications once created. Our results of operations may be affected by the timing, effectiveness and costs associated with the successful implementation of any upgrades or changes to our systems and infrastructure to accommodate such alternative devices and platforms. Further, in the event that it is more difficult or less compelling for our customers to buy products from us on their mobile or other devices, or if our customers choose not to buy products from us on such devices or to use mobile or other products that do not offer access to our sites, our customer growth could be harmed and our business, financial condition and operating results may be materially adversely affected.

***Significant merchandise returns could harm our business.***

We allow our customers to return products, subject to our return policy. If merchandise returns are significant, our business, prospects, financial condition and results of operations could be harmed. Further, we may modify our policies relating to returns from time to time, which could result in customer dissatisfaction or an increase in the number of product returns. Many of our products are large and require special handling and delivery. From time to time our products are damaged in transit, which can increase return rates and harm our brand.

16

***We are subject to risks related to online payment methods.***

We accept payments using a variety of methods, including credit card, debit card, PayPal, credit accounts and gift cards. As we offer new payment options to consumers, we may be subject to additional regulations, compliance requirements and fraud. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower profitability. We are also subject to payment card association operating rules and certification requirements, including the current and future Payment Card Industry Data Security Standard ("PCI") and rules governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply, including in connection with any possible payment card data breach. As our business changes, we may also be subject to different rules under existing standards, which may require new assessments that involve costs above what we currently pay for compliance. If we fail to comply with the rules or requirements of any provider of a payment method we accept, if the volume of fraud in our transactions limits or terminates our rights to use payment methods we currently accept, or if a data breach occurs relating to our payment systems, we may, among other things, be subject to fines, penalties, assessments or higher transaction fees and may lose, or face restrictions placed upon, our ability to accept credit card and debit card payments from consumers or to facilitate other types of online payments. In addition, the card brands and our bank could compel the Company to complete more robust PCI questionnaires and reports, especially in the event of a data breach. If any of these events were to occur, our business, financial condition and operating results could be materially adversely affected.

We occasionally receive orders placed with fraudulent credit card data. We may suffer losses as a result of orders placed with fraudulent credit card data even if the associated financial institution approved payment of the orders. Under current credit card practices, we may be liable for fraudulent credit card transactions. If we are unable to detect or control credit card fraud, our liability for these transactions could harm our business, financial condition and results of operations.

***We rely on the performance of members of management and highly skilled personnel, and if we are unable to attract, develop, motivate and retain well qualified employees, our business could be harmed.***

We believe our success has depended, and continues to depend, on the members of our senior management team. The loss of any of our senior management or other key employees could materially harm our business. Our future success also depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. The market for such positions is competitive. Qualified individuals are in high demand, and we may incur significant costs to attract them. Our inability to recruit and develop highly-skilled personnel could materially adversely affect our ability to execute our business plan, and we may not be able to find adequate replacements. All of our officers and other U.S. employees are at-will employees, meaning that they may terminate their employment relationship with us at any time, and their knowledge of our business and industry would be extremely difficult to replace. If we do not succeed in attracting well-qualified employees or retaining and motivating existing employees, our business, financial condition and operating results may be materially adversely affected.

17

***Our limited operating history makes it difficult to evaluate our current business and future prospects and the risk of your investment.***

We were incorporated in 2019, and, as such, have a limited operating history. We have limited historical financial data upon which to base our projected revenue, planned operating expenses or upon which to evaluate our commercial prospects. Our operating results are not predictable and our historical results may not be indicative of our future results as our business expands. Our limited operating history makes it difficult for potential investors to evaluate our prospective operations and business prospects. Investors should consider our future prospects in light of the risks and uncertainties of early-stage companies operating in a competitive environment. We may encounter unanticipated problems as we continue to refine our business model and may be forced to make significant changes to our anticipated sales and revenue models to compete with our competitors' offerings, which may adversely affect our results of operations and profitability.

***We have identified a material weakness in our internal control over financial reporting and may identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, which may result in material misstatements of our financial statements or cause us to fail to meet our reporting obligations or fail to prevent fraud, which would harm our business and could negatively impact the price of our common stock.***

Effective internal control over financial reporting is necessary for us to provide reliable financial reports and prevent or detect fraud. If we cannot provide reliable financial reports or prevent fraud, our reputation and operating results would be harmed. In connection with management's evaluation of the effectiveness of our internal control over financial reporting and the audit of our consolidated financial statements for the year ended December 31, 2022, we identified a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

The following material weaknesses, which were discovered to be material during 2022, were present at December 31, 2022: lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls; ineffective assessment and identification of changes in risk impacting internal control over financial reporting; inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures; and ineffective evaluation and determination as to whether the components of internal control were present and functioning. The material weaknesses described or any newly identified material weakness could result in a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected. To remediate the material weaknesses identified above, we are implementing or plan to implement the following measures: enhancing reporting structure and increasing the number of qualified resources in roles over internal control over financial reporting; establishing formal risk assessment procedures to identify and monitor changes in the organization that could have an impact on internal control over financial reporting; and developing and documenting policies and procedures, including related business process and technology controls, assessing their effectiveness and establishing a program for continuous assessment of their effectiveness. See also Item 9A *"Controls and Procedures—Management's Annual Report on Internal Control Over Financial Reporting"* for more information.

In addition, our independent registered public accounting firm has not performed an evaluation of our internal control over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act because no such evaluation has been required. Had our independent registered public accounting firm performed an evaluation of our internal control over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act, additional material weaknesses may have been identified. If we are unable to successfully remediate our existing or any future material weakness in our internal control over financial reporting, or identify any additional material weaknesses that may exist, the accuracy and timing of our financial reporting may be adversely affected, we may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to applicable stock exchange listing requirements, we may be unable to prevent fraud, our business could be harmed, investors may lose confidence in our financial reporting and the trading price of our common stock may decline as a result. Additionally, our reporting obligations as a public company will place a significant strain on our management, operational and financial resources and systems for the foreseeable future and may cause us to fail to timely achieve and maintain the adequacy of our internal control over financial reporting. The requirements of being a public company, including compliance with the reporting requirements of the Exchange Act, and the requirements of the Sarbanes-Oxley Act, may strain our resources, increase our costs and distract management, and we may be unable to comply with these requirements in a timely or cost-effective manner.

18

***Certain of our directors and officers could be in a position of conflict of interest.***

Our Executive Chairman, Ellery W. Roberts, is the controlling principal of 1847 Partners LLC (our "Manager"), which provides certain services to us, including administrative supervision and oversight of our day-to-day business operations, for a quarterly management fee equal to $62,500. He may obtain compensation and other benefits in transactions relating to us that involve our Manager. Consequently, Mr. Roberts may be in a position of conflict. Additionally, Edward J. Tobin, a member of our board of directors, also serves as a director of our Manager.

These conflicts may not be resolved in our favor. Such conflicts of interest could have a material adverse effect on our business and operations. Further, the appearance of conflicts of interest created by related party transactions could impair the confidence of our investors. In the case of transactions with affiliates, there may be an absence of arms' length negotiations with respect to the terms, conditions and consideration with respect to goods and services provided to or by us.

***Our business, financial condition and results of operations could be adversely affected by disruptions in the global economy resulting from the ongoing military conflict between Russia and Ukraine.***

The global economy has been negatively impacted by increasing tension, uncertainty and tragedy resulting from ongoing military conflict between Russia and Ukraine. The adverse and uncertain economic conditions resulting therefrom have impacted and may further negatively impact global demand, cause supply chain disruptions and increase costs for transportation, energy and other raw materials. Furthermore, governments in the United States, the European Union, the United Kingdom, Canada and others have imposed financial and economic sanctions on certain industry segments and various parties in Russia and Belarus. We are monitoring the conflict including the potential impact of financial and economic sanctions on the global economy. Increased trade barriers, sanctions and other restrictions on global or regional trade could adversely affect our business, financial condition and results of operations. The length and impact of the ongoing military conflict is highly unpredictable, and resulted in market disruptions, including significant volatility in commodity prices, credit and capital markets, an increase in cyber security incidents as well as supply chain disruptions. Further escalation of geopolitical tensions related to this military conflict and/or its expansion could result in increased volatility and disruption to the global economy and the markets in which we operate adversely impacting our business, financial condition or results of operations.

***The ongoing COVID-19 pandemic, and any future outbreaks or other public health emergencies, may cause a material adverse effect on our results of operations, financial position and liquidity.***

The COVID-19 pandemic continues to evolve. At this time, there continues to be significant volatility and uncertainty relating to the full extent to which the COVID-19 pandemic and the various responses to it will impact our business, operations and financial results.

While the COVID-19 pandemic recently appeared to be trending downward, new variants of COVID-19 continue to emerge and spread throughout the U.S. and globally. The global economy, our employees, patients, centers, communities, and business operations have been, and may continue to be, significantly affected by the COVID-19 pandemic and new variants. As new variants continue to emerge, the full extent to which the COVID-19 pandemic will impact our business, results of operations, financial condition and liquidity will depend on future developments that are highly uncertain and cannot be accurately predicted.

The COVID-19 pandemic has also significantly increased economic uncertainty and has led to disruption and volatility in the global capital markets, which could increase the cost of and accessibility to capital. If we need to access the capital markets, there can be no assurance that financing may be available on attractive terms, if at all. The COVID-19 pandemic has caused and could continue to cause periods of significant economic slowdown, which could lead to reduced discretionary consumer spending and a corresponding reduction in demand for our products and could result in a material adverse effect on our business, financial condition and operating results.

To counteract the effects of COVID-19, governments around the world have implemented fiscal stimulus measures and vaccination rollouts, however, the magnitude and overall effectiveness of these actions remain uncertain and certain U.S. federal and state laws and regulations intended to reduce the spread of COVID-19 are in direct conflict, which means we may be unable to comply with all applicable laws and regulations in some of the jurisdictions in which we operate. Further, the full extent of the impact of COVID-19, including the extent of its impact on our business and financial condition, will depend on numerous evolving factors that we may not be able to accurately predict, including, but not limited to: the length of time that the pandemic continues; the availability, distribution and continued efficacy of available treatments and vaccines; vaccination rates among the general public and our employees; its effect on our suppliers, logistics providers and the demand for our products; the effect of governmental regulations imposed in response to the pandemic; the effect on our customers, their communities and customer demand and ability to pay for our products and services, which may be affected by increased consumer debt levels, changes in net worth due to market conditions and other factors that impact consumer confidence; disruptions or restrictions on our employees' ability to work and travel, as well as uncertainty regarding all of the foregoing.

19

While the home industry has fared much better during the COVID-19 pandemic than other sectors of the economy, periodic surges in COVID-19 cases due to new variants and the resurgence of inflation brought on by labor and supply shortages have had and may continue to have an adverse impact upon our business. Much is still unknown, including the duration and severity of the COVID-19 pandemic, the emergence of variants of COVID-19 that may continue to prolong the pandemic, the amount of time it will take for normal economic activity to resume, and future government actions that may be taken. Accordingly, the situation remains dynamic and subject to rapid and possibly material change, including but not limited to changes that may materially affect the operations of our suppliers, logistics providers and customers, which ultimately could result in material adverse effects on our business, financial condition and operating results. We cannot at this time predict the full impact of the COVID-19 pandemic, but it could have a larger material adverse effect on our business, liquidity, financial condition and operating results beyond what is discussed within this report. We will continue to actively monitor the COVID-19 situation and may take further actions that alter our business operations as may be required by federal, state, local or foreign authorities, or that we determine are in the best interests of our customers, employees, suppliers, partners, stockholders and communities. We cannot predict with any certainty whether and to what degree the disruption caused by the COVID-19 pandemic and reactions thereto will continue, and we expect to face difficulty in accurately forecasting our financial condition and operational results.

Additionally, to the extent the COVID-19 pandemic adversely affects our business, results of operations or financial condition, it may heighten other risks described in this "*Risk Factors*" section.

**Risks Related to Our Indebtedness and Liquidity**

***If we require additional financing to fuel our continued business growth, such additional financing may not be available on reasonable terms or at all.***

Our future growth, including the potential for future market expansion may require additional capital. We will consider raising additional funds through various financing sources, including the procurement of additional commercial debt financing. However, there can be no assurance that such funds will be available on commercially reasonable terms, if at all. If such financing is not available on satisfactory terms, we may be unable to execute our growth strategy, and operating results may be adversely affected. Any additional debt financing will increase expenses and must be repaid regardless of operating results and may involve restrictions limiting our operating flexibility.

Our ability to obtain financing may be impaired by such factors as the capital markets, both generally and specifically in our industry, which could impact the availability or cost of future financings. If the amount of capital we are able to raise from financing activities, together with our revenues from operations, are not sufficient to satisfy our capital needs, we may be required to decrease the pace of, or eliminate, our future product offerings and market expansion opportunities and potentially curtail operations.

***Our third-party loans contain certain terms that could materially adversely affect our financial condition.***

We are party to third party loans that are secured by our assets. See Item 7 "*Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources*" and "*—Recent Developments*" for a description of these loans. The loan documents contain customary representations, warranties and affirmative and negative covenants. If an event of default were to occur under these loans, the lenders thereto may pursue all remedies available to them, including declaring the obligations under the loans immediately due and payable, which could materially adversely affect our financial condition.

***Our debt and our ability to increase future leverage could limit our operating flexibility and ability to grow, and adversely affect our financial condition and cash flows.***

We currently have and have in the past had periods of significant leverage and any future increased leverage could adversely affect our ability to fund our operations, limit our ability to react to changes in the economy or our industry (placing us at a competitive disadvantage compared to competitors that are less highly leveraged), reduce our ability to use cash flows for operating, investing and financing opportunities (including working capital, capital expenditures, mergers and acquisitions and equity or debt repurchases), and prevent us from meeting our obligations under the agreements governing our indebtedness. Our ability to make scheduled payments on our debt obligations will depend on our ability to generate sufficient cash flows. We cannot assure you that our business will generate cash flow from operations, or that additional capital will be available to us, in an amount sufficient to enable us to meet our payment obligations under the Term Loan and Revolving Loan and to fund other liquidity needs. Failure to generate sufficient cash flow would require us to refinance or restructure our debt or seek to raise additional capital (which could be dilutive to stockholders). If we are unable to implement one or more of these alternatives, we may not be able to meet our payment obligations under the Term Loan and Revolving Loan. Furthermore, the Term Loan and Revolving Loan contain covenants that may restrict our ability to implement our business plan, finance future operations, pay dividends, respond to changing business and economic conditions, secure additional financing, and engage in certain transactions (including mergers, acquisitions and dispositions).

If we default under the Term Loan and Revolving Loan because of an inability to meet our payment obligations, a covenant breach or otherwise, all outstanding amounts thereunder could become immediately due and payable. We cannot assure you that we would have sufficient funds to repay all the outstanding amounts under the Term Loan and Revolving Loan, and any acceleration of amounts due would have a material adverse effect on our business, growth strategy, liquidity, financial condition and ability to continue as a going concern. We and our subsidiaries also may be able to incur substantial additional indebtedness in the future, subject to the foregoing restrictions, which could exacerbate the leverage risks noted above.

From time to time, based on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors and subject to compliance with applicable laws and regulations, we may seek to utilize cash on hand, borrowings or raise capital to retire, repurchase or redeem our notes, repay debt, repurchase shares of our common stock or otherwise enter into similar transactions to support our capital structure and business or utilize excess cash flow on a strategic basis.

**Risks Related to Laws and Regulations**

*Government regulation of the internet and e-commerce is evolving, and unfavorable changes or failure by us to comply with these regulations could substantially harm our business and results of operations.*

We are subject to general business regulations and laws as well as regulations and laws specifically governing the Internet and e-commerce. Existing and future regulations and laws could impede the growth of the Internet, e- commerce or mobile commerce. These regulations and laws may involve taxes, tariffs, privacy and data security, anti-spam, content protection, electronic contracts and communications, consumer protection, Internet neutrality and gift cards. It is not clear how existing laws governing issues such as property ownership, sales and other taxes and consumer privacy apply to the Internet as the vast majority of these laws were adopted prior to the advent of the Internet and do not contemplate or address the unique issues raised by the Internet or e-commerce. It is possible that general business regulations and laws, or those specifically governing the Internet or e-commerce, may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other rules or our practices. We cannot be sure that our practices have complied, comply or will comply fully with all such laws and regulations. Any failure, or perceived failure, by us to comply with any of these laws or regulations could result in damage to our reputation, a loss in business and proceedings or actions against us by governmental entities or others. Any such proceeding or action could hurt our reputation, force us to spend significant amounts in defense of these proceedings, distract our management, increase our costs of doing business, decrease the use of our sites by consumers and suppliers and may result in the imposition of monetary liability. We may also be contractually liable to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any such laws or regulations. Adverse legal or regulatory developments could substantially harm our business. Further, if we enter into new market segments or geographical areas and expand the products and services we offer, we may be subject to additional laws and regulatory requirements or prohibited from conducting our business, or certain aspects of it, in certain jurisdictions. We will incur additional costs complying with these additional obligations and any failure or perceived failure to comply would adversely affect our business and reputation.

*Failure to comply with applicable laws and regulations relating to privacy, data protection and consumer protection, or the expansion of current or the enactment of new laws or regulations relating to privacy, data protection and consumer protection, could adversely affect our business and our financial condition.*

A variety of laws and regulations govern the collection, use, retention, sharing, export and security of personal information. Laws and regulations relating to privacy, data protection and consumer protection are evolving and subject to potentially differing interpretations. These requirements may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another or may conflict with other rules or our practices. As a result, our practices may not comply, or may not comply in the future with all such laws, regulations, requirements and obligations. Any failure, or perceived failure, by us to comply with our posted privacy policies or with any applicable privacy or consumer protection- related laws, regulations, industry self-regulatory principles, industry standards or codes of conduct, regulatory guidance, orders to which we may be subject or other legal obligations relating to privacy or consumer protection could adversely affect our reputation, brand and business, and may result in claims, proceedings or actions against us by governmental entities or others or other liabilities or require us to change our operations and/or cease using certain data sets. Any such claim, proceeding or action could hurt our reputation, brand and business, force us to incur significant expenses in defense of such proceedings, distract our management, increase our costs of doing business, result in a loss of customers and suppliers and may result in the imposition of monetary penalties. We may also be contractually required to indemnify and hold harmless third parties from the costs or consequences of non-compliance with any laws, regulations or other legal obligations relating to privacy or consumer protection or any inadvertent or unauthorized use or disclosure of data that we store or handle as part of operating our business.

In addition, various federal, state and foreign legislative and regulatory bodies, or self-regulatory organizations, may expand current laws or regulations, enact new laws or regulations or issue revised rules or guidance regarding privacy, data protection and consumer protection. Any such changes may force us to incur substantial costs or require us to change our business practices. This could compromise our ability to pursue our growth strategy effectively and may adversely affect our ability to acquire customers or otherwise harm our business, financial condition and operating results.

*If the use of "cookie" tracking technologies is further restricted, regulated, or blocked, or if changes in technology cause cookies to become less reliable or acceptable as a means of tracking consumer behavior, the amount or accuracy of Internet user information we collect would decrease, which could harm our business and operating results.*

Federal, state and international governmental authorities continue to evaluate the privacy implications inherent in the use of proprietary or third-party "cookies" and other methods of online tracking for behavioral advertising and other purposes. U.S. and foreign governments have enacted, have considered or are considering legislation or regulations that could significantly restrict the ability of companies and individuals to engage in these activities, such as by regulating the level of consumer notice and consent required before a company can employ cookies or other electronic tracking tools or the use of data gathered with such tools. Additionally, some providers of consumer devices and web browsers have implemented, or announced plans to implement, means to make it easier for Internet users to prevent the placement of cookies or to block other tracking technologies, which could if widely adopted significantly reduce the effectiveness of such practices and technologies. The regulation of the use of cookies and other current online tracking and advertising practices or a loss in our ability to make effective use of services that employ such technologies could increase our costs of operations and limit our ability to acquire new customers on cost-effective terms and consequently, materially adversely affect our business, financial condition and operating results.

***Changes in tax treatment of companies engaged in e-commerce may adversely affect the commercial use of our sites and our business, financial condition and operating results.***

Due to the global nature of the Internet, it is possible that various states or foreign countries might attempt to impose additional or new regulation on our business or levy additional or new sales, income or other taxes relating to our activities. Tax authorities at the international, U.S. federal, state and local levels are currently reviewing the appropriate treatment of companies engaged in e-commerce. New or revised international, U.S. federal, state or local tax regulations or court decisions may subject us or our customers to additional sales, income and other taxes. For example, on June 21, 2018, the U.S. Supreme Court rendered a 5-4 majority decision in *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) where the Court held, among other things, that a state may require an out-of-state seller with no physical presence in the state to collect and remit sales taxes on goods the seller ships to consumers in the state, overturning existing court precedent. Other new or revised taxes and, in particular, sales taxes, value added taxes and similar taxes could increase the cost of doing business online and decrease the attractiveness of selling products over the Internet. New taxes and rulings could also create significant increases in internal costs necessary to capture data and collect and remit taxes. In addition, we may charge sales taxes in jurisdictions where our competitors do not, resulting in our product prices potentially being higher than those of our competitors. As a result, we may lose sales to our competitors in these jurisdictions. Any of these events or a successful assertion by one or more states or foreign countries requiring us to collect taxes where we currently do not do so, or to collect more taxes in a jurisdiction in which we currently collect some taxes, could have a material adverse effect on our business, financial condition and operating results.

***Changes to applicable tax laws and regulations or exposure to additional income tax liabilities could adversely affect our results of business, financial condition and operating results.***

We are subject to various complex and evolving U.S. federal, state and local taxes. U.S. federal, state and local tax laws, policies, statutes, rules, regulations or ordinances could be interpreted, changed, modified or applied adversely to us, possibly with retroactive effect, and may have an adverse effect on our business and future profitability. For example, several tax proposals have been set forth that would, if enacted, make significant changes to U.S. tax laws. Such proposals have included an increase in the U.S. federal income tax rate applicable to corporations (such as us) from 21%, the imposition of a minimum tax on book income for certain corporations, and the imposition of an excise tax on certain corporate stock repurchases that would be borne by the corporation repurchasing such stock. Congress could consider, and could include some or all of these proposals in connection with tax reform that may be undertaken. It is unclear whether these or similar changes will be enacted and, if enacted, how soon any such changes could take effect. The passage of any legislation as a result of these proposals and other similar changes in U.S. federal income tax laws could adversely affect us, which, in turn, could adversely affect our business, financial condition and operating results.

***We may not be able to adequately protect our intellectual property rights.***

We regard our customer lists, domain names, trademarks, trade dress, trade secrets, proprietary technology and similar intellectual property as critical to our success, and we rely on trade secret protection, agreements and other methods with our employees and others to protect our proprietary rights. We might not be able to obtain broad protection for all of our intellectual property. For example, we are the registrant of the Internet domain names for our websites. However, we might not be able to prevent third parties from registering, using or retaining domain names that interfere with our consumer communications or infringe or otherwise decrease the value of our marks, domain names and other proprietary rights.

The protection of our intellectual property rights may require the expenditure of significant financial, managerial and operational resources. We may initiate claims or litigation against others for infringement, misappropriation or violation of our intellectual property rights or proprietary rights or to establish the validity of such rights. Any litigation, whether or not it is resolved in our favor, could result in significant expense to us and divert the efforts of our technical and management personnel, which may materially adversely affect our business, financial condition and operating results. Moreover, the steps we take to protect our intellectual property may not adequately protect our rights or prevent third parties from infringing or misappropriating our proprietary rights, and we may not be able to broadly enforce all of our intellectual property rights. Any of our intellectual property rights may be challenged by others or invalidated through administrative process or litigation. Additionally, the process of obtaining intellectual property protections is expensive and time-consuming, and we may not be able to pursue all necessary or desirable actions at a reasonable cost or in a timely manner. Even if issued, there can be no assurance that these protections will adequately safeguard our intellectual property, as the legal standards relating to the validity, enforceability and scope of protection of patent and other intellectual property rights are uncertain. We also cannot be certain that others will not independently develop or otherwise acquire equivalent or superior technology or intellectual property rights. We may also be exposed to claims from third parties claiming infringement of their intellectual property rights, or demanding the release or license of open source software or derivative works that we developed using such software (which could include our proprietary code) or otherwise seeking to enforce the terms of the applicable open source license. These claims could result in litigation and could require us to purchase a costly license, publicly release the affected portions of our source code, be limited in or cease using the implicated software unless and until we can re-engineer such software to avoid infringement or change the use of the implicated open source software.

22

***We may be accused of infringing intellectual property rights of third parties.***

The e-commerce industry is characterized by vigorous protection and pursuit of intellectual property rights, which has resulted in protracted and expensive litigation for many companies. We may be subject to claims and litigation by third parties that we infringe their intellectual property rights. The costs of supporting such litigation and disputes are considerable, and there can be no assurances that favorable outcomes will be obtained. As our business expands and the number of competitors in our market increases and overlaps occur, we expect that infringement claims may increase in number and significance. Any claims or proceedings against us, whether meritorious or not, could be time-consuming, result in considerable litigation costs, require significant amounts of management time or result in the diversion of significant operational resources, any of which could materially adversely affect our business, financial condition and operating results.

We have received in the past, and we may receive in the future, communications alleging that certain items posted on or sold through our sites violate third-party copyrights, designs, marks and trade names or other intellectual property rights or other proprietary rights. Brand and content owners and other proprietary rights owners have actively asserted their purported rights against online companies. In addition to litigation from rights owners, we may be subject to regulatory, civil or criminal proceedings and penalties if governmental authorities believe we have aided and abetted in the sale of counterfeit or infringing products.

Such claims, whether or not meritorious, may result in the expenditure of significant financial, managerial and operational resources, injunctions against us or the payment of damages by us. We may need to obtain licenses from third parties who allege that we have violated their rights, but such licenses may not be available on terms acceptable to us, or at all. These risks have been amplified by the increase in third parties whose sole or primary business is to assert such claims.

***We may be subject to product liability and other similar claims if people or property are harmed by the products we sell.***

Some of the products we sell may expose us to product liability and other claims and litigation (including class actions) or regulatory action relating to safety, personal injury, death or environmental or property damage. Some of our agreements with members of our supply chain may not indemnify us from product liability for a particular product, and some members of our supply chain may not have sufficient resources or insurance to satisfy their indemnity and defense obligations. Although we maintain liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms, or at all.

***We are engaged in legal proceedings that could cause us to incur unforeseen expenses and could occupy a significant amount of our management's time and attention.***

From time to time, we are subject to litigation or claims that could negatively affect our business operations and financial position. Litigation disputes could cause us to incur unforeseen expenses, result in site unavailability, service disruptions, and otherwise occupy a significant amount of our management's time and attention, any of which could negatively affect our business operations and financial position. We also from time to time receive inquiries and subpoenas and other types of information requests from government authorities and we may become subject to related claims and other actions related to our business activities. While the ultimate outcome of investigations, inquiries, information requests and related legal proceedings is difficult to predict, such matters can be expensive, time consuming and distracting, and adverse resolutions or settlements of those matters may result in, among other things, modification of our business practices, reputational harm or costs and significant payments, any of which could negatively affect our business operations and financial position. See Item 3, "*Legal Proceedings*" for a description of our pending litigation and claims.

**Risks Related to Ownership of Our Common Stock**

***We have a limited number of shares of common stock available for issuance, which may limit our ability to raise capital***.

We have historically relied on the equity markets to raise capital to fund our business and operations. As of December 31, 2022, we had only 2,220,201 shares of common stock available for issuance, of which all shares were reserved for issuance upon vesting or exercise of equity awards and options, under our employee stock purchase and equity incentive plans, and under our at-the-market offering program. The limited number of shares available for issuance may limit our ability to raise capital in the equity markets and satisfy obligations with shares instead of cash, which could adversely impact our ability to fund our business and operations.

***We may not be able to maintain a listing of our common stock and warrants on NYSE American.***

As a result of the matters relating to the investigation (See "Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operation – Investigation") our former auditor withdrew its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declined to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively. If the Company does not make progress consistent with the plan discussed under the Risk Factor "Prior to the filing of this annual report on Form 10-K, we have been delinquent in our SEC reporting obligations for over 12 months. Although we expect to file our periodic reports in a timely fashion going forward, we cannot provide assurance that our business and the price of our common stock will not be materially adversely affected by our previous failure to file required periodic reports." during the plan period discussed therein or if the Company does not complete its Delayed Filings with the Securities and Exchange Commission by the end of the maximum 12-month cure period on August 22, 2023, Exchange staff will initiate delisting proceedings as appropriate.

Our common stock and warrants are currently traded on NYSE American. We must meet certain financial and liquidity criteria to maintain the listing of our common stock and warrants. If we fail to meet any listing standards or if we violate any listing requirements, our common stock or warrants may be delisted. In addition, our board of directors may determine that the cost of maintaining our listing on a national securities exchange outweighs the benefits of such listing. A delisting of our common stock and warrants from NYSE American may materially impair our stockholders' ability to buy and sell our common stock and warrants and could have an adverse effect on the market price of, and the efficiency of the trading market for, our common stock and warrants. The delisting of our common stock or warrants could significantly impair our ability to raise capital and the value of your investment.

***The market price, trading volume and marketability of our common stock and warrants may, from time to time, be significantly affected by numerous factors beyond our control, which may materially adversely affect the market price of your common stock and warrants, the marketability of your common stock and warrants and our ability to raise capital through future equity financings.***

The market price and trading volume of our common stock and warrants may fluctuate significantly. Many factors that are beyond our control may materially adversely affect the market price of your common stock and warrants, the marketability of your common stock and warrants and our ability to raise capital through equity financings. These factors include the following:

- actual or anticipated variations in our periodic operating results;

- increases in market interest rates that lead investors of our securities to demand a higher investment return;

- changes in earnings estimates or financial projections we may provide to the public and any changes in these estimates or projections or our failure to meet these estimates or projections; failure of securities analysts to initiate or maintain coverage of our company, changes in financial estimates or ratings by any securities analysts who follow us or our failure to meet these estimates or the expectations of investors;

- changes in market valuations of similar companies;

- actions or announcements by us or our competitors of new businesses, services or products, significant technical innovations, acquisitions, strategic partnerships, joint ventures, operating results or capital commitments;

- adverse market reaction to any increased indebtedness we may incur in the future;

- changes in operating performance and stock market valuations of other technology or retail companies generally, or those in our industry in particular;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- changes in laws or regulations applicable to our business;

- additions or departures of key personnel;

- actions by stockholders, including sales of large blocks of our common stock;

- speculation in the media, online forums, or investment community; and

- our ability to maintain the listing of our common stock and warrants on NYSE American.

In addition, stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many technology companies, including e-commerce companies. Stock prices of many technology companies, including e-commerce companies, have fluctuated in a manner unrelated or disproportionate to the operating performance of those companies. Volatility in our stock price could adversely affect our business and financing opportunities and expose us to litigation. Securities litigation can subject us to substantial costs, divert resources and the attention of management from our business and materially adversely affect our business, financial condition and operating results.

*Our warrants may not have any value.*

Our outstanding warrants have a weighted average remaining contractual life of 3.4 years with a weighted average exercise price of $2.30. There can be no assurance that the market price of our common stock will ever equal or exceed the exercise price of the warrants. In the event that the stock price of our common stock does not exceed the exercise price of the warrants during the period when the warrants are exercisable, the warrants may not have any value.

*Holders of our warrants will have no rights as stockholders until such holders exercise their warrants and acquire our common stock.*

Until holders of our warrants acquire common stock upon exercise thereof, such holders will have no rights with respect to the common stock underlying the warrants. Upon exercise of the warrants, the holders will be entitled to exercise the rights of a common stockholder only as to matters for which the record date occurs after the exercise date.

*An active, liquid trading market for our common stock may not be sustained, which may make it difficult to sell our common stock and warrants.*

We cannot predict the extent to which investor interest in us will sustain a trading market or how active and liquid that market may remain. If an active and liquid trading market is not sustained, holders of our common stock and warrants may have difficulty selling any of our common stock that they purchased at a price above the price they purchased it or at all. The failure of an active and liquid trading market to continue would likely have a material adverse effect on the value of our common stock. The market price of our common stock and warrants may decline, and holders of our common stock and warrants may not be able to sell their shares of our common stock and warrants at or above the price they paid or at all. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares and may impair our ability to acquire other companies or technologies by using our shares as consideration.

*We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future.*

We have not paid in the past and do not expect to declare or pay dividends in the foreseeable future, as we anticipate that we will invest future earnings in the development and growth of our business. In addition, under our Credit Agreement, we are restricted from paying cash dividends, and we expect these restrictions to continue in the future, which may in turn limit our ability to pay cash dividends on our common stock. Our ability to pay cash dividends may also be restricted by the terms of any future credit agreement or any future debt or preferred equity securities that we or our subsidiaries may issue. Therefore, holders of our common stock may not receive any return on their investment unless they sell their securities, and holders may be unable to sell their securities on favorable terms or at all.

*If securities industry analysts do not publish research reports on us, or publish unfavorable reports on us, then the market price and market trading volume of our common stock and warrants could be negatively affected.*

Any trading market for our common stock and warrants may be influenced in part by any research reports that securities industry analysts publish about us, our business, our market and our competitors. We do not currently have and may never obtain research coverage by securities industry analysts. If no securities industry analysts commence coverage of us, the market price and market trading volume of our common stock and warrants could be negatively affected. In the event we are covered by analysts, and one or more of such analysts downgrade our securities, or otherwise reports on us unfavorably, or discontinues coverage of us, the market price and market trading volume of our common stock and warrants could be negatively affected.

*Future issuances of our common stock or securities convertible into, or exercisable or exchangeable for, our common stock could cause the market price of our common stock to decline and would result in the dilution of our stockholders' holdings.*

Future issuances of our common stock or securities convertible into, or exercisable or exchangeable for, our common stock, could cause the market price of our common stock to decline. We cannot predict the effect, if any, of future issuances of our securities on the price of our common stock. In all events, future issuances of our common stock would result in the dilution of our stockholders' holdings. In addition, the perception that new issuances of our securities could occur could adversely affect the market price of our common stock.

25

***Future issuances of debt securities, which would rank senior to our common stock upon our bankruptcy or liquidation, and future issuances of preferred stock, which could rank senior to our common stock for the purposes of dividends and liquidating distributions, may adversely affect the level of return holders of our common stock may be able to achieve from an investment in our common stock.***

In the future, we may attempt to increase our capital resources by offering debt securities. Upon bankruptcy or liquidation, holders of our debt securities, and lenders with respect to other borrowings we may make, would receive distributions of our available assets prior to any distributions being made to holders of our common stock. Moreover, if we issue preferred stock, the holders of such preferred stock could be entitled to preferences over holders of common stock in respect of the payment of dividends and the payment of liquidating distributions. Because our decision to issue debt or preferred stock in any future offering, or borrow money from lenders, will depend in part on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of any such future offerings or borrowings. Holders of our common stock must bear the risk that any future offerings we conduct or borrowings we make may adversely affect the level of return, if any, they may be able to achieve from an investment in our common stock.

***If our shares of common stock become subject to the penny stock rules, it would become more difficult to trade our shares.***

The SEC has adopted rules that regulate broker-dealer practices in connection with transactions in penny stocks. Penny stocks are generally equity securities with a price of less than $5.00, other than securities registered on certain national securities exchanges or authorized for quotation on certain automated quotation systems, provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system. If we do not retain a listing on NYSE American or another national securities exchange and if the price of our common stock is less than $5.00, our common stock could be deemed a penny stock. The penny stock rules require a broker-dealer, before a transaction in a penny stock not otherwise exempt from those rules, to deliver a standardized risk disclosure document containing specified information. In addition, the penny stock rules require that before effecting any transaction in a penny stock not otherwise exempt from those rules, a broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive (i) the purchaser's written acknowledgment of the receipt of a risk disclosure statement; (ii) a written agreement to transactions involving penny stocks; and (iii) a signed and dated copy of a written suitability statement. These disclosure requirements may have the effect of reducing the trading activity in the secondary market for our common stock, and therefore stockholders may have difficulty selling their shares.

***For as long as we are an "emerging growth company," or a "smaller reporting company" we will not be required to comply with certain reporting requirements that apply to some other public companies, and such reduced disclosures requirement may make our common stock less attractive.***

As an "emerging growth company" as defined in the Jumpstart Our Business Startups Act ("JOBS Act"), we may take advantage of exemptions from certain disclosure requirements applicable to other public companies that are not emerging growth companies. We are an emerging growth company until the earliest of (i) the last day of the fiscal year during which we have total annual gross revenues of $1.235 billion or more; (ii) the last day of the fiscal year following the fifth anniversary of the first sale of common equity securities pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act"); (iii) the date on which we have, during the previous three-year period, issued more than $1 billion in non-convertible debt; or (iv) the date on which we are deemed to be a "large accelerated filer" under the rules of the SEC.

For so long as we remain an "emerging growth company," we will not be required to, among other things:

- have an auditor report on our internal control over financial reporting pursuant to Sarbanes-Oxley;

- comply with any new requirements adopted by the Public Company Accounting Oversight Board requiring mandatory audit firm rotation or a supplement to the auditor's report providing additional information about our audit and our financial statements;

- include detailed compensation discussion and analysis in our filings under the Exchange Act and instead may provide a reduced level of disclosure concerning executive compensation; and

- hold a non-binding stockholder advisory vote on executive compensation and stockholder approval of any "golden parachute" payments not previously approved.

Notwithstanding the above, we are also currently a "smaller reporting company", meaning that we are not an investment company, an asset-backed issuer, or a majority-owned subsidiary of a parent company that is not a smaller reporting company and have either: (i) a public float of less than $250 million, or (ii) annual revenues of less than $100 million during the most recently completed fiscal year and: (A) no public float, or (B) a public float of less than $700 million. In the event that we are still considered a smaller reporting company, at such time we cease being an emerging growth company, the disclosure we will be required to provide in our SEC filings will increase but will still be less than it would be if we were not considered either an "emerging growth company" or a smaller reporting company. Specifically, similar to emerging growth companies, smaller reporting companies are able to provide simplified executive compensation disclosures in their filings; are exempt from the provisions of Section 404(b) of the Sarbanes-Oxley Act requiring that independent registered public accounting firms provide an attestation report on the effectiveness of internal control over financial reporting; and have certain other decreased disclosure obligations in their SEC filings, including, among other things, only being required to provide two years of audited financial statements in annual reports. Decreased disclosures in our SEC filings due to our status as an emerging growth company or smaller reporting company may make it harder for investors to analyze the Company's results of operations and financial prospects.

Because of these exemptions, some investors may find our common shares less attractive, which may result in a less active trading market for our common stock, and our share price may be more volatile.

***Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of our company more difficult, and limit attempts by our stockholders to replace or remove our current management.***

Certain provisions of Delaware law and our certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. Our certificate of incorporation and bylaws include provisions that:

- permit the board of directors to establish the number of directors and fill any vacancies and newly created directorships;

- provide that the Board is expressly authorized to adopt, amend or repeal our bylaws;

- providing indemnification to our directors and officers;

- controlling the procedures for the conduct and scheduling of board of directors and stockholder meetings;

- do not give the holders of our common stock cumulative voting rights with respect to the election of directors;

- provide that directors may only be removed by the majority of the shares of voting stock then outstanding; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. They may also make it more difficult for a third party to acquire us, even if the third party's offer may be considered beneficial by many of our stockholders. As a result, our stockholders may be limited in their ability to obtain a premium for their shares.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in our management.

**ITEM 1B. UNRESOLVED STAFF COMMENTS.**

Not applicable.

**ITEM 2. PROPERTIES.**

We operate the following facilities:

| Property Location: | Description of Use | Leased Square Footage (1) |
|---|---|---|
| Brooklyn, New York | Headquarters; Office Space; Showroom | 21,000 |
| Brooklyn, New York | Office Space | 5,835 |
| Brooklyn, New York | Showroom | 3,800 |
| Somerset, New Jersey | Warehouse | 129,785 |
| Hamilton, New Jersey | Warehouse | 135,000 |
| St. Charles, Missouri | Office Space; Showroom; Warehouse | 86,800 |
| Ballwin, Missouri(2) | Office Space; Showroom; Warehouse | 50,000 |
| Largo, Florida | Showroom; Warehouse | 5,800 |
| **Total** | | 438,020 |

(1)  Represents the total leased space.
(2)  On June 30, 2021, we closed this warehouse and retail showroom in anticipation of relocating to a new facility. We intend to sub-lease this space.

We believe that all our current facilities have been adequately maintained, are generally in good condition, and are suitable and capable of supporting our operations for the foreseeable future.

**ITEM 3. LEGAL PROCEEDINGS.**

**Derivative Actions**

At the Company's annual meeting on December 21, 2021, the stockholders were asked to approve an amendment to the Company's Amended and Restated Certificate of Incorporation, dated July 30, 2020 (the "Certificate of Incorporation"), increasing the number of authorized shares of the Company's common stock, par value $0.0001 per share ("Common Stock" and such proposal, the "Share Increase Proposal") by 50,000,000 shares of Common Stock. As reported in a Form 8-K filing on December 28, 2021, the Share Increase Proposal was adopted and a Certificate of Amendment to the Certificate of Incorporation setting forth the amendment adopted pursuant to the Share Increase Proposal (the "Certificate of Amendment") was filed with the Secretary of State of the State of Delaware (the "Delaware Secretary of State"). To date, none of these newly authorized shares has actually been issued.

Three purported beneficial owners of Common Stock subsequently expressed concerns about a statement in the Company's proxy statement related to the Share Increase Proposal, specifically questioning, in light of the proxy statement, the ability of brokerage firms and other custodians to vote shares of Common Stock held by them for the benefit of their customers in the absence of instructions from the beneficial owners. Based on an examination of the situation performed following receipt of these demands, the Company believes that the vote at the annual meeting was properly tabulated and that the proposed amendment was properly adopted in accordance with Delaware law. In light of the demands, however, and to ensure against any future question as to the validity of these newly authorized shares, the Company elected to seek validation of its Certificate of Amendment through a Petition to the Court of Chancery of the State of Delaware (the "Court of Chancery") pursuant to Section 205 of the Delaware General Corporation Law (the "205 Petition"). The action, styled *In re 1847 Goedeker Inc.*, C.A. 2022-0219-SG (the "Action"), sought entry by the Court of Chancery of an order validating and declaring effective the Certificate of Amendment, and validating the additional shares of Common Stock authorized under the Share Increase Proposal. Two purported stockholders objected to the 205 Petition. One such objecting, purported stockholder (the "Stockholder Plaintiff") filed his own lawsuit (which was then consolidated with the 205 Petition) requesting that such relief not be granted and asserting two claims for relief: first, against the Company for alleged violation of the Delaware General Corporation Law Section 225(b) for improper tabulation of the stockholder vote on the Share Increase Proposal; and second, asserting that the Company's directors breached their fiduciary duties by incorrectly tabulating the stockholder vote, and by causing a purportedly invalid amendment to the Certificate of Incorporation to be filed with the Delaware Secretary of State. The Court of Chancery held a hearing on May 27, 2022, to consider the Company's motion for entry of an order under Section 205 and subsequently entered an order denying the motion without prejudice on June 30, 2022. On July 7, 2022, the Company filed a Certificate of Correction with the Secretary of State of the State of Delaware, voiding the Charter Amendment and causing the number of authorized shares of Common Stock to remain at 200,000,000.

On June 12, 2023, the Company submitted to the Court of Chancery a Stipulation and [Proposed] Order Regarding Notice and Closing of the Case regarding the Action (the "Dismissal Order"). As stated in the Dismissal Order, the Company and the other parties to the Action negotiated at arm's length and resolved the stockholders' claims to entitlement to a mootness fee award, and the Company agreed to pay $475,000 for attorneys' fees and expenses to the stockholders' counsel (the "Attorneys' Fees"). Pursuant to Court of Chancery Rules 23(e) and 41(a), the parties to the Action stipulated to voluntary dismissal of the Action with prejudice as to the Stockholder Plaintiff and without prejudice as to any actual or potential claims of any other members of the putative class, and such dismissal was granted by the Court on June 13, 2023. As stipulated in the Dismissal Order, the Company paid the Attorneys' Fees to the stockholders' counsel on June 28, 2023 and such payment fully satisfied and resolved the stockholders' and the stockholders' counsel's entitlement to any fees or expenses in the Action.

On October 31, 2022, a putative shareholder class action was filed against Polished.com Inc. (the "Company") and certain of its current and former officers and directors, as well as certain underwriters of the Company's 2020 initial public offering (the "IPO"). The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Maschhoff v. Polished.com Inc., et al.*, No. 1:22-cv-06606. The complaint asserts violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as well as Sections 10(b) and Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about December 20, 2022, plaintiffs filed a motion for the appointment of lead plaintiff and lead counsel. Although that motion is fully briefed, to date, oral argument has yet to be scheduled.

28

On January 26, 2023, a derivative stockholder complaint was filed against certain of the Company's current and former officers and directors, naming the Company as a nominal defendant. The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Wong v. Moore et al.*, No. 1:23-cv-00559. The complaint asserts violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about March 7, 2023, plaintiff filed a stipulation and proposed order to stay proceedings until any motions to dismiss in the related class action (captioned *Maschhoff v. Polished.com Inc. et al.*, No. 1:22-cv-06606) are decided. On March 23, 2023, the stipulation was so-ordered.

On February 13, 2023, a derivative stockholder complaint was filed against certain of the Company's current and former officers and directors as well as the Company's external manager, naming the Company as a nominal defendant. The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Gossett v. Moore, et al.*, No. 1:23-cv-1168. The complaint asserts claims for breach of fiduciary duty against the former officers and directors and aiding and abetting breaches of fiduciary of duty against the external manager, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about April 24, 2023, plaintiffs filed a joint stipulation and proposed order consolidating the related derivative actions and appointing co-lead counsel. To date, the stipulation has yet to be ordered.

**Action Against Former Employee**

On February 22, 2023, the Company filed an action against a former employee asserting a claim for conversion based on the individual's retention of profits from sales to the Company's customers. The action was commenced in the Supreme Court of the State of New York, County of Kings and is captioned *Polished.com, Inc. v. Naoulo*, No. 505712/2023. On March 5, 2023, the defendant filed an answer and asserted counterclaims for breach of contract, breach of implied contract and defamation. On May 25, 2023, the defendant filed an amended answer and added a counterclaim for tortious interference with prospective business relations. On June 14, 2023, the Company moved to dismiss the amended counterclaims. The opposition has not been filed yet.

From time to time, we may be subject to various legal proceedings and claims arising in the ordinary course of business. All other litigation currently pending against the Company relates to matters that have arisen in the ordinary course of business and we believe that such matters will not have a material adverse effect on our consolidated financial condition, results of operations or cash flows.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

29

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.**

**Market Information**

Our common stock and warrants are traded on the NYSE American under the symbols "POL" and "POL WS," respectively.

**Holders of Record**

As of July 26, 2023, there were approximately 52 stockholders of record of our common stock and 1 holder of record of our warrants. For our common stock, the actual number of holders is greater than this number of record holders, and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or held by other nominees. The number of holders of record of common stock also does not include stockholders whose shares may be held in trust by other entities.

**Dividend Policy**

We have never declared or paid cash dividends on our common stock. We do not anticipate declaring or paying any cash dividends to holders of our common stock in the foreseeable future. Holders of our warrants are not entitled to participate in any dividends declared by our board of directors. We currently intend to retain future earnings, if any, to finance the growth of our business. Our future dividend policy is within the discretion of our board of directors and will depend upon then-existing conditions, including our results of operations, financial condition, capital requirements, investment opportunities, statutory restrictions on our ability to pay dividends and other factors our board of directors may deem relevant. In addition, under our Credit Agreement, we are restricted from paying cash dividends, and we expect these restrictions to continue in the future, which may in turn limit our ability to pay cash dividends on our common stock. Our ability to pay cash dividends may also be restricted by the terms of any future credit agreement or any future debt or preferred equity securities that we or our subsidiaries may issue. See also Item 1A *"Risk Factors—Risks Related Ownership of Our Common Stock—We do not expect to declare or pay dividends in the foreseeable future."*

**Securities Authorized for Issuance under Equity Compensation Plans**

See Item 12 *"Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."*

**Recent Sales of Unregistered Securities**

None.

**Issuer's Purchases of Equity Securities**

On December 17, 2021 the Company's board of directors authorized the repurchase of up to $25.0 million of the Company's common stock. Subject to certain conditions, repurchases may be made in accordance with applicable securities laws in open market or private, including accelerated, repurchase transactions from time to time, depending on market conditions.

During the year ended December 31, 2022, the Company purchased 1,229,222 shares of its common stock at a total purchase price of $2 million or $1.63 per share. Effective December 31, 2022, the board of directors authorized the retirement of these shares. The Company has $23.0 million remaining under its current share repurchase authorization.

**ITEM 6. [Reserved.]**

Part II, Item 6 is no longer required due to amendments to Regulation S-K that eliminate Item 301.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

**RESTATEMENT OF PREVIOUSLY ISSUED CONSOLIDATED FINANCIAL STATEMENTS**

The following discussion and analysis summarizes the significant factors affecting our operating results, financial condition, liquidity and cash flows as of and for the periods presented below. The following discussion and analysis should be read in conjunction with our consolidated financial statements and the related notes thereto included Part II, Item 8 of this report. This report restates amounts as of and for the year ended December 31, 2021 included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and for the period ended March 31, 2022 included in our Quarterly Report on Form 10-Q for the period ended March 31, 2022. See Note 2, "*Summary of Significant Accounting Policies – Restatement,*" in "*Item 8 Financial Statements and Supplementary Data*", for additional information. The restatement also includes corrections for other errors previously identified as immaterial, individually and in the aggregate, to our consolidated financial statements. The impact of the restatement is reflected in Management's Discussion and Analysis of Financial Condition and Results of Operations below.

**Overview**

We operate a content-driven and technology-enabled shopping destination for appliances, furniture and home goods. With warehouse fulfillment centers in the Northeast and Midwest, as well as showrooms in Brooklyn, New York, and Largo, Florida. We offer one-stop shopping for national and global brands. We carry many household name-brands, including Bosch, Cafe, Frigidaire Pro, Whirlpool, LG, and Samsung, and also carry many major luxury appliance brands such as Miele, Thermador, La Cornue, Dacor, Ilve, Jenn-Air and Viking, among others. We also sell furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients.

**Recent Developments**

*Investigation*

On August 15, 2022, the Company filed a form 12b-25 with the Securities and Exchange Commission related to its 10-Q for the six months ended June 30, 2022, reporting that the Audit Committee had begun an independent investigation regarding certain allegations made by certain former employees related to the Company's business operations.

On December 22, 2022, the Company issued a press release stating that the Board had completed its assessment of the results of the Audit Committee's previously disclosed investigation. The investigation, which was supported by independent legal counsel and advisors, produced the following key findings pertaining to the Company's business operations under former management during the 2021-2022 period:

- The Company was charged by its former Chief Executive Officer approximately $800,000 for expenses unrelated to the Company and its operations.

- The Company appears to not have had in place all the necessary documentation for all of its employees and, in turn, may have failed to comply with certain legal requirements. The Company subsequently put in place enhanced controls to remedy any labor issues, including but not limited to hiring a controller with significant relevant experience, hiring a new human resources director who is leading an overhaul of certain employee policies and initiating the installation of enhanced payroll software that requires all new employees to provide I-9 information and verifies the validity of key information, and believes it is now in full compliance with legal requirements.

- The Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient. The Company subsequently put in place enhanced controls to remedy such issues, including but not limited to initiating the installation of enhanced software and systems for inventory management, ensuring the implementation of standardized policies for the handling and sale of damaged inventory and developing a plan to convert the Company to a new ERP and system for accounting.

The Company entered into a settlement agreement with Albert Fouerti regarding matters relating to the investigation. Among other things, Mr. Fouerti agreed not to compete for a period of two years following the execution of the settlement agreement.

*Resignation of Auditors*

On December 20, 2022, the Company received a letter from the Company's independent registered public accounting firm, Friedman LLP, informing the Company of its decision to resign effective December 20, 2022 as the auditors of the Company.

31

In the Letter, Friedman advised the Company that based on the results of the Board's internal investigation as reported to Friedman, it appears there may be material adjustments and/or disclosures necessary to previously reported financial information. Additionally, the Board's internal investigation has identified facts, that if further investigated by Friedman, might cause Friedman to no longer to be able to rely on the representations of (i) management that was in place at the time Friedman issued its audit report for the year ended December 31, 2021, or (ii) management that was in place at the time of Friedman's association with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021 and March 31, 2022. Prior to the Letter, in the past two years, the Company had not received from Friedman an adverse opinion or a disclaimer of opinion, and their opinion was not qualified or modified as to uncertainty, audit scope, or accounting principles. The resignation by Friedman was neither recommended nor approved by the Audit Committee or the Board and there were no disagreements with management and Friedman. Friedman had previously reported a material weakness to the Audit Committee, which was included on the Company's Form 10-K for the year ended December 31, 2021, filed on March 31, 2022, regarding the ineffectiveness of the Company's internal controls over financial reporting.

In connection with the Letter, Friedman advised us that it was withdrawing its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declined to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively.

### Engagement of New Independent Registered Public Accounting Firm

On December 26, 2022, the Audit Committee approved the engagement of Sadler, Gibb & Associates, LLC as the Company's independent registered public accounting firm for the fiscal years ended December 31, 2022 and 2021.

### Cybersecurity Incident

On March 16, 2023, we experienced a hacking attack that impacted the check-out page on the Company's e-commerce website. In response, the Company deployed containment measures, launched an investigation with assistance from third-party cybersecurity experts and notified appropriate law enforcement authorities. The Company considers the matter remediated. The investigation determined that certain personal information, including names, addresses, zip codes, payment card numbers, expiration dates, and CVVs, was extracted from the Company's systems as part of this incident. The investigation could not determine with precision which payment card data was included in the timeframe of exposure. Out of an abundance of caution, the Company notified all payment card users who made transactions on the Company's e-commerce website within the window of exposure. As of May 24, 2023, the Company provided appropriate notice to approximately 9,290 individuals, as well as to regulatory authorities in accordance with applicable law. The Company has incurred, and may continue to incur, certain expenses related to this attack. Further, the Company remains subject to risks and uncertainties as a result of the incident, including as a result of the data that was extracted from the Company's network as noted above. Additionally, security and privacy incidents have led to, and may continue to lead to, additional regulatory scrutiny. Although we are unable to predict the full impact of this incident, including how it could negatively impact our operations or results of operations on an ongoing basis, we presently do not expect that it will have a material effect on the Company's operations.

The Company has engaged outside consultants through its outside counsel to help assess and expand the Company's cyber defenses and payment card protections and policies.

### Impact of COVID-19 Pandemic

In 2022, we experienced only minor impact to our operations, primarily due to staffing challenges brought on by COVID-19. We continue to monitor the current COVID-19 situation in each market in which we operate and will react accordingly. In May 2023, the US Government declared an end to the pandemic.

**Trends and Principal Factors Affecting Our Financial Performance**

Our operating results are primarily affected by the following factors:

- our ability to offer competitive product pricing;

- our ability to broaden product offerings;

- industry demand and competition;

- market conditions and our market position; and

Supply chain constraints also impacted our order fulfillment timing, further amplifying order cancellations and refunds caused by the outbreak of the COVID-19 pandemic. While switching to the authorization model in July 2021 helped mitigate order cancellations, we continued to experience order cancellations related to customer deposits collected in 2020 and early 2021 throughout third and fourth quarter 2021, resulting in negative operating cash flow.

***Factors Affecting Comparability of Our Future Results of Operations to Our Historical Results of Operations***

The comparability of our results of operations between the periods discussed below is affected by the acquisitions we have completed during such periods. We may also evaluate and pursue acquisitions in the future, and such acquisitions, if completed, will continue to impact the comparability of our financial results. Our acquisitions may have materially different characteristics than our historical results, and such differences in economics may impact the comparability of our future results of operations to our historical results.

- On June 2, 2021, we completed the Appliances Connection acquisition.

- On July 29, 2021, we completed the Appliance Gallery Acquisition.

The Company accounted for the above acquisitions using the acquisition method of accounting in accordance with FASB ASC Topic 805 "Business Combinations." In accordance with ASC 805, the Company used its best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date.

**Results of Operations**

***Comparison of Years Ended December 31, 2022 and 2021***

*Restatement*

The Company restated its previously issued financial statements as of and for the year ended December 31, 2021, to reflect the following adjustments:

*Consolidated Statement of Operations*

1.  Reduction in revenue of $16.6 million, which comprised the following: (1) an increase in the allowance for sales returns of $7.4 million, (2) revenue of $8.1 million that should be recognized in 2022, and (3) sales tax collections of $1.1 million improperly recognized as revenue.

2.  Net reduction in cost of goods of $6.7 million, which comprised of the following: (1) reduction in product cost of sales due to an increase in the allowance for sales returns of $4.0 million, (2) reduction in product cost of sales of $6.0 million relating to revenue cutoff that should be recognized in 2022, and (3) an offsetting increase in cost of goods sold from an over accrual of vendor rebates ($0.4 million), under accrual of vendor purchases ($1.5 million), and an error in inventory cutoff ($1.4 million).

3.  Increase in general and administrative expenses of $0.9 million, resulting from an increase in bad debt expense of $0.6 million in accordance with the Company's policy for allowance for doubtful accounts, and an over accrual of sales tax receivable of $0.3 million.

4.  As a result of the changes above, income tax changed from a tax benefit of $4.4 million to a tax expense of $0.1 million.

*Consolidated Balance Sheet*

5.  Net increase in current assets of $6.6 million, which comprised the following: (1) increase in inventory of $7.7 million, resulting from the reduction in cost of goods sold attributable to the allowance for sales returns, revenue cutoff, and inventory cutoff, offset by a reduction in showroom inventory of $1.0 million that was reclassified as property and equipment, (2) reduction in receivables of $1.1 million, resulting from an increase to the allowance for doubtful accounts of $0.6 million, and an over accrual of vendor rebates (as detailed in Nos. 1-4 above).

6.  Net increase in current liabilities of $18.3 million, which comprised the following: (1) increase in accounts payable of $10.3 million, as a result of the increase in the allowance for sales returns, and an under accrual of sales tax refund receivable (netted with the sales tax liability), and (2) increase in customer deposits related to revenue cutoff (as detailed in Nos. 1-4 above).

7.  Increase in long-term liabilities of $4.5 million, relating to an increase to the deferred tax liability as a result of the changes described above.

**POLISHED.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2021**
(in thousands)

|  | As Originally Reported | | Adjustments | As Restated |
|---|---|---|---|---|
| Current assets | $ 121,318 (5) | $ | 6,577 | $ 127,895 |
| Property and equipment | 3,554 (5) | | 1,031 | 4,585 |
| Total assets | $ 375,984 | $ | 7,608 | $ 383,592 |
|  |  |  |  |  |
| Current liabilities | $ 105,341 (6) | | 18,320 | $ 123,661 |
| Deferred tax liability | 3,867 (7) | | 4,540 | 8,407 |
| Total liabilities | 170,381 | | 22,860 | 193,241 |
| Accumulated deficit | (19,056) | | (15,252) | (34,308) |
| Total liabilities and stockholders' equity | $ 375,984 | $ | 7,608 | $ 383,592 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEAR ENDED DECEMBER 31, 2021**
(in thousands)

|  | As Originally Reported | | Adjustments | As Restated |
|---|---|---|---|---|
| Product sales, net | $ 362,314 (1) | $ | (16,589) | $ 345,725 |
| Cost of goods sold | 282,655 (2) | | (6,733) | 275,922 |
| Operating expense | 71,339 (3) | | 918 | 72,257 |
| Income taxes | 4,376 (4) | | (4,478) | (102) |
| Net income (loss) | $ 7,670 | $ | (15,252) | $ (7,582) |
|  |  |  |  |  |
| Net income (loss) per common share |  |  |  |  |
| BASIC | $ 0.12 | | | $ (0.12) |
| DILUTED | $ 0.10 | | | $ (0.12) |
|  |  |  |  |  |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING |  |  |  |  |
| BASIC | 64,528,299 | | | 64,528,299 |
| DILUTED | 76,460,460 | | | 64,528,299 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE YEAR ENDED DECEMBER 31, 2021**
(in thousands)

|  | Common Stock | | Additional Paid-Inc Capital | Accumulated Deficit | Stockholders' Equity |
|---|---|---|---|---|---|
|  | Shares | Amount |  |  |  |
| Balance at December 31, 2021 as originally filed | 106,387,322 | $ 11 | $ 224,648 | $ (19,056) | $ 205,603 |
| Adjustments to result of operations for the year ended December 31, 2021 | - | - | - | (15,252) | (15,252) |
| Balance at December 31, 2021 as restated | 106,387,322 | $ 11 | $ 224,648 | $ (34,308) | $ 190,351 |

34

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEAR ENDED DECEMBER 31, 2021**
(in thousands)

| | As Originally Reported | | Adjustments | As Restated |
|---|---|---|---|---|
| Cash Flows from Operating Activities | | | | |
| Net income (loss) | $ 7,670 | (1-4) $ | (15,252) $ | (7,582) |
| Receivables | (5,603) | (5) | 444 | (5,159) |
| Inventory | (18,459) | (5) | (8,121) | (26,580) |
| Accounts payable and accrued expenses | 14,178 | (6) | 10,207 | 24,385 |
| Customer deposits | (18,968) | (6) | 8,113 | (10,855) |
| Deferred tax expense (benefit) | (4,908) | (7) | 4,540 | (368) |
| Miscellaneous other accounts | 1,116 | | 69 | 1,185 |
| | | | | |
| Net cash used in operating activities | (18,328) | | - | (18,328) |
| | | | | |
| Net cash used in investing activities | (204,834) | | - | (204,834) |
| | | | | |
| Net cash provided by financing activities | 247,041 | | - | 247,041 |
| | | | | |
| Net change in cash and restricted cash | 23,879 | | | 23,879 |
| Cash and restricted cash at beginning of year | 9,912 | | - | 9,912 |
| | | | | |
| Cash and restricted cash at end of year | $ 33,791 | $ | - $ | 33,791 |

35

The following table sets forth key components of our results of operations for the years ended December 31, 2022 and 2021 in thousands and as a percentage of our revenue.

| | For the Year Ended December 31, 2022 | | (As Restated) For the Year Ended December 31, 2021 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Net Sales | Amount | % of Net Sales |
| Product sales, net | $ 534,474 | 100.0% | $ 345,725 | 100.0% |
| Cost of goods sold | 444,957 | 83.3% | 275,922 | 79.8% |
| Gross profit | 89,517 | 16.7% | 69,803 | 20.2% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 28,800 | 5.4% | 21,745 | 6.3% |
| Advertising | 25,461 | 4.8% | 11,961 | 3.5% |
| Bank and credit card fees | 18,776 | 3.5% | 13,599 | 3.9% |
| Depreciation and amortization | 11,456 | 2.1% | 6,557 | 1.9% |
| Impairment of goodwill and intangible assets | 109,140 | 20.4% | - | - |
| Loss on abandonment of right-of-use asset | - | -% | 1,437 | 0.4% |
| General and administrative | 24,226 | 4.5% | 16,958 | 4.9% |
| Total Operating Expenses | 217,859 | 40.8% | 72,257 | 20.9% |
| | | | | |
| LOSS FROM OPERATIONS | (128,342) | (24.0)% | (2,454) | (0.7)% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 518 | 0.1% | 95 | 0.0% |
| Adjustment in value of contingency | (2) | (0.0)% | (9) | (0.0)% |
| Interest expense | (3,940) | (0.7)% | (3,682) | (1.1)% |
| Gain on change in fair value of derivative instruments | 3,178 | 0.6% | - | - |
| Loss on settlement of debt | (3,240) | (0.6)% | (1,748) | (0.5)% |
| Other income (expense) | (2,546) | (0.5)% | 318 | 0.1% |
| Total Other Expenses | (6,032) | (1.1)% | (5,026) | (1.5)% |
| | | | | |
| NET LOSS BEFORE INCOME TAXES | (134,374) | (25.1)% | (7,480) | (2.2)% |
| | | | | |
| INCOME TAX (EXPENSE) BENEFIT | 8,409 | 1.6% | (102) | (0.0)% |
| | | | | |
| NET LOSS | $ (125,965) | (23.6)% | $ (7,582) | (2.2)% |

*Product sales, net*. We generate revenue from the retail sales of appliances, furniture, home goods and related products. Our product sales were $534.5 million for the year ended December 31, 2022, an increase of $188.8 million, or 54.6% when compared to the year ended December 31, 2021. This increase was primarily due to the impact of the Appliances Connection Acquisition.

*Cost of goods sold*. Our cost of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their products. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Vendor funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $445.0 and $275.9 million for the years ended December 31, 2022, and 2021, respectively, an increase of $169.0 million, or 61.3%.

As a percentage of net sales, cost of goods sold was 83.3% and 79.8% for the years ended December 31, 2022, and 2021, respectively. The increase in product costs as a percentage of nets sales results from aggressive pricing to drive revenue growth, purchase disruptions resulting from increased customer cancellations, increased damages and returns and a decrease in vendor rebates as the Company did not meet some of its purchasing commitments set by each vendor, a key component of vendor rebates. Freight costs remained consistent as a percentage of sales for each period.

*Gross profit and gross margin*. As a result of the foregoing, our gross profit was $89.5 million for the year ended December 31, 2022, compared to $69.8 million for the year ended December 31, 2021, which included $61.4 million from Appliances Connection for the period from June 2, 2021 to December 31, 2021. Our gross margin (gross profit as a percentage of net sales) was 16.7% for the year ended December 31, 2022, compared to 20.2% (or 17.6% excluding Appliances Connection) for the year ended December 31, 2021. The gross profit percentage declined by 3.4% from the year ended December 31, 2021 to the year ended December 31, 2022. As noted above, the principal driver of such decline was aggressive pricing to drive revenue growth and the reduction in vendor rebates.

*Personnel expenses*. Personnel expenses include employee salaries and bonuses, as well as related payroll taxes, insurance premiums, training costs, and stock compensation expense. Our personnel expenses were $28.8 million for the year ended December 31, 2022, and $21.7 million for the year ended December 31, 2021, which included $11.5 million from Appliances Connection for the period from June 2, 2021 to December 31, 2021. As a percentage of net sales, personnel expenses were 5.4% for the year ended December 31, 2022, and 6.3% (or 21.4% excluding Appliances Connection) for the year ended December 31, 2021. These increases were primarily due to the impact of the Appliances Connection Acquisition. The decrease in personnel expenses as a percentage of sales is attributed to the efforts made to right-size the business following the Appliances Connection Acquisition.

*Advertising expenses*. Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $25.5 million for the year ended December 31, 2022. For the year ended December 31, 2021, advertising expense was $12.0 million, which included $7.9 million from Appliances Connection for the period from June 2, 2021 to December 31, 2021. As a percentage of net sales, advertising expenses were 4.8% for the year ended December 31, 2022, and 3.5% for the year ended December 31, 2021 (or 8.5% excluding Appliances Connection). The increase in advertising expenses for 2022 resulted from a decision made by management at the time to augment spending on search engine advertisements.

*Bank and credit card fees*. Bank and credit card fees comprise the expenses incurred in payment to credit card processors for processing credit card transactions made by customers and to third-party sellers operating on the platforms where we sell parts and other items. Our bank and credit card fees were $18.8 million for the year ended December 31, 2022, and $13.6 million for the year ended December 31, 2021, which included $12.2 million from Appliances Connection for the period from June 2, 2021 to December 31, 2021. As a percentage of net sales, bank and credit card fees were 3.5% for the year ended December 31, 2022, and 3.9% for the year ended December 31, 2021 (or 2.8% excluding Appliances Connection).

The increase in bank and credit card fees in 2022 resulted primarily from the inclusion of Appliances Connection sales for the entire year. The slight decline in bank and credit card fees as a percentage of sales was due to a shift in the mix of credit cards used by customers and third-party sales, which typically have higher fees compared to credit cards.

*Depreciation and amortization expense*. Depreciation and amortization expense was $11.5 million, or 2.1% of sales, for the year ended December 31, 2022, and $6.6 million, or 1.9% of sales, for the year ended December 31, 2021. The increase is the result of amortizing intangible assets acquired in the Appliances Connection Acquisition for the entire year.

*Loss on abandonment of right-of-use asset*. During the year ended December 31, 2021, we incurred a loss in the amount of $1.4 million, or 0.4% of net sales, related to the closure of our old warehouse and showroom, and write-off of related leasehold improvements. There was no loss on abandonment of an asset in the year ended December 31, 2022.

*Impairment of goodwill and intangible assets*. Effective as of December 31, 2022, the Company determined that goodwill and intangible assets had been impaired. Accordingly, the Company recorded a total impairment charge of $109.1 million or 20.4% of sales. Out of the total impairment charge, $85.4 million was attributed to goodwill and $23.7 million was attributed to intangible assets.

*General and administrative expenses*. Our general and administrative expenses consist primarily of professional fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $24.2 million or 4.5% of sales for the year ended December 31, 2022, and $17.0 million or 4.9% of sales for the year ended December 31, 2021, which included $8.2 million from Appliances Connection for the period from June 2, 2021 to December 31, 2021. The increase in general and administrative expenses for the year was $7.3 million or 42.9% As a percentage of sales, the increase is primarily related to increased directors and officers insurance and health insurance costs, an increased allowance for doubtful accounts, and the accrual of non-recurring expenses for settling the Delaware lawsuit and other contract disputes. See "Item 3 — Legal Proceedings". As a percentage of sales, general and administrative expenses were essentially unchanged.

*Total other income (expense)*. We had $6.0 million or 1.1% of sales of net other expenses for the year ended December 31, 2022, and $5.0 million or 1.5% of sales in total other expenses, net, for the year ended December 31, 2021, which included $0.3 million of other expense, net, from Appliances Connection for the period from June 2, 2021 to December 31, 2021. Total other expenses, net, for the year ended December 31, 2022, consisted primarily of interest expense of $3.9 million, loss on settlement of debt of $3.2 million, and estimated potential penalties of $2.1 million on late filing of sales tax returns. Those items were partially offset by a gain of $3.2 million resulting from the change in the fair value on derivative instruments. Total other expenses, net, for the year ended December 31, 2021, consisted primarily of interest expense of $3.7 million, loss on settlement of debt of $1.7 million.

*Income tax benefit (expense)*. We had an income tax net benefit of $8.4 million for the year ended December 31, 2022, as compared to an income tax expense of $0.1 million for the year ended December 31, 2021.

*Net loss*. As a result of the cumulative effect of the factors described above, we had net loss of $126.0 million or 23.6% of sales for the year ended December 31, 2022, compared to a net loss of $7.6 million or 2.2% of sales for the year ended December 31, 2021, which included net income of $14.9 million from Appliances Connection for the period from June 2, 2021 to December 31, 2021.

**Liquidity and Capital Resources**

Management assesses liquidity and going concern uncertainty in the Company's consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

As of December 31, 2022, we had cash and cash equivalents of $19.5 million, restricted cash of $1.0 million, and vendor deposits of $25.0 million, and total working capital of $25.8 million. For the year ended December 31, 2022, the Company incurred an operating loss of $134.4 million, cash flows used in operations of $46.7 million. The operating loss for 2022 included non-cash charges for depreciation and amortization ($11.5 million) and an impairment charge ($109.1 million)

The Company performed an assessment to determine whether there were conditions or events that, considered in the aggregate, raised substantial doubt about the Company's ability to continue as a going concern within one year after the filing date of this report, when the accompanying financial statements are being issued. Initially, this assessment did not consider the potential mitigating effect of management's plans that had not been fully implemented.

38

The Company considered several conditions and events including (1) financial results and operations, (2) the investigation of certain allegations made by certain former employees related to the Company's business operations, (3) technical non-compliance with certain loan covenants of our term loan with Bank of America, based in part due to our failure to timely deliver financial statements, and (4) the Company not being in compliance with the continued listing standards of NYSE American LLC (the "Exchange") since the Company failed to timely file certain required filings, which if not successfully remediated could lead to the potential delisting of the Company from the Exchange

Based on the circumstances discussed above in the initial assessment, substantial doubt exists regarding our ability to continue as a going concern. Management then assessed the mitigating effect of its plans to determine if it is probable that the plans (1) would be effectively implemented within one year after the filing date of this report, when the accompanying financial statements are being issued and (2) when implemented, would mitigate the relevant conditions or events that raise substantial doubt about the Company's ability to continue as a going concern. See Note 2, "*Summary of Significant Accounting Policies – Liquidity and Going Concern Assessment.*"

*Summary of Cash Flow*

The following table provides detailed information about our net cash flow for all consolidated financial statement periods presented in this report.

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | **2022** | **(Restated) 2021** |
| Net cash used in operating activities | $ (46,681) | $ (18,328) |
| Net cash used in investing activities | (1,420) | (204,834) |
| Net cash provided by in financing activities | 34,809 | 247,041 |
| Net change in cash, cash equivalents, and restricted cash | $ (13,292) | $ 23,879 |

*Cashflows used in operating activities*. Our net cash used in operating activities was $46.7 million for the year ended December 31, 2022, as compared to $18.3 million for the year ended December 31, 2021. Significant changes in operating assets and liabilities affecting cash flows during these years included:

- Net loss was $126.0 million and $7.6 million for the years ended December 31, 2022 and 2021, respectively,

- Cash used by receivables was $3.5 million and $5.2 million for the years ended December 31, 2022 and 2021, respectively, due primarily to increases in sales volume as a result of the Acquisition of Appliances Connection,

- Cash provided by inventories was $ 9.7 million and $26.6 million for the years ended December 31, 2022 and 2021, respectively, due primarily to efforts to manage inventory levels to a more reasonable level, and

- Cash used by customer deposits was $21.5 million and $10.8 million for the years ended December 31, 2022 and 2021, respectively. The decrease in customer deposits is attributed to the change in the Company's practice, wherein customers' cards were charged at the time of order placement, as opposed to charging them when the product shipped. This new policy was adopted in July 2021.

*Cashflows used in investing activities*. Our net cash used in investing activities was $1.4 million for the year ended December 31, 2022, and $204.8 million for the year ended December 31, 2021. The 2021 amount was a primarily a result of $202.9 million net cash paid in the acquisitions of Appliances Connection and Appliance Gallery.

*Cashflows provided by financing activities*. Our net cash provided by financing activities was $34.8 million and $247.0 million for the years ended December 31, 2022 and 2021, respectively Significant changes in financing activities affecting cash flows during these years included:

- Net cash received from public offerings (including warrant exercises) of $194.4 million for the years ended December 31, 2021, and

- Net cash received from debt issuances of $43.0 million and $60.8 million for the year ended December 31, 2022 and 2021, respectively.

*Public Offerings*

On June 2, 2021, the Company sold 91,111,111 units, consisting of one share of common stock and a warrant to purchase one share of common stock, at a public offering price of $2.25 per unit to ThinkEquity, a division of Fordham Financial Management, Inc. (the "Underwriter"), pursuant to an underwriting agreement dated May 27, 2021, for total gross proceeds of $205.0 million. Under the underwriting agreement, the Company granted the Underwriter a 30-day option to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $2.0832 per share, and/or warrants to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $0.0093 per warrant, in any combination thereof, solely to cover over-allotments, if any. The Underwriter exercised its option to purchase 2,000,000 additional warrants and 2,000,000 additional shares for total gross proceeds of $4.5 million. After deducting the underwriting commission and expenses, the Company received net proceeds of approximately $194.4 million. The Company used the proceeds from the offering to fund a portion of the purchase price for the AC Acquisition.

From June 25 through July 16, 2021, 1,052,248 shares of common stock were issued as a result of the exercise of 1,052,248 warrants for proceeds of $2.4 million.

*Debt*

*Credit Facilities*

<u>M&T</u>

On June 2, 2021, the Company entered into a credit and guaranty agreement (the "M&T Credit Agreement") with the financial institutions party thereto from time to time ("M&T Lenders"), and Manufacturers and Traders Trust Company, as sole lead arranger, sole book runner, administrative agent and collateral agent ("M&T"), pursuant to which the M&T Lenders agreed to make available to the Company and ACI senior secured credit facilities in the aggregate initial amount of $70.0 million, including (i) a $60.0 million term loan (the "M&T Term Loan") and (ii) a $10.0 million revolving credit facility (the "M&T Revolving Loan"). The M&T Loans beared interest on the unpaid principal amount at a rate determined by the Base Rate (as defined in the Credit Agreement), then at the Base Rate plus the Applicable Margin. Each of the M&T Loans were set to mature on June 2, 2026.

On June 2, 2021, the Company borrowed the entire amount of the Term Loan and issued term loan notes to the M&T Lenders in the aggregate principal amount of $60.0 million. As of December 31, 2021, the carrying value of the M&T Term Loan was $55.2 million, comprised of principal of $58.5 million, net of unamortized loan costs of $3.3 million. Loan costs before amortization included $3.5 million of lender and placement agent fees and $0.3 million of legal other fees. The Company did not borrow any amounts under the M&T Revolving Loan.

On May 9, 2022, the Company repaid the M&T Term Loan, through the proceeds of a new loan issuance. As a result, the obligations under the M&T Credit Agreement were terminated.

<u>Bank of America</u>

On May 9, 2022, the Company entered into a Credit Agreement (the "Credit Agreement") with the lenders identified therein (the "Lenders") and Bank of America, N.A., as administrative agent, swingline lender and letter of credit issuer (the "Agent"), pursuant to which the Lenders agreed to make available to the Borrowers senior secured credit facilities in the aggregate initial amount of $140.0 million, including (i) a $100.0 million term loan (the "Term Loan") and (ii) a $40.0 million revolving credit facility (the "Revolving Loan"), which revolving credit facility included a $2.00 million swingline sublimit (the "Swing Line Loan" and together with the Term Loan and the Revolving Loan, the "Loans") and, separately, a $10.0 million letter of credit commitment, in each case, on the terms and conditions contained in the Credit Agreement.

On May 9, 2022, the Company borrowed the entire amount of the Term Loan in the aggregate principal amount of $100.0 million. A portion of the proceeds of the Term Loan were to repay and terminate the M&T Credit Agreement. Commencing on September 30, 2022, through and including June 30, 2023, the Borrowers repaid the principal amount of the Term Loan in quarterly installments of $1,250,000 each, payable on the last business day of each March, June, September and December.

As of December 31, 2022, the carrying value of the Term Loan was $96.5 million, comprised of principal of $97.5 million, net of unamortized loan costs of $1.0 million. Loan costs before amortization included $1.1 million of lender and other fees. During the year-ended December 31 2022, Bank of America froze the $40.0 million Revolving Loan before any borrowings had been made against the facility as a result of our technical non-compliance with specified loan covenants, based in part due to our failure to timely deliver financial statements.

Subsequent to year-end, on July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "Amendment"), in part, to waive events of defaults on its existing credit agreement. The Amendment requires the Company to pay the existing Term Facility and Revolving Facility by August 31, 2024 (the "Maturity Date"). The Revolving Loan decreased to $10,000,000 from and after July 25, 2023. The Letter of Credit commitments decreased to $2,000,000 and the Swing Line Loan was eliminated. The amendment also establishes a new EBITDA covenant and requires the Company to maintain minimum liquidity of $8 million including restricted cash and $5 million excluding restricted cash. Liquidity as defined in the Amendment includes Cash and certain qualifying customer and credit card accounts receivable.

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

Commencing on September 30, 2023, through and including June 30, 2024, the Borrowers must repay the principal amount of the Term Loan in quarterly installments of $1,875,000 each, payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

40

*Vehicle Loans*

The Company has financed purchases of transportation vehicles with notes payable, which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.8% to 5.7%. As of December 31, 2022, the outstanding balance of these vehicle loans is $0.9 million.

**Management Services Agreement**

On April 5, 2019, the Company entered into a management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and prior significant stockholder, which was amended effective on August 4, 2020. Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that under certain circumstances specified in the management services agreement, the quarterly fee may be reduced if similar fees payable to the Manager by subsidiaries of the Company's former parent company, 1847 Holdings LLC, exceed a threshold amount.

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of the Company in connection with performing services under the management services agreement.

The Company expensed management fees of $0.3 million for each of the years ended December 31, 2022 and 2021, respectively.

**Earn Out Payments**

On January 18, 2019, the Company entered into an asset purchase agreement with Goedeker Television, Steve Goedeker, and and Mike Goedeker, pursuant to which on April 5, 2019, the Company acquired substantially all of the assets of Goedeker Television used in its retail appliance and furniture business (the "Goedeker Business").

Pursuant to the asset purchase agreement, Goedeker Television is entitled to receive an earn out payment of $0.2 million if the EBITDA (as defined in the asset purchase agreement) of the Goedeker Business for the trailing twelve (12) month period from April 5, 2022 is $2.5 million or greater, and may be entitled to receive a partial earn out payment if the EBITDA of the Goedeker Business is less than $2.5 million but greater than $1.5 million. The Company expects to meet this target and adjusted the contingent note payable in the consolidated balance sheet to the present value of the amount due to $0.2 million as of December 31, 2021.

The contingent not payable balance was repaid in 2022.

**Leases**

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C for its prior principal office in Ballwin, Missouri. The lease is for a term of five years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. The lease agreement contains customary events of default, representations, warranties, and covenants.

41

On May 31, 2019, YF Logistics entered into a sublease agreement with DMI for its warehouse space in Hamilton, NJ. The initial term of the sublease was for a period commencing on June 1, 2019, and terminating on April 30, 2020, with automatic renewals for successive one-year terms until the earlier of (i) termination by either upon thirty days' prior written notice or (ii) April 30, 2024. The sublease provides for a base rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges, or any other amounts due by DMI, for a total of $56,250 per month. The initial right-of-use ("ROU") asset and liability associated with this lease is $3.0 million.

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC, which was amended on March 31, 2021, for its new principal office and showroom in St. Charles, Missouri. The lease terminates on April 30, 2027, with two options to renew for an additional five-year periods. The base rent is $20,977 per month until September 30, 2021, and increases to $31,465 per month until April 30, 2022, after which time the base rent increases at approximately 2.5% per year thereafter. The Company must also pay its 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible for paying for the utilities used on the premises. The lease contains customary events of default. The initial ROU asset and liability associated with this lease is $2.0 million.

On June 2, 2021, 1 Stop entered into a new lease agreement with 1870 Bath Ave. LLC, a related party, for the premises located at 1870 Bath Avenue, Brooklyn, New York. The lease is for a term of ten years and provides for a base rent of $74,263 per month during the first year with annual increases to $96,896 during the last year of the term. 1 Stop is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018. The initial ROU asset and liability associated with this lease is $8.4 million.

On June 2, 2021, Joe's Appliances entered into a new lease agreement with 7812 5th Ave Realty LLC, a related party, for the premises located at 7812 5th Avenue, Brooklyn, New York. The lease is for a term of ten years and provides for a base rent of $6,365 per month during the first year with annual increases to $8,305 during the last year of the term. Joe's Appliances is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018. The initial ROU asset and liability associated with this lease is $0.7 million.

On June 30, 2021, the Company closed an old warehouse and retail showroom in anticipation of relocating to a new facility. Accordingly, the Company wrote off $1.4 million representing the remaining ROU asset and related leasehold improvements as of that date.

On July 29, 2021, AC Gallery entered into a lease agreement with Tom's Flooring, LLC for the showroom and warehouse located in Largo, Florida. The lease is for a term of four months commencing on September 1, 2021, and ending on December 31, 2021, and provides for a base rent of $6,500 per month. AC Gallery must also pay its one-third pro rata portion of the common area maintenance charges, utilities, and sales taxes. The lease contains customary events of default. The lease is short term and therefore not recorded as a ROU asset and liability.

On September 9, 2021, the Company entered into a warehouse agreement for a new warehouse in Somerset, New Jersey. The warehouse agreement is for a term of 26 months commencing on October 1, 2021, and ending November 29, 2023, unless the master lease for the premises is terminated earlier. The monthly storage fee is $136,274 for the first year, $140,362 for the second year, and $144,573 for the last two months. The Company also paid a security deposit of $272,549. The lease agreement contains customary events of default, representations, warranties, and covenants. The initial ROU and liability associated with this operating lease is $3.4 million.

On March 15, 2022, the Company entered into a lease for additional office space with 8780 19th Ave LLC ("Landlord"), an entity owned by Albert and Elie Fouerti. The Company contends that the lease required the Landlord do certain work at Landlord's expense to improve the building at a cost of approximately $1.2 million. Landlord has refused to pay for this work, contending that this expense was the Company's responsibility. In addition, the total remaining amount due on the lease at December 31, 2022 is also approximately $1.2 million. Landlord contends that the Company is in default of the lease for failing to pay rent. The Company disagrees that its rent obligations have been triggered and further contends that Landlord has violated the lease by failing to pay for the work. The Company and the Landlord remain in dispute over these issues.

Subsequent to December 31, 2022, the Company signed a letter of intent for a sublease from DMI, a related party for a new warehouse in a building leased by DMI. The new lease will allow the Company to close its two existing New Jersey warehouses and consolidate operations into one new warehouse. The lease, which is expected to be finalized in the fourth quarter of 2023 or the first quarter of 2024, will be for leased space of approximately 228,000 square feet for seven years at a cost of approximately $15 per square foot, including common area charges with annual increases of 3.75%.

42

**Critical Accounting Policies and Estimates**

The following discussion relates to critical accounting policies and estimates for our company. The preparation of consolidated financial statements in conformity with GAAP requires our management to make assumptions, estimates and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. We have identified certain accounting policies that are significant to the preparation of our consolidated financial statements. These accounting policies are important for an understanding of our financial condition and results of operation. Critical accounting policies are those that are most important to the portrayal of our financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and judgments used in the preparation of our consolidated financial statements:

***Revenue Recognition***

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606, *"Revenue from Contracts with Customers"*. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

Substantially all the Company's sales are to individual retail consumers (homeowners), builders and designers. The Company's performance obligation is to deliver the customer's order. Each customer order generally contains only one performance obligation based on the merchandise sale to be delivered, at which time revenue is recognized.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, the Company's products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. The Company delivers products to its customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from the Company's warehouse to the customer (a "Company Shipment"). The second way is through a shipment of the products through a third-party carrier from a warehouse other than the Company's warehouse to the customer (a "Drop Shipment") and the third way is where the Company itself delivers the products to the customer and often also installs the product (a "Local Delivery"). In the case of a Local Delivery, the Company loads the product onto its own trucks and delivers and installs the product at the customer's location. When a product is delivered through a Local Delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a Company Shipment and a Drop Shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from the Company's warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves the Company's warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, the Company has satisfied its performance obligation and the Company recognizes revenue.

The Company agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In the Company's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue.

We offer promotional financing and credit cards issued by third-party banks that manage and directly extend credit to our customers. The banks are the sole owners of the accounts receivable generated under the program and, accordingly, we do not hold any customer receivables related to these programs and act as an agent in the financing transactions with customers. We frequently offer sales incentives that entitle our customers to discounts at the time of purchase (if 3rd party financing is obtained or a seasonal sale discounts). This is not a performance obligation but is recognized as a reduction of the transaction price when the transaction occurs.

The Company also sells extended warranty contracts, acting as an agent for the warranty company and earns a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the accompanying consolidated statements of operations. The Company assumes no liability for repairs to products on which it has sold a warranty contract or products for which no warranty is sold, as the warranty obligations associated with the sale of our products are assurance-type warranties that are a guarantee of the product's intended functionality and, therefore, do not represent a distinct performance obligation within the context of the contract.

Sales returns are estimated based on historical return levels and our expectation of future returns. We also recognize a return asset, and corresponding adjustment to cost of sales, for our right to recover the goods returned by the customer, measured at the former carrying amount of the goods, less any expected recovery cost. At each financial reporting date, we assess our estimates of expected returns, refund liabilities, and return assets.

*Goodwill*

Goodwill represents the excess of consideration transferred over the fair value of tangible and identifiable intangible net assets acquired and the liabilities assumed in a business combination. Substantially all of the Company's goodwill was recognized in the purchase price allocations when the Company was acquired in 2019 and when ACI was acquired in June 2021. Goodwill is not amortized, but is tested for impairment at the reporting unit level annually or more frequently if events or changes in circumstances indicate that it is more likely than not that the fair value of the reporting unit is less than its carrying amount. In conducting the impairment test, the Company first reviews qualitative factors to determine whether it is more likely than not that the fair value of the reporting unit is less than its carrying amount. We currently operate as a single reporting unit.

When testing goodwill for impairment, the Company has the option of first performing a qualitative assessment to determine whether it is more likely than not that the fair value of the reporting unit is less than its carrying amount. If we elect to bypass the qualitative assessment, or if a qualitative assessment indicates it is more likely than not that carrying value exceeds its fair value, we perform a quantitative goodwill impairment test. Under the quantitative goodwill impairment test, if our reporting unit's carrying amount exceeds its fair value, we will record an impairment charge based on that difference.

The Company conducts its annual goodwill impairment test on December 31 or whenever an indicator of impairment exists. As a result of the quantitative impairment assessment, the carrying value of the single reporting unit exceeded its fair value, and the Company recorded $85.4 million of non-cash goodwill impairment charge during the year-ended December 31, 2022. At December 31, 2021, there was no impairment of goodwill.

*Impairment of Long-Lived Assets*

The Company reviews the carrying value of long-lived assets such property and equipment, right-of-use ("ROU") assets, and definite-lived intangible assets for impairment whenever events or changes in circumstances indicate the carrying amount of the assets might not be recoverable. These events and circumstances may include significant decreases in the market price of an asset or asset group, significant changes in the extent or manner in which an asset or asset group is being used by the Company or in its physical condition, a significant change in legal factors or in the business climate, a history or forecast of future operating or cash flow losses, significant disposal activity, a significant decline in the Company's share price, a significant decline in revenue or adverse changes in the economic environment. If such facts indicate a potential impairment, the Company will assess the recoverability of an asset group by determining if the carrying value of the asset group exceeds the sum of the projected undiscounted cash flows expected to result from the use and eventual disposition of the assets over the remaining economic life of the primary asset in the asset group. If the recoverability test indicates that the carrying value of the asset group is not recoverable, the Company will estimate the fair value of the asset group using appropriate valuation methodologies, which would typically include an estimate of discounted cash flows. Any impairment would be measured as the difference between the asset group's carrying amount and its estimated fair value.

During the fourth quarter of 2022, the Company recognized an impairment charge of $23.7 million related to our marketing-related and customer relationships intangible assets, which is primarily composed of intangible assets recognized in the acquisition of ACI. During 2021, we identified changes in events and circumstances relating to a certain ROU operating lease asset, that was abandoned as a result of the Company closing its warehouse and retail showroom in anticipation of relocating to a new facility that was acquired in the acquisition of ACI. Consequently, the lease facility was abandoned, and we recorded an impairment loss during the year ended December 31, 2021 of $1.4 million.

*Income Taxes*

Income taxes are accounted for under the asset and liability method. Under the asset and liability method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases.

Deferred income tax assets and liabilities are recorded with respect to temporary differences in the accounting treatment of items for financial reporting purposes and for income tax purposes. Where, based on the weight of available evidence, it is more likely than not that some amount of recorded deferred tax assets will not be realized, a valuation allowance is established for the amount that, in management's judgment, is sufficient to reduce the deferred tax asset to an amount that is more likely than not to be realized. A tax position must meet a minimum probability threshold before a financial statement benefit is recognized. The minimum threshold is defined as a tax position that is more likely than not to be sustained upon examination by the applicable taxing authority, including resolution of any related appeals or litigation processes, based on the technical merits of the position. The tax benefit to be recognized is measured as the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement.

**Results of Operations**

The comparability of our results of operations between the periods discussed below is affected by the acquisitions we have completed during such periods. We may also evaluate and pursue acquisitions in the future, and such acquisitions, if completed, will continue to impact the comparability of our financial results. Our acquisitions may have materially different characteristics than our historical results, and such differences in economics may impact the comparability of our future results of operations to our historical results.

- On June 2, 2021, we completed the Appliances Connection Acquisition.

44

- On July 29, 2021, we completed the AC Gallery Acquisition. The Company accounted for the above acquisitions using the acquisition method of accounting in accordance with FASB ASC Topic 805 "Business Combinations." In accordance with ASC 805, the Company used its best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date.

**Results of Operations**

*Comparison of the three months ended March 31, 2023 and 2022*

*Restatement*

The Company restated its previously issued financial statements as of and for the three months ended March 31, 2022, to reflect the following adjustments:

*Consolidated Statements of Operations*

1. Revenue declined by $4.1 million because of an understatement of a returns allowance and revenue cutoff issues.

2. Cost of goods sold increased $1.0 million, net of reclassification of expenses from operating expenses to cost of goods sold offset by the reduction in product cost associated with the reduction in revenue.

3. Operating expense declined by $1.9 million primarily by reclassification of operating expense to cost of goods sold.

4. Other income (expense) various miscellaneous adjustments totaling $0.2 million.

5. Income tax expense declined by $3.3 million.

6. As a result of the above adjustments, net income declined by $0.1 million.

*Consolidated Balance Sheet*

7. Current assets declined by $13.2 million from a $3.8 million reduction in vendor rebate accrual, inventory declined by $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments, and prepaid expenses declined by $2.7 million by to adjust for charging some items to expense, rather than prepaid expense.

8. Reclassification of showroom inventory to property and equipment.

9. Eliminate a right-of-use asset on a property that was not occupied.

10. Reflect the issuance of shares granted to two directors.

11. Reflect adjustments made to 2021 accumulated deficit and adjustment to net income for the three months ended March 31, 2022.

45

**POLISHED.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
**March 31, 2022**
(in thousands)

| | As Originally Reported | | Adjustments | | As Restated |
|---|---|---|---|---|---|
| Current assets | $ 134,010 | (7) $ | (13,223) | $ | 120,787 |
| Property and equipment | 3,688 | (8) | 978 | | 4,666 |
| Operating lease right-of-use assets | 15,262 | (9) | (1,127) | | 14,135 |
| Total assets | $ 386,581 | $ | (13,372) | $ | 373,209 |
| | | | | | |
| Total liabilities | $ 175,037 | | 1,849 | $ | 176,886 |
| Common stock and additional paid in capital | 224,678 | (10) | 134 | | 224,812 |
| Accumulated deficit | (13,134) | (11) | (15,354) | | (28,489) |
| Total liabilities and stockholders' equity | $ 386,581 | $ | (13,371) | $ | 373,209 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**
(in thousands)

| | As originally Reported | | Adjustments | | As Restated |
|---|---|---|---|---|---|
| Product sales, net | $ 152,752 | (1) $ | (4,071) | $ | 148,681 |
| Cost of goods sold | 116,883 | (2) | 1,036 | | 117,919 |
| Operating expense | 25,802 | (3) | (1,915) | | 23,887 |
| Other expenses | (762) | (4) | (186) | | (948) |
| Income taxes | (3,383) | (5) | 3,275 | | (108) |
| Net income (loss) | $ 5,922 | (6) $ | (103) | $ | 5,819 |
| | | | | | |
| Net income per common share | | | | | |
| BASIC | $ 0.06 | | | $ | 0.05 |
| DILUTED | $ 0.06 | | | $ | 0.05 |
| | | | | | |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | | | | |
| BASIC | 106,387,332 | | | | 106,387,332 |
| DILUTED | 106,387,332 | | | | 106,387,332 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**
(in thousands)

| | Common Stock | | Additional Paid-Inc Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance March 31, 2022, as originally filed | 106,386,332 | $    11 | $ 224,667 | $ (13,134) | $ 211,544 |
| Adjustment to reflect issuance of vested stock | 69,766 | - | 134 | - | 134 |
| Adjustments to results of operations for the year ended December 31, 2021 | | | | (15,252) | (15,252) |
| Adjustments to results of operations for the three months ended March 31, 2022 | - | - | - | (103) | (103) |
| | | | | | |
| Balance March 31,2022, as restated | 106,456,098 | $    11 | $ 224,801 | $ (28,489) | $ 196,323 |

46

**POLISHED.COM INC**
**CONSOLDIATED STATESMENTS OF CASH FLOWS**
**THREE MONTHS ENDED MARCH 31, 2022**
(UNAUDITED)
(in thousands)

| | As originally Filed | Adjustments | As Restated |
|---|---|---|---|
| Cash Flows from Operating Activities | | | |
| Net income (loss) | $ 5,922 | $ (103) | $ 5,819 |
| Deferred tax expense (benefit) | 1,785 | (1,810) | (25) |
| Receivables | (1,694) | 2,693 | 999 |
| Merchandise inventory | (8,209) | 14,343 | 6,134 |
| Prepaid expenses and other assets | (2,312) | 2,751 | 439 |
| Accounts payable and accrued expenses | 11,368 | (9,450) | 1,918 |
| Customer deposits | (7,622) | (8,603) | (16,225) |
| Various other changes | (2,985) | 372 | (2,612) |
| | | | |
| Net cash used in operating activities | (3,747) | 193 | (3,554) |
| | | | |
| Cash Flows from Investing Activities | | | |
| Purchases of property and equipment | (6) | (31) | (37) |
| | | | |
| Net cash used in investing activities | (6) | (31) | (37) |
| | | | |
| Net cash used in financing activities | (1,634) | - | (1,634) |
| | | | |
| Net change in cash and restricted cash | (5,387) | 162 | (5,225) |
| Cash and restricted cash at beginning of year | 33,791 | - | 33,791 |
| | | | |
| Cash and restricted cash at end of year | $ 28,404 | $ 162 | $ 28,566 |
| | | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | | |
| End of the period | | | |
| Cash and cash equivalents | $ 25,821 | $ 162 | $ 25,983 |
| Restricted cash | 2,583 | - | 2,583 |
| | | | |
| | $ 28,404 | $ 28,404 | $ 28,404 |

47

The following unaudited table sets forth key components of our results of operations for the three months ended March 31, 2023 and 2022, in thousands and as a percentage of our revenue.

| | For the Three Months Ended March 31, 2023 | % of Sales | (As Restated) For the Three Months Ended March 31, 2022 | % of Sales |
|---|---|---|---|---|
| Product sales, net | $ 95,439 | 100.0% | $ 148,681 | 100.0% |
| Cost of goods sold | 74,292 | 77.8% | 117,919 | 79.3% |
| Gross profit | 21,147 | 22.2% | 30,762 | 20.7% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 6,484 | 6.8% | 6,646 | 4.5% |
| Advertising | 5,121 | 5.4% | 5,578 | 3.8% |
| Bank and credit card fees | 3,373 | 3.5% | 4,589 | 3.1% |
| Depreciation and amortization | 1,070 | 1.1% | 2,819 | 1.9% |
| General and administrative | 4,987 | 5.2% | 4,255 | 2.9% |
| | | | | |
| Total Operating Expenses | 21,035 | 22.0% | 23,887 | 16.1% |
| | | | | |
| INCOME FROM OPERATIONS | 112 | 0.1% | 6,875 | 4.6% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 357 | 0.4% | 44 | 0.0% |
| Adjustment in value of contingency | - | - | (2) | (0.0)% |
| Interest expense | (1,882) | (2.0)% | (941) | (0.6)% |
| Loss on change in fair value of derivative instruments | (1,325) | (1.4)% | - | 0.0% |
| Other income (expense) | 81 | 0.1% | (49) | (0.0)% |
| | | | | |
| Total Other Expenses | (2,769) | (2.9)% | (948) | (0.6)% |
| | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (2,657) | (2.8)% | 5,927 | 4.0% |
| | | | | |
| INCOME TAX EXPENSE | (104) | (0.1)% | (108) | (0.1)% |
| | | | | |
| NET INCOME (LOSS) | $ (2,761) | (2.9)% | $ 5,819 | 3.9% |

*Product sales, net.* We generate revenue from the retail sales of appliances, furniture, home goods and related products. Our product sales were $95.4 million for the three months ended March 31, 2023, compared to $148.7 million for the three months ended March 31, 2022, a decrease of $53.2 million, or 35.8%. The decrease can be partially attributed to the reduction in pandemic-driven pent-up demand as well as a decision by management to focus on profitability as opposed to volume.

48

*Cost of goods sold.* Our cost of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their products. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Vendor funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $74.3 million for the three months ended March 31, 2023, as compared to $117.9 million for the three months ended March 31, 2022, a decrease of $43.6 million, or 37.0%, the decrease was attributable to the decline in sales during the same period, although the percentage decline was greater than the percentage decline in sales.

*Gross profit and gross margin.* As a result of the foregoing, our gross profit was $21.1 million for the three months ended March 31, 2023, as compared to $30.8 million for the three months ended March 31, 2022, a decrease of $9.6 million, or 31.3%. Our gross margin (gross profit as a percentage of net sales) was 22.2% for the three months ended March 31, 2023, and 20.7% for the three months ended March 31, 2022. The decrease in the amount of gross profit was driven by reduced sales offset by an increased gross margin as management placed an emphasis on profitable sales rather than growing revenue.

*Personnel expenses.* Personnel expenses include employee salaries and bonuses, as well as related payroll taxes, health insurance premiums, training costs, and stock compensation expense. Our personnel expenses were $6.5 million for the three months ended March 31, 2023, compared to $6.6 million for the three months ended March 31, 2022, a decrease of $0.2 million, or 2.4%. As a percentage of net sales, personnel expenses were 6.8% and 4.5% for the three months ended March 31, 2023 and 2022, respectively. The decline is related to the reduction of sales, which offset the impact of a higher headcount in comparison to sales during the period.

*Advertising expenses.* Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $5.1 million for the three months ended March 31, 2023, compared to $5.6 million for the three months ended March 31, 2022, an increase of $0.5 million, or 8.2%. As a percentage of net sales, advertising expenses were 5.4% and 3.8% for the three months ended March 31, 2023 and 2022, respectively. The decline is related to the reduction in sales, offset by increased costs from new marketing strategies.

*Bank and credit card fees.* Bank and credit card fees are primarily the fees comprise the expenses incurred in payment to credit card processors for processing credit card transactions made by customers and to third-party sellers operating on the platforms where we sell parts and other items. Our bank and credit card fees were $3.4 million for the three months ended March 31, 2023, and $4.6 million for the three months ended March 31, 2022, a decrease of $1.2 million, or 26.5%. As a percentage of net sales, bank and credit card fees were 3.5% and 3.1% for the three months ended March 31, 2023 and 2022, respectively. The decline is related to the reduction in sales, offset by a shift in the mix of credit cards used by customers and third-party sales, which typically have higher fees compared to credit cards.

*Depreciation and amortization expense.* Depreciation and amortization expense was $1.1 million or 1.1% of sales, for the three months ended March 31, 2023, and $2.8 million, or 1.9% of net sales, for the three months ended March 31, 2022. The decrease is the result of the 2022 impairment charge of intangible assets, reducing the amount of amortization.

*General and administrative expenses.* Our general and administrative expenses consist primarily of advisor fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $5.0 million for the three months ended March 31, 2023, as compared to $4.3 million for the three months ended March 31, 2022, an increase of $0.7 million, or 17.2%. As a percentage of net sales, general and administrative expenses were 5.2% and 2.9% for the three months ended March 31, 2023 and 2022, respectively. Such changes were primarily due to increased professional related fees.

*Total other income (expense).* We had $2.8 million in total net other expenses, for the three months ended March 31, 2023, as compared to total other expenses, net, of $0.09 million for the three months ended March 31, 2022. Total other expense, net, for the three months ended March 31, 2023, consisted primarily of interest expense of $1.9 million and a loss of $1.3 million on the change in fair value on derivative instruments. Total other expenses, net, for the three months ended March 31, 2022, consisted primarily of interest expense of $0.9 million.

*Income tax expense.* We had an income tax expense of $0.1 million for both the three months ended March 31, 2023, and 2022, respectively.

*Net income (loss).* As a result of the cumulative effect of the factors described above, we had net loss of $2.8 million for the three months ended March 31, 2023, as compared to net income of $5.8 million for the three months ended March 31, 2022, a decrease of $8.6 million, or 147.4%.

**Liquidity and Capital Resources**

Management assesses liquidity and going concern uncertainty in the Company's consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

As of March 31, 2023, we had cash and cash equivalents of $25.6 million and restricted cash of $0.95 million. For the three months ended March 31, 2023, the Company had operating income of $0.1 million, cash flows from operations of $7.6 million, and had working capital of $23.9 million.

Management has prepared estimates of operations for fiscal years 2023 and 2024 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these consolidated financial statements in the Company's 10-K. The continuing impact of COVID-19 on the Company's business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business. Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

***Summary of Cash Flow***

The following table provides detailed information about our net cash flow for the three months ended March 31, 2023 and 2022 (in thousands).

| | Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | 2023 | | (Restated) 2022 |
| Net cash provided by (used in) operating activities | $ 7,577 | $ | (3,554) |
| Net cash used in investing activities | (124) | | (38) |
| Net cash used in financing activities | (1,387) | | (1,633) |
| Net change in cash, cash equivalents, and restricted cash | $ 6,066 | $ | (5,225) |

*Cashflows provided by (used) in operating activities*. Our net cash provided in operating activities was $7.6 million for the three months ended March 31, 2023, as compared to net cash used in operating activities of $3.6 million for the three months ended March 31, 2022. Significant changes in operating assets and liabilities affecting cash flows during these periods included:

- During the three months ended March 31, 2023, the Company incurred a net loss of $2.8 million, as compared to net income of $5.8 million for the three months ended March 31, 2022,

- Cash provided by receivables was $10.0 million and $1.0 million for the three months ended March 31, 2023 and 2022, respectively,

- Cash provided by inventories was $5.4 million and $6.1 million for the three months ended March 31, 2023 and 2022, respectively, due primarily to efforts to manage inventory levels to support the growth in sales as a result of the Appliances Connection Acquisition, and

- Cash used by customer deposits was $2.2 million and $16.2 million for the three months ended March 31, 2023 and 2022, respectively.

*Cashflows used in investing activities*. Our net cash used in investing activities was $0.1 million for the three months ended March 31, 2023, as compared to $0.04 million for the three months ended March 31, 2022.

Cashflows used in financing activities. Our net cash used in financing activities was $1.4 million for the three months ended March 31, 2023, as compared to $1.6 million for the three months ended March 31, 2022.

Significant changes in financing activities affecting cash flows during these years included:

- Repayments of notes payable of $1.4 million and $1.6 million for the three months ended March 31, 2023 and 2022, respectively.

**Liquidity and Capital Resources**

See Note 2, "*Summary of Significant Accounting Policies – Liquidity and Going Concern Assessment.*"

**Debt**

See Note 11, *Notes Payable*, Note 12 *Leases,* and Note 14, *Related Parties* for a discussion of our current debt, leases, and management services agreement.

**Comparison of the three months ended June 30, 2022 and 2021**

The unaudited condensed consolidated operating results presented below for the three months ended June 30, 2022, include the results of Appliances Connection, and, therefore, are not comparable to the consolidated operating results for the three months ended June 30, 2021. The following table sets forth key components of our results of operations for the three months ended June 30, 2022 and 2021, in thousands and as a percentage of our revenue.

| | Three Months Ended June 30, 2022 | | Three Months Ended June 30, 2021 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Sales | Amount | % of Sales |
| Product sales, net | $ 138,463 | 100.0% | $ 64,072 | 100.0% |
| Cost of goods sold | 115,438 | 83.4% | 51,017 | 79.6% |
| Gross profit | 23,025 | 16.6% | 13,055 | 20.4% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 7,402 | 5.3% | 4,821 | 7.5% |
| Advertising | 5,363 | 3.9% | 2,932 | 4.6% |
| Bank and credit card fees | 4,600 | 3.3% | 2,095 | 3.3% |
| Depreciation and amortization | 2,887 | 2.1% | 175 | 0.3% |
| Loss on abandonment of right-of-use asset | - | 0.0% | 1,437 | 2.2% |
| General and administrative | 3,563 | 2.6% | 2,858 | 3.9% |
| | | | | |
| Total Operating Expenses | 23,815 | 17.2% | 14,318 | 22.3% |
| | | | | |
| LOSS FROM OPERATIONS | (790) | (0.6)% | (1,263) | -2.0% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 64 | 0.0% | 12 | 0.0% |
| Interest expense | (302) | (0.2)% | (1,017) | (1.6)% |
| Loss on change in fair value of derivative instruments | (936) | (0.7)% | - | 0.0% |
| Loss on settlement of debt | (3,241) | (2.3)% | (1,748) | (2.7)% |
| Other expense | (41) | (0.0)% | - | 0.0% |
| | | | | |
| Total Other Expenses | (4,456) | (3.2)% | (2,753) | (4.3)% |
| | | | | |
| NET LOSS BEFORE INCOME TAXES | (5,246) | (3.8)% | (4,016) | (6.3)% |
| | | | | |
| INCOME TAX BENEFIT | 954 | 0.7% | 8,049 | 12.6% |
| | | | | |
| NET INCOME (LOSS) | $ (4,292) | (3.1)% | $ 4,033 | 6.3% |

*Product sales, net.* We generate revenue from the retail sales of appliances, furniture, home goods and related products. Our product sales were $138.5 million for the three months ended June 30, 2022, as compared to $64.1 million for the three months ended June 30, 2021, an increase of $74.4 million, or 116.1%. This increase was primarily due to the impact of the Appliances Connection Acquisition.

*Cost of goods sold.* Our cost of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their products. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Vendor funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $115.4 million for the three months ended June 30, 2022, as compared to $51.0 million for the three months ended June 30, 2021, an increase of $64.4 million, or 126.3%, with the increase driven by the impact of the Appliances Connection Acquisition.

*Gross profit and gross margin.* As a result of the foregoing, our gross profit was $23.0 million for the three months ended June 30, 2022, as compared to $13.1 million for the three months ended June 30, 2021, an increase of $1.0 million, or 76.4%. Our gross margin (gross profit as a percentage of net sales) was 16.6% for the three months ended June 30, 2022, and 20.4% for the three months ended June 30, 2021. The decrease in the amount of gross profit was driven by the impact of the Appliances Connection Acquisition. The decline in the gross margin percentage is attributable to aggressive pricing to drive revenue growth, purchase disruptions resulting from increased customer cancellations, and a decrease in vender rebates.

*Personnel expenses.* Personnel expenses include employee salaries and bonuses, as well as related payroll taxes, health insurance premiums, training costs and stock compensation expenses. Our personnel expenses were $7.4 million for the three months ended June 30, 2022, as compared to $4.8 million for the three months ended June 30, 2021, an increase of $2.6 million, or 53.5%. As a percentage of net sales, personnel expenses were 5.3% and 7.5% for the three months ended June 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition.

*Advertising expenses.* Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $5.4 million for the three months ended June 30, 2022, as compared to $2.9 million for the three months ended June 30, 2021, an increase of $2.4 million, or 82.9%. As a percentage of net sales, advertising expenses were 3.9% and 4.6% for the three months ended June 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition.

*Bank and credit card fees*. Bank and credit card fees comprise the expenses incurred in payment to credit card processors for processing credit card transactions made by customers and to third-party sellers operating on the platforms where we sell parts and other items. Our bank and credit card fees were $4.6 million for the three months ended June 30, 2022, as compared to $2.1 million for the three months ended June 30, 2021, an increase of $2.5 million, or 119.6%. As a percentage of net sales, bank and credit card fees were 3.3% for the three months ended June 30, 2022 and 2021, respectively. Bank and credit card fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders associated with the Appliances Connection Acquisition.

*Depreciation and amortization expense*. Depreciation and amortization expense was $2.9 million, or 2.1% of net sales, for the three months ended June 30, 2022, as compared to $0.2 million, or 0.3% of net sales, for the three months ended June 30, 2021. The increase is the result of amortizing intangible assets acquired in the Appliances Connection Acquisition for the entire year.

*Loss on abandonment of right-of-use asset*. During the three months ended June 30, 2021, we incurred a loss in the amount of $1.4 million related to the closure of our old warehouse and showroom and write-off of related leasehold improvements.

*General and administrative expenses*. Our general and administrative expenses consist primarily of professional advisor fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $3.6 million for the three months ended June 30, 2022, as compared to $2.9 million for the three months ended June 30, 2021, an increase of $0.7 million, or 24.7%. As a percentage of net sales, general and administrative expenses were 2.6% and 4.5% for the three months ended June 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition.

*Total other income (expense)*. We had $4.5 million in total net other expense, for the three months ended June 30, 2022, and $2.9 million for the three months ended June 30, 2021. Total other expense, net, for the three months ended June 30, 2022, consisted primarily of loss on the settlement of debt of $3.2 million, a loss on the change in the fair value of a derivative instrument of $0.9 million and interest expense of $0.3 million. The total other expense, net, for the three months ended June 30, 2021, consisted primarily of loss on the settlement of debt of $1.7 million and interest expense of $1.0 million.

*Income tax benefit*. We had an income tax benefit of $1.0 million for the three months ended June 30, 2022, as compared to an income tax benefit of $8.0 million for the three months ended June 30, 2021.

*Net income*. As a result of the cumulative effect of the factors described above, we had a net loss of $4.3 million for the three months ended June 30, 2022, as compared to net income of $4.0 million for the three months ended June 30, 2021, a decrease of $8.3 million, or 206.4%.

**Comparison of the six months ended June 30, 2022 and 2021**

The unaudited condensed consolidated operating results presented below for the six months ended June 30, 2022, include the results of Appliances Connection, and, therefore, are not comparable to the consolidated operating results for the six months ended June 30, 2021. The following table sets forth key components of our results of operations for the six months ended June 30, 2022 and 2021, in thousands and as a percentage of our revenue.

| | Six Months Ended June 30, 2022 | | Six Months Ended June 30, 2021 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Net Sales | Amount | % of Net Sales |
| Product sales, net | $ 287,144 | 100.0% | $ 77,769 | 100.0% |
| Cost of goods sold | 233,357 | 81.3% | 62,085 | 79.8% |
| Gross profit | 53,787 | 18.7% | 15,684 | 20.2% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 14,048 | 4.9% | 6,753 | 8.7% |
| Advertising | 10,941 | 3.8% | 4,015 | 5.2% |
| Bank and credit card fees | 9,189 | 3.2% | 2,628 | 3.4% |
| Depreciation and amortization | 5,706 | 2.0% | 297 | 0.4% |
| Loss on abandonment of right-of-use asset | - | 0.0% | 1,437 | 1.8% |
| General and administrative | 7,818 | 2.7% | 5,097 | 6.6% |
| | | | | |
| Total Operating Expenses | 47,702 | 16.6% | 20,227 | 26.0% |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | 6,085 | 2.1% | (4,543) | (5.8)% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 108 | (0.0)% | 22 | 0.0% |
| Adjustment in value of contingency | (2) | (0.0)% | - | 0.0% |
| Interest expense | (1,243) | (0.4)% | (1,251) | (1.6)% |
| Loss on change in fair value of derivative instruments | (936) | (0.3)% | - | 0.0% |
| Loss on settlement of debt | (3,241) | (1.1)% | (1,748) | (2.2)% |
| Other income (expense) | (90) | (0.0)% | 11 | 0.0% |
| | | | | |
| Total Other Expenses | (5,404) | (1.9)% | (2,966) | (3.8)% |
| | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | 681 | 0.2% | (7,509) | (9.7)% |
| | | | | |
| INCOME TAX BENEFIT | 846 | 0.3% | 8,048 | 10.3% |
| | | | | |
| NET INCOME | $ 1,527 | 0.5% | $ 539 | 0.7% |

54

*Product sales, net*. We generate revenue from the retail sales of appliances, furniture, home goods and related products. Our product sales were $287.1 million for the six months ended June 30, 2022, as compared to $77.8 million for the six months ended June 30, 2021, an increase of $209.4 million, or 269.2%. This growth was primarily driven by the significant impact of the Appliances Connection Acquisition during the period.

*Cost of goods sold*. Our cost of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their products. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Vendor funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $233.4 million for the six months ended June 30, 2022, as compared to $62.1 million for the six months ended June 30, 2021, an increase of $171.3 million, or 275.9%, with the increase driven by the impact of the Appliances Connection Acquisition.

*Gross profit and gross margin*. As a result of the foregoing, our gross profit was $53.8 million for the six months ended June 30, 2022, as compared to $15.7 million for the six months ended June 30, 2021, an increase of $38.1 million, or 242.9%. Our gross margin (gross profit as a percentage of net sales) was 18.7% for the six months ended June 30, 2022, and 20.2% for the six months ended June 30, 2021. The decrease in the amount of gross profit was driven by the impact of the Appliances Connection Acquisition. The decline in the gross margin percentage is attributable to aggressive pricing to drive revenue growth, purchase disruptions resulting from increased customer cancellations, and a decrease in vender rebates.

*Personnel expenses*. Personnel expenses include employee salaries and bonuses, as well as payroll taxes, health insurance premiums, training costs, and stock compensation expense. Our personnel expenses were $14.0 million for the six months ended June 30, 2022, as compared to $6.8 million for the six months ended June 30, 2021, an increase of $7.3 million, or 108.0%. As a percentage of net sales, personnel expenses were 4.9% and 8.7% for the six months ended June 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition.

*Advertising expenses*. Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $10.9 million for the six months ended June 30, 2022, as compared to $4.0 million for the six months ended June 30, 2021, an increase of $6.9 million, or 172.5%. As a percentage of net sales, advertising expenses were 3.8% and 5.2% for the six months ended June 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition.

*Bank and credit card fees*. Bank and credit card fees comprise the expenses incurred in payment to credit card processors for processing credit card transactions made by customers and to third-party sellers operating on the platforms where we sell parts and other items. Our bank and credit card fees were $9.2 million for the six months ended June 30, 2022, as compared to $2.6 million for the six months ended June 30, 2021, an increase of $6.6 million, or 249.7%. As a percentage of net sales, bank and credit card fees were 3.2% and 3.4% for the six months ended June 30, 2022 and 2021, respectively. Bank and credit card fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders associated with the Appliances Connection Acquisition.

*Depreciation and amortization*. Depreciation and amortization expense was $5.7 million, or 2.0% of net sales, for the six months ended June 30, 2022, as compared to $0.3 million, or 0.4% of net sales, for the six months ended June 30, 2021. The increase is the result of amortizing intangible assets acquired in the Appliances Connection Acquisition for the entire year.

*Loss on abandonment of right-of-use asset*. During the six months ended June 30, 2021, we incurred a loss in the amount of $1.4 million related to the closure of our old warehouse and showroom and write-off of related leasehold improvements.

*General and administrative expenses*. Our general and administrative expenses consist primarily of professional advisor fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $7.8 million for the six months ended June 30, 2022, as compared to $5.1 million for the six months ended June 30, 2021, an increase of $2.7 million, or 53.4%. As a percentage of net sales, general and administrative expenses were 2.7% and 6.6% for the six months ended June 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition.

*Total other income (expense)*. We had $5.4 million in total net other expense for the six months ended June 30, 2022, as compared to total net other expense of $3.0 million for the six months ended June 30, 2021. Total other expense, net, for the six months ended June 30, 2022, consisted primarily of loss on the settlement of debt of $3.2 million, a loss on the change in the fair value of a derivative instruments of $0.9 million, and interest expense of $1.2 million. Total other expense, net, for the six months ended June 30, 2021, consisted primarily of loss on the settlement of debt of $1.7 million and interest expense of $1.3 million.

*Income tax benefit*. We had an income tax net benefit of $0.8 million for the six months ended June 30, 2022, as compared to an income tax benefit of $8.0 million for the six months ended June 30, 2021.

*Net income*. As a result of the cumulative effect of the factors described above, we had net income of $1.5 million for the six months ended June 30, 2022, as compared to net income of $0.5 million for the six months ended June 30, 2021, an increase of $1.0 million, or 183.3%.

### Summary of Cash Flow

The following table provides detailed information about our net cash flow for the six months ended June 30, 2022 and 2021 (in thousands).

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2022 | 2021 |
| Net cash used in operating activities | $ (22,190) | $ (6,985) |
| Net cash used in investing activities | (256) | (198,133) |
| Net cash provided by financing activities | 37,774 | 248,826 |
| Net change in cash, cash equivalents, and restricted cash | $ 15,328 | $ 43,708 |

*Cash flows used in operating activities*. Our net cash used in operating activities was $22.2 million for the six months ended June 30, 2022, as compared to $7.0 million for the six months ended June 30, 2021. Significant changes in operating assets and liabilities affecting cash flows during these periods included:

- Net income was $1.5 million and $0.5 million for the six months ended June 30, 2022 and 2021, respectively,

- Cash used by receivables was $2.3 million, as compared to cash provided by receivables of $0.5 million for the six months ended June 30, 2022 and 2021, respectively,

- Cash used in inventories was $4.5 million, as compared to cash provided by inventories of $2.3 million for the six months ended June 30, 2022 and 2021, respectively, and

- Cash used by customer deposits was $12.1 million and $1.7 million for the six months ended June 30, 2022 and 2021, respectively. Prior to July 2021, the Company charged a customer's card when an order was placed. After July 2021, the customer's card was charged when the order shipped. The decline in customer deposits results from shipping or refunding customer orders that had previously been paid.

*Cash flows used by investing activities.* Our net cash used in investing activities was $0.3 million for the six months ended June 30, 2022, as compared to $198.1 million for the six months ended June 30, 2021. Net cash used in investing activities for the six months ended June 30, 2021, primarily consisted of cash paid in the acquisition of Appliances Connection of $197.6 million.

*Cash flows provided by financing activities.* Our net cash provided by financing activities was $37.8 million for the six months ended June 30, 2022, as compared to net cash provided by financing activities of $248.8 million for the six months ended June 30, 2021.

Significant changes in financing activities affecting cash flows during these years included:

- Net cash received from notes payable proceeds of $43.0 million and $55.2 million for the six months ended June 30, 2022 and June 30, 2021 respectively,

- Repayments of notes payable of $3.2 million and $3.3 million for the six months ended June 30, 2022 and 2021, respectively, and

- Net proceeds of $194.6 million received from public offering and proceeds from the exercise of warrants of $2.3 million for the six months ended June 30, 2021.

**Liquidity and Capital Resources**

For a discussion of our current liquidity and capital resources, see Note 2, "*Summary of Significant Accounting Policies – Liquidity and Going Concern Assessment.*"

**Debt**

See Note 11, *Notes Payable*, Note 12 *Leases,* and Note 14, *Related Parties* for a discussion of our current debt, leases, and management services agreement.

**Comparison of the three months ended September 30, 2022 and 2021**

The unaudited condensed consolidated operating results presented below for the three months ended September 30, 2022, include the results of Appliances Connection, and, therefore, are not comparable to the consolidated operating results for the three months ended September 30, 2021. The following table sets forth key components of our results of operations for the three months ended September 30, 2022 and 2021, in thousands and as a percentage of our revenue.

| | Three Months Ended September 30, 2022 | | Three Months Ended September 30, 2021 | |
| | Amount | % of Sales | Amount | % of Sales |
|---|---|---|---|---|
| Product sales, net | $ 143,566 | 100.0% | $ 141,867 | 100.0% |
| Cost of goods sold | 122,431 | 85.3% | 110,495 | 77.9% |
| Gross profit | 21,135 | 14.7% | 31,372 | 22.1% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 8,348 | 5.8% | 8,547 | 6.0% |
| Advertising | 7,534 | 5.2% | 3,715 | 2.6% |
| Bank and credit card fees | 5,932 | 4.1% | 4,918 | 3.5% |
| Depreciation and amortization | 2,882 | 2.0% | 3,610 | 2.5% |
| General and administrative | 7,260 | 5.1% | 4,080 | 2.9% |
| | | | | |
| Total Operating Expenses | 31,956 | 22.3% | 24,870 | 17.5% |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | (10,821) | (7.5)% | 6,502 | 4.6% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 174 | 0.1% | 34 | 0.0% |
| Interest expense | (1,351) | (0.9)% | (1,099) | (0.8)% |
| Gain on change in fair value of derivative instruments | 4,476 | 3.1% | - | 0.0% |
| Other income (expense) | (50) | (0.0)% | 8 | 0.0% |
| | | | | |
| Total Other Income (Expenses) | 3,249 | 2.3% | (1,057) | (0.7)% |
| | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (7,572) | (5.3)% | 5,445 | 3.8% |
| | | | | |
| INCOME TAX (EXPENSE) BENEFIT | 2,388 | 1.7% | (2,129) | (1.5)% |
| | | | | |
| NET INCOME (LOSS) | $ (5,184) | (3.6)% | $ 3,316 | 2.3% |

*Product sales, net.* We generate revenue from the retail sales of appliances, furniture, home goods and related products. Our product sales were $143.6 million for the three months ended September 30, 2022, as compared to $141.9 million for the three months ended September 30, 2021, an increase of $1.7 million, or 1.2%.

*Cost of goods sold.* Our cost of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their products. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Vendor funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $122.4 million for the three months ended September 30, 2022, as compared to $110.5 million for the three months ended September 30, 2021, an increase of $11.9 million, or 10.8%, is mainly attributed to higher freight and product costs, along with a decrease in vendor rebates during the period.

*Gross profit and gross margin.* As a result of the foregoing, our gross profit was $21.1 million for the three months ended September 30, 2022, as compared to $31.4 million for the three months ended September 30, 2021, a decrease of $10.2 million, or 32.6%. Our gross margin (gross profit as a percentage of net sales) was 14.7% for the three months ended September 30, 2022, and 22.1% for the three months ended September 30, 2021. The decline in gross profit is mainly attributed to increased product and freight costs during the period. Additionally, the decrease in the gross margin percentage is attributable to several factors, including aggressive pricing strategies aimed at driving revenue growth, purchase disruptions arising from increased customer cancellations, and a reduction in vendor rebates.

*Personnel expenses.* Personnel expenses include employee salaries and bonuses, as well as related payroll taxes, health insurance premiums, training costs, and stock compensation expense. Our personnel expenses were $8.3 million for the three months ended September 30, 2022, as compared to $8.5 million for the three months ended September 30, 2021, a decrease of $0.2 million, or 2.3%. As a percentage of net sales, personnel expenses were 5.8% and 6.0% for the three months ended September 30, 2022 and 2021, respectively.

*Advertising expenses.* Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $7.5 million for the three months ended September 30, 2022, as compared to $3.7 million for the three months ended September 30, 2021, an increase of $3.8 million, or 102.8%. As a percentage of net sales, advertising expenses were 5.2% and 2.6% for the three months ended September 30, 2022 and 2021, respectively. Such changes were primarily due to an effort to increase revenue through higher advertising spending.

*Bank and credit card fees.* Bank and credit card fees comprise the expenses incurred in payment to credit card processors for processing credit card transactions made by customers and to third-party sellers operating on the platforms where we sell parts and other items. Our bank and credit card fees were $5.9 million for the three months ended September 30, 2022, as compared to $4.9 million for the three months ended September 30, 2021, an increase of $1.0 million, or 20.6%. As a percentage of net sales, bank and credit card fees were 4.1% and 3.5% for the three months ended September 30, 2022 and 2021, respectively. Bank and credit card fees are based on customer orders that are paid with a credit card (substantially all orders). The change is related to a shift in the mix of credit cards used by customers and third-party sales, which typically have higher fees compared to credit cards.

*Depreciation and amortization expense.* Depreciation and amortization expense was $2.9 million, or 2.0% of net sales, for the three months ended September 30, 2022, as compared to $3.6 million, or 2.5% of net sales, for the three months ended September 30, 2021. The decrease is the result of decreased depreciation expense during the period.

*Acquisition expenses.* During the three months ended September 30, 2021, we incurred expenses related to the acquisition of Appliances Connection in the amount of $0.06 million.

*General and administrative expenses.* Our general and administrative expenses consist primarily of professional advisor fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $7.3 million for the three months ended September 30, 2022, as compared to $4.1 million for the three months ended September 30, 2021, an increase of $3.2 million, or 77.9%. As a percentage of net sales, general and administrative expenses were 5.1% and 2.9% for the three months ended September 30, 2022 and 2021, respectively. This increase is primarily driven by higher professional fees incurred in relation to the investigation of certain allegations made by former employees regarding the Company's business operations. See "*Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operation – Investigation*" initiated by the Board.

*Total other income (expense).* We had $3.2 million in total net other income for the three months ended September 30, 2022, as compared to total net other expense of $1.1 million for the three months ended September 30, 2021. Total other income, net, for the three months ended September 30, 2022, consisted primarily of a gain on the change in the fair value on derivative instruments of $4.5 million, offset by interest expense of $1.4 million. Total other expense, net, for the three months ended September 30, 2021, consisted primarily of interest expense of $1.1 million.

*Income tax benefit (expense).* We had an income tax net benefit of $2.4 million for the three months ended September 30, 2022, as compared to an income tax expense of $2.1 million for the three months ended September 30, 2021.

*Net income (loss).* As a result of the cumulative effect of the factors described above, we had a net loss of $5.2 million for the three months ended September 30, 2022, as compared to net income of $3.3 million for the three months ended September 30, 2021, a decrease of $8.5 million, or 256.3%.

**Comparison of the nine months ended September 30, 2022 and 2021**

The unaudited condensed consolidated operating results presented below for the nine months ended September 30, 2022, include the results of Appliances Connection, and, therefore, are not comparable to the consolidated operating results for the nine months ended September 30, 2021. The following table sets forth key components of our results of operations for the nine months ended September 30, 2022 and 2021, in thousands and as a percentage of our revenue.

| | Nine Months Ended September 30, 2022 | | Nine Months Ended September 30, 2021 | |
|---|---|---|---|---|
| | Amount | % of Sales | Amount | % of Sales |
| Product sales, net | $ 430,710 | 100.0% | $ 219,637 | 100.0% |
| Cost of goods sold | 355,788 | 82.6% | 172,581 | 78.6% |
| Gross profit | 74,922 | 17.4% | 47,056 | 21.4% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 22,396 | 5.2% | 15,300 | 7.0% |
| Advertising | 18,475 | 4.3% | 7,730 | 3.5% |
| Bank and credit card fees | 15,121 | 3.5% | 7,546 | 3.4% |
| Depreciation and amortization | 8,588 | 2.0% | 3,908 | 1.8% |
| Loss on abandonment of right-of-use asset | - | 0.0% | 1,437 | 0.7% |
| General and administrative | 15,078 | 3.5% | 9,176 | 4.2% |
| | | | | |
| Total Operating Expenses | 79,658 | 18.5% | 45,097 | 20.5% |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | (4,736) | (1.1)% | 1,959 | 0.9% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 282 | 0.1% | 57 | 0.0% |
| Adjustment in value of contingency | (2) | (0.0)% | - | 0.0% |
| Interest expense | (2,594) | (0.6)% | (2,350) | (1.1)% |
| Gain on change in fair value of derivative instruments | 3,540 | 0.8% | - | 0.0% |
| Loss on settlement of debt | (3,241) | (0.8)% | (1,748) | (0.8)% |
| Other income (expense) | (140) | 0.0% | 19 | 0.0% |
| | | | | |
| Total Other Expenses | (2,155) | (0.5)% | (4,022) | (1.8)% |
| | | | | |
| NET LOSS BEFORE INCOME TAXES | (6,891) | (1.6)% | (2,063) | (0.9)% |
| | | | | |
| INCOME TAX BENEFIT | 3,234 | 0.8% | 5,919 | 2.7% |
| | | | | |
| NET INCOME (LOSS) | $ (3,657) | (0.8)% | $ 3,856 | 1.8% |

*Product sales, net.* We generate revenue from the retail sales of appliances, furniture, home goods and related products. Our product sales were $430.7 million for the nine months ended September 30, 2022, as compared to $219.6 million for the nine months ended September 30, 2021, an increase of $211.1 million, or 96.1%. This growth was primarily driven by the significant impact of the Appliances Connection Acquisition during the period.

*Cost of goods sold.* Our cost of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their products. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Vendor funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $355.8 million for the nine months ended September 30, 2022, as compared to $172.6 million for the nine months ended September 30, 2021, an increase of $183.2 million, or 106.2%, with the increase driven by the impact of the Appliances Connection Acquisition.

*Gross profit and gross margin.* As a result of the foregoing, our gross profit was $74.9 million for the nine months ended September 30, 2022, as compared to $47.1 million for the nine months ended September 30, 2021, a decrease of $27.9 million, or 59.2%. Our gross margin (gross profit as a percentage of net sales) was 17.4% for the nine months ended September 30, 2022, and 21.4% for the nine months ended September 30, 2021. The decrease in the gross margin percentage is attributable to several factors, including aggressive pricing strategies aimed at driving revenue growth, purchase disruptions arising from increased customer cancellations, and a reduction in vendor rebates.

*Personnel expenses.* Personnel expenses include employee salaries and bonuses, as well as related payroll taxes, health insurance premiums, training costs, and stock compensation expense. Our personnel expenses were $22.4 million for the nine months ended September 30, 2022, as compared to $15.3 million for the nine months ended September 30, 2021, an increase of $7.1 million, or 46.4%. As a percentage of net sales, personnel expenses were 5.2% and 7.0% for the nine months ended September 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition.

*Advertising expenses.* Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $18.5 million for the nine months ended September 30, 2022, as compared to $7.7 million for the nine months ended September 30, 2021, an increase of $10.8 million, or 139.0%. As a percentage of net sales, advertising expenses were 4.3% and 3.5% for the nine months ended September 30, 2022 and 2021, respectively. The change was primarily due to an effort to increase revenue through higher advertising spend.

*Bank and credit card fees.* Bank and credit card fees comprise the expenses incurred in payment to credit card processors for processing credit card transactions made by customers and to third-party sellers operating on the platforms where we sell parts and other items. Our bank and credit card fees were $15.1 million for the nine months ended September 30, 2022, as compared to $7.5 million for the nine months ended September 30, 2021, an increase of $7.6 million, or 100.4%. As a percentage of net sales, bank and credit card fees were 3.5% and 3.4% for the nine months ended September 30, 2022 and 2021, respectively.

*Depreciation and amortization expense.* Depreciation and amortization expense was $8.6 million, or 2.0% of net sales, for the nine months ended September 30, 2022, as compared to $3.9 million, or 1.8% of net sales, for the nine months ended September 30, 2021. The increase is the result of amortizing intangible assets acquired in the Appliances Connection Acquisition the entire year.

*Loss on abandonment of right-of-use asset.* During the nine months ended September 30, 2021, we incurred a loss in the amount of $1.4 million related to the closure of our old warehouse and showroom and write-off of related leasehold improvements.

*General and administrative expenses.* Our general and administrative expenses consist primarily of professional advisor fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $15.1 million for the nine months ended September 30, 2022, as compared to $9.2 million for the nine months ended September 30, 2021, an increase of $5.9 million, or 64.3%. As a percentage of net sales, general and administrative expenses were 3.5% and 4.2% for the nine months ended September 30, 2022 and 2021, respectively. Such changes were primarily due to the impact of the Appliances Connection Acquisition and higher professional fees incurred in relation to the investigation of certain allegations made by former employees regarding the Company's business operations. See "*Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operation – Investigation*" initiated by the Board.

*Total other income (expense).* We had $2.2 million in total net other expense for the nine months ended September 30, 2022, as compared to total net other expense, of $4.0 million for the nine months ended September 30, 2021. Total other expense, net, for the nine months ended September 30, 2022, consisted primarily of loss on the extinguishment of debt of $3.2 million and interest expense of $2.6 million, offset by a gain from the change in fair value of a derivative asset of $3.5 million. Total other expense, net, for the nine months ended September 30, 2021, consisted primarily of loss on settlement of debt of $1.7 million and interest expense of $2.4 million.

*Income tax benefit.* We had an income tax net benefit of $3.2 million for the nine months ended September 30, 2022, as compared to an income tax benefit of $5.9 million for the nine months ended September 30, 2021.

*Net income (loss).* As a result of the cumulative effect of the factors described above, we had a net loss of $3.7 million for the nine months ended September 30, 2022, as compared to net income of $3.9 million for the nine months ended September 30, 2021, a decrease of $7.5 million, or 194.8%.

### Summary of Cash Flow

The following table provides detailed information about our net cash flow for the nine months ended September 30, 2022 and 2021 (in thousands).

|  | Nine Months Ended September 30, | |
| --- | --- | --- |
|  | 2022 | 2021 |
| Net cash used in operating activities | $ (38,693) | $ (18,316) |
| Net cash used in investing activities | (1,318) | (203,628) |
| Net cash provided by financing activities | 36,386 | 247,218 |
| Net change in cash, cash equivalents, and restricted cash | $ (3,625) | $ 25,274 |

*Cash flows used in operating activities.* Our net cash used in operating activities was $38.7 million for the nine months ended September 30, 2022, as compared to $18.3 million for the nine months ended September 30, 2021. Significant changes in operating assets and liabilities affecting cash flows during these periods included:

- Net loss was $3.7 million, as compared to net income of $3.9 million for the nine months ended September 30, 2022 and 2021, respectively,

- Cash used by receivables was $1.8 million and $2.6 million for the nine months ended September 30, 2022 and 2021, respectively,

- Cash provided by inventories was $7.3 million, as compared to cash used by inventory of $11.7 million for the nine months ended September 30, 2022 and 2021, respectively,

- Cash used by customer deposits was $20.9 million and $16.9 million for the nine months ended September 30, 2022 and 2021, respectively. Prior to July 2021, the Company charged a customer's card when an order was placed. After July 2021, the customers card was charged when the order shipped. The decline in customer deposits results from shipping or refunding customer orders that had previously been paid.

*Cash flows used in investing activities.* Our net cash used in investing activities was $1.3 million for the nine months ended September 30, 2022, as compared to $203.6 million for the nine months ended September 30, 2021. Net cash used in investing activities for the nine months ended September 30, 2022, consisted of leasehold improvements of $1.3 million. Net cash used in investing activities for the nine months ended September 30, 2021, primarily consisted of cash paid in the acquisition of Appliances Connection, net of cash acquired, of $201.5 million.

*Cash flows provided by financing activities.* Our net cash provided in financing activities was $36.4 million for the nine months ended September 30, 2022, as compared to $247.2 million for the nine months ended September 30, 2021.

Significant changes in financing activities affecting cash flows during these years included:

- Net cash received from notes payable proceeds of $43.0 million and $55.2 million for the nine months ended September 30, 2022 and September 30, 2021, respectively,

- Repayments of notes payable of $4.6 million and $4.9 million for the nine months ended September 30, 2022 and 2021, respectively,

- Stock repurchases of $2.0 million for the nine months ended September 30, 2022, and

- Net proceeds of $194.6 million received from public offering and proceeds from the exercise of warrants of $2.3 million for the nine months ended September 30, 2021.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

As a smaller reporting company, we are not required to disclose this item.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.

The full text of our audited consolidated financial statements begins on page F-1 of this annual report.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

*Resignation of Independent Registered Public Accounting Firm*

On December 20, 2022, the Company received a letter from the Company's independent registered public accounting firm, Friedman LLP, informing the Company of its decision to resign effective December 20, 2022 as the auditors of the Company.

In the Letter, Friedman advised the Company that based on the results of the Board's internal investigation as reported to Friedman, it appeared there may be material adjustments and/or disclosures necessary to previously reported financial information. Additionally, the Board's internal investigation identified facts, that if further investigated by Friedman, might cause Friedman to no longer to be able to rely on the representations of (i) management that was in place at the time Friedman issued its audit report for the year ended December 31, 2021, or (ii) management that was in place at the time of Friedman's association with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021 and March 31, 2022. Prior to the Letter, in the past two years, the Company had not received from Friedman an adverse opinion or a disclaimer of opinion, and Friedman's opinion was not qualified or modified as to uncertainty, audit scope, or accounting principles. The resignation by Friedman was neither recommended nor approved by the Audit Committee or the Board and there were no disagreements with management and Friedman. Friedman had previously reported a material weakness to the Audit Committee, which was included on the Company's Form 10-K for the year ended December 31, 2021, filed on March 31, 2022, regarding the ineffectiveness of the Company's internal controls over financial reporting.

In connection with the Letter, Friedman advised us that it was withdrawing its previously issued audit opinion on our December 31, 2021 consolidated financial statements, issued on March 31, 2022, and declined to be associated with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021, and March 31, 2022, filed on August 8, 2021, November 16, 2021 and May 12, 2022, respectively.

*Engagement of New Independent Registered Public Accounting Firm*

On December 26, 2022, the Audit Committee approved the engagement of Sadler, Gibb & Associates, LLC as the Company's independent registered public accounting firm for the fiscal years ended December 31, 2022 and 2021.

**ITEM 9A. CONTROLS AND PROCEDURES.**

*Evaluation of Disclosure Controls and Procedures*

The Company maintains "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, designed to ensure that information required to be disclosed by a company in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives.

Based on the evaluation performed as of December 31, 2022, as a result of the material weaknesses in internal control over financial reporting that are described below in "Management's Report on Internal Control Over Financial Reporting," our Interim Chief Executive Officer and Interim Chief Financial Officer determined that our disclosure controls and procedures were not effective as of such date.

*Management's Report on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate "internal control over financial reporting," as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). A company's internal control over financial reporting is a process designed by, or under the supervision of, its Chief Executive Officer and Chief Financial Officer, and effected by such company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

i.  pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

ii.  provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and the receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

iii.  provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management, with the participation of our interim Chief Executive Officer and interim Chief Financial Officer, has conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2022, based on the framework set forth in *Internal Control-Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management has concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2022, due to the material weaknesses described below.

*Material Weaknesses in Internal Control over Financial Reporting*

Management has determined that the Company's ineffective internal control over financial reporting and resulting material weaknesses, stem primarily from management's inability to maintain appropriately designed controls, which impacts the control environment, risk assessment procedures and ability to detect or prevent material misstatements to the financial statements. The material weaknesses were attributed to:

- Lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls;

- Ineffective assessment and identification of changes in risk impacting internal control over financial reporting;

- Inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures;

- Ineffective evaluation and determination as to whether the components of internal control were present and functioning; and

- The lack of an accounting system that is required for a company or our size.

*Management's Remediation Plans*

Management is actively engaged in the implementation of remediation plans to address the controls contributing to the material weaknesses. The Company's remediation actions include, but are not limited to, the following:

- Enhance reporting structure and increase the number of qualified resources in roles over internal control over financial reporting;

- Establish formal risk assessment procedures to identify and monitor changes in the organization that could have an impact on internal control over financial reporting;

- Develop and document policies and procedures, including related business process and technology controls, assess their effectiveness and establish a program for continuous assessment of their effectiveness; and

- Implementation of a new ERP.

We believe these measures will remediate the control deficiencies, but management is assessing the need for any additional steps to remediate the underlying causes that give rise to these material weaknesses. The material weaknesses will not be considered remediated until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. There is no assurance that additional remediation steps will not be necessary.

Management's report on internal control over financial reporting was not subject to attestation by the Company's registered accounting firm and will not be required to be subject to attestation so long as we are a smaller reporting company under the Securities Act.

Notwithstanding the identified material weaknesses, management believes the consolidated financial statements included in this Form 10-K fairly present, in all material respects, our results of operations and cash flows for year ended December 31, 2022 and our financial condition as of such date, in accordance with GAAP.

**Changes in Internal Control Over Financial Reporting**

Except as set forth above, there were no changes in our internal control over financial reporting during the quarter ended December 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B. OTHER INFORMATION.**

None.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.**

Not applicable.

65

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

**Directors and Executive Officers**

Set forth below is information regarding our directors, executive officers and significant employees as of the date of this report.

| Name | Age | Position |
|------|-----|----------|
| J.E. "Rick" Bunka | 64 | Interim Chief Executive Officer |
| Robert D. Barry | 79 | Interim Chief Financial Officer and Secretary |
| Jody Rusnak | 61 | Chief Merchandizing and Brand Innovation Officer |
| Ellery W. Roberts | 53 | Executive Chairman of the Board of Directors |
| Ellette A. Anderson | 47 | Director |
| Clark R. Crosnoe | 54 | Director |
| Glyn C. Milburn | 52 | Director |
| James M. Schneider | 70 | Director |
| G. Alan Shaw | 60 | Director |
| Alan P. Shor | 64 | Director |
| Edward J. Tobin | 66 | Director |
| Houman Akhavan | 45 | Director |

*J.E. "Rick" Bunka.* Mr. Bunka has served as our Interim Chief Executive Officer since October 2022. Since 2019, Mr. Bunka co-founded and has served as Partner of Park North Capital, LLC, a merchant bank that services companies seeking optimize their growth, capital structures, liquidity and operations. Also, since 2013, Mr. Bunka has served as the President of Point North LLC, a business advisory service, through which he served in an advisory role to Polished when it was known as 1847 Goedeker Inc. Formerly, Mr. Bunka held the position of President and Chief Executive Officer of Dots. Over his 15-year tenure at Dots, Mr. Bunka led a transformation of the regional close out retailer into a national specialty women's brand with more than 400 stores across 28 states. He was also appointed Chief Restructuring Officer of Love Culture in 2014 and of Anna's Linens in 2015. Early in his career, he was a Management Consultant at PriceWaterhouse, specializing in strategic planning, merchandising and organizational development in the retail and service sectors.

*Robert D. Barry.* Mr. Barry has served as our Interim Chief Financial Officer since October 2022. Mr. Barry previously served as our Chief Accounting Officer from July 2021 through January 2022, and also previously served as our Chief Financial Officer from January 2019 to July 2021. He also served as the Controller of Neese from July 2017 until the sale of Neese in April 2021. From April 2013 until August 2016, Mr. Barry was Chief Executive Officer and Chief Financial Officer of Pawn Plus Inc., a chain of retail pawn stores. Prior to that, Mr. Barry served as Executive Vice President and Chief Financial Officer of Regional Management Corp. (NYSE: RM), a consumer loan business based in Greenville, South Carolina for several years. Prior to joining Regional Management Corp., he held various executive roles that include Executive Vice President and Chief Financial Officer for Regional Acceptance Corporation (NASDAQ: REGA) and Financial Institutions Partner at KPMG LLP. Mr. Barry is a Certified Public Accountant and also serves on the Board of Directors of 1847 Holdings LLC.

*Jody Rusnak.* Mr. Rusnak has served as our Chief Merchandizing and Brand Innovation Officer since November 2021. Mr. Rusnak is an accomplished senior executive with more than three decades of B2C and B2B experience, as well as significant experience growing product assortment and driving growth across categories. Throughout his career, Mr. Rusnak has held several leadership roles within best-in-class retailer Nebraska Furniture Mart, Inc., where he was responsible for the P&L of the Appliances & Electronics categories. His leadership abilities include driving innovative approaches to merchandise, customer engagement and category expansion. In addition, Mr. Rusnak excels in vendor management, builder channel development and optimization, building and developing teams, and mentorship. He holds two bachelor's degrees in Computer Science and Business Management.

66

*Ellery W. Roberts*. Mr. Roberts has served as the Chairman of our board of directors since our inception and the Executive Chairman of our Board of Directors since August 30, 2021. Mr. Roberts brings over 20 years of private equity investing experience to our company. Mr. Roberts has been the Chairman, Chief Executive Officer, President and Chief Financial Officer of 1847 Holdings since its inception on January 22, 2013 and is also the sole manager of our manager. Mr. Roberts has also been a director of Western Capital Resources, Inc., a public company, since May 2010. In July 2011, Mr. Roberts formed The 1847 Companies LLC, a company that is No longer active, where he began investing his own personal capital and capital of high net worth individuals in select transactions. Prior to forming The 1847 Companies LLC, Mr. Roberts was the co-founder and was co-managing principal from October 2009 to June 2011 of RW Capital Partners LLC, the recipient of a "Green Light" letter from the U.S. Small Business Administration permitting RW Capital Partners LLC to raise capital in pursuit of the Small Business Investment Company license with the preliminary support of the Small Business Administration. Mr. Roberts was a founding member of Parallel Investment Partners, LP (formerly SKM Growth Investors, LP), a Dallas-based private equity fund focused on re-capitalizations, buyouts and growth capital investments in lower middle market companies throughout the United States. Previously, Mr. Roberts served as Principal with Lazard Group LLC, a Senior Financial Analyst at Colony Capital, Inc., and a Financial Analyst with the Corporate Finance Division of Smith Barney Inc. (now known as Morgan Stanley Smith Barney LLC). Mr. Roberts received his B.A. degree in English from Stanford University. We believe Mr. Roberts is qualified to serve on our board of directors due to his extensive investment experience.

*Ellette A. Anderson*. Ms. Anderson has served on our board of directors since July 2020. In 2013, Ms. Anderson founded Griffin Archer LLC, a full-service advertising agency that offers a comprehensive range of services addressing both the traditional and digital marking aspects of business. As the Chief Executive Officer of Griffin Archer, Ms. Anderson is responsible for overseeing new business acquisitions, strategic planning, and creative direction for their entire client portfolio. From April 2004 to August 2013, she served as a Writer and Associate Creative Director at Carmichael Lynch Advertising in Minneapolis where she received multiple industry awards for her creative work on several iconic brands. She holds a B.A. degree in English Literature from the University of Kansas. We believe Ms. Anderson is qualified to serve on our board of directors due to her deep experience in the advertising and marketing industry.

*Clark R. Crosnoe*. Mr. Crosnoe has served on our board of directors since July 2020. In 2009, Mr. Crosnoe founded CRC Capital LLC, a registered investment advisor and manager of the CRC Investment Fund LP, a private investment partnership focused on publicly-traded equity securities. As managing member of CRC Capital LLC, Mr. Crosnoe is responsible for strategy, oversight and the day-to-day investment decisions of the fund. The portfolio typically includes investments in the consumer, financial, healthcare, industrial and energy sectors. In 1999, Mr. Crosnoe was a founding employee of Parallel Investment Partners where he was named partner in 2003. As a partner, he was responsible for sourcing, evaluating, structuring, executing and monitoring investments, and also dedicated a substantial portion of his time to marketing activities for the firm. Mr. Crosnoe began his career in investment banking at Wasserstein Perella & Co. and also gained valuable experience at multi-billion dollar hedge fund HBK Investments. Mr. Crosnoe holds undergraduate degrees from the University of Texas at Austin and earned an MBA from Harvard Business School in 1996. We believe Mr. Crosnoe is qualified to serve on our board of directors due to his approximately 24 years of private and public investment and advisory experience.

*Glyn C. Milburn*. Mr. Milburn has served on our board of directors since July 2020. Since January 2021, Mr. Milburn has served as the Senior Director of Government Affairs at Ygrene Energy Fund, an energy finance vehicle with offices in California and Florida. From February 2016 to January 2021, Mr. Milburn has served as a Partner at Jimmy Blackman & Associates, a full- service Government and Public Affairs firm, where he is responsible for business strategy, client management, communications and campaign management for a client portfolio comprised of large public safety labor unions, banking/finance companies, and hotel operators across the State of California. From April 2013 to January 2016, Mr. Milburn served as a Special Assistant in the City of Los Angeles where he held two positions in the City of Los Angeles, one in the Office of Los Angeles Mayor Eric Garcetti's Office of Economic Development and another in the Office of Los Angeles Councilman Dennis Zine. From August 2012 to March 2013, Mr. Milburn co-Founded Provident Investment Advisors LLC, a special investment vehicle for energy, technology and healthcare ventures, where he served as Managing Member. Mr. Milburn holds a B.A. degree in Public Policy from Stanford University. We believe Mr. Milburn is qualified to serve on our board of directors due to his valuable background in policy development, regulatory and strategic planning experience.

*James M. Schneider*. Mr. Schneider has served on our board of directors since January 2022. Since 2006, Mr. Schneider has served as Chairman of Horizon Bank SSB, a privately held bank in Texas. Prior to that, he was the CFO of Dell, Inc. Since 2010, Mr. Schneider has been employed by private equity firm Lead Edge Capital, currently serving as an operating partner. Mr. Schneider holds a bachelor's degree in accounting from Carroll University and is a Certified Public Accountant and former partner at PricewaterhouseCoopers LLP. Mr. Schneider serves as a director of Frontier Bancshares Inc., a provider of commercial banking services for retail and intuitional customers, and Lohman Technologies, LLC, a provider of medical equipment. Mr. Schneider served as a director of General Communications Inc., a publicly-held telecommunications corporation from 1994 until 2018 and Zilliant Inc. from 2011 until 2021. We believe Mr. Schneider is qualified to serve on our board of directors due to his extensive experience on public company boards and accounting experience.

*G. Alan Shaw*. Mr. Shaw has served on our board of directors since October 2021. Mr. Shaw brings expansive appliance industry knowledge and valuable supplier relationships to our Board. He has been a leader in the industry for more than twenty years, beginning his career with Whirlpool and finishing it as the Chief Executive Officer of Electrolux's North American business, a position he held from January 2016 until his retirement in January 2020. He has held President and c-level positions with several North American-based durable goods companies since 2003, including Char-Broil and Husqvarna Group. He holds a B.S. degree in Economics and Political Science from the University of Idaho and an MBA in Marketing from Indiana University. We believe Mr. Shaw is qualified to serve on our board of directors due to his extensive appliance industry and executive leadership experience.

*Alan P. Shor*. Mr. Shor has served on our board of directors since June 2021. Mr. Shor is a co-founder of The Retail Connection, L.P., a retail real estate company, and has served as its President and Co-Chairman of the Board of Directors since its launch in January 2004. Mr. Shor is deeply involved in the strategic direction and day-to-day operations of the company and also leads its investment and merchant banking business. He has served as an operating partner with leading private equity firms which have deep experience in consumer and multi-unit based investments. He is an investor in and a board member of four high-growth retail chains: Diamonds Direct, a diamond retailer, (since 2015), WSS, a shoe retailer, (since 2016), Neighborhood Goods, a department store, (since 2018) and Obsession Fragrance (since 2019). Prior to launching The Retail Connection, Mr. Shor served as President, Chief Operating Officer and a member of the Board of Zale Corporation, a publicly-held specialty retailer of fine jewelry. Prior to joining Zale, he spent 12 years with Troutman Sanders, an international law firm, where he built a strong track record of advising senior management teams of Fortune 1000 companies. Mr. Shor is also active in a number of professional and charitable organizations. Mr. Shor graduated with honors from both the University of Georgia and University of Georgia School of Law. We believe Mr. Shor is qualified to serve on our board of directors due to his valuable background in the retail and investment industries.

*Edward J. Tobin*. Mr. Tobin has served on our board of directors since April 2020. Mr. Tobin has served as Managing Director of 1847 Partners LLC, our manager, since January 2014. From 1997 until November 2014, Mr. Tobin was a Director of Global Emerging Markets North America, Inc., where he managed Special Situations and Venture investing. In this role, he oversaw structured finance transactions in industries such as clean tech, media, telecommunications, manufacturing, real estate and life sciences. Prior to that, Mr. Tobin was Managing Director of Lincklaen Partners, a private family investment office. Previously, he had been a portfolio manager with Neuberger and Berman and a Vice President of Nordberg Capital, Inc. Mr. Tobin received his MBA from the Wharton School, as well as a Master of Science in Engineering and a Bachelor of Science in Economics from the University of Pennsylvania. We believe Mr. Tobin is qualified to serve on our board of directors due to his extensive investment experience.

*Houman Akhavan*. Mr. Akhavan has served on our board of directors since January 2023. Mr. Akhavan is currently the Chief Marketing Officer of CarParts.com, Inc., and has been since February 2019. Prior to his role as CarParts.com's Chief Marketing Officer, Mr. Akhavan was the Chief Executive Officer of Growth Rocket (d/b/a Idea Launch, Inc.) from January 2015 to February 2019. Mr. Akhavan previously served as CarParts.com's Vice President of Marketing from January 2006 to December 2014. We believe Mr. Akhavan is qualified to serve on our Board due to extensive experience growing revenue and market share in start-up and public company environments.

Our directors currently have terms which will end at our next annual meeting of the stockholders or until their successors are elected and qualify, subject to their prior death, resignation or removal. Officers serve at the discretion of the board of directors. There is no arrangement or understanding between any director or executive officer and any other person pursuant to which he was or is to be selected as a director, nominee or officer.

**Family Relationships**

There are no family relationships among any of our executive officers or directors.

**Involvement in Certain Legal Proceedings**

To the best of our knowledge, except as described below, none of our directors or executive officers has, during the past ten years:

- been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offences);

- had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two years prior to that time;

- been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, barring, suspending or otherwise limiting, his involvement in (i) acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission, or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in or continuing any conduct or practice in connection with such activity, (ii) any type of business practice, or (iii) the purchase or sale of any security or commodity or in connection with any violation of federal or state securities laws or federal commodities laws;

- been the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any federal or state authority barring, suspending or otherwise limiting for more than 60 days the right of such person to engage in any activity acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission, or an associated person of any of the foregoing, or as an investment adviser, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in or continuing any conduct or practice in connection with such activity, or to be associated with persons engaged in any such activity;

- been found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease- and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self- regulatory organization (as defined in Section 3(a)(26) of the Exchange Act (15 U.S.C. 78c(a)(26))), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act (7 U.S.C. 1(a)(29))), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

69

**Corporate Governance**

*Governance Structure*

We chose to appoint a separate Chairman of the Board of Directors who is not our Chief Executive Officer. Our board of directors has made this decision based on their belief that a separate Chairman of the Board of Directors can act as a balance to the Chief Executive Officer.

*The Board of Directors' Role in Risk Oversight*

The board of directors oversees that the assets of our company are properly safeguarded, that the appropriate financial and other controls are maintained, and that our business is conducted wisely and in compliance with applicable laws and regulations and proper governance. Included in these responsibilities is the board of directors' oversight of the various risks facing our company. In this regard, our board of directors seeks to understand and oversee critical business risks. Our board of directors does not view risk in isolation. Risks are considered in virtually every business decision and as part of our business strategy. Our board of directors recognizes that it is neither possible nor prudent to eliminate all risk. Indeed, purposeful and appropriate risk-taking is essential for our company to be competitive on a global basis and to achieve its objectives.

While the board of directors oversees risk management, company management is charged with managing risk. Management communicates routinely with the board of directors and individual directors on the significant risks identified and how they are being managed. Directors are free to, and indeed often do, communicate directly with senior management.

Our board of directors administers its risk oversight function as a whole by making risk oversight a matter of collective consideration. Much of this work has been delegated to committees, which will meet regularly and report back to the full board of directors. The audit committee oversees risks related to our consolidated financial statements, the financial reporting process, accounting and legal matters, the compensation committee evaluates the risks and rewards associated with our compensation philosophy and programs, and the nominating and corporate governance committee evaluates risk associated with management decisions and strategic direction.

*Independent Directors*

The rules of NYSE American generally require that a majority of an issuer's board of directors must consist of independent directors. Our board of directors currently consists of nine (9) directors, seven (7) of whom, Ellette A. Anderson, Clark R. Crosnoe, Glyn C. Milburn, James M. Schneider, G. Alan Shaw, Alan P. Shor and Houman Akhavan, are independent within the meaning of the rules of NYSE American.

*Committees of the Board of Directors*

Our board of directors has established an audit committee, a compensation and nominating and corporate governance committee, each with its own charter approved by the board of directors. Each committee's charter is available on our website at www.polished.com.

In addition, our board of directors may, from time to time, designate one or more additional committees, which shall have the duties and powers granted to it by our board of directors.

*Audit Committee*

Clark R. Crosnoe, Glyn C. Milburn, James M. Schneider and G. Alan Shaw, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American, serve on our audit committee, with Mr. Crosnoe serving as the chairman. Our board of directors has determined that Messrs. Crosnoe and Schneider qualify as "audit committee financial experts." The audit committee oversees our accounting and financial reporting processes and the audits of the consolidated financial statements of our company.

The audit committee is responsible for oversight of, among other things: (i) the integrity of our consolidated financial statements and financial reporting process and systems of internal accounting and financial controls; (ii) the performance of the internal audit services function; (iii) the annual independent audit of our consolidated financial statements; (iv) the engagement of the independent auditors, including the pre-approval any audit and/or permissible non-audit services provided by our independent auditors, and the evaluation of the independent auditors' qualifications, independence and performance; (v) our compliance with legal and regulatory requirements, including our disclosure of controls and procedures; (vi) the evaluation of enterprise risk issues; and (vii) reviewing and assessing annually the audit committee's performance and the adequacy of its charter.

### *Compensation Committee*

Alan P. Shor, Clark R. Crosnoe and Ellette A. Anderson, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American, serve on our compensation committee, with Mr. Shor serving as the chairman. The members of the compensation committee are also "outside directors" as defined in Section 162(m) of the Internal Revenue Code of 1986, as amended, or the Code, and "non-employee directors" within the meaning of Section 16 of the Exchange Act. The compensation committee assists the board of directors in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers.

The compensation committee is responsible for, among other things: (i) reviewing and approving the compensation of our executive officers; (ii) evaluating and making recommendations to the board of directors regarding the compensation of our directors; (iii) evaluating and making recommendations to the board of directors regarding equity-based and incentive- compensation plans, policies and programs that are subject to our board of directors' approval; and (iv) reviewing and assessing annually the compensation committee's performance and the adequacy of its charter.

### *Nominating and Corporate Governance Committee*

Ellette A. Anderson, G. Alan Shaw and Glyn C. Milburn, each of whom satisfies the "independence" requirements of Rule 10A-3 under the Exchange Act and the rules of NYSE American, serve on our nominating and corporate governance committee, with Mr. Milburn serving as the chairman. The nominating and corporate governance committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board of directors and its committees. The nominating and corporate governance committee will be responsible for, among other things: (i) identifying and evaluating individuals qualified to become members of the board of directors by reviewing nominees for election to the board of directors submitted by stockholders and recommending to the board director nominees for each annual meeting of stockholders and for election to fill any vacancies on the board; (ii) advising the board of directors with respect to board organization, desired qualifications of board members, the membership, function, operation, structure and composition of committees (including any committee authority to delegate to subcommittees), and self-evaluation and policies; (iii) advising on matters relating to corporate governance and monitoring developments in the law and practice of corporate governance; (iv) overseeing compliance with our code of ethics; and (v) approving any related party transactions.

The nominating and corporate governance committee will seek to identify potential director candidates who will strengthen the board of directors, including by establishing procedures for soliciting and reviewing potential nominees from directors and stockholders (as discussed below) and for notifying those who suggest nominees of the outcome of such review. The nominating and corporate governance committee shall have sole authority to retain and terminate any search firm to be used to identify director candidates, including sole authority to approve any such search firm's fees and other terms of retention.

In making director recommendations, the nominating and corporate governance committee may consider some or all of the following factors: (i) the candidate's judgment, skill, experience with other organizations of comparable purpose, complexity and size, and subject to similar legal restrictions and oversight; (ii) the interplay of the candidate's experience with the experience of other members of the board of directors; (iii) the extent to which the candidate would be a desirable addition to the board of directors and any committee thereof; (iv) whether or not the person has any relationships that might impair his or her independence; and (v) the candidate's ability to contribute to the effective management of our company, taking into account the needs of our company and such factors as the individual's experience, perspective, skills and knowledge of the industry in which we operate.

A stockholder may nominate one or more persons for election as a director at an annual meeting of stockholders if the stockholder complies with the notice and information provisions contained in our bylaws. Such notice must be in writing to the secretary of our company not less than 90 days and not more than 120 days prior to the anniversary date of the preceding year's annual meeting of stockholders or as otherwise required by requirements of the Exchange Act. In addition, stockholders furnishing such notice must be a holder of record on both (i) the date of delivering such notice and (ii) the record date for the determination of stockholders entitled to vote at such meeting.

### Code of Ethics

We have adopted a code of ethics that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. Such code of ethics addresses, among other things, honesty and ethical conduct, conflicts of interest, compliance with laws, rules, regulations and policies, including full, fair, accurate, timely, and understandable disclosures in reports required under the federal securities laws, and reporting of violations of the code.

We are required to disclose any amendment to, or waiver from, a provision of our code of ethics applicable to our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. We intend to use our website as a method of disseminating this disclosure, as permitted by applicable SEC rules. Any such disclosure will be posted to our website, www.polished.com, within four (4) business days following the date of any such amendment to, or waiver from, a provision of our code of ethics.

### Insider Trading Policy

We maintain an insider trading policy that prohibits trading our common shares when in possession of material non-public information. It also prohibits directors, officers and other employees from engaging in hedging transactions and, unless approved in advance by our Chief Financial Officer (or such other individual designated by the board of directors), holding our securities in a margin account or otherwise pledging our shares as collateral for a loan. Since the adoption of our insider trading policy, we have granted one waiver to the policy's general prohibition on pledging. See "Item 12 — Security Ownership of Certain Beneficial Owners and Management".

**Delinquent Section 16(a) Reports**

- On July 31, 2023, Ellette A. Anderson filed a late Form 5 with respect to one transaction.

**ITEM 11. EXECUTIVE COMPENSATION.**

**Summary Compensation Table - Years Ended December 31, 2022 and 2021**

The following table sets forth information concerning all cash and non-cash compensation awarded to, earned by or paid to our named executive officers for services rendered in all capacities during the noted periods.

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | Option Awards ($)(2) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| J.E. "Rick" Bunka, | 2022 | 194,231 | -- | -- | -- | -- | 194,231 |
| Interim Chief Executive Officer(3) | 2021 | -- | -- | -- | -- | -- | -- |
| | | | | | | | |
| Robert D. Barry, | 2022 | 245,577 | -- | -- | -- | -- | 245,577 |
| Interim Chief Financial Officer(4) | 2021 | 290,793 | 25,000 | 25,000 | -- | 11,508 | 352,301 |
| | | | | | | | |
| Jody Rusnak, | 2022 | 350,000 | -- | -- | -- | -- | 350,000 |
| Chief Merchandising and Brand Innovation Officer(5) | 2021 | 26,923 | -- | -- | -- | -- | 26,923 |
| | | | | | | | |
| Maria Johnson, | 2022 | 310,961 | 134,750 | -- | -- | 37,109 | 482,821 |
| Former Chief Financial Officer(6) | 2021 | 162,885 | 149,750 | -- | 315,600 | 2,198 | 628,235 |
| | | | | | | | |
| Albert Fouerti, | 2022 | 306,308 | 175,000 | -- | -- | -- | 481,308 |
| Former Chief Executive Officer(7) | 2021 | 210,000 | 175,000 | -- | -- | -- | 385,000 |

(1) Amounts represent cash bonuses.

(2) The amount is equal to the aggregate grant-date fair value with respect to the awards, computed in accordance with FASB ASC Topic 718, determined without regard to estimated forfeitures. See Note 2 to our consolidated financial statements in this Annual Report on Form 10-K for a discussion of the assumptions used in determining the FASB ASC 718 grant date fair value of these awards.

(3)   Mr. Bunka was appointed Interim Chief Executive Officer by the Board effective October 14, 2022.

(4)   Mr. Barry is currently our Interim Chief Financial Officer. Previously, Mr. Barry was a full-time employee following our initial public offering on July 31, 2020. Mr. Barry's title was changed to Chief Accounting Officer in July 2021, and he was our Chief Accounting Officer until January 2022. Mr. Barry was appointed Interim Chief Financial Officer by the Board effective October 14, 2022. Other compensation represents matching contributions under our 401(k) plan.

(5)   Mr. Rusnak has served as our Chief Merchandizing and Brand Innovation Officer since November 2021.

(6)   Ms. Johnson served as our Chief Financial Officer from July 2021 until her resignation in October 2022. Other compensation for 2022 represents a vacation payout. Other compensation for 2021 represents payments for parking her personal vehicle.

(7)   Mr. Fouerti served as our Chief Executive Officer from August 2021 until his resignation in October 2022.

**Employment Agreements**

On October 14, 2022, the Board appointed with immediate effect J.E. "Rick" Bunka as Interim Chief Executive Officer and Robert D. Barry as Interim Chief Financial Officer of the Company, following the resignations of Albert Fouerti as Chief Executive Officer and President, Elie Fouerti as Chief Operating Officer and Maria Johnson as Chief Financial Officer and Secretary.

In connection with his appointment as Interim Chief Executive Officer, Mr. Bunka entered into an engagement agreement with the Company, pursuant to which, the Company shall pay Mr. Bunka a fee of $16,826.92 per week for his services. Mr. Bunka's term commenced on October 14, 2022, and will be for a period of six-months, unless extended by Mr. Bunka and the Company. In addition to payment for his services, Mr. Bunka shall be eligible for a success fee equal to $2,187,500 and a leadership transition fee of $437,500. The success fee shall be earned if, during his term, the Company consummates a Change in Control (as defined in the Company's 2020 Equity Incentive Plan) and Mr. Bunka is performing services (and has not given notice) through the date of closing of such Change in Control. The leadership transition fee shall be paid if, in the Board's sole determination, Mr. Bunka has materially assisted in the successful transition to permanent executive leadership during his term.

In connection with his appointment as Interim Chief Financial Officer, Mr. Barry entered into an employment agreement with the Company, pursuant to which, the Company shall pay Mr. Barry an annual base salary of $325,000, paid bi-weekly with standard payroll deductions and less applicable taxes, and an annual bonus target for 2023 of up to 50% of his applicable base salary, subject to adoption by the Company's board of directors. In addition to payment for his services, Mr. Barry shall be eligible for a Change in Control bonus equal to $325,000, if, subsequent to January 1, 2023, the Company consummates a Change in Control and Mr. Barry remains employed through the date of closing of such Change in Control.

**Outstanding Equity Awards at Fiscal Year-End**

The following table includes certain information with respect to the value of all unexercised options and unvested shares of restricted stock previously awarded to the executive officers named above at the fiscal year ended December 31, 2022.

| | Option Awards | | | | |
|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date |
| J.E. "Rick" Bunka | – | – | – | – | – |
| Robert D. Barry | – | – | – | – | – |
| Jody Rusnak | – | – | – | – | – |
| Maria Johnson | – | – | – | – | – |
| Albert Fouerti | – | – | – | – | – |

**Additional Narrative Disclosures**

*Retirement Benefits*

We have not maintained, and do not currently maintain, a defined benefit pension plan or nonqualified deferred compensation plan. We currently make available a retirement plan intended to provide benefits under Section 401(k) of the Code, pursuant to which employees, including the executive officers named above, can make voluntary pre-tax contributions. We currently match 100% of elective deferrals up to 3% of compensation and 50% of elective deferrals for next 2% of compensation. All contributions under the plan are subject to certain annual dollar limitations, which are periodically adjusted for changes in the cost of living. See "— Summary Compensation Table - Years Ended December 31, 2020 and 2019" for matches made for the executive officers named above.

**Director Compensation**

In mid-2021, we revised the fees paid to our directors such that our independent directors receive an annual fee of $40,000, payable monthly. The Chair of the Board receives an additional annual fee of $50,000. Each independent director who serves on the Audit Committee also receives an annual fee of $6,000, those who serve on the Compensation Committee receive an annual fee of $4,500, and those who serve on the Nominating and Governance Committee also receive an annual fee of $3,000. The Chairman of the Audit Committee receives an additional $10,000, the Chairman of the Compensation Committee receives an additional $7,500 and the Chairman of the Nominating and Governance Committee receives an additional $5,000.

| **Audit Committee** | | |
|---|---|---|
| Committee Chair Fee | $ | 10,000 |
| Committee Member Fee | $ | 6,000 |
| **Compensation Committee** | | |
| Committee Chair Fee | $ | 7,500 |
| Committee Member Fee | $ | 4,500 |
| **Nominating and Corporate Governance Committee** | | |
| Committee Chair Fee | $ | 5,000 |
| Committee Member Fee | $ | 3,000 |

In addition, on March 29, 2022, each of Messrs. Shaw and Schneider received a grant of 34,883 shares of fully vested common stock. On February 8, 2023, Mr. Akhavan received a grant of 83,011 shares of fully vested common stock.

The table below sets forth the compensation to our non-employee directors during the fiscal year ended December 31, 2022.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards($) | Total ($) |
|---|---|---|---|
| Ellette A. Anderson | 47,500 | - | 47,500 |
| Clark R. Crosnoe | 54,500 | - | 54,500 |
| Glyn C. Milburn | 51,000 | - | 51,000 |
| Ellery Roberts | 90,000 | - | 90,000 |
| G. Alan Shaw | 49,000 | 60,000 | 109,000 |
| Alan P. Shor | 47,500 | - | 47,500 |
| Edward Tobin | 40,000 | - | 40,000 |
| James M. Schneider | 42,167 | 60,000 | 102,167 |
| Houman Akhavan | - | - | - |

**2020 Equity Incentive Plan**

On July 30, 2020, we established the 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "Plan"). The purpose of the Plan is to grant restricted stock, stock options and other forms of incentive compensation to our officers, employees, directors and consultants.

The following summary briefly describes the principal features of the Plan and is qualified in its entirety by reference to the full text of the Plan.

Awards that may be granted include: (a) incentive stock options, (b) non-qualified stock options, (c) stock appreciation rights, (d) restricted awards, (e) performance share awards, and (f) performance compensation awards. These awards offer our officers, employees, consultants and directors the possibility of future value, depending on the long-term price appreciation of our common stock and the award holder's continuing service with our company.

Stock options give the option holder the right to acquire from us a designated number of shares of common stock at a purchase price that is fixed upon the grant of the option. The exercise price will not be less than the market price of the common stock on the date of grant. Stock options granted may be either tax-qualified stock options (so-called "incentive stock options") or non-qualified stock options.

Stock appreciation rights, or SARs, which may be granted alone or in tandem with options, have an economic value similar to that of options. When a SAR for a particular number of shares is exercised, the holder receives a payment equal to the difference between the market price of the shares on the date of exercise and the exercise price of the shares under the SAR. Again, the exercise price for SARs normally is the market price of the shares on the date the SAR is granted. Under the Plan, holders of SARs may receive this payment – the appreciation value – either in cash or shares of common stock valued at the fair market value on the date of exercise. The form of payment will be determined by us.

Restricted shares are shares of common stock awarded to participants at No cost. Restricted shares can take the form of awards of restricted stock, which represent issued and outstanding shares of our common stock subject to vesting criteria, or restricted stock units, which represent the right to receive shares of our common stock subject to satisfaction of the vesting criteria. Restricted shares are forfeitable and non-transferable until the shares vest. The vesting date or dates and other conditions for vesting are established when the shares are awarded.

The Plan also provides for performance compensation awards, representing the right to receive a payment, which may be in the form of cash, shares of common stock, or a combination, based on the attainment of pre-established goals.

All of the permissible types of awards under the Plan are described in more detail as follows:

*Purposes of Plan*: The purposes of the Plan are to attract and retain officers, employees and directors for our company and its subsidiaries; motivate them by means of appropriate incentives to achieve long-range goals; provide incentive compensation opportunities; and further align their interests with those of our stockholders through compensation that is based on our common stock.

*Administration of the Plan*: The Plan is administered by our compensation committee (which we refer to as the administrator). Among other things, the administrator has the authority to select persons who will receive awards, determine the types of awards and the number of shares to be covered by awards, and to establish the terms, conditions, performance criteria, restrictions and other provisions of awards. The administrator has authority to establish, amend and rescind rules and regulations relating to the Plan.

*Eligible Recipients*: Persons eligible to receive awards under the Plan will be those officers, employees, consultants, and directors of our company and its subsidiaries who are selected by the administrator.

*Shares Available Under the Plan*: The maximum number of shares of our common stock that may be delivered to participants under the Plan is 1,000,000 (subject to stockholder approval of such increase), subject to adjustment for certain corporate changes affecting the shares, such as stock splits. Shares subject to an award under the Plan for which the award is canceled, forfeited or expires again become available for grants under the Plan. Shares subject to an award that is settled in cash will not again be made available for grants under the Plan.

*Stock Options*:

*General*. Subject to the provisions of the Plan, the administrator has the authority to determine all grants of stock options. That determination will include: (i) the number of shares subject to any option; (ii) the exercise price per share; (iii) the expiration date of the option; (iv) the manner, time and date of permitted exercise; (v) other restrictions, if any, on the option or the shares underlying the option; and (vi) any other terms and conditions as the administrator may determine.

*Option Price*. The exercise price for stock options will be determined at the time of grant. Normally, the exercise price will not be less than the fair market value on the date of grant. As a matter of tax law, the exercise price for any incentive stock option awarded may not be less than the fair market value of the shares on the date of grant. However, incentive stock option grants to any person owning more than 10% of our voting stock must have an exercise price of not less than 110% of the fair market value on the grant date.

*Exercise of Options.* An option may be exercised only in accordance with the terms and conditions for the option agreement as established by the administrator at the time of the grant. The option must be exercised by notice to us, accompanied by payment of the exercise price. Payments may be made in cash or, at the option of the administrator, by actual or constructive delivery of shares of common stock to the holder of the option based upon the fair market value of the shares on the date of exercise.

*Expiration or Termination.* Options, if not previously exercised, will expire on the expiration date established by the administrator at the time of grant. In the case of incentive stock options, such term cannot exceed ten years provided that in the case of holders of more than 10% of our voting stock, such term cannot exceed five years. Options will terminate before their expiration date if the holder's service with our company or a subsidiary terminates before the expiration date. The option may remain exercisable for specified periods after certain terminations of employment, including terminations as a result of death, disability or retirement, with the precise period during which the option may be exercised to be established by the administrator and reflected in the grant evidencing the award.

*Incentive and Non-Qualified Options.* As described elsewhere in this summary, an incentive stock option is an option that is intended to qualify under certain provisions of the Code, for more favorable tax treatment than applies to non-qualified stock options. Any option that does not qualify as an incentive stock option will be a non-qualified stock option. Under the Code, certain restrictions apply to incentive stock options. For example, the exercise price for incentive stock options may not be less than the fair market value of the shares on the grant date and the term of the option may not exceed ten years. In addition, an incentive stock option may not be transferred, other than by will or the laws of descent and distribution, and is exercisable during the holder's lifetime only by the holder. In addition, No incentive stock options may be granted to a holder that is first exercisable in a single year if that option, together with all incentive stock options previously granted to the holder that also first become exercisable in that year, relate to shares having an aggregate fair market value in excess of $100,000, measured at the grant date.

**Stock Appreciation Rights**: Awards of SARs may be granted alone or in tandem with stock options. SARs provide the holder with the right, upon exercise, to receive a payment, in cash or shares of stock, having a value equal to the excess of the fair market value on the exercise date of the shares covered by the award over the exercise price of those shares. Essentially, a holder of a SAR benefits when the market price of the common stock increases, to the same extent that the holder of an option does, but, unlike an option holder, the SAR holder need not pay an exercise price upon exercise of the award.

**Stock Awards**: Stock awards can also be granted under the Plan. A stock award is a grant of shares of common stock or of a right to receive shares in the future. These awards will be subject to such conditions, restrictions and contingencies as the administrator shall determine at the date of grant. Those may include requirements for continuous service and/or the achievement of specified performance goals.

**Cash Awards**: A cash award is an award that may be in the form of cash or shares of common stock or a combination, based on the attainment of pre-established performance goals and other conditions, restrictions and contingencies identified by the administrator.

**Performance Criteria**: Under the Plan, one or more performance criteria will be used by the administrator in establishing performance goals. Any one or more of the performance criteria may be used on an absolute or relative basis to measure the performance of our company, as the administrator may deem appropriate, or as compared to the performance of a group of comparable companies, or published or special index that the administrator deems appropriate. In determining the actual size of an individual performance compensation award, the administrator may reduce or eliminate the amount of the award through the use of negative discretion if, in its sole judgment, such reduction or elimination is appropriate. The administrator shall not have the discretion to (i) grant or provide payment in respect of performance compensation awards if the performance goals have not been attained or (ii) increase a performance compensation award above the maximum amount payable under the Plan.

**Other Material Provisions**: Awards will be evidenced by a written agreement, in such form as may be approved by the administrator. In the event of various changes to the capitalization of our company, such as stock splits, stock dividends and similar re-capitalizations, an appropriate adjustment will be made by the administrator to the number of shares covered by outstanding awards or to the exercise price of such awards. The administrator is also permitted to include in the written agreement provisions that provide for certain changes in the award in the event of a change of control of our company, including acceleration of vesting. Except as otherwise determined by the administrator at the date of grant, awards will not be transferable, other than by will or the laws of descent and distribution. Prior to any award distribution, we are permitted to deduct or withhold amounts sufficient to satisfy any employee withholding tax requirements. Our board also has the authority, at any time, to discontinue the granting of awards. The board also has the authority to alter or amend the Plan or any outstanding award or may terminate the Plan as to further grants, provided that No amendment will, without the approval of our stockholders, to the extent that such approval is required by law or the rules of an applicable exchange, increase the number of shares available under the Plan, change the persons eligible for awards under the Plan, extend the time within which awards may be made, or amend the provisions of the Plan related to amendments. No amendment that would adversely affect any outstanding award made under the Plan can be made without the consent of the holder of such award.

76

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS.**

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of July 28, 2023 by (i) each of our named executive officers and directors; (ii) all of our current executive officers and directors as a group; and (iii) each person who is known by us to beneficially own more than 5% of our common stock. Unless otherwise specified, the address of each of the persons set forth below is c/o our company, 1870 Bath Ave, Brooklyn, NY 11214.

| Name and Address of Beneficial Owner | Title of Class | Amount and Nature of Beneficial Ownership(1) | Percent of Class(2) |
|---|---|---|---|
| J.E. "Rick" Bunka, Interim Chief Executive Officer | Common Stock | - | * |
| Robert D. Barry, Interim Chief Financial Officer and Secretary(3) | Common Stock | 75,199 | * |
| Jody Rusnak, Chief Merchandising and Brand Innovation Officer | Common Stock | 98,684 | * |
| Ellery W. Roberts, Executive Chairman of the Board of Directors(4) | Common Stock | 397,597 | * |
| Ellette A. Anderson, Director | Common Stock | 25,438 | * |
| Clark R. Crosnoe, Director(5) | Common Stock | 647,238 | * |
| Glyn C. Milburn, Director | Common Stock | 27,738 | * |
| James M. Schneider, Director | Common Stock | 170,723 | * |
| G. Alan Shaw, Director | Common Stock | 34,883 | * |
| Alan P. Shor, Director | Common Stock | 23,438 | * |
| Edward J. Tobin, Director | Common Stock | 984,118 | * |
| Houman Akhavan, Director(6) | Common Stock | 209,757 | * |
| All current executive officers and directors(12 persons) | Common Stock | 2,694,813 | 2.6% |
| **5% Stockholders** | | | |
| Cannell Capital LLC(7) | Common Stock | 5,258,805 | 4.99% |
| Empery Asset Management, LP(8) | Common Stock | 5,258,805 | 4.99% |
| Altium Growth Fund, LP(9) | Common Stock | 5,258,805 | 4.99% |
| The Vanguard Group (10) | Common Stock | 5,369,942 | 5.1% |
| Morgan Dempsey Capital Management LLC (11) | Common Stock | 6,036,954 | 5.7% |

\*   Less than 1%

(1)   Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Except as otherwise indicated, each of the beneficial owners listed above has direct ownership of and sole voting power and investment power with respect to our common stock.

(2)   A total of 105,386,867 shares of common stock are considered to be outstanding pursuant to SEC Rule 13d-3(d)(1) as of July 28, 2023. For each beneficial owner above, any options exercisable within 60 days have been included in the denominator.

(3)   Includes 13,000 shares of common stock held by Mr. Barry's spouse and 40,000 shares of common stock issuable upon the exercise of warrants.

(4)   Includes 22,200 shares held by Cardinal 33 LLC. Mr. Roberts is the Manager of Cardinal 33 LLC and has voting and investment power over the securities held by it. Mr. Roberts disclaims beneficial ownership of the shares held by Cardinal 33 LLC except to the extent of his pecuniary interest, if any, in such shares.

(5) Includes 558,438 shares held by CRC Investment Fund LP and 88,800 shares held by NM 2018 Trust. Mr. Crosnoe is the managing member and owns 100% of CRC Investment Fund GP, LLC, the general partner of CRC Investment Fund LP, and of CRC Capital LLC, the manager of CRC Investment Fund LP, and has sole voting and investment power over the shares held by CRC Investment Fund LP. Mr. Crosnoe is the investment adviser to NM 2018 Trust and also has a power of attorney to direct purchases and sales of the shares held by it. Mr. Crosnoe disclaims beneficial ownership of the shares held by CRC Investment Fund LP and NM 2018 Trust except to the extent of his pecuniary interest, if any, in such shares.

(6) Includes approximately 147,638 shares of common stock and approximately 62,119 shares of common stock issuable upon the exercise of warrants.

(7) Includes 4,992,381 shares of common stock and 266,424 shares of common stock issuable upon the exercise of warrants, but excludes an additional 4,888,030 shares of common stock issuable on the exercise of warrants that cannot be exercised due to a beneficial ownership blocker provision pursuant to a securities purchase agreement. The beneficial owner cannot exercise warrants to the extent it would beneficially own, after any such exercise, more than 4.99% of the outstanding shares of common stock. Based solely on the information set forth in the Schedule 13G/A filed by Cannell Capital LLC with the SEC on February 14, 2022. J. Carlo Cannell may be deemed to be the beneficial owner of the shares held by Cannell Capital LLC. The address of the business office of each of Cannell Capital LLC and J. Carlo Cannell Is 245 Meriwether Circle, Alta, WY 83414

(8) Includes 5,258,805 shares of common stock issuable upon the exercise of warrants, but excludes an additional 3,190,450 shares of common stock issuable upon the exercise of warrants that cannot be exercised due to a beneficial ownership blocker provision in a securities purchase agreement. The beneficial owner cannot exercise warrants to the extent it would beneficially own, after any such exercise, more than 4.99% of the outstanding shares of common stock. Based solely on the information set forth in the Schedule 13G/A filed by Empery Asset Management, LP ("Empery") with the SEC on January 24, 2022. Empery serves as the investment manager to certain funds holding an aggregate of 8,449,255 shares of common stock. Empery AM GP, LLC, the general partner of Empery, has the power to exercise investment discretion. Each of Empery and Ryan M. Lane and Martin D. Hoe, the managing members of Empery AM GP, LLC, may be deemed to be the beneficial owner of all shares of common stock held by such funds. Each of the foregoing disclaims any beneficial ownership of any such shares of common stock. The address of each of the foregoing beneficial owners is 1 Rockefeller Plaza, Suite 1205, New York, New York 10020.

(9) Includes 5,258,805 shares of common stock issuable upon the exercise of warrants, but excludes an additional 845,019 shares of common stock issuable upon the exercise of warrants that cannot be exercised due to a beneficial ownership blocker provision in a securities purchase agreement. The beneficial owner cannot exercise warrants to the extent it would beneficially own, after any such exercise, more than 4.99% of the outstanding shares of common stock. Based solely on the information set forth in the Schedule 13G/A filed by Altium Growth Fund, LP (the "Altium"), with the SEC on February 14, 2022. Altium is the record and direct beneficial owner of the shares. Altium Capital Management, LP is the investment adviser of, and may be deemed to beneficially own the common shares held by, Altium. Altium Growth GP, LLC is the general partner of, and may be deemed to beneficially own the common shares held by, Altium. The address of the principal business office of each of the foregoing beneficial owners is 152 West 57th Street, FL 20, New York, NY 10019.

(10) Based solely on the information set forth in the Schedule 13G filed by The Vanguard Group ("Vanguard") with the SEC on February 9, 2023. The business address of Vanguard is 100 Vanguard Blvd. Malvern, PA 19355.

(11) Based solely on the information set forth in the Schedule 13D/A filed by Morgan Dempsey Capital Management LLC, a Wisconsin limited liability company ("Morgan Dempsey") with the SEC on February 3, 2023. The principal business of Morgan Dempsey is the performance of investment management and advisory services. Mr. Marc Dion and Mr. David Durham are the managing members of Morgan Dempsey. The present principal occupation of Mr. Dion, Mr. Durham, and Mr. Peters is the performance of investment management and advisory services. Mr. Dion and Mr. Durham are both citizens of the United States. The business address of Morgan Dempsey is 111 Heritage Reserve, Suite 200, Menomonee Falls, WI 53051.

**Changes in Control**

We do not currently have any arrangements which if consummated may result in a change of control of our company.

**Securities Authorized for Issuance Under Equity Compensation Plans**
The following table sets forth certain information about the securities authorized for issuance under our incentive plans as of December 31, 2022.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 150,000 | $    3.10 | 2,220,201 |
| Equity compensation plans not approved by security holders | – | – | – |
| Total | 150,000 | $    3.10 | 2,220,201 |

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE.**

**Transactions with Related Persons**

The following includes a summary of transactions since the beginning of our 2022 fiscal year, or any currently proposed transaction, in which we were or are to be a participant and the amount involved exceeded or exceeds the lesser of $120,000 or one percent of the average of our total assets at year-end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest (other than compensation described under Item 11 "*Executive Compensation*"). We believe the terms obtained or consideration that we paid or received, as applicable, in connection with the transactions described below were comparable to terms available or the amounts that would be paid or received, as applicable, in arm's-length transactions.

***Management Services Agreement***

On April 5, 2019, the Company entered into a management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and prior significant stockholder, which was amended effective on August 4, 2020. Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that under certain circumstances specified in the management services agreement, the quarterly fee may be reduced if similar fees payable to the Manager by subsidiaries of the Company's former parent company, 1847 Holdings LLC, exceed a threshold amount.

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of the Company in connection with performing services under the management services agreement. The Company did not pay any expenses for the years ended December 31, 2022 and 2021.
The Company expensed management fees of $0.25 million for each of the years ended December 31, 2022 and 2021, respectively.

***Advances***

We repaid $33,738 of related party advances to our Manager in August 2020. These advances were unsecured, bore No interest, and did not have formal repayment terms or arrangements.

***Related Party Note***

A portion of the purchase price for the acquisition of Goedeker Television Co. ("Goedeker Television").was paid by our issuance to Steve Goedeker, as representative of Goedeker Television, of a 9% subordinated promissory note in the principal amount of $4,100,000. Michael Goedeker, our director, President and Chief Operating Officer until March 2020 and a significant stockholder, was also a director, officer and principal stockholder of Goedeker Television. On June 2, 2020, the parties entered into an amendment and restatement of the note that became effective as of the closing of our initial public offering on August 4, 2020, pursuant to which (i) the principal amount of the existing note was increased by $250,000, (ii) upon the closing of the initial public offering, we agreed to make all payments of principal and interest due under the note through the date of the closing, and (iii) from and after the closing, the interest rate of the note was increased from 9% to 12%. In accordance with the terms of the amended and restated note, we used a portion of the proceeds from the initial public offering to pay $1,083,842 of the balance of the note representing a $696,204 reduction in the principal balance and interest accrued through August 4, 2020 of $387,638. We repaid this note in August 2020.

***Leonite Securities Purchase Agreement***

On April 5, 2019, our Company, 1847 Goedeker Holdco Inc. ("Holdco") (our direct parent company at such time) and 1847 Holdings (Holdco's parent company at such time) entered into a securities purchase agreement with Leonite Capital LLC ("Leonite") (the "Leonite Securities Purchase Agreement"), pursuant to which our Company, Holdco and 1847 Holdings issued to Leonite a secured convertible promissory note (the "Secured Note") in the aggregate principal amount of $714,286. As additional consideration for the purchase of the Secured Note, (i) 1847 Holdings issued to Leonite 50,000 common shares (valued at $137,500), (ii) 1847 Holdings issued to Leonite a five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis, and (iii) Holdco issued to Leonite shares of common stock equal to a 7.5% non-dilutable interest in Holdco. As of December 31, 2019, the balance of the note was $584,943. As a result of this transaction, Leonite became a related party.

On May 11, 2020, the Company, Holdco, 1847 Holdings and Leonite entered into a first amendment to Secured Note, pursuant to which the parties agreed (i) to extend the maturity date of the Secured Note to October 5, 2020, (ii) that our failure to repay the Secured Note on the original maturity date of April 5, 2020 shall not constitute and event of default under the note and (iii) to increase the principal amount of the Secured Note by $207,145, as a forbearance fee.

In connection with the amendment, (i) 1847 Holdings issued to Leonite another five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis and (ii) upon closing of 1847 Holdings' acquisition of Asien's Appliance, Inc., 1847 Holdings' wholly owned subsidiary 1847 Asien Inc. issued to Leonite shares of common stock equal to a 5% interest in 1847 Asien Inc.

Under the Secured Note, Leonite had the right at any time at its option to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of the note into fully paid and non-assessable common shares or any shares of capital stock or other securities of 1847 Holdings into which such common shares may be changed or reclassified.

On May 4, 2020, Leonite converted $100,000 of the outstanding balance of the Secured Note into 100,000 common shares of 1847 Holdings. On July 24, 2020, Leonite converted $50,000 of the outstanding balance of the Secured Note into 50,000 common shares of 1847 Holdings.

On August 4, 2020, we used a portion of the proceeds from our initial public offering to repay the note in full.

On September 2, 2020, 1847 Holdings and Leonite entered into an amendment to the warrant issued on April 5, 2019, pursuant to which the warrant was amended to allow for the exercise of the warrant for 180,000 common shares of 1847 Holdings in exchange for Leonite's surrender of the remaining 20,000 common shares underlying that warrant, as well as all 200,000 common shares underlying the second warrant issued to Leonite on May 11, 2020. On September 18, 2020, Leonite exercised the warrant in accordance with the foregoing for 180,000 common shares of 1847 Holdings. As a result, both warrants have terminated.

### DMI Cooperative

The Company is a member of Dynamic Marketing, Inc. ("DMI"), an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases our ability to compete with competitors, including big box appliance and electronics retailers. We own an approximate 5% interest in the cooperative. Additionally, Albert Fouerti, our former Chief Executive Officer, is on the board of DMI. As such, DMI is deemed to be a related party.

During the years ended December 31, 2022 and 2021, total purchases from DMI, net of holdbacks, were $255.9 million and $177.8 million, respectively. At December 31, 2022, deposits at DMI totaled $25.0 million and the vendor rebate due from DMI were $5.8 million. At December 31, 2021, vendor rebate deposits, net, due from DMI were $12.2 million and vendor rebates receivable were $5.8 million.

### Related Party Leases

On May 31, 2019, our subsidiary YF Logistics LLC entered into a sublease agreement with DMI for our warehouse space in Hamilton, New Jersey. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty (30) days' prior written notice or (ii) April 30, 2024. The sublease provides for a base rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month.

On June 2, 2021, our subsidiary 1 Stop Electronics Center, Inc. entered into a lease agreement with 1870 Bath Ave. LLC, an entity that is owned by Albert Fouerti, our former Chief Executive Officer, and Elie Fouerti, our former Chief Operating Officer, for our premises located at 1870 Bath Avenue, Brooklyn, New York. The lease is for a term of ten years and provides for a base rent of $74,263 per month during the first year with annual increases to $96,896.37 during the last year of the term. 1 Stop Electronics Center, Inc. is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. The initial right-of-use ("ROU") asset and liability associated with this lease is $8.4 million.

On June 2, 2021, our subsidiary Joe's Appliances LLC entered into a lease agreement with 812 5th Ave Realty LLC, an entity that is owned by Albert Fouerti, our former Chief Executive Officer, and Elie Fouerti, our former Chief Operating Officer, for our premises located at 7812 5th Avenue, Brooklyn, New York. The lease is for a term of ten years and provides for a base rent of $6,365.40 per month during the first year with annual increases to $8,305.40 during the last year of the term. Joe's Appliances LLC is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. The initial ROU asset and liability associated with this lease is $0.7 million.

On March 15, 2022, the Company entered into a lease agreement by and between the Company and 8780 19 Ave LLC, a New York limited liability company owned by Albert Fouerti, our former Chief Executive Officer, and Elie Fouerti, our former Chief Operating Officer, for the lease of a new office building located in Brooklyn, New York. The lease commenced on March 1, 2022 and shall expire on December 31, 2026. The Company has the option to extend the term of the lease for one additional term of five years. The premises of the lease contain approximately 5,835 rentable square feet. Under the terms of the lease, the Company will lease the premises at the monthly rate of $22,000 for the first year, with scheduled annual increases. The Company will receive a four-month rent concession so that its first rental payment shall become due on or before July 1, 2022.

### Director Independence

Our board of directors has determined that Ellette A. Anderson, Clark R. Crosnoe, Glyn C. Milburn, James M. Schneider, G. Alan Shaw, Alan P. Shor and Houman Akhavan are independent within the meaning of the rules of NYSE American.

81

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES.**

**Independent Auditors' Fees**

The following is a summary of the fees billed to us for professional services rendered for the fiscal years ended December 31, 2022 and 2021:

| Year Ended December 31, | | 2022 | | 2021 |
|---|---|---|---|---|
| Audit Fees | $ | 564,535 | $ | 1,056,990 |
| Audit-Related Fees | $ | – | $ | 131,560 |
| Tax Fees | | – | | – |
| All Other Fees | | – | | – |
| TOTAL | $ | 564,535 | $ | 1,188,550 |

"Audit Fees" consisted of fees billed for professional services rendered by the principal accountant for the audit of our annual consolidated financial statements and review of the consolidated financial statements included in our Form 10-K and 10-Q or services that are normally provided by the accountant in connection with statutory and regulatory filings or engagements. Total audit fees for the year ended December 31, 2022 were $514,660 for Sadler, Gibb & Associates and $49,875 for Friedman LLP. Total audit fees for the year ended December 31, 2021 were $1,056,990. Audit fees in 2021 for Sadler Gibb were $506,990 and 550,000 for Friedman LLP.

"Audit-Related Fees" consisted of fees billed for assurance and related services by the principal accountant that were reasonably related to the performance of the audit or review of our financial statements and are not reported under the paragraph captioned "Audit Fees" above. There were no audit-related fees for the year ended December 31, 2022 were $131,560 of audit related fees for the year ended December 31, 2021. Audit related fees in 2021 were $21,560 for Sadler Gibb and $110,000 for Friedman LLP.

"Tax Fees" consisted of fees billed for professional services rendered by the principal accountant for tax returns preparation.

"All Other Fees" consisted of fees billed for products and services provided by the principal accountant, other than the services reported above under other captions of this Item 14.

**Pre-Approval Policies and Procedures**

Under the Sarbanes-Oxley Act of 2002, all audit and non-audit services performed by our auditors must be approved in advance by our board of directors to assure that such services do not impair the auditors' independence from us. In accordance with its policies and procedures, our board of directors pre-approved the audit service performed by Sadler, Gibb & Associates for our consolidated financial statements as of and for the year ended December 31, 2022.

**PART IV**

**ITEM 15. EXHIBIT AND FINANCIAL STATEMENT SCHEDULES.**

**(a)** *List of Documents Filed as a Part of This Report:*

(1) *Index to Consolidated Financial Statements*:

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB Firm ID #3627) | F-2 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 (As Restated) | F-3 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022 and 2021 (As Restated) | F-4 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2022 and 2021 (As Restated) | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022 and 2021 (As Restated) | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| | |
| Condensed Consolidated Balance Sheets as of March 31, 2023 (Unaudited) and December 31, 2022 | F-36 |
| Condensed Consolidated Balance Sheets as of March 31, 2022 (As Restated), June 30, 2022, September 30, 2022 (Unaudited), and December 31, 2021 | F-35 |
| Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2022 (As Restated), June 30, 2022, September 30, 2022, and March 31, 2023 (Unaudited) | F-37 |
| Condensed Consolidated Statements of Operations for the Six Months Ended June 30, 2022 and the Nine Months Ended September 30, 2022 (Unaudited) | F-38 |
| Condensed Consolidated Statements of Stockholders' Equity for the Three Months Ended March 31, 2022 (As Restated), June 30, 2022, September 30, 2022, and March 31, 2023 (Unaudited) | F-39 |
| Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2022 (As Restated), June 30, 2022, September 30, 2022, and March 31, 2023 (Unaudited) | F-40 |
| Notes to the Condensed Consolidated Financial Statements (Unaudited) | F-41 |

(2) *Index to Consolidated Financial Statement Schedules:*

All schedules have been omitted because the required information is included in the consolidated financial statements or the notes thereto, or because it is not required.

(3) *Index to Exhibits*:

See exhibits listed under Part (b) below.

**(b)**  *Exhibits***:**

| Exhibit No. | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of 1847 Goedeker Inc. (incorporated by reference to Exhibit 4.1 to the Registration Statement on Form S-8 filed on August 3, 2020) |
| 3.2 | Certificate of Amendment of Amended and Restated Certificate of Incorporation of 1847 Goedeker Inc. (incorporated by reference to Exhibit 4.2 to the Registration Statement on Form S-8 filed on December 28, 2021) |
| 3.3 | Bylaws of 1847 Goedeker Inc. (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 3.4 | Amendment No 1. To Bylaws of 1847 Goedeker Inc. (incorporated by reference to Exhibit 3.1 to the Current Report on Form 8-K filed on August 13, 2021) |
| 3.5 | Certificate of Correction of Certificate of Amendment of 1847 Goedeker Inc. (incorporated by reference to Exhibit 3.1 of the Current Report on Form 8-K filed on July 7, 2022) |
| 3.6 | Certificate of Amendment to Amended and Restated Certificate of Incorporation of Polished.com Inc. (incorporated by reference to Exhibit 3.1 of the Current Report on Form 8-K filed on July 21, 2022) |
| 3.7 | Amended and Restated Bylaws of Polished.com Inc. (incorporated by reference to Exhibit 3.2 of the Current Report on Form 8-K filed on July 21, 2022) |
| 4.1 | Description of Registrant's Common Stock (incorporated by reference to Exhibit 4.1 to the Annual Report on Form 10-K filed on March 31, 2022) |
| 4.2 | Common Stock Purchase Warrant issued to Evergreen Capital Management LLC on March 19, 2021 (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on March 25, 2021) |
| 4.3 | Common Stock Purchase Warrant issued to SILAC Insurance Company on March 19, 2021 (incorporated by reference to Exhibit 4.2 to the Current Report on Form 8-K filed on March 25, 2021) |
| 4.4 | Form of Representative's Warrant for Initial Public Offering (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on August 5, 2020) |
| 10.1 | Securities Purchase Agreement, dated October 20, 2020, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and the other parties signatory thereto (incorporated by reference to Exhibit 10.1 to the Annual Report on Form 10-K filed on March 29, 2021) |

84

| 10.2 | Amendment No. 1 to Securities Purchase Agreement, dated December 8, 2020, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and the other parties signatory thereto (incorporated by reference to Exhibit 10.2 to the Annual Report on Form 10-K filed on March 29, 2021) |
|------|------|
| 10.3 | Amendment No. 2 to Securities Purchase Agreement, dated April 6, 2021, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and the other parties signatory thereto (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on April 6, 2021) |
| 10.4 | Warrant Agent Agreement, dated May 27, 2021, between 1847 Goedeker Inc. and American Stock Transfer & Trust Company, LLC and Form of Warrant (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.5 | Credit and Guaranty Agreement, dated June 2, 2021, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, certain other subsidiaries party thereto from time to time as guarantors, the financial institutions party thereto from time to time, and Manufacturers and Traders Trust Company (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.6 | Loan and Security Agreement, dated June 3, 2021, between 1847 Goedeker Inc. and Northpoint Commercial Finance LLC (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on June 9, 2021) |
| 10.7 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Manufacturers and Traders Trust Company on June 2, 2021 (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.8 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to First Horizon Bank on June 2, 2021 (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.9 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Sterling National Bank on June 2, 2021 (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.10 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to BankUnited N.A. on June 2, 2021 (incorporated by reference to Exhibit 10.5 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.11 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Manufacturers and Traders Trust Company on June 2, 2021 (incorporated by reference to Exhibit 10.6 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.12 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to First Horizon Bank on June 2, 2021 (incorporated by reference to Exhibit 10.7 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.13 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Sterling National Bank on June 2, 2021 (incorporated by reference to Exhibit 10.8 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.14 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to BankUnited N.A. on June 2, 2021 (incorporated by reference to Exhibit 10.9 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.15 | Pledge and Security Agreement, dated June 2, 2021, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and such other subsidiaries from time to time a party thereto, in favor of Manufacturers and Traders Trust Company (incorporated by reference to Exhibit 10.10 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.16 | Management Services Agreement, dated April 5, 2019, between 1847 Goedeker Inc. and 1847 Partners LLC (incorporated by reference to Exhibit 10.1 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.17 | Amendment No. 1 to Management Services Agreement, dated April 21, 2020, between 1847 Goedeker Inc. and 1847 Partners LLC (incorporated by reference to Exhibit 10.2 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.18 | Lease Agreement, dated April 5, 2019, between S.H.J., L.L.C. and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.22 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.19 | Lease Agreement, dated January 13, 2021, by and between Westgate 200, LLC and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on January 20, 2021) |
| 10.20 | First Amendment to Lease Agreement, dated March 30, 2021, by and between Westgate 200, LLC and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on April 5, 2021) |
| 10.21 | Lease, dated June 2, 2021, between 1870 Bath Ave. LLC and 1 Stop Electronics Center, Inc. (incorporated by reference to Exhibit 10.14 to the Current Report on Form 8-K filed on June 3, 2021) |

| 10.22 | Lease, dated June 2, 2021, between 7812 5th Ave Realty LLC and Joe's Appliances LLC (incorporated by reference to Exhibit 10.15 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.23 | Sublease Agreement, dated May 31, 2019, between YF Logistics LLC and Icon 400 Cabot Owner Pool 4 NJ, LLC (incorporated by reference to Exhibit 10.16 to the Registration Statement on Form S-1 filed on May 3, 2021) |
| 10.24 | Lease Agreement, dated March 15, 2022, between 8780 19 Ave LLC and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on March 21, 2022) |
| 10.25 | Warehouse Agreement, dated September 9, 2021, between Brook Warehousing Corporation and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.4 to the Quarterly Report on Form 10-Q filed on November 15, 2021) |
| 10.26 | Agreement, dated September 9, 2021, between Brook Warehousing Corporation and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.5 to the Quarterly Report on Form 10-Q filed on November 15, 2021) |
| 10.27 | Securities Purchase Agreement, dated March 19, 2021, among 1847 Goedeker Inc., Evergreen Capital Management LLC and SILAC Insurance Company (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.28 | Security Agreement, dated March 19, 2021, between 1847 Goedeker Inc. and SILAC Insurance Company (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.29 | 10% OID Senior Secured Promissory Note issued to Evergreen Capital Management LLC on March 19, 2021 (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.30 | 10% OID Senior Secured Promissory Note issued to SILAC Insurance Company on March 19, 2021 (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed on March 25, 2021) |
| 10.31 | Trademark Assignment Agreement, dated October 15, 2020, between Superior Deals, Inc. and Albert Fouerti (incorporated by reference to Exhibit 10.7 to the Registration Statement on Form S-1 filed on May 3, 2021) |
| 10.32 | Trademark Assignment Agreement, dated October 15, 2020, between 1 Stop Electronics, Inc. and Albert Fouerti (incorporated by reference to Exhibit 10.7 to the Registration Statement on Form S-1 filed on May 3, 2021) |
| 10.33# | Amendment to Employment Letter Agreement, dated June 3, 2021, between 1847 Goedeker Inc. and Douglas T. Moore (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed on June 9, 2021) |
| 10.34# | Separation and Release Agreement, dated August 30, 2021, between Douglas T. Moore and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on September 3, 2021) |
| 10.35# | Amendment No. 1 to Separation Agreement and Release, dated September 17, 2021, between Douglas T. Moore and 1847 Goedeker Inc. (incorporated by reference to Exhibit 10.3 to the Quarterly Report on Form 10-Q filed on November 15, 2021) |
| 10.36# | Employment Agreement between Appliances Connection Inc. and Albert Fouerti (incorporated by reference to Exhibit 10.36 to the Annual Report on Form 10-K filed on March 31, 2022) |
| 10.37# | Employment Agreement between Appliances Connection Inc. and Elie Fouerti (incorporated by reference to Exhibit 10.37 to the Annual Report on Form 10-K filed on March 31, 2022) |
| 10.38# | Employment Letter Agreement, dated July 14, 2021, between 1847 Goedeker Inc. and Maria Johnson (incorporated by reference to Exhibit 10.1 to the Current Report filed on July 20, 2021) |
| 10.39# | Employment Letter Agreement, dated April 21, 2020, between 1847 Goedeker Inc. and Robert D. Barry (incorporated by reference to Exhibit 10.25 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.40# | Transition and Separation Agreement, dated January 31, 2022, between 1847 Goedeker Inc. and Robert D. Barry (incorporated by reference to Exhibit 10.1 to the Current Report filed on Form 8-K filed on February 2, 2022) |
| 10.41# | Independent Director Agreement between 1847 Goedeker Inc. and director Glyn C. Milburn, dated April 21, 2020, together with a schedule identifying other substantially identical agreements between the Company and each of its independent directors identified on the schedule and identifying the material differences between each of those agreements and the filed Independent Director Agreement (incorporated by reference to Exhibit 10.41 to the Annual Report on Form 10-K filed on March 31, 2022) |
| 10.42# | Independent Director Agreement between 1847 Goedeker Inc. and director G. Alan Shaw, dated October 17, 2021 (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on October 21, 2021) |
| 10.43# | Independent Director Agreement between 1847 Goedeker Inc. and director James M. Schneider, dated January 14, 2022 (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on January 21, 2022) |

| 10.44# | Independent Director Agreement between 1847 Goedeker Inc. and director Alan P. Shor, dated May 18, 2021, (incorporated by reference to Exhibit 10.16 to the Current Report on Form 8-K filed on June 3, 2021) |
| --- | --- |
| 10.45# | Indemnification Agreement between 1847 Goedeker Inc. and Ellery W. Roberts, dated May 7, 2020, together with a schedule identifying other substantially identical agreements between the Company and each of its directors identified on the schedule and identifying the material differences between each of those agreements and the filed Indemnification Agreement (incorporated by reference to Exhibit 10.45 to the Annual Report on Form 10-K filed on March 31, 2022) |
| 10.46# | Indemnification Agreement between 1847 Goedeker Inc. and G. Alan Shaw, dated October 17, 2021, (incorporated by reference to Exhibit 10.5 to the Current Report on Form 8-K filed on October 21, 2021) |
| 10.47# | Indemnification Agreement between 1847 Goedeker Inc. and James M. Schneider, dated January 14, 2022 (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on January 21, 2022) |
| 10.48# | 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 4.3 to the Registration Statement on Form S-8 filed on August 3, 2020) |
| 10.49# | Amendment No. 1 to 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 10.31 to the Registration Statement on Form S-1 filed on May 3, 2021) |
| 10.50# | Amendment No. 2 to 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 99.3 to the Registration Statement on Form S-8 filed on December 28, 2021) |
| 10.51# | Form of Stock Option Agreement for 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 10.30 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.52# | Form of Restricted Stock Award Agreement for 1847 Goedeker Inc. 2020 Equity Incentive Plan (incorporated by reference to Exhibit 10.31 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 10.53 | Cooperation Agreement, dated October 15, 2021, by and among 1847 Goedeker Inc., David L. Kanen, Philotimo Fund, LP, Philotimo Focused Growth and Income Fund and Kanen Wealth Management LLC (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on October 21, 2021) |
| 10.54 | Credit Agreement, dated as of May 9, 2022, among 1847 Goedeker Inc., Appliances Connection Inc., certain subsidiaries of the borrowers party thereto, Bank of America, N.A., certain lenders party thereto, BofA Securities, Inc., Manufacturers and Traders Trust Company and Webster Bank, National Association (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on May 11, 2022) |
| 10.55 | Security and Pledge Agreement, dated as of May 9, 2022, among 1847 Goedeker Inc., Appliances Connection Inc., the Grantors thereto and Bank of America, N.A. (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on May 11, 2022) |
| 10.56* | First Amendment to Credit Agreement, dated as of July 25, 2023, by and among Polished.com Inc., Appliances Connection Inc., certain guarantors party thereto, certain lenders party thereto and Bank of America, N.A. |
| 10.57 | Settlement Agreement, dated December 21, 2022, between Albert Fouerti and Polished.com Inc. (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on December 27, 2022) |
| 10.58*# | Employment Letter Agreement, dated October 14, 2022, between Polished.com Inc. and Robert D. Barry. |
| 10.59*# | Engagement Agreement, dated October 14, 2022, between Polished.com Inc. and J.E. "Rick" Bunka. |
| 21.1 | List of Subsidiaries (incorporated by reference to Exhibit 21.1 to the Annual Report on Form 10-K filed on March 31, 2022) |
| 23.1* | Consent of Sadler, Gibb & Associates, LLC |
| 31.1* | Certifications of Principal Executive Officer filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certifications of Principal Financial and Accounting Officer filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certifications of Principal Executive Officer furnished pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2** | Certifications of Principal Financial and Accounting Officer furnished pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |

87

| 101.INS* | Inline XBRL Instance Document |
|---|---|
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104* | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

\*    Filed herewith

\*\*   Furnished herewith

†    Certain confidential information contained in this exhibit has been redacted in accordance with Regulation S-K Item 601(b) because the information (i) is not material and (ii) is the type that the registrant treats as private or confidential.

\#    Executive compensation plan or arrangement

**ITEM 16. FORM 10-K SUMMARY.**

None.

**CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB Firm ID #3627) | F-2 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 (As Restated) | F-3 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022 and 2021 (As Restated) | F-4 |
| Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2022 and 2021 (As Restated) | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022 and 2021 (As Restated) | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
|  |  |
| Condensed Consolidated Balance Sheets as of March 31, 2023 (Unaudited) and December 31, 2022 | F-36 |
| Condensed Consolidated Balance Sheets as of March 31, 2022 (As Restated), June 30, 2022, September 30, 2022 (Unaudited), and December 31, 2021 | F-35 |
| Condensed Consolidated Statements of Operations for the Three Months Ended March 31, 2022 (As Restated), June 30, 2022, September 30, 2022, and March 31, 2023 (Unaudited) | F-37 |
| Condensed Consolidated Statements of Operations for the Six Months Ended June 30, 2022 and the Nine Months Ended September 30, 2022 (Unaudited) | F-38 |
| Condensed Consolidated Statements of Stockholders' Equity for the Three Months Ended March 31, 2022 (As Restated), June 30, 2022, September 30, 2022, and March 31, 2023 (Unaudited) | F-39 |
| Condensed Consolidated Statements of Cash Flows for the Three Months Ended March 31, 2022 (As Restated), June 30, 2022, September 30, 2022, and March 31, 2023 (Unaudited) | F-40 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of Polished.com Inc:

Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Polished.com Inc ("the Company") as of December 31, 2022 and 2021 (As Restated), the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2022 and the related notes (collectively referred to as the "consolidat
ed financial statements"). In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021 (As Restated), and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

Restatement of Previously Issued Financial Statements

As discussed in Note 2 to the consolidated financial statements, the Company has restated its 2021 consolidated financial statements to correct misstatements.

Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Sadler, Gibb & Associates, LLC

We have served as the Company's auditor since 2022.

Draper, UT
July 31, 2023

F-2

**POLISHED.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except share and per share data)

| | December 31, 2022 | December 31, 2021 (As Restated) |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 19,549 | $ 25,724 |
| Restricted cash | 950 | 8,067 |
| Receivables, net | 26,650 | 23,531 |
| Vendor deposits | 25,022 | 12,200 |
| Merchandise inventory, net | 41,766 | 52,393 |
| Prepaid expenses and other current assets | 11,217 | 5,980 |
| Total Current Assets | 125,154 | 127,895 |
| Property and equipment, net | 5,075 | 4,585 |
| Operating lease right-of-use assets | 11,688 | 14,937 |
| Derivative instruments | 3,178 | - |
| Goodwill | 106,173 | 191,614 |
| Intangible assets, net | 10,296 | 44,212 |
| Deferred tax asset | 1 | - |
| Other long-term assets | 349 | 349 |
| TOTAL ASSETS | $ 261,914 | $ 383,592 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 81,537 | $ 82,799 |
| Customer deposits | 7,292 | 28,815 |
| Current portion of notes payable, net | 6,628 | 7,910 |
| Current portion of finance lease liabilities | 112 | 65 |
| Current portion of operating lease liabilities | 3,726 | 3,874 |
| Contingent note payable | - | 198 |
| Total Current Liabilities | 99,295 | 123,661 |
| Notes payable, net of current portion | 90,816 | 48,559 |
| Finance lease liabilities, net of current portion | 225 | 121 |
| Operating lease liabilities, net of current portion | 9,013 | 12,493 |
| Deferred tax liability, net | - | 8,407 |
| TOTAL LIABILITIES | 199,349 | 193,241 |
| Stockholders' Equity | | |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized; none issued and outstanding as of December 31, 2021 and 2020 | - | - |
| Common stock, $0.0001 par value, 200,000,000 shares authorized; 105,227,876 and 106,387,332 shares issued and outstanding as of December 31, 2022 and 2021 | 11 | 11 |
| Additional paid-in capital | 222,827 | 224,648 |
| Accumulated deficit | (160,273) | (34,308) |
| TOTAL STOCKHOLDERS' EQUITY | 62,565 | 190,351 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 261,914 | $ 383,592 |

*The accompanying notes are an integral part of these consolidated financial statements*

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except share and per share data)

| | For the Years Ended December 31, | |
|---|---|---|
| | 2022 | 2021 (As Restated) |
| Product sales, net | $ 534,474 | $ 345,725 |
| Cost of goods sold | 444,957 | 275,922 |
| Gross profit | 89,517 | 69,803 |
| | | |
| Operating Expenses | | |
| Personnel | 28,800 | 21,745 |
| Advertising | 25,461 | 11,961 |
| Bank and credit card fees | 18,776 | 13,599 |
| Depreciation and amortization | 11,456 | 6,557 |
| Impairment of goodwill and intangible assets | 109,140 | - |
| Loss on abandonment of right-of-use asset | - | 1,437 |
| General and administrative | 24,226 | 16,958 |
| | | |
| Total Operating Expenses | 217,859 | 72,257 |
| | | |
| LOSS FROM OPERATIONS | (128,342) | (2,454) |
| | | |
| Other Income (Expenses) | | |
| Interest income | 518 | 95 |
| Adjustment in value of contingency | (2) | (9) |
| Interest expense | (3,940) | (3,682) |
| Gain on change in fair value of derivative instruments | 3,178 | - |
| Loss on settlement of debt | (3,240) | (1,748) |
| Other income | (2,546) | 318 |
| | | |
| Total Other Expenses | (6,032) | (5,026) |
| | | |
| NET LOSS BEFORE INCOME TAXES | (134,374) | (7,480) |
| | | |
| INCOME TAX (EXPENSE) BENEFIT | 8,409 | (102) |
| | | |
| NET LOSS | $ (125,965) | $ (7,582) |
| | | |
| NET LOSS PER COMMON SHARE – BASIC AND DILUTED | $ (1.18) | $ (0.12) |
| | | |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING | | |
| BASIC AND DILUTED | 106,436,719 | 64,528,299 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-4

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
(in thousands, except share and per share data)

| | Common Stock | | | Additional Paid-in Capital | Accumulated Deficit | Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | | Amount | | | |
| Balance at January 1, 2021 | 6,111,200 | $ | 1 | $ 13,409 | $ (26,726) | $ (13,316) |
| Issuance of warrants with debt | - | | - | 1,340 | - | 1,340 |
| Issuance of common stock in the acquisition of Appliances Connection | 5,895,973 | | 1 | 12,263 | - | 12,264 |
| Issuance of common stock and warrants in connection with a public offering | 93,111,111 | | 9 | 194,389 | - | 194,398 |
| Issuance of common stock through equity incentive awards | 216,800 | | - | 555 | - | 555 |
| Issuance of common stock in connection with exercise of warrants | 1,052,248 | | - | 2,368 | - | 2,368 |
| Stock-based compensation | - | | - | 324 | - | 324 |
| Net loss for the year ended December 31, 2021 | - | | - | - | (7,582) | (7,582) |
| Balance at December 31, 2021 (As Restated) | 106,387,332 | $ | 11 | $ 224,648 | $ (34,308) | $ 190,351 |
| Issuance of common stock to directors | 69,766 | | - | - | - | - |
| Purchase of and subsequent retirement of treasury stock | (1,229,222 | | - | (2,000) | - | (2,000) |
| Stock compensation expense | - | | - | 179 | - | 179 |
| Net loss for the year-ended December 31, 2022 | - | | - | - | (125,965) | (125,965) |
| Balance at December 31, 2022 | 105,227,876 | | 11 | 222,827 | (160,273) | 62,565 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-5

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)

| | | For the Years Ended December 31, | |
| --- | ---: | ---: | ---: |
| | | **2022** | **2021** |
| | | | **(As Restated)** |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net loss | $ | (125,965) $ | (7,582) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Impairment of goodwill and intangible assets | | 109,140 | - |
| Gain on change in fair value of derivative | | (3,178) | - |
| Depreciation and amortization | | 11,456 | 6,557 |
| Amortization of debt discount | | 515 | 1,042 |
| Stock-based compensation | | 179 | 879 |
| Inventory reserve | | 946 | 418 |
| Bad debt expense | | 415 | 767 |
| Loss on settlement of debt | | 3,240 | 1,748 |
| Loss on abandonment of right-of-use asset | | - | 1,437 |
| Adjustment in value of contingency | | 2 | 9 |
| Deferred tax benefit | | (8,409) | (368) |
| Non-cash lease expense | | 3,249 | 1,639 |
| Changes in operating assets and liabilities: | | | |
| Receivables | | (3,533) | (5,159) |
| Vendor deposits | | (12,823) | (1,652) |
| Merchandise inventory | | 9,681 | (26,580) |
| Prepaid expenses and other assets | | (5,238) | (3,448) |
| Accounts payable and accrued expenses | | (1,208) | 24,385 |
| Customer deposits | | (21,523) | (10,855) |
| Operating lease liabilities | | (3,627) | (1,565) |
| Net cash used in operating activities | | (46,681) | (18,328) |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Purchases of property and equipment | | (1,420) | (1,899) |
| Cash paid to sellers in acquisition of Appliances Connection, net of cash acquired | | - | (201,515) |
| Cash paid to sellers in acquisition of Appliance Gallery | | - | (1,420) |
| Net cash used in investing activities | | (1,420) | (204,834) |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Net proceeds from public equity offering | | - | 194,398 |
| Proceeds from exercise of warrants | | - | 2,368 |
| Proceeds from notes payable | | 43,045 | 60,833 |
| Repayments of notes payable | | (5,927) | (10,528) |
| Repayments of convertible notes payable | | (200) | - |
| Repayments of finance lease liabilities | | (109) | (30) |
| Purchase of treasury stock | | (2,000) | - |
| Net cash provided by financing activities | | 34,809 | 247,041 |
| | | | |
| NET CHANGE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | | (13,292) | 23,879 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, BEGINNING OF YEAR | | 33,791 | 9,912 |
| | | | |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, END OF YEAR | $ | 20,499 $ | 33,791 |
| | | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | | |
| End of the year | | | |
| Cash and cash equivalents | $ | 19,549 $ | 25,724 |
| Restricted cash | | 950 | 8,067 |
| | | | |
| | $ | 20,499 $ | 33,791 |
| | | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | | |
| Beginning of the year | | | |
| Cash and cash equivalents | $ | 25,724 $ | 935 |
| Restricted cash | | 8,067 | 8,977 |
| | | | |
| | $ | 33,791 $ | 9,912 |
| | | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION | | | |
| Cash paid for interest | $ | 4,161 $ | 1,795 |
| Cash paid for income taxes | $ | 5,073 $ | 2,483 |

NON-CASH INVESTING AND FINANCING ACTIVITIES

| | | |
|---|---|---|
| Operating lease right-of-use assets and liabilities assumed | - | 14,520 |
| Financed purchases of property and equipment | 308 | - |
| Settlement of notes payable and interest in issuance of new note | 55,851 | - |
| Debt discount on notes payable from OID | 1,104 | 2,310 |
| Debt discount on notes payable from warrants | - | 1,340 |
| Stock issued in the acquisition of Appliances Connection | - | 12,264 |
| Due to seller (consideration) settled by vendor deposits | - | 5,000 |
| Net assets acquired in the acquisition of Appliances Connection | - | 38,955 |
| Net assets acquired in the acquisition of Appliance Gallery | - | 252 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-6

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

**NOTE 1—ORGANIZATION AND NATURE OF BUSINESS**

1847 Goedeker Inc. ("1847 Goedeker") was formed under the laws of the State of Delaware on January 10, 2019 for the sole purpose of acquiring the business of Goedeker Television Co., a Missouri corporation ("Goedeker Television") Prior to the acquisition, the Company did not have any operations other than operations relating to its incorporation and organization. On July 20, 2022, the 1847 Goedeker amended the Certificate of Incorporation changing its name to Polished.com Inc. ("Polished.com").

On October 20, 2020, 1847 Goedeker formed Appliances Connection Inc. ("ACI") as a wholly owned subsidiary in the State of Delaware. On June 2, 2021, ACI acquired all of the issued and outstanding capital stock or other equity securities of 1 Stop Electronics Center, Inc., a New York corporation ("1 Stop"), Gold Coast Appliances, Inc., a New York corporation ("Gold Coast"), Superior Deals Inc., a New York corporation ("Superior Deals"), Joe's Appliances LLC, a New York limited liability company ("Joe's Appliances") and YF Logistics LLC, a New Jersey limited liability company ("YF Logistics," and collectively with 1 Stop, Gold Coast, Superior Deals, and Joe's Appliances, "Appliances Connection").

On July 6, 2021, 1847 Goedeker formed AC Gallery Inc. ("AC Gallery") as a wholly owned subsidiary in the State of Delaware.

On July 29, 2021, AC Gallery acquired substantially all the assets and assumed substantially all the liabilities of Appliance Gallery, Inc., a retail appliance store in Largo, Florida ("Appliance Gallery"). As a result of this transaction, AC Gallery acquired the former business of Appliance Gallery and continues to operate this business.

Polished.com and its consolidated subsidiaries (collectively, the "Company," "we," "us," or "our") operate a content-driven and technology-enabled shopping destination for appliances, furniture and home goods. With warehouse fulfillment centers in the Northeast and Midwest, as well as showrooms in Brooklyn, New York, and Largo, Florida, the Company offers one-stop shopping for national and global brands. The Company carries many household name-brands, including Bosch, I, Frigidaire Pro, Whirlpool, LG, and Samsung, and also carries many major luxury appliance brands such as Miele, Thermador, La Cornue, Dacor, Ilve, Jenn-Air and Viking, among others. The Company also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients.

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation*

The consolidated financial statements of the Company have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars.

*Principles of Consolidation*

The consolidated financial statements include our wholly owned subsidiaries. Intercompany balances and transactions have been eliminated in consolidation. The Company does not have a majority or minority interest in any other company, either consolidated or unconsolidated.

*Use of Estimates*

The preparation of these consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, as well as the disclosure of contingent assets and liabilities, at the date of and during the reported period of the consolidated financial statements. Actual results could differ from those estimates. We evaluate our estimates and assumptions on an ongoing basis.

*Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and marketable securities with original maturities of three months or less. The Company maintains deposits in several financial institutions, which may at times exceed amounts covered by insurance provided by the U.S. Federal Deposit Insurance Corporation ("FDIC"). The Company has not experienced any losses related to amounts in excess of FDIC limits.

Cash and cash equivalents include: (1) currency on hand, (2) demand deposits with banks or financial institutions, (3) other kinds of accounts that have the general characteristics of demand deposits, and (4) short-term, highly liquid investments that are both readily convertible to known amounts of cash and so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. The majority of payments due from financial institutions for the settlement of credit card and debit card transactions process within two business days and are, therefore, classified as cash and cash equivalents. Other payment methods that take more time to settle are classified as receivables.

At December 31, 2022, restricted cash includes $0.2 million to secure a vendor letter of credit and $0.75 million withheld by credit card processors as security for the Company's customer refund claims and credit card chargebacks. The cash pledged to secure the letter of credit will be released when the vendor offers the Company credit terms, and the cash held by credit card processors will be released at the discretion of the credit card companies.

F-7

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

***Revenue Recognition and Cost of Revenue***

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606, *"Revenue from Contracts with Customers."* Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

Substantially all the Company's sales are to individual retail consumers (homeowners), builders and designers. The Company's performance obligation is to deliver the customer's order. Each customer order generally contains only one performance obligation based on the merchandise sale to be delivered, at which time revenue is recognized.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, the Company's products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. The Company delivers products to its customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from the Company's warehouse to the customer (a "Company Shipment"). The second way is through a shipment of the products through a third-party carrier from a warehouse other than the Company's warehouse to the customer (a "Drop Shipment") and the third way is where the Company itself delivers the products to the customer and often also installs the product (a "Local Delivery"). In the case of a Local Delivery, the Company loads the product on its own or contracted trucks and delivers and installs the product at the customer's location. When a product is delivered through a Local Delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a Company Shipment and a Drop Shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from the Company's warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves the Company's warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, the Company has satisfied its performance obligation and the Company recognizes revenue.

The Company agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In the Company's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue.

We offer promotional financing and credit cards issued by third-party banks that manage and directly extend credit to our customers. The banks are the sole owners of the accounts receivable generated under the program and, accordingly, we do not hold any customer receivables related to these programs and act as an agent in the financing transactions with customers. We frequently offer sales incentives that entitle our customers to discounts at the time of purchase (if 3rd party financing is obtained or a seasonal sale discounts). This is not a performance obligation but is recognized as a reduction of the transaction price when the transaction occurs.

The Company also sells extended warranty contracts, acting as an agent for the warranty company and earns a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the accompanying consolidated statements of operations. The Company assumes no liability for repairs to products on which it has sold a warranty contract or products for which no warranty is sold, as the warranty obligations associated with the sale of our products are assurance-type warranties that are a guarantee of the product's intended functionality and, therefore, do not represent a distinct performance obligation within the context of the contract.

Sales returns are estimated based on historical return levels and our expectation of future returns. We also recognize a return asset, and corresponding adjustment to cost of sales, for our right to recover the goods returned by the customer, measured at the former carrying amount of the goods, less any expected recovery cost. At each financial reporting date, we assess our estimates of expected returns, refund liabilities, and return assets.

Customer deposits – Includes amounts collected from customers when an order is placed. The deposits are recognized as revenue when the order is shipped to the customer, or they are refunded by the Company in the event of an order cancellation. As of December 31, 2022, and 2021, customer deposits amounted to $7.3 million and $28.8 million, respectively.

Cost of revenue – Includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors. Vendor allowances primarily consist of volume rebates that are earned as a result of attaining certain purchase levels and advertising allowances for the promotion of vendors' products that are typically based on guaranteed minimum amounts with additional amounts being earned for attaining certain purchase levels. These vendor allowances are accrued as earned, with those allowances received as a result of attaining certain purchase levels accrued over the incentive period based on estimates of purchases. Volume rebates and certain advertising allowances reduce the carrying cost of inventory and are recognized in cost of sales when earned.

Shipping and Handling – The Company invoices its customers for shipping and handling charges associated with luxury appliance sales and premium services like "white glove" delivery. For standard delivery, also known as "curb" delivery, the cost of shipping and handling is already included in the quoted price provided to the customer. Irrespective of the delivery option chosen by the customer, the cost of shipping and handling is included in cost of sales.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

Advertising – Costs for advertising are expensed as incurred and include direct response performance marketing costs, such as paid search advertising, social media advertising, and search engine optimization. For the years ended December 31, 2022 and 2021, advertising expenses amounted to $25.5 million and $12.0 million, respectively.

### Receivables

Receivables consists of customer's balance payments for which the Company extends credit to certain homebuilders and designers based on prior business relationships, and vendor rebate receivables. Vendor rebate receivables represent amounts due from manufacturers from whom the Company purchases products. Rebate receivables are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts for vendor rebates.

The Company maintains an allowance for doubtful accounts, which is established based on estimated losses expected to be incurred in the collection of accounts receivable. As of December 31, 2022 and 2021, the balance of the allowance was $1.5 million and $1.0 million, respectively. The Company had no significant concentrations of receivables balances as of December 31, 2022, and 2021.

### Merchandise Inventory

Inventory consists of finished products acquired for resale and is stated at the lower of cost (on an average cost basis) or net realizable value. The Company conducts regular evaluations of the inventory value and performs write-downs based on its estimates of market conditions. As of December 31, 2022 and 2021, the Company determined that an obsolescence allowance of $1.8 million and $0.8 million, respectively, was necessary.

### Property and Equipment

Property and equipment are stated at their historical cost. Maintenance and repair expenses of property and equipment are expensed in operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

|  | Useful Life (Years) |
| --- | --- |
| Equipment | 5 |
| Warehouse equipment | 2-7 |
| Furniture and fixtures | 1-3 |
| Transportation equipment | 1-5 |
| Leasehold improvements | 2-5 |
| Showroom inventory | 5 |

### Intangible Assets

The Company's definite-lived intangible assets primarily consisted of marketing-related and customer relationships which are being amortized over their estimated useful lives, or 5 years.

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. The Company has no intangibles with indefinite lives.

### Goodwill

Goodwill represents the excess of consideration transferred over the fair value of tangible and identifiable intangible net assets acquired and the liabilities assumed in a business combination. Substantially all of the Company's goodwill was recognized in the purchase price allocations when the Company was acquired in 2019 and when ACI was acquired in June 2021. Goodwill is not subject to amortization; instead, it is tested for impairment at the reporting unit level annually or more frequently if events or changes in circumstances indicate that it is more likely than not that the fair value of the reporting unit is less than its carrying amount. In conducting the impairment test, the Company first reviews qualitative factors to determine whether it is more likely than not that the fair value of the reporting unit is less than its carrying amount. We currently operate as a single reporting unit.

When testing goodwill for impairment, the Company has the option of first performing a qualitative assessment to determine whether it is more likely than not that the fair value of the reporting unit is less than its carrying amount. If we elect to bypass the qualitative assessment, or if a qualitative assessment indicates it is more likely than not that carrying value exceeds its fair value, we perform a quantitative goodwill impairment test. Under the quantitative goodwill impairment test, if our reporting unit's carrying amount exceeds its fair value, we will record an impairment charge based on that difference.

The Company conducts its annual goodwill impairment test on December 31 or whenever an indicator of impairment exists. As a result of the quantitative impairment assessment, the carrying value of the single reporting unit exceeded its fair value, and the Company recorded $85.4 million of non-cash goodwill impairment charge during the year ended December 31, 2022. At December 31, 2021, there was no impairment of goodwill.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

***Impairment of Long-Lived Assets***

The Company reviews the carrying value of long-lived assets such property and equipment, right-of-use ("ROU") assets, and definite-lived intangible assets for impairment whenever events or changes in circumstances indicate the carrying amount of the assets might not be recoverable. These events and circumstances may include significant decreases in the market price of an asset or asset group, significant changes in the extent or manner in which an asset or asset group is being used by the Company or in its physical condition, a significant change in legal factors or in the business climate, a history or forecast of future operating or cash flow losses, significant disposal activity, a significant decline in the Company's share price, a significant decline in revenue or adverse changes in the economic environment. If such facts indicate a potential impairment, the Company would assess the recoverability of an asset group by determining if the carrying value of the asset group exceeds the sum of the projected undiscounted cash flows expected to result from the use and eventual disposition of the assets over the remaining economic life of the primary asset in the asset group. If the recoverability test indicates that the carrying value of the asset group is not recoverable, the Company will estimate the fair value of the asset group using appropriate valuation methodologies, which would typically include an estimate of discounted cash flows. Any impairment would be measured as the difference between the asset group's carrying amount and its estimated fair value.

During the fourth quarter of 2022, the Company recognized an impairment charge of $23.7 million related to our marketing-related and customer relationships intangible assets, which is primarily composed of intangible assets recognized in the acquisition of ACI. During 2021, we identified changes in events and circumstances relating to a certain ROU operating lease asset, that was abandoned as a result of the Company closing its warehouse and retail showroom in anticipation of relocating to a new facility that was acquired in the acquisition of ACI. Consequently, the lease facility was abandoned and we recorded an impairment loss during the year ended December 31, 2021 of $1.4 million.

***Leases***

The Company accounts for leases in accordance with ASC Topic 842, *"Leases."* The Company determines whether a contract is a lease at contract inception or for a modified contract at the modification date. At inception or modification, the Company recognizes ROU assets and related lease liabilities on the balance sheet for all leases greater than one year in duration. Lease liabilities and their corresponding ROU assets are initially measured at the present value of the unpaid lease payments as of the lease commencement date. If the lease contains a renewal and/or termination option, the exercise of the option is included in the term of the lease if the Company is reasonably certain that a renewal or termination option will be exercised. As the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The IBR is determined by estimating what it would cost the Company to borrow a collateralized amount equal to the total lease payments over the lease term based on the contractual terms of the lease and the location of the leased asset.

Operating lease payments are recognized as an expense on a straight-line basis over the lease term in equal amounts of rent expense attributed to each period during the term of the lease, regardless of when actual payments are made. This generally results in rent expense in excess of cash payments during the early years of a lease and rent expense less than cash payments in later years. The difference between rent expense recognized and actual rental payments is typically represented as the spread between the ROU asset and lease liability.

When calculating the present value of minimum lease payments, we account for leases as one single lease component if a lease has both lease and non-lease fixed cost components. Variable lease and non-lease cost components are expensed as incurred.

We do not recognize ROU assets and lease liabilities for short-term leases that have an initial lease term of 12 months or less. We recognize the lease payments associated with short-term leases as an expense on a straight-line basis over the lease term.

***Fair Value of Financial Instruments***

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. The fair value hierarchy is defined in the following three categories:

> Level 1: Unadjusted quoted prices that are available in active markets for identical assets or liabilities at the measurement date.

> Level 2: Significant other observable inputs available at the measurement date, other than quoted prices included in Level 1, either directly or indirectly.

> Level 3: Significant unobservable inputs that cannot be corroborated by observable market data and reflect the use of significant management judgment.

Cash, restricted cash, receivables, inventory, vendor deposits, prepaid expenses, accounts payable, accrued expenses, and customer deposits approximate fair value, due to their short-term nature. The carrying value of notes payable and short and long-term debt also approximates fair value since these instruments bear market rates of interest.

F-10

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

Assets and liabilities that are measured at fair value on a nonrecurring basis relate primarily to long-lived assets and goodwill, which are remeasured when the derived fair value is below carrying value in the consolidated balance sheets.

*Derivative Instruments – Interest Rate Swaps*

The Company uses interest rate swap agreements to manage interest rate exposures. The Company recognizes interest rate swap agreements as either a derivative asset or liability on the balance sheet at fair value.

The fair value of an interest rate swap agreement is determined using widely accepted valuation techniques, including discounted cash flow analyses on the expected cash flows of each derivative. These analyses reflect the contractual terms of the derivative, including the period to maturity, and use observable market-based inputs, including interest rate curves and implied volatilities. The fair value of interest rate swap agreements is determined using the market standard methodology of netting the discounted future fixed cash payments and the discounted expected variable cash receipts.

Included in the following table are the Company's major categories of assets and liabilities measured at fair value on a recurring basis as of December 31, 2022 (in thousands):

| Description | Fair Value Measurement at December 31, 2022 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Assets: | | | | |
| Derivative instruments | | | | |
| Interest rate swap | $ - | $ 3,178 | $ - | $ 3,178 |

*Income Taxes*

Income taxes are accounted for under the asset and liability method. Under the asset and liability method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases.

Deferred income tax assets and liabilities are recorded with respect to temporary differences in the accounting treatment of items for financial reporting purposes and for income tax purposes. Where, based on the weight of available evidence, it is more likely than not that some amount of recorded deferred tax assets will not be realized, a valuation allowance is established for the amount that, in management's judgment, is sufficient to reduce the deferred tax asset to an amount that is more likely than not to be realized. A tax position must meet a minimum probability threshold before a financial statement benefit is recognized. The minimum threshold is defined as a tax position that is more likely than not to be sustained upon examination by the applicable taxing authority, including resolution of any related appeals or litigation processes, based on the technical merits of the position. The tax benefit to be recognized is measured as the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement.

*Sales Tax Liability*

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. The Company accrued sales taxes in the states with sales tax. The Company accrued the liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. As of December 31, 2022 and 2021, the accrued amount for this liability, along with related interest expense, was $19.3 million and $18.5 million, respectively.

Between August 2022 and November 2022, the Company experienced delays in filing sales tax returns. The Company is in the process of paying these taxes to become current with all sales tax filings. In connection with the late filings, the Company has accrued penalties and interest that may be due upon payment of past-due taxes.

*Earnings (Loss) Per Share*

Basic earnings (loss) per share is calculated by dividing net income (loss) by the weighted average number of shares of common stock outstanding during each period. Diluted earnings (loss) per share is calculated by adjusting the weighted average number of shares of common stock outstanding for the dilutive effect, if any, of common stock equivalents. Common stock equivalents whose effect would be antidilutive are not included in diluted earnings (loss) per share. The Company uses the treasury stock method to determine the dilutive effect, which assumes that all common stock equivalents have been exercised at the beginning of the period and that the funds obtained from those exercises were used to repurchase shares of common stock of the Company at the average closing market price during the period (see Note 16).

F-11

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

*Stock-Based Compensation*

We recognize the fair value compensation cost relating to stock-based payment transactions in accordance with ASC Topic *718, "Share-Based Payments,"*. Under the provisions of ASC 718, stock-based compensation cost is measured at the grant date, based on the fair value of the award, and is recognized on a straight-line basis over the employee's requisite service period, which is generally the vesting period (see Note 15). The fair value of our stock options is estimated using a Black-Scholes option valuation model. Restricted stock awards are valued based on the closing stock price on the date of grant (intrinsic value method). The Company has elected to recognize forfeitures as they occur.

*Impact of COVID-19*

In 2022, we experienced only minor impact to our operations, primarily due to staffing challenges brought on by COVID-19. We continue to monitor the current COVID-19 situation in each market in which we operate and will react accordingly. In May 2023, the US Government declared an end to the pandemic.

*Liquidity and Going Concern Assessment*

Management assesses liquidity and going concern uncertainty in the Company's consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

As of December 31, 2022, we had cash and cash equivalents of $19.5 million, restricted cash of $1.0 million, and vendor deposits of $25.0 million, and total working capital of $25.9 million. For the year ended December 31, 2022, the Company incurred an operating loss of $134.4 million, and cash flows used in operations of $46.7 million. The operating loss for 2022 included $11.5 million in non-cash charges for depreciation and amortization, as well as an impairment charge of $109.1 million.

The Company performed an assessment to determine whether there were conditions or events that, considered in the aggregate, raised substantial doubt about the Company's ability to continue as a going concern within one year after the filing date of this report, when the accompanying financial statements are being issued. Initially, this assessment did not consider the potential mitigating effect of management's plans that had not been fully implemented.

The Company considered several conditions and events including (1) financial results and operations, (2) the investigation of certain allegations made by certain former employees related to the Company's business operations, (3) technical non-compliance with certain loan covenants of our term loan with Bank of America, based in part due to our failure to timely deliver financial statements, and (4) the Company not being in compliance with the continued listing standards of NYSE American LLC (the "Exchange") since the Company failed to timely file certain required filings, which if not successfully remediated could lead to the potential delisting of the Company from the Exchange

Based on the circumstances discussed above in the initial assessment, substantial doubt exists regarding our ability to continue as a going concern. Management then assessed the mitigating effect of its plans to determine if it is probable that the plans (1) would be effectively implemented within one year after the filing date of this report, when the accompanying financial statements are being issued and (2) when implemented, would mitigate the relevant conditions or events that raise substantial doubt about the Company's ability to continue as a going concern.

F-12

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

As discussed below, the Company has implemented plans which encompass short-term cash preservation initiatives to provide the Company with adequate liquidity to meet its obligations for at least the 12-month period following the date its fiscal year 2022 financial statements are issued, in addition to creating sustained cash flow generation thereafter. The Company has either taken or intends to take, the following actions, among others, to improve its liquidity position and to address uncertainty about its ability to continue as a going concern:

- As described in Note 19, the Company entered into a loan amendment of their term loan and revolver loan agreement with Bank of America, in which Bank of America waived specific technical defaults and re-established a revolver loan commitment balance of $10 million.

- We are taking concrete steps to improve efficiency and profitability through headcount reductions and consolidation of operations including the imminent consolidation of two existing New Jersey warehouses into one new warehouse.

- We hired an internationally recognized firm of digital advertising consultants to help us improve our return on advertising spend, which we believe when completed will result in more sales per dollar of advertising expense.

- We are implementing new financing initiatives for our customers, including a new store-branded credit card and a leasing alternative for customers who do not qualify for conventional credit, and we have added a new payment processor which will provide additional liquidity compared to our incumbent processor.

- We have changed our sales focus to emphasizing the sale of high-margin luxury products, as opposed to mass-market appliances, began becoming dealers for higher-margin small appliances and promoting them on our website, and have begun actively negotiating improved terms with several of our largest appliance vendors.

Management has prepared estimates of operations for fiscal years 2023 and 2024 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these consolidated financial statements in the Company's 10-K. The accompanying consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business. Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

**_Recent Accounting Pronouncements_**

_Recently Adopted_

In August 2020, the FASB issued ASU 2020-06, Accounting for Convertible Instruments and Contracts In An Entity's Own Equity. ASU 2020-06 simplifies the accounting for certain convertible instruments by removing the separation models for convertible debt with a cash conversion feature and for convertible instruments with a beneficial conversion feature. As a result, more convertible debt instruments will be reported as a single liability instrument with no separate accounting for embedded conversion features. Additionally, ASU 2020-06 amends the diluted earnings per share calculation for convertible instruments by requiring the use of the if-converted method. The treasury stock method is no longer available. For SEC filers, excluding smaller reporting companies, ASU 2020-06 is effective for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. For all other entities, ASU 2020-06 is effective for fiscal years beginning after December 15, 2023, including interim periods within those fiscal years. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The Company adopted this guidance on January 1, 2022. The Company's adoption of this update did not have a material impact on the consolidated financial statements and related disclosures.

F-13

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

*Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13 Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on our consolidated financial statements.

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers. This ASU amends ASC 805 to require acquiring entities to apply ASC 606 to recognize and measure contract assets and contract liabilities in business combinations. The ASU is effective for public entities for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on our consolidated financial statements.

In March 2022, the FASB issued ASU 2022-02, Troubled Debt Restructurings ("TDRs") and Vintage Disclosures (Topic 326): Financial Instruments – Credit Losses. This amended guidance will eliminate the accounting designation of a loan modification as a TDR, including eliminating the measurement guidance for TDRs. The amendments also enhance existing disclosure requirements and introduce new requirements related to modifications of receivables made to borrowers experiencing financial difficulty. Additionally, this guidance requires entities to disclose gross write-offs by year of origination for financing receivables, such as loans and interest receivable. The ASU is effective January 1, 2023, and is required to be applied prospectively, except for the recognition and measurement of TDRs which can be applied on a modified retrospective basis. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on our consolidated financial statements.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to the Company's consolidated financial statements.

**Restatement**

The Company restated its previously issued financial statements as of and for the year ended December 31, 2021, to reflect the following adjustments:

*Consolidated Statement of Operations*

1.  Reduction in revenue of $16.6 million, which comprised the following: (1) an increase in the allowance for sales returns of $7.4 million, (2) revenue of $8.1 million that should be recognized in 2022, and (3) sales tax collections of $1.1 million improperly recognized as revenue.

2.  Net reduction in cost of goods of $6.7 million, which comprised of the following: (1) reduction in product cost of sales due to an increase in the allowance for sales returns of $4.0 million, (2) reduction in product cost of sales of $6.0 million relating to revenue cutoff that should be recognized in 2022, and (3) an offsetting increase in cost of goods sold from an over accrual of vendor rebates ($0.4 million), under accrual of vendor purchases ($1.5 million), and an error in inventory cutoff ($1.4 million).

3.  Increase in general and administrative expenses of $0.9 million, resulting from an increase in bad debt expense of $0.6 million in accordance with the Company's policy for allowance for doubtful accounts, and an over accrual of sales tax receivable of $0.3 million.

4.  As a result of the changes above, income tax changed from a tax benefit of $4.4 million to a tax expense of $0.1 million.

F-14

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

*Consolidated Balance Sheet*

5.  Net increase in current assets of $6.6 million, which comprised the following: (1) increase in inventory of $7.7 million, resulting from the reduction in cost of goods sold attributable to the allowance for sales returns, revenue cutoff, and inventory cutoff, offset by a reduction in showroom inventory of $1.0 million that was reclassified as property and equipment, (2) reduction in receivables of $1.1 million, resulting from an increase to the allowance for doubtful accounts of $0.6 million, and an over accrual of vendor rebates (as detailed in Nos. 1-4 above).

6.  Net increase in current liabilities of $18.3 million, which comprised the following: (1) increase in accounts payable of $10.3 million, as a result of the increase in the allowance for sales returns, and an under accrual of sales tax refund receivable (netted with the sales tax liability), and (2) increase in customer deposits related to revenue cutoff (as detailed in Nos. 1-4 above).

7.  Increase in long-term liabilities of $4.5 million, relating to an increase to the deferred tax liability as a result of the changes described above.

**POLISHED.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
**DECEMBER 31, 2021**
(in thousands)

| | As Originally Reported | | Adjustments | As Restated |
|---|---|---|---|---|
| Current assets | $ | 121,318 (5) | $ 6,577 | $ 127,895 |
| Property and equipment | | 3,554 (5) | 1,031 | 4,585 |
| Total assets | $ | 375,984 | $ 7,608 | $ 383,592 |
| | | | | |
| Current liabilities | $ | 105,341 (6) | 18,320 | $ 123,661 |
| Deferred tax liability | | 3,867 (7) | 4,540 | 8,407 |
| Total liabilities | | 170,381 | 22,860 | 193,241 |
| Accumulated deficit | | (19,056) | (15,252) | (34,308) |
| Total liabilities and stockholders' equity | $ | 375,984 | $ 7,608 | $ 383,592 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE YEAR ENDED DECEMBER 31, 2021**
(in thousands)

| | As Originally Reported | | Adjustments | As Restated |
|---|---|---|---|---|
| Product sales, net | $ | 362,314 (1) | $ (16,589) | $ 345,725 |
| Cost of goods sold | | 282,655 (2) | (6,733) | 275,922 |
| Operating expense | | 71,339 (3) | 918 | 72,257 |
| Income taxes | | 4,376 (4) | (4,478) | (102) |
| Net income (loss) | $ | 7,670 | $ (15,252) | $ (7,582) |
| | | | | |
| Net income (loss) per common share | | | | |
| BASIC | $ | 0.12 | | $ (0.12) |
| DILUTED | $ | 0.10 | | $ (0.12) |
| | | | | |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | | | |
| BASIC | | 64,528,299 | | 64,528,299 |
| DILUTED | | 76,460,460 | | 64,528,299 |

F-15

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE YEAR ENDED DECEMBER 31, 2021**
(in thousands)

| | Common Stock | | Additional Paid-Inc Capital | Accumulated Deficit | Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance at December 31, 2021 as originally filed** | 106,387,322 | $      11 | $      224,648 | $      (19,056) | $      205,603 |
| Adjustments to results of operations for the year ended December 31, 2021 | - | - | - | (15,252) | (15,252) |
| **Balance at December 31, 2021 as restated** | 106,387,322 | $      11 | $      224,648 | $      (34,308) | $      190,351 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEAR ENDED DECEMBER 31, 2021**
(in thousands)

| | As Originally Reported | Adjustments | As Restated |
|---|---|---|---|
| Cash Flows from Operating Activities | | | |
| Net income (loss) | $      7,670 | $      (15,252) | $      (7,582) |
| Receivables | (5,603) (1-4) | 444 | (5,159) |
| Inventory | (18,459) (5) | (8,121) | (26,580) |
| Accounts payable and accrued expenses | 14,178 (5) | 10,207 | 24,385 |
| Customer deposits | (18,968) (6) | 8,113 | (10,855) |
| Deferred tax expense (benefit) | (4,908) (6) | 4,540 | (368) |
| Miscellaneous other accounts | 1,116 (7) | 69 | 1,185 |
| | | | |
| Net cash used in operating activities | (18,328) | - | (18,328) |
| | | | |
| Net cash used in investing activities | (204,834) | - | (204,834) |
| | | | |
| Net cash provided by financing activities | 247,041 | - | 247,041 |
| | | | |
| Net change in cash and restricted cash | 23,879 | - | 23,879 |
| Cash and restricted cash at beginning of year | 9,912 | - | 9,912 |
| | | | |
| Cash and restricted cash at end of year | $      33,791 | $      - | $      33,791 |

F-16

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

**NOTE 3—REVENUES**

Disaggregated Revenue – The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows (in thousands):

| | For the Years Ended | |
| --- | --- | --- |
| | December 31, 2022 | December 31, 2021 |
| Appliance sales | $ 500,506 | $ 313,456 |
| Furniture and other sales | 33,878 | 32,269 |
| Total | $ 534,474 | $ 345,725 |

**NOTE 4—RECEIVABLES**

Receivables at December 31, 2022 and 2021, consisted of the following (in thousands):

| | December 31, 2022 | December 31, 2021 |
| --- | --- | --- |
| Trade accounts receivable | $ 13,691 | $ 10,693 |
| Vendor rebates receivable | 8,514 | 11,189 |
| Other receivables | 5,951 | 2,660 |
| Total receivables | 28,156 | 24,542 |
| Less allowance for doubtful accounts | (1,506) | (1,011) |
| Total receivables, net | $ 26,650 | $ 23,531 |

**NOTE 5—VENDOR DEPOSITS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income and serves as collateral for the Company's accounts payable with the vendor (see Note 14).

Vendor deposits as of December 31, 2022 and 2021, were $25.0 million and $12.2 million, respectively.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

**NOTE 6—MERCHANDISE INVENTORY**

Merchandise inventory at December 31, 2022 and 2021, consisted of the following (in thousands):

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Appliances | $ 39,702 | $ 49,631 |
| Furniture and other | 3,853 | 3,605 |
| | | |
| Total merchandise inventory | 43,555 | 53,236 |
| Less reserve for obsolescence | (1,789) | (843) |
| | | |
| Total merchandise inventory, net | $ 41,766 | $ 52,393 |

**NOTE 7—PROPERTY AND EQUIPMENT**

Property and equipment at December 31, 2021 and 2020, consisted of the following (in thousands):

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Warehouse equipment | $ 291 | 290 |
| Financed warehouse equipment | 515 | 256 |
| Office furniture and equipment | 324 | 226 |
| Transportation equipment | 1,466 | 1,417 |
| Leasehold improvements | 3,131 | 1,814 |
| Showroom inventory | 1,037 | 1,032 |
| Total property and equipment | 6,764 | 5,035 |
| Less: accumulated depreciation | (1,689) | (450) |
| | | |
| Property and equipment, net | $ 5,075 | $ 4,585 |

Depreciation expense for the years ended December 31, 2022 and 2021 was $1.2 million and $0.4 million, respectively.

F-18

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

**NOTE 8—INTANGIBLE ASSETS AND GOODWILL**

Intangible assets at December 31, 2022 and 2021, consisted of the following (in thousands):

| | December 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| Customer relationships | $ | 3,461 | $ | 24,148 |
| Marketing-related | | 6,835 | | 26,935 |
| | | | | |
| Total intangible assets | | 10,296 | | 51,083 |
| Less: accumulated amortization | | - | | (6,871) |
| | | | | |
| Intangible assets, net | $ | 10,296 | $ | 44,212 |

In connection with the acquisition of Goedeker Television, the Company identified intangible assets of $2.1 million, representing marketing-related and customer relationships. For the Appliances Connection acquisition, the Company identified intangible assets of $49.0 million, representing marketing-related and customer relationships. During the year-ended December 31, 2022, the Company recognized an impairment charge of $23.7 million related to our marketing-related and customer relationships intangible assets.

These assets are being amortized on a straight-line basis over their average estimated remaining useful life of 41 months. Amortization expense for the years ended December 31, 2022 and 2021 was $10.2 million and $6.1 million, respectively.

Following is the estimated amortization expense for the customer relationship and marketing-related intangible assets for the next five years as of December 31, 2021 (in thousands):

| Year Ending December 31, | | Amount |
|---|---|---|
| 2023 | $ | 3,013 |
| 2024 | | 3,013 |
| 2025 | | 3,013 |
| 2026 | | 1,257 |
| | | |
| Total | $ | 10,296 |

F-19

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

The changes in the carrying amount of goodwill for the years ended December 31, 2022 and 2021, are as follows (in thousands):

| | | |
|---|---|---:|
| Balance January 1, 2021 | $ | 4,726 |
| | | |
| Goodwill from acquisition of Appliances Connection | | 185,720 |
| Goodwill from acquisition of Appliances Gallery | | 1,168 |
| | | |
| Balance at December 31, 2021 | $ | 191,614 |
| Impairment charge for the year-ended December 31, 2022 | | (85,441) |
| Balance December 31, 2022 | $ | 106,173 |

At December 31, 2022, the Company recognized an impairment charge of $85.4 million to goodwill. At December 31, 2021, there was no impairment of goodwill.

**NOTE 9—ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

Accounts payable and accrued expenses at December 31, 2022 and 2021, consisted of the following (in thousands):

| | December 31, 2022 | | December 31, 2021 | |
|---|---:|---|---:|---|
| Trade accounts payable | $ | 34,345 | $ | 42,659 |
| Accrued sales tax | | 36,196 | | 24,980 |
| Accrued payroll liabilities | | 680 | | 984 |
| Accrued interest | | 37 | | 794 |
| Accrued liability for sales returns | | 3,916 | | 7,624 |
| Accrued income taxes | | - | | 274 |
| Credit cards payable | | 32 | | 1,004 |
| Accrued insurance | | 1,180 | | 955 |
| Accrued severance | | - | | 496 |
| Other accrued liabilities | | 5,151 | | 3,029 |
| | | | | |
| Total accounts payable and accrued expenses | $ | 81,537 | $ | 82,799 |

F-20

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

**NOTE 10—BUSINESS COMBINATIONS**

*Appliances Connection*

On October 20, 2020, the Company entered into a securities purchase agreement, which was amended on December 8, 2020 and April 6, 2021 (as amended, the "AC Purchase Agreement"), with ACI, Appliances Connection and the sellers (the "Sellers"), pursuant to which ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection from the Sellers (the "AC Acquisition"). The AC Acquisition was completed on June 2, 2021.

AC is one of the leading e-commerce retailers of household appliances and carries many household name brands, including Bosch, Cafe, Frigidaire Pro, Whirlpool, LG, and Samsung, and also carries many major luxury appliance brands such as Miele, Thermador, La Cornue, Dacor, Ilve, Wolf, Jenn-Air, Viking among others. The completion of the AC acquisition accelerates the Company's long-term vision that changes the way Americans shop for appliances.

The aggregate purchase price was $224.7 million, consisting of (i) $180.0 million in cash, (ii) 5,895,973 shares of the Company's common stock valued at $12.3 million, and (iii) $32.4 million as a result of the post-closing net working capital adjustment provision. The Company recorded $0.9 million in acquisition-related expenses.

The Company accounted for the AC Acquisition using the acquisition method of accounting in accordance with ASC Topic 805, *"Business Combinations"*. In accordance with ASC 805, the Company assigned fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date.

The purchase price was allocated as follows (in thousands):

**Purchase consideration at fair value:**

| | | |
|---|---|---|
| Cash consideration | $ | 180,000 |
| Common stock | | 12,264 |
| Working capital adjustment | | 32,411 |
| **Total consideration** | $ | 224,675 |

**Assets acquired and liabilities assumed at fair value:**

| | | |
|---|---|---|
| Cash | $ | 5,897 |
| Receivables | | 17,141 |
| Vendor deposits | | 15,000 |
| Merchandise inventory | | 21,634 |
| Prepaid expenses and other current assets | | 2,194 |
| Property and equipment | | 1,891 |
| Right-of-use operating lease assets | | 1,834 |
| Customer relationships | | 23,399 |
| Tradenames | | 25,567 |
| Goodwill | | 185,720 |
| Accounts payable and accrued expenses | | (45,715) |
| Customer deposits | | (17,536) |
| Notes payable | | (1,527) |
| Finance lease liabilities | | (215) |
| Right-of-use operating lease liabilities | | (1,834) |
| Net deferred tax liabilities | | (8,775) |
| **Net assets acquired** | $ | 224,675 |

F-21

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

The adjustments to the initial allocation are based on more detailed information obtained about the specific assets acquired and liabilities assumed. The adjustments made to the initial allocation did not result in material changes to the amortization expense recorded in the previous quarters.

We are amortizing the customer relationship and tradename intangible assets acquired over 5 years. The goodwill consists largely of the synergies expected from combining operations and is not deductible for tax purposes.

From the date of acquisition until December 31, 2021, Appliances Connection contributed net sales of $297.9 million and net income from continuing operations of $14.9 million, which are included in our consolidated statements of operations.

*Appliance Gallery*

On July 6, 2021, AC Gallery entered into an asset purchase agreement, which was amended on July 21, 2021 and July 29, 2021 (as amended, the "AG Purchase Agreement"), with Appliance Gallery, pursuant to which AC Gallery agreed to acquire substantially all the assets and assumed substantially all the liabilities of Appliance Gallery (the "AG Acquisition"). The AG Acquisition was completed on July 29, 2021.

Pursuant to the AG Purchase Agreement, the purchase price paid at closing was $1.4 million.

The Company accounted for the Gallery Acquisition using the acquisition method of accounting in accordance with ASC Topic 805, *"Business Combinations"*. In accordance with ASC 805, the Company assigned fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date.

The purchase price was allocated as follows (in thousands):

**Purchase consideration at fair value:**

| | | |
|---|---|---|
| Cash consideration | $ | 1,420 |
| **Total consideration** | $ | 1,420 |

**Assets acquired and liabilities assumed at fair value:**

| | | |
|---|---|---|
| Merchandise inventory | $ | 483 |
| Prepaid expenses and other current assets | | 6 |
| Property and equipment | | 19 |
| Goodwill | | 1,168 |
| Customer deposits | | (256) |
| **Net assets acquired** | $ | 1,420 |

Goodwill recognized for this transaction is deductible for tax purposes.

From the date of acquisition until December 31, 2021, Appliance Gallery contributed net sales of $0.2 million and net income from continuing operations of $0.2 million, which are included in our consolidated statements of operations.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

*Pro Forma Information*

The following unaudited pro forma results presented below (in thousands) include the effects of the AC and AG Acquisitions as if they had been consummated as of January 1, 2021, with adjustments to give effect to pro forma events that are directly attributable to the acquisitions.

|  | December 31, 2021 |
| --- | --- |
| Net sales | $ 525,152 |
| Net income | $ 12,658 |
| Earnings per share: | |
| Basic and diluted | $ 0.20 |

These unaudited pro forma results are presented for informational purposes only and are not necessarily indicative of what the actual results of operations would have been if the acquisitions had occurred at the beginning of the period presented, nor are they indicative of future results of operations.

**NOTE 11—NOTES PAYABLE**

*Arvest Loan*

On August 25, 2020, the Company entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3.5 million. On May 10, 2021, the Company repaid this loan.

*Credit Facilities*

M&T Credit Agreement

On June 2, 2021, the Company entered into a credit and guaranty agreement (the "M&T Credit Agreement") with the financial institutions party thereto from time to time ("M&T Lenders"), and Manufacturers and Traders Trust Company, as sole lead arranger, sole book runner, administrative agent and collateral agent ("M&T"), pursuant to which the M&T Lenders agreed to make available to the Company and ACI senior secured credit facilities in the aggregate initial amount of $70.0 million, including (i) a $60.0 million term loan (the "M&T Term Loan") and (ii) a $10.0 million revolving credit facility (the "M&T Revolving Loan"). The M&T Loans bear interest on the unpaid principal amount at a rate determined by the Base Rate (as defined in the Credit Agreement), then at the Base Rate plus the Applicable Margin. Each of the M&T Loans were set to mature on June 2, 2026.

On June 2, 2021, the Company borrowed the entire amount of the Term Loan and issued term loan notes to the M&T Lenders in the aggregate principal amount of $60.0 million. As of December 31, 2021, the carrying value of the M&T Term Loan was $55.2 million, comprised of principal of $58.5 million, net of unamortized loan costs of $3.3 million. Loan costs before amortization included $3.5 million of lender and placement agent fees and $0.3 million of legal other fees. The Company did not borrow any amounts under the M&T Revolving Loan.

On May 9, 2022, the Company repaid the M&T Term Loan, through the proceeds of a new loan issuance. As a result, the obligations under the M&T Credit Agreement were terminated.

Bank of America Credit Agreement

On May 9, 2022, the Company entered into a Credit Agreement (the "Credit Agreement") with the lenders identified therein (the "Lenders") and Bank of America, N.A., as administrative agent, swingline lender and letter of credit issuer (the "Agent"), pursuant to which the Lenders agreed to make available to the Borrowers senior secured credit facilities in the aggregate initial amount of $140.0 million, including (i) a $100.0 million term loan (the "Term Loan") and (ii) a $40.0 million revolving credit facility (the "Revolving Loan"), which revolving credit facility included a $2.00 million swingline sublimit (the "Swing Line Loan" and together with the Term Loan and the Revolving Loan, the "Loans") and, separately, a $10.0 million letter of credit commitment, in each case, on the terms and conditions contained in the Credit Agreement.

On May 9, 2022, the Company borrowed the entire amount of the Term Loan in the aggregate principal amount of $100.0 million. A portion of the proceeds of the Term Loan were to repay and terminate the M&T Credit Agreement. Commencing on September 30, 2022, through and including June 30, 2023, the Borrowers repaid the principal amount of the Term Loan in quarterly installments of $1,250,000 each, payable on the last business day of each March, June, September and December.

As of December 31, 2022, the carrying value of the Term Loan was $96.5 million, comprised of principal of $97.5 million, net of unamortized loan costs of $1.0 million. Loan costs before amortization included $1.1 million of lender and other fees.

As a result of our technical non-compliance with specified loan covenants for both the Bank of America Term Loan and Revolving loan, based in part due to our failure to timely deliver financial statements, Bank of America froze the $40.0 million Revolving Loan before any borrowings had been made against the facility.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

Subsequent to year-end, on July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "Amendment"), in part, to waive events of defaults on its existing credit agreement. The Amendment requires the Company to pay the existing Term Facility and Revolving Facility by August 31, 2024 (the "Maturity Date"). The Revolving Loan decreased to $10,000,000 from and after July 25, 2023. The Letter of Credit commitments decreased to $2,000,000 and the Swing Line Loan was eliminated. The amendment also establishes a new EBITDA covenant and requires the Company to maintain minimum liquidity of $8 million including restricted cash and $5 million excluding restricted cash. Liquidity as defined in the Amendment includes Cash and certain qualifying customer and credit card accounts receivable.

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

Commencing on September 30, 2023, through and including June 30, 2024, the Borrowers must repay the principal amount of the Term Loan in quarterly installments of $1,875,000 each, payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

***Northpoint Loan***

On June 3, 2021, the Company entered into a loan and security agreement with Northpoint Commercial Finance LLC ("Northpoint"), pursuant to which Northpoint may from time-to-time advance funds for the acquisition, financing and/or refinancing by the Company of inventory purchased from Samsung Electronics America, Inc. and/or affiliates and for such other purposes as are acceptable Northpoint. The loan and security agreement provides that Northpoint may establish a credit limit and may adjust such credit limit from time to time; provided that such credit limit does not constitute a commitment or committed line of credit to Northpoint. As of December 31, 2021, such credit limit is $2.0 million, of which $0.2 million was owed and included in accounts payable.

The applicable per annum interest rates for a loan, including any default rates, will be determined at the time of the loan. The loan and security agreement contains customary events of default and is secured by a security interest in all of the Company's inventory (i) that is manufactured, distributed, or sold by Samsung Electronics America, Inc. and/or its affiliates and/or (ii) that bears any trade names, trademarks, or logos of Samsung Electronics America, Inc. and/or its affiliates; all returns, repossessions, exchanges, substitutions, replacements, attachments, parts, accessories and accessions of any of the foregoing; all price protection payments, discounts, rebates, credits, factory holdbacks and incentive payments related to any of the foregoing; supporting obligations to any of the foregoing; and products and proceeds in whatever form of any of the foregoing.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

*10% OID Senior Promissory Notes*

On March 19, 2021, the Company entered into a securities purchase agreement with two institutional investors, pursuant to which the Company issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2.8 million and (ii) a four-year warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $12.00 (subject to adjustments), which may be exercised on a cashless basis, for a purchase price of $2.5 million each, or $5.0 million in the aggregate, the relative fair value of which is $1.3 million and was recorded as debt discount. After deducting a placement fee and other expenses, the Company received net proceeds of $4.6 million. The original issue discount and warrant expense were amortized as interest expense. On June 2, 2021, the Company repaid these notes from the proceeds of the Term Loan. At the time of repayment, the Company wrote off the balance of the debt discount of $1.7 million, as a loss on early settlement of debt.

*Vehicle Loans*

The Company has financed purchases of transportation vehicles with notes payable, which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.8% to 5.7%. As of December 31, 2022, the outstanding balance of these vehicle loans is $0.9 million.

Future minimum principal payments on our total notes payable as of December 31, 2022, are as follows (in thousands):

| Year Ending December 31, | | Amount |
|---|---|---|
| 2023 | $ | 6,628 |
| 2024 | | 91,576 |
| 2025 | | 182 |
| 2026 | | 9 |
| 2027 | | 8 |
| | | |
| Total future minimum payments | | 98,403 |
| Less: debt discount | | (959) |
| Total | | 97,444 |
| | | |
| Total current portion of notes payable, net | $ | 6,628 |
| Total notes payable, net of current portion | $ | 90,816 |

**NOTE 12— LEASES**

*Operating Leases*

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C for its prior principal office in Ballwin, Missouri. The lease is for a term of five years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. The lease agreement contains customary events of default, representations, warranties, and covenants. In June 2021, the Company abandoned the building leased from S.H.J., L.L.C. In connection with the abandonment of this Right of Use asset, the Company recognized an abandonment loss of $1.4 million. The Company remains obligated on the lease until April 4, 2024.

On May 31, 2019, YF Logistics entered into a sublease agreement with Dynamic Marketing, Inc. ("DMI") for its warehouse space in Hamilton, NJ. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty days' prior written notice or (ii) April 30, 2024. The sublease provides for a base rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month. The initial ROU asset and liability associated with this lease is $3.0 million.

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC, which was amended on March 31, 2021, for its new principal office and showroom in St. Charles, Missouri. The lease terminates on April 30, 2027, with two options to renew for additional five year periods. The base rent is $20,977 per month until September 30, 2021, and increases to $31,465 per month until April 30, 2022, after which time the base rent increases at approximately 2.5% per year thereafter. The Company must also pay its 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. The lease contains customary events of default. The initial ROU asset and liability associated with this lease is $2.0 million.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

On June 2, 2021, 1 Stop entered into a new lease agreement with 1870 Bath Ave. LLC, a related party, for the premises located at 1870 Bath Avenue, Brooklyn, NY. The lease is for a term of ten years and provides for a base rent of $74,263 per month during the first year with annual increases to $96,896 during the last year of the term. 1 Stop is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018. The initial ROU asset and liability associated with this lease is $8.4 million.

On June 2, 2021, Joe's Appliances entered into a new lease agreement with 7812 5th Ave Realty LLC, a related party, for the premises located at 7812 5th Avenue, Brooklyn, NY. The lease is for a term of ten years and provides for a base rent of $6,365 per month during the first year with annual increases to $8,305 during the last year of the term. Joe's Appliances is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018. The initial ROU asset and liability associated with this lease is $0.7 million.

On July 29, 2021, AC Gallery entered into a lease agreement with Tom's Flooring, LLC for the showroom and warehouse located in Largo, Florida. The lease is for a term of four months commencing on September 1, 2021 and ending on December 31, 2021 and provides for a case rent of $6,500 per month. AC Gallery must also pay its one-third pro rata portion of the common area maintenance charges, utilities and sales taxes. The lease contains customary events of default. The lease is short term and therefore not recorded as a right of use asset and liability.

On September 9, 2021, the Company entered into a warehouse agreement for a new warehouse in Somerset, NJ. The warehouse agreement is for a term of 26 months commencing on October 1, 2021 and ending November 29, 2023, unless the master lease for the premises is terminated earlier. The monthly storage fee is $136,274 for the first year, $140,362 for the second year, and $144,573 for the last two months. The Company also paid a security deposit of $272,549. The lease agreement contains customary events of default, representations, warranties, and covenants. The initial ROU and liability associated with this operating lease is $3.4 million.

The following was included in our consolidated balance sheet as of December 31, 2022 and 2021 (in thousands):

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Operating lease right-of-use assets | $        11,688 | $        14,937 |
| | | |
| Lease liabilities, current portion | 3,726 | 3,628 |
| Lease liabilities, long-term | 9,013 | 12,739 |
| | | |
| Total operating lease liabilities | $        12,739 | $        16,367 |
| | | |
| Weighted-average remaining lease term (months) | 73 | 77 |
| | | |
| Weighted average discount rate | 3.9% | 4.0% |

Operating lease expense was $3.8 million and $1.8 million for the years ended December 31, 2022 and 2021, respectively.

F-26

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

As of December 31, 2022, maturities of operating lease liabilities were as follows, in thousands:

| Year Ending December 31, | | Amount |
|---|---|---|
| 2023 | $ | 4,175 |
| 2024 | | 1,808 |
| 2025 | | 1,489 |
| 2026 | | 1,531 |
| 2027 | | 1,284 |
| Thereafter | | 4,159 |
| Total | | 14,446 |
| Less: imputed interest | | (1,707) |
| Total operating lease liabilities | $ | 12,739 |

**Finance Leases**

The Company has three finance leases, acquired in the acquisition of Appliances Connection. At December 31, 2022, the total amount due on these leases was $0.34 million.

Future minimum principal payments on our finance leases payable as of December 31, 2022, are as follows (in thousands):

| Year Ending December 31, | | Amount |
|---|---|---|
| 2023 | $ | 125 |
| 2024 | | 109 |
| 2025 | | 107 |
| 2026 | | 21 |
| Total future minimum payments | | 362 |
| Less: debt discount | | (25) |
| Total | | 337 |
| | | |
| Total current portion of finance leases, net | $ | 112 |
| Total finance leases, net of current portion | $ | 225 |

**NOTE 13—SUPPLIER CONCENTRATION**

For the years ended December 31, 2022 and 2021, the Company purchased a substantial portion of finished goods from one vendor (DMI – see Note 14), representing 69% and 72%, respectively.

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

**NOTE 14—RELATED PARTIES**

*Management Services Agreement*

On April 5, 2019, the Company entered into a management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's executive chairman and prior significant stockholder, which was amended effective on August 4, 2020. Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that under certain circumstances specified in the management services agreement, the quarterly fee may be reduced if similar fees payable to the Manager by subsidiaries of the Company's former parent company, 1847 Holdings LLC, exceed a threshold amount.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of the Company in connection with performing services under the management services agreement. The Company did not pay any expenses for the years ended December 31, 2021 and 2020.

The Company expensed management fees of $0.3 million for each of the years ended December 31, 2022 and 2021 respectively.

*DMI*

The Company is a member of DMI, an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 1.6% interest in DMI. Additionally, Albert Fouerti, the Company's former Chief Executive Officer, director, and a former significant stockholder of Appliances Connection prior to the AC Acquisition, was on the board of DMI until November 2022. As such, DMI is deemed to be a related party for 2022 and 2021.

During the years ended December 31, 2022 and 2021, total purchases from DMI, net of holdbacks, were $255.9 million and $177.8 million, respectively. At December 31, 2022, deposits at DMI totaled $25.0 million and the vendor rebate due from DMI were $5.8 million. At December 31, 2021, vendor rebate deposits, net, due from DMI were $12.2 million and vendor rebates receivable were $5.8 million.

*Lease Agreements*

As described above, 1 Stop and Joe's Appliances entered into lease agreements with 1870 Bath Ave. LLC and 7812 5th Ave Realty LLC. These entities are owned by Albert Fouerti and Elie Fouerti (the Company's former Chief Executive and Chief Operating Officers and significant stockholders of the Company). The total rent paid to these two entities in 2022 was $1.0 million and $0.6 million for the period from June 2, 2021 to December 31, 2021. In addition, YF Logistics has entered into a sublease agreement with DMI. The total rent expense under this related party lease was $0.7 million for the year-ended December 31, 2022 and $0.4 million for the period June 2, 2021 to December 31, 2021.

On March 15, 2022, the Company entered into a lease for additional office space with 8780 19th Ave LLC ("Landlord"), an entity owned by Albert and Elie Fouerti. The Company contends that the lease required the Landlord do certain work at Landlord's expense to improve the building at a cost of approximately $1.2 million. Landlord has refused to pay for this work, contending that this expense was the Company's responsibility. In addition, the total remaining amount due on the lease at December 31, 2022 is also approximately $1.2 million. Landlord contends that the Company is in default of the lease for failing to pay rent. The Company disagrees that its rent obligations have been triggered and further contends that Landlord has violated the lease by failing to pay for the work. The Company and the Landlord remain in dispute over these issues.

**NOTE 15—STOCKHOLDERS' EQUITY**
As of December 31, 2022 and 2021, the Company was authorized to issue 200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. To date, the Company has not designated or issued any shares of preferred stock.

On December 17, 2021, the Company approved a new share repurchase program under which the Company may repurchase up to $25.0 million of its outstanding shares of common stock in the open market, in accordance with all applicable securities laws and regulations, including Rule 10b-18 of the Securities Exchange Act of 1934, as amended. The Company's decision to repurchase its shares, as well as the timing of such repurchases, will depend on a variety of factors that include ongoing assessments of the Company's capital needs, obtaining requisite senior lender consent, market conditions and the price of the Company's common stock, and other corporate considerations, as determined by management. During 2022, the Company purchased 1,229,222 shares of common stock for a total purchase price of $2,000,000. Effective December 31, 2022, the board authorized that the shares purchased be retired.

*Common Stock*
As of December 31, 2022 and 2021, the Company had 105,227,876 and 106,387,332 shares of common stock issued and outstanding, respectively. Each share entitles the holder thereof to one vote per share on all matters coming before the stockholders of the Company for a vote.

On June 2, 2021, the Company sold 91,111,111 units, consisting of one share of common stock and a warrant to purchase one share of common stock, at a public offering price of $2.25 per unit to ThinkEquity, a division of Fordham Financial Management, Inc. (the "Underwriter"), pursuant to an underwriting agreement dated May 27, 2021, for total gross proceeds of $205.0 million. Under the underwriting agreement, the Company granted the Underwriter a 30-day option to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $2.0832 per share, and/or warrants to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $0.0093 per warrant, in any combination thereof, solely to cover over-allotments, if any. The Underwriter exercised its option to purchase 2,000,000 additional warrants and 2,000,000 additional shares for total gross proceeds of $4.5 million.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

After deducting the underwriting commission and expenses, the Company received net proceeds of approximately $194.4 million. The Company used the proceeds of the offering to fund a portion of the purchase price for the AC Acquisition.

On June 2, 2021, the Company issued 5,895,973 shares of common stock to the Sellers in connection with the Acquisition (See Note 10).

From June 25 through July 16, 2021, 1,052,248 shares of common stock were issued as a result of the exercise of 1,052,248 warrants for proceeds of $2.4 million.

On June 3, 2021, the Company granted restricted stock awards under the 1847 Goedeker Inc. 2020 Equity Incentive Plan described below to certain directors, officers, and management of the Company for an aggregate of 216,800 shares of common stock valued at $0.6 million. All restricted stock awards vested immediately.

On March 29, 2022, the Company granted 69,766 shares to two new directors valued at $0.07 million. All restricted stock awards vest immediately.

In July 2022, the Company purchased 1,229,222 shares of its common stock in accordance with a board approved stock repurchase program. The total cost of the acquired shares was $2,000,000 or an average cost of $1.63 per share. Effective December 31, 2022 the board retired all the purchased shares.

### Equity Incentive Plan

Effective as of July 30, 2020, the Company established the 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "Plan") and reserved 555,000 shares of common stock for issuance under the Plan. The Plan was approved by the Company's board of directors and stockholders on April 21, 2020. On April 9, 2021, the board of directors approved an amendment to the Plan to increase the number of shares of common Stock reserved for issuance under the Plan from 555,000 to 1,000,000 shares. On December 17, 2021, the board of directors approved an amendment to the Plan to increase the number of shares of common Stock reserved for issuance under the Plan from 1,000,000 to 11,000,000 shares. Such increase was approved by the Company's stockholders effective as of December 21, 2021.

The Plan is administered by the compensation committee of the board of directors. The Plan permits the grant of restricted stock, stock options and other forms of incentive compensation to the Company's officers, employees, directors, and consultants.
As of December 31, 2022, 11,000,000 shares remain issuable under the 2020 EIP.

### Stock Options

On July 28, 2021, the Company issued to a Company officer nonqualified stock options to purchase 150,000 shares of common stock pursuant to the Plan. The stock options have an exercise price of $3.10 per share and vest 25% annually over a 4-year period. The Company has calculated these options' estimated fair market value at $0.3 million using the Black-Scholes pricing model, with the following assumptions: expected term 6.25 years, stock price $3.10, exercise price $3.10, volatility 77.65%, risk-free rate 1.00%, and no forfeiture rate.

Below is a table summarizing the changes in stock options outstanding during the years ended December 31, 2022 and 2021:

| | Options | | Weighted-Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2020 | 555,000 | $ | 9.00 |
| Granted | 150,000 | | 3.10 |
| Exercised | - | | - |
| Forfeited | (482,039) | | 9.00 |
| Outstanding at December 31, 2021 | 222,961 | $ | 5.03 |
| Granted | - | | - |
| Exercised | - | | - |
| Forfeited | (185,461) | | 5.42 |
| Outstanding at December 31, 2022 | 37,500 | $ | 3.10 |
| Exercisable at December 31, 2022 | 37,500 | $ | 3.10 |

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

During the year end December 31, 2022, 72,960 stock options forfeited as a result of employee terminations.

Stock-based compensation expense related to stock options of $0.2 and $0.3 million was recorded during the years ended December 31, 2022 and 2021, respectively. As of December 31, 2022, the remaining unrecognized compensation cost related to non-vested stock options is $0.2 million and is expected to be recognized over 2.6 years. The outstanding stock options have a weighted average remaining contractual life of 8.6 years and a total intrinsic value of nil.

*Warrants*

On August 4, 2020, the Company issued warrants for the purchase of 55,560 shares of common stock to affiliates of the representative in its initial public offering. These warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, an exercise price of $11.25 per share (subject to customary adjustments), and may also be exercised on a cashless basis if, at any time during the term of the warrants, the issuance of common stock upon exercise of the warrants is not covered by an effective registration statement.

On March 19, 2021, the Company issued four-year warrants to purchase an aggregate of 400,000 shares of common stock to two investors. These warrants are exercisable at any time and from time to time, in whole or in part, at an exercise price of $12.00 per share (subject to customary adjustments) and may also be exercised on a cashless basis if, at any time during the term of the warrants, the issuance of common stock upon exercise of the warrants is not covered by an effective registration statement.

On June 2, 2021, the Company issued warrants to purchase 93,111,111 shares of common stock in the public offering. These warrants are exercisable immediately and expire five years from the date of issuance. The warrants have an exercise price of $2.25 per share, subject to appropriate adjustment in the event of certain stock dividends and distributions, stock splits, stock combinations, reclassifications or similar events affecting the Company's common stock or upon any distributions of assets, including cash, stock or other property to stockholders, and may also be exercised on a cashless basis if, at any time during the term of the warrants, the issuance of common stock upon exercise of the warrants is not covered by an effective registration statement.

Below is a table summarizing the changes in warrants outstanding during the years ended December 31, 2022 and 2021:

| | Warrants | | Weighted-Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2020 | 55,560 | $ | 11.25 |
| Granted | 93,511,111 | | 2.29 |
| Exercised | (1,052,248) | | (2.25) |
| Forfeited | - | | - |
| Outstanding at December 31, 2021 | 92,514,423 | $ | 2.30 |
| Granted | - | | - |
| Exercised | - | | - |
| Forfeited | - | | - |
| Outstanding at December 31, 2022 | 92,514,423 | $ | 2.30 |
| Exercisable at December 31, 2022 | 92,514,423 | $ | 2.30 |

As of December 31, 2022, the outstanding warrants have a weighted average remaining contractual life of 3.4 years and a total intrinsic value of nil.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

**NOTE 16—EARNINGS (LOSS) PER SHARE**

The computation of weighted average shares outstanding and the basic loss per common share for the following periods consisted of the following (in thousands, except per share amounts):

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Basic Loss Per Share** | | |
| Net loss | $ (125,965) | $ (7,582) |
| Weighted average common shares outstanding | 106,436,719 | 64,528,299 |
| | | |
| Basic loss per share | $ (1.18) | $ (0.12) |
| **Diluted Loss Per Share** | | |
| Weighted average common shares outstanding | 106,436,719 | 64,528,299 |
| Effect of dilutive stock options and warrants | - | - |
| Total potential shares outstanding | 106,436,719 | 64,528,299 |
| Diluted loss per share | $ (1.18) | $ (0.12) |

For the year ended December 31, 2022 and 2021, there were 92,737,384 potential common share equivalents from warrants and options excluded from the diluted earnings per share calculations as their effect is anti-dilutive.

**NOTE 17—INCOME TAXES**

As of December 31, 2022 and 2021, the Company had net operating loss carry forwards of approximately $6.3 million and $21.0 million, respectively, that may be available to reduce future years' taxable income indefinitely. Future tax benefits which may arise as a result of these losses have not been recognized in these consolidated financial statements, as their realization is determined not likely to occur. Accordingly, the Company has recorded a valuation allowance for the deferred tax asset relating to these tax loss carry-forwards. For the year ending December 2021, the company reflects a deferred tax liability in the amount of 8.4M due to the future tax liability from an asset with an indefinite life known as a "naked credit." The future tax liability from this indefinite lived asset can be offset by up to 80% of net operating loss carryforwards created after 2017. The remaining portion of the future tax liability from indefinite lived assets cannot be used to offset definite lived deferred tax assets. The impairment of the value indefinite lived assets in the year ending December 31, 2022 reduced the future expected tax liability sufficiently that no naked credit exists because the future tax liability is determined to be less than 80% of future net operating losses.

The components of the provision for income taxes for the years ended December 31, 2022 and 2021, consisted of the following (in thousands):

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Current federal and state | $ - | $ 468 |
| Valuation allowance | 3,960 | 1,201 |
| Deferred federal and state | (12,369) | (1,567) |
| Total provision (benefit) for income taxes | $ (8,409) | $ 102 |

F-31

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

The difference between the income tax expense (benefit) reported and amounts computed by applying the statutory federal rate of 21.0% to pretax income (loss) for the years ended December 31, 2022 and 2021, consisted of the following (in thousands):

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Federal tax | $ (28,219) | $ (1,571) |
| State tax, net of federal benefit | (3,185) | (177) |
| Other state tax adjustments | - | 34 |
| Permanent items | 504 | (1) |
| Goodwill impairment | 18,531 | |
| Acquisition costs | | 202 |
| Change in state tax rates | | 436 |
| Valuation allowance | 3,960 | 1.179 |
| Total income tax provision (benefit) | $ (8,409) | $ 102 |
| Effective tax rate | (6.3)% | (1.4)% |

Deferred income tax assets and liabilities at December 31, 2022 and 2021, consisted of the following temporary differences and carry-forward items (in thousands):

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Inventory | 418 | $ 197 |
| Receivables | 352 | 236 |
| Accrued expenses | 79 | 1,929 |
| Interest limitations | 1,170 | 370 |
| Reserves | 5,443 | 4,312 |
| Other | 169 | 169 |
| Derivative | (743) | |
| Lease liabilities | 2,977 | 3,825 |
| Loss carryforward | 4,853 | 1,429 |
| Valuation allowance | (10,957) | (6,998) |
| Total deferred tax asset | 3,761 | $ 5,469 |
| Fixed assets | (123) | (246) |
| Right-of-use assets | (2,732) | (3,490) |
| Intangibles | (906) | (10,140) |
| Total deferred tax liability | $ (3,761) | $ (13,876) |
| Total deferred tax liability, net | $ - | $ (8,407) |

F-32

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

The Company accrues interest and penalties related to unrecognized tax benefits. The Company does not believe it has any unrecognized tax benefits for December 31, 2022 and 2021 that would have a material impact on the financial statements. The Company's income tax returns are open to examination by the Internal Revenue Service and various State jurisdictions.

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Net deferred tax liability | $ 1 | $ (8,407) |
| Valuation allowance | $ - | $ - |

**NOTE 18—DERIVATIVE INSTRUMENTS (INTEREST RATE SWAP):**

On May 9, 2022, the Company entered into a Term Loan agreement with Bank of America, N.A. (See Note 11). On the same day, the Company entered into an interest rate swap agreement to reduce its exposure to fluctuations in the floating interest rate tied to SOFR under the Term Loan with a notional amount of $100 million. The interest rate swap became effective on May 9, 2022, and will terminate on May 31, 2029. The Company receives variable interest payments monthly based on a one-month SOFR and pays a fixed rate of 2.93% to the counterparty.

As of December 31, 2022, the fair value of the interest rate swap agreement was $3.2 million and was classified as a derivative asset in our consolidated balance sheet. Additionally, during the year ended December 31, 2022, the Company recognized a $3.2 million gain on the change in fair value of the interest rate swap.

The Company classified the interest rate swap in Level 2 of the fair value hierarchy.

**NOTE 19—COMMITMENTS AND CONTINGENCIES**

On January 18, 2019, the Company entered into an asset purchase agreement with Goedeker Television, Steve Goedeker and Mike Goedeker, pursuant to which on April 5, 2019 the Company acquired substantially all of the assets of Goedeker Television used in its retail appliance and furniture business (the "Goedeker Business").

Pursuant to the asset purchase agreement, Goedeker Television entitled to receive an earn out payment of $0.2 million if the EBITDA (as defined in the asset purchase agreement) of the Goedeker Business for the trailing twelve (12) month period from April 5, 2022 is $2.5 million or greater, and may be entitled to receive a partial earn out payment if the EBITDA of the Goedeker Business is less than $2.5 million but greater than $1.5 million. The Company expects to meet this target and adjusted the contingent note payable in the consolidated balance sheet to the present value of the amount due of $0.2 million as of December 31, 2021. The final payment of $0.2 was paid October 2022.

*Legal Proceedings*

At the Company's annual meeting on December 21, 2021, the stockholders were asked to approve an amendment to the Company's Amended and Restated Certificate of Incorporation, dated July 30, 2020 (the "Certificate of Incorporation"), increasing the number of authorized shares of the Company's common stock, par value $0.0001 per share ("Common Stock" and such proposal, the "Share Increase Proposal") by 50,000,000 shares of Common Stock. As reported in a Form 8-K filing on December 28, 2021, the Share Increase Proposal was adopted and a Certificate of Amendment to the Certificate of Incorporation setting forth the amendment adopted pursuant to the Share Increase Proposal (the "Certificate of Amendment") was filed with the Secretary of State of the State of Delaware (the "Delaware Secretary of State"). To date, none of these newly authorized shares has actually been issued.

Three purported beneficial owners of Common Stock subsequently expressed concerns about a statement in the Company's proxy statement related to the Share Increase Proposal, specifically questioning, in light of the proxy statement, the ability of brokerage firms and other custodians to vote shares of Common Stock held by them for the benefit of their customers in the absence of instructions from the beneficial owners. Based on an examination of the situation performed following receipt of these demands, the Company believes that the vote at the annual meeting was properly tabulated and that the proposed amendment was properly adopted in accordance with Delaware law. In light of the demands, however, and to ensure against any future question as to the validity of these newly authorized shares, the Company has elected to seek validation of its Certificate of Amendment through a Petition to the Court of Chancery of the State of Delaware (the "Court of Chancery") pursuant to Section 205 of the Delaware General Corporation Law (the "205 Petition"). The action, styled *In re 1847 Goedeker Inc.*, C.A. 2022-0219-SG, seeks entry by the Court of Chancery of an order validating and declaring effective the Certificate of Amendment, and validating the additional shares of Common Stock authorized under the Share Increase Proposal.

**POLISHED.COM INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2022 AND 2021**

One of the purported stockholders who had submitted a demand related to adoption of the Share Increase Proposal has filed a Class Action Complaint in the Court of Chancery against the Company and its Board of Directors. The lawsuit, captioned *Scot T. Boden v. 1847 Goedeker Inc., et al.*, C.A. No. 2022-0196-SG (the "*Boden* Action"), asserts two claims for relief. The first is against the Company for alleged violation of the Delaware General Corporation Law Section 225(b) for improper tabulation of the stockholder vote on the Share Increase Proposal. The second asserts that the Company's directors breached their fiduciary duties by incorrectly tabulating the stockholder vote, and by causing a purportedly invalid amendment to our Certificate of Incorporation to be filed with the Delaware Secretary of State.

Subsequent to December 31, 2022, the Company settled this claim for $475,000.

On October 31, 2022, a putative shareholder class action was filed against Polished.com Inc. (the "Company") and certain of its current and former officers and directors, as well as certain underwriters of the Company's 2020 initial public offering (the "IPO"). The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Ryan Maschhoff v. Polished.com Inc., et al.*, No. 1:22-cv-06606. The complaint asserts violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as well as Sections 10(b) and Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about December 20, 2022, plaintiffs filed a motion for the appointment of lead plaintiff and lead counsel. Although that motion is fully briefed, to date, oral argument has yet to be scheduled.

**NOTE 20—SUBSEQUENT EVENTS**

Subsequent to December 31, 2022, the Company signed a letter of intent for a sublease from DMI, a related party for a new warehouse in a building being leased by DMI. The new lease will allow the Company to close its two existing New Jersey warehouses and consolidate operations into one new warehouse. The lease, which is expected to be finalized in the third quarter of 2023 is for 228,000 square feet for seven years at a cost of approximately $15 per square foot, including common area charges with annual increases of 3.75%.

***Bank of America Loan Amendment***

On July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "Amendment"), in part, to waive events of defaults on its existing credit agreement. The Amendment requires the Company to pay the existing Term Facility and Revolving Facility by August 31, 2024 (the "Maturity Date"). The Revolving Loan decreased to $10,000,000 from and after July 25, 2023. The Letter of Credit commitments decreased to $2,000,000 and the Swing Line Loan was eliminated. The amendment also establishes a new EBITDA covenant and requires the Company to maintain minimum liquidity of $8 million including restricted cash and $5 million excluding restricted cash. Liquidity as defined in the Amendment includes Cash and certain qualifying customer and credit card accounts receivable.

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

Commencing on September 30, 2023, through and including June 30, 2024, the Borrowers must repay the principal amount of the Term Loan in quarterly installments of $1,875,000 each, payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

F-34

**POLISHED.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except share and per share data)

| | September 30, 2022 | June 30, 2022 | March 31, 2022 | December 31, 2021 |
|---|---|---|---|---|
| | | | As Restated | As Restated |
| | (Unaudited) | (Unaudited) | (Unaudited) | (Unaudited) |
| ASSETS | | | | |
| Current Assets | | | | |
| Cash and cash equivalents | $ 28,433 | $ 47,386 | $ 25,983 | $ 25,724 |
| Restricted cash | 1,733 | 1,733 | 2,583 | 8,067 |
| Receivables, net | 24,892 | 25,657 | 22,411 | 23,531 |
| Vendor deposits | 24,785 | 18,130 | 18,067 | 12,200 |
| Merchandise inventory, net | 44,488 | 56,750 | 46,203 | 52,393 |
| Prepaid expenses and other current assets | 9,825 | 6,335 | 5,540 | 5,980 |
| Total Current Assets | 134,156 | 155,991 | 120,787 | 127,895 |
| Property and equipment, net | 5,287 | 4,551 | 4,666 | 4,585 |
| Operating lease right-of-use assets | 12,512 | 13,327 | 14,135 | 14,937 |
| Derivative instruments | 3,540 | - | - | - |
| Goodwill | 191,614 | 191,614 | 191,614 | 191,614 |
| Intangible assets, net | 36,549 | 39,103 | 41,658 | 44,212 |
| Other long-term assets | 349 | 349 | 349 | 349 |
| TOTAL ASSETS | $ 384,007 | $ 404,935 | $ 373,209 | $ 383,592 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | |
| Current Liabilities | | | | |
| Accounts payable and accrued expenses | $ 70,602 | $ 72,093 | $ 84,717 | $ 82,799 |
| Due to related party | 2,413 | 2,413 | - | - |
| Customer deposits | 7,955 | 16,750 | 12,590 | 28,815 |
| Current portion of notes payable, net | 6,009 | 5,395 | 7,907 | 7,910 |
| Current portion of finance lease liabilities | 115 | 118 | 121 | 65 |
| Current portion of operating lease liabilities | 3,808 | 3,747 | 3,688 | 3,874 |
| Contingent note payable | 200 | 200 | 200 | 198 |
| Total Current Liabilities | 91,102 | 100,716 | 109,222 | 123,661 |
| Notes payable, net of current portion | 92,727 | 94,645 | 47,180 | 48,559 |
| Finance lease liabilities, net of current portion | 252 | 279 | 306 | 121 |
| Operating lease liabilities, net of current portion | 9,865 | 10,838 | 11,796 | 12,493 |
| Derivative instruments | - | 936 | - | - |
| Deferred tax liability, net | 5,174 | 7,470 | 8,382 | 8,407 |
| TOTAL LIABILITIES | 199,120 | 214,884 | 176,886 | 193,241 |
| Stockholders' Equity | | | | |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized; none issued and outstanding as of March 31, June 30, September 30, or December 31, 2022 | - | - | - | - |
| Common stock $0.0001 par value, 200,000,000 shares authorized; 106,387,332 shares issued and outstanding at December 31, 2021, 106,457,098 shares issued and outstanding at March 31, 2022, and 105,227,876 shares issued and outstanding at June 30, 2022 and September 30, 2022 | 11 | 11 | 11 | 11 |
| Treasury stock, at cost | (2,000) | (2,000) | - | - |
| Additional paid-in capital | 224,841 | 224,821 | 224,801 | 224,648 |
| Accumulated deficit | (37,965) | (32,781) | (28,489) | (34,308) |
| TOTAL STOCKHOLDERS' EQUITY | 184,887 | 190,051 | 196,323 | 190,351 |
| | $ 384,007 | $ 404,935 | $ 373,209 | $ 383,592 |

F-35

**POLISHED.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
(in thousands, except share and per share data)

| | March 31, 2023 | December 31, 2022 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| | | |
| Current Assets | | |
| Cash and cash equivalents | 25,615 | 19,549 |
| Restricted cash | 950 | 950 |
| Receivables, net | 16,693 | 26,650 |
| Vendor deposits | 30,078 | 25,022 |
| Merchandise inventory, net | 36,350 | 41,766 |
| Prepaid expenses and other current assets | 10,920 | 11,217 |
| | | |
| Total Current Assets | 120,606 | 125,154 |
| | | |
| Property and equipment, net | 4,975 | 5,075 |
| Operating lease right-of-use assets | 10,857 | 11,688 |
| Derivative instruments | 1,853 | 3,178 |
| Goodwill | 106,173 | 106,173 |
| Intangible assets, net | 9,542 | 10,296 |
| Deferred tax asset, net | 3 | 1 |
| Other long-term assets | 349 | 349 |
| | | |
| TOTAL ASSETS | 254,358 | 261,914 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | 80,938 | 81,537 |
| Customer deposits | 5,090 | 7,292 |
| Current portion of notes payable, net | 7,264 | 6,628 |
| Current portion of finance lease liabilities | 107 | 112 |
| Current portion of operating lease liabilities | 3,353 | 3,726 |
| | | |
| Total Current Liabilities | 96,752 | 99,295 |
| | | |
| Notes payable, net of current portion | 88,972 | 90,816 |
| Finance lease liabilities, net of current portion | 199 | 225 |
| Operating lease liabilities, net of current portion | 8,443 | 9,013 |
| | | |
| TOTAL LIABILITIES | 194,366 | 199,349 |
| | | |
| Stockholders' Equity | | |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized; none issued and outstanding as of March 31, 2023 or December 31, 2022 | - | - |
| Common stock $0.0001 par value, 200,000,000 shares authorized; 105,469,878 and 105,227,876 shares issued and outstanding at March 31, 2023 and December 31, 2022, respectively | 11 | 11 |
| Additional paid-in capital | $ 223,015 | $ 222,827 |
| Accumulated deficit | $ (163,034) | $ (160,273) |
| | | |
| TOTAL STOCKHOLDERS' EQUITY | $ 59,992 | $ 62,565 |
| | | |
| | $ 254,358 | $ 261,914 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except share and per share data)
(Unaudited)

| | Three Months Ended | | Three Months Ended | | Three Months Ended | |
|---|---|---|---|---|---|---|
| | June 30, 2022 | June 30, 2021 | September 30, 2022 | September 30, 2021 | March 31, 2023 | March 31, 2022 |
| Product sales, net | $ 138,463 | $ 64,072 | $ 143,566 | $ 141,867 | $ 95,439 | $ 148,681 |
| Cost of goods sold | 115,438 | 51,017 | 122,431 | 110,495 | 74,292 | 117,919 |
| Gross profit | 23,025 | 13,055 | 21,135 | 31,372 | 21,147 | 30,762 |
| | | | | | | |
| Operating Expenses | | | | | | |
| Personnel | 7,402 | 4,821 | 8,348 | 8,547 | 6,484 | 6,646 |
| Advertising | 5,363 | 2,932 | 7,534 | 3,715 | 5,121 | 5,578 |
| Bank and credit card fees | 4,600 | 2,095 | 5,932 | 4,918 | 3,373 | 4,589 |
| Depreciation and amortization | 2,887 | 175 | 2,882 | 3,610 | 1,070 | 2,819 |
| Loss on abandonment of right-of-use asset | - | 1,437 | - | - | - | - |
| General and administrative | 3,563 | 2,858 | 7,260 | 4,080 | 4,987 | 4,255 |
| | | | | | | |
| Total Operating Expenses | 23,815 | 14,318 | 31,956 | 24,870 | 21,035 | 23,887 |
| | | | | | | |
| INCOME (LOSS) FROM OPERATIONS | (790) | (1,263) | (10,821) | 6,502 | 112 | 6,875 |
| | | | | | | |
| Other Income (Expenses) | | | | | | |
| Interest income | 64 | 12 | 174 | 34 | 357 | 44 |
| Financing costs | - | - | - | - | - | - |
| Adjustment in value of contingency | - | - | - | - | - | (2) |
| Interest expense | (302) | (1,017) | (1,351) | (1,099) | (1,882) | (941) |
| Gain (loss) on change in fair value of derivative instruments | (936) | - | 4,476 | - | (1,325) | - |
| Loss on settlement of debt | (3,241) | (1,748) | - | - | - | - |
| Other income (expense) | (41) | - | (50) | 8 | 81 | (49) |
| | | | | | | |
| Total Other Income (Expenses) | (4,456) | (2,753) | 3,249 | (1,057) | (2,769) | (948) |
| | | | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (5,246) | (4,016) | (7,572) | 5,445 | (2,657) | 5,927 |
| | | | | | | |
| INCOME TAX (EXPENSE) BENEFIT | 954 | 8,049 | 2,388 | (2,129) | (104) | (108) |
| | | | | | | |
| NET INCOME (LOSS) | $ (4,292) | $ 4,033 | $ (5,184) | $ 3,316 | $ (2,761) | $ 5,819 |
| | | | | | | |
| Income per common share | | | | | | |
| Basic | $ (0.04) | $ 0.11 | $ (0.05) | $ 0.03 | $ (0.03) | $ 0.05 |
| Diluted | $ (0.04) | $ 0.09 | $ (0.05) | $ 0.03 | $ (0.03) | $ 0.05 |
| | | | | | | |
| Weighted average common shares outstanding | | | | | | |
| Basic | 105,774,197 | 36,540,827 | 105,227,876 | 106,387,331 | 105,380,910 | 106,386,548 |
| Diluted | 105,774,197 | 46,448,892 | 105,227,876 | 131,787,293 | 105,380,910 | 106,386,548 |

F-37

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except share and per share data)
(Unaudited)

| | Six Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | June 30, 2022 | June 30, 2021 | September 30, 2022 | September 30, 2021 |
| Product sales, net | $ 287,144 | $ 77,769 | $ 430,710 | $ 219,637 |
| Cost of goods sold | 233,357 | 62,085 | 355,788 | 172,581 |
| Gross profit | 53,787 | 15,684 | 74,922 | 47,056 |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 14,048 | 6,753 | 22,396 | 15,300 |
| Advertising | 10,941 | 4,015 | 18,475 | 7,730 |
| Bank and credit card fees | 9,189 | 2,628 | 15,121 | 7,546 |
| Depreciation and amortization | 5,706 | 297 | 8,588 | 3,908 |
| Loss on abandonment of right of use asset | - | 1,437 | - | 1,437 |
| General and administrative | 7,818 | 5,097 | 15,078 | 9,176 |
| | | | | |
| Total Operating Expenses | 47,702 | 20,227 | 79,658 | 45,097 |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | 6,085 | (4,543) | (4,736) | 1,959 |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 108 | 22 | 282 | 57 |
| Adjustment in value of contingency | (2) | - | (2) | (280) |
| Interest expense | (1,243) | (1,251) | (2,594) | (2,350) |
| Gain (loss) on change in fair value of derivative instruments | (936) | - | 3,540 | - |
| Loss on settlement of debt | (3,241) | (1,748) | (3,241) | (1,748) |
| Other income (expense) | (90) | 11 | (140) | 19 |
| | | | | |
| Total Other Income (Expenses) | (5,404) | (2,966) | (2,155) | (4,022) |
| | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | 681 | (7,509) | (6,891) | (2,063) |
| | | | | |
| INCOME TAX (EXPENSE) BENEFIT | 846 | 8,048 | 3,234 | 5,919 |
| | | | | |
| NET INCOME (LOSS) | 1,527 | 539 | (3,657) | $ 3,856 |
| | | | | |
| Income per common share | | | | |
| Basic | $ 0.01 | $ 0.03 | $ (0.03) | $ 0.08 |
| Diluted | $ 0.01 | $ 0.02 | $ (0.03) | $ 0.06 |
| | | | | |
| Weighted average common shares outstanding | | | | |
| Basic | 106,080,764 | 21,410,073 | 105,792,287 | 50,047,045 |
| Diluted | 106,080,764 | 26,364,106 | 105,792,287 | 61,816,085 |

F-38

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
(in thousands, except share and per share data)

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Treasury Stock At Cost | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance January 1, 2022 | 106,387,332 | $ 11 | $ 224,648 | $ (34,308) | - | $ 190,351 |
| Issuance of common stock through equity incentive awards | 69,766 | - | 120 | - | - | 120 |
| Stock compensation expense | - | - | - | - | - | - |
| March 31, 2022 | - | - | 33 | - | - | 33 |
| Net income for the three months ended March 31, 2022 | - | - | - | 5,819 | - | 5,819 |
| Balance March 31, 2022 (Unaudited) | 106,457,098 | 11 | 224,801 | (28,489) | | 196,323 |
| Purchase of treasury stock | (1,229,222) | - | - | - | (2,000) | (2,000) |
| Stock compensation expense | - | - | 20 | - | - | 20 |
| Net loss for the three months ended June 30, 2022 | - | - | - | (4,292) | - | (4,292) |
| Balance June 30, 2022 (Unaudited) | 105,227,876 | 11 | 224,821 | (32,781) | (2,000) | 190,051 |
| Stock compensation expense | - | - | 20 | - | - | 20 |
| September 30, 2022 | - | - | - | - | - | - |
| Net loss for the three months ended September 30, 2022 | - | - | - | (5,184) | - | (5,184) |
| Balance September 30, 2022 (Unaudited) | 105,227,876 | 11 | 224,841 | (37,965) | (2,000) | 184,887 |
| Retire treasury stock | - | - | (2,000) | - | 2,000 | - |
| Stock compensation expense | - | - | - | - | - | - |
| December 31, 2022 | - | - | (14) | - | - | (14) |
| Net loss for the three months ended December 31, 2022 | - | - | - | (122,308) | - | (122,308) |
| Balance December 31, 2022 | 105,227,876 | 11 | 222,827 | (160,273) | - | 62,565 |
| Issuance of common stock through equity incentive awards | 83,011 | - | 60 | - | - | 60 |
| Issuance of common stock in connection with employment agreements | 158,991 | - | 120 | - | - | 120 |
| Stock compensation expense | - | - | 8 | - | - | 8 |
| Net loss for the three months ended March 31, 2023 | - | - | - | (2,761) | - | (2,761) |
| Balance March 31, 2023 (Unaudited) | 105,469,878 | $ 11 | $ 223,015 | $ (163,034) | $ - | $ 59,992 |

F-39

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands, except share and per share data)
(Unaudited)

| | Three Months Ended | | Six Months Ended | Nine Months Ended |
| --- | --- | --- | --- | --- |
| | March 31, 2023 | March 31, 2022 | June 31, 2022 | September 30, 2022 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | | |
| Net income (loss) | $ (2,761) | $ 5,819 | $ 1,527 | (3,657) |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | | | |
| Depreciation and amortization | 1,070 | 2,819 | 5,706 | 8,588 |
| Amortization of debt discount | 54 | 185 | 406 | 460 |
| Loss on settlement of debt | - | - | 3,241 | 3,241 |
| Stock-based compensation | 68 | 153 | 173 | 193 |
| Adjustment to contingent liability | - | 2 | 2 | 2 |
| Inventory reserve | - | 57 | 157 | 557 |
| Loss (Gain) on change in fair value of derivative instruments | 1,325 | - | 936 | (3,540) |
| Bad debt expense | | 121 | 175 | 411 |
| Deferred tax benefit | (1) | (25) | (938) | (3,234) |
| Non-cash lease expense | 831 | 801 | 1,610 | 2,425 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | 9,957 | 999 | (2,301) | (1,772) |
| Deposits with vendors | (5,055) | (5,867) | (5,931) | (12,586) |
| Inventory | 5,416 | 6,134 | (4,513) | 7,349 |
| Prepaid expenses and other current assets | 297 | 439 | (355) | (3,846) |
| Accounts payable and accrued liabilities | (478) | 1,918 | (10,652) | (12,143) |
| Due to related party | - | - | 2,413 | 2,413 |
| Customer deposits | (2,202) | (16,225) | (12,065) | (20,860) |
| Operating lease liabilities | (944) | (884) | (1,781) | (2,694) |
| Net cash (used in) provided operating activities | 7,577 | (3,554) | (22,190) | (38,693) |
| | | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | | |
| Purchases of property and equipment | (124) | (37) | (256) | (1,318) |
| Net cash used in investing activities | (124) | (37) | (256) | (1,318) |
| | | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | |
| Cash received from notes payable | - | - | 43,045 | 43,044 |
| Repayment of notes payable | (1,356) | (1,615) | (3,223) | (4,580) |
| Repayments of financing lease liabilities | (31) | (19) | (48) | (78) |
| Purchase of treasury stock at cost | - | - | (2,000) | (2,000) |
| Net cash (used in) provided by in financing activities | (1,387) | (1,634) | 37,774 | 36,387 |
| | | | | |
| NET CHANGE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 6,066 | (5,225) | 15,328 | (3,625) |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, BEGINNING OF PERIOD | 20,499 | 33,791 | 33,791 | 33,791 |
| | | | | |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, END OF PERIOD | 25,565 | $ 28,566 | $ 49,119 | $ 30,167 |
| | | | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | | | |
| End of the period | | | | |
| Cash and cash equivalents | $ 25,615 | $ 25,983 | $ 47,386 | $ 28,433 |
| Restricted cash | 950 | 2,583 | 1,733 | 1,733 |
| | | | | |
| | $ 25,565 | $ 28,566 | $ 49,119 | $ 30,166 |
| | | | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | | | |
| Beginning of the period | | | | |
| Cash and cash equivalents | $ 19,549 | $ 25,724 | $ 25,724 | $ 25,724 |
| Restricted cash | 950 | 8,067 | 8,067 | 8,067 |
| | | | | |
| | $ 20,499 | $ 33,791 | $ 33,791 | $ 33,791 |
| | | | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION | | | | |
| Cash paid for interest | $ 1,634 | $ 639 | $ 1,531 | $ 2,731 |
| Cash paid for income taxes | $ - | $ - | $ - | $ 3,905 |

| NON-CASH INVESTING AND FINANCING ACTIVITIES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Common stock issued in vesting of RSUs | $ | - | $ | - | $ | - | $ | - |
| Financed purchases of property and equipment | $ | 94 | | 308 | $ | 308 | $ | 308 |
| Common stock issued in connection with employment agreements | $ | 121 | | - | | - | | - |
| Debt discount on notes payable | $ | - | $ | - | $ | 1,104 | $ | 1,104 |
| Settlement of notes payable and interest through the issuance of a new note | $ | - | $ | - | $ | 55,851 | $ | 55,851 |

F-40

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 1—BASIS OF PRESENTATION**

In the opinion of management, the accompanying unaudited condensed consolidated financial statements of Polished.com, Inc. (the "Company," "Polished.com," "1847 Goedeker," "we," "us," or "our") have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and applicable rules and regulations of the U.S. Securities and Exchange Commission ("SEC") regarding interim financial reporting and reflect all adjustments, consisting of normal recurring adjustments, necessary to present fairly the results of the interim periods presented. Certain information and note disclosures normally included in the audited financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations. The information included in the Quarterly Report on Form 10-Q should be read in conjunction with the audited consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2022. Furthermore, interim results for the three months ended March 31, 2022 (As Restated), June 30, 2022, September 30, 2022, and March 31, 2023 are not necessarily indicative of the results that may be expected for the full year ending December 31, 2022 or future periods. Furthermore, interim results for the six months ended June 30, 2022 and the nine months ended September 30, 2022 are not necessarily indicative of the results that may be expected for the full year ending December 31, 2022 or future periods.

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Derivative Instruments – Interest Rate Swaps*

The Company uses interest rate swap agreements to manage interest rate exposures. The Company recognizes interest rate swap agreements as either a derivative asset or liability on the balance sheet at fair value.

The fair value of an interest rate swap agreement is determined using widely accepted valuation techniques, including discounted cash flow analyses on the expected cash flows of each derivative. These analyses reflect the contractual terms of the derivative, including the period to maturity, and use observable market-based inputs, including interest rate curves and implied volatilities. The fair value of interest rate swap agreements is determined using the market standard methodology of netting the discounted future fixed cash payments and the discounted expected variable cash receipts.

*<u>Recent Accounting Pronouncements</u>*

<u>Recently Adopted</u>

In August 2020, the FASB issued ASU 2020-06, Accounting for Convertible Instruments and Contracts In An Entity's Own Equity. ASU 2020-06 simplifies the accounting for certain convertible instruments by removing the separation models for convertible debt with a cash conversion feature and for convertible instruments with a beneficial conversion feature. As a result, more convertible debt instruments will be reported as a single liability instrument with no separate accounting for embedded conversion features. Additionally, ASU 2020-06 amends the diluted earnings per share calculation for convertible instruments by requiring the use of the if-converted method. The treasury stock method is no longer available. For SEC filers, excluding smaller reporting companies, ASU 2020-06 is effective for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. For all other entities, ASU 2020-06 is effective for fiscal years beginning after December 15, 2023, including interim periods within those fiscal years. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The Company adopted this guidance on January 1, 2022. The Company's adoption of this update did not have a material impact on the consolidated financial statements and related disclosures.

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

*Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13 Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on our consolidated financial statements.

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers. This ASU amends ASC 805 to require acquiring entities to apply ASC 606 to recognize and measure contract assets and contract liabilities in business combinations. The ASU is effective for public entities for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on our consolidated financial statements.

In March 2022, the FASB issued ASU 2022-02, Troubled Debt Restructurings ("TDRs") and Vintage Disclosures (Topic 326): Financial Instruments – Credit Losses. This amended guidance will eliminate the accounting designation of a loan modification as a TDR, including eliminating the measurement guidance for TDRs. The amendments also enhance existing disclosure requirements and introduce new requirements related to modifications of receivables made to borrowers experiencing financial difficulty. Additionally, this guidance requires entities to disclose gross write-offs by year of origination for financing receivables, such as loans and interest receivable. The ASU is effective January 1, 2023, and is required to be applied prospectively, except for the recognition and measurement of TDRs which can be applied on a modified retrospective basis. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on our consolidated financial statements.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to the Company's consolidated financial statements.

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

*Restatement*

The Company restated its previously issued financial statements as of and for the three months ended March 31, 2022, to reflect the following adjustments:

*Consolidated Statements of Operations*

1. Revenue declined by $4.1 million because of an understatement of a returns allowance and revenue cutoff issues.
2. Cost of goods sold increased $1.0 million, net by reclassification of expenses from operating expenses to cost of goods sold offset by the reduction in product cost associated with the reduction in revenue.
3. Operating expense declined by $1.9 million primarily by reclassification of operating expense to cost of goods sold
4. Other income (expense) various miscellaneous adjustments totaling $0.2 million.
5. Income tax expense declined by $3.3 million.
6. As a result of the above adjustments, net income declined by $0.1 million.

*Consolidated Balance Sheet*

7. Current assets declined by $13.2 million from a $3.8 million reduction in vendor rebate accrual, inventory declined by $6.7 million, net from changes to sales returns allowance and revenue cutoff adjustments, and prepaid expenses declined by $2.7 million by to adjust for charging some items to expense, rather than prepaid expense.
8. Reclassification of showroom inventory to property and equipment.
9. Eliminate a right-of-use asset on a property that was not occupied.
10. Reflect the issuance of shares granted to two directors.
11. Reflect adjustments made to 2021 accumulated deficit and adjustment to net income for the three months ended March 31, 2022.

F-43

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**POLISHED.COM INC.**
**CONSOLIDATED BALANCE SHEETS**
**March 31, 2022**
(in thousands)

| | As originally Reported | | Adjustments | As Restated |
|---|---|---|---|---|
| Current assets | $ 134,010 (7) | $ | (13,223) $ | 120,787 |
| Property and equipment | 3,688 (8) | | 978 | 4,666 |
| Operating lease right-of-use assets | 15,262 (9) | | (1,127) | 14,135 |
| Total assets | $ 386,581 | $ | (13,372) $ | 373,209 |
| | | | | |
| Total liabilities | $ 175,037 | | 1,849 $ | 176,886 |
| Common stock and additional paid in capital | 224,678 (10) | | 134 | 224,812 |
| Accumulated deficit | (13,134) (11) | | (15,354) | (28,489) |
| Total liabilities and stockholders' equity | $ 386,581 | $ | (13,371) $ | 373,209 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**
(in thousands)

| | As originally Reported | | Adjustments | As Restated |
|---|---|---|---|---|
| Product sales, net | $ 152,752 (1) | $ | (4,071) $ | 148,681 |
| Cost of goods sold | 116,883 (2) | | 1,036 | 117,919 |
| Operating expense | 25,802 (3) | | (1,915) | 23,887 |
| Other income (expense) | (762) (4) | | (186) | (948) |
| Income taxes | (3,383) (5) | | 3,275 | (109) |
| Net income (loss) | $ 5,922 (6) | $ | (103) $ | 5,819 |
| | | | | |
| Net income (loss) per common share | | | | |
| BASIC | $ 0.06 | | $ | 0.05 |
| DILUTED | $ 0.06 | | $ | 0.05 |
| | | | | |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING | | | | |
| BASIC | 106,387,332 | | | 106,387,332 |
| DILUTED | 106,387,332 | | | 106,387,332 |

F-44

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**
(in thousands)

| | Common Stock | | Additional Paid-Inc | Accumulated | Total Stockholders' |
| | Shares | Amount | Capital | Deficit | Equity |
|---|---|---|---|---|---|
| Balance March 31, 2022 as originally filed | 106,386,332 | $ 11 | $ 224,667 | $ (13,134) | $ 211,544 |
| Adjustment to reflect issuance of vested stock | 69,766 | - | 134 | - | 134 |
| Adjustments to results of operations for the year ended December 31, 2022 | | | | (15,252) | (15,252) |
| Adjustments to results of operations for the three months ended March 31, 2022 | - | - | - | (103) | (103) |
| Balance March 31, 2022, as restated | 106,456,098 | $ 11 | $ 224,801 | $ (28,489) | $ 196,323 |

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**THREE MONTHS ENDED MARCH 31, 2022**
(UNAUDITED)
(in thousands)

| | As originally Filed | Adjustments | As Restated |
|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net income (loss) Adjustments to reconcile net income (loss) to net cash used in by operating activities: | $ 5,922 | $ (103) | $ 5,819 |
| Deferred tax (liability) asset | 1,785 | (1,810) | (25) |
| Changes in operating assets and liabilities: | | | |
| Receivables | (1,694) | 2,693 | 999 |
| Merchandise inventory | (8,209) | 14,343 | 6,134 |
| Prepaid expenses and other assets | (2,312) | 2,751 | 439 |
| Accounts payable and accrued expenses | 11,368 | (9,450) | 1,918 |
| Customer deposits | (7,622) | (8,603) | (16,225) |
| Various other changes | (2,985) | 372 | (2,612) |
| | | | |
| Net cash used in operating activities | (3,747) | 193 | (3,554) |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Net cash used in investing activities | (6) | (31) | (37) |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Net cash used in financing activities | (1,634) | - | (1,634) |
| | | | |
| NET CHANGE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | (5,387) | 162 | (5,225) |
| | | | |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, BEGINNING OF PERIOD | 33,791 | - | 33,791 |
| | | | |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, END OF PERIOD | $ 28,404 | $ 162 | $ 28,566 |
| | | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | | |
| End of the period | | | |
| Cash and cash equivalents | $ 25,821 | 162 | 25,983 |
| Restricted cash | 2,583 | - | 2,583 |
| | | | |
| | $ 28,404 | $ 28,404 | $ 28,404 |

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 3—REVENUES**

Disaggregated Revenue – The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows (in thousands):

| | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2023 | | March 31, 2022 | | June 30, 2022 | | September 30, 2022 | |
| Appliance sales | $ | 90,464 | $ | 138,549 | $ | 128,242 | $ | 136,044 |
| Furniture sales and other sales | | 4,975 | | 10,132 | | 10,221 | | 7,522 |
| Total | $ | 95,439 | $ | 148,681 | $ | 138,463 | $ | 141,566 |

**NOTE 4—RECEIVABLES**

Receivables consisted of the following (in thousands):

| | March 31, 2023 | | March 31, 2022 | | June 30, 2022 | | September 30, 2022 | |
|---|---|---|---|---|---|---|---|---|
| Trade accounts receivable | $ | 11,576 | $ | 15,831 | $ | 15,367 | $ | 17,160 |
| Vendor rebates receivable | | 4,393 | | 5,462 | | 6,902 | | 11,633 |
| Other receivables | | 2,230 | | 2,251 | | 2,251 | | 2,251 |
| Total receivables | | 18,199 | | 23,544 | | 26,844 | | 26,314 |
| Less allowance for doubtful accounts | | (1,507) | | (1,133) | | (1,507) | | (1,422) |
| Total receivables, net | $ | 16,693 | $ | 22,411 | $ | 25,657 | $ | 24,892 |

**NOTE 5—MERCHANDISE INVENTORY**

Merchandise inventory at March 31, 2023, March 31, 2022, June 30, 2022 and September 30, 2022 consisted of the following (in thousands):

| | March 31, 2023 | | March 31, 2022 | | June 30, 2022 | | September 30, 2022 | |
|---|---|---|---|---|---|---|---|---|
| Appliances | $ | 35,109 | $ | 44,626 | $ | 54,216 | $ | 42,593 |
| Furniture | | 721 | | 714 | | 925 | | 826 |
| Other | | 2,309 | | 1,763 | | 2,609 | | 2,469 |
| Total merchandise inventory | | 38,139 | | 47,103 | | 57,750 | | 45,888 |
| Less reserve for obsolescence | | (1,789) | | (900) | | (1,000) | | (1,400) |
| Total merchandise inventory, net | $ | 36,350 | $ | 46,203 | $ | 56,750 | $ | 44,488 |

F-46

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 6—INTANGIBLE ASSETS**

Intangible assets consisted of the following (in thousands):

| | March 31, 2023 | | March 31, 2022 | | June 30, 2022 | | September 30, 2022 |
|---|---|---|---|---|---|---|---|
| Customer relationships | $ | 3,461 | $ | 24,148 | $ | 24,148 | $ | 24,148 |
| Marketing-related | | 6,835 | | 26,935 | | 26,935 | | 26,935 |
| | | | | | | | | |
| Total intangible assets | | 20,296 | | 51,083 | | 51,083 | | 51,083 |
| Less: accumulated amortization | | (753) | | (9,425) | | (11,979) | | (14,534) |
| | | | | | | | | |
| Intangible assets, net | $ | 9,543 | $ | 41,658 | $ | 39,104 | $ | 36,549 |

In connection with the acquisition of Goedeker Television, the Company identified intangible assets of $2.1 million, representing marketing-related and customer relationships. For the Appliances Connection acquisition, the Company identified intangible assets of $49.0 million, representing marketing-related and customer relationships. During the fourth quarter of 2022, the Company recognized an impairment charge of $23.7 million related to our marketing-related and customer relationships intangible assets.

These assets are being amortized on a straight-line basis over their average estimated remaining useful life of 41 months. Amortization expense for the three months ended March 31, 2023 was $0.8 million and $2.55 million for each of the three month periods ended March 31, June 30, and September 30, 2022.

Following is the estimated amortization expense for the customer relationship and marketing-related intangible assets for the next five years as of March 31, 2023 (in thousands):

| Year Ending December 31, | | Amount |
|---|---|---|
| 2023, remainder of year | $ | 2,260 |
| 2024 | | 3,013 |
| 2025 | | 3,013 |
| 2026 | | 1,256 |
| 2027 | | - |
| | | |
| Total | $ | 9,543 |

F-47

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 7—BUSINESS COMBINATIONS**

*Appliances Connection*

On October 20, 2020, the Company entered into a securities purchase agreement, which was amended on December 8, 2020 and April 6, 2021 (as amended, the "AC Purchase Agreement"), with ACI, Appliances Connection and the sellers (the "Sellers"), pursuant to which ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection from the Sellers (the "AC Acquisition"). The AC Acquisition was completed on June 2, 2021.

AC is one of the leading e-commerce retailers of household appliances and carries many household name brands, including Bosch, Cafe, Frigidaire Pro, Whirlpool, LG, and Samsung, and also carries many major luxury appliance brands such as Miele, Thermador, La Cornue, Dacor, Ilve, Wolf, Jenn-Air, Viking among others. The completion of the AC acquisition accelerates the Company's long-term vision that changes the way Americans shop for appliances.

The aggregate purchase price was $224.7 million, consisting of (i) $180.0 million in cash, (ii) 5,895,973 shares of the Company's common stock valued at $12.3 million, and (iii) $32.4 million as a result of the post-closing net working capital adjustment provision. The Company recorded $0.9 million in acquisition-related expenses.

The Company accounted for the AC Acquisition using the acquisition method of accounting in accordance with ASC Topic 805, *"Business Combinations"*. In accordance with ASC 805, the Company assigned fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date.

The purchase price was allocated as follows (in thousands):

**Purchase consideration at fair value:**

| | | |
|---|---|---:|
| Cash consideration | $ | 180,000 |
| Common stock | | 12,264 |
| Working capital adjustment | | 32,411 |
| **Total consideration** | $ | 224,675 |

**Assets acquired and liabilities assumed at fair value:**

| | | |
|---|---|---:|
| Cash | $ | 5,897 |
| Receivables | | 17,141 |
| Vendor deposits | | 15,000 |
| Merchandise inventory | | 21,634 |
| Prepaid expenses and other current assets | | 2,194 |
| Property and equipment | | 1,891 |
| Right-of-use operating lease assets | | 1,834 |
| Customer relationships | | 23,399 |
| Tradenames | | 25,567 |
| Goodwill | | 185,720 |
| Accounts payable and accrued expenses | | (45,715) |
| Customer deposits | | (17,536) |
| Notes payable | | (1,527) |
| Finance lease liabilities | | (215) |
| Right-of-use operating lease liabilities | | (1,834) |
| Net deferred tax liabilities | | (8,775) |
| **Net assets acquired** | $ | 224,675 |

F-48

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

The adjustments to the initial allocation are based on more detailed information obtained about the specific assets acquired and liabilities assumed. The adjustments made to the initial allocation did not result in material changes to the amortization expense recorded in the previous quarters.

We are amortizing the customer relationship and tradename intangible assets acquired over 5 years. The goodwill consists largely of the synergies expected from combining operations and is not deductible for tax purposes.

From the date of acquisition until December 31, 2021, Appliances Connection contributed net sales of $297.9 million and net income from continuing operations of $14.9 million, which are included in our consolidated statements of operations.

**NOTE 8—NOTES PAYABLE**

*Credit Facilities*

M&T Credit Agreement

On June 2, 2021, the Company entered into a credit and guaranty agreement (the "M&T Credit Agreement") with the financial institutions party thereto from time to time ("M&T Lenders"), and Manufacturers and Traders Trust Company, as sole lead arranger, sole book runner, administrative agent and collateral agent ("M&T"), pursuant to which the M&T Lenders agreed to make available to the Company and ACI senior secured credit facilities in the aggregate initial amount of $70.0 million, including (i) a $60.0 million term loan (the "M&T Term Loan") and (ii) a $10.0 million revolving credit facility (the "M&T Revolving Loan"). The M&T Loans bear interest on the unpaid principal amount at a rate determined by the Base Rate (as defined in the Credit Agreement), then at the Base Rate plus the Applicable Margin. Each of the M&T Loans were set to mature on June 2, 2026.

On June 2, 2021, the Company borrowed the entire amount of the Term Loan and issued term loan notes to the M&T Lenders in the aggregate principal amount of $60.0 million. As of December 31, 2021, the carrying value of the M&T Term Loan was $55.2 million, comprised of principal of $58.5 million, net of unamortized loan costs of $3.3 million. Loan costs before amortization included $3.5 million of lender and placement agent fees and $0.3 million of legal other fees. The Company did not borrow any amounts under the M&T Revolving Loan.

On May 9, 2022, the Company repaid the M&T Term Loan, through the proceeds of a new loan issuance. As a result, the obligations under the M&T Credit Agreement were terminated.

Bank of America Credit Agreement

On May 9, 2022, the Company entered into a Credit Agreement (the "Credit Agreement") with the lenders identified therein (the "Lenders") and Bank of America, N.A., as administrative agent, swingline lender and letter of credit issuer (the "Agent"), pursuant to which the Lenders agreed to make available to the Borrowers senior secured credit facilities in the aggregate initial amount of $140.0 million, including (i) a $100.0 million term loan (the "Term Loan") and (ii) a $40.0 million revolving credit facility (the "Revolving Loan"), which revolving credit facility included a $2.00 million swingline sublimit (the "Swing Line Loan" and together with the Term Loan and the Revolving Loan, the "Loans") and, separately, a $10.0 million letter of credit commitment, in each case, on the terms and conditions contained in the Credit Agreement.

F-49

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

On May 9, 2022, the Company borrowed the entire amount of the Term Loan in the aggregate principal amount of $100.0 million. A portion of the proceeds of the Term Loan were to repay and terminate the M&T Credit Agreement. Commencing on September 30, 2022, through and including June 30, 2023, the Borrowers repaid the principal amount of the Bank of America Term Loan in quarterly installments of $1,250,000 each, payable on the last business day of each March, June, September and December.

As of December 31, 2022, the carrying value of the Term Loan was $96.5 million, comprised of principal of $97.5 million, net of unamortized loan costs of $1.0 million. Loan costs before amortization included $1.1 million of lender and other fees.

As a result of our technical non-compliance with specified loan covenants for both the Bank of America Term Loan and Revolving loan, based in part due to our failure to timely deliver financial statements, Bank of America froze the $40.0 million Revolving Loan before any borrowings had been made against the facility.

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

Commencing on September 30, 2023, through and including June 30, 2024, the Borrowers must repay the principal amount of the Term Loan in quarterly installments of $1,875,000 each, payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

Future minimum principal payments on our total notes payable as of March 31, 2023, are as follows (in thousands):

| Year Ending December 31, | | Amount |
|---|---|---|
| 2023 Remainder of year | $ | 5,296 |
| 2024 | | 91,594 |
| 2025 | | 201 |
| 2026 | | 29 |
| 2027 | | 21 |
| Total future minimum payments | | 97,141 |
| Less: debt discount | | (905) |
| Total | $ | 96,236 |
| Total current portion of notes payable, net | $ | 7,264 |
| Total notes payable, net of current portion | $ | 88,972 |

**NOTE 9— LEASES**

***Operating Leases***

The following was included in our consolidated balance sheet as of December 31, 2022 and 2021 (in thousands):

| | March 31, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| Operating lease right-of-use assets | $ | 10,857 | $ | 11,688 |
| Lease liabilities, current portion | | 3,353 | | 3,726 |
| Lease liabilities, long-term | | 8,443 | | 9,014 |
| Total operating lease liabilities | $ | 11,796 | $ | 12,740 |
| Weighted-average remaining lease term (months) | | 70 | | 73 |
| Weighted average discount rate | | 3.9% | | 3.9% |

Operating lease expense was expense was $1.1 million for the three months ended March 31, 2023 and $3.8 million and $1.8 million for the years ended December 31, 2022 and 2021, respectively.

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

As of March 31, 2023, maturities of operating lease liabilities were as follows, in thousands:

| Year Ending December 31, | Amount |
|---|---|
| 2023 Remainder of year | $ 4,175 |
| 2024 | 1,808 |
| 2025 | 1,489 |
| 2026 | 1,532 |
| 2027 | 1,284 |
| Thereafter | 4,159 |
| Total | 14,447 |
| Less: imputed interest | (1,707) |
| | |
| Total operating lease liabilities | $ 12,740 |

### *Finance Leases*

The Company has three finance leases, acquired in the acquisition of Appliances Connection. At March 31, 2023, the total amount due on these leases was $0.34 million.

Future minimum principal payments on our finance leases payable as of March 31, 2023, are as follows (in thousands):

| Year Ending December 31, | Amount |
|---|---|
| 2023 Remainder of year | $ 90 |
| 2024 | 109 |
| 2025 | 107 |
| 2026 | 21 |
| 2027 | - |
| Total future minimum payments | 362 |
| Less: debt discount | (21) |
| Total | 306 |
| | |
| Total current portion of finance leases, net | $ 108 |
| Total finance leases, net of current portion | $ 198 |

F-52

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 10—SUPPLIER CONCENTRATION**

For the three months ended March 31, 2023 and the years ended December 31, 2022 and 2021, the Company purchased a substantial portion of finished goods from one vendor (DMI – see Note 14), representing 69%, 69% and 72.%, respectively.

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

**NOTE 11—RELATED PARTIES**

*Management Services Agreement*

On April 5, 2019, the Company entered into a management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's executive chairman and prior significant stockholder, which was amended effective on August 4, 2020. Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that under certain circumstances specified in the management services agreement, the quarterly fee may be reduced if similar fees payable to the Manager by subsidiaries of the Company's former parent company, 1847 Holdings LLC, exceed a threshold amount.

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of the Company in connection with performing services under the management services agreement. The Company did not pay any expenses for the years ended December 31, 2021 and 2020.

The Company expensed management fees of $0.3 million for each of the years ended December 31, 2022 and 2021 respectively.

*DMI*

The Company is a member of DMI, an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 1.6% interest in DMI. As such, DMI is deemed to be a related party for 2022 and 2021.

During the three months ended March 31, 2023 and 2022 , total purchases from DMI, were $48.4 million and $73.4 million, respectively. At March 31, 2023, deposits at DMI totaled 30.0 million and vendor rebates due from DMI were $4.4 million.

*Lease Agreements*

As described above, 1 Stop and Joe's Appliances entered into lease agreements with 1870 Bath Ave. LLC a[nd] 7812 5th Ave Realty LLC. These entities are owned by Albert Fouerti and Elie Fouerti (the Company's former Chief Executive and Chief Operating Officers and significant stockholders of the Company). The total rent paid to these two entities in 2022 was $1.0 million and $0.6 million for the period from June 2, 2021 to December 31, 2021. In addition, YF Logistics has entered into a sublease agreement with DMI. The total rent expense under this related party lease was $0.7 million for the year-ended December 31, 2022 and $0.4 million for the period June 2, 2021 to December 31, 2021.

F-53

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

On March 15, 2022, the Company entered into a lease for additional office space with 8780 19th Ave LLC ("Landlord"), an entity owned by Albert and Elie Fouerti. The Company contends that the lease required the Landlord do certain work at Landlord's expense to improve the building at t cost of approximately $1.2 million. Landlord has refused to pay for this work, contending that this expense was the Company's responsibility. In addition, the total remaining amount due on the lease at December 31, 2022 is also approximately $1.2 million. Landlord contends that the Company is in default of the lease for failing to pay rent. The Company disagrees that its rent obligations have been triggered and further contends that Landlord has violated the lease by failing to pay for the work. The Company and the Landlord remain in dispute over these issues.

**NOTE 12—STOCKHOLDERS' EQUITY**

As of March 31, 2023, the Company was authorized to issue 200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. To date, the Company has not designated or issued any shares of preferred stock.

During 2022, the Company purchased 1,229,222 shares of common stock for a total purchase price of $2,000,000. Effective December 31, 2022, the board authorized that the shares purchased be retired.

*Common Stock*

As of March 31, 2023 and December 31, 2022, the Company had 105,469,878 and 105,227,876 shares of common stock issued and outstanding, respectively. Each share entitles the holder thereof to one vote per share on all matters coming before the stockholders of the Company for a vote.

During the three months ended March 31, 2023 the Company issued 242,002 shares to employees and a director and recognized $188 thousand of compensation expense in connection therewith.

*Equity Incentive Plan*

Effective as of July 30, 2020, the Company established the 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "Plan") and reserved 555,000 shares of common stock for issuance under the Plan. The Plan was approved by the Company's board of directors and stockholders on April 21, 2020. On April 9, 2021, the board of directors approved an amendment to the Plan to increase the number of shares of common Stock reserved for issuance under the Plan from 555,000 to 1,000,000 shares. On December 17, 2021, the board of directors approved an amendment to the Plan to increase the number of shares of common Stock reserved for issuance under the Plan from 1,000,000 to 11,000,000 shares. Such increase was approved by the Company's stockholders effective as of December 21, 2021.

The Plan is administered by the compensation committee of the board of directors. The Plan permits the grant of restricted stock, stock options and other forms of incentive compensation to the Company's officers, employees, directors, and consultants.

As of March 31, 2023, 11,000,000 shares remain issuable under the 2020 EIP.

F-54

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

*Stock Options*

On January 1, 2023, the Company granted an option to purchase 86,550 shares of common stock pursuant to an employment agreement. The stock options have an exercise price of $0.58 per share and vest 25% annually over a 4-year period. The Company has calculated the estimated fair market value of these options at $0.03 million using the Black-Scholes pricing model, with the following assumptions: expected term 7.0 years, stock price $0.58, exercise price $0.58, volatility 67%, risk-free rate 3.9%, and no forfeiture rate.

Below is a table summarizing the changes in stock options outstanding during the three months ended March 31, 2023:

| | Options | | Weighted-Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2022 | 150,000 | $ | 3.10 |
| Granted | 86,550 | | 0.58 |
| Exercised | - | | - |
| Forfeited | (150,000) | $ | 3.10 |
| Outstanding at March 31, 2023 | 86,550 | $ | 0.58 |
| Exercisable at March 31, 2023 | - | $ | - |

During the three months ended March 31, 2023, 37,500 stock options forfeited, as a result of employee terminations.

*Warrants*

Below is a table summarizing the changes in warrants outstanding during the three months ended March 31,

| | Warrants | | Weighted-Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2022 | 92,514,423 | $ | 2.30 |
| Granted | - | | - |
| Exercised | | | - |
| Forfeited | - | | - |
| Outstanding at March 31, 2023 | $ 92,514,423 | $ | 2.30 |
| Exercisable at March 31, 2023 | $ 92,514,423 | $ | 2.30 |

As of March 31, 2023, the outstanding warrants have a weighted average remaining contractual life of 3.2 years and a total intrinsic value of nil.

F-55

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 13—EARNINGS (LOSS) PER SHARE**

The computation of weighted average shares outstanding and the basic loss per common share for the following periods consisted of the following (in thousands, except per share amounts):

| | | Three Months Ended | | |
| --- | --- | --- | --- | --- |
| | March 31, 2022 | June 30, 2022 | September 30, 2022 | March 31, 2023 |
| **Basic Earnings (Loss) Per Share** | | | | |
| Net income (loss) | $ 5,819 | $ (4,292) | $ (5,184) | $ (2,761) |
| Weighted average common shares outstanding | 106,386,548 | 105,774,197 | 105,227,876 | 105,380,910 |
| | | | | |
| Basic earnings (loss) per share | $ 0.05 | $ (.04) | $ (0.05) | $ (0.03) |

| | | Six Months Ended | | Nine Months Ended |
| --- | --- | --- | --- | --- |
| | June 30, 2022 | June 30, 2021 | September 30, 2022 | September 30, 2021 |
| **Basic Earnings (Loss) Per Share** | | | | |
| Net income (loss) | $ 1,527 | $ 539 | $ (3,627) | $ 3,856 |
| Weighted average common shares outstanding | 106,080,764 | 21,410,073 | 105,792,287 | 50,047,045 |
| | | | | |
| Basic earnings (loss) per share | $ 0.01 | $ 0.03 | $ (0.03) | $ 0.08 |

For the three months ended March 31, 2023 and March 31, 2022, there were 92,514,423 and 92,694,423, respectively potential common share equivalents from stock options and warrants excluded from the diluted EPS calculations as their effect is anti-dilutive.

F-56

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 14—COMMITMENTS AND CONTINGENCIES**

*Legal Proceedings*

Three purported beneficial owners of Common Stock subsequently expressed concerns about a statement in the Company's proxy statement related to the Share Increase Proposal, specifically questioning, in light of the proxy statement, the ability of brokerage firms and other custodians to vote shares of Common Stock held by them for the benefit of their customers in the absence of instructions from the beneficial owners. Based on an examination of the situation performed following receipt of these demands, the Company believes that the vote at the annual meeting was properly tabulated and that the proposed amendment was properly adopted in accordance with Delaware law. In light of the demands, however, and to ensure against any future question as to the validity of these newly authorized shares, the Company has elected to seek validation of its Certificate of Amendment through a Petition to the Court of Chancery of the State of Delaware (the "Court of Chancery") pursuant to Section 205 of the Delaware General Corporation Law (the "205 Petition"). The action, styled *In re 1847 Goedeker Inc.*, C.A. 2022-0219-SG, seeks entry by the Court of Chancery of an order validating and declaring effective the Certificate of Amendment, and validating the additional shares of Common Stock authorized under the Share Increase Proposal.

One of the purported stockholders who had submitted a demand related to adoption of the Share Increase Proposal has filed a Class Action Complaint in the Court of Chancery against the Company and its Board of Directors. The lawsuit, captioned *Scot T. Boden v. 1847 Goedeker Inc., et al.*, C.A. No. 2022-0196-SG (the "*Boden* Action"), asserts two claims for relief. The first is against the Company for alleged violation of the Delaware General Corporation Law Section 225(b) for improper tabulation of the stockholder vote on the Share Increase Proposal. The second asserts that the Company's directors breached their fiduciary duties by incorrectly tabulating the stockholder vote, and by causing a purportedly invalid amendment to our Certificate of Incorporation to be filed with the Delaware Secretary of State.

Subsequent to December 31, 2022, the Company settled this claim for $475,000.

On October 31, 2022, a putative shareholder class action was filed against Polished.com Inc. (the "Company") and certain of its current and former officers and directors, as well as certain underwriters of the Company's 2020 initial public offering (the "IPO"). The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Ryan Maschhoff v. Polished.com Inc., et al.*, No. 1:22-cv-06606. The complaint asserts violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as well as Sections 10(b) and Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about December 20, 2022, plaintiffs filed a motion for the appointment of lead plaintiff and lead counsel. Although that motion is fully briefed, to date, oral argument has yet to be scheduled.

F-57

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**NOTE 15—SUBSEQUENT EVENTS**

Subsequent to December 31, 2022, the Company signed a letter of intent for a sublease from DMI, a related party for a new warehouse in a building being leased by DMI. The new lease will allow the Company to close its two existing New Jersey warehouses and consolidate operations into one new warehouse. The lease, which is expected to be finalized in the fourth quarter of 2023 or the first quarter of 2024, will be for leased space of approximately 228,000 square feet for seven years at a cost of approximately $15 per square foot, including common area charges with annual increases of 3.75%.

*Bank of America Loan Amendment*

On July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "Amendment"), in part, to waive events of defaults on its existing credit agreement. The Amendment requires the Company to pay the existing Term Facility and Revolving Facility by August 31, 2024 (the "Maturity Date"). The Revolving Loan decreased to $10,000,000 from and after July 25, 2023. The Letter of Credit commitments decreased to $2,000,000 and the Swing Line Loan was eliminated. The amendment also establishes a new EBITDA covenant and requires the Company to maintain minimum liquidity of $8 million including restricted cash and $5 million excluding restricted cash. Liquidity as defined in the Amendment includes Cash and certain qualifying customer and credit card accounts receivable.

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

Commencing on September 30, 2023, through and including June 30, 2024, the Borrowers must repay the principal amount of the Term Loan in quarterly installments of $1,875,000 each, payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: July 31, 2023

|  | Polished.com Inc. |
|---|---|
|  | /s/ J.E. "Rick" Bunka |
|  | Name:  J.E. "Rick" Bunka |
|  | Title:   Interim Chief Executive Officer |
|  | *(Principal Executive Officer)* |
|  |  |
|  | /s/ Robert D. Barry |
|  | Name:  Robert D. Barry |
|  | Title:   Interim Chief Financial Officer and Secretary |
|  | *(Principal Financial Officer)* |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | Date |
|---|---|---|
| /s/ J.E. "Rick" Bunka<br>J.E. "Rick" Bunka | Chief Executive Officer<br>(principal executive officer) | July 31, 2023 |
| /s/ Robert D. Barry<br>Robert D. Barry | Chief Financial Officer and Secretary<br>(principal financial officer) | July 31, 2023 |
| /s/ Ellery W. Roberts<br>Ellery W. Roberts | Executive Chairman of the Board of Directors | July 31, 2023 |
| /s/ Ellette A. Anderson<br>Ellette A. Anderson | Director | July 31, 2023 |
| /s/ Clark R. Crosnoe<br>Clark R. Crosnoe | Director | July 31, 2023 |
| /s/ Glyn C. Milburn<br>Glyn C. Milburn | Director | July 31, 2023 |
| /s/ James M. Schneider<br>James M. Schneider | Director | July 31, 2023 |
| /s/ G. Alan Shaw<br>G. Alan Shaw | Director | July 31, 2023 |
| /s/ Alan P. Shor<br>Alan P. Shor | Director | July 31, 2023 |
| /s/ Edward J. Tobin<br>Edward J. Tobin | Director | July 31, 2023 |
| /s/ Houman Akhavan<br>Houman Akhavan | Director | July 31, 2023 |

**Exhibit 10.56**

*Execution Version*

FIRST AMENDMENT TO CREDIT AGREEMENT

This FIRST AMENDMENT TO CREDIT AGREEMENT (this "*Amendment*") is entered into as of July 25, 2023, by and among POLISHED.COM INC., a Delaware corporation (the "*Company*"), APPLIANCES CONNECTION INC., a Delaware corporation (together with the Company, the "*Borrowers*"), the Guarantors that are identified on the signature pages hereof (the "*Guarantors*", together with the Borrowers, the "*Loan Parties*"), the Lenders under the Credit Agreement referred to below that are identified on the signature pages hereof and BANK OF AMERICA, N.A., as administrative agent for the Lenders (the "*Administrative Agent*").

WHEREAS, the Loan Parties, the lenders from time to time party thereto (the "*Lenders*") and the Administrative Agent have entered into that certain Credit Agreement, dated as of May 9, 2022 (as amended, amended and restated, supplemented, extended, or otherwise modified from time to time prior to the effectiveness of this Amendment, the "*Existing Credit Agreement*"; the Existing Credit Agreement, as amended by this Amendment, is referred to herein as the "*Credit Agreement*"); capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement; and

WHEREAS, the Loan Parties have requested that, on the Amendment Effective Date (as defined below), the Administrative Agent and the Lenders waive the Events of Default set forth in *Annex C* attached hereto (collectively, the "*Specified Events of Default*"), as more fully provided herein; and the Administrative Agent and the Lenders have agreed to waive the Specified Events of Default, subject to the modifications to the Existing Credit Agreement and the other terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1. <u>Amendment</u>.

(a) The Existing Credit Agreement (excluding any Exhibits or Schedules thereto (other than as expressly set forth in *Sections 1(b)* through *1(d) below*)) is hereby amended as set forth in *Annex A* attached hereto such that all of the newly inserted double underlined text (indicated textually in the same manner as the following example: **<u>double-underlined text</u>**) and any formatting changes attached hereto shall be deemed to be inserted and all stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) shall be deemed to be deleted therefrom.

(b) Exhibit C (Form of Compliance Certificate) to the Existing Credit Agreement is hereby amended and restated in its entirety as set forth in *Annex B* attached hereto. Exhibit L (Form of Liquidity Certificate) attached hereto in *Annex B* is hereby attached to the Credit Agreement as Exhibit L thereto. Schedule 5.21(e) (Commercial Tort Claims) to the Existing Credit Agreement is hereby supplemented by adding to such Schedule the matters set forth on Supplement to Schedule 5.21(e) attached hereto as *Annex B*.

1

(c) From and after the Amendment Effective Date (i) the Revolving Commitments under the Existing Credit Agreement shall be decreased by an amount equal to $30,000,000, such that the aggregate Revolving Commitments from and after the Amendment Effective Date will be $10,000,000 and (ii) the L/C Commitments under the Existing Credit Agreement shall be decreased by an amount equal to $8,000,000, such that the aggregate L/C Commitments from and after the Amendment Effective Date will be $2,000,000. Schedules 1.01(b) (Initial Commitments and Applicable Percentage) and 2.03 (Letter of Credit Commitments) to the Existing Credit Agreement are hereby deleted in their entirety and replaced with Schedules 1.01(b) (Commitments and Applicable Percentage) and 2.03 (Letter of Credit Commitments) as set forth in *Annex B* attached hereto reflecting the Revolving Commitments and Letter of Credit Commitments as agreed among the Loan Parties, Administrative Agent, the L/C Issuer and the Lenders.

(d) Exhibit H (Form of Swingline Loan Notice), Exhibit L (Form of Incremental Term Note) and Schedule 2.01 (Swingline Commitment) to the Existing Credit Agreement are hereby deleted in their entirety.

2. Waiver. Subject to the compliance by the Loan Parties with the terms and conditions set forth in this Amendment, the Administrative Agent and the Lenders hereby agree to waive the Specified Events of Default. For the avoidance of doubt, (a) the waiver of the Specified Events of Default is a one-time waiver, effective solely for the purposes set forth herein, and shall be limited precisely as written and shall not extend beyond the terms expressly set forth herein, and (b) in no event shall this Amendment be deemed to be a waiver of any other Default or Event of Default now existing or hereafter arising or enforcement of the Administrative Agent's, the Lenders' and the other Secured Parties' rights with respect thereto.

3. Conditions Precedent. This Amendment shall become effective when the following conditions have been satisfied, as determined by the Agent in its sole discretion (the date on which the foregoing occurs, the "*Amendment Effective Date*"):

(a) The Administrative Agent shall have received complete and correct copies of:

(i) this Amendment, duly executed by the Administrative Agent and each of the Loan Parties and Lenders and the L/C Issuer;

(ii) that certain letter agreement regarding fees, duly executed by the Company and the Administrative Agent (the "*Amendment Fee Letter*"); and

(iii) a customary perfection certificate signed by a Responsible Officer of the Borrowers.

(b) (i) The Administrative Agent (on behalf of the Lenders) shall have a valid and perfected first priority Lien and security interest in the Collateral (subject to Permitted Liens having priority by operation of law) and (ii) all filings, recordations and customary lien searches (the results of which shall demonstrate that no Liens exist with respect to any Collateral, other than Permitted Liens) necessary or desirable in connection with the security interests in and Liens on the Collateral shall have been duly made or obtained and all filing and recording fees and taxes in connection therewith shall have been duly paid.

2

(c) The Administrative Agent shall have received (i) a copy of the organizational documents of each Loan Party, as amended, modified, or supplemented prior to the date hereof, and, to the extent applicable, certified as of the Amendment Effective Date or a recent date (not more than 30 days prior to the date hereof) by the appropriate Governmental Authority (or, in the event that any organizational documents of any Loan Party have not been amended or otherwise modified from such organizational documents delivered to the Administrative Agent on the Closing Date, a certification by the secretary or assistant secretary of the relevant Loan Party to such effect), (ii) resolutions of the governing body of each Loan Party approving and authorizing the execution, delivery, and performance of this Amendment and the other applicable Loan Documents to which it is a party, certified by its secretary or assistant secretary as being in full force, (iii) signature and incumbency certificates of the officers of such Loan Party executing this Amendment and the other documents contemplated hereby, and (iv) for each Loan Party, such Person's good standing certificate in its state of incorporation (or organization).

(d) The Administrative Agent shall have received an opinion of McDermott Will & Emery LLP, counsel to the Loan Parties, in form and substance satisfactory to the Administrative Agent.

(e) The Administrative Agent shall have received a duly executed and delivered copy of the engagement letter, pursuant to which the Company shall have appointed a Person of nationally recognized standing reasonably acceptable to the Administrative Agent to act as its chief transition officer, in form and substance satisfactory to the Required Lenders.

(f) The Administrative Agent and the Lenders shall have received all fees and expenses, if any, required to be paid pursuant to the Amendment Fee Letter and Section 2.09 of the Credit Agreement and the Loan Documents, and all reasonable and documented fees and expenses of Morgan, Lewis & Bockius LLP to the extent required to be paid on the Amendment Effective Date, to the extent that a reasonably detailed invoice is provided to the Borrowers at least one (1) Business Day prior to the Amendment Effective Date.

(g) The Administrative Agent shall have received a certificate, dated as of the date hereof, from the Responsible Officer of the Company substantially in the form delivered to the Administrative Agent on the Closing Date, certifying as to the financial condition, solvency and related matters of the Company and its Subsidiaries, on a Consolidated basis, after giving effect to the Transactions contemplated to occur on the Amendment Effective Date and the other transactions contemplated hereby.

(h) The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Company (i) certifying that after giving effect to the Transactions contemplated to occur on the Amendment Effective Date (1) the representations and warranties of each Borrower and each other Loan Party set forth in the Credit Agreement and the other Loan Documents shall (A) with respect to representations and warranties that contain a materiality qualification, be true and correct on and as of the Amendment Effective Date, and (B) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects on and as of the Amendment Effective Date, in each case except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects (except to the extent such representations and warranties are already qualified by materiality, in which case they shall be true and correct in all respects) as of such earlier date , and (2) no Default or Event of Default shall exist, (ii) certifying that there has been no event or circumstance since the date of the Audited Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (iii) either (x) attaching copies of all material consents, licenses and approvals required in connection with the execution, delivery and performance by each Loan Party and the validity against each Loan Party of the Loan Documents to which it is a party, and such material consents, licenses and approvals shall be in full force and effect or (y) stating that no such material consents, licenses or approvals are so required.

3

(i) Upon the reasonable request of any Lender made at least two (2) Business Days prior to the Amendment Effective Date, the Borrowers shall have provided to such Lender, and such Lender shall be reasonably satisfied with, the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act, and any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered to each Lender that so requests, a Beneficial Ownership Certification in relation to such Loan Party.

(j) The representations and warranties in *Section 5 below* shall be true and correct as of the Amendment Effective Date after giving effect to the Transactions contemplated to occur on such date.

4. <u>Post-Closing Obligations</u>.

(a) No later than thirty (30) days after the Amendment Effective Date (or any such later date agreed to in writing by the Administrative Agent in its reasonable discretion), the Loan Parties shall either (i) deliver to the Administrative Agent a Qualifying Control Agreement with respect to each deposit account that is not an Excluded Account or (ii) transfer all cash and Cash Equivalents of the Loan Parties (other than cash and Cash Equivalents held in an Excluded Account) to a deposit account of the Loan Parties maintained with Bank of America with respect to which a Qualifying Control Agreement has been entered.

(b) Within thirty (30) days after the Amendment Effective Date (or any such later date agreed to in writing by the Administrative Agent in its discretion), the Loan Parties shall deliver to the Administrative Agent a cash collateral agreement that is reasonably satisfactory to the Administrative Agent with respect to the Specified Cash Collateral Account.

(c) Within sixty (60) days after the Amendment Effective Date (or any such later date agreed to in writing by the Administrative Agent in its discretion), the Loan Parties shall:

(i) deliver all evidence that the Wells Fargo Financing Agreement (and related filings) has been terminated;

(ii) deliver to the Administrative Agent a termination statement with respect to UCC-1 financing statement (original filing #202006025817121) filed against Gold Coast Appliances, Inc. in favor of U.S. Small Business Administration with the New York Department of State;

4

(iii) deliver to the Administrative Agent a Qualifying Control Agreement (to the extent such Qualifying Control Agreement has not already been delivered under *subsection (a)(i) above*) with respect to each deposit account that is not an Excluded Account; and

(iv) deliver to the Administrative Agent estoppel letters, consents and waivers with respect to all locations referred to in Section 6.13(d) of the Credit Agreement.

5. <u>Representations and Warranties</u>. To induce the Administrative Agent and the Lenders to enter into this Amendment, each of the Loan Parties represents and warrants to the Administrative Agent and the Lenders, as of the Amendment Effective Date, that:

(a) All of the representations and warranties of each Borrower and each other Loan Party set forth in the Credit Agreement and the other Loan Documents shall (i) with respect to representations and warranties that contain a materiality qualification, be true and correct on and as of the Amendment Effective Date, and (ii) with respect to representations and warranties that do not contain a materiality qualification, be true and correct in all material respects on and as of the Amendment Effective Date, in each case except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects (except to the extent such representations and warranties are already qualified by materiality, in which case they shall be true and correct in all respects) as of such earlier date.

(b) The execution, delivery and performance of this Amendment by each Loan Party party hereto has been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) contravene the terms of any of such Person's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any Lien (other than any Lien created pursuant to the Collateral Documents and any Permitted Lien) under, or require any payment to be made under (1) any material Contractual Obligation to which such Person is a party or (2) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Applicable Law.

(c) This Amendment has been duly executed and delivered by each Loan Party party hereto and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity.

(d) At the time of and immediately after giving effect to this Amendment and the Transactions contemplated to occur on the Amendment Effective Date, no Default or Event of Default has occurred and is continuing.

6. Release. Each Loan Party hereby fully and unconditionally releases and forever discharges each of the Administrative Agent, the Lenders and the other Secured Parties and their respective directors, officers, employees, subsidiaries, branches, affiliates, attorneys, agents, representatives, successors and assigns and all persons, firms, corporations and organizations acting on any of their behalfs (collectively, the "*Released Parties*"), of and from any and all claims, allegations, causes of action, costs or demands and liabilities, of whatever kind or nature, from the beginning of the world, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, anticipated or unanticipated, which any Loan Party has, had, claims to have had or hereafter claims to have against the Released Parties by reason of any act or omission on the part of the Released Parties, or any of them, occurring on or prior to the Amendment Effective Date, including all such loss or damage of any kind heretofore sustained or that may arise as a consequence of the dealings among the parties regarding or relating to the Transactions or the Loan Documents on or prior to the Amendment Effective Date (collectively, all of the foregoing, the "*Claims*"), but, in all cases, excluding any Claim that (x) is determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Released Party or (y) results from a claim brought by a Borrower or any other Loan Party against a Released Party for a material breach of such Released Party's obligations under this Amendment, if such Borrower or such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction. Each Loan Party represents and warrants that it has no knowledge of any claim by it against the Released Parties or of any facts or acts of omissions of the Released Parties which on the date hereof would be the basis of a claim of any Loan Party against the Released Parties which is not released hereby, in each case, regarding or relating to the Transactions or the Loan Documents. Each Loan Party acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Claims.

7. Reference to and Effect on the Credit Agreement and the Other Loan Documents; Ratification.

(a) Each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Existing Credit Agreement, as amended by this Amendment.

(b) The Existing Credit Agreement and each of the other Loan Documents, as specifically amended by this Amendment, are and shall continue to be in full force and effect and are hereby in all respects ratified and confirmed. Each Loan Party hereby further ratifies and reaffirms the validity and enforceability of all of the Liens heretofore granted, pursuant to and in connection with the Credit Agreement or any other Loan Document to the Administrative Agent on behalf and for the benefit of the Lenders and the other Secured Parties, as collateral security for the Secured Obligations, in accordance with their respective terms, and acknowledges that all of such Liens, and all Collateral pledged or otherwise provided as security for the Secured Obligations, continues to be and remain Collateral for such Secured Obligations from and after the Amendment Effective Date and further agrees and acknowledges that all Collateral secures, and has always been intended to secure, all Secured Obligations and agrees that such security shall continue in full force and effect as continuing security for all the present and future Secured Obligations of the Loan Parties.

(c) Each Loan Party expressly acknowledges and agrees that (i) there has not been, and this Amendment does not constitute or establish, a novation with respect to the Existing Credit Agreement or any of the other Loan Documents, or a mutual departure from the strict terms, provisions, and conditions thereof, other than as set forth herein, and (ii) nothing in this Amendment shall affect or limit the Administrative Agent's or the Lenders' right to demand payment of liabilities owing from the Company and the other Loan Parties that may be parties to the Loan Documents from time to time to the Administrative Agent or the Lenders under, or to demand strict performance of the terms, provisions and conditions of, the Credit Agreement and the other Loan Documents, to exercise any and all rights, powers, and remedies under the Credit Agreement or the other Loan Documents or at law or in equity, or to do any and all of the foregoing, immediately at any time after the occurrence of a Default or an Event of Default under the Credit Agreement or the other Loan Documents, in each case, in accordance with the terms set forth in the Credit Agreement and the other Loan Documents. Nothing implied in this Amendment or in any other document contemplated hereby shall be construed as a release or other discharge of any of the Loan Parties under any Loan Document from any of its obligations and liabilities as a borrower, guarantor or pledgor under any of the Loan Documents.

(d) Each Loan Party hereby restates, ratifies, and reaffirms each and every term, covenant, and condition set forth in the Credit Agreement and the other Loan Documents to which it is a party effective as of the Amendment Effective Date.

(e) The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Administrative Agent or any Lender under any of the Loan Documents, nor constitute a waiver of or consent to any provision of any of the Loan Documents, except as expressly provided herein.

8. <u>Governing Law</u>.  THIS AMENDMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AMENDMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

9. <u>Counterparts; Integration</u>.

(a) This Amendment may be in the form of an Electronic Record and may be executed using Electronic Signatures. Each of the Loan Parties and Credit Parties agrees that any Electronic Signature on or associated with this Amendment shall be valid and binding on such Person to the same extent as a manual, original signature, and that this Amendment will constitute the legal, valid and binding obligation of such Person enforceable against such Person in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered. This Amendment may be executed in as many counterparts as necessary or convenient, including both paper and electronic counterparts, but all such counterparts are one and the same Amendment. Notwithstanding anything contained herein to the contrary, Administrative Agent is not under any obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to by such Person pursuant to procedures approved by it; provided, further, without limiting the foregoing, (i) to the extent the Administrative Agent has agreed to accept such Electronic Signature, the Administrative Agent and each of the Credit Parties shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of any Loan Party and/or any Credit Party without further verification and (ii) upon the request of the Administrative Agent or any Credit Party, any Electronic Signature shall be promptly followed by such manually executed counterpart.

7

(b) This Amendment, the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent or the L/C Issuer, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

10. Expenses. The Loan Parties agree to pay the Administrative Agent for its reasonable and documented expenses in connection with this Amendment and the transactions contemplated hereby to the extent required under Section 11.04(a) of the Credit Agreement.

11. Miscellaneous. Sections 11.02 (Notices; Effectiveness; Electronic Communications) (to the extent not set forth in *Section 9 above*), 11.12 (Severability), 11.14 (Governing Law; Jurisdiction; Etc.) (to the extent not set forth in *Section 8 above*) and 11.15 (Waiver of Jury Trial) of the Credit Agreement are incorporated herein, *mutatis mutandis*. This Amendment shall constitute a Loan Document.

*[The remainder of the page is intentionally left blank]*

8

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Amendment as of the date first above written.

**POLISHED.COM INC.**,
as a Borrower

By:   /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

**APPLIANCES CONNECTION INC.**,
as a Borrower

By:   /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

[Polished – Signature Page to First Amendment to Credit Agreement]

**1 STOP ELECTRONICS CENTER, INC.,**
as a Guarantor

By:    /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

**GOLD COAST APPLIANCES, INC.,**
as a Guarantor

By:    /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

**SUPERIOR DEALS INC.,**
as a Guarantor

By:    /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

**JOE'S APPLIANCES LLC**,
as a Guarantor

By:    /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

**YF LOGISTICS LLC**,
as a Guarantor

By:    /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

**AC GALLERY INC.,**
as a Guarantor

By:    /s/ J.E. "Rick" Bunka
Name:  J.E. "Rick" Bunka
Title:   Interim Chief Executive Officer

[Polished – Signature Page to First Amendment to Credit Agreement]

**BANK OF AMERICA, N.A.**,
as Administrative Agent

By:    /s/ Christine Trotter
Name: Christine Trotter
Title:  Vice President

[Polished – Signature Page to First Amendment to Credit Agreement]

**BANK OF AMERICA, N.A.**,
as Administrative Agent

By:     /s/ Kelly Werbecki
Name:  Kelly Werbecki
Title:   Senior Vice President

[Polished – Signature Page to First Amendment to Credit Agreement]

**MANUFACTURERS AND TRADERS TRUST COMPANY**, as a Lender

By:   /s/ Francis Ballard

Name:  Francis Ballard

Title:  SVP

**WEBSTER BANK, NATIONAL ASSOCIATION**, as a Lender

By:   /s/ Elvis Grgurovic

Name:  Elvis Grgurovic

Title:  Managing Director

**FIRST HORIZON BANK**, as a Lender

By:   /s/ Jeanna McWilliams

Name:  Jeanna McWilliams

Title:  Senior Vice President

**BANKUNITED, N.A.**, as a Lender

By:   /s/ Jackeline Garuz

Name:  Jackeline Garuz

Title:  Sr. Vice President

[Polished – Signature Page to First Amendment to Credit Agreement]

*Annex A*

Conformed Credit Agreement

[attached]

*Annex B*

Exhibit C, Exhibit L, Schedule 1.01(b),
Schedule 2.03 and Supplement
to Schedule 5.21(e) to the Credit Agreement

[attached]

**Schedule 1.01(b)**

**Commitments and Applicable Percentages**

| Lender | Revolving Commitment | Applicable Percentage (Revolving Loans) | Outstanding Amount of Term Loans[1] | Applicable Percentage (Term Loans) |
|---|---|---|---|---|
| Bank of America, N.A. | $ 2,767,857.14 | 27.678571428% | $ 29,294,642.86 | 27.678571428% |
| Manufacturers and Traders Trust Company | $ 2,250,000.00 | 22.500000000% | $ 21,375,000.00 | 22.500000000% |
| Webster Bank, National Association | $ 2,250,000.00 | 22.500000000% | $ 21,375,000.00 | 22.500000000% |
| First Horizon Bank | $ 1,366,071.43 | 13.660714286% | $ 12,977,678.57 | 13.660714286% |
| BankUnited, N.A. | $ 1,366,071.43 | 13.660714286% | $ 12,977,678.57 | 13.660714286% |
| Total | $ 10,000,000 | 100.000000000% | $ 95,000,000 | 100.000000000% |

1    As of the First Amendment Effective Date.

**Schedule 2.03**

**Letter of Credit Commitments**

| L/C Issuer | L/C Commitment |
|---|---|
| Bank of America, N.A. | $ 2,000,000 |

**Supplement to Schedule 5.21(e)[2]**

1. Wong v. Moore et al., No. 1:23-cv-00559. On January 26, 2023, this derivative stockholder complaint was filed against certain of the Company's current and former officers and directors, naming the Company as a nominal defendant in the United States District Court for the Eastern District of New York court. The complaint asserts violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about March 7, 2023, plaintiff filed a stipulation and proposed order to stay proceedings until any motions to dismiss in the related class action (captioned Maschhoff v. Polished.com Inc. et al., No. 1:22-cv-06606) are decided. On March 23, 2023, the stipulation was so-ordered.

2. Gossett v. Moore, et al., No. 1:23-cv-1168. On February 13, 2023, this derivative stockholder complaint was filed against certain of the Company's current and former officers and directors as well as the Company's external manager, naming the Company as a nominal defendant in the United States District Court for the Eastern District of New York court. The complaint asserts claims for breach of fiduciary duty against the former officers and directors and aiding and abetting breaches of fiduciary of duty against the external manager, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about April 24, 2023, plaintiffs filed a joint stipulation and proposed order consolidating the related derivative actions and appointing co-lead counsel. To date, the stipulation has yet to be ordered.

---

[2]   The expected values of the actions listed above have not yet been determined as of the First Amendment Effective Date.

*Annex C*

Specified Events of Default

1. An Event of Default arising under Section 8.01(b) of the Existing Credit Agreement as a result of the Loan Parties' failure to deliver the audited financial statements as and when required under Section 6.01(a) of the Existing Credit Agreement for the fiscal year ended December 31, 2022.

2. Events of Default arising under Section 8.01(b) of the Existing Credit Agreement as a result of the Loan Parties' failure to deliver the quarterly financial statements as and when required under Section 6.01(b) of the Existing Credit Agreement for the fiscal quarters ended June 30, 2022, September 30, 2022, December 31, 2022 and March 31, 2023.

3. Events of Default arising under Section 8.01(b) of the Existing Credit Agreement as a result of the Loan Parties' failure to deliver Compliance Certificates as and when required under Section 6.02(b) of the Existing Credit Agreement with respect to the fiscal year ended December 31, 2022 and the fiscal quarters ended June 30, 2022, September 30, 2022, December 31, 2022 and March 31, 2023.

4. Events of Default arising under Section 8.01(c) of the Existing Credit Agreement as a result of the Loan Parties' failure to comply with Section 6.04 of the Existing Credit Agreement with respect to certain outstanding sales tax liabilities to the extent communicated to the Administrative Agent in writing, in each case, prior to the Amendment Effective Date.

5. An Event of Default arising under Section 8.01(b) of the Existing Credit Agreement as a result of the Loan Parties' failure to comply with Section 7.01(u) of the Existing Credit Agreement.

6. Events of Default arising under Section 8.01(c) of the Existing Credit Agreement as a result of the Loan Parties' failure to comply with the requirements set forth in Section 6.13(d) and Section 6.13(e) of the Existing Credit Agreement.

7. Events of Default arising under Section 8.01(b) of the Existing Credit Agreement as a result of the Loan Parties' failure to deliver any required notices pursuant to Section 6.03(a) of the Existing Credit Agreement with respect to the other Events of Default described in the other paragraphs of this *Annex C*.

8. Events of Default arising under Section 8.01(d) of the Existing Credit Agreement as a result of any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Loan Parties as to the non-existence of the other Events of Default described in the other paragraphs of this *Annex C*.

**Exhibit 10.58**

**Polished.com Inc.**
13850 Manchester Rd. | Ballwin, MO 63011

October 14, 2022

Mr. Robert D. Barry
7516 Wingfoot Drive
Raleigh, NC 27615

Dear Bob:

We are pleased to extend you an offer of employment with Polished.com Inc. (the "Company") The terms and conditions of employment are as follows:

**ROLE**

Interim Chief Financial Officer ("CFO").

**RESPONSIBILITIES**

The duties and overall responsibilities associated with your position shall be those consistent with your title. You shall report directly to the Chief Executive Officer and shall at all times adhere to all Company policies and procedures.

**TERM**

You are expected to perform your duties full-time and not to undertake any activities which conflict with your obligations to the Company. Your employment will be "at-will" and shall last until either party terminates the Agreement in accordance with this Agreement. As an interim position, it is expected that your service will continue month-to-month until the Company's determination that a full-time CFO has been hired. For the sake of clarity, the actual term (the "Term") shall continue until either party terminates this Agreement, and the Term, in writing. Each party agrees to give at least thirty (30) days' notice of such party's intent to terminate (the "Notice Period"); provided that in the event that you give such notice, the Company may in its sole discretion elect to waive the Notice Period or any portion thereof, in which case the Company shall have no obligation to pay you any base salary (or other compensation or benefits) for any portion of the Notice Period which the Company has waived. Upon termination you shall be paid base salary through the date of termination and any other amounts as expressly due by operation of law.

**LOCATION**

Your appointed location is the Company's New York location. Please note that your position will require travel locally and outside the New York area at the Company's sole expense. You shall be reimbursed reasonable travel costs incurred to commute from your home to the New York area for the duration of the Term, upon timely submission of such costs in accordance with the Company's policies and procedures.

**COMPENSATION**.

- An annual base salary of $325,000, paid bi-weekly with standard payroll deductions and less applicable taxes. The base salary will be reviewed annually as part of the performance review process and the establishment of annual EBITDA budgets.

- An annual bonus target for 2023 of up to 50% of your applicable base salary in accordance with the terms of an incentive plan to be adopted by the board of directors of the Company, pro-rated for the actual time of the Term in calendar year 2023 through the termination date. You will work with the board of directors of the Company to agree upon metrics in excess of present earnings targets to achieve maximum annual bonus potential. Pursuant to the terms of this plan, you must be actively employed at the time of payment in order to receive this bonus; provided, unless you resign or are terminated by the Company for "Cause" (as defined in the Company's 2020 Equity Incentive Plan), you shall remain eligible for the pro-rated bonus through the date of termination, provided you sign a separation agreement in a form provided by the Company.

- As a regular, full-time employee of the Company, you will be eligible to participate in a number of the Company's sponsored benefit plans once the applicable waiting periods are met. You must complete the online enrollment process within 30 days of your hire date to elect or decline coverage. Please be prepared to provide proof of dependent status (such as a marriage or birth certificate) for any eligible dependents you wish to enroll. Refer to the attached Benefits Overview for additional plan information.

- In lieu of granting equity, you shall be eligible for a Change in Control bonus equal to $325,000 if, subsequent to January 1, 2023, the Company consummates a Change in Control (as defined in the Company's 2020 Equity Incentive Plan) and you remain employed through the date of closing of such Change in Control. You shall be paid the Change in Control bonus in a lump sum within thirty (30) days subsequent to the closing, provided you execute any documents reasonably requested by the Company and have not committed any act of "Cause".

- We expect you to observe any contractual or legal obligations that you owe to any previous employer. Please advise us of any restrictive covenants, non-solicitation covenants, or other contractual or legal obligations you owe to your previous employer. You will be subject to all of our policies, including our Code of Conduct and our Insider Trading policies. Further details on these policies and others are outlined in the Employee Handbook.

- You shall be subject to and covered by any indemnification procedures, by-laws, or policies adopted by the Company, inclusive of Directors and Officers insurance coverage, to the extent provided for the in Company's Charter.

**CONFIDENTIALITY**.

You shall not, directly or indirectly, disclose to any person or entity who is not authorized by the Company or any subsidiary or affiliate to receive such information, or use or appropriate for your own benefit or for the benefit of any person or entity other than the Company or any subsidiary or affiliate, any documents or other papers relating to the Company's business or the customers of the Company or any subsidiary or affiliate, including, without limitation, files, business relationships and accounts, pricing policies, customer lists, computer software and hardware, or any other materials relating to the Company's business or the customers of the Company or any affiliate of the Company or any trade secrets or confidential information, including, without limitation, any business or operational methods, drawings, sketches, designs or product concepts, know-how, marketing plans or strategies, product development techniques or plans, business acquisition plans, financial or other performance data, personnel and other policies of the Company or any affiliate of the Company, whether generated by you or by any other person, except as required in the course of performing your duties hereunder or with the express written consent of the Company; provided, however, that the confidential information shall not include any information readily ascertainable from public or published information, or trade sources or independent third parties (other than as a direct or indirect result of unauthorized disclosure by you). This confidentiality provision shall survive the termination of this Agreement and the cessation of your employment.

In the event of termination of your employment, or earlier upon request of the Company you shall promptly deliver to the Company (a) all property of the Company then in your possession and (b) all documents and data of any nature and in whatever medium of the Company or any of its Affiliates, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any Confidential Information.

**NON-COMPETITION**.

During your employment hereunder, you will not engage, directly or indirectly, as an employee, officer, director, partner, manager, consultant, agent, owner (other than a minority shareholder or other equity interest of not more than 1% of a company whose equity interests are publicly traded on a nationally recognized stock exchange or over-the-counter) or in any other capacity, in any business or entity that is in competition with the Company or any of its subsidiaries. You will also devote 100% of your work time to the Company.

**NON-SOLICITATION**.

For a two year period following the termination of your employment for any reason or without reason, you will not solicit or induce any person who was an employee of the Company or any of its subsidiaries or related companies on the date of your termination or within three months prior to leaving your employment with the Company or any of its subsidiaries or related companies to leave their employment with the Company or any of its subsidiaries or related companies.

**MISCELLANEOUS**

- This offer is contingent upon proper documentation of your legal ability to work in the United States.

- If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effectuate the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. Each party acknowledges and agrees that a breach or threatened breach of this Agreement would cause irreparable damage to the other party and that the injured party may not have an adequate remedy at law. Therefore, the obligations of the parties under this Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement or otherwise. The parties further agree that, in the event of any action for specific performance in respect of such breach or violation by a party, the other party will not assert the defense that a remedy at law would be adequate.

- Facsimile execution and delivery of this Agreement is legal, valid and binding execution and delivery for all purposes. This Agreement shall not confer any rights or remedies upon any person other than the parties and their respective successors and permitted assigns. This Agreement constitutes the entire agreement among the parties and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by both of the parties hereto.

- Nothing contained in this agreement is intended to impede, prohibit or restrict you (or an attorney acting on your behalf) from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, Commodity Futures Trading Commission ("CFTC"), FINRA, or any other state or federal regulatory authority or self-regulatory organization regarding this agreement or its underlying facts or circumstances, or about a possible violation of securities laws (or recovering any remuneration for doing so), the Commodities Exchange Act, or employment laws, or exercising rights under the federal Defend Trade Secrets Act ("DTSA") which provides that an individual shall not be held criminally or civilly liable for the disclosure of a trade secret that is made (i) in confidence to a government official or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. This paragraph does not, however, authorize you to disclose information you obtain through a communication that is subject to the attorney-client privilege or the work product doctrine.

- It is the intention of the parties that payments and benefits under this letter agreement be interpreted to be exempt from or in compliance with Section 409A of the Internal Revenue Code of 1986, as amended, and accordingly, to the maximum extent permitted, the payments and benefits made hereunder shall be construed to be exempt from or in compliance with Section 409A.

[Signature page follows]

4

While every member of our team is critical to our success, your role of Interim Chief Financial Officer is one that I look to for significant contributions. I look forward to welcoming you to the team, working with you and positioning the Company for a successful future! If you have any questions, please do not hesitate to call me.

Regards,

Ellery W. Roberts
**Ellery W. Roberts**

/s/ Robert D. Barry                                                October 14, 2022
**Robert D. Barry**                                                **Date**

*Please return a signed copy of this offer letter and attached job description as formal acceptance of your ability to perform the requirements of the position. A representative from the Human Resource team will be in touch with you before your start date to discuss what you will need to bring on your first day. Your employment with the company is considered "at will" and can be terminated by you at any time. The Company also reserves the same right.*

5

**Exhibit 10.59**

<u>ENGAGEMENT AGREEMENT</u>

**THIS AGREEMENT** made and entered into this 14th day of **October**, 2022 by and between **Polished.com Inc.,** a Delaware corporation, having a principal place of business at 1870 Bath Avenue, Brooklyn, NY 11214, hereinafter referred to as "<u>Polished.</u>", and J.E. Rick Bunka of **Point North LLC**, a Ohio limited liability company, having a principal place of business at 205 Falling Stone Drive, Holly Springs, NC 27540, hereinafter referred to as the "<u>Consultant</u>."

**W I T N E S S E T H:**

**WHEREAS**, Polished.com desires to retain the services of Consultant, and Consultant is willing to be retained as a consultant and independent contractor to Polished.com, upon the terms and subject to the conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth below, and intending to be legally bound hereby, the parties agree as follows:

1. **Consulting Services**.

(a) Polished.com hereby retains the Consultant, and the Consultant hereby agrees, to perform the role of Interim Chief Executive Officer for Polished.com (the "<u>Consulting Services</u>") on the terms and conditions set forth herein. During the Term (as defined below), the Consultant shall be required to devote such time in rending services as shall be mutually agreeable to Polished.com and the Consultant. Consultant shall report to Polished.com Board of Directors. Consultant is expected to perform the Consulting Services full-time and not to undertake any activities which conflict with Consultant's obligations to the Company; provided, however, that time spent on reasonable inquiries from noncompetitive entities for which you maintain a consulting relationship as of the commencement date of the Term shall not be a violation hereto. To that end, Consultant represents and warrants that Consultant does not presently perform or intend to perform, during the term of the Agreement, consulting or other services for, or engage in or intend to engage in an employment relationship with, companies whose businesses or proposed businesses in any way involve products or services which would be competitive with the Company's products or services, or those products or services proposed or in development by the Company during the term of the Agreement.

(b) Consultant hereby agrees (i) to comply at all times with all applicable laws and, to the extent disclosed to Consultant, policies of Polished.com in connection with the performance of the Consulting Services and (ii) to use Consultant's best efforts in all aspects of performing the Consulting Services and to provide any such Consulting Services in a good, timely, efficient, professional, diligent and workmanlike manner.

(c) Consultant shall furnish and submit intermediate reports to Polished.com Board (hereafter referred to as "<u>The Board</u>") in such form, timing and number as may be reasonably requested by The Board as may be reasonably requested concerning the work and services performed under this Agreement.

2. **Term**. The term ("Term") of this Agreement shall commence on October 14, 2022, for a period of 6 months unless extended upon mutually agreed upon terms. For the sake of clarity, either side can earlier terminate the Term upon ten (10) days written notice to the other. If the contract is early terminated by Polished, and Consultant has not committed any act of "Cause" as determined by the Board in its sole discretion (and shall include, but not be limited to, material breach of this Agreement, willful misconduct, gross negligence, or commission of a crime), then the initial retainer under subsection 3(b) will serve as the termination fee and shall not be required to be returned, provided the Consultant signs a release agreement in a form provided by the Company and abides by any restriction provided for herein.

3. **Compensation**.

(a) During the Term, Polished.com shall pay the Consultant a consultant fee of $16,826.92 per week (the "Consulting Fee"), payable as set forth in Section 3(b) below. Consultant will be reimbursed for travel to and from North Carolina as well as any normal and customary travel expense associated with the role upon provision of receipts in a form provided by the Company's policies. The Company will provide Consultant with hotel or temporary housing and ground transportation as reasonably determined by the Company through the term of the agreement, or the earlier of becoming a full time Polished.com employee. During the Term, Polished.com shall also reimburse the Consultant for all reasonable and necessary expenses incurred by the Consultant in performing the Consulting Services In addition to payment of services, Consultant is eligible for (a) a Success Fee equal to $2,187,500 ("Success Fee") and (b) a Leadership Transition fee of $437,500 (the "Leadership Transition Fee"). The Change of Control Fee shall be earned if, during the Term, the Company consummates a Change in Control (as defined in the Company's 2020 Equity Incentive Plan) and Consultant is performing services (and have not given notice) through the date of closing of such Change in Control. The Leadership Transition Fee shall be paid if, in the Board's sole determination, the Consultant has materially assisted in the successful transition to permanent executive leadership during the Term. If earned, Consultant shall be paid the Success Fee in a lump sum within thirty (30) days subsequent to the closing of the Change in Control. If earned, the Success Fee shall be paid within thirty (30) days subsequent to the end of the Term. No Success Fee or Leadership Transition Fee shall be payable unless (a) Consultant executes any documents reasonably requested by the Company and (b) has not committed any act of Cause as determined by the Board in its sole discretion.

(b) Polished.com will establish an initial retainer of $100,000, paid in advance on or as soon as practicable following the start of the Term. Thereafter Consultant will invoice Polished.com on a monthly basis in arrears for the services and expenses incurred by the Consultant pursuant to this Agreement. Payment on Consultant's invoices shall be made within 10 days of receipt by Polished.com. For the sake of clarity, the Consultant shall return any portion of the initial retainer on a pro-rata basis in the event of a termination of the Term prior to the six week anniversary thereof.

4. **Independent Contractor Status**. Consultant shall be an independent contractor and Consultant acknowledges, and confirms to Polished.com, Consultant's status as that of an independent contractor. Nothing herein shall be deemed or construed to create a joint venture, partnership, agency, or employee/employer relationship between the parties for any purpose, including but not limited to taxes or employee benefits. Consultant will be solely responsible for payment of any and all taxes and insurance, including without limitation medical insurance. Consultant will submit to Polished.com upon request evidence of compliance with the provisions of this paragraph in a form and manner satisfactory to Polished.com. . Consultant acknowledges and agrees that Consultant shall not be eligible for any Company employee benefits and, to the extent Consultant otherwise would be eligible for any Company employee benefits but for the express terms of this Agreement, Consultant hereby expressly declines to participate in such Company employee benefits. Consultant agrees to indemnify, defend and hold the Company harmless from any liability for, or assessment of, any claims or penalties or interest with respect to such taxes, labor or employment requirements, including any liability for, or assessment of, taxes imposed on the Company by the relevant taxing authorities with respect to any compensation paid to Consultant or any liability related to the withholding of such taxes.

5. **Power to Act on Behalf of Polished.com**. Consultant shall perform the duties of Interim Chief Executive Officer have the power and authority to represent Polished.com in conformance with the company governance procedures established by the Board from time to time. Consultant shall report to the Board.

6. **Confidential Information**.

(a) The Consultant acknowledges that while rendering the Consulting Services the Consultant will occupy a position of trust and confidence. The Consultant in the performance of the Consulting Services may have access to and become familiar with "Confidential Information," as defined below. Both during the Term of this Agreement and thereafter, Consultant covenants and agrees that Consultant (a) shall exercise utmost diligence to protect and safeguard the Confidential Information; (b) shall not disclose to any third party any such Confidential Information, except as may be required in the course of Consultant's performance of the Consulting Services and authorized by Polished.com in writing and/or required by laws and /or court requirement; and (c) shall not use, directly or indirectly, for Consultant's own benefit or for the benefit of another, any such Confidential Information. Consultant acknowledges that Confidential Information has been and will be developed and acquired by Polished.com by means of substantial expense and effort, that the Confidential Information is a valuable proprietary asset of Polished.com' business, and that its disclosure would cause substantial and irreparable injury to Polished.com' business.

(b) "Confidential Information" means all information of a confidential or proprietary nature, whether or not specifically labeled or identified as "confidential," in any form or medium, that is or was disclosed to, or developed or learned by, Consultant in connection with Consultant's past, present or future involvement with Polished.com and that relates to the business, products, services, research or development of Polished.com or any of its subsidiaries, affiliates or its suppliers, distributors or customers. Confidential Information includes but is not limited to the following: (i) internal business information (including, but not limited to, information relating to strategic plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures, accounting and business methods); (ii) identities of, individual requirements of, specific contractual arrangements with, and information about, any of Polished.com' or any of its subsidiaries, affiliates, suppliers, distributors and customers and their confidential information; (iii) trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto or other information or thing that has economic value, actual or potential, from not being generally known to or not being readily ascertainable by proper means by other persons; and (iv) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable). Confidential Information shall not include information that Consultant can demonstrate: (a) is publicly known through no wrongful act or breach of obligation of confidentiality; or (b) was rightfully received by Consultant from a third party without a breach of any obligation of confidentiality by such third party.

Page 3 of 7

7. **<u>Work Product</u>**.

(a) All Work Product shall be made for hire by the Consultant for Polished.com or any of its subsidiaries or affiliates and will be the sole and exclusive property of Polished.com. "<u>Work Product</u>" means all ideas, discoveries, inventions, innovations, improvements, developments, methods, processes, designs, analyses, drawings, reports and all similar or related information, whether or not patentable or reduced to practice or comprising Confidential Information, and any copyrightable work, trade mark, trade secret or other intellectual property rights, whether or not comprising Confidential Information, and any other form of Confidential Information, any of which relate to Polished.com or any of its affiliates or subsidiaries actual or anticipated business, research and development or existing or future products or services and which:

(i) were or are conceived, reduced to practice, contributed to or developed or made by Consultant, whether alone or jointly with others and whether on Polished.com' premises or elsewhere within the scope of the Consultant's duties hereunder;

(ii) relates to the business and operation of Polished.com or any subsidiary or affiliate, including but not limited to any product, service, or other item which would be in competition with the products or services offered by Polished.com or any subsidiary or affiliate or which is related to products or services of Polished.com or any subsidiary or affiliate, whether presently existing, under development, or under active consideration; or

(iii) was, in whole or in part, the result of the Consultant's use of Polished.com' resources, including without limitation personnel, computers, equipment, facilities, Confidential Information or otherwise.

(b) Consultant will disclose promptly to Polished.com any and all Work Product. During the Term of this Agreement and after termination of this Agreement, if Polished.com should then so request, the Consultant agrees to assign and does hereby assign to Polished.com all rights in the Work Product.

8. **<u>Nondisparagement</u>**. The Parties to this Agreement agree not to make any disparaging statements that reflect negatively on the reputation or good name of the Parties. Nothing herein shall be read to require any untruthful statement under oath or as otherwise required by law or regulatory process.

9. **Nonsolicitation** During the Term and for a two year period following the termination of the Term for any reason, Consultant will not (shall not, directly or indirectly (other than in furtherance of the business of the Company), (a) initiate communications with, solicit, persuade, entice, induce or encourage any individual who is then or who has been within the preceding 12- month period, an employee of or consultant to the Company or any of its affiliates to terminate employment with, or a consulting relationship with, the Company or such affiliate, as the case may be, or to become employed by or enter into a contract or other agreement with any other person, and the Consultant shall not approach any such employee or consultant for any such purpose or authorize or knowingly approve the taking of any such actions by any other person; or (b) initiate communications with, solicit, persuade, entice, induce, encourage (or assist in connection with any of the foregoing) any person who is then or has been within the preceding 12-month period a customer or account of the Company or its affiliates, or any actual customer leads whose identity the Consultant learned during the course of his engagement with the Company, to terminate or to adversely alter its contractual or other relationship with the Company or its affiliates.

10. **Indemnification**. Polished.com agrees to indemnify, defend, and hold harmless Consultant in accordance with the Company's charter, bylaws, and applicable law. The Company shall also secure and maintain a Directors and Officers insurance policy covering Consultant of sufficient size, scope and term as determined by the Board of Directors in its sole discretion to be commercially reasonable for a company of this type and size. Nothing herein shall be interpreted as obligating Polished.com to indemnify Consultant against its willful misconduct.

11 **Entire Agreement**. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the Consulting Services and contains all of the covenants and agreements between the parties with respect to the matters contained herein. No alterations, amendments, changes or additions to this Agreement will be binding upon either the Consultant or Polished.com unless in writing and signed by both parties. No waiver of any right arising under this Agreement made by either party will be valid unless set forth in writing signed by both parties.

12. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

13. **Successors and Assigns**. Each Party may not assign or transfer this Agreement or any rights or obligations hereunder without the prior written consent of the other Party. Consultant may not subcontract any portion of this Agreement or the Consulting Services provided for hereunder.

14. **Arbitration**. All disputes arising under this Agreement or with respect to its interpretation or enforcement not otherwise resolved by the parties shall be decided by arbitration. The arbitration shall be held in the State of Missouri for determination by the American Arbitration Association in accordance with its then existing rules pertaining thereto using one arbitrator. The decision of the arbitrator shall be final and binding upon all parties and judgment upon the award may be entered in any Court having jurisdiction thereof. Filing fees and other costs assessed by the American Arbitration Association shall initially be shared between and paid equally by the parties provided that the non-prevailing party in such arbitration, within thirty (30) days following a final determination of such arbitration, shall reimburse the prevailing party for any such fees and costs previously advanced by the prevailing party to the extent so awarded by the arbitrator.

15. **Injunctive Relief**. If the Consultant breaches any of the provisions of Sections 6 through 9 hereof (collectively, the "Restrictive Covenants"), the Company and its affiliates shall, in addition to the rights set forth in Section 14 hereof, have the right and remedy to seek from any court of competent jurisdiction specific performance of the Restrictive Covenants or injunctive relief against any act which would violate any of the Restrictive Covenants, it being acknowledged and agreed that any such breach may cause irreparable injury to the Company and its affiliates and that money damages will not provide an adequate remedy to the Company and its affiliates.

16. **Severability of Covenants**. If any of the Restrictive Covenants, or any part thereof, is held by a court of competent jurisdiction or any foreign, federal, state, county or local government or other governmental, regulatory or administrative agency or authority to be invalid, void, unenforceable or against public policy for any reason, the remainder of the Restrictive Covenants shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and such court, government, agency or authority shall be empowered to substitute, to the extent enforceable, provisions similar thereto or other provisions so as to provide to the Company and its affiliates, to the fullest extent permitted by applicable law, the benefits intended by such provisions

17. **Waiver**. The rights and remedies herein specified are cumulative and, except as otherwise herein provided, are not exclusive of any rights or remedies which any party hereto would otherwise have.

18. **Notice**. All notices of other communication which are required or permitted hereunder shall be in writing and sufficient if delivered personally, or sent by registered or certified mail, postage prepaid, or by overnight carrier at the address set forth in the heading of this Agreement.

19. **Exceptions**. Nothing contained in this agreement is intended to impede, prohibit or restrict Consultant (or an attorney acting on Consultant's behalf) from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, Commodity Futures Trading Commission ("CFTC"), FINRA, or any other state or federal regulatory authority or self-regulatory organization regarding this agreement or its underlying facts or circumstances, or about a possible violation of securities laws (or recovering any remuneration for doing so), the Commodities Exchange Act, or employment laws, or exercising rights under the federal Defend Trade Secrets Act ("DTSA") which provides that an individual shall not be held criminally or civilly liable for the disclosure of a trade secret that is made (i) in confidence to a government official or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. This paragraph does not, however, authorize Consultant to disclose information obtained through a communication that is subject to the attorney-client privilege or the work product doctrine.

20. **Conflicts with this Agreement**. Consultant represents and warrants that Consultant is not under any pre-existing obligation in conflict or in any way inconsistent with the provisions of this Agreement. Consultant represents and warrants that Consultant's performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Consultant in confidence or in trust prior to commencement of this Agreement. Consultant warrants that Consultant has the right to disclose and/or or use all ideas, processes, techniques, and other information, if any, which Consultant has gained from third parties, and which Consultant discloses to the Company or uses in the course of performance of this Agreement, without liability to such third parties. Notwithstanding the foregoing, Consultant agrees that Consultant shall not bundle with or incorporate into any deliveries provided to the Company herewith any third party products, ideas, processes, or other techniques, without the express, written prior approval of the Company. Consultant represents and warrants that Consultant has not granted and will not grant any rights or licenses to any intellectual property or technology that would conflict with Consultant's obligations under this Agreement. Consultant will not knowingly infringe upon any copyright, patent, trade secret or other property right of any former client, employer or third party in the performance of the Services.

21. **Full-Time Employment Agreement**. In the event the parties by mutual desire intend to retain Consultant as a full-time Chief Executive Officer, the Company shall use reasonable best efforts to provide a compensation package reflecting any change in value in the stock price of the Company between the effective date of this agreement and the start date of any full-time employment. For the sake of clarity nothing here requires the Company to retain Consultant as a full-time employee or to provide any specific compensation package.

**IN WITNESS WHEREOF**, the parties hereto intending to be legally bound have set their hands and seals the day and year first above written.

**POLISHED.COM INC.:**

By:   /s/ Ellery W. Roberts
Name: Ellery W. Roberts
Title: Executive Chairman

**Point North LLC:**

/s/ J.E. "Rick" Bunka
Name: J.E. "Rick" Bunka
Title: Principal

Page 7 of 7

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Polished.com
Brooklyn, NY

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-240307, 333-256402 and 333-261919) of our report dated July 31, 2023, with respect to the consolidated financial statements of Polished.com Inc., which appears in this Annual Report on Form 10-K of the Company for the year ended December 31, 2022 and 2021 (As Restated).

We also consent to the reference of our firm under the caption "Experts" in this registration statement.

*/s/ Sadler, Gibb & Associates, LLC*

Draper, UT
July 31, 2023

**Exhibit 31.1**

**CERTIFICATION**
**PURSUANT TO EXCHANGE ACT RULE 13A-14(a) OR RULE 15D-14(a)**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, J.E. "Rick" Bunka, certify that:

1. I have reviewed this Annual Report on Form 10-K of Polished.com Inc. (the "registrant") for the year ended December 31, 2022;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 31, 2023

By:  /s/ J.E. "Rick" Bunka
     J.E. "Rick" Bunka
     Interim Chief Executive Officer
     *(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATION**
**PURSUANT TO EXCHANGE ACT RULE 13A-14(a) OR RULE 15D-14(a)**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert D. Barry, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Polished.com Inc. (the "registrant") for the year ended December 31, 2022;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 31, 2023

By:   /s/ Robert D. Barry
Robert D. Barry
Interim Chief Financial Officer and Secretary
*(Principal Financial Officer)*

**Exhibit 32.1**

**CERTIFICATION**
**PURSUANT TO 18 U.S.C. § 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Polished.com Inc. (the "Company") for the year ended December 31, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, J.E. "Rick" Bunka, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 31, 2023

By:   /s/ J.E. "Rick" Bunka
J.E. "Rick" Bunka
Interim Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 32.2**

**CERTIFICATION**
**PURSUANT TO 18 U.S.C. § 1350,**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Polished.com Inc. (the "Company") for the year ended December 31, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert D. Barry, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.  the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 31, 2023

By:  /s/ Robert D. Barry
Robert D. Barry
Interim Chief Financial Officer and Secretary
*(Principal Financial Officer)*

# Exhibit 5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended: September 30, 2023

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 001-39418

**Polished.com Inc.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **83-3713938** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **1870 Bath Avenue, Brooklyn, NY** | **11214** |
|---|---|
| (Address of principal executive offices) | (Zip code) |

**800-299-9470**
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.0001 per share | POL | NYSE American LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of November 17, 2023, there were 2,109,347 shares of the registrant's common stock issued and outstanding.

**Polished.com Inc.**
**Quarterly Report on Form 10-Q**
**Period Ended September 30, 2023**

**TABLE OF CONTENTS**

**PART I FINANCIAL INFORMATION**

| | | |
|---|---|---|
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item 4. | Controls and Procedures | 30 |

**PART II OTHER INFORMATION**

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 32 |
| Item 1A. | Risk Factors | 33 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 33 |
| Item 3. | Defaults Upon Senior Securities | 33 |
| Item 4. | Mine Safety Disclosures | 33 |
| Item 5. | Other Information | 33 |
| Item 6. | Exhibits | 34 |

i

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This report contains forward-looking statements that are based on our management's beliefs and assumptions and on information currently available to us. All statements other than statements of historical facts are forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- cybersecurity or data security breaches such as the hacking attack we disclosed in May 2023, the improper disclosure of confidential, personal or proprietary data and changes to laws and regulations governing cybersecurity and data privacy, including any related costs, fines or lawsuits, and our ability to continue ongoing operations and safeguard the integrity of our information technology infrastructure, data, and employee, customer and vendor information;

- our ability to acquire new customers and sustain and/or manage our growth;

- the effect of supply chain delays and disruptions on our operations and financial condition;

- our goals and strategies;

- the identification of material weaknesses in our internal control over financial reporting and disclosure controls and procedures that, if not corrected, could affect the reliability of our unaudited condensed consolidated financial statements and have other adverse consequences such as a failure to meet reporting obligations;

- our future business development, financial condition and results of operations;

- expected changes in our revenue, costs or expenditures;

- growth of and competition trends in our industry;

- our expectations regarding demand for, and market acceptance of, our products;

- our expectations regarding our relationships with investors, institutional funding partners and other parties we collaborate with;

- fluctuations in general economic and business conditions in the markets in which we operate; and

- relevant government policies and regulations relating to our industry.

In some cases, you can identify forward-looking statements by terms such as "may," "could," "will," "should," "would," "expect," "plan," "intend," "anticipate," "believe," "estimate," "predict," "potential," "project" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions. You should not place undue reliance on forward-looking statements because they involve known and unknown risks, uncertainties and other factors, which are, in some cases, beyond our control and which could materially affect results. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under Item 1A *Risk Factors*" in the Company's Annual Report on Form 10-K for the year ended December 31, 2022 and elsewhere in this report. If one or more of these risks or uncertainties occur, or if our underlying assumptions prove to be incorrect, actual events or results may vary significantly from those implied or projected by the forward-looking statements. No forward-looking statement is a guarantee of future performance.

The forward-looking statements made in this report relate only to events or information as of the date on which the statements are made in this report. Except as expressly required by the federal securities laws, there is no undertaking to publicly update or revise any forward-looking statements, whether as a result of new information, future events, changed circumstances or any other reason.

**PART I**
**FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS.**

**POLISHED.COM INC.**
**UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Condensed Consolidated Balance Sheets as of September 30, 2023 (Unaudited) and December 31, 2022 | 2 |
| Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2023 and 2022 (Unaudited) | 3 |
| Condensed Consolidated Statement of Stockholders' Equity for Three and Nine Months Ended September 30, 2023 and 2022 (Unaudited) | 4 |
| Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2023 and 2022 (Unaudited) | 5 |
| Notes to Condensed Consolidated Financial Statements (Unaudited) | 6 |

1

**POLISHED.COM INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
(in thousands, except share and per share data)

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| | | |
| Current Assets | | |
| Cash and cash equivalents | $ 9,811 | $ 19,549 |
| Restricted cash | 5,391 | 950 |
| Receivables, net | 19,864 | 26,650 |
| Vendor deposits | 30,828 | 25,022 |
| Merchandise inventory, net | 30,093 | 41,766 |
| Prepaid expenses and other current assets | 11,526 | 11,217 |
| | | |
| Total Current Assets | 107,513 | 125,154 |
| | | |
| Property and equipment, net | 3,275 | 5,075 |
| Operating lease right-of-use assets | 9,172 | 11,688 |
| Derivative instruments | 4,197 | 3,178 |
| Goodwill | 106,173 | 106,173 |
| Intangible assets, net | 8,036 | 10,296 |
| Deferred tax asset | - | 1 |
| Other long-term assets | 451 | 349 |
| | | |
| TOTAL ASSETS | $ 238,817 | $ 261,914 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 76,524 | $ 81,537 |
| Customer deposits | 4,530 | 7,292 |
| Current portion of notes payable, net | 7,859 | 6,628 |
| Current portion of finance lease liabilities | 110 | 112 |
| Current portion of operating lease liabilities | 1,945 | 3,726 |
| | | |
| Total Current Liabilities | 90,968 | 99,295 |
| | | |
| Notes payable, net of current portion | 85,160 | 90,816 |
| Finance lease liabilities, net of current portion | 142 | 225 |
| Operating lease liabilities, net of current portion | 7,919 | 9,013 |
| Deferred tax liability | 262 | - |
| | | |
| TOTAL LIABILITIES | 184,451 | 199,349 |
| | | |
| Stockholders' Equity | | |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized; none issued and outstanding as of September 30, 2023 and December 31, 2022 | - | - |
| Common stock, $0.0001 par value, 200,000,000 shares authorized; 2,109,398 and 2,104,558 shares issued and outstanding as of September 30, 2023 and December 31, 2022, respectively | 1 | 1 |
| Additional paid-in capital | 223,029 | 222,837 |
| Accumulated deficit | (168,664) | (160,273) |
| | | |
| TOTAL STOCKHOLDERS' EQUITY | 54,366 | 62,565 |
| | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 238,817 | $ 261,914 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except share and per share data)
(Unaudited)

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2023 | September 30, 2022 | September 30, 2023 | September 30, 2022 |
| Product sales, net | $ 77,818 | $ 143,566 | $ 261,018 | $ 430,710 |
| Cost of goods sold | 62,513 | 122,431 | 204,987 | 355,788 |
| Gross profit | 15,305 | 21,135 | 56,031 | 74,922 |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 5,874 | 8,348 | 18,379 | 22,396 |
| Advertising | 5,061 | 7,534 | 14,694 | 18,475 |
| Bank and credit card fees | 2,557 | 5,932 | 8,935 | 15,121 |
| Depreciation and amortization | 1,061 | 2,882 | 3,199 | 8,588 |
| General and administrative | 6,747 | 7,260 | 16,619 | 15,078 |
| | | | | |
| Total Operating Expenses | 21,300 | 31,956 | 61,826 | 79,658 |
| | | | | |
| LOSS FROM OPERATIONS | (5,995) | (10,821) | (5,795) | (4,736) |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 407 | 174 | 1,139 | 282 |
| Adjustment in value of contingency | - | - | - | (2) |
| Interest expense | (1,886) | (1,351) | (4,821) | (2,594) |
| Gain on change in fair value of derivative instruments | 446 | 4,476 | 1,020 | 3,540 |
| Loss on settlement of debt | - | - | - | (3,241) |
| Other income (expense) | 227 | (50) | 331 | (140) |
| | | | | |
| Total Other Income (Expenses) | (806) | 3,249 | (2,331) | (2,155) |
| | | | | |
| NET LOSS BEFORE INCOME TAXES | (6,801) | (7,572) | (8,126) | (6,891) |
| | | | | |
| INCOME TAX (EXPENSE) BENEFIT | 167 | 2,388 | (265) | 3,234 |
| | | | | |
| NET LOSS | $ (6,634) | $ (5,184) | $ (8,391) | $ (3,657) |
| | | | | |
| Income per common share | | | | |
| Basic | $ (3.14) | $ (2.46) | $ (3.98) | $ (1.73) |
| Diluted | $ (3.14) | $ (2.46) | $ (3.98) | $ (1.73) |
| | | | | |
| Weighted average common shares outstanding | | | | |
| Basic | 2,109,398 | 2,104,558 | 2,108,811 | 2,115,846 |
| Diluted | 2,109,398 | 2,104,558 | 2,108,811 | 2,115,846 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

3

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
(in thousands, except share and per share data)

**For the Three and Nine Months Ended September 30, 2023**

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Treasury Stock At Cost | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance January 1, 2023 | 2,104,558 | 1 | 222,837 | (160,273) | - | 62,565 |
| Issuance of common stock through equity incentive awards | 1,660 | - | 60 | - | - | 60 |
| Issuance of common stock in connection with employment agreements | 3,180 | - | 120 | - | - | 120 |
| Stock compensation expense | - | - | 8 | - | - | 8 |
| Net loss for the three months ended March 31, 2023 | - | - | - | (2,761) | - | (2,761) |
| Balance March 31, 2023 (unaudited) | 2,109,398 | 1 | 223,025 | (163,034) | - | 59,992 |
| Stock compensation expense | | | 2 | | | 2 |
| Net income for the three months ended June 30, 2023 | | | | 1,004 | | 1,004 |
| Balance June 30, 2023 (unaudited) | 2,109,398 | 1 | 223,027 | (162,030) | - | 60,998 |
| Stock compensation expense | - | - | 2 | - | - | 2 |
| Net loss for the three months ended September 30, 2023 | | | | (6,634) | | (6,634) |
| Balance September 30, 2023 (Unaudited) | 2,109,398 | 1 | 223,029 | (168,664) | - | 54,366 |

**For the Three and Nine Months Ended September 30, 2022**

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Treasury Stock At Cost | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance January 1, 2022 | 2,127,747 | $ 1 | $ 224,658 | $ (34,308) | - | $ 190,351 |
| Issuance of common stock through equity incentive awards | 1,395 | - | 120 | - | - | 120 |
| Stock compensation expense for the three months ended March 31, 2022 | - | - | 33 | - | - | 33 |
| Net income for the three months ended March 31, 2022 | - | - | - | 5,819 | - | 5,819 |
| Balance March 31, 2022 (Unaudited) | 2,129,142 | 1 | 224,811 | (28,489) | | 196,323 |
| Purchase of treasury stock | (24,584) | - | - | - | (2,000) | (2,000) |
| Stock compensation expense for the three months ended June 30, 2022 | - | - | 20 | - | - | 20 |
| Net loss for the three months ended June 30, 2022 | - | - | - | (4,292) | - | (4,292) |
| Balance June 30, 2022 (Unaudited) | 2,104,558 | 1 | 224,831 | (32,781) | (2,000) | 190,051 |
| Stock compensation expense for the three months ended September 30, 2022 | - | - | 20 | - | - | 20 |
| Net loss for the three months ended September 30, 2022 | - | - | - | (5,184) | - | (5,184) |
| Balance September 30, 2022 (Unaudited) | 2,104,558 | $ 1 | $ 224,851 | $ (37,965) | $ (2,000) | $ 184,887 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

4

**POLISHED.COM INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands, except share and per share data)
(Unaudited)

| | Nine Months Ended | |
| --- | --- | --- |
| | September 30, 2023 | September 30, 2022 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net loss | $ (8,391) | $ (3,657) |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 3,199 | 8,588 |
| Amortization of debt discount | 163 | 460 |
| Loss on settlement of debt | - | 3,241 |
| Loss on disposal of fixed assets | 1,094 | - |
| Stock-based compensation | 72 | 193 |
| Adjustment to contingent liability | - | 2 |
| Inventory reserve | (1,200) | 557 |
| Loss (Gain) on change in fair value of derivative instruments | (1,020) | (3,540) |
| Bad debt expense | (219) | 411 |
| Deferred tax expense (benefit) | 263 | (3,234) |
| Non-cash lease expense | 2,516 | 2,425 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 7,005 | (1,772) |
| Deposits with vendors | (5,806) | (12,586) |
| Inventory | 12,873 | 7,349 |
| Prepaid expenses and other current assets | (410) | (3,846) |
| Accounts payable and accrued liabilities | (4,893) | (12,143) |
| Due to related party | - | 2,413 |
| Customer deposits | (2,762) | (20,860) |
| Operating lease liabilities | (2,874) | (2,694) |
| Net cash used in operating activities | (390) | (38,693) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Purchases of property and equipment | (140) | (1,318) |
| Net cash used in investing activities | (140) | (1,318) |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Cash received from notes payable | - | 43,044 |
| Repayment of notes payable | (4,682) | (4,580) |
| Repayments of financing lease liabilities | (85) | (78) |
| Purchase of treasury stock at cost | - | (2,000) |
| Net cash (used in) provided by financing activities | (4,767) | 36,386 |
| | | |
| NET CHANGE IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | (5,297) | (3,625) |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, BEGINNING OF PERIOD | 20,499 | 33,791 |
| | | |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH, END OF PERIOD | $ 15,202 | $ 30,166 |
| | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | |
| End of the period | | |
| Cash and cash equivalents | $ 9,811 | $ 28,433 |
| Restricted cash | 5,391 | 1,733 |
| | | |
| | $ 15,202 | $ 30,166 |
| | | |
| Cash, cash equivalents, and restricted cash consist of the following: | | |
| Beginning of the period | | |
| Cash and cash equivalents | $ 19,549 | $ 25,724 |
| Restricted cash | 950 | 8,067 |
| | | |
| | $ 20,499 | $ 33,791 |
| | | |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash paid for interest | $ 4,821 | $ 2,731 |
| Cash paid for income taxes | $ - | $ 3,905 |
| | | |
| NON-CASH INVESTING AND FINANCING ACTIVITIES | | |
| Common stock issued in vesting of RSUs | $ - | $ - |

| | | | | |
|---|---|---|---|---|
| Financed purchases of property and equipment | $ | 94 | $ | 308 |
| Common stock issued in connection with employment agreements | $ | 121 | $ | - |
| Debt discount on notes payable | $ | - | $ | 1,104 |
| Settlement of notes payable and interest through the issuance of a new note | $ | - | $ | 55,851 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

5

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

**NOTE 1-BASIS OF PRESENTATION**

In the opinion of management, the accompanying unaudited condensed consolidated financial statements of Polished.com Inc. (the "Company," "Polished.com Inc.," "we," "us," or "our") have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and applicable rules and regulations of the U.S. Securities and Exchange Commission ("SEC") regarding interim financial reporting and reflect all adjustments, consisting of normal recurring adjustments, necessary to present fairly the results of the interim periods presented. Certain information and note disclosures normally included in the audited financial statements prepared in accordance with GAAP have been condensed or omitted pursuant to such rules and regulations. The information included in the Quarterly Report on Form 10-Q should be read in conjunction with the audited consolidated financial statements and accompanying notes included in our Annual Report on Form 10-K for the year ended December 31, 2022. Furthermore, interim results for the three and nine months ended September 30, 2023 are not necessarily indicative of the results that may be expected for the full year ending December 31, 2023 or future periods.

**NOTE 2-RECENT ACCOUNTING PRONOUNCEMENTS**

*Recently Adopted*

In June 2016, the FASB issued ASU 2016-13 Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company adopted this guidance on January 1, 2023. The Company's adoption of this update did not have a material impact on the consolidated financial statements and related disclosures.

In October 2021, the FASB issued ASU 2021-08, Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers. This ASU amends ASC 805 to require acquiring entities to apply ASC 606 to recognize and measure contract assets and contract liabilities in business combinations. The ASU is effective for public entities for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. The Company adopted this guidance on January 1, 2023. The Company's adoption of this update did not have a material impact on the consolidated financial statements and related disclosures.

In March 2022, the FASB issued ASU 2022-02, Troubled Debt Restructurings ("TDRs") and Vintage Disclosures (Topic 326): Financial Instruments - Credit Losses. This amended guidance will eliminate the accounting designation of a loan modification as a TDR, including eliminating the measurement guidance for TDRs. The amendments also enhance existing disclosure requirements and introduce new requirements related to modifications of receivables made to borrowers experiencing financial difficulty. Additionally, this guidance requires entities to disclose gross write-offs by year of origination for financing receivables, such as loans and interest receivable. The ASU is effective January 1, 2023, and is required to be applied prospectively, except for the recognition and measurement of TDRs which can be applied on a modified retrospective basis. The Company adopted this guidance on January 1, 2023. The Company's adoption of this update did not have a material impact on the consolidated financial statements and related disclosures.

6

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

**NOTE 3-LIQUIDITY AND GOING CONCERN ASSESSMENT**

Management assesses liquidity and going concern uncertainty in the Company's consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

As of September 30, 2023, we had cash and cash equivalents of $9.8 million, restricted cash of $5.4 million, and vendor deposits of $30.8 million. For the nine months ended September 30, 2023, the Company incurred an operating loss of $5.8 million (including $3.2 million in non-cash charges for depreciation and amortization), cash flows used in operations of $0.4 million, and working capital of $15.9 million. As of December 31, 2022, we had cash and cash equivalents of $19.6 million, restricted cash of $1.0 million, and vendor deposits of $25 million, and total working capital of $25.9 million. For the year ended December 31, 2022, the Company incurred an operating loss of $134.4 million (including $11.5 million in non-cash charges for depreciation and amortization, as well as an impairment charge of $109.1 million), and cash flows used in operations of $46.7 million.

The Company performed an assessment to determine whether there were conditions or events that, considered in the aggregate, raised substantial doubt about the Company's ability to continue as a going concern within one year after the filing date of this report, when the accompanying financial statements are being issued. Initially, this assessment did not consider the potential mitigating effect of management's plans that had not been fully implemented.

Based on the initial assessment, substantial doubt exists regarding our ability to continue as a going concern. Management then assessed the mitigating effect of its plans to determine if it is probable that the plans (1) would be effectively implemented within one year after the filing date of this report, when the accompanying financial statements are being issued and (2) when implemented, would mitigate the relevant conditions or events that raise substantial doubt about the Company's ability to continue as a going concern.

As discussed below, the Company has implemented plans which encompass short-term cash preservation initiatives to provide the Company with adequate liquidity to meet its obligations for at least the 12-month period following the date its financial statements are issued, in addition to creating sustained cash flow generation thereafter. The Company has either taken or intends to take, the following actions, among others, to improve its liquidity position and to address uncertainty about its ability to continue as a going concern:

- As described in Note 8, the Company entered into a loan amendment of their term loan and revolver loan agreement with Bank of America, granting the Company a waiver (relating to the specified events of default) through November 2024.

- We are taking concrete steps to improve efficiency and profitability through headcount reductions and consolidation of operations including the closing of one warehouse and the imminent relocation to a new warehouse increasing the efficiency of warehouse operations and reduction of product damage.

7

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

- We hired an internationally recognized firm of digital advertising consultants to help us improve our return on advertising spend. This firm provided us the tools needed to improve future digital marketing results which we are now beginning to deploy.

- We are implementing new financing initiatives for our customers, including a new store-branded credit card and a leasing alternative for customers who do not qualify for conventional credit.

- We have changed our sales focus to emphasizing the sale of high-margin luxury products, in addition to mass-market appliances, began becoming dealers for higher-margin small appliances and promoting them on our website, and have begun actively negotiating improved terms with several of our largest appliance vendors.

Management has prepared estimates of operations for fiscal years 2023 and 2024 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these consolidated financial statements in the Company's 10-Q. The accompanying consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business. Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

## NOTE 4-DISAGGREGATION OF REVENUES

The Company sells a vast assortment of household appliances, including refrigerators, ovens, dishwashers, microwaves, freezers, washers and dryers. In addition to appliances, we also offer a broad assortment of products in the furniture, décor, bed & bath, lighting, outdoor living, electronics categories, fitness equipment, plumbing fixtures, air conditioners, fireplaces, fans, dehumidifiers, humidifiers, air purifiers and televisions.

Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. Each customer order generally contains only one performance obligation based on the merchandise sale to be delivered, at which time revenue is recognized.

The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows (in thousands):

| | For the Three Months Ended | | For the Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | September 30 2023 | September 30 2022 | September 30 2023 | September 30 2022 |
| Appliance sales | $ 70,620 | $ 136,044 | $ 234,797 | $ 402,835 |
| Furniture and other sales | 7,198 | 7,522 | 26,221 | 27,875 |
| Total | $ 77,818 | $ 141,566 | $ 261,018 | $ 430,710 |

8

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
September 30, 2023 and 2022 (UNAUDITED)

**NOTE 5-SUPPLEMENTAL FINANCIAL STATEMENT DISCLOSURES**

*Receivables*

Receivables at September 30, 2023 and December 31, 2022, consisted of the following (in thousands):

|  | September 30, 2023 | | December 31, 2022 | |
| --- | --- | --- | --- | --- |
| Trade accounts receivable | $ | 15,050 | $ | 13,691 |
| Vendor rebates receivable |  | 5,459 |  | 8,514 |
| Other receivables |  | 637 |  | 5,951 |
| Total receivables |  | 21,146 |  | 28,156 |
| Less allowance for doubtful accounts |  | (1,282) |  | (1,506) |
| Total receivables, net | $ | 19,864 | $ | 26,650 |

*Merchandise Inventory*

Inventory as of September 30, 2023 and December 31, 2022, consisted of the following (in thousands):

|  | September 30, 2023 | | December 31, 2022 | |
| --- | --- | --- | --- | --- |
| Appliances | $ | 28,240 | $ | 39,702 |
| Furniture and other |  | 2,442 |  | 3,853 |
| Total merchandise inventory |  | 30,682 |  | 43,555 |
| Less reserve for obsolescence |  | (589) |  | (1,789) |
| Total merchandise inventory, net | $ | 30,093 | $ | 41,766 |

*Property and Equipment*

Property and equipment at September 30, 2023 and December 31, 2022, consisted of the following (in thousands):

|  | September 30, 2023 | | December 31, 2022 | |
| --- | --- | --- | --- | --- |
| Warehouse equipment | $ | 806 | $ | 806 |
| Furniture and fixtures |  | 337 |  | 324 |
| Transportation equipment |  | 1,566 |  | 1,466 |
| Leasehold improvements |  | 2,157 |  | 3,131 |
| Showroom inventory |  | 1,037 |  | 1,037 |
| Total property and equipment |  | 5,903 |  | 6,764 |
| Less: accumulated depreciation |  | (2,628) |  | (1,689) |
| Property and equipment, net | $ | 3,275 | $ | 5,075 |

Depreciation expense for the three and nine months ended September 30, 2023 and 2022, was $ 0.3 million and $0.9 million, respectively.

9

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

*Intangible Assets*

The following table provides a breakdown of identifiable intangible assets as of September 30, 2023 and December 31, 2022 (in thousands):

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Customer relationships | $ 3,461 | $ 3,461 |
| Marketing related - tradename | 6,835 | 6,835 |
| Total intangible assets | 10,296 | 10,296 |
| Accumulated amortization | (2,260) | (-) |
| | | |
| Intangible assets, net | $ 8,036 | $ 10,296 |

Amortization expense for the three and nine months ended September 30, 2023, was $0.8 million and $2.3 million, respectively. In comparison, amortization expense for the three and nine months ended September 30, 2022, was $2.6 million and $7.7 million, respectively.

These assets are being amortized on a straight-line basis over their weighted average estimated useful life of 2.6 years.

At September 30, 2023, estimated annual amortization expense for each of the next five years is as follows (in thousands):

| Year ending December 31, | Amount |
|---|---|
| 2023 (Remainder of year) | $ 754 |
| 2024 | 3,013 |
| 2025 | 3,013 |
| 2026 | 1,256 |
| 2027 | - |
| | |
| Total | $ 8,036 |

*Accounts Payable and Accrued Expenses*

Accounts payable and accrued expenses at September 30, 2023 and December 31, 2022, consisted of the following (in thousands):

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Trade accounts payable | $ 38,002 | $ 34,345 |
| Accrued sales tax | 32,039 | 36,196 |
| Accrued payroll liabilities | 1,110 | 680 |
| Accrued interest | 39 | 37 |
| Accrued liability for sales returns | 1,916 | 3,916 |
| Credit cards payable | 115 | 32 |
| Accrued insurance | - | 1,180 |
| Other accrued liabilities | 3,303 | 5,151 |
| | | |
| Total accounts payable and accrued expenses | $ 76,524 | $ 81,537 |

10

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

**NOTE 6-OPERATING LEASES**

The following was included in our unaudited condensed consolidated balance sheet at September 30, 2023 and December 31, 2022 (in thousands):

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Operating lease right-of-use assets | $ 9,172 | $ 11,688 |
| | | |
| Lease liabilities, current portion | 1,945 | 3,726 |
| Lease liabilities, long-term | 7,919 | 9,013 |
| | | |
| Total operating lease liabilities | $ 9,864 | $ 12,739 |
| | | |
| Weighted-average remaining lease term (months) | 77 | 73 |
| | | |
| Weighted average discount rate | 3.9% | 3.9% |

Operating lease expense for the three and nine months ended September 30, 2023 and 2022, was $1.3 million and $3.2 million, respectively.

As of September 30, 2023, maturities of operating lease liabilities were as follows, in thousands:

| Years Ending December 31, | Amount |
|---|---|
| 2023 - Remainder of year | $ 948 |
| 2024 | 1,808 |
| 2025 | 1,489 |
| 2026 | 1,532 |
| 2027 | 1,284 |
| Thereafter | 4,158 |
| | |
| Total | 11,219 |
| Less: imputed interest | (1,355) |
| | |
| Total operating lease liabilities | $ 9,864 |

***Finance Leases***

The Company has three finance leases. At September 30, 2023, the total amount due on these leases was $0.3 million.

11

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

**NOTE 7-RELATED PARTIES**

On March 15, 2022, the Company entered into a lease for additional office space with 8780 19th Ave LLC ("Landlord"), an entity owned by Albert and Elie Fouerti, the Company's former Chief Executive and Chief Operating Officer, respectively. The Company contends that the lease required the Landlord do certain work at Landlord's expense to improve the building at a cost of approximately $
1.2 million. Landlord has refused to pay for this work, contending that this expense was the Company's responsibility. In addition, the total remaining amount due on the lease at September 30, 2023 is also approximately $1.2 million. Landlord contends that the Company is in default of the lease for failing to pay rent. The Company disagrees that its rent obligations have been triggered and further contends that Landlord has violated the lease by failing to pay for the work. On August 23, 2023, the Company entered into a lease termination agreement with the Landlord. Under the terms of the termination agreement, the Company was relieved of its obligations under the lease and agreed to terminate its claims for reimbursement of the improvements it made to the building and to pay $100,000.

*DMI*

The Company is a member of DMI, an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 1.6% interest in DMI.

During the nine months ended September 30, 2023, total purchases from DMI represented approximately 65% of total purchases. At September 30, 2023 vendor deposits at DMI totaled $30.8 million.

*Lease Agreements*

The Company has lease agreements with 1870 Bath Ave. LLC, 812 and 5th Ave Realty LLC. These two entities are owned by the Company's former Chief Executive Officer and Chief Operating Officer. In addition, the Company has a sublease agreement with DMI. The total rent expense under these related party leases was $0.8 million for the nine months ended September 30, 2023.

12

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

**NOTE 8-NOTES PAYABLE**

*Credit Facilities*

Bank of America Credit Agreement

On May 9, 2022, the Company entered into a Credit Agreement (the "Credit Agreement") with the lenders identified therein (the "Lenders") and Bank of America, N.A., as administrative agent, swingline lender and letter of credit issuer (the "Agent"), pursuant to which the Lenders agreed to make available to the Borrowers senior secured credit facilities in the aggregate initial amount of $ 140.0 million, including (i) a $100.0 million term loan (the "Term Loan") and (ii) a $40.0 million revolving credit facility (the "Revolving Loan"), which revolving credit facility included a $2.00 million swingline sublimit (the "Swing Line Loan" and together with the Term Loan and the Revolving Loan, the "Loans") and, separately, a $10.0 million letter of credit commitment, in each case, on the terms and conditions contained in the Credit Agreement.

On May 9, 2022, the Company borrowed the entire amount of the Term Loan in the aggregate principal amount of $100.0 million. A portion of the proceeds of the Term Loan were to repay and terminate the M&T Credit Agreement. Commencing on September 30, 2022, through and including September 30, 2023, the Borrowers repaid the principal amount of the Term Loan in quarterly installments of $1,250,000 each, payable on the last business day of each March, June, September, and December.

As of September 30, 2023, the carrying value of the Term Loan was $92.3 million, comprised of a principal of $93.1 million, net of unamortized loan costs of $0.8 million. Loan costs before amortization included $1.1 million of lender and other fees.

As a result of our technical non-compliance with specified loan covenants for both the Bank of America Term Loan and Revolving Loan, based in part due to our failure to timely deliver financial statements, Bank of America froze the $40.0 million Revolving Loan before any borrowings had been made against the facility.

On July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "First Amendment"), in part, to require the Company maintain liquidity, which includes cash and certain qualifying customer and credit card account receivables, of $8.0 million. The Company and Bank of America amended the Credit Agreement on November 20, 2023 (the "Second Amendment"), which requires the Company to establish a Bank of America cash collateral account where cash and cash equivalents deposited in the cash collateral account do not constitute Liquidity for purposes of the Credit Agreement. Further, the Second Amendment requires that (i) at least $3.0 million of Liquidity be comprised of unrestricted cash and cash equivalents and (ii) more than $5.0 million of Liquidity be comprised of certain qualifying customer and credit card accounts receivable.

The Company entered into the Second Amendment, in part, to waive events of defaults on its existing Credit Agreement. The Term Loan Lenders, as part of the Second Amendment, agreed to defer the principal installment of the Term Loans in the amount of $937,500 required to be made on December 31, 2023 until the earliest to occur of (i) January 31, 2024, (ii) the date on which a subordinated Term Loan or an equity contribution, as applicable, is consummated (even if the date of such consummation precedes December 31, 2023) and (iii) an event of default. The Second Amendment requires the Company to pay the existing Term Facility and Revolving Facility by November 30, 2024 (the "Maturity Date").

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

13

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

On May 9, 2022, the Company entered into an interest rate swap agreement to reduce its exposure to fluctuations in the floating interest rate tied to SOFR (see Note 9). The initial notional amount of the swap is $100 million with an original termination date of May 31, 2029, which was amended in the current period to May 31, 2027. As a result of the swap, the Company pays interest at a fixed rate of 2.9%, plus applicable margins.

Commencing on September 30, 2023, through and including September 30, 2024, the Borrowers must repay the principal amount of the Term Loan in installments of $937,500 each, payable on the last business day of December and January and quarterly installments of $1,875,000 payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

*Vehicle Loans*

The Company has financed purchases of transportation vehicles with notes payable, which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.8% to 5.7%. As of September 30, 2023, the outstanding balance of these vehicle loans is $0.7 million.

Maturities of Notes Payable are as follows:

| For the years ended December 31, | | September 30, 2023 |
|---|---|---|
| 2023 (Remainder of year) | $ | 1,033 |
| 2024 | | 92,531 |
| 2025 | | 201 |
| 2026 | | 29 |
| 2027 | | 21 |
| Thereafter | | - |
| Total | | 93,815 |
| Less: Loan costs | | (796) |
| Total | $ | 93,019 |
| Amount classified as a current liability | $ | 7,859 |
| Amount classified as long-term liability | | 85,160 |
| | | |
| Total | $ | 93,019 |

14

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

**NOTE 9-DERIVATIVE INSTRUMENTS (INTEREST RATE SWAP):**

On May 9, 2022, the Company entered into a Term Loan agreement with Bank of America, N.A. (See Note 11). On the same day, the Company entered into an interest rate swap agreement to reduce its exposure to fluctuations in the floating interest rate tied to SOFR under the Term Loan with a notional amount of $

100 million. The interest rate swap became effective on May 9, 2022, and was to terminate on May 31, 2029. The swap agreement was modified in the current period and will now terminate on May 31, 2027. The Company receives variable interest payments monthly based on a one-month SOFR and pays a fixed rate of 2.93% to the counterparty.

As of September 30, 2023, the fair value of the interest rate swap agreement was $4.2 million and was classified as a derivative asset in our consolidated balance sheet. During the three and nine months ended September 30, 2023 the Company recognized a $0.4 million and $1.0 million gain, respectively on the change in fair value of the interest rate swap.

The Company classified the interest rate swap in Level 2 of the fair value hierarchy.

**NOTE 10-STOCKHOLDERS' EQUITY**

As of September 30, 2023, the Company was authorized to issue

200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. On September 30, 2023 and December 31, 2022, there were 2,109,398 and 2,104,558 shares of common stock outstanding, respectively.

*Stock Options*

Below is a table summarizing the changes in stock options outstanding during the nine months ended September 30, 2023:

| | Options | | Weighted-Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2022 | 750 | $ | 155.00 |
| Granted | 1,731 | $ | 28.89 |
| Exercised | | | |
| Forfeited | (750) | | 155.00 |
| Outstanding at September 30, 2023 | 1,731 | $ | 28.89 |
| Exercisable at September 30, 2023 | - | | - |

The number of options has been restated to reflect the impact of the reverse stock split that occurred on October 20, 2023. During the nine months ended September 30, 2023, 750 stock options were forfeited, as a result of employee terminations.

Stock-based compensation expense of $0.2 million was recorded during the nine months ended September 30, 2023. As of September 30, 2023, the remaining unrecognized compensation cost related to non-vested stock options is $0.03 million and is expected to be recognized over 3.3 years. The outstanding stock options have a weighted average remaining contractual life of 9.26 years and a total intrinsic value of $nil.

15

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

*Warrants*

Below is a table summarizing the changes in warrants outstanding during the nine months ended September 30, 2023

| | Warrants | | Weighted-Average Exercise Price |
|---|---|---|---|
| Outstanding at December 31, 2022 | 1,871,333 | $ | 114.85 |
| Granted | - | | - |
| Exercised | - | | - |
| Forfeited | - | | - |
| Outstanding at September 30, 2023 | 1,871,333 | $ | 114.85 |
| Exercisable at September 30, 2023 | 1,871,333 | $ | 114.85 |

The number of options has been restated to reflect the impact of the reverse stock split that occurred on October 20, 2023. As of September 30, 2023, the outstanding warrants have a weighted average remaining contractual life of 2.67 years and a total intrinsic value of $nil.

**NOTE 11-EARNINGS (LOSS) PER SHARE**

The computation of weighted average shares outstanding and the basic and diluted earnings (loss) per common share for the following periods consisted of the following (in thousands, except share and per share amounts):

| | For the Three Months Ended | | For the Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2023 | September 30, 2022 | September 30, 2023 | September 30, 2022 |
| **Basic Earnings (Loss) Per Share** | | | | |
| Net income (loss) | $ (6,634) | $ (5,184) | $ (8,391) | $ (3,657) |
| Basic weighted average common shares outstanding | 2,109,398 | 2,104,558 | 2,108,811 | 2,115,846 |
| Basic earnings (loss) per share | $ (3.14) | $ (2.46) | $ (3.98) | $ (1.73) |
| Effect of dilutive stock options and warrants | - | - | - | - |
| Diluted weighted average common shares outstanding | 2,109,398 | 2,104,558 | 2,108,811 | 2,115,846 |
| Diluted earnings (loss) per share | $ (3.14) | $ (2.46) | $ (3.98) | $ (1.73) |

For the three and nine months ended September 30, 2023 and 2022, there were
1,852,015 and 1,871,333, respectively, potentially diluted options and warrants were excluded from the diluted EPS calculations as their effect is anti-dilutive.

16

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

**NOTE 12-COMMITMENTS AND CONTINGENCIES**

*Legal Proceedings*

At the Company's annual meeting on December 21, 2021, the stockholders were asked to approve an amendment to the Company's Amended and Restated Certificate of Incorporation, dated July 30, 2020 (the "Certificate of Incorporation"), increasing the number of authorized shares of the Company's common stock, par value $
0.0001 per share ("Common Stock" and such proposal, the "Share Increase Proposal") by 50,000,000 shares of Common Stock. As reported in a Form 8-K filing on December 28, 2021, the Share Increase Proposal was adopted and a Certificate of Amendment to the Certificate of Incorporation setting forth the amendment adopted pursuant to the Share Increase Proposal (the "Certificate of Amendment") was filed with the Secretary of State of the State of Delaware (the "Delaware Secretary of State"). To date, none of these newly authorized shares has actually been issued. Three purported beneficial owners of Common Stock subsequently expressed concerns about a statement in the Company's proxy statement related to the Share Increase Proposal, specifically questioning, in light of the proxy statement, the ability of brokerage firms and other custodians to vote shares of Common Stock held by them for the benefit of their customers in the absence of instructions from the beneficial owners. Based on an examination of the situation performed following receipt of these demands, the Company believes that the vote at the annual meeting was properly tabulated and that the proposed amendment was properly adopted in accordance with Delaware law. In light of the demands, however, and to ensure against any future question as to the validity of these newly authorized shares, the Company elected to seek validation of its Certificate of Amendment through a Petition to the Court of Chancery of the State of Delaware (the "Court of Chancery") pursuant to Section 205 of the Delaware General Corporation Law (the "205 Petition"). The action, styled In re 1847 Goedeker Inc., C.A. 2022-0219-SG (the "Action"), sought entry by the Court of Chancery of an order validating and declaring effective the Certificate of Amendment, and validating the additional shares of Common Stock authorized under the Share Increase Proposal.

Two purported stockholders objected to the 205 Petition. One such objecting, purported stockholder (the "Stockholder Plaintiff") filed his own lawsuit (which was then consolidated with the 205 Petition) requesting that such relief not be granted and asserting two claims for relief: first, against the Company for alleged violation of the Delaware General Corporation Law Section 225(b) for improper tabulation of the stockholder vote on the Share Increase Proposal; and second, asserting that the Company's directors breached their fiduciary duties by incorrectly tabulating the stockholder vote, and by causing a purportedly invalid amendment to our Certificate of Incorporation to be filed with the Delaware Secretary of State. The Court of Chancery held a hearing on May 27, 2022, to consider the Company's motion for entry of an order under Section 205 and subsequently entered an order denying the motion without prejudice on September 30, 2022. On July 7, 2022, the Company filed a Certificate of Correction with the Secretary of State of the State of Delaware, voiding the Charter Amendment and causing the number of authorized shares of Common Stock to remain at 200,000,000.

On June 12, 2023, the Company submitted to the Court of Chancery a Stipulation and [Proposed] Order Regarding Notice and Closing of the Case regarding the Action (the "Dismissal Order"). As stated in the Dismissal Order, the Company and the other parties to the Action negotiated at arm's length and resolved the stockholders' claims to entitlement to a mootness fee award, and the Company agreed to pay $475,000 for attorneys' fees and expenses to the stockholders' counsel (the "Attorneys' Fees"). Pursuant to Court of Chancery Rules 23(e) and 41(a), the parties to the Action stipulated to voluntary dismissal of the Action with prejudice as to the Stockholder Plaintiff and without prejudice as to any actual or potential claims of any other members of the putative class, and such dismissal was granted by the Court on June 13, 2023. As stipulated in the Dismissal Order, the Company paid the Attorneys' Fees to the stockholders' counsel on June 28, 2023 and such payment fully satisfied and resolved the stockholders' and the stockholders' counsel's entitlement to any fees or expenses in the Action.

On October 31, 2022, a putative shareholder class action was filed against Polished.com Inc. (the "Company") and certain of its current and former officers and directors, as well as certain underwriters of the Company's 2020 initial public offering (the "IPO"). The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Maschhof v. Polished.com Inc.*, et al., No. 1:22-cv-06606. The complaint asserts violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as well as Sections 10(b) and Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about September 8, 2023, the Court appointed lead plaintiff and lead counsel. An amended complaint was filed on or before October 31, 2023.

**POLISHED.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**September 30, 2023 and 2022 (UNAUDITED)**

On January 26, 2023, a derivative stockholder complaint was filed against certain of the Company's current and former officers and directors, naming the Company as a nominal defendant. The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Wong v. Moore et al.*, No. 1:23-cv-00559. The complaint asserts violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about March 7, 2023, plaintiff filed a stipulation and proposed order to stay proceedings until any motions to dismiss in the related class action (captioned *Maschhoff v. Polished.com Inc. et al.*, No. 1:22-cv-06606) are decided. On March 23, 2023, the stipulation was so-ordered.

On February 13, 2023, a derivative stockholder complaint was filed against certain of the Company's current and former officers and directors as well as the Company's external manager, naming the Company as a nominal defendant. The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Gossett v. Moore, et al.*, No. 1:23-cv-1168. The complaint asserts claims for breach of fiduciary duty against the former officers and directors and aiding and abetting breaches of fiduciary of duty against the external manager, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about April 24, 2023, plaintiffs filed a joint stipulation and proposed order consolidating the related derivative actions and appointing co-lead counsel. To date, the stipulation has yet to be ordered.

**NOTE 13-SUPPLIER CONCENTRATION**

Significant customers and suppliers are those that account for greater than ten percent of the Company's revenues and purchases.

For the nine months September 30, 2023, the Company approximately 65% of purchases were made from DMI.

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

**NOTE 14-SUBSEQUENT EVENTS**

Subsequent to December 31, 2022, the Company signed a letter of intent for a sublease from DMI, a related party for a new warehouse in a building being leased by DMI. The new lease will allow the Company to close its two existing New Jersey warehouses and consolidate operations into one new warehouse. The lease, which is expected to be finalized in the fourth quarter of 2023 or the first quarter of 2024 is for 232,640 square feet for seven years at a cost of approximately $15 per square foot, including common area charges with annual increases of 3.75%.

On July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "First Amendment"), in part, to require the Company maintain liquidity, which includes cash and certain qualifying customer and credit card account receivables, of $8.0 million. The Company and Bank of America amended the Credit Agreement on November 20, 2023 (the "Second Amendment"), which requires the Company to establish a Bank of America cash collateral account where cash and cash equivalents deposited in the cash collateral account do not constitute Liquidity for purposes of the Credit Agreement. Further, the Second Amendment requires that (i) at least $3.0 million of Liquidity be comprised of unrestricted cash and cash equivalents and (ii) more than $5.0 million of Liquidity be comprised of certain qualifying customer and credit card accounts receivable.

The Company entered into the Second Amendment, in part, to waive events of defaults on its existing Credit Agreement. The Term Loan Lenders, as part of the Second Amendment, agreed to defer the principal installment of the Term Loans in the amount of $937,500 required to be made on December 31, 2023 until the earliest to occur of (i) January 31, 2024, (ii) the date on which a subordinated Term Loan or an equity contribution, as applicable, is consummated (even if the date of such consummation precedes December 31, 2023) and (iii) an event of default. The Second Amendment requires the Company to pay the existing Term Facility and Revolving Facility by November 30, 2024 (the "Maturity Date").

On October 19, 2023, the Company's shareholders approved a reverse stock split between 1-for-25 and not more than 1-for-75 at any time on or prior to October 19, 2023. The directors of the Company determined on a ratio of 1-for-50 for the Reverse Stock Split. On October 20, 2023, the Reverse Stock Split became effective. All references in these financial statements to number of common shares, price per share and weighted average number of shares outstanding prior to the 1 for 50 reverse split have been adjusted to reflect the stock split on a retroactive basis as of the earliest period presented, unless otherwise noted.

18

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Except as otherwise indicated by the context and for the purposes of this Quarterly Report on Form 10-Q, the terms "Company," "we," "us," or "our" refer to Polished.com Inc., a Delaware corporation, and its consolidated subsidiaries, including but not limited to, 1 Stop Electronics Center, Inc., a New York corporation ("1 Stop"), Gold Coast Appliances, Inc., a New York corporation ("Gold Coast"), Superior Deals Inc., a New York corporation ("Superior Deals"), Joe's Appliances LLC, a New York limited liability company ("Joe's Appliances"), and YF Logistics LLC, a New Jersey limited liability company ("YF Logistics" and together with 1 Stop, Gold Coast, Superior Deals, and Joe's Appliances, "Appliances Connection"), and AC Gallery Inc., a Delaware corporation ("AC Gallery"). The following discussion and analysis summarizes the significant factors affecting our operating results, financial condition, liquidity and cash flows as of and for the periods presented below. The following discussion and analysis should be read in conjunction with our unaudited condensed consolidated financial statements and the related notes thereto included elsewhere in this report. The discussion contains forward-looking statements that are based on the beliefs of management, as well as assumptions made by, and information currently available to, management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed below and elsewhere in this report, particularly in the section "Cautionary Statement Regarding Forward-Looking Statements" and in our Annual Report on Form 10-K for the year ended December 31, 2022 under the heading Item 1A "Risk Factors."*

**Overview**

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the unaudited condensed consolidated financial statements and related notes thereto, which are included in Part I, Item 1 of this Form 10-Q.

We operate a content-driven and technology-enabled shopping destination for appliances, furniture and home goods. With warehouse fulfillment centers in the Northeast and Midwest, as well as showrooms in Brooklyn, New York, and Largo, Florida. We offer one-stop shopping for national and global brands. We carry many household name-brands, including Bosch, Cafe, Frigidaire Pro, Whirlpool, LG, and Samsung, and also carry many major luxury appliance brands such as Miele, Thermador, La Cornue, Dacor, Ilve, Jenn-Air, and Viking, among others. We also sell furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builders and business clients.

**Recent Developments**

***Amendment of Bank of America Credit Agreement***

On July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "First Amendment"), in part, to require the Company maintain liquidity, which includes cash and certain qualifying customer and credit card account receivables, of $8.0 million. The Company and Bank of America amended the Credit Agreement on November 20, 2023 (the "Second Amendment"), which requires the Company to establish a Bank of America cash collateral account where cash and cash equivalents deposited in the cash collateral account do not constitute Liquidity for purposes of the Credit Agreement. Further, the Second Amendment requires that (i) at least $3.0 million of Liquidity be comprised of unrestricted cash and cash equivalents and (ii) more than $5.0 million of Liquidity be comprised of certain qualifying customer and credit card accounts receivable.

The Company entered into the Second Amendment, in part, to waive events of defaults on its existing Credit Agreement. The Term Loan Lenders, as part of the Second Amendment, agreed to defer the principal installment of the Term Loans in the amount of $937,500 required to be made on December 31, 2023 until the earliest to occur of (i) January 31, 2024, (ii) the date on which a subordinated Term Loan or an equity contribution, as applicable, is consummated (even if the date of such consummation precedes December 31, 2023) and (iii) an event of default. The Second Amendment requires the Company to pay the existing Term Facility and Revolving Facility by November 30, 2024 (the "Maturity Date").

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

Concurrent with closing of the Bank of America loan, the Company purchased a fixed rate loan swap (See Note 9) capping its interest rate at 2.9%, plus applicable margins.

Commencing on December 31, 2023, through and including January 31, 2024, the Borrowers must repay the principal amount of the Term Loan in installments of $937,500, and quarterly installments of $1,875,000 each, payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

*Reverse Stock Split*

On October 19, 2023, the Company filed with the Secretary of State of the State of Delaware the Certificate of Amendment to affect a reverse stock split (the "Reverse Split") of the Company's common stock at an exchange ratio of 1 for 50, which was approved by the board of directors. The Reverse Split was effective at 12:01 a.m. Eastern Time on October 20, 2023 (the "Effective Time"). At the Effective Time, every 50 shares of the Company's issued and outstanding common stock were automatically converted into one share of common stock, without any change in the par value per share. In addition, proportionate adjustments were made to the per share exercise price and the number of shares issuable upon the exercise of all outstanding stock options, warrants and convertible securities, and to the number of shares issued and issuable under the Company's stock incentive plans. Any stockholder who would otherwise be entitled to a fractional share of common stock created as a result of the Reverse Split will be entitled to receive a cash payment in lieu thereof equal to the fractional share to which the stockholder would otherwise be entitled multiplied by the closing sales price of a share of common stock on October 19, 2023, as adjusted for the Reverse Split.

**Trends and Principal Factors Affecting Our Financial Performance**

Our operating results are primarily affected by the following factors:

- our ability to acquire new customers or retain existing customers, including those shopping online

- our ability to offer competitive product pricing;

- our ability to broaden product offerings;

- industry demand and competition;

- market conditions and our market position; and

- our ability to successfully integrate the operations of Appliances Connection with our business.

20

**Results of Operations**

**Comparison of Three Months Ended September 30, 2023 and 2022**

The following table sets forth key components of our results of operations for the three months ended September 30, 2023 and 2022, in thousands and as a percentage of our revenue.

| | Three Months Ended September 30, 2023 | | Three Months Ended September 30, 2022 | |
|---|---|---|---|---|
| | Amount | % of Sales | Amount | % of Sales |
| Product sales, net | $ 77,818 | 100.0% | $ 143,566 | 100.0% |
| Cost of goods sold | 62,513 | 80.3% | 122,431 | 85.3% |
| Gross profit | 15,305 | 19.7% | 21,135 | 14.7% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 5,874 | 7.5% | 8,348 | 5.8% |
| Advertising | 5,061 | 6.5% | 7,534 | 5.2% |
| Bank and credit card fees | 2,557 | 3.3% | 5,932 | 4.1% |
| Depreciation and amortization | 1,061 | 1.4% | 2,882 | 2.0% |
| General and administrative | 6,747 | 8.7% | 7,260 | 5.1% |
| | | | | |
| Total Operating Expenses | 21,300 | 27.4% | 31,956 | 22.3% |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | (5,995) | -7.7% | (10,821) | -7.5% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 407 | 0.5% | 174 | 0.1% |
| Interest expense | (1,886) | -2.4% | (1,351) | -0.9% |
| Gain (loss) on change in fair value of derivative instruments | 446 | 0.6% | 4,476 | 3.1% |
| Other income (expense) | 227 | 0.3% | (50) | 0.0% |
| | | | | |
| Total Other Income (Expenses) | (806) | -1.0% | 3,249 | 2.3% |
| | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (6,801) | -8.7% | (7,572) | -5.3% |
| | | | | |
| INCOME TAX (EXPENSE) BENEFIT | 167 | 0.2% | 2,388 | 1.7% |
| | | | | |
| NET INCOME (LOSS) | $ (6,634) | -8.5% | $ (5,184) | -3.6% |

*Product sales, net*. We generate revenue from the retail sale of appliances, furniture, home goods and related products. Our product sales were $77.8 million for the three months ended September 30, 2023, as compared to $143.6 million for the three months ended September 30, 2022, a decrease of $65.7 million, or 45.8%. The decrease in sales is attributable to several factors including a general slowdown in the economy, inflation, an increase in interest rates which affects the mass market, housing and the remodeling business. Also, in 2023, the Company emphasized higher-margin sales instead of pursuing a policy of revenue growth with less emphasis on profitability.

*Cost of goods sold.* Our costs of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their product. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $62.5 million for the three months ended September 30, 2023, as compared to $122.4 million for the three months ended September 30, 2022, a decrease of $59.9 million, or 48.9%. The decrease is related to reduced sales for the three months ended September 30, 2023.

*Gross profit and gross margin*. As a result of the foregoing, our gross profit was $15.3 million for the three months ended September 30, 2023, as compared to $21.1 million for the three months ended September 30, 2022, a decrease of $5.8 million, or 27.6%. Our gross margin (gross profit as a percentage of net sales) was 19.7% for the three months ended September 30, 2023 and 14.7% for the three months ended September 30, 2022. The improvement in the gross profit percentage is the result of management's emphasis on profitability as opposed to revenue growth.

*Personnel expenses*. Personnel expenses include employee salaries and bonuses plus related payroll taxes. It also includes health insurance premiums, training costs and stock compensation expense. Our personnel expenses were $5.9 million for the three months ended September 30, 2023, as compared to $8.3 million for the three months ended September 30, 2022, a decrease of $2.5 million, or 29.6%. As a percentage of net sales, personnel expenses were 7.5% and 5.8% for the three months ended September 30, 2023 and 2022, respectively. In the current quarter, we affected a reduction in force to align headcount to declines in revenue. As a result, personnel costs include $0.2 million of severance costs.

*Advertising expenses*. Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $5.1 million for the three months ended September 30, 2023, as compared to $7.5 million for the three months ended September 30, 2022, a decrease of $2.5 million, or 32.8%. As a percentage of net sales, advertising expenses were 6.5% and 5.2% for the three months ended September 30, 2023 and 2022, respectively.

*Bank and credit card fees*. Bank and credit card fees are primarily the fees we pay credit card processors for processing credit card purchases made by customers and to third party sellers on whose websites we sell parts and other small items. Our bank and credit card fees were $2.6 million for the three months ended September 30, 2023, as compared to $5.9 million for the three months ended September 30, 2022, a decrease of $3.3 million, or 56.9%. As a percentage of net sales, bank and credit card fees were 3.3% and 4.1% for the three months ended September 30, 2023 and 2022, respectively. Bank and credit card fees are based on customer orders that are paid with a credit card (substantially all orders), so the decrease was largely due to the decline in sales.

*Depreciation and amortization*. Depreciation and amortization was $1.1 million, or 1.4% of net sales, for the three months ended September 30, 2023, as compared to $2.9 million, or 2.0% of net sales, for the three months ended September 30, 2022. The decrease is the result of the 2022 impairment charge that reduced the amount of intangible assets to be amortized.

*General and administrative expenses*. Our general and administrative expenses consist primarily of professional advisor fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $6.7 million for the three months ended September 30, 2023, as compared to $7.3 million for the three months ended September 30, 2022, a decrease of $0.5 million, or 7.1%. As a percentage of net sales, general and administrative expenses were 8.7% and 5.1% for the three months ended September 30, 2023 and 2022, respectively. The decrease results from lower insurance premiums and professional fees partially offset by the write-off of fixed assets associated with the terminated lease of 8780 19th Avenue.

Following is a summary of general and administrative expenses for the three months ended September 30, 2023 and 2022

| | Three Months Ended September 30 | | | |
| --- | --- | --- | --- | --- |
| | | 2023 | | 2022 |
| Professional Fees | $ | 2,237 | $ | 3,029 |
| Insurance | | 1,341 | | 1,641 |
| Loss on Disposal of Fixed Assets | | 1,094 | | - |
| Rent | | 1,045 | | 988 |
| All Other | | 1,030 | | 1,602 |
| Total | $ | 6,747 | $ | 7,260 |

*Total other income (expense)*. We had $0.8 million in total other expense, net, for the three months ended September 30, 2023, as compared to total other income, net, of $3.2 million for the three months ended September 30, 2022. Total other income, net, for the three months ended September 30, 2023 consisted primarily of a gain on the change in fair value of a derivative of $0.4 million and interest income of $0.4 million, offset by interest expense of $1.9 million. Total other expense, net, for the three months ended September 30, 2022 consisted of a change in the fair value of a derivative of $4.5 million and interest income of $0.2 million offset by interest expense of $1.4 million.

*Income tax benefit (expense)*. We had an income tax benefit of $0.2 million for the three months ended September 30, 2023, as compared to an income tax benefit of $2.4 million for the three months ended September 30, 2022.

*Net income (loss)*. As a result of the cumulative effect of the factors described above, we had net losses of $6.6 million and $5.2 million for the three months ended September 30, 2023 and September 30, 2022, respectively, an increase of $1.5 million or 28.0%.

**Comparison of the Nine Months ended September 30, 2023 and 2022**

The following table sets forth key components of our results of operations for the nine months ended September 30, 2023 and 2022, in thousands and as a percentage of our revenue.

| | Nine Months Ended September 30, 2023 | | Nine Months Ended September 30, 2022 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Sales | Amount | % of Sales |
| Product sales, net | $ 261,018 | 100.0% | $ 430,710 | 100.0% |
| Cost of goods sold | 204,987 | 78.5% | 355,788 | 82.6% |
| Gross profit | 56,031 | 21.5% | 74,922 | 17.4% |
| | | | | |
| Operating Expenses | | | | |
| Personnel | 18,379 | 7.0% | 22,396 | 5.2% |
| Advertising | 14,694 | 5.6% | 18,475 | 4.3% |
| Bank and credit card fees | 8,935 | 3.4% | 15,121 | 3.5% |
| Depreciation and amortization | 3,199 | 1.2% | 8,588 | 2.0% |
| General and administrative | 16,619 | 6.4% | 15,078 | 3.5% |
| | | | | |
| Total Operating Expenses | 61,826 | 23.7% | 79,658 | 18.5% |
| | | | | |
| INCOME (LOSS) FROM OPERATIONS | (5,795) | -2.2% | (4,736) | -1.1% |
| | | | | |
| Other Income (Expenses) | | | | |
| Interest income | 1,139 | 0.4% | 282 | 0.1% |
| Adjustment in value of contingency | - | 0.0% | (2) | 0.0% |
| Interest expense | (4,821) | -1.8% | (2,594) | -0.6% |
| Gain (loss) on change in fair value of derivative instruments | 1,020 | 0.4% | 3,540 | 0.8% |
| Loss on extinguishment of debt | - | 0.0% | (3,241) | -0.8% |
| Other income (expense) | 331 | 0.1% | (140) | 0.0% |
| | | | | |
| Total Other Income (Expenses) | (2,331) | -0.9% | (2,155) | -0.5% |
| | | | | |
| NET INCOME (LOSS) BEFORE INCOME TAXES | (8,126) | -3.1% | (6,891) | -1.6% |
| | | | | |
| INCOME TAX (EXPENSE) BENEFIT | (265) | -0.1% | 3,234 | 0.8% |
| | | | | |
| NET INCOME (LOSS) | $ (8,391) | -3.2% | $ (3,657) | -0.8% |

*Product sales, net*. We generate revenue from the retail sale of appliances, furniture, home goods and related products. Our product sales were $261.0 million for the nine months ended September 30, 2023, as compared to $430.7 million for the nine months ended September 30, 2022, a decrease of $169.7 million, or 39.4%. The decrease in sales is attributable to several factors including a general slowdown in the economy, inflation, an increase in interest rates which affects the mass market, housing and the remodeling business. Also, in 2023, the Company emphasized higher-margin sales instead of pursuing a policy of revenue growth with less emphasis on profitability.

*Cost of goods sold*. Our costs of goods sold are comprised of product costs and freight costs. Product costs represent the amount we pay the manufacturer for their product. We negotiate special terms and pricing with the manufacturer, which are generally based on the number of products we purchase. Periodically, manufacturers offer special pricing for purchasing a certain volume of products at one time. Funding might also be offered to support our marketing and advertising efforts. Freight is the cost of delivering products to customers. Our cost of goods sold was $205.0 million for the nine months ended September 30, 2023, as compared to $355.8 million for the nine months ended September 30, 2022, a decrease of $150.8 million, or 42.4%.

*Gross profit and gross margin*. As a result of the foregoing, our gross profit was $56.0 million for the nine months ended September 30, 2023, as compared to $74.9 million for the nine months ended September 30, 2022, a decrease of $18.9 million, or 26.0%. Our gross margin (gross profit as a percentage of net sales) was 21.5% for the nine months ended September 30, 2023 and 17.4% for the nine months ended September 30, 2022. The improvement in the gross profit percentage is the result of management's emphasis on profitability as opposed to revenue growth. The decrease in gross profit results from reduced sales. The increase in gross margin results from management's emphasis on profitability in the current period.

*Personnel expenses*. Personnel expenses include employee salaries and bonuses plus related payroll taxes. It also includes health insurance premiums, 401(k) contributions, training costs and stock compensation expense. Our personnel expenses were $18.4 million for the nine months ended September 30, 2023, as compared to $22.4 million for the nine months ended September 30, 2022, a decrease of $4.0 million, or 17.9%. As a percentage of net sales, personnel expenses were 7.0% and 5.2% for the nine months ended September 30, 2023 and 2022, respectively.

In 2023, we affected a reduction in force to align headcount to declines in revenue. As a result, personnel costs include $0.3 million of severance costs.

*Advertising expenses*. Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $14.7 million for the nine months ended September 30, 2023, as compared to $18.5 million for the nine months ended September 30, 2022, a decrease of $3.8 million, or 20.5%. As a percentage of net sales, advertising expenses were 5.6% and 4.3% for the nine months ended September 30, 2023 and 2022, respectively.

*Bank and credit card fees*. Bank and credit card fees are primarily the fees we pay credit card processors for processing credit card purchases made by customers and to third party sellers on whose websites we sell parts and other small items. Our bank and credit card fees were $8.9 million for the nine months ended September 30, 2023, as compared to $15.1 million for the nine months ended September 30, 2022, a decrease of $6.2 million, or 40.9%. As a percentage of net sales, bank and credit card fees were 3.4% and 3.5% for the nine months ended September 30, 2023 and 2022, respectively. Bank and credit card fees are based on customer orders that are paid with a credit card (substantially all orders), so the decrease was largely due to the decline in sales.

*Depreciation and amortization*. Depreciation and amortization was $3.2 million, or 1.2% of net sales, for the nine months ended September 30, 2023, as compared to $8.6 million, or 2.0% of net sales, for the nine months ended September 30, 2022. The decrease is the result of the 2022 impairment charge that reduced the amount of intangible assets to be amortized.

*General and administrative expenses*. Our general and administrative expenses consist primarily of professional advisor fees, rent expense, insurance, and other expenses incurred in connection with general operations. Our general and administrative expenses were $16.6 million for the nine months ended September 30, 2023, as compared to $15.1 million for the nine months ended September 30, 2022, an increase of $1.5 million, or 10.2%. As a percentage of net sales, general and administrative expenses were 6.4% and 3.5% for the nine months ended September 30, 2023 and 2022, respectively. The increase results from higher insurance premiums and a write-off of fixed assets associated with the terminated lease of 8780 19th Avenue.

Following is a summary of general and administrative expenses for the three months ended September 30, 2023 and 2022

|  | Nine Months Ended September 30 | |
|---|---|---|
|  | 2023 | 2022 |
| Professional Fees | $ 5,421 | $ 5,625 |
| Insurance | 3,864 | 3,324 |
| Rent | 3,237 | 3,045 |
| Loss on Disposal of Fixed Assets | 1,094 | - |
| All Other | 3,003 | 3,084 |
| Total | $ 16,619 | $ 15,078 |

24

*Total other income (expense)*. We had $2.3 million in total other expense, net, for the nine months ended September 30, 2023, as compared to total other expense, net, of $2.2 million for the nine months ended September 30, 2022. Total other expense, net, for the nine months ended September 30, 2023 consisted primarily of interest expense of $4.8 million, a gain on the change in fair value of a derivative of $1.0 million and interest income of $1.1 million. Total other expense, net, for the nine months ended September 30, 2022 consisted of a $3.2 million loss on settlement of a debt obligation and interest expense of $2.6 million offset by a gain on the fair value of a derivative of $3.5 million and interest income of $0.3 million.

*Income tax benefit (expense)*. We had an income tax expense of $0.3 million for the nine months ended September 30, 2023, as compared to an income tax benefit of $3.2 million for the nine months ended September 30, 2022.

*Net income (loss)*. As a result of the cumulative effect of the factors described above, we had a net loss of $8.4 million for the nine months ended September 30, 2023, as compared to a net loss of $3.7 million for the nine months ended September 30, 2022, an increase of $4.7 million, or 129.5%.

**Liquidity and Capital Resources**

As of September 30, 2023, we had cash and cash equivalents of $15.2 million including restricted cash of $5.4 million. For the nine months ended September 30, 2023, we had an operating loss of approximately $8.4 million, cash flows used in operations of $0.4 million and working capital of $15.9 million. As of and for the year ended December 31, 2022, we had an operating loss of $128.3 million (including a non-cash impairment charge of $109.1 million), cash used in operations of $46.7 million, cash and cash equivalents of $20.5 million including restricted cash of $0.95 million and working capital of $25.9 million.

Management has prepared estimates of operations for fiscal years 2023 and 2024 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these unaudited condensed consolidated financial statements.

The accompanying unaudited condensed consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business. Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

**Summary of Cash Flow**

The following table provides detailed information about our net cash flow for the nine months ended September 30, 2023 and 2022 (in thousands).

| | Nine Months Ended September 30, | |
|---|---|---|
| | **2023** | **2022** |
| Net cash used in operating activities | $ (390) | $ (38,693) |
| Net cash used in investing activities | (140) | (1,318) |
| Net cash (used in) provided by financing activities | (4,767) | 36,386 |
| | | |
| Net change in cash, cash equivalents, and restricted cash | $ (5,297) | $ (3,625) |

*Cashflows used in operating activities.* Our net cash used in operating activities was $0.4 million for the nine months ended September 30, 2023, as compared to net cash used in operating activities of $38.7 million for the nine months ended September 30, 2022. Significant changes in operating assets and liabilities affecting cash flows during these periods included:

- Net loss was $8.4 million for the nine months ended September 30, 2023 compared to a net loss of $3.7 million for the nine months ended September 30, 2022,

- Cash used by receivables was $7.0 million and $1.8 million for the nine months ended September 30, 2023 and 2022, respectively,

- Cash used by vendor deposits was $5.8 million and $12.6 million for the nine months ended September 30, 2023 and 2022, respectively

- Cash provided by inventories was $12.9 million and $7.3 million for the nine months ended September 30, 2023 and 2022, respectively, due to efforts to manage inventory levels to support revenue levels in the respective years,

- Cash used by accounts payable and accrued expenses was $4.9 million and $12.1 million for the nine months ended September 30, 2023 and 2022, respectively, and

- Cash used by customer deposits was $2.8 million and $20.9 million for the nine months ended September 30, 2023 and 2022, respectively. Prior to July 2022, on certain sales transactions, the Company charged a customer's card when an order was placed. After July 2022, the customer's card was charged when the order shipped. The large decline in customer deposits results from shipping or refunding customer orders that had previously been paid.

*Cashflows provided by investing activities.* Our net cash used in investing activities was $0.1 million for the nine months ended September 30, 2023, as compared to $1.3 million for the nine months ended September 30, 2022. The cash used in both years was for purchases of property and equipment.

*Cashflows (used in) provided by financing activities.* Our net cash used in financing activities was ($4.8) million for the nine months ended September 30, 2023, as compared to net cash provided by financing activities of $36.4 million for the nine months ended September 30, 2022.

Significant changes in financing activities affecting cash flows during these years included:

- Net cash received from notes payable proceeds of $43.0 million for the nine months ended September 30, 2022,

- Repayments of notes payable of $4.7 million and $4.6 million for the nine months ended September 30, 2023 and 2022, respectively, and

- Stock repurchases of $2.0 million for the nine months ended September 30, 2022.

26

*Credit Facilities*

Bank of America Credit Agreement

On May 9, 2022, the Company entered into a Credit Agreement (the "Credit Agreement") with the lenders identified therein (the "Lenders") and Bank of America, N.A., as administrative agent, swingline lender and letter of credit issuer (the "Agent"), pursuant to which the Lenders agreed to make available to the Borrowers senior secured credit facilities in the aggregate initial amount of $140.0 million, including (i) a $100.0 million term loan (the "Term Loan") and (ii) a $40.0 million revolving credit facility (the "Revolving Loan"), which revolving credit facility included a $2.00 million swingline sublimit (the "Swing Line Loan" and together with the Term Loan and the Revolving Loan, the "Loans") and, separately, a $10.0 million letter of credit commitment, in each case, on the terms and conditions contained in the Credit Agreement.

On May 9, 2022, the Company borrowed the entire amount of the Term Loan in the aggregate principal amount of $100.0 million. A portion of the proceeds of the Term Loan were to repay and terminate the M&T Credit Agreement. Commencing on September 30, 2022, through and including September 30, 2023, the Borrowers repaid the principal amount of the Term Loan in quarterly installments of $1,250,000 each, payable on the last business day of each March, June, September and December.

As of September 30, 2023, the carrying value of the Term Loan was $92.3 million, comprised of principal of $93.7 million, net of unamortized loan costs of $0.8 million.

As a result of our technical non-compliance with specified loan covenants for both the Bank of America Term Loan and Revolving Loan, based in part due to our failure to timely deliver financial statements, Bank of America froze the $40.0 million Revolving Loan before any borrowings had been made against the facility.

On July 25, 2023, the Company and Bank of America amended the Credit Agreement (the "First Amendment"), in part, to require the Company maintain liquidity, which includes cash and certain qualifying customer and credit card account receivables, of $8.0 million. The Company and Bank of America amended the Credit Agreement on November 20, 2023 (the "Second Amendment"), which requires the Company to establish a Bank of America cash collateral account where cash and cash equivalents deposited in the cash collateral account do not constitute Liquidity for purposes of the Credit Agreement. Further, the Second Amendment requires that (i) at least $3.0 million of Liquidity be comprised of unrestricted cash and cash equivalents and (ii) more than $5.0 million of Liquidity be comprised of certain qualifying customer and credit card accounts receivable.

The Company entered into the Second Amendment, in part, to waive events of defaults on its existing Credit Agreement. The Term Loan Lenders, as part of the Second Amendment, agreed to defer the principal installment of the Term Loans in the amount of $937,500 required to be made on December 31, 2023 until the earliest to occur of (i) January 31, 2024, (ii) the date on which a subordinated Term Loan or an equity contribution, as applicable, is consummated (even if the date of such consummation precedes December 31, 2023) and (iii) an event of default. The Second Amendment requires the Company to pay the existing Term Facility and Revolving Facility by November 30, 2024 (the "Maturity Date").

27

The Term Loan and Revolving Loan will bear interest on the unpaid principal amount thereof as follows: (i) if it is a loan bearing interest at a rate determined by the Base Rate, then at the Base Rate plus the Applicable Rate for such loan and (ii) if it is a loan bearing interest at a rate determined by Term SOFR, then at Term SOFR plus the Applicable Rate for such loan. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from Term SOFR to Base Rate, and may elect the interest rate benchmark for future revolving loans as either Term SOFR or Base Rate (and, with respect to any loan made using Term SOFR, may also select the interest period applicable to any such loan), by notifying the Agent and the Lenders from time to time in accordance with the provisions of the Amendment and Credit Agreement. The Applicable Rate increased from a high of 1.95% and 0.95%, respectively, for Term SOFR and Base Rate in the Credit Agreement to 4.00% for each of Term SOFR and Base Rate as a result of the Amendment. Interest is payable in arrears on each Interest Payment Date (as defined in the Credit Agreement). Notwithstanding the foregoing, following an event of default, the loans under the Credit Facilities will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable loan.

Commencing on December 31, 2023, through and including January 31, 2024, the Borrowers must repay the principal amount of the Term Loan in installments of $937,500, and quarterly installments of $1,875,000 each, payable on the last business day of each March, June, September and December. Revolving Loans may be repaid and reborrowed at any time until the Maturity Date, subject to the terms and conditions set forth in the Credit Agreement. Mandatory prepayments of Revolving Loans are required if the amount borrowed at any time exceeds the commitment amount. The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of loss or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement. The Loans may from time to time be further evidenced by separate promissory notes issued by the Borrowers.

As a result of the reduced term, the Company has begun discussions with investment bankers to place financing to replace the existing credit agreement by August 31, 2024.

***Management Services Agreement***

On April 5, 2019, the Company entered into a management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and prior significant stockholder, which was amended effective on August 4, 2020. Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that under certain circumstances specified in the management services agreement, the quarterly fee may be reduced if similar fees payable to the Manager by subsidiaries of the Company's former parent company, 1847 Holdings LLC, exceed a threshold amount.

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of the Company in connection with performing services under the management services agreement.

The Company expensed management fees of $0.06 and $0.18 million for the three and nine months ended September 30, 2023 and 2022, respectively.

*Leases*

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C. for its prior principal office in Ballwin, Missouri. The lease is for a term of five years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. The lease agreement contains customary events of default, representations, warranties, and covenants. The termination date of this lease agreement is April 4, 2024.

On May 31, 2019, YF Logistics entered into a sublease agreement with Dynamic Marketing, Inc. ("DMI") for its warehouse space in Hamilton, NJ. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one-year terms until the earlier of (i) termination by either upon thirty days' prior written notice or (ii) April 30, 2024. The sublease provides for a base rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month.

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC, which was amended on March 31, 2021, for its new principal office and showroom in St. Charles, Missouri. The lease terminates on April 30, 2027, with two options to renew for an additional five-year period. The base rent is $20,977 per month until September 30, 2021, and increases to $31,465 per month until April 30, 2022, after which time the base rent increases at approximately 2.5% per year thereafter. The Company must also pay its 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. The lease contains customary events of default.

On June 2, 2021, 1 Stop entered into a new lease agreement with 1870 Bath Ave. LLC, a related party, for the premises located at 1870 Bath Avenue, Brooklyn, New York. The lease is for a term of ten years and provides for a base rent of $74,263 per month during the first year with annual increases to $96,896 during the last year of the term. 1 Stop is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018.

On June 2, 2021, Joe's Appliances entered into a new lease agreement with 7812 5th Ave Realty LLC, a related party, for the premises located at 7812 5th Avenue, Brooklyn, New York. The lease is for a term of ten years and provides for a base rent of $6,365 per month during the first year with annual increases to $8,305 during the last year of the term. Joe's Appliances is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018. The initial ROU asset and liability associated with this lease is $0.7 million.

On July 29, 2021, AC Gallery entered into a lease agreement with Tom's Flooring, LLC for the showroom and warehouse located in Largo, Florida. The lease is for a term of four months commencing on September 1, 2021 and ending on December 31, 2021 and provides for a base rent of $6,500 per month. The lease is currently month-to-month. AC Gallery must also pay its one-third pro rata portion of the common area maintenance charges, utilities and sales taxes. The lease contains customary events of default. The lease is short term and therefore not recorded as a ROU asset and liability.

On September 9, 2021, the Company entered into a warehouse agreement for a new warehouse in Somerset, New Jersey. The warehouse agreement is for a term of 26 months commencing on October 1, 2021, and ending November 29, 2023, unless the master lease for the premises is terminated earlier. The monthly storage fee is $136,274 for the first year, $140,362 for the second year, and $144,573 for the last two months. The Company also paid a security deposit of $272,549. The lease agreement contains customary events of default, representations, warranties, and covenants. The initial ROU and liability associated with this operating lease is $3.4 million.

On March 15, 2022, the Company entered into a lease for additional office space with 8780 19th Ave LLC ("Landlord"), an entity owned by Albert and Elie Fouerti, the Company's former Chief Executive and Chief Operating Officer, respectively. The Company contends that the lease required the Landlord do certain work at Landlord's expense to improve the building at a cost of approximately $1.2 million. Landlord has refused to pay for this work, contending that this expense was the Company's responsibility. In addition, the total remaining amount due on the lease at September 30, 2023 is also approximately $1.2 million. Landlord contends that the Company is in default of the lease for failing to pay rent. The Company disagreed that its rent obligations have been triggered and further contended that Landlord has violated the lease by failing to pay for the work. On August 23, 2023, the Company entered into a lease termination agreement with the Landlord. Under the terms of the termination agreement, the Company was relieved of its obligations under the lease and agreed to terminate its claims for reimbursement of the improvements it made to the building and to pay $100,000.

### Critical Accounting Policies and Estimates

For information regarding the Company's Critical Accounting Policies and Estimates, see the "Critical Accounting Policies and Estimates" section of Item 7. "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" in our Annual Report on Form 10-K for the year ended December 31, 2022.

### ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

As a smaller reporting company, we are not required to disclose information under this item.

### ITEM 4. CONTROLS AND PROCEDURES.

Evaluation of Disclosure Controls and Procedures

The Company maintains "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, designed to ensure that information required to be disclosed by a company in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives. Management, with the participation of our Interim Chief Executive Officer and Interim Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2023.

Based on the evaluation performed as of September 30, 2023, as a result of the material weaknesses in internal control over financial reporting that are described below, and as further described in Item 9A of our Annual Report on Form 10-K filed with the SEC on July 31, 2023, our Interim Chief Executive Officer and Interim Chief Financial Officer determined that our disclosure controls and procedures were not effective as of such date.

*Material Weaknesses in Internal Control over Financial Reporting*

Management has determined that the Company's ineffective internal control over financial reporting and resulting material weaknesses, stem primarily from management's inability to maintain appropriately designed controls, which impacts the control environment, risk assessment procedures and ability to detect or prevent material misstatements to the financial statements. The material weaknesses were attributed to:

- Lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls;

- Ineffective assessment and identification of changes in risk impacting internal control over financial reporting;

- Inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures;

- Ineffective evaluation and determination as to whether the components of internal control were present and functioning; and

- The lack of an accounting system that is required for a company or our size.

*Management's Remediation Plans*

Management is actively engaged in the implementation of remediation plans to address the controls contributing to the material weaknesses. The Company has taken, and continues to take, the following remediation actions:

- Enhance reporting structure and increase the number of qualified resources in roles over internal control over financial reporting;

- Establish formal risk assessment procedures to identify and monitor changes in the organization that could have an impact on internal control over financial reporting;

- Develop and document policies and procedures, including related business process and technology controls, assess their effectiveness and establish a program for continuous assessment of their effectiveness; and

- Implementation of a new ERP

We believe these measures will remediate the control deficiencies, but management is assessing the need for any additional steps to remediate the underlying causes that give rise to these material weaknesses. The material weaknesses will not be considered remediated until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. There is no assurance that additional remediation steps will not be necessary.

**Changes in Internal Control Over Financial Reporting**

Except as set forth above, there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended September 30, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

PART II

OTHER INFORMATION

**ITEM 1. LEGAL PROCEEDINGS.**

**Derivative Actions**

At the Company's annual meeting on December 21, 2021, the stockholders were asked to approve an amendment to the Company's Amended and Restated Certificate of Incorporation, dated July 30, 2020 (the "Certificate of Incorporation"), increasing the number of authorized shares of the Company's common stock, par value $0.0001 per share ("Common Stock" and such proposal, the "Share Increase Proposal") by 50,000,000 shares of Common Stock. As reported in a Form 8-K filing on December 28, 2021, the Share Increase Proposal was adopted and a Certificate of Amendment to the Certificate of Incorporation setting forth the amendment adopted pursuant to the Share Increase Proposal (the "Certificate of Amendment") was filed with the Secretary of State of the State of Delaware (the "Delaware Secretary of State"). To date, none of these newly authorized shares has actually been issued. Three purported beneficial owners of Common Stock subsequently expressed concerns about a statement in the Company's proxy statement related to the Share Increase Proposal, specifically questioning, in light of the proxy statement, the ability of brokerage firms and other custodians to vote shares of Common Stock held by them for the benefit of their customers in the absence of instructions from the beneficial owners. Based on an examination of the situation performed following receipt of these demands, the Company believes that the vote at the annual meeting was properly tabulated and that the proposed amendment was properly adopted in accordance with Delaware law. In light of the demands, however, and to ensure against any future question as to the validity of these newly authorized shares, the Company elected to seek validation of its Certificate of Amendment through a Petition to the Court of Chancery of the State of Delaware (the "Court of Chancery") pursuant to Section 205 of the Delaware General Corporation Law (the "205 Petition"). The action, styled In re 1847 Goedeker Inc., C.A. 2022-0219-SG (the "Action"), sought entry by the Court of Chancery of an order validating and declaring effective the Certificate of Amendment, and validating the additional shares of Common Stock authorized under the Share Increase Proposal.

Two purported stockholders objected to the 205 Petition. One such objecting, purported stockholder (the "Stockholder Plaintiff") filed his own lawsuit (which was then consolidated with the 205 Petition) requesting that such relief not be granted and asserting two claims for relief: first, against the Company for alleged violation of the Delaware General Corporation Law Section 225(b) for improper tabulation of the stockholder vote on the Share Increase Proposal; and second, asserting that the Company's directors breached their fiduciary duties by incorrectly tabulating the stockholder vote, and by causing a purportedly invalid amendment to our Certificate of Incorporation to be filed with the Delaware Secretary of State. The Court of Chancery held a hearing on May 27, 2022, to consider the Company's motion for entry of an order under Section 205 and subsequently entered an order denying the motion without prejudice on September 30, 2022. On July 7, 2022, the Company filed a Certificate of Correction with the Secretary of State of the State of Delaware, voiding the Charter Amendment and causing the number of authorized shares of Common Stock to remain at 200,000,000.

On June 12, 2023, the Company submitted to the Court of Chancery a Stipulation and [Proposed] Order Regarding Notice and Closing of the Case regarding the Action (the "Dismissal Order"). As stated in the Dismissal Order, the Company and the other parties to the Action negotiated at arm's length and resolved the stockholders' claims to entitlement to a mootness fee award, and the Company agreed to pay $475,000 for attorneys' fees and expenses to the stockholders' counsel (the "Attorneys' Fees"). Pursuant to Court of Chancery Rules 23(e) and 41(a), the parties to the Action stipulated to voluntary dismissal of the Action with prejudice as to the Stockholder Plaintiff and without prejudice as to any actual or potential claims of any other members of the putative class, and such dismissal was granted by the Court on June 13, 2023. As stipulated in the Dismissal Order, the Company paid the Attorneys' Fees to the stockholders' counsel on June 28, 2023 and such payment fully satisfied and resolved the stockholders' and the stockholders' counsel's entitlement to any fees or expenses in the Action.

On October 31, 2022, a putative shareholder class action was filed against Polished.com Inc. (the "Company") and certain of its current and former officers and directors, as well as certain underwriters of the Company's 2020 initial public offering (the "IPO"). The action was commenced in the United States District Court for the Eastern District of New York court and is captioned Maschhof v. Polished.com Inc., et al., No. 1:22-cv-06606. The complaint asserts violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as well as Sections 10(b) and Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about September 8, 2023, the Court appointed lead plaintiff and lead counsel. An amended complaint was filed on or before October 31, 2023.

On January 26, 2023, a derivative stockholder complaint was filed against certain of the Company's current and former officers and directors, naming the Company as a nominal defendant. The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Wong v. Moore et al.*, No. 1:23-cv-00559. The complaint asserts violations of Section 14(a) of the Exchange Act, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about March 7, 2023, plaintiff filed a stipulation and proposed order to stay proceedings until any motions to dismiss in the related class action (captioned *Maschhoff v. Polished.com Inc. et al.*, No. 1:22-cv-06606) are decided. On March 23, 2023, the stipulation was so-ordered.

On February 13, 2023, a derivative stockholder complaint was filed against certain of the Company's current and former officers and directors as well as the Company's external manager, naming the Company as a nominal defendant. The action was commenced in the United States District Court for the Eastern District of New York court and is captioned *Gossett v. Moore, et al.*, No. 1:23-cv-1168. The complaint asserts claims for breach of fiduciary duty against the former officers and directors and aiding and abetting breaches of fiduciary of duty against the external manager, arising from alleged misstatements and omissions made in certain of the Company's SEC filings made in connection with the IPO. On or about April 24, 2023, plaintiffs filed a joint stipulation and proposed order consolidating the related derivative actions and appointing co-lead counsel. To date, the stipulation has yet to be ordered.

32

**Action Against Former Employee**

On February 22, 2023, the Company filed an action against a former employee asserting a claim for conversion based on the individual's retention of profits from sales to the Company's customers. The action was commenced in the Supreme Court of the State of New York, County of Kings and is captioned *Polished.com, Inc. v. Naoulo*, No. 505712/2023. On March 5, 2023, the defendant filed an answer and asserted counterclaims for breach of contract, breach of implied contract and defamation. On May 25, 2023, the defendant filed an amended answer and added a counterclaim for tortious interference with prospective business relations. On June 14, 2023, the Company moved to dismiss the amended counterclaims. On October 10, 2023, the Court dismissed all of the amended counterclaims except for breach of implied contract.

On September 19, 2023, the Company filed an action against a former employee and certain entities under that former employee's control, asserting claims for fraud and conversion based on the individual's misappropriation of Company inventory. The action was commenced in the Superior Court of New Jersey, Monmouth County and is captioned Polished.com, Inc. v. Irmiyayev et al., No. MON-L-002942-23. The defendant's response is due on or before November 9, 2023.

From time to time, we may be subject to various legal proceedings and claims arising in the ordinary course of business. All other litigation currently pending against the Company relates to matters that have arisen in the ordinary course of business and we believe that such matters will not have a material adverse effect on our consolidated financial condition, results of operations or cash flows.

**ITEM 1A. RISK FACTORS.**

Factors that could cause our actual results to differ materially from those in this report include the risk factors described in our Annual Report on Form 10-K filed with the SEC on July 31, 2023. Any of those factors could result in a significant or material adverse effect on our results of operations or financial condition. Additional risk factors not presently known to us or that we currently deem immaterial may also impair our business or results of operations. As of the date of this report, there have been no material changes to the risk factors disclosed in our Annual Report on Form 10-K filed with the SEC on July 31, 2023. We may disclose changes to such factors or disclose additional factors from time to time in our future filings with the SEC.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.**

We have not sold any equity securities during the nine months ended September 30, 2023 that were not previously disclosed in a current report on Form 8-K that was filed during the quarter.

We did not repurchase any shares of our common stock during the nine months ended September 30, 2023

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES.**

None.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

**ITEM 5. OTHER INFORMATION.**

None.

**ITEM 6. EXHIBITS.**

| Exhibit No. | Description |
|---|---|
| 3.1 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation of Polished.com Inc., dated October 19, 2023 (incorporated by reference to Exhibit 3.1 to the Current Report on Form 8-K filed on October 20, 2023). |
| 10.1 | First Amendment to Credit Agreement, dated as of July 25, 2023, by and among Polished.com Inc., Appliances Connection Inc., certain guarantors party thereto, certain lenders party thereto and Bank of America, N.A. (incorporated by reference to Exhibit 10.56 to the Annual Report on Form 10-K filed on July 31, 2023) |
| 10.2 | Settlement and Termination Agreement, dated August 23, 2023, by and between Polished.com Inc. and 8780 19 Ave LLC (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on August 25, 2023). |
| 10.3* | Second Amendment to Credit Agreement, dated as of November 20, 2023, by and among Polished.com Inc., Appliances Connection Inc., certain guarantors party thereto, certain lenders party thereto and Bank of America, N.A. |
| 31.1* | Certifications of Principal Executive Officer filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certifications of Principal Financial and Accounting Officer filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certifications of Principal Executive Officer furnished pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2** | Certifications of Principal Financial and Accounting Officer furnished pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS | Inline XBRL Instance Document |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

\*     Filed herewith
\*\*   Furnished herewith

34

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: November 20, 2023

**Polished.com Inc.**

/s/ J. E. "Rick" Bunka

Name:  J. E. "Rick" Bunka
Title:   Interim Chief Executive Officer
          *(Principal Executive Officer)*

/s/ Robert D. Barry

Name:  Robert D. Barry
Title:   Interim Chief Financial Officer, Chief Accounting
          Officer and Secretary
          *(Principal Financial and Accounting Officer)*

35

# Exhibit 6

# *Eden Alpha CI LP v. Polished.com Inc.*

United States District Court for the Eastern District of New York

January 23, 2025, Decided; January 24, 2025, Filed

22-CV-6606 (NGG) (VMS)

**Reporter**

763 F. Supp. 3d 270 *; 2025 U.S. Dist. LEXIS 13068 **; 2025 LX 57763

EDEN ALPHA CI LLP, individually and on behalf of all others similarly situated, Plaintiff, -against- POLISHED.COM INC. F/K/A 1847 GOEDEKER INC., DOUGLAS T. MOORE, ALBERT FOUERTI, MARIA JOHNSON, Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Dismissed by, in part *Eden Alpha Ci LLP v. Polished.Com Inc., 2026 U.S. Dist. LEXIS 49394, 2026 LX 165181 (Mar. 10, 2026)*

**Counsel: [**1]** For Anthony Porraro, Movant: Adam Apton, LEAD ATTORNEY, Levi & Korsinsky, LLP, New York, NY.

For Eden Alpha CI LP, Movant: Gonen Haklay, LEAD ATTORNEY, PRO HAC VICE, The Rosen Law Firm, Jenkintown, PA; Jacob A. Goldberg, LEAD ATTORNEY, The Rosen Law Firm, P.A., Jenkintown, PA; Phillip Kim, LEAD ATTORNEY, The Rosen Law Firm, New York, NY.

For Ari Gold, Movant: Jeremy Alan Lieberman, LEAD ATTORNEY, Pomerantz LLP, New York, NY.

For Ryan Maschhoff, Individually and on behalf of all others similarly situated, Plaintiff: Gonen Haklay, LEAD ATTORNEY, PRO HAC VICE, The Rosen Law Firm, Jenkintown, PA; Jacob A. Goldberg, LEAD ATTORNEY, The Rosen Law Firm, P.A., Jenkintown, PA; Phillip Kim, The Rosen Law Firm, New York, NY.

For Polished.com Inc., formerly known as, 1847 Goedeker Inc., Defendant: Jason Daniel Gerstein, McDermott Will & Emery LLP, New York, NY; Timothy E. Hoeffner, McDermott Will & Emery, New York, NY.

For Albert Fouerti, Defendant: John F. Sylvia, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA.

For Maria Johnson, Defendant: Genevieve Graeme York-Erwin, Douglas W Greene, LEAD ATTORNEYS, Baker & Hostetler LLP, Seattle, WA; Zachary Rowen Taylor, Baker & Hostetler LLP, New **[**2]** York, NY.

**Judges:** NICHOLAS G. GARAUFIS, United States District Judge.

**Opinion by:** NICHOLAS G. GARAUFIS

# Opinion

**[*284]  MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

Lead Plaintiff Eden Alpha CI LLP ("Plaintiff") brings this putative class action against Polished.com Inc. ("Polished"), Douglas Moore, Albert Fouerti, and Maria Johnson (collectively, "Defendants"), alleging violations of the federal securities laws. (Am. Compl. (Dkt. 34).) Pending before the court are Defendants Moore, Fouerti, and Johnson's (the "Individual Defendants") motion for consideration and/or judicial notice of certain documents and motion to **[*285]** dismiss the Amended Complaint. (Individual Defendants' Motion for Judicial Notice ("Defs.' Mot. for Not.") (Dkt. 48-2); Individual Defendants' Motion to Dismiss ("Defs.' MTD") (Dkt. 48-1).) For the reasons that follow, the motion for consideration and/or judicial notice is GRANTED in part and DENIED in part, the motion to dismiss is GRANTED, and Plaintiff's request for leave to file a second amended complaint is GRANTED.

## I. BACKGROUND

### A. General Background[1]

---

[1] The following facts are drawn from the Amended Complaint and, for purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 349 (2d Cir. 2022)*.

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 669 of 845

Page 2 of 27

763 F. Supp. 3d 270, *285; 2025 U.S. Dist. LEXIS 13068, **2

Plaintiff represents a putative class of investors who acquired publicly traded Polished common stock between August 12, 2021 and **[**3]** July 31, 2023 (the "Class Period"). (Am. Compl. ¶ 3.) Defendants are Polished, a Delaware corporation that sold, among other things, fitness equipment, furniture, and commercial appliances to consumers and businesses; Douglas Moore, Polished's CEO from August 2019 to August 31, 2021; Albert Fouerti, Polished's CEO from September 1, 2021 to October 14, 2022; and Maria Johnson, Polished's CFO from July 2021 to October 14, 2022. (*Id.* ¶¶ 14-18.)

Founded in 1951 as Goedeker Television Co., Polished expanded from a brick-and-mortar appliance store to a large, nationwide appliance retailer that conducted the majority of its business online. (*Id.* ¶¶ 28-29.) In January 2019, 1847 Goedeker Inc. was incorporated in the State of Delaware as a Special Purpose Acquisition Company with "the sole purpose of acquiring substantially all of the assets of Goedeker Television Co." (*Id.* ¶¶ 4, 30.) 1847 Goedeker completed the acquisition of Goedeker Television in April 2019 and thereafter traded on the New York Stock Exchange under the ticker symbol "GOED." (*Id.*) 1847 Goedeker eventually changed its name to "Polished.com Inc.," and its ticker symbol to "POL." (*Id.* ¶ 37.)

Brothers Albert and Elie Fouerti founded **[**4]** Appliances Connection ("AC"), an online appliance retailer, in 2015. (*Id.* 131.) The company was "one of the leading retailers of household appliances in the U.S.," with a showroom in Brooklyn and multiple warehouses on the east coast, including a warehouse in Hamilton, New Jersey called YF Logistics LLC ("YF Logistics"). (*Id.* ¶ 31, 45; Pl.'s MTD Opp. (Dkt. 48-20) at 2.) Albert Fouerti served as AC's CEO from 2015 through June 1, 2021. (Am. Compl. ¶ 17.)

In August 2020, Polished executives began negotiating with the Fouerti brothers a potential merger of AC into Polished. (*Id.* ¶ 32.) As part of its due diligence, then-CEO of Polished Douglas Moore visited YF Logistics in Hamilton, New Jersey, and AC's headquarters in Brooklyn, New York. (*Id.* ¶ 33.) Additionally, in anticipation of the acquisition, Polished formed a wholly owned subsidiary—Appliances Connection, Inc. ("ACI")—to purchase AC's assets. (*Id.* ¶ 34.) Polished's Board of Directors approved the acquisition of AC in October 2020, and the acquisition closed on June 2, 2021. (*Id.* ¶¶ 32, 36.) Upon closing, AC's assets became part of ACI, and Albert Fouerti became President of ACI. (*Id.* ¶ 34.) A few months later, in September 2021, **[**5]**

Fouerti replaced Moore as Polished's CEO. (*Id.* ¶ 17.)

## B. Alleged Improper Business Practices

Plaintiff alleges that Albert Fouerti—first at AC and then at Polished alongside **[*286]** Moore and Johnson—engaged in several fraudulent, illegal, or otherwise improper business practices. (Am. Compl. ¶¶ 38-84.) Through the reports of eleven anonymous former employees ("FEs") at Polished and YF Logistics, Plaintiff claims that Polished: (1) committed fraud with respect to inventory numbers, (2) forged and falsified documents as a routine business practice, (3) employed undocumented workers who lacked work permits or social security numbers, and (4) fired its former Vice President of Logistics after he disclosed the improper practices to Moore and attempted to discuss the practices with Fouerti and Johnson. (*Id.* ¶¶ 52-72, 75-84.)

Several FEs report deficiencies in YF Logistics' inventory practices. (*Id.* ¶¶ 52-65.) FE5, a "Manifest Manager" at YF Logistics from June 2022 to August 2023, and FE7, an "Inventory Control Manager" at YF Logistics from January 2021 to December 2022—both of whom reported to Danny Jean, the warehouse manager—report that YF Logistics "never had an accurate count of its inventory" **[**6]** and that "there would always be material inconsistencies between the inventory listed on paper, and the much smaller actual count." (*Id.* ¶¶ 42, 44, 52-53.) FE6, an IT support specialist at YF Logistics from February 2022 to December 2022, also claims that "the physical count was never correct." (*Id.* ¶¶ 43, 52.) FE7 further reports that a manager named "Luigi" would "let employees buy appliances from the 'scrap' pile for cash, for enormous discounts, and then pocket the cash." (*Id.* ¶ 53.) FE6 claims that "employees stole many appliances from YF Logistics' warehouse." (*Id.*) Moreover, when FE11, an "Inventory Control Manager" at YF Logistics from October 2020 to March 2021, made multiple suggestions to Elie Fouerti on ways to improve inventory practices, Fouerti reportedly rejected those suggestions. (*Id.* ¶¶ 48, 54.) FE2, a "Reverse Logistics Manager" at Polished from October 2015 to December 2021 who reported to Polished's VP of Logistics, claims to have been similarly rebuffed after raising inventory concerns with "management." (*Id.* ¶¶ 39, 57.)

FE3, a "Dispute Analyst" at AC and Polished from September 2019 to July 2023, reported to a manager that in turn reported to Albert Fouerti. **[**7]** (*Id.* ¶ 40.)

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 670 of 845

Page 3 of 27

763 F. Supp. 3d 270, *286; 2025 U.S. Dist. LEXIS 13068, **7

FE3 reportedly sat two desks away from Albert Fouerti in Polished's Brooklyn office. (*Id.*) At an un-specified time and date, FE3 claims to have heard Albert Fouerti state during a meeting that "every piece of inventory must be carried as available for sale, even if it was damaged." (*Id.* ¶ 55.) FE3 reportedly received numerous complaints a day from unhappy customers and personally observed that "many of the warehoused items available for sale were actually damaged," (*Id.*) Also at an unspecified time and date, FE3 allegedly heard Albert Fouerti state that, "even if an item was not in stock, [] AC would sell it, charge the customers the second the order was placed, and then keep the money." (*Id.* ¶ 56.) FE3 also claims to "know[] that Albert Fouerti forged AC's, and then later ACI's, inventory numbers," although FE3 provides no basis for that knowledge. (*Id.*) Likewise, although they provide no basis for this knowledge, FE3, FE5, FE6, and FE7 all claim that "Polished's publicly reported inventory numbers were materially false." (*Id.* ¶ 58.)

Next, according to the Amended Complaint, multiple FEs "observed that Albert and Elie Fouerti repeatedly ordered [] documents [] forged, and **[**8]** mandated that employees perform unethical and illegal business practices." (*Id.* ¶ 59.) FE2 reports that Albert and Elie Fouerti ordered an employee in Brooklyn named Ketevan Talakvadze to repeatedly forge documents. For example, "if a product was returned after 35 days, outside the window to return **[*287]** it to a manufacturer, the Fouertis ordered Talakvadze to alter the document so that it appeared the appliance had been returned within the time limit." (*Id.* ¶ 60.) FE2 further claims that YF Logistics would ship damaged products, charge the customer for the cost of the return, and then collect a refund from the shipper for the damages, thus allowing YF Logistics to "recoup even more money." (*Id.* ¶ 61.) FE8, who worked in the customer service department at a YF Logistics warehouse in Somerset, New Jersey from November 2021 to October 2022, reports similar conduct. (*Id.* ¶¶ 45, 64.)

According to FE3 and FE10, a Customer Service Supervisor at Polished from September 2020 to March 2022, AC and later ACI "forged customer signatures, delivery signatures, and lied to convince credit card companies that products had been delivered with no damage when they were actually damaged when delivered, gaining **[**9]** a material advantage with respect to chargeback resolutions." (*Id.* ¶¶ 47, 62-63.) FE4, who handled credit card disputes at Polished from 2018 to 2022, reports similar conduct. (*Id.* ¶¶ 41, 65.)

FE9, a customer service supervisor at Polished from March 2018 to March 2022, likewise reports that "ACI employees routinely changed dates on invoices so that valid warranty claims would be outside the warranty period," and claims to have personally observed forged signatures on delivery orders, falsely indicating that lost appliances were delivered. (*Id.* ¶¶ 46, 63.)

The Amended Complaint also alleges that Polished and/or YF Logistics employed undocumented workers. (*Id.* ¶ 66-72.) For example, FE6 claims that "numerous workers at YF Logistics openly told FE6 that they were undocumented, were hired under an alias, with no supporting paperwork, and were paid in cash." (*Id.* ¶ 68.) FE3 states that Sam Bazzi, head of Human Resources at Polished from January 2021 to July 2021, "found that 60% of the workers at YF Logistics had no social security numbers and were not authorized to work in the U.S." (*Id.* ¶ 69.) When FE3 brought these statistics to Albert Fouerti's attention at some unspecified time, FE3 **[**10]** was fired. (*Id.* ¶ 69.)

The Amended Complaint further contends that Albert Fouerti fired FE1—Polished's VP of Logistics from October 2020 to November 2021—after FE1 attempted to bring the above issues to management's attention. (*Id.* ¶ 75-84.) After the AC acquisition, FE1 visited ACI's facilities "to see how ACI was run in order to successfully merge its systems and practices with Polished's systems and practices." (*Id.* ¶ 75.) From these visits, FE1 reportedly concluded that "Albert Fouerti was requiring illegal and unethical fraudulent practices, resulting in serious systemic and operational issues at ACT." (*Id.* ¶ 76.) On September 9, 2021, FE1 reported these issues via email to Robert Barry, a Polished executive, and several other individuals in Polished's management. (*Id.* ¶¶ 76-80.) Barry reportedly told FE1 that he should discuss these issues with Albert Fouerti and Maria Johnson. (*Id.* ¶ 82.) According to the Amended Complaint, "[a] series of emails were exchanged between FE1, Fouerti, and others," and Fouerti eventually "asked FE1 to meet with him and Johnson at 2:30 p.m. on September 21, 2021." (*Id.*) During the September 21 meeting, FE1 "attempted to discuss the concerns and fraudulent **[**11]** practices he had raised in his September 9, 2021 email," but as the meeting went on, Fouerti became "openly hostile . . . interrupting FE1 constantly . . . bec[oming] louder [and] attacking FE1 on a personal level." (*Id.* ¶ 83.) Fouerti eventually told FE1 that he was "finished" with FE1, and Johnson later confirmed that FE1 was fired. (*Id.* ¶¶ 83, 84.)

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 671 of 845

Page 4 of 27

763 F. Supp. 3d 270, *287; 2025 U.S. Dist. LEXIS 13068, **11

**[*288]** Finally, FE3 claims that, at an unspecified time and date, Albert Fouerti created a fake salesperson profile, assigned "about half of all online orders" to that fake salesperson, and reaped the commissions on those orders. (*Id.* ¶ 74.) Plaintiff also notes, and the Individual Defendants do not dispute, that Albert Fouerti charged Polished approximately $800,000 for expenses unrelated to the company and its operations. (*Id.* 99 73, 154; Defs.' MTD at 5.)

## C. Financial Disclosures and Polished's Decline

Plaintiff claims that Polished, Moore, Fouerti, and Johnson made several material misrepresentations and omissions during the Class Period, across five financial disclosures. (Am. Compl. ¶¶ 167-173 (citing the Q2 2021 Form 10-Q filed on August 12, 2021; the Q3 2021 Form 10-Q filed on November 15, 2021; the Q3 2021 earnings call held on November **[**12]** 15, 2021; the 2021 Form 10-K filed on March 31, 2022; and the Q1 2022 Form 10-Q filed on May 16, 2022).)[2] The challenged statements generally fall into four categories: (1) financial metrics and opinions regarding Polished's future prospects (*id.* ¶¶ 116, 118, 126, 128); (2) restated financial metrics (*id.* ¶¶ 134, 138, 144); (3) statements and certifications regarding Polished's internal controls (*id.* ¶¶ 120, 130, 132, 136, 146); and (4) statements concerning Polished's fulfilment, logistics, and returns processes (*id.* ¶¶ 122, 124, 140, 142). In general, these disclosures represented that Polished was profitable and opined that the company would continue operating as a going concern in the months or year to come.

Following the last of the challenged disclosures in May 2022, Polished's affairs took a turn for the worse. On August 15, 2022, Polished announced that it would delay its Q2 2022 Form 10-Q filing because of an ongoing internal investigation, stating:

> The Audit Committee of [Polished's] Board of Directors ("Audit Committee") *recently began an independent investigation regarding certain allegations made by certain former employees related to the Company's business operations.* The **[**13]** investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and consultants to complete the investigation as soon as possible. The

> Company cannot predict the duration of the investigation, [its] eventual scope, its outcome, or its impact on the Company's financial results. As a result of the additional time required to complete the investigation, the Company has not finalized its financial statements for the period ended June 30, 2022. The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation, but does not anticipate that it will be in a position to file the Second Quarter 10-Q on or before [the deadline].

(*Id.* ¶ 148 (emphasis in original).) According to Plaintiff, "[o]n this news, Polished's stock price fell 35.7%, from $75.50 at the close on August 15, 2022, to $48.50 at the close on August 16, 2022." (*Id.* ¶ 149.)

On August 25, 2022, Polished announced that it had engaged an independent consulting firm "to augment its existing management, identify opportunities to accelerate long-term profitable growth and, separately, to potentially **[**14]** expedite the Audit Committee of the Board of Directors' ongoing investigation." (*Id.* ¶ 150.) A few months later, on October 14, 2022, **[*289]** Albert Fouerti, Maria Johnson, and Elie Fouerti resigned from the company. (*Id.* ¶ 151.) Polished then issued several additional statements detailing its ongoing internal investigation and announcing a delay in the filing of its Q3 2022 Form 10-Q. (*Id.* ¶¶ 152-53.)

On December 22, 2022, Polished disclosed the results of the Audit Committee's internal investigation, listing the key findings as follows:

> The Company was charged by its former Chief Executive Officer [Albert Fouerti] approximately $800,000 for expenses unrelated to the Company and its operations.

> The Company appears to not have had in place all the necessary documentation for all of its employees and, in turn, may have failed to comply with certain legal requirements. As elaborated on below, the Company has subsequently put in place enhanced controls to remedy any labor issues and believes it is now in full compliance with legal requirements.

> The Company's controls, software and procedures for managing and tracking inventory, including damaged inventory, were insufficient. As elaborated on below, **[**15]** the Company has subsequently put in place enhanced controls to remedy such

---

[2] Form 10—K (or "10-K") is an annual financial report filed with the SEC. Likewise, Form 10-Q (or "10-Q") is a quarterly financial report filed with the SEC.

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 672 of 845

Page 5 of 27

763 F. Supp. 3d 270, *289; 2025 U.S. Dist. LEXIS 13068, **15

issues.

(*Id.* ¶ 154.) A few days later, Polished announced that its independent registered public accounting firm, Friedman LLP ("Friedman"), had resigned, withdrawn its audit for fiscal year 2021, and declined to be associated with the quarterly financial statements for Q2 2021, Q3 2021, or Q1 2022. (*Id.* ¶ 155.)

Finally, on July 31, 2023, Polished filed its delayed 2022 Form 10-K (the "July Restatement") with the Securities and Exchange Commission (the "SEC"), in which it restated its financial results for fiscal year 2021 and Q1 of 2022. (*Id.* ¶ 156.) As to fiscal year 2021, the company restated its previously issued 2021 Form 10-K to reflect the following adjustments:

*Consolidated Statement of Operations*

1. Reduction in revenue of $16.6 million, which comprised the following: (1) an increase in the allowance for sales returns of $7.4 million, (2) revenue of $8.1 million that should be recognized in 2022, and (3) sales tax collections of $1.1 million improperly recognized as revenue.

2. Net reduction in cost of goods of $6.7 million, which comprised of the following: (1) reduction in product cost of sales due to **[**16]** an increase in the allowance for sales returns of $4.0 million, (2) reduction in product cost of sales of $6.0 million relating to revenue cutoff that should be recognized in 2022, and (3) an offsetting increase in cost of goods sold from an over accrual of vendor rebates ($0.4 million), under accrual of vendor purchases ($1.5 million), and an error in inventory cutoff ($1.4 million).

3. Increase in general and administrative expenses of $0.9 million, resulting from an increase in bad debt expense of $0.6 million in accordance with the Company's policy for allowance for doubtful accounts, and an over accrual of sales tax receivable of $0.3 million.

4. As a result of the changes above, income tax changed from a tax benefit of $4.4 million to a tax expense of $0.1 million.

*Consolidated Balance Sheet*

5. Net increase in current assets of $6.6 million, which comprised the following: (1) increase in inventory of $7.7 million, resulting from the reduction in cost of goods sold attributable to the allowance for sales returns, revenue cutoff, and inventory cutoff, offset by a reduction in showroom inventory of $1.0 million that **[*290]** was reclassified as property and equipment, (2) reduction in receivables **[**17]** of $1.1 million, resulting from an increase to the allowance for doubtful accounts of $0.6 million, and an over accrual of vendor rebates (as detailed in Nos. 1-4 above).

6. Net increase in current liabilities of $18.3 million, which comprised the following: (1) increase in accounts payable of $10.3 million, as a result of the increase in the allowance for sales returns, and an under accrual of sales tax refund receivable (netted with the sales tax liability), and (2) increase in customer deposits related to revenue cutoff (as detailed in Nos. 1-4 above).

7. Increase in long-term liabilities of $4.5 million, relating to an increase to the deferred tax liability as a result of the changes described above.

(July Restatement (Dkt. 48-10) at ECF pp. 162-63 (emphasis in original).) As to Q1 2022, Polished restated its previously issued Q1 2022 Form 10-Q to reflect the following adjustments:

*Consolidated Statements of Operations*

1. Revenue declined by $4.1 million because of an understatement of a returns allowance and revenue cutoff issues.

2. Cost of goods sold increased $1.0 million, net by reclassification of expenses from operating expenses to cost of goods sold offset by the reduction in **[**18]** product cost associated with the reduction in revenue.

3. Operating expense declined by $1.9 million primarily by reclassification of operating expense to cost of goods sold.

4. Other income (expense) various miscellaneous adjustments totaling $0.2 million.

5. Income tax expense declined by $3.3 million.

6. As a result of the above adjustments, net income declined by $0.1 million.

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 673 of 845

Page 6 of 27

763 F. Supp. 3d 270, *290; 2025 U.S. Dist. LEXIS 13068, **18

*Consolidated Balance Sheet*

7. Current assets declined by $13.2 million from a $3.8 million reduction in vendor rebate accrual, inventory declined by $6,7 million, net from changes to sales returns allowance and revenue cutoff adjustments, and prepaid expenses declined by $2.7 million by to adjust for charging some items to expense, rather than prepaid expense.

8. Reclassification of showroom inventory to property and equipment.

9. Eliminate a right-of-use asset on a property that was not occupied.

10. Reflect the issuance of shares granted to two directors.

11. Reflect adjustments made to 2021 accumulated deficit and adjustment to net income for the three months ended March 31, 2022.

(*Id.* at ECF p. 206 (emphasis in original).) According to Plaintiff, following the July Restatement, "Polished's stock price fell 68%, **[**19]** from $31.55 at the close on July 31, 2023, to $10.00 at the close on August 1, 2023." (Am. Compl. ¶ 57.)

### D. Procedural History

On October 21, 2022, Plaintiff filed suit against Polished, the Individual Defendants, and several others, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"). (Compl. (Dkt. 1).) Over the next few months, three different plaintiffs moved for appointment of lead plaintiff and lead counsel, with some submitting memoranda in opposition to the other's motions. (See Dkts. 6-15.) The court referred these motions to Magistrate Judge Vera M. Scanlon for decision pursuant to *28 U.S.C. § 636(b)(1)(A)* and *Federal Rule of Civil Procedure 72(a)*. (Order Dated 1/11/2023.) In September 2023, Judge Scanlon appointed Eden Alpha CI LLP as lead plaintiff and The Rosen Law Firm, **[*291]** P.A. as lead counsel. (Mem. and Order Appointing Lead Plaintiff (Dkt. 30) at 2.)

On October 31, 2023, on consent of the parties and by order of the court, Plaintiff filed the operative Amended Complaint, alleging: (Count I) violations of *Section 10(b) of the Exchange Act* and the SEC *Rule 10b-5(b)* against

Polished, Fouerti,[3] and Johnson; (Count II) violations of *Section 10(b)* and *Rule 10b-5(a)* and *(c)* against Polished and Fouerti; and (Count III) violations of *Section 20(a)* against the Individual Defendants. (Stipulation and Order (Dkt. 33); Am. Compl. ¶¶ 167-190.) Count I alleges **[**20]** that several statements in Polished's Q2 2021 Form 10-Q, Q3 2021 Form 10-Q, Q3 2021 earnings call, 2021 Form 10-K, and Q1 2022 Form 10-Q were false or materially misleading, as evidenced by the allegations of the FEs and the July Restatement. (Am. Compl. ¶¶ 167-173.) Building upon these alleged misrepresentations, Count II claims scheme liability as to Polished and Fouerti, and Count III claims control person liability as to the Individual Defendants. (*Id.* ¶¶ 180-190.)

Although Counts I, II, and III refer only to Polished, Moore, Fouerti, and Johnson, the Amended Complaint's caption listed numerous other individuals and entities as Defendants. (*See* Am. Compl.) Consequently, when those individuals and entities moved to delete their names from the caption, the court granted their motions, leaving Polished, Moore, Fouerti, and Johnson as the remaining Defendants in this case. (*See, e.g.*, Letter Mot. to Amend Caption (Dkt. 35); Order Granting Mot. to Amend (Dkt. 37).)

On February 27, 2024, the court held a pre-motion conference at which it granted Defendants' request to file a motion to dismiss the Amended Complaint. (Minute Entry Dated 2/27/2024.) Soon thereafter, on March 7, 2024, Polished **[**21]** filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the District of Delaware, triggering an automatic stay of the proceedings pursuant to *11 U.S.C. § 362(a)*. (Notice of Bankruptcy (Dkt. 42).) *See In re Polished.com Inc., et al.*, No. 24-BK-10353 (Bankr. D. Del.) However, as automatic stays generally do not apply to nonbankrupt codefendants, the proceedings continued against the Individual Defendants.[4] (*See* Pl.'s Letter Dated

---

[3] From this point forward, unless otherwise noted, references to "Fouerti" are to Albert Fouerti.

[4] "It is well-established that stays pursuant to *§ 362(a)* are limited to debtors and do not encompass non-bankrupt co-defendants." *Tchrs. Ins. & Annuity Ass'n of Am. v. Butler, 803 F.2d 61, 65 (2d Cir. 1986)*. As such, courts in this circuit regularly decline to extend a debtor corporation's automatic stay to its non-debtor officers and principals. *See Gray v. Hirsch, 230 B.R. 239, 242 (Bankr. S.D.N.Y. 1999)* (collecting cases). While an automatic stay *can* apply to non-debtors, it does so only in unusual circumstances, "when a claim against

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 674 of 845

Page 7 of 27

763 F. Supp. 3d 270, *291; 2025 U.S. Dist. LEXIS 13068, **21

3/11/2024 (Dkt. 43).)

**[\*292]** On June 21, 2024, the Individual Defendants filed their fully briefed motion to dismiss the Amended Complaint under *Federal Rules of Civil Procedure 12(b)(6)* and *9(b)* and the *Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4*. (Deft.' MTD; Pl.'s MTD Opp.; Defs.' Reply in Supp. of MTD ("Defs.' Reply") (Dkt. 48-22).) At the same time, the Individual Defendants filed a fully briefed motion requesting that the court consider and/or take judicial notice of certain documents. (See Defs.' Mot. for Not.; Pl.'s Opp. to Mot. for Not. (Dkt. 48-21); Defs.' Reply in Supp. of Mot. for Not. (Dkt. 48-23).)

---

the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287 (2d Cir. 2003)*. "The question is whether the action against the non-debtor is sufficiently likely to have a material effect upon reorganization efforts, [such] that debtor protection requires an exception to the usual limited scope of the stay" *Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC, No. 22-CV-4094 (KPF), 2023 U.S. Dist. LEXIS 67940, 2023 WL 3506142, at *1 (S.D.N.Y. Apr. 18, 2023)* (internal quotation marks and citation omitted). Moreover, "[a] court should not extend the automatic stay where the non-debtor is independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty." *Franco v. Ideal Mortg. Bankers, Ltd., No. 7-CV-3956 (JS) (AKT), 2017 U.S. Dist. LEXIS 186194, 2017 WL 5195223, at *2 (E.D.N.Y. Nov. 9, 2017)* (internal quotation marks and citation omitted).

After Polished filed for bankruptcy, Plaintiff informed the court that it intended to dismiss Polished from the case without prejudice and pursue its claims solely against the Individual Defendants. (Pl.'s Letter Dated 3/11/2024 at 1.) It has not done so, and Polished remains a named Defendant in this action. *See John M. Wunderlich, Bankruptcy's Protection For Non-Debtors From Securities Fraud Litigation, 16 Fordham J. Corp. & Fin. L. 375, 395 n.115 (2011)* (noting that, generally, "a securities fraud case against non-debtors goes forward without the debtor-company named in the suit [such that,] in practice, whether the court should extend the automatic stay usually is not an issue"). Neither party has raised the issue of whether the automatic stay should extend to the Individual Defendants. Nor has the Bankruptcy Court taken any action to enjoin the proceedings as to the Individual Defendants. *See generally In re Polished.com Inc., et at*, No. 24-BK-10353 (Bankr. D. Del.). Thus, because neither party has raised it, the court need not and does not decide whether an extension of the automatic stay to the Individual Defendants would be appropriate in these circumstances.

## II. LEGAL STANDARD

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiffs favor. *See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008)*. In addition, **[\*\*22]** the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) CATSF*).[5] To survive a motion to dismiss under *Rule 12(b) (6)*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*).

Complaints alleging securities fraud are subject to the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)* and the PSLRA. *In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 166 (2d Cir. 2021)* ("*Synchrony*"). *Rule 9(b)* requires that "a party must state with particularity the circumstances constituting fraud." *Fed. R. Civ. P. 9(b)*. To satisfy this standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Synchrony, 988 F.3d at 167*. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI, 493 F.3d at 99*.

The PSLRA expands on the *Rule 9(b)* standard, requiring securities fraud complaints to "specify each misleading statement; . . . set forth the facts on which a **[\*\*23]** belief that a statement is misleading was formed; and . . . state with particularity facts giving rise to a strong inference **[\*293]** that the defendant[s] acted with the required state of mind." *Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012)*; *see also 15 U.S.C. § 78u-4(b)(1)*, *(2)*. "The requisite state of mind in a *Rule 10b-5* action is an intent to deceive, manipulate or defraud." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000)*. Such an

---

[5] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 675 of 845

Page 8 of 27

763 F. Supp. 3d 270, *293; 2025 U.S. Dist. LEXIS 13068, **23

intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI, 493 F.3d at 99*.

## III. MOTION FOR CONSIDERATION AND/OR JUDICIAL NOTICE

As previously noted, in ruling on a motion to dismiss, the court may consider the complaint, "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI, 493 F.3d at 98*. "A document is incorporated by reference if the complaint makes[] a clear, definite and substantial reference to the document." *Stinnett v. Delta Air Lines, Inc., 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017)*. Where a document is not incorporated by reference, the court may nevertheless consider it if "the complaint relies **[**25**]** heavily upon [the document's] terms and effect, thereby rendering the document integral to the complaint." *DiFolco v. MSNBC Cable L.L.C, 622 F.3d 104, 111 (2d Cir. 2010)*.

The court "may also consider matters of which judicial notice may be taken under *Fed. R. Evid. 201*." *Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991)*. A court may take judicial notice of a fact that is "not subject to reasonable dispute" either because it is "generally known within the trial court's territorial jurisdiction" or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b)*. It is well-established that courts may take judicial notice of "public disclosure documents required by law to be filed, and actually filed, with the SEC." *Kramer, 937 F.2d at 774*.

Here, the Individual Defendants request that the court "consider and take judicial notice of" sixteen documents and four Financial Accounting Standards Board ("FASB") standards. (Defs.' Mot. for Not. at 3-4, 6-8.) The documents include financial forms filed by Polished with the SEC, press releases, and a transcript of the November 15, 2021 earnings call. (*Id.* at 3-4.) The Individual Defendants argue that these documents are "incorporated by reference into the Amended Complaint and/or [are] a proper subject of judicial notice." (*Id.* at 1.) Plaintiff **[**25**]** opposes this request. (Pl.'s Opp. to Mot.

for Not. at 1.)

The court agrees with the Individual Defendants that it may consider Exhibits 1-12 because they are incorporated by reference in the Amended Complaint. However, Exhibits 13-16 are not incorporated by reference in the Amended Complaint, and the court concludes that it would be inappropriate to consider those documents at this time. Lastly, the court will consider the FASB standards just as it would any other source of regulatory authority.

### A. Exhibits 1-12

Exhibits 1-12 include four press releases (contained within Exhibits 8, 9, 10, and 11), a transcript of Polished's Q3 2021 earnings call held on November 15, 2021 (Exhibit 3), and eleven documents filed by Polished with the SEC (Exhibits 1, 2, 4-12). (Defs.' **[*294]** Mot. for Not. at 3-4.) Exhibit 1 is Polished's Q2 2021 Form 10-Q, Exhibit 2 is its Q3 2021 Form 10-Q, Exhibit 3 is a transcript of the Q3 2021 earnings call, Exhibit 4 is its 2021 Form 10-K, Exhibit 5 is its QI 2022 Form 10-Q, and Exhibit 7[6] is the July Restatement. (Q2 2021 Form 10-Q (Dkt. 48-4); Q3 2021 Form 10-Q (Dkt. 48-5); Q3 CallTr. (Dkt. 48-6); 2021 Form 10-K (Dkt. 48-7); QI 2022 Form 10-Q (Dkt. 48-8); July Restatement.) **[**26**]** The Amended Complaint quotes from and makes substantial reference to each of these documents. (Defs.' Mot. for Not. at 3-4. (citing the Amended Complaint).) In fact, the statements contained within Exhibits 1-5 and 7 form the backbone of Plaintiff's *Section 10(b)* claims. (Am. Compl. ¶¶ 167-179.) Thus, because the Amended Complaint "makes [] a clear, definite and substantial reference" to each of these documents, Exhibits 1-12 are incorporated by reference and deemed part of the Amended Complaint. *Stinnett, 278 F. Supp. 3d at 608*; *Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)* ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.").

---

[6] Polished filed the July Restatement with the SEC on July 31, 2023, and subsequently amended and refiled the restatement on August 8, 2023. Exhibit 7 is a copy of the amended restatement filed in August 2023. The Individual Defendants represent that Exhibit 7 is "substantially similar to the version filed on July 31, 2023." (Notice Req. at 4 n.2.) Plaintiff does not dispute that assertion. (*See generally* Pl.'s Opp. to Not.) As such, the court accepts that Exhibit 7 is substantially similar to the restatement filed on July 31, 2023.

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 676 of 845

Page 9 of 27

763 F. Supp. 3d 270, *294; 2025 U.S. Dist. LEXIS 13068, **26

## B. Exhibits 13-16

Exhibits 13-16 are documents filed with the SEC but not referenced in the Amended Complaint. (Defs.' Mot. for Not. at 7.) They include Polished's 2020 Form 10-K (Exhibit 13) and three Form 4s (Exhibits 14-16). (*Id.*)

As noted above, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)*. "[M]ere notice or possession [of the document in question] is not enough." *Id.* The Amended **[\*\*27]** Complaint does not reference these SEC filings at any point, so they are not incorporated by reference. Nor do the Individual Defendants argue that these filings are "integral" to the Amended Complaint. (*See* Defs.' Mot. for Not.) And even if the filings were integral to the Amended Complaint, the court cannot consider them for the truth of the matters asserted. *Roth, 489 F.3d at 509*. Similarly, while the court may take judicial notice of the SEC filings, it cannot do so to establish the truth of the matters asserted therein. *Id.* ("If the court takes judicial notice, it does so in order to determine what statements [the documents] contained—but. . . *not for the truth of the matters asserted"* (emphasis in original)). As such, the court declines to consider at this stage the documents contained within Exhibits 13-16.

## C. FASB Standards

Finally, the Individual Defendants request that the court consider four FASB standards (also referred to as Accounting Standards Codification or "ASC") cited in the Amended Complaint. (Defs.' Mot. for Not. at 4; Am. Compl. ¶¶ 85-86.)

Plaintiff alleges that the Individual Defendants, in making certain financial disclosures, violated Generally Accepted Accounting Principles ("GAAP"). **[\*\*28]** (Am. Compl. ¶¶ 85-115.) "The SEC has the statutory **[\*295]** authority for the promulgation of GAAP for public companies and has delegated that authority to the [FASB] and the American Institute of Certified Public Accountants." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig., 763 F. Supp. 2d 423,467 (S.D.N.Y. 2011)*. The FASB is "the designated organization in the private sector for establishing standards of financial accounting and reporting." *In re*

*WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 478 n.3 (S.D.N.Y. 2005)*. These standards "have been recognized by the SEC as authoritative." *Id.* SEC Regulation S-X provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading. *17 C.F.R. § 210.4-01 (a)(1)*. Ultimately, however, "[a]negations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman v. Alias Rsch. Inc., 174 F.3d 79, 84 (2d Cir. 1999)*.

Plaintiff alleges that the Individual Defendants violated four FASB standards: ASC 606, ASC 330, ASC 705, and ASC 310. (Am. Compl. ¶¶ 85-86, 99, 135.) Although Plaintiff's generally oppose the Individual Defendants' motion, they do not specifically object to the court's consideration of these standards. (See Pl.'s Opp. to Mot. for Not.) Logically so: the Amended Complaint relies significantly on alleged violations of FASB standards in attempting to state **[\*\*29]** a securities fraud claim, and Plaintiff presumably wants the court to refer to those standards in adjudicating the motion to dismiss. As such, the court will consider the FASB standards, particularly the standards cited in the Amended Complaint, just as it would any other source of regulatory authority.

In sum, the Individual Defendants' request that the court consider Exhibits 1-12 and the FASB standards is GRANTED, their request that the court consider Exhibits 13-16 is DENIED, and their request that the court take judicial notice of any of these Exhibits is DENIED.

## IV. MOTION TO DISMISS

Plaintiff asserts claims under *Sections 10(b)* and *20(a) of the Exchange Act*. *See* *15 U.S.C. §§ 78j*, *78t*. Count I of the Amended Complaint alleges violations of *Section 10(b)* and SEC *Rule 10b-5(b)* against Polished, Fouerti, and Johnson; Count II alleges violations of *Section 10(b)* and *Rule 10b-5(a)* and *(c)* against Polished and Fouerti; and Count III alleges violations of *Section 20(a)* against the Individual Defendants.[7] (Am. Compl. ¶¶ 167-190.)

Plaintiff's claims under *Section 10(b)* and *Rule 10b-5(b)*

---

[7] In accordance with the automatic stay, in adjudicating this motion to dismiss the court considers only those allegations against the Individual Defendants, and does not consider nor render a decision on the allegations as to Polished.

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 677 of 845   Page 10 of 27

763 F. Supp. 3d 270, *295; 2025 U.S. Dist. LEXIS 13068, **29

require a material misrepresentation or omission and scienter. The Amended Complaint fails to establish these elements; as such, Plaintiff fails to state a claim under *Section 10(b)*. Plaintiff likewise fails to state a claim for scheme liability under *Section 10(b)* and *Rule 10b-5 (a)* and *(c)* because **[**30]** the Amended Complaint does not actually describe a scheme in connection with the purchase or sale of securities. Finally, since liability under *Section 20(a)* is dependent on a primary violation of the Exchange Act, Plaintiff's *Section 20(a)* claim fails as well.

## A. Primary Liability: *Section 10(b) of the Exchange Act* and *Rule 10b-5(b)*

Count I of the Amended Complaint alleges violations of *Section 10(b)* and *Rule 10b-5(b)* **[*296]** against Polished, Fouerti, and Johnson. To state a claim under *Section 10(b)* and *Rule 10b-5(b)*, Plaintiff must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019)*. At issue in this motion to dismiss are elements one, two, and six: material misrepresentation (or omission), scienter, and loss causation. (See *generally* Defs.' MTD.)

1. Anonymous Employee Accounts

Before turning to the disputed elements of Plaintiff's *Section 10(b)* and *Rule 10b-5(b)* claims, the court addresses the accounts of the eleven anonymous FEs. The Amended Complaint relies on the FEs—and the improper business practices they allege—to establish (1) the false or misleading nature of the alleged misrepresentations or omissions and (2) scienter. (Pl.'s MTD Opp. at 10-26.) However, **[**31]** for the reasons that follow, the court concludes that it cannot credit the FE accounts, as currently pleaded, for purposes of establishing either of these elements.

As a general matter, "if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)*. "Following *Novak*, district courts in the Second Circuit generally credit anonymous witnesses in two situations." *In re NIO Sec. Litig., No. 19-CV-1424 (NGG) (JRC), 2021 U.S. Dist. LEXIS 152311, 2021 WL 3566300, at *7 (E.D.N.Y. Aug. 12, 2021)*. First, courts will credit anonymous witnesses whose "positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011)*. Second, where "independent adequately pled factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened." Id. However, anonymous witnesses "cannot be used to merely parrot conclusoiy allegations contained in the complaint." *Id.* Rather, such sources "must show that individual defendants actually possessed the knowledge highlighting the falsity **[**32]** of public statements; conclusory statements that defendants were aware of certain information, and mere allegations that defendants would have or should have had such knowledge is insufficient." *Id. at 591* (collecting cases).

As relevant here, courts routinely decline to credit anonymous witness accounts in at least four circumstances. *See Miao v. Fanhua, Inc., 442 F. Supp. 3d 774, 798-99 (S.D.N.Y. 2020)*. First, courts generally do not credit the statements of anonymous witnesses "who are insufficiently described or whose descriptions do not suggest that they [were] in [a] position to know the facts attributed to them." *Id. at 799* (collecting cases). Second, statements "that cannot situate in time relevant occurrences are sometimes disregarded because they cannot establish that the challenged statements were knowingly false when made." *Id.* (collecting cases). Third, allegations by anonymous witnesses that are insufficiently particular are often discounted or disregarded. *Id. at 800* (collecting cases). Fourth, courts tend not to credit uncorroborated statements of anonymous witnesses that are sourced secondhand from individuals "with whom plaintiffs' counsel have not themselves interacted." *Id.* (collecting cases).

**[*297]** Here, each of the FE accounts suffers from one or all of the above **[**33]** deficiencies.

First, the descriptions of many of the FEs do not suggest that they were in a position to know the facts attributed to them. For example, FEs 5, 6, 7, and 8 worked at YF Logistics warehouses in New Jersey, in roles ranging from inventory control manager, to IT support specialist, to customer service representative. (Am. Compl. ¶¶ 42-45.) Nevertheless, FEs 5, 6, and 7 assert that "Polished's publicly reported inventory numbers were materially false," and FE8—a customer

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 678 of 845    Page 11 of 27

763 F. Supp. 3d 270, \*297; 2025 U.S. Dist. LEXIS 13068, \*\*33

service representative—claims that Albert Fouerti ordered employees to engage in fraudulent business practices at ACL (*Id.* ¶¶ 58, 64.) But these FEs' respective positions at *YF Logistics* do not suggest that they would be in a position to know about *Polished's* or *ACI's* practices more broadly. See, *e.g., Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp., 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018)* (disregarding statements of five former employees because they "worked mainly within a single [company] unit, so they had no insight on how other [company] units, let alone other [company] divisions, projected aftermarket sales"); *In re China Mobile Games & Entm't Grp., LTD Sec. Litig., No. 14-CV-4471 (KMW), 2016 U.S. Dist. LEXIS 29258, 2016 WL 922711, at \*4 (S.D.N.Y. Mar. 7, 2016)* (disregarding allegations of confidential witness ("CW") who worked at a subsidiary, not the parent company, as such testimony "could describe the anomalies of a rogue fiefdom rather **[\*\*34]** than company-wide practices"); *Stichting Pensioenfonds ABP v. Merrill Lynch & Co. (In re Lehman Bros. Secs. & Erisa Litig.), No. 10-CV-6637 (LAK), 2013 U.S. Dist. LEXIS 107559, 2013 WL 3989066, at \*4 (S.D.N.Y. July 31, 2013)* (disregarding CWs who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010)* (discounting allegations of "low-level" or "rank-and-file" employees" or "outside contractors" whom the complaint did not indicate had any "access to aggregated data regarding [the company's] credit risk"), *aff'd*, *430 F. App'x 63 (2d Cir. 2011)*.

More importantly, with the exception of FE1 and FE3, none of the FEs are alleged to have "met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period." *In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011)*. At best, the FEs claim that they reported to a manager who—sometimes through multiple other persons—ultimately reported to Albert Fouerti. (See, *e.g.*, Am. Compl. ¶¶ 39, 43, 65.) While FE2 and FE8 claim that Albert Fouerti gave certain orders, missing from the Amended Complaint is any indication of "what kind of access [FE2 and FE8] had to [Fouerti], in what form and context [Fouerti] made [these] alleged statement[s], or how [FE2 and FE8 were] privy to [those] statements." *Glaser, 772 F. Supp. 2d at 595*. The absence of any communication between the FEs and the Individual Defendants is fatal **[\*\*35]** to Plaintiffs theory of scienter. Even accepting the FE accounts as true, they do not

"show that [the] individual defendants actually possessed the knowledge highlighting the falsity of public statements; [and] conclusory statements that defendants were aware of certain information, [or] that defendants would have or should have had such knowledge [,] is insufficient." *Patel v. Koninklijke Philips N.V., No. 21-CV-4606 (ERK) (MMH), 2024 U.S. Dist. LEXIS 171544, 2024 WL 4265758, at \*7 n.4 (E.D.N.Y. Sept. 23, 2024)*; *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank ofCom., 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010)* (remarking that "Plaintiffs should, but do not, **[\*298]** provide specific instances in which Defendants received information that was contrary to their public declarations"); *Glaser, 772 F. Supp. 2d at 595* (failure to describe how CW was privy to individual defendant's alleged contradictory statement was fatal to the CW's allegations); *Loc. No. 38, 724 F. Supp. 2d at 460* (discounting CW allegations where there was no indication that the sources had any contact with the individual defendants). This lack of description "is, alone, fatal to [the FEs'] allegations." *Glaser, 772 F. Supp. 2d at 595*; *see also In re Wachovia, 753 F. Supp. 2d at 352* (refusing to credit CW allegations despite "colorful" accusations of improper business practices because there was "no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period").

Second, with the exception **[\*\*36]** of FE1, each of the FE accounts are "unmoored in time." *Gregory v. ProNAi Therapeutics Inc., 297 F. Supp. 3d 372, 408-09 (S.D.N.Y. 2018)* (characterizing factual allegations as "problematic" where the complaint "does not attempt to pinpoint when" the relevant issues '"became apparent"). While the Amended Complaint provides the start and end date of each FE's employment with Polished or YF Logistics, it does not situate in time any alleged improper business practice or statement by the Individual Defendants. (See Am. Compl. ¶¶ 38-84.) "This omission renders the task of matching [FE] allegations to contrary public statements all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement." *In re Wachovia, 753 F. Supp. 2d at 352* (emphasis in original). For example, FEs 2, 3, 4, 9, and 10 all began working at ACI or YF Logistics *before* the start of the Class Period in August 2021. (Am. Compl. ¶¶ 39-41, 46-47.) Without any allegation as to when FEs 2, 3, 4, 9, or 10 observed the alleged improper business practices, it is all but impossible to discern when those

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 679 of 845    Page 12 of 27

763 F. Supp. 3d 270, *298; 2025 U.S. Dist. LEXIS 13068, **36

incidents occurred in relation to the alleged misstatements and omissions, or whether they occurred during the Class Period at all. *[**37]* See *Gregory, 297 F. Supp. 3d at 409* (disregarding CW accounts where the complaint "alleges that CW-2 worked at [the defendant-company] from May 2015 to July 2016 but otherwise is imprecise as to dates"); *see also In re Wachovia, 753 F. Supp. 2d at 352* (same). FE11's account is likewise unhelpful, as FE11 left YF Logistics in March 2021, months before the start of the class period. (Am. Compl. ¶ 48) *Francisco v. Abengoa, S.A., 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020)* (noting that "courts have rejected confidential witness allegations where the confidential witnesses left the company before the class period"). While FEs 5-8 began working at YF Logistics after the start of the Class Period, their accounts are also unspecific as to time, making it impossible to match their allegations to any contrary contemporaneous public statements by the Individual Defendants. *See Gregory, 297 F. Supp. 3d at 381, 409* (disregarding account of CW who started working at the defendant-company after the start of the class period but whose account was "otherwise is imprecise as to dates").

Next, many of the FE allegations are insufficiently particular. For example, the Amended Complaint claims that "FE8 was instructed to lie and tell customers that the order was backlogged ... when in fact ACI did not have the product in stock," but does not state who told FE8 to lie or when. **[**38]** (Am. Compl. ¶ 64.) FE3 claims to "know[]" that Albert Fouerti forged AC's, and then later ACI's, inventory **[*299]** numbers, but provides no explanation as to the basis for their knowledge. (*Id.* ¶ 56.) FE2 asserts that they raised certain issues with "management" at ACI, but does not specify with whom they spoke or when. (*Id.* ¶ 57.) Additionally, FEs 3, 5, 6, and 7 claim that "Polished's publicly reported inventory numbers were materially false," (Am. Compl. ¶ 58.), but this "merely parrot[s the] conclusory allegations contained in the complaint." *Glaser, 772 F. Supp. at 590*; *see also In re Sierra Wireless, Inc. Sec. Litig., 482 F. Supp. 2d, 365, 376 (S.D.N.Y. 2007)* ("[P]laintiffs have not satisfied the heightened pleading requirements [because the CW on whom they rely] merely parrots the conclusory allegations contained in the complaint."). Lastly, while FE1 claims to have reported the improper business practices to certain Polished executives in a September 9, 2021 email, the Amended Complaint does not actually state whether FE1 successfully brought those practices to the attention of Johnson or Albert Fouerti at the September 21, 2021 meeting. (Am. Compl. ¶¶ 76-

83.) FE1 claims that he "attempted to discuss the concerns and fraudulent practices" with Fouerti, but states that Fouerti "constantly" **[**39]** interrupted, became loud and hostile, and attacked FE1 on a personal level before firing him. (*Id.* ¶ 83.) FE1 does not detail what information, if any, he shared with Fouerti and Johnson. (*Id.*) Plaintiff effectively asks the court to assume that, after this meeting, Fouerti and Johnson knew about the alleged improper business practices. Such logical leaps will not satisfy the heightened pleading requirements for Plaintiff's securities fraud claim. *See Miao, 442 F. Supp. 3d at 800 n.21* (collecting cases in which courts disregarded insufficiently particular CW allegations).

Fourth and finally, several of the FE accounts are sourced secondhand from individuals with whom Plaintiff's counsel have not themselves interacted. For example, FE2 claims that Ketevan Talakvadze "told FE2 . . . that she did not want to forge [] documents, but that Albert and Elie Fouerti ordered her to do it." (Am. Compl. ¶ 60.) Similarly, FE3 alleges that Sam Bazzi told FE3 that "60% of the workers at YF Logistics had no social security numbers and were not authorized to work in the U.S." (*Id.* ¶ 69; *see also id.* ¶ 63 (according to FE9, "[w]hen the customer complained, ACI employees would tell them that the item was delivered, and that ACI had a **[**40]** document proving it"); *id.* ¶ 68 ("FE6 stated that numerous workers at YF Logistics openly told FE6 that they were undocumented, were hired under an alias, with no supporting paperwork, and were paid in cash.").) The foregoing allegations are "particularly uninformative" because they suggest that the FEs obtained their information "through intermediaries, thus undermining the likelihood that [they have] personal knowledge of [their] allegations." *Glaser, 772 F. Supp. 2d at 595*.

In sum, the court concludes that the FE accounts are not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak, 216 F.3d at 314*. As such, the court will not credit their accounts in assessing the sufficiency of the allegations in the Amended Complaint.

2. Alleged Material Misrepresentations and Omissions

"A material misrepresentation or omission must be both (1) false or misleading, and (2) material." *Leadersel Innotech ESG v. Teladoc Health, Inc., No. 23-CV-1112, 2024 U.S. App. LEXIS 24196, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024)* (citing *Singh, 918 F.3d at 62-*

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 680 of 845    Page 13 of 27

763 F. Supp. 3d 270, *299; 2025 U.S. Dist. LEXIS 13068, **40

_63_). To adequately allege a material misrepresentation, "a plaintiff must plead **[*300]** facts that show that the defendant made a statement of material fact that was untrue at the time it was made." _In re Liberty Tax, Inc. Secs. Litig., 435 F. Supp. 3d 457, 465 (E.D.N.Y. 2020)._ A misrepresentation or omission is material **[**41]** if there is a "substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." _United States v. Gramins, 939 F.3d 429, 445 (2d Cir. 2019)_; _Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)_ (applying same standard to omissions). A misrepresentation or omission is important to a reasonable investor "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." _Gramins, 939 F.3d at 445_; _Basic Inc., 485 U.S. at 231-32_.

Plaintiff alleges that Fouerti and Johnson made numerous material misrepresentations and omissions across four SEC filings and one earnings call. As noted above, the challenged statements generally fall into four categories: (1) financial metrics and opinions regarding Polished's future prospects (Am. Compl. ¶¶ 116, 118, 126, 128); (2) restated financial metrics (_id._ ¶¶ 134, 138, 144); (3) statements and certifications regarding Polished's internal controls (_id._ ¶¶ 120, 130, 132, 136, 146); and (4) statements concerning Polished's fulfilment, logistics, and returns processes (_id._ ¶¶ 122, 124, 140, 142). The court discusses each in turn.

_a. Financial metrics and opinions regarding Polished's future prospects_

The first group of challenged **[**42]** statements are financial metrics and opinions contained within Polished's Q2 and Q3 2021 Forms 10Q. These disclosures were _not_ subject to the July Restatement.

Johnson[8] endorsed the following statements in

Polished's Q2 2021 Form 10-Q:

• For the six months ended June 30, 2021, the Company incurred operating losses of approximately $4,543,516 and negative cash flow from operations of $6,985,302, but had working capital of $15,530,879. Additionally, the Company had over $45 million of unrestricted cash at June 30, 2021. On June 2, 2021, the Company closed on the acquisition of Appliances Connection. Appliances Connection has historically been profitable, however, only 29 days of their operations are included in results for the three and six months of 2021.

• We had an income tax net benefit of $8,048,478 for the three months ended June 30, 2021, as compared to an income tax benefit of $688,953 for the three months ended June 30, 2020. The tax benefit arose from the elimination of the allowance for the deferred tax asset. The acquisition of Appliances Connection on June 2, 2021 makes it more likely than not that the Company will be profitable, **[*301]** and will be able to utilize previously derived **[**43]** net operating losses.

(Q2 2021 Form 10-Q at ECF pp. 15, 37.) Similarly, Fouerti and Johnson endorsed the following statement in Polished's Q3 2021 Form 10-Q:

• For the nine months ended September 30, 2021, the Company had operating profit of $2.0 million, $18.3 million of cash flow used in operations, and working capital of $20.0 million. Additionally, the Company had $27.2 million of unrestricted cash at September 30, 2021. On June 2, 2021, the Company completed the acquisition of Appliances Connection. Appliances Connection has historically been profitable; however, less than 4 months of their operations are included in results for the nine months ended September 30, 2021.

(Q3 2021 Form 10-Q at ECF p. 16.)

Plaintiff claims that the foregoing statements were materially false or misleading for several reasons. (Am. Compl. ¶¶ 117, 119, 127, 129.) First, Plaintiff asserts that the statements about Polished's ability to operate as a going concern were false because, "but for the fraud, as Polished admitted at the end of the Class Period, Polished was not profitable." (_Id._) Plaintiff

---

[8] While Count I alleges primary liability against Fouerti and Johnson, _Moore_ and Johnson signed the Q2 2021 Form 10-Q filed on August 12, 2021. (_See_ Q2 2021 Form 10-Q at ECF pp. 53-54.) Although the AC merger was complete by August 2021, Fouerti had yet to join Polished as its CEO, and, as such, he did not sign the Q2 2021 Form 10-Q. (Am. Compl. ¶ 17.) Thus, to the extent Plaintiff contends that Fouerti made any misstatements or omissions in the Q2 2021 Form 10-Q, that claim is meridess. _See In re Smith Barney Transfer Agent_

_Litig., 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012)_ (holding that defendant was not primarily liable for misleading statements in SEC filings that he did not sign because he did not "make" the statements they contained).

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 681 of 845    Page 14 of 27

763 F. Supp. 3d 270, *301; 2025 U.S. Dist. LEXIS 13068, **43

contends that Polished and Fouerti "knew or recklessly disregarded that at no point in 2021 was **[\*\*44]** the consolidated entity Polished profitable," citing the July Restatement as evidence of that alleged fact. (*Id.*) Second, Plaintiff asserts that AC was not profitable, and, as a result, "Defendants' stated opinion that Polished would be able to continue as a going concern" based on AC's profitability was false. (*Id.*) Third, Plaintiff claims that, "in the context of praising AC and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices." (*Id.*)

Plaintiff has not met its burden of showing that the above statements were materially false or misleading. Plaintiff contends that the statements about Polished's financial metrics for Q2 and Q3 2021 were false because (1) the July Restatement revealed that Polished was not profitable at any point in 2021 and (2) the financial metrics were based on "the false supporting fact of AC's profitability." (*Id.*) While the July Restatement did restate Polished's financials for fiscal year 2021 and QI of 2022, it did *not* restate the company's financials for Q2 or Q3 of 2021. (July Restatement at ECF 163-64, 206-09.) That Polished restated **[\*\*45]** its consolidated financials for fiscal year 2021 to reveal net losses instead of net profits for that year does not prove or indicate that the company was unprofitable during Q2 or Q3 of that year. Nor does it render false Polished's statements that it realized certain income tax benefits in Q2 and Q3 of 2021. In other words, the July Restatement does not show that the financial metrics disclosed in Polished's Q2 or Q3 Forms 10-Q were "untrue at the time [they were] made." *In re Liberty Tax, 435 F. Supp. 3d at 465.* Furthermore, even accepting Plaintiffs argument that the Q2 and Q3 2021 financial metrics were premised on AC's profitability, Plaintiff does not plead *any* facts demonstrating that AC was unprofitable. Such conclusory allegations are plainly insufficient to prove the falsity of the Q2 or Q3 2021 financial metrics. *See ATSI, 493 F.3d at 99* ("Allegations that are conclusory or unsupported by factual assertions are insufficient.").

Next, Plaintiff contends that certain opinions rendered in Polished's Q2 and Q3 2021 Forms 10-Q were materially false or misleading. (Am. Compl. ¶¶ 117, 119, 127, **[\*302]** 129.) Johnson endorsed the following opinions in Polished's Q2 2021 Form 10-Q:

• In the second quarter of 2021, the Company acquired Appliances Connection. **[\*\*46]** Appliances Connection has a history of profitable operations. As such, the Company determined that it was more likely than not that it would have profitable operations in the future and therefore be able to realize the deferred tax assets and accordingly reversed the allowance for deferred tax assets at June 30, 2021.

• Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these unaudited condensed consolidated financial statements. Additionally, only one month of operations for Appliances Connection, which has operated profitably, are included in the results of operations for the six months ended June 30, 2021.

• Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

(Q2 2021 Form 10-Q at ECF pp. 14, 16.) Likewise, Fouerti **[\*\*47]** and Johnson endorsed the following opinions in Polished's Q3 2021 Form 10-Q:

• In the second quarter of 2021, the Company acquired Appliances Connection. Appliances Connection has a history of profitable operations. As such, the Company determined that it was more likely than not that it would have profitable operations in the future and therefore be able to realize the deferred tax assets and accordingly reversed the allowance for deferred tax assets at June 30, 2021.

• Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

(Q3 2021 Form 10-Q at ECF pp. 15, 17.)

Opinions may be actionable under *Rule 10b-5* if (1) the speaker disbelieved the opinion at the time it was made, (2) the opinion "contained one or more embedded factual statements that can be proven false," or (3) the

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 682 of 845   Page 15 of 27

763 F. Supp. 3d 270, *302; 2025 U.S. Dist. LEXIS 13068, **47

opinion, "without providing critical context, implied facts that can be proven *false."Abramson v. Newlink Genetics Corp., 965 F.3d 165, 174-75 (2d Cir. 2020)*. As the Second Circuit has explained:

> A statement structured, "I believe **[\*\*48]** that x is so because y has occurred," contains the factual and falsifiable statement, "y has occurred." If y has in fact not occurred, the statement of opinion is actionable because an embedded but complete "statement of a material fact" under the first part of *Rule 10b-5* can be proven false.
>
> . . . [Additionally,] when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material **[\*303]** facts that were omitted, liability under *Rule 10b-5* may follow.

*Id. at 175.*

Here, Plaintiff does not claim that Fouerti or Johnson disbelieved these opinions at the time they were made. (Am. Compl. ¶¶ 117, 119, 127, 129.) Instead, Plaintiff apparently contends that the opinions "contained one or more embedded factual statements that can be proven false," or "without providing critical context, implied facts that can be proven false." *Abramson, 965 F.3d at 175.* (*See* Am. Compl. ¶¶ 117, 119, 127, 129.) Specifically, Plaintiff argues that Fouerti and Johnson's opinion that Polished would "more likely than not . . . have profitable operations in the future" was false or materially misleading because it was premised on the false supporting fact of AC's profitability. (Am. Compl. ¶¶ **[\*\*49]** 117, 119, 127, 129.) Plaintiff further contends that the opinions were false or materially misleading because, "but for the fraud, as Polished admitted at the end of the Class Period [when it filed the July Restatement], Polished was not profitable." (*Id.*)

As discussed above, Plaintiff does not plead any facts demonstrating that AC was unprofitable. Moreover, Plaintiff does not explain how "the fraud"—*i.e.*, the alleged improper business practices—rendered the above opinions false or misleading. That Polished had inaccurate counts of its inventory, forged and falsified documents as a routine business practice, and employed undocumented workers does not necessarily render false Polished's opinions that it would be profitable in the future and continue operations as a going concern. In other words, Plaintiff fails to allege any facts demonstrating that these opinions, "without providing critical context, implied facts that can be

proven false." *Abramson, 965 F.3d at 175.* As such, Fouerti and Johnson were not required to paint an overly gloomy picture of future prospects.[9]

Finally, the court rejects Plaintiff's argument that, in the context of rendering the above statements and opinions, the Individual **[\*\*50]** Defendants were "duty-bound to disclose that Albert Fouerti was and continued to be a thief and mandated fraudulent business practices." (Am. Compl. ¶¶ 117, 119, 127, 129.) With respect to alleged omissions, it bears emphasis that *Section 10(b)* and *Rule 10b-5(b)* "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)*. A company "is not required to disclose a fact merely because **[\*304]** a reasonable investor would very much like to know that fact." *In re Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)*. Rather, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Id.* Such a duty may arise "when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or a statement is made that would be inaccurate, incomplete, or misleading without further context." *Synchrony, 988 F.3d at 167*.

Plaintiff fails to adequately allege that Fouerti or Johnson had a duty to disclose the alleged improper

---

[9] The Individual Defendants contend that these opinions are also forward-looking statements protected by the PSLRA's safe harbor. (Defs.' MTD at 19-20.) The court agrees that these opinions contain certain forward-looking aspects, namely, Polished's projections for the future. However, when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the statement is not protected by the PSLRA. *Manavazian v. Atec Grp., 160 F. Supp. 2d 468, 481 (E.D.N.Y. 2001)* (statements not subject to PSLRA safe harbor provision or bespeaks caution doctrine where plaintiffs alleged that defendants "knowingly misrepresented present material facts as part of forward-looking statements"); *see also In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 566 n.17 (S.D.N.Y. 2011)* (same). Here, Polished's opinions that it would be profitable in the future and continue operations as a going concern were based on a representation of present facts, including AC's historic profitability, "estimates of operations for fiscal years 2021 and 2022," and "relevant conditions and events that are known and reasonably knowable." (Q2 2021 Form 10-Q at ECF p. 16; Q3 2021 Form 10-Q at ECF pp. 16-17.) As such, the opinions are not protected by the PSLRA's safe harbor or the bespeaks caution doctrine, discussed in more detail *infra,*

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 683 of 845    Page 16 of 27

763 F. Supp. 3d 270, *304; 2025 U.S. Dist. LEXIS 13068, **50

business practices. Plaintiff does not claim that Fouerti or Johnson "trad [ed] on confidential information" or that "a statute or regulation require [d] disclosure" of the improper practices. *Id. at 167*. Rather, Plaintiff argues that the above statements and opinions were misleading **[**51]** without the further context of the alleged improper practices. (Am. Compl. ¶¶ 117, 119, 127, 129.) But Plaintiff does not explain how the alleged practices rendered Polished's statements about its current or future profitability false or misleading. Instead, Plaintiff simply asserts that Fouerti and Johnson were "duty-bound" to disclose the alleged improper business practices, without explaining why. But *Section 10(b)* and *Rule 10b-5(b)* do not create a duty to disclose any and all material information, and a corporation "is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner, 9 F.3d at 267*. The "mere existence of reports of adverse events" is not sufficient to create a duty to disclose; "Something more is needed." *Dalberth v. Xerox Corp., 766 F.3d 172, 183 (2d Cir. 2014)*. As such, Plaintiff fails to allege an actionable omission in the above statements and opinions.

### b. Restated financial metrics

The second group of challenged statements are Polished's financial metrics for fiscal year 2021 and Q1 of 2022. (Am. Compl. ¶¶ 96, 135, 139, 145.) These statements *were* subject to the July Restatement.

Fouerti and Johnson endorsed the following statement in Polished's 2021 Form 10-K:

> As of December 31, 2021, we had cash and cash equivalents **[**52]** of $25.7 million and restricted cash of $8.1 million. For the year ended December 31, 2021, the Company incurred operating income of approximately $8.3 million, cash flows used in operations of $18.3 million, and working capital of $16.0 million. On June 2, 2021, the Company completed the acquisition of Appliances Connection. Appliances Connection has historically been profitable; however, less than 7 months of their operations are included in results for the year ended December 31, 2021.

(2021 Form 10-K at ECF p. 80.) Fouerti and Johnson also endorsed several other financial metrics for fiscal year 2021, including: Product sales = $362.3 million; Gross profit = $79.7 million; Operating income = $8.3 million; Net income = $7.7 million; Net income per share = $0.12. (*Id.* at ECF pp. 69-70.) Likewise, Fouerti and

Johnson endorsed the following financial metrics for Q1 of 2022: Product sales = $152.8 million; Gross profit = $35.9 million; Operating income = $10.1 million; Net income = $5.9 million; Net income per share = $0.06. (Q1 2022 Form 10-Q at ECF pp. 6-7.) Finally, Fouerti and Johnson endorsed the following opinion in the 2021 Form 10-K:

> The accompanying consolidated financial statements **[**53]** have been prepared on a going concern basis under which the Company **[*305]** is expected to be able to realize its assets and satisfy its liabilities in the normal course of business. Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

(2021 Form 10-K at ECF p. 80.)

Plaintiff claims that the foregoing statements and opinion were materially false or misleading for several reasons. (Am. Compl. ¶¶ 96, 135, 139, 145.) Plaintiff repeats its claim that "Defendants' stated opinion that Polished would be able to continue as a going concern" based on AC's profitability was false. (*Id.* ¶ 139.) It also reiterates that, "in the context of praising AC and discussing profitability and going concern, Defendants were duty-bound to disclose that Albert Fouerti . . . was and continued to be a thief and mandated fraudulent business practices." (*Id.*) Plaintiff additionally alleges that the above-listed financial metrics were false, as evidenced by the July Restatement **[**54]** in which Polished restated its financials for fiscal year 2021 and Q1 2022. (*Id.*) Finally, Plaintiff contends that Polished calculated these statistics in violation of GAAP, thus rendering the metrics false and misleading. (*Id.* ¶¶ 85-115, 135, 145.)

In light of the July Restatement, there can be no dispute that the Amended Complaint pleads numerous false and misleading misstatements with respect to Polished's 2021 Form 10-K and Q1 2022 Form 10-Q. *See Varghese v. China Shenghuo Pharm. Holdings, Inc., 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009)* ("Misreported financial information clearly amounts to a false statement of fact."). Pursuant to GAAP, "previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d*

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 684 of 845    Page 17 of 27

763 F. Supp. 3d 270, *305; 2025 U.S. Dist. LEXIS 13068, **54

474, 486 (S.D.N.Y. 2004). "Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc., 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017). As such, the Amended Complaint adequately alleges that the fiscal year 2021 and Q1 2022 financial metrics were false when stated.

Likewise, the Amended Complaint sufficiently alleges that the above-quoted opinion was false or misleading when made. In its 2021 Form 10-K, Fouerti and Johnson [**55] opined as followed: "Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts . . . indicate improved operations and the Company's ability to continue operations as a going concern." (2021 Form 10-K at ECF p. 80.) The court presumes that Fouerti and Johnson premised this rosy outlook, at least in part, on Polished's positive financial results for fiscal year 2021. Because those financial results were incorrect, the opinion either "contained one or more embedded factual statements that can be proven false," or "implied facts that can be proven false." Abramson, 965 F.3d at 175. Thus, Plaintiff adequately alleges that this opinion was materially false or misleading.

*c. Statements and certifications regarding Polished's internal controls*

The third group of challenged statements are statements and certifications regarding Polished's internal controls. (Am. Compl. ¶¶ 121, 131, 133, 137, 147.)

 [*306] Internal controls are "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; [**56] (ii) Reliability of financial reporting; [and] (iii) Compliance with applicable laws and regulations." In re Bear Stearns, 763 F. Supp. 2d at 471.[10] The Sarbanes-Oxley Act ("SOX") requires

management to report assessments of internal controls annually. 15 U.S.C. § 7262(a). It also requires management to make certain certifications ("SOX certifications") in each annual or quarterly report. 15 U.S.C. § 7241(a).

Moore and Johnson, and then Fouerti and Johnson, made the following SOX certifications in Polished's Q2 2021 Form 10-Q, Q3 2021 Form 10-Q, and 2021 Form 10-K:

> The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q2 2021 [**57] Form 10-Q at ECF pp. 49, 51; Q3 2021 Form 10-Q at ECF pp. 62, 64; 2021 Form 10-K at ECF pp. 141, 143.) These SOX certifications largely mirror the statutory language. See 15 U.S.C. § 7241(a) (5).

Additionally, in its Q2 2021 Form 10-Q, Polished stated:

> There were no changes in the Company's internal control over financial reporting or in any other factors that could significantly affect these controls during the three months ended June 30, 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Q2 2021 Form 10-Q at ECF p. 45.) Likewise, in its Q3 2021 Form 10-Q, Polished stated:

> During the three months ended September 30, 2021, the Company hired a new Chief Executive Officer and a new Chief Financial Officer.

---

[10] Polished's 2021 Form 10—K adopts the "Internal Control—Integrated Framework" promulgated by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). (2021 Form 10-K at ECF p. 59.) The above

definition of internal controls comes from Chapter 1 of the COSO Framework. In re Bear Stearns, 763 F. Supp. 2d at 471.

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 685 of 845    Page 18 of 27

763 F. Supp. 3d 270, *306; 2025 U.S. Dist. LEXIS 13068, **57

There were no other changes in the Company's internal control over financial reporting or in any other factors that could significantly affect these controls during the three months ended September 30, 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Q3 2021 Form 10-Q at ECF p. 47.)

Plaintiff contends that the foregoing statements and **[\*\*58]** certifications were materially false and misleading "because they rendered Polished duty-bound to disclose **[\*307]** then-existing material weaknesses, of which Polished and Albert Fouerti knew of or recklessly disregarded." (Am. Compl. ¶9 121, 131.) Plaintiff points to the following disclosure from Polished's 2021 Form 10-K as proof that material weaknesses existed in Polished's internal controls during Q2 and Q3 of 2021:

The following material weaknesses, which were discovered to be material during 2021, were present at December 31, 2021: lack of structure and responsibility, insufficient number of qualified resources and inadequate oversight and accountability over the performance of controls; ineffective assessment and identification of changes in risk impacting internal control over financial reporting; inadequate selection and development of effective control activities, general controls over technology and effective policies and procedures; and ineffective evaluation and determination as to whether the components of internal control were present and functioning.

(2021 Form 10-K at ECF p. 28.) Plaintiff further contends that the Fouerti certifications in the Q3 2021 Form 10-Q and 2021 Form **[\*\*59]** 10-K were particularly false and misleading because Fouerti was "duty-bound to disclose" the alleged improper business practices discussed in detail above. (Am. Compl. ¶¶ 133, 137, 147.)

The Individual Defendants contend that Plaintiffs argument is "classic impermissible fraud by hindsight, and it conveniently ignores the fact that [SOX] only requires a company to report its assessments of internal controls annually." (Defs.' MTD at 26.) They argue that "the fact that management assessed the Company's internal controls as of year-end 2021 and promptly disclosed the material weakness negates any inference that Defendants were disingenuous about their earlier certifications." (*Id.*) The Individual Defendants also point

out that the company "only identified material weaknesses in [its] internal controls in 2021 *as of* December 31, 2021." (*Id.* (emphasis in original).)

The Second Circuit encountered a similar challenge to SOX certifications in *New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo, 122 F.4th 28 (2d Cir. 2023)*. There, plaintiffs argued that defendants' restatement, in which it "acknowledged a failure of internal controls," rendered its executives' prior SOX certifications regarding internal controls false or misleading. *Id. at 47*. The Second Circuit characterized the **[\*\*60]** SOX certifications as opinions because they "contain[ed] language that convey[ed] management's subjective judgments about the company's internal controls." *Id.* The Court then rejected plaintiffs' challenge to the certifications, reasoning that the company's "change of opinion, standing alone, does not mean that the original certified opinions were disingenuous. Nor is a genuinely held opinion that turned out to be wrong necessarily actionable." *Id.* (footnote omitted). Instead, in that case, plaintiffs "fail[ed] to adequately allege that the [] executives who signed the certifications did not believe what they certified." *Id.*

For the reasons articulated by the Second Circuit in *DeCarlo*, the court concludes that the challenged statements and SOX certifications regarding internal controls are inactionable statements of opinion. The challenged statements and certifications are opinions because they "contain language that conveys management's subjective judgments about the company's internal controls." *Id.* Moreover, Plaintiff does not contend that Fouerti or Johnson disbelieved these opinions at the time they were made. (Am. Compl. ¶¶ 121, 131, 133, 137, 147.) Instead, Plaintiff claims that the **[\*\*61]** statements and certifications were false based on the 2021 Form 10-K's disclosure **[\*308]** of material weaknesses in internal controls. (*Id.* ¶¶ 121, 131.) But Polished's "change of opinion, standing alone, does not mean that the original certified opinions were disingenuous. Nor is a genuinely held opinion that turned out to be wrong necessarily actionable." *DeCarlo, 122 F.4th at 47*. In other words, Polished's conclusion that material weaknesses "were present at December 31, 2021," does not necessarily prove or indicate that Fouerti and Johnson's prior opinions were false when made. (2021 Form 10-K at ECF p. 28.) Other than the Form 10-K itself, Plaintiff cites no fact indicating that material weaknesses in internal controls existed in Q2 or Q3 of 2021, or that Fouerti or Johnson knew of those weaknesses. (Am. Compl. ¶¶ 121, 131.) Thus, Plaintiff

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 686 of 845    Page 19 of 27

763 F. Supp. 3d 270, *308; 2025 U.S. Dist. LEXIS 13068, **61

fails to adequately allege that the statements and SOX certifications were false or materially misleading.

Plaintiff also fails to adequately allege that the statements or SOX certifications rendered Fouerti and Johnson "duty-bound" to disclose the alleged improper business practices discussed above. (*Id.* ¶¶ 133, 137, 147.) Recall that "an omission is actionable under the **[**62]** securities laws only when the corporation is subject to a duty to disclose the omitted facts," *In re Time Warner Sec. Litig., 9 F.3d at 267*, and that such a duty may arise when "when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or a statement is made that would be inaccurate, incomplete, or misleading without further context," *Synchrony, 988 F.3d at 167*. Plaintiff does not allege that Fouerti or Johnson "trad [ed] on confidential information" or that "a statute or regulation require [d] disclosure" of the improper practices. *Id.* Though Plaintiff apparently contends that the statements and certifications were misleading without the context of the improper business practices, it does not explain *how* the alleged practices affected Polished's internal controls, let alone how they rendered the above statements false or misleading. As with other alleged misstatements, Plaintiff simply asserts that Fouerti and Johnson were "duty-bound" to disclose the alleged improper business practices, without explaining why. Such con-clusory allegations fail to state a claim for actionable omissions. *In re Time Warner, 9 F.3d at 267*.

For these reasons, Plaintiff has not met its burden of showing that the above statements and certifications were materially **[**63]** false or misleading.

*d. Statements concerning Polished's fulfilment, logistics, and returns processes*

The fourth and final group of challenged statements are statements concerning Polished's fulfilment, logistics, and returns processes. (Am. Compl. ¶¶ 123, 125, 141, 143.) These statements are contained within the Q3 2021 earnings call held on November 15, 2021 and the 2021 Form 10-K.

In the Q3 earnings call, Fouerti stated:

> We built a stand-alone business that has superior value proposition relative to the competition. With respect to our go-forward strategy, I have been working with the Board and the rest of the management team to put in place a new plan to solidify our foundation for long-term growth. We are

an e-commerce company that specializes in home appliances and providing great content, not a hardline merchant and not an omnichannel retailer.

> Our priorities must reflect this reality. In the quarters to come, we are going to be focused on initiatives that include building a best-in-class tech stack and digital marketing presence. *The backbone of our success will be our fulfillment and logistics systems as well as* **[*309]** *the other technologies in our supply chain.* This is why we are investing **[**64]** in our tech stack, while also constantly optimizing our consumer-facing digital platforms.

(Q3 Call Tr. at ECF pp. 5-6 (challenged portion in italics).)

Plaintiff alleges that the italicized statement was materially false and misleading because, "[b]y mentioning fulfillment and logistics, Defendants were duty bound to disclose, but omitted," the alleged improper business practices, including the inventory issues, the sale of damaged items, and Fouerti's theft of the business. (Am. Compl. ¶ 123.) Individual Defendants argue that this statement is an opinion and/or a forward-looking statement protected by the PSLRA safe harbor provision. (Defs.' MTD at 21.)

"Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud." *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020)*. Forward-looking statements are "statements whose truth cannot be ascertained until some time after they are made." *Sas-katchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc., 718 F. Supp. 3d 344, 386 (S.D.N.Y. 2024)*. By contrast, "statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking statements." *In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011)*; *see also Saskatchewan Healthcare, 718 F. Supp. 3d at 386* (explaining that the "Second Circuit has contrasted forward-looking statements with statements of **[**65]** present or historical facts, in other words, statements regarding facts that exist and are known"). When an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, however, the statement is not protected. *Manavazian, 160 F. Supp. 2d at 481* (statements not subject to safe harbor provision or bespeaks caution doctrine where plaintiffs alleged that defendants "knowingly misrepresent ed present material

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 687 of 845   Page 20 of 27

763 F. Supp. 3d 270, *309; 2025 U.S. Dist. LEXIS 13068, **65

facts as part of forward-looking statements").

The PSLRA creates a statutory safe harbor for forward-looking statements. *15 U.S.C. § 78u-5(c)*; *Slayton v. Am. Express Co., 604 F.3d 758, 765 (2d Cir. 2010)*. Under that provision, "a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016)*. "[A] forward-looking statement is protected . . . if any of the three prongs applies." *Id. at 245-46*. However, the PSLRA excludes from the safe harbor provision forward-looking statements "included in a financial statement prepared in accordance with [GAAP]." *Slayton, 604 F.3d at 767* (citing *15 U.S.C. § 78u-5 (b) (2)(A)*).

Additionally, the "bespeaks caution" doctrine **[**66]** "limits fraud liability for forward-looking statements that . . . are coupled with sufficient cautionary language or risk disclosures that, taken in context, bespeak caution to the reader." *In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 467-68 (S.D.N.Y. 2004)*. Put another way, "a forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Gregory, 297 [*310] F. Supp. 3d at 398*. When there is cautionary language, the court analyzes "the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004)*. Importantly, "[c] autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Id.; see also In re Prudential Sec. Inc. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)* ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

The court concludes that the challenged statement is protected by the PSLRA safe harbor provision or the bespeaks caution doctrine. The statement is forward looking because its truth—that the backbone of Polished's success *will* be its fulfilment and **[**67]** logistics systems—"[could not] be ascertained until some time after [it was] made." *Saskatchewan Healthcare, 718 F. Supp. 3d at 386*. Moreover, the Q3 call began with the following cautionary language:

Please note that various remarks about future expectations, plans and prospects constitute forward-looking statements for the purposes of the safe harbor provisions under the Private Securities Litigation Reform Act of 1995. The company cautions that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated, including risks described in the company's filings with the SEC.

(Q3 Call Tr. at ECF p. 5.) Thus, Fouerti identified the statement as forward-looking by making a "remark[] about future expectations," and the statement was accompanied by sufficient cautionary language. (*Id.*) As such, the PSLRA safe harbor provision and the bespeaks caution doctrine shield this statement from liability.

Even if the statement were not protected by the PSLRA safe harbor or the bespeaks caution doctrine, the statement is also inactionable puffery. "Statements containing simple economic projections, expressions of optimism, and other puffery" do not give rise to securities violations. *Novak, 216 F.3d at 315*. Such statements are inactionable **[**68]** as a matter of law because they are "too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014)*. "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Rombach, 355 F.3d at 174*. Thus, "[t]o succeed on this claim, plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Id.*

Here, Fouerti's statement that the backbone of Polished's success will be its fulfilment and logistics systems is "quite general, delivered in corporate jargon, and relate [d] to future expectations." *City of Omaha, 450 F. Supp. 3d at 400*. A reasonable investor would not rely on it. Accordingly, it is non-actionable puffery.

Next, Fouerti engaged in the following colloquy in the Q3 earnings call:

UNKNOWN ANALYST: Okay. And your return policies, how does that work if the - unfortunately, product is damaged in the shipping and handling, how does that flow back to your balance sheet?

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 688 of 845   Page 21 of 27

763 F. Supp. 3d 270, *310; 2025 U.S. Dist. LEXIS 13068, **68

**[\*311]** ALBERT FOUERTI: *So right now, we take it back It's just a regular process return. If you take the* **[\*\*69]** *product, it gets returned back to us. We process it exchange or we process a refund to the consumer. And it depends if their manufacturer take it back and our factories just gets allowance - each manufacturer has a different process in place to take back and address these type of returns.*
(Q3 Call Tr. at ECF p. 14 (challenged portion in italics).)

Plaintiff alleges that the italicized statement was materially false and misleading because it omitted the fact that "Polished's return process involved fraud as a business practice, . . . including forging documents, shipping damaged products . . . , forging invoices and bills of lading, refusing to accept returns from customers based on forged paperwork, and lying to credit card companies and producing forged documents." (Am. Compl. ¶ 125.) Individual Defendants argue that the FE allegations are insufficiently pleaded and, even if the allegations were sufficiendy pleaded, they do not render this statement false or misleading because it is a "generic statement[] that [is] undeniably true on [its] face." (Defs.' MTD at 21-22.)

The FE accounts, accepted on their face, indicate that Fouerti's statement was "inaccurate, incomplete, or misleading," **[\*\*70]** because it omitted the fact that the company's returns process actually involved shipping damaged products, charging consumers for the return freight, and forging documents to indicate that a product was returned within the time limit set by the manufacturer. *Synchrony, 988 F.3d at 167*. (*See* Am. Compl. ¶¶ 52-65.) However, as discussed above, the FE accounts suffer from several critical deficiencies which prevent the court from crediting their allegations. As such, the Amended Complaint fails to adequately allege a material misrepresentation or omission in this statement.

In its 2021 Form 10-K Polished stated:

In our fulfillment of large durable goods, we have created an infrastructure that allows us to deliver products in most states. We want to scale this infrastructure by continuing to improve execution, fulfillment center locations, and delivery timing. *This proprietary logistic process enables us to provide our customers' products quickly and to provide a better shipping and delivery experience than they might otherwise experience. Additionally, we believe this logistics network will help us reduce expenses, touchpoints, damages and returns.*

(2021 Form 10-K at ECF p. 11 (challenged portion in italics).)

Plaintiff **[\*\*71]** asserts that the alleged improper business practices at Polished rendered the above italicized statement false or materially misleading. (Am. Compl. ¶ 141.) However, as noted above, the FE allegations suffer from several critical deficiencies which prevent the court from crediting their accounts. As such, the Amended Complaint fails to adequately allege a material misrepresentation or omission in this statement.

Finally, Polished made the following risk disclosure in its 2021 Form 10-K:

**Risks Related to our Business and Industry**

. . .

*Our continued revenue growth will depend upon, among other factors, our ability to acquire more customers, build our brands and launch new brands, introduce new products or offerings and improve existing product.*

Maintaining and enhancing our brands is critical to acquiring and expanding our base of customers and suppliers. **[\*312]** Our ability to maintain and enhance our brands *depends largely on our ability to maintain customer confidence in our product and customer service offerings, including by delivering products on time and without damage*. If customers do not have a satisfactory shopping experience, they may seek out alternative offerings from our competitors **[\*\*72]** and may not return to our sites as often in the future, or at all. . . .

*Customer complaints* or negative publicity about our sites, products, delivery times, customer data handling and security practices or customer support, especially on blogs, social media websites and our sites, could rapidly and severely diminish consumer use of our sites and consumer and supplier confidence in us and result in harm to our brands.

(2021 Form 10-K at ECF pp. 17-19 (bold in original) (challenged portions in italics).)

Plaintiff repeats its claim that the alleged improper business practices at Polished rendered the above italicized statements false or materially misleading. (Am. Compl. ¶ 143.) Additionally, Plaintiff claims that the risk warning was false or materially misleading "because the

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 689 of 845   Page 22 of 27

763 F. Supp. 3d 270, *312; 2025 U.S. Dist. LEXIS 13068, **72

risk warned of as hypothetical had materialized": Polished "was shipping damaged goods or shipping appliances to the wrong addresses, or not shipping appliances to customers at all, but charging customers in every such case[,] and then denying the aggrieved customers satisfaction, refusing to refund money as a course of practice." (*Id.* ¶ 143.)

Courts in this Circuit have held that a risk disclosure "can itself constitute **[\*\*73]** a material misrepresentation when it presents as a risk an event that has already transpired." *Chapman v. Mueller Water Prods., Inc., 466 F. Supp. 3d 382, 405 (S.D.N.Y. 2020)* (collecting cases). The FE accounts, accepted on their face, indicate that this risk disclosure may have warned of a risk that had already transpired, i.e., that Polished was losing customer confidence in its products, delivering damaged goods, and receiving complaints. (*See* Am. Compl. ¶¶ 55, 61-64.) However, because the court does not credit the FE accounts, the Amended Complaint fails to adequately allege a material misrepresentation or omission in this statement.

In sum, the court concludes that the Amended Complaint fails to allege a material misrepresentation or omission as to the: financial metrics and opinions regarding Polished's future prospects (Am. Compl. ¶¶ 116, 118, 126, 128); statements and certifications regarding Polished's internal controls (*id.* ¶¶ 120, 130, 132, 136, 146); and statements concerning Polished's fulfilment, logistics, and returns processes (*id.* ¶¶ 122, 124, 140, 142). However, the court concludes that the Amended Complaint sufficiently alleges material misrepresentations or omissions in the restated financial metrics. (*Id.* ¶¶ 134, 138, 144).

3. Scienter

Under **[\*\*74]** the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *Anschutz Corp., 690 F.3d at 108*. "The requisite state of mind in a *Rule 10b-5* action is an intent to deceive, manipulate or defraud." *Ganino, 228 F.3d at 168*. Such an intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI, 493 F.3d at 99*. Motive and opportunity may be established by demonstrating that defendants benefitted "in a concrete and personal way" from the alleged fraud. *Novak, 216 F.3d at 311*. Conscious misbehavior means "deliberate[ly] illegal behavior, a standard **[\*313]** met when it is clear that a

scheme, viewed broadly, is necessarily going to injure." *Gould v. Winstar Comms., Inc., 692 F.3d 148, 158 (2d Cir. 2012)*. Recklessness may be established "where a defendant has engaged in conduct that was highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id. at 158-59*. This standard is met "where a defendant failed to review or check information that it had a duty to monitor, **[\*\*75]** or ignored obvious signs of fraud." *Id. at 159*.

Importantly, there are "several important limitations on the scope of liability for securities fraud based on reckless conduct." *Novak, 216 F.3d at 309*. First, the Second Circuit "refuse[s] to allow plaintiffs to proceed with allegations of fraud by hindsight." *Id.* "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Id.* As such, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* Second, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.* And where a plaintiff claims that defendants had access to contrary facts, the plaintiff "must specifically identify the reports or statements containing this information." *Id.* Finally, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman, 174 F.3d at 84*; *see also Novak, 216 F.3d at 309*.

"[I]n **[\*\*76]** determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 323, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*. A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id. at 324*. In making this determination, the court must review "all the allegations holistically." *Id. at 326*.

The Amended Complaint relies on circumstantial evidence of conscious misbehavior or recklessness to

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 690 of 845   Page 23 of 27

763 F. Supp. 3d 270, *313; 2025 U.S. Dist. LEXIS 13068, **76

establish scienter.[11] *ATSI, 493 F.3d at 99*. Specifically, Plaintiff relies on four sets of facts to establish circumstantial evidence of conscious misbehavior or recklessness as to Fouerti and Johnson: (1) the FE accounts; (2) the resignations of Fouerti and Johnson; (3) the resignation of Polished's independent accounting firm, Friedman; and (4) alleged GAAP violations. (Am. Compl. **[*314]** ¶¶ 38-115, 151, 155; Pl.'s MTD Opp. at 10-17.) The Individual Defendants argue that the FE accounts are "insufficiently pleaded, irrelevant, and should be disregarded." (Defs.' MTD at 7.) They further contend that the resignations and alleged GAAP violations do not support a strong inference of scienter. **[**77]** (Defs.' Reply at 9 n.14; Defs.' MTD at 29.) For the reasons that follow, the court concludes that the Amended Complaint fails to sufficiently allege scienter as to Fouerti or Johnson.[12]

As discussed above, the FE accounts are not "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak, 216 F.3d at 314*. With the exception of FE1 and FE3, none of the FEs are alleged to have "met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period." *In re Wachovia, 753 F. Supp. 2d at 352*. Even accepting the FE accounts as true, they do not "show that [the] individual defendants actually possessed the knowledge highlighting the

falsity of public statements; [and] conclusory statements that defendants were aware of certain information, [or] that defendants would have or should have had such knowledge[,] is insufficient." *Patel, 2024 U.S. Dist. LEXIS 171544, 2024 WL 4265758, at *7 n.4*. This lack of detail "is, alone, fatal to [the FEs'] allegations." *Glaser, 772 F. Supp. 2d at 595*. Moreover, the court cannot credit FE3's allegations because they are unmoored in time, insufficiently particular, and come from secondhand sources with whom Plaintiff's **[**78]** counsel have not personally interacted. *Miao, 442 F. Supp. 3d at 799*. Finally, though FE1 provides exact dates and times of interactions with Fouerti and Johnson, the actual content of those interactions is unclear. (*See* Am. Compl. ¶¶ 82-83.) While Plaintiff's memorandum in opposition claims that FE1 was in "regular contact" with Fouerti and Johnson regarding the alleged improper practices, the Amended Complaint does not contain that allegation. (Pl.'s MTD Opp. at 3, 14, 22-23) *LaFlamme, 702 F. Supp. 2d at 148 n.18* ("[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss."). As currently pleaded, the Amended Complaint is silent as to whether FE1 actually brought to Fouerti and Johnson's attention the alleged improper business practices. (*See* Am. Compl. ¶¶ 82-83.) FE1's account is therefore insufficiently particular to create a strong inference of scienter. *Miao, 442 F. Supp. 3d at 799*.

This leaves the court with the resignations of Fouerti, Johnson, and Friedman, and the alleged GAAP violations. None of these occurrences, standing alone, would raise a strong inference of scienter. *Novak, 216 F.3d at 309* ("[A]negations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); **[**79]** *In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)* ("[A]lthough not sufficient in and of themselves, [resignations] add to the overall pleading of circumstantial evidence of fraud."). Thus, the question is whether these allegations, considered "holistically," constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Tellabs, 551 U.S. at 326*. The court concludes that they do not.

"For executive resignations to raise a strong inference of scienter, they **[*315]** must be highly unusual and suspicious." *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012)*, *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., 783 F.3d 383 (2d Cir. 2015)*. Resignations are highly unusual and suspicious "when independent facts

---

[11] In its memorandum in opposition, Plaintiff argues that Fouerti had both the motive and opportunity to fraudulently inflate AC's numbers via the alleged fraudulent business practices so that he could induce Goedeker to complete the acquisition. (Pl.'s MTD Opp. at 14.) The Individual Defendants correctly point out that this theory of motive was not alleged in the Amended Complaint. (Defs.' Reply in Supp. of MTD at 7-8.) Because these allegations are raised for the first time in Plaintiff's opposition brief, the court does not consider them in deciding this motion to dismiss. *See Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998)*; *LaFlamme v. Societe Air France, 702 F. Supp. 2d 136, 148 n.18 (E.D.N.Y. 2010)* ("[T]he court disregards these allegations which are first raised in plaintiffs' motion papers because it is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss.").

[12] Plaintiff asserts that the Amended Complaint pleads "a strong inference of scienter for Albert [Fouerti], Moore, and Johnson." (Pl.'s MTD Opp. at 17.) However, as Count I alleges primary liability against Fouerti and Johnson, Moore's alleged scienter is irrelevant to the court's analysis of Count I. (Am. Compl. ¶¶ 167-179.)

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 691 of 845    Page 24 of 27

763 F. Supp. 3d 270, *315; 2025 U.S. Dist. LEXIS 13068, **79

indicate that the resignation was somehow tied to the fraud alleged, that the resignation somehow alerted defendants to the fraud, or that defendants' scienter was otherwise evident." *See Glaser, 772 F. Supp. 2d at 598*.

The Amended Complaint does not sufficiently allege that the resignations of Fouerti and Johnson were "highly unusual and suspicious." *Lighthouse, 902 F. Supp. 2d at 343*. Fouerti and Johnson resigned in October 2022—three months after Polished's announcement of the internal investigation, two months before Friedman's resignation, and nine months before Polished filed the July Restatement. (Am. Compl. ¶¶ 148-156.) "When corporate misconduct is disclosed, members of management resign for all sorts of reasons, **[\*\*80]** including that they were negligent in overseeing the responsible employees or simply because the optics of changing management are better for investors and regulators." *Schiro v. Cemex, S.A.B. de C.V., 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019)*. In this case, the resignations of Fouerti and Johnson "are at least as consistent with punishing those at the helm for their poor judgment and leadership, than resignations relating to concocting a scheme to defraud shareholders." *Lighthouse, 902 F. Supp. 2d at 343*; *see also Jun v. 500.com Ltd., No. 20-CV-806 (GRB) (AKT), 2021 U.S. Dist. LEXIS 178927, 2021 WL 4260644, at \*2 (E.D.N.Y. Sept. 20, 2021)* ("That a corporate executive would resign from a company under investigation for an international bribery scheme hardly seems suspect—there are many plausible economic, cultural and practical reasons for such a departure that do not involve knowledge of the scheme."). "The amended complaint simply contains no allegations supporting an inference of fraud that is at least as compelling as an inference of mismanagement or one of the myriad other reasons an executive might resign." *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc., No. 15-CV-6034 (RJS), 2016 U.S. Dist. LEXIS 136929, 2016 WL 5794774, at \*21 (S.D.N.Y. Sept. 30, 2016)*. As such, the court concludes that the resignations of Fouerti and Johnson do not support a strong inference of scienter.

The resignation of Friedman presents a closer call. Polished summarized Friedman's resignation as follows:

In the [resignation] Letter, Friedman advised the Company that based on the **[\*\*81]** results of the Company's Board of Directors (the "Board") internal investigation as reported to Friedman, it appears there may be material adjustments and/or disclosures necessary to previously reported financial information.

Additionally, the Board's internal investigation has identified facts, that if further investigated by Friedman, might cause Friedman to no longer to be able to rely on the representations of (i) management that was in place at the time Friedman issued its audit report for the year ended December 31, 2021, or (ii) management that was in place at the time of Friedman's association with the quarterly financial statements for the periods ended June 30, 2021, September 30, 2021 and March 31, 2022. Prior to the Letter, in the past two years, the Company had not received from Friedman an adverse opinion or a disclaimer of opinion, and their opinion was not **[\*316]** qualified or modified as to uncertainty, audit scope, or accounting principles. . . .(Am. Compl. ¶ 155.) For purposes of adjudicating this motion to dismiss, the court assumes without deciding that the above statement, coupled with Polished's eventual restatement of its 2021 Form 10-K and Q1 2022 Form 10-Q, indicate **[\*\*82]** that Friedman's resignation was tied to the alleged misstatements of Polished's financials for fiscal year 2021 and Q1 of 2022. *Glaser, 772 F. Supp. 2d at 598*.

However, even assuming that Friedman's resignation was unusual or suspicious, the Amended Complaint does not allege a strong inference of scienter. While the Second Circuit has "suggested that employees' suspicious' resignations may be suggestive of scienter, [it has] done so only in the context of other compelling circumstantial allegations supporting scienter." *KBC Asset Mgmt. NV v. MetLife, Inc., No. 21-CV-291, 2022 U.S. App. LEXIS 4313, 2022 WL 480213, at \*3 (2d Cir. Feb. 17, 2022)*. Here, Plaintiffs only remaining allegation supporting scienter is the GAAP violations. But "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman, 174 F.3d at 84*. And the mere fact that Polished restated its financials for fiscal year 2021 and Q1 of 2022 does not mean that Fouerti or Johnson engaged in conscious misbehavior or recklessness. As noted above, Plaintiff cannot "proceed with allegations of fraud by hindsight," and "allegations that defendants should have anticipated future events for] made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." **[\*\*83]** *Novak, 216 F.3d at 309*. Thus, the court concludes that Friedman's resignation and the alleged GAAP violations, standing alone, fall short of sustaining Plaintiff's burden to allege a strong inference of scienter. *See Varghese, 672 F. Supp. 2d at 608* (strong inference of scienter where, in addition to resignations and GAAP violations, plaintiffs alleged that defendants received "repeated

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 692 of 845   Page 25 of 27

763 F. Supp. 3d 270, *316; 2025 U.S. Dist. LEXIS 13068, **83

disclosures" of weak internal controls and an email from an independent member of the Board of Directors and Audit Committee in which he alerted the company to internal control deficiencies and then resigned); *McIntire v. China Mediaexpress Holdings, Inc., 927 F. Supp. 2d 105, 117 (S.D.N.Y. 2013)* (strong inference of scienter where, in addition to resignations and GAAP violations, plaintiffs alleged that defendant contemporaneously reported drastically different income and revenue figures with the SEC and the Chinese Administration of Industry and Commerce, and investigators visited the defendant's facilities and found no employees working); *In re Scottish Re Grp., 524 F. Supp. 2d at 394* (strong inference of scienter where plaintiffs cited "contemporaneous circumstances . . . of which the [defendants] were aware, and which made their failure to take an earlier valuation allowance tantamount to conscious misbehavior"). As such, the Amended Complaint fails to sufficiently allege scienter. **[\*\*84]** *See Jun, 2021 U.S. Dist. LEXIS 178927, 2021 WL 4260644, at \*1-2* (in similar circumstances, concluding that plaintiffs failed to adequately allege scienter).

4. Loss Causation

To adequately state a claim for securities fraud, a plaintiff must plead both transaction causation and loss causation. *ATSI, 493 F.3d at 106*. Transaction causation is similar to reliance and requires a showing that, "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)*. Loss causation "is the causal link between the alleged misconduct and **[\*317]** the economic harm ultimately suffered by the plaintiff," and a plaintiff must claim that "the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." *Id. at 172-73* (emphasis in original). To establish loss causation, a plaintiff must allege "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." *Id. at 173* (emphasis in original).

Because Plaintiff has not identified actionable misstatements or omissions or adequately alleged **[\*\*85]** scienter as to the few actionable misstatements, the court need not reach the issue of loss causation. *See, e.g., Altayyar v. Etsy, Inc., 242 F. Supp. 3d 161, 184 (E.D.N.Y. 2017)* ("Since the plaintiffs have not identified any actionable misstatements or

adequately alleged scienter, there is no basis upon which they may plead reliance or loss causation."); *In re Neurotrope, Inc. Sec. Litig., 315 F. Supp. 3d 721, 730 (S.D.N.Y. 2018)* ("Because the Complaint fails to allege a material misrepresentation or omission, and scienter, the loss causation issue is not addressed."). In sum, because the Amended Complaint does not sufficiently allege a material misrepresentation or omission or scienter, Plaintiff fails to state a claim under *Section 10(b)* and *Rule 10b-5 (b)*.

**B. Scheme Liability: *Section 10(b) of the Exchange Act* and *Rule10b-5(a)* and *(c)***

Count II of the Amended Complaint alleges violations of *subsections (a)* and *(c) of Rule 10b-5*, which prohibit, respectively, "employ[ing] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit." *17 C.F.R. § 240.10b-5(a)*, *(c)*. "Unlike the better-known *subsection (b)*, these subsections do not require the defendant to make a misstatement or omission; they require only deceptive conduct." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021)*. To state a claim for scheme liability, Plaintiff must plausibly allege: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance **[\*\*86]** of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Id.* Importantly, "the deceptive or fraudulent scheme or activity must have occurred *in connection with the purchase or sale of a security." Id.* (emphasis added). "To maintain a *10b-5(a)* or *(c)* claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Id.*

"[T]he three subsections of *Rule 10b-5* are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric." *In re Smith Barney, 884 F. Supp. at 161*. As such, "where the core misconduct alleged is in fact a misstatement, it is improper to impose [] liability by designating the alleged fraud a manipulative device rather than a misstatement." *Id.* Put another way, "scheme liability under *subsections (a)* and *(c) of Rule 10b-5* hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Id.*

Plaintiff fails to meet the heightened pleading standard

Case 26-50213-TMH   Doc 18-1   Filed 06/08/26   Page 693 of 845   Page 26 of 27

763 F. Supp. 3d 270, *317; 2025 U.S. Dist. LEXIS 13068, **86

applicable to its scheme liability claim. The Amended Complaint describes numerous improper business practices mandated, and sometimes **[\*\*87]** **[\*318]** personally carried out by, Fouerti. (Am. Compl. ¶¶ 38-84.) But aside from a single conclusory statement that Fouerti engaged in "a course of business that operated as a fraud or deceit . . . in connection with [the purchase of Polished stock]," the Amended Complaint does not actually describe a scheme *in connection with the purchase or sale of securities. (Id.* ¶ 181.) At no point does Plaintiff "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Plumber & Steamfitters Loc., 11 F.4th at 105*. Instead, Plaintiffs claim "rests upon the incorporation of the previous [65] pages of the pleading paired with the conclusory assertion that Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to deceive the investing public." *Id.* But these purported acts of fraud—committed against Polished, customers, and credit card companies—do not establish a deceptive scheme to defraud *investors. See id.* (allegations of money laundering insufficient to plead a scheme to defraud investors); *Fogel v. Wal-Mart De Mexico SAB De CV, No. 13-CV-2282 (KPF), 2017 U.S. Dist. LEXIS 26976, 2017 WL 751155, at \*18 (S.D.N.Y. Feb. 27, 2017)* (allegations of bribery scheme insufficient to plead scheme to defraud investors). As such, the Amended Complaint fails to state **[\*\*88]** a claim for scheme liability.

### C. Control Person Liability: *Section 20(a) of the Exchange Act*

Count III of the Amended Complaint alleges violations of *Section 20(a)* against the Individual Defendants. To state a claim for control person liability under *Section 20(a)*, Plaintiff must plausibly allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI, 493 F.3d at 108*; *Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 457 n.1 (2d Cir. 2019)* (explaining that a violation of *Section 20(a)* "depends on there first being a primary violation of *Section 10(b)*"). For the reasons stated above, the Amended Complaint fails to allege a primary violation of the securities laws. Consequently, it cannot sufficiently allege a violation of *Section 20(a)*. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 206-07 (2d Cir. 2009)* (concluding that the "control person liability claim

pursuant to . . . *section 20 of the Exchange Act* must also fail for want of a primary violation").

### V. LEAVE TO AMEND

In a footnote on the final page of its opposition, Plaintiff states: "If the Court dismisses the Complaint, Plaintiff respectfully requests leave to amend." (Pl.'s MTD Opp. at 31 n.19.) The Individual Defendants do not specifically oppose this request, although they ask the court to dismiss the Amended Complaint with prejudice. *(See* **[\*\*89]** Defs.' MTD at 30; *see also* Defs.' Reply at 10.)

*Rule 15(a) (2) of the Federal Rules of Civil Procedure* provides that a court "should freely give leave [to amend] when justice so requires." *Fed. R. Civ. P. 15(a) (2)*. "District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under *Rule 9(b)*." *ATSI, 493 F.3d at 108*. Ultimately, "[t]he decision to grant or deny leave to amend rests within the discretion of the trial court." *N. Assurance Co. of Am. v. Square D Co., 201 F.3d 84, 87 (2d Cir. 2000)*.

Although the court is unsure whether Plaintiff can remedy the flaws in the Amended Complaint, the court will allow **[\*319]** Plaintiff to amend its pleading. Even where Plaintiffs "have not specified how they would amend their pleading if granted leave to do so, the Second Circuit has admonished district courts that 'complaints dismissed under *Rule 9(b)* are almost always dismissed with leave to amend.'" *Schiro, 396 F. Supp. 3d at 309* (quoting *Pasternack v. Shrader, 863 F.3d 162, 175 (2d Cir. 2017)*). Because Plaintiff has not yet had an opportunity to amend its complaint in response to a court order pointing out the deficiencies in its pleading, the court will afford Plaintiff an opportunity to do so. *See id.* (adopting same approach); *Ulbricht v. Ternium S.A., No. 18-CV-6801 (PKC) (RLM), 2020 U.S. Dist. LEXIS 167702, 2020 WL 5517313, at \*12 (E.D.N.Y. Sept. 14 2020)* (adopting same approach).

Plaintiff is warned that the court will not grant further leave to amend "unless [Plaintiff] provide [s] a detailed indication of what facts [it] would **[\*\*90]** add to cure the pleading's defects . . . with an explanation of why the amendment would not be futile." *Schiro, 396 F. Supp. 3d at 309*; *see also F5 Cap. v. Pappas, 856 F.3d 61, 90 (2d Cir. 2017)* (denial of leave to amend appropriate where plaintiff failed to "explain how it proposed to amend the complaint to cure its defects"); *Loreley Fin.*

Case 26-50213-TMH    Doc 18-1    Filed 06/08/26    Page 694 of 845    Page 27 of 27

763 F. Supp. 3d 270, *319; 2025 U.S. Dist. LEXIS 13068, **90

*(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015)* (leave to amend properly denied "where the request gives no clue as to how the complaint's defects would be cured").


## VI. CONCLUSION

For foregoing reasons, the Individual Defendants' motion for consideration and/or judicial notice is GRANTED in part and DENIED in part, the Individual Defendants' motion to dismiss is GRANTED, and Plaintiffs request for leave to file a second amended complaint is GRANTED. Plaintiff shall file its second amended complaint within 30 days of the issuance of this opinion. Failure to file a second amended complaint within the specified time period will result in the court entering an order dismissing this case with prejudice.

SO ORDERED.

Dated: Brooklyn, New York

January 23, 2025

/s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District Judge

---

**End of Document**

# Exhibit 7

# *Eden Alpha CI UP v. Polished.Com Inc.*

United States District Court for the Eastern District of New York

March 10, 2026, Decided; March 10, 2026, Filed

22-CV-6606 (NGG) (VMS)

**Reporter**

2026 U.S. Dist. LEXIS 49394 *; 2026 LX 165181; 2026 WL 673462

Eden Alpha CI LLP, Individually and on behalf of all others similarly situated, Plaintiff, -against- POLISHED.COM INC. F/K/A 1847 GOEDEKER INC., DOUGLAS T. MOORE, ALBERT FOUERTI, and MARIA JOHNSON, Defendants.

**Prior History:** *Eden Alpha CI LP v. Polished.com Inc., 763 F. Supp. 3d 270, 2025 U.S. Dist. LEXIS 13068 (Jan. 23, 2025)*

**Counsel:** [*1] For Anthony Porraro, Movant: Adam Apton, LEAD ATTORNEY, Levi & Korsinsky, LLP, New York, NY.

For Eden Alpha CI LP, Movant: Gonen Haklay, LEAD ATTORNEY, PRO HAC VICE, The Rosen Law Firm, Jenkintown, PA; Jacob A. Goldberg, LEAD ATTORNEY, The Rosen Law Firm, P.A., Jenkintown, PA; Phillip Kim, LEAD ATTORNEY, The Rosen Law Firm, New York, NY.

For Ari Gold, Movant: Jeremy Alan Lieberman, LEAD ATTORNEY, Pomerantz LLP, New York, NY.

For Ryan Maschhoff, Individually and on behalf of all others similarly situated, Plaintiff: Gonen Haklay, LEAD ATTORNEY, PRO HAC VICE, The Rosen Law Firm, Jenkintown, PA; Jacob A. Goldberg, LEAD ATTORNEY, The Rosen Law Firm, P.A., Jenkintown, PA; Phillip Kim, The Rosen Law Firm, New York, NY.

For Polished.com Inc., formerly known as, 1847 Goedeker Inc., Defendant: Jason Daniel Gerstein, Timothy E. Hoeffner, Dechert LLP, Three Bryant Park, New York, NY.

For Albert Fouerti, Defendant: John F. Sylvia, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA.

For Maria Johnson, Defendant: Genevieve Graeme York-Erwin, LEAD ATTORNEY, Douglas Wesley Greene, Baker & Hostetler LLP, Seattle, WA; Zachary Rowen Taylor, Baker & Hostetler LLP, New York, NY.

**Judges:** NICHOLAS G. GARAUFIS, [*2] United States District Judge.

**Opinion by:** NICHOLAS G. GARAUFIS

# Opinion

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

Lead Plaintiff Eden Alpha CI UP ("Plaintiff') brings this putative class action against Polished.com Inc. ("Polished"), Douglas Moore, Albert Fouerti, and Maria Johnson (collectively, "Defendants"), alleging violations of the federal securities laws. (Second Am. Compl. ("SAC") (Dkt. 53).) Pending before the court are Defendants Moore, Fouerti, and Johnson's (the "Individual Defendants") motion for judicial notice of certain documents and motion to dismiss the SAC. (Mot. for Jud. Not. ("Defs.' Mot. for Not.") (Dkt. 56-2); Mot. to Dismiss ("MTD") (Dkt. 56-1).) For the reasons that follow, the motion for judicial notice is GRANTED IN PART and DENIED IN PART, and the motion to dismiss is GRANTED.

## I. BACKGROUND

### A. Facts

The court assumes familiarity with the background facts of the case and references its fact section in its last Memorandum and Order ("M&O") dismissing the First Amended Complaint ("FAC") (Dkt. 34) with leave to amend. (M&O (Dkt. 51) at 2-12.)

### B. Procedural History

On October 21, 2022, Plaintiff filed suit against

Polished, the Individual Defendants, and several **[\*3]** others, alleging violations of the *Securities Exchange Act of 1934 (the "Exchange Act")*. (Compl. (Dkt. 1).) In September 2023, Judge Scanlon appointed Eden Alpha CI TIP as a lead plaintiff and The Rosen Law Firm, P.A. as lead counsel. (Mem. and Order Appointing Lead Plaintiff (Dkt. 30) at 2.)

On October 31, 2023, on consent of the parties and by order of the court, Plaintiff filed the FAC, alleging: (Count I) violations of *Section 10(b) of the Exchange Act* and SEC *Rule 10b-5(b)* against Polished, Fouerti, and Johnson; (Count II) violations of *Section 10(b)* and *Rule 10b-5(a)* and *(c)* against Polished and Fouerti; and (Count III) violations of *Section 20(a) of the Exchange Act* against the Individual Defendants. (Stipulation and Order (Dkt. 33); FAC ¶¶ 167-190.) Count I alleges that several statements in Polished's Q2 2021 Form 10-Q, Q3 2021 Form 10-Q, Q3 2021 earnings call with investors, 2021 Form 10-K, and Q1 2022 Form 10-Q were false or materially misleading, as evidenced by the allegations of Former Employees ("FEs") and the July Restatement. (FAC ¶¶ 167-173.) Building upon these alleged misrepresentations, Count II claims scheme liability as to Polished and Fouerti, and Count III claims control person liability as to the Individual Defendants. (*Id.* ¶¶ 180-190.)

On March 7, 2024, Polished filed for Chapter 7 bankruptcy in the United States **[\*4]** Bankruptcy Court for the District of Delaware, triggering an automatic stay of the proceedings in this court pursuant to *11 U.S.C. § 362(a)*. (Notice of Bankruptcy dated 3/7/2024 (Dkt. 42).) *See In re Polished.com Inc., et al.*, No. 24-BK-10353 (Bankr. D. Del.). However, as automatic stays generally do not apply to non-bankrupt codefendants, the proceedings continued against the Individual Defendants.[1] (*See* PL's Letter Dated 3/11/2024 (Dkt.

---

[1] "It is well-established that stays pursuant to *§ 362(a)* are limited to debtors and do not encompass non-bankrupt co-defendants." *Tchrs. Ins. And Annuity Ass'n of Am. v. Butler, 803 F.2d 61, 65 (2d Cir. 1986)*. After Polished filed for bankruptcy, Plaintiff informed the court that it intended to dismiss Polished from the case without prejudice and pursue its claims solely against the Individual Defendants. (Pl.'s Letter Dated 3/11/2024 at 1.) After the issuance of the M&O and before the filing of the SAC, Plaintiff informed the court that it would "describe Polished as a non-party defendant" and that "Polished is no longer a party to this action." (Pl.'s Letter 1/28/25 (Dkt. 52).) It has not followed through on the promises made in either letter, (*see* SAC 9 1), and thus Polished formally remains a named Defendant in this action.

43).)

On June 21, 2024, the Individual Defendants filed their fully briefed motion to dismiss the FAC under *Federal Rules of Civil Procedure 12 (b) (6)* and *9 (b)* and the *Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4*. (Defs.' First MTD (Dkt. 48-1); Pl.'s First MTD Opp'n (Dkt. 48-20); Defs.' Reply in Supp. of First MTD (Dkt. 48-22).) At the same time, the Individual Defendants filed a fully briefed motion requesting that the court consider or take judicial notice of certain documents. (*See* Defs.' First Mot. for Not. (Dkt. 48-2); Pl.'s Opp'n to First Mot. for Not. (Dkt. 48-21); Defs.' Reply in Supp. of First Mot. for Not. (Dkt. 4823).)

On January 24, 2025, the court issued its M&O granting in part and denying in part the Individual Defendants' motion for consideration and/or judicial notice, granting the Individual Defendants' motion to dismiss, and granting **[\*5]** Plaintiffs request for leave to file a SAC. (M&O at 67.) The court made three central findings. First, it found that it "could not credit the [former employee] accounts, as currently pleaded, for purposes of establishing" the false or misleading nature of the alleged representations or omissions, or scienter. (M&O at 23, 23-29.) Second, the court categorized the challenged statements as falling into four categories—of these, the court only found that the FAC successfully pleaded false and misleading statements with respect to restated financial metrics, specifically Polished's 2021 10-K and 1Q2022 10-Q, as a result of the July Restatement. (*Id.* at 30-54.) Third, the court found that the FAC failed to sufficiently raise a strong inference of scienter. (*Id.* at 57.) The court described Plaintiff as relying on "four sets of facts to establish circumstantial evidence of conscious misbehavior or recklessness," which included the FE accounts, the resignations of Fouerti and Johnson, the resignation of Polished's independent accounting firm, Friedman, and alleged GAAP violations. (*Id.* at 56.) After dismissing the sufficiency of FE1's account, the court found that a holistic analysis of the **[\*6]** remaining three bases was also insufficient to establish a strong inference of scienter. (*Id.* at 56-62.) Separately, the court declined to reach the issue of loss causation because Plaintiff had not "identified actionable misstatements or omissions or adequately alleged scienter." (*Id.* at 62 (citing *Altayyar v. Etsy, Inc., 242 F. Supp. 3d 161, 184 (E.D.N.Y. 2017)* ("Since the plaintiffs have not identified any actionable misstatements or adequately alleged scienter, there is no basis upon which they may plead reliance or loss

causation."))².

On February 24, 2025 Plaintiff filed its SAC. (Dkt. 53.) It alleges the same three counts but adds Douglas Moore, Polished's former CEO from August 2019 to August 31, 2021, as a defendant under Count I. (SAC ¶¶ 190, 195-96.)

On June 9, 2025, the Individual Defendants filed their fully briefed motion to dismiss the SAC under *Federal Rules of Civil Procedure 12 (b) (6)* and *9(b)* and the *Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4*. (MTD; Pl.'s Opp'n to MTD ("Opp'n") (Dkt 56-17); Defs.' Reply in Supp. of MTD ("Defs.' Reply") (Dkt. 56-19).) At the same time, the Individual Defendants filed a fully briefed motion requesting that the court take judicial notice of certain documents. (*See* Defs.' Mot. for Not. (Dkt. 56-2); Pl.'s Opp'n to Mot. for Not. (Dkt. 56-18); Defs.' Reply in Supp. of Mot. for Not. (Dkt. **[*7]** 56-20).)

## II. LEGAL STANDARDS

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiffs favor. *See Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008)*. To survive a motion to dismiss under *Rule 12(b) (6)*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*).

Complaints alleging securities fraud are subject to the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)* and the PSLRA. *In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 166-67 (2d Cir. 2021)* (*"Synchrony"*). *Rule 9(b)* requires that "a party must state with particularity the circumstances constituting fraud." *Fed. R. Civ. P. 9(b)*. To satisfy this standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Synchrony, 988 F.3d at 167*. "Allegations that are conclusory or unsupported by factual assertions

---

² When quoting cases, unless otherwise noted, <u>all</u> citations and internal quotation marks are omitted, and all alterations are adopted.

are insufficient." *ATS/ Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)* (*"ATSI"*).

The PSLRA expands on the *Rule 9(b)* standard, requiring securities fraud complaints to "specify each misleading statement; . . . set forth the facts on which a belief that a statement is misleading was formed; and . . . state with particularity facts giving rise **[*8]** to a strong inference that the defendant [s] acted with the required state of mind." *Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012)*; *see also 15 U.S.C. § 78u-4(b) (1)*, *(2)*. "The requisite state of mind in a *Rule 10b-5* action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000)* (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)*). Such an intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI, 493 F.3d at 99*.

The court makes all new findings in reviewing this motion to dismiss the SAC. *Arce v. Walker, 139 F.3d 329, 332 n.4 (2d Cir. 1998)* ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.") (quoting *Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977)*). Plaintiffs assertion that there is any "law of the case" is incorrect, and the court will rule on the SAC as though it is the first complaint it has considered. (Opp'n at 21.) However, the court at various times refers to and incorporates its findings from the prior M&O into this opinion to the extent they concern the allegations asserted in the SAC.

## III. MOTION FOR JUDICIAL NOTICE

In ruling on a motion to dismiss, the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by **[*9]** reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI, 493 F.3d 98*. "A document is incorporated by reference if the complaint makes[] a clear, definite and substantial reference to the document." *Stinnett v. Delta Air Lines, Inc., 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017)*. Where a document is not incorporated by reference, the court may nevertheless consider it if "the complaint relies heavily upon [the document's] terms and effect, thereby

rendering the document integral to the complaint." *DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)*.

The court "may also consider matters of which judicial notice may be taken under *Fed. R. Evid. 201*." *Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991)*. A court may take judicial notice of a fact that is "not subject to reasonable dispute" either because it is "generally known within the trial court's territorial jurisdiction" or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Fed. R. Evid. 201(b)*. It is well-established that courts may take judicial notice of "public disclosure documents required by law to be filed, and actually filed, with the *SEC.*"*Kramer, 937 F.2d at 774*.

Here, Individual Defendants request that the court take judicial notice of thirteen (13) documents and four Financial Accounting Standards **[*10]** Board ("FASB") standards. (Defs.' Mot. for Not. at 37.) The documents include financial forms filed by Polished with the SEC, press releases, and a transcript of its November 15, 2021 earnings call. (*Id.* at 3-4.) The Individual Defendants argue that these documents are "incorporated by reference into the [SAC] and/or [are] a proper subject of judicial notice." (*Id.* at 1.) Plaintiff opposes this request. (Pl.'s Opp'n to Mot. for Not. at 1.)

The court declines to take judicial notice of any documents but agrees with the Individual Defendants that it may consider Exhibits 1-13 because they are incorporated by reference in the SAC. The court will also consider the FASB standards just as it would any other source of regulatory authority. (*See* M&O at 18); *Ganino, 228 F.3d at 159 n.4* ("The SEC treats the FASB's standards as authoritative.").

### A. Exhibits 1-13

Exhibits 1-13 include four press releases (contained within Exhibits 8, 9, 10, and 11), a transcript of Polished's Q3 2021 earnings call held on November 15, 2021, (Exhibit 3), and eleven documents filed by Polished with the SEC, (Exhibits 1, 2, 4-13). (Defs.' Mot. for Not. at 3-4.) The SAC quotes from and makes substantial reference to each of these documents. (Defs.' **[*11]** Mot. for Not. at 3-4. (citing the SAC).) These "clear, definite and substantial reference [s]" to each of the Exhibits incorporates them by reference so that they are part of the SAC. *Stinnett, 278 F. Supp. 3d*

*at 608*; *Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007)*.

### B. FASB Standards

Individual Defendants request that the court consider four FASB standards (also referred to as Accounting Standards Codification or "ASC") cited in the SAC. (Defs.' Mot. for Not. at 6-7.)

Plaintiff alleges that the Individual Defendants, in making certain financial disclosures, violated Generally Accepted Accounting Principles ("GAAP"). (SAC ¶¶ 101-131.) "The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the [FASB] and the American Institute of Certified Public Accountants." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig., 763 F. Supp. 2d 423, 467 (S.D.N.Y. 2011)*. The FASB is "the designated organization in the private sector for establishing standards of financial accounting and reporting." *In re WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 478 n.3 (S.D.N.Y. 2005)*. These standards "have been recognized by the SEC as authoritative." *Id.* SEC Regulation S—X provides that financial statements filed with the SEC that are not presented in conformity with GAAP are presumed to be misleading. *17 C.F.R. § 210.4-01(a) (1)*. Ultimately, however, "[a]llegations of a violation of GAAP provisions or SEC regulations, **[*12]** without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman v. Alias Rsch. Inc., 174 F.3d 79, 84 (2d Cir. 1999)*.

Plaintiff alleges that the Individual Defendants violated four FASB standards: ASC 606, ASC 330, ASC 705, and ASC 310. (SAC ¶ 151.) The SAC relies significantly on alleged violations of FASB standards in attempting to state a securities fraud claim. (*Id.* ¶¶ 101-17, 150-51, 160-61.) Plaintiff presumably wants the court to refer to those standards in adjudicating the motion to dismiss. As such, the court will consider the FASB standards, particularly the standards cited in the SAC, just as it would any other source of regulatory authority. *Cf. In re Avon Sec. Litig., No. 19-CV-1420 (CM), 2019 U.S. Dist. LEXIS 200816, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019)* (crediting alleged GAAP violations as support for scienter allegations).

In sum, the Individual Defendants' request that the court consider Exhibits 1-13 and the FASB standards is GRANTED, and their request that the court take judicial notice of these Exhibits is DENIED.

## IV. MOTION TO DISMISS

### A. Primary Liability

The SAC fails to rectify the shortcomings of the FAC as to primary liability for the reasons that follow.

1. Class Period

In a footnote in its opposition, Plaintiff writes that "the Court may, if it chooses, shorten the Class Period to start on March 31, 2022, to reflect **[*13]** its different rulings on the falsity of the 2Q21 and 3Q21 financial statements versus the fiscal year 2021 and 1Q22 financial statements." (Opp'n at 21 n.19.) By this, Plaintiff refers to this court's prior ruling, as described above, where it found credible misstatements in the 2021 10-K and 1Q22 10-Q because of the July Restatement,[3] but that also found the 2Q21 and 3Q21 financial statements not to contain false statements. Individual Defendants characterize "these concessions" as constituting waiver of Plaintiffs claims as to statements contained in these documents, (Defs.' Reply at 5), while Plaintiff "reserves all rights regarding these statements," (Opp'n at 21). While the court has the power to "alter or modify the class" as it sees fit, *In re Sumi-tomo Copper Litig., 262 F.3d 134, 139 (2d Cir. 2001)*, no class has yet been certified, and thus Plaintiffs allegations control. To adjudicate this motion, and in accordance with the court's findings below, *see infra* Section IV.A.4, the court adopts Plaintiffs proposed class period as beginning on March 31, 2022, and ending on July 31, 2023. (Opp'n at 21 n.19; SAC ¶¶ 2, 10.)

Accordingly, as Individual Defendants point out, the claims against Moore are dismissed, as Moore stepped down as CEO on **[*14]** August 31, 2021, and stepped down as a director of Polished in September 2021, half a year before the new class period began. (SAC ¶ 18; Defs.' Reply at 6.) There are no allegations that he helped prepare, sign, or certify any financial statements containing a challenged statement during the class period. (*See, e.g.*, SAC ¶ 22.)

2. Additional FE Allegations

_____

[3] As summarized in the M&O, the July Restatement refers to Polished's filing of its delayed 2022 Form 10-K with the SEC, where it restated financial results from fiscal year 2021 and 1Q22. (*See* M&O at 10-11.)

The FAC and the SAC utilized anonymous witness accounts to attempt to prove both material falsity and scienter. (FAC ¶¶ 3884; SAC ¶¶ 42-100.) The first M&O explained that anonymous witness accounts, like the ones pleaded in the FAC and the SAC, are discredited in four circumstances:

> "First, courts generally do not credit the statements of anonymous witnesses "who are insufficiently described or whose descriptions do not suggest that they [were] in [a] position to know the facts attributed to them." *Miao v. Fanhua, Inc., 442 F. Supp. 3d 774, 799 (S.D.N.Y. 2020)* (collecting cases). Second, statements "that cannot situate in time relevant occurrences are sometimes disregarded because they cannot establish that the challenged statements were knowingly false when made." *Id.* (collecting cases). Third, allegations by anonymous witnesses that are insufficiently particular are often discounted or disregarded. **[*15]** *Id. at 800* (collecting cases). Fourth, courts tend not to credit uncorroborated statements of anonymous witnesses that are sourced secondhand from individuals "with whom plaintiffs' counsel have not themselves interacted." *Id.* (collecting cases).

(M&O at 23-24.) In the FAC, each of the eleven anonymous FEs suffered from at least one of these deficiencies. (*See* M&O at 24.) The SAC attempts to rectify Plaintiffs pleading by marshaling additional allegations for FEs 1, 2, 4, and 11. However, as no new material allegations are presented regarding FEs 3, 5, and 6-10, the court reiterates the deficiencies identified in the First M&O as to these individuals. (*Id.* at 24-29.) Its analysis of the new allegations likewise reveals their deficiencies and finds that they cannot support Plaintiffs claims.

#### a. FE2, FE4, and FE11

The SAC fails to establish any of these accounts as credible for purposes of supporting its claims.

FE2 was a "reverse logistics manager" and FE4 was a "chargeback specialist" in the company's accounting department. (SAC ¶¶ 43, 45.) The SAC attempts to moor their allegations in time. (*See* SAC ¶¶ 45, 86, 87, 91, 96.) While this new information helps to understand more precisely when different **[*16]** events allegedly occurred, these accounts still suffer from fatal defects.

FE2's account still fails to describe their access to

Fouerti and recites conclusory allegations that they "rais[ed] these issues with management at [ACI] ." (SAC ¶ 76.) These are not specific enough to find that Fouerti or others were on notice of FE2's complaints. (M&O at 28; citing Loc. No. 38, *Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447*, *Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010)* (discounting CW allegations where there was no indication that the sources had any contact with the individual defendants).) FE2's account is further undermined by its heavy reliance on secondhand reports. (*See, e.g.*, SAC ¶ 86 (describing what an employee of Fouerti's is alleged to have told FE2 about being forced to forge documents) and ¶ 87 (same, with another employee named Vito).) Such secondhand accounts are not credited by courts. *See Miao, 442 F. Supp. 3d at 799.*

FE4's allegations, meanwhile, relate to a party not in the lawsuit, and the court cannot impute knowledge to other defendants based on what may have been raised to the then-Chief Accounting Officer, Robert Barry. (SAC ¶ 91); *see In re Am. Express Co. Sec. Litig., No. 02-CV-5533 (WHP), 2008 U.S. Dist. LEXIS 74372, 2008 WL 4501928, at *36 (S.D.N.Y. Sept. 26, 2008)*, aff'd sub nom. *Slayton v. Am. Exp. Co., 604 F.3d 758 (2d Cir.2010)* (finding no inference of scienter where "Plaintiffs have also failed to allege any facts showing that the confidential source . . . had any contact **[*17]** with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period"). Accordingly, because FE4 is not alleged to have "met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period," this employee's allegations cannot support any inference of scienter. *In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011)*. The M&O correctly rejected this level of interaction as too attenuated. (*See* M&O at 25.)

The SAC also adds allegations to FE11's account. FE11 was an "inventory control manager" before Polished acquired Appliances Connection ("AC").[4] (SAC ¶ 73.) FE11 now alleges that in comparing orders for delivery with the existence of the appliances in the warehouse, "[a]ppliances would commonly, almost daily, not be present in the warehouse" and that FE11 "was ordered to send a different product, or an already damaged product, that was in the YF Logistics[5] warehouse." (*Id.*) FE11 would bring such issues to Fouerti "with whom he had frequent conversations" but Fouerti would "handle" the issues and FE11 "never heard of the issue[s] again." (*Id.*)

These allegations likewise cannot sustain Plaintiff's claim. First, FE11 **[*18]** did not work in Polished's warehouse, but YF logistics, a subsidiary. (SAC ¶ 52.) Accordingly, FE11 would not have sufficient insight into how the company operated as a whole to know if these alleged discrepancies had a material impact on Polished's financial statements. *See, e.g., Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp., 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018)* (disregarding the statements of five former employees because they "worked mainly within a single [company] unit, so they had no insight on how other [company] units, let alone other [company] divisions, projected aftermarket sales"); *In re China Mobile Games & Ent. Grp., Ltd Sec. Litig., No. 14-CV-4471 (KMW), 2016 U.S. Dist. LEXIS 29258, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016)* (disregarding allegations of confidential witness ("CW") who worked at a subsidiary, not the parent company, as such testimony "could describe the anomalies of a rogue fiefdom rather than company-wide practices"). These new allegations also do nothing to rectify an additional issue raised in the first M&O: FE11 left YF logistics in March of 2021, "months before the start of the class period"— now a year before the new class period. (M&O at 27.) As described below, even though pre-class period allegations can be considered by the court, FE11's do not fall within even the twelve months covered by the 2021 Form 10-K. (SAC ¶¶ 52.) The court resists crediting these attenuated **[*19]** allegations, far from "contemporaneous" with the statements made at the beginning of the class period. *See Glickman v. Alexander & Alexander Servs., Inc., No. 93-CV-7594 (LAP), 1996 U.S. Dist. LEXIS 2325, 1996 WL 88570, at *11 n.6 (S.D.N.Y. Feb. 29, 1996)* ("[A] stronger inference of fraud may be raised when the fraudulent acts occur simultaneously with, or closely precede, the realization of their purpose.").

---

[4] For simplicity, the court will refer to Appliances Connection, the pre-acquisition company, as "AC," and Appliances Connection Inc. as "ACI," the post-transaction name for the Goedeker wholly owned subsidiary of the AC assets. (SAC 6.)

[5] AC owned YF Logistics, a 200,000 square foot subsidiary warehouse in Hamilton, New Jersey, along with four other subsidiaries called 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals, Inc., and Joe's Appliance LLC. (SAC II 33.) The SAC elsewhere refers to YF Logistics as "ACI's main warehouse." (*Id.* ¶ 46.)

The additional allegations in the SAC fail to move the needle as to the credibility of these accounts. Plaintiffs greatest revisions to the SAC come with the account of FE1, the former "VP of Logistics."

### b. FE1

Plaintiffs main addition in the SAC is a more fleshed out series of allegations about FE1, which describe direct communication with the Individual Defendants in Polished's leadership. Although Plaintiff's SAC bolsters some of the allegations of FE1, the court declines to credit the allegations made by this anonymous account.

The SAC satisfies the M&O's critique that there were no allegations that FE1 brought the allegedly fraudulent practices to the attention of Johnson or Fouerti at the September 21, 2021 meeting. (M&O at 28.) The SAC details what FE1 allegedly shared with these Individual Defendants such that, assuming the allegations to be true, Fouerti and Johnson both "knew about the alleged improper business practices." **[\*20]** (*Id.*) It also situates in time when the statements were made. (*See* SAC ¶¶ 59-69.) Although these alleged timeframes are not precise, for example, "[i]n early August 2021," this level of accuracy is sufficient at the pleading stage. *See Madison Maidens, Inc. v. Am. Mfrs. Mut. Ins. Co., No. 05-CV-4585 (LTS) (JCF), 2006 U.S. Dist. LEXIS 13573, 2006 WL 785270 (S.D.N.Y. Mar. 27, 2006)* ("[A] plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.").

The parties dispute if this is enough. Individual Defendants argue that the SAC does not include details indicating that FE1 was "in a position to know facts attributed to him" including that "(1) there were 1,200 'missing appliances' at YF Logistics, and/or (2) that those allegedly missing appliances caused the Company's valuation of inventory to be 'materially false.'" (MTD at 8 (citing SAC ¶¶ 61, 139).) In their view, neither FE1's alleged hand counts of inventory nor access to ACI's ledger suffice to allege anything about ACI or Polished's inventory more broadly. (MTD at 8-9; *see* SAC ¶ 61.) Individual Defendants aver that no pleaded facts connect these missing appliances to FE1's personal knowledge that they "resulted in the [Polished's] financial **[\*21]** statements being false or misleading." (*Id.* at 9.)

Plaintiff counters that FE1's allegations "directly address the weakness this Court found in the FAC" and that the SAC "adequately pleads the Individual Defendants' knowledge of the inventory and other issues, which they ignored in publishing materially false financial statements." (Opp'n at 10.) Plaintiff details a series of conversations FE1 allegedly had with each of the Individual Defendants, including a conversation with Defendant Moore in July 2021, (SAC ¶ 62), one with Defendant Johson, (*id.*), and several with Defendant Fouerti—including twice in August 2021, (*id. 9* 64.) In these meetings FE1 told them about "all of the inventory problems and the 1,200 missing appliances," (*Id.* ¶ 62), and told Fouerti that "inventory was missing and materially overstated on the balance sheet." (*Id.* at 9 64.)

Individual Defendants are right, but on narrower grounds. Throughout Individual Defendants' briefing they push the court to disregard the FE accounts, because they concern conduct that allegedly occurred before the class period began. (MTD at 7, 9, 10; Defs.' Reply at 5-6). However, "[f] acts that fall outside the relevant period can be considered **[\*22]** in determining whether a complaint alleges scienter" and "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant." *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC, 587 F. Supp. 3d 56, 95 (S.D.N.Y. 2022)*; *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001)*. Indeed, a case Individual Defendants cite in both their motion and their reply with an explanatory parenthetical that "allegations relating to conduct pre-dating the class period could not support scienter" is misleading. *Fogel v. Wal-Mart de Mexico SAB De CV, No. 13-CV-2282 (KPF), 2017 U.S. Dist. LEXIS 26976, 2017 WL 751155, at \*17 (S.D.N.Y. Feb. 27, 2017)*. That case only rules that *statements* made in the pre-class period are not actionable. *See id.* But it is silent on accounts that are brought forward before the class period and the extent to which they can be used to make inferences about falsity and scienter during the class period. And the accounts of employees no longer at the company could be relevant if they were close in time or pertinent to the full-year financial reporting for FY21, at the earliest. *See, e.g., In re Argit Quantum Inc. Sec. Litig., 774 F. Supp. 3d 505, 529-30 (E.D.N.Y. 2025)* (rejecting defendants' claim that the CWs could not have relevant knowledge because none were employed at the company when the challenged statements were made); *see also Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018)*, re-manded on other grounds sub nom. Abramson v. Newlink Genetics Corp., 965 F.3d 165 (2d

*Cir. 2020)* (finding a "period leading up to" the relevant event strengthened plaintiffs' allegations regarding anonymous **[*23]** source's role); *Emps.' Ret. Sys. v. Blanford, 794 F.3d 297, 307 (2d Cir. 2015)* ("[A]llegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.").

The narrower and correct rule statement is that these examples *lose* explanatory value the further they are from the alleged misstatements, not that they should be rejected as a bright line rule. *Compare Reckitt Benckiser Grp., 587 F. Supp. 3d at 95* ("facts that fall outside the relevant period can be considered"), *with Glickman, 1996 U.S. Dist. LEXIS 2325, 1996 WL 88570, at *11 n.6* ("[A] stronger inference of fraud may be raised when the fraudulent acts occur simultaneously with, or closely precede, the realization of their purpose."), *and In re FuboTV Inc. Sec. Litig. , No. 21-CV-1412 (ALC), 2023 U.S. Dist. LEXIS 55624, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023)* (finding that allegations made by a CW who left the company seven months previously would be "even less likely [to] have information that could support an inference of contemporaneous falsity"). Thus, the court can still consider FE1's allegations even though they occurred outside the Class Period.

The main reason that FE1's allegations as to falsity and scienter fail is because FE1 was not in a position to know, nor had the expertise to value, the allegedly missing inventory. As to units of inventory, at some point during June of 2021, FE1 conducted "two separate hand counts" of YF Logistics warehouse. (SAC ¶ 61.) **[*24]** FE1 compared his hand counts of YF Logistics' inventory to ACI's ledger to come to the conclusion that "the ledger and, in turn, ACI's balance sheet were materially false." (SAC ¶ 61.) There are not sufficient allegations that lay out in detail how many units were in the warehouse at the time, what percentage of total units this number represented, if the warehouse was closed to prevent units from coming in and out and keep the numbers stable, and importantly, whether this count was ever repeated at a later point in time. *See, e.g., Ford v. VOXX Int'l Corp., No. 14-CV-4183 (JS) (AYS), 2016 U.S. Dist. LEXIS 95956, 2016 WL 3982466, at *6-7 (E.D.N.Y. July 22, 2016)* (declining to credit a single FE1 who could not quantify alleged magnitude of declining sales); *Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 411 n.10 (S.D.N.Y. 2007)* (failing to credit allegations of a write-down as a CW failed to "distinguish between ferry and container assets" and conclusory allegations to when certain containers were overvalued).

Without more, Plaintiff rests most of its case on numbers from a single day, which could have changed the next day or week without FE1's knowledge. *See In re Lehman Bros. Sec. & Erisa Litig., No. 10-CV-6637 (LAK), 2013 U.S. Dist. LEXIS 107559, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013)* (disregarding CWs who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly"). Further, as ACI was a "wholly owned subsidiary" of Polished, its inventory system **[*25]** would not necessarily reflect the entire company's inventory, and the SAC makes no representation about how much of the entire company's inventory was on this system. (SAC ¶ 6.) Accordingly, FE1 would not have a complete picture of the entire inventory of the company's stock keeping units. *See Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010)*, aff'd, *430 F. App'x 63 (2d Cir. 2011)* (discounting allegations of CWs whom the complaint did not indicate had any "access to aggregated data regarding [the company's ] credit risk"); *In re Sierra Wireless, Inc. Sec. Litig., 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007)* (finding insufficient allegations by a former founder of a subsidiary who had no knowledge about the parent's corporate strategy). The SAC fails to represent how FE1 knew that 1,200 missing units at the subsidiary, on a single day, "materially misstated [Polished's inventory] on the balance sheet" for an entire quarter or fiscal year. (SAC ¶ 65.) The court took no position in the M&O as to whether FE1 could be so credited, and Individual Defendants persuasively argue that the SAC does not plead facts sufficient to allow the court to believe FEl's account. (*See* M&O at 27-28; MTD at 8-11.)

Regarding valuation, there are also no allegations that FE1 could accurately *value* the missing units. (MTD at 10.) Polished allegedly had 500,000 stock keeping **[*26]** units, or items of inventory for sale, as of March 31, 2022. (Polished's 2021 Fowl 10-K, filed with SEC March 31, 2022 (Dkt. 56-7) at ECF p. 10.) There is no allegation that FE1 understood how to value this inventory, and the omission of the value of these missing units also undermines Plaintiffs credibility. *Campo v. Sears Holdings Corp., 635 F. Supp. 2d 323, 335-36 (S.D.N.Y. 2009)*, aff'd, *371 F. App'x 212 (2d Cir. 2010)* (finding that reports relied upon by a CW that contained "lease terms for less than a third of Kmart's stores" were "questionable" in valuing Kmart's entire real estate portfolio); *Caiafa, 525 F. Supp. 2d 398 at 411 n.10* (failing to credit CW's write-down allegations that failed to "specif[y] the amount by which the containers were overvalued, and at what times"). Even assuming

these 1,200 units were truly missing, the court cannot credit that this number was material without knowing anything about the valuation of these goods.

Plaintiff points to this court's decision in *Nio* to attempt to salvage its claims. (Opp'n at 10 (citing *In re Nio, Inc. Sec. Litig., No. 19-CV-1424 (NGG) (JRC), 2021 U.S. Dist. LEXIS 152311, 2021 WL 3566300, at \*7 (E.D.N.Y. Aug. 12, 2021)*).) There, the court credited the accounts of three anonymous sources to deny a motion to dismiss a securities fraud claim. The accounts of three individuals—a purchasing manager in charge of factory development, a senior salesperson, and a car design engineer—supported the claim **[\*27]** for material misrepresentation that an electric vehicle factory had been built. *Nio, 2021 U.S. Dist. LEXIS 152311, 2021 WL 3566300, at \*4, 7*. The court credited the allegations of the latter two through the accounts of the first, since that FE1—the purchasing manager—was directly in charge of "selecting factory sites and negotiating with factory suppliers." *2021 U.S. Dist. LEXIS 152311, [WL] at \*7*. Whether the company had begun building the factory was directly within both FE1s knowledge and competence to assess. Here, however, Plaintiffs FE1 did not have a complete picture of Polished's entire inventory, and the valuation of thousands of units of inventory would require specialization or familiarity with valuation methods (neither of which is alleged in the SAC). Unlike the findings in *Nio*, the anonymous accounts here cannot sustain or corroborate each other because the court finds them individually unreliable.

Plaintiff levels serious allegations against Individual Defendants. However, the weakness of key FE accounts precludes this court from deeming them sufficiently credible to sustain Plaintiffs claims. *See Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)*; *see also In re MRU Holdings Sec. Litig., 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011)* ("Clearly, an inference that the defendants knew their statements to be false cannot be based on allegations which are themselves speculative.") (quoting *Wexner v. First Manhattan Co., 902 F.2d 169, 173 (2d Cir. 1990)*). As **[\*28]** such, the court will not credit their accounts in assessing the sufficiency of the allegations in the SAC.

3. Alleged Material Misrepresentations and Omissions

Plaintiff makes nearly identical allegations in the SAC that Fouerti and Johnson made numerous material misrepresentations and omissions across four SEC filings and one earnings call. The challenged statements in the SAC generally fall into four categories: (1) financial metrics and opinions regarding Polished's future prospects (SAC ¶¶ 132, 134, 142, 144, 154); (2) restated financial metrics (*id.* ¶¶ 150, 160); (3) statements and certifications regarding Polished's internal controls (*id.* ¶¶ 136, 146, 148, 152, 162); and (4) statements concerning Polished's fulfilment, logistics, and returns processes (*id.* ¶¶ 138, 140, 156, 158).

"A material misrepresentation or omission must be both (1) false or misleading, and (2) material." *Leadersel Innotech ESG v. Teladoc Health, Inc., No. 23-CV-1112, 2024 U.S. App. LEXIS 24196, 2024 WL 4274362, at \*2 (2d Cir. Sept. 24, 2024)* (citing *Singh v. Cigna Corp., 918 F.3d 57, 62-63 (2d Cir. 2019)*). To adequately allege a material misrepresentation, "a plaintiff must plead facts that show that the defendant made a statement of material fact that was untrue at the time it was made." *In re Liberty Tax, Inc. Secs. Litig., 435 F. Supp. 3d 457, 465 (E.D.N.Y. 2020)*. A misrepresentation or omission is material if there is a "substantial likelihood that a reasonable investor **[\*29]** would find the misrepresentation important in making an investment decision." *United States v. Gramins, 939 F.3d 429, 445 (2d Cir. 2019)*; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 186-89, 35 S. Ct. 1318, 191 L. Ed. 2d 253 (2015)* (applying the same standard to omissions). A misrepresentation or omission is important to a reasonable investor "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Gramins, 939 F.3d at 445* (citing *Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*); *see also Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38, 45-47, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)*.

The SAC does not make materially different claims as to the statements. As the court declines to credit the new allegations brought by the FEs, it adopts the same reasoning and conclusions for the aforementioned four groups of statements as the M&O. The statements contained in groups (1), (3), (4) fail to allege material misrepresentations and omissions. (M&O at 30-38, 41-54.) But the SAC adequately alleges that certain challenged statements in the restated financial metrics—those contained in group (2)—which include the 2021 Form 10-K and 2022 Form 10-Q, were both false and misleading when stated. (M&O at 38-41.)

The court briefly addresses two of Plaintiff's new arguments for the sake of completeness. Plaintiff argues

that the 2021 10-K Risk Factor,[6] a statement in group **[*30]** (4), had already materialized when it was made, and that the SOX Certifications, in group (3), were false statements of fact. (Opp'n at 22-23.) Plaintiff argues that FE1's new allegations show that Fouerti knew this risk had materialized, because Polished was already shipping damaged products. (SAC ¶¶ 73-74, 79-80.) Plaintiff also avers that FE1's account proves that the SOX Certifications were false because FE1 directly told Fouerti about improprieties in the business. (Opp'n at 22-23.) This, Plaintiff reasons, renders his certifications false. (*Id.*)

For this Risk Factor, the pleading for FEs 1, 3, and 11, whose accounts Plaintiff cites in support of allegedly damaged products being shipped, contains no dates of when FE1, FE3, or FE11 allegedly heard Fouerti demand that employees ship and carry damaged goods for sale. (Opp'n at 22 (citing SAC ¶¶ 73-74, 7980).) This is a fatal defect to their accounts. *See Miao, 442 F. Supp. 3d at 799.*

SOX Certifications are statements of opinion, not fact. (M&O at 44-45 (citing *New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo, 122 F.4th 28, 47 (2d Cir. 2023)*).) Accordingly, Plaintiff must allege that "(1) the speaker does not hold the belief . . . professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information **[*31]** that makes the statement misleading to a reasonable investor." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp., 336 F. Supp. 3d 196, 217 (S.D.N.Y. 2018)* (quoting *Tongue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016)*). FE1's accounts are not credible for the reasons laid out above. Even taken as true, no allegations here are sufficient to prove that Fouerti and Johnson disbelieved these statements, provided false facts, or omitted information making the statement misleading. *See id.* The 1,200 pieces of allegedly missing inventory from two hand-counts months earlier from a subsidiary warehouse are insufficient to prove fraud. Nor do they meet the PSLRA's heightened pleading standard. *See Synchrony, 988 F.3d at 166-67.* And as Individual Defendants point out, the SAC is impermissibly vague with respect to the alleged forgeries or hiring practices. (Defs.' Reply at 6-7.) FE1's accounts do not mention that he even brought hiring practices to Fouerti or Johnson's attention. (SAC ¶¶ 64-67.)

For these reasons, the SAC fails to plead that either the Risk Factor or the SOX Certifications were either false or misleading.

4. Scienter

Plaintiffs claims, including new allegations attempting to establish Individual Defendants' motive to commit fraud, fail to raise a strong inference of scienter.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise **[*32]** to a strong inference that the defendant[s] acted with the required state of mind." *Anschutz Corp., 690 F.3d at 108.* "The requisite state of mind in a *Rule 10b-5* action is an intent to deceive, manipulate or defraud." *Ganino, 228 F.3d at 168.* Such an intent may be established "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI, 493 F.3d at 99.* Motive and opportunity may be established by demonstrating that defendants benefitted "in a concrete and personal way" from the alleged fraud. *Novak, 216 F.3d at 311.* Conscious misbehavior means "deliberate Ely] illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *Gould v. Winstar Comms., Inc., 692 F.3d 148, 158 (2d Cir. 2012).* Recklessness may be established "where a defendant has engaged in conduct that was highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id. at 158-59.* This standard is met "where a defendant failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud." *Id. at 159.* Importantly, there are "several important **[*33]** limitations on the scope of liability for securities fraud based on reckless conduct." *Novak, 216 F.3d at 309.* First, plaintiffs cannot "proceed with allegations of fraud by hindsight." *Id.* "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Id.* As such, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* Second, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.* And where a plaintiff claims that defendants had access to contrary facts, the plaintiff "must specifically identify

---

[6] Polished included a risk warning in its 2021 10-K outlining factors that could impact the company's growth. (SAC ¶ 158.)

the reports or statements containing this information." *Id.* Finally, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Stevelman, 174 F.3d at 84*; *see also Novak, 216 F.3d at 309*.

"Mr' determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account **[*34]** plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 323, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)* (*"Tellabs"*). A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id. at 324*. In making this determination, the court must review "all the allegations holistically." *Id. at 326*.

The SAC adds new allegations to argue that Fouerti and Moore had the motive and the opportunity to commit fraud, and like the FAC, relies on circumstantial evidence of conscious misbehavior or recklessness to establish scienter. In addition to the original four sets of facts alleged in the FAC—(1) the FE accounts; (2) the resignations of Fouerti and Johnson; (3) the resignation of Polished's independent accounting firm, Friedman; and (4) alleged GAAP violations, (SAC ¶¶ 42-131, Opp'n at 7-21)—the SAC adds (5) a section alleging that Fouerti and Moore had motives to violate the securities laws. (SAC ¶¶ 53-56.) For the reasons that follow, the court does not find that this additional allegation raises a strong inference of scienter as to any Individual Defendant.

a. *Motive and Opportunity*

Plaintiffs additional allegations as to motive are insufficient as a matter **[*35]** of law.[7] Plaintiff asserts that the SAC "pleads Fouerti's motive to concoct and carry out the fraudulent scheme, ¶¶ 53-55, and that the fraudulent scheme predated Goedeker's purchase of [AC]. ¶¶ 53-97." (Opp'n at 14.) Fouerti allegedly "directed fraudulent inventory practices, and other fraud . . . well before Polished acquired [AC]." (SAC ¶ 53.) He purportedly "leveraged the scheme to produce numbers which were clearly attractive to Goedeker, and negotiated a concrete personal benefit for himself of

$180 million" upon acquisition of his company. (Opp'n at 14 (citing SACT ¶ 54).) Fouerti also allegedly stole $800,000 directly from Polished and paid his father a $104,000 salary for a fictitious job at YF Logistics. (SAC ¶ 55.) Plaintiff then alleges that Moore's motive is established by his $650,000 severance payment when he left the CEO role on August 30, 2021. (SAC ¶ 56.)

These allegations fail to bolster Plaintiffs allegations of scienter. As to Fouerti, the allegations about the fraudulent inventory practices and "false financials" before the acquisition are not pleaded with sufficient detail for this court to credit them. There are no detailed allegations of what type of fraud **[*36]** occurred, or why the financials were supposedly false. *See ATSI, 493 F.3d at 99* ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). Further, the idea that he made the numbers "attractive" to Goedeker is insufficient to show motive. Even accepting this allegation as true, schemes to defraud other shareholders do "not support the argument that [the alleged fraud] show [ed] motive to defraud a company's *own* shareholders." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 200-201 (2d Cir. 2009)* (*"ECA"*). Indeed, without further allegations, it is "at least as compelling" an inference, *Tellabs, 551 U.S. at 326*, that this alleged motive, "common to most corporate officers . . . for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation," could be legitimate. *ECA, 552 F.3d at 198*. And in any event, this motive would "not constitute 'motive' for the purposes of this inquiry." *Id.; see also Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001)* ("The desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired.").

This alleged motive also has nothing to do with any challenged statement. Goedeker's purchase of AC is not only activity far before the class period, but also before Fouerti was an employee of Polished. *See In re Lions Gate Ent. Corp. Sec. Litig., 165 F. Supp. 3d 1, 23 (S.D.N.Y. 2016)* (declining **[*37]** to find a concrete benefit to defendants in retaining control over company in a takeover battle three years before the challenged statements, and finding a lack of connection between nondisclosure of an SEC investigation and this "benefit"). This alleged scheme is not adequately connected to any class period activity or defrauding investors. As with the other scienter pleading requirements, "mere conclusory allegations connecting fraud to benefits for purposes of motive are insufficient."

---

[7] The parties do not contest whether the Individual Defendants had "opportunity," which generally requires access to inside corporate information. *See Stevelman v. Alias Research, Inc., 174 F.3d 79, 86 (2d Cir. 1999)*.

*Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011)* (citing *Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009)*). And as Defendants point out, none of Plaintiff's cited cases in its Opposition deal directly with whether motive allegations concerning a *different*, pre-class fraud can create a strong inference of scienter. (Defs.' Reply at 8 n.7.)[8]

Likewise, accepting as true the allegations that Fouerti stole $800,000 from the company, and created a fake job for his father at YF Logistics, Plaintiff has not tied these "motives" to any challenged statement or a scheme to perpetrate a fraud on the company's investors. *Glaser, 772 F. Supp. 2d at 587*; *In re Lions Gate, 165 F. Supp. 3d at 23* ("The plaintiffs have failed to connect the motive to the allegedly materially false statements or omissions.").

Lastly, while Moore has already been dismissed from the case, considering **[*38]** the new pleading still ends with the same result. Moore's motive allegations fail as Moore is only connected to 2Q21 financial statements, and any contemporaneity is highly attenuated. (SAC 9 132); *see Glickman, 1996 U.S. Dist. LEXIS 2325, 1996 WL 88570, at *11 n.6*. And as Defendants insist, Moore's severance payment is "unremarkable and cannot demonstrate motive to defraud investors." (Defs.' Reply at *8; see also* M&O at 58-60 (citing voluminous caselaw in finding the resignations of Fouerti and Johnson failed to support a strong inference of scienter); *In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510 (S.D.N.Y.)*, *aff'd sub nom. Condra v. PXRE Grp. Ltd., 357 F. App'x 393 (2d Cir. 2009)* (failing to find scienter through tenuous linkage between a negotiation of a "golden parachute" severance payment and the alleged fraud). No motive allegations are made as to Johnson, which therefore also fail.

---

[8] These include an out-of-circuit, unreported default judgment action that details the standard for obtaining a permanent injunction in the Ninth Circuit, not the 10b-5 scienter standard in the Second Circuit. (Opp'n at 14 (citing *Sec. & Exch. Comm'n v. McMillan*, No. 06-CV-0951 (PCT) (SMM), 2009 WL 10708627, at *3 (D. Ariz. Oct. 20, 2009)).) Another out-of-circuit, unreported SEC action does not aid the court in comparing either facts or law to the instant case, as Plaintiff merely parrots that a case prior order concluded the defendant acted with scienter. (*Id.* (citing *SEC v. Yin Nan Wang, No. 13-CV-7553 (JAK), 2016 U.S. Dist. LEXIS 201999, 2016 WL 11533562, at *2, *9 (C.D. Cal. Oct. 31, 2016)*).)

*b. Circumstantial Evidence*

Plaintiff also fails to offer sufficient circumstantial evidence to successfully raise an inference that the Individual Defendants were acting with conscious misbehavior or recklessness. "[I]f a plaintiff fails to allege adequate motive, as in this case, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." *Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012)*, *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp., 543 F. App'x 72 (2d Cir. 2013)* (summary order). As detailed above, the court does not **[*39]** credit the amended allegations as to the FEs. While FEI's allegations now include more information about what was allegedly discussed in their direct conversations with Fouerti and Johnson, including the September 21, 2021 meeting where FE1's employment was terminated, (SAC ¶¶ 59-69), FE1's statements are not credible because there are no allegations that they "played any direct or meaningful role in the company-wide financial forecasting or reporting process," in either fully understanding Polished's inventory or its valuation. *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc., No. 09-CV-1740 (VLB), 2013 U.S. Dist. LEXIS 40788, 2013 WL 1188050, at *35 (D. Conn. Mar. 23, 2013)*; *see also In re MRU Holdings Sec. Litig., 769 F. Supp. 2d at 515*.

The M&O found that individually the other three factors, (1) the resignations of Fouerti and Johnson, (2) the resignation of Polished's independent accounting firm, Friedman, and (3) alleged GAAP violations were insufficient to create a "strong inference of scienter." (M&O at 58 (citing *Novak, 216 F.3d at 309* ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); *In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)* ("[A]lthough not sufficient in and of themselves, [resignations] add to the overall pleading of circumstantial evidence of fraud.").) And even when considering them "holistically" the court still did not find they adduced "strong **[*40]** circumstantial evidence of conscious misbehavior or recklessness." (M&O at 58 (citing *Tellabs, 551 U.S. at 326*); *see generally id.* 5862 (discussing the other factors).) As the court declines to credit the allegations of FE1 and the other anonymous witnesses, (*see supra* Section IV.A.3), the court again finds that Plaintiff has failed to materially augment its FAC. There is not sufficient circumstantial evidence from which to infer conscious misbehavior or

recklessness as to any Individual Defendant.

Taken holistically with the other allegations already discussed and substantially identical to those in the FAC, Plaintiff fails to raise a strong inference of scienter as to any Individual Defendant.

5. Loss Causation

Because the majority of the challenged statements are not actionable misstatements or omissions, and because Plaintiff has failed to adequately raise a strong inference of scienter as to the few actionable misstatements, the court declines to reach the issue of loss causation. (*See* M&O at 62); *see, e.g., Altayyar v. Etsy, Inc., 242 F. Supp. 3d 161, 184 (E.D.N.Y. 2017)* ("Since the plaintiffs have not identified any actionable misstatements or adequately alleged scienter, there is no basis upon which they may plead reliance or loss causation."); *In re Neurotrope, Inc. Sec. Litig., 315 F. Supp. 3d 721, 730 (S.D.N.Y. 2018)* ("Because the Complaint **[\*41]** fails to allege a material misrepresentation or omission, and scienter, the loss causation issue is not addressed.").

\* \* \*

In sum, the Second Amended Complaint does not sufficiently allege a material misrepresentation, omission, or scienter. *See Synchrony, 988 F.3d at 167.* Thus, Plaintiff fails to state a claim under *Section 10(b)* and *Rule 10b-5(b)*.

**B. Scheme Liability**

The court previously found that Plaintiff's Count II alleging scheme liability failed because the various purportedly improper practices failed to describe a scheme "in connection with the purchase or sale of securities." (M&O at 63-64.)

Count II of the SAC fails for the same reasons.[9] As a

threshold matter, scheme liability cannot be established when a complaint "only alleges misstatements and omissions." *SEC v. Rio Tinto, 41 F.4th 47, 53 (2d Cir. 2022)*. Outside the allegations of the misstatements, which make up the vast majority of the ink spilled in the SAC, Plaintiff fails to "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021)*. The purported acts of fraud against Polished, customers, and credit card companies "do not establish a deceptive scheme to defraud investors." (M&O at 64 (quoting *Plumber & Steamfitters Loc., 11 F.4th at 105* (holding that allegations of money **[\*42]** laundering were insufficient to plead a scheme to defraud investors)); *Fogel v. Wal-Mart de Mexico SAB de CV, No. 13-CV-2282 (KPF), 2017 U.S. Dist. LEXIS 26976, 2017 WL 751155, at \*18 (S.D.N.Y. Feb. 27, 2017)* (holding that allegations of a bribery scheme were similarly insufficient).) Scienter, a necessary element of a scheme-liability claim, is likewise missing and requires dismissal. *See Plumber & Steamfitters Loc., 11 F.4th at 105; Meyer v. Organogenesis Holdings Inc., 727 F.Supp.3d 368, 398 n.12 (E.D.N.Y. 2024)* (finding that a scheme liability claim failed "in light of Plaintiffs' failure to establish scienter").[10]

**C. *Section 20(a)***

The court previously found that Plaintiff failed to allege violations of *Section 20(a)* against Individual Defendants in its Count III, as the FAC failed to "allege a primary violation of the securities laws." (M&O at 65 (citing *ECA, 553 F.3d at 206-07* (concluding that the "control person liability claim pursuant to . . . *section 20 of the Exchange Act* must also fail for want of a primary violation")).) For the reasons stated above the SAC fails to allege a primary violation of the securities laws. Consequently, Plaintiff cannot allege a violation of *Section 20(a)*. *See ECA, 553 F.3d at 206-07.*

---

[9] Plaintiff incorrectly states in its briefing that the court made factual findings as to the various allegations in the FAC about improper business practices directed and carried out by Fouerti. (Opp'n at 23.) As a matter of elementary procedure, "[o]n a motion to dismiss, the court does not find facts." *United States v. Prevezon Holdings LTD., 122 F. Supp. 3d 57, 78 (S.D.N.Y. 2015)*. As described above, while the court refers to its earlier M&O to the extent certain allegations and arguments are materially identical, it reviews only the SAC as the operative complaint. Thus, there is no law of the case Plaintiff

can point to here. *See supra* Section II.

[10] The primary case Plaintiff discusses here is an unreported, out-of-circuit decision. (Opp'n at 24 (citing *Maverick Fund, Ltd. v. Mohawk Industries, Inc., 21-CV-0118 (VMC), 2023 U.S. Dist. LEXIS 65439, 2023 WL 2887603, at \*9 (N.D. Ga. Mar. 31, 2023)*).) It is immaterial to this case that the court there found defendants to have adequately pled falsity and scienter.

**V. CONCLUSION**

For foregoing reasons, the Individual Defendants' motion for judicial notice is GRANTED IN PART and DENIED IN PART. The Individual Defendants' motion to dismiss is GRANTED and the Second Amended Complaint is DISMISSED WITH PREJUDICE as to these defendants. As Plaintiff has made multiple representations that Polished **[*43]** is no longer in the case, the court DIRECTS it to make an application to keep the case open as to that entity within 30 days. If it does not, the Clerk of Court is respectfully DIRECTED to close the case.

SO ORDERED.

Dated: Brooklyn, New York

March 10, 2026

/s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District Judge

---

**End of Document**

# Exhibit 8

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10−Q**
(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended: June 30, 2021

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-39418

**1847 GOEDEKER INC.**

(Exact name of registrant as specified in its charter)

| **Delaware** | **83-3713938** |
|---|---|
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |
| **3817 Millstone Parkway, St. Charles, MO** | **63301** |
| (Address of principal executive offices) | (Zip Code) |

**888-768-1710**

(Registrant's telephone number, including area code)

(Former name or former address, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.0001 per share | GOED | NYSE American LLC |
| Warrants to Purchase Common Stock | GOED WS | NYSE American LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☐ | Accelerated filer ☐ |
|---|---|
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of August 10, 2021, there were 106,387,332 shares of the registrant's common stock issued and outstanding.

---

**1847 GOEDEKER INC.**
**Quarterly Report on Form 10-Q**
**Period Ended June 30, 2021**
**TABLE OF CONTENTS**
**PART I**
**FINANCIAL INFORMATION**

| Item 1. | Financial Statements | 1 |
|---|---|---|
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 38 |
| Item 4. | Controls and Procedures | 38 |

**PART II**
**OTHER INFORMATION**

| Item 1. | Legal Proceedings | 39 |
|---|---|---|
| Item 1A. | Risk Factors | 39 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 39 |
| Item 3. | Defaults Upon Senior Securities | 39 |
| Item 4. | Mine Safety Disclosures | 39 |
| Item 5. | Other Information | 39 |
| Item 6. | Exhibits | 40 |

i

---

**PART I**
**FINANCIAL INFORMATION**

**ITEM 1. FINANCIAL STATEMENTS.**

**1847 GOEDEKER INC.**
**UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Condensed Consolidated Balance Sheets as of June 30, 2021 (unaudited) and December 31, 2020 | 2 |
| Condensed Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2021 and 2020 (unaudited) | 3 |

| | |
|---|---|
| Condensed Consolidated Statement of Stockholders' Equity (Deficit) for Three and Six Months Ended June 30, 2021 and 2020 (unaudited) | 4 |
| Condensed Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2021 and 2020 (unaudited) | 5 |
| Notes to Condensed Consolidated Financial Statements (unaudited) | 6 |

1

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | June 30, 2021 (unaudited) | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 45,234,542 | $ 934,729 |
| Restricted cash | 8,385,848 | 8,977,187 |
| Receivables | 21,266,787 | 1,998,232 |
| Vendor deposits | 10,755,209 | 547,648 |
| Merchandise inventory, net | 21,134,023 | 5,147,241 |
| Prepaid expenses and other current assets | 3,680,975 | 635,084 |
| Total Current Assets | 110,457,384 | 18,240,121 |
| Property and equipment, net | 2,480,055 | 245,948 |
| Operating lease right-of-use assets, net | 12,822,972 | 1,578,235 |
| Goodwill | 222,107,789 | 4,725,689 |
| Intangible assets, net | 1,170,239 | 1,381,937 |
| Deferred tax asset | 8,049,978 | - |
| Other long-term assets | 45,000 | 45,000 |
| TOTAL ASSETS | $ 357,133,417 | $ 26,216,930 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued expenses | $ 51,897,666 | $ 12,701,715 |
| Due to Sellers | 3,351,024 | - |
| Customer deposits | 30,811,985 | 21,879,210 |
| Current portion of notes payable, net | 6,455,272 | 663,339 |
| Current portion finance lease liability | 65,378 | - |
| Current portion of operating lease liabilities | 2,157,010 | 450,712 |
| Contingent note payable | 188,170 | - |
| Total Current Liabilities | 94,926,505 | 35,694,976 |
| Notes payable, net of current portion, net | 51,344,869 | 2,522,030 |
| Finance lease liability, net of current portion | 145,431 | - |
| Operating lease liabilities, net of current portion | 12,149,107 | 1,127,523 |
| Contingent note payable | - | 188,170 |
| TOTAL LIABILITIES | 158,565,912 | 39,532,699 |
| **Stockholders' Equity (Deficit)** | | |
| Preferred stock, $0.0001 par value, 20,000,000 shares authorized; none issued and outstanding as of June 30, 2021 or December 31, 2020 | - | - |
| Common stock, $0.0001 par value, 200,000,000 shares authorized; 106,374,232 and 6,111,200 shares issued and outstanding as of June 30, 2021 and December 31, 2020, respectively | 10,638 | 611 |
| Additional paid-in capital | 224,743,096 | 13,409,328 |
| Accumulated deficit | (26,186,229) | (26,725,708) |
| Total Stockholders' Equity (Deficit) | 198,567,505 | (13,315,769) |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 357,133,417 | $ 26,216,930 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

2

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Product sales, net | $ 64,072,098 | $ 15,285,031 | $ 77,769,466 | $ 24,962,209 |
| Cost of goods sold | 51,016,609 | 12,685,158 | 62,085,520 | 20,796,328 |
| Gross profit | 13,055,489 | 2,599,873 | 15,683,946 | 4,165,881 |
| **Operating Expenses** | | | | |
| Personnel | 4,821,168 | 1,040,189 | 6,752,492 | 2,351,673 |
| Advertising | 2,931,815 | 891,907 | 4,015,063 | 1,558,343 |
| Bank and credit card fees | 2,095,359 | 454,569 | 2,628,101 | 699,309 |
| Depreciation and amortization | 175,143 | 91,790 | 297,475 | 183,631 |
| Acquisition expenses | 357,411 | - | 802,899 | - |

| | | | | |
|---|---|---|---|---|
| Loss on abandonment of right of use asset | 1,437,042 | - | 1,437,042 | - |
| General and administrative | 2,500,381 | 1,509,417 | 4,294,390 | 2,949,257 |
| Total Operating Expenses | 14,318,319 | 3,987,872 | 20,227,462 | 7,742,213 |
| LOSS FROM OPERATIONS | (1,262,830) | (1,387,999) | (4,543,516) | (3,576,332) |
| Other Income (Expense) | | | | |
| Interest income | 12,283 | 1,062 | 22,379 | 1,062 |
| Financing costs | (74,738) | (74,504) | (80,003) | (269,186) |
| Interest expense | (943,392) | (296,708) | (1,170,957) | (557,996) |
| Loss on extinguishment of debt | (1,747,901) | (948,856) | (1,747,901) | (948,856) |
| Write-off of acquisition receivable | - | (809,000) | - | (809,000) |
| Change in fair value of warrant liability | - | (2,127,656) | - | (2,127,656) |
| Other income (expense) | 794 | 2,880 | 10,999 | 5,263 |
| Total Other Income (Expense) | (2,752,954) | (4,252,782) | (2,965,483) | (4,706,369) |
| NET LOSS BEFORE INCOME TAXES | (4,015,784) | (5,640,781) | (7,508,999) | (8,282,701) |
| INCOME TAX (EXPENSE) BENEFIT | 8,048,478 | 688,953 | 8,048,478 | 1,123,953 |
| NET INCOME (LOSS) | $ 4,032,694 | $ (4,951,828) | $ 539,479 | $ (7,158,748) |
| NET INCOME (LOSS) PER COMMON SHARE | $ 0.11 | $ (0.99) | $ 0.03 | $ (1.43) |
| DILUTED NET INCOME (LOSS) PER COMMON SHARE | $ 0.09 | $ (0.99) | $ 0.02 | $ (1.43) |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING - | | | | |
| BASIC | 36,540,827 | 5,000,000 | 21,410,073 | 5,000,000 |
| DILUTED | 46,448,892 | 5,000,000 | 26,364,106 | 5,000,000 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

3

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(UNAUDITED)**

**For the Three and Six Months Ended June 30, 2021**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Deficit | (Deficit) |
| Balance, January 1, 2021 | 6,111,200 | $ 611 | $ 13,409,328 | $ (26,725,708) | $ (13,315,769) |
| Stock-based compensation expense | - | - | 124,575 | - | 124,575 |
| Issuance of warrants in connection with notes payable | - | - | 1,340,438 | - | 1,340,438 |
| Net loss | - | - | - | (3,493,215) | (3,493,215) |
| Balance, March 31, 2021 | 6,111,200 | $ 611 | $ 14,874,341 | $ (30,218,923) | $ (15,343,971) |
| Issuance of common stock in connection with acquisition | 5,895,973 | 590 | 12,263,034 | - | 12,263,624 |
| Issuance of common stock in connection with public offering | 93,111,111 | 9,311 | 194,588,189 | - | 194,597,500 |
| Issuance of stock grants | 216,800 | 22 | 554,978 | - | 555,000 |
| Exercise of warrants | 1,039,148 | 104 | 2,337,979 | - | 2,338,083 |
| Stock-based compensation expense | - | - | 124,575 | - | 124,575 |
| Net income | - | - | - | 4,032,694 | 4,032,694 |
| Balance, June 30, 2021 | 106,374,232 | $ 10,638 | $ 224,743,096 | $ (26,186,229) | $ 198,567,505 |

**For the Three and Six Months Ended June 30, 2020**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Deficit | Deficit |
| Balance, January 1, 2020 | 4,750,000 | $ 475 | $ 1,079,179 | $ (5,157,871) | $ (4,078,217) |
| Net loss | - | - | - | (2,206,920) | (2,206,920) |
| Balance, March 31, 2020 | 4,750,000 | $ 475 | $ 1,079,179 | $ (7,364,791) | $ (6,285,137) |
| Issuance of 1847 Holdings warrants in connection with notes payable | - | - | 566,711 | - | 566,711 |
| Forgiveness of related party debt | - | - | 137,500 | - | 137,500 |
| Issuance of 1847 Holdings shares in connection with exercise of warrant | - | - | 275,000 | - | 275,000 |
| Net loss | - | - | - | (4,951,828) | (4,951,828) |
| Balance, June 30, 2020 | 4,750,000 | $ 475 | $ 2,058,390 | $ (12,316,619) | $ (10,257,754) |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

4

**1847 GOEDEKER INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

Six Months Ended June 30,

|  | 2021 | 2020 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income (loss) | $ 539,479 | $ (7,158,748) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 297,475 | 183,631 |
| Amortization of debt discount | 666,927 | 318,599 |
| Stock-based compensation expense | 804,150 | - |
| Loss on extinguishment of debt | 1,747,901 | 948,856 |
| Loss on abandonment of right of use asset | 1,437,042 | - |
| Write-off of acquisition receivable | - | 809,000 |
| Change in fair value of warrant liability | - | 2,127,656 |
| Deferred tax asset | (8,049,978) | (1,123,953) |
| Non-cash lease expense | 340,687 | 207,883 |
| Changes in operating assets and liabilities: | | |
| Receivables | 475,812 | (214,726) |
| Vendor deposits | (207,561) | (50,543) |
| Merchandise inventory | 2,313,999 | (344,635) |
| Prepaid expenses and other assets | (1,037,508) | (1,914,049) |
| Accounts payable and accrued expenses | (4,358,830) | 2,003,642 |
| Customer deposits | (1,740,825) | 8,267,312 |
| Operating lease liabilities | (214,072) | (207,883) |
| Net cash provided by (used in) provided by operating activities | (6,985,302) | 3,852,042 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of property and equipment | (509,428) | (7,000) |
| Cash paid to Sellers in acquisition, net of cash acquired | (197,623,238) | - |
| Net cash used in investing activities | (198,132,666) | (7,000) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from equity offering | 194,597,500 | - |
| Cash received from warrant exercise | 2,338,083 | - |
| Proceeds from term note payable | 55,216,594 | 642,500 |
| Repayment on notes payable | (3,321,536) | (181,674) |
| Payments on finance leases | (4,199) | - |
| Net payments on lines of credit | - | (814,492) |
| Net cash provided by (used in) financing activities | 248,826,442 | (353,566) |
| **NET CHANGE IN CASH AND RESTRICTED CASH** | 43,708,474 | 3,491,476 |
| CASH AND RESTRICTED CASH, BEGINNING OF PERIOD | 9,911,916 | 64,470 |
| CASH AND RESTRICTED CASH, END OF PERIOD | $ 53,620,390 | $ 3,555,946 |
| Cash, cash equivalents, and restricted cash consist of the following: | | |
| End of period | | |
| Cash and cash equivalents | $ 45,234,542 | $ 3,555,946 |
| Restricted cash | 8,385,848 | - |
|  | $ 53,620,390 | $ 3,555,946 |
| Cash, cash equivalents, and restricted cash consist of the following | | |
| Beginning of period | | |
| Cash and cash equivalents | $ 934,729 | $ 64,470 |
| Restricted cash | 8,977,187 | - |
|  | $ 9,911,916 | $ 64,470 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | |
| Cash paid for interest | $ 1,018,317 | $ 170,385 |
| Cash paid for taxes | $ 697,976 | $ - |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | |
| Right of use assets acquired | $ 11,108,055 | $ - |
| Right of use liabilities assumed | $ 11,108,055 | $ - |
| Debt discount on notes payable from OID | $ 910,000 | $ - |
| Debt discount, warrants on short-term note payable | $ 1,340,438 | $ - |
| Stock issued in the acquisition of Appliances Connection | $ 12,263,624 | $ - |
| Debt paid off through issuance of new note | $ 5,616,111 | $ - |
| Due to Seller (consideration) settled by vendor deposits | $ 5,000,000 | $ - |
| Conversion of debt through issuance of 1847 Holdings common shares | $ - | $ 275,000 |
| Exercise of warrant liability through issuance of 1847 Holdings non-controlling interest | $ - | $ 118,500 |
| Derecognition of related party debt | $ - | $ 137,500 |
| Adjustment to fair value of goodwill based on final purchase price allocation | $ - | $ 121,736 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements*

5

**1847 GOEDEKER INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 1-ORGANIZATION AND NATURE OF BUSINESS**

1847 Goedeker Inc. (the "Company") was formed under the laws of the State of Delaware on January 10, 2019 for the sole purpose of acquiring the business of Goedeker Television Co. Prior to the acquisition, the Company did not have any operations other than operations relating to its incorporation and organization.

On April 5, 2019, the Company acquired substantially all the assets and assumed substantially all the liabilities of Goedeker Television Co., a Missouri corporation ("Goedeker"). As a result of this transaction, the Company acquired the former business of Goedeker and continues to operate this business.

On October 20, 2020, the Company formed Appliances Connection Inc. ("ACI") as a wholly owned subsidiary in the State of Delaware.

On June 2, 2021, ACI acquired all of the issued and outstanding capital stock or other equity securities of 1 Stop Electronics Center, Inc., a New York corporation ("1 Stop"), Gold Coast Appliances, Inc., a New York corporation ("Gold Coast"), Superior Deals Inc., a New York corporation ("Superior Deals"), Joe's Appliances LLC, a New York limited liability company ("Joe's Appliances") and YF Logistics LLC, a New Jersey limited liability company ("YF Logistics," and collectively with 1 Stop, Gold Coast, Superior Deals, and Joe's Appliances, "Appliances Connection"). See Note 9.

The Company operates a technology-driven e-commerce platform for appliances, furniture, home goods and related products. Since its founding in 1951, the Company has evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering the largest online selection of household appliances across all major appliance brands with competitive pricing.

**NOTE 2-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation*

The unaudited condensed consolidated financial statements of the Company and its consolidated subsidiaries have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and with the instructions to Article 8 of Regulation S-X.

In the opinion of management, all adjustments considered necessary for a fair presentation have been included. Operating results for the six months ended June 30, 2021 are not necessarily indicative of the results that may be expected for the year ending December 31, 2021.

These unaudited interim consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Company's annual report on Form 10-K for the year ended December 31, 2020.

*Principles of Consolidation*

The unaudited condensed consolidated financial statements include the accounts of the Company and its consolidated subsidiaries, ACI, 1 Stop, Gold Coast, Superior Deals, Joe's Appliances and YF Logistics. All significant intercompany balances and transactions have been eliminated in consolidation. The Company does not have a majority or minority interest in any other company, either consolidated or unconsolidated.

*Stock Split*

On July 30, 2020, the Company completed a 4,750-for-1 forward stock split of its outstanding common stock. As a result of this stock split, the Company's issued and outstanding common stock increased from 1,000 to 4,750,000 shares. Accordingly, all share and per share information has been restated to retroactively show the effect of this stock split.

6

---

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

*Use of Estimates*

The preparation of these unaudited condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the unaudited condensed consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Cash and equivalents include: (1) currency on hand, (2) demand deposits with banks or financial institutions, (3) other kinds of accounts that have the general characteristics of demand deposits, and (4) short-term, highly liquid investments that are both readily convertible to known amounts of cash and so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. The majority of payments due from financial institutions for the settlement of credit card and debit card transactions process within two business days and are, therefore, classified as cash and cash equivalents. Other payment methods that take more time to settle are classified as receivables.

At June 30, 2021,  restricted cash includes approximately $300,000 to secure vendor letters of credit and $8,085,848 withheld by credit card processors as security for the Company's customer refund claims and credit card chargebacks. Cash pledged to secure the letter of credit will be released when the vendor offers the Company credit terms, and the cash held by credit card processors will be released at the discretion of the credit card companies.

*Revenue Recognition and Cost of Revenue*

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

7

---

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

The Company's performance obligation is to deliver the customer's order. Each customer order generally contains only one performance obligation based on the merchandise sale to be delivered, at which time revenue is recognized.

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, the Company's products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times

depending on the method of delivery. The Company delivers products to its customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from the Company's warehouse to the customer (a "Company Shipment"). The second way is through a shipment of the products through a third-party carrier from a warehouse other than the Company's warehouse to the customer (a "Drop Shipment") and the third way is where the Company itself delivers the products to the customer and often also installs the product (a "Local Delivery"). In the case of a Local Delivery, the Company loads the product on to its own truck and delivers and installs the product at the customer's location. When a product is delivered through a Local Delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a Company Shipment and a Drop Shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from the Company's warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves the Company's warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, the Company has satisfied its performance obligation and the Company recognizes revenue.

The Company agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In the Company's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all the Company's sales are to individual retail consumers (homeowners), builders and designers.

Shipping and Handling – The Company bills its customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue – The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Appliance sales | $ 56,202,115 | $ 11,533,006 | $ 66,387,297 | $ 19,335,110 |
| Furniture sales | 6,172,784 | 2,768,327 | 8,487,474 | 4,050,163 |
| Other sales | 1,697,199 | 983,698 | 2,894,695 | 1,576,936 |
| Total | $ 64,072,098 | $ 15,285,031 | $ 77,769,466 | $ 24,962,209 |

The Company also sells extended warranty contracts. The Company is an agent for the warranty company and earns a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the accompanying consolidated statement of operations. The Company assumes no liability for repairs to products on which it has sold a warranty contract.

8

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

*Receivables*

Receivables consists of customer's balance payments for which the Company extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom the Company purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

The Company historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. The Company had no significant concentrations of receivables balances as of June 30, 2021

*Merchandise Inventory*

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on its estimate of market conditions.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements. Depreciation is computed using the straight-line method over estimated useful lives as follows:

| Category | Useful Life (Years) |
|---|---|
| Furniture and fixtures | 7 |
| Machinery and equipment | 5-7 |
| Office equipment | 5-7 |
| Transportation equipment | 5 |

*Goodwill*

The Company tests its goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in the Company's expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and the Company's consolidated financial results.

The Company tests goodwill by estimating fair value using a Discounted Cash Flow ("DCF") model. The key assumptions used in the DCF model

to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during three and six months ended June 30, 2021 and 2020.

*Intangible Assets*

As of June 30, 2021 and December 31, 2020, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

9

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. Impairments for the three and six months ended June 30, 2021 were $1,437,042 due to an abandonment of certain right of use assets. There were no impairments for the six months ended June 30, 2020.

*Long-Lived Assets*

The Company reviews its property and equipment and any identifiable intangibles (including right of use assets) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell. Impairments for the three and six months ended June 30, 2021 were $1,437,042 due to an abandonment of certain right of use assets and the respective leasehold improvements. There were no impairments for the six months ended June 30, 2020.

*Lease Liabilities*

Lease liabilities and their corresponding right of use assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the right of use asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the right of use asset may not be recoverable. When such events occur, the Company compares the carrying amount of the right of use asset to the undiscounted expected future cash flows related to the right of use asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the right of use asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the right of use asset.

10

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value, due to their short-term nature. The fair value hierarchy is defined in the following three categories:

   Level 1: Quoted market prices in active markets for identical assets or liabilities.
   Level 2: Observable market-based inputs or inputs that are corroborated by market data.
   Level 3: Unobservable inputs that are not corroborated by market data.

*Customer Deposits*

Customer deposits represent the amount collected from customers when an order is placed. The deposits are transferred to revenue when the order ships to the customer or returned to the customer if the order is subsequently cancelled.

*Income Taxes*

Under the Company's accounting policies, the Company initially recognizes a tax position in its unaudited condensed consolidated financial statements when it becomes more likely than not that the position will be sustained upon examination by the tax authorities. Such tax positions are initially and subsequently measured as the largest amount of tax positions that has a greater than 50% likelihood of being realized upon ultimate settlement with the tax authorities assuming full knowledge of the position and all relevant facts. Although the Company believes its provisions for

unrecognized tax positions are reasonable, the Company can make no assurance that the final tax outcome of these matters will not be different from that which the Company has reflected in its income tax provisions and accruals. The tax law is subject to varied interpretations, and the Company has taken positions related to certain matters where the law is subject to interpretation. Such differences could have a material impact on the Company's income tax provisions and operating results in the period(s) in which the Company makes such determination.

In the second quarter of 2021, the Company acquired Appliances Connection. Appliances Connection has a history of profitable operations. As such, the Company determined that it was more likely than not that it would have profitable operations in the future and therefore be able to realize the deferred tax assets and accordingly reversed the allowance for deferred tax assets at June 30, 2021.

### Sales Tax Liability

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At June 30, 2021 and December 31, 2020, the amount of such accrual was $17,947,165 and $5,804,100. The amount of sales tax liability acquired in the Appliances Connection transaction was $10,975,324 plus accrued interest of $1,042,991, which are included in accounts payable and accrued expenses.

As of June 30, 2021, only one state has notified the Company of a potential sales tax liability of approximately $82,000, all of which was previously accrued.

11

## 1847 GOEDEKER INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
### JUNE 30, 2021 AND 2020
### (UNAUDITED)

### Income (Loss) Per Share

Basic income (loss) per share is calculated by dividing the net loss applicable to common shareholders by the weighted average number of common shares during the period. Diluted earnings per share is calculated by dividing the net income available to common shareholders by the diluted weighted average number of shares outstanding during the year. The diluted weighted average number of shares outstanding is the basic weighted number of shares adjusted for any potentially dilutive securities. For the three and six months ended June 30, 2021, the potentially dilutive securities were warrants for the purchase of 455,560 shares of common stock and options for the purchase of 555,000 shares of common stock. The potentially dilutive securities for the three and six months ended June 30, 2020 were warrants for the purchase of 250,000 shares of common stock. These potentially dilutive securities were excluded from diluted loss per share.

### Reclassifications

Certain accounts have been reclassified to conform with classifications adopted in the period ended June 30, 2021. Such reclassifications had no effect on net earnings or financial position.

### Impact of COVID-19

In December 2019, a novel strain of coronavirus ("COVID-19") emerged in China. On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. The extent of the COVID-19 pandemic's continued effect on the Company's operational and financial performance and those of third parties on which the Company relies will depend on future developments, including the effectiveness of vaccines and other treatments for COVID-19, and other new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change. The Company does not yet know the full extent of potential impacts on its business and financing. However, these effects could have a material impact on the Company's liquidity, capital resources, operations and business and those of the third parties on which the Company relies.

### Going Concern Assessment

Management assesses going concern uncertainty in the Company's unaudited condensed consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the unaudited condensed consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

For the six months ended June 30, 2021, the Company incurred operating losses of approximately $4,543,516 and negative cash flow from operations of $6,985,302, but had working capital of $15,530,879. Additionally, the Company had over $45 million of unrestricted cash at June 30, 2021. On June 2, 2021, the Company closed on the acquisition of Appliances Connection. Appliances Connection has historically been profitable, however, only 29 days of their operations are included in results for the three and six months of 2021.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these unaudited condensed consolidated financial statements. Additionally, only one month of operations for Appliances Connection, which has operated profitably, are included in the results of operations for the six months ended June 30, 2021.

The impact of COVID-19 on the Company's business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying unaudited condensed consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business.

Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these unaudited condensed consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern.

12

## 1847 GOEDEKER INC.
### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

***Recent Accounting Pronouncements***

*Recently Adopted*

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. The Company adopted ASU 2018-13 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's unaudited condensed consolidated financial statements.

*Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to the Company's unaudited condensed consolidated financial statements.

**NOTE 3-RECEIVABLES**

At June 30, 2021 and December 31, 2020, receivables consisted of the following:

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| Trade receivables from customers | $ 11,858,185 | $ - |
| Vendor rebates receivable | 5,486,634 | 1,337,791 |
| Credit cards in process of collection | 189,207 | 660,441 |
| Other receivables | 3,732,761 | - |
| Total receivables | $ 21,266,787 | $ 1,998,232 |

13

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 4-MERCHANDISE INVENTORY**

At June 30, 2021 and December 31, 2020, the inventory balances are composed of:

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| Appliances | $ 19,974,548 | $ 5,285,975 |
| Furniture | 486,207 | 194,852 |
| Other | 1,098,268 | 91,414 |
| Total merchandise inventory | 21,559,023 | 5,572,241 |
| Allowance for inventory obsolescence | (425,000) | (425,000) |
| Merchandise inventory, net | $ 21,134,023 | $ 5,147,241 |

**NOTE 5-VENDOR DEPOSITS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income.

Prior to obtaining an open line of credit with a major vendor, the Company paid in advance for its purchases. The vendor did not ship product to the Company until an order was complete. As a result, the vendor held Company funds. A second vendor uses the Company's vendor deposit account as collateral. Orders from this vendor exceeded the deposit account and the Company prepaid for some orders. Vendor deposits as of June 30, 2021 and December 31, 2020 were $10,755,209 and $547,648, respectively.

**NOTE 6-PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at June 30, 2021 and December 31, 2020:

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| Equipment | $ 69,336 | $ 69,336 |
| Warehouse equipment | 374,448 | 61,070 |
| Furniture and fixtures | 8,434 | 512 |
| Transportation equipment | 1,417,047 | 63,784 |
| Leasehold improvements | 216,405 | 136,931 |
| Construction in progress | 509,428 | - |
| Total property and equipment | 2,595,098 | 331,633 |
| Accumulated depreciation | (115,043) | (85,685) |
| Property and equipment, net | $ 2,480,055 | $ 245,948 |

Depreciation expense for the six months ended June 30, 2021 and 2020 was $85,777 and $21,864, respectively.

All property and equipment are pledged to secure the Loans described below (See Note 10).

On June 30, 2021, the Company closed its old warehouse and retail showroom in anticipation of relocating to a new facility. Accordingly, the Company wrote the remaining right of use asset and related leasehold improvements as of that date.

14

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 7-INTANGIBLE ASSETS AND GOODWILL**

The following provides a breakdown of identifiable intangible assets as of June 30, 2021 and December 31, 2020:

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| Customer relationships | $ 749,000 | $ 749,000 |
| Marketing related - tradename | 1,368,000 | 1,368,000 |
| Total intangible assets | 2,117,000 | 2,117,000 |
| Accumulated amortization | (946,761) | (735,063) |
| Intangible assets, net | $ 1,170,239 | $ 1,381,937 |

In connection with the acquisition of Goedeker, the Company identified intangible assets of $2,117,000, representing trade names and customer relationships. These assets are being amortized on a straight-line basis over their weighted average estimated useful life of 2.75 years. Amortization expense for the three months ended June 30, 2021 and 2020 was $10,849 and $80,883, respectively. For the six months ended June 30, 2021 and 2020 amortization expense was $211,698 and $161,766, respectively.

As of June 30, 2021, the estimated annual amortization expense for each of the next five years is as follows:

| | |
|---|---|
| 2021 (remainder of year) | $ 211,698 |
| 2022 | 423,396 |
| 2023 | 423,396 |
| 2024 | 111,749 |
| Total | $ 1,170,239 |

Following is a summary of goodwill:

| | |
|---|---|
| Balance December 31, 2020 | $ 4,725,689 |
| Preliminary goodwill from acquisition of Appliances Connection | 217,382,100 |
| Balance June 30, 2021 | $ 222,107,789 |

**NOTE 8-ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

The following is schedule of accounts payable and accrued expenses at June 30, 2021 and December 31, 2020:

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| Trade accounts payable | $ 23,939,457 | $ 5,975,486 |
| Sales tax | 17,947,165 | 5,804,100 |
| Accrued payroll liabilities | 786,407 | 492,573 |
| Accrued interest | 199,340 | 10,000 |
| Accrued liability for sales returns | 200,000 | 200,000 |
| Other accrued liabilities | 8,825,297 | 219,556 |
| Total accounts payable and accrued expenses | $ 51,897,666 | $ 12,701,715 |

15

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 9-BUSINESS COMBINATION**

On October 20, 2020, the Company entered into a securities purchase agreement, which was amended on December 8, 2020 and April 6, 2021 (as amended, the "Purchase Agreement"), with ACI, Appliances Connection and the sellers set forth on Exhibit A thereto (the "Sellers"), pursuant to which ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection from the Sellers (the "Acquisition"). The Acquisition was completed on June 2, 2021.

The aggregate purchase price is $222,000,000 (subject to adjustment), consisting of (i) $180,000,000 in cash (subject to adjustment), (ii) 2,333,333 shares of the Company's common stock having a stated value that is equal to $21,000,000 and (iii) 3,562,640 shares of the Company's common stock, which is equal to (A) $21,000,000 divided by (B) the average of the closing price of the Company's common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the Acquisition.

The purchase price was subject to a closing net working capital adjustment provision. Under this provision, the Sellers delivered to ACI a statement setting forth their good faith estimate of the net working capital of Appliances Connection (which excludes accruals for sales tax liabilities). If such estimated net working capital exceeded a target net working capital of ($15,476,941), then ACI was required to make a cash payment to the Sellers that is equal to such excess. If such target net working capital exceeded such estimated net working capital, then the Sellers were required make a cash payment to ACI that is equal to such excess.

Upon execution of the Purchase Agreement, ACI paid a deposit in the amount of $100,000, and upon execution of the first amendment to Purchase Agreement, ACI paid an additional deposit in the amount of $75,000, all of which was credited towards the cash portion of the purchase price at closing.

As a result of these adjustments, the cash portion of the purchase price paid was $212,597,483. The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the Acquisition, ACI shall deliver to the Sellers a statement setting forth its calculation of the net working capital (as defined in the Purchase Agreement). If such net working capital exceeds the

estimated net working capital described above, then within five (5) days after the final determination of such net working capital ACI shall send payment by wire transfer of immediately available funds to the Sellers in an amount equal to such excess. If the estimated net working capital exceeds such net working capital, then within five (5) days the Sellers shall pay to ACI in cash an amount equal to such excess.

The Company accounted for the Acquisition using the acquisition method of accounting in accordance with FASB ASC Topic 805 "Business Combinations". In accordance with ASC 805, we used our best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date.

The fair value of the purchase consideration issued to Appliances Connection was allocated to the net tangible assets acquired. The Company accounted for the Acquisition as the purchase of a business under GAAP under the acquisition method of accounting, and the assets and liabilities acquired were recorded as of the acquisition date, at their respective fair values and consolidated with those of the Company. The preliminary fair value of the net assets to be acquired is $7,479,007. The excess of the aggregate estimated fair value of the net tangible assets, $217,382,100, has been allocated to provisional goodwill.

The table below represents the estimated preliminary purchase price allocation to the net assets acquired, as well as the associated estimated useful lives of the acquired intangible assets.

16

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

| Provisional purchase consideration at preliminary fair value: | |
|---|---:|
| Cash consideration | $ 180,000,000 |
| Share issuance | 12,263,624 |
| Working capital adjustment paid to sellers | 24,060,458 |
| Working capital adjustment payable to sellers | 8,537,025 |
| Amount of consideration | $ 224,861,107 |
| | |
| Assets acquired and liabilities assumed at preliminary fair value | |
| Cash | $ 6,437,220 |
| Accounts receivable | 19,744,368 |
| Inventories | 18,300,781 |
| Vendor deposits | 15,000,000 |
| Other assets | 2,194,384 |
| Property and equipment | 1,890,968 |
| Right of use operating lease assets | 1,833,899 |
| Accounts payable and accrued expenses | (43,673,578) |
| Customer deposits | (10,673,600) |
| Finance lease obligation | (215,008) |
| Operating lease liability | (1,833,899) |
| Current portion of notes payable | (458,913) |
| Long term portion of notes payable | (1,067,615) |
| Net tangible assets acquired | $ 7,479,007 |
| | |
| Total net assets acquired | $ 7,479,007 |
| Consideration paid | 224,861,107 |
| Preliminary goodwill | $ 217,382,100 |

*Pro forma*

The following unaudited proforma results of operations are presented for information purposes only. The unaudited proforma results of operations are not intended to present actual results that would have been attained had the Acquisition been completed as of January 1, 2020, or to project potential operating results as of any future date or for any future periods. Appliances Connection's revenue and net income for the three and six months ended June 30, 2021 included in the consolidated statement of operations amounted to approximately $47,780,835 and $4,872,936, respectively.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---:|---:|---:|---:|
| | **2021** | **2020** | **2021** | **2020** |
| Product sales, net | $ 140,128,696 | $ 91,490,100 | $ 263,086,153 | $ 158,241,719 |
| Net income | $ 17,288,674 | $ 799,593 | $ 32,898,194 | $ 3,443,584 |
| Basic earnings per share | $ 0.16 | $ 0.01 | $ 0.31 | $ 0.03 |
| Diluted earnings per share (a) | $ 0.16 | $ 0.01 | $ 0.31 | $ 0.03 |
| Basic number of shares | 105,335,084 | 105,335,084 | 105,335,084 | 105,335,084 |
| Diluted number of shares | 105,335,084 | 105,335,084 | 105,335,084 | 105,335,084 |

(a) Assumes shares outstanding at offering were outstanding for all periods and that warrant price is equal to the offering price resulting in no diluted shares.

The Company believes that as a result of the Appliances Connection acquisition, it acquired identified intangible assets which will reduce goodwill. The nature and amount of intangible assets acquired will be determined by a valuation report, but the amount of any intangible assets will create an additional deferred tax liability increasing the amount of goodwill as there is no tax basis in goodwill or intangible assets.

17

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

**NOTE 10-NOTES PAYABLE**

*Credit Facilities*

On June 2, 2021, the Company and ACI, as borrowers, entered into a credit and guaranty agreement (the "Credit Agreement") with Appliances Connection and certain other subsidiaries of the Company party thereto from time to time as guarantors (the "Guarantors"), the financial institutions party thereto from time to time ("Lenders"), and Manufacturers and Traders Trust Company, as sole lead arranger, sole book runner, administrative agent and collateral agent ("M&T), pursuant to which the Lenders have agreed to make available to the Company and ACI senior secured credit facilities in the aggregate initial amount of $70,000,000, including (i) a $60,000,000 term loan (the "Term Loan") and (ii) a $10,000,000 revolving credit facility (the "Revolving Loan"), which revolving credit facility includes a $2,000,000 swingline subfacility (the "Swing Line Loan" and together with the Term Loan and the Revolving Loan, the "Loans") and a $2,000,000 letter of credit subfacility, in each case, on the terms and conditions contained in the Credit Agreement. On June 2, 2021, the Company borrowed the entire amount of the Term Loan and issued term loan notes to the Lenders in the aggregate principal amount of $60,000,000. As of June 30, 2021, the Company has not made any loans under the Revolving Loan. As of June 30, 2021, the outstanding balance of the Term Loan is $56,311,521, comprised of principal of $60,000,000, net of unamortized loan costs of $3,688,479. Loan costs before amortization include $3,500,000 of lender and placement agent fees and $250,995 of legal other fees. The Company classified $6,000,000 as a current liability and the balance as a long-term liability.

Each of the Loans matures on June 2, 2026. The Loans will bear interest on the unpaid principal amount thereof as follows: (i) if it is a Loan bearing interest at a rate determined by the Base Rate (as defined in the Credit Agreement), then at the Base Rate plus the Applicable Margin (as defined in the Credit Agreement) for such Loan; (ii) if it is a Loan bearing interest at a rate determined by the LIBOR Rate (as defined in the Credit Agreement), then at the LIBOR Rate plus the Applicable Margin for such Loan; and (iii) if it is a Swing Line Loan, then at the rate applicable to Loans bearing interest at a rate determined by the Base Rate. The Term Loan initially bears interest at the LIBOR Rate plus Applicable Margin (3.9%), with an initial interest period of six months. The Company may elect to continue or convert the existing interest rate benchmark for the Term Loan from LIBOR Rate to Base Rate, and may elect the interest rate benchmark for future Revolving Loans as either LIBOR Rate or Base Rate (and, with respect to any Loan made at the LIBOR Rate, may also select the interest period applicable to any such Loan), by notifying M&T and Lenders from time to time in accordance with the provisions of the Credit Agreement. Notwithstanding the foregoing, following an event of default, the Loans will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable Loan.

The Company must repay the principal amount of the Term Loan in quarterly installments of $1,500,000 each, payable on the last business day of each March, June, September and December, commencing on September 30, 2021. The remaining unpaid principal amount of the Term Loan must be repaid on the maturity date, unless payment is sooner required by the Credit Agreement. Mandatory repayments of amounts borrowed under the Revolving Loan facility are required only if the amount borrowed at any time exceeds the commitment amount. Amounts borrowed under Revolving Loans may be repaid and reborrowed at any time until the maturity date.

The Company may voluntarily prepay the Loans from time to time in accordance with the provisions of the Credit Agreement, and will be required to prepay the Loans under certain limited circumstances as set forth in the Credit Agreement, including upon receipt of cash proceeds in connection with certain specified asset sales, receipt of insurance or condemnation proceeds or other cash proceeds received other than in the ordinary course of business or upon receipt of cash proceeds from the incurrence of indebtedness that is not permitted under the Credit Agreement, all as more specifically set forth in the Credit Agreement.

Under the Credit Agreement, the Company is required to pay certain fees to M&T, including a commitment fee of up to 0.5% per annum with respect to the unused portion of the Lenders' revolving loan commitments, determined as set forth in the Credit Agreement, and certain fees in connection with the issuance of any letters of credit under the Credit Agreement.

The Credit Agreement contains customary representations, warranties, affirmative and negative financial and other covenants, including leverage ratio and fixed charge coverage ratios, and events of default for loans of this type. The Loans are guaranteed by the Guarantors and are secured by a first priority security interest in substantially all of the assets of the Company, ACI and the Guarantors.

18

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

Maturities of the Term Loan are as follows:

| For the years ended December 31, | Amount |
|---|---|
| 2021 (remainder of year) | $ 3,000,000 |
| 2022 | 6,000,000 |
| 2023 | 6,000,000 |
| 2024 | 6,000,000 |
| 2025 | 6,000,000 |
| Thereafter | 33,000,000 |
| Total | 60,000,000 |
| Less: Loan costs | (3,688,479) |
| Total | $ 56,311,521 |
| Amount classified as a current liability | $ 6,000,000 |
| Amount classified as long-term liability | $ 50,311,521 |

*Northpoint Loan*

On June 3, 2021, the Company entered into a loan and security agreement with Northpoint Commercial Finance LLC ("Northpoint"), pursuant to which Northpoint may from time to time advance funds for the acquisition, financing and/or refinancing by the Company of inventory purchased from Samsung Electronics America, Inc. and/or affiliates and for such other purposes as are acceptable Northpoint. The loan and security agreement provides that Northpoint may establish a credit limit and may adjust such credit limit from time to time; provided that such credit limit does not constitute a commitment or committed line of credit Northpoint. As of June 30, 2021, such credit limit is $1,000,000 and the Company has not borrowed any funds.

The applicable per annum interest rates for a loan, including any default rates, will be determined at the time of the loan. The loan and security agreement contains customary events of default and is secured by a security interest in all of the Company's inventory (i) that is manufactured, distributed, or sold by Samsung Electronics America, Inc. and/or its affiliates and/or (ii) that bears any trade names, trademarks, or logos of Samsung Electronics America, Inc. and/or its affiliates; all returns, repossessions, exchanges, substitutions, replacements, attachments, parts, accessories and accessions of any of the foregoing; all price protection payments, discounts, rebates, credits, factory holdbacks and incentive

payments related to any of the foregoing; supporting obligations to any of the foregoing; and products and proceeds in whatever form of any of the foregoing.

*Arvest Loan*

On August 25, 2020, the Company entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of December 31, 2020, the outstanding balance of this loan is $3,185,369 comprised of principal of $3,283,628, net of unamortized loan costs of $98,259. On May 10, 2021, the Company repaid this loan by transferring principal and accrued interest from the restricted cash account.

*10% OID Senior Promissory Notes*

On March 19, 2021, the Company entered into a securities purchase agreement with two institutional investors, pursuant to which the Company issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis, for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate, the relative fair value of which is $1,340,438 and was recorded as debt discount. After deducting a placement fee and other expenses, the Company received net proceeds of $4,590,000. The original issue discount and warrant expense were amortized as interest expense. On June 2, 2021, the Company repaid these notes in full from the proceeds of the Term Loan. At the time of repayment, the Company wrote off the balance of the debt discount, $1,653,048, as a loss on early extinguishment of debt.

19

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

*Vehicle Loans*

Appliances Connection has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.59% to 5.74%. As of June 30, 2021, the outstanding balance of these notes is $1,488,620.

Following is a summary of payments due for the succeeding five years:

| For the years ended December 31, | | Amount |
|---|---|---|
| 2021 (remainder of year) | $ | 246,761 |
| 2022 | | 396,848 |
| 2023 | | 363,842 |
| 2024 | | 311,979 |
| 2025 | | 169,190 |
| Thereafter | | - |
| Total | $ | 1,488,620 |
| Amount classified as a current liability | $ | 455,272 |
| Amount classified as a long-term liability | $ | 1,033,348 |

**NOTE 11-LEASES**

*Financing Leases*

Appliances connection has three finance leases for the acquisition of forklifts. At June 30, 2021, the total amount due on these leases was $210,809. The Following is a summary of payments due on financing leases for the succeeding five years:

| For the years ended December 31, | | Amount |
|---|---|---|
| 2021 (remainder of year) | $ | 36,528 |
| 2022 | | 66,284 |
| 2023 | | 52,644 |
| 2024 | | 35,688 |
| 2025 and thereafter | | 48,960 |
| Total payments | | 240,104 |
| Less: amount representing interest | | (29,295) |
| Present value of minimum lease payments | $ | 210,809 |

*Operating Leases*

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C for its prior principal office in Ballwin, Missouri. The lease is for a term five (5) years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. The lease contains customary events of default.

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC, which was amended on March 31, 2021, for its new principal office and showroom in St. Charles, Missouri. The lease terminates on April 30, 2027, with two (2) options to renew for additional five (5) year periods. The base rent is $20,977 per month until September 30, 2021, and increases to $31,465 per month until April 30, 2022, after which time the base rent increases at approximately 2.5% per year thereafter. The Company must also pay its 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. The lease contains customary events of default. In connection with the new lease, the Company recorded a right of use asset and liability of $1,954,022 representing the initial present value of future lease payments.

20

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

On June 2, 2021, 1 Stop entered into a new lease agreement with 1870 Bath Ave. LLC, a related party, for the premises located at 1870 Bath Avenue, Brooklyn, NY. The lease is for a term of ten (10) years and provides for a base rent of $74,263 per month during the first year with annual increases to $96,896 during the last year of the term. 1 Stop is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018. The

initial right of use asset and liability associated with this lease is $8,430,959.

On June 2, 2021, Joe's Appliances entered into a new lease agreement with 812 5th Ave Realty LLC, a related party, for the premises located at 7812 5th Avenue, Brooklyn, NY. The lease is for a term of ten (10) years and provides for a base rent of $6,365 per month during the first year with annual increases to $8,305 during the last year of the term. Joe's Appliances is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default. This lease replaces the prior lease entered into between the parties on September 1, 2018. The initial right of use asset and liability associated with this lease is $723,074.

On May 31, 2019, YF Logistics entered into a sublease agreement with Dynamic Marketing, Inc. ("DMI") for its warehouse space in Hamilton, NJ. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty (30) days' prior written notice or (ii) April 30, 2024. The sublease provides for a base rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month. The initial right of use asset and liability associated with this lease is $3,007,661.

During the three and six months ended June 20, 2021, the Company accrued rent expense of $62,386 and $721,959, respectively. During the three and six months ended June 30, 2020, rent expense was $461,401 and $671,135, respectively.

Supplemental balance sheet information related to leases at June 30, 2021 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use assets | $ | 12,822,972 |
| Lease liabilities, current portion | $ | 2,157,010 |
| Lease liabilities, long-term | | 12,149,107 |
| Total operating lease liabilities | $ | 14,306,117 |
| Weighted average remaining lease term (months) | | 100 |
| Weighted average discount rate | | 4.2% |

Maturities of the lease liabilities for each of the next five years is as follows:

| | | |
|---|---|---|
| 2021 (remainder of year) | $ | 1,167,967 |
| 2022 | | 2,580,999 |
| 2023 | | 2,620,008 |
| 2024 | | 1,805,142 |
| 2025 | | 1,486,525 |
| Thereafter | | 7,065,391 |
| Total lease payments | $ | 16,726,032 |
| Less imputed interest | | (2,419,915) |
| Total lease liability | $ | 14,306,117 |

21

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

On June 30, 2021, the Company closed its old warehouse and retail showroom in anticipation of relocating to a new facility. Accordingly, the Company wrote-off the remaining right of use asset and related leasehold improvements as of that date.

**NOTE 12-SUPPLIER CONCENTRATION**

Significant customers and suppliers are those that account for greater than ten percent of the Company's revenues and purchases.

For the three and six months ended June 30, 2021, the Company purchased a substantial portion of finished goods from DMI, 55% and 60%, respectively.

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

**NOTE 13-RELATED PARTIES**

*Management Services Agreement*

On April 5, 2019, the Company entered into a management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and prior significant stockholder, which was amended effective on August 4, 2020. Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that under certain circumstances specified in the management services agreement, the quarterly fee may be reduced if similar fees payable to the Manager by subsidiaries of the Company's former parent company, 1847 Holdings LLC, exceed a threshold amount.

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of the Company in connection with performing services under the management services agreement. The Company did not pay any expenses for the three and six months ended June 30, 2021 and 2020.

The Company expensed management fees of $62,500 for the three months ended June 30, 2021 and 2020 and $125,000 for the six months ended June 30, 2021 and 2020.

*DMI*

The Company is a member of DMI, an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 5% interest in the cooperative. Additionally, Albert Fouerti, who is a member of the Company's board of directors, is the president of ACI and Appliances Connection, and a former significant stockholder of Appliances Connection prior to the Acquisition, is on the board of DMI. As such, DMI is deemed to be a related party.

At June 30, 2021, vendor rebate deposits due from DMI were $10,009,836. During the three and six months ended June 30, 2021, total purchases from DMI, net of holdbacks, were $26,999,225 and $27,970,121, respectively.

22

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

*Lease Agreements*

As described above, 1 Stop, Joe's Appliances and Gold Coast have entered into lease agreements with 1870 Bath Ave. LLC, 812 5th Ave Realty LLC and 54 Glen Cove Realty, LLC, respectively. Each of these entities is owned by Albert Fouerti and Elie Fouerti (the vice president of 1 Stop, Joe's Appliances and Gold Coast and former significant stockholder of each prior to the Acquisition). In addition, YF Logistics has entered into a sublease agreement with DMI. The total rent expense under these related party leases was $148,685 for the period June 2 to June 30, 2021.

**NOTE 14-STOCKHOLDERS' DEFICIT**

As of June 30, 2021, the Company was authorized to issue 200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. To date, the Company has not designated or issued any shares of preferred stock.

*Common Stock*

As of June 30, 2021 and December 31, 2020, the Company had 106,374,232 and 6,111,200 shares of common stock issued and outstanding, respectively. Each share entitles the holder thereof to one vote per share on all matters coming before the stockholders of the Company for a vote.

On May 27, 2021, the Company entered into an underwriting agreement with ThinkEquity, a division of Fordham Financial Management, Inc. (the "Underwriter"), relating to a public offering of units, each unit consisting of one share of common stock and a warrant to purchase one share of common stock. Under the underwriting agreement, the Company agreed to sell 91,111,111 units to the Underwriter, at a purchase price per unit of $2.0925 (the offering price to the public of $2.25 per unit minus the Underwriter's discount), and also agreed to grant to the Underwriter a 30-day option to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $2.0832 per share, and/or warrants to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $0.0093 per warrant, in any combination thereof, solely to cover over-allotments, if any. The Underwriter exercised its option to purchase 2,000,000 additional warrants on May 28, 2021 and exercised its option to purchase 2,000,000 additional shares on June 3, 2021. The shares of common stock and warrants contained in the units were immediately separable and were issued separately.

On June 2, 2021, the Company sold 91,111,111 shares of common stock and warrants to purchase 93,111,111 shares of common stock for total gross proceeds of $205,020,000. After deducting the underwriting commission and expenses, the Company received net proceeds of approximately $194,597,500. The Company used the proceeds of the offering to fund a portion of the purchase price for the Acquisition.

On June 7, 2021, the Company sold 2,000,000 shares of common stock to the Underwriter for total gross proceeds of $4,480,000. After deducting the underwriting commission and expenses, the Company received net proceeds of approximately $4,166,400.

During June 2021, 1,039,148 shares of common stock were issued as a result of the exercise of 1,039,148 warrants with proceeds of $2,338,083

On June 2, 2021, the Company issued 5,895,973 shares of common stock to the Sellers in connection with the Acquisition (See Note 9).

23

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

On June 3, 2021, the Company granted restricted stock awards under the Plan described below to certain directors and officers of the Company for an aggregate of 216,800 shares of common stock valued at $555,000, the value of the stock on the date of grant. All shares were immediately vested. The Company did not issue any shares of common stock during the three and six months ended June 20, 2020.

*Equity Incentive Plan*

Effective as of July 30, 2020, the Company established the 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "Plan") and reserved 555,000 shares of common stock for issuance under the Plan. The Plan was approved by the Company's board of directors and stockholders on April 21, 2020. On April 9, 2021, the board of directors approved an amendment to the Plan to increase the number of shares of common Stock reserved for issuance under the Plan from 555,000 to 1,000,000 shares. Such increase was approved by the Company's stockholders effective as of May 13, 2021.

The Plan is administered by compensation committee of the board of directors. The Plan permits the grant of restricted stock, stock options and other forms of incentive compensation to the Company's officers, employees, directors and consultants. As of June 30, 2021, a total of 228,200 shares of common stock remain available for issuance under the Plan.

During the third and fourth quarters of 2020, the Company issued options for the purchase of 555,000 shares of common stock with a total fair value of $1,848,056. The Company recorded stock option expense related to these options of $113,886 and $227,772 for the three and six months ended June 30, 2021, respectively. The remaining compensation expense of $1,199,998 will be recognized over the remaining vesting period of 37 months. The following table presents activity relating to stock options for the six months ended June 30, 2021:

| | Shares | | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|---|
| Outstanding at January 1, 2021 | 555,000 | $ | 9.00 | 9 |
| Granted | - | | - | - |
| Exercised | - | | - | - |
| Forfeited / Cancelled / Expired | - | | - | - |
| Outstanding at June 30, 2021 | 555,000 | $ | 9.00 | 8.50 |
| Exercisable at June 30, 2021 | 65,790 | $ | 9.00 | 8.50 |

As of June 30, 2021, vested outstanding stock options had no intrinsic value as the exercise price is greater than the estimated fair value of the underlying common stock.

The Company recognizes compensation expense for stock option awards on a straight-line basis over the applicable service period of the award. The service period is generally the vesting period.

*Warrants*

On August 4, 2020, the Company issued warrants for the purchase of 55,560 shares of common stock to affiliates of the representative in its initial public offering. These warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, an exercise price of $11.25 per share (subject to customary adjustments), and may also be exercised on a cashless basis if at any time during

the term of the warrants the issuance of common stock upon exercise of the warrants is not covered by an effective registration statement.

On March 19, 2021, the Company issued four-year warrants to purchase an aggregate of 400,000 shares of common stock to two investors. These warrants are exercisable at any time and from time to time, in whole or in part, at an exercise price of $12.00 per share (subject to customary adjustments), and may also be exercised on a cashless basis if at any time during the term of the warrants the issuance of common stock upon exercise of the warrants is not covered by an effective registration statement.

24

**1847 GOEDEKER INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**JUNE 30, 2021 AND 2020**
**(UNAUDITED)**

On June 2, 2021, the Company issued warrants to purchase 93,111,111 shares of common stock in the public offering. These warrants are exercisable immediately and expire five years from the date of issuance. The warrants have an exercise price of $2.25 per share, subject to appropriate adjustment in the event of certain stock dividends and distributions, stock splits, stock combinations, reclassifications or similar events affecting the Company's common stock or upon any distributions of assets, including cash, stock or other property to stockholders, and may also be exercised on a cashless basis if at any time during the term of the warrants the issuance of common stock upon exercise of the warrants is not covered by an effective registration statement.

All of the foregoing warrants contain an exercise limitation, pursuant to which a holder will not have the right to exercise any portion of the warrant if the holder (together with its affiliates) would beneficially own in excess of 4.99% of the number of shares of the Company's common stock outstanding immediately after giving effect to the exercise, which such percentage may be increased or decreased to any other percentage not in excess of 9.99% upon 61 days' notice to the Company.

The following table presents activity relating to the warrants for the six months ended June 30, 2021:

| | Shares | | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|---|
| Outstanding at January 1, 2021 | 55,560 | $ | 11.25 | 4.5 |
| Granted | 93,511,111 | | 2.25 | 5.0 |
| Exercised | (1,039,148) | | 2.25 | - |
| Cancelled / Expired | - | | - | - |
| Outstanding at June 30, 2021 | 92,527,523 | $ | 2.30 | 5.0 |

**NOTE 15-COMMITMENTS AND CONTINGENCIES**

On January 18, 2019, the Company entered into an asset purchase agreement with Goedeker, Steve Goedeker and Mike Goedeker, pursuant to which on April 5, 2019 the Company acquired substantially all of the assets of Goedeker used in its retail appliance and furniture business (the "Goedeker Business").

Pursuant to the asset purchase agreement, Goedeker entitled to receive an earn out payment of $200,000 if the EBITDA (as defined in the asset purchase agreement) of the Goedeker Business for the trailing twelve (12) month period from April 5, 2022 is $2,500,000 or greater, and may be entitled to receive a partial earn out payment if the EBITDA of the Goedeker Business is less than $2,500,000 but greater than $1,500,000. The Company expects to meet this target and adjusted the contingent note payable in the condensed consolidated balance sheet to the present value of the amount due.

**NOTE 16-SUBSEQUENT EVENTS**

In accordance with ASC 855-10, the Company has analyzed its operations subsequent to June 30, 2021 to the date these unaudited condensed consolidated financial statements were issued and has determined that it does not have any material subsequent events to disclose in these unaudited condensed consolidated financial statements, except as set forth below.

On July 28, 2021, the Company issued an option under the Plan for the purchase of 150,000 shares of common stock to the Company's new Chief Financial Officer, Maria Johnson. The option has an exercise price of $3.10 per share and vests with respect to 25% of the shares commencing on July 28, 2022 and on each of the first, second and third anniversaries thereof, respectively, subject to Ms. Johnson's continuous service to the Company on each applicable vesting date; provided that, in the event of a change in control (as defined in the Plan), the option will vest in full.

25

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*The following management's discussion and analysis of financial condition and results of operations provides information that management believes is relevant to an assessment and understanding of our plans and financial condition. The following financial information is derived from our condensed consolidated financial statements and should be read in conjunction with such condensed consolidated financial statements and notes thereto set forth elsewhere herein.*

**Use of Terms**

Except as otherwise indicated by the context and for the purposes of this report only, references in this report to "we," "us," "our" and the "Company" are to 1847 Goedeker Inc., a Delaware corporation, and its consolidated subsidiaries, Appliances Connection Inc., a Delaware corporation ("ACI"), 1 Stop Electronics Center, Inc., a New York corporation ("1 Stop"), Gold Coast Appliances, Inc., a New York corporation ("Gold Coast"), Superior Deals Inc., a New York corporation ("Superior Deals"), Joe's Appliances LLC, a New York limited liability company ("Joe's Appliances"), and YF Logistics LLC, a New Jersey limited liability company ("YF Logistics"). 1 Stop, Gold Coast, Superior Deals, Joe's Appliances and YF Logistics are sometimes referred to herein as "Appliances Connection."

**Special Note Regarding Forward Looking Statements**

This report contains forward-looking statements that are based on our management's beliefs and assumptions and on information currently available to us. All statements other than statements of historical facts are forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- the impact of the coronavirus pandemic on our operations and financial condition;
- our goals and strategies;
- our future business development, financial condition and results of operations;

- expected changes in our revenue, costs or expenditures;
- growth of and competition trends in our industry;
- our expectations regarding demand for, and market acceptance of, our products;
- our expectations regarding our relationships with investors, institutional funding partners and other parties we collaborate with;
- fluctuations in general economic and business conditions in the markets in which we operate; and
- relevant government policies and regulations relating to our industry.

In some cases, you can identify forward-looking statements by terms such as "may," "could," "will," "should," "would," "expect," "plan," "intend," "anticipate," "believe," "estimate," "predict," "potential," "project" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions. You should not place undue reliance on forward-looking statements because they involve known and unknown risks, uncertainties and other factors, which are, in some cases, beyond our control and which could materially affect results. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under Item 1A "Risk Factors" included in our Annual Report on Form 10-K for the year ended December 31, 2020 and elsewhere in this report. If one or more of these risks or uncertainties occur, or if our underlying assumptions prove to be incorrect, actual events or results may vary significantly from those implied or projected by the forward-looking statements. No forward-looking statement is a guarantee of future performance.

The forward-looking statements made in this report relate only to events or information as of the date on which the statements are made in this report. Except as expressly required by the federal securities laws, there is no undertaking to publicly update or revise any forward-looking statements, whether as a result of new information, future events, changed circumstances or any other reason.

**Overview**

We operate a technology-driven e-commerce platform for appliances, furniture, home goods and related products. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering the largest online selection of household appliances across all major appliance brands with competitive pricing. While we still maintain showrooms in the St. Louis area and, following the acquisition described below, in Brooklyn, New York, over 95% of our sales are placed through our websites at www.goedekers.com and www.appliancesconnection.com. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

26

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

On June 2, 2021, we acquired Appliances Connection, a leading retailer of household appliances based in Brooklyn, New York. Appliances Connection has built powerful home-grown logistics technology that can help reduce cycle time and efficiencies for our operations. Appliances Connection brings the relationships, network, and technology necessary to continue economies of scale for our business throughout the United States e-commerce market. We intend to leverage Appliances Connection's powerful platform to increase speed, reduce costs and increase margins across our entire business.

**Impact of Coronavirus Pandemic**

Starting in late 2019, a novel strain of the coronavirus, or COVID-19, began to rapidly spread around the world and every state in the United States. Most states and cities have at various times instituted quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, our showroom was closed from April through June of 2020, but our call center and warehouse continued to operate. Since most of our sales are completed online and our call center and warehouse and distribution operations continued to operate, the restrictions put in place in response to the pandemic did not had a materially negative impact on our operations.

However, we are dependent upon suppliers to provide us with all of the products that we sell. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain products. As a result, we have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect our business and financial results. Even if we are able to find alternate sources for such products, they may cost more, which could adversely impact our profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact our business. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on revenue.

Furthermore, the spread of COVID-19 has adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce our ability to access capital in the future, which could negatively affect liquidity.

The extent to which the pandemic may impact our results will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this report, including the effectiveness of vaccines and other treatments for COVID-19, and other new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to our performance, financial condition, results of operations and cash flows.

27

**Emerging Growth Company**

We qualify as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;
- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);
- submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and
- disclose certain executive compensation related items such as the correlation between executive compensation and performance and

comparisons of the chief executive officer's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year following the fifth anniversary of our initial public offering, (ii) the last day of the first fiscal year in which our total annual gross revenues are $1.07 billion or more, (ii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iv) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

**Principal Factors Affecting Our Financial Performance**

Our operating results are primarily affected by the following factors:

- our ability to acquire new customers or retain existing customers;
- our ability to offer competitive product pricing;
- our ability to broaden product offerings;
- industry demand and competition;
- market conditions and our market position; and
- our ability to successfully integrate the operations of Appliances Connection without business.

**Key Financial Operating Metrics**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Site Sessions (in millions) | 5.3 | 3.1 | 7.8 | 4.5 |
| Order History (in millions) | $ 105.1 | $ 29.8 | $ 105.7 | $ 45.2 |

A site session occurs when a person visits our websites. An order occurs when a customer has visited our websites and ordered one or more items and has paid for them. An order is paid for by our customer when the order is placed and booked as revenue by us when the order is shipped.

Total revenues and total orders for any given month may not be equal for two primary reasons: (1) normal customer cancellations and (2) the time required to ship an order and recognize revenue. When there are no supply chain issues, the time from order to shipping is between 20 and 25 days. Thus, an order made after the 10th of the current month will become revenue in the succeeding month, distorting the comparison between a months' orders and its sales. COVID-19 significantly increased the time between order and shipment, which increased customer cancellations.

Our site sessions increased to approximately 5.3 million in the three months ended June 30, 2021, which included approximately 2.7 million site sessions attributable to Appliances Connection from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to approximately 3.1 million in the three months ended June 30, 2020. These increased site sessions resulted in three-year highs for orders in the three months ended June 30, 2021.

28

**Results of Operations**

*Comparison of Three Months Ended June 30, 2021 and 2020*

The following table sets forth key components of our results of operations for the three months ended June 30, 2021 and 2020, in dollars and as a percentage of our net sales.

| | Three Months Ended June 30, 2021 | | Three Months Ended June 30, 2020 | |
|---|---|---|---|---|
| | Amount | % of Net Sales | Amount | % of Net Sales |
| Products sales, net | $ 64,072,098 | 100.00% | $ 15,285,031 | 100.00% |
| Cost of goods sold | 51,016,609 | 79.62% | 12,685,158 | 82.99% |
| Gross profit | 13,055,489 | 20.38% | 2,599,873 | 17.01% |
| Operating expenses | | | | |
| Personnel | 4,821,168 | 7.52% | 1,040,189 | 6.81% |
| Advertising | 2,931,815 | 4.58% | 891,907 | 5.84% |
| Bank and credit card fees | 2,095,359 | 3.27% | 454,569 | 2.97% |
| Depreciation and amortization | 175,143 | 0.27% | 91,790 | 0.60% |
| Acquisition expenses | 357,411 | 0.56% | - | - |
| Loss on abandonment of right of use asset | 1,437,042 | 2.25% | - | - |
| General and administrative | 2,500,381 | 3.90% | 1,509,417 | 9.88% |
| Total operating expenses | 14,318,319 | 22.35% | 3,987,872 | 26.09% |
| Loss from operations | (1,262,830) | (1.97)% | (1,387,999) | (9.08)% |
| Other income (expense) | | | | |
| Interest income | 12,283 | 0.02% | 1,062 | 0.01% |
| Financing costs | (74,738) | (0.12)% | (74,504) | (0.49)% |
| Interest expense | (943,392) | (1.47)% | (296,708) | (1.94)% |
| Loss on extinguishment of debt | (1,747,901) | (2.73)% | (948,856) | (6.21)% |
| Write-off of acquisition receivable | - | - | (809,000) | (5.29)% |
| Change in fair value of warrant liability | - | - | (2,127,656) | (13.92)% |
| Other income | 794 | - | 2,880 | 0.02% |
| Total other income (expense) | (2,752,954) | (4.30)% | (4,252,782) | (27.82)% |
| Net loss before income taxes | (4,015,784) | (6.27)% | (5,640,781) | (36.90)% |
| Income tax benefit (expense) | 8,048,478 | 12.56% | 688,953 | 4.51% |
| Net income (loss) | $ 4,032,694 | 6.29% | $ (4,951,828) | (32.40)% |

*Product sales, net*. We generate revenue from the retail sale of home furnishings, including appliances, furniture, home goods and related products. Our product sales were $64,072,098 for the three months ended June 30, 2021, which included $47,780,835 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $15,285,031 for the three months ended June 30, 2020, an increase of $48,787,067, or 319.18%. Excluding Appliances Connection, our product sales increased by $1,006,232, or 6.58%. This increase is due to increased sales volume to meet appliance and furniture demand resulting from increased advertising, which has a direct impact on customer orders and shipped sales.

During the three months ended June 30, 2021, we experienced delays in getting products from manufacturers due to continued supply chain issues related to the COVID-19 pandemic, which resulted in cancellations of some customer orders. For the three months ended June 30, 2021, we estimate that cancellations caused by shipping delays approximated $11.5 million based on the historical ratio of shipped sales to customer orders of approximately 80.7% for the three most recent pre COVID-19 years (2017 to 2019) to the actual ratio of approximately 47.3% in the three months ended June 30, 2021.

29

Our revenue by sales type is as follows:

|  | Three Months Ended June 30, 2021 | | Three Months Ended June 30, 2020 | |
|---|---|---|---|---|
|  | Amount | % | Amount | % |
| Appliance sales | $ 56,202,115 | 87.72% | $ 11,533,006 | 75.45% |
| Furniture sales | 6,172,784 | 9.63% | 2,768,327 | 18.11% |
| Other sales | 1,697,199 | 2.65% | 983,698 | 6.44% |
| Total | $ 64,072,098 | 100.00% | $ 15,285,031 | 100.00% |

The percentage of furniture sales declined in the 2021 period as compared to the 2020 period as furniture sales comprised a lower percentage of Appliances Connection's sales (3.27%) as compared to the Company (28.18%).

*Cost of goods sold*. Our cost of goods sold consists of the cost of purchased merchandise plus the cost of delivering merchandise and, where applicable, installation, net of promotional rebates and other incentives received from vendors. Our cost of goods sold was $51,016,609 for the three months ended June 30, 2021, which included $37,661,999 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $12,685,158 for the three months ended June 30, 2020, an increase of $38,331,451, or 302.18%. Excluding Appliances Connection, our cost of goods sold increased by $669,452, or 5.28%. As a percentage of net sales, cost of goods sold was 79.62% (or 81.97% excluding Appliances Connection) and 82.99% for the three months ended June 30, 2021 and 2020, respectively. Such decrease was due to impact of the acquisition of Appliances Connection, which has a lower cost of goods sold as a percentage of revenue than the Company. Excluding Appliances Connection, our cost of goods sold as a percentage of net sales decreased slightly due to a change in product mix with furniture sales, which have lower costs, comprising a larger percentage of our net sales in the 2021 period.

*Gross profit and gross margin*. As a result of the foregoing, our gross profit was $13,055,489 for the three months ended June 30, 2021, which included $10,118,836 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $2,599,873 for the three months ended June 30, 2020, an increase of $10,455,616, or 402.16%. Excluding Appliances Connection, our gross profit increased by $336,780, or 12.95%. Our gross margin (gross profit as a percentage of net sales) was 20.38% (or 18.03% excluding Appliances Connection) and 17.01% for the three months ended June 30, 2021 and 2020, respectively. Such increase was primarily due to the impact of the acquisition of Appliances Connection. Excluding Appliances Connection, our gross margin increased slightly due to the change in product mix described above.

*Personnel expenses*. Personnel expenses include employee salaries and bonuses plus related payroll taxes. It also includes health insurance premiums, 401(k) contributions, training costs and stock compensation expense. Our personnel expenses were $4,821,168 for the three months ended June 30, 2021, which included $1,951,705 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $1,040,189 for the three months ended June 30, 2020, an increase of $3,780,979, or 363.49%. Excluding Appliances Connection, our personnel expenses increased by $1,829,274, or 175.86%. As a percentage of net sales, personnel expenses were 7.52% (or 17.61% excluding Appliances Connection) and 6.81% for the three months ended June 30, 2021 and 2020, respectively. Such increase is the result of hiring the senior management team and support staff needed because of increased customer orders. Additionally, during the 2021 period, we incurred stock compensation expenses of $679,575 that we did not have in the 2020 period.

*Advertising expenses*. Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses were $2,931,815 for the three months ended June 30, 2021, which included $913,533 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $891,907 for the three months ended June 30, 2020, an increase of $2,039,908, or 228.71%. Excluding Appliances Connection, our advertising expenses increased by $1,126,375, or 126.29%. As a percentage of net sales, advertising expenses were 4.58% (or 12.39% excluding Appliances Connection) and 5.84% for the three months ended June 30, 2021 and 2020, respectively. The increase relates to an increase in advertising spending to drive traffic to our website.

*Bank and credit card fees*. Bank and credit card fees are primarily the fees we pay credit card processors for processing credit card payments made by customers. Our bank and credit card fees were $2,095,359 for the three months ended June 30, 2021, which included $1,573,462 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $454,569 for the three months ended June 30, 2020, an increase of $1,640,790, or 360.96%. Excluding Appliances Connection, our bank and credit card fees increased by $67,328 or 14.81%. As a percentage of net sales, bank and credit card fees were 3.27% (or 3.20% excluding Appliances Connection) and 2.97% for the three months ended June 30, 2021 and 2020, respectively. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders. We pay a credit card fee for each order, regardless of whether that order is shipped or cancelled by customer.

*Depreciation and amortization*. Depreciation and amortization was $175,143, or 0.27% of net sales, for the three months ended June 30, 2021, which included $52,812 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $91,790, or 0.60% of net sales, for the three months ended June 30, 2020.

*Acquisition expenses*. During the three months ended June 30, 2021, we incurred expenses related to the acquisition of Appliances Connection in the amount of $357,411.

30

*Loss on abandonment of right of use asset*. During the three months ended June 30, 2021, we incurred a loss in the amount of $1,437,042 related to the closure of our old warehouse and showroom and write-off of related leasehold improvements.

*General and administrative expenses*. Our general and administrative expenses consist primarily of professional advisor fees, rent expense,

insurance, unremitted sales tax, and other expenses incurred in connection with general operations. Our general and administrative expenses were $2,500,381 for the three months ended June 30, 2021, which included $703,723 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $1,509,417 for the three months ended June 30, 2020, an increase of $990,964, or 65.65%. Excluding Appliances Connection, our general and administrative expenses increased by $287,241, or 19.03%. As a percentage of net sales, general and administrative expenses were 3.90% (or 11.03% excluding Appliances Connection) and 9.88% for the three months ended June 30, 2021 and 2020, respectively. The increase was largely due to increased directors and officers insurance expenses, fees to our independent directors, and legal, audit and other professional fees in connection with becoming a public company in August 2020, as well as consulting fees to upgrade our online shopping cart, fees for our Electronic Data Interchange initiative, and other consulting fees.

*Total other income (expense)*. We had $2,752,954 in total other expense, net, for the three months ended June 30, 2021, which included other expense, net, of $50,665 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to total other expense, net, of $4,252,782 for the three months ended June 30, 2020. Total other expense, net, for the three months ended June 30, 2021 consisted of interest expense of $943,392, financing costs of $74,738 and a loss on extinguishment of debt of $1,747,901, offset by interest income of $12,283 and other income of $794. Total other expense, net, for the three months ended June 30, 2020 consisted of interest expense of $296,708, financing costs of $74,504, a loss on extinguishment of debt of $948,856, a loss on acquisition working capital receivable of $809,000, and change in the warrant liability of $2,127,656, offset by interest income of $1,062 and other income of $2,880.

*Income tax benefit (expense)*. We had an income tax net benefit of $8,048,478 for the three months ended June 30, 2021, as compared to an income tax benefit of $688,953 for the three months ended June 30, 2020. The tax benefit arose from the elimination of the allowance for the deferred tax asset. The acquisition of Appliances Connection on June 2, 2021 makes it more likely than not that the Company will be profitable, and will be able to utilize previously derived net operating losses.

*Net income (loss)*. As a result of the cumulative effect of the factors described above, we had net income of $4,032,694 for the three months ended June 30, 2021, which include a net income of $4,872,936 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to a net loss of $4,951,828 for the three months ended June 30, 2020, an increase of $8,984,522, or 181.44%. Excluding Appliances Connection, net loss decreased by $4,111,586, or 83.03%.

***Comparison of Six Months Ended June 30, 2021 and 2020***

The following table sets forth key components of our results of operations for the six months ended June 30, 2021 and 2020, in dollars and as a percentage of our net sales.

| | Six Months Ended June 30, 2021 | | Six Months Ended June 30, 2020 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Net Sales | Amount | % of Net Sales |
| Products sales, net | $ 77,769,466 | 100.00% | $ 24,962,209 | 100.00% |
| Cost of goods sold | 62,085,520 | 79.83% | 20,796,328 | 83.31% |
| Gross profit | 15,683,946 | 20.17% | 4,165,881 | 16.69% |
| Operating expenses | | | | |
| Personnel | 6,752,492 | 8.68% | 2,351,673 | 9.42% |
| Advertising | 4,015,063 | 5.16% | 1,558,343 | 6.24% |
| Bank and credit card fees | 2,628,101 | 3.38% | 699,309 | 2.80% |
| Depreciation and amortization | 297,475 | 0.38% | 183,631 | 0.74% |
| Acquisition expenses | 802,899 | 1.03% | - | - |
| Loss on abandonment of right of use asset | 1,437,042 | 1.85% | - | - |
| General and administrative | 4,294,390 | 5.52% | 2,949,257 | 11.81% |
| Total operating expenses | 20,227,462 | 26.01% | 7,742,213 | 31.02% |
| Loss from operations | (4,543,516) | (5.84)% | (3,576,332) | (14.33)% |
| Other income (expense) | | | | |
| Interest income | 22,379 | 0.03% | 1,062 | - |
| Financing costs | (80,003) | (0.10)% | (269,186) | (1.08)% |
| Interest expense | (1,170,957) | (1.51)% | (557,996) | (2.24)% |
| Loss on extinguishment of debt | (1,747,901) | (2.25)% | (948,856) | (3.80)% |
| Write-off of acquisition receivable | - | - | (809,000) | (3.24)% |
| Change in fair value of warrant liability | - | - | (2,127,656) | (8.52)% |
| Other income | 10,999 | 0.01% | 5,263 | 0.02% |
| Total other income (expense) | (2,965,483) | (3.81)% | (4,706,369) | (18.85)% |
| Net loss before income taxes | (7,508,999) | (9.66)% | (8,282,701) | (33.18)% |
| Income tax benefit (expense) | 8,048,478 | 10.35% | 1,123,953 | 4.50% |
| Net income (loss) | $ 539,479 | 0.69% | $ (7,158,748) | (28.68)% |

*Product sales, net*. Our product sales were $77,769,466 for the six months ended June 30, 2021, which included $47,780,835 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $24,962,209 for the six months ended June 30, 2020, an increase of $52,807,257, or 211.55%. Excluding Appliances Connection, our product sales increased by $5,026,422 or 20.1%. This increase is due to increased sales volume to meet appliance and furniture demand resulting from increased advertising, which has a direct impact on customer orders and shipped sales.

During the six months ended June 30, 2021, we experienced delays in getting products from manufacturers due to continued supply chain issues related to the COVID-19 pandemic, which resulted in cancellations of some customer orders. For the six months ended June 30, 2021, we estimate that cancellations caused by shipping delays approximated $22.5 million based on the historical ratio of shipped sales to customer orders of approximately 80.7% for the three most recent pre COVID-19 years (2017 to 2019) to the actual ratio of approximately 46.1% in the six months ended June 30, 2021.

Our revenue by sales type is as follows:

| | Six Months Ended June 30, 2021 | | Six Months Ended June 30, 2020 | |
| --- | --- | --- | --- | --- |
| | Amount | % | Amount | % |

| | | | | |
|---|---|---|---|---|
| Appliance sales | $ 66,387,297 | 85.37% | $ 19,335,110 | 77.46% |
| Furniture sales | 8,487,474 | 10.91% | 4,050,163 | 16.23% |
| Other sales | 2,894,695 | 3.72% | 1,576,936 | 6.32% |
| Total | $ 77,769,466 | 100.00% | $ 24,962,209 | 100.00% |

The percentage of furniture sales declined in the 2021 period as compared to the 2020 period as furniture sales comprised a lower percentage of Appliances Connection's sales (3.27%) compared to the Company (23.01%).

*Cost of goods sold*. Our cost of goods sold was $62,085,520 for the six months ended June 30, 2021, which included $37,661,999 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $20,796,328 for the six months ended June 30, 2020, an increase of $41,289,192, or 198.54%. Excluding Appliances Connection, our cost of goods sold increased by $3,627,193, or 17.4%. As a percentage of net sales, cost of goods sold was 79.83% (or 81.44% excluding Appliances Connection) and 83.31% for the six months ended June 30, 2021 and 2020, respectively. Such decrease was due to impact of the acquisition of Appliances Connection, which has a lower cost of goods sold than the Company.

*Gross profit and gross margin*. As a result of the foregoing, our gross profit was $15,683,946 for the six months ended June 30, 2021, which included $10,118,836 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $4,165,881 for the six months ended June 30, 2020, an increase of $11,518,065, or 276.49%. Excluding Appliances Connection, our gross profit increased by $1,399,229, or 33.6%%. Our gross margin (gross profit as a percentage of net sales) was 20.17% (or 18.56% excluding Appliances Connection) and 16.69% for the six months ended June 30, 2021 and 2020, respectively. Such increase was primarily due to the impact of the acquisition of Appliances Connection, as well as a change in product mix with furniture sales, which have higher margins, comprising a larger percentage of our net sales in the 2021 period.

*Personnel expenses*. Our personnel expenses were $6,752,492 for the six months ended June 30, 2021, which included $1,951,705 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $2,351,673 for the six months ended June 30, 2020, an increase of $4,400,819, or 187.14%. Excluding Appliances Connection, our personnel expenses increased by $2,449,114, or 104.1%. As a percentage of net sales, personnel expenses were 8.68% (or 16.01% excluding Appliances Connection) and 9.42% for the six months ended June 30, 2021 and 2020, respectively. Such increase is the result of hiring the senior management team and support staff needed because of increased customer orders. Additionally, during the 2021 period, we incurred stock compensation expenses of $804,150 that we did not have in the 2020 period.

*Advertising expenses*. Our advertising expenses were $4,015,063 for the six months ended June 30, 2021, which included $913,533 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $1,558,343 for the six months ended June 30, 2020, an increase of $2,456,720, or 157.65%. Excluding Appliances Connection, our advertising expenses increased by $1,543,187, or 99.00%. As a percentage of net sales, advertising expenses were 5.16% (or 10.34% excluding Appliances Connection) and 6.24% for the six months ended June 30, 2021 and 2020, respectively. The increase relates to an increase in advertising spending to drive traffic to our website.

*Bank and credit card fees*. Our bank and credit card fees were $2,628,101 for the six months ended June 30, 2021, which included $1,573,462 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $699,309 for the six months ended June 30, 2020, an increase of $1,928,792, or 275.81%. Excluding Appliances Connection, our bank and credit card fees increased by $355,330, or 50.81%. As a percentage of net sales, bank and credit card fees were 3.38% (or 3.52% excluding Appliances Connection) and 2.80% for the six months ended June 30, 2021 and 2020, respectively. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders. We pay a credit card fee for each order, regardless of whether that order is shipped or cancelled by customer.

*Depreciation and amortization*. Depreciation and amortization was $297,475, or 0.38% of net sales, for the six months ended June 30, 2021, which included $52,812 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $183,631, or 0.74% of net sales, for the six months ended June 30, 2020.

*Acquisition expenses*. During the six months ended June 30, 2021, we incurred expenses related to the acquisition of Appliances Connection in the amount of $802,899.

*Loss on abandonment of right of use asset*. During the six months ended June 30, 2021, we incurred a loss in the amount of $1,437,042 related to the closure of our old warehouse and showroom and write-off of related leasehold improvements.

*General and administrative expenses*. Our general and administrative expenses were $4,294,390 for the six months ended June 30, 2021, which included $703,723 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $2,949,257 for the six months ended June 30, 2020, an increase of $1,345,133, or 45.61%. Excluding Appliances Connection, our general and administrative expenses increased by $641,410, or 21.75%. As a percentage of net sales, general and administrative expenses were 5.52% (or 11.97% excluding Appliances Connection) and 11.81% for the six months ended June 30, 2021 and 2020, respectively. The increase was largely due to increased directors and officers insurance expenses, fees to our independent directors, and legal, audit and other professional fees in connection with becoming a public company in August 2020, as well as consulting fees to upgrade our online shopping cart, fees for our Electronic Data Interchange initiative, and other consulting fees.

*Total other income (expense)*. We had $2,965,483 in total other expense, net, for the six months ended June 30, 2021, which included other expense, net, of $50,665 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to total other expense, net, of $4,706,369 for the six months ended June 30, 2020. Total other expense, net, for the three months ended June 30, 2021 consisted of interest expense of $1,170,957, financing costs of $80,003 and a loss on extinguishment of debt of $1,747,901, offset by interest income of $22,379 and other income of $10,999. Total other expense, net, for the six months ended June 30, 2020 consisted of interest expense of $557,996, financing costs of $269,186, a loss on extinguishment of debt of $948,856, a loss on acquisition working capital receivable of $809,000, and change in the warrant liability of $2,127,656, offset by interest income of $1,062 and other income of $5,263.

*Income tax benefit (expense)*. We had an income tax net benefit of $8,048,478 for the six months ended June 30, 2021, as compared to an income tax benefit of $1,123,953 for the six months ended June 30, 2020. The tax benefit arose from the elimination of the allowance for the deferred tax asset. The acquisition of Appliances Connection on June 2, 2021 makes it more likely than not that the Company will be profitable, and will be able to utilize previously derived net operating losses.

*Net income (loss)*. As a result of the cumulative effect of the factors described above, we had net income of $539,479 for the six months ended June 30, 2021, which include a net income of $4,872,936 from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to a net loss of $7,158,748 for the six months ended June 30, 2020, an increase of $7,698,227, or 107.54%. Excluding Appliances Connection, net loss decreased by $2,828,291, or 39.47%.

**Liquidity and Capital Resources**

As of June 30, 2021, we had cash and cash equivalents of $45,234,542 and restricted cash of $8,385,848. We have relied on cash on hand, external bank lines of credit, proceeds from our public offerings described below, issuance of third party and related party debt and the issuance of notes to support cashflow from operations.

For the six months ended June 30, 2021, the Company incurred operating losses of approximately $4,543,516 and negative cash flow from operations of $6,985,302, but had working capital of $15,530,879. Additionally, the Company had over $45 million of unrestricted cash at June 30, 2021. On June 2, 2021, the Company closed on the acquisition of Appliances Connection. Appliances Connection has historically been profitable, however, only 29 days of their operations are included in results for the three and six months of 2021.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of this report. Additionally, only one month of operations for Appliances Connection, which has operated profitably, are included in the results of operations for the six months ended June 30, 2021.

The impact of COVID-19 on the Company's business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying unaudited condensed consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business.

*Summary of Cash Flow*

The following table provides detailed information about our net cash flow for the six months ended June 30, 2021 and 2020.

|  | Six Months Ended June 30, | |
|---|---|---|
|  | **2021** | **2020** |
| Net cash provided by (used in) operating activities | $ (6,985,302) | $ 3,852,042 |
| Net cash used in investing activities | (198,132,666) | (7,000) |
| Net cash provided by (used in) financing activities | 248,826,442 | (353,566) |
| Net change in cash and restricted cash | 43,708,474 | 3,491,476 |
| Cash and restricted cash, beginning of period | 9,911,916 | 64,470 |
| Cash and restricted cash, end of period | $ 53,620,390 | $ 3,555,946 |

Our net cash used in operating activities was $6,985,302 for the six months ended June 30, 2021, which included $8,947,315 in net cash provided by operating activities from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to $3,852,042 net cash provided by operating activities for the six months ended June 30, 2020. For the six months ended June 30, 2021, our net income of $539,479, a decrease in inventory of $2,313,999, non-cash expenses for early extinguishment of debt of $1,747,901 and an impairment loss of $1,437,042, offset by a decrease in accounts payable and accrued expenses of $4,358,830, customer deposits of $1,740,825, prepaid expenses and other current assets of $1,037,508, and an increase in deferred tax asset of $8,049,978, represent the primary drivers for cash used in operations. For the six months ended June 30, 2020, our net loss of $7,158,748, a decrease in prepaid expenses and other assets of $1,914,049 and deferred tax assets of $1,123,953, offset by an in customer deposits of $8,267,312, an increase in accounts payable and accrued expenses of $2,003,642, and a change in fair value of warrant liability of $2,127,656, were the primary drivers of the net cash provided by operating activities.

Our net cash used in investing activities was $198,132,666 for the six months ended June 30, 2021, as compared to $7,000 for the six months ended June 30, 2020. Net cash used in investing activities for the six months ended June 30, 2021 consisted of cash paid in the acquisition of Appliances Connection of $197,623,238 and purchases of property and equipment of $509,428. Net cash used in investing activities for the for the six months ended June 30, 2020 consisted of entirely purchases of property and equipment. Appliances Connection did not have any investing activities for the six months ended June 30, 2021.

Our net cash provided by financing activities was $248,826,442 for the six months ended June 30, 2021, which included $42,107 in net cash used in financing activities from Appliances Connection for the period from June 2, 2021 (date of acquisition) to June 30, 2021, as compared to net cash used in financing activities of $353,566 for the six months ended June 30, 2020. Net cash provided by financing activities for the six months ended June 30, 2021 consisted of proceeds from the public offering described below of $194,597,500, proceeds from the exercise of warrants of $2,335,083, proceeds from the term loan described below of $55,216,594, offset by repayment on notes payable of $ 3,321,536. Net cash used in financing activities for the six months ended June 30, 2020 consisted of net payments on lines of credit of $814,492 and repayment on notes payable of $181,674, offset by proceeds from a paycheck protection plan loan of $642,600.

*Public Offering*

On May 27, 2021, we entered into an underwriting agreement with ThinkEquity, a division of Fordham Financial Management, Inc. (the "Underwriter"), relating to a public offering of units, each unit consisting of one share of common stock and a warrant to purchase one share of common stock. Under the underwriting agreement, we agreed to sell 91,111,111 units to the Underwriter, at a purchase price per unit of $2.0925 (the offering price to the public of $2.25 per unit minus the Underwriter's discount), and also agreed to grant to the Underwriter a 30-day option to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $2.0832 per share, and/or warrants to purchase up to 2,000,000 additional shares of common stock, at a purchase price of $0.0093 per warrant, in any combination thereof, solely to cover over-allotments, if any. The Underwriter exercised its option to purchase 2,000,000 additional warrants on May 28, 2021 and exercised its option to purchase 2,000,000 additional shares on June 3, 2021. The shares of common stock and warrants contained in the units were immediately separable and were issued separately.

On June 2, 2021, we sold 91,111,111 shares of common stock and warrants to purchase 93,111,111 shares of common stock to the Underwriter for total gross proceeds of $205,020,000. After deducting the underwriting commission and expenses, we received net proceeds of approximately $190,481,100.

On June 7, 2021, we sold 2,000,000 shares of common stock to the Underwriter for total gross proceeds of $4,480,000. After deducting the underwriting commission and expenses, we received net proceeds of approximately $4,166,400.

As of June 30, 2021, an aggregate of 1,039,148 warrants were converted to common stock at $2.25 per share, yielding proceeds of $2,338,083.

We used to the proceeds of this offering to fund a portion of the purchase price for the acquisition of Appliances Connection.

*Private Placement*

On March 19, 2021, we entered into a securities purchase agreement with two institutional investors, pursuant to which we issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of our

common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis, for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. After deducting a placement fee and other expenses, we received net proceeds of $4,590,000. On June 2, 2021, we repaid these notes in full from the proceeds of the term loan described below.

### Credit Facilities

On June 2, 2021, the Company and ACI, as borrowers, entered into a credit and guaranty agreement with Appliances Connection and certain other subsidiaries party thereto from time to time as guarantors (the "Guarantors"), the financial institutions party thereto from time to time ("Lenders"), and Manufacturers and Traders Trust Company, as sole lead arranger, sole book runner, administrative agent and collateral agent ("M&T), pursuant to which the Lenders have agreed to make available to the Company and ACI senior secured credit facilities in the aggregate initial amount of $70,000,000, including (i) a $60,000,000 term loan (the "Term Loan") and (ii) a $10,000,000 revolving credit facility (the "Revolving Loan"), which revolving credit facility includes a $2,000,000 swingline subfacility (the "Swing Line Loan" and together with the Term Loan and the Revolving Loan, the "Loans") and a $2,000,000 letter of credit subfacility, in each case, on the terms and conditions contained in the credit and guaranty agreement. On June 2, 2021, we borrowed the entire amount of the Term Loan and issued term loan notes to the Lenders in the aggregate principal amount of $60,000,000. As of June 30, 2021, we have not made any loans under the Revolving Loan. As of June 30, 2021, the outstanding balance of the Term Loan is $56,311,521, comprised of principal of $60,000,000 net of unamortized loan costs of $3,688,479. We have classified $6,000,000 as a current liability and the balance as a long-term liability.

35

Each of the Loans matures on June 2, 2026. The Loans will bear interest on the unpaid principal amount thereof as follows: (i) if it is a Loan bearing interest at a rate determined by the base rate (as defined in the credit and guaranty agreement), then at the base rate plus the applicable margin (as defined in the credit and guaranty agreement) for such Loan; (ii) if it is a Loan bearing interest at a rate determined by the LIBOR rate (as defined in the credit and guaranty agreement), then at the LIBOR rate plus the applicable margin for such Loan; and (iii) if it is a Swing Line Loan, then at the rate applicable to Loans bearing interest at a rate determined by the base rate. The Term Loan initially bears interest at the LIBOR rate plus applicable margin (3.9%), with an initial interest period of six months. We may elect to continue or convert the existing interest rate benchmark for the Term Loan from LIBOR rate to base rate, and may elect the interest rate benchmark for future Revolving Loans as either LIBOR rate or base rate (and, with respect to any Loan made at the LIBOR rate, may also select the interest period applicable to any such Loan), by notifying M&T and Lenders from time to time in accordance with the provisions of the credit and guaranty agreement. Notwithstanding the foregoing, following an event of default, the Loans will bear interest at a rate that is 2% per annum higher than the interest rate then in effect for the applicable Loan.

We must repay the principal amount of the Term Loan in quarterly installments of $1,500,000 each, payable on the last business day of each March, June, September and December, commencing on September 30, 2021. The remaining unpaid principal amount of the Term Loan must be repaid on the maturity date, unless payment is sooner required by the credit and guaranty agreement. Mandatory repayments of amounts borrowed under the Revolving Loan facility are required only if the amount borrowed at any time exceeds the commitment amount.

The credit and guaranty agreement contains customary representations, warranties, affirmative and negative financial and other covenants and events of default for loans of this type. The Loans are guaranteed by the Guarantors and are secured by a first priority security interest in substantially all of the assets of the Company, ACI and the Guarantors.

### Vehicle Loans

Appliances Connection has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.59% to 5.74%. As of June 30, 2021, the outstanding balance of these notes is $1,488,620.

### Financing Leases

Appliances Connection has three finance leases for the acquisition of forklifts. At June 30, 2021, the total amount due on these leases was $210,809.

### Contractual Obligations

Our principal commitments consist mostly of obligations under the loans described above and other contractual commitments described below.

### Management Services Agreement

On April 5, 2019, we entered into a management services agreement with 1847 Partners LLC (the "Manager"), pursuant to which we appointed the Manager to provide certain services to us for a quarterly management fee equal to $62,500. Under certain circumstances specified in the management services agreement, our quarterly fee may be reduced if similar fees payable to the Manager by subsidiaries of our former parent company, 1847 Holdings LLC, exceed a threshold amount.

Pursuant to the management services agreement, we must also reimburse the Manager for all costs and expenses which are specifically approved by our board of directors, including all out-of-pocket costs and expenses, that are actually incurred by us or our affiliates on our behalf in connection with performing services under the management services agreement.

We expensed management fees of $62,500 for the three months ended June 30, 2021 and 2020 and $125,000 for the six months ended June 30, 2021 and 2020.

### Earn Out Payment

Pursuant to an asset purchase agreement, dated January 18, 2019, as amended, among the Company, Goedeker Television Co. ("Goedeker"), Steve Goedeker and Mike Goedeker, Goedeker is entitled to receive an earn out payment of $200,000 if the EBITDA (as defined in the asset purchase agreement) of the business acquired from Goedeker for the trailing twelve (12) month period from April 5, 2022 is $2,500,000 or greater, and may be entitled to receive a partial earn out payment if the EBITDA is less than $2,500,000 but greater than $1,500,000.

36

### Leases

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C for its prior principal office in Ballwin, Missouri. The lease is for a term five (5) years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. The lease contains customary events of default.

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC, which was amended on March 31, 2021, for its new principal office and showroom in St. Charles, Missouri. The lease terminates on April 30, 2027, with two (2) options to renew for additional five (5) year periods. The base rent is $20,977 per month until September 30, 2021, and increases to $31,465 per month until April 30, 2022, after which time the base rent increases at approximately 2.5% per month every year. The Company must also pay its 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. The lease contains customary events of default.

On June 2, 2021, 1 Stop entered into a new lease agreement with 1870 Bath Ave. LLC, a related party, for the premises located at 1870 Bath Avenue, Brooklyn, NY. The lease is for a term of ten (10) years and provides for a base rent of $74,263 per month during the first year with annual increases

to $96,896.37 during the last year of the term. 1 Stop is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default.

On June 2, 2021, Joe's Appliances entered into a new lease agreement with 812 5th Ave Realty LLC, a related party, for the premises located at 7812 5th Avenue, Brooklyn, NY. The lease is for a term of ten (10) years and provides for a base rent of $6,365.40 per month during the first year with annual increases to $8,305.40 during the last year of the term. Joe's Appliances is also responsible for all property taxes, insurance costs and the utilities used on the premises. The lease contains customary events of default.

On May 31, 2019, YF Logistics entered into a sublease agreement with Dynamic Marketing, Inc. ("DMI") for its warehouse space in Hamilton, NJ. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty (30) days' prior written notice or (ii) April 30, 2024. The sublease provides for a base rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month.

**Off-Balance Sheet Arrangements**

We have no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Critical Accounting Policies and Estimates**

The preparation of the unaudited condensed consolidated financial statements requires our management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. On a regular basis, we evaluate these estimates. These estimates are based on management's historical industry experience and on various other assumptions that are believed to be reasonable under the circumstances. Actual results may differ from these estimates.

For a description of the accounting policies that, in management's opinion, involve the most significant application of judgment or involve complex estimation and which could, if different judgment or estimates were made, materially affect our reported financial position, results of operations, or cash flows, see "Management's Discussion and Analysis of Financial Condition and Results of Operations - Critical Accounting Policies" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2020 filed with the Securities and Exchange Commission (the "SEC") on March 29, 2021.

During the three and six months ended June 30, 2021, there were no significant changes in our accounting policies and estimates other than the newly adopted accounting standards that are disclosed in Note 2 to our unaudited condensed consolidated financial statements.

37

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Not applicable.

**ITEM 4. CONTROLS AND PROCEDURES.**

**Evaluation of Disclosure Controls and Procedures**

We have adopted and maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports filed under the Exchange Act, such as this quarterly report on Form 10-Q, is collected, recorded, processed, summarized and reported within the time periods specified in the rules of the SEC. Our disclosure controls and procedures are also designed to ensure that such information is accumulated and communicated to management to allow timely decisions regarding required disclosure. As required under Exchange Act Rule 13a-15, our management, including our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this quarterly report on Form 10-Q, have concluded that, due to deficiencies identified in our preliminary evaluation, our disclosure controls and procedures are ineffective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. Subject to receipt of additional financing, we intend to retain additional individuals and resources to remedy the ineffective controls.

**Changes in Internal Control Over Financial Reporting**

There were no changes in the Company's internal control over financial reporting or in any other factors that could significantly affect these controls during the three months ended June 30, 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

38

**PART II**
**OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS.**

From time to time, we may become involved in various lawsuits and legal proceedings, which arise, in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these, or other matters, may arise from time to time that may harm our business. We are currently not aware of any such legal proceedings or claims that we believe will have a material adverse effect on our business, financial condition or operating results.

**ITEM 1A. RISK FACTORS.**

Not applicable.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS.**

We have not sold any equity securities during three months ended June 30, 2021 that were not previously disclosed in a current report on Form 8-K that was filed during the quarter.

We did not repurchase any of shares of our common stock during the three months ended June 30, 2021.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES.**

None.

**ITEM 4. MINE SAFETY DISCLOSURES.**

Not applicable.

**ITEM 5. OTHER INFORMATION.**

We have no information to disclose that was required to be in a report on Form 8-K during the three months ended June 30, 2021 but was not reported. There have been no material changes to the procedures by which security holders may recommend nominees to our board of directors.

**ITEM 6. EXHIBITS.**

| Exhibit No. | Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of 1847 Goedeker Inc. (incorporated by reference to Exhibit 4.1 to the Registration Statement on Form S-8 filed on August 3, 2020) |
| 3.2 | Bylaws of 1847 Goedeker Inc. (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-1 filed on April 22, 2020) |
| 4.1 | Warrant Agent Agreement, dated May 27, 2021, between 1847 Goedeker Inc. and American Stock Transfer & Trust Company, LLC and Form of Warrant (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on June 3, 2021) |
| 4.2 | Common Stock Purchase Warrant issued to Evergreen Capital Management LLC on March 19, 2021 (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on March 25, 2021) |
| 4.3 | Common Stock Purchase Warrant issued to SILAC Insurance Company on March 19, 2021 (incorporated by reference to Exhibit 4.2 to the Current Report on Form 8-K filed on March 25, 2021) |
| 4.4 | Form of Representative's Warrant for Initial Public Offering (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed on August 5, 2020) |
| 10.1 | Amendment to Employment Letter Agreement, dated June 3, 2021, between 1847 Goedeker Inc. and Douglas T. Moore (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed on June 9, 2021) |
| 10.2 | Loan and Security Agreement, dated June 3, 2021, between 1847 Goedeker Inc. and Northpoint Commercial Finance LLC (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on June 9, 2021) |
| 10.3 | Credit and Guaranty Agreement, dated June 2, 2021, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, certain other subsidiaries party thereto from time to time as guarantors, the financial institutions party thereto from time to time, and Manufacturers and Traders Trust Company (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.4 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Manufacturers and Traders Trust Company on June 2, 2021 (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.5 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to First Horizon Bank on June 2, 2021 (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.6 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Sterling National Bank on June 2, 2021 (incorporated by reference to Exhibit 10.4 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.7 | Term Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to BankUnited N.A. on June 2, 2021 (incorporated by reference to Exhibit 10.5 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.8 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Manufacturers and Traders Trust Company on June 2, 2021 (incorporated by reference to Exhibit 10.6 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.9 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to First Horizon Bank on June 2, 2021 (incorporated by reference to Exhibit 10.7 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.10 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to Sterling National Bank on June 2, 2021 (incorporated by reference to Exhibit 10.8 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.11 | Revolving Loan Note issued by 1847 Goedeker Inc. and Appliances Connection Inc. to BankUnited N.A. on June 2, 2021 (incorporated by reference to Exhibit 10.9 to the Current Report on Form 8-K filed on June 3, 2021) |

| | |
|---|---|
| 10.12 | Pledge and Security Agreement, dated June 2, 2021, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and such other subsidiaries from time to time a party thereto, in favor of Manufacturers and Traders Trust Company (incorporated by reference to Exhibit 10.10 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.13 | Lease, dated June 2, 2021, between 1870 Bath Ave. LLC and 1 Stop Electronics Center, Inc. (incorporated by reference to Exhibit 10.14 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.14 | Lease, dated June 2, 2021, between 7812 5th Ave Realty LLC and Joe's Appliances LLC (incorporated by reference to Exhibit 10.15 to the Current Report on Form 8-K filed on June 3, 2021) |
| 10.15 | Amendment No. 2 to Securities Purchase Agreement, dated April 6, 2021, among 1847 Goedeker Inc., Appliances Connection Inc., 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Superior Deals Inc., Joe's Appliances LLC, YF Logistics LLC, and the other parties signatory thereto (incorporated by reference to Exhibit 10.3 to the Current Report on Form 8-K filed on April 6, 2021) |
| 10.16 | Independent Director Agreement, dated May 18, 2021, between 1847 Goedeker Inc. and Alan P. Shor (incorporated by reference to Exhibit 10.16 to the Current Report on Form 8-K filed on June 3, 2021) |
| 31.1* | Certifications of Principal Executive Officer filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certifications of Principal Financial and Accounting Officer filed pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certifications of Principal Executive Officer furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2** | Certifications of Principal Financial and Accounting Officer furnished pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS* | Inline XBRL Instance Document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104* | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

\*      Filed herewith

\*\*   Furnished herewith

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: August 12, 2021

**1847 GOEDEKER INC.**

/s/ Douglas T. Moore

Name: Douglas T. Moore
Title: Chief Executive Officer
*(Principal Executive Officer)*

/s/ Robert D. Barry

Name: Robert D. Barry
Title: Chief Accounting Officer
*(Principal Accounting Officer)*

42

**Exhibit 31.1**

## CERTIFICATIONS

I, Douglas T. Moore, certify that:

1. I have reviewed this quarterly report on Form 10-Q of 1847 Goedeker Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 12, 2021

/s/ Douglas T. Moore
_____
Douglas T. Moore
Chief Executive Officer
*(Principal Executive Officer)*

**Exhibit 31.2**

**CERTIFICATIONS**

I, Maria Johnson, certify that:

1. I have reviewed this quarterly report on Form 10-Q of 1847 Goedeker Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 12, 2021

/s/ Maria Johnson
_____
Maria Johnson
Chief Financial Officer
*(Principal Financial and Accounting Officer)*

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

The undersigned Chief Executive Officer of 1847 GOEDEKER INC. (the "Company"), DOES HEREBY CERTIFY that:

1. The Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021 (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. Information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

IN WITNESS WHEREOF, the undersigned has executed this statement on August 12, 2021.

/s/ Douglas T. Moore
Douglas T. Moore
Chief Executive Officer
*(Principal Executive Officer)*

A signed original of this written statement required by Section 906 has been provided to 1847 Goedeker Inc. and will be retained by 1847 Goedeker Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

The forgoing certification is being furnished to the Securities and Exchange Commission pursuant to § 18 U.S.C. Section 1350. It is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

The undersigned Chief Financial Officer of 1847 GOEDEKER INC. (the "Company"), DOES HEREBY CERTIFY that:

1. The Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2021 (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. Information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

IN WITNESS WHEREOF, the undersigned has executed this statement on August 12, 2021.

/s/ Maria Johnson
Maria Johnson
Chief Financial Officer
*(Principal Financial and Accounting Officer)*

A signed original of this written statement required by Section 906 has been provided to 1847 Goedeker Inc. and will be retained by 1847 Goedeker Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

The forgoing certification is being furnished to the Securities and Exchange Commission pursuant to § 18 U.S.C. Section 1350. It is not being filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and is not to be incorporated by reference into any filing of the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

# Exhibit 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
## SCHEDULE 14C
#### Information Statement Pursuant to Section 14(c) of the
#### Securities Exchange Act of 1934

Check the appropriate box:

☐   Preliminary Information Statement
☐   Confidential, for Use of the Commission Only (as permitted by Rule 14c-5(d)(2))
☒   Definitive Information Statement

# 1847 GOEDEKER INC.
### (Name of Registrant as Specified In Its Charter)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required
☐   Fee computed on table below per Exchange Act Rules 14c-5(g) and 0-11

| | | |
|---|---|---|
| (1) | Title of each class of securities to which transaction applies: | |
| (2) | Aggregate number of securities to which transaction applies: | |
| (3) | Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined): | |
| (4) | Proposed maximum aggregate value of transaction: | |
| (5) | Total fee paid: | |

☐   Fee paid previously with preliminary materials
☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

| | | |
|---|---|---|
| (1) | Amount Previously Paid: | |
| (2) | Form, Schedule or Registration Statement No.: | |
| (3) | Filing Party: | |
| (4) | Date Filed: | |



### 1847 GOEDEKER INC.
### 13850 Manchester Rd.
### Ballwin, MO 63011
#### Notice of Action Taken Pursuant to Written Consent of Stockholders

Dear Stockholder:

The accompanying information statement is furnished to holders of shares of common stock of 1847 Goedeker Inc. ("*we*," "*us*," "*our*" or "*our company*") pursuant to Section 14 of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), and Regulation 14C and Schedule 14C thereunder, in connection with an approval by written consent of the holders of our common stock.

On October 20, 2020, we entered into a securities purchase agreement, which was amended on December 2, 2020 and April 6, 2021 (as amended, the "*purchase agreement*"), to acquire the following five household appliances companies through our newly formed wholly owned subsidiary Appliances Connection Inc., a Delaware corporation ("*ACI*"): (1) 1 Stop Electronics Center, Inc., a New York corporation; (2) Gold Coast Appliances, Inc., a New York corporation; (3) Superior Deals Inc., a New York corporation; (4) Joe's Appliances LLC, a New York limited liability company; and (5) YF Logistics LLC, a New Jersey limited liability company (collectively, "*Appliances Connection*").

Pursuant to the purchase agreement, ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $210,000,000, subject to adjustment. The purchase price consists of (i) $168,000,000 in cash, (ii) 1,222,239 shares of our common stock and 1,111,094 shares of our series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of our series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the acquisition; provided, that if we have obtained stockholder approval prior to closing, then we will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock. We refer to this proposed acquisition of Appliances Connection as the "*proposed acquisition*."

Our common stock is listed on NYSE American under the ticker symbol "GOED." As a result, we are subject to Section 712 of the NYSE American Company Guide, pursuant to which stockholder approval is required prior to approval of applications to list additional shares to be issued as sole or partial consideration for an acquisition of the stock or assets of another company where the present or potential issuance of common stock, or securities convertible into common stock, could result in an increase in outstanding common shares of 20% or more. If all shares of common stock are issued to the sellers of Appliances Connection as contemplated by the purchase agreement, including upon conversion of any shares of series A preferred stock or series A-1 preferred stock that are issued, this would result in an increase of more than 20% of our outstanding common stock. Accordingly, our stockholders approved, pursuant to a written consent, the issuance of all shares of common stock contemplated by the purchase agreement, including all shares of common stock upon the conversion of any shares of series A preferred stock and series A-1 preferred stock that may be issued in accordance with the terms of the purchase agreement (the "*stock issuance*").

In addition to the stock issuance, stockholders also approved an increase in the number of shares available for issuance under the 1847 Goedeker Inc. 2020 Equity Incentive Plan from 555,000 shares of common stock to 1,000,000 shares of common stock (the "*plan increase*").

Our board of directors approved the stock issuance and the plan increase and recommended that our stockholders approve them as well. In connection with the adoption of these matters, our board of directors elected to seek the written consent of the holders of a majority of our outstanding common stock in order to reduce associated costs and implement the proposals in a timely manner.

This notice and the accompanying information statement are being furnished to you to inform you that the stock issuance and the plan increase have been approved by stockholders. The board of directors is not soliciting your proxy in connection with these matters and proxies are not

requested from stockholders.

Pursuant to Rule 14c-2 promulgated under the Exchange Act, stockholder approval of the stock issuance and the plan increase will not become effective until 20 calendar days following the date on which the information statement is first mailed to our stockholders. You are urged to read the information statement in its entirety.

BY ORDER OF THE BOARD OF DIRECTORS,

/s/ Robert D. Barry

Robert D. Barry
Secretary

April 22, 2021

**THE ACCOMPANYING INFORMATION STATEMENT IS BEING MAILED
TO STOCKHOLDERS ON OR ABOUT APRIL 23, 2021
WE ARE NOT ASKING YOU FOR A PROXY
AND YOU ARE REQUESTED NOT TO SEND US A PROXY**

---

**1847 GOEDEKER INC.
13850 Manchester Rd.
Ballwin, MO 63011
INFORMATION STATEMENT
NO VOTE OR OTHER ACTION OF THE COMPANY'S STOCKHOLDERS
IS REQUIRED IN CONNECTION WITH THIS INFORMATION STATEMENT
WE ARE NOT ASKING YOU FOR A PROXY AND
YOU ARE REQUESTED NOT TO SEND US A PROXY**

This information statement is first being mailed on or about April 23, 2021 to the holders of record of the outstanding common stock, $0.0001 par value per share, of 1847 Goedeker Inc., a Delaware corporation ("*we*," "*us*," "*our*," "*our company*" or "*Goedeker*"), as of the close of business on April 9, 2021, pursuant to Rule 14c-2 promulgated under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"). This information statement relates to a written consent in lieu of a meeting, dated April 9, 2021, of stockholders owning at least a majority of the outstanding shares of our common stock (the "*written consent*").

On October 20, 2020, we entered into a securities purchase agreement, which was amended on December 2, 2020 and April 6, 2021 (as amended, the "*purchase agreement*"), to acquire the following five household appliances companies through our newly formed wholly owned subsidiary Appliances Connection Inc., a Delaware corporation ("*ACI*"): (1) 1 Stop Electronics Center, Inc,, a New York corporation ("*1 Stop*"); (2) Gold Coast Appliances, Inc., a New York corporation ("*Gold Coast*"); (3) Superior Deals Inc., a New York corporation ("*Superior Deals*"); (4) Joe's Appliances LLC, a New York limited liability company ("*Joe's Appliances*"); and (5) YF Logistics LLC, a New Jersey limited liability company ("*YF Logistics*" and together with 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, "*Appliances Connection*").

Pursuant to the purchase agreement, ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $210,000,000, subject to adjustment. The purchase price consists of (i) $168,000,000 in cash, (ii) 1,222,239 shares of our common stock and 1,111,094 shares of our series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of our series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the acquisition; provided, that if we have obtained stockholder approval prior to closing, then we will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock. We refer to this proposed acquisition of Appliances Connection as the "*proposed acquisition*." References to the "*combined company*" in this information statement are to Goedeker after the consummation the proposed acquisition.

Our common stock is listed on NYSE American under the ticker symbol "GOED." As a result, we are subject to Section 712 of the NYSE American Company Guide, pursuant to which stockholder approval is required prior to approval of applications to list additional shares to be issued as sole or partial consideration for an acquisition of the stock or assets of another company where the present or potential issuance of common stock, or securities convertible into common stock, could result in an increase in outstanding common shares of 20% or more. If all shares of common stock are issued to the sellers of Appliances Connection as contemplated by the purchase agreement, including upon conversion of any shares of series A preferred stock or series A-1 preferred stock that are issued, this would result in an increase of more than 20% of our outstanding common stock. Accordingly, our stockholders approved, pursuant to a written consent, the issuance of all shares of common stock contemplated by the purchase agreement, including all shares of common stock upon the conversion of any shares of series A preferred stock and series A-1 preferred stock that may be issued in accordance with the terms of the purchase agreement (the "*stock issuance*").

In addition to the stock issuance, the written consent also approved an increase in the number of shares available for issuance under the 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "*Plan*") from 555,000 shares of common stock to 1,000,000 shares of common stock (the "*plan increase*").

Our board of directors approved the stock issuance and the plan increase and recommended that our stockholders approve them as well. In connection with the adoption of these matters, our board of directors elected to seek the written consent of the holders of a majority of our outstanding common stock in order to reduce associated costs and implement the proposals in a timely manner.

The written consent is sufficient under the General Corporation Law of the State of Delaware (the "*DGCL*"), our amended and restated certificate of incorporation and our bylaws to approve the stock issuance and the plan increase. Accordingly, the stock issuance and the plan increase will not be submitted to the other stockholders of our company for a vote, and this information statement is being furnished to such other stockholders to provide them with certain information concerning the written consent in accordance with the requirements of the Exchange Act, and the regulations promulgated under the Exchange Act, including Regulation 14C.

Pursuant to Rule 14c-2 promulgated under the Exchange Act, stockholder approval of the stock issuance and the plan increase will not become effective until 20 calendar days following the date on which this information statement is first mailed to our stockholders.

---

**TABLE OF CONTENTS**

| | |
|---|---|
| SUMMARY TERM SHEET | 1 |
| CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS | 2 |
| AUTHORIZATION BY THE BOARD OF DIRECTORS AND THE MAJORITY STOCKHOLDERS | 3 |
| THE PROPOSED ACQUISITION AND STOCK ISSUANCE | 4 |
| THE PLAN INCREASE | 11 |

| | |
|---|---|
| INFORMATION ABOUT GOEDEKER | 14 |
| INFORMATION ABOUT APPLIANCES CONNECTION | 22 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS FOR GOEDEKER | 27 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS FOR APPLIANCES CONNECTION | 41 |
| MARKET PRICE AND DIVIDEND INFORMATION | 48 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 49 |
| EXECUTIVE COMPENSATION | 50 |
| STOCKHOLDERS ENTITLED TO INFORMATION STATEMENT | 52 |
| DELIVERY OF DOCUMENTS TO STOCKHOLDERS SHARING AN ADDRESS | 52 |
| WHERE YOU CAN FIND MORE INFORMATION | 52 |
| FINANCIAL STATEMENTS | F-1 |
| ANNEX A – SECURITIES PURCHASE AGREEMENT, AS AMENDED | A-1 |
| ANNEX B – 1847 GOEDEKER INC. 2020 EQUITY INCENTIVE PLAN, AS AMENDED | B-1 |

## SUMMARY TERM SHEET

This summary term sheet summarizes certain information regarding the proposed acquisition, but does not contain all of the information that may be important to you. You should carefully read this entire information statement, including the attached Annexes, for a more complete understanding of the proposed acquisition.

- Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 stock-keeping units ("*SKUs*") across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem. For more information about our company, please see the sections entitled "Information About Goedeker" and "Management's Discussion and Analysis of Financial Condition and Results of Operations for Goedeker."

- Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool. For more information about Appliances Connection, please see the sections entitled "Information About Appliances Connection" and "Management's Discussion and Analysis of Financial Condition and Results of Operations for Appliances Connection."

- On October 20, 2020, we entered into the purchase agreement, which was amended on December 2, 2020 and April 6, 2021, to acquire Appliances Connection for an aggregate purchase price of $210,000,000, subject to adjustment. The purchase price consists of (i) $168,000,000 in cash, (ii) 1,222,239 shares of our common stock and 1,111,094 shares of our series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of our series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the proposed acquisition; provided, that if we have obtained stockholder approval prior to closing, then we will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock. For more information about the proposed acquisition, please see the section entitled "The Proposed Acquisition and Stock Issuance."

- Our management and board considered various factors in determining whether to approve and adopt the purchase agreement and the transactions contemplated thereby, including the proposed acquisition. The board's reasons for approving the Acquisition are described in the section entitled "The Proposed Acquisition and Stock Issuance—Reasons for the Proposed Acquisition."

- Unless waived by the parties to the purchase agreement, and subject to applicable law, the closing of the proposed acquisition is subject to a number of conditions set forth in the purchase agreement, including, among others, the receipt of all authorizations, consents, permits, licenses or approvals of all governmental authorities or other third parties; the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*"); the absence of any temporary, preliminary or permanent restraining order preventing the consummation of the proposed acquisition; the release of any security interests related to Appliances Connection; the execution of new leases for properties leased by 1 Stop, Gold Coast and Joe's Appliances; the execution of certain employment agreements between certain officers of Appliances Connection and ACI; the receipt of an opinion of the sellers' counsel; and the receipt of documents required for the transfer of the securities of Appliances Connection to ACI. For more information about the closing conditions to the proposed acquisition, please see the section entitled "The Proposed Acquisition and Stock Issuance—The Purchase Agreement—Conditions to Closing."

- The purchase agreement may be terminated at any time prior to the consummation of the proposed acquisition upon agreement of the parties thereto, or by our company or Appliances Connection and the sellers in specified circumstances. For more information about the termination rights under the purchase agreement, please see the section entitled "The Proposed Acquisition and Stock Issuance—The Purchase Agreement—Termination."

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This information statement contains forward-looking statements that are based on our management's beliefs and assumptions and on information currently available to us. All statements other than statements of historical facts are forward-looking statements. The forward-looking statements are contained principally in, but not limited to, the sections entitled "Summary Term Sheet," "Management's Discussion and Analysis of Financial Condition and Results of Operations for Goedeker," "Management's Discussion and Analysis of Financial Condition and Results of Operations for Appliances Connection," "Information About Goedeker" and "Information About Appliances Connection." These statements relate to future

events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- our ability to consummate the proposed acquisition;
- the synergies that we expect to experience resulting from the proposed acquisition;
- our ability to successfully integrate Appliances Connection's business with our existing business;
- the impact of the COVID-19 pandemic on our operations and financial condition;
- our goals and strategies;
- our future business development, financial condition and results of operations;
- expected changes in our revenue, costs or expenditures;
- growth of and competition trends in our industry;
- our expectations regarding demand for, and market acceptance of, our products;
- our expectations regarding our relationships with investors, institutional funding partners and other parties we collaborate with;
- fluctuations in general economic and business conditions in the markets in which we operate; and
- relevant government policies and regulations relating to our industry.

In some cases, you can identify forward-looking statements by terms such as "may," "could," "will," "should," "would," "expect," "plan," "intend," "anticipate," "believe," "estimate," "predict," "potential," "project" or "continue" or the negative of these terms or other comparable terminology. These statements are only predictions. You should not place undue reliance on forward-looking statements because they involve known and unknown risks, uncertainties and other factors, which are, in some cases, beyond our control and which could materially affect results.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this information statement, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

You should read this information statement and the documents that we reference in this information statement and have attached to this information statement with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

The forward-looking statements made in this information statement relate only to events or information as of the date on which the statements are made in this information statement. Although we have ongoing disclosure obligations under United States federal securities laws, we do not intend to update or otherwise revise the forward-looking statements in this information statement, whether as a result of new information, future events or otherwise.

2

## AUTHORIZATION BY THE BOARD OF DIRECTORS AND THE MAJORITY STOCKHOLDERS

On April 9, 2021, our board of directors unanimously adopted resolutions approving the stock issuance and the plan increase and recommended that our stockholders approve it. In connection with the adoption of these resolutions, our board of directors elected to seek the written consent of stockholders in order to reduce associated costs and implement the stock issuance and the plan increase in a timely manner. On April 9, 2021, the following stockholders (the "*majority stockholders*") executed and delivered the written consent to us:

| Name of Stockholder | Number of Shares |
|---|---|
| Ellery W. Roberts | 1,375,597 |
| Edward J. Tobin | 960,680 |
| Leonite Capital LLC | 503,369 |
| Louis A. Bevilacqua | 298,427 |
| **TOTAL** | **3,138,073** |

Pursuant to our amended and restated certificate of incorporation and bylaws, any action which may be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing or by electronic transmission setting forth the action so taken shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Pursuant to the DGCL and our amended and restated certificate of incorporation and bylaws, approval of the stock issuance and the plan increase at a meeting would require the affirmative vote of a majority of shares present in person, by remote communication, if applicable, or represented by proxy at the meeting and entitled to vote. Holders of shares of our common stock are entitled to one (1) vote per share. As of the record date, April 9, 2021, there were 6,111,200 shares of common stock issued and outstanding, of which 3,138,073 shares, or 51.35%, were held by the majority stockholders.

Accordingly, we have obtained all necessary corporate approvals in connection with the stock issuance and the plan increase. We are not seeking written consent from any other stockholder, and other stockholders will not be given an opportunity to vote with respect to the stock issuance or the plan increase. All necessary corporate approvals have been obtained. This information statement is furnished solely for the purposes of advising stockholders of the action taken by written consent and giving stockholders notice of such actions taken as required by the Exchange Act.

As the action taken by the majority stockholders was by written consent, there will be no stockholders meeting and representatives of the principal accountants for the current year and for the most recently completed fiscal year will not have the opportunity to make a statement if they desire to do so and will not be available to respond to appropriate questions from our stockholders.

3

## THE PROPOSED ACQUISITION AND STOCK ISSUANCE

**Overview**

On October 20, 2020, we entered into the purchase agreement, which was amended on December 2, 2020 and April 6, 2021, to acquire Appliances Connection for an aggregate purchase price of $210,000,000, subject to adjustment, which will be payable through a combination of cash and shares of our common stock, series A preferred stock and series A-1 preferred stock. The terms of the purchase agreement are complex and only briefly summarized below. For further information, please see the full text of the purchase agreement, which is attached as Annex A hereto. The discussion

herein is qualified in its entirety by reference to the purchase agreement. Please see the subsection entitled "—The Purchase Agreement" below, for additional information and a summary of certain terms of the purchase agreement. You are urged to carefully read the purchase agreement in its entirety.

**The Companies**

*1847 Goedeker Inc.*

Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 SKUs across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

Our company was incorporated in the State of Delaware on January 10, 2019 for the sole purpose of acquiring substantially all of the assets of Goedeker Television Co. ("*Goedeker Television*"). On April 5, 2019, we acquired substantially all of the assets of Goedeker Television. As a result of this transaction, we acquired the former business of Goedeker Television, which was established in 1951, and continue to operate this business. All discussions in this information statement regarding our business prior to the acquisition reflect the business of Goedeker Television, our predecessor company. Prior to our acquisition of substantially all of the assets of Goedeker Television, we had no operations other than operations relating to our incorporation and organization.

Our common stock is listed on NYSE American under the symbol "GOED." Our principal executive offices are located at 13850 Manchester Rd., Ballwin, MO 63011, and our telephone number is 888-768-1710. We maintain a website at www.goedekers.com. Information available on our website is not incorporated by reference in and is not deemed a part of this information statement.

Please see "Information About Goedeker" and "Management's Discussion and Analysis of Financial Condition and Results of Operations for Goedeker" for important business and financial information regarding our company.

*Appliances Connection Inc.*

October 20, 2020, we formed ACI as a wholly owned subsidiary in the State of Delaware for the sole purpose of completing the proposed acquisition.

ACI is a privately-held corporation and its securities do not trade on any marketplace. The principal executive offices of ACI are located at c/o our company, 13850 Manchester Rd., Ballwin, MO 63011, and its telephone number is 888-768-1710.

---

4

---

*Appliances Connection*

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website 1stopcamera.com.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at goldcoastappliances.com.

Joe's Appliance, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, joesappliances.com.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website www.appliancesconnection.com.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

Appliances Connection has built powerful home-grown logistics technology that can help reduce cycle time and efficiencies for the combined company's operations. Appliances Connection will bring the relationships, network, and technology necessary to continue economies of scale for the entire business of the combined company throughout the United States e-commerce market. We intend to leverage Appliances Connection's powerful platform to increase speed, reduce costs and increase margins across our entire business.

Please see "Information About Appliances Connection" and "Management's Discussion and Analysis of Financial Condition and Results of Operations for Appliances Connection" for important business and financial information regarding Appliances Connection.

**The Purchase Agreement**

This subsection of the information statement describes the material provisions of the purchase agreement, but does not purport to describe all of the terms of the purchase agreement. The following summary is qualified in its entirety by reference to the complete text of the purchase agreement, which is attached as Annex A hereto. You are urged to read the purchase agreement in its entirety because it is the primary legal document that governs the proposed acquisition.

The purchase agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the purchase agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the purchase agreement. The representations, warranties and covenants in the purchase agreement are also modified in important part by the underlying disclosure schedules, which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to stockholders and were used for the purpose of allocating risk among the parties rather than establishing matters as

facts.

### Consideration

The aggregate purchase price for our acquisition of Appliances Connection is $210,000,000, subject to adjustment as described below. The purchase price consists of (i) $168,000,000 in cash, (ii) 1,222,239 shares of our common stock and 1,111,094 shares of our series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of our series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the proposed acquisition; provided, that if we have obtained stockholder approval prior to closing, then we will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock.

---

5

---

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the sellers shall deliver to ACI at least one day prior to the closing of the proposed acquisition a statement setting forth their good faith estimate of the net working capital of Appliances Connection (which excludes accruals for sales tax liabilities). If such estimated net working capital exceeds a target net working capital of ($15,476,941), then within five (5) days ACI shall make a cash payment to the sellers that is equal to such excess. If such target net working capital exceeds such estimated net working capital, then either (i) if finally determined at the closing, the cash portion of the purchase price shall be decreased by such excess or (ii) within 5 days of the closing, the sellers shall make a cash payment to ACI that is equal to such excess.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the proposed acquisition, ACI shall deliver to the sellers a statement setting forth its calculation of the net working capital. If such net working capital exceeds the estimated net working capital referred to above, then within five (5) days after the final determination of such net working capital ACI shall send payment by wire transfer of immediately available funds to the sellers in an amount equal to such excess. If the estimated net working capital exceeds such net working capital, then within five (5) days the sellers shall pay to ACI in cash an amount equal to such excess.

The cash portion of the purchase price will also be (i) decreased by (A) the amount of any outstanding unpaid indebtedness of Appliances Connection (other than trade debt) existing as of the closing date and (B) any transaction expenses, and (ii) increased by the amount of cash or cash equivalents held by, or on the books of, Appliances Connection as of the closing date, if any, that is in excess of $850,000.

Upon execution of the purchase agreement, ACI paid a deposit in the amount of $100,000 and upon execution of the first amendment to the purchase agreement, ACI paid an additional deposit in the amount of $75,000, all of which will be credited towards the cash portion of the purchase price at closing.

### Representations, Warranties and Covenants

The purchase agreement contains customary representations, warranties and covenants, including those related to the operation of Appliances Connection's business prior to the closing, a customary non-solicitation covenant during the period prior to closing, and a covenant that the sellers will not compete with the business of 1 Stop as of the closing date for a period of two (2) years following closing.

The purchase agreement also contains a covenant related to our obligation to obtain stockholder approval of the proposed acquisition and to file this information statement in connection therewith.

The purchase agreement also contains customary demand and "piggy-back" registration rights with respect to the shares to be issued to the sellers.

### Conditions to Closing

The closing of the purchase agreement is subject to customary closing conditions, including, without limitation:

- the receipt of all authorizations, consents, permits, licenses or approvals of all governmental authorities or other third parties;
- the expiration or termination of any waiting period applicable to the consummation of the transaction under the HSR Act, which has been completed;
- the absence of any temporary, preliminary or permanent restraining order preventing the consummation of the proposed acquisition;
- the release of any security interests related to Appliances Connection;
- the execution of new leases for properties leased by 1 Stop and Joe's Appliances;
- the execution of certain employment agreements between certain officers of Appliances Connection and ACI;

---

6

---

- the receipt of an opinion of the sellers' counsel; and
- the receipt of documents required for the transfer of the securities of Appliances Connection to ACI.

In addition, ACI shall have obtained on terms and conditions reasonably satisfactory to it all of the financing necessary to pay the cash portion of the purchase price and pay related fees and expenses to consummate the proposed acquisition and provide reasonably adequate working capital for the Appliances Connection after the closing.

### Other Agreements

In connection with closing of the proposed acquisition, we agreed to use commercially reasonable efforts to cause each holder of 10% or more of our voting power to enter into a voting agreement requiring such persons to vote in favor of the stock issuance. The voting agreement will also contain certain transfer restrictions for our securities owned by them.

In addition, each seller agreed to enter into a lock-up agreement which will provide that the seller may not transfer or assign or otherwise dispose of the shares that will be issued to such seller at closing for a period of 180 days after the closing, and thereafter the seller will only be permitted to sell shares at a rate of no more than one percent of our outstanding stock per quarter until the one year anniversary of the closing.

### Indemnification

The purchase agreement contains mutual indemnification for breaches of representations or warranties and failure to perform covenants or obligations contained in the purchase agreement. In the case of the indemnification provided by the sellers with respect to breaches of certain non-fundamental representations and warranties, the sellers will only become liable for indemnified losses if the amount exceeds an aggregate of $2,100,000, whereupon the sellers will be liable for all losses relating back to the first dollar, provided that the liability of the sellers for breaches of certain non-fundamental representations and warranties shall not exceed $21,000,000.

### Termination

The purchase agreement may be terminated as follows:

- by mutual written consent of ACI, our company and the sellers at any time prior to the closing;
- by either ACI and our company or the sellers if any governmental entity will have issued an order or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by the purchase agreement;
- by either ACI and our company or the sellers if the closing does not occur on or before June 30, 2021; provided, that the right to terminate

shall not be available to any party that has breached in any material respect its obligations under the purchase agreement in any manner that shall have caused the failure of a condition to the consummation of the proposed acquisition;

- by ACI and our company if any seller or Appliances Connection has breached its respective representations and warranties or any covenant or other agreement to be performed by it in a manner such that the closing conditions related to such representations, warranties or covenants of such party would not be satisfied; or
- by the sellers if ACI or our company has breached its representations and warranties or any covenant or other agreement to be performed by it in a manner such that the closing conditions related to such representations, warranties or covenants of such party would not be satisfied.

In the event that the purchase agreement is terminated in accordance with the circumstances described in the first, second or fourth bullets set forth above, the deposit referred to above shall be returned to ACI with two (2) business days. In the event that the purchase agreement is terminated by the sellers in accordance with the circumstances described in the third or fifth bullets set forth above, the sellers shall retain the deposit.

7

## Background of the Proposed Acquisition

The following dates describing certain events are approximate. The primary persons involved in the events and negotiations described below were Ellery W. Roberts and Douglas T. Moore, the Chairman of the Board and Chief Executive Officer our company, respectively, on behalf of our company, Albert Fouerti and Elie Fouerti, the President and Vice President, respectively, of Appliances Connection, on behalf of Appliances Connection, and Avi Geller, the Chief Investment Officer of Leonite Capital LLC, or Leonite, a principal stockholder of our company.

On August 4, 2020, Mr. Geller suggested to Mr. Roberts that we might consider an acquisition of Appliances Connection and offered to make an introduction to management of Appliances Connection. Mr. Roberts then, on August 10, 2020, informed Mr. Moore of Mr. Geller's suggestion.

On August 12, 2020, Messrs. Roberts and Geller discussed a proposed acquisition with Messrs. A. Fouerti and E. Fouerti, after which time Mr. Roberts summarized the discussions for Mr. Moore on August 18, 2020.

On August 13, 2020, Bevilacqua PLLC, counsel to our company, circulated a draft of a letter of intent for the proposed acquisition to Appliances Connection and Murtha Cullina LLP, counsel to Appliances Connection, and the parties subsequently negotiated the terms of the letter of intent.

On August 31, 2020, the parties executed the letter of intent and began their respective due diligence.

On September 8, 2020, Bevilacqua PLLC delivered an initial draft of the purchase agreement to Appliances Connection and Murtha Cullina LLP for review. From that date until the purchase agreement was executed, the parties negotiated the terms and conditions of the purchase agreement.

On September 9, 2020, Mr. Moore visited Appliances Connection's New Jersey warehouse and Brooklyn store and offices and met with Messrs. A. Fouerti and E. Fouerti. Mr. Geller also participated in some of the discussions. The parties discussed the operations of both companies and the details of the proposed acquisition. Subsequent to this initial meeting, Messrs. Moore, A. Fouerti and E. Fouerti have continued to have discussions at least weekly regarding due diligence and business integration issues.

On October 20, 2020, our board of directors unanimously approved the purchase agreement and the proposed acquisition pursuant to a written consent in lieu of a meeting.

October 20, 2020, the parties executed the purchase agreement.

On October 29, 2020, Bevilacqua PLLC delivered a draft of the disclosures to be included in this information statement to Appliances Connection and Murtha Cullina LLP for review. Subsequent to that date and until this information statement was filed, the parties reviewed drafts of such disclosure and completed the 2020 audits of our company and Appliances Connection.

On November 24, 2020, Messrs. Roberts, Moore, A. Fouerti and E. Fouerti, along with Robert D. Barry, our Chief Financial Officer, delivered a presentation to potential investors regarding the proposed acquisition.

On November 25, 2020, Bevilacqua PLLC delivered a draft amendment to the purchase agreement to Appliances Connection and Murtha Cullina LLP for review.

On December 2, 2020, the parties entered into the amendment to the purchase agreement.

On April 5, 2021, Murtha Cullina LLP delivered a draft second amendment to the purchase agreement to us and Bevilacqua PLLC and for review.

On April 6, 2021, the parties entered into the second amendment to the purchase agreement.

On April 9, 2021, our board of directors recommended that stockholders approve the stock issuance and set the record date, April 9, 2021.

On April 9, 2021, the majority stockholders executed the written consent.

On April 12, 2021, we filed a preliminary version of this information statement with the SEC.

On April 22, 2021, we filed a final version of this information statement with the SEC.

8

## Reasons for the Proposed Acquisition

In evaluating the purchase agreement and the proposed acquisition, our board of directors consulted with our management and its advisors and, in reaching its decision to approve the purchase agreement and the transactions contemplated by the purchase agreement, our board of directors considered a variety of factors, including the following (which are not necessarily in order of relative importance):

- the accretive nature of Appliances Connection's earnings when combined with our earnings;
- the relatively stable nature of Appliances Connection's revenue and earnings year to year;
- the expected synergies that would result from the business combination in the areas of product ordering, marketing, cost of goods sold and third-party logistics;
- the location and demographic mix of Appliances Connection;
- Appliances Connection's foothold in the country's largest market, New York, which immediately provides a model of how to be more effective in similar large urban markets throughout the United States and their demonstrated success in providing appliances at the premium and super premium part of the industry's product offerings which will allow more access to the upper end of the business model where margins are higher and less prone to swings in consumer demand;
- the diversity of brand name product offerings of Appliances Connection, which are both complimentary and similar to our brand name product offerings;
- the extensive assortments of global appliance brands offered by Appliances Connection; and

- Appliances Connection's ability to provide "last mile" customer services through its large warehouse, its acquisition of inventory at discounted rates and its expertise in delivering, hooking up and hauling away of old appliances, which puts them in a top of class position for the logistics required to compete across the country on a low cost distribution model.

Our board of directors also considered the risks and potentially negative factors relating to the proposed acquisition, including:

- the potential inability to quickly integrate the business of Appliances Connection with our own business;
- the potential underestimation of time and resources necessary for integration and to achieve expected synergies;
- information technology and infrastructure capability and transition costs;
- unforeseen costs and expenses relating to the combination of the two companies;
- supply interruptions continuing beyond the first quarter of 2021, which would impact both businesses; and
- the possibility of an economic downturn affecting demand for appliances.

Our board of directors believed that, overall, the potential benefits of the proposed acquisition to our stockholders outweighed the risks and uncertainties of the proposed acquisition. The foregoing discussion of factors considered by our board of directors is not intended to be exhaustive and is not provided in any specific order or ranking, but includes material factors considered by our board. In reaching its decision regarding the proposed acquisition, our board did not quantify or otherwise assign relative weights to the specific factors. Moreover, each member of our board applied his or her own personal business judgment and may have given different weights to different factors. Our board did not undertake to make any specific determination as to whether any factor, or any particular aspect of any factor, supported or did not support its ultimate determination. Our board based its recommendation on the totality of the information presented.

The factors, potential risks and uncertainties contained in this explanation of our reasons for the proposed acquisition and other information presented in this section contain information that is forward-looking in nature and, therefore, should be read in light of the factors discussed in "Cautionary Statement Regarding Forward-Looking Statements."

**No Interests of Related Persons**

No director or executive officer of our company at any time since the beginning of the last fiscal year has any interest in the proposed acquisition.

9

**Reports, Opinions and Appraisals**

Due to the respective financial condition of our company and Appliances Connection, neither our company nor Appliances Connection engaged a financial advisor to prepare a fairness opinion regarding the proposed acquisition, as such an opinion would be expensive, would use limited financial resources and each company considered that the incurrence of such expenses was not prudent under their respective financial circumstances.

**Total Shares to be Issued in the Proposed Acquisition**

Upon completion of the proposed acquisition, we will issue to the sellers of Appliances Connection 1,222,239 shares of our common stock, 1,111,094 shares of our series A preferred stock and a number of shares of our series A-1 preferred stock that is equal to (i) $21,000,000 divided by (ii) the average of the closing price of our shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the proposed acquisition; provided, that if we have obtained stockholder approval prior to closing, then we will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock. As of April 9, 2021, the closing price of our common stock was $8.80, which would result in the issuance of 2,386,364 shares of common stock or series A-1 preferred stock. If issued, the shares of series A preferred stock and series A-1 preferred stock will be automatically converted into shares of our common stock, on the basis of one (1) common share for each preferred share held, on the 20th calendar day following the date on which this information statement is first mailed to our stockholders. As a result, we would issue a total of 4,719,697 shares of common stock in connection with the proposed acquisition, which would constitute approximately 43.58% of our outstanding common stock following such issuance.

**Why the Company Needed Stockholder Approval**

Our common stock is listed on NYSE American under the ticker symbol "GOED." As a result, we are subject to Section 712 of the NYSE American Company Guide, pursuant to which stockholder approval is required prior to approval of applications to list additional shares to be issued as sole or partial consideration for an acquisition of the stock or assets of another company where the present or potential issuance of common stock, or securities convertible into common stock, could result in an increase in outstanding common shares of 20% or more. As noted above, if we issued all shares of common stock as contemplated by the purchase agreement, this would result in an increase of more than 20% of our outstanding common stock. Accordingly, our stockholders approved, pursuant to the written consent, the issuance of all shares of common stock contemplated by the purchase agreement, including all shares of common stock upon the conversion of any shares of series A preferred stock and series A-1 preferred stock that may be issued in accordance with the terms of the purchase agreement.

**Regulatory Matters**

Under the HSR Act and the rules that have been promulgated thereunder by the U.S. Federal Trade Commission ("*FTC*"), certain transactions may not be consummated unless information has been furnished to the Antitrust Division of the Department of Justice ("*Antitrust Division*") and the FTC and certain waiting period requirements have been satisfied. The proposed acquisition is subject to these requirements and may not be completed until the expiration of a 30-day waiting period following the filing of the required Notification and Report Forms with the Antitrust Division and the FTC or until early termination is granted. If the FTC or the Antitrust Division makes a request for additional information or documentary material related to the Acquisition (known as a "*Second Request*"), the waiting period with respect to the proposed acquisition will be extended for an additional period of 30 days, which will begin on the date on which we and Appliances Connection each certify compliance with the Second Request. Complying with a Second Request can take a significant period of time. On November 5, 2020, we and each of the two controlling owners of Appliances Connection submitted the requisite filings under the HSR Act with the Antitrust Division and the FTC. The FTC and Antitrust Division granted early termination of the waiting periods with respect to the proposed acquisition on and effective November 20, 2020.

At any time before or after consummation of the proposed acquisition, notwithstanding termination of the waiting periods under the HSR Act, the applicable competition authorities could take such action under applicable antitrust laws as each deems necessary or desirable in the public interest, including seeking to enjoin the consummation of proposed acquisition, to delay the integration, or to unwind or restructure the proposed acquisition. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. We cannot assure you that the Antitrust Division, the FTC, any state attorney general, or any other government authority or private party will not attempt to challenge the proposed acquisition on antitrust grounds, and, if such a challenge is made, we cannot assure you as to its result.

The consummation of the proposed acquisition is not subject to any other regulatory or governmental approvals.

**No Appraisal Rights**

Appraisal rights are not available to our stockholders in connection with the proposed acquisition.

**Accounting Treatment**

We will account for the proposed acquisition using the acquisition method of accounting in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 805 "Business Combinations" ("*ASC 805*"). In accordance with ASC 805, we will use our best

estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date. Goodwill of Appliances Connection will be measured as the excess of the purchase consideration over the fair value of the net tangible assets and identifiable assets acquired.

10

## THE PLAN INCREASE

**Overview**

On April 21, 2020, our board of directors and stockholders adopted the Plan, which became effective on July 30, 2020. The purpose of the Plan is to grant restricted stock, stock options and other forms of incentive compensation to our officers, employees, directors and consultants.

The maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan is 555,000 shares. As of the date of this information statement, no shares remain available for issuance under the Plan. As a result, our board of directors approved an increase in the number of shares available under the Plan to 1,000,000 shares. Such increase was approved by stockholders pursuant to the written consent.

Our board believes equity compensation is an important component of our compensation programs. Our ability to attract, retain and motivate top quality employees is material to our success, and we believe we can better achieve these objectives with grants made under the Plan. In addition, our board believes that the interests of both our company and our stockholders are advanced by affording our employees, officers and directors the opportunity to acquire or increase their proprietary interests in our company.

**Significant Features of the Plan**

The following is a summary of certain significant features of the Plan, as amended. The information which follows is subject to, and qualified in its entirety by reference to, the Plan document, which is attached to this information statement as Annex B. We urge you to read the Plan in its entirety.

Awards that may be granted include: (a) incentive stock options, (b) non-qualified stock options, (c) stock appreciation rights, (d) restricted awards, (e) performance share awards, and (f) performance compensation awards. These awards offer our officers, employees, consultants and directors the possibility of future value, depending on the long-term price appreciation of our common stock and the award holder's continuing service with our company.

Stock options give the option holder the right to acquire from us a designated number of shares of common stock at a purchase price that is fixed upon the grant of the option. The exercise price will not be less than the market price of the common stock on the date of grant. Stock options granted may be either tax-qualified stock options (so-called "incentive stock options") or non-qualified stock options.

Stock appreciation rights ("*SARs*"), which may be granted alone or in tandem with options, have an economic value similar to that of options. When a SAR for a particular number of shares is exercised, the holder receives a payment equal to the difference between the market price of the shares on the date of exercise and the exercise price of the shares under the SAR. Again, the exercise price for SARs normally is the market price of the shares on the date the SAR is granted. Under the Plan, holders of SARs may receive this payment – the appreciation value – either in cash or shares of common stock valued at the fair market value on the date of exercise. The form of payment will be determined by us.

Restricted shares are shares of common stock awarded to participants at no cost. Restricted shares can take the form of awards of restricted stock, which represent issued and outstanding shares of our common stock subject to vesting criteria, or restricted stock units, which represent the right to receive shares of our common stock subject to satisfaction of the vesting criteria. Restricted shares are forfeitable and non-transferable until the shares vest. The vesting date or dates and other conditions for vesting are established when the shares are awarded.

The Plan also provides for performance compensation awards, representing the right to receive a payment, which may be in the form of cash, shares of common stock, or a combination, based on the attainment of pre-established goals.

All of the permissible types of awards under the Plan are described in more detail as follows:

*Purposes of Plan*: The purposes of the Plan are to attract and retain officers, employees and directors for our company and its subsidiaries; motivate them by means of appropriate incentives to achieve long-range goals; provide incentive compensation opportunities; and further align their interests with those of our stockholders through compensation that is based on our common stock.

*Administration of the Plan*: The Plan is administered by our compensation committee (the "*Administrator*"). Among other things, the Administrator has the authority to select persons who will receive awards, determine the types of awards and the number of shares to be covered by awards, and to establish the terms, conditions, performance criteria, restrictions and other provisions of awards. The Administrator has authority to establish, amend and rescind rules and regulations relating to the Plan.

11

*Eligible Recipients*: Persons eligible to receive awards under the Plan will be those officers, employees, consultants, and directors of our company and its subsidiaries who are selected by the Administrator.

*Shares Available Under the Plan*: The maximum number of shares of our common stock that may be delivered to participants under the Plan is 1,000,000, subject to adjustment for certain corporate changes affecting the shares, such as stock splits. Shares subject to an award under the Plan for which the award is canceled, forfeited or expires again become available for grants under the Plan. Shares subject to an award that is settled in cash will not again be made available for grants under the Plan.

*Stock Options*:

*General.* Subject to the provisions of the Plan, the Administrator has the authority to determine all grants of stock options. That determination will include: (i) the number of shares subject to any option; (ii) the exercise price per share; (iii) the expiration date of the option; (iv) the manner, time and date of permitted exercise; (v) other restrictions, if any, on the option or the shares underlying the option; and (vi) any other terms and conditions as the Administrator may determine.

*Option Price.* The exercise price for stock options will be determined at the time of grant. Normally, the exercise price will not be less than the fair market value on the date of grant. As a matter of tax law, the exercise price for any incentive stock option awarded may not be less than the fair market value of the shares on the date of grant. However, incentive stock option grants to any person owning more than 10% of our voting stock must have an exercise price of not less than 110% of the fair market value on the grant date.

*Exercise of Options.* An option may be exercised only in accordance with the terms and conditions for the option agreement as established by the Administrator at the time of the grant. The option must be exercised by notice to us, accompanied by payment of the exercise price. Payments may be made in cash or, at the option of the Administrator, by actual or constructive delivery of shares of common stock to the holder of the option based upon the fair market value of the shares on the date of exercise.

*Expiration or Termination.* Options, if not previously exercised, will expire on the expiration date established by the Administrator at the time of grant. In the case of incentive stock options, such term cannot exceed ten years provided that in the case of holders of more than 10% of our voting stock, such term cannot exceed five years. Options will terminate before their expiration date if the holder's service with our company or a subsidiary terminates before the expiration date. The option may remain exercisable for specified periods after certain terminations of employment, including terminations as a result of death, disability or retirement, with the precise period during which the option may be exercised to be

established by the Administrator and reflected in the grant evidencing the award.

*Incentive and Non-Qualified Options.* As described elsewhere in this summary, an incentive stock option is an option that is intended to qualify under certain provisions of Internal Revenue Code of 1986, as amended (the "*Code*"), for more favorable tax treatment than applies to non-qualified stock options. Any option that does not qualify as an incentive stock option will be a non-qualified stock option. Under the Code, certain restrictions apply to incentive stock options. For example, the exercise price for incentive stock options may not be less than the fair market value of the shares on the grant date and the term of the option may not exceed ten years. In addition, an incentive stock option may not be transferred, other than by will or the laws of descent and distribution, and is exercisable during the holder's lifetime only by the holder. In addition, no incentive stock options may be granted to a holder that is first exercisable in a single year if that option, together with all incentive stock options previously granted to the holder that also first become exercisable in that year, relate to shares having an aggregate fair market value in excess of $100,000, measured at the grant date.

**Stock Appreciation Rights**: Awards of SARs may be granted alone or in tandem with stock options. SARs provide the holder with the right, upon exercise, to receive a payment, in cash or shares of stock, having a value equal to the excess of the fair market value on the exercise date of the shares covered by the award over the exercise price of those shares. Essentially, a holder of a SAR benefits when the market price of the common stock increases, to the same extent that the holder of an option does, but, unlike an option holder, the SAR holder need not pay an exercise price upon exercise of the award.

**Stock Awards**: Stock awards can also be granted under the Plan. A stock award is a grant of shares of common stock or of a right to receive shares in the future. These awards will be subject to such conditions, restrictions and contingencies as the Administrator shall determine at the date of grant. Those may include requirements for continuous service and/or the achievement of specified performance goals.

---

12

---

**Cash Awards**: A cash award is an award that may be in the form of cash or shares of common stock or a combination, based on the attainment of pre-established performance goals and other conditions, restrictions and contingencies identified by the Administrator.

**Section 162(m) of the Code**: Section 162(m) of the Code limits publicly-held companies to an annual deduction for U.S. federal income tax purposes of $1.0 million for compensation paid to each of their chief executive officer and their three highest compensated executive officers (other than the chief executive officer) determined at the end of each year, referred to as covered employees.

*Performance Criteria*: Under the Plan, one or more performance criteria will be used by the Administrator in establishing performance goals. Any one or more of the performance criteria may be used on an absolute or relative basis to measure the performance of our company, as the Administrator may deem appropriate, or as compared to the performance of a group of comparable companies, or published or special index that the Administrator deems appropriate. In determining the actual size of an individual performance compensation award, the Administrator may reduce or eliminate the amount of the award through the use of negative discretion if, in its sole judgment, such reduction or elimination is appropriate. The Administrator shall not have the discretion to (i) grant or provide payment in respect of performance compensation awards if the performance goals have not been attained or (ii) increase a performance compensation award above the maximum amount payable under the Plan.

*Other Material Provisions*: Awards will be evidenced by a written agreement, in such form as may be approved by the Administrator. In the event of various changes to the capitalization of our company, such as stock splits, stock dividends and similar re-capitalizations, an appropriate adjustment will be made by the Administrator to the number of shares covered by outstanding awards or to the exercise price of such awards. The Administrator is also permitted to include in the written agreement provisions that provide for certain changes in the award in the event of a change of control of our company, including acceleration of vesting. Except as otherwise determined by the Administrator at the date of grant, awards will not be transferable, other than by will or the laws of descent and distribution. Prior to any award distribution, we are permitted to deduct or withhold amounts sufficient to satisfy any employee withholding tax requirements. Our board also has the authority, at any time, to discontinue the granting of awards. The board also has the authority to alter or amend the Plan or any outstanding award or may terminate the Plan as to further grants, provided that no amendment will, without the approval of our stockholders, to the extent that such approval is required by law or the rules of an applicable exchange, increase the number of shares available under the Plan, change the persons eligible for awards under the Plan, extend the time within which awards may be made, or amend the provisions of the Plan related to amendments. No amendment that would adversely affect any outstanding award made under the Plan can be made without the consent of the holder of such award.

**New Plan Benefits**

Future awards, if any, that will be made to eligible persons under the Plan are subject to the discretion of the Administrator and, therefore, we cannot currently determine the benefits or number of shares subject to awards that may be granted in the future to our employees, consultants and non-employee directors under the Plan.

**No Dissenters' Rights**

Under Delaware law, holders of our common stock are not entitled to dissenter's rights of appraisal with respect to the approval of the plan increase.

---

13

---

## INFORMATION ABOUT GOEDEKER

**Overview**

Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 SKUs across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

**Corporate History and Structure**

Our company was incorporated in the State of Delaware on January 10, 2019 for the sole purpose of acquiring substantially all of the assets of Goedeker Television. On April 5, 2019, we acquired substantially all of the assets of Goedeker Television for an aggregate purchase price of $4,175,373, consisting of: (i) the issuance of a promissory note in the principal amount of $4,100,000 and a deemed fair value of $3,637,898; (ii) up to $600,000 in earn out payments with a deemed fair value of $81,494; (iii) a 22.5% ownership interest in our parent company at the time, 1847 Goedeker Holdco Inc., with a deemed fair value of $786,981, (iv) cash of $478,000, and (v) net of a working capital adjustment of $809,000. As a result of this

transaction, we acquired the former business of Goedeker Television and continue to operate this business. Prior to our acquisition of substantially all of the assets of Goedeker Television, we had no operations other than operations relating to our incorporation and organization.

On October 20, 2020, we formed ACI as a wholly owned subsidiary in the State of Delaware for the sole purpose of completing the proposed acquisition. As of the date of this information statement, we do not have any other subsidiaries.

**The Large and Growing United States Appliance Market**

The United States household major appliances market is highly fragmented with big box retailers, online retailers, and thousands of local and regional retailers competing for share in what has historically been a high touch sale process. According to Statista, revenue in the United States household major appliances market (excluding small appliances) is projected to reach $22.9 billion in 2021 and is expected to grow at an annual growth rate of 1.68% from 2021 to 2025.

According to the United States Census Bureau, there are approximately 100 million households in the United States with annual incomes between $25,000 and $250,000 and approximately 193 million individuals between the ages of 20 and 64 in the United States, many of whom are accustomed to purchasing goods online. As younger generations age, start new families and move into new homes, we expect online sales of household appliances to increase. In addition, we believe the online household appliances market will further grow as older generations of consumers become increasingly comfortable purchasing online, particularly if the process is easy and efficient.

When shopping for appliances their homes, consumers bring their own unique combination of style and budget, requiring vast selection to garner broad appeal. Brick and mortar retailers must balance selection with the challenges of high inventory carrying costs, complex vendor requirements and limited showroom and storage space. As a result, consumers are faced with a decision between shopping in multiple stores, or settling for what is available. Just as e-commerce has changed the landscape of other retail sectors, we believe an easy-to-browse, online shopping experience with massive selection and excellent customer service has the potential to change the way people buy household appliances.

Logistics, fulfillment and customer service for household appliances are challenging given the myriad vendors and product specifications, and the cumbersome size and weight of items. Household appliances often have a low dollar value to weight ratio compared to other categories of retail, therefore requiring a logistics network that is optimized for items with those characteristics. Many consumers also seek first-rate customer service so they are not burdened with managing delivery, shipping and return logistics on their own. However, we believe big box retailers that serve the mass market for home goods are often unable or unwilling to provide this level of service.

14

**Our Solution - Key Benefits for Our Customers**

We offer broad selection and choice. Our easy to use website makes it easy for customers to discover products, styles and price points that appeal to them. Convenience and value are central to our offering. We offer a one-stop shop for consumers in the appliance category, with competitive pricing reflecting the many vendors on our platform and a differentiated and robust merchandising experience.

We offer consumers an engaging shopping journey through the combination of our technology-rich platform and our experienced customer support personnel, available via chat, email, text and phone. Superior customer service is a core part of the experience that we will offer shoppers. Our customer service organization will help consumers navigate our site, answer questions and complete orders, staffed with specialists focused on specific product classes. This team helps us build trust with consumers, enhance its reputation and drive sales.

**Competitive Strengths**

Based on management's belief and experience in the industry, we believe that the following competitive strengths enable us to compete effectively:

- *Name and reputation*. We believe that we enjoy a long-standing (50+ years) reputation with vendors and customers for our focus on offering a full line of appliances and other home furnishings with competitive pricing and superior customer service.
- *Product selection and pricing*. We believe that our broad product selection and attractive pricing model creates a sustainable competitive advantage. We strive to offer consumers the broadest choice in the market and review pricing by other retailers on a daily basis to ensure our product offerings are competitively priced. We have negotiated attractive terms with our vendor partners, allowing us to pass through savings and selection to customers.
- *Website ease of use*. Our purpose-built technology platform is designed to provide consumers with a compelling user experience as they browse, research and purchase our products. We use personalization, based on past browsing and shopping patterns, to create a more engaging consumer experience.
- *Best in class customer service and marketing technology*. We believe that the investments we have made in our call center tools and shopping platforms, combined with digital marketing optimization, allow tus to offer an unmatched customer journey.

**Our Growth Strategies**

Our mission is to change the way consumers buy appliances and, in doing so, become the leading online retailer of home appliances. Our strategies to achieve this mission, while increasing value for our shareholders, will include:

- *Grow our brand*. Increasing brand awareness and growing favorable brand equity among consumers is central to our growth. We plan to drive brand awareness through a combination of sophisticated, multi-layered marketing programs and word-of-mouth referrals. We will continue to invest in marketing initiatives to efficiently attract consumers.
- *Expand in the commercial market*. To date, we have directed all marketing efforts toward the consumer. With remodels and new home construction, there is opportunity to market to home builders, real estate developers, contractors and interior designers who are making or influencing the purchasing decision for many consumers. We believe that our low price business model will be received well by this market, creating substantial revenue opportunities and more repeat business. Evidence of unmet demand and market need is ongoing with large commercial sales occurring organically each week through our website and contact center.
- *Drive continued operational excellence*. We are committed to improving productivity and profitability through several operational initiatives designed to grow revenue and expand margins. Some of the key initiatives for operational excellence include:
  - *Logistics and shipping optimization*. We plan to implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. We plans to pick up products from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, we expect to take advantage of buying opportunities and capture time-sensitive customers more frequently. We will also explore options to use a showroom, warehousing and cross dock model in other key markets.

15

  - *Optimize price*. We will continue building a data-based understanding of price elasticity dynamics, promotional strategies and other price management tools to drive optimized pricing for our products.
  - *Drive marketing efficiencies*. As we continue to grow and scale, we believe that we will continue to improve the efficiency of our marketing investments. We believe that with larger budgets and deeper experience, we will benefit from lower media rates and

increased data that will improve our customer targeting capabilities.

- ***Opportunistically pursue strategic acquisitions***. We may continue to expand our business through opportunistic acquisitions that allow it to enhance our customer offering, build our multi-brand portfolio, enter new geographies or enhance our operational infrastructure.

**Products and Services**

*Appliances*

The appliance category is our largest revenue source. We have a long history of selling these products and serving the distinct needs of consumers looking to replace or add to their home appliances. We offer nearly 22,000 appliance SKUs from all mainline original equipment manufacturers, including Bosch, Whirlpool, GE, Maytag, LG, Samsung, Sharp, and Kitchen Aid, among others. We sell all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers.

*Furniture*

We began selling furniture online in 2015 and currently offer approximately 63,000 SKUs from approximately 150 furniture vendors. Furniture is our second largest product category. The organization of product by type and characteristics makes for a complete shopping experience in a complicated product category.

*Other Products*

We also offer a broad assortment of products in the décor, bed & bath, lighting, outdoor living and electronics categories. While these are not individually high-volume categories, they complement the appliance and furniture categories to produce a one-stop home goods offering for our customers.

We also offer customers the opportunity to purchase warranties that protect their appliances beyond the manufacturers' warranty period. These warranties are offered through third party vendors. We remit the cost of the warranty to the warranty company, net of our commission. The warranty company assumes all costs of the warrantied product.

*Installation Services*

We offer installation and removal services within the continental United States. A full-service install involves hooking up the appliance, testing it to ensure proper operation, and removing packing materials from customer's home, office or other delivery location. We fulfill such installation services through third-party logistics service provider partners.

**Pricing**

We believe that our pricing model creates a competitive advantage as we strive to sell at the lowest possible price in the market. Our team tracks pricing daily on more than 15,000 appliance SKUs, comparing prices with all major resellers. Adjustments are made daily to ensure the success this strategy. Our business model emphasizes value added products up to and including super premium products. As a result, we believe that our average selling price by product category is higher than industry norms.

**Vendor/Supplier Relationships**

We offer more than 240 vendors and over 141,000 SKUs available for purchase through our website. During the year ended December 31, 2020, we purchased a substantial portion of products from Whirlpool (38%) and General Electric brands (12.3%). Whirlpool brands accounted for 44.1% of product purchases during the year ended December 31, 2019. No other supplier accounted for more than 10% of our purchases in the years ended December 31, 2020 or 2019.

---

16

---

We are substantially dependent on Whirlpool for a large portion of our product purchases. Products are purchased from all suppliers, including Whirlpool, on an at-will basis. We have no long-term purchase agreements with Whirlpool or any other supplier. Relationships with suppliers are subject to change from time to time. Changes in our relationships with suppliers occur periodically and could positively or negatively impact our net sales and operating profits. We believe that we can be successful in mitigating negative effects resulting from unfavorable changes in the relationships with suppliers through, among other things, the development of new or expanded supplier relationships.

**Sales and Marketing**

We market our products through a variety of methods, including through paid shopping and paid searches, display marketing, affiliate marketing, organic marketing, paid social media marketing and email marketing. The diagram below sets forth some of our key marketing statistics for 2020.



This chart shows results from our marketing efforts. The revenue shown exceeds total revenue as a customer may visit the site more than once before making a purchase, causing revenue attribution in multiple channels.

*Paid Shopping and Paid Search*

Our most effective channel is paid shopping and paid search. We utilize multiple search platforms (primarily Google) to put our products in front of

consumers that are searching for products online. We have engaged a "best in class" agency and continually monitor and optimize campaigns in order to create more efficient and profitable campaign results. We specialize in a "bottom of the funnel" approach, meaning our campaigns are designed to spend more liberally with those at the end of the purchase cycle, and more conservatively with those in the beginning of the purchase journey.

### Display Marketing

The majority of our display efforts are in the form of remarketing across the Google ad network. At this time, we are not focused on major branding efforts as much as we are on capitalizing on consumers who have begun their buying journey. With high average order values, we find that remarketing works effectively at bringing consumers back on the website or the phone to place an order.

---

17

---

### Affiliate Marketing

Keeping a keen eye on nexus laws, we have scaled back our affiliate marketing in order to protect the interests of our company. We have found that the administrative burden and tax impact or revenue generated by many of the affiliates outweighed the benefits. As of the date of this information statement, we have only one affiliate marketing relationship remaining with 169 affiliate partners.

### Organic Marketing

Organic marketing continues to be a strong channel for our company. While we are not heavily invested in organic at this time, the channel resulted in approximately 1.1 million users coming to our website in 2020. We understand best practices in technology, programming, copywriting, link acquisition as well as many other strategies to ensure we are in a strong position with the largest search engines.

### Paid Social Media

Social media is utilized sparingly to drive traffic and manage brand perception. It is our goal to not look irrelevant to consumers viewing us on social media, while at the same time minimizing spending on these channels. We have found awareness campaigns on social media to be ineffective with products at our price point. We do take advantage of the remarketing opportunities on Facebook, which work well for us by driving highly qualified traffic back to our website where that traffic is converted to customers.

### Email

Using email marketing, we put relevant products and offers in front our of a growing email database of approximately 259,000 opted-in consumers multiple times per week. Our marketing team produces email content by utilizing in-house design, copy and programming resources. Messages are sent using an enterprise-level email service provider and metrics such as deliverability, open rates and click rates are constantly monitored. Messages are targeted to individuals based on numerous factors including what time they are most likely to read emails, past purchase behavior and frequency of interaction.

Additionally, we utilize a multitude of triggered email programs, such as cart and browse abandonment, to entice customers back into the funnel. We continue to pursue best practices such as offer modals and scraping the checkout in order to facilitate continued list growth. Below is a diagram representing key performance metrics for the period from July to December 2020.



---

18

---

### Customers and Markets

Based on a study that we commissioned in 2019, our average shopper is between 35 and 64 years old and lives in a single-family home, which they own. Most of our customers are not reluctant to buy at a premium price for top quality as long as we and our products provide good value. Our most popular brands tend to be middle to upper market brands that are not found in the stores of many large retailers. A significant percentage of our customers have household income above $100,000.

Our physical store presence and warehouse is located in St Louis, Missouri, and third-party distribution, delivery and installation agreements allow us to serve, sell and ship to customers nationwide. We plan to expand our agreements directly with manufacturers to pick up and deliver from their warehouse to reach more customers, more quickly at reduced costs. In fact, while we started many years ago as a brick and mortar only business, about 78% of our sales originate from outside the Midwest market. The diagram below represents our sales by region for 2020:



**Customer Support**

Our customer support team exists to sell and service customers at all parts of the buying and ownership cycle. We believe that by integrating phone support with marketing efforts, we differentiate ourselves from big box and independent retailers. Leading edge contact center technology and management is in early stage deployment and promises to increase sales close rates, decrease cancellations, increase average ticket size and create customers that purchase within the next twelve months. Current repeat purchasing is roughly 11% within a year, which demonstrates a reasonable satisfaction with the current model. We have a customer service team of 29 members and call center sales team of 22 members.

Our call center is now available to field inbound customer calls from 8:00 am to 6:00 pm CT, Monday through Saturday and Sunday from 12:00pm to 6:00 pm CT. Approximately 36% of all sales involve an order that was placed with a sales representative. This percentage should increase in 2021 as chat becomes a more deployed resource for our shoppers and customers.

**Logistics**

***Purchasing and Inventory Management***

We primarily purchase inventory only after a sale has been made through our website, which allows us to tightly manage our inventory and warehouse space while still providing customers quick delivery times and control over the entire process. However, we do also make some strategic inventory buys to take advantage of lower costs and to satisfy consumer demand more quickly. About 64% of appliances flow through our warehouse while almost all furniture is drop shipped to the customer. All inventory is managed with a barcode system and is automatically tracked through our Microsoft Dynamics GP ERP system. As described above, initiatives are underway that will allow us to pick up products closer and more quickly directly from our manufacturers' warehouses.

---

19

---

***Shipping and Delivery***

We take ownership of inventory when it is delivered to our warehouse. At this point, warehouse staff unloads the product, determines the delivery location, picks a carrier and ultimately ships the product. We primarily use R+L Carriers for most of our larger shipping services. We also use AM Home Delivery for furniture deliveries. If a customer is outside of their service zones or requires faster delivery times, we will use one of our three or four specialty carriers to get the job done.

***Returns and Exchanges***

Our return and exchange policy is designed to be as worry-free and customer-friendly as possible. We offer a 30-day money back, 100% satisfaction guarantee. If a customer is not satisfied with his or her order, we will exchange or refund the full purchase price, minus all shipping costs, within 30 days of delivery. We do not charge a restocking fee when items are returned or exchanged, which we believe differentiates us from other retailers. We will not take returns of, or exchange, products that are damaged, installed, assembled, or used after the customer has taken delivery.

**Competition**

We compete with big box retailers, independent appliance and furniture retailers, hybrid retail and direct-to-consumer companies and web only companies. As a hybrid retail and direct-to-consumer company, we have the ability to navigate the competitive offerings of each competitor, utilizing online marketing, our customer service expertise and large curated assortments to attract and retain new customers.

***Appliances***

The U.S. appliance market in general is highly fragmented with thousands of local and regional retailers competing for share. Our primary competitors in the appliance market include:

- *Big Box Retailers:* Home Depot, Lowe's, Best Buy and Walmart;
- *Online Retailers and Marketplaces:* Amazon and Wayfair; and
- *Specialty Retailers:* AJ Madison, Appliances Connection and US Appliance.

The shifting landscape to online sales in the segment is providing a significant market share capture and positioning opportunity for companies. We are continuing to capitalize on this market shift.

***Furniture and Homewares***

Although consolidation in the U.S. furniture and homeware market continues to progress, the industry is still relatively fragmented compared to other retail subsectors of similar market value. Our main competitors in the furniture and homewares market include:

- *Furniture Stores:* Ashley Furniture, Bob's Discount Furniture, Havertys and Rooms To Go;
- *Big Box Retailers:* Bed Bath & Beyond, IKEA, Target and Walmart;
- *Department Stores:* JCPenney and Macy's;
- *Specialty Retailers:* Crate and Barrel and Ethan Allen; and
- *Online Retailers and Marketplaces:* Amazon, Wayfair and eBay.

Much like the appliance market, the shifting landscape to online sales in the segment is providing a significant market share capture and positioning opportunity for companies. We are continuing to capitalize on this market shift. We believe there may be opportunities for nationally

distributed niche products, like sleeper sofas, where we could benefit from not inventorying product but marketing and then ordering on demand after payment. Similar opportunities are even more broadly available in the appliance market.

20

## Intellectual Property

We own several domain names, including for our www.goedekers.com website. The agreements with suppliers generally provide us with limited, non-exclusive licenses to use the supplier's trademarks, service marks and trade names for the sole purpose of promoting and selling their products.

To protect intellectual property, we rely on a combination of laws and regulations, as well as contractual restrictions. We also rely on the protection of laws regarding unregistered copyrights for certain content we create. We also rely on trade secret laws to protect proprietary technology and other intellectual property. To further protect intellectual property, we enter into confidentiality agreements with our executive officers and directors.

## Facilities

We are headquartered at 13850 Manchester Rd., St. Louis, Missouri 63011. This facility totals 50,000 square feet of office, showroom and warehouse space. We lease this facility pursuant to a lease agreement entered into with S.H.J., L.L.C., a Missouri limited liability company and affiliate of Goedeker Television, on April 5, 2019. The lease is for a term of five (5) years and provides for a base rent of $45,000 per month. In addition, we are responsible for all taxes and insurance premiums during the lease term.

On January 13, 2021, we entered into a lease agreement with Westgate 200, LLC, which was amended on March 30, 2021, for a new location totaling approximately 86,800 square feet of office, showroom and warehouse space in St. Charles, Missouri. The initial term of the lease expires on April 30, 2027 with two (2) options to renew for additional five (5) year periods. The base rent is initially $20,976.79 per month and increases to $31,465 on October 1, 2021, with annual increases thereafter to a base rent during the sixth year of $35,558 per month. We will also pay our 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and are also responsible to pay for the utilities used on the premises.

We believe that all properties have been adequately maintained, are generally in good condition, and are suitable and adequate for our business.

## Employees

As of December 31, 2020, we employed 102 full-time employees. None of our employees are represented by labor unions, and we believe that we have excellent relationships with our employees.

## Legal Proceedings

From time to time, we may become involved in various lawsuits and legal proceedings which arise in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these or other matters may arise from time to time that may harm our business. We are not currently aware of any such legal proceedings or claims that we believe will have a material adverse effect on our business, financial condition or operating results.

## Regulation

Our business is subject a variety of laws and regulations applicable to companies conducting business on the Internet. Jurisdictions vary as to how, or whether, existing laws governing areas such as personal privacy and data security, consumer protection or sales and other taxes, among other areas, apply to the Internet and e-commerce, and these laws are continually evolving. For example, certain applicable privacy laws and regulations require us to provide customers with our policies on sharing information with third parties, and advance notice of any changes to these policies. Related laws may govern the manner in which we store or transfer sensitive information or impose obligations on us in the event of a security breach or inadvertent disclosure of such information. Additionally, tax regulations in jurisdictions where we do not currently collect state or local taxes may subject us to the obligation to collect and remit such taxes, or to additional taxes, or to requirements intended to assist jurisdictions with their tax collection efforts. New legislation or regulation, the application of laws from jurisdictions whose laws do not currently apply to our business, or the application of existing laws and regulations to the Internet and e-commerce generally could result in significant additional taxes on our business. Further, we could be subject to fines or other payments for any past failures to comply with these requirements. The continued growth and demand for e-commerce is likely to result in more laws and regulations that impose additional compliance burdens on e-commerce companies.

21

## INFORMATION ABOUT APPLIANCES CONNECTION

### Overview

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website 1stopcamera.com.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and laundry appliances and operates out of its Brooklyn, New York showroom as well as online at goldcoastappliances.com.

Joe's Appliances, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, joesappliances.com.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website www.appliancesconnection.com.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

Appliances Connection has built powerful home-grown logistics technology that can help reduce cycle time and efficiencies for the combined company's operations. Appliances Connection will bring the relationships, network, and technology necessary to continue economies of scale for the entire business of the combined company throughout the United States e-commerce market. The combined company will leverage Appliances

Connection's powerful platform to increase speed, reduce costs and increase margins across our entire business.

**Products and Services**

*Appliances*

Appliances Connection is an authorized dealer of most major appliance brands, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool. It offers approximately 38,550 appliance SKUs. It sells all major home appliances, including refrigerators, ranges, ovens, dishwashers, microwaves, freezers, washers and dryers, and air conditioners.

*Furniture*

Appliances Connection sells a full line of furniture for every room in the home and currently offers approximately 247,700 SKUs from approximately 240 furniture vendors. It utilizes a sophisticated website that includes organization of product by type and characteristics that makes for a complete shopping experience in a complicated product category.

22

*Other Products*

Appliances Connection also sells outdoor living products, fitness equipment, plumbing fixtures, air conditioners, fireplaces, fans, dehumidifiers, humidifiers, air purifiers and televisions. Appliances Connection also sells commercial appliances for its builder and business clients.

Appliances Connection is an authorized dealer of most major outdoor appliance and furniture brands. It sells all major outdoor living appliances and furniture including various types of electronic, charcoal, and gas grills, barbeques, and smokers. Appliances Connection also offers anything a customer would need to create a fully functioning outdoor kitchen, including outdoor refrigerators, sinks, ranges, kitchen islands, ice makers, and warming drawers. Appliances Connection's patio and lawn furniture selection include umbrellas, lounge chairs, outdoor beds, outdoor fireplaces and fire pits, swings, patio sets, and patio sofas.

**Installation and Other Services**

Appliances Connection offers installation and removal services within the continental United States. Appliances Connection primarily fulfills such installation services internally through YF Logistics, utilizing third-party logistics service provider partners provide these services to delivery points in remote areas within the continental United States where YF Logistics may not be available.

Appliances Connection also has outside business partners such as Scavolini, a leader in kitchen cabinetry and design, and an in-house design team trained by the experts at Scavolini that will help customers remodel and reinvent their kitchens, living rooms, bathrooms and laundry rooms.

**Pricing**

Appliances Connection provides the customer with a full suite of appliance and furniture options, from familiar household names up to luxury and premium brands, utilizing a pricing model intended to offer customers the lowest prices available in the market. This allows the customer to easily find the appliance they are looking for within their budget. Appliances Connection's team tracks the manufacturer minimum advertised price daily on more than 38,550 appliance SKUs, comparing prices across all major resellers. Price adjustments are made monthly or more frequent basis to ensure product offerings are competitively priced, maximizing value for customers.

**Vendor/Supplier Relationships**

Appliances Connection offers more nearly 2,000 vendors and nearly 300,000 SKUs available for purchase through its website. Appliances Connection is a member of Dynamic Marketing, Inc., or DMI, a 60-member appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and them make such products available to its members, including Appliances Connection, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including Appliances Connection, with leverage and purchasing power with appliance vendors, and increases Appliances Connection's ability to compete with competitors, including big box appliance and electronics retailers. Appliances Connection owns an approximate 5% equity interest in DMI. Additionally, Albert Fouerti, one of the owners of Appliances Connection who will also become a member of our board of directors upon closing of the proposed acquisition, is on the Board of DMI. During the years ended December 31, 2020 and 2019, Appliances Connection purchased a substantial portion of products (75.2% and 70.7%, respectively) from DMI. The other largest vendors include the following: Ashley Furniture, Sub-Zero, Miele, BSH Home Appliances, Ilve, and ALMO Distributing. Appliances Connection's business model allows it to constantly review and evaluate each supplier relationship and it is are always open to building new supplier/vendor relationships.

As noted above, Appliances Connection utilizes DMI for a large portion of its product purchases. Products are purchased from all suppliers, including any purchases made through DMI, on an at-will basis. Appliances Connection does not have any long-term purchase agreements with DMI or any other suppliers. Relationships with suppliers are subject to change from time to time. Changes in relationships with suppliers occur periodically and could positively or negatively impact net sales and operating profits. We believe that Appliances Connection can be successful in mitigating negative effects resulting from unfavorable changes in the relationships with suppliers through, among other things, the development of new or expanded supplier relationships.

23

**Sales and Marketing**

Appliances Connection markets its products through a variety of methods, including through online advertisements and promotions and digital marketing, including through Appliances Connection's retail website, www.appliancesconnection.com. To a lesser degree, it also utilizes more traditional forms of marketing like television and radio advertisements in the New York City media market.

*Online Advertisement and Promotions*

Appliances Connection's major marketing channel is its website located at www.appliancesconnection.com. The website is key to new product launches as consumers can view product features and specifications. The website is up to date with all promotional MAP pricing, falling in line with expectations from the manufacturers and taking advantage of buyer holidays. The website facilitates sales of products to markets not reached by Appliances Connection's brick and mortar store.

*Digital Marketing*

Appliances Connection has more than 12,100 followers on Twitter, 28,700 fans on Facebook and 2,000 subscribers on YouTube. It has been using digital marketing media with engaging posts to promote its products.

*Television and Radio Marketing*

Appliances Connection utilizes television and radio marketing as a more traditional means to reach customers who may not be as active online or on social media, primarily targeting the New York City media audience.

*Showrooms*

Appliances Connection maintains two showrooms in Brooklyn, New York where customers can fully visualize their renovations by touching and seeing the products in the showroom. The showrooms also allow customers to access factory-trained staff's knowledge and experience to assist customers with their product selections.

**Customers and Markets**

Most of Appliances Connection's customers are not reluctant to buy at a premium price for top quality as long as Appliances Connection and its products provide good value. The most popular brands tend to be middle to upper market brands that are not found in the stores of many large retailers. Customers demand variety and Appliances Connection has successfully been able to provide them with an abundance of options when it comes to choosing their household appliances and furniture.

24

While Appliances Connection's physical showrooms are located in Brooklyn, New York and its warehouse is located in New Jersey, the combination of YF Logistics and third-party distribution, delivery and installation agreements allow Appliances Connection to serve, sell and ship to customers nationwide. Its proprietary logistical technology has allowed it to expand its presence outside of the Northeast region and Appliances Connection is able to provide customers all over the country with the top-notch level of support that the original Northeastern customers have always enjoyed. While about one-third of Appliances Connection's sales are still in the Northeast market, it has successfully been expanding its footprint into the rest of the Continental United States. The diagram below represents Appliances Connection's sales by region for 2020:



**Customer Support**

Appliances Connection's in-house customer support team facilitates sales and support for its products at each stage of the purchasing process as well as ongoing post-sale technical support. Appliances Connection's customer care staff, which includes approximately 54 employees, includes a highly-trained and knowledgably call center sales team that also provides customer support over the phone, via email, or via online chat on its website. Additionally, the customer care staff provides technical support to customers, offering additional information with respect to product features and manufacturer warranties to increase customer satisfaction and return business.

Appliances Connection's call center is now available to field inbound customer calls from 9:00 am to 9:00 pm ET, Monday through Thursday, Friday from 9:00 am to 4:00 pm ET and Sunday from 10:00 am to 5:00 pm ET. Approximately 50% of all sales involve an order that was placed with a sales representative. Appliances Connection expects this percentage to increase in 2021 as online chat becomes a more deployed resource for shoppers and customers.

**Logistics**

***Purchasing and Inventory Management***

Appliances Connection carefully monitors and manages its inventory levels in an effort to match quantities on hand with customer demand as closely as possible by tracking historical and projected consumer demand, as well as continuous monitoring and adjustment of inventory receipt levels. In some instances, Appliances Connection purchases inventory only after a sale has been made through its website. Nearly all of Appliances Connection's appliances flow through its Hamilton, New Jersey warehouse. All inventory is managed with a barcode system and is automatically tracked through its proprietary in-house inventory management system.

***Shipping and Delivery***

Appliances Connection takes ownership of inventory when it is delivered to its warehouse in New Jersey. At this point, warehouse staff unloads the product, determines the delivery location, picks a carrier and ultimately ships the product. Appliances Connection primarily uses YF Logistics for its shipping and logistics services; however, if the shipment is outside of YF Logistics' service zone, it utilizes other third party carriers for shipping and installation services to get the job done.

Appliances Connection plans to implement a series of initiatives with key vendors to increase shipping speed to customers, cut costs and increase margins. Appliances Connection plans to pick up product from manufacturers' warehouses and selectively use inventory buys to reduce costs. With access to vendor warehouse operations, Appliances Connection expects to take advantage of buying opportunities and capture time-sensitive customers more frequently.

25

***Returns and Exchanges***

Appliances Connection offers a 30-day return policy that allows customers to return merchandise if, for any reason, they are not 100% satisfied with their purchase. If a customer is not satisfied with his or her order, Appliances Connection will exchange or refund the full purchase price within 30 days of delivery.

**Intellectual Property**

1 Stop operates under the registered trademark "CONNECT TO GOOD." Superior Deals owns four registered trademarks, "FORTÉ," "SUPERIORBRANDS," "MILO ITALIA" and "SUPERIORBRANDS." 1 Stop and Gold Coast own numerous domain names, including the www.appliancesconnection.com website, as well as 1stopcamera.com, goldcoastappliances.com, and joesappliances.com.

The agreements with suppliers generally provide Appliances Connection with limited, non-exclusive licenses to use the supplier's trademarks, service marks and trade names for the sole purpose of promoting and selling its products.

**Facilities**

Appliances Connection is headquartered at 1870 Bath Avenue, Brooklyn, NY 11214. It has a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York.

Appliances Connection leases two facilities pursuant to lease agreements entered into between 1 Stop and Joe's Appliances and 1870 Bath Ave. LLC and 7812 5th Ave Realty LLC, respectively, which are entities owned and controlled by Albert Fouerti and Elie Fouerti, the principal officers and owners of 1 Stop and Joe's Appliances. The leases are for a term of ten (10) years and provide for different monthly fixed rent from $5,300 per

month to $74,000 per month for the first year of the term. In addition, Appliances Connection is responsible for all taxes and insurance premiums during the lease term.

YF Logistics subleases the warehouse space from DMI for a rent equal to 71.43% of the base rent paid by DMI under its lease for the premises, plus 71.43% of any taxes, operating expenses, additional charges or any other amounts due by DMI, for a total of $56,250 per month. The initial term of the sublease was for a period commencing on June 1, 2019 and terminating on April 30, 2020, with automatic renewals for successive one year terms until the earlier of (i) termination by either upon thirty (30) days' prior written notice or (ii) April 30, 2024.

Appliances Connection believes that all properties have been adequately maintained, are generally in good condition, and are suitable and adequate for the businesses of Appliances Connection.

### Employees

As of December 31, 2020, 1 Stop employed 154 full-time employees, YF Logistics employed 135 full-time employees, Superior Deals employed 5 full-time employees and Joe's Appliances employed 1 full-time employee. Gold Coast did not have any full-time employees. None of the employees are represented by labor unions, and Appliances Connection believes that it has excellent relationships with its employees.

### Legal Proceedings

From time to time, Appliances Connection may become involved in various lawsuits and legal proceedings which arise in the ordinary course of business. However, litigation is subject to inherent uncertainties, and an adverse result in these or other matters may arise from time to time that may harm its business. Appliances Connection is not currently aware of any such legal proceedings or claims that it believes will have a material adverse effect on its business, financial condition or operating results.

### Regulation

Appliances Connection's business is subject a variety of laws and regulations applicable to companies conducting business on the Internet. Jurisdictions vary as to how, or whether, existing laws governing areas such as personal privacy and data security, consumer protection or sales and other taxes, among other areas, apply to the Internet and e-commerce, and these laws are continually evolving. For example, certain applicable privacy laws and regulations require Appliances Connection to provide customers with its policies on sharing information with third parties, and advance notice of any changes to these policies. Related laws may govern the manner in which Appliances Connection stores or transfers sensitive information or impose obligations on it in the event of a security breach or inadvertent disclosure of such information. Additionally, tax regulations in jurisdictions where Appliances Connection does not currently collect state or local taxes may subject it to the obligation to collect and remit such taxes, or to additional taxes, or to requirements intended to assist jurisdictions with their tax collection efforts. New legislation or regulation, the application of laws from jurisdictions whose laws do not currently apply to Appliances Connection's business, or the application of existing laws and regulations to the Internet and e-commerce generally could result in significant additional taxes on its business. Further, Appliances Connection could be subject to fines or other payments for any past failures to comply with these requirements. The continued growth and demand for e-commerce is likely to result in more laws and regulations that impose additional compliance burdens on e-commerce companies.

26

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS FOR GOEDEKER

*The following discussion and analysis summarizes the significant factors affecting our operating results, financial condition, liquidity and cash flows as of and for the periods presented below. The following discussion and analysis should be read in conjunction with the financial statements and the related notes thereto included elsewhere in this information statement. The discussion contains forward-looking statements that are based on the beliefs of management, as well as assumptions made by, and information currently available to, management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed below and elsewhere in this information statement, particularly in "Cautionary Statement Regarding Forward-Looking Statements.*

*All periods presented on or prior to April 5, 2019 represent the operations of Goedeker Television, our predecessor. Unless otherwise specified, all results of operations information for the year ended December 31, 2019 reflects the full year.*

*References to "Successor" refer to the financial position and results of operations of our company subsequent to April 5, 2019. References to "Predecessor" refer to the financial position and results of operations of Goedeker Television on and before April 5, 2019.*

### Overview

Our company operates a technology-driven e-commerce platform for appliances and furniture, offering a combination of selection, service and value we believe to be unmatched in the $22.9 billion United States household major appliance industry. Since our founding in 1951, we have evolved from a local brick and mortar operation serving the St. Louis metro area to a nationwide omni-channel retailer offering over 141,000 SKUs across all major appliance brands with competitive pricing. Our relentless focus on customer experience encompasses our easy to navigate websites, highly trained call center representatives and sophisticated fulfillment ecosystem.

Our customers span a wide range of demographics, style and budget, which we attract with our efficient digital marketing capabilities and match with our broad product selection. We have invested considerably in our scalable logistics infrastructure, purpose built for the unique demands of the appliance market and see it as a competitive advantage, strengthening as we grow. Our tightly-integrated vendor relationships and order management tools allow us to offer our vast selection of products while holding limited inventory, contributing to strong and improving operating metrics.

### Recent Developments

#### *Impact of Coronavirus Pandemic*

In late 2019, a novel strain of coronavirus, or COVID-19, was reported to have surfaced in Wuhan, China. The virus has since spread to over 150 countries and every state in the United States. On March 11, 2020, the World Health Organization declared the outbreak a pandemic, and on March 13, 2020, the United States declared a national emergency.

Most states and cities, including in markets in which we operate, reacted by instituting quarantines, restrictions on travel, "stay at home" rules, social distancing measures and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Pursuant to restrictions in Missouri, our showroom was closed from April through June of 2020, but our call center and warehouse continued to operate. Since over 95% of our sales are completed online and our call center and warehouse and distribution operations continued to operate, the restrictions put in place have not had a materially negative impact on our operations. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facility or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

In addition, we are dependent upon suppliers to provide us with all of the products that we sell. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain of our products. As a result, we have faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect our business and financial results. Even if we are able to find alternate sources for such products, they may cost more, which could adversely impact our profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact our

business. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on our revenue.

27

Furthermore, the spread of COVID-19 has adversely impacted global economic activity and has contributed to significant volatility and negative pressure in financial markets. The pandemic has resulted, and may continue to result, in a significant disruption of global financial markets, which may reduce our ability to access capital in the future, which could negatively affect our liquidity.

We have taken steps to take care of our employees, including providing the ability for employees to work remotely and implementing strategies to support appropriate social distancing techniques for those employees who are not able to work remotely. We have also taken precautions with regard to employee, facility and office hygiene as well as implementing significant travel restrictions. We are also assessing our business continuity plans for all business units in the context of the pandemic. This is a rapidly evolving situation, and we will continue to monitor and mitigate developments affecting our workforce, our suppliers, our customers, and the public at large to the extent we are able to do so. We have and will continue to carefully review all rules, regulations, and orders and responding accordingly.

If the current pace of the pandemic does not continue to slow and the spread of COVID-19 is not contained, our business operations could be further delayed or interrupted. We expect that government and health authorities may announce new or extend existing restrictions, which could require us to make further adjustments to our operations in order to comply with any such restrictions. We may also experience limitations in employee resources. In addition, our operations could be disrupted if any of our employees were suspected of having COVID-19, which could require quarantine of some or all such employees or closure of our facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect our ability to operate our business and result in additional costs.

The extent to which the pandemic may impact our results will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this information statement, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to our performance, financial condition, results of operations and cash flows.

### Lease Agreement

On January 13, 2021, we entered into a lease agreement with Westgate 200, LLC, which was amended on March 30, 2021, for a new location totaling approximately 86,800 square feet of office, showroom and warehouse space in St. Charles, Missouri. The initial term of the lease expires on April 30, 2027 with two (2) options to renew for additional five (5) year periods. The base rent is initially $20,976.79 per month and increases to $31,465 on October 1, 2021, with annual increases thereafter to a base rent during the sixth year of $35,558 per month. We will also pay our 43.4% pro rata portion of the property taxes, operating expenses and insurance costs and are also responsible to pay for the utilities used on the premises.

### Securities Purchase Agreement

On March 19, 2021, we entered into a securities purchase agreement with two institutional investors, pursuant to which we issued to each investor (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 and (ii) a four-year warrant to purchase 200,000 shares of our common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis, for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. After deducting a placement fee and other expenses, we received net proceeds of $4,590,000.

The notes bear interest at a rate of 10% per annum and mature on December 19, 2021. We may prepay the notes in whole or in part at any time or from time to time without penalty or premium upon at least five (5) days prior written notice, which notice period may be waived by the holder. In addition, if we issue and sell shares of our equity securities to investors on or before the maturity date in an equity financing with total gross proceeds of not less than $10,000,000 (excluding the conversion of the notes or other convertible securities issued for capital raising purposes), then we must repay the then-outstanding principal amount of the notes and any accrued but unpaid interest.

The notes are secured by a first priority security interest in all of our assets and contain customary events of default. Upon, and during the continuance of, an event of default, the notes are convertible, in whole or in part, at the option of the holder into shares of common stock at a conversion price equal to $12.00, or if lower, 80% of the lowest volume weighted average price for the twenty (20) consecutive trading days prior to the applicable conversion date, but in no event less than $9.00. The conversion price will be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction that proportionately decreases or increases the common stock. In addition, if we sell or grant any common stock or securities convertible into or exchangeable for common stock or grant any right to reprice such securities at an effective price per share that is lower than the then conversion price, the conversion price shall be reduced to such price, subject to certain exceptions set forth in the notes.

28

Notwithstanding the foregoing, we shall not effect any conversion of a note, and a holder shall not have the right to convert any principal and/or interest of a note, to the extent that after giving effect to the conversion the holder (together with the holder's affiliates and any persons acting as a group together with the holder or any of the holder's affiliates) would beneficially own over 4.99% of the number of shares of our common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the note. The holder may, upon not less than 61 days' prior notice to us, increase or decrease such limitation, provided that such limitation in no event exceeds 9.99% of the number of shares of our common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the note. The warrants also contain this beneficial ownership limitation.

The securities purchase agreement contains customary representations, warranties and covenants for a transaction of this type. Pursuant to the securities purchase agreement, the investors were granted piggy-back registration rights with respect to the shares issuable upon conversion of the notes and exercise of the warrants. We also agreed that, until the date that no investor own any securities, we will timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by us pursuant to the Exchange Act even if we are not then subject to the reporting requirements of the Exchange Act. In addition, we agreed that, so long as any of the notes remain outstanding, neither our company, nor any subsidiary of our company, shall, without each investor's written consent and subject to certain exceptions set forth in the securities purchase agreement:

- sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business;
- incur, create, assume or suffer to exist any lien on any of its property or assets, except for certain liens set forth in the Purchase Agreement;
- incur or suffer to exist or guarantee any indebtedness that is senior to or *pari passu* with (in priority of payment and performance) our obligations under the securities purchase agreement except for non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;

- pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock, other than dividends on shares of common stock solely in the form of additional shares of common stock, or directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock;
- redeem, repurchase or otherwise acquire in any one transaction or series of related transactions any shares of our capital stock or any warrants, rights or options to purchase or acquire any such shares, or repay any *pari passu* or subordinated indebtedness other than non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;
- lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of our company, except loans, credits or advances (i) in existence or committed on the closing date and which we have informed each investor in writing prior to the closing date, (ii) in regard to transactions with unaffiliated third parties, made in the ordinary course of business, or (iii) in regard to transactions with unaffiliated third parties, not in excess of $50,000; or
- repay any affiliate (as defined in Rule 144) of our company in connection with any indebtedness or accrued amounts owed to any such party.

**Principal Factors Affecting Our Financial Performance**

Our operating results are primarily affected by the following factors:

- our ability to acquire new customers or retain existing customers;
- our ability to offer competitive product pricing;
- our ability to broaden product offerings;
- industry demand and competition; and
- market conditions and our market position.

29

**Key Financial Operating Metrics**

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Site Sessions (in millions) | 9.9 | 6.3 |
| Order History (in millions) | $ 123.2 | $ 61.8 |

A site session occurs when a person visits our website. An order occurs when a customer has visited our website and ordered one or more items and has paid for them. An order is paid for by our customer when the order is placed and booked as revenue by us when the order is shipped.

Total revenues and total orders for any given month may not be equal for two primary reasons: (1) normal customer cancellations and (2) the time required to ship an order and recognize revenue. When there are no supply chain issues, the time from order to shipping is between 20 and 25 days. Thus, an order made after the 10th of the current month will become revenue in the succeeding month, distorting the comparison between a months' orders and its sales. In 2020, supply chain issues related to COVID-19 increased the time up to 44 days from order to delivery.

Our site sessions increased to approximately 9.9 million in the year ended December 31, 2020, as compared to approximately 6.3 million in the year ended December 31, 2019. These increased site sessions resulted in three-year highs for orders in the year ended December 31, 2020.

**Emerging Growth Company**

We qualify as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012 (the "*JOBS Act*"). As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal controls over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;
- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements (i.e., an auditor discussion and analysis);
- submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency;" and
- disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year following the fifth anniversary of our initial public offering, (ii) the last day of the first fiscal year in which our total annual gross revenues are $1.07 billion or more, (iii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Exchange Act, which would occur if the market value of our common stock that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iv) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

30

**Results of Operations**

*Comparison of Years Ended December 31, 2020 and 2019*

The following table sets forth key components of our results of operations for the year ended December 31, 2020 (Successor), for the period from April 6 to December 31, 2019 (Successor), and for the period from January 1 to April 5, 2019 (Predecessor), in dollars and as a percentage of our revenue.

| | Successor | | | | Predecessor | |
| --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2020 | | Period April 6 to December 31, 2019 (As Restated) | | Period January 1 to April 5, 2019 | |
| | Amount | % of Net Sales | Amount | % of Net Sales | Amount | % of Net Sales |
| Product sales, net | $ 55,133,653 | 100.00% | $ 34,668,112 | 100.0% | $ 12,946,901 | 100.0% |
| Cost of goods sold | 47,878,541 | 86.84% | 28,596,129 | 82.49% | 11,004,842 | 85.00% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross profit | 7,255,112 | 13.16% | 6,071,983 | 17.51% | 1,942,059 | 15.00% |
| Operating expenses | | | | | | |
| Personnel | 6,565,380 | 11.91% | 2,909,751 | 8.39% | 913,919 | 7.06% |
| Advertising | 4,865,361 | 8.82% | 1,996,507 | 5.76% | 714,276 | 5.52% |
| Bank and credit card fees | 1,806,620 | 3.28% | 870,877 | 2.51% | 329,247 | 2.54% |
| Depreciation and amortization | 549,712 | 1.00% | 271,036 | 0.78% | 9,675 | 0.07% |
| General and administrative | 7,900,566 | 14.33% | 4,728,571 | 13.64% | 451,214 | 3.49% |
| Total operating expenses | 21,687,639 | 39.37% | 10,776,742 | 31.09% | 2,418,331 | 18.68% |
| Loss from operations | (14,432,527) | (26.18)% | (4,704,759) | (13.57)% | (476,272) | (3.68)% |
| Other income (expense) | | | | | | |
| Interest income | 2,479 | - | - | - | 23,807 | 0.18% |
| Financing costs | (762,911) | (1.38)% | (520,160) | (1.50)% | - | - |
| Adjustment in value of contingency | (138,922) | (0.25)% | 32,246 | 0.09% | - | - |
| Interest expense | (870,847) | (1.58)% | (785,411) | (2.27)% | - | - |
| Loss on extinguishment of debt | (1,756,095) | (3.19)% | - | - | - | - |
| Write-off of acquisition receivable | (809,000) | (1.47)% | - | - | - | - |
| Change in fair value of warrant liability | (2,127,656) | (3.86)% | 106,900 | 0.31% | - | - |
| Other income | 25,945 | 0.05% | 15,010 | 0.04% | 7,200 | 0.06% |
| Total other income (expense) | (6,437,007) | (11.68)% | (1,151,415) | (3.32)% | 31,007 | 0.24% |
| Net loss before income taxes | (20,869,534) | (37.85)% | (5,856,174) | (16.89)% | (445,265) | (3.44)% |
| Income tax benefit (expense) | (698,303) | (1.27)% | 698,303 | 2.01% | - | - |
| Net loss | $ (21,567,837) | (39.12)% | $ (5,157,871) | (14.88)% | $ (445,265) | (3.44)% |

31

We believe that reviewing our operating results for the year ended December 31, 2019 by combining the results of the 2019 successor period (April 6, 2019 through December 31, 2019) and 2019 predecessor period (January 1, 2019 through April 5, 2019) with the pro forma adjustment related to the acquisition described below, is more useful in discussing our overall operating performance compared to the results of the year ended December 31, 2020 (successor). We do not see any potential risks associated with utilizing this pro forma presentation.

Following are the year ended December 31, 2020 and the combined period for 2019:

| | Year Ended December 31, 2020 | Period April 6 to December 31, 2019 Successor (As Restated) | Period January 1 to April 5, 2019 Predecessor | Pro Forma Combined Year Ended December 31, 2019 | Increase (Decrease) |
|---|---|---|---|---|---|
| Product sales, net | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 | $ 47,615,013 | $ 7,518,640 |
| Cost of goods sold | 47,878,541 | 28,596,129 | 11,004,842 | 39,600,971 | 8,277,570 |
| Gross profit | 7,255,112 | 6,071,983 | 1,942,059 | 8,014,042 | (758,930) |
| Operating expenses | | | | | |
| Personnel | 6,565,380 | 2,909,751 | 913,919 | 3,823,670 | 2,741,710 |
| Advertising | 4,865,361 | 1,996,507 | 714,276 | 2,710,783 | 2,154,578 |
| Bank and credit card fees | 1,806,620 | 870,877 | 329,247 | 1,200,124 | 606,496 |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 | 280,711 | 269,001 |
| General and administrative | 7,900,566 | 4,728,571 | 451,214 | 5,246,045* | 2,654,521 |
| Total operating expenses | 21,687,639 | 10,776,742 | 2,418,331 | 13,261,333 | 8,426,306 |
| Loss from operations | (14,432,527) | (4,704,759) | (476,272) | (5,247,291) | 9,185,236 |
| Other income (expense) | | | | | |
| Interest income | 2,479 | - | 23,807 | 23,807 | (21,328) |
| Financing costs | (762,911) | (520,160) | - | (520,160) | 242,751 |
| Adjustment in value of contingency | (138,922) | 32,246 | - | 32,246 | (171,168) |
| Interest expense | (870,847) | (785,411) | - | (785,411) | 85,436 |
| Loss on extinguishment of debt | (1,756,095) | - | - | - | 1,756,095 |
| Write-off of acquisition receivable | (809,000) | - | - | - | 809,000 |
| Change in fair value of warrant liability | (2,127,656) | 106,900 | - | 106,900 | (2,234,556) |
| Other income | 25,945 | 15,010 | 7,200 | 22,210 | 3,735 |
| Total other income (expense) | (6,437,007) | (1,151,415) | 31,007 | (1,120,408) | 5,316,599 |
| Net loss before income taxes | (20,869,534) | (5,856,174) | (445,265) | (6,367,699)* | 14,501,835 |
| Income tax benefit (expense) | (698,303) | 698,303 | - | 698,303 | (1,396,606) |
| Net loss | $ (21,567,837) | $ (5,157,871) | $ (445,265) | $ (5,669,396)* | $ 15,898,441 |

*    Includes a pro forma adjustment of $66,260 for the management fee to 1847 Partners LLC ("*our manager*").
*Product sales, net.* We generate revenue from the retail sale of home furnishings, including appliances, furniture, home goods and related products. Our product sales increased by $7,518,640, or 15.79%, to $55,133,653 for the year ended December 31, 2020 from $47,615,013 for the combined year ended December 31, 2019, which included $12,946,901 for our predecessor from January 1, 2019 to April 5, 2019 and $34,668,112 for our successor from April 6, 2019 to December 31, 2019.

32

The increase is due to increased sales volume to meet appliance and furniture demand resulting from increased advertising, which has a direct impact on customer orders and shipped sales. In the first three months of 2020, sales were affected by working capital issues, which delayed the timing of ordering product to fulfill customer orders resulting in increased order cancellations. Late in the second quarter of 2020 and through the

remainder of 2020, we experienced delays in getting products from manufacturers whose production facilities were closed or operating at reduced capacity because of the COVID-19 pandemic, which resulted in some cancellations of customer orders. We estimate that cancellations caused by shipping delays approximated $39.7 million in the year ended December 31, 2020, based on the historical ratio of shipped sales to customer orders of approximately 79% to the actual ratio of approximately 45% in the year ended December 31, 2020.

Our net sales by sales type is as follows:

| | 2020 Successor | | 2019 | 2019 | 2019 Total | |
| | Amount | % of Net Sales | Successor | Predecessor | Amount | % of Net Sales |
|---|---|---|---|---|---|---|
| Appliance sales | $ 40,113,568 | 72.76% | $ 28,487,053 | $ 9,784,525 | $ 38,271,578 | 80.38% |
| Furniture sales | 11,800,277 | 21.40% | 4,405,866 | 2,456,085 | 6,861,951 | 14.41% |
| Other sales | 3,219,808 | 5.84% | 1,775,193 | 706,291 | 2,481,484 | 5.21% |
| Total | $ 55,133,653 | 100.00% | $ 34,668,112 | $ 12,946,901 | $ 47,615,013 | 100.00% |

The percentage of furniture sales increased in 2020 as compared to 2019 as furniture was more readily available from manufacturers than appliances.

*Cost of goods sold.* Our cost of goods sold consists of the cost of purchased merchandise plus the cost of delivering merchandise and, where applicable, installation, net of promotional rebates and other incentives received from vendors. Our cost of goods sold increased by $8,277,570, or 20.90%, to $47,878,541 for the year ended December 31, 2020 from $39,600,971 for the combined year ended December 31, 2019, which included $11,004,842 for our predecessor from January 1, 2019 to April 5, 2019 and $28,596,129 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, cost of goods sold increased from 83.17% in 2019 to 86.84% in 2020. Such increase was due to COVID-19 related supply chain issues reducing the volume we purchased, which resulted in decreased manufacturer rebates, as well as due to the change in product mix, with furniture sales, which have lower margins, accounting for a larger portion of our total sales in 2020.

*Personnel expenses.* Personnel expenses include employee salaries and bonuses plus related payroll taxes. It also includes health insurance premiums, 401(k) contributions, training costs and stock compensation expense. Our personnel expenses increased by $2,741,710, or 71.70%, to $6,565,380 for the year ended December 31, 2020 from $3,823,670 for the combined year ended December 31, 2019, which included $913,919 for our predecessor from January 1, 2019 to April 5, 2019 and $2,909,751 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, personnel expenses increased from 8.03% in 2019 to 11.91% in 2020. The increase is the result of hiring additional senior management and other staff needed for increased customer demand for our products, the accrual of $359,216 as the present value of a severance contract payable to our former president and $398,908 in stock compensation expense. Beginning in the second quarter of 2020, there was a dramatic increase in cancellations of customer orders, which were primarily related to the lack of product availability. We hired a number of temporary employees to process cancellations and address the related customer service issues. As a percentage of orders, our personnel expense declined to 5.8% in 2020 from 6.2% in 2019.

*Advertising expenses.* Advertising expenses include the cost of marketing our products and primarily include online search engine expenses. Our advertising expenses increased by $2,154,578, or 79.48%, to $4,865,361 for the year ended December 31, 2020 from $2,710,783 for the combined year ended December 31, 2019, which included $714,276 for our predecessor from January 1, 2019 to April 5, 2019 and $1,996,507 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, advertising expenses increased from 5.69% in 2019 to 8.82% in 2020. The increase relates to an increase in advertising spending to drive traffic to our website. Measuring our advertising expense as a percentage of orders, we had a decline in 2020 of 3.9% compared to 4.4% in 2019.

*Bank and credit card fees.* Bank and credit card fees are primarily the fees we pay credit card processors for processing credit card payments made by customers. Our bank and credit card fees increased by $606,496, or 50.54%, to $1,806,620 for the year ended December 31, 2020 from $1,200,124 for the combined year ended December 31, 2019, which included $329,247 for our predecessor from January 1, 2019 to April 5, 2019 and $870,877 for our successor from April 6, 2019 to December 31, 2019. As a percentage of net sales, bank and credit card fees increased from 2.52% in 2019 to 3.28% in 2020. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was largely due to the increase in customer orders. We pay a credit card fee for each order, regardless of whether that order is shipped or cancelled by customer. Comparing bank and credit card fees as a percentage orders shows a reduction from 1.9% of orders in 2019 to 1.5% in 2020.

33

*Depreciation and amortization.* Depreciation and amortization was $549,712, or 1.00% of net sales, for the year ended December 31, 2020, as compared to $280,711, or 0.59% of net sales, for the combined year ended December 31, 2019.

*General and administrative expenses.* Our general and administrative expenses consist primarily of professional advisor fees, bad debts, rent expense, insurance, unremitted sales tax, and other expenses incurred in connection with general operations. Our general and administrative expenses increased by $2,654,521, or 50.60%, to $7,900,566 for the year ended December 31, 2020 from $5,246,045 for the combined year ended December 31, 2019, which included $451,214 for our predecessor from January 1, 2019 to April 5, 2019, $4,728,571 for our successor from April 6, 2019 to December 31, 2019 and a pro forma adjustment of $66,260 for the management fee to our manager. As a percentage of net sales, general and administrative expenses increased from 11.02% in 2019 to 14.33% in 2020. The increase was largely due to increased directors and officers insurance expenses, fees to our board of directors, and legal, audit and other professional fees in connection with becoming a public company, as well as consulting fees to upgrade our online shopping cart, fees to our manager under the offsetting management services agreement described below, fees for our Electronic Data Interchange initiative, and other consulting fees. Comparing general and administrative expenses as a percentage orders shows a reduction from 8.4% of orders in 2019 to 6.4% in 2020.

*Total other income (expense).* We had $6,437,007 in total other expense, net, for the year ended December 31, 2020, as compared to total other expense, net, of $1,120,408 for the combined year ended December 31, 2019, which included income of $31,007 for our predecessor from January 1, 2019 to April 5, 2019 and expenses of $1,151,415 for our successor from April 6, 2019 to December 31, 2019. Total other expense, net, for the year ended December 31, 2020 consisted of financing costs of $762,911, interest expense of $870,847, adjustment in value of contingency of $138,922, loss on debt modification and extinguishment of $1,756,095, write-off of acquisition receivable of $809,000, and change in the warrant liability of $2,127,656, offset by interest income of $2,479 and other income of $25,945, while total other expense, net, for the year ended December 31, 2019 consisted of financing costs of $520,160 and interest expense of $785,411, offset by a gain on write-down of contingency of $32,246, a change in fair value of warrant liability of $106,900, interest income of $23,807 and other income of $22,210.

*Income tax benefit (expense).* We had an income tax expense of $698,303 for the year ended December 31, 2020, as compared to an income tax benefit of $698,303 for the combined year ended December 31, 2019. In the fourth quarter of 2020, we determined that we should establish a valuation allowance for the deferred tax asset, resulting in an income tax expense of $698,303.

*Net loss.* As a result of the cumulative effect of the factors described above, our net loss increased by $15,898,441, or 280.43%, to $21,567,837 for the year ended December 31, 2020 from $5,669,396 for the combined year ended December 31, 2019, which included $445,265 for our predecessor from January 1, 2019 to April 5, 2019 and $5,856,174 for our successor from April 6, 2019 to December 31, 2019 and a pro forma adjustment of $66,260 for the management fee to our manager. The net loss for the year ended December 31, 2020 was also affected by certain non-cash charges described

below equal to $4,831,673 in the aggregate.

**Non-GAAP to GAAP Reconciliation**

This information statement contains financial measures that are not calculated in accordance with generally accepted accounting principles in the United States of America ("*GAAP*"). The non-GAAP financial measures are net loss before taxes for the year ended December 31, 2020 excluding the following non-cash charges (i) an adjustment in value of contingency of $138,922, (ii) a loss on extinguishment of debt of $1,756,095, (iii) a write-off of acquisition receivable of $809,000 and (iv) a non-cash charge to change in warrant liability expense of $2,127,656.

34

The non-GAAP financial information should be considered supplemental to, and not as a substitute for, or superior to, financial measures calculated in accordance with GAAP. Management, however, believes that these non-GAAP financial measures, when used in conjunction with the results presented in accordance with GAAP, may provide a more complete understanding of our results and may facilitate a fuller analysis of our results, particularly in evaluating performance from one period to another. Management has chosen to provide this supplemental information to investors, analysts, and other interested parties to enable them to perform additional analyses of results and to illustrate the results giving effect to the non-GAAP adjustments shown in the reconciliation described in the next paragraph. Furthermore, the economic substance behind our decision to use such non-GAAP measures is that such measures approximate our controllable operating performance more closely than the most directly comparable GAAP financial measures. Management strongly encourages investors to review our consolidated financial statements and publicly filed reports in their entirety and cautions investors that the non-GAAP measures used by us may differ from similar measures used by other companies, even when similar terms are used to identify such measures.

The following tables provides a reconciliation of the non-GAAP net loss before taxes to the comparable GAAP measure.

| | Year Ended December 31, 2020 | | |
| | GAAP | Elimination of Non-Cash Charges | Non-GAAP |
|---|---|---|---|
| Loss from operations | $ (14,432,527) | $ - | $ (14,432,527) |
| Other income (expense) | | | |
| Interest income | 2,479 | - | 2,479 |
| Financing costs | (762,911) | - | (762,911) |
| Adjustment in value of contingency | (138,922) | (138,922) | - |
| Interest expense | (870,847) | - | (870,847) |
| Loss on extinguishment of debt | (1,756,095) | (1,756,095) | - |
| Write-off of acquisition receivable | (809,000) | (809,000) | - |
| Change in fair value of warrant liability | (2,127,656) | (2,127,656) | - |
| Other income | 25,945 | - | 25,945 |
| Total other income (expense) | (6,437,007) | (4,831,673) | (1,605,334) |
| Net loss before income taxes | $ (20,869,534) | | $ (16,037,861) |

**Liquidity and Capital Resources**

As of December 31, 2020, we had cash and cash equivalents of $934,729 and restricted cash of $8,977,187. We have generated significant losses since our acquisition of Goedeker Television and have relied on cash on hand, external bank lines of credit, proceeds from our initial public offering described below, issuance of third party and related party debt and the issuance of a note to support cashflow from operations. For the year ended December 31, 2020, we incurred operating losses of approximately $14.4 million, cash flows from operations of $5.4 million, and negative working capital of $17.5 million.

On August 4, 2020, we completed an initial public offering of our common stock, pursuant to which we sold 1,111,200 shares of common stock, at a purchase price of $9.00 per share, for total gross proceeds of $10,000,800. After deducting the underwriting commission and offering expenses, we received net proceeds of $8,602,166. We used a portion of the proceeds from the initial public offering to pay off certain debt.

As noted above, we received net proceeds of $4,590,000 from the sale of notes and warrants on March 19, 2021. These proceeds will supplement our cash flow from operations and provide additional liquidity.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund our operations and to service our debt obligations for one year from the date of the filing of this information statement. We may, however, in the future require additional cash resources due to changing business conditions, implementation of our strategy to expand our business, or other investments or acquisitions we may decide to pursue. If our own financial resources are insufficient to satisfy our capital requirements, we may seek to sell additional equity or debt securities or obtain additional credit facilities. The sale of additional equity securities could result in dilution to our stockholders. The incurrence of indebtedness would result in increased debt service obligations and could require us to agree to operating and financial covenants that would restrict our operations. Financing may not be available in amounts or on terms acceptable to us, if at all. Any failure by us to raise additional funds on terms favorable to us, or at all, could limit our ability to expand our business operations and could harm our overall business prospects.

35

The impact of COVID-19 on our business has been considered in these assumptions; however, it is too early to know the full impact of COVID-19 or its timing on a return to more normal operations.

The accompanying consolidated financial statements have been prepared on a going concern basis under which we are expected to be able to realize our assets and satisfy our liabilities in the normal course of business.

**Summary of Cash Flow**

The following table provides detailed information about our net cash flow for all financial statement periods presented in this information statement.

| | Year Ended December 31, 2020 Successor | Year Ended December 31, 2019 | | |
| | | 2019 Successor (As Restated) | 2019 Predecessor | 2019 Total (As Restated) |
|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 5,408,883 | $ (2,299,215) | $ 611,268 | $ (1,687,947) |
| Net cash used in investing activities | (113,147) | (2,200) | - | (2,200) |
| Net cash provided by financing activities | 4,144,872 | 2,772,723 | - | 2,772,723 |

| Net change in cash | $ | 9,440,608 | $ | 471,308 | $ | 611,268 | $ | 1,082,576 |

Our net cash provided by operating activities was $5,408,883 for the year ended December 31, 2020, as compared to net cash used in operating activities of $1,687,947 for the combined year ended December 31, 2019, which included net cash used in operating activities of $2,299,215 for our successor from April 6, 2019 to December 31, 2019 and net cash provided by operating activities of $611,268 for our predecessor from January 1, 2019 to April 5, 2019. For the year ended December 31, 2020, our net loss of $21,567,837 and an increase in merchandise inventory of $3,767,151, offset by an increase in customer deposits of $17,714,914, an increase in accounts payable and accrued expenses of $7,337,081, a change in fair value of warrant liability of $2,127,656 and a loss on extinguishment of debt of $1,756,095, were the primary drivers of the net cash provided by operating activities. For the combined year ended December 31, 2019, our net loss of $5,603,136, offset by increases in accounts payable and accrued expenses of $1,821,629 and merchandise inventory of $1,066,627, were the primary drivers of the net cash used in operating activities.

Our net cash used in investing activities was $113,147 for the year ended December 31, 2020, as compared to $2,200 for the year ended December 31, 2019, all of which was during the period from April 6, 2019 to December 31, 2019. The net cash used in investing activities for both years consisted entirely of purchases of property and equipment.

Our net cash provided by financing activities was $4,144,872 for the year ended December 31, 2020, as compared to $2,772,723 for the combined year ended December 31, 2019, all of which was during the period from April 6, 2019 to December 31, 2019. Net cash provided by financing activities for the year ended December 31, 2020 consisted of net proceeds of $8,602,166 from our initial public offering and $642,600 in proceeds from our Paycheck Protection Program loan, offset by payments of $2,883,754 on our notes payable (including repayment of our Paycheck Protection Program loan), payments of $771,431 on our convertible notes payable, net payments on lines of credit of $1,339,430 and $105,279 in loan financing costs. For the combined year ended December 31, 2019, net cash provided by financing activities consisted of proceeds from note payable of $1,500,000, net borrowings from lines of credit of $1,339,430 and proceeds from convertible notes payable of $650,000, offset by repayments on notes payable $357,207 and cash paid for financing costs of $359,500.

### Initial Public Offering

On August 4, 2020, we sold 1,111,200 shares of common stock in connection with our initial public offering to the underwriters at a purchase price per share of $8.325 (the offering price to the public of $9.00 per share minus the underwriters' discount) for total gross proceeds of $10,000,800. After deducting the underwriting commission and expenses, we received net proceeds of approximately $8,602,166. We also issued warrants for the purchase of 55,560 shares of common stock to affiliates of the underwriter, ThinkEquity, a division of Fordham Financial Management, Inc. The warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25 (125% of the public offering price per share).

### Term Loan

On August 25, 2020, we entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of December 31, 2020, the outstanding balance of this loan is $3,185,369, comprised of principal of $3,283,628, net of unamortized loan costs of $98,259.

The loan matures on August 25, 2025 and bears interest at 3.250% per annum; provided that, upon an event of default, the interest rate shall increase by 6% until paid in full. Pursuant to the terms of the loan agreement, we are required to make monthly payments of $63,353 beginning on September 25, 2020 and until the maturity date, at which time all unpaid principal and interest will be due. We may prepay the loan in full or in part at any time without penalty. The loan agreement contains customary events of default and affirmative and negative covenants for a loan of this type. The loan is secured by all financial assets credited to our securities account held by Arvest Investments, Inc.

36

### Contractual Obligations

Our principal commitments consist mostly of obligations under the loan described above, the operating leases described under "Information About Goedeker—Facilities" and other contractual commitments described below.

### Management Services Agreement

On April 5, 2019, we entered into a management services agreement with our manager, pursuant to which we appointed our manager to provide certain services to us for a quarterly management fee equal to $62,500. Under certain circumstances specified in the management services agreement, our quarterly fee may be reduced if similar fees payable to our manager by subsidiaries of our former parent company, 1847 Holdings LLC, exceed a threshold amount.

Pursuant to the management services agreement, we must also reimburse our manager for all costs and expenses which are specifically approved by our board of directors, including all out-of-pocket costs and expenses, that are actually incurred by our or our affiliates on our behalf in connection with performing services under the management services agreement.

The services provided by our manager include: conducting general and administrative supervision and oversight of our day-to-day business and operations, including, but not limited to, recruiting and hiring of personnel, administration of personnel and personnel benefits, development of administrative policies and procedures, establishment and management of banking services, managing and arranging for the maintaining of liability insurance, arranging for equipment rental, maintenance of all necessary permits and licenses, acquisition of any additional licenses and permits that become necessary, participation in risk management policies and procedures; and overseeing and consulting with respect to our business and operational strategies, the implementation of such strategies and the evaluation of such strategies, including, but not limited to, strategies with respect to capital expenditure and expansion programs, acquisitions or dispositions and product or service lines.

We expensed $250,000 and $183,790 in management fees for the years ended December 31, 2020 and 2019, respectively.

### Earn Out Payments

Pursuant to the asset purchase agreement with Goedeker Television, it is entitled to receive the following earn out payments to the extent that our business achieves the applicable EBITDA (as defined in the asset purchase agreement) targets:

1.  An earn out payment of $200,000 if the EBITDA of our business for the trailing twelve (12) month period from the closing date is $2,500,000 or greater, which target was not met;
2.  An earn out payment of $200,000 if the EBITDA of our business for the trailing twelve (12) month period from the first anniversary of closing date is $2,500,000 or greater, which target we do not expect to meet; and
3.  An earn out payment of $200,000 if the EBITDA of our business for the trailing twelve (12) month period from the second anniversary of the closing date is $2,500,000 or greater. We expect to meet this target and adjusted the contingent note payable in the consolidated balance sheet to the present value of the amount due.

37

To the extent the EBITDA of our business for any applicable period is less than $2,500,000 but greater than $1,500,000, we must pay a partial earn out payment to Goedeker Television in an amount equal to the product determined by multiplying (i) the EBITDA Achievement Percentage by (ii)

the applicable earn out payment for such period, where the "Achievement Percentage" is the percentage determined by dividing (A) the amount of (i) the EBITDA of our business for the applicable period less (ii) $1,500,000, by (B) $1,000,000. For avoidance of doubt, no partial earn out payments shall be earned or paid to the extent the EBITDA of our business for any applicable period is equal or less than $1,500,000.

To the extent Goedeker Television is entitled to all or a portion of an earn out payment, the applicable earn out payment(s) (or portion thereof) shall be paid on the date that is three (3) years from the closing date, and shall accrue interest from the date on which it is determined Goedeker Television is entitled to such earn out payment (or portion thereof) at a rate equal to five percent (5%) per annum, computed on the basis of a 360 day year for the actual number of days elapsed.

**Off-Balance Sheet Arrangements**

We have no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Critical Accounting Policies**

The following discussion relates to critical accounting policies for our company. The preparation of consolidated financial statements in conformity with GAAP requires our management to make assumptions, estimates and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. We have identified certain accounting policies that are significant to the preparation of our consolidated financial statements. These accounting policies are important for an understanding of our financial condition and results of operation. Critical accounting policies are those that are most important to the portrayal of our financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to our consolidated financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and judgments used in the preparation of our consolidated financial statements:

***Revenue Recognition and Cost of Revenue***

We record revenue in accordance with Financial Accounting Standards Board ("*FASB*"), Accounting Standards Codification ("*ASC*"), Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

We collect the full sales price from the customer at the time the order is placed, which is recorded as customer deposits on the accompanying consolidated balance sheet. We do not incur incremental costs obtaining purchase orders from customers, however, if we did, because all our contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

The revenue that we recognize arises from orders we receive from our customers. Our performance obligations under the customer orders correspond to each sale of merchandise that we make to customers under the purchase orders; as a result, each purchase order generally contains only one performance obligation based on the merchandise sale to be completed.

38

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, our products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. We deliver products to our customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from our warehouse to the customer (which we refer to as a company shipment). The second way is through a shipment of the products through a third-party carrier from a warehouse other than our warehouse to the customer (which we refer to as a drop shipment) and the third way is where we deliver the products to the customer and often also install the product (which we refer to as a local delivery). In the case of a local delivery, we load the product on to our own truck and deliver and install the product at the customer's location. When a product is delivered through a local delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a company shipment and a drop shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from our warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves our warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, we have satisfied our performance obligation and we recognize revenue.

We agree with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In our contracts with customers, we allocate the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax we collect concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all our sales are to individual retail consumers.

Shipping and Handling – We bill our customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue – We disaggregate revenue from contracts with customers by product type, as we believe it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

We also sell extended warranty contracts. We are an agent for the warranty company and earn a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the our consolidated statement of operations. We assume no liability for repairs to products on which we have sold a warranty contract.

We experience operational trends which are primarily holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

***Receivables***

Receivables represent rebates receivable due from manufacturers from whom we purchase products and amounts due from credit card processors that do not settle within two days. Rebates receivable are stated at the amount that management expects to collect from manufacturers, net of accounts payable amounts due the vendor. Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on our assessment of the credit history with our manufacturers, we have concluded that there should be no allowance for uncollectible accounts. We historically collect substantially all of our outstanding rebates receivables. Uncollectible balances are expensed in the period it is determined to be uncollectible.

***Merchandise Inventory***

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. We periodically evaluate the value of items in inventory and provide write-downs to inventory based on our estimate of market conditions.

### Goodwill

We test our goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in our expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and our consolidated financial results.

39

We test goodwill by estimating fair value using a discounted cash flow model. The key assumptions used in the discounted cash flow model to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during the years ended December 31, 2020 and 2019.

### Intangible Assets

As of December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

We periodically evaluate the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. We have no intangibles with indefinite lives.

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value.

### Long-Lived Assets

We review our property and equipment and any identifiable intangibles (including ROU asset) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

### Lease Liabilities

Lease liabilities and their corresponding right of use ("*ROU*") assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of our leases do not provide an implicit rate, we use an estimated incremental borrowing rate ("*IBR*") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. We adjust the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement. Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

We review the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, we compare the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

40

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
## AND RESULTS OF OPERATIONS FOR APPLIANCES CONNECTION

*The following discussion and analysis summarizes the significant factors affecting the operating results, financial condition, liquidity and cash flows of Appliances Connection as of and for the periods presented below. The following discussion and analysis should be read in conjunction with the financial statements and the related notes of Appliances Connection thereto included elsewhere in this information statement. The discussion contains forward-looking statements that are based on the beliefs of management, as well as assumptions made by, and information currently available to, management. Actual results could differ materially from those discussed in or implied by forward-looking statements as a result of various factors, including those discussed below and elsewhere in this information statement, particularly in "Cautionary Statement Regarding Forward-Looking Statements.*

### Overview

Headquartered in Brooklyn, New York and founded in 1998, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, New Jersey and a 23,000 square foot showroom in Brooklyn, New York. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients. It also provides appliance installation services and old appliance removal services. Appliances Connection serves retail customers, builders, architects, interior designers, restaurants, schools and other large corporations. It ships to 48 states in the Continental United States and offers nearly 300,000 products, from luxury brands like Viking, Miele, Thermador, Sub-Zero, Wolf, Forte, Ilve, and Bosch, to household favorites like GE, LG, Frigidaire and Whirlpool.

1 Stop, founded in 2000, specializes in the sale of appliances and consumer electronics, including laundry, refrigeration, and air conditioning appliances, ranges, dishwashers, plumbing fixtures, televisions and video monitors, home and office furniture, as well as home décor, fireplaces, generators and small appliances. 1 Stop operates out of its Brooklyn, New York showroom as well as through its website 1stopcamera.com.

Gold Coast, which has been in business since 2015, is primarily engaged in the retail sale of outdoor, cooking, air conditioning, refrigeration and

laundry appliances and operates out of its Brooklyn, New York showroom as well as online at goldcoastappliances.com.

Joe's Appliances, which was formed in 2018, is also primarily engaged in retail sale offerings of a comprehensive suite of major appliances, including outdoor, cooking, air conditioning, refrigeration and laundry appliances, and appliance services. Joe's Appliances operates out if it's Brooklyn, New York store location as well as online at its website, joesappliances.com.

Superior Deals is in the electrical appliances, television and radio sets industry, while also providing a full line of appliance accessories including power cords, hoses, connections, brackets, and water and air filters. Superior Deals has been in business since 2000, primarily serving customers in the New York metro area, as well as nationally through Appliances Connection's retail website www.appliancesconnection.com.

YF Logistics, formed in 2014, is a full-service logistics company that fulfills customer orders for 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, utilizing its own in-house logistics team to ship, install, and service appliances and other products across the continental United States from its 200,000 square foot warehouse located in Hamilton, New Jersey.

**Recent Developments**

*Impact of Coronavirus Pandemic*

In late 2019, a novel strain of coronavirus, or COVID-19, was reported to have surfaced in Wuhan, China. The virus has since spread to over 150 countries and every state in the United States. On March 11, 2020, the World Health Organization declared the outbreak a pandemic, and on March 13, 2020, the United States declared a national emergency.

Most states and cities reacted by instituting quarantines, restrictions on travel, "stay at home" rules and restrictions on the types of businesses that could continue to operate, as well as guidance in response to the pandemic and the need to contain it. Appliances Connection's retail facilities and warehouse were deemed essential businesses that were not subject to restrictions in New York and New Jersey, so they remained open and continued to operate. Therefore, the restrictions put in place have not had a materially negative impact on the operations Appliances Connection. However, the situation surrounding COVID-19 remains fluid, and we may be required to close or limit service offerings in our retail facilities or warehouse in response to guidance from applicable government and public health officials, which could adversely affect our operations and revenues.

In addition, Appliances Connection is dependent upon suppliers to provide it with all of the products that its sells. The pandemic has impacted and may continue to impact suppliers and manufacturers of certain products. As a result, Appliances Connection has faced and may continue to face delays or difficulty sourcing certain products, which could negatively affect its business and financial results. Even if Appliances Connection is able to find alternate sources for such products, they may cost more, which could adversely impact its profitability and financial condition.

The global deterioration in economic conditions, which may have an adverse impact on discretionary consumer spending, could also impact Appliances Connection's business. For instance, consumer spending may be negatively impacted by general macroeconomic conditions, including a rise in unemployment, and decreased consumer confidence resulting from the pandemic. Changing consumer behaviors as a result of the pandemic may also have a material impact on Appliances Connection's revenue.

Appliances Connection has taken steps to take care of its employees, including providing the ability for employees to work remotely and implementing strategies to support appropriate social distancing techniques for those employees who are not able to work remotely. Appliances Connection has also taken precautions with regard to employee, facility and office hygiene as well as implementing significant travel restrictions. Appliances Connection continues to assess business continuity plans for all business units in the context of the pandemic. This is a rapidly evolving situation, and Appliances Connection will continue to monitor and mitigate developments affecting its workforce, its suppliers, its customers and the public at large to the extent they are able to do so and it will continue to carefully review all rules, regulations, and orders and responding accordingly.

If the current pace of the pandemic cannot be slowed and the spread of the virus is not contained, Appliances Connection's business operations could be further delayed or interrupted. It is expected that government and health authorities may announce new or extend existing restrictions, which could require Appliances Connection to make further adjustments to its operations in order to comply with any such restrictions. In addition, Appliances Connection's operations could be disrupted if any of its employees were suspected of having the virus, which could require quarantine of some or all such employees or closure of its facilities for disinfection. The duration of any business disruption cannot be reasonably estimated at this time but may materially affect Appliances Connection's ability to operate its business and result in additional costs.

The extent to which the pandemic may impact the results of Appliances Connection will depend on future developments, which are highly uncertain and cannot be predicted as of the date of this information statement, including new information that may emerge concerning the severity of the pandemic and steps taken to contain the pandemic or treat its impact, among others. Nevertheless, the pandemic and the current financial, economic and capital markets environment, and future developments in the global supply chain and other areas present material uncertainty and risk with respect to the performance, financial condition, results of operations and cash flows of Appliances Connection.

**Principal Factors Affecting Financial Performance**

Appliances Connection's operating results are primarily affected by the following factors:

- its ability to acquire new customers or retain existing customers;
- its ability to offer competitive product pricing;
- its ability to broaden product offerings;
- industry demand and competition; and
- market conditions and its market position.

**Key Financial Operating Metrics**

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Site Sessions | 31.0 | 17.6 |
| Order History | $ 466,916,838 | $ 252,349,786 |

A site session occurs when a person visits Appliances Connection's website. An order occurs when a customer has visited the website and ordered one or more items and has paid for them. An order is paid for by the customer when the order is placed and booked as revenue by when the order is shipped.

Appliances Connection's site sessions increased to approximately 31.0 million in the year ended December 31, 2020, as compared to approximately 17.6 million in the year ended December 31, 2019. These increased site sessions resulted in record orders in the year ended December 31, 2020.

**Results of Operations**

*Comparison of Years Ended December 31, 2020 and 2019*

The following table sets forth key components of the results of operations of Appliances Connection for the years ended December 31, 2020 and 2019, in dollars and as a percentage of net sales.

| | Year Ended December 31, 2020 | | Year Ended December 31, 2019 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Net Sales | Amount | % of Net Sales |
| Net sales | $ 312,608,528 | 100.00% | $ 219,333,461 | 100.00% |
| Cost of sales | 247,379,397 | 79.13% | 176,771,632 | 80.59% |
| Gross profit | 65,229,131 | 20.87% | 42,561,829 | 19.41% |
| Operating expenses | | | | |
| Personnel | 13,563,628 | 4.34% | 10,919,298 | 4.98% |
| Advertising | 9,164,242 | 2.93% | 5,073,731 | 2.31% |
| Bank and credit card fees | 12,361,428 | 3.95% | 9,413,611 | 4.29% |
| Depreciation and amortization | 782,773 | 0.25% | 553,357 | 0.25% |
| General and administrative | 9,949,762 | 3.18% | 7,095,979 | 3.24% |
| Total operating expenses | 45,821,833 | 14.66% | 33,055,976 | 15.07% |
| Income from operations | 19,407,298 | 6.21% | 9,505,853 | 4.33% |
| Other income (expense) | | | | |
| Other income | 1,336,115 | 0.43% | 1,880,282 | 0.86% |
| Other expense | (663,674) | (0.21)% | (247,539) | (0.11)% |
| Total other income (expense) | 672,441 | 0.22% | 1,632,743 | 0.74% |
| Net Income | $ 20,079,739 | 6.42% | $ 11,138,596 | 5.08% |

*Net sales.* Appliances Connection generates revenue from the retail sale of home furnishings, including appliances, furniture, home goods, and related products. Its net sales increased by $93,275,067, or 42.53%, to $312,608,528 for the year ended December 31, 2020 from $219,333,461 for the year ended December 31, 2019. Such increase is due to increased demand for its home furnishings, appliances, furniture, home goods and related products due to increased advertising, as well as customers spending more time at their homes as a result of the ongoing COVID-19 pandemic, combined with governmental and enhanced unemployment benefits, and its position as an "essential business". Additionally, management believes its net sales in the year ended December 31, 2020 were favorably impacted by a strong alignment of its technologically advanced online sales and infrastructure platform with current customer trends for online and phone-based shopping and decreased competition from certain of its competitors that are relatively more reliant on showroom and in-person sales that were closed for a portion of such period due to the pandemic.

*Cost of sales.* Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendors. Cost of sales increased by $70,607,765, or 39.94%, to $247,379,397 for the year ended December 31, 2020 from $176,771,632 for the year ended December 31, 2019. Such increase was generally in line with the increase in net sales. As a percentage of net sales, cost of sales decreased slightly from 80.59% in 2019 to 79.13% in 2020.

*Personnel expenses.* Personnel expenses include employee salaries and bonuses plus related payroll taxes as well as health insurance premiums. Personnel expenses increased by $2,644,330, or 24.22%, to $13,563,628 for the year ended December 31, 2020 from $10,919,298 for the year ended December 31, 2019. Such increase was due to additional payroll hours to support the increased sales in 2020, as well as increases in the minimum wage in New Jersey and Long Island. As a percentage of net sales, personnel expenses were 4.34% and 4.98% for the years ended December 31, 2020 and 2019, respectively.

*Advertising expenses.* Advertising expenses include the cost of marketing products and primarily include online search engine, digital, social media, television and radio advertising expenses. Advertising expenses increased by $4,090,511, or 80.62%, to $9,164,242 for the year ended December 31, 2020 from $5,073,731 for the year ended December 31, 2019. Such increase was due to increased investments in digital and social media engagement to capitalize on current customer trends for online shopping, as well as increased investment on television and radio to promote additional brand recognition. As a percentage of net sales, advertising expenses were 2.93% and 2.31% for the years ended December 31, 2020 and 2019, respectively.

43

*Bank and credit card fees.* Bank and credit card fees are primarily the fees paid to credit card processors for processing credit card payments made by customers. Bank and credit card fees increased by $2,947,817, or 31.31%, to $12,361,428 for the year ended December 31, 2020 from $9,413,611 for the year ended December 31, 2019. These fees are based on customer orders that are paid with a credit card (substantially all orders), so the increase was primarily due to the increase in customer orders as well as recent increases in interchange rates charged by credit card networks. As a percentage of net sales, bank and credit card fees were 3.95% and 4.29% for the years ended December 31, 2020 and 2019, respectively.

*Depreciation and amortization.* Depreciation and amortization was $782,773, or 0.25% of net sales, for the year ended December 31, 2020, as compared to $553,357, or 0.25% of net sales, for the year ended December 31, 2019.

*General and administrative expenses.* General and administrative expenses consist primarily of professional advisor fees, bad debts, rent expense, sales tax expense, insurance, and other expenses incurred in connection with general operations. General and administrative expenses increased by $2,853,783, or 40.22%, to $9,949,762 for the year ended December 31, 2020 from $7,095,979 for the year ended December 31, 2019. The primary increases are were increases in insurance, rent, and telephone service expenses and payments on notes payable used to finance purchases of transportation vehicles. As a percentage of net sales, general and administrative expenses were 3.18% and 3.24% for the years ended December 31, 2020 and 2019, respectively.

*Total other income (expense).* Total other income, net, was $672,441 for the for the year ended December 31, 2020, which included other income of $1,336,115 and other expense of $663,674. For the for the year ended December 31, 2019, total other income, net, was $1,632,743, which included other income of $1,880,282 and other expense of $247,539. Other income includes interest income on bank and vendor deposits and other expense includes interest expense on financed equipment.

*Net income.* As a result of the cumulative effect of the factors described above, net income was $20,079,739 for the year ended December 31, 2020, as compared to $11,138,596 for the year ended December 31, 2019, an increase of $8,941,143, or 80.27%. As a percentage of net sales, net income was 6.42% and 5.08% for the years ended December 31, 2020 and 2019, respectively.

**Liquidity and Capital Resources**

As of December 31, 2020, Appliances Connection had cash and cash equivalents of $14,842,912. To date, Appliances Connection has financed its operations primarily through revenue generated from operations.

***Summary of Cash Flow***

The following table provides detailed information about Appliances Connection's net cash flow for all financial statement periods presented in this information statement.

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Net cash provided by operating activities | $   16,594,919 | 2,125,205 |
| Net cash provided by (used in) investing activities | 2,610 | (68,636) |
| Net cash used in financing activities | (7,666,660) | (1,577,959) |
| Net change in cash | 8,930,869 | 478,610 |
| Cash at beginning of year | 5,912,043 | 5,433,433 |
| Cash at end of year | $   14,842,912 | $   5,912,043 |

Net cash provided by operating activities was $16,594,919 and $2,125,205 for the years ended December 31, 2020 and 2019, respectively. For the year ended December 31, 2020, the primary drivers of the net cash provided by operating activities were net income of $20,079,739, an increase in accounts payable and accrued expenses of $5,959,575, an increase in customer deposits of $5,611,683 and operating lease right-of-use assets of $1,442,621, offset by a decrease in deposits with vendors of $9,728,097, a decrease in accounts receivable of $5,674,584 and operating lease liabilities of $1,363,066. For the year ended December 31, 2019, the primary drivers of the net cash provided by operating activities were net income of $11,138,596 and an increase in accounts payable and accrued expenses of $6,768,230, offset by decreases in customer deposits of $7,612,046, inventory of $3,934,936 and deposits with vendors of $3,236,141.

Net cash provided by investing activities was $2,610 for the year ended December 31, 2020, compared with net cash used in investing activities of $68,636 for the year ended December 31, 2019. The net cash provided by investing activities for the year ended December 31, 2020 consisted of proceeds from disposal of assets of $33,444, offset by purchases of property and equipment of $30,834, while the net cash used in investing activities for the year ended December 31, 2019 consisted entirely of purchases of property and equipment.

Net cash used in financing activities was $7,666,660 and $1,577,959 for the years ended December 31, 2020 and 2019, respectively. Net cash used in financing activities for the year ended December 31, 2020 consisted of distributions of $9,637,816, repayments on notes payable of $318,457 and repayments of financing lease liabilities of $19,978, offset by proceeds from PPP and EIDL (as defined below) loans of $2,309,591, while net cash used in financing activities for the year ended December 31, 2019 consisted of distributions of $1,318,549, repayments on notes payable of $241,647 and repayments of financing lease liabilities of $17,763.

*Notes Payable*

Appliances Connection has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased. These notes have five-year terms and interest rates ranging from 3.09% to 5.74%. As of December 31, 2020, the outstanding balance of these notes is $1,687,285. We expect to repay these notes from the proceeds of the term loan described in the "Use of Proceeds" section above.

During the year ended December 31, 2020, Appliances Connection received Paycheck Protection Program, or PPP, loans pursuant to the Coronavirus Aid, Relief and Economic Security Act, or the CARES Act, in an aggregate principal amount of $1,872,470, which have two-year maturities and bear interest at 1.0% per annum. The PPP loans may be prepaid in whole or in part without penalty. No interest payments are due within the initial six months of the PPP loans. The interest accrued during the initial six-month period is due and payable, together with the principal, on the maturity date. Appliances Connection intends to use all proceeds from the PPP loans to retain employees, maintain payroll and make lease and utility payments to support business continuity throughout the COVID-19 pandemic, which amounts are intended to be eligible for forgiveness, subject to the provisions of the CARES Act. As of December 31, 2020, the outstanding balance of the PPP loans is $1,872,470. Subsequent to December 31, 2020, Appliances Connection was notified by its bank that its application for forgiveness of the PPP loans had been approved and that the loans had been forgiven in their entirety.

Additionally, during the year ended December 31, 2020, pursuant to the Economic Injury Disaster Loan, or EIDL, program under the CARES Act, Appliances Connection entered into three promissory notes with the U.S. Small Business Administration with an aggregate principal amount of $412,200. The EIDL loans have thirty-year maturities and bear interest at 3.75% per annum. The EIDL loans are secured by all of the assets of 1 Stop, Gold Coast and YF Logistics. Installment payments, including principal and interest, will begin one-year from the origination date. The EIDL loans may be prepaid at any time prior to maturity with no prepayment penalties. As of December 31, 2020, the outstanding balance of the EIDL loans is $412,200. We expect to repay the EIDL loan from the proceeds of the term loan described in the "Use of Proceeds" section above.

*Financing Leases*

On March 3, 2018, Appliances Connection entered in an equipment financing lease to purchase a forklift for $59,326, maturing on March 2, 2023. As of December 31, 2020, the balance payable was $33,346.

On January 23, 2019, Appliances Connection entered in an equipment financing lease to purchase a forklift for $55,510, maturing on January 23, 2024. As of December 31, 2020, the balance payable was $36,828.

**Contractual Obligations**

Appliances Connection's principal commitments consist mostly of obligations under the notes and financing leases described above and the operating leases described under "Information About Appliances Connection—Facilities" above.

**Off-Balance Sheet Arrangements**

Appliances Connection has no off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on its financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Critical Accounting Policies**

The following discussion relates to critical accounting policies for Appliances Connection. The preparation of the combined financial statements in conformity with GAAP requires management to make assumptions, estimates and judgments that affect the amounts reported, including the notes thereto, and related disclosures of commitments and contingencies, if any. Appliances Connection has identified certain accounting policies that are significant to the preparation of its combined financial statements. These accounting policies are important for an understanding of its financial condition and results of operation. Critical accounting policies are those that are most important to the portrayal of its financial condition and results of operations and require management's difficult, subjective, or complex judgment, often as a result of the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Certain accounting estimates are particularly sensitive because of their significance to the combined financial statements and because of the possibility that future events affecting the estimate may differ significantly from management's current judgments. We believe the following critical accounting policies involve the most significant estimates and

judgments used in the preparation of Appliances Connection's combined financial statements:

*Revenue Recognition and Cost of Revenue*

Appliances Connection records revenue in accordance with FASB ASC Topic 606. This ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. This ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments. Appliances Connection's adoption of this ASU resulted in no change to the Company's results of operations or balance sheet.

Appliances Connection collects 100 percent of the payment for internet and phone orders, including tax in certain jurisdictions, from the customer at the time the order is placed. Customers placing orders with a purchase order are allowed to purchase on credit and make payment after receipt of product. Appliances Connection does not incur incremental costs obtaining purchase orders from customers; however, if Appliances Connection did, because all Appliances Connection's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

Performance Obligations – The revenue that Appliances Connection recognizes arises from orders it receives from contracts with customers. Appliances Connection's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers and each order generally contains only one performance obligation based on the merchandise sale to be completed. Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, Appliances Connection's products, which generally occurs when the customer assumes the risk of loss. The transfer of control generally occurs at the point of pickup, shipment, or installation, depending on the type of order. Once this occurs, Appliances Connection has satisfied its performance obligation and Appliances Connection's recognizes revenue.

Transaction Price – Appliances Connection agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In Appliances Connection's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax that Appliances Connection collects concurrently with revenue-producing activities are excluded from revenue.

Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendor to Appliances Connection.

Substantially all Appliances Connection's sales are to individual retail consumers (homeowners), builders, and designers. The large majority of customers are homeowners and their contractors, with the homeowner being key in the final decisions. Appliances Connection has a diverse customer base with no one customer accounting for more than five percent of total revenue.

*Receivables*

Receivables consists of customer's balance payments for which Appliances Connection extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom Appliances Connection purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on Appliances Connection's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

46

Appliances Connection historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. Appliances Connection had no significant concentrations of receivables balances as of December 31, 2020 and 2019.

*Inventory*

Inventory mainly consists of finished goods acquired for resale and is valued at the average cost determined on a specific item basis. Appliances Connection periodically evaluates the value of items in inventory and provides write-downs to inventory based on estimate of its ability to sell the item as well as general market conditions.

*Property and Equipment*

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

|  | Useful Life (Years) |
|---|---|
| Furniture and fixtures | 7 |
| Transportation equipment | 5 |
| Machinery and equipment | 5-7 |
| Office equipment | 5-7 |
| Leasehold improvements | Shorter of lease term of estimated useful life |

*Long-lived Assets*

Appliances Connection reviews its property and equipment and any identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management if triggering events occur. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash receivables, inventory, and prepaid expenses approximate fair value. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

47

## MARKET PRICE AND DIVIDEND INFORMATION

**Market Information**

Our common stock began trading on NYSE American under the symbol "GOED" on July 31, 2020.

1 Stop, Gold Coast, Superior Deals, Joe's Appliances and YF Logistics are privately-held companies and their securities do not trade on any marketplace.

**Number of Holders of our Common Stock**

As of April 21, 2021, there were approximately 50 stockholders of record of our common stock. In computing the number of holders of record of our common stock, each broker-dealer and clearing corporation holding shares on behalf of its customers is counted as a single stockholder.

1 Stop, Gold Coast, Superior Deals and Joe's Appliances are owned by Albert Fouerti, who will become the President of ACI and a member of our board of directors upon closing of the proposed acquisition, and Elie Fouerti, who will become the Vice President of ACI upon closing of the proposed acquisition. Youssef Fouerti owns 100% of YF Logistics. Please see Exhibit A to the purchase agreement, a copy of which is attached as Annex A hereto, for the precise ownership of Appliances Connection.

**Dividend Policy**

We have never declared or paid cash dividends on our common stock. We currently intend to retain all available funds and any future earnings for use in the operation of our business and do not anticipate paying any cash dividends on our common stock in the near future. Any future determination to declare dividends will be made at the discretion of our board of directors and will depend on our financial condition, operating results, capital requirements, contractual restrictions, general business conditions and other factors that our board of directors may deem relevant. Appliances Connection has historically paid distributions to its owners. We do not anticipate that the combined company will pay dividends in accordance with our dividend policy described above.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table sets forth certain information about the securities authorized for issuance under our incentive plans as of December 31, 2020.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 555,000 | $ 9.00 | - |
| Equity compensation plans not approved by security holders | - | - | - |
| Total | 555,000 | $ 9.00 | - |

On July 30, 2020, we established the Plan. The purpose of the Plan is to grant restricted stock, stock options and other forms of incentive compensation to our officers, employees, directors and consultants. The maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan is 555,000 shares. Cancelled and forfeited stock options and stock awards may again become available for grant under the Plan. As of December 31, 2020, no shares remained available for issuance under the Plan.

48

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of April 21, 2021 by (i) each of our named executive officers and directors; (ii) all of our named executive officers and directors as a group; and (iii) each person who is known by us to beneficially own more than 5% of our common stock. Unless otherwise specified, the address of each of the persons set forth below is c/o our company, 13850 Manchester Rd., Ballwin, MO 63011.

| Name and Address of Beneficial Owner | Title of Class | Amount and Nature of Beneficial Ownership[1] | Percent of Class[2] |
|---|---|---|---|
| Douglas T. Moore, CEO and Director[3] | Common Stock | 65,790 | 1.07% |
| Robert D. Barry, CFO | Common Stock | 12,433 | * |
| Thomas S. Harcum, CMO and CTO | Common Stock | 0 | * |
| Jacob Guilhas, VP of Logistics | Common Stock | 0 | * |
| Michael K. Hargrave, Chief Merchant | Common Stock | 0 | * |
| Ellery W. Roberts, Chairman of the Board | Common Stock | 1,375,597 | 22.51% |
| Edward J. Tobin, Director | Common Stock | 960,680 | 15.72% |
| Ellette A. Anderson, Director | Common Stock | 0 | * |
| Clark R. Crosnoe. Director | Common Stock | 0 | * |
| Paul A. Froning, Director | Common Stock | 42,628 | * |
| Glyn C. Milburn, Director | Common Stock | 0 | * |
| All executive officers and directors (11 persons) | Common Stock | 2,457,128 | 40.20% |

| | | | |
|---|---|---|---|
| Mike Goedeker[4] | Common Stock | 534,375 | 8.74% |
| Steve Goedeker[5] | Common Stock | 534,375 | 8.74% |
| Avi Geller[6] | Common Stock | 503,369 | 8.24% |

\*     Less than 1%

(1)   Beneficial Ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Except as otherwise indicated, each of the beneficial owners listed above has direct ownership of and sole voting power and investment power with respect to our common stock.

(2)   A total of 6,111,200 shares of common stock are considered to be outstanding pursuant to SEC Rule 13d-3(d)(1) as of April 21, 2021. For each beneficial owner above, any options exercisable within 60 days have been included in the denominator.

(3)   Consists of 65,790 shares of common stock which Mr. Moore has the right to acquire within 60 days through the exercise of vested options.

(4)   Based solely on the information set forth in the Schedule 13G filed by Michael Goedeker with the SEC on February 26, 2021.

(5)   Based solely on the information set forth in the Schedule 13G filed by Stephen Goedeker with the SEC on February 26, 2021.

(6)   Represents shares of common stock held by Leonite Capital LLC, or Leonite. Based on the information set forth in the Schedule 13G filed by Leonite with the SEC on October 26, 2020, Avi Geller is the Chief Investment Officer of Leonite and has voting and investment power over the securities held by it. Mr. Geller disclaims beneficial ownership of the shares held by Leonite except to the extent of his pecuniary interest, if any, in such shares. The address of Leonite is 1 Hillcrest Center Dr, Suite 232, Spring Valley, NY 10977.

We do not currently have any arrangements which if consummated may result in a change of control of our company.

## EXECUTIVE COMPENSATION

**Summary Compensation Table - Years Ended December 31, 2020 and 2019**

The following table sets forth information concerning all cash and non-cash compensation awarded to, earned by or paid to the named persons for services rendered in all capacities during the noted periods. No other executive officers received total annual salary and bonus compensation in excess of $100,000.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Option Awards ($)[1] | All Other Compensation ($)[2] | Total ($) |
|---|---|---|---|---|---|---|
| Douglas T. Moore, | 2020 | 341,923 | 130,000 | 910,264 | 16,965 | 1,399,152 |
| Chief Executive Officer | 2019 | 133,727 | 35,000 | - | 9,465 | 178,192 |
| Robert D. Barry, | 2020 | 149,077 | - | 376,800 | - | 525,877 |
| Chief Financial Officer[3] | 2019 | 61,762 | - | - | - | 61,762 |
| Thomas S. Harcum, | 2020 | 131,923 | - | 157,000 | 17,470 | 306,393 |
| Chief Marketing and Technology Officer | 2019 | - | - | - | - | - |

(1)   The amount is equal to the aggregate grant-date fair value with respect to the awards, computed in accordance with FASB ASC Topic 718.

(2)   The amounts included for Mr. Moore for 2019 include reimbursement for accommodations in the amount of $6,955, reimbursement for airline tickets in the amount of $1,640, and reimbursement for car rental expenses in the amount of $870. In 2020, the amounts represent reimbursement for accommodations of $14,630 and $2,335 for 401(k) plan matches. For Mr. Harcum, the amount represents reimbursement for accommodations.

(3)   Mr. Barry was a part-time employee in 2019 following the acquisition of Goedeker Television until our initial public offering on July 31, 2020, at which time he became a full-time employee. Compensation for 2020 includes $55,385 as a part-time employee.

**Employment Agreements**

On August 15, 2019, we entered into an employment letter agreement with Mr. Moore setting forth the terms of the compensation for his services as Chief Executive Officer of our company. On April 21, 2020, we amended the employment letter agreement, which became effective upon closing of our initial public offering on August 4, 2020. Pursuant to the employment letter agreement, as amended, Mr. Moore is entitled to an annual base salary of $400,000 and an annual incentive bonus of up to 100% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. On August 19, 2020, we also granted Mr. Moore a special bonus of up to $125,000 to the extent that we achieve certain milestones. We also agreed to grant to Mr. Moore an option to purchase 263,158 shares of our common stock immediately following the closing of the initial public offering with an exercise price of $9.00, equal to the public offering price per share paid in the initial public offering. Vesting of the options will occur annually over a 4-year period in increments of 25% per year beginning on August 15, 2020. Mr. Moore also received relocation compensation, including a signing bonus of $35,000, reimbursement of living and accommodations in the St. Louis area for up to six months, car rental expenses for up to two months, and reimbursement of once monthly round trip airline tickets to St. Louis for either Mr. Moore or his spouse until April 2020. Mr. Moore is also entitled to a 15% discount on all purchases from our company. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Moore's employment is at-will and may be terminated by us at any time. Mr. Moore may terminate his employment upon 90 days' notice. If we terminate Mr. Moore's employment without cause, he is entitled to six months of base compensation, which will be paid in a lump sum upon termination. The employment letter agreement contains restrictive covenants prohibiting Mr. Moore from (i) owning or operating a business that competes with our company during the term of his employment and for a period of one year following the termination of his employment or (ii) soliciting our employees for a period of two years following the termination of his employment.

On April 21, 2020, we entered into an employment letter agreement with Robert D. Barry setting forth the terms of the compensation for his services as Chief Financial Officer of our company. This employment letter agreement became effective upon closing of our initial public offering on August 4, 2020. Pursuant to the employment letter agreement, Mr. Barry is entitled to an annual base salary of $250,000 and an annual incentive bonus of up to 50% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. Mr. Barry is also entitled to a 15% discount on all purchases from our company. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Barry's employment is at-will and may be terminated by us at any time. Mr. Barry may terminate his employment upon 90 days' notice. If we terminate Mr. Barry's employment without cause, he is entitled to six months of base compensation, which will be paid in a lump sum upon termination. The employment letter agreement contains restrictive covenants prohibiting Mr. Barry from (i) owning or operating a business that competes with our company during the term of his employment and for a period of one year following the termination of his employment or (ii) soliciting our employees for a period of two years following the termination of his employment.

On December 13, 2019, we entered into an employment offer letter with Thomas S. Harcum setting forth the terms of the compensation for his

services as Chief Marketing Officer and Chief Technology Officer of our company, effective as of January 6, 2020. Pursuant to the employment offer letter, Mr. Harcum is entitled to an annual base salary of $140,000 and an annual incentive bonus of up to 20% of base to the extent that we achieve certain annual EBITDA objectives to be established by our compensation committee. He is also eligible to participate in all employee benefit plans, including health insurance, commensurate with his position. Mr. Harcum's employment is at-will and may be terminated by us at any time.

**Outstanding Equity Awards at Fiscal Year-End**

The following table includes certain information with respect to the value of all unexercised options and unvested shares of restricted stock previously awarded to the executive officers named above at the fiscal year ended December 31, 2020.

| | Option Awards | | | | |
| | | | Equity Incentive Plan Awards: | | |
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Number of Securities Underlying Unexercised Options (#) Unexercisable | Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date |
|---|---|---|---|---|---|
| Douglas T. Moore | 65,790 | 197,368 | - | $ 9.00 | 08/04/2030 |
| Robert D. Barry | - | 120,000 | - | $ 9.00 | 09/10/2030 |
| Thomas S. Harcum | - | 50,000 | - | $ 9.00 | 09/10/2030 |

**Additional Narrative Disclosure**

*Retirement Benefits*

We have not maintained, and do not currently maintain, a defined benefit pension plan or nonqualified deferred compensation plan. We currently make available a retirement plan intended to provide benefits under Section 401(k) of the Code, pursuant to which employees, including the executive officers named above, can make voluntary pre-tax contributions. We currently match 100% of elective deferrals up to 3% of compensation and 50% of elective deferrals for next 2% of compensation. These matching contributions vest 100% following 60 days of the participant's employment. All contributions under the plan are subject to certain annual dollar limitations, which are periodically adjusted for changes in the cost of living. See "—Summary Compensation Table - Years Ended December 31, 2020 and 2019" for matches made for the executive officers named above.

*Potential Payments Upon Termination or Change in Control*

As described under "—Employment Agreements" above, Messrs. Moore and Barry are entitled severance if their employment is terminated without cause.

In the event of a change in control (as defined in our 2020 Equity Incentive Plan), all options issued to the executive officers named above shall become immediately vested and exercisable with respect to 100% of the shares subject to the option.

**Director Compensation**

We have agreed to pay our independent directors a fee of $35,000 per year, which is payable monthly commencing in the first month following the closing of the of our initial public offering in August 2020. We also agreed to reimburse the independent directors for pre-approved reasonable business expenses incurred in good faith in connection with the performance of their duties for us.

The table below sets forth the compensation to our independent directors during the fiscal year ended December 31, 2020.

| Name | Fees Earned or Paid in Cash ($) | Total ($) |
|---|---|---|
| Ellette A. Anderson | 14,583 | 14,583 |
| Clark R. Crosnoe | 14,583 | 14,583 |
| Paul A. Froning | 14,583 | 14,583 |
| Glyn C. Milburn | 14,583 | 14,583 |

**STOCKHOLDERS ENTITLED TO INFORMATION STATEMENT**

This information statement is being mailed to you on or about April 23, 2021. We will pay all costs associated with the distribution of this information statement, including the costs of printing and mailing. We will reimburse brokerage firms and other custodians, nominees and fiduciaries for reasonable expenses incurred by them in sending this information statement to the beneficial owners of our common stock.

On April 9, 2021, our board of directors established April 9, 2021 as the record date for the determination of stockholders entitled to receive this information statement.

**DELIVERY OF DOCUMENTS TO STOCKHOLDERS SHARING AN ADDRESS**

We may deliver only one information statement to multiple stockholders sharing an address, unless we have received contrary instructions from one or more of the stockholders. We will promptly deliver a separate copy of this information statement to a stockholder at a shared address to which a single copy was delivered, upon written or oral request to us at the following address and telephone number:

13850 Manchester Rd.
Ballwin, MO 63011
Attn: Corporate Secretary
Phone: 888-768-1710

In addition, a stockholder can direct a notification to us at the phone number and mailing address listed above that the stockholder wishes to receive a separate information statement in the future. Stockholders sharing an address that receive multiple copies can request delivery of a single copy of the information statements by contacting us at the phone number and mailing address listed above.

**WHERE YOU CAN FIND MORE INFORMATION**

We file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information are available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. Additionally, we will make these filings available, free of charge, on our website at www.goedekers.com as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the SEC. The information on our website, other than these filings, is not, and should not be, considered part of this information statement and is not incorporated by reference into this document.

52

## FINANCIAL STATEMENTS

|  | Page |
|---|---|
| **Audited Consolidated Financial Statements of 1847 Goedeker Inc. as of and for the Years Ended December 31, 2020 and 2019** | **F-2** |
| Report of Independent Registered Public Accounting Firm | F-3 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 (as Restated) | F-4 |
| Consolidated Statements of Operations for the Year Ended December 31, 2020 and the Period from April 6, 2019 to December 31, 2019 (Successor) (as Restated) and for the Period from January 1, 2019 to April 5, 2019 (Predecessor) | F-5 |
| Statement of Stockholders' Equity for Predecessor for the Period from January 1, 2019 to April 5, 2019 | F-6 |
| Consolidated Statement of Stockholder's Deficit for Successor for the Year Ended December 31, 2020 and the Period from April 5, 2019 to December 31, 2019 (as Restated) | F-7 |
| Consolidated Statements of Cash Flows for the Year Ended December 31, 2020 and the Period from April 6, 2019 to December 31, 2019 (Successor) (as Restated) and for the Period from January 1, 2019 to April 5, 2019 (Predecessor) | F-8 |
| Notes to Consolidated Financial Statements | F-9 |
| **Audited Combined Financial Statements of 1 Stop Electronics Center, Inc., YF Logistics LLC, Gold Coast Appliances, Inc., Joe's Appliances LLC and Superior Deals Inc. (dba Appliances Connection) as of and for the Years Ended December 31, 2020 and 2019** | **F-33** |
| Report of Independent Registered Public Accounting Firm | F-34 |
| Combined Balance Sheets as of December 31, 2020 and 2019 | F-35 |
| Combined Statements of Income and Changes in Owners' Equity for the Years Ended December 31, 2020 and 2019 | F-36 |
| Combined Statements of Cash Flows for the Years Ended December 31, 2020 and 2019 | F-37 |
| Notes to Combined Financial Statements | F-38 |
| **Unaudited Pro Forma Combined Financial Statements** | **F-50** |
| Unaudited Pro Forma Combined Balance Sheet as of December 31, 2020 | F-51 |
| Unaudited Pro Forma Combined Statement of Operations for the Year Ended December 31, 2020 | F-52 |
| Notes to Unaudited Pro Forma Combined Financial Statements | F-53 |

F-1

**1847 GOEDEKER INC.**
**AUDITED CONSOLIDATED FINANCIAL STATEMENTS**
**AS OF AND FOR THE YEARS ENDED DECEMBER 31, 2020 AND 2019**

F-2

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
1847 Goedeker Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of 1847 Goedeker Inc. and subsidiary (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of operations, stockholder's deficit, and cash flows for the year ended December 31, 2020 and the period from April 6, 2019 through December 31, 2019 (effective April 6, 2019, the "Successor Company"), the period from January 1, 2019 through April 5, 2019 (pre-April 6, 2019, the "Predecessor Company"), and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Successor Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the year ended December 31, 2020 and for the period from April 6, 2019 through December 31, 2019, in conformity with accounting principles generally accepted in the United States of America. Further, in our opinion, the Predecessor Company financial statements referred to above present fairly, in all material respects, the results of its operations and cash flows for the period from January 1, 2019 through April 5, 2019 in conformity with accounting principles generally accepted in the United States of America.

**Restatement of Previously Issued Financial Statements**

As discussed in Note 3 to the consolidated financial statements, the Company has restated its 2019 financial statements to correct errors.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2020.

Marlton, New Jersey

March 29, 2021

F-3

**1847 GOEDEKER INC.**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| | | (As Restated) |
| ASSETS | | |
| Current Assets | | |
| Cash and cash equivalents | $ 934,729 | $ 471,308 |
| Restricted cash | 8,977,187 | - |
| Receivables | 1,998,232 | 1,455,248 |
| Vendor deposits | 547,648 | 294,960 |
| Merchandise inventory, net | 5,147,241 | 1,380,090 |
| Prepaid expenses and other current assets | 635,084 | 892,796 |
| Total Current Assets | 18,240,121 | 4,494,402 |
| Property and equipment, net | 245,948 | 185,606 |
| Operating lease right-of-use assets, net | 1,578,235 | 2,000,755 |
| Goodwill | 4,725,689 | 4,603,953 |
| Intangible assets, net | 1,381,937 | 1,878,844 |
| Deferred tax assets | - | 698,303 |
| Other long-term assets | 45,000 | 45,000 |
| TOTAL ASSETS | $ 26,216,930 | $ 13,906,863 |
| LIABILITIES AND STOCKHOLDERS' DEFICIT | | |
| Current Liabilities | | |
| Accounts payable and accrued expenses | $ 12,701,715 | $ 5,375,420 |
| Customer deposits | 21,879,210 | 4,164,296 |
| Advances, related party | - | 137,500 |
| Lines of credit | - | 1,250,930 |
| Current portion of notes payable, related parties | - | 1,068,075 |
| Current portion of notes payable | 663,339 | 999,200 |
| Convertible notes payable | - | 584,943 |
| Warrant liability | - | 122,344 |
| Current portion of operating lease liabilities | 450,712 | 422,520 |
| Total Current Liabilities | 35,694,976 | 14,125,228 |
| Notes payable, related parties, net of current portion | - | 2,232,369 |
| Notes payable, net of current portion | 2,522,030 | - |
| Operating lease liabilities, net of current portion | 1,127,523 | 1,578,235 |
| Contingent note payable | 188,170 | 49,248 |
| TOTAL LIABILITIES | 39,532,699 | 17,985,080 |
| Stockholders' Deficit | | |
| Preferred stock, $.0001 par value, 20,000,000 shares authorized; none issued and outstanding at December 31, 2020 or 2019 | - | - |
| Common stock, $.0001 par value, 200,000,000 shares authorized; 6,111,200 and 4,750,000 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 611 | 475 |
| Additional paid-in capital | 13,409,328 | 1,079,179 |
| Accumulated deficit | (26,725,708) | (5,157,871) |
| Total Stockholders' Deficit | (13,315,769) | (4,078,217) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 26,216,930 | $ 13,906,863 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-4

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2020 | Period from April 6, 2019 through December 31, 2019 | Period from January 1, 2019 through April 5, 2019 |
| | | (As Restated) | |
| Product sales, net | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 |
| Cost of goods sold | 47,878,541 | 28,596,129 | 11,004,842 |
| Gross profit | 7,255,112 | 6,071,983 | 1,942,059 |
| Operating Expenses | | | |
| Personnel | 6,565,380 | 2,909,751 | 913,919 |
| Advertising | 4,865,361 | 1,996,507 | 714,276 |
| Bank and credit card fees | 1,806,620 | 870,877 | 329,247 |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 |
| General and administrative | 7,900,566 | 4,728,571 | 451,214 |
| Total Operating Expenses | 21,687,639 | 10,776,742 | 2,418,331 |

| | | | |
|---|---|---|---|
| LOSS FROM OPERATIONS | (14,432,527) | (4,704,759) | (476,272) |
| Other Income (Expense) | | | |
| Interest income | 2,479 | - | 23,807 |
| Financing costs – amortization of debt discount | (762,911) | (520,160) | - |
| Adjustment in value of contingency | (138,922) | 32,246 | |
| Interest expense | (870,847) | (785,411) | - |
| Loss on extinguishment of debt | (1,756,095) | - | - |
| Write-off of acquisition receivable | (809,000) | - | - |
| Change in fair value of warrant liability | (2,127,656) | 106,900 | - |
| Other income | 25,945 | 15,010 | 7,200 |
| Total Other Income (Expense) | (6,437,007) | (1,151,415) | 31,007 |
| NET LOSS BEFORE INCOME TAXES | (20,869,534) | (5,856,174) | (445,265) |
| INCOME TAX BENEFIT (EXPENSE) | (698,303) | 698,303 | - |
| NET LOSS | $ (21,567,837) | $ (5,157,871) | $ (445,265) |
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ (3.95) | $ (1.03) | $ (63.61) |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | 5,463,603 | 5,000,000 | 7,000 |

*The accompanying notes are an integral part of these consolidated financial statements*

F-5

**1847 GOEDEKER INC.**
**STATEMENT OF STOCKHOLDERS' EQUITY**
**(PREDECESSOR)**

| | Common Stock | | Additional Paid-in | Retained | Total Stockholders' |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Earnings | Equity |
| Balance, December 31, 2018 | 7,000 | $ 7,000 | $ 707,049 | $ 2,684,628 | $ 3,398,677 |
| Net loss for the period from January 1, 2019 through April 5, 2019 | - | - | - | (445,265) | (445,265) |
| Balance, April 5, 2019 | 7,000 | $ 7,000 | $ 707,049 | $ 2,239,363 | $ 2,953,412 |

*The accompanying notes are an integral part of consolidated these financial statements*

F-6

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(SUCCESSOR)**

**For the Period from April 6, 2019 through December 31, 2019 (as Restated)**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Deficit | (Deficit) |
| Balance, April 6, 2019 | - | $ - | $ - | $ - | $ - |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 786,506 | - | 786,981 |
| Issuance of warrants in connection with notes payable | - | - | 292,673 | - | 292,673 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | - | - | - | (5,157,871) | (5,157,871) |
| Balance, December 31, 2019 | 4,750,000 | $ 475 | $ 1,079,179 | $ (5,157,871) | $ (4,078,217) |

**For the Year Ended December 31, 2020**

| | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | Capital | Deficit | (Deficit) |
| Balance, January 1, 2020 (as restated) | 4,750,000 | $ 475 | $ 1,079,179 | $ (5,157,871) | $ (4,078,217) |
| Issuance of 1847 Holdings warrants in connection with notes payable | - | - | 566,711 | - | 566,711 |
| Forgiveness of related party debt | - | - | 137,500 | - | 137,500 |
| Issuance of 1847 Holdings shares in connection with conversion of notes payable | - | - | 375,000 | - | 375,000 |
| Issuance of common stock for cash | 1,111,200 | 111 | 8,602,055 | - | 8,602,166 |
| Issuance of common stock in connection with exercise of warrant | 250,000 | 25 | 2,249,975 | - | 2,250,000 |
| Stock-based compensation expense | - | - | 398,908 | - | 398,908 |
| Net loss | - | - | - | (21,567,837) | (21,567,837) |
| Balance, December 31, 2020 | 6,111,200 | $ 611 | $ 13,409,328 | $ (26,725,708) | $ (13,315,769) |

*The accompanying notes are an integral part of these consolidated financial statements*

F-7

**1847 GOEDEKER INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, 2020 | Period from April 6, 2019 through December 31, 2019 | Period from January 1, 2019 through April 5, 2019 |
| | | (As Restated) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net loss | $ (21,567,837) | $ (5,157,871) | $ (445,265) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 549,712 | 271,036 | 9,675 |
| Amortization of finance costs | 681,976 | 599,814 | - |
| Loss on extinguishment of debt | 1,756,095 | - | - |
| Write-off of acquisition receivable | 809,000 | - | - |
| Adjustment in contingent liability | 138,922 | (32,246) | - |
| Stock-based compensation | 398,908 | - | - |
| Change in fair value of warrant liability | 2,127,656 | (106,900) | - |
| Non-cash lease expense | 422,520 | 299,245 | - |
| Deferred tax assets | 698,303 | (698,303) | - |
| Changes in operating assets and liabilities: | | | |
| Receivables | (664,720) | (999,066) | 1,730,079 |
| Vendor deposits | (252,688) | (294,960) | (73,770) |
| Merchandise inventory | (3,767,151) | 471,161 | 595,466 |
| Prepaid expenses and other assets | (551,288) | 167,066 | 2,784 |
| Accounts payable and accrued expenses | 7,337,081 | 1,625,064 | 196,565 |
| Customer deposits | 17,714,914 | 1,855,990 | (1,404,266) |
| Operating lease liabilities | (422,520) | (299,245) | - |
| Net cash provided by (used in) operating activities | 5,408,883 | (2,299,215) | 611,268 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Purchases of property and equipment | (113,147) | (2,200) | - |
| Net cash used in investing activities | (113,147) | (2,200) | - |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Proceeds from initial public offering, net | 8,602,166 | - | - |
| Proceeds from note payable | 642,600 | 1,500,000 | - |
| Payments on notes payable | (2,883,754) | (357,207) | - |
| Proceeds from convertible notes payable | - | 650,000 | - |
| Payments on convertible notes payable | (771,431) | - | |
| Net borrowings (payments) on lines of credit | (1,339,430) | 1,339,430 | - |
| Cash paid for financing costs | (105,279) | (359,500) | - |
| Net cash provided by financing activities | 4,144,872 | 2,772,723 | - |
| **NET CHANGE IN CASH AND RESTRICTED CASH** | 9,440,608 | 471,308 | 611,268 |
| CASH AND RESTRICTED CASH, BEGINNING OF YEAR | 471,308 | - | 1,525,693 |
| CASH AND RESTRICTED CASH, END OF YEAR | $ 9,911,916 | $ 471,308 | $ 2,136,961 |
| Cash, cash equivalents and restricted cash consist of the following: | | | |
| End of year | | | |
| Cash and cash equivalents | $ 934,726 | $ 471,308 | $ - |
| Restricted cash | 8,977,187 | - | - |
| | $ 9,911,916 | $ 471,308 | $ - |
| Cash, cash equivalents and restricted cash consist of the following: | | | |
| Beginning of year | | | |
| Cash and cash equivalents | $ 471,308 | $ - | $ 1,525,693 |
| Restricted cash | - | - | - |
| | $ 471,308 | $ - | $ 1,525,693 |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | | |
| Cash paid for interest | $ 764,424 | $ 292,890 | $ - |
| Cash paid for taxes | $ - | $ - | $ - |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES** | | | |
| Operating lease right-of-use asset and liability | $ - | $ 2,300,000 | $ - |
| Debt discounts on notes payable | $ - | $ 64,286 | $ - |
| Warrants in 1847 Holdings contributed on notes payable | $ 566,711 | $ 292,673 | $ - |
| 1847 Holdings common shares contributed on note payable | $ - | $ 137,500 | $ - |
| Acquisition of Goedeker Television Co. | $ - | $ 4,725,689 | $ - |
| Conversion of debt through issuance of 1847 Holdings common shares | $ 375,000 | $ - | $ - |
| Derecognition of related party debt | $ 137,500 | $ - | $ - |

| | | | | | |
|---|---|---|---|---|---|
| Adjustment to fair value of goodwill based on final purchase price allocation | $ | 121,736 | $ | - | $ | - |
| Conversion of warrant into common stock | $ | 2,250,000 | $ | - | $ | - |
| Issuance of note payable to repay Seller note | $ | 3,500,000 | $ | - | $ | - |

*The accompanying notes are an integral part of these consolidated financial statements*

F-8

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 1—ORGANIZATION AND NATURE OF BUSINESS**

1847 Goedeker Inc. (the "Company") was formed under the laws of the State of Delaware on January 10, 2019 for the sole purpose of acquiring the business of Goedeker Television Co. Prior to the acquisition, the Company did not have any operations other than operations relating to its incorporation and organization.

On April 5, 2019, the Company acquired substantially all the assets and assumed substantially all the liabilities of Goedeker Television Co., a Missouri corporation ("Goedeker"). As a result of this transaction, the Company acquired the former business of Goedeker and continues to operate this business.

October 20, 2020, the Company formed Appliances Connection Inc. ("ACI") as a wholly owned subsidiary in the State of Delaware. At December 31, 2020, ACI had no assets or liabilities.

The Company is a one-stop e-commerce destination for home furnishings, including appliances, furniture, home goods and related products. Since Goedeker's founding in 1951, it has evolved from a local brick and mortar operation serving the St. Louis metro area to a large nationwide omnichannel retailer that offers one-stop shopping. While the Company still maintains its St. Louis showroom, over 95% of its sales are placed through its website at www.goedekers.com.

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation*

The consolidated financial statements of the Company and ACI have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars.

Management has analyzed the impact of the Coronavirus pandemic ("COVID-19") on its consolidated financial statements as of December 31, 2020 and has determined that the changes to its significant judgments and estimates did not have a material impact with respect to goodwill, intangible assets or long-lived assets.

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its consolidated subsidiary, ACI. All significant intercompany balances and transactions have been eliminated in consolidation. The Company does not have a majority or minority interest in any other company, either consolidated or unconsolidated.

*Stock Split*

On July 30, 2020, the Company completed a 4,750-for-1 forward stock split of its outstanding common stock. As a result of this stock split, the Company's issued and outstanding common stock increased from 1,000 to 4,750,000 shares. Accordingly, all share and per share information has been restated to retroactively show the effect of this stock split.

*Predecessor and Successor Reporting*

The acquisition of Goedeker, as described in Note 1, was accounted for under the acquisition method of accounting in accordance with GAAP. For the purpose of financial reporting, Goedeker was deemed to be the predecessor company and the Company is deemed to be the successor company in accordance with the rules and regulations issued by the Securities and Exchange Commission. The assets and liabilities of Goedeker were recorded at their respective fair values as of the acquisition date. Fair value adjustments related to the transaction are reflected in the books of the Company, resulting in assets and liabilities of the Company being recorded at fair value at April 6, 2019. Therefore, the Company's financial information prior to the transaction is not comparable to its financial information subsequent to the transaction.

As a result of the impact of pushdown accounting, the consolidated financial statements and certain note presentations separate the Company's presentations into two distinct periods, the period before the consummation of the transaction (labeled "Predecessor") and the period after that date (labeled "Successor"), to indicate the application of a different basis of accounting between the periods presented.

F-9

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

*Use of Estimates*

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Cash and equivalents include: (1) currency on hand, (2) demand deposits with banks or financial institutions, (3) other kinds of accounts that have the general characteristics of demand deposits, and (4) short-term, highly liquid investments that are both readily convertible to known amounts of cash and so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. The majority of payments due from financial institutions for the settlement of credit card and debit card transactions process within two business days and are, therefore, classified as cash and cash equivalents. Other payment methods that take more time to settle are classified as receivables.

Restricted cash includes $3,298,529 pledged to secure a note, $100,000 to secure a vendor letter of credit and $5,578,658 withheld by credit card processors as security for the Company's customer refund claims and credit card chargebacks. The cash pledged to secure the note payable will be released as the note is repaid, the cash pledged to secure the letter of credit will be released when the vendor offers the Company credit terms, and the cash held by credit card processors will be released at the discretion of the credit card companies.

*Revenue Recognition and Cost of Revenue*

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. Revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASC 606 also requires additional disclosure about the nature, amount, timing,

and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments.

The Company collects the full sales price from the customer at the time the order is placed, which is recorded as customer deposits on the accompanying consolidated balance sheet. The Company does not incur incremental costs obtaining purchase orders from customers, however, if the Company did, because all the Company's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

The revenue that the Company recognizes arises from orders it receives from its customers. The Company's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers under the purchase orders; as a result, each purchase order generally contains only one performance obligation based on the merchandise sale to be completed.

F-10

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, the Company's products, which generally occurs when the customer assumes the risk of loss. The risk of loss shifts to the customer at different times depending on the method of delivery. The Company delivers products to its customers in three possible ways. The first way is through a shipment of the products through a third-party carrier from the Company's warehouse to the customer (a "Company Shipment"). The second way is through a shipment of the products through a third-party carrier from a warehouse other than the Company's warehouse to the customer (a "Drop Shipment") and the third way is where the Company itself delivers the products to the customer and often also installs the product (a "Local Delivery"). In the case of a Local Delivery, the Company loads the product on to its own truck and delivers and installs the product at the customer's location. When a product is delivered through a Local Delivery, risk of loss passes to the customer at the time of installation and revenue is recognized upon installation at the customer's location. In the case of a Company Shipment and a Drop Shipment, the delivery to the customer is made free on board, or FOB, shipping point (whether from the Company's warehouse or a third party's warehouse). Therefore, risk of loss and title transfers to the customer once the products are shipped (i.e., leaves the Company's warehouse or a third-party's warehouse). After shipment and prior to delivery, the customer is able to redirect the product to a different destination, which demonstrates the customer's control over the product once shipped. Once the risk of loss has shifted to the customer, the Company has satisfied its performance obligation and the Company recognizes revenue.

The Company agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In the Company's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax, value added tax, and other tax the Company collects concurrently with revenue-producing activities are excluded from revenue.

Cost of revenue includes the cost of purchased merchandise plus the cost of shipping merchandise and where applicable installation, net of promotional rebates and other incentives received from vendors.

Substantially all the Company's sales are to individual retail consumers.

Shipping and Handling – The Company bills its customers for shipping and handling charges, which are included in net sales for the applicable period, and the corresponding shipping and handling expense is reported in cost of sales.

Disaggregated Revenue – The Company disaggregates revenue from contracts with customers by product type, as it believes it best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's disaggregated revenue by product type is as follows:

|  | Successor | | Predecessor |
|---|---|---|---|
|  | Year Ended December 31, 2020 | Period from April 6, 2019 through December 31, 2019 | Period from January 1, 2019 through April 5, 2019 |
| Appliance sales | $ 40,113,568 | $ 28,487,053 | $ 9,784,525 |
| Furniture sales | 11,800,277 | 4,405,866 | 2,456,085 |
| Other sales | 3,219,808 | 1,775,193 | 706,291 |
| Total | $ 55,133,653 | $ 34,668,112 | $ 12,946,901 |

The Company also sells extended warranty contracts. The Company is an agent for the warranty company and earns a commission on the warranty contracts purchased by customers; therefore, the cost of the warranty contracts is netted against warranty revenue in the accompanying consolidated statement of operations. The Company assumes no liability for repairs to products on which it has sold a warranty contract.

The Company experiences operational trends which are primarily holidays such as Presidents Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, and Christmas and Black Friday and Cyber Monday.

F-11

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

*Receivables*

Receivables represent rebates receivable due from manufacturers from whom the Company purchases products and amounts due from credit card processors that do not settle within two days. Rebates receivable are stated at the amount that management expects to collect from manufacturers, net of accounts payable amounts due the vendor. Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts. The Company historically collects substantially all of its outstanding rebates receivables. Uncollectible balances are expensed in the period it is determined to be uncollectible.

*Merchandise Inventory*

Inventory consists of finished products acquired for resale and is valued at the lower-of-cost-or-market with cost determined on an average item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on its estimate of market

conditions.

**Property and Equipment**

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements. Depreciation is computed using the straight-line method over estimated useful lives as follows:

| Category | Useful Life (Years) |
|---|---|
| Machinery and equipment | 5 |
| Office equipment | 5 |
| Vehicles | 5 |

**Goodwill**

The Company tests its goodwill for impairment at least annually on December 31 and whenever events or circumstances change that indicate impairment may have occurred. A significant amount of judgment is involved in determining if an indicator of impairment has occurred. Such indicators may include, among others: a significant decline in the Company's expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; and slower growth rates. Any adverse change in these factors could have a significant impact on the recoverability of goodwill and the Company's consolidated financial results.

The Company tests goodwill by estimating fair value using a Discounted Cash Flow ("DCF") model. The key assumptions used in the DCF model to determine the highest and best use of estimated future cash flows include revenue growth rates and profit margins based on internal forecasts, terminal value and an estimate of a market participant's weighted-average cost of capital used to discount future cash flows to their present value. There were no impairment charges during the years ended December 31, 2020 and 2019.

**Intangible Assets**

As of December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of tradenames and customer relationships which are being amortized over their estimated useful lives, or 5 years.

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

F-12

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

In applying the acquisition method of accounting, amounts assigned to identifiable assets and liabilities acquired were based on estimated fair values as of the date of acquisition, with the remainder recorded as goodwill. Identifiable intangible assets are initially valued at fair value using generally accepted valuation methods appropriate for the type of intangible asset. Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of December 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. At December 31, 2020 and 2019, there were no impairments in intangible or the right of use ("ROU") assets.

**Long-Lived Assets**

The Company reviews its property and equipment and any identifiable intangibles (including ROU asset) for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management upon triggering events. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell. At December 31, 2020 and 2019, there were no impairments in long-lived assets.

**Lease Liabilities**

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

**Fair Value of Financial Instruments**

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value, due to their short-term nature. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

F-13

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

*Customer Deposits*

Customer deposits represent the amount collected from customers when an order is placed. The deposits are transferred to revenue when the order ships to the customer or returned to the Company if the order is subsequently cancelled.

*Derivative Instrument Liability*

The Company accounts for derivative instruments in accordance with ASC 815, *Derivatives and Hedging*, which establishes accounting and reporting standards for derivative instruments and hedging activities, including certain derivative instruments embedded in other financial instruments or contracts, and requires recognition of all derivatives on the balance sheet at fair value, regardless of hedging relationship designation. Accounting for changes in fair value of the derivative instruments depends on whether the derivatives qualify as hedge relationships and the types of relationships designated are based on the exposures hedged. At December 31, 2019, the Company classified a warrant issued in conjunction with a term loan as a derivative instrument (see Note 12). There were no derivative instruments at December 31, 2020.

*Income Taxes*

Under the Company's accounting policies, the Company initially recognizes a tax position in its consolidated financial statements when it becomes more likely than not that the position will be sustained upon examination by the tax authorities. Such tax positions are initially and subsequently measured as the largest amount of tax positions that has a greater than 50% likelihood of being realized upon ultimate settlement with the tax authorities assuming full knowledge of the position and all relevant facts. Although the Company believes its provisions for unrecognized tax positions are reasonable, the Company can make no assurance that the final tax outcome of these matters will not be different from that which the Company has reflected in its income tax provisions and accruals. The tax law is subject to varied interpretations, and the Company has taken positions related to certain matters where the law is subject to interpretation. Such differences could have a material impact on the Company's income tax provisions and operating results in the period(s) in which the Company makes such determination.

*Sales Tax Liability*

On June 21, 2018, the U.S. Supreme Court issued an opinion in *South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018)*, whereby the longstanding *Quill Corp v. North Dakota* sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At December 31, 2020 and 2019, the amount of such accrual was $5,804,100 and $2,910,200, respectively, which is included in accounts payable and accrued expenses. To date, only one state has notified the Company of a potential sales tax liability of approximately $11,000.

*Basic Income (Loss) Per Share*

Basic income (loss) per share is calculated by dividing the net loss applicable to common shareholders by the weighted average number of common shares during the period. Diluted earnings per share is calculated by dividing the net income available to common shareholders by the diluted weighted average number of shares outstanding during the year. The diluted weighted average number of shares outstanding is the basic weighted number of shares adjusted for any potentially dilutive securities. For the year ended December 31, 2020, the potentially dilutive securities were warrants for the purchase of 55,560 shares of common stock issued to affiliates of the underwriter in its initial public offering described below and options for the purchase of 555,000 shares of common stock. For the year ended December 31, 2019, the potentially dilutive securities were penny warrants for the purchase of 250,000 shares of common stock, which were included in basic loss per share, but excluded from diluted loss per share.

*Reclassifications*

Certain accounts have been reclassified to conform with classifications adopted in the period ended December 31, 2020. Such reclassifications had no effect on net earnings or financial position.

F-14

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

*Going Concern Assessment*

Management assesses going concern uncertainty in the Company's consolidated financial statements to determine whether there is sufficient cash on hand and working capital, including available borrowings on loans, to operate for a period of at least one year from the date the consolidated financial statements are issued or available to be issued, which is referred to as the "look-forward period", as defined in GAAP. As part of this assessment, based on conditions that are known and reasonably knowable to management, management will consider various scenarios, forecasts, projections, estimates and will make certain key assumptions, including the timing and nature of projected cash expenditures or programs, its ability to delay or curtail expenditures or programs and its ability to raise additional capital, if necessary, among other factors. Based on this assessment, as necessary or applicable, management makes certain assumptions around implementing curtailments or delays in the nature and timing of programs and expenditures to the extent it deems probable those implementations can be achieved and management has the proper authority to execute them within the look-forward period.

The Company has generated significant losses since its acquisition and has relied on cash on hand, external bank lines of credit, proceeds from the IPO described below, issuance of third party and related party debt and the issuance of a note to support cashflow from operations.

For the year ended December 31, 2020, the Company incurred operating losses of approximately $14.4 million, cash flows from operations of $5.4 million, and negative working capital of $17.5 million.

Management has prepared estimates of operations for fiscal years 2021 and 2022 and believes that sufficient funds will be generated from operations to fund its operations, and to service its debt obligations for one year from the date of the filing of these consolidated financial statements in the Company's 10-K.

On August 4, 2020, the Company completed an initial public offering of its common stock, pursuant to which the Company sold 1,111,200 shares of its common stock, at a purchase price of $9.00 per share, for total gross proceeds of $10,000,800 (the "IPO"). After deducting the underwriting commission and offering expenses, the Company received net proceeds of $8,602,166. The Company used a portion of the proceeds from the IPO to pay off certain debt as described below.

As described in Note 19 below, the Company received net proceeds of $4,590,000 from the sale of 10% OID senior secured promissory note and warrants on March 19, 2021. These proceeds will supplement the Company's cash flow from operations and provide additional liquidity.

The impact of COVID-19 on the Company's business has been considered in these assumptions; however, it is too early to know the full impact of

COVID-19 or its timing on a return to more normal operations.

The accompanying consolidated financial statements have been prepared on a going concern basis under which the Company is expected to be able to realize its assets and satisfy its liabilities in the normal course of business.

Management believes that based on relevant conditions and events that are known and reasonably knowable that its forecasts, for one year from the date of the filing of these consolidated financial statements, indicate improved operations and the Company's ability to continue operations as a going concern. The Company has contingency plans to reduce or defer expenses and cash outlays should operations not improve in the look forward period.

## 1847 GOEDEKER INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2020 AND 2019

### Recent Accounting Pronouncements

#### Recently Adopted

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASC 842"), which requires lessees to recognize ROU assets and related lease liabilities on the balance sheet for all leases greater than one year in duration. The Company adopted ASC 842 on January 1, 2019 using a modified retrospective transition approach for leases existing at, or entered into after, the beginning of the earliest comparative period presented in the consolidated financial statements. The modified retrospective approach did not require any transition accounting for leases that expired before the earliest comparative period presented. The adoption of this standard resulted in the recording of ROU assets and lease liabilities for all of the Company's lease agreements with original terms of greater than one year. The adoption of ASC 842 did not have a significant impact on the Company's consolidated statements of income or cash flows. See Note 15 for the required disclosures relating to the Company's lease agreements.

In June 2018, the FASB issued Accounting Standards Update ("ASU") 2018-07, *Compensation-Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting,* which simplifies the accounting for nonemployee share-based payment transactions by expanding the scope of ASC Topic 718, *Compensation - Stock Compensation*, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new standard, most of the guidance on stock compensation payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. This standard became effective for the Company on January 1, 2019. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In February 2018, the FASB issued ASU 2018-02, *Income Statement-Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*, which allows a reclassification from accumulated other comprehensive income ("AOCI") to retained earnings for stranded tax effects resulting from U.S. federal tax legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017.

In August 2017, the FASB issued ASU 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities*, which expands and refines hedge accounting for both financial and non-financial risk components, aligns the recognition and presentation of the effects of hedging instruments and hedge items in the consolidated financial statements, and includes certain targeted improvements to ease the application of current guidance related to the assessment of hedge effectiveness. ASU 2017-12 became effective for the Company on January 1, 2019. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles – Goodwill and Other – Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods beginning after December 15, 2019, including interim periods within those annual periods. Early adoption is permitted. The Company adopted ASU 2018-15 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. The Company adopted ASU 2018-13 on January 1, 2020 on a prospective basis. The adoption of this standard did not have a material impact on the Company's consolidated financial statements.

## 1847 GOEDEKER INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## DECEMBER 31, 2020 AND 2019

#### Not Yet Adopted

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to the Company's consolidated financial statements.

### NOTE 3—RESTATEMENT OF FINANCIAL STATEMENTS

The Company restated its previously issued financial statements as of and for the year ended December 31, 2019 to reflect the modification of a sales tax liability and purchase accounting adjustments:

(1) The Company determined that it should accrue a liability for potential 2019 sales taxes that might be payable to the states in which it operates as a result of the Wayfair decision (See Note 2 – Sales Tax Liability). Accordingly, the Company accrued a liability of $2,910,200,

representing a potential liability for sales taxes and penalties of $2,808,000 and interest expense of $102,200.

(2) The Company adjusted the fair value of ownership interests in Holdco that were transferred to seller and the value of liabilities assumed in the April 5, 2019 acquisition (see Note 10) resulting in a $372,063 reduction in Goodwill; a $192,542 reduction in Additional Paid in Capital, and $179,521 reduction in liabilities assumed, which was recognized as a general and administrative expense.

The following tables summarize the effect of the restatement on the specific items presented in our historical financial statements included in our previously reported December 31, 2019 financial statements:

F-17

## 1847 GOEDEKER INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2020 AND 2019
1847 GOEDEKER INC.
BALANCE SHEET

| | December 31, 2019 (As Filed) | | Adjustments | December 31, 2019 (As Restated) |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Total Current Assets | 4,494,402 | | - | 4,494,402 |
| Goodwill | 4,976,016 | (2) | (372,063) | 4,603,953 |
| TOTAL ASSETS | $ 14,278,926 | | $ (372,063) | $ 13,906,863 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| Current Liabilities | | | | |
| Accounts payable and accrued expenses | $ 2,465,220 | (1) | $ 2,910,200 | $ 5,375,420 |
| Total Current Liabilities | 11,215,028 | | 2,910,200 | 14,125,228 |
| TOTAL LIABILITIES | 15,074,880 | | 2,910,200 | 17,985,080 |
| Stockholders' Deficit | | | | |
| Additional paid-in capital | 1,271,721 | (2) | (192,542) | 1,079,179 |
| Accumulated deficit | (2,068,150) | (1) | (2,910,200) | (5,157,871) |
| | | (2) | (179,521) | |
| Total Stockholders' Deficit | (795,954) | | (3,282,263) | (4,078,217) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | 14,278,926 | | $ (372,063) | $ 13,906,863 |

1847 GOEDEKER INC.
STATEMENTS OF OPERATIONS

| | Period from April 6, 2019 through December 31, 2019 (As Filed) | | Adjustments | Period from April 6, 2019 through December 31, 2019 (As Restated) |
|---|---|---|---|---|
| Gross profit | 6,071,983 | | - | 6,071,983 |
| Operating Expenses | | | | |
| General and administrative | 1,741,050 | (1) | 2,808,000 | 4,728,571 |
| | | (2) | 179,521 | |
| Total Operating Expenses | 7,789,221 | | 2,987,521 | 10,776,742 |
| LOSS FROM OPERATIONS | (1,717,238) | | (2,987,521) | (4,704,759) |
| Total Other Income (Expense) | (1,049,215) | | (102,200) | (1,151,415) |
| NET LOSS BEFORE INCOME TAXES | (2,766,453) | | (3,089,721) | (5,856,174) |
| INCOME TAX BENEFIT (EXPENSE) | 698,303 | | - | 698,303 |
| NET LOSS | $ (2,068,150) | | $ (3,089,721) | $ (5,157,871) |
| LOSS PER COMMON SHARE – BASIC AND DILUTED | $ (0.41) | | | $ (1.03) |
| WEIGHTED-AVERAGE NUMBER OF COMMON SHARES OUTSTANDING – BASIC AND DILUTED | 5,000,000 | | | 5,000,000 |

F-18

## 1847 GOEDEKER INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2020 AND 2019
1847 GOEDEKER INC.
STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)

| | Common Stock Shares | Amount | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|
| As Filed: | | | | | |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 979,048 | - | 979,523 |

| | | | | | |
|---|---|---|---|---|---|
| Net loss for the period from April 6, 2019 through December 31, 2019 | - | - | - | (2,068,150) | (2,068,150) |
| Balance, December 31, 2019 | 4,750,000 | $ 475 | $ 1,272,195 | $ (2,068,150) | $ (795,954) |
| As Restated: | | | | | |
| Capital contribution by Holdco for the acquisition of Goedeker Television Co. | 4,750,000 | 475 | 786,506 | - | 786,981 |
| Net loss for the period from April 6, 2019 through December 31, 2019 | - | - | - | (5,157,871) | (5,157,871) |
| Balance, December 31, 2019 | 4,750,000 | $ 475 | $ 1,079,179 | $ (5,157,871) | $ (4,078,217) |

**1847 GOEDEKER INC.**
**STATEMENTS OF CASH FLOWS**

| | Period from April 6, 2019 through December 31, 2019 (As Filed) | | Adjustments | Period from April 6, 2019 through December 31, 2019 (As Restated) |
|---|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | | | |
| Net loss | $ (2,068,150) | (1) | $ (2,910,200) | $ (5,157,871) |
| | | (2) | (179,521) | |
| Accounts payable and accrued expenses | (1,464,657) | (1) | 2,910,200 | |
| | | (2) | 179,521 | 1,625,064 |
| Net cash provided by (used in) operating activities | (2,299,215) | | - | (2,299,215) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | | |
| Net cash used in investing activities | (2,200) | | | (2,200) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | |
| Net cash provided by financing activities | 2,772,723 | | - | 2,772,723 |
| NET CHANGE IN CASH AND RESTRICTED CASH | 471,308 | | - | 471,308 |
| CASH AND RESTRICTED CASH, BEGINNING OF YEAR | - | | - | - |
| CASH AND RESTRICTED CASH, END OF YEAR | $ 471,308 | | $ - | $ 471,308 |

**NOTE 4—RECEIVABLES**

At December 31, 2020 and 2019, receivables consisted of the following: respectively.

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Vendor rebates receivable | $ 1,337,791 | $ 1,455,248 |
| Credit cards in process of collection | 660,441 | - |
| Total receivables | $ 1,998,232 | $ 1,455,248 |

F-19

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 5—MERCHANDISE INVENTORY**

At December 31, 2020 and 2019, the inventory balances are composed of:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Appliances | $ 5,285,975 | $ 1,538,552 |
| Furniture | 194,852 | 184,755 |
| Other | 91,414 | 81,783 |
| Total merchandise inventory | 5,572,241 | 1,805,090 |
| Allowance for inventory obsolescence | (425,000) | (425,000) |
| Merchandise inventory, net | $ 5,147,241 | $ 1,380,090 |

**NOTE 6—VENDOR DEPOSITS**

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income.

Prior to obtaining an open line of credit with a major vendor, the Company paid in advance for its purchases. The vendor did not ship product to the Company until an order was complete. As a result, the vendor held Company funds. A second vendor uses the Company's vendor deposit account as collateral. Orders from this vendor exceeded the deposit account and the Company prepaid for some orders. Vendor deposits as of December 31, 2020 and 2019 were $547,648 and $294,960, respectively.

**NOTE 7—PROPERTY AND EQUIPMENT**

Property and equipment consist of the following at December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Equipment | $ 69,336 | $ 7,376 |
| Warehouse equipment | 61,070 | 29,188 |
| Furniture and fixtures | 512 | 512 |

| | | |
|---|---|---|
| Transportation equipment | 63,784 | 63,784 |
| Leasehold improvements | 136,931 | 117,626 |
| Total property and equipment | 331,633 | 218,486 |
| Accumulated depreciation | (85,685) | (32,880) |
| Property and equipment, net | $ 245,948 | $ 185,606 |

Depreciation expense for the year ended December 31, 2020, the period April 6, 2019 to December 31, 2019 and the period January 1, 2019 to April 5, 2019 was approximately $53,000, $33,000 and $10,000, respectively.

F-20

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 8—INTANGIBLE ASSETS**

The following provides a breakdown of identifiable intangible assets as of December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Customer relationships | $ 749,000 | $ 749,000 |
| Marketing related - tradename | 1,368,000 | 1,368,000 |
| Total intangible assets | 2,117,000 | 2,117,000 |
| Accumulated amortization | (735,063) | (238,156) |
| Intangible assets, net | $ 1,381,937 | $ 1,878,844 |

In connection with the acquisition of Goedeker, the Company identified intangible assets of $2,117,000, representing trade names and customer relationships. These assets are being amortized on a straight-line basis over their weighted average estimated useful life of 3.3 years. Amortization expense for the year ended December 31, 2020, the period April 6, 2019 to December 31, 2019 and the period January 1, 2019 to April 5, 2019 was $496,907, $238,156 and $-0-, respectively.

As of December 31, 2020, the estimated annual amortization expense for each of the next five years is as follows:

| | | |
|---|---|---|
| 2021 | $ | 423,396 |
| 2022 | | 423,396 |
| 2023 | | 423,396 |
| 2024 | | 111,749 |
| Total | $ | 1,381,937 |

**NOTE 9—ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

The following is schedule of accounts payable and accrued expenses at December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade accounts payable | $ 5,975,486 | $ 1,644,216 |
| Sales tax | 5,804,100 | 2,910,200 |
| Accrued payroll liabilities | 492,573 | 192,305 |
| Accrued interest | 10,000 | 253,678 |
| Accrued liability for sales returns | 200,000 | 200,000 |
| Other accrued liabilities | 219,556 | 175,021 |
| Total accounts payable and accrued expenses | $ 12,701,715 | $ 5,375,420 |

**NOTE 10—BUSINESS COMBINATION**

On January 18, 2019, the Company entered into an asset purchase agreement with Goedeker and Steve Goedeker and Mike Goedeker (the "Stockholders"), pursuant to which the Company agreed to acquire substantially all of the assets of Goedeker used in its retail appliance and furniture business (the "Goedeker Business").

On April 5, 2019, the Company, Goedeker and the Stockholders entered into an amendment to the asset purchase agreement and closing of the acquisition of substantially all of the assets of Goedeker was completed.

The aggregate purchase price, recorded as a capital contribution from the Company's parent company at that time, 1847 Goedeker Holdco Inc. ("Holdco"), was $4,175,373 consisting of: (i) the issuance of a promissory note in the principal amount of $4,100,000 and a deemed fair value of $3,637,898; (ii) up to $600,000 in earn out payments (as described below) with a deemed fair value of $81,494; (iii) a 22.5% ownership interest in Holdco transferred to the Stockholders with a deemed fair value of $786,981, (iv) cash of $478,000, and (v) net of a working capital adjustment of $809,000.

F-21

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

The asset purchase agreement provided for an adjustment to the purchase price based on the difference between actual working capital at closing and the seller's preliminary estimate of closing date working capital. In accordance with the asset purchase agreement, an independent CPA firm was retained by the Company and Goedeker to resolve differences in the working capital amounts. The report issued by that CPA firm determined that Goedeker owed the Company $809,000, which Goedeker has not paid. On or about March 23, 2020, the Company submitted a claim for arbitration to the American Arbitration Association relating to Goedeker's failure to pay. The claim alleged, *inter alia*, breach of contract, fraud, indemnification and the breach of the covenant of good faith and fair dealing. The Company alleged damages in the amount of $809,000, plus attorneys' fees and costs. The $809,000 is included in other assets in the accompanying balance sheet as of December 31, 2019.

On June 2, 2020, the Company entered into a settlement agreement with Goedeker, Steve Goedeker, Mike Goedeker and 1847 Holdings LLC, the Company's indirect parent company at such time ("1847 Holdings"). The settlement agreement and the related transaction documents that are exhibits to the settlement agreement were all signed on June 2, 2020 only became effective upon the closing of the IPO on August 4, 2020. Pursuant

to the settlement agreement, the parties entered into an amendment and restatement of the 9% subordinated promissory note described below (see Note 13). In addition, the parties agreed that the arbitration action described above would be settled effective upon the closing of the IPO and that each party to such arbitration action would release all claims that it has against the other parties to such action. As part of the settlement of the arbitration action, the Company agreed that the sellers will not have to pay the $809,000 working capital adjustment amount, which resulted in a loss on write-off of acquisition receivable during the year ended December 31, 2020.

Goedeker is also entitled to receive the following earn out payments to the extent the Goedeker Business achieves the applicable EBITDA (as defined in the asset purchase agreement) targets:

1. An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the closing date is $2,500,000 or greater, which target was not met;

2. An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the first anniversary of closing date is $2,500,000 or greater, which target the Company does not expect to meet; and

3. An earn out payment of $200,000 if the EBITDA of the Goedeker Business for the trailing twelve (12) month period from the second anniversary of the closing date is $2,500,000 or greater. The Company expects to meet this target and adjusted the contingent note payable in the consolidated balance sheet to the present value of the amount due.

To the extent the EBITDA of the Goedeker Business for any applicable period is less than $2,500,000 but greater than $1,500,000, the Company must pay a partial earn out payment to Goedeker in an amount equal to the product determined by multiplying (i) the EBITDA Achievement Percentage by (ii) the applicable earn out payment for such period, where the "Achievement Percentage" is the percentage determined by dividing (A) the amount of (i) the EBITDA of the Goedeker Business for the applicable period less (ii) $1,500,000, by (B) $1,000,000. For avoidance of doubt, no partial earn out payments shall be earned or paid to the extent the EBITDA of the Goedeker Business for any applicable period is equal or less than $1,500,000. For the trailing twelve (12) month period from the closing date, EBITDA for the Goedeker Business was ($2,825,000) so Goedeker is not entitled to an earn our payment for that period.

To the extent Goedeker is entitled to all or a portion of an earn out payment, the applicable earn out payment(s) (or portion thereof) shall be paid on the date that is three (3) years from the closing date, and shall accrue interest from the date on which it is determined Goedeker is entitled to such earn out payment (or portion thereof) at a rate equal to five percent (5%) per annum, computed on the basis of a 360 day year for the actual number of days elapsed.

The Company determined the fair value of the earnout on the date of acquisition was $81,494. Such amount was recorded as a contingent consideration liability within the accounts payable and accrued expense line item on the consolidated balance sheet and is revalued to fair value each reporting period until settled. The year 1 contingent liability of $32,246 was written-off in the year ended December 31, 2019 as the target was not met and the balance of the liability at December 31, 2019 is $49,248. Management reviewed the contingent consideration due at December 31, 2020 and adjusted the balance to the present value of the amount it estimates will be due in April 2022.

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

The fair value of the purchase consideration issued to Goedeker was allocated to the net tangible assets acquired. The Company accounted for the acquisition as the purchase of a business under GAAP under the acquisition method of accounting, and the assets and liabilities acquired were recorded as of the acquisition date, at their respective fair values and consolidated with those of the Company. The fair value of the net liabilities assumed was approximately $550,316. The excess of the aggregate fair value of the net tangible assets has been allocated to goodwill. Provisional goodwill was estimated at $4,603,953 at December 31, 2019 due to the preliminary valuation. During the year ended December 31, 2020, the Company subsequently adjusted the value of goodwill by $121,736 to $4,725,689 based on the finalized purchase price allocation.

The table below shows the analysis of the Goedeker asset purchase:

| Purchase consideration at fair value (as restated): | | |
|---|---|---|
| Note payable, net of $462,102 debt discount and $215,500 of capitalized financing costs | $ | 3,637,898 |
| Cash to seller at closing | | 478,000 |
| Working capital adjustment | | (809,000) |
| Contingent note payable | | 81,494 |
| Fair value of ownership interest in Holdco transferred to seller | | 786,981 |
| Amount of consideration | $ | 4,175,373 |
| | | |
| Assets acquired and liabilities assumed at fair value | | |
| Accounts receivable | $ | 456,183 |
| Inventories | | 1,851,251 |
| Other assets | | 295,863 |
| Property and equipment | | 216,286 |
| Customer related intangibles | | 749,000 |
| Marketing related intangibles - tradename | | 1,368,000 |
| Accounts payable and accrued expenses | | (3,056,855) |
| Customer deposits | | (2,430,044) |
| Net tangible assets acquired (liabilities assumed) | $ | (550,316) |
| | | |
| Total net assets acquired (liabilities assumed) | $ | (550,316) |
| Consideration paid | | 4,175,373 |
| Goodwill | $ | 4,725,689 |

**NOTE 11—LINES OF CREDIT**

*Burnley Capital LLC*

On April 5, 2019, the Company, as borrower, and Holdco entered into a loan and security agreement with Burnley Capital LLC ("Burnley") for revolving loans in an aggregate principal amount that will not exceed the lesser of (i) the borrowing base (as defined in the loan and security agreement) or (ii) $1,500,000 minus reserves established Burnley at any time in accordance with the loan and security agreement. In connection with the closing of the acquisition of Goedeker on April 5, 2019, the Company borrowed $744,000 under the loan and security agreement and issued a revolving note to Burnley in the principal amount of up to $1,500,000. As of December 31, 2019, the balance of the line of credit was $571,997.

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the revolving note in full and the loan and security agreement was terminated. The total payoff amount was $118,194, consisting of principal of $32,350, interest of $42 and prepayment, legal, and other

fees of $85,802.

*Northpoint Commercial Finance LLC*

On June 24, 2019, the Company, as borrower, entered into a loan and security agreement with Northpoint Commercial Finance LLC, which was amended on August 2, 2019, for revolving loans up to an aggregate maximum loan amount of $1,000,000 for the acquisition, financing or refinancing by the Company of inventory at an interest rate of LIBOR plus 7.99%. As of December 31, 2019, the balance of the line of credit was $678,993. The loan and security agreement was terminated on May 18, 2020 and there is no outstanding balance as of December 31, 2020.

F-23

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 12—NOTES PAYABLE AND WARRANT LIABILITY**

*Arvest Loan*

On August 25, 2020, the Company entered into a promissory note and security agreement with Arvest Bank for a loan in the principal amount of $3,500,000. As of December 31, 2020, the outstanding balance of this loan is $3,185,369 comprised of principal of $3,283,628, net of unamortized loan costs of $98,259. The Company classified $663,339 as a current liability and the balance as a long-term liability.

The loan matures on August 25, 2025 and bears interest at 3.250% per annum; provided that, upon an event of default, the interest rate shall increase by 6% until paid in full. Pursuant to the terms of the loan agreement, the Company is required to make monthly payments of $63,353 beginning on September 25, 2020 and until the maturity date, at which time all unpaid principal and interest will be due. The Company may prepay the loan in full or in part at any time without penalty. The loan agreement contains customary events of default and affirmative and negative covenants for a loan of this type. The loan is secured by all financial assets credited to the Company's securities account held by Arvest Investments, Inc.

Maturities of the debt are as follows:

For the years ended December 31,

| | | |
|---|---|---|
| 2021 | $ | 663,339 |
| 2022 | | 685,222 |
| 2023 | | 707,826 |
| 2024 | | 731,177 |
| 2025 | | 496,064 |
| Total | $ | 3,283,628 |
| Less: Loan costs | | (98,259) |
| Total | $ | 3,185,369 |

*Small Business Community Capital II, L.P.*

On April 5, 2019, the Company, as borrower, and Holdco entered into a loan and security agreement with Small Business Community Capital II, L.P. ("SBCC") for a term loan in the principal amount of $1,500,000, pursuant to which the Company issued to SBCC a term note in the principal amount of up to $1,500,000 and a ten-year warrant to purchase shares of the most senior capital stock of the Company equal to 5.0% of the outstanding equity securities of the Company on a fully-diluted basis for an aggregate price equal to $100. As of December 31, 2019, the balance of the note was $999,201.

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the term note in full and the loan and security agreement was terminated. The total payoff amount was $1,122,412 consisting of principal of $1,066,640, interest of $11,773 and prepayment, legal, and other fees of $43,999.

The Company classified the warrant as a derivative liability on the balance sheet at June 30, 2020 of $2,250,000 based on the estimated value of the warrant in the IPO. The increase in the value of the warrant from the estimated value of $122,344 at December 31, 2019 resulted in a charge of $2,127,656 during the year ended December 31, 2020. Immediately prior to the closing of the IPO on August 4, 2020, SBCC converted the warrant into 250,000 shares of common stock.

**NOTE 13—NOTES PAYABLE, RELATED PARTIES**

As noted in Note 10, a portion of the purchase price for the acquisition was paid by the issuance by the Company to Steve Goedeker, as representative of Goedeker, of a 9% subordinated promissory note in the principal amount of $4,100,000. As of December 31, 2019, the balance of the note was $3,300,444.

F-24

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

Pursuant to the settlement agreement described above (see Note 10), the parties entered into an amendment and restatement of the note that became effective as of the closing of the IPO on August 4, 2020, pursuant to which (i) the principal amount of the existing note was increased by $250,000, (ii) upon the closing of the IPO, the Company agreed to make all payments of principal and interest due under the note through the date of the closing, and (iii) from and after the closing, the interest rate of the note was increased from 9% to 12%. In accordance with the terms of the amended and restated note, the Company used a portion of the proceeds from the IPO to pay $1,083,842 of the balance of the note representing a $696,204 reduction in the principal balance and interest accrued through August 4, 2020 of $387,638.

The Company repaid this note payable with proceeds from the Arvest Loan. In connection with the refinance, the Company recorded a $757,239 loss on extinguishment of debt consisting of a $250,000 forbearance fee, write-off of unamortized loan discount of $338,873, and write-off of unamortized debt costs of $168,366.

**NOTE 14—CONVERTIBLE PROMISSORY NOTE**

On April 5, 2019, 1847 Holdings, Holdco and the Company (collectively, "1847") entered into a securities purchase agreement with Leonite Capital LLC, a Delaware limited liability company ("Leonite"), pursuant to which 1847 issued to Leonite a secured convertible promissory note in the aggregate principal amount of $714,286. As additional consideration for the purchase of the note, (i) 1847 Holdings issued to Leonite 50,000 common shares (valued at $137,500), (ii) 1847 Holdings issued to Leonite a five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis, and (iii) Holdco issued to Leonite shares of common stock equal to a 7.5% non-dilutable interest in Holdco. As of December 31, 2019, the balance of the note was $584,943. As a result of this transaction,

Leonite became a related party.

On May 11, 2020, 1847 and Leonite entered into a first amendment to secured convertible promissory note, pursuant to which the parties agreed (i) to extend the maturity date of the note to October 5, 2020, (ii) that 1847's failure to repay the note on the original maturity date of April 5, 2020 shall not constitute and event of default under the note and (iii) to increase the principal amount of the note by $207,145, as a forbearance fee. The Company accounted for this transaction as a loss on extinguishment of debt.

In connection with the amendment, (i) 1847 Holdings issued to Leonite another five-year warrant to purchase 200,000 common shares at an exercise price of $1.25 per share (subject to adjustment), which may be exercised on a cashless basis and (ii) upon closing of 1847 Holdings' acquisition of Asien's Appliance, Inc., 1847 Holdings' wholly owned subsidiary 1847 Asien Inc. issued to Leonite shares of common stock equal to a 5% interest in 1847 Asien Inc. The Company accounted for the issuance of the 200,000 additional warrants as a $566,711 loss on debt restructuring and an increase in additional paid-in-capital, representing the estimated fair value of the 200,000 additional warrants for a five-year period.

1847 Holdings issued 50,000 common shares valued at $137,500 and a debt-discount related to the warrants valued at $292,673. In the second quarter of 2020, the $137,500 value of the shares was transferred from a liability to 1847 Holdings to additional paid-in-capital. The Company amortized $129,343 of financing costs related to the shares and warrants in the year ended December 31, 2020.

Under the note, Leonite had the right at any time at its option to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of the note into fully paid and non-assessable common shares or any shares of capital stock or other securities of 1847 Holdings into which such common shares may be changed or reclassified.

On May 4, 2020, Leonite converted $100,000 of the outstanding balance of the note into 100,000 common shares of 1847 Holdings. The Company accounted for this transaction as a $100,000 reduction in the principal amount of the debt, a $175,000 loss on extinguishment of debt, and a $275,000 increase in additional paid-in-capital representing the fair value of the 1847 Holdings common shares on the conversion date.

On July 24, 2020, Leonite converted $50,000 of the outstanding balance of the note into 50,000 common shares of 1847 Holdings. The Company accounted for this transaction as a $50,000 reduction in the principal amount of the debt, a $50,000 loss on extinguishment of debt, and a $100,000 increase in additional paid-in-capital representing the fair value of the 1847 Holdings common shares on the conversion date.

F-25

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

As a result of the activity on this note, $948,856 was recorded as loss on extinguishment of debt for the year ended December 31, 2020.

On August 4, 2020, the Company used a portion of the proceeds from the IPO to repay the note in full. The total payoff amount was $780,653, consisting of principal of $771,431 and interest of $9,222.

On September 2, 2020, 1847 Holdings and Leonite entered into an amendment to the warrant issued on April 5, 2019, pursuant to which the warrant was amended to allow for the exercise of the warrant for 180,000 common shares of 1847 Holdings in exchange for Leonite's surrender of the remaining 20,000 common shares underlying that warrant, as well as all 200,000 common shares underlying the second warrant issued to Leonite on May 11, 2020. On September 18, 2020, Leonite exercised the warrant in accordance with the foregoing for 180,000 common shares of 1847 Holdings. As a result, both warrants have terminated.

**NOTE 15—OPERATING LEASE**

On April 5, 2019, the Company entered into a lease agreement with S.H.J., L.L.C., a Missouri limited liability company and affiliate of the Company at that time. The lease is for a term five (5) years and provides for a base rent of $45,000 per month. In addition, the Company is responsible for all taxes and insurance premiums during the lease term. In the event of late payment, interest shall accrue on the unpaid amount at the rate of eighteen percent (18%) per annum. The lease contains customary events of default, including if: (i) the Company shall fail to pay rent within five (5) days after the due date; (ii) any insurance required to be maintained by the Company pursuant to the lease shall be canceled, terminated, expire, reduced, or materially changed; (iii) the Company shall fail to comply with any term, provision, or covenant of the lease and shall not begin and pursue with reasonable diligence the cure of such failure within fifteen (15) days after written notice thereof to the Company; (iv) the Company shall become insolvent, make an assignment for the benefit of creditors, or file a petition under any section or chapter of the Bankruptcy Code, or under any similar law or statute of the United States of America or any State thereof; or (v) a receiver or trustee shall be appointed for the leased premises or for all or substantially all of the assets of the Company.

During the year ended December 31, 2020 and the period April 6 to December 31, 2019, the Company paid and expensed rent payments of $540,000 and $397,500, respectively.

At December 31, 2019, the operating lease right of use asset was $2,000,755. Supplemental balance sheet information related to lease at December 31, 2020 was as follows:

| | | |
|---|---|---:|
| Operating lease right-of-use asset | $ | 2,300,000 |
| Lease liability, current portion | $ | 450,712 |
| Lease liability, long-term | | 1,127,523 |
| Total operating lease liability | $ | 1,578,235 |
| Weighted average remaining lease term (months) | | 39 |
| Weighted average discount rate | | 6.5% |

Maturities of the lease liability for each of the next five years is as follows:

| | | |
|---|---|---:|
| 2021 | $ | 540,000 |
| 2022 | | 540,000 |
| 2023 | | 540,000 |
| 2024 | | 135,000 |
| Total lease payments | $ | 1,755,000 |
| Less imputed interest | | (176,765) |
| Total lease liability | $ | 1,578,235 |

F-26

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 16—RELATED PARTIES**

*Offsetting Management Services Agreement*

On April 5, 2019, the Company entered into an offsetting management services agreement with 1847 Partners LLC (the "Manager"), a company owned and controlled by Ellery W. Roberts, the Company's chairman and a significant stockholder. This agreement was amended on April 21, 2020 with the amendment becoming effective at the closing of IPO on August 4, 2020.

Pursuant to the offsetting management services agreement, as amended, the Company appointed the Manager to provide certain services to it for a quarterly management fee equal to $62,500; provided, however, that, (i) pro-rated payments shall be made in the first quarter and the last quarter of the term, (ii) if the aggregate amount of management fees paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal year exceeds, or is expected to exceed, 9.5% of 1847 Holdings' gross income with respect to such fiscal year, then the management fee to be paid by the Company for any remaining fiscal quarters in such fiscal year shall be reduced, on a pro rata basis determined by reference to the management fees to be paid to the Manager by all of the subsidiaries of 1847 Holdings, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal year, does not exceed 9.5% of 1847 Holdings' gross income with respect to such fiscal year, and (iii) if the aggregate amount the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to any fiscal quarter exceeds, or is expected to exceed, the aggregate amount of the parent management fee (as defined in the offsetting management services agreement) with respect to such fiscal quarter, then the management fee to be paid by the Company for such fiscal quarter shall be reduced, on a pro rata basis, until the aggregate amount of the management fee paid or to be paid by the Company, together with all other management fees paid or to be paid by all other subsidiaries of 1847 Holdings to the Manager, in each case, with respect to such fiscal quarter, does not exceed the parent management fee calculated and payable with respect to such fiscal quarter.

The Company shall also reimburse the Manager for all costs and expenses of the Company which are specifically approved by the board of directors of the Company, including all out-of-pocket costs and expenses, that are actually incurred by the Manager or its affiliates on behalf of Goedeker in connection with performing services under the offsetting management services agreement. The Company did not pay any expenses for the years ended December 31, 2020 and 2019.

The Company expensed $250,000 and $183,790 in management fees for the years ended December 31, 2020 and 2019, respectively.

*Other Transactions*

See Note 14 for a description of the securities purchase agreement and secured convertible promissory note that the Company entered into with 1847 Holdings, Holdco and Leonite, as well as the related shares and warrants issued by 1847 Holdings, the Company's indirect parent company at such time.

**NOTE 17—STOCKHOLDERS' DEFICIT**

As of December 31, 2020, the Company was authorized to issue 200,000,000 shares of common stock, $0.0001 par value per share, and 20,000,000 shares of "blank check" preferred stock, 0.0001 par value per share. To date, the Company has not designated or issued any shares of preferred stock.

*Common Stock*

As of December 31, 2020 and 2019, the Company had 6,111,200 and 4,750,000 shares of common stock issued and outstanding, respectively. Each share entitles the holder thereof to one vote per share on all matters coming before the stockholders of the Company for a vote.

F-27

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

Upon the Company's inception on January 10, 2019, the Company issued 4,750,000 shares of common stock for a total purchase price of $1.00.

On August 4, 2020, the Company sold 1,111,200 shares of common stock for total gross proceeds of $10,000,800. After deducting the underwriting commission and expenses, the Company received net proceeds of $8,602,166.

On August 4, 2020, the Company issued 250,000 shares of common stock to SBCC upon conversion of its warrant (see Note 12).

*Equity Incentive Plan*

Effective as of July 30, 2020, the Company established the 1847 Goedeker Inc. 2020 Equity Incentive Plan ("Plan"). The Plan was approved by the Company's board of directors and stockholders on April 21, 2020. The Plan is administered by compensation committee of the board of directors. The Plan permits the grant of restricted stock, stock options and other forms of incentive compensation to the Company's officers, employees, directors and consultants. The maximum number of shares of common stock that may be issued pursuant to awards granted under the Plan is 555,000 shares. As of December 31, 2020, there were 555,000 shares granted and no shares available for grant.

During the year ended December 31, 2020, the Company issued options for the purchase of 555,000 shares of common stock with a total value of $1,848,056. The Company recorded stock option expense of $398,908 and for the year ended December 31, 2020. The remaining compensation expense of $1,449,148 will be recognized over the remaining vesting periods.

The following table presents activity relating to stock options for the year ended December 31, 2020:

| | Shares | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|
| Outstanding at December 31, 2019 | - | $ - | - |
| Granted | 555,000 | 9.00 | 10 |
| Exercised | - | - | - |
| Forfeited / Cancelled / Expired | - | - | - |
| Outstanding at December 31, 2020 | 555,000 | $ 9.00 | 9 |
| Exercisable at December 31, 2020 | 65,790 | $ 9.00 | 9 |

As of December 31, 2020, vested outstanding stock options had no intrinsic value as the exercise price is greater than the estimated fair value of the underlying common stock.

The Company recognizes compensation expense for stock option awards on a straight-line basis over the applicable service period of the award. The service period is generally the vesting period. The following assumptions were used to calculate stock-based compensation expense for the year ended December 31, 2020:

| | |
|---|---|
| Volatility | 46.6% |

| | |
|---|---|
| Risk-free interest rate | 0.47% |
| Dividend yield | 0.0% |
| Expected term | 6.25 Years |

F-28

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

The following table sets forth stock-based compensation expense for the year ended December 31, 2020 and the four succeeding years:

| | | |
|---|---|---|
| Year Ended December 31, 2020 | $ | 398,908 |
| 2021 | | 483,185 |
| 2022 | | 462,024 |
| 2023 | | 367,198 |
| 2024 | | 136,741 |
| 2025 | | - |
| Total stock-based compensation | $ | 1,848,056 |

*Warrants*

On August 4, 2020, the Company issued warrants for the purchase of 55,560 shares of common stock to affiliates of the representative in the IPO (the "Underwriter Warrants"). The Underwriter Warrants are exercisable at any time and from time to time, in whole or in part, beginning on January 26, 2021 until July 30, 2025, at a per share exercise price equal to $11.25.

On April 5, 2019, the Company issued to SBCC a ten-year warrant to purchase shares of the most senior capital stock of the Company equal to 5.0% of the outstanding equity securities of the Company on a fully-diluted basis for an aggregate price equal to $100. SBCC exercised this warrant for the purchase of 250,000 shares of common stock on August 4, 2020.

The following table presents activity relating to the Underwriter Warrants for the year ended December 31, 2020:

| | Shares | | Weighted Average Exercise Price | Weighted Average Contractual Term in Years |
|---|---|---|---|---|
| Outstanding at December 31, 2019 | - | $ | - | - |
| Granted | 55,560 | | 11.25 | 5 |
| Exercised | - | | - | - |
| Cancelled / Expired | - | | - | - |
| Outstanding at December 31, 2020 | 55,560 | $ | 11.25 | 4.5 |
| Exercisable at December 31, 2020 | -0- | $ | 11.25 | 4.5 |

The Company recognizes stock issuance expense for the Underwriter Warrants on a straight-line basis over the vesting period of the Underwriter Warrants. The following assumptions were used to calculate stock issuance expense for the year ended December 31, 2020:

| | |
|---|---|
| Volatility | 46.5% |
| Risk-free interest rate | 0.47% |
| Dividend yield | 0.0% |
| Term | 4.5 years |

**NOTE 18—INCOME TAXES**

As of December 31, 2020 and 2019, the Company had net operating loss carry forwards of approximately $15,002,557 and $1,593,680, respectively, that may be available to reduce future years' taxable income indefinitely. Future tax benefits which may arise as a result of these losses have not been recognized in these consolidated financial statements, as their realization is determined not likely to occur and accordingly, the Company has recorded a valuation allowance for the deferred tax asset relating to these tax loss carry-forwards. The net change in the valuation allowance resulted in an increase of $4,377,815 and $709,582 for the years ended December 31, 2020 and 2019, respectively.

F-29

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

The provision for Federal and state income tax consists of the following.

The cumulative tax effect at the expected rate of 25.7% and 25.7% of significant items comprising the Company's net deferred tax amount is as follows.

Due to the change in ownership provisions of the Tax Reform Act of 1986, net operating loss carry forwards incurred prior to 2018 for Federal income tax reporting purposes are subject to annual limitations. Should a change in ownership occur net operating loss carry forwards may be limited as to use in future years.

The components for the provision of income taxes include:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Current Federal and State | $          - | $          - |
| Deferred Federal and State | 698,303 | (698,303) |
| Total provision (benefit) for income taxes | $    698,303 | $    (698,303) |

A reconciliation of the statutory US Federal income tax rate to the Company's effective income tax rate is as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Federal tax | $    (4,382,602) | $    (1,229,797) |
| State tax, net of Federal benefit | (891,129) | (250,059) |
| Change in warrant value | 537,535 | - |

| | 2020 | 2019 |
|---|---|---|
| Write-off of acquisition and other receivables | 238,540 | - |
| Other | 108,439 | 71,971 |
| Valuation allowance | 5,087,396 | 709,582 |
| Total income tax provision (benefit) | $ 698,303 | $ (698,303) |
| Effective tax rate | (3.3)% | 11.92% |

Deferred income taxes reflect the net tax effect of temporary differences between amounts recorded for financial reporting purposes and amounts used for tax purposes. The major components of deferred tax assets and liabilities are as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Deferred tax assets | | |
| Inventory | $ 107,398 | $ 107,398 |
| Accrued expenses | 1,589,889 | 792,845 |
| Interest limitation | 319,698 | 191,886 |
| Other | 6,597 | - |
| Lease liability | 398,820 | 505,591 |
| Loss carryforward | 3,791,146 | 339,287 |
| Valuation allowance | (5,796,978) | (709,582) |
| Total deferred tax assets | $ 416,595 | $ 1,227,425 |
| Deferred tax liabilities | | |
| Other | - | (94) |
| Right of use assets | (398,820 | (505,591) |
| Intangibles | $ (17,775) $ | (23,437) |
| Total deferred tax liabilities | $ (416,595) $ | (529,122) |
| Total net deferred income tax assets (liabilities) | $ - | $ 698,303 |

The Company accrues interest and penalties related to unrecognized tax benefits. The Company does not believe it has any unrecognized tax benefits for December 31, 2020 and 2019 that would have a material impact on the financial statements. The Company's income tax returns are open to examination by the Internal Revenue Service and various State jurisdictions.

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Net deferred tax asset (liability) | $ 5,796,978 | $ 1,407,885 |
| Valuation allowance | $ (5,796,978) | $ (709,852) |

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

**NOTE 19—SUBSEQUENT EVENTS**

In accordance with ASC 855-10, the Company has analyzed its operations subsequent to December 31, 2020 to the date these consolidated financial statements were issued and has determined that it does not have any material subsequent events to disclose in these consolidated financial statements, except as set forth below.

*Lease Agreement*

On January 13, 2021, the Company entered into a lease agreement with Westgate 200, LLC for a new premises in St. Charles, Missouri. The lease is for a term of 63 months with two (2) options to renew for additional five (5) year periods and provides for a base rent of $4.35 per square foot per year with 2.5% annual increases and a three-month abatement, resulting in a base rent during the first year of $20,976.79 per month, increasing to a base rent during the fifth year of $23,146.80 per month. The Company must also pay its 29% pro rata portion of the property taxes, operating expenses and insurance costs and is also responsible to pay for the utilities used on the premises. In the event of late payment, interest shall accrue on the unpaid amount at the rate equal to the greater of (i) two (2) percentage points in excess of the prime lending rate as established by U.S. Bank, N.A., or (ii) the default rate applicable to the first priority mortgage in effect at the time such default interest rate is imposed.

The lease contains customary events of default, including (i) if the Company shall fail to pay rent within five (5) days after the due date, (ii) if the Company shall fail to observe or perform any other terms, covenants, conditions or provisions under the lease and fail to cure such default within thirty (30) days after written notice to the Company, (iii) if the Company fails to occupy all or any material portion of the lease premises for more than ninety (90) consecutive days, for reasons other than force majeure, and fails to pay all costs incurred by the landlord as a result of such failure to occupy, and other customary representations, warranties and covenants.

*Securities Purchase Agreement*

On March 19, 2021, the Company entered into a Securities Purchase Agreement (the "Purchase Agreement") with two institutional investors (each, a "Purchaser" and together, the "Purchasers"), pursuant to which the Company issued to each Purchaser (i) a 10% OID senior secured promissory note in the principal amount of $2,750,000 (together, the "Notes") and (ii) a four-year warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $12.00, subject to adjustments, which may be exercised on a cashless basis (together, the "Warrants"), for a purchase price of $2,500,000 each, or $5,000,000 in the aggregate. After deducting a placement fee and other expenses, the Company received net proceeds of $4,590,000.

The Notes bear interest at a rate of 10% per annum and mature on December 19, 2021. The Notes may be prepaid by the Company in whole or in part at any time or from time to time without penalty or premium upon at least five (5) days prior written notice, which notice period may be waived by the holder. In addition, if the Company issues and sells shares of its equity securities to investors on or before the maturity date in an equity financing with total gross proceeds of not less than $10,000,000 (excluding the conversion of the notes or other convertible securities issued for capital raising purposes), then the Company must repay the then-outstanding principal amount of the Notes and any accrued but unpaid interest.

The Notes are secured by a first priority security interest in all of the Company's assets and contain customary events of default. Upon, and during the continuance of, an event of default, the Notes are convertible, in whole or in part, at the option of the holder into shares of common stock at a conversion price equal to $12.00, or if lower, 80% of the lowest volume weighted average price for the twenty (20) consecutive trading days prior to the applicable conversion date, but in no event less than $9.00. The conversion price will be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction that proportionately decreases or increases the common stock. In addition, if the Company sells or grants any common stock or securities convertible into or exchangeable for common stock or grants any right to reprice such

securities at an effective price per share that is lower than the then conversion price, the conversion price shall be reduced to such price, subject to certain exceptions set forth in the Notes.

F-31

**1847 GOEDEKER INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

Notwithstanding the foregoing, the Company shall not effect any conversion of a Note, and a holder shall not have the right to convert any principal and/or interest of a Note, to the extent that after giving effect to the conversion the holder (together with the holder's affiliates and any persons acting as a group together with the holder or any of the holder's affiliates) would beneficially own over 4.99% of the number of shares of the common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Note. The holder may, upon not less than 61 days' prior notice to the Company, increase or decrease such limitation, provided that such limitation in no event exceeds 9.99% of the number of shares of the common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Note. The Warrants also contain this beneficial ownership limitation.

The Purchase Agreement contains customary representations, warranties and covenants for a transaction of this type. Pursuant to the Purchase Agreement, the Purchasers were granted piggy-back registration rights with respect to the shares issuable upon conversion of the Notes and exercise of the Warrants. The Company also agreed that, until the date that no Purchasers own any securities, the Company will timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company pursuant to the Exchange Act even if the Company is not then subject to the reporting requirements of the Exchange Act. In addition, the Company agreed that, so long as any of the Notes remain outstanding, neither the Company, nor any subsidiary of the Company, shall, without each Purchaser's written consent and subject to certain exceptions set forth in the Purchase Agreement:

- sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business;
- incur, create, assume or suffer to exist any lien on any of its property or assets, except for certain liens set forth in the Purchase Agreement;
- incur or suffer to exist or guarantee any indebtedness that is senior to or *pari passu* with (in priority of payment and performance) the Company's obligations under the Purchase Agreement except for non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;
- pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock, other than dividends on shares of common stock solely in the form of additional shares of common stock, or directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock;
- redeem, repurchase or otherwise acquire in any one transaction or series of related transactions any shares of capital stock of the Company or any warrants, rights or options to purchase or acquire any such shares, or repay any *pari passu* or subordinated indebtedness of the Company other than non-equity linked indebtedness relating to the acquisition of inventory secured by certain liens;
- lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Company, except loans, credits or advances (i) in existence or committed on the closing date and which the Company has informed each Purchaser in writing prior to the closing date, (ii) in regard to transactions with unaffiliated third parties, made in the ordinary course of business, or (iii) in regard to transactions with unaffiliated third parties, not in excess of $50,000; or
- repay any affiliate (as defined in Rule 144) of the Company in connection with any indebtedness or accrued amounts owed to any such party.

F-32

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**AUDITED COMBINED FINANCIAL STATEMENTS**
**DECEMBER 31, 2020 AND 2019**

F-33

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Members and Owners of
1 Stop Electronics Center, lnc., YF Logistics LLC,
Gold Coast Appliances, lnc., Superior Deals lnc.
and Joe's Appliances LLC (dba Appliances Connection)

**Opinion on the Combined Financial Statements**

We have audited the accompanying combined balance sheets of 1 Stop Electronics Center, lnc., YF Logistics LLC, Gold Coast Appliances, lnc., Superior Deals lnc. and Joe's Appliances LLC (dba Appliances Connection and collectively the "Company") as of December 31, 2020 and 2019, and the related combined statements of income and changes in owners' equity, and cash flows for the years ended December 31, 2020 and 2019, and the related notes (collectively referred to as the "combined financial statements"). In our opinion, the combined financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the years ended December 31, 2020 and 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These combined financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's combined financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the combined financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the

effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the combined financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the combined financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the combined financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2020.

Marlton, New Jersey

April 5, 2021

F-34

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED BALANCE SHEETS**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash and cash equivalents | $ 14,842,912 | $ 5,912,043 |
| Receivables, net | 19,392,582 | 13,717,998 |
| Deposits with vendors | 31,733,415 | 22,005,318 |
| Inventories, net | 12,004,038 | 11,702,331 |
| Prepaid expenses and other current assets | 217,439 | 176,582 |
| Total Current Assets | 78,190,386 | 53,514,272 |
| Property and equipment, net | 1,997,822 | 1,591,869 |
| Other assets | 144,528 | - |
| Operating lease right-of-use assets | 4,646,508 | 6,089,129 |
| TOTAL ASSETS | $ 84,979,244 | $ 61,195,270 |
| **LIABILITIES AND OWNERS' EQUITY** | | |
| Current Liabilities | | |
| Accounts payable and accrued liabilities | $ 21,179,975 | $ 15,220,400 |
| Customer deposits | 8,853,214 | 3,241,531 |
| Current portion of notes payable | 466,235 | 276,534 |
| Current portion of financing lease liabilities | 23,576 | 21,081 |
| Current portion of operating lease liabilities | 1,517,390 | 1,421,696 |
| Total Current Liabilities | 32,040,390 | 20,181,242 |
| Notes payable, net of current portion | 3,505,620 | 541,484 |
| Financing lease liabilities, net of current portion | 47,665 | 70,138 |
| Operating lease liabilities, net of current portion | 3,279,080 | 4,737,840 |
| TOTAL LIABILITIES | 38,872,755 | 25,530,704 |
| Owners' Equity | | |
| Common stock | 3,000 | 3,000 |
| Members' equity | 46,103,489 | 35,661,566 |
| Total Owners' Equity | 46,106,489 | 35,664,566 |
| TOTAL LIABILITIES AND OWNERS' EQUITY | $ 84,979,244 | $ 61,195,270 |

The accompanying notes are an integral part of these combined financial statements.

F-35

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF INCOME AND CHANGES IN OWNERS' EQUITY**

| | For the Years Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Net sales | $ 312,608,528 | $ 219,333,461 |
| Cost of sales | 247,379,397 | 176,771,632 |
| Gross Profit | 65,229,131 | 42,561,829 |
| Operating Expenses | | |
| Personnel | 13,563,628 | 10,919,298 |
| Advertising | 9,164,242 | 5,073,731 |
| Bank and credit card fees | 12,361,428 | 9,413,611 |
| Depreciation and amortization | 782,773 | 553,357 |
| General and administrative | 9,949,762 | 7,095,979 |
| Total Operating Expenses | 45,821,833 | 33,055,976 |
| INCOME FROM OPERATIONS | 19,407,298 | 9,505,853 |

Other Income (Expense)

| | 2020 | 2019 |
|---|---|---|
| Other income | 1,336,115 | 1,880,282 |
| Other expense | (663,674) | (247,539) |
| Total Other Income (Expense) | 672,441 | 1,632,743 |
| NET INCOME | $ 20,079,739 | $ 11,138,596 |
| OWNERS' EQUITY - Beginning | $ 35,664,566 | $ 25,844,519 |
| Distributions paid | (9,637,816) | (1,318,549) |
| OWNERS' EQUITY - Ending | $ 46,106,489 | $ 35,664,566 |

The accompanying notes are an integral part of these combined financial statements.

F-36

**1 STOP ELECTRONICS CENTER, INC.; YF LOGISTICS LLC;**
**GOLD COAST APPLIANCES, INC.; JOE'S APPLIANCES LLC; AND SUPERIOR DEALS INC.**
**(dba APPLIANCES CONNECTION)**
**COMBINED STATEMENTS OF CASH FLOWS**

| | For the Years Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income | $ 20,079,739 | $ 11,138,596 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 782,773 | 553,357 |
| Change in inventory reserves | 275,646 | 108,727 |
| Gain on disposition of assets | (28,633) | - |
| Operating lease right-of-use assets | 1,442,621 | 1,133,031 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (5,674,584) | (1,611,014) |
| Deposits with vendors | (9,728,097) | (3,236,141) |
| Inventory | (577,353) | (3,934,936) |
| Prepaid expenses and other current assets | (40,857) | (138,760) |
| Accounts payable and accrued expenses | 5,959,575 | 6,768,230 |
| Customer deposits | 5,611,683 | (7,612,046) |
| Operating lease liabilities | (1,363,066) | (1,081,172) |
| Other assets | (144,528 | - |
| Due from related parties | - | 37,333 |
| Net cash provided by operating activities | 16,594,919 | 2,125,205 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Proceeds from disposal of assets | 33,444 | - |
| Purchases of property and equipment | (30,834) | (68,636) |
| Net cash provided by (used in) investing activities | 2,610 | (68,636) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from notes payable | 2,309,591 | - |
| Repayments on notes payable | (318,457) | (241,647) |
| Repayments of financing lease liabilities | (19,978) | (17,763) |
| Distributions paid | (9,637,816) | (1,318,549) |
| Net cash used in financing activities | (7,666,660) | (1,577,959) |
| NET CHANGE IN CASH IN CASH AND CASH EQUIVALENTS | 8,930,869 | 478,610 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | 5,912,043 | 5,433,433 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $ 14,842,912 | $ 5,912,043 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION** | | |
| Cash paid for interest | $ 56,876 | $ 54,213 |
| Non-cash investing and financing activities: | | |
| Financed purchases of property and equipment | $ 1,180,711 | $ 398,698 |
| Operating lease right-of-use asset and liability | $ - | $ 3,245,290 |

The accompanying notes are an integral part of these combined financial statements.

F-37

**NOTES TO COMBINED FINANCIAL STATEMENTS**
**NOTE 1 – ORGANIZATION AND NATURE OF BUSINESS**

1 Stop Electronics Center, Inc. was formed under the laws of the State of New York on February 2, 2000. YF Logistics LLC was formed under the laws of the State of New Jersey on January 24, 2014. Gold Coast Appliances, Inc. was formed under the laws of the State of New York on February 11, 2015. Joe's Appliances LLC was formed under the laws of the State of New York on November 9, 2018. Superior Deals Inc. was formed under the laws of the State of New York on September 21, 2020. The entities collectively do business as Appliances Connection and are referred to throughout as "the Company."

Founded in 2000, Appliances Connection is one of the leading retailers of household appliances with a 200,000 square foot warehouse in Hamilton, NJ and a 23,000 square foot showroom in Brooklyn, New York. Appliances Connection carries many household name brands, including Bosch, GE, Frigidaire, Whirlpool, LG, and Samsung, and also carries many major luxury appliance brands such as Verona, Thermador, La Cornue, Dacor, Smeg,

and Viking. Appliances Connection provides appliance installation services and old appliance removal services. In addition to selling appliances, it also sells furniture, fitness equipment, plumbing fixtures, televisions, outdoor appliances, and patio furniture, as well as commercial appliances for builder and business clients.

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The combined financial statements of the Company have been prepared in accordance with generally accepted accounting principles in the United States of America ("GAAP") and are presented in US dollars. All intercompany transactions have been eliminated. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with the original maturities of three months or less to be cash equivalents. At December 31, 2020 and 2019, the Company had $12,203,949 and $3,914,525, respectively, in its domestic accounts in excess of Federal Deposit Insurance Corporation ("FDIC") insured limits. No losses have been incurred by the Company as a result of such excesses of FDIC limits.

### Use of Estimates

The preparation of combined financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Revenue Recognition and Cost of Revenue

The Company records revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. This ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. This ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer purchase orders, including significant judgments. The Company's adoption of this ASU resulted in no change to the Company's results of operations or balance sheet.

Appliances Connection collects 100 percent of the payment for internet and phone orders, including tax in certain jurisdictions, from the customer at the time the order is placed. Customers placing orders with a purchase order are allowed to purchase on credit and make payment after receipt of product. Appliances Connection does not incur incremental costs obtaining purchase orders from customers; however, if Appliances Connection did, because all Appliances Connection's contracts are less than a year in duration, any contract costs incurred would be expensed rather than capitalized.

F-38

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Revenue Recognition and Cost of Revenue (Continued)

Performance Obligations – The revenue that Appliances Connection recognizes arises from orders it receives from contracts with customers. Appliances Connection's performance obligations under the customer orders correspond to each sale of merchandise that it makes to customers and each order generally contains only one performance obligation based on the merchandise sale to be completed. Control of the delivery transfers to customers when the customer can direct the use of, and obtain substantially all the benefits from, Appliances Connection's products, which generally occurs when the customer assumes the risk of loss. The transfer of control generally occurs at the point of pickup, shipment, or installation, depending on the type of order. Once this occurs, Appliances Connection has satisfied its performance obligation and Appliances Connection's recognizes revenue.

Transaction Price – Appliances Connection agrees with customers on the selling price of each transaction. This transaction price is generally based on the agreed upon sales price. In Appliances Connection's contracts with customers, it allocates the entire transaction price to the sales price, which is the basis for the determination of the relative standalone selling price allocated to each performance obligation. Any sales tax that Appliances Connection collects concurrently with revenue-producing activities are excluded from revenue.

Cost of sales includes the cost of purchased merchandise plus freight and any applicable delivery charges from the vendor to the company.

Substantially all Appliances Connection's sales are to individual retail consumers (homeowners), builders, and designers. The large majority of customers are homeowners and their contractors, with the homeowner being key in the final decisions. The Company has a diverse customer base with no one customer accounting for more than five percent of total revenue.

### Receivables

Receivables consists of customer's balance payments for which the Company extends credit to certain homebuilders and designers based on prior business relationship, and vendor rebate receivables. Vendor rebates receivable represent amounts due from manufactures from whom the Company purchases products. Rebates receivable are stated at the amount that management expects to collect from manufacturers (vendors). Rebates are calculated on product and model sales programs from specific vendors. The rebates are paid at intermittent periods either in cash or through issuance of vendor credit memos, which can be applied against vendor accounts payable. Based on the Company's assessment of the credit history with its manufacturers, it has concluded that there should be no allowance for uncollectible accounts.

The Company historically collects substantially all its trade receivables from customers and bad debt expense has been historically immaterial to the combined financial statements. Uncollectible balances are expensed in the period it is determined to be uncollectible. The Company had no significant concentrations of receivables balances as of December 31, 2020 and 2019.

### Inventory

Inventory mainly consists of finished goods acquired for resale and is valued at the average cost determined on a specific item basis. The Company periodically evaluates the value of items in inventory and provides write-downs to inventory based on estimate of its ability to sell the item as well as general market conditions. Based on these evaluations, the Company determined an obsolescence allowance of $550,101 and $274,455 was needed at December 31, 2020 and 2019, respectively.

F-39

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Property and Equipment

Property and equipment is stated at the historical cost. Maintenance and repairs of property and equipment are charged to operations as incurred. Leasehold improvements are amortized over the lesser of the base term of the lease or estimated life of the leasehold improvements.

Depreciation is computed using the straight-line method over estimated useful lives as follows:

|  | Useful Life (Years) |
|---|---|
| Furniture and fixtures | 7 |

| | |
|---|---|
| Transportation equipment | 5 |
| Machinery and equipment | 5-7 |
| Office equipment | 5-7 |
| Leasehold improvements | Shorter of lease term of estimated useful life |

***Intangible Assets***

At December 31, 2020 and 2019, definite-lived intangible assets primarily consisted of capitalized web development costs which are being amortized over their estimated useful lives of three years.

The Company periodically evaluates the reasonableness of the useful lives of these assets. Once these assets are fully amortized, they are removed from the accounts. These assets are reviewed for impairment or obsolescence when events or changes in circumstances indicate that the carrying amount may not be recoverable. If impaired, intangible assets are written down to fair value based on discounted cash flows or other valuation techniques. The Company has no intangibles with indefinite lives.

Identifiable intangible assets with definite lives are amortized over their estimated useful lives and are reviewed for impairment if indicators of impairment arise. Intangible assets with indefinite lives are tested for impairment within one year of acquisitions or annually as of October 1, and whenever indicators of impairment exist. The fair values of intangible assets are compared against their carrying values, and an impairment loss would be recognized for the amount by which a carrying amount exceeds its fair value. No impairment of intangible assets was recognized as of and for the years ended December 31, 2020 and 2019.

***Long-lived Assets***

The Company reviews its property and equipment and any identifiable intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The test for impairment is required to be performed by management if triggering events occur. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to the future undiscounted operating cash flow expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

***Lease Liabilities***

Lease liabilities and their corresponding ROU assets are recorded based on the present value of lease payments over the expected lease term at the lease commencement date. As most of the Company's leases do not provide an implicit rate, the Company uses an estimated incremental borrowing rate ("IBR") based on the information available at the commencement date of the respective lease to determine the present value of future payments. The determination of the IBR requires judgment and is primarily based on publicly available information for companies within the same industry and with similar credit profiles. The Company adjusts the rate for the impact of collateralization, the lease term and other specific terms included in each lease arrangement. The IBR is determined at the lease commencement and is subsequently reassessed upon a modification to the lease arrangement.

Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

The Company reviews the ROU asset for impairment whenever events or changes in circumstances indicate that the carrying amount of the ROU asset may not be recoverable. When such events occur, the Company compares the carrying amount of the ROU asset to the undiscounted expected future cash flows related to the ROU asset. If the comparison indicates that an impairment exists, the amount of the impairment is calculated as the difference between the excess of the carrying amount over the fair value of the ROU asset. If a readily determinable market price does not exist, fair value is estimated using discounted expected cash flows attributable to the ROU asset.

***Impact of COVID-19***

In December 2019, a novel strain of coronavirus ("COVID-19") emerged in China. On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 a pandemic. The extent of the COVID-19 pandemic's continued effect on our operational and financial performance and those of third parties on which the Company relies will depend on future developments, including the duration, spread and intensity of the outbreak, the pace at which jurisdictions across the country re-open and restrictions begin to lift. The ultimate impact of the COVID-19 pandemic is highly uncertain and subject to change. The Company does not yet know the full extent of potential impacts on its business and financing. However, these effects could have a material impact on the Company's liquidity, capital resources, operations and business and those of the third parties on which the Company relies.

***Proposed Acquisition***

On October 20, 2020, the Company entered into a Securities Purchase Agreement, which was amended on December 8, 2020 (as amended, the "Purchase Agreement") with 1847 Goedeker Inc. ("Goedeker"), Appliances Connection Inc., a wholly owned subsidiary of Goedeker (the "Buyer") and the holders of all of the equity interests of the Company (the "Sellers"), pursuant to which the Buyer agreed to acquire all of the issued and outstanding capital stock or other equity interests of the Company from the Sellers for an aggregate purchase price of $210,000,000, subject to adjustment, consisting of (i) $168,000,000 in cash (the "Cash Portion"), (ii) 1,222,239 shares of Goedeker's common stock and 1,111,094 shares of Goedeker's series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of Goedeker's series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of Goedeker's common stock (as reported on the NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the transaction; provided, that if Goedeker has obtained stockholder approval prior to closing, then Goedeker will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock.

**NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

***Proposed Acquisition (Continued)***

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the Sellers shall deliver to the Buyer at least one day prior to the closing of the acquisition a statement setting forth its good faith estimate of the net working capital of the Company (the "Estimated Closing Net Working Capital"). If the Estimated Closing Net Working Capital exceeds the Target Net Working Capital, then within 5 days the Buyer shall make a cash payment to the Sellers that is equal to such excess. If the Target Net Working Capital exceeds the Estimated Closing Net Working Capital, then either (i) if finally determined at the closing, the Cash Portion shall be decreased by such excess or (ii) within 5 days of the closing, the Sellers shall make a cash payment to the Buyer that is equal to such excess. "Target Net Working Capital" is defined in the Purchase Agreement as negative $15,476,941.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the acquisition, the Buyer shall deliver to the Sellers a statement setting forth its calculation of Net Working Capital (the "Closing Net Working Capital"). The "Post-Closing Net Working Capital Adjustment" shall be an amount equal to the Closing Net Working Capital minus the Estimated Closing Net Working Capital. If the Post-Closing Net Working Capital Adjustment is a negative number, then within 5 days the Sellers shall pay to the Buyer in cash an amount equal to the Post-Closing Net Working Capital Adjustment. If the Post-Closing Net Working Capital Adjustment is a positive number, the Buyer shall, within 5 days after the final determination of the Post-Closing Net Working Capital Adjustment, send payment by wire transfer of immediately available funds to the Sellers in an amount equal to the Post-Closing Net Working Capital Adjustment.

The Cash Portion of the purchase price will also be (A) decreased by (i) the amount of any outstanding unpaid indebtedness of the Company (other than trade debt) existing as of the closing date and (ii) any transaction expenses, and (B) increased by the amount of cash or cash equivalents held by, or on the books of, the Company as of the closing date, if any, that is in excess of $850,000.

The Purchase Agreement contains customary representations, warranties and covenants, including a covenant that the Sellers will not compete with the business of 1 Stop as of the closing date for a period of two (2) years following closing.

The Purchase Agreement also contains mutual indemnification for breaches of representations or warranties and failure to perform covenants or obligations contained in the Purchase Agreement. In the case of the indemnification provided by the Sellers with respect to breaches of certain non-fundamental representations and warranties, the Sellers will only become liable for indemnified losses if the amount exceeds an aggregate of $2,100,000, whereupon the Sellers will be liable for all losses relating back to the first dollar, provided that the liability of the Sellers for breaches of certain non-fundamental representations and warranties shall not exceed $21,000,000.

The closing of the Purchase Agreement is subject to customary closing conditions, including, without limitation, the expiration or termination of any waiting period applicable to the consummation of the transaction under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended; the receipt of all authorizations, consents and approvals of all governmental authorities or agencies; the release of any security interests; the Buyer obtaining the requisite acquisition financing; and delivery of all opinions and documents required for the transfer of the Securities to the Buyer.

In connection with closing of the transaction, the Sellers will enter into a Voting Support and Confidentiality Agreement with the other parties named therein, pursuant to which the parties will agree to vote in favor of the transactions contemplated by the Purchase Agreement and also agreed to certain transfer restrictions on the securities of Goedeker owned by them.

In connection with closing of the transaction, Goedeker will enter into a Lock-Up and Resale Restriction Agreement with the holders names therein, pursuant to which the parties will agree that such holders will not transfer the securities of Goedeker owned by them for a period of 180 days.

F-42

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

*Fair Value of Financial Instruments*

The fair value of a financial instrument is the amount that could be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Financial assets are marked to bid prices and financial liabilities are marked to offer prices. Fair value measurements do not include transaction costs. A fair value hierarchy is used to prioritize the quality and reliability of the information used to determine fair values. Categorization within the fair value hierarchy is based on the lowest level of input that is significant to the fair value measurement. Cash, restricted cash, receivables, inventory, and prepaid expenses approximate fair value. The fair value hierarchy is defined in the following three categories:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

*Sales Tax Liability*

On June 21, 2018, the U.S. Supreme Court issued an opinion in South Dakota v. Wayfair, Inc., 138 S. Ct. 2080 (2018), whereby the longstanding Quill Corp v. North Dakota sales tax case was overruled, and states may now require remote sellers to collect sales tax under certain circumstances. In 2020, the Company began collecting sales tax in nearly all states that have sales tax. The Company accrued sales taxes in the states with sales tax. The Company accrued the potential liability from the effective date of a state's adoption of the Wayfair decision up to the date the Company began collecting and filing sales taxes in the various states. At December 31, 2020 and 2019, the amount of such accrual was $11,700,329 and $6,138,533 respectively, which is included in accounts payable and accrued expenses.

*Income Taxes*

All combined entities have elected to be taxed as an "S Corporation" under the provisions of the Internal Revenue Code and comparable state income tax law. As an S Corporation, the Company is generally not subject to corporate income taxes and the Company's net income or loss is reported on the individual tax return of the stockholder of the Company. Therefore, no provision or liability for income taxes is reflected in the combined financial statements.

Management has evaluated its tax positions and has concluded that the Company had taken no uncertain tax positions that could require adjustment or disclosure in the combined financial statements to comply with provisions set forth in ASC 740, Income Taxes.

*Recent Accounting Pronouncements*

In June 2018, the FASB issued ASU 2018-07, *Compensation-Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, which simplifies the accounting for nonemployee share-based payment transactions by expanding the scope of ASC Topic 718, *Compensation - Stock Compensation*, to include share-based payment transactions for acquiring goods and services from nonemployees. Under the new standard, most of the guidance on stock compensation payments to nonemployees would be aligned with the requirements for share-based payments granted to employees. This standard became effective for us on January 1, 2019. The adoption of this standard did not have a material impact on the combined financial statements.

In February 2018, the FASB issued ASU 2018-02, *Income Statement-Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*, which allows a reclassification from accumulated other comprehensive income (AOCI) to retained earnings for stranded tax effects resulting from U.S. federal tax legislation commonly referred to as the Tax Cuts and Jobs Act, which was enacted in December 2017 (the "2017 Tax Act"). The adoption of this standard did not have a material impact on the combined financial statements.

F-43

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

*Recent Accounting Pronouncements (Continued)*

In August 2017, the FASB issued ASU 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities*, which expands and refines hedge accounting for both financial and non-financial risk components, aligns the recognition and

presentation of the effects of hedging instruments and hedge items in the financial statements, and includes certain targeted improvements to ease the application of current guidance related to the assessment of hedge effectiveness. ASU 2017-12 became effective for us on January 1, 2019. The adoption of this standard did not have a material impact on the combined financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles – Goodwill and Other – Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). ASU 2018-15 is effective for annual periods beginning after December 15, 2019, including interim periods within those annual periods. Early adoption is permitted. We adopted ASU 2018-15 on January 1, 2020 on a prospective basis, and do not expect the adoption will result in a material impact for future periods.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement*, which removes, modifies and adds various disclosure requirements related to fair value disclosures. Disclosures related to transfers between fair value hierarchy levels will be removed and further detail around changes in unrealized gains and losses for the period and unobservable inputs used in determining level 3 fair value measurements will be added, among other changes. ASU 2018-13 is effective for interim and annual reporting periods beginning after December 15, 2019, and early adoption is permitted. We adopted ASU 2018-13 on January 1, 2020 on a prospective basis, and do not expect the adoption will result in a material impact for future periods.

In June 2016, the FASB issued ASU 2016-13 *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years beginning after December 15, 2019. This pronouncement was amended under ASU 2019-10 to allow an extension on the adoption date for entities that qualify as a small reporting company. The Company has elected this extension and the effective date for the Company to adopt this standard will be for fiscal years beginning after December 15, 2022. The Company has not completed its assessment of the standard but does not expect the adoption to have a material impact on the Company's financial position, results of operations, or cash flows.

The Company currently believes that all other issued and not yet effective accounting standards are not relevant to its combined financial statements.

## NOTE 3 – RECEIVABLES

At December 31, 2020 and 2019, receivables consisted of the following:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade receivables from customers | $ 11,831,572 | $ 8,889,916 |
| Credit card receivables in process of collection | 1,716,364 | 724,440 |
| Vendor rebate receivables | 5,844,646 | 4,103,642 |
| Total receivables | $ 19,392,582 | $ 13,717,998 |

F-44

## NOTE 4 — DEPOSITS WITH VENDORS

Deposits with vendors represent cash on deposit with one vendor arising from accumulated rebates paid by the vendor. The deposits are used by the vendor to seek to secure the Company's purchases. The deposit can be withdrawn at any time up to the amount of the Company's credit line with the vendor. Alternatively, the Company could secure their credit line with a floor plan line from a lender and withdraw all its deposits. The Company has elected to leave the deposits with the vendor on which it earns interest income. There were no purchase commitments outstanding at December 31, 2020 or 2019.

## NOTE 5 – PROPERTY AND EQUIPMENT

Property and equipment consist of the following at December 31, 2020 and, 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Furniture and fixtures | $ 241,469 | $ 181,593 |
| Transportation equipment | 2,880,673 | 1,858,185 |
| Leasehold improvements | 870,034 | 870,034 |
| Machinery and equipment | 205,435 | 161,828 |
| Office equipment | 92,431 | 92,431 |
| Total property and equipment | 4,290,042 | 3,164,071 |
| Less: accumulated depreciation | (2,292,220) | (1,572,202) |
| Property and equipment, net | $ 1,997,822 | $ 1,591,869 |

Depreciation expense for the years ended December 31, 2020 and 2019 was $782,773 and $454,014, respectively.

## NOTE 6 – ACCOUNTS PAYABLE AND ACCRUED EXPENSES

The following is schedule of accounts payable and accrued expenses at December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Trade accounts payable | $ 7,260,224 | $ 6,910,165 |
| Accrued tax liability | 12,568,110 | 7,632,886 |
| Accrued payroll liabilities | 275,672 | 468,590 |
| Other accrued liabilities | 1,075,969 | 208,759 |
| Total accounts payable and accrued expenses | $ 21,179,975 | $ 15,220,400 |

F-45

## NOTE 7 – NOTES PAYABLE

The Company has financed purchases of transportation vehicles with notes payable which are secured by the vehicles purchased.

Notes payable consist of the following at December 31, 2020 and 2019:

| Lender | Origination Date | Maturity Date | Interest Rate | December 31, 2020 | December 31, 2019 |
|---|---|---|---|---|---|
| Ally | 11/16/15 | 11/16/20 | 3.09% | $ - | $ 10,442 |
| Ally | 11/16/15 | 11/16/20 | 3.09% | - | 9,432 |
| Ally | 12/22/15 | 12/21/20 | 3.09% | - | 9,748 |
| Ally | 6/19/16 | 6/19/21 | 3.59% | 5,970 | 24,886 |
| Toyota | 10/31/16 | 10/31/21 | 5.39% | 16,041 | 31,610 |
| Toyota | 10/31/16 | 10/31/21 | 5.39% | - | 39,920 |
| Toyota | 12/1/16 | 12/1/21 | 5.39% | 14,616 | 27,372 |
| Ally | 4/19/17 | 4/19/22 | 4.99% | 19,788 | 31,370 |
| Toyota | 7/12/17 | 7/12/22 | 5.39% | 57,754 | 97,121 |
| Hitachi | 10/10/17 | 10/10/22 | 5.40% | 24,007 | 35,290 |
| Hitachi | 10/30/17 | 10/30/22 | 5.40% | 36,377 | 52,498 |
| Hitachi | 10/4/18 | 10/4/23 | 5.49% | 51,611 | 65,140 |
| Hitachi | 9/17/18 | 10/17/23 | 5.49% | 48,615 | 67,042 |
| Toyota | 4/25/19 | 4/25/24 | 5.74% | 120,600 | 154,158 |
| Toyota | 10/7/19 | 10/7/24 | 4.48% | 61,462 | 76,371 |
| Toyota | 12/16/19 | 12/15/24 | 4.52% | 69,730 | 85,618 |
| Toyota | 7/2/20 | 7/1/25 | 5.14% | 267,938 | - |
| Toyota | 2/5/20 | 2/4/25 | 4.52% | 70,458 | - |
| Hitachi | 3/4/20 | 2/28/25 | 4.99% | 147,493 | - |
| Hitachi | 9/1/20 | 8/31/25 | 4.75% | 77,813 | - |
| Toyota | 6/18/20 | 6/17/25 | 4.99% | 262,776 | - |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 77,391 | - |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 87,973 | - |
| Toyota | 11/9/20 | 11/9/25 | 4.75% | 89,049 | - |
| Popular Bank | 4/15/20 | 4/15/22 | 1.00% | 1,192,780 | - |
| Popular Bank | 4/27/20 | 4/27/22 | 1.00% | 679,690 | - |
| SBA | 7/25/20 | 10/25/50 | 3.75% | 112,100 | - |
| SBA | 7/20/20 | 10/20/50 | 3.75% | 150,000 | - |
| SBA | 7/25/20 | 10/25/50 | 3.75% | 150,000 | - |
| Toyota | 12/16/20 | 12/16/25 | 3.75% | 79,823 | - |
| Total notes payable | | | | $ 3,971,855 | $ 818,018 |
| Less: current portion | | | | (466,235) | (276,534) |
| Notes payable, net of current portion | | | | $ 3,505,620 | $ 541,484 |

F-46

**NOTE 7 – NOTES PAYABLE (CONTINUED)**

Following is a summary of notes payable payments due for the succeeding five years:

| Year Ending December 31, | Amount |
|---|---|
| 2021 | $ 466,235 |
| 2022 | 2,269,302 |
| 2023 | 355,381 |
| 2024 | 303,025 |
| 2025 | 207,276 |
| Thereafter | 370,636 |
| Total | $ 3,971,855 |

**NOTE 8 – LEASES**

***Financing Leases***

On March 3, 2018, the Company entered in an equipment financing lease to purchase a forklift for $59,326, maturing on March 2, 2023. As of December 31, 2020 and 2019, the balance payable was $33,346 and $44,320, respectively.

On January 23, 2019, the Company entered in an equipment financing lease to purchase a forklift for $55,510, maturing on January 23, 2024. As of December 31, 2020 and 2019, the balance payable was $36,828 and $46,935, respectively.

Following is a summary of payments due on financing leases for the succeeding five years:

| Year Ending December 31, | Amount |
|---|---|
| 2021 | $ 31,724 |
| 2022 | 31,724 |
| 2023 | 18,084 |
| 2024 | 1,128 |
| 2025 and thereafter | - |
| Total payments | 82,660 |
| Less: amount representing interest | (11,419) |
| Present value of minimum lease payments | $ 71,241 |

***Operating Leases***

The Company has entered into four lease agreements under which it leases warehouse equipment, and which have been classified as operating leases. The Company leases warehouse, showroom, and office facilities under long-term leases. All the facility leases include fixed rental payments and have been classified as operating leases.

As of December 31, 2020 and 2019, the weighted-average remaining lease term for all operating leases is 2.9 years and 3.9 years, respectively, while the weighted-average remaining lease term for all finance leases is 2.6 years and 3.6 years, respectively.

Because the Company generally does not have access to the rate implicit in operating leases, we utilize our incremental borrowing rate as the

discount rate. The weighted average discount rate associated with operating leases as of December 31, 2020 and 2019 is 4.8 percent and 4.8 percent, respectively.

The Company recognizes operating lease expense on a straight-line basis over the lease term. Rental expense under the operating lease for the years ended December 31, 2020 and 2019 were $1,707,095 and $1,319,220, respectively.

F-47

**NOTE 8 – LEASES (CONTINUED)**
***Operating Leases (Continued)***

Cash payments included in the measurement of our operating lease liabilities for the years ended December 31, 2020 and 2019 were $1,686,170 and $981,720, respectively.

Supplemental balance sheet information related to lease at December 31, 2020 was as follows:

| | | |
|---|---|---|
| Operating lease right-of-use asset | $ | 4,646,508 |
| Lease liability, current portion | | 1,517,390 |
| Lease liability, long-term | | 3,279,080 |
| Total operating lease liability | $ | 4,796,470 |
| Weighted-average remaining lease term (months) | | 35 |
| Weighted average discount rate | | 4.8% |

Future minimum lease payments under operating leases as of December 31, 2020 (in thousands) were as follows:

| Year Ending December 31, | | Amount |
|---|---|---|
| 2021 | $ | 1,716,503 |
| 2022 | | 1,747,752 |
| 2023 | | 1,404,330 |
| 2024 | | 281,250 |
| 2025 and thereafter | | - |
| Total | $ | 5,149,835 |
| Less imputed interest | | (353,365) |
| Total lease liability | $ | 4,796,470 |

**NOTE 9 – SUPPLIER CONCENTRATION**

Significant customers and suppliers are those that account for greater than ten percent of the Company's revenues and purchases.

In 2020 and 2019, the Company purchased a substantial portion of finished goods from a third-party vendor (75.2% and 70.7%, respectively).

The Company believes there are numerous other suppliers that could be substituted should the supplier become unavailable or non-competitive.

F-48

**NOTE 10 – RELATED PARTY TRANSACTIONS**

The Company leases four facilities pursuant to lease agreements entered into with four separate entities owned by Albert and Elie Fouerti, the Company's Chief Executive Officer and Vice President, respectively. Albert and Elie Fouerti, directly and indirectly through affiliated trusts, are each a 50 percent owner of 1 Stop Electronics Center, Inc., Gold Coast Appliances, Inc., Joe's Appliances LLC, and YF Logistics LLC. See Note 8 for disclosures of cash payments made and amounts recognized as expense during the years ended December 31, 2020 and 2019 and for disclosure of future minimum lease payments as of December 31, 2020 under these leases.

The Company is a member of Dynamic Marketing, Inc. ("DMI"), an appliance purchasing cooperative. DMI purchases consumer electronics and appliances at wholesale prices from various vendors, and then makes such products available to its members, including the Company, who sell such products to end consumers. DMI's purchasing group arrangement provides its members, including the Company, with leverage and purchasing power with appliance vendors, and increases the Company's ability to compete with competitors, including big box appliance and electronics retailers. The Company owns an approximate 5% equity interest in DMI. Additionally, one of the owners of the Company is on the Board of DMI. As such, DMI is deemed to be a related party. At December 31, 2020 and 2019, vendor rebate deposits, net, due from DMI were $31,733,415 and $22,005,318, respectively, and vendor rebates receivable were $4,691,514 and $3,284,594, respectively. During the year ended December 31, 2020, the following transactions were carried out with DMI: total purchases $175,630,820, vendor rebates $8,222,373, interest income $968,080, consulting income $255,000, and rent expense $675,000. During the year ended December 31, 2019, the following transactions were carried out with DMI: total purchases $120,328,645, vendor rebates $3,284,594, interest income $1,428,546, consulting income $188,617, and rent expense $337,500.

**NOTE 11 – SUBSEQUENT EVENTS**

Subsequent to December 31, 2020, the Company was notified by its bank that the application for forgiveness of the Paycheck Protection loans had been approved and that the loans had been fully forgiven, resulting in the recognition of other income of $1,888,174 including principal and interest. Subsequent to December 31, 2020, the Company paid $9,228,596 in member distributions.

F-49

**1847 GOEDEKER INC.**
**UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS**

F-50

**1847 GOEDEKER INC.**
**UNAUDITED PRO FORMA COMBINED BALANCE SHEET**
**AS OF DECEMBER 31, 2020**

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Current Assets | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ 934,729 | $ 14,842,912 | $ 189,000,000 | (a) | $ 39,808,808 |
| | | | (180,000,000) | (b) | |
| | | | 58,550,000 | (c) | |
| | | | (12,680,161) | (d) | |
| | | | (26,866,817) | (e) | |
| | | | (3,971,855) | (f) | |
| Restricted cash | 8,977,187 | - | (3,185,369) | (f) | 5,791,818 |
| Receivables | 1,998,232 | 19,392,582 | - | | 21,390,814 |
| Vendor deposits | 547,648 | 31,733,415 | (31,733,415) | (g) | 547,648 |
| Merchandise inventory, net | 5,147,241 | 12,004,038 | - | | 17,151,279 |
| Prepaid expenses and other current assets | 635,084 | 217,439 | (100,000) | (d) | 752,523 |
| Total Current Assets | 18,240,121 | 78,190,386 | (10,987,617) | | 85,442,890 |
| Property and equipment, net | 245,948 | 1,997,822 | - | | 2,243,770 |
| Operating lease right-of-use assets | 1,578,235 | 4,646,508 | - | | 6,224,743 |
| Goodwill | 4,725,689 | - | 243,922,331 | (j) | 248,648,020 |
| Intangible assets, net | 1,381,937 | - | - | | 1,381,937 |
| Other long-term assets | 45,000 | 144,528 | - | | 189,528 |
| TOTAL ASSETS | $ 26,216,930 | $ 84,979,244 | $ 232,934,714 | | $ 344,130,888 |
| LIABILITIES, OWNERS' EQUITY AND STOCKHOLDERS' EQUITY (DEFICIT) | | | | | |
| Current Liabilities | | | | | |
| Accounts payable and accrued expenses | $ 12,701,715 | $ 21,179,975 | $ - | | $ 33,881,690 |
| Customer deposits | 21,879,210 | 8,853,214 | - | | 30,732,424 |
| Current portion of notes payable | 663,339 | 466,235 | (1,129,574) | (f) | - |
| Current portion of acquisition note payable | - | - | 6,000,000 | (c) | 6,000,000 |
| Current portion of financing lease liability | - | 23,576 | - | | 23,576 |
| Current portion of operating lease liabilities | 450,712 | 1,517,390 | - | | 1,968,102 |
| Total Current Liabilities | 35,694,976 | 32,040,390 | 4,870,426 | | 72,605,792 |
| Notes payable, net of current portion | 2,522,030 | 3,505,620 | (6,027,650) | (f) | - |
| Acquisition note payable, net of current potion | - | - | 52,550,000 | (c) | 52,550,000 |
| Financing lease liabilities, net of current portion | - | 47,665 | - | | 47,665 |
| Operating lease liabilities, net of current portion | 1,127,523 | 3,279,080 | - | | 4,406,603 |
| Contingent note payable | 188,170 | - | - | | 188,170 |
| TOTAL LIABILITIES | 39,532,699 | 38,872,755 | 51,392,776 | | 129,798,230 |
| Owners' Equity | - | 46,103,489 | (46,103,489) | (h) | - |
| Stockholders' Equity (Deficit) | | | | | |
| Preferred stock, $.0001 par value, 20,000,000 shares authorized; none issued and outstanding at December 31, 2020 | - | - | - | | - |
| Common stock, $.0001 par value, 200,000,000 shares authorized; 6,111,200 and 4,750,000 shares issued and outstanding as of December 31, 2020 (34,036,430 on a pro-forma basis) | 611 | 3,000 | (3,000) | (h) | 3,403 |
| | | | 2,348 | (a) | |
| | | | 233 | (i) | |
| | | | 211 | (i) | |
| Additional paid-in capital | 13,409,328 | - | 189,997,652 | (a) | 241,054,963 |
| | | | (1,000,000) | (a) | |
| | | | 20,299,763 | (i) | |
| | | | 18,348,220 | (i) | |
| Accumulated deficit | (26,725,708) | - | - | | (26,725,708) |
| Total Owners' Equity, Stockholders' Equity (Deficit) | (13,315,769) | 46,106,489 | 181,541,938 | | 214,332,658 |
| TOTAL LIABILITIES, OWNERS' EQUITY AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 26,216,930 | $ 84,979,244 | $ 232,934,714 | | $ 344,130,888 |

F-51

**1847 GOEDEKER INC.**
**UNAUDITED PRO FORMA COMBINED STATEMENT OF OPERATIONS**
**YEAR ENDED DECEMBER 31, 2020**

| | Goedeker | Appliances Connection | Pro Forma Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|
| Product sales, net | $ 55,133,653 | $ 312,608,528 | $ - | | $ 367,742,181 |
| Cost of goods sold | 47,878,541 | 247,379,397 | - | | 295,257,938 |
| Gross Profit | 7,255,112 | 65,229,131 | - | | 72,484,243 |
| Operating Expenses | | | | | |
| Personnel | 6,565,380 | 13,563,628 | - | | 20,129,008 |
| Advertising | 4,865,361 | 9,164,242 | - | | 14,029,603 |
| Bank and credit card fees | 1,806,620 | 12,361,428 | - | | 14,168,048 |
| Depreciation and amortization | 549,712 | 782,773 | - | | 1,332,485 |
| General and administrative | 7,900,566 | 9,949,762 | - | | 17,850,328 |
| Total Operating Expenses | 21,687,639 | 45,821,833 | - | | 67,509,472 |

| | | | | | |
|---|---:|---:|---:|:--|---:|
| Income (Loss) From Operations | (14,432,527) | 19,407,298 | - | | 4,974,771 |
| Other Income (Expense) | | | | | |
| Interest income | 2,479 | 977,249 | (977,249) | (k) | 2,479 |
| Financing costs | (762,911) | - | - | | (762,911) |
| Interest expense | (870,847) | (663,674) | (3,590,000) | (l) | (5,004,521) |
| | | | 120,000 | (m) | |
| Loss on extinguishment of debt | (1,756,095) | - | - | | (1,756,095) |
| Write-off of acquisition receivable | (809,000) | - | - | | (809,000) |
| Adjustment in value of contingency | (138,922) | - | - | | (138,922) |
| Change on fair value of warrant liability | (2,127,656) | - | - | | (2,127,656) |
| Other income | 25,945 | 358,866 | - | | 384,811 |
| Total Other Income (Expense) | (6,437,007) | 672,441 | (4,447,249) | | (10,211,815) |
| Net Income (Loss) Before Income Taxes | (20,869,534) | 20,079,739 | (4,447,249) | | (5,237,044) |
| Income tax expense | 698,303 | - | * | | 698,303 |
| Net Income (Loss) | $ (21,567,837) | $ 20,079,739 | $ (4,447,249) | | $ (5,935,347) |
| Income (Loss) Per Common Share – Basic and Diluted | $ (3.95) | | | | $ (0.18) |
| Weighted-Average Number of Common Shares Outstanding – Basic and Diluted | 5,463,603 | | | | 33,338,833 |

*The Company determined that there is no tax effect in the acquisition. Taxable income, if any, would be offset by the Company's available net loss carryforwards.

**1847 GOEDEKER INC.**
**NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS**

NOTE 1 – DESCRIPTION OF THE TRANSACTIONS

On October 20, 2020, 1847 Goedeker Inc. ("Goedeker") entered into a securities purchase agreement, which was amended on December 2, 2020 and April 6, 2021 (as amended, the "Purchase Agreement"), to acquire the following five household appliances companies through its newly formed wholly owned subsidiary Appliances Connection Inc., a Delaware corporation ("ACI"): (1) 1 Stop Electronics Center, Inc., a New York corporation; (2) Gold Coast Appliances, Inc., a New York corporation; (3) Superior Deals Inc., a New York corporation; (4) Joe's Appliances LLC, a New York limited liability company; and (5) YF Logistics LLC, a New Jersey limited liability company (collectively, "Appliances Connection").

Pursuant to the Purchase Agreement, ACI agreed to acquire all of the issued and outstanding capital stock or other equity securities of Appliances Connection for an aggregate purchase price of $222,000,000, subject to adjustment (the "Proposed Acquisition"). The purchase price consists of (i) $180,000,000 in cash, (ii) 1,222,239 shares of Goedeker's common stock and 1,111,094 shares of Goedeker's series A preferred stock, collectively having a stated value that is equal to $21,000,000, and (iii) a number of shares of Goedeker's series A-1 preferred stock that is equal to (A) $21,000,000 divided by (B) the average of the closing price of Goedeker's shares of common stock (as reported on NYSE American) for the 20 trading days immediately preceding the 3rd trading day prior to the closing date of the Proposed Acquisition; provided, that if Goedeker has obtained stockholder approval prior to closing, then Goedeker will issue the same number of shares of common stock in lieu of the series A preferred stock and series A-1 preferred stock. For purposes of these unaudited pro forma combined financials statements, Goedeker has assumed that all shares will be issued as common stock.

The purchase price is subject to a closing net working capital adjustment provision. Under this provision, the sellers shall deliver to ACI at least one day prior to the closing of the Proposed Acquisition a statement setting forth their good faith estimate of the net working capital of Appliances Connection (which excludes accruals for sales tax liabilities). If such estimated net working capital exceeds a target net working capital of ($15,476,941), then within five (5) days ACI shall make a cash payment to the sellers that is equal to such excess. If such target net working capital exceeds such estimated net working capital, then either (i) if finally determined at the closing, the cash portion of the purchase price shall be decreased by such excess or (ii) within 5 days of the closing, the sellers shall make a cash payment to ACI that is equal to such excess.

The purchase price is also subject to a post-closing net working capital adjustment provision. On or before the 75th day following the closing of the Proposed Acquisition, ACI shall deliver to the sellers a statement setting forth its calculation of the net working capital. If such net working capital exceeds the estimated net working capital referred to above, then within five (5) days after the final determination of such net working capital ACI shall send payment by wire transfer of immediately available funds to the sellers in an amount equal to such excess. If the estimated net working capital exceeds such net working capital, then within five (5) days the sellers shall pay to ACI in cash an amount equal to such excess.

The cash portion of the purchase price will also be (i) decreased by (A) the amount of any outstanding unpaid indebtedness of Appliances Connection (other than trade debt) existing as of the closing date and (B) any transaction expenses, and (ii) increased by the amount of cash or cash equivalents held by, or on the books of, Appliances Connection as of the closing date, if any, that is in excess of $850,000.

Upon execution of the Purchase Agreement, ACI paid a deposit in the amount of $100,000, and upon execution of the first amendment to the Purchase Agreement, ACI paid an additional deposit in the amount of $75,000, all of which will be credited towards the cash portion of the purchase price at closing.

Goedeker intends to pay the cash portion of the purchase price for the proposed acquisition with (i) the proceeds from a public offering of its common stock and (ii) the proceeds of a term loan from a commercial bank. Goedeker has entered into a non-binding engagement letter with a commercial bank for the provision of a senior secured credit facility involving a term loan in the expected principal amount of $60 million.

**1847 GOEDEKER INC.**
**NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS**

NOTE 2 – BASIS OF PRO FORMA PRESENTATION

The unaudited pro forma combined balance sheet as of December 31, 2020 combines the historical consolidated balance sheet of Goedeker with the historical combined balance sheet of Appliances Connection and was prepared as if the Proposed Acquisition had occurred on December 31, 2020.

The unaudited pro forma combined statement of operations for the year ended December 31, 2020 combines the historical consolidated statement of operations of Goedeker with the historical combined statement of operations of Appliances Connection and was prepared as if the Proposed Acquisition had occurred on January 1, 2020.

The historical financial information is adjusted in the unaudited pro forma combined financial information to give effect to pro forma events that are (1) directly attributable to the Proposed Acquisition, (2) factually supportable, and (3) with respect to the combined statement of operations, expected to have a continuing impact on the combined results.

Goedeker accounted for the Proposed Acquisition in the unaudited pro forma combined financial information using the acquisition method of accounting in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 805 "Business Combinations" ("ASC 805"). In accordance with ASC 805, Goedeker used its best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date. Goodwill of Appliances Connection is measured as the excess of the purchase consideration over the fair value of the net tangible assets and identifiable assets acquired. The preliminary fair value of the net assets to be acquired is $1,592,913. The excess of the aggregate estimated fair value of the net tangible assets, $243,922,331, has been allocated to provisional goodwill.

The pro forma adjustments described below were developed based on management's assumptions and estimates, including assumptions relating to the consideration paid and the allocation thereof to the assets acquired and liabilities assumed from Appliances Connection based on preliminary estimates to fair value. The final purchase consideration and allocation of the purchase consideration will differ from that reflected in the unaudited pro forma combined financial statements after the final valuation procedures are performed and the amounts are finalized.

The unaudited pro forma combined financial information is provided for illustrative purposes only and does not purport to represent what the actual consolidated results of operations or the consolidated financial position of the combined company would have been had the Proposed Acquisition occurred on the dates assumed, nor are the necessarily indicative of future consolidated results of operations or financial position.

Goedeker expects to incur costs and realize benefits associated with integrating the operations of Goedeker and Appliances Connection. The unaudited pro forma combined financial statements do not reflect the costs of any integration activities or any benefits that may result from operating efficiencies or revenue synergies. The unaudited pro forma combined statement of operations does not reflect any non-recurring charges directly related to the Proposed Acquisition that the combined company may incur upon completion of the Proposed Acquisition.

F-54

## 1847 GOEDEKER INC.
### NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 3 – PURCHASE PRICE ALLOCATION

The table below represents the estimated preliminary purchase price allocation to the net assets acquired based on their estimated fair values, as well as the associated estimated useful lives of the acquired intangible assets. Such amounts were estimated using the most recent balance sheet of Appliances Connection as of December 31, 2020. Upon closing of the Proposed Acquisition, final valuations will be performed, whereby increases or decreases in the fair value of relevant balance sheet accounts will result in adjustments, which may result in material differences from the information presented herein.

**Provisional purchase consideration at preliminary fair value:**

| | |
|---|---:|
| Cash consideration | $ 180,000,000 |
| Share issuance | 38,648,427 |
| Working capital adjustment paid to sellers | 26,866,817 |
| Amount of consideration (excluding potential gross-up): | $ 245,515,244 |
| | |
| Assets acquired and liabilities assumed at preliminary fair value | |
| Cash | $ 2,062,751 |
| Accounts receivable | 19,392,582 |
| Inventories | 12,004,038 |
| Other assets | 361,967 |
| Property and equipment | 1,997,822 |
| Operating lease right-of-use asset | 4,646,508 |
| Accounts payable and accrued expenses | (21,179,975) |
| Customer deposits | (8,853,214) |
| Current portion of notes payable | (466,235) |
| Long term portion of notes payable | (3,505,620) |
| Current portion of operating and finance lease liabilities | (1,540,966) |
| Operating and finance lease liabilities, net of current portions | (3,326,745) |
| Net tangible assets acquired | $ 1,592,913 |
| | |
| Total net assets acquired | $ 1,592,913 |
| Consideration paid | 245,515,244 |
| Preliminary goodwill | $ 243,922,331 |
| | |
| **Estimated working capital adjustment:** | |
| Working capital on preliminary statement | $ (11,389,876) |
| Target working capital | (15,476,941) |
| Net estimated working capital adjustment | $ (26,866,817) |

F-55

## 1847 GOEDEKER INC.
### NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL STATEMENTS

NOTE 4 – PRO FORMA ADJUSTMENTS

The pro forma adjustments included in the unaudited pro forma condensed combined financial statements are as follows:

| | | |
|---|---|---:|
| (a) | Net proceeds from common stock offering as follows: | |
| | Sale of 23,482,882 shares of $.0001 par value common stock at $8.70, the March 31, 2021 closing price | $ 204,301,075 |
| | Underwriting discount | (14,301,075) |
| | Estimated cash expenses | (1,000,000) |
| | Net proceeds | $ 189,000,000 |

| (b) | Disbursed to sellers in cash | $ 180,000,000 |
| (c) | Proceeds of acquisition note payable (term loan), net of a $1,450,000 discount | $ 58,550,000 |
| (d) | Pay sellers' for cash, net of (i) $100,000 deposit paid at signing of purchase agreement, (ii) long-term debt of $3,505,620, and (iii) cash threshold of $850,000 | $ 12,860,161 |
| (e) | Estimated working capital adjustment paid to sellers | $ 26,866,817 |
| (f) | Payoff all debt in accordance with terms of acquisition note payable | $ 7,157,224 |
| (g) | Appliances Connection vendor deposits not acquired in transaction | $ 31,733,415 |
| (h) | Members' equity eliminated in consolidation | $ 46,106,489 |
| (i) | Shares issued to sellers | |
| | 2,333,333 at fixed price of $9.00 per share | $ 20,299,996 |
| | 2,109,015 at the weighted average price of $9.96 for the 20 trading days ended March 31, 2021 | $ 18,348,431 |
| (j) | Preliminary goodwill as the difference between consideration paid and net assets acquired | $ 243,922,331 |
| (k) | Eliminate interest income earned on vendor deposits that do not transfer to the combined company | $ 977,249 |
| (l) | Interest expense and amortization of loan discount on acquisition note payable | $ 3,590,000 |
| (m) | Estimated reduction in interest expense on loans paid off in accordance with terms of acquisition note payable | $ 120,000 |

F-56

<strong>ANNEX A</strong>

**SECURITIES PURCHASE AGREEMENT**
**dated as of October 20, 2020**
**among**
**1847 GOEDEKER INC.**
**APPLIANCES CONNECTION INC.**
**1 STOP ELECTRONICS CENTER, INC.**
**GOLD COAST APPLIANCES INC.**
**SUPERIOR DEALS INC.**
**JOE'S APPLIANCES LLC**
**YF LOGISTICS LLC**
**AND**
**THE OTHER PARTIES SET FORTH IN EXHIBIT A HERETO**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1 | Certain Definitions. | 1 |
| ARTICLE II PURCHASE AND SALE OF THE SECURITIES | | 5 |
| 2.1 | Purchase and Sale of the Securities. | 5 |
| 2.2 | Working Capital Adjustment. | 6 |
| 2.3 | Adjustment for Outstanding Indebtedness, Transaction Expenses and Cash. | 8 |
| 2.4 | Closing. | 8 |
| 2.5 | Transactions to be Effected at the Closing. | 8 |
| ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS | | 8 |
| 3.1 | Authority and Enforceability. | 8 |
| 3.2 | Noncontravention. | 9 |
| 3.3 | The Securities. | 9 |
| 3.4 | Brokers' Fees. | 9 |
| 3.5 | Investment Representations. | 9 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANIES | | 10 |
| 4.1 | Organization; Standing and Power; Authority and Enforceability. | 10 |
| 4.2 | No Subsidiaries. | 10 |
| 4.3 | Capitalization. | 10 |
| 4.4 | Noncontravention. | 11 |
| 4.5 | Financial Statements. | 11 |
| 4.6 | Taxes. | 11 |
| 4.7 | Compliance with Laws and Orders; Permits. | 12 |
| 4.8 | No Undisclosed Liabilities. | 12 |
| 4.9 | Tangible Personal Assets. | 12 |
| 4.10 | Real Property. | 12 |
| 4.11 | Intellectual Property. | 12 |
| 4.12 | Absence of Certain Changes or Events. | 13 |
| 4.13 | Contracts. | 14 |
| 4.14 | Litigation. | 14 |
| 4.15 | Employee Benefits. | 14 |
| 4.16 | Labor and Employment Matters. | 14 |
| 4.17 | Environmental Matters. | 15 |

| 4.18 | Insurance. | 15 |
|---|---|---|
| 4.19 | Brokers' Fees. | 15 |
| 4.20 | Certain Business Relationships with the Company. | 15 |
| 4.21 | Equipment. | 15 |
| 4.22 | Suppliers. | 15 |
| 4.23 | Inventory. | 15 |
| 4.24 | Officers and Directors; Bank Accounts, Signing Authority, Powers of Attorney. | 15 |
| 4.25 | Accounts Receivable. | 16 |
| 4.26 | No Other Representations and Warranties. | 16 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER AND THE PARENT | | 16 |
| 5.1 | Organization. | 16 |
| 5.2 | Authorization. | 16 |
| 5.3 | Noncontravention. | 16 |
| 5.4 | Brokers' Fees. | 16 |
| 5.5 | Capitalization. | 16 |
| 5.6 | Valid Issuance of Securities. | 17 |
| 5.7 | SEC Reports; Financial Statements. | 17 |
| 5.8 | Undisclosed Liabilities. | 17 |
| 5.9 | Compliance with Laws and Orders. | 17 |
| 5.10 | Litigation. | 18 |
| 5.11 | Environmental Matters. | 18 |
| 5.12 | Insurance. | 18 |
| ARTICLE VI COVENANTS | | 18 |
| 6.1 | Consents. | 18 |

A-i

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 6.2 | Operation of the Companies' Business. | 19 |
| 6.3 | Access. | 19 |
| 6.4 | Notice of Developments. | 19 |
| 6.5 | No Solicitation. | 19 |
| 6.6 | Preparation of Proxy Statement; Stockholders' Meeting. | 20 |
| 6.7 | Voting Agreement; Sellers Approval of Agreement and Acquisition. | 20 |
| 6.8 | Lock-Up Agreements. | 21 |
| 6.9 | Registration Rights. | 21 |
| 6.10 | Financial Information. | 21 |
| 6.11 | Taking of Necessary Action; Further Action. | 23 |
| 6.12 | Tax Matters. | 23 |
| ARTICLE VII CONDITIONS TO OBLIGATIONS TO CLOSE | | 26 |
| 7.1 | Conditions to Obligation of the Buyer and the Parent. | 26 |
| 7.2 | Conditions to Obligation of the Sellers and the Companies. | 27 |
| ARTICLE VIII TERMINATION; AMENDMENT; WAIVER | | 28 |
| 8.1 | Termination of Agreement. | 28 |
| 8.2 | Effect of Termination. | 28 |
| 8.3 | Amendments. | 28 |
| 8.4 | Waiver. | 28 |
| ARTICLE IX INDEMNIFICATION | | 29 |
| 9.1 | Survival. | 29 |
| 9.2 | Indemnification by Sellers. | 29 |
| 9.3 | Indemnification by Buyer. | 29 |
| 9.4 | Third Party Indemnification Procedures; Direct Claim Procedures. | 29 |
| 9.5 | Direct Claim Procedures. | 30 |
| 9.6 | Limitation on Indemnification Obligation. | 31 |
| 9.7 | Payments. | 31 |
| 9.8 | Tax Refunds, Insurance Proceeds and Other Payments. | 31 |
| 9.9 | Mitigation. | 31 |
| ARTICLE X MISCELLANEOUS | | 32 |
| 10.1 | Press Releases and Public Announcement. | 32 |
| 10.2 | No Third-Party Beneficiaries. | 32 |
| 10.3 | Entire Agreement. | 32 |
| 10.4 | Succession and Assignment. | 32 |
| 10.5 | Construction. | 32 |
| 10.6 | Notices. | 32 |
| 10.7 | Governing Law. | 33 |
| 10.8 | Consent to Jurisdiction and Service of Process. | 33 |
| 10.9 | Headings. | 33 |
| 10.10 | Severability. | 33 |
| 10.11 | Expenses. | 33 |
| 10.12 | Incorporation of Exhibits and Schedules. | 33 |
| 10.13 | Limited Recourse. | 33 |
| 10.14 | Specific Performance. | 33 |

| 10.15 | Counterparts. | 33 |
|-------|---------------|-----|
| 10.16 | Disclosure Schedules. | 34 |
| 10.17 | Conflicts; Privileges. | 34 |

A-ii

## SECURITIES PURCHASE AGREEMENT

SECURITIES PURCHASE AGREEMENT, dated as of October 20, 2020 (the "**Agreement**"), among **1847 Goedeker Inc.**, a Delaware corporation ("**Parent**"), **Appliances Connection Inc.**, a Delaware corporation (the "**Buyer**"), **1 Stop Electronics Center, Inc.**, a New York corporation ("**1 Stop**"), **Gold Coast Appliances Inc.**, a New York corporation ("**Gold Coast**"), **Superior Deals Inc.**, a New York corporation ("**Superior Deals**"), **Joe's Appliances LLC**, a New York limited liability company ("**Joe's Appliances**"), and YF Logistics LLC, a New Jersey limited liability company ("**YF Logistics**" and together with 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, each a "**Company**" and collectively, the "**Companies**"), and the other party or parties set forth in **Exhibit A** hereto (each a "**Seller**" and, collectively, the "**Sellers**").

### BACKGROUND

Each Seller is the record and beneficial owner of the capital stock or other equity securities (the "**Securities**") of the Companies set forth opposite each such Seller's name on **Exhibit A**. The Sellers collectively own 100% of the issued and outstanding Securities of the Companies. The Sellers desire to sell all of the Securities to the Buyer, and the Buyer desires to purchase all of the Securities from the Sellers, upon the terms and subject to the conditions set forth in this Agreement (such sale and purchase of the Securities, the "**Acquisition**").

The Buyer is a newly formed, wholly owned subsidiary of the Parent. The Parent is a public reporting company that is required to file reports with the U.S. Securities and Exchange Commission (the "**SEC**") under Section 13 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). The Parent's common stock, $0.0001 par value per share ("**Common Stock**"), is traded under the symbol "GOED" on the NYSE American national securities exchange. In connection with the Acquisition, the Parent will issue to the Sellers as partial consideration for the Securities shares of its Common Stock and shares of its Series A and Series A-1 Convertible Preferred Stock, $0.0001 par value per share (collectively, the Series A Preferred Stock and the Series A-1 Preferred Stock are referred to herein as the "**Preferred Stock**"), as described below in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the respective representations and warranties, covenants and agreements contained herein, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

1.1 <u>Certain Definitions</u>.

(a) When used in this Agreement, the following terms will have the meanings assigned to them in this Section 1.1(a) and other defined terms will have the meanings given to them elsewhere in this Agreement:

"**1 Stop Lease**" means the lease by and between 1 Stop and Landlord in the form attached hereto as **Exhibit F-1**.

"**A. Fouerti Employment Agreement**" means the employment agreement between Albert Fouerti and Buyer substantially in the form attached hereto as **Exhibit G-1**.

"**Accounts Receivable**" means accounts receivable, trade receivables, and other similar receivables, and any security, claim, remedy, or other right related to any of the foregoing, in each case relating to or arising out of the business of the Companies.

"**Action**" means any claim, action, suit, inquiry, hearing, proceeding or other investigation.

"**Affiliate**" means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means possession of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of stock, membership interests or other equity interests, as trustee or executor, by Contract or otherwise.

A-1

"**Ancillary Agreements**" means the Voting Agreement, the Lock-Up Agreement and any other contracts or agreements entered into among the parties to this Agreement in connection with the Acquisition or the other transactions contemplated hereby.

"**Benefit Plan**" means any "employee benefit plan" as defined in ERISA Section 3(3), including any (i) nonqualified deferred compensation or retirement plan or arrangement which is an Employee Pension Benefit Plan (as defined in ERISA Section 3(2)), (ii) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan, (iii) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan (as defined in ERISA Section 3(37)), (iv) Employee Welfare Benefit Plan (as defined in ERISA Section 3(1)) or material fringe benefit plan or program, or (v) stock purchase, stock option, severance pay, change-in-control, vacation pay, company award, salary continuation, sick leave, excess benefit, bonus or other incentive compensation, life insurance, or other employee benefit plan, contract, program, policy or other arrangement, whether or not subject to ERISA, under which any present or former employee of the Companies has any present or future right to benefits sponsored or maintained by the Companies or any ERISA Affiliate.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which banks located in New York, New York are authorized or required by Law to close.

"**Closing Transaction Expenses Certificate**" means a certificate delivered by the Sellers stating (i) the identity of any Person to whom payment of Transaction Expenses shall be made, (ii) the amount of the Transaction Expenses payable to such Person, and (iii) wire transfer information for such Person.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means the Mutual Confidentiality Agreement dated as of August 13, 2020 by and between Parent and 1 Stop.

"**Contract**" means any written agreement, contract, commitment, arrangement or understanding.

"**E. Fouerti Employment Agreement**" means the employment agreement between Albert Fouerti and Buyer substantially in the form attached hereto as **Exhibit G-2**.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person who is, or at any time was, a member of a "controlled group of corporations" within the meaning of Section 414(b) or (c) of the Code and, for the purpose of Section 302 of ERISA and/or Section 412, 4971, 4977, 4980D, 4980E and/or each "applicable section" under Section 414(f)(2) of the Code, within the meaning of Section 412(n)(6) of the Code that includes, or at any time included, the Companies or any Affiliate thereof, or any predecessor of any of the foregoing.

"**GAAP**" means United States generally accepted accounting principles as in effect on the date hereof.

"**Gold Coast Lease**" means the lease by and between Gold Coast and Landlord in the form attached hereto as **Exhibit F-2**.

"**Governmental Entity**" means any entity or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to

United States federal, state or local government or foreign, international, multinational or other government, including any department, commission, board, agency, bureau, official or other regulatory, administrative or judicial authority thereof.

"**HSR Act**" means the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended.

"**Indebtedness**" means (a) all obligations of the Companies or any of their subsidiaries for borrowed money; (b) all obligations of the Companies or any of their subsidiaries evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of others for borrowed money secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property owned or acquired by any Company, whether or not the obligation secured thereby has been assumed; (d) all guarantees by the Companies or any of their subsidiaries of obligations of others for borrowed money; and (e) all obligations, contingent or otherwise, of the Companies or any of their subsidiaries as an account party in respect of letters of credit and letters of guaranty.

A-2

"**Intellectual Property**" means all intellectual property and other similar proprietary rights in any jurisdiction worldwide, whether registered or unregistered, including such rights in and to: (i) patents (including all reissues, divisions, provisionals, continuations and continuations-in-part, re-examinations, renewals and extensions thereof), patent applications, patent disclosures or other patent rights; (ii) copyrights, design, design registration, and all registrations, applications for registration, and renewals for any of the foregoing, and any "moral" rights; (iii) trademarks, service marks, trade names, business names, logos, trade dress, certification marks and other indicia of commercial source or origin together with all goodwill associated with the foregoing, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets and business, technical and know-how information, databases, data collections and other confidential and proprietary information and all rights therein; (v) software, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other software-related specifications and documentation; and (vi) Internet domain name registrations.

"**Inventory**" means all inventories of raw materials, supplies, work-in-process, finished goods, and other materials used in or held for use in the business of the Companies or any of their subsidiaries.

"**IRS**" means the Internal Revenue Service.

"**Joe's Appliances Lease**" means the lease by and between Joe's Appliances and Landlord in the form attached hereto as **Exhibit F-3**.

"**Knowledge**" or any similar phrase means (a) with respect to the Sellers, the actual knowledge of each Seller; and (b) with respect to Parent or Buyer, the actual knowledge of the individuals set forth in Section 1.1(a) of the Disclosure Schedule.

"**Landlord**" means 1870 Bath Ave. LLC, a New York limited liability company.

"**Law**" means any statute, law, ordinance, rule or regulation of any Governmental Entity.

"**Liability**" means all Indebtedness, obligations and other liabilities and contingencies of a Person, whether absolute, accrued, contingent, fixed or otherwise, or whether due or to become due.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, hypothecation or other encumbrance in respect of such property or asset.

"**Material Adverse Effect**" means any state of facts, change, development, event, effect, condition, occurrence, action or omission that, individually or in the aggregate, is reasonably expected to result in a material adverse effect on the business, assets, properties, financial condition, results of operations of the Companies and their Subsidiaries, taken as a whole, or that prevents, materially impedes or materially delays the consummation by the Sellers and the Companies of the Acquisition and the other transactions contemplated by this Agreement; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Companies operate; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Parent or Buyer; (vi) any matter of which Parent or Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with any Company; (ix) any natural or man-made disaster or acts of God; or (x) any failure by any Company to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded).

"**Net Working Capital**" means (i) Accounts Receivable; plus (ii) Inventory; plus (iii) prepaid expenses and other current assets that have an economic benefit to the Companies post-Closing; less (iv) current accounts payable, accrued liabilities and outstanding checks and other current liabilities as of the Closing Date, which shall be prepared in accordance with Section 2.2(a) and as finally determined pursuant to Section 2.2(c); provided, however that the calculation of Net Working Capital shall not include cash or cash equivalents, or any items otherwise included in the definitions of Indebtedness or Transaction Expenses.

A-3

"**Order**" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by or with any Governmental Entity of competent jurisdiction.

"**Outside Date**" means ninetieth (90th) day following the date of this Agreement.

"**Permit**" means any authorization, approval, consent, certificate, license, clearance, permit or franchise of or from any Governmental Entity of competent jurisdiction or pursuant to any Law.

"**Permitted Liens**" means (i) Liens for current Taxes that are not yet due and payable or that may hereafter be paid without material penalty or that are being contested in good faith, (ii) statutory Liens of landlords and workers,' carriers' and mechanics' or other like Liens incurred in the ordinary course of business not yet overdue or that are being contested in good faith, (iii) Liens, easements, servitudes, covenants, conditions, restrictions, encroachments and other similar non-monetary matters affecting title to any assets of the Companies or any of their Subsidiaries and other title defects which do not materially interfere with the present or proposed use of the properties by the Companies or their Subsidiaries or assets they affect taken as a whole, (iv) zoning, building codes, and other land use Laws regulating the use or occupancy of leased real property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such leased real property and which are not violated in any material respect by the current use and operation of such leased real property or the operation of the business of the Company (v) Liens that will be released prior to or as of the Closing, (vi) Liens arising under this Agreement, (vii) Liens created by or through the Buyer, or (viii) Liens that, individually or in the aggregate, do not materially interfere with the ability of the Companies to conduct their business as currently conducted and do not materially adversely affect the value of, or the ability to sell, such personal properties and assets.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental

Entity or any agency, instrumentality or political subdivision of a Governmental Entity, or any other entity or body.

"**Pro Rata Basis**" means, for each Seller the pro rata basis percentage specified in the last column of **Exhibit A** to this Agreement.

"**Pro Rata Cash Basis**" means, for each Seller the pro rata basis percentage specified in the fourth column of **Exhibit A** to this Agreement.

"**Pro Rata Share Basis**" means, for each Seller the pro rata basis percentage specified in the penultimate column of **Exhibit A** to this Agreement.

"**Representatives**" means, with respect to any Person, the respective directors, officers, employees, counsel, accountants and other representatives of such Person.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other Subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of a non-corporate Person.

"**Target Net Working Capital**" means negative Fifteen Million Four Hundred Seventy Six Thousand Nine Hundred Forty One and 38/100 Dollars (-$15,476,941.38), which is the average monthly Net Working Capital for the seven-month period ending July 31, 2020. The calculation of the Target Net Working Capital as agreed upon by the parties hereto is set forth on **Exhibit B** attached hereto (the "**Target Net Working Capital Statement**").

"**Taxes**" means all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, transfer, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, in each case, imposed by any Taxing Authority.

"**Taxing Authority**" means any Governmental Entity having or purporting to exercise jurisdiction with respect to any Tax.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, filed or required to be filed with any Taxing Authority.

A-4

"**Trailing 20 Day Trading Price**" means the average of the closing price of the shares of Parent's Common Stock (as reported on the NYSE American) for the twenty (20) Trading Days immediately preceding the third (3rd) Trading Day prior to the Closing Date.

"**Trading Day**" means (i) any day on which the Common Stock of the Parent is listed and traded on the NYSE American, (ii) if the Common Stock is not then listed and traded on NYSE American, then a day on which trading occurs on any over-the-counter markets, or (iii) if trading does not occur on the over-the-counter markets, any Business Day.

"**Transaction Expenses**" means, to the extent not paid by the Companies or its Subsidiaries before the Closing, the amount of all fees, costs and expenses (including legal, accounting, investment banking, broker's, finder's and other professional or advisory fees and expenses) of the Companies and its Subsidiaries incurred by or on behalf of, or to be paid by, the Companies or any Subsidiary in connection with the negotiation and execution of this Agreement and the other transaction documents and the consummation of the Acquisition.

"**Transaction Proposal**" means any written bona fide proposal made by a third party relating to (i) any direct or indirect acquisition or purchase of all or substantially all of the assets of the Companies or any of their Subsidiaries, (ii) any direct or indirect acquisition or purchase of a majority of the combined voting power of the Securities or any equity securities of any of their Subsidiaries, or (iii) any merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Companies in which the other party thereto or its stockholders will own 51% or more of the combined voting power of the parent entity resulting from any such transaction.

"**$**" means United States dollars.

(b) For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) the meaning assigned to each term defined herein will be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting any gender will include all genders as the context requires; (ii) where a word or phrase is defined herein, each of its other grammatical forms will have a corresponding meaning; (iii) the terms "hereof", "herein", "hereunder", "hereby" and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement; (iv) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule without reference to a document, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement; (v) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule will also apply to paragraphs and other subdivisions; (vi) the word "include", "includes" or "including" when used in this Agreement will be deemed to include the words "without limitation", unless otherwise specified; (vii) a reference to any party to this Agreement or any other agreement or document will include such party's predecessors, successors and permitted assigns; (viii) a reference to any Law means such Law as amended, modified, codified, replaced or reenacted as of the date hereof, and all rules and regulations promulgated thereunder as of the date hereof; and (ix) the term "as of the Closing" or "as of the Closing Date" when used to calculate financial amounts in this Agreement will be as of 11:59 p.m. local time on the Closing Date.

ARTICLE II
PURCHASE AND SALE OF THE SECURITIES

2.1 Purchase and Sale of the Securities.

(a) Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, each Seller will contribute, sell, transfer and deliver to the Buyer, and the Buyer will purchase and receive from each Seller all the Securities set forth opposite such Seller's name on **Exhibit A**, constituting all of the issued and outstanding Securities of the Companies, for an aggregate purchase price of Two Hundred Ten Million Dollars ($210,000,000), consisting of: (a) One Hundred Sixty Eight Million Dollars ($168,000,000) in cash in immediately available funds (the "**Cash Portion**"), (b) One Million Two Hundred Twenty Two Thousand Two Hundred Thirty Nine (1,222,239) shares of newly-issued Common Stock of the Parent and One Million One Hundred Eleven Thousand Ninety Four (1,111,094) shares of newly-issued Series A Preferred Stock of Parent (collectively, the "**Fixed Share Consideration**"), collectively, having a stated value that is equal to Twenty One Million Dollars ($21,000,000) or Nine Dollars ($9.00) per share of Common Stock or Series A Preferred Stock, as applicable (c) a number of shares of Series A-1 Preferred Stock of Parent that is equal to (i) Twenty One Million Dollars ($21,000,000) divided by (ii) Trailing 20 Day Price (the "**Variable Share Consideration**" and, collectively with the Cash Portion and the Fixed Share Consideration, the "**Purchase Price**"), payable as described below and allocated among the Sellers as set forth on **Exhibit A**.

A-5

(b) Upon executing this Agreement, Buyer shall pay a deposit of One Hundred Thousand Dollars ($100,000) in cash to 1 Stop (the "**Deposit**") by wire transfer of immediately available funds to the account designated by 1 Stop on Schedule 2.1(b) of the Disclosure Schedule.

(c) At the Closing, the Buyer will deliver to Sellers the Cash Portion (subject to any adjustment pursuant to Sections 2.2 and 2.3 hereof) minus the Deposit in immediately available funds to the accounts designated by the Sellers prior to the Closing to be divided among the Sellers on a Pro Rata Cash Basis.

(d) At the Closing, the Parent will issue to each of the Sellers the number of shares of Common Stock and Series A Preferred Stock comprising the Fixed Share Consideration as is specified opposite such Seller's name on **Exhibit A** to this Agreement.

(e) At the Closing, the Parent will issue to each Seller the relative percentages of the Variable Share Consideration as is specified opposite such Seller's name on **Exhibit A** to this Agreement.

(f) In order to comply with NYSE American regulations, the Parties have limited the number of shares of Common Stock of the Parent being issued to the Sellers to One Million Two Hundred Twenty Two Thousand Two Hundred Thirty Nine (1,222,239), which is 19.9% of the issued and outstanding Common Stock of the Parent on the date of this Agreement. To the extent that, at the Closing, for any reason, the Common Stock included in the Fixed Share Consideration would be in excess of 19.9%, then an adjustment will be made to reduce the number of shares of Common Stock included in the Fixed Share Consideration such that only 19.9% of the Fixed Share Consideration shall be comprised of Common Stock and to increase, by an equal number of shares, the number of shares of Series A Preferred Stock included in the Fixed Share Consideration. The Sellers agree that they shall be prohibited from exercising their right to vote the Common Stock included in the Fixed Share Consideration in connection with the approval by the stockholders of the Parent to approve the Acquisition or any matters relating thereto and that the Series A Preferred Stock included in the Fixed Share Consideration shall not have any voting rights.

(g) The Series A Preferred Stock and the Series A-1 Preferred Stock shall be identical, except that the Series A Preferred Stock shall have a stated value of $9.00 per share and the Series A-1 Preferred Stock shall have a stated value equal to the Trailing 20 Day Price and each series of preferred stock shall otherwise have the powers, preferences and relative, participating, optional or other rights, and the qualifications, limitations and restrictions as are set forth in the forms of Certificate of Designation of the Preferred Stock which shall be in the form of **Exhibit C** to this Agreement (the "**Certificate of Designations**").

2.2 Working Capital Adjustment.

(a) Closing Net Working Capital Adjustment.

At least one (1) Business Day before the Closing, the Sellers shall deliver to the Buyer a statement setting forth its good faith estimate of the Net Working Capital of the Companies (the "**Estimated Closing Net Working Capital**"), which statement shall contain an estimated unaudited combined balance sheet of the Companies (the "**Adjustment Balance Sheet**") as of the Closing Date, a calculation of the Estimated Closing Net Working Capital (the "**Estimated Closing Net Working Capital Statement**"), and a certificate of the Sellers stating that the Adjustment Balance Sheet and the Estimated Closing Net Working Capital was prepared in accordance with GAAP applied on a consistent basis with the preparation of the Target Net Working Capital Statement.

If the Estimated Closing Net Working Capital exceeds the Target Net Working Capital, then within five (5) days the Buyer shall make a cash payment to the Sellers that is equal to such excess and such payment will be divided among the Sellers on a Pro Rata Cash Basis. If the Target Net Working Capital exceeds the Estimated Closing Net Working Capital, then either (i) if finally determined at the Closing, the Cash Portion shall be decreased by such excess and such decreased amount shall be divided among the Sellers on a Pro Rata Cash Basis or (ii) within five (5) days of the Closing, the Sellers shall make a cash payment to the Buyer on a Pro Rata Cash Basis that is equal to such excess. Any such adjustment shall be treated as an adjustment to the Purchase Price.

The Buyer and the Parent shall be entitled to have access to the books and records of the Companies and the Sellers' work papers prepared in connection with the Adjustment Balance Sheet and Estimated Closing Net Working Capital Statement and shall be entitled to discuss such books and records and work papers with the Sellers and those other persons responsible for the preparation thereof.

A-6

(b) Post-Closing Net Working Capital Adjustment.

Within seventy five (75) days after the Closing Date, Buyer shall prepare and deliver to the Sellers a statement setting forth its calculation of Net Working Capital (the "**Closing Net Working Capital**"), which statement shall contain an unaudited combined balance sheet of the Companies as of the Closing Date, a calculation of Net Working Capital (the "**Closing Net Working Capital Statement**") and a certificate of the Chief Financial Officer of Buyer that the Closing Net Working Capital Statement was prepared in accordance with GAAP applied on a consistent basis with the preparation of the Target Net Working Capital Statement.

The "**Post-Closing Net Working Capital Adjustment**" shall be an amount equal to the Closing Net Working Capital minus the Estimated Closing Net Working Capital.

(c) Examination and Review.

(i) Examination. After receipt of the Closing Net Working Capital Statement, the Sellers shall have thirty (30) days (the "**Review Period**") to review the Closing Net Working Capital Statement. During the Review Period, the Sellers and their accountants shall have full access to the books and records of the Companies, the personnel of, and work papers prepared by, the Buyer and/or its accountants to the extent that they relate to the Closing Net Working Capital Statement and to such historical financial information (to the extent in the Buyer's possession) relating to the Closing Net Working Capital Statement as the Sellers may reasonably request for the purpose of reviewing the Closing Net Working Capital Statement and to prepare a Statement of Objections (defined below); *provided,* that such access shall be in a manner that does not interfere with the normal business operations of the Buyer or the Companies.

(ii) Objection. On or prior to the last day of the Review Period, the Sellers may object to the Closing Net Working Capital Statement by delivering to the Buyer a written statement setting forth their objections in reasonable detail, indicating each disputed item or amount and the basis for its disagreement therewith (the "**Statement of Objections**"). If the Sellers fail to deliver the Statement of Objections before the expiration of the Review Period, the Closing Net Working Capital Statement and the Post-Closing Net Working Capital Adjustment, as the case may be, reflected in the Closing Net Working Capital Statement shall be deemed to have been accepted by the Sellers. If the Sellers deliver the Statement of Objections before the expiration of the Review Period, the Buyer and the Sellers shall negotiate in good faith to resolve such objections within thirty (30) days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period, the Post-Closing Net Working Capital Adjustment and the Closing Net Working Capital Statement with such changes as may have been previously agreed in writing by the Buyer and the Sellers shall be final and binding.

(iii) Resolution of Disputes. If the Sellers and the Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**") and any amounts not so disputed, the "**Undisputed Amounts**") shall be submitted for resolution to the office of an impartial nationally recognized firm of independent certified public accountants mutually chosen by the Sellers and the Buyer (the "**Independent Accountant**") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Net Working Capital Adjustment and the Closing Net Working Capital Statement, as the case may be. The parties hereto agree that all adjustments shall be made without regard to materiality. The Independent Accountant shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Net Working Capital Statement and the Statement of Objections, respectively.

(iv) Fees of the Independent Accountant. The fees and expenses of the Independent Accountant shall be paid by the Sellers, on the one hand, and by the Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to the Sellers or the Buyer, respectively, bears to the aggregate amount actually contested by the Sellers and the Buyer. Any such fees and expenses payable by the Sellers

shall be split on a Pro Rata Basis amongst the Sellers.

(v) <u>Determination by Independent Accountant.</u> The Independent Accountant shall make a determination as soon as practicable within thirty (30) days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Net Working Capital Statement and/or the Post-Closing Net Working Capital Adjustment, as the case may be, shall be conclusive and binding upon the parties hereto.

A-7

(d) <u>Payment of Post-Closing Net Working Capital Adjustment</u>.

(i) If the Post-Closing Net Working Capital Adjustment is a negative number, then within five (5) days the Sellers shall pay to the Buyer in cash an amount equal to the Post-Closing Net Working Capital Adjustment divided among the Sellers on a Pro Rata Cash Basis.

(ii) If the Post-Closing Net Working Capital Adjustment is a positive number, the Buyer shall, within five (5) days after the final determination of the Post-Closing Net Working Capital Adjustment, send payment by wire transfer of immediately available funds to the Sellers in an amount equal to the Post-Closing Net Working Capital Adjustment divided among the Sellers on a Pro Rata Cash Basis.

2.3 <u>Adjustment for Outstanding Indebtedness, Transaction Expenses and Cash</u>. The Cash Portion shall be (A) decreased by (i) the amount of any outstanding unpaid Indebtedness of the Companies (other than trade debt) existing as of the Closing Date and (ii) any Transaction Expenses, and (B) increased by the amount of cash or cash equivalents held by, or on the books of, the Companies as of the Closing Date, if any, that is in excess of $850,000.

2.4 <u>Closing</u>. The consummation of the Acquisition and the other transactions contemplated hereby (the "**Closing**") will take place by the reciprocal delivery of closing documents by electronic mail, regular mail, fax or any other means mutually agreed upon by the parties and the electronic transfer of funds on the second (2nd) business day immediately following the satisfaction or waiver of conditions to closing contained in Article VII of this Agreement (other than any conditions that by their nature are to be satisfied at the Closing), but not later than the Outside Date or such other date as the Buyer and the Sellers may mutually determine (the date on which the Closing actually occurs is referred to as the "**Closing Date**").

2.5 <u>Transactions to be Effected at the Closing</u>.

(a) At the Closing, the Buyer or the Parent, as applicable, will (i) pay to each Seller such Seller's Cash Portion of the Purchase Price on a Pro Rata Cash Basis, adjusted in accordance with Sections 2.2 and 2.3 of this Agreement, by paying such sum to each Seller by transfer of immediately available funds in accordance with instructions provided by the Sellers, (ii) issue to each Seller on a Pro Rata Share Basis such Seller's share of the Fixed Share Consideration and the Variable Share Consideration, (iii) pay, via wire transfer of immediately available funds, any Transaction Expenses reflected in the Closing Transaction Expenses Certificate to be delivered by the Companies to Buyer within one (1) day of the Closing and (iv) deliver to the Sellers all other documents, instruments or certificates required to be delivered by the Buyer at or prior to the Closing pursuant to Section 7.2 of this Agreement.

(b) At the Closing, each Seller will (i) deliver to the Buyer a certificate or certificates representing the Securities, if certificated, duly endorsed or accompanied by stock powers, duly endorsed in blank and (ii) deliver to the Buyer all other documents, instruments or certificates required to be delivered by the Sellers at or prior to the Closing pursuant to Section 7.1 of this Agreement.

ARTICLE III<br>REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each of the Sellers, severally, but not jointly, represents and warrants to the Buyer that each statement contained in this Article III is true and correct as of the date hereof.

3.1 <u>Authority and Enforceability</u>. Each Seller has the requisite power and authority, and, in the case of any Seller that is an individual, the requisite legal capacity, to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the Acquisition and the other transactions contemplated hereby. The execution, delivery and performance by each Seller of this Agreement and the consummation by each Seller of the Acquisition and the other transactions contemplated hereby have been duly authorized by all necessary action on the part of each Seller and no other action is necessary on the part of such Seller to authorize this Agreement or to consummate the Acquisition or the other transactions contemplated hereby. This Agreement has been duly executed and delivered by the Seller and, assuming the due authorization, execution and delivery by each other party hereto, constitutes a legal, valid and binding obligation of the Seller, enforceable against each Seller in accordance with its terms, except as limited by (a) bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws relating to creditors' rights generally and (b) general principles of equity, whether such enforceability is considered in a proceeding in equity or at Law.

A-8

3.2 <u>Noncontravention</u>.

(a) Neither the execution and the delivery of this Agreement nor the consummation of the Acquisition or the other transactions contemplated by this Agreement, will, with or without the giving of notice or the lapse of time or both, (i) to the actual knowledge of each Seller, violate any Law applicable to such Seller or (ii) violate any Contract related to the Companies to which such Seller is a party, except in the case of clauses (i) and (ii) to the extent that any such violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the assets, properties, condition (financial or otherwise), or operations of such Seller.

(b) The execution and delivery of this Agreement by each Seller does not, and the performance of this Agreement by each Seller will not, require any consent, approval, authorization or Permit of, or filing with or notification to, any Governmental Entity, except for filings under the HSR Act and except where the failure to take such action would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the assets, properties, condition (financial or otherwise), or operations of each Seller.

3.3 <u>The Securities</u>.

(a) Each Seller holds of record and owns beneficially the issued and outstanding Securities of the Companies set forth opposite such Seller's name on **Exhibit A**, free and clear of all Liens (except for Permitted Liens and any restriction on transfer arising under applicable securities Laws). The Securities set forth opposite each Seller's name on **Exhibit A** correctly sets forth all Securities owned of record or beneficially by such Seller in the Companies.

(b) No Seller is a party to any Contract obligating such Seller to vote or dispose of any Securities, or other equity or voting interests in, the Companies.

(c) Each Seller has the full right to sell, convey, transfer, assign and deliver the Securities, without the need to obtain the consent or approval of any third party and the Buyer will have, good and valid record and title to the Securities, free and clear of all Liens (except in each case for any restriction on transfer arising under applicable securities Laws).

3.4 <u>Brokers' Fees</u>. The Sellers do not have any other Liability to pay any fees or commissions to any broker, finder or agent with respect to this Agreement, the Acquisition or the transactions contemplated by this Agreement.

3.5 <u>Investment Representations</u>.

(a) The shares of Common Stock and Preferred Stock of Parent that constitute the Fixed Share Consideration and the Variable Share Consideration are being acquired by the Sellers for the Sellers' own account, for investment purposes and not with a view to the sale or distribution of all or any part of the Common Stock or Preferred Stock, nor with any present intention to sell or in any way distribute the same, as those terms are used in the Securities Act, and the rules and regulations promulgated thereunder.

(b) Each of the Sellers has sufficient knowledge and experience in financial matters so as to be capable of evaluating the merits and risks of acquiring the Common Stock and the Preferred Stock.

(c) Each of the Sellers has reviewed copies of such documents and other information as such Seller has deemed necessary in order to make an informed investment decision with respect to its acquisition of the Common Stock and the Preferred Stock.

(d) Each of the Sellers understands that the Common Stock and the Preferred Stock may not be sold, transferred or otherwise disposed of without registration under the Securities Act or the availability of an exemption therefrom, and that in the absence of an effective registration statement covering the Common Stock and the Preferred Stock or an available exemption from registration under the Securities Act, the Common Stock and the Preferred Stock must be held indefinitely.

(e) Each of the Sellers understands and has the financial capability of assuming the economic risk of an investment in the Common Stock and the Preferred Stock for an indefinite period of time.

(f) Each of the Sellers has been advised by the Parent that the undersigned will not be able to dispose of the Common Stock and the Preferred Stock, or any interest therein, without first complying with the relevant provisions of the Securities Act and any applicable state securities laws.

A-9

(g) Each of the Sellers understands that the provisions of Rule 144 promulgated under the Securities Act, permitting the routine sales of the securities of certain issuers subject to the terms and conditions thereof, are not currently, and may not hereafter be, available with respect to the Common Stock and the Preferred Stock.

(h) Each of the Sellers is an "Accredited Investor" as defined in rule 501 (a) of Regulation D of the Act.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANIES

Each of the Sellers, severally, but not jointly, represents and warrants to the Buyer that each statement contained in this Article IV is true and correct as of the date hereof, except as set forth in the schedule accompanying this Agreement (the "**Disclosure Schedule**") corresponding to the applicable sections of this Article IV. Each section of the Disclosure Schedule will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedule. Any representation or warranty concerning the Companies shall be deemed to be a representation concerning the Companies and their Subsidiaries, if any, as a whole unless the context specifically requires otherwise.

4.1 Organization; Standing and Power; Authority and Enforceability.

(a) Each Company and each of its Subsidiaries is a corporation, limited liability company or other legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize the concept of good standing) under the Laws of its jurisdiction of organization, and has the requisite corporate, limited liability company or other organizational, as applicable, power and authority to own, lease and operate its assets and to carry on its business as now conducted. Each Company and its Subsidiaries is duly qualified or licensed to do business as a foreign corporation, limited liability company or other legal entity and is in good standing (with respect to jurisdictions that recognize the concept of good standing) in each jurisdiction where the character of the assets and properties owned, leased or operated by it or the nature of its business makes such qualification or license necessary, except where the failure to be so qualified or licensed or to be in good standing, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) The Companies have the requisite power and authority to execute and deliver this Agreement, to perform their respective obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by the Companies of this Agreement and the consummation by the Companies of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Companies, and no other action is necessary on the part of the Companies to authorize this Agreement or to consummate the Acquisition or the other transactions contemplated hereby. This Agreement has been duly executed and delivered by the Companies and, assuming the due authorization, execution and delivery by each other party hereto, constitutes a legal, valid and binding obligation of the Companies, enforceable against the Companies in accordance with its terms, except as limited by (i) bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws relating to creditors' rights generally and (ii) general principles of equity, whether such enforceability is considered in a proceeding in equity or at Law.

4.2 No Subsidiaries. The Companies do not own or have any interest in any shares or have an ownership interest in any other Person.

4.3 Capitalization.

(a) Section 4.3 of the Disclosure Schedule sets forth the authorized, issued and outstanding Securities of the Companies.

(b) The Companies have no plans or agreements pursuant to which they have granted or committed to grant any option or right to acquire stock or membership interests or any other award payable in or based upon the stock or membership interests of the Companies. There are no outstanding options, warrants or other securities or subscription, preemptive or other rights convertible into or exchangeable or exercisable for any stock or membership interests or other equity or voting interests of the Companies and there are no "phantom interest" rights, interest appreciation rights or other similar rights with respect to the Companies. There are no Contracts of any kind to which the Companies are a party or by which the Companies are bound, obligating the Companies to issue, deliver, grant or sell, or cause to be issued, delivered, granted or sold, additional stock or membership interests, or other equity or voting interests in, or options, warrants or other securities or subscription, preemptive or other rights convertible into, or exchangeable or exercisable for, stock or membership interests, or other equity or voting interests in, the Companies, or any "phantom interests" right, interest appreciation right or other similar right with respect to the Companies, or obligating the Companies to enter into any such Contract.

A-10

(c) There are no securities or other instruments or obligations of the Companies, the value of which is in any way based upon or derived from any equity or voting interests of the Companies or having the right to vote (or convertible into, or exchangeable or exercisable for, securities having the right to vote) on any matters on which any of the Companies' members may vote.

(d) There are no Contracts, contingent or otherwise, obligating the Companies to repurchase, redeem or otherwise acquire any stock or membership interests of, or other equity or voting interests in, the Companies. There are no voting trusts, registration rights agreements or stockholder or member agreements to which the Companies are a party with respect to the voting of stock or membership interests in the Companies or with respect to the granting of registration rights for any of the stock or membership interests in the Companies. There are no rights plans affecting the Companies.

(e) Except as set forth in Section 4.3 of the Disclosure Schedule, the Companies have no outstanding Indebtedness.

4.4 Noncontravention.

(a) Neither the execution and delivery of this Agreement nor the consummation of the Acquisition and the other transactions contemplated by this Agreement will (i) violate any provision of the articles of incorporation or bylaws (or comparable organization documents, as applicable) of the Companies, (ii) to the Knowledge of the Sellers and assuming compliance with the filing and notice requirements set forth in Section 4.4(b)(i), violate any Law applicable to the Companies on the date hereof or (iii) violate any Contract to which the Companies are a party, except in the case of clauses (ii) and (iii) to the extent that any such violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) The execution and delivery of this Agreement by the Companies does not, and the performance of this Agreement by the Companies will not, require any consent, approval, authorization or Permit of, or filing with or notification to, any Governmental Entity, except for (i) the filings set forth in Section 4.4 of the Disclosure Schedule, (iii) filings under the HSR Act, or (ii) where the failure to take such action would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.5 Financial Statements. Section 4.5 of the Disclosure Schedule contains true and complete copies of (i) the unaudited balance sheet of each of the Companies as of December 31, 2019 and December 31, 2018 and the related unaudited statements of income, stockholders' equity and cash flows for the two years ended December 31, 2019 and December 31, 2018 (the "**Annual Financial Statements**") and (ii) the unaudited balance sheet of each of the Companies as of August 31, 2020 and the related statements of income, stockholders' equity and cash flows for the eight-month period ended August 31, 2020 (the "**Interim Financial Statements**" and, together with the Annual Financial Statements, the "**Financial Statements**"). The Financial Statements have been prepared from the Companies' books and records in accordance with the Companies' historical accounting practices applied on a consistent basis throughout the periods indicated. The Financial Statements fairly present, in all material respects, the financial condition and results of operations of the Companies as of the indicated dates and for the indicated periods (subject to normal year-end adjustments and the absence of notes).

4.6 Taxes. Except as set forth in Section 4.6 of the Disclosure Schedule:

(a) All material Tax Returns required to have been filed by each of the Companies have been filed, and each such Tax Return reflects the liability for Taxes due for the relevant period in all material respects. All Taxes shown as due on such Tax Returns, to the extent payable by the Company filing the Tax return, have been paid or accrued.

(b) To the Knowledge of the Sellers, there is no audit pending against any of the Companies in respect of any Taxes. There are no Liens on any of the assets of any of the Companies that arose in connection with any failure (or alleged failure) to pay any Tax, other than Liens for Taxes.

(c) Each of the Companies has withheld and paid (or is holding for imminent payment on the next relevant due date) all Taxes required to have been withheld and paid in connection with amounts paid to any third party.

(d) None of the Companies has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to payment or collection of any Tax assessment or deficiency.

(e) None of the Companies is a party to any Tax allocation, Tax sharing or similar agreement.

A-11

Except for certain representations related to Taxes in Section 4.15, the representations and warranties set forth in this Section 4.6 are the Sellers' sole and exclusive representations and warranties regarding Tax matters.

4.7 Compliance with Laws and Orders; Permits.

(a) To the Knowledge of the Sellers, the Companies are in compliance with all Laws and Orders to which the businesses of the Companies are subject, except where such failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) The Companies own, hold, possess or lawfully use in the operation of their businesses all Permits that are necessary for them to conduct their businesses as now conducted, except where such failure to own, hold, possess or lawfully use such Permit would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.8 No Undisclosed Liabilities. The Companies do not have any Liabilities, except for (a) Liabilities set forth in the Interim Financial Statements and (b) Liabilities which have arisen since the date of the Interim Financial Statements in the ordinary course of business, (c) Liabilities arising in connection with the Acquisition or the transactions contemplated thereby, (d) Liabilities to be included in the computation of Indebtedness or Transaction Expenses as of the Closing, (e) Liabilities to be included in the computation of Net Working Capital, (f) Liabilities disclosed on another section of the Disclosure Schedules, (g) Liabilities incidental to the existence of the Company and its Subsidiaries, and (h) other Liabilities which would not, individually or in the aggregate, be expected to have a Material Adverse Effect to the Companies and their Subsidiaries taken as a whole.

4.9 Tangible Personal Assets.

(a) Except as set forth in Section 4.9 of the Disclosure Schedule, the Companies have good title to, or a valid interest in, all of their tangible personal assets, free and clear of all Liens, except for Permitted Liens.

(b) The Companies' tangible personal assets are in operating condition and working order and repair, when taken as a whole, subject to ordinary wear and tear and repairs from time to time in the ordinary course of business and are suitable for the purposes for which they are currently being used.

4.10 Real Property. The Companies do not own any real property. Section 4.10 of the Disclosure Schedule contains a list of all leases and subleases (collectively, the "**Real Property Leases**") under which the Companies are either lessor or lessee. The Sellers have made available to the Buyer true and complete copies of each Real Property Lease. To the Knowledge of the Sellers, (a) all Real Property Leases are valid and binding Contracts of the Companies and are in full force and effect (except for those that have terminated or will terminate by their own terms), and (b) neither the Companies nor, to the Knowledge of the Sellers, any other party thereto is in violation or breach of or default (or with notice or lapse of time, or both, would be in violation or breach of or default) under the terms of any Real Property Lease, in each case, except where such default would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.11 Intellectual Property.

(a) Section 4.11 of the Disclosure Schedule sets forth a list that includes all material Intellectual Property owned by the Companies that is registered or subject to an application for registration at the United States Patent and Trademark Office, foreign patent and trademark office, or the United States Copyright Office (the "**Company-Owned Intellectual Property**") (including the jurisdictions where such Company-Owned Intellectual Property is registered or where applications have been filed, and all registration or application numbers, as appropriate).

(b) All necessary registration, maintenance and renewal fees have been paid and all necessary documents have been filed with the United States Patent and Trademark Office or foreign patent and trademark office in the relevant foreign jurisdiction for the purposes of maintaining the registered Company-Owned Intellectual Property.

(c) Except as set forth in Section 4.11 of the Disclosure Schedule, (i) the Companies are the exclusive owners of the Company-Owned Intellectual Property free and clear of all Liens (other than Permitted Liens); (ii) to the Knowledge of the Sellers, no proceedings have been instituted, are pending or are threatened that challenge the rights of the Companies in or the validity or enforceability of the Company-Owned Intellectual

Property; (iii) to the Knowledge of the Sellers, neither the use of the Company-Owned Intellectual Property as currently used by the Companies in the conduct of the Companies' businesses, nor the conduct of the businesses as presently conducted by the Companies infringes, dilutes, misappropriates or otherwise violates in any material respect the Intellectual Property rights of any Person; and (iv) as of the date of this Agreement, the Companies have not made any claim of a violation, infringement, misuse or misappropriation by any Person, of their rights to, or in connection with, the Company-Owned Intellectual Property.

A-12

(d) Except as set forth in Schedule 4.11 of the Disclosure Schedule, the Companies have not permitted or granted a license to any Person to use any Company-Owned Intellectual Property.

(e) Section 4.11 of the Disclosure Schedule sets forth a complete and accurate list of all licenses, other than "off the shelf" commercially available software programs, pursuant to which the Companies have been granted a license to use Intellectual Property that is material to and used in the conduct of the business by the Companies.

(f) To the Knowledge of the Sellers, the Companies are not in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any Contract pursuant to which any third party is authorized to use any Company-Owned Intellectual Property or pursuant to which the Companies are licensed to use Intellectual Property owned by a third party, except where such default would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.12 Absence of Certain Changes or Events. Except as set forth in Section 4.12 of the Disclosure Schedule, since the date of the Interim Financial Statements, no event has occurred that has had, individually or in the aggregate, a Material Adverse Effect. Without limiting the generality of the foregoing, except as set forth in Section 4.12 of the Disclosure Schedule, since that date:

(a) the Companies have not sold, leased, transferred, or assigned any of their assets, tangible or intangible, other than in the ordinary course of business;

(b) the Companies have not entered into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) either involving more than $100,000 or outside the ordinary course of business;

(c) no party (including the Companies) has accelerated, terminated, modified, or cancelled any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) involving more than $100,000 to which the Companies are a party or by which any of them is bound;

(d) the Companies have not imposed any Liens upon any of its assets, tangible or intangible;

(e) the Companies have not made any capital expenditure (or series of related capital expenditures) either involving more than $100,000 or outside the ordinary course of business;

(f) the Companies have not made any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans, and acquisitions) either involving more than $100,000 or outside the ordinary course of business;

(g) the Companies have not transferred, assigned, or granted any license or sublicense of any rights under or with respect to any Intellectual Property;

(h) there has been no change made or authorized in the articles of incorporation or bylaws (or comparable documents) of the Companies;

(i) the Companies have not issued, sold, or otherwise disposed of any of their stock or membership interests, or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of their stock;

(j) the Companies have not made any loan to, or entered into any other transaction with, any of their directors, officers, and employees outside the ordinary course of business;

(k) the Companies have not entered into any employment contract or modified the terms of any existing such contract or agreement providing for base compensation, severance or change of control payments in excess of $100,000 per annum that is not terminable by the Companies or such Subsidiary upon notice of sixty (60) days or less;

(l) the Companies have not granted any increase in the base compensation of any of its directors, officers, and employees outside the ordinary course of business in an amount greater than $100,000 per annum; and

(m) the Companies have not committed in writing to do any of the foregoing.

A-13

4.13 Contracts.

(a) Except as set forth in Section 4.13 of the Disclosure Schedule, as of the date hereof, the Companies are not a party to or bound by any: (i) Contract not contemplated by this Agreement that materially limits the ability of the Companies to engage or compete in any manner of the businesses presently conducted by the Companies; (ii) Contract that creates a partnership or joint venture or similar arrangement with respect to any material businesses of the Companies; (iii) indenture, credit agreement, loan agreement, security agreement, guarantee, note, mortgage or other evidence of indebtedness or agreement providing for Indebtedness in excess of $50,000; (iv) Contract that relates to the acquisition or disposition of any material business (whether by merger, sale of equity, sale of assets or otherwise) other than this Agreement; or (v) Contract that involves performance of services or delivery of goods or materials by or to the Companies in an amount or with a value in excess of $50,000 in the calendar year 2019.

(b) The Sellers have made available to the Buyer true and complete copies of each of the Contracts set forth in Section 4.13 of the Disclosure Schedule. To the Knowledge of the Sellers, (i) all such Contracts are valid and binding, (ii) all such Contracts are in full force and effect (except for those that have terminated or will terminate by their own terms), and (iii) neither any Company nor any other party thereto, is in violation or breach of or default under (or with notice or lapse of time, or both, would be in violation or breach of or default under) the terms of any such Contract, in each case, except where such default would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.14 Litigation. Section 4.14 of the Disclosure Schedule sets forth each instance in which any of the Companies (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge in which the potential loss to the Companies is valued in excess of $100,000 individually, or in the aggregate or (ii) is a party to, or to the Knowledge of any of the Sellers is threatened to be made a party to, any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, in each case, if determined adversely to the Company (or to Seller or any Affiliate thereof) would result in a loss to the Companies in value in excess of $100,000, individually, or in the aggregate.

4.15 Employee Benefits.

(a) Section 4.15 of the Disclosure Schedule includes a list of all Benefit Plans maintained or contributed to by the Companies or any of their Subsidiaries (the "**Company Benefit Plans**"). To the extent applicable, the Sellers have delivered or made available to the Buyer copies of (i) each Company Benefit Plan, and (ii) the most recent summary plan description for each Company Benefit Plan for which such a summary plan description is required.

(b) Except as set forth in Section 4.15 of the Disclosure Schedule: (i) none of the Company Benefit Plans is subject to Title IV of ERISA; (ii) none of the Company Benefit Plans is intended to be qualified under Section 401(a) of the Code; and (iii) each Company Benefit Plan is in compliance with all applicable provisions of ERISA and the Code, except for instances of noncompliance that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c) Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could reasonably be expected to, either alone or in conjunction with any other event (whether contingent or otherwise), (i) result in any payment or benefit becoming due or payable, or required to be provided, to any current or former director, employee or independent contractor of the Companies (other than any benefits that would otherwise be paid in the ordinary course of business), (ii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such current or former director, employee or independent contractor, or result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation or (iii) result in any amount failing to be deductible by reason of Section 280G of the Code.

4.16 Labor and Employment Matters. Section 4.16 of the Disclosure Schedule sets forth a list of all written employment agreements that obligate the Companies to pay an annual salary of $100,000 or more and to which the Companies are a party. To the Knowledge of the Sellers, there are no pending labor disputes, work stoppages, requests for representation, pickets, work slow-downs due to labor disagreements or any actions or arbitrations that involve the labor or employment relations of the Companies. The Companies are not a party to any collective bargaining agreement. The Companies are in material compliance with all foreign, federal and state laws respecting employment and employment practices, terms and conditions of employment, wages and hours and nondiscrimination in employment, and are not engaged in any unfair labor practice. There is no charge pending or, to the Knowledge of the Sellers, threatened against any of the Companies alleging unlawful discrimination in employment practices before any court or agency and there is no charge of or proceeding with regard to any unfair labor practice against any of the Companies pending before the National Labor Relations Board or any similar entity. Each Company is in material compliance with all laws (i) with respect to classification of independent contractors and (ii) with respect to classification of employees as "exempt" or "nonexempt" from overtime requirements under applicable law.

A-14

4.17 Environmental Matters. Except for any matter that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the Knowledge of the Sellers (i) the Companies are in compliance with all applicable Laws relating to protection of the environment ("**Environmental Laws**"), (ii) the Companies possess and are in compliance with all Permits required under any applicable Environmental Law for the conduct of their operations and (iii) there are no Actions pending against the Company alleging a violation of any Environmental Law.

4.18 Insurance. Section 4.18 of the Disclosure Schedule sets forth a list of each insurance policy that covers the Companies or their businesses, properties, assets, directors, officers or employees. To the Knowledge of Sellers, such insurance policies (a) are in full force and effect in all material respects and the Companies are not in violation or breach of or default under any of its obligations under any such insurance policy, except where such default would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (b) are sufficient for compliance in all material respects by the Company with all requirements of Law and of all agreements to which the Companies are a party, and (c) are valid, outstanding and enforceable policies.

4.19 Brokers' Fees. Except as set forth in Section 4.19 of the Disclosure Schedule, the Companies have no Liability to pay any fees or commissions to any broker, finder or agent with respect to this Agreement, the Acquisition or the transactions contemplated by this Agreement.

4.20 Certain Business Relationships with the Company. Except as set forth in Section 4.20 of the Disclosure Schedule, no Seller, nor any Affiliate of a Seller, has been involved in any business arrangement or relationship with the Companies within the past 12 months that involves more than $100,000, and no Seller, nor any Affiliate of a Seller, owns any material asset, tangible or intangible, which is used in the business of the Companies.

4.21 Equipment. Section 4.21 of the Disclosure Schedule sets forth a complete and accurate list of all plants, fixtures, machinery, installations, equipment, furniture, tools, spare parts, supplies, materials and other personal property (collectively, the "**Equipment**") owned by the Companies other than items having a net book or market value individually of less than twenty thousand dollars ($20,000) or expensed for tax purposes (other than under Section 179 of the Code), as of the date of the Interim Financial Statements, and the Companies have not acquired any Equipment in excess of such amount since such date.

4.22 Suppliers. Section 4.22 of the Disclosure Schedule sets forth a correct and complete list of the top 10 suppliers of the Companies on a combined basis during the fiscal year ended December 31, 2019 and for the eight month period ended August 31, 2020 and indicates with respect to each the name and dollar volume of business with the Companies (including the primary categories, based on purchases or sales, of products or services bought or sold). The Companies are not required to provide any material bonding or other financial security arrangements in connection with its transactions with any supplier required to be disclosed on Section 4.22 of the Disclosure Schedule except as set forth therein. Since the date of the Annual Financial Statements, no supplier required to be disclosed on Section 4.22 of the Disclosure Schedule has terminated its relationship with, or materially reduced its sales to, the Companies.

4.23 Inventory. All Inventory is owned by the respective Companies, and all such inventory consists of a quality and quantity usable and salable for sale in the ordinary course of business at customary gross margins, except for any inventory that is obsolete, discontinued, damaged, or of below standard quality or merchantability that has been written down to realizable fair market value on the Financial Statements.

4.24 Officers and Directors; Bank Accounts, Signing Authority, Powers of Attorney. Section 4.24 of the Disclosure Schedule lists all officers and directors (or equivalent governing positions) of the Companies. Except as set forth in Section 4.24 of the Disclosure Schedule, the Companies do not have an account or safe deposit box in any bank and no Person has any power, whether solely or jointly, to sign any checks on behalf of the Companies, to withdraw any money or other property from any bank, brokerage or other account of the Companies or to act under any power of attorney granted by the Companies at any time for any such purpose. Section 4.24 of the Disclosure Schedule also sets forth the names of all Persons authorized to borrow money or sign notes on behalf of the Companies.

A-15

4.25 Accounts Receivable. Except as set forth in Section 4.25 of the Disclosure Schedule, all Accounts Receivable arose in the ordinary course of the business and represent or will represent valid obligations due.

4.26 No Other Representations and Warranties. Except for the representations and warranties contained in Article III and this Article IV (including the related portions of the Disclosure Schedule), none of the Sellers, the Companies or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Sellers or the Companies.

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF BUYER AND THE PARENT

The Buyer and the Parent, jointly and severally, represent and warrant to the Sellers that each statement contained in this Article V is true and

correct as of the date hereof except (i) as set forth in the Disclosure Schedule corresponding to the applicable sections of this Article IV or (ii) as set forth in the SEC Reports.

5.1 Organization. Each of the Buyer and the Parent is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

5.2 Authorization. Each of the Buyer and the Parent has the requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by each of the Buyer and the Parent of this Agreement and the consummation by each of the Buyer and the Parent of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Buyer and the Parent, respectively, and no other action is necessary on the part of the Buyer or the Parent to authorize this Agreement or to consummate the Acquisition or the other transactions contemplated hereby. This Agreement has been duly executed and delivered by the Buyer and the Parent and, assuming the due authorization, execution and delivery by each other party hereto, constitutes a legal, valid and binding obligation of the Buyer and the Parent, enforceable against the Buyer and the Parent, respectively, in accordance with its terms, except as limited by (i) bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar Laws relating to creditors' rights generally and (ii) general principles of equity, whether such enforceability is considered in a proceeding in equity or at Law.

5.3 Noncontravention.

(a) Neither the execution and the delivery of this Agreement, nor the consummation of the Acquisition and the other transactions contemplated by this Agreement, will, with or without the giving of notice or the lapse of time or both, (i) violate any provision of the certificate of incorporation or bylaws of either of the Buyer or the Parent, (ii) violate any Law applicable to either of the Buyer or the Parent on the date hereof or (iii) violate any Contract to which either the Buyer or the Parent is a party, except in the case of clauses (ii) and (iii) to the extent that any such violation would not reasonably be expected to prevent or materially delay the consummation of the Acquisition and the other transactions contemplated by this Agreement.

(b) The execution and delivery of this Agreement by the each of Buyer and the Parent does not, and the performance of this Agreement by the Buyer will not, require any consent, approval, authorization or Permit of, or filing with or notification to, any Governmental Entity, except for (i) post-closing securities filings or notifications required to be made under federal securities laws, (ii) filings under the HSR Act, or (ii) where the failure to take such action would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the assets, properties, condition (financial or otherwise), operations of the Buyer and the Parent and any of their Subsidiaries, taken as a whole.

5.4 Brokers' Fees. Neither the Buyer nor the Parent has any Liability to pay any fees or commissions to any broker, finder or agent with respect to this Agreement, the Acquisition or the transactions contemplated by this Agreement that could result in any Liability being imposed on the Sellers or the Companies.

A-16

5.5 Capitalization. (a) The authorized equity capital of the Parent consists of 200,000,000 shares of Common Stock, of which 6,111,200 shares are issued and outstanding, and 20,000,000 shares of Preferred Stock, of which no shares are issued and outstanding. The Parent has reserved 555,000 shares of Common Stock for issuance to officers, directors, employees and consultants of the Parent pursuant to its 2020 Equity Incentive (the "**Stock Plan**"). Of such reserved shares, options to purchase 263,158 shares of Common Stock have been granted and are currently outstanding, and 291,842 shares of Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan. Except as aforesaid, there are no outstanding options, warrants, script rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exercisable or exchangeable for, or giving any person any right to subscribe for or acquire, any shares of Common Stock, or contracts, commitments, understandings or arrangements by which the Parent or any Subsidiary is or may become bound to issue additional shares of Common Stock, or securities or rights convertible or exchangeable into shares of Common Stock.

(b) Section 5.5(b) of the Disclosure Schedule set forth as of the date of this Agreement (i) each of the Subsidiaries of the Parent and the Parent's ownership interest in each such Subsidiary, as well as the ownership interest of any other Person or Persons in each such Subsidiary and (ii) Parent's or its Subsidiaries' capital stock, equity interest or other direct or indirect ownership interest in any other Person (other than securities in a publicly traded company held for investment by Parent or any of its Subsidiaries and consisting of less than one percent of the outstanding capital stock of such company). Parent has made available to Seller a copy of the current organizational structure of Parent and its Subsidiaries.

5.6 Valid Issuance of Securities. The Fixed Share Consideration and the Variable Share Consideration, upon issuance in accordance with the terms of this Agreement and the instruments representing such securities for the consideration provided for herein and therein, shall be duly authorized and validly issued, fully paid and nonassessable, free of restrictions on transfer other than restrictions on transfer under the Lock-up Agreement, applicable state and federal securities laws, and free and clear of all Liens. Assuming the accuracy of the representations of Seller in Section 3.5 and subject to the filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made in a timely manner, each of the Fixed Share Consideration and the Variable Share Consideration will be issued in compliance with all applicable federal and state securities laws.

5.7 SEC Reports; Financial Statements.

(a) The Parent has filed all reports required to be filed by it under the Exchange Act, including pursuant to Section 13(a) or 15(d) thereof, for the two years preceding the date hereof (or such shorter period as the Parent was required by law to file such material) (the foregoing materials (together with any materials filed by the Parent under the Exchange Act, whether or not required) being collectively referred to herein as the "**SEC Reports**") on a timely basis or has received a valid extension of such time of filing and has filed any such SEC Reports prior to the expiration of any such extension. The Parent has made available to each Seller true, correct and complete copies of all SEC Reports. As of their respective dates, the SEC Reports complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the SEC promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Parent included in the SEC Reports ("**Parent Financial Statements**") comply in all material respects with applicable accounting requirements and the rules and regulations of the SEC with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with GAAP, except as may be otherwise specified in such financial statements or the notes thereto, and fairly present in all material respects the financial position of the Parent and its consolidated Subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments. All material agreements to which the Parent or any Subsidiary is a party or to which the property or assets of the Parent or any Subsidiary are subject are included as part of or specifically identified in the SEC Reports.

(b) Parent is in compliance in all material respects with the applicable listing and corporate governance rules and regulations of the NYSE American.

5.8 Undisclosed Liabilities. Parent has no Liabilities required to be included in a balance sheet under GAAP, except for (i) Liabilities fully reflected or reserved against in the Parent Financial Statements and (ii) Liabilities that have arisen after June 30, 2020 in the ordinary course of business (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or

violation of law).

5.9 <u>Compliance with Laws and Orders</u>. Neither Parent nor Buyer is in violation of, and neither Parent nor Buyer has received any notice that Buyer or Parent is, or has been, in violation of or in default under, any Law or Order, where such violation or default would have a material adverse effect on Parent and its Subsidiaries taken as a whole.

A-17

5.10 <u>Litigation</u>. <u>Section 5.10 of the Disclosure Schedule</u> sets forth each instance in which any of Parent and its Subsidiaries (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge in which the potential loss to Parent or such Subsidiary is valued in excess of $100,000 individually or (ii) is a party to, or to the Knowledge of Parent is threatened to be made a party to, any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, in each case, if determined adversely to the Company (or to Parent or any Affiliate thereof) would result in a loss to Parent or such Subsidiary in excess of $100,000, individually.

5.11 <u>Environmental Matters</u>. Except for any matter that would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business of Parent or its Subsidiaries, taken as a whole, to the Knowledge of Parent and Buyer (i) each of Parent and its Subsidiaries are in compliance with all applicable Environmental Laws, (ii) each of Parent and its subsidiaries possess and are in compliance with all Permits required under any applicable Environmental Law for the conduct of their operations and (iii) there are no Actions pending against the Parent or any of its Subsidiaries alleging a violation of any Environmental Law.

5.12 <u>Insurance</u>. <u>Section 5.12 of the Disclosure Schedule</u> sets forth a list of each insurance policy that covers the Parent, its Subsidiaries or their businesses, properties, assets, directors, officers or employees. To the Knowledge of Parent, such insurance policies (a) are in full force and effect in all material respects and neither Parent nor any of its Subsidiaries are in violation or breach of or default under any of its obligations under any such insurance policy, except where such default would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business of Parent or its Subsidiaries, taken as a whole, (b) are sufficient for compliance in all material respects by the Parent with all requirements of Law and of all agreements to which the Companies are a party, and (c) are valid, outstanding and enforceable policies.

ARTICLE VI
COVENANTS

6.1 <u>Consents</u>

(a) Parent and the Sellers shall submit any and all filings required under the HSR Act with respect to the Acquisition to the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission, upon the earlier of (i) fifteen (15) business days of the date hereof, (ii) or two (2) business days of being in a position to certify all such filings. Parent will be responsible for payment of any filing fee required for filings to be made in connection with the Acquisition, and will pay any required fee at the time it submits its filings Parent and Sellers shall use their respective commercially reasonable efforts to determine whether any other filings are necessary or advisable under any other antitrust, competition, foreign investment, or other applicable Laws and, if determined that any such additional filings are necessary or advisable then, to prepare and submit such filings as promptly as practicable following the date hereof.

(b) Parent and Sellers shall consult and cooperate with one and other in connection with the preparation of all respective filings, and consider in good faith the views of the other Party, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions, and proposals made or submitted by or on behalf of any Party in connection with proceedings under or relating to any Antitrust Laws and in connection with resolving any investigation or other inquiry concerning the Transactions initiated by any Governmental Entity.

(c) Parent and Sellers and the Companies shall use their respective commercially reasonable efforts to respond to requests, if any, as may be made by any Government Entity with respect to the Transactions under any antitrust Law. In the context of this <u>Section 6.1(c)</u>, "commercially reasonable efforts" shall include the following:

(i) if Parent, Sellers, or the Companies or any of their respective Affiliates or representatives receives a formal request for additional information or documentary material from a Governmental Entity, Parent or Sellers or the Companies, as the case may be, shall comply at the earliest practicable date with such formal request and in any event no later than by any deadline that is established by Law or as reasonably determined by Parent and Sellers;

(ii) Parent, Sellers, or the Companies, as the case may be, shall provide the other Party a complete copy of any filing with the Governmental Entity (subject to redaction of any material not reasonably needed by the other party) and each shall promptly respond to any request from the other for information or documentation reasonably requested by the other party in connection with the development and implementation of a strategy and negotiating positions with any Governmental Entity ; <u>provided</u>, that access to any such filing, information or documentation will, at such party's request be restricted to such other parties' outside counsel and economists or advisors retained by such counsel;

A-18

(iii) Each of Parent, Sellers, and the Companies shall (A) promptly inform the other of any communication made to, or received by such Party from, any Governmental Entity regarding any of the Transactions and, subject to applicable Law, if practicable, permit the other party to review in advance any material proposed written communication to any such Governmental Entity , and incorporate the other party's reasonable comments, (B) not agree to participate in any substantive meeting or discussion with any such Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the Transactions unless, to the extent reasonably practicable, it consults with the other party in advance and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend, and (C) furnishes the other party with copies of all correspondence, filings, and written communications between them and their Affiliates and their respective representatives, on the one hand, and any such Governmental Entity or its respective staff, on the other hand, with respect to this Agreement and the Transactions; and

(iv) Unless mutually agreed to by the Parties, all filing parties party will request "early termination" of any approval required from any Governmental Entity.

(d) Notwithstanding anything to the contrary in this Agreement the foregoing, neither Parent, Buyer nor any of their Affiliates shall be required to (i) propose, negotiate, commit to, or effect any divestiture or any other concessions or conditions, or (ii) litigate with any Governmental Entity to oppose any enforcement action, including an enforcement action to prohibit the Transactions from being consummated or to remove any court or regulatory orders impeding the ability to consummate the Transactions.

(e) Except as expressly provided herein, the Parties shall bear their own costs and expenses incurred with respect to the preparation of their respective filings contemplated in this <u>Section 6.1</u>; <u>provided, however</u>, that Buyer shall bear one hundred percent of any filing fee under the HSR Act with respect to the Acquisition.

6.2 <u>Operation of the Companies' Business</u>. During the period commencing on the date hereof and ending at the earlier of the Closing and the termination of this Agreement in accordance with Article VIII, each Company, except (i) as otherwise contemplated by this Agreement, (ii) as required by applicable Law or (iii) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or

delayed), shall:

(a) use commercially reasonable efforts to carry on its business in a manner consistent with past practice;

(b) maintain the properties and other assets of the Companies in good working order (normal wear excepted); and

(c) use commercially reasonable efforts to maintain its business and employees, customers, assets and operations as a going concern and in accordance with past practice.

6.3 Access. During the period commencing on the date hereof and ending at the earlier of the Closing and the termination of this Agreement in accordance with Article VIII, the Companies will provide reasonable access to the Companies' financial, accounting, business records, contracts and other legal documents maintained by the Companies for the purpose of the Buyer completing its due diligence investigation. Buyer shall not contact or communicate with any of the Companies' employees, customers, suppliers or advisors without the prior written consent of the Companies. The parties hereto will cooperate to complete due diligence in a reasonably expeditious timeframe.

6.4 Notice of Developments. The Sellers and the Companies will give prompt written notice to the Buyer of any event that would reasonably be expected to give rise to, individually or in the aggregate, a Material Adverse Effect or would reasonably be expected to cause a breach of any of their respective representations, warranties, covenants or other agreements contained herein. The Buyer will give prompt written notice to the Sellers and the Companies of any event that could reasonably be expected to cause a breach of any of its representations, warranties, covenants or other agreements contained herein or could reasonably be expected to, individually or in the aggregate, prevent or materially delay the consummation of the Acquisition and the other transactions contemplated by this Agreement. The delivery of any notice pursuant to this Section 6.4 will not limit, expand or otherwise affect the remedies available hereunder (if any) to the party receiving such notice.

6.5 No Solicitation.

(a) The Companies will, and will cause each of their Representatives, including, without limitation, the Sellers to, cease immediately any existing discussions regarding a Transaction Proposal.

A-19

(b) During the period commencing on the date hereof and ending at the earlier of the Closing and the termination of this Agreement in accordance with Article VIII, without the prior consent of the Buyer, no Companies will, nor will they authorize or permit any of their respective Representatives, including, without limitation, the Sellers to (and the Sellers agree that they shall not), directly or indirectly through another Person to, (i) solicit, initiate or encourage (including by way of furnishing information), or take any other action designed to facilitate any inquiries, proposals or offers from any Person that constitute, or would reasonably be expected to constitute, a Transaction Proposal, (ii) participate in any discussions or negotiations (including by way of furnishing information) regarding any Transaction Proposal or (iii) otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other Person to do or seek any of the foregoing. The Sellers shall immediately communicate to the Buyer the terms of any Transaction Proposal received by any of the Sellers or the Companies, or any of their Representatives.

6.6 Covenant not to Compete. For a period of two (2) years from and after the Closing (the "**Noncompetition Period**"), each Seller, jointly and severally, shall not engage directly or indirectly in any business that is competitive with 1 Stop's business activities as of the Closing Date operating in or related to the sale of appliances, furniture, home goods, and related products anywhere in the United States (the "**Business**"); provided, however, that no ownership of less than 1% of the outstanding stock of any publicly-traded corporation shall be deemed to constitute a breach of the obligations contained in this Section 6.6. During the Noncompetition Period, each Seller, severally and not jointly, shall not induce or attempt to induce any customer or supplier of the Buyer or any Affiliate of the Buyer as of the Closing Date to terminate its relationship with the Buyer or any Affiliate of the Buyer. During the Noncompetition Period, each Seller, severally and not jointly, shall not, on behalf of any entity other than the Buyer or an Affiliate of the Buyer, solicit or attempt to solicit the employment any Person who is, or was at any time during the preceding twelve (12) months, an employee or officer of the Buyer or an Affiliate of the Buyer as of the Closing Date, provided, however, that each Seller may undertake such actions directed to the general public (including, without limitation, mass mailing based on commercially acquired mailing lists, newspaper, radio and television advertisements) which shall not constitute solicitation under this Section 6.6.

6.7 Preparation of Proxy Statement; Stockholders' Meeting. (a) As promptly as reasonably practicable following the date of this Agreement, Parent shall prepare and provide a draft for review by the Sellers and file with the SEC a proxy statement on Schedule 14A of the Exchange Act (the "**Proxy Statement**") relating to a special meeting of the stockholders of the Parent (the "**Parent Stockholder Meeting**") at which the stockholders of the Parent will vote on, among other things, a proposal to approve ("**Parent Stockholder Approval**") the issuance of Parent Common Stock upon conversion of the Parent Preferred Stock and any other proposals necessary to permit the consummation of the Acquisition as required by applicable Law, including the rules and regulations of the NYSE American provided, that each of the Parent and the Sellers shall consult with the other party and provide the other party a reasonable period of time to review such preliminary Proxy Statement and any amendments thereto prior to the filing of such document with the SEC and will reasonably consider any comments from the other party.

(b) The parties shall reasonably cooperate with each other in the preparation of the Proxy Statement and to have such preliminary Proxy Statement cleared by the SEC as promptly as practicable after such filing. The Parent shall notify the Sellers promptly following the receipt of any comments (whether written or oral) from the SEC and of any request by the SEC for amendments or supplements to the Proxy Statement or for additional information and will supply the Sellers with copies of all correspondence with the SEC with respect to the Proxy Statement between Parent and any of its representatives, on the one hand, and the SEC on the other hand. The Proxy Statement, and any supplement or amendment thereto, shall comply in all material respects with all applicable requirements of Law.

(c) Parent shall date the Proxy Statement as of the approximate date of mailing to Parent stockholders and shall use its commercially reasonable efforts to cause Proxy Statement to be mailed to Parent stockholders at the earliest practicable date. Whenever any event occurs which is required to be set forth in an amendment or supplement to the Proxy Statement, (A) Parent shall promptly inform the Sellers of such occurrences, (B) Parent shall prepare and file with the SEC any such amendment or supplement to the Proxy Statement, (C) Parent shall use its commercially reasonable efforts to have the Proxy Statement prepared for use at the Parent Stockholder Meeting, and (D) Parent shall use commercially reasonable efforts to have the amendment of or supplement to Proxy Statement cleared by the SEC as quickly as commercially practical.

(d) Parent will, as soon as practicable, following the date on which the preliminary Proxy Statement is cleared by the SEC, duly call, give notice of, and as soon as practicable convene and hold the Parent Stockholder Meeting for the purpose of obtaining the Parent Stockholder Approval. Parent will, through its board of directors, recommend to Parent stockholders that they approve all of the proposals coming before the stockholders of the Parent at the Parent Stockholders Meeting.

A-20

(e) If on the date of the Parent Stockholder Meeting, Parent has not received proxies representing a sufficient number voting securities to approve all proposals being voted on at the Parent Stockholder Meeting, Parent shall adjourn its stockholder meeting until such date as shall be mutually agreed upon by Parent and the Sellers, which date shall not be less than 5 days nor more than 10 days after the date of adjournment, and subject to

the terms and conditions of this Agreement shall continue to use its commercially reasonable efforts, together with its proxy solicitor (if any), to assist in the solicitation of proxies from stockholders relating to such party's stockholder approval at its stockholder meeting. Parent shall only be required to adjourn or postpone the Parent Stockholder Meeting one time pursuant to this Section 6.6(e).

(f) The Sellers and the Companies will promptly provide to Parent information that is required to be included in the Proxy Statement with respect to the Sellers and the Companies and supplement such information from time to time until the date of the Parent Stockholder Meeting.

6.8 Voting Agreement; Sellers Approval of Agreement and Acquisition. The Parent shall use commercially reasonable efforts to cause each holder of 10% or more of the voting power of Parent to enter into a voting agreement in the form of **Exhibit D** to this Agreement (the "**Voting Agreement**") requiring such persons to vote in favor all proposals coming before stockholders of Parent at the Parent Stockholders Meeting. The Sellers acknowledge and agree that they have consented to and approved this Agreement, the Acquisition and that no further action by the board of directors or stockholders or other equity owners of the Companies is required in order to consummate the Acquisition.

6.9 Lock-Up Agreements. The Sellers shall enter into an agreement (a "**Lock-Up Agreement**") that provides that no Seller will transfer or assign or otherwise dispose of the shares of Common Stock or Preferred Stock (or any shares of Common Stock issuable upon conversion of the Preferred Stock) that will be owned by the Sellers at the Closing for a period of 180 days after the Closing and thereafter the Sellers will only sell such shares of Common Stock or Preferred Stock at a rate of no more than one percent of the outstanding stock of the Parent per quarter until the one year anniversary of the Closing in the form set forth in **Exhibit E** attached to this Agreement.

6.10 Registration Rights.

(a) Demand Registration.

(i) Grant of Right. The Parent, upon written demand (a "**Demand Notice**") of the Sellers holding a majority of the Registrable Securities (as defined below), agrees to register on Form S-3 (if available, or Form S-1 or such other form of registration statement that is available and appropriate for the registration of the Registrable Securities), on one occasion, all or any portion of the Parent Common Stock issuable to the Sellers hereunder, including the Parent Common Stock issuable upon conversion of the Parent Preferred Stock issuable to the Sellers hereunder (collectively, the "**Registrable Securities**"). On such occasion, the Parent will file a registration statement with the SEC covering the Registrable Securities within sixty (60) days after receipt of a Demand Notice and use its reasonable best efforts to have the registration statement declared effective promptly thereafter, subject to compliance with and review by the SEC; provided, however, that the Parent shall not be required to comply with a Demand Notice if the Parent has filed a registration statement with respect to which the Sellers are entitled to piggyback registration rights pursuant to Section 6.10(b) hereof and either: (i) the Sellers have elected to participate in the offering covered by such registration statement or (ii) if such registration statement relates to an underwritten primary offering of securities of the Company, until the offering covered by such registration statement has been withdrawn or until thirty (30) days after such offering is consummated. The demand for registration may be made at any time following the Closing Date.

(ii) Terms. The Parent shall bear all fees and expenses attendant to the registration of the Registrable Securities pursuant to Section 6.9(a) but the Sellers shall pay any and all underwriting commissions and the expenses of any legal counsel selected by the Sellers to represent them in connection with the sale of the Registrable Securities. The Parent agrees to use its reasonable commercial efforts to cause the filing required herein to become effective promptly and to qualify or register the Registrable Securities in such States as are reasonably requested by the Sellers; provided, however, that in no event shall the Parent be required to register the Registrable Securities in a State in which such registration would cause: (i) the Parent to be obligated to register or license to do business in such State or submit to general service of process in such State or (ii) the principal shareholders of the Parent to be obligated to escrow their shares of capital stock of the Parent. The Parent shall cause any registration statement filed pursuant to the demand right granted under Section 6.9(a) to remain effective for a period of at least twelve (12) consecutive months after the date that the Sellers of the Registrable Securities covered by such registration statement are first given the opportunity to sell all of such securities. The Sellers shall only use the prospectuses provided by the Parent to sell the Registrable Securities and will immediately cease to use any prospectus furnished by the Parent if the Parent advises the Sellers that such prospectus may no longer be used due to a material misstatement or omission. Notwithstanding the provisions of this Section 6.9(a) the Sellers shall be entitled to a demand registration under this Section 6.9(a) on only one (1) occasion and such demand registration right shall terminate on the second anniversary of the date of this Agreement.

A-21

(b) "Piggy-Back" Registration.

(i) Grant of Right. In addition to the demand right of registration described in Section 6.9(a) hereof, the Sellers shall have the right, for a period of no more than two (2) years from the date of this Agreement, to include the Registrable Securities as part of any other registration of securities filed by the Parent (other than in connection with a transaction contemplated by Rule 145(a) promulgated under the Securities Act or pursuant to Form S-8 or any equivalent form); provided, however, that if, solely in connection with any primary underwritten public offering for the account of the Parent, the managing underwriter(s) thereof shall, in its reasonable discretion, impose a limitation on the number of shares of Common Stock which may be included in the Registration Statement because, in such underwriter(s)' judgment, marketing or other factors dictate such limitation is necessary to facilitate public distribution, then the Parent shall be obligated to include in such Registration Statement only such limited portion of the Registrable Securities with respect to which the Sellers requested inclusion hereunder as the underwriter shall reasonably permit. Any exclusion of Registrable Securities shall be made pro rata among the Sellers seeking to include Registrable Securities in proportion to the number of Registrable Securities sought to be included by such Sellers; provided, however, that the Parent shall not exclude any Registrable Securities unless the Company has first excluded all outstanding securities, the holders of which are not entitled to inclusion of such securities in such Registration Statement or are not entitled to pro rata inclusion with the Registrable Securities.

(ii) Terms. The Parent shall bear all fees and expenses attendant to registering the Registrable Securities pursuant to Section 6.9(b) hereof, but the Sellers shall pay any and all underwriting commissions and the expenses of any legal counsel selected by the Sellers to represent them in connection with the sale of the Registrable Securities. In the event of such a proposed registration, the Parent shall furnish the Sellers of outstanding Registrable Securities with not less than thirty (30) days written notice prior to the proposed date of filing of such registration statement. Such notice to the Sellers shall continue to be given for each registration statement filed by the Company during the two (2) year period following the date of this Agreement until such time as all of the Registrable Securities have been sold by the Sellers. The holders of the Registrable Securities shall exercise the "piggy-back" rights provided for herein by giving written notice within ten (10) days of the receipt of the Parent's notice of its intention to file a registration statement. Except as otherwise provided in this Agreement, there shall be no limit on the number of times the Seller may request registration under this Section 6.9; provided, however, that such registration rights shall terminate on the second anniversary of the date of this Agreement.

(c) General Terms.

(i) Indemnification. The Parent shall indemnify the holders of the Registrable Securities to be sold pursuant to any registration statement hereunder and each person, if any, who controls such holders within the meaning of Section 15 of the Securities Act or Section 20(a) of the Exchange Act against all loss, claim, damage, expense or liability (including all reasonable attorneys' fees and other expenses reasonably incurred in investigating, preparing or defending against any claim whatsoever) to which any of them may become subject under the Securities Act, the Exchange Act or

otherwise, arising from such registration statement but only to the same extent and with the same effect as the provisions pursuant to which the Company has agreed to indemnify the underwriters in connection with the Parent's last public offering of its securities. The holders of the Registrable Securities to be sold pursuant to such registration statement, and their successors and assigns, shall severally, and not jointly, indemnify the Parent, against all loss, claim, damage, expense or liability (including all reasonable attorneys' fees and other expenses reasonably incurred in investigating, preparing or defending against any claim whatsoever) to which they may become subject under the Securities Act, the Exchange Act or otherwise, arising from information furnished by or on behalf of such holders, or their successors or assigns, in writing, for specific inclusion in such registration statement to the same extent and with the same effect as the Parent is required to indemnify the underwriter in connection with Parent's last public offering of its securities.

(ii) <u>Underwriting Agreement</u>. The Parent shall enter into an underwriting agreement with the managing underwriter(s), if any, selected by any Sellers whose Registrable Securities are being registered pursuant to this Section 6.9, which managing underwriter shall be reasonably satisfactory to the Parent. Such agreement shall be reasonably satisfactory in form and substance to the Parent, each Seller and such managing underwriters, and shall contain such representations, warranties and covenants by the Parent and such other terms as are customarily contained in agreements of that type used by the managing underwriter. The Sellers whose Registrable Securities are being registered shall be parties to any such underwriting agreement relating to an underwritten sale of their Registrable Securities and may, at their option, require that any or all the representations, warranties and covenants of the Parent to or for the benefit of such underwriters shall also be made to and for the benefit of such Sellers. Such Sellers shall not be required to make any representations or warranties to or agreements with the Parent or the underwriters except as they may relate to such Sellers, their Registrable Securities and their intended methods of distribution.

A-22

(iii) <u>Documents to be Delivered by Holder(s)</u>. Each of the Sellers participating in any of the foregoing offerings shall furnish to the Parent a completed and executed questionnaire provided by the Parent requesting information customarily sought of selling security holders.

6.11 <u>Financial Information</u>. The Sellers shall reasonably cooperate with the Buyer and the Buyer's independent certified public accounting firm, at the Buyer's sole expense, in order to enable the Buyer to create audited financial statements prepared in accordance with GAAP for the two full fiscal years preceding the Closing Date by making available the Companies' records as they are maintained in the ordinary course of business and answering reasonable questions.

6.12 <u>Taking of Necessary Action; Further Action</u>. Subject to the terms and conditions of this Agreement, the Sellers, the Companies and Buyer will take all such reasonable and lawful action as may be necessary or appropriate in order to effectuate the Acquisition in accordance with this Agreement as promptly as practicable.

6.13 <u>Tax Matters</u>.

(a) <u>Filing of Tax Returns</u>.

(i) Sellers, at their cost and expense, shall prepare and timely file (or cause to be prepared and timely filed) all Tax Returns that are required to be filed by or with respect to each Company for Tax years or periods ending on or before the Closing Date. In each case, the Tax Returns shall be prepared in a manner consistent with past practices unless otherwise required by any applicable Law and the relevant Company shall timely remit (or cause to be timely remitted) any Taxes shown due on such Tax Returns (if any) to the extent payable by the Company filing the Tax Return.

(ii) Except as described in Section 6.13(a)(i), the Buyer shall timely prepare and file (or cause to be timely prepared and filed) all Tax Returns with respect to each Company that are required to be filed after the Closing Date. With respect to any Tax Return that is required to be filed by or with respect to any Company for any Tax year or period that begins before and ends after the Closing Date (a "**Straddle Period**"), such Tax Return shall be prepared in a manner consistent with past practice unless otherwise required by applicable Law and (x) the Buyer shall deliver a completed draft of such Tax Return to the Sellers no later than thirty (30) days prior to the due date for filing such Tax Return (or, if such due date is within forty-five (45) days following the Closing Date, as promptly as practicable following the Closing Date), (y) the Sellers (and their authorized representatives) shall have the right to review such Tax Return prior to the filing thereof, and (z) the Sellers shall be permitted to object to any item(s) on such Tax Return within ten (10) days of receipt of such Tax Returns by written notice of objection to the Buyer stating that they so object, specifying with particularity any such objectionable item(s) and the specific factual or legal basis for such objection. If a notice of objection shall be duly delivered, the Sellers and the Buyer shall negotiate in good faith and use their reasonable best efforts to resolve such item. If the Buyer and the Sellers are unable to reach such agreement within ten (10) days after receipt by the Buyer of such notice, the disputed item shall be resolved by an independent accounting firm ("**Independent Accounting Firm**") the Buyer and the Sellers shall appoint by mutual agreement. If the Independent Accounting Firm is unable to resolve any disputed item before the due date for such Tax Return, the Tax Return shall be filed as prepared by the Buyer and then amended to reflect the Independent Accounting Firm's resolution. The Buyer shall remit (or cause to be remitted) any Taxes due with respect to such Tax Return. The Sellers or the Buyer, as the case may be, shall pay the other party for the Taxes for which the Sellers or the Buyer, respectively, is liable pursuant to Section 9.2 or Section 9.3, but which are payable with any Tax Return to be filed by the other party pursuant to paragraph (a) or paragraph (b) of this Section 6.13(a) no later than the tenth (10th) day after receipt of written request from the party entitled to payment, setting forth in detail the computation of the amount owed by the Sellers or the Buyer, as the case may be.

The fees and expenses of the Independent Accounting Firm's review and determination pursuant to this Section 6.13(a)(ii) shall be borne by the Sellers and the Buyer in inverse proportion as they may prevail on all disputed amounts resolved by the Independent Accounting Firm, which proportionate allocations shall also be determined by the Independent Accounting Firm at the time its determination is rendered on the Disputed Amounts submitted. For example, should the disputed amounts total an amount equal to $1,000 and the Independent Accounting Firm awards $600 in favor of the Seller's position, 60% of the costs of its review would be borne by the Buyer and 40% of the costs would be borne by the Sellers. During the review by the Independent Accounting Firm, the Buyer, the Sellers and the accountants for the relevant Company will each make available to the Independent Accounting Firm interviews with such individuals, and such information, books and records and work papers, as may be reasonably required by the Independent Accounting Firm to fulfill its obligations under Section 6.13(a)(ii); provided, however, that the accountants for the relevant Company shall not be obliged to make any work papers available to the Independent Accounting Firm except in accordance with such accountants' normal disclosure procedures and then only after such firm has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such accountants.

A-23

(iii) After the Closing Date, the Buyer shall not (or shall cause or permit any of the Companies to) amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return relating in whole or in part to any Company with respect to any taxable year or period (or portion thereof) ending on or before the Closing Date (or with respect to any Straddle Period) except (i) as required by applicable Law, or (ii) with the prior written consent of the Sellers (which consent shall not be unreasonably withheld, conditioned or delayed).

(b) <u>Straddle Periods</u>.

(i) Unless prohibited by applicable Law, the Sellers and the Buyer shall each cause any relevant taxable year or period of each Company to terminate

as of the Closing Date. To the extent any Company's relevant taxable year or period cannot be so terminated and it is necessary to determine the Buyer's and the Sellers' liability for any Company's Taxes attributable to a Straddle Period, the determination of such Taxes for the portion of the Straddle Period ending on and including the Closing Date (the "**Pre-Closing Straddle Period**"), and the portion of the Straddle Period beginning after the Closing Date (the "Post-Closing Straddle Period") shall be determined by assuming that the Straddle Period consisted of two (2) taxable years or periods, one which ended at the close of the Closing Date and the other which began at the beginning of the day following the Closing Date.

(ii) The portion of such Tax attributable to the Pre-Closing Straddle Period will (a) in the case of any Taxes other than sales or use taxes, value-added taxes, employment taxes, withholding taxes, and any Tax based on or measured by income, receipts or profits earned during a Straddle Period, be determined on a per diem basis and be deemed to be the amount of such Tax for the entire Tax period multiplied by a fraction, the numerator of which is the number of days in the Pre-Closing Straddle Period and denominator of which is the number of days in the Straddle Period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding Tax period multiplied by a fraction, the numerator of which is the number of days in the Pre-Closing Straddle Period and the denominator of which is the number of days in the Straddle Period); and (b) in the case of any sales or use taxes, value-added taxes, employment taxes, withholding taxes, and any Tax based on or measured by income, receipts or profits earned during a Straddle Period, be determined on an interim closing of the books basis and be deemed equal to the amount that would be payable if the Straddle Period ended on and included the Closing Date. The portion of Tax attributable to a Post-Closing Straddle Period will be calculated in a corresponding manner. Notwithstanding anything to the contrary in this Agreement, for purposes of determining Taxes on an interim closing of the books basis for which the Sellers shall be responsible in respect of any such short taxable year or period or deemed short taxable year or period, all of the Transaction Expenses and other related party items paid on or prior to the Closing Date shall be accrued as an expense and be treated as having been paid in a Pre-Closing Straddle Period or pre-closing Tax period, as applicable.

(iii) The parties hereto will, to the extent permitted by applicable Law, elect with the relevant Taxing Authority to treat a portion of any Straddle Period as a short taxable period ending as of the close of business on the Closing Date.

(c) Tax Proceedings.

(i) An Indemnified Party shall promptly deliver to the Indemnifying Party a copy of any written communication received by the Indemnified Party or any of its Affiliates from a Taxing Authority concerning Taxes for which indemnification may be claimed pursuant to the provisions of this Agreement and shall promptly notify the Indemnifying Party in writing of any pending or threatened audit, claim or demand (a "**Tax Claim**") that could give rise to a right of indemnification, and to the extent reasonably estimable, describing in reasonable detail the facts and circumstances with respect to the subject matter of such Tax Claim; provided, however, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Agreement except to the extent the Indemnifying Party is actually prejudiced by such failure.

(ii) After the Closing Date and except as otherwise provided in Sections 6.13(c)(iii), the Buyer shall have the exclusive right to control any Tax Claim or administrative or judicial proceeding with respect to any Tax liability, in each case to the extent that such Tax Claims or administrative or judicial proceedings relate to Tax liability with respect to a Company. The Sellers shall have the right to participate in any such Tax Claim or administrative or judicial proceeding at their own expense; provided that the Buyer may not settle, compromise and/or concede any portion of any such Tax Claim or administrative or judicial proceeding without the prior written consent of the Sellers which shall not be unreasonably withheld, conditioned or delayed.

A-24

(iii) The Sellers shall have the exclusive right to control any Tax Claim or administrative or judicial proceeding with respect to any Tax liability, in each case to the extent that such Tax Claims or administrative or judicial proceedings relate to Tax liability with respect to a Company for a taxable period ending on or prior to the Closing Date. Notwithstanding the preceding sentence, the Buyer and such Company shall have the right to participate in such Tax Claim or administrative or judicial proceeding described in the preceding sentence at their own expense, and the Sellers shall not settle, compromise and/or concede any portion of such Tax Claim or administrative or judicial proceeding without the prior written consent of the Buyer and such Company, which shall not be unreasonably withheld, conditioned or delayed; provided that, if the Sellers fail to assume control of the conduct of any such Tax Claim or administrative or judicial proceeding within fifteen (15) days following the receipt by the Sellers of notice of such Tax Claim or administrative or judicial proceeding, the Buyer and such Company shall have the right to assume control of such Tax Claim or administrative or judicial proceeding and shall be entitled to settle, compromise and/or concede any portion of such Tax Claim or administrative or judicial proceeding. In the event of any conflict between the provisions of this Section 6.13(c)(iii) and the provisions of Article IX, the provisions of this Section 6.13(c)(iii) shall control.

(d) Refunds. Any refunds of Taxes (or credits against Taxes in lieu of cash Tax refunds) (including any interest paid or credited with respect thereto) received by, or on behalf of, any Company that are attributable to any Tax Returns filed with respect to any Tax periods ending on or prior to the Closing Date will be for the benefit of the Sellers. Except as otherwise provided in Section 9.8, the Buyer shall pay (or cause to be paid) to the Sellers any such refund actually received in cash, or the value of any credit available to the Buyer or the relevant Company as a result of the Buyer or the Company electing to receive such credit in lieu of a cash Tax refund, promptly and no later than five (5) Business Days after the receipt or availability thereof, (less any expenses, including Taxes, incurred in connection with the receipt of such refunds or credits); provided, however, that this Section 6.13(d) shall not apply to any refund or credit with respect to Taxes of the Company that result from the carryback of losses, credits or similar items from Tax periods (or portions thereof) beginning after the Closing Date. The Buyer shall cooperate in the filing of a claim for refund (including an amendment of a Tax Return for any Tax period ending on or prior to the Closing Date or any portion of a Straddle Period that extends before the Closing Date through the Closing Date, if the Sellers request that the Buyer or the relevant Company, as the case may be, file such claim for refund (or amendment) and all costs related to the preparation of such claim for refund (or amendment) are paid for by the Sellers.

(e) Transfer Taxes. Notwithstanding anything to the contrary in this Agreement, the Buyer shall be liable for and shall indemnify and hold harmless the Sellers from and against any sales tax, use tax, direct or indirect real property transfer or gains tax, documentary stamp tax, value added tax or similar taxes and related fees attributable to the sale or transfer of the Securities ("**Transfer Taxes**"). The party required by Law to file a Tax Return with respect to such Transfer Taxes shall timely prepare, with the other party's cooperation, and file such Tax Return. If the Sellers file (or caused to be filed) any such Tax Return, the Buyer shall promptly reimburse the Sellers for any Transfer Taxes paid by the Sellers in connection with the filing of such Tax Return. The Buyer and the Sellers each agrees to timely sign and deliver (or to cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) such Transfer Taxes.

(f) Tax Cooperation. The Sellers and the Buyer shall furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Companies and their respective assets or businesses (including access to books and records as well as the timely provision of powers of attorney or similar authorizations) as is reasonably necessary for the filing of all Tax Returns, the making of any election related to Taxes, the preparation for any audit by any Taxing Authority and the prosecution or defense of any audit, proposed adjustment or deficiency, assessment, claim, suit or other proceeding relating to any Taxes or Tax Return. The Sellers and the Buyer shall cooperate with each other in the conduct of any audit or other proceeding related to Taxes and all other Tax matters relating to the Companies and their respective

assets or businesses and each shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Agreement.

(g) Post-Closing Actions. The Buyer shall not, and shall not permit any of its Affiliates (including, after the Closing Date for the avoidance of doubt, the Companies) to (a) voluntarily approach any Taxing Authority regarding any Taxes or Tax Returns of any Company relating to any Tax period (or portions of a Straddle Period) ending on or before the Closing Date or (b) after the Closing Date, take any action relating to Taxes, or that could create a liability for Taxes, for any Tax period (or portions of a Straddle Period) ending on or before the Closing Date that is outside the ordinary course of business (other than as expressly contemplated by this Agreement) without the prior written consent of the Sellers (which shall not be unreasonably withheld, conditioned or delayed) to the extent the actions in (a) or (b) could reasonably be expected to result in any Tax liability with respect to which the Sellers have agreed to provide indemnification under this Agreement or (c) relate to Taxes with respect to which a Company is treated as a pass through entity and which Taxes flow through to the Sellers.

A-25

(h) Disputes. If the Sellers and the Buyer are unable to resolve any disagreement relating to Sections 6.13(a) through (g), the disagreement shall be referred to the Independent Accounting Firm. The Independent Accounting Firm shall resolve the disagreement within thirty (30) days and the Sellers and the Buyer agree the decision of the Independent Accounting Firm shall be conclusive and binding on both the Sellers and the Buyer. Except as otherwise provided in this Agreement, the fees of the Independent Accounting Firm shall be divided equally between Sellers and the Buyer.

(i) Survival. The indemnity and payment obligations set forth in this Section 6.13 and Article IX with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations, including any extensions or waivers thereof.

6.14 Confidentiality.

6.15 Each of Buyer and Parent acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Parent or Buyer pursuant to this Agreement, except as required by applicable law, including the Securities Act of 1933, as amended (the "**Securities Act**") and the Exchange Act, as amended. Subject to the terms in this Section 6.14, each of the parties hereto agrees to be bound by the terms and conditions of the Confidentiality Agreement, and such terms and conditions shall apply to the parties hereto, as if the Potential Party (as defined in the Confidentiality Agreement) were defined to include the Companies and the Sellers. If this Agreement is terminated for any reason prior to the Closing, the Confidentiality Agreement and the provisions of this Section 6.14 shall nonetheless continue in full force and effect.

ARTICLE VII
CONDITIONS TO OBLIGATIONS TO CLOSE

7.1 Conditions to Obligation of the Buyer and the Parent. The obligation of the Buyer and the Parent to consummate the Acquisition is subject to the satisfaction or waiver by the Buyer and the Parent of the following conditions:

(a) The representations and warranties of the Sellers set forth in this Agreement will be true and correct in all respects as of the date of this Agreement and as of the Closing Date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties will be true and correct as of such other date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) does not have, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) Each Seller and each Company will have performed all covenants required to be performed by it under this Agreement at or prior to the Closing, except where the failure to perform does not have, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or materially adversely affect the ability of each Seller and each Company to consummate the Acquisition or perform its other obligations hereunder.

(c) The waiting period applicable to the consummation of the Acquisition and the other transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated and the parties hereto will have received all other authorizations, consents and approvals of all Governmental Entities in connection with the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

(d) No temporary, preliminary or permanent restraining Order preventing the consummation of the Acquisition will be in effect.

(e) The Buyer shall have received an opinion of the Sellers' counsel in form and substance reasonably satisfactory to the Buyer and its counsel.

(f) The Sellers shall have obtained the consents, permits, licenses, approvals or notifications of any lenders, lessors, suppliers, customers or other third parties required to consummate the Acquisition.

(g) The Sellers shall have obtained pay-off letters and releases of the Liens at the Sellers' expense from such Persons as Buyer shall have requested.

(h) The Sellers shall have delivered to the Parent and the Buyer the Lock-Up Agreement.

(i) As required by a lock-up agreement currently in effect, the Parent shall have obtained the consent of the underwriter in its initial public offering to issue to the Common Stock and the Preferred Stock to the Sellers as contemplated by this Agreement.

A-26

(j) The Buyer shall have received fully executed copies of each of (i) the 1 Stop Lease; (ii) the Gold Coast Lease, and (iii) the Joe's Appliances Lease.

(k) The Buyer shall have received each of (i) the A. Fouerti Employment Agreement duly executed by Albert Fouerti and (ii) the E. Fouerti Employment Agreement duly executed by Elie Fouerti.

(l) Each Company shall have delivered evidence reasonably satisfactory to the Buyer of such Company's organization and proceedings and its existence in the jurisdiction in which it is formed, including evidence of such existence as of the Closing.

(m) The Buyer shall have obtained on terms and conditions reasonably satisfactory to it all of the financing necessary to pay the Cash Portion and pay related fees and expenses to consummate the Acquisition and provide reasonably adequate working capital for the Companies after the Closing.

(n) The Companies shall have delivered to Buyer a certificate of each Company, executed by an officer of each such Company, dated as of the Closing Date, certifying on behalf of the Companies that each of the conditions set forth in Section 7.1(a) and Section 7.1(b) have been satisfied in all respects.

7.2 Conditions to Obligation of the Sellers and the Companies. The obligation of the Sellers and the Companies to consummate the Acquisition is subject to the satisfaction or waiver by the Sellers of the following conditions:

(a) The representations and warranties of the Buyer and the Parent set forth in this Agreement will be true and correct in all respects as of the date of this Agreement and as of the Closing Date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties will be true and correct as of such other date), except where the failure of such representations and warranties

to be so true and correct does not adversely affect the ability of the Buyer or the Parent to consummate the Acquisition and the other transactions contemplated by this Agreement.

(b) Each of the Buyer and the Parent will have performed all of the covenants required to be performed by it under this Agreement at or prior to the Closing except such failures to perform as do not materially adversely affect the ability of the Buyer or the Parent to consummate the Acquisition and the other transactions contemplated by this Agreement.

(c) The waiting period applicable to the consummation of the Acquisition and the other transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated and the parties hereto will have received all other authorizations, consents and approvals of all Governmental Entities in connection with the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Without limiting the generality of the foregoing, all filings with NYSE American shall have been made by Parent and Parent shall have otherwise taken all such actions as may be reasonably necessary for the Parent Common Stock (and the Parent Common Stock underlying the Parent Preferred Stock) to be issued pursuant hereto to be accepted by NYSE American for issuance and approved for listing thereon from and after the time of Closing (or, with respect to the shares of Common Stock underlying the Parent Preferred Stock, from and after the date of the issuance of such shares of underlying Common Stock following Stockholder Approval), subject to official notice of issuance.

(d) No temporary, preliminary or permanent restraining Order preventing the consummation of the Acquisition will be in effect.

(e) The Buyer and the Parent shall have obtained any consents, permits, licenses, approvals or notifications of any lenders, lessors, suppliers, customers or other third parties required to consummate the Acquisition.

(f) The Parent shall have filed the Certificate of Designations with the Secretary of State of the State of Delaware.

(g) The Buyer and the Parent shall have delivered the Voting Agreement.

(h) The Buyer shall have delivered each of (i) the A. Fouerti Employment Agreement; and (ii) the E. Fouerti Employment Agreement, in each case duly executed by Buyer.

(i) The Buyer and the Parent shall have delivered to the Companies a certificate of the Buyer and the Parent, executed by an officer of the Buyer and the Parent, respectively, dated as of the Closing Date, certifying on behalf of the Buyer and the Parent, respectively, that each of the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied in all respects.

A-27

## ARTICLE VIII
### TERMINATION; AMENDMENT; WAIVER

8.1 <u>Termination of Agreement</u>. This Agreement may be terminated as follows:

(a) by mutual written consent of the Buyer, the Parent and the Sellers at any time prior to the Closing;

(b) by either the Buyer and the Parent or the Sellers if any Governmental Entity will have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the transactions contemplated by this Agreement;

(c) by either the Buyer and the Parent or the Sellers if the Closing does not occur on or before the Outside Date; *provided*, that the right to terminate this Agreement pursuant to this Section 8.1(c) shall not be available to any Party that has breached in any material respect its obligations under this Agreement in any manner that shall have caused the failure of a condition to the consummation of the Acquisition.

(d) by the Buyer and the Parent if any Seller or any Company has breached its respective representations and warranties or any covenant or other agreement to be performed by it in a manner such that the Closing conditions set forth in Section 7.1(a) or 7.1(b) would not be satisfied; or

(e) by the Sellers if the Buyer or the Parent has breached its representations and warranties or any covenant or other agreement to be performed by it in a manner such that the Closing conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied.

8.2 <u>Effect of Termination</u>.

(a) In the event this Agreement is terminated in accordance with Section 8.1(a), Section 8.1(b), or Section 8.1(d), the Seller Representative shall return the Deposit to Buyer within two (2) Business Days.

(b) In the event this Agreement is terminated by Seller pursuant to Section 8.1(c) or Section 8.1(e), Sellers shall retain the Deposit and, if applicable, the Additional Deposit.

(c) In the event of termination of this Agreement as provided in Section 8.1, other than with respect to Section 8.1(b), this Agreement will terminate and all rights and obligations of the parties under this Agreement automatically end without any Liability (other than with respect to any suit for breach of this Agreement) on the part of the Buyer, the Parent, the Companies or the Sellers (or any member, stockholder agent, consultant or Representative of any such party); <u>provided</u>, that the provisions of Sections 10.1 through 10.15 and this Section 8.2 will survive any termination hereof pursuant to Section 8.1.

8.3 <u>Amendments</u>. This Agreement may not be amended except by an instrument in writing signed on behalf of the Buyer, the Parent, the Companies and the Sellers.

8.4 <u>Waiver</u>. At any time prior to the Closing, the Buyer and the Parent may (a) extend the time for the performance of any of the covenants, obligations or other acts of the Sellers and the Companies or (b) waive any inaccuracy of any representations or warranties or compliance with any of the agreements, covenants or conditions of the Sellers or the Companies. Any agreement on the part of the Buyer and the Parent to any such extension or waiver will be valid only if such waiver is set forth in an instrument in writing signed on its behalf by its duly authorized officer. At any time prior to the Closing, the Sellers and the Companies may (a) extend the time for the performance of any of the covenants, obligations or other acts of the Buyer or the Parent or (b) waive any inaccuracy of any representations or warranties or compliance with any of the agreements, covenants or conditions of the Buyer or the Parent. Any agreement on the part of the Sellers and the Companies to any such extension or waiver will be valid only if such waiver is set forth in an instrument in writing signed by the Sellers and the Companies. Except for any waiver under the preceding sentences of this Section 8.4, the failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise will not constitute a waiver of such rights. The waiver of any such right with respect to particular facts and other circumstances will not be deemed a waiver with respect to any other facts and circumstances, and each such right will be deemed an ongoing right that may be asserted at any time and from time to time.

A-28

## ARTICLE IX
### INDEMNIFICATION

9.1 <u>Survival</u>. The representations, warranties made herein and in any certificate delivered in connection herewith shall survive for a period of twelve (12) months following the Closing Date, at which time they shall expire; provided, however, that (a) the representations and warranties set forth in Sections 3.1 (Authority and Enforceability), 3.3 (The Securities), 4.1 (Organization; Standing and Power; Authority and Enforceability), 4.3 (Capitalization), 4.6 (Taxes), Section 5.1 (Organization), Section 5.2 (Authorization), and Section 5.5 (Capitalization) of this Agreement (the "**Fundamental Representations**") shall survive for a period of ten (10) years, except for the representations and warranties in Section 4.6 (Taxes)

which shall survive the Closing until the expiration of the applicable statute of limitation. If written notice of a claim has been given prior to the expiration of the applicable representations and warranties, then notwithstanding any statement herein to the contrary, the relevant representations and warranties shall survive as to such claim, until such claim is finally resolved. Unless a specified period is set forth in this Agreement (in which event such specified period will control), and for covenants that by their terms are to be performed after the Closing Date, all agreements and covenants contained in this Agreement will survive the Closing and remain in effect until thirty (30) days after the expiration of the applicable statutes of limitations. To avoid any doubt, the parties hereto agree that the time limitations herein limit the time in which a claim may be brought even though such time limits may be less than those otherwise afforded under applicable statutes of limitations. In the event that a claim has been brought within such time periods, the running of such time prior to the final adjudication of such claim shall not time bar the continuation of such claim.

9.2 Indemnification by Sellers. From and after the Closing, each Seller, on a several and not joint basis (on a Pro Rata Basis), hereby agrees to indemnify, defend and save the Buyer and the Parent and, to the extent applicable, its respective Affiliates, stockholders, officers, directors, employees, agents and representatives (each, a "**Buyer Indemnified Party**" and collectively, the "**Buyer Indemnified Parties**") harmless from and against any and all direct and actual Liabilities, deficiencies, demands, claims, Actions, assessments, losses, costs, expenses, interest, fines, penalties and damages (including reasonable fees and expenses of attorneys and accountants but excluding any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales, or amounts calculated as a multiple of earnings, profits, revenue, sales or other measure)) (individually and collectively, the "**Losses**") suffered, sustained or incurred by any Buyer Indemnified Party arising out of or otherwise by virtue of: (a) any breach of any of the representations or warranties of such Seller or the Companies contained in Article III or IV of this Agreement or (b) the failure of such Seller to perform any of its covenants or obligations contained in this Agreement.

9.3 Indemnification by Buyer. From and after the Closing, the Buyer agrees to indemnify, defend and save the Sellers and to the extent applicable, the Sellers' Affiliates, employees, agents and representatives (each, a "**Seller Indemnified Party**" and collectively the "**Seller Indemnified Parties**") harmless from and against any and all Losses sustained or incurred by any Seller Indemnified Party arising out of or otherwise by virtue of: (a) any breach of any of the representations and warranties of Buyer or Parent contained in Article V of this Agreement or (b) the failure of the Buyer or Parent to perform any of its covenants or obligations contained in this Agreement.

9.4 Third Party Indemnification Procedures; Direct Claim Procedures.

(a) If a Buyer Indemnified Party or a Seller Indemnified Party seeks indemnification under this Article IX, such party (the "**Indemnified Party**") shall promptly give written notice to the other party (the "**Indemnifying Party**") of the assertion of any claim or the commencement of any suit, action or proceeding by any third party (a "**Third Party Claim**") in respect of which indemnity may be sought under this Article IX. Such notice shall contain details reasonably sufficient to disclose to the Indemnifying Party the nature and scope of the claim including an estimate of the amount of claimed Losses (if known and quantifiable) and copies of all relevant pleadings, documents and information. Any failure in the delivery of such notice shall not affect the obligations of the Indemnifying Party, except to the extent (and only to the extent) that the rights and remedies of the Indemnifying Party are prejudiced as a result of the failure to give, or delay in giving, such notice.

A-29

(b) The Indemnifying Party shall be entitled to participate in the defense of any Third Party Claim and, subject to the limitations set forth in this Section 9.4(b), shall be entitled to control and appoint lead counsel for such defense, in each case at its own expense; *provided*, that (i) the Indemnifying Party provides written notice to the Indemnified Party that the Indemnifying Party intends to undertake such defense and (ii) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently; *provided*, *further*, that the Indemnifying Party shall not have the right to defend against such Third Party Claim (unless otherwise agreed to in writing by the Indemnified Party) if (A) the claim for indemnification relates to or arises in connection with any criminal or quasi-criminal proceeding, action, indictment, allegation or investigation, (B) the claim seeks an injunction or other equitable relief against any Indemnified Party or any of its Affiliates, or (C) the Indemnified Party shall in good faith determine after consultation with outside counsel that the Indemnified Party may have available to it one or more defenses or counterclaims that are inconsistent with one or more of the defenses or counterclaims that may be available to the Indemnifying Party in respect of a Third Party Claim that would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party.

(c) The Indemnifying Party shall notify the Indemnified Party within fifteen (15) days after having received any claim notice with respect to whether or not it is exercising its right to defend the Indemnified Party against the Third Party Claim. If the Indemnifying Party has the right to and elects to assume the control of the defense of any Third Party Claim in accordance with the provisions of this Section 9.4, (i) the Indemnifying Party shall have the right to defend such Third Party Claim with counsel selected by the Indemnifying Party (which counsel shall be subject to the approval of the Indemnified Party, such approval not to be unreasonably withheld, conditioned or delayed), (ii) the Indemnifying Party shall not enter into any settlement agreement with respect to such Third Party Claim without the prior written consent of the Indemnified Party (which shall not be unreasonably withheld, delayed or conditioned) and (iii) the Indemnified Party shall be entitled to participate in the defense of any Third Party Claim and to employ at its expense separate counsel of its choice for such purpose (in which case the counsel of the Indemnifying Party shall reasonably cooperate with such separate counsel to facilitate such participation, including (x) promptly providing to such separate counsel copies of all written materials received in respect of the Third Party Claim, (y) providing such separate counsel a reasonable opportunity to review and comment on materials being drafted and furnished in respect of such Third Party Claim (which such comments shall be considered in good faith) and (z) providing the opportunity to participate in all meetings (whether in person, by teleconference or otherwise) relating to such Third Party Claim).

(d) If the Indemnifying Party does not notify the Indemnified Party that the Indemnifying Party elects to defend the Indemnified Party pursuant to Section 9.4(c) within fifteen (15) days after receipt of notice of a Third Party Claim, or the Indemnifying Party is otherwise not entitled to defend the Indemnified Party pursuant to Section 9.4(b), then the Indemnified Party may defend, and be reimbursed by the Indemnifying Party for its reasonable costs and expenses in regard to, the Third Party Claim with counsel selected by the Indemnified Party in all appropriate proceedings. In such circumstances, the Indemnified Party may defend any such Third Party Claim and have full control of such defense and proceedings including the settlement, compromise or discharge thereof; *provided, however*, that no such Third Party Claim shall be settled, compromised or discharged by the Indemnified Party without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, delayed or conditioned). The Indemnifying Party shall be entitled to participate in the defense of any Third Party Claim described in this Section 9.4(d) and to employ one separate counsel of its choice for such purpose (in which case the counsel of the Indemnified Party shall reasonably cooperate with such separate counsel to facilitate such participation, including (x) promptly providing to such separate counsel copies of all written materials received in respect of the Third Party Claim, (y) providing such separate counsel a reasonable opportunity to review and comment on materials being drafted and furnished in respect of such Third Party Claim (which such comments shall be considered in good faith) and (z) providing the opportunity to participate in all meetings (whether in person, by teleconference or otherwise) relating to such Third Party Claim). The fees and expenses of such separate counsel shall be paid by the Indemnifying Party.

(e) Each party shall cooperate, and cause its respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or

appeals, as may be reasonably requested in connection therewith; _provided_ that no Indemnified Party, upon reasonable advice of counsel, shall have any obligation to disclose any information the disclosure of which would reasonably be expected to result in a violation of applicable Law or is subject to attorney-client or any other privilege, and if requested by an Indemnified Party, the Indemnifying Party will enter into an appropriate joint defense agreement (or other privilege-preserving agreement) in connection with obtaining access to such information.

A-30

9.5 Direct Claim Procedures. In the event an Indemnified Party brings a claim for indemnity against an Indemnifying Party that does not involve a Third Party Claim (a "**Direct Claim**"), the Indemnified Party shall give prompt notice in writing of such Direct Claim to the Indemnifying Party. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is materially prejudiced by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail (excluding anything subject to attorney-client or similar privilege) with respect thereto and shall indicate the estimated amount, if reasonably known and quantifiable and assuming the truth of the facts asserted therein, of the Losses that have been or may be sustained by the Indemnified Party; _provided, however_, that (a) the notice with respect to a Direct Claim (a "**Direct Claim Notice**") need only specify such information to the knowledge of such Indemnified Party as of the date of such notice and (b) shall be updated and amended from time to time by the Indemnified Party by delivering an updated or amended Direct Claim Notice. The Indemnifying Party shall have sixty (60) days after its receipt of such notice to respond in writing to such Direct Claim Notice. During such 60-day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim, and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's, the Companies' and its Subsidiaries' premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. The Indemnifying Party may object to a claim for indemnification set forth in a Direct Claim Notice by delivering a notice to the Indemnified Party seeking indemnification within sixty (60) days of the delivery of the applicable Direct Claim Notice (the "**Direct Claim Objection Deadline**"), setting forth in reasonable detail the objections to the Direct Claim. If the Indemnifying Party notifies the applicable Indemnified Party that it objects by the Direct Claim Objection Deadline or fails to object by the Direct Claim Objection Deadline, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

9.6 Limitation on Indemnification Obligation.

(a) Notwithstanding anything in this Agreement to the contrary, the liability of the Sellers to the Buyer Indemnified Parties with respect to claims for indemnification pursuant to Section 9.2(a) is subject to the following limitations:

(i) The Sellers shall not, in the aggregate, be liable to the Buyer Indemnified Parties for Losses arising under Section 9.2(a) (other than with respect to Fundamental Representations or for actual fraud in the making of representations or warranties of the Sellers in this Agreement ("**Fraud**")) that exceed $21,000,000.

(ii) The Sellers shall not be liable to the Buyer Indemnified Parties for Losses arising under Section 9.2(a) (other than with respect to Fundamental Representations) until and unless the aggregate amounts indemnifiable for such breaches exceeds $2,100,000. In the event the Buyer Indemnified Parties' claim for Losses, in the aggregate, exceed $2,100,000, the Buyer Indemnified Parties shall be entitled to Losses back to the first dollar of such Losses.

(iii) The Sellers shall not be liable to the Buyer Indemnified Parties for Losses arising under Section 9.2 unless the claim therefor is asserted in writing on or prior to the expiration of the applicable representation and/or warranty.

(b) Notwithstanding anything in this Agreement to the contrary, Buyer and Parent shall not, in the aggregate, be liable to the Seller Indemnified Parties for Losses arising under Section 9.3(a) (other than with respect to Fundamental Representations or for Fraud) that exceed $21,000,000.

(c) All indemnification payments pursuant to this Article IX shall be deemed to be adjustments to the Purchase Price.

(d) Subject to the limitations contained in this Article IX, each of the Seller's liability under this Article IX is limited to the amount of cash actually received by such Seller pursuant to this Agreement and allocated among the Sellers on a Pro Rata Basis; provided, however, that in no event shall one Seller be liable for the Fraud of another Seller.

9.7 Payments. Payments of all amounts owing by an Indemnifying Party under this Article IX shall be made promptly upon the final determination in accordance with this Article IX that an indemnification obligation is owing by the Indemnifying Party to the Indemnified Party.

9.8 Tax Refunds, Insurance Proceeds and Other Payments. The amount of any and all Losses for which indemnification is provided pursuant to this Article IX will be net of any Tax benefit to which an Indemnified Party is entitled by reason of payment of such Liability (taking into account any Tax cost or reduction in such Tax benefits by reason of receipt of the indemnification payment) and any amounts of any insurance proceeds, indemnification payments, contribution payments or reimbursements receivable by, or payable in kind to, the Indemnified Party with respect to such Losses or any of the circumstances giving rise thereto. In connection therewith, if, at any time following payment in full by the Indemnifying Party of any amounts of Losses due under this Agreement, the Indemnified Party receives any insurance proceeds, indemnification payments, contribution payments or reimbursements relating to the circumstances giving rise to such Losses, the Indemnified Party will promptly remit to the Indemnifying Party such proceeds, payments or reimbursements in an amount not to exceed the amount of the corresponding indemnification payment made by the Indemnifying Party. The Buyer and the Parent will use (and will cause their respective Affiliates to use) commercially reasonable efforts to collect the proceeds of any available insurance which would have the effect of reducing any Losses (in which case the net proceeds thereof will reduce the Losses).

9.9 Mitigation. The Indemnified Party will use its commercially reasonable efforts to mitigate any Losses with respect to which it may be entitled to seek indemnification pursuant to this Agreement.

A-31

ARTICLE X
MISCELLANEOUS

10.1 Press Releases and Public Announcement. Neither the Buyer or the Parent on the one hand, nor the Sellers or the Companies on the other, will issue any press release or make any public announcement relating to this Agreement, the Acquisition or the other transactions contemplated by this Agreement without the prior written approval of the other party; _provided, however_, that, the Buyer may make regulatory filings referring to this Agreement or attaching a copy hereof as may be required by applicable Law, including the Securities Act of 1933, as amended and the Exchange Act, as amended.

10.2 No Third-Party Beneficiaries. This Agreement will not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns, except that the provisions of Article IX are intended for the benefit of the Buyer Indemnified Parties and the Seller Indemnified Parties.

10.3 Entire Agreement. This Agreement and the Ancillary Agreements (including the Exhibits and the Schedules hereto) constitutes the entire agreement among the parties hereto and supersedes any prior understandings, agreements or representations by or among the parties hereto, written or oral, to the extent they related in any way to the subject matter hereof.

10.4 Succession and Assignment. This Agreement will be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns. No party hereto may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval, in the case of assignment by the Buyer or the Parent, by the Sellers, and, in the case of assignment by the Sellers or the Companies, the Buyer and the Parent.

10.5 Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

10.6 Notices. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally against written receipt or by facsimile or electronic mail transmission or mailed (by registered or certified mail, postage prepaid, return receipt requested) or delivered by reputable overnight courier, fee prepaid, to the parties hereto at the addresses of the parties as specified below:

If to the Buyer, Parent or a Company (after the Closing):

> c/o 1847 Goedeker Inc.
> 13850 Manchester Road
> Ballwin, MO 63011
> Attn: Douglas T. Moore, CEO
> Facsimile:
> Email:

with a copy to:

> BEVILACQUA PLLC
> 1050 Connecticut Avenue, NW, Suite 500
> Washington, DC 20036
> Attn: Louis A. Bevilacqua, Esq.
> Facsimile:
> Email:

A-32

If to Sellers or a Company (prior to the Closing):

> To the addresses specified on **Exhibit A** hereto

with a copy to:

> MURTHA CULLINA LLP
> One Century Tower
> 265 Church Street
> New Haven, CT 06510
> Attn: James W. McLaughlin
> Facsimile:
> Email:

Any party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties notice in the manner set forth herein.

10.7 Governing Law. This Agreement will be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to any choice of Law or conflict of Law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of New York.

10.8 Consent to Jurisdiction and Service of Process. EACH OF THE PARTIES HERETO CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF NEW YORK AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS RELATING TO THIS AGREEMENT, THE ACQUISITION OR THE OTHER TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT MAY BE LITIGATED IN SUCH COURTS. EACH OF THE PARTIES HERETO ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS RESPECTIVE PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY FINAL AND NONAPPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT, THE ACQUISITION OR THE OTHER TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

10.9 Headings. The descriptive headings contained in this Agreement are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

10.10 Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, (d) with respect to the Sellers' obligations in Section 6.6 of this Agreement, the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision and (e) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms of such illegal, invalid or unenforceable provision as may be possible.

10.11 Expenses. Except as otherwise provided in this Agreement, whether or not the Acquisition is consummated, all expenses incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the party incurring such expenses.

10.12 Incorporation of Exhibits and Schedules. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

10.13 Limited Recourse. Notwithstanding anything in this Agreement to the contrary, the obligations and Liabilities of the parties hereunder or in any Ancillary Agreement will be without recourse to any stockholder or member of such party or any of such stockholder's or member's Affiliates, or any of their respective Representatives or agents (in each case, in their capacity as such).

10.14 Specific Performance. The parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with the terms hereof and that the parties will be entitled to specific performance of the terms hereof in addition to any other remedy at Law or in equity.

10.15 Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic

signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

A-33

10.16 Disclosure Schedules. The Disclosure Schedules, attached hereto as **Exhibit H**, shall be subject to the following terms and conditions: (a) all disclosures in the Financial Statements shall be deemed to be disclosed on all sections of the Disclosure Schedules; (b) any item disclosed on or in any particular part or section of the Disclosure Schedules shall be deemed to be disclosed on and in all parts or sections of the Disclosure Schedules, to the extent such deemed disclosure is reasonably apparent; (c) no disclosure of any matter contained in the Disclosure Schedules shall create an implication that such matter meets any standard of materiality (matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules; such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature, nor shall the inclusion of any item be construed as implying that any such item is "material" for any purpose); (d) any disclosures contained in the Disclosure Schedules which refer to a document are qualified in their entirety by reference to the text of such document; and (e) headings and introductory language have been inserted in the Disclosure Schedules for convenience of reference only and shall to no extent have the effect of amending or changing the express description of the sections as set forth in this Agreement.

10.17 Conflicts; Privileges.

(a) It is acknowledged by each of the parties that the Sellers and the Companies have retained Murtha Cullina LLP to act as their counsel in connection with the negotiation and execution of this Agreement and the transactions contemplated by this Agreement and that Murtha Cullina LLP has not acted as counsel for any other Person in connection with the transactions contemplated by this Agreement and that no other party to this Agreement has the status of a client of Murtha Cullina LLP for conflict of interest or any other purposes as a result thereof.

(b) Each of Buyer and Parent hereby agrees that, in the event that a dispute arises among Buyer or any of its Affiliates (including, after the Closing, any Companies) and Sellers or any of their Affiliates (including, prior to the Closing, the Companies), Murtha Cullina LLP may represent Sellers or any such Affiliate in such dispute, even though the interests of Sellers or such Affiliate may be directly adverse to Buyer or any of its Affiliates (including, after the Closing, the Companies), and even though Murtha Cullina LLP may have represented a Company in a manner substantially related to such dispute, or may be handling ongoing matters for Buyer or a Company.

(c) Each of Buyer and Parent hereby waives, on behalf of itself and each of its Affiliates (including, after the Closing, the Companies): (i) any claim that it has or may have that Murtha Cullina LLP has a conflict in interest in connection with or is otherwise prohibited from engaging in such representations; and (ii) agrees that, in the event that a dispute arises after the Closing among Buyer or any of its Affiliates (including the Companies) and Sellers or any Affiliate of Sellers, Murtha Cullina LLP may represent any such party in such dispute, even though the interest of any such party may be directly adverse to Buyer or any of its Affiliates (including the Companies), and even though Murtha Cullina LLP may have represented a Company in a matter substantially related to such dispute, or may be handling ongoing matters for Buyer or a Company.

(d) Each of Buyer and Parent, on behalf of itself and each of its Affiliates (including, after the Closing, the Companies) further agrees that, if, and to the extent that, at any time subsequent to the Closing, each Company shall have the right to assert or waive an attorney-client privilege with respect to any communications between or among it or any of its directors or officers concerning or in contemplation of this Agreement or the transactions contemplated hereby, Sellers shall have the sole right to waive such attorney-client privilege. Further, no Murtha Cullina LLP attorney shall be required to respond to any inquiry concerning such communications without the approval of Sellers.

(e) Notwithstanding any other provision in this Agreement, prior to the Closing, Sellers shall be permitted to remove from the Companies any email, document and other records containing attorney-client privileged information where the attorney-client privilege is held jointly between a Company, on the one hand, and Sellers or any of their Affiliates, on the other hand ("**Jointly Privileged Information**"). From and after the Closing, Buyer shall cause each Company and its Affiliates to provide to Sellers copies (including electronic, digital or otherwise) of any Jointly Privileged Information that is inadvertently not removed prior to the Closing. Sellers agree that any email, document and other record temporarily removed for analysis to determine the presence of Jointly Privileged Information pursuant to the first sentence of this Section 10.17(e) shall be returned to the Company promptly following the completion of such review if it is determined by Sellers that such email, document or other record does not contain Jointly Privileged Information.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

A-34

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BUYER:**
**APPLIANCES CONNECTION INC.**
By:   /s/ Doulas T. Moore
Name: Douglas T. Moore
Title:  Chief Executive Officer

**PARENT:**
**1847 GOEDEKER INC.**
By:   /s/ Doulas T. Moore
Name: Douglas T. Moore
Title:  Chief Executive Officer

**COMPANIES:**
**1 STOP ELECTRONICS CENTER, INC.**
By:   /s/ Albert Fouerti
Name: Albert Fouerti
Title:  President

**GOLD COAST APPLIANCES INC.**
By:   /s/ Albert Fouerti
Name: Albert Fouerti
Title:  President

**SUPERIOR DEALS INC.**
By:   /s/ Albert Fouerti
Name: Albert Fouerti
Title:  President

**JOE'S APPLIANCES LLC**

| | |
|---|---|
| By: | /s/ Albert Fouerti |
| Name: | Albert Fouerti |
| Title: | President |

**YF LOGISTICS LLC**

| | |
|---|---|
| By: | /s/ Youssef Fouerti |
| Name: | Youssef Fouerti |
| Title: | Sole Member |

A-35

**SELLERS:**

/s/ Albert Fouerti

**Albert Fouerti**

/s/ Elie Fouerti

**Elie Fouerti**

/s/ Youssef Fouerti

**Youssef Fouerti**

**THE 2020 ALBERT FOUERTI TRUST**

| | |
|---|---|
| By: | /s/ David Rosenblatt |
| | David Rosenblatt, Esq., Trustee |

**THE 2020 ELIE FOUERTI TRUST**

| | |
|---|---|
| By: | /s/ David Rosenblatt |
| | David Rosenblatt, Esq., Trustee |

A-36

**EXHIBIT A**
**Schedule of Sellers**

| Name and Address of Seller | Ownership of Companies | Cash Portion (inclusive of the Deposit, and subject to any adjustment pursuant to Section 2.2 and 2.3 hereof) | Pro Rata Cash Basis | Portion of Common Stock included in Fixed Share Consideration | Portion of Series A Preferred Stock included in Fixed Share Consideration | Percentage of Common Stock and Series A-1 Preferred Stock included in Variable Share Consideration (*This percentage is also the Pro Rata Share Basis*) | Pro Rata Basis |
|---|---|---|---|---|---|---|---|
| **Albert Fouerti** **Address:** **Email:** | Eighty (80.0) shares of common stock of 1 Stop (40% of 1 Stop) <br><br> One hundred (100) shares of common stock of Gold Coast (50% of Gold Coast) <br><br> One hundred (100) shares of common stock of Superior Deals (50% of Superior Deals) <br><br> 50% of the membership interests of Joe's Appliances <br><br> 0% of the membership interests of YF Logistics | $83,500,000.00 | 49.70% | 0 shares of Common Stock | 0 shares of Series A Preferred Stock | 0% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 39.76% |
| **The 2020 Albert Fouerti Trust** **Address:** | Twenty (20) shares of common stock of 1 Stop (10% of 1 Stop) <br><br> 0 shares of common stock of Gold Coast (0% of Gold Coast) <br><br> 0 shares of common stock of Superior Deals (0% of Superior Deals) <br><br> 0% of the membership interests of Joe's Appliances <br><br> 0% of the membership interests of YF Logistics | $ 0.00 | 0% | 611,119.50 shares of Common Stock | 555,547 shares of Series A Preferred Stock | 50.00% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 10.00% |
| | Eighty (80.0) shares of common stock of 1 Stop | | | | | | |

| Name | Interests | Cash | % | Common Stock | Series A Preferred | Variable Share Consideration | % |
|---|---|---|---|---|---|---|---|
| **Elie Fouerti**<br>Address:<br>Email: | (40% of 1 Stop)<br><br>One hundred (100) shares of common stock of Gold Coast (50% of Gold Coast)<br><br>One hundred (100) shares of common stock of Superior Deals (50% of Superior Deals)<br><br>50% of the membership interests of Joe's Appliances<br><br>0% of the membership interests of YF Logistics | $83,500,000.00 | 49.70% | 0 shares of Common Stock | 0 shares of Series A Preferred Stock | 0.00% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 39.76% |
| **The 2020 Elie Fouerti Trust**<br>Address: | Twenty (20) shares of common stock of 1 Stop (10% of 1 Stop)<br><br>0 shares of common stock of Gold Coast (0% of Gold Coast)<br><br>0 shares of common stock of Superior Deals (0% of Superior Deals)<br><br>0% of the membership interests of Joe's Appliances<br><br>0% of the membership interests of YF Logistics | $ 0.00 | 0% | 611,119.50 shares of Common Stock | 555,547 shares of Series A Preferred Stock | 50.00% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 10.00% |
| **Youssef Fouerti**<br>Address:<br>Email: | 0 shares of common stock of 1 Stop (0% of 1 Stop)<br><br>0 shares of common stock of Gold Coast (0% of Gold Coast)<br><br>0 shares of common stock of Superior Deals (0% of Superior Deals)<br><br>0% of the membership interests of Joe's Appliances<br><br>100% of the membership interests of YF Logistics | $ 1,000,000.00 | 0.60% | 0 shares of Common Stock | 0 shares of Series A Preferred Stock | 0% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 0.48% |

A-37

**EXHIBIT B**
**Illustrative Calculation of Target Net Working Capital**

| | 1/31/2020 | 2/29/2020 | 3/31/2020 | 4/30/2020 | 5/31/2020 | 6/30/2020 | 7/31/2020 |
|---|---|---|---|---|---|---|---|
| Accounts Receivable - 1 Stop | 26,489,043.11 | 25,528,405.55 | 25,130,102.86 | 23,819,658.01 | 26,472,225.71 | 25,573,624.92 | 25,860,323.82 |
| Accounts Receivable - Superior Deals | 49,803.80 | 49,803.80 | 26,711.30 | 120,076.74 | 276,076.12 | 183,012.42 | 316,414.02 |
| Inventory | 13,214,293.66 | 13,261,988.51 | 14,005,332.99 | 15,379,509.24 | 14,812,547.93 | 15,710,443.01 | 14,745,489.34 |
| Prepaid Insurance - 1 Stop | 54,568.88 | 39,158.88 | 23,748.88 | 8,338.88 | (16,094.91) | 249,471.17 | 225,328.80 |
| Prepaid Insurance - YF | 68,913.97 | 49,224.27 | 29,534.57 | 9,844.87 | (14,784.68) | 310,478.35 | 280,908.98 |
| Accounts Payable - 1 Stop | (23,957,826.03) | (25,107,255.56) | (25,372,813.15) | (24,856,510.41) | (23,247,437.52) | (21,846,356.02) | (19,389,526.30) |
| Accounts Payable - YF | (361,429.75) | (397,534.55) | (341,984.40) | (393,277.57) | (279,760.62) | (500,852.93) | (717,288.24) |
| Credit Cards Payable: | | | | | | | |
| Amex Plum | (552,694.89) | (1,013,345.61) | (304,598.12) | (753,620.17) | (608,083.15) | (670,227.85) | (801,833.24) |
| Amex Black | (1,052,020.96) | (993,348.43) | (410,098.66) | (745,360.98) | (341,588.96) | (171,990.78) | (1,510,065.83) |
| Capital One 1 Stop | (282,790.32) | (335,906.98) | (173,695.64) | (390,522.56) | (509,126.17) | (582,582.45) | (499,227.57) |
| Amex YF | (287,678.84) | (311,518.48) | (409,077.52) | (354,380.65) | (317,473.65) | (142,078.52) | (324,003.38) |
| Capital One YF | (25,148.93) | (25,000.57) | (30,239.17) | - | - | - | 4,403.35 |
| American Express Gold Coast | (8,108.53) | (12,374.26) | (8,154.24) | (2,175.19) | (11,704.01) | (2,575.91) | (1,334.06) |
| Equipment/Vehicle Loans Payable Current Portion | (297,960.24) | (295,749.32) | (294,185.74) | (292,672.44) | (291,059.39) | (287,993.17) | (284,922.87) |
| Customer Deposits and deferred revenue from current | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| sales | (9,897,299.31) | (9,638,544.03) | (8,769,654.04) | (9,762,182.52) | (16,701,088.74) | (15,099,061.83) | (14,697,298.00) |
| Payroll Liabilities - 1 Stop | (11,526.79) | (12,932.22) | (15,134.84) | (16,771.82) | (18,975.70) | 295,586.33 | (29,401.98) |
| Payroll Liabilities - YF | (16,923.07) | (13,354.89) | (18,107.90) | (18,437.94) | (18,767.98) | 135,806.04 | (19,444.48) |
| Payroll Liabiliities - Gold Coast | (5,219.91) | (4,563.99) | (3,874.97) | (3,905.94) | (3,406.94) | (19.18) | (5,186.93) |
| Payroll Liabilities - Joe's Appliances | (4,120.07) | (3,791.77) | (3,895.37) | (1,733.88) | (2,482.73) | 318.47 | 4,156.03 |
| Sales tax payable - 1 Stop | (155,821.26) | (213,074.19) | (325,593.74) | (319,394.99) | (390,821.24) | (672,910.60) | (428,707.19) |
| Sales tax Payable - Gold Coast | | (13,472.28) | | | (8,691.69) | (7,808.54) | (12,443.85) |
| Sales tax Payable - Joe's Appliances | | (11,074.36) | | | (5,168.70) | (5,295.01) | (11,319.09) |
| Sales tax Payable - Superior Deals | - | - | - | - | | (868.51) | (1,974.16) |
| Deferred Revenue from projects, builders, etc. | (16,048,723.10) | (14,293,281.10) | (14,152,302.33) | (15,212,276.99) | (17,442,222.10) | (16,057,517.70) | (16,057,202.31) |
| Outstanding Checks - Bridgehamton 3270 | (1,016,877.02) | (971,126.63) | (770,921.13) | (1,090,926.76) | (1,486,610.60) | (1,374,598.69) | (2,560,164.45) |
| Outstanding Checks - Capital One 6547 | - | - | (32,390.38) | (25,894.88) | (43,024.88) | (63,257.16) | (89,503.63) |
| Outstanding Checks - Popular Community Gold Coast | (67,208.99) | (63,398.23) | (64,629.78) | (65,646.98) | (65,498.53) | (65,948.53) | (65,948.53) |
| Outstanding Checks - Capital One 4661 closed | (40,446.22) | (81,165.82) | (171,402.51) | - | - | - | - |
| Outstanding Checks - Popular Community 6753 | - | - | - | - | - | - | - |
| Outstanding Checks - Bridgehamton 0664 closed | (390,571.06) | - | - | - | - | - | - |
| Total | (14,603,771.87) | (14,883,232.26) | (12,457,323.03) | (14,968,264.93) | (20,263,023.13) | (15,093,202.67) | (16,069,771.75) |
| Sum | | | | | | | (108,338,589.64) |
| Number of periods | | | | | | | 7 |

Average over 7 months =
Target Net Working Capital                                                      **$(15,476,941.38)**

---

**AMENDMENT NO. 1**
**TO THE**
**SECURITIES PURCHASE AGREEMENT**

AMENDMENT NO. 1 TO THE SECURITIES PURCHASE AGREEMENT, dated December 8, 2020 (the "**Amendment**"), among **1847 GOEDEKER INC.**, a Delaware corporation ("**Parent**"), APPLIANCES CONNECTION INC., a Delaware corporation (the "**Buyer**"), **1 STOP ELECTRONICS CENTER, INC.**, a New York corporation ("**1 Stop**"), GOLD COAST APPLIANCES INC., a New York corporation ("**Gold Coast**"), SUPERIOR DEALS INC., a New York corporation ("**Superior Deals**"), JOE'S APPLIANCES LLC, a New York limited liability company ("**Joe's Appliances**"), and YF Logistics LLC, a New Jersey limited liability company ("**YF Logistics**" and together with 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, each a "**Company**" and collectively, the "**Companies**"), and the other party or parties set forth in **Exhibit A** hereto (each a "**Seller**" and, collectively, the "**Sellers**"). Each of the Buyer, the Companies, the Sellers and the Parent are sometimes referred to in this Amendment individually as a "**Party**" and, collectively, as the "**Parties**."

**RECITALS**

A. The Parties have previously entered into that certain Securities Purchase Agreement, dated as of October 20, 2020 (the "**Securities Purchase Agreement**").

B. The Parties desire to amend the Securities Purchase Agreement as set forth herein.

C. Pursuant to Section 8.3 of the Securities Purchase Agreement, the Securities Purchase Agreement may be amended by the Parties only by an instrument in writing signed on behalf of the Buyer, the Parent, the Companies and the Sellers.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing premises and the respective representations and warranties, covenants and agreements contained herein, the Parties hereto agree as follows:

1. Definitions. All capitalized terms used herein without definition shall have the meanings ascribed to them in the Securities Purchase Agreement, as applicable.

2. Amendments.

    A.    The definition of "**Outside Date**" here hereby amended to mean May 31, 2021.

    B.    Section 2.1(a) is hereby amended and restated in its entirety to read as follows:

"(a) Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, each Seller will contribute, sell, transfer and deliver to the Buyer, and the Buyer will purchase and receive from each Seller all the Securities set forth opposite such Seller's name on **Exhibit A**, constituting all of the issued and outstanding Securities of the Companies, for an aggregate purchase price of *Two Hundred Twenty Two Million Dollars ($222,000,000)*, consisting of: (a) *One Hundred Eighty Million Dollars ($180,000,000)* in cash in immediately available funds (the "**Cash Portion**"), (b) One Million Two Hundred Twenty Two Thousand Two Hundred Thirty Nine (1,222,239) shares of newly-issued Common Stock of the Parent and One Million One Hundred Eleven Thousand Ninety Four (1,111,094) shares of newly-issued Series A Preferred Stock of Parent (collectively, the "**Fixed Share Consideration**"), collectively, having a stated value that is equal to Twenty One Million Dollars ($21,000,000) or Nine Dollars ($9.00) per share of Common Stock or Series A Preferred Stock, as applicable (c) a number of shares of Series A-1 Preferred Stock of Parent that is equal to (i) Twenty One Million Dollars ($21,000,000) divided by (ii) Trailing 20 Day Price (the "**Variable Share Consideration**" and, collectively with the Cash Portion and the Fixed Share Consideration, the "**Purchase Price**"), payable as described below and allocated among the Sellers as set forth on **Exhibit A**."

C.   Section 2.1(h) is hereby added to the Securities Purchase Agreement as follows:

"(h) Notwithstanding anything to the contrary contained herein, in the event that the Parent obtains the requisite consent of its stockholders prior to the Closing such that it may issue at the Closing the entire amount of the Fixed Share Consideration and the entire amount of the Variable Share Consideration (together, the **Stock Consideration**") in Common Stock, in lieu of Series A Preferred Stock and Series A-1 Preferred Stock, in compliance with NYSE American regulations, then at the Closing the Buyer will satisfy the Stock Consideration with Common Stock only. For the avoidance of doubt, if the Buyer satisfies the Stock Consideration with Common Stock only, then the Sellers would receive 2,333,333 shares of Common Stock constituting the Fixed Share Consideration and a number of shares of Common Stock equal to (i) Twenty One Million Dollars ($21,000,000), divided by (ii) the Trailing 20 Day Price as the Variable Share Consideration."

D.   **Exhibit A** (Schedule of Sellers) to the Securities Purchase Agreement is hereby amended and restated in its entirety to read as set forth on **Exhibit A** to this Amendment. On and after the date of this Amendment, each reference in the Securities Purchase Agreement to "**Exhibit A**" and each reference to the "**Exhibit A**" in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Securities Purchase Agreement, will mean and be a reference to the Exhibit A attached to this Amendment..

3. Additional Deposit. As consideration for the amendment to the Securities Purchase Agreement contained in Section 2.A. above, upon executing this Amendment, Buyer shall pay a deposit of Seventy-Five Thousand Dollars ($75,000) in cash to 1 Stop (the "**Additional Deposit**") by wire transfer of immediately available funds to the account designated by 1 Stop on Schedule 2.1(b) of the Disclosure Schedule. At the Closing, the Additional Deposit will be deducted from the Cash Portion that Buyer will deliver to Sellers in the same manner as the Deposit, as set forth in Section 2.1(b) of the Securities Purchase Agreement, and in every other way shall be deemed to be part of the Deposit and shall be treated identically to the Deposit under the terms of the Securities Purchase Agreement.

4. Effect of Amendment. Except as amended as set forth above, the Securities Purchase Agreement shall continue in full force and effect.

5. Counterparts. This Amendment may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6. Governing Law. This Amendment will be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to any choice of Law or conflict of Law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of New York.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

A-40

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be duly executed as of the date first above written.

**BUYER:**
**APPLIANCES CONNECTION INC.**
By:   /s/ Doulas T. Moore
Name:   Douglas T. Moore
Title:   Chief Executive Officer
**PARENT:**
**1847 GOEDEKER INC.**
By:   /s/ Doulas T. Moore
Name:   Douglas T. Moore
Title:   Chief Executive Officer
**COMPANIES:**
**1 STOP ELECTRONICS CENTER, INC.**
By:   /s/ Albert Fouerti
Name:   Albert Fouerti
Title:   President
**GOLD COAST APPLIANCES INC.**
By:   /s/ Albert Fouerti
Name:   Albert Fouerti
Title:   President
**SUPERIOR DEALS INC.**
By:   /s/ Albert Fouerti
Name:   Albert Fouerti
Title:   President
**JOE'S APPLIANCES LLC**
By:   /s/ Albert Fouerti
Name:   Albert Fouerti
Title:   President
**YF LOGISTICS LLC**
By:   /s/ Youssef Fouerti
Name:   Youssef Fouerti
Title:   Sole Member

A-41

**SELLERS:**
/s/ Albert Fouerti
**Albert Fouerti**
/s/ Elie Fouerti
**Elie Fouerti**

|  |  |
|---|---|
|  | /s/ Youssef Fouerti |
|  | **Youssef Fouerti** |
|  | **THE 2020 ALBERT FOUERTI TRUST** |
|  | By: /s/ David Rosenblatt |
|  | David Rosenblatt, Esq., Trustee |
|  | **THE 2020 ELIE FOUERTI TRUST** |
|  | By: /s/ David Rosenblatt |
|  | David Rosenblatt, Esq., Trustee |

A-42

## EXHIBIT A
## Schedule of Sellers

| Name and Address of Seller | Ownership of Companies | Cash Portion (inclusive of the Deposit, and subject to any adjustment pursuant to Section 2.2 and 2.3 hereof) | Pro Rata Cash Basis | Portion of Common Stock included in Fixed Share Consideration | Portion of Series A Preferred Stock included in Fixed Share Consideration | Percentage of Common Stock and Series A-1 Preferred Stock included in Variable Share Consideration (*This percentage is also the Pro Rata Share Basis*) | Pro Rata Basis |
|---|---|---|---|---|---|---|---|
| **Albert Fouerti** Address: Email: | Eighty (80.0) shares of common stock of 1 Stop (40% of 1 Stop)<br><br>One hundred (100) shares of common stock of Gold Coast (50% of Gold Coast)<br><br>One hundred (100) shares of common stock of Superior Deals (50% of Superior Deals)<br><br>50% of the membership interests of Joe's Appliances<br><br>0% of the membership interests of YF Logistics | $89,500,000.00 | 49.72% | 0 shares of Common Stock | 0 shares of Series A Preferred Stock | 0% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 40.32% |
| **The 2020 Albert Fouerti Trust** Address: | Twenty (20) shares of common stock of 1 Stop (10% of 1 Stop)<br><br>0 shares of common stock of Gold Coast (0% of Gold Coast)<br><br>0 shares of common stock of Superior Deals (0% of Superior Deals)<br><br>0% of the membership interests of Joe's Appliances<br><br>0% of the membership interests of YF Logistics | $ 0.00 | 0% | 611,119.50 shares of Common Stock | 555,547 shares of Series A Preferred Stock | 50.00% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 9.46% |
| **Elie Fouerti** Address: | Eighty (80.0) shares of common stock of 1 Stop (40% of 1 Stop)<br><br>One hundred (100) shares of common stock of Gold Coast (50% of Gold Coast)<br><br>One hundred (100) shares of common stock of Superior Deals (50% of Superior Deals)<br><br>50% of the membership interests of Joe's Appliances<br><br>0% of the membership interests of YF Logistics<br><br>Twenty (20) shares of | $89,500,000.00 | 49.72% | 0 shares of Common Stock | 0 shares of Series A Preferred Stock | 0.00% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 40.32% |

| Seller | Equity Interests | Cash | | Common Stock | Series A Preferred Stock | Variable Share Consideration | Percentage |
|---|---|---|---|---|---|---|---|
| **The 2020 Elie Fouerti Trust** Address: | common stock of 1 Stop (10% of 1 Stop)<br><br>0 shares of common stock of Gold Coast (0% of Gold Coast)<br><br>0 shares of common stock of Superior Deals (0% of Superior Deals)<br><br>0% of the membership interests of Joe's Appliances<br><br>0% of the membership interests of YF Logistics | $ 0.00 | 0% | 611,119.50 shares of Common Stock | 555,547 shares of Series A Preferred Stock | 50.00% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 9.46% |
| **Youssef Fouerti** Address: | 0 shares of common stock of 1 Stop (0% of 1 Stop)<br><br>0 shares of common stock of Gold Coast (0% of Gold Coast)<br><br>0 shares of common stock of Superior Deals (0% of Superior Deals)<br><br>0% of the membership interests of Joe's Appliances<br><br>100% of the membership interests of YF Logistics | $ 1,000,000.00 | 0.56% | 0 shares of Common Stock | 0 shares of Series A Preferred Stock | 0% of the Common Stock and Series A-1 Preferred Stock included in the Variable Share Consideration | 0.45% |

A-43

---

## AMENDMENT NO. 2
## TO THE
## SECURITIES PURCHASE AGREEMENT

AMENDMENT NO. 2 TO THE SECURITIES PURCHASE AGREEMENT, dated April 6, 2021 (the "**Amendment**"), among **1847 GOEDEKER INC.**, a Delaware corporation ("**Parent**"), **APPLIANCES CONNECTION INC.**, a Delaware corporation (the "**Buyer**"), **1 STOP ELECTRONICS CENTER, INC.**, a New York corporation ("**1 Stop**"), **GOLD COAST APPLIANCES INC.**, a New York corporation ("**Gold Coast**"), **SUPERIOR DEALS INC.**, a New York corporation ("**Superior Deals**"), **JOE'S APPLIANCES LLC**, a New York limited liability company ("**Joe's Appliances**"), and YF Logistics LLC, a New Jersey limited liability company ("**YF Logistics**" and together with 1 Stop, Gold Coast, Superior Deals and Joe's Appliances, each a "**Company**" and collectively, the "**Companies**"), and the other party or parties identified as "Sellers" on the signature page hereto (each a "**Seller**" and, collectively, the "**Sellers**"). Each of the Buyer, the Companies, the Sellers and the Parent are sometimes referred to in this Amendment individually as a "**Party**" and, collectively, as the "**Parties**."

### RECITALS

D. The Parties have previously entered into that certain Securities Purchase Agreement, dated as of October 20, 2020 (as amended by that certain Amendment No. 1 to Securities Purchase Agreement dated December 8, 2020, the "**Securities Purchase Agreement**").

E. The Parties desire to amend the Securities Purchase Agreement as set forth herein.

F. Pursuant to Section 8.3 of the Securities Purchase Agreement, the Securities Purchase Agreement may be amended by the Parties only by an instrument in writing signed on behalf of the Buyer, the Parent, the Companies and the Sellers.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the respective representations and warranties, covenants and agreements contained herein, the Parties hereto agree as follows:

3. <u>Definitions</u>. All capitalized terms used herein without definition shall have the meanings ascribed to them in the Securities Purchase Agreement, as applicable.

4. <u>Amendments</u>.

E. Section 1.1(a) is hereby amended to add the following new definition:

"**Specified Sales Tax Liability**" means the aggregate amounts collectively accrued by the Companies for the potential liability related to the Companies' obligations as remote sellers to collect sales taxes on sales made in certain states under certain circumstances as a result of the U.S. Supreme Court's opinion in South Dakota v. Wayfair, Inc., which amount as of December 31, 2020 was $12,568,110.

F. The definition of "**Net Working Capital**" now appearing in Section 1.1(a) of the Securities Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"**Net Working Capital**" means (i) Accounts Receivable; plus (ii) Inventory; plus (iii) prepaid expenses and other current assets that have an economic benefit to the Companies post-Closing; less (iv) current accounts payable, accrued liabilities and outstanding checks and other current liabilities as of the Closing Date, which shall be prepared in accordance with Section 2.2(a) and as finally determined pursuant to Section 2.2(c); provided, however that the calculation of Net Working Capital shall not include cash or cash equivalents, or any items otherwise included in the definitions of Indebtedness, Specified Sales Tax Liability, or Transaction Expenses.

G. The definition of "**Outside Date**" now appearing in Section 1.1(a) of the Securities Purchase Agreement is hereby amended to mean June 30, 2021.

A-44

H.      The definition of "**Gold Coast Lease**" now appearing in Section 1.1(a) of the Securities Purchase Agreement is hereby deleted.

I.      Section 7.1(j) of the Securities Purchase Agreement is hereby is hereby deleted in its entirety and replaced with the following:
"(j) The Buyer shall have received fully executed copies of each of (i) the 1 Stop Lease and (ii) the Joe's Appliances Lease."

J.      Exhibit F-2 to the Securities Purchase Agreement, the Gold Coast Lease, is hereby deleted.

7. Effect of Amendment. Except as amended as set forth above, the Securities Purchase Agreement shall continue in full force and effect and hereby ratified and confirmed by the Parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the Securities Purchase Agreement or as a waiver of or consent to any further or future action on the part of either Party that would require the waiver or consent of the other Party. On and after the date hereof, each reference in the Securities Purchase Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Securities Purchase Agreement in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Securities Purchase Agreement, will mean and be a reference to the Securities Purchase Agreement as amended by this Amendment.

8. Counterparts. This Amendment may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

9. Governing Law. This Amendment will be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to any choice of Law or conflict of Law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of New York.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

A-45

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be duly executed as of the date first above written.

**BUYER:**
**APPLIANCES CONNECTION INC.**
By:     /s/ Douglas T. Moore
Name:  Douglas T. Moore
Title:   Chief Executive Officer

**PARENT:**
**1847 GOEDEKER INC.**
By:     /s/ Douglas T. Moore
Name:  Douglas T. Moore
Title:   Chief Executive Officer

**COMPANIES:**
**1 STOP ELECTRONICS CENTER, INC.**
By:     /s/ Albert Fouerti
Name:  Albert Fouerti
Title:   President

**GOLD COAST APPLIANCES INC.**
By:     /s/ Albert Fouerti
Name:  Albert Fouerti
Title:   President

**SUPERIOR DEALS INC.**
By:     /s/ Albert Fouerti
Name:  Albert Fouerti
Title:   President

**JOE'S APPLIANCES LLC**
By:     /s/ Albert Fouerti
Name:  Albert Fouerti
Title:   President

**YF LOGISTICS LLC**
By:     /s/ Youssef Fouerti
Name:  Youssef Fouerti
Title:   Sole Member

A-46

**SELLERS:**
/s/ Albert Fouerti
**Albert Fouerti**
/s/ Elie Fouerti
**Elie Fouerti**
/s/ Youssef Fouerti
**Youssef Fouerti**
**THE 2020 ALBERT FOUERTI TRUST**
By:     /s/ David Rosenblatt
        David Rosenblatt, Esq., Trustee
**THE 2020 ELIE FOUERTI TRUST**
By:     /s/ David Rosenblatt
        David Rosenblatt, Esq., Trustee

A-47

**1847 GOEDEKER INC.**
**2020 EQUITY INCENTIVE PLAN**

1. Purpose; Eligibility.

1.1. General Purpose. The name of this plan is the 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "**Plan**"). The purposes of the Plan are to (a) enable 1847 Goedeker Inc., a Delaware corporation (the "**Company**"), and any Affiliate to attract and retain the types of Employees, Consultants and Directors who will contribute to the Company's long-term success; (b) provide incentives that align the interests of Employees, Consultants and Directors with those of the stockholders of the Company; and (c) promote the success of the Company's business.

1.2. Eligible Award Recipients. The persons eligible to receive Awards are the Employees, Consultants and Directors of the Company and its Affiliates and such other individuals designated by the Committee who are reasonably expected to become Employees, Consultants and Directors after the receipt of Awards.

1.3. Available Awards. Awards that may be granted under the Plan include: (a) Incentive Stock Options, (b) Non-qualified Stock Options, (c) Stock Appreciation Rights, (d) Restricted Awards, (e) Performance Share Awards, and (f) Performance Compensation Awards.

2. Definitions.

"**Affiliate**" means a corporation or other entity that, directly or through one or more intermediaries, controls, is controlled by or is under common control with, the Company.

"**Applicable Laws**" means the requirements related to or implicated by the administration of the Plan under applicable state corporate law, United States federal and state securities laws, the Code, any stock exchange or quotation system on which the shares of Common Stock are listed or quoted, and the applicable laws of any foreign country or jurisdiction where Awards are granted under the Plan.

"**Award**" means any right granted under the Plan, including an Incentive Stock Option, a Non-qualified Stock Option, a Stock Appreciation Right, a Restricted Award, a Performance Share Award or a Performance Compensation Award.

"**Award Agreement**" means a written agreement, contract, certificate or other instrument or document evidencing the terms and conditions of an individual Award granted under the Plan which may, in the discretion of the Company, be transmitted electronically to any Participant. Each Award Agreement shall be subject to the terms and conditions of the Plan.

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"**Board**" means the Board of Directors of the Company, as constituted at any time.

"**Cause**" means:

With respect to any Employee or Consultant: (a) if the Employee or Consultant is a party to an employment or service agreement with the Company or its Affiliates and such agreement provides for a definition of Cause, the definition contained therein; or (b) if no such agreement exists, or if such agreement does not define Cause: (i) the commission of, or plea of guilty or no contest to, a felony or a crime involving moral turpitude or the commission of any other act involving willful malfeasance or material fiduciary breach with respect to the Company or an Affiliate; (ii) conduct that results in or is reasonably likely to result in harm to the reputation or business of the Company or any of its Affiliates; (iii) gross negligence or willful misconduct with respect to the Company or an Affiliate; or (iv) material violation of state or federal securities laws.

With respect to any Director, a determination by a majority of the disinterested Board members that the Director has engaged in any of the following: (a) malfeasance in office; (b) gross misconduct or neglect; (c) false or fraudulent misrepresentation inducing the director's appointment; (d) willful conversion of corporate funds; or (e) repeated failure to participate in Board meetings on a regular basis despite having received proper notice of the meetings in advance.

B-1

The Committee, in its absolute discretion, shall determine the effect of all matters and questions relating to whether a Participant has been discharged for Cause.

"**Change in Control**" means (a) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its subsidiaries, taken as a whole, to any Person that is not a subsidiary of the Company; (b) the Incumbent Directors cease for any reason to constitute at least a majority of the Board; (c) the date which is 10 business days prior to the consummation of a complete liquidation or dissolution of the Company; (d) the acquisition by any Person of Beneficial Ownership of more than 50% (on a fully diluted basis) of either (i) the then outstanding shares of Common Stock of the Company, taking into account as outstanding for this purpose such Common Stock issuable upon the exercise of options or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such Common Stock (the "**Outstanding Company Common Stock**") or (ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "**Outstanding Company Voting Securities**"); provided, however, that for purposes of this Plan, the following acquisitions shall not constitute a Change in Control: (A) any acquisition by the Company or any Affiliate, (B) any acquisition by any employee benefit plan sponsored or maintained by the Company or any subsidiary, (C) any acquisition which complies with clauses, (i), (ii) and (iii) of subsection (e) of this definition or (D) in respect of an Award held by a particular Participant, any acquisition by the Participant or any group of persons including the Participant (or any entity controlled by the Participant or any group of persons including the Participant); or (e) the consummation of a reorganization, merger, consolidation, statutory share exchange or similar form of corporate transaction involving the Company that requires the approval of the Company's stockholders, whether for such transaction or the issuance of securities in the transaction (a "**Business Combination**"), unless immediately following such Business Combination: (i) more than 50% of the total voting power of (A) the entity resulting from such Business Combination (the "**Surviving Company**"), or (B) if applicable, the ultimate parent entity that directly or indirectly has beneficial ownership of sufficient voting securities eligible to elect a majority of the members of the board of directors (or the analogous governing body) of the Surviving Company (the "**Parent Company**"), is represented by the Outstanding Company Voting Securities that were outstanding immediately prior to such Business Combination (or, if applicable, is represented by shares into which the Outstanding Company Voting Securities were converted pursuant to such Business Combination), and such voting power among the holders thereof is in substantially the same proportion as the voting power of the Outstanding Company Voting Securities among the holders thereof immediately prior to the Business Combination; (ii) no Person (other than any employee benefit plan sponsored or maintained by the Surviving Company or the Parent Company) is or becomes the Beneficial Owner, directly or indirectly, of 50% or more of the total voting power of the outstanding voting securities eligible to elect members of the

board of directors of the Parent Company (or the analogous governing body) (or, if there is no Parent Company, the Surviving Company); and (iii) at least a majority of the members of the board of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company) following the consummation of the Business Combination were Board members at the time of the Board's approval of the execution of the initial agreement providing for such Business Combination. The foregoing notwithstanding, in no event shall a Change in Control be deemed to have occurred unless such change shall satisfy the definition of a change in control under Section 409A of the Code.

"**Code**" means the Internal Revenue Code of 1986, as it may be amended from time to time. Any reference to a section of the Code shall be deemed to include a reference to any regulations promulgated thereunder.

"**Committee**" means the compensation committee of the Board, or if no such committee has been established, the full Board, or a committee of one or more members appointed to administer the Plan in accordance with *Section* **3.3** and *Section* **3.4**.

"**Common Stock**" means the common stock, $0.0001 par value per share, of the Company, or such other securities of the Company as may be designated by the Committee from time to time in substitution thereof.

"**Consultant**" means any individual who is engaged by the Company or any Affiliate to render consulting or advisory services.

B-2

"**Continuous Service**" means that the Participant's service with the Company or an Affiliate, whether as an Employee, Consultant or Director, is not interrupted or terminated. The Participant's Continuous Service shall not be deemed to have terminated merely because of a change in the capacity in which the Participant renders service to the Company or an Affiliate as an Employee, Consultant or Director or a change in the entity for which the Participant renders such service, *provided that* there is no interruption or termination of the Participant's Continuous Service; *provided further that* if any Award is subject to Section 409A of the Code, this sentence shall only be given effect to the extent consistent with Section 409A of the Code. For example, a change in status from an Employee of the Company to a Director of an Affiliate will not constitute an interruption of Continuous Service. The Committee or its delegate, in its sole discretion, may determine whether Continuous Service shall be considered interrupted in the case of any leave of absence approved by that party, including sick leave, military leave or any other personal or family leave of absence.

"**Covered Employee**" has the same meaning as set forth in Section 162(m)(3) of the Code, as interpreted by IRS Notice 2007-49.

"**Director**" means a member of the Board.

"**Disability**" means that the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment; *provided, however,* for purposes of determining the term of an Incentive Stock Option pursuant to *Section* **6.10** hereof, the term Disability shall have the meaning ascribed to it under Section 22(e)(3) of the Code. The determination of whether an individual has a Disability shall be determined under procedures established by the Committee. Except in situations where the Committee is determining Disability for purposes of the term of an Incentive Stock Option pursuant to *Section* **6.10** hereof within the meaning of Section 22(e)(3) of the Code, the Committee may rely on any determination that a Participant is disabled for purposes of benefits under any long-term disability plan maintained by the Company or any Affiliate in which a Participant participates. The foregoing notwithstanding, in no event shall a Disability be deemed to have occurred unless such disability satisfies the requirements of Section 409A of the Code.

"**Effective Date**" shall mean July 30, 2020.

"**Employee**" means any person, including an Officer or Director, employed by the Company or an Affiliate; *provided, that,* for purposes of determining eligibility to receive Incentive Stock Options, an Employee shall mean an employee of the Company or a parent or subsidiary corporation within the meaning of Section 424 of the Code. Mere service as a Director or payment of a director's fee by the Company or an Affiliate shall not be sufficient to constitute "employment" by the Company or an Affiliate.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" means, as of any date, the value of the Common Stock as determined below. If the Common Stock is listed on any established stock exchange or a national market system, including without limitation, the New York Stock Exchange or the Nasdaq Stock Market, the Fair Market Value shall be the closing price of a share of Common Stock (or if no sales were reported the closing price on the date immediately preceding such date) as quoted on such exchange or system on the day of determination, as reported in the *Wall Street Journal* or similar publication. In the absence of an established market for the Common Stock, the Fair Market Value shall be determined in good faith by the Committee and such determination shall be conclusive and binding on all persons.

"**Grant Date**" means the date on which the Committee adopts a resolution, or takes other appropriate action, expressly granting an Award to a Participant that specifies the key terms and conditions of the Award or, if a later date is set forth in such resolution, then such date as is set forth in such resolution.

"**Incentive Stock Option**" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

"**Incumbent Directors**" means individuals who, on the Effective Date, constitute the Board, *provided that* any individual becoming a Director subsequent to the Effective Date whose election or nomination for election to the Board was approved by a vote of at least two-thirds of the Incumbent Directors then on the Board (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as a nominee for Director without objection to such nomination) shall be an Incumbent Director. No individual initially elected or nominated as a director of the Company as a result of an actual or threatened election contest with respect to Directors or as a result of any other actual or threatened solicitation of proxies by or on behalf of any person other than the Board shall be an Incumbent Director.

"**Negative Discretion**" means the discretion authorized by the Plan to be applied by the Committee to eliminate or reduce the size of a Performance Compensation Award in accordance with *Section* **7.4(d)(iv)** of the Plan. "**Non-Employee Director**" means a Director who is a "non-employee director" within the meaning of Rule 16b-3.

B-3

"**Non-qualified Stock Option**" means an Option that by its terms does not qualify or is not intended to qualify as an Incentive Stock Option.

"**Officer**" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

"**Option**" means an Incentive Stock Option or a Non-qualified Stock Option granted pursuant to the Plan.

"**Optionholder**" means a person to whom an Option is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Option.

"**Option Exercise Price**" means the price at which a share of Common Stock may be purchased upon the exercise of an Option.

"**Outside Director**" means a Director who is not a current employee of the Company, is not a former employee of the Company who receives compensation for prior services (other than benefits under a tax-qualified retirement plan) during the year, has not been an officer of the Company and does not receive remuneration from the Company, directly or indirectly, in any capacity other than as a director.

"**Participant**" means an eligible person to whom an Award is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Award.

"**Performance Compensation Award**" means any Award designated by the Committee as a Performance Compensation Award pursuant to *Section 7.4* of the Plan.

"**Performance Criteria**" means the criterion or criteria that the Committee shall select for purposes of establishing the Performance Goal(s) for a Performance Period with respect to any Performance Compensation Award under the Plan. The Performance Criteria that will be used to establish the Performance Goal(s) shall be based on the attainment of specific levels of performance of the Company (or Affiliate, division, business unit or operational unit of the Company) and may include the following: (a) net earnings or net income (before or after taxes); (b) basic or diluted earnings per share (before or after taxes); (c) net revenue or net revenue growth; (d) gross revenue; (e) gross profit or gross profit growth; (f) net operating profit (before or after taxes); (g) return on assets, capital, invested capital, equity, or sales; (h) cash flow (including, but not limited to, operating cash flow, free cash flow, and cash flow return on capital); (i) earnings before or after taxes, interest, depreciation and/or amortization; (j) gross or operating margins; (k) improvements in capital structure; (l) budget and expense management; (m) productivity ratios; (n) economic value added or other value added measurements; (o) share price (including, but not limited to, growth measures and total stockholder return); (p) expense targets; (q) margins; (r) operating efficiency; (s) working capital targets; (t) enterprise value; (u) safety record; (v) completion of acquisitions or business expansion; (w) achieving research and development goals and milestones; (x) achieving product commercialization goals; and (y) other criteria as may be set by the Committee from time to time.

Any one or more of the Performance Criteria may be used on an absolute or relative basis to measure the performance of the Company and/or an Affiliate as a whole or any division, business unit or operational unit of the Company and/or an Affiliate or any combination thereof, as the Committee may deem appropriate, or as compared to the performance of a group of comparable companies, or published or special index that the Committee, in its sole discretion, deems appropriate, or the Committee may select Performance Criterion (o) above as compared to various stock market indices. The Committee also has the authority to provide for accelerated vesting of any Award based on the achievement of Performance Goals pursuant to the Performance Criteria specified in this paragraph, provided such accelerated vesting does not violate the rules of Code Section 409A. The Committee shall, within the first 90 days of a Performance Period (or, such longer or shorter time period as the Committee shall determine) define in an objective fashion the manner of calculating the Performance Criteria it selects to use for such Performance Period. In the event that applicable tax and/or securities laws change to permit the Committee discretion to alter the governing Performance Criteria without obtaining stockholder approval of such changes, the Committee shall have sole discretion to make such changes without obtaining stockholder approval.

"**Performance Formula**" means, for a Performance Period, the one or more objective formulas applied against the relevant Performance Goal to determine, with regard to the Performance Compensation Award of a particular Participant, whether all, some portion but less than all, or none of the Performance Compensation Award has been earned for the Performance Period.

B-4

"**Performance Goals**" means, for a Performance Period, the one or more goals established by the Committee for the Performance Period based upon the Performance Criteria. The Committee is authorized at any time during the first 90 days of a Performance Period (or such longer or shorter time period as the Committee shall determine) or at any time thereafter, in its sole and absolute discretion, to adjust or modify the calculation of a Performance Goal for such Performance Period to the extent permitted under Section 409A of the Code in order to prevent the dilution or enlargement of the rights of Participants based on the following events: (a) asset write-downs; (b) litigation or claim judgments or settlements; (c) the effect of changes in tax laws, accounting principles, or other laws or regulatory rules affecting reported results; (d) any reorganization and restructuring programs; (e) extraordinary nonrecurring items as described in Accounting Principles Board Opinion No. 30 (or any successor or pronouncement thereto) and/or in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to stockholders for the applicable year; (f) acquisitions or divestitures; (g) any other specific unusual or nonrecurring events, or objectively determinable category thereof; (h) foreign exchange gains and losses; and (i) a change in the Company's fiscal year.

"**Performance Period**" means the one or more periods of time not less than one fiscal quarter in duration, as the Committee may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to and the payment of a Performance Compensation Award.

"**Performance Share**" means the grant of a right to receive a number of actual shares of Common Stock or share units based upon the performance of the Company during a Performance Period, as determined by the Committee.

"**Permitted Transferee**" means: (a) a member of the Optionholder's immediate family (child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships), any person sharing the Optionholder's household (other than a tenant or employee), a trust in which these persons have more than 50% of the beneficial interest, a foundation in which these persons (or the Optionholder) control the management of assets, and any other entity in which these persons (or the Optionholder) own more than 50% of the voting interests; (b) third parties designated by the Committee in connection with a program established and approved by the Committee pursuant to which Participants may receive a cash payment or other consideration in consideration for the transfer of a Non-qualified Stock Option; and (c) such other transferees as may be permitted by the Committee in its sole discretion.

"**Restricted Award**" means any Award granted pursuant to *Section 7.2(a)*.

"**Rule 16b-3**" means Rule 16b-3 promulgated under the Exchange Act or any successor to Rule 16b-3, as in effect from time to time.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Stock Appreciation Right**" means the right pursuant to an Award granted under *Section 7.1* to receive, upon exercise, an amount payable in cash or shares equal to the number of shares subject to the Stock Appreciation Right that is being exercised multiplied by the excess of (a) the Fair Market Value of a share of Common Stock on the date the Award is exercised, over (b) the exercise price specified in the Stock Appreciation Right Award Agreement.

"**Ten Percent Stockholder**" means a person who owns (or is deemed to own pursuant to Section 424(d) of the Code) stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or of any of its Affiliates.

3. Administration.

3.1. Authority of Committee. The Plan shall be administered by the Committee or, in the Board's sole discretion, by the Board. Subject to the terms of the Plan and the provisions of Section 409A of the Code, the Committee's charter and Applicable Laws, and in addition to other express powers and authorization conferred by the Plan, the Committee shall have the authority:

(a) to construe and interpret the Plan and apply its provisions;

(b) to promulgate, amend, and rescind rules and regulations relating to the administration of the Plan;

(c) to authorize any person to execute, on behalf of the Company, any instrument required to carry out the purposes of the Plan;

(d) to delegate its authority to one or more Officers of the Company with respect to Awards that do not involve Covered Employees or "insiders" within the meaning of Section 16 of the Exchange Act;

B-5

(e) to determine when Awards are to be granted under the Plan and the applicable Grant Date;

(f) from time to time to select, subject to the limitations set forth in this Plan, those Participants to whom Awards shall be granted;

(g) to determine the number of shares of Common Stock to be made subject to each Award;

(h) to determine whether each Option is to be an Incentive Stock Option or a Non-qualified Stock Option;

(i) to prescribe the terms and conditions of each Award, including, without limitation, the exercise price and medium of payment and vesting provisions, and to specify the provisions of the Award Agreement relating to such grant;

(j) to determine the target number of Performance Shares to be granted pursuant to a Performance Share Award, the performance measures that will be used to establish the performance goals, the performance period(s) and the number of Performance Shares earned by a Participant;

(k) to designate an Award (including a cash bonus) as a Performance Compensation Award and to select the Performance Criteria that will be used to establish the Performance Goals;

(l) to amend any outstanding Awards, including for the purpose of modifying the time or manner of vesting, or the term of any outstanding Award; *provided, however*, that if any such amendment impairs a Participant's rights or increases a Participant's obligations under his or her Award or creates or increases a Participant's federal income tax liability with respect to an Award, such amendment shall also be subject to the Participant's consent;

(m) to determine the duration and purpose of leaves of absences which may be granted to a Participant without constituting termination of their employment for purposes of the Plan, which periods shall be no shorter than the periods generally applicable to Employees under the Company's employment policies;

(n) to make decisions with respect to outstanding Awards that may become necessary upon a change in corporate control or an event that triggers anti-dilution adjustments;

(o) to interpret, administer, reconcile any inconsistency in, correct any defect in and/or supply any omission in the Plan and any instrument or agreement relating to, or Award granted under, the Plan; and

(p) to exercise discretion to make any and all other determinations which it determines to be necessary or advisable for the administration of the Plan.

The Committee also may modify the purchase price or the exercise price of any outstanding Award, *provided that* if the modification effects a repricing, stockholder approval shall be required before the repricing is effective.

3.2. Committee Decisions Final. All decisions made by the Committee pursuant to the provisions of the Plan shall be final and binding on the Company and the Participants, unless such decisions are determined by a court having jurisdiction to be arbitrary and capricious.

3.3. Delegation. The Committee may delegate administration of the Plan to a subcommittee or subcommittees of one or more members of the Committee, and the term "**Committee**" shall apply to any person or persons to whom such authority has been delegated. The Committee shall have the power to delegate to a subcommittee any of the administrative powers the Committee is authorized to exercise (and references in this Plan to the Board or the Committee shall thereafter be to the committee or subcommittee), subject, however, to such resolutions, not inconsistent with the provisions of the Plan, as may be adopted from time to time by the Board. The Board may abolish the Committee at any time and re-vest in the Board the administration of the Plan. The members of the Committee shall be appointed by and serve at the pleasure of the Board. From time to time, the Board may increase or decrease the size of the Committee, add additional members to, remove members (with or without cause) from, appoint new members in substitution therefor, and fill vacancies, however caused, in the Committee. The Committee shall act pursuant to a vote of the majority of its members or, in the case of a Committee comprised of only two members, the unanimous consent of its members, whether present or not, or by the written consent of the majority of its members and minutes shall be kept of all of its meetings and copies thereof shall be provided to the Board. Subject to the limitations prescribed by the Plan and the Board, the Committee may establish and follow such rules and regulations for the conduct of its business as it may determine to be advisable.

B-6

3.4. Committee Composition. Except as otherwise determined by the Board, the Committee shall consist solely of two or more Non-Employee Directors who are also Outside Directors. The Board shall have discretion to determine whether or not it intends to comply with the exemption requirements of Rule 16b-3. However, if the Board intends to satisfy such exemption requirements, with respect to Awards to any Covered Employee and with respect to any insider subject to Section 16 of the Exchange Act, the Committee shall be a compensation committee of the Board that at all times consists solely of two or more Non-Employee Directors who are also Outside Directors. Within the scope of such authority, the Board or the Committee may (a) delegate to a committee of one or more members of the Board who are not Outside Directors the authority to grant Awards to eligible persons who are not then Covered Employees and are not expected to be Covered Employees at the time of recognition of income resulting from such Award or (b) delegate to a committee of one or more members of the Board who are not Non-Employee Directors the authority to grant Awards to eligible persons who are not then subject to Section 16 of the Exchange Act. Nothing herein shall create an inference that an Award is not validly granted under the Plan in the event Awards are granted under the Plan by a compensation committee of the Board that does not at all times consist solely of two or more Non-Employee Directors who are also Outside Directors.

3.5. Indemnification. In addition to such other rights of indemnification as they may have as Directors or members of the Committee, and to the extent allowed by Applicable Laws, the Committee shall be indemnified by the Company against the reasonable expenses, including attorney's fees, actually incurred in connection with any action, suit or proceeding or in connection with any appeal therein, to which the Committee may be party by reason of any action taken or failure to act under or in connection with the Plan or any Award granted under the Plan, and against all amounts paid by the Committee in settlement thereof (*provided, however*, that the settlement has been approved by the Company, which approval shall not be unreasonably withheld) or paid by the Committee in satisfaction of a judgment in any such action, suit or proceeding, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding that such Committee did not act in good faith and in a manner which such person reasonably believed to be in the best interests of the Company, or in the case of a criminal proceeding, had no reason to believe that the conduct complained of was unlawful; *provided, however*, that within 60 days after institution of any such action, suit or proceeding, such Committee shall, in writing, offer the Company the opportunity at its own expense to handle and defend such action, suit or proceeding.

4. Shares Subject to the Plan.

4.1. Subject to adjustment in accordance with *Section* 11, a total of 555,000 shares of Common Stock shall be available for the grant of Awards under the Plan. Any shares of Common Stock granted in connection with Options and Stock Appreciation Rights shall be counted against this limit as one (1) share for every one (1) Option or Stock Appreciation Right awarded. Any shares of Common Stock granted in connection with Awards other than Options and Stock Appreciation Rights shall be counted against this limit as two (2) shares of Common Stock for every one (1) share of Common Stock granted in connection with such Award. During the terms of the Awards, the Company shall keep available at all times the number of shares of Common Stock required to satisfy such Awards.

4.2. Shares of Common Stock available for distribution under the Plan may consist, in whole or in part, of authorized and unissued shares, treasury

shares or shares reacquired by the Company in any manner.

4.3. Any shares of Common Stock subject to an Award that is canceled, forfeited or expires prior to exercise or realization, either in full or in part, shall again become available for issuance under the Plan. Any shares of Common Stock that again become available for future grants pursuant to this **Section 4.3** shall be added back as one (1) share if such shares were subject to Options or Stock Appreciation Rights and as two (2) shares if such shares were subject to other Awards. Notwithstanding anything to the contrary contained herein: shares subject to an Award under the Plan shall not again be made available for issuance or delivery under the Plan if such shares are (a) shares tendered in payment of an Option, (b) shares delivered or withheld by the Company to satisfy any tax withholding obligation, or (c) shares covered by a stock-settled Stock Appreciation Right or other Awards that were not issued upon the settlement of the Award.

5. Eligibility.

5.1. Eligibility for Specific Awards. Incentive Stock Options may be granted only to Employees. Awards other than Incentive Stock Options may be granted to Employees, Consultants and Directors and those individuals whom the Committee determines are reasonably expected to become Employees, Consultants and Directors following the Grant Date.

5.2. Ten Percent Stockholders. A Ten Percent Stockholder shall not be granted an Incentive Stock Option unless the Option Exercise Price is at least 110% of the Fair Market Value of the Common Stock at the Grant Date and the Option is not exercisable after the expiration of five years from the Grant Date.

B-7

6. Option Provisions. Each Option granted under the Plan shall be evidenced by an Award Agreement. Each Option so granted shall be subject to the conditions set forth in this **Section 6**, and to such other conditions not inconsistent with the Plan as may be reflected in the applicable Award Agreement. All Options shall be separately designated Incentive Stock Options or Non-qualified Stock Options at the time of grant, and, if certificates are issued, a separate certificate or certificates will be issued for shares of Common Stock purchased on exercise of each type of Option. Notwithstanding the foregoing, the Company shall have no liability to any Participant or any other person if an Option designated as an Incentive Stock Option fails to qualify as such at any time or if an Option is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code and the terms of such Option do not satisfy the requirements of Section 409A of the Code. The provisions of separate Options need not be identical, but each Option shall include (through incorporation of provisions hereof by reference in the Option or otherwise) the substance of each of the following provisions:

6.1. Term. Subject to the provisions of **Section 5.2** regarding Ten Percent Stockholders, no Incentive Stock Option shall be exercisable after the expiration of 10 years from the Grant Date. The term of a Non-qualified Stock Option granted under the Plan shall be determined by the Committee; *provided, however*, no Non-qualified Stock Option shall be exercisable after the expiration of 10 years from the Grant Date.

6.2. Exercise Price of An Incentive Stock Option. Subject to the provisions of **Section 5.2** regarding Ten Percent Stockholders, the Option Exercise Price of each Incentive Stock Option shall be not less than 100% of the Fair Market Value of the Common Stock subject to the Option on the Grant Date. Notwithstanding the foregoing, an Incentive Stock Option may be granted with an Option Exercise Price lower than that set forth in the preceding sentence if such Option is granted pursuant to an assumption or substitution for another option in a manner satisfying the provisions of Section 424(a) of the Code.

6.3. Exercise Price of a Non-qualified Stock Option. The Option Exercise Price of each Non-qualified Stock Option shall be not less than 100% of the Fair Market Value of the Common Stock subject to the Option on the Grant Date. Notwithstanding the foregoing, a Non-qualified Stock Option may be granted with an Option Exercise Price lower than that set forth in the preceding sentence if such Option is granted pursuant to an assumption or substitution for another option in a manner satisfying the provisions of Section 409A of the Code.

6.4. Consideration. The Option Exercise Price of Common Stock acquired pursuant to an Option shall be paid, to the extent permitted by applicable statutes and regulations, either (a) in cash or by certified or bank check at the time the Option is exercised or (b) in the discretion of the Committee, upon such terms as the Committee shall approve, the Option Exercise Price may be paid: (i) by delivery to the Company of other Common Stock, duly endorsed for transfer to the Company, with a Fair Market Value on the date of delivery equal to the Option Exercise Price (or portion thereof) due for the number of shares being acquired, or by means of attestation whereby the Participant identifies for delivery specific shares of Common Stock that have an aggregate Fair Market Value on the date of attestation equal to the Option Exercise Price (or portion thereof) and receives a number of shares of Common Stock equal to the difference between the number of shares thereby purchased and the number of identified attestation shares of Common Stock (a "**Stock for Stock Exchange**"); (ii) a "cashless" exercise program established with a broker; (iii) by reduction in the number of shares of Common Stock otherwise deliverable upon exercise of such Option with a Fair Market Value equal to the aggregate Option Exercise Price at the time of exercise; (iv) any combination of the foregoing methods; or (v) in any other form of legal consideration that may be acceptable to the Committee. Unless otherwise specifically provided in the Option, the exercise price of Common Stock acquired pursuant to an Option that is paid by delivery (or attestation) to the Company of other Common Stock acquired, directly or indirectly from the Company, shall be paid only by shares of the Common Stock of the Company that have been held for more than six months (or such longer or shorter period of time required to avoid a charge to earnings for financial accounting purposes). Notwithstanding the foregoing, during any period for which the Common Stock is publicly traded (i.e., the Common Stock is listed on any established stock exchange or a national market system) an exercise by a Director or Officer that involves or may involve a direct or indirect extension of credit or arrangement of an extension of credit by the Company, directly or indirectly, in violation of Section 402(a) of the Sarbanes-Oxley Act of 2002 shall be prohibited with respect to any Award under this Plan.

6.5. Transferability of An Incentive Stock Option. An Incentive Stock Option shall not be transferable except by will or by the laws of descent and distribution and shall be exercisable during the lifetime of the Optionholder only by the Optionholder. Notwithstanding the foregoing, the Optionholder may, by delivering written notice to the Company, in a form satisfactory to the Company, designate a third party who, in the event of the death of the Optionholder, shall thereafter be entitled to exercise the Option.

B-8

6.6. Transferability of a Non-qualified Stock Option. A Non-qualified Stock Option may, in the sole discretion of the Committee, be transferable to a Permitted Transferee, upon written approval by the Committee to the extent provided in the Award Agreement. If the Non-qualified Stock Option does not provide for transferability, then the Non-qualified Stock Option shall not be transferable except by will or by the laws of descent and distribution and shall be exercisable during the lifetime of the Optionholder only by the Optionholder. Notwithstanding the foregoing, the Optionholder may, by delivering written notice to the Company, in a form satisfactory to the Company, designate a third party who, in the event of the death of the Optionholder, shall thereafter be entitled to exercise the Option.

6.7. Vesting of Options. Each Option may, but need not, vest and therefore become exercisable in periodic installments that may, but need not, be equal. The Option may be subject to such other terms and conditions on the time or times when it may be exercised (which may be based on performance or other criteria) as the Committee may deem appropriate. The vesting provisions of individual Options may vary. No Option may be exercised for a fraction of a share of Common Stock. The Committee may, but shall not be required to, provide for an acceleration of vesting and

exercisability in the terms of any Award Agreement upon the occurrence of a specified event, provided such acceleration of vesting and exercisability complies with the provisions of Section 409A of the Code.

6.8. Termination of Continuous Service. Unless otherwise provided in an Award Agreement or in an employment agreement the terms of which have been approved by the Committee, in the event an Optionholder's Continuous Service terminates (other than upon the Optionholder's death or Disability), the Optionholder may exercise his or her Option (to the extent that the Optionholder was entitled to exercise such Option as of the date of termination) but only within such period of time ending on the earlier of (a) the date three months following the termination of the Optionholder's Continuous Service or (b) the expiration of the term of the Option as set forth in the Award Agreement; *provided that*, if the termination of Continuous Service is by the Company for Cause, all outstanding Options (whether or not vested) shall immediately terminate and cease to be exercisable. If, after termination, the Optionholder does not exercise his or her Option within the time specified in the Award Agreement, the Option shall terminate.

6.9. Extension of Termination Date. An Optionholder's Award Agreement may also provide that if the exercise of the Option following the termination of the Optionholder's Continuous Service for any reason would be prohibited at any time because the issuance of shares of Common Stock would violate the registration requirements under the Securities Act or any other state or federal securities law or the rules of any securities exchange or interdealer quotation system, then the Option shall terminate on the earlier of (a) the expiration of the term of the Option in accordance with **Section 6.1** or (b) the expiration of a period after termination of the Participant's Continuous Service that is three months after the end of the period during which the exercise of the Option would be in violation of such registration or other securities law requirements.

6.10. Disability of Optionholder. Unless otherwise provided in an Award Agreement, in the event that an Optionholder's Continuous Service terminates as a result of the Optionholder's Disability, the Optionholder may exercise his or her Option (to the extent that the Optionholder was entitled to exercise such Option as of the date of termination), but only within such period of time ending on the earlier of (a) the date 12 months following such termination or (b) the expiration of the term of the Option as set forth in the Award Agreement. If, after termination, the Optionholder does not exercise his or her Option within the time specified herein or in the Award Agreement, the Option shall terminate.

6.11. Death of Optionholder. Unless otherwise provided in an Award Agreement, in the event an Optionholder's Continuous Service terminates as a result of the Optionholder's death, then the Option may be exercised (to the extent the Optionholder was entitled to exercise such Option as of the date of death) by the Optionholder's estate, by a person who acquired the right to exercise the Option by bequest or inheritance or by a person designated to exercise the Option upon the Optionholder's death, but only within the period ending on the earlier of (a) the date 12 months following the date of death or (b) the expiration of the term of such Option as set forth in the Award Agreement. If, after the Optionholder's death, the Option is not exercised within the time specified herein or in the Award Agreement, the Option shall terminate.

6.12. Incentive Stock Option $100,000 Limitation. To the extent that the aggregate Fair Market Value (determined at the time of grant) of Common Stock with respect to which Incentive Stock Options are exercisable for the first time by any Optionholder during any calendar year (under all plans of the Company and its Affiliates) exceeds $100,000, the Options or portions thereof which exceed such limit (according to the order in which they were granted) shall be treated as Non-qualified Stock Options.

7. Provisions of Awards Other Than Options.

7.1. Stock Appreciation Rights.

(a) General. Each Stock Appreciation Right granted under the Plan shall be evidenced by an Award Agreement. Each Stock Appreciation Right so granted shall be subject to the conditions set forth in this **Section 7.1**, and to such other conditions not inconsistent with the Plan as may be reflected in the applicable Award Agreement. Stock Appreciation Rights may be granted alone ("**Free Standing Rights**") or in tandem with an Option granted under the Plan ("**Related Rights**"). All such grants shall comply with the provisions of Section 409A of the Code.

B-9

(b) Grant Requirements. Any Related Right that relates to a Non-qualified Stock Option may be granted at the same time the Option is granted or at any time thereafter but before the exercise or expiration of the Option. Any Related Right that relates to an Incentive Stock Option must be granted at the same time the Incentive Stock Option is granted.

(c) Term of Stock Appreciation Rights. The term of a Stock Appreciation Right granted under the Plan shall be determined by the Committee; *provided, however*, no Stock Appreciation Right shall be exercisable later than the tenth anniversary of the Grant Date.

(d) Vesting of Stock Appreciation Rights. Each Stock Appreciation Right may, but need not, vest and therefore become exercisable in periodic installments that may, but need not, be equal. The Stock Appreciation Right may be subject to such other terms and conditions on the time or times when it may be exercised as the Committee may deem appropriate. The vesting provisions of individual Stock Appreciation Rights may vary. No Stock Appreciation Right may be exercised for a fraction of a share of Common Stock. The Committee may, but shall not be required to, provide for an acceleration of vesting and exercisability in the terms of any Stock Appreciation Right upon the occurrence of a specified event, provided such acceleration of vesting and exercisability complies with the provisions of Section 409A of the Code.

(e) Exercise and Payment. Upon exercise of a Stock Appreciation Right, the holder shall be entitled to receive from the Company an amount equal to the number of shares of Common Stock subject to the Stock Appreciation Right that is being exercised multiplied by the excess of (i) the Fair Market Value of a share of Common Stock on the date the Award is exercised, over (ii) the exercise price specified in the Stock Appreciation Right or related Option. Payment with respect to the exercise of a Stock Appreciation Right shall be made on the date of exercise. Payment shall be made in the form of shares of Common Stock (with or without restrictions as to substantial risk of forfeiture and transferability, as determined by the Committee in its sole discretion), cash or a combination thereof, as determined by the Committee.

(f) Exercise Price. The exercise price of a Free Standing Stock Appreciation Right shall be determined by the Committee, but shall not be less than 100% of the Fair Market Value of one share of Common Stock on the Grant Date of such Stock Appreciation Right. A Related Right granted simultaneously with or subsequent to the grant of an Option and in conjunction therewith or in the alternative thereto shall have the same exercise price as the related Option, shall be transferable only upon the same terms and conditions as the related Option, and shall be exercisable only to the same extent as the related Option; *provided, however*, that a Stock Appreciation Right, by its terms, shall be exercisable only when the Fair Market Value per share of Common Stock subject to the Stock Appreciation Right and related Option exceeds the exercise price per share thereof and no Stock Appreciation Rights may be granted in tandem with an Option unless the Committee determines that the requirements of **Section 7.1(b)** are satisfied.

(g) Reduction in the Underlying Option Shares. Upon any exercise of a Related Right, the number of shares of Common Stock for which any related Option shall be exercisable shall be reduced by the number of shares for which the Stock Appreciation Right has been exercised. The number of shares of Common Stock for which a Related Right shall be exercisable shall be reduced upon any exercise of any related Option by the number of shares of Common Stock for which such Option has been exercised.

7.2. Restricted Awards.

(a) General. A Restricted Award is an Award of actual shares of Common Stock ("**Restricted Stock**") or hypothetical Common Stock units ("**Restricted Stock Units**") having a value equal to the Fair Market Value of an identical number of shares of Common Stock, which may, but need not, provide that such Restricted Award may not be sold, assigned, transferred or otherwise disposed of, pledged or hypothecated as collateral for

a loan or as security for the performance of any obligation or for any other purpose for such period (the "**Restricted Period**") as the Committee shall determine. Each Restricted Award granted under the Plan shall be evidenced by an Award Agreement. Each Restricted Award so granted shall be subject to the conditions set forth in this *Section* **7.2**, and to such other conditions not inconsistent with the Plan as may be reflected in the applicable Award Agreement.

B-10

(b) Restricted Stock and Restricted Stock Units.

(i) Each Participant granted Restricted Stock shall execute and deliver to the Company an Award Agreement with respect to the Restricted Stock setting forth the restrictions and other terms and conditions applicable to such Restricted Stock. If the Committee determines that the Restricted Stock shall be held by the Company or in escrow rather than delivered to the Participant pending the release of the applicable restrictions, the Committee may require the Participant to additionally execute and deliver to the Company (A) an escrow agreement satisfactory to the Committee, if applicable and (B) the appropriate blank stock power with respect to the Restricted Stock covered by such agreement. If a Participant fails to execute an agreement evidencing an Award of Restricted Stock and, if applicable, an escrow agreement and stock power, the Award shall be null and void. Subject to the restrictions set forth in the Award, the Participant generally shall have the rights and privileges of a stockholder as to such Restricted Stock, including the right to vote such Restricted Stock and the right to receive dividends; *provided that*, any cash dividends and stock dividends with respect to the Restricted Stock shall be withheld by the Company for the Participant's account, and interest may be credited on the amount of the cash dividends withheld at a rate and subject to such terms as determined by the Committee. The cash dividends or stock dividends so withheld by the Committee and attributable to any particular share of Restricted Stock (and earnings thereon, if applicable) shall be distributed to the Participant in cash or, at the discretion of the Committee, in shares of Common Stock having a Fair Market Value equal to the amount of such dividends, if applicable, upon the release of restrictions on such share and, if such share is forfeited, the Participant shall have no right to such dividends.

(ii) The terms and conditions of a grant of Restricted Stock Units shall be reflected in an Award Agreement. No shares of Common Stock shall be issued at the time a Restricted Stock Unit is granted, and the Company will not be required to set aside a fund for the payment of any such Award. A Participant shall have no voting rights with respect to any Restricted Stock Units granted hereunder. The Committee may also grant Restricted Stock Units with a deferral feature, whereby settlement is deferred beyond the vesting date until the occurrence of a future payment date or event set forth in an Award Agreement ("**Deferred Stock Units**"). At the discretion of the Committee, each Restricted Stock Unit or Deferred Stock Unit (representing one share of Common Stock) may be credited with cash and stock dividends paid by the Company in respect of one share of Common Stock ("**Dividend Equivalents**"). Dividend Equivalents shall be withheld by the Company and credited to the Participant's account, and interest may be credited on the amount of cash Dividend Equivalents credited to the Participant's account at a rate and subject to such terms as determined by the Committee. Dividend Equivalents credited to a Participant's account and attributable to any particular Restricted Stock Unit or Deferred Stock Unit (and earnings thereon, if applicable) shall be distributed in cash or, at the discretion of the Committee, in shares of Common Stock having a Fair Market Value equal to the amount of such Dividend Equivalents and earnings, if applicable, to the Participant upon settlement of such Restricted Stock Unit or Deferred Stock Unit and, if such Restricted Stock Unit or Deferred Stock Unit is forfeited, the Participant shall have no right to such Dividend Equivalents.

(c) Restrictions.

(i) Restricted Stock awarded to a Participant shall be subject to the following restrictions until the expiration of the Restricted Period, and to such other terms and conditions as may be set forth in the applicable Award Agreement: (A) if an escrow arrangement is used, the Participant shall not be entitled to delivery of the stock certificate; (B) the shares shall be subject to the restrictions on transferability set forth in the Award Agreement; (C) the shares shall be subject to forfeiture to the extent provided in the applicable Award Agreement; and (D) to the extent such shares are forfeited, the stock certificates shall be returned to the Company, and all rights of the Participant to such shares and as a stockholder with respect to such shares shall terminate without further obligation on the part of the Company.

(ii) Restricted Stock Units and Deferred Stock Units awarded to any Participant shall be subject to (A) forfeiture until the expiration of the Restricted Period, and satisfaction of any applicable Performance Goals during such period, to the extent provided in the applicable Award Agreement, and to the extent such Restricted Stock Units or Deferred Stock Units are forfeited, all rights of the Participant to such Restricted Stock Units or Deferred Stock Units shall terminate without further obligation on the part of the Company and (B) such other terms and conditions as may be set forth in the applicable Award Agreement.

(iii) The Committee shall have the authority to remove any or all of the restrictions on the Restricted Stock, Restricted Stock Units and Deferred Stock Units whenever it may determine that, by reason of changes in Applicable Laws or other changes in circumstances arising after the date the Restricted Stock or Restricted Stock Units or Deferred Stock Units are granted, such action is appropriate.

(d) Restricted Period. With respect to Restricted Awards, the Restricted Period shall commence on the Grant Date and end at the time or times set forth on a schedule established by the Committee in the applicable Award Agreement. No Restricted Award may be granted or settled for a fraction of a share of Common Stock. The Committee may, but shall not be required to, provide for an acceleration of vesting in the terms of any Award Agreement upon the occurrence of a specified event, provided such acceleration is consistent with the provisions of Section 409A of the Code.

B-11

(e) Delivery of Restricted Stock and Settlement of Restricted Stock Units. Upon the expiration of the Restricted Period with respect to any shares of Restricted Stock, the restrictions set forth in *Section* **7.2(c)** and the applicable Award Agreement shall be of no further force or effect with respect to such shares, except as set forth in the applicable Award Agreement. If an escrow arrangement is used, upon such expiration, the Company shall deliver to the Participant, or his or her beneficiary, without charge, the stock certificate evidencing the shares of Restricted Stock which have not then been forfeited and with respect to which the Restricted Period has expired (to the nearest full share) and any cash dividends or stock dividends credited to the Participant's account with respect to such Restricted Stock and the interest thereon, if any. Upon the expiration of the Restricted Period with respect to any outstanding Restricted Stock Units, or at the expiration of the deferral period with respect to any outstanding Deferred Stock Units, the Company shall deliver to the Participant, or his or her beneficiary, without charge, one share of Common Stock for each such outstanding vested Restricted Stock Unit or Deferred Stock Unit ("**Vested Unit**") and cash equal to any Dividend Equivalents credited with respect to each such Vested Unit in accordance with *Section* **7.2(b)(ii)** hereof and the interest thereon or, at the discretion of the Committee, in shares of Common Stock having a Fair Market Value equal to such Dividend Equivalents and the interest thereon, if any; *provided, however*, that, if explicitly provided in the applicable Award Agreement, the Committee may, in its sole discretion, elect to pay cash or part cash and part Common Stock in lieu of delivering only shares of Common Stock for Vested Units. If a cash payment is made in lieu of delivering shares of Common Stock, the amount of such payment shall be equal to the Fair Market Value of the Common Stock as of the date on which the Restricted Period lapsed in

the case of Restricted Stock Units, or the delivery date in the case of Deferred Stock Units, with respect to each Vested Unit.

(f) Stock Restrictions. Each certificate representing Restricted Stock awarded under the Plan shall bear a legend in such form as the Company deems appropriate.

7.3. Performance Share Awards.

(a) Grant of Performance Share Awards. Each Performance Share Award granted under the Plan shall be evidenced by an Award Agreement. Each Performance Share Award so granted shall be subject to the conditions set forth in this **Section 7.3**, and to such other conditions not inconsistent with the Plan as may be reflected in the applicable Award Agreement. The Committee shall have the discretion to determine: (i) the number of shares of Common Stock or stock-denominated units subject to a Performance Share Award granted to any Participant; (ii) the performance period applicable to any Award; (iii) the conditions that must be satisfied for a Participant to earn an Award; and (iv) the other terms, conditions and restrictions of the Award.

(b) Earning Performance Share Awards. The number of Performance Shares earned by a Participant will depend on the extent to which the performance goals established by the Committee are attained within the applicable Performance Period, as determined by the Committee. No payout shall be made with respect to any Performance Share Award except upon written certification by the Committee that the minimum threshold performance goal(s) have been achieved.

7.4. Performance Compensation Awards.

(a) General. The Committee shall have the authority, at the time of grant of any Award described in this Plan (other than Options and Stock Appreciation Rights granted with an exercise price equal to or greater than the Fair Market Value per share of Common Stock on the Grant Date), to designate such Award as a Performance Compensation Award. In addition, the Committee shall have the authority to make an Award of a cash bonus to any Participant and designate such Award as a Performance Compensation Award.

(b) Eligibility. The Committee will, in its sole discretion, designate within the first 90 days of a Performance Period (or such shorter or longer time period as the Committee shall determine) which Participants will be eligible to receive Performance Compensation Awards in respect of such Performance Period. However, designation of a Participant eligible to receive an Award hereunder for a Performance Period shall not in any manner entitle the Participant to receive payment in respect of any Performance Compensation Award for such Performance Period. The determination as to whether or not such Participant becomes entitled to payment in respect of any Performance Compensation Award shall be decided solely in accordance with the provisions of this **Section 7.4**. Moreover, designation of a Participant eligible to receive an Award hereunder for a particular Performance Period shall not require designation of such Participant eligible to receive an Award hereunder in any subsequent Performance Period and designation of one person as a Participant eligible to receive an Award hereunder shall not require designation of any other person as a Participant eligible to receive an Award hereunder in such period or in any other period.

B-12

(c) Discretion of Committee with Respect to Performance Compensation Awards. With regard to a particular Performance Period, the Committee shall have full discretion to select the length of such Performance Period (provided any such Performance Period shall be not less than one fiscal quarter in duration), the type(s) of Performance Compensation Awards to be issued, the Performance Criteria that will be used to establish the Performance Goal(s), the kind(s) and/or level(s) of the Performance Goal(s) that is (are) to apply to the Company and the Performance Formula. Within the first 90 days of a Performance Period (or such shorter or longer time period as the Committee shall determine), the Committee shall, with regard to the Performance Compensation Awards to be issued for such Performance Period, exercise its discretion with respect to each of the matters enumerated in the immediately preceding sentence of this **Section 7.4(c)** and record the same in writing.

(d) Payment of Performance Compensation Awards.

   (i) Condition to Receipt of Payment. Unless otherwise provided in the applicable Award Agreement, a Participant must be employed by the Company on the last day of a Performance Period to be eligible for payment in respect of a Performance Compensation Award for such Performance Period.

   (ii) Limitation. A Participant shall be eligible to receive payment in respect of a Performance Compensation Award only to the extent that: (A) the Performance Goals for such period are achieved; and (B) the Performance Formula as applied against such Performance Goals determines that all or some portion of such Participant's Performance Compensation Award has been earned for the Performance Period.

   (iii) Certification. Following the completion of a Performance Period, the Committee shall review and certify in writing whether, and to what extent, the Performance Goals for the Performance Period have been achieved and, if so, calculate and certify in writing the amount of the Performance Compensation Awards earned for the period based upon the Performance Formula. The Committee shall then determine the actual size of each Participant's Performance Compensation Award for the Performance Period and, in so doing, may apply Negative Discretion in accordance with **Section 7.4(d)(iv)** hereof, if and when it deems appropriate.

   (iv) Use of Discretion. In determining the actual size of an individual Performance Compensation Award for a Performance Period, the Committee may reduce or eliminate the amount of the Performance Compensation Award earned under the Performance Formula in the Performance Period through the use of Negative Discretion if, in its sole judgment, such reduction or elimination is appropriate. The Committee shall not have the discretion to grant or provide payment in respect of Performance Compensation Awards for a Performance Period if the Performance Goals for such Performance Period have not been attained.

   (v) Timing of Award Payments. Performance Compensation Awards granted for a Performance Period shall be paid to Participants as soon as administratively practicable following completion of the certifications required by this **Section 7.4** but in no event later than 2 1/2 months following the end of the fiscal year during which the Performance Period is completed.

8. Securities Law Compliance. Each Award Agreement shall provide that no shares of Common Stock shall be purchased or sold thereunder unless and until (a) any then applicable requirements of state or federal laws and regulatory agencies have been fully complied with to the satisfaction of the Company and its counsel and (b) if required to do so by the Company, the Participant has executed and delivered to the Company a letter of investment intent in such form and containing such provisions as the Committee may require. The Company shall use reasonable efforts to seek to obtain from each regulatory commission or agency having jurisdiction over the Plan such authority as may be required to grant Awards and to issue and sell shares of Common Stock upon exercise of the Awards; *provided, however*, that this undertaking shall not require the Company to register under the Securities Act the Plan, any Award or any Common Stock issued or issuable pursuant to any such Award. If, after reasonable efforts, the Company is unable to obtain from any such regulatory commission or agency the authority which counsel for the Company deems necessary for the lawful issuance and sale of Common Stock under the Plan, the Company shall be relieved from any liability for failure to issue and sell Common Stock upon exercise of such Awards unless and until such authority is obtained.

9. Use of Proceeds from Stock. Proceeds from the sale of Common Stock pursuant to Awards, or upon exercise thereof, shall constitute general funds of the Company.

B-13

10. Miscellaneous.

10.1. Acceleration of Exercisability and Vesting. The Committee shall have the power to accelerate the time at which an Award may first be exercised or the time during which an Award or any part thereof will vest in accordance with the Plan, notwithstanding the provisions in the Award stating the time at which it may first be exercised or the time during which it will vest, provided any such acceleration or exercisability or vesting is in compliance with the provisions of Section 409A of the Code.

10.2. Stockholder Rights. Except as provided in the Plan or an Award Agreement, no Participant shall be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to such Award unless and until such Participant has satisfied all requirements for exercise of the Award pursuant to its terms and no adjustment shall be made for dividends (ordinary or extraordinary, whether in cash, securities or other property) or distributions of other rights for which the record date is prior to the date such Common Stock certificate is issued, except as provided in *Section* **11** hereof.

10.3. No Employment or Other Service Rights. Nothing in the Plan or any instrument executed or Award granted pursuant thereto shall confer upon any Participant any right to continue to serve the Company or an Affiliate in the capacity in effect at the time the Award was granted or shall affect the right of the Company or an Affiliate to terminate (a) the employment of an Employee with or without notice and with or without Cause or (b) the service of a Director pursuant to the By-laws of the Company or an Affiliate, and any applicable provisions of the corporate law of the state in which the Company or the Affiliate is incorporated, as the case may be.

10.4. Transfer; Approved Leave of Absence. For purposes of the Plan, no termination of employment by an Employee shall be deemed to result from either (a) a transfer of employment to the Company from an Affiliate or from the Company to an Affiliate, or from one Affiliate to another, or (b) an approved leave of absence for military service or sickness, or for any other purpose approved by the Company, if the Employee's right to reemployment is guaranteed either by a statute or by contract or under the policy pursuant to which the leave of absence was granted or if the Committee otherwise so provides in writing, in either case, except to the extent inconsistent with Section 409A of the Code if the applicable Award is subject thereto.

10.5. Withholding Obligations. To the extent provided by the terms of an Award Agreement and subject to the discretion of the Committee, the Participant may satisfy any federal, state or local tax withholding obligation relating to the exercise or acquisition of Common Stock under an Award by any of the following means (in addition to the Company's right to withhold from any compensation paid to the Participant by the Company) or by a combination of such means: (a) tendering a cash payment; (b) authorizing the Company to withhold shares of Common Stock from the shares of Common Stock otherwise issuable to the Participant as a result of the exercise or acquisition of Common Stock under the Award, *provided, however*, that no shares of Common Stock are withheld with a value exceeding the minimum amount of tax required to be withheld by law; or (c) delivering to the Company previously owned and unencumbered shares of Common Stock of the Company.

11. Adjustments Upon Changes in Stock. In the event of changes in the outstanding Common Stock or in the capital structure of the Company by reason of any stock or extraordinary cash dividend, stock split, reverse stock split, an extraordinary corporate transaction such as any recapitalization, reorganization, merger, consolidation, combination, exchange, or other relevant change in capitalization occurring after the Grant Date of any Award, Awards granted under the Plan and any Award Agreements, the exercise price of Options and Stock Appreciation Rights, the maximum number of shares of Common Stock subject to all Awards stated in *Section* **4** and the maximum number of shares of Common Stock with respect to which any one person may be granted Awards during any period stated in *Section* **4** will be equitably adjusted or substituted, as to the number, price or kind of a share of Common Stock or other consideration subject to such Awards to the extent necessary to preserve the economic intent of such Award. In the case of adjustments made pursuant to this *Section* **11**, unless the Committee specifically determines that such adjustment is in the best interests of the Company or its Affiliates, the Committee shall, in the case of Incentive Stock Options, ensure that any adjustments under this *Section* **11** will not constitute a modification, extension or renewal of the Incentive Stock Options within the meaning of Section 424(h)(3) of the Code and in the case of Non-qualified Stock Options, ensure that any adjustments under this *Section* **11** will not constitute a modification of such Non-qualified Stock Options within the meaning of Section 409A of the Code. Any adjustments made under this *Section* **11** shall be made in a manner which does not adversely affect the exemption provided pursuant to Rule 16b-3 under the Exchange Act. The Company shall give each Participant notice of an adjustment hereunder and, upon notice, such adjustment shall be conclusive and binding for all purposes.

12. Effect of Change in Control.

12.1. In the discretion of the Board and the Committee, any Award Agreement may provide, or the Board or the Committee may provide by amendment of any Award Agreement or otherwise, notwithstanding any provision of the Plan to the contrary, that in the event of a Change in Control, Options and/or Stock Appreciation Rights shall become immediately exercisable with respect to all or a specified portion of the shares subject to such Options or Stock Appreciation Rights, and/or the Restricted Period shall expire immediately with respect to all or a specified portion of the shares of Restricted Stock or Restricted Stock Units.

B-14

12.2. In addition, in the event of a Change in Control, the Committee may in its discretion and upon at least 10 days' advance notice to the affected persons, cancel any outstanding Awards and pay to the holders thereof, in cash or stock, or any combination thereof, the value of such Awards based upon the price per share of Common Stock received or to be received by other stockholders of the Company in the event. In the case of any Option or Stock Appreciation Right with an exercise price that equals or exceeds the price paid for a share of Common Stock in connection with the Change in Control, the Committee may cancel the Option or Stock Appreciation Right without the payment of consideration therefor.

12.3. The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to all or substantially all of the assets and business of the Company and its Subsidiaries, taken as a whole.

13. Amendment of the Plan and Awards.

13.1. Amendment of Plan. The Board at any time, and from time to time, may amend or terminate the Plan. However, except as provided in *Section* **11** relating to adjustments upon changes in Common Stock and *Section* **13.3**, no amendment shall be effective unless approved by the stockholders of the Company to the extent stockholder approval is necessary to satisfy any Applicable Laws. At the time of such amendment, the Board shall determine, upon advice from counsel, whether such amendment will be contingent on stockholder approval.

13.2. Stockholder Approval. The Board may, in its sole discretion, submit any other amendment to the Plan for stockholder approval.

13.3. Contemplated Amendments. It is expressly contemplated that the Board may amend the Plan in any respect the Board deems necessary or advisable to provide eligible Employees, Consultants and Directors with the maximum benefits provided or to be provided under the provisions of the Code and the regulations promulgated thereunder relating to Incentive Stock Options or to the nonqualified deferred compensation provisions of Section 409A of the Code and/or to bring the Plan and/or Awards granted under it into compliance therewith.

13.4. No Impairment of Rights. Rights under any Award granted before amendment of the Plan shall not be impaired by any amendment of the Plan unless (a) the Company requests the consent of the Participant and (b) the Participant consents in writing.

13.5. Amendment of Awards. The Committee at any time, and from time to time, may amend the terms of any one or more Awards; *provided, however*, that the Committee may not affect any amendment which would otherwise constitute an impairment of the rights under any Award unless

(a) the Company requests the consent of the Participant and (b) the Participant consents in writing.

14. <u>General Provisions</u>.

14.1. <u>Forfeiture Events</u>. The Committee may specify in an Award Agreement that the Participant's rights, payments and benefits with respect to an Award shall be subject to reduction, cancellation, forfeiture or recoupment upon the occurrence of certain events, in addition to applicable vesting conditions of an Award. Such events may include, without limitation, breach of non-competition, non-solicitation, confidentiality, or other restrictive covenants that are contained in the Award Agreement or otherwise applicable to the Participant, a termination of the Participant's Continuous Service for Cause, or other conduct by the Participant that is detrimental to the business or reputation of the Company and/or its Affiliates.

14.2. <u>Clawback</u>. Notwithstanding any other provisions in this Plan, any Award which is subject to recovery under any law, government regulation or stock exchange listing requirement, will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation or stock exchange listing requirement (or any policy adopted by the Company pursuant to any such law, government regulation or stock exchange listing requirement).

14.3. <u>Other Compensation Arrangements</u>. Nothing contained in this Plan shall prevent the Board from adopting other or additional compensation arrangements, subject to stockholder approval if such approval is required; and such arrangements may be either generally applicable or applicable only in specific cases.

B-15

14.4. <u>Sub-plans</u>. The Committee may from time to time establish sub-plans under the Plan for purposes of satisfying blue sky, securities, tax or other laws of various jurisdictions in which the Company intends to grant Awards. Any sub-plans shall contain such limitations and other terms and conditions as the Committee determines are necessary or desirable. All sub-plans shall be deemed a part of the Plan, but each sub-plan shall apply only to the Participants in the jurisdiction for which the sub-plan was designed.

14.5. <u>Deferral of Awards</u>. The Committee may establish one or more programs under the Plan to permit selected Participants the opportunity to elect to defer receipt of consideration upon exercise of an Award, satisfaction of performance criteria, or other event that absent the election would entitle the Participant to payment or receipt of shares of Common Stock or other consideration under an Award. The Committee may establish the election procedures, the timing of such elections, the mechanisms for payments of, and accrual of interest or other earnings, if any, on amounts, shares or other consideration so deferred, and such other terms, conditions, rules and procedures that the Committee deems advisable for the administration of any such deferral program. All of such programs and procedures shall be consistent with the rules of Section 409A of the Code.

14.6. <u>Unfunded Plan</u>. The Plan shall be unfunded. Neither the Company, the Board nor the Committee shall be required to establish any special or separate fund or to segregate any assets to assure the performance of its obligations under the Plan.

14.7. <u>Recapitalizations</u>. Each Award Agreement shall contain provisions required to reflect the provisions of **Section 11**.

14.8. <u>Delivery</u>. Upon exercise of a right granted under this Plan, the Company shall issue Common Stock or pay any amounts due within a reasonable period of time thereafter. Subject to any statutory or regulatory obligations the Company may otherwise have, for purposes of this Plan, thirty (30) days shall be considered a reasonable period of time.

14.9. <u>No Fractional Shares</u>. No fractional shares of Common Stock shall be issued or delivered pursuant to the Plan. The Committee shall determine whether cash, additional Awards or other securities or property shall be issued or paid in lieu of fractional shares of Common Stock or whether any fractional shares should be rounded, forfeited or otherwise eliminated.

14.10. <u>Other Provisions</u>. The Award Agreements authorized under the Plan may contain such other provisions not inconsistent with this Plan, including, without limitation, restrictions upon the exercise of the Awards, as the Committee may deem advisable.

14.11. <u>Section 409A</u>. The Plan is intended to comply with Section 409A of the Code to the extent subject thereto, and, accordingly, to the maximum extent permitted, the Plan shall be interpreted and administered to be in compliance therewith. Any payments described in the Plan that are due within the "short-term deferral period" as defined in Section 409A of the Code shall not be treated as deferred compensation unless Applicable Laws require otherwise. Notwithstanding anything to the contrary in the Plan, to the extent required to avoid accelerated taxation and tax penalties under Section 409A of the Code, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to the Plan during the six (6) month period immediately following the Participant's termination of Continuous Service shall instead be paid on the first payroll date after the six-month anniversary of the Participant's separation from service (or the Participant's death, if earlier). Notwithstanding the foregoing, neither the Company nor the Committee shall have any obligation to take any action to prevent the assessment of any excise tax or penalty on any Participant under Section 409A of the Code and neither the Company nor the Committee will have any liability to any Participant for such tax or penalty.

14.12. <u>Disqualifying Dispositions</u>. Any Participant who shall make a "disposition" (as defined in Section 424 of the Code) of all or any portion of shares of Common Stock acquired upon exercise of an Incentive Stock Option within two years from the Grant Date of such Incentive Stock Option or within one year after the issuance of the shares of Common Stock acquired upon exercise of such Incentive Stock Option (a "**Disqualifying Disposition**") shall be required to immediately advise the Company in writing as to the occurrence of the sale and the price realized upon the sale of such shares of Common Stock.

14.13. <u>Section 16</u>. It is the intent of the Company that the Plan satisfy, and be interpreted in a manner that satisfies, the applicable requirements of Rule 16b-3 as promulgated under Section 16 of the Exchange Act so that Participants will be entitled to the benefit of Rule 16b-3, or any other rule promulgated under Section 16 of the Exchange Act, and will not be subject to short-swing liability under Section 16 of the Exchange Act. Accordingly, if the operation of any provision of the Plan would conflict with the intent expressed in this **Section 14.13**, such provision to the extent possible shall be interpreted and/or deemed amended so as to avoid such conflict.

B-16

14.14. <u>Beneficiary Designation</u>. Each Participant under the Plan may from time to time name any beneficiary or beneficiaries by whom any right under the Plan is to be exercised in case of such Participant's death. Each designation will revoke all prior designations by the same Participant, shall be in a form reasonably prescribed by the Committee and shall be effective only when filed by the Participant in writing with the Company during the Participant's lifetime.

14.15. <u>Expenses</u>. The costs of administering the Plan shall be paid by the Company.

14.16. <u>Severability</u>. If any of the provisions of the Plan or any Award Agreement is held to be invalid, illegal or unenforceable, whether in whole or in part, such provision shall be deemed modified to the extent, but only to the extent, of such invalidity, illegality or unenforceability and the remaining provisions shall not be affected thereby.

14.17. <u>Plan Headings</u>. The headings in the Plan are for purposes of convenience only and are not intended to define or limit the construction of the provisions hereof.

14.18. <u>Non-Uniform Treatment</u>. The Committee's determinations under the Plan need not be uniform and may be made by it selectively among

persons who are eligible to receive, or actually receive, Awards. Without limiting the generality of the foregoing, the Committee shall be entitled to make non-uniform and selective determinations, amendments and adjustments, and to enter into non-uniform and selective Award Agreements.

15. Effective Date of Plan. The Plan shall become effective as of the Effective Date, but no Award shall be exercised (or, in the case of a stock Award, shall be granted) unless and until the Plan has been approved by the stockholders of the Company, which approval shall be within twelve (12) months before or after the date the Plan is adopted by the Board.

16. Termination or Suspension of the Plan. The Plan shall terminate automatically on April 18, 2028. No Award shall be granted pursuant to the Plan after such date, but Awards theretofore granted may extend beyond that date. The Board may suspend or terminate the Plan at any earlier date pursuant to *Section* **13.1** hereof, provided any such suspension or termination is consistent with the provisions of Section 409A of the Code. No Awards may be granted under the Plan while the Plan is suspended or after it is terminated.

17. Choice of Law. Except to the extent governed by Federal law, the law of the State of Delaware shall govern all questions concerning the construction, validity and interpretation of this Plan, without regard to such state's conflict of law rules.

As adopted by the Board of Directors of the Company on April 21, 2020.

As approved by the stockholders of the Company on April 21, 2020.

B-17

**AMENDMENT NO. 1**
**TO**
**1847 GOEDEKER INC.**
**2020 EQUITY INCENTIVE PLAN**

The 1847 Goedeker Inc. 2020 Equity Incentive Plan (the "**Plan**") is hereby amended as follows:

Section 4.1 of the Plan is hereby amended in its entirety to read as follows:

"4.1 Subject to adjustment in accordance with *Section 11*, a total of 1,000,000 shares of Common Stock shall be available for the grant of Awards under the Plan. Any shares of Common Stock granted in connection with Options and Stock Appreciation Rights shall be counted against this limit as one (1) share for every one (1) Option or Stock Appreciation Right awarded. Any shares of Common Stock granted in connection with Awards other than Options and Stock Appreciation Rights shall be counted against this limit as two (2) shares of Common Stock for every one (1) share of Common Stock granted in connection with such Award. During the terms of the Awards, the Company shall keep available at all times the number of shares of Common Stock required to satisfy such Awards."

Except as herein amended, the provisions of the Plan shall remain in full force and effect.

As adopted by the Board of Directors on April 9, 2021.

As approved by the stockholders effective as of _____, 2021.

B-18